JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**(a) PLAINTIFFS**

UNITED NATIONAL MAINTENANCE, INC., a
Nevada Corporation

**DEFENDANTS**

SAN DIEGO CONVENTION CENTER CORPORATION,
INC., a California corporation

FILED

NOV 13 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Carson City
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT San Diego
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

KIRBY NOONAN LANCE & HOGE, LLP
600 West Broadway, Ste. 1100
San Diego, CA  92101
(619) 231-8666

ATTORNEYS (IF KNOWN)

'07 CV 2172 BEN (JMA)

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business in This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [X] 2 | [ ] 2 | Incorporated and Principal Place of Business in Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

Violations of Sections 1 and 2 of the Sherman
Act 15 U.S.C. Sections 1, 2

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reappointment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury - Medical Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [X] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury - Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 650 Airline Regs. | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 810 Selective Service |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 690 Other | **SOCIAL SECURITY** | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | **LABOR** | [ ] 861 HIA (1395ff) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 862 Black Lung (923) | [ ] 891 Agricultural Acts |
| [ ] 195 Contract Product Liability | | | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 730 Labor/Mgmt. Reporting & Disclosure Act | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motion to Vacate Sentence | | [ ] 865 RSI (405(g)) | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | **HABEAS CORPUS:** | [ ] 740 Railway Labor Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | [ ] 790 Other Labor Litigation | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | [ ] 791 Empl. Ret. Inc. Security Act | [ ] 871 IRS - Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 245 Tort Product Liability | [ ] 440 Other Civil Rights | [ ] 540 Mandamus & Other | | | [ ] 890 Other Statutory Actions |
| [ ] 290 All Other Real Property | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Conditions | | | |

## VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [X] 1 Original Proceeding
- [ ] 2 Removal from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 10,000,000 +

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] YES  [ ] NO

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____    Docket Number _____

DATE 11-13-07

SIGNATURE OF ATTORNEY OF RECORD

11/14/07

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

$350.  144462

# ORIGINAL



1 | James R. Lance (147173)
    jlance@knlh.com
2 | Jacob M. Slania (200652)
    jslania@knlh.com
3 | Dylan O. Malagrino (228052)
    dmalagrino@knlh.com
4 | **KIRBY NOONAN LANCE & HOGE LLP**
   600 West Broadway, Suite 1100
5 | San Diego, California 92101-3387
   Telephone (619) 231-8666
6 | Facsimile (619) 231-9593



FILED

NOV 1 3 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                            DEPUTY

7 | Jeffrey A. Leon [PRO HAC VICE PENDING]
   Kristopher J. Stark [PRO HAC VICE PENDING]
8 | **UNGARETTI & HARRIS LLP**
   3500 Three First National Plaza
9 | Chicago, Illinois 60602-4224
   Telephone (312) 977-4400
10 | Facsimile (312) 977-4405

'07 CV    2172    BEN JMA

11 | Attorneys for Plaintiff
    UNITED NATIONAL MAINTENANCE, INC.
12 |

13 | **UNITED STATES DISTRICT COURT**

14 | **SOUTHERN DISTRICT OF CALIFORNIA**

15 |

| | |
|---|---|
| 16 UNITED NATIONAL MAINTENANCE, INC., a Nevada Corporation, | CASE NO. |
| 17 | **VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES (VIOLATION OF THE SHERMAN AND CLAYTON ACTS)** |
| 18 Plaintiff, | |
| vs. | |
| 19 | **JURY TRIAL DEMANDED** |
| SAN DIEGO CONVENTION CENTER CORPORATION, INC., a California corporation, | |
| 20 | |
| 21 Defendant. | |
| 22 | |

23 |

24 |         Plaintiffs UNITED NATIONAL MAINTENANCE, INC. (herein after referred to as

25 | "UNITED"), by and through its respective undersigned attorneys and for its Complaint against the San

26 | Diego Convention Center Corporation, Inc. (herein after referred to as "SDCC") states as follows:

27 |

28 |

KNLH\497699.1

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

**INTRODUCTION**

1.    UNITED brings this action to enjoin SDCC from violating antitrust laws and to recover damages for federal and pendent state claims.  UNITED demands a jury trial.

2.    SDCC has engaged in a naked scheme to unlawfully eliminate competition in the market for Trade Show Cleaning Services (defined *infra*) in San Diego.  SDCC is on the verge of successfully monopolizing this market as a result of its implementation of an anticompetitive policy barring any outside Trade Show Cleaning Services employees from entering the San Diego Convention Center (hereinafter referred to as "SDCC Facility") while requiring any trade association, general contractor or service provider, including Plaintiff UNITED, to contract at supra-competitive prices for the use of the SDCC's employees to provide Trade Show Cleaning Services at the SDCC Facility.  This policy has no valid purpose and is in direct violation of Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2.

**PARTIES**

3.    Plaintiff UNITED is, and at all times herein mentioned was, a corporation duly organized and existing under the laws of the State of Nevada, authorized and qualified to transact, and transacting business in California. UNITED presently conducts business in San Diego County, California. UNITED is engaged in the business of providing cleaning, janitorial, maintenance and related services to trade shows and conventions (hereinafter referred to as "Trade Show Cleaning Services") at the SDCC Facility, and it has developed a national reputation for providing such services at trade shows and conventions nationwide.  UNITED has provided Trade Show Cleaning Services for over 40 years.

4.    Prior to the implementation of SDCC's policy, UNITED maintained employees, leased a facility and maintained equipment in San Diego.

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

5.    Defendant SDCC is, and at all times herein mentioned was, a corporation duly organized and existing under the laws of the State of California, and authorized to transact, and transacting, business in California, with its principal place of business in the City and County of San Diego, California.  SDCC's Articles of Incorporation state that it is a non-profit public benefit corporation, and its business purpose is to operate and manage the SDCC Facility.  SDCC also sells Trade Show Cleaning Services for shows held at the SDCC Facility and is a direct competitor of UNITED in San Diego.

6.    The SDCC was incorporated on October 31, 1984, and has "managed, marketed and operated" the SDCC Facility continuously since 1989 without having registered as a public agency on the Roster of Public Agencies with the California Secretary of State as required by the California Government Code Section 53050 et seq.  Because SDCC has failed to so register, UNITED is not required to serve a notice of claim on SDCC under the California Tort Claims Act and need not plead that it did so.  Further, SDCC may not assert the failure of UNITED to comply with the notice requirement of the Tort Claims Act as a defense to any of the claims alleged herein.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 because UNITED has brought this action to restrain violations of 15 U.S.C. §§ 1, 2 and to recover damages.  This Court has supplemental jurisdiction over UNITED's state claims pursuant to 28 U.S.C. § 1367 because such claims arise out of the same core of operative facts as the federal antitrust claims and are so related to the federal antitrust claims that they form part of the same case and controversy.

8.    SDCC transacts business in the San Diego area of the Southern District of California and has committed unlawful acts in the Southern District of California.  Therefore, this Court has

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  jurisdiction over SDCC and venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and 15

2  U.S.C. § 22.

### INTERSTATE COMMERCE

9.      The activities of SDCC, as described herein, have been within the flow of, and have
substantially affected, interstate commerce as the business of attracting and servicing conventions is at
the core of interstate commerce.  Indeed, the vast majority of SDCC conventions are organized and
contracted for by out-of-state entities, and the participants overwhelmingly travel to San Diego in the
flow of interstate commerce.  Further, businesses such as UNITED perform services at the SDCC
Facility pursuant to national contracts.

### THE SAN DIEGO CONVENTION CENTER MARKET

10.      SDCC operates and manages the SDCC Facility located at 111 West Harbor Drive, San
Diego, California.  It is the only true convention center in San Diego, offering over 615,000 square
feet of exhibit space and over 1,000,000 square feet of combined exhibit and meeting space making it
the 11th largest convention center in the United States and is viewed by many in the trade show
industry as one of the top five convention centers in the United States.  By contrast, the next largest
venues in and around San Diego are hotels offering only a fraction of the space the SDCC Facility
offers.  For instance, the next largest facility suitable for trade shows in the San Diego market will be
the Hilton San Diego Convention Center offering 165,000 square feet of meeting space and that
facility does not open until November 2008.  There is no remotely comparable alternative venue in
San Diego for the type of trade shows that use the SDCC Facility.

11.      SDCC's primary business is to lease the SDCC Facility, pursuant to license
agreements, to various trade associations for daily periods to hold trade shows.  Trade shows are
regularly held in the SDCC Facility on a annual or rotating basis.

12.      Because the SDCC Facility is one of the top five trade show venues in the United

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

States, trade associations must typically sign a contract with SDCC at least five years or even 15 years in advance to secure a preferable date. The same is the case at other similar large facilities in the United States such as those in Las Vegas, Chicago, and Orlando.

13.    Trade associations that license the SDCC Facility are essentially handed the keys to an empty building wherein they are contractually responsible for their use of the SDCC Facility between move-in and move-out dates. Trade associations typically hire general contractors, such as GES Exposition Services ("GES") and Champion Exposition Services ("Champion"), to organize and manage their trade shows at the SDCC Facility. Organizing and managing trade shows at the SDCC Facility is no small job. There are a tremendous number of logistical challenges for general contractors serving trade associations including setting up and taking down a trade show in very narrow time windows.

14.    The general contractors, including but not limited to GES and Champion, have continuously, since the SDCC Facility opened 19 years ago, hired subcontractors to perform many of the various services associated with trade shows, including electrical, exhibit installation and dismantling ("I&D"), and Trade Show Cleaning Services. The employees of these subcontractors have historically (and with the exception of UNITED) continued to have access to the SDCC Facility to provide the services for which they have contracted.

15.    General contractors have always benefited from competition to provide Trade Show Cleaning Services in San Diego. The SDCC and UNITED have competed head to head for the business of Trade Show Cleaning Services ever since the SDCC Facility opened. GES and other general contractors have utilized the services of UNITED to provide Trade Show Cleaning Services in San Diego even before the SDCC Facility opened. GES, Champion and other general contractors desire to continue to use the services of UNITED in San Diego in the future.

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

## THE TRADE SHOW CLEANING SERVICES
## PRODUCT MARKET

16.     Trade Show Cleaning Services is a specialized product that is not reasonably interchangeable with other janitorial or custodial services. There is a sufficient demand for these services such that it is efficient for a firm such as UNITED to provide these services in competition with SDCC Facility personnel.

17.     There are two distinct components to Trade Show Cleaning Services: (1) cleaning of the aisles and common areas of the SDCC Facility ("Facility Cleaning"); and, (2) cleaning of individual exhibit booths ("Booth Cleaning").

18.     Facility Cleaning addresses the cleaning of all common areas utilized by a trade show throughout the move-in phase, construction and installation of the show exhibits and through the move-out phase wherein all relevant common areas must be cleaned in time for the next scheduled event.

19.     Booth Cleaning addresses the cleaning of individual exhibits and contiguous aisle space throughout the show including during the overnight hours. This service is tailored to ensure that the unique needs of each individual exhibit are met.

20.     Unlike traditional janitorial service firms, whose employees can expect their work areas to be the same size and in a relatively similar condition each day, the size, scope, and cleaning needs of each trade show are unique. The unique needs of each show demand that a provider of Trade Show Cleaning Services have a tremendous amount of trade show specific logistical expertise because they must anticipate needs proactively based on the past experience of the Trade Show Cleaning Services management. Due to this lack of expertise, a traditional janitorial firm cannot provide Trade Show Cleaning Services in an efficient and effective manner.   If these services could be provided by

1  traditional janitorial firms, there would be many more competitors to UNITED and SDCC and general

2  contractors would in all likelihood provide these services themselves.

3       21.    The Trade Show Cleaning Services product must be individually tailored to the needs

4  of small and large trade shows alike, to account for the specific cleaning needs of the exhibits of each

5  industry.  For example, a food show has very different needs from a technology show.  The size and

6  industry of each show requires a specific amount and positioning of manpower and equipment in very

7  specific time windows to perform differentiated tasks.  This service must be provided in a seamless

8  fashion so that UNITED recognizes and acts on a particular issue as it develops, without the luxury of

9  waiting for a request or response from its customer.

10       22.    Unlike SDCC, UNITED is a national service provider of Trade Show Cleaning

11  Services.  It provides services to customers that promote trade shows wherever they are held in the

12  United States, including those held at the SDCC Facility on an annual or rotating basis.  The

13  knowledge and experience gained from producing shows in each city with its customers enables

14  UNITED to provide a specialized level of service that many customers using the SDCC Facility value.

15  Ultimately, the complexities of these shows demand carefully selected and integrated vendor partners,

16  such as UNITED, who have a thorough understanding of each show's special needs.

17  ## THE RELEVANT GEOGRAPHIC MARKET IS SAN DIEGO

18       23.    Trade Show Cleaning Service contractors such as UNITED and SDCC can only

19  profitably educate and train a separate workforce of their own at each location.  Margins are too thin

20  and customers will not pay the expense of traveling and housing so many low wage workers.  It is not

21  profitable to move employees from city to city to compete for cleaning contracts as a regular business

22  model.  Rather, a company must make the investment of building, hiring and training locally as a

23  precursor to providing these services.  Because of these factors, UNITED trains and maintains its own

24  workforce at each location and SDCC's workforce only works locally as well.  For these reasons,

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

Trade Show Cleaning Services simply are not reasonably interchangeable with other cleaning services.

24.     The distinct nature and requirements of Trade Show Cleaning Services ensure high entry barriers, including large start-up costs, upfront training, specialized knowledge and the difficulty of obtaining repetitive learning-by-doing skills of this business. Even if an entrant was willing to take the time and expense of trying to build a new entrant, it would be extremely difficult to convince a customer to take a chance on an untested startup.

25.     Accordingly, for the past 19 years, UNITED has maintained a workforce and equipment in San Diego with the sole purpose of providing Trade Show Cleaning Services to San Diego and San Diego only. Even though Los Angeles and Palm Springs are geographically close to San Diego, UNITED maintains separate work forces at each location because those workforces cannot profitably be moved to even relatively close geographic areas.

26.     Prior to the implementation of this policy, UNITED's San Diego workforce of 51 employees, including managers and supervisors, was located in the San Diego area. Some of these employees have been employed by UNITED for the sole purpose of providing Trade Show Cleaning Services in San Diego for 17 years. Since the policy was implemented in July 2007, UNITED has lost 47 of these 51 employees because they were not working and UNITED cannot pay them to not work. Obviously, they have little choice but to seek other employment. As more time passes, it will become more difficult for UNITED to get them back. UNITED cannot compete in San Diego without its workforce.

27.     While competition between convention cities of certain sizes exists, a trade show cannot profitably change its show location in response to an increase in the cost of Trade Show Cleaning Services. Shows at the SDCC Facility are contracted for years in advance, in many

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1    instances five to fifteen years in advance. The vast majority of trade shows to be held at the SDCC

2    Facility in the next several years are thus already locked-in place by contract.

3         28.    Further, Trade Show Cleaning Services is a very small component of trade show and

4    exhibition costs. I&D services and electrical contracting dwarf Trade Show Cleaning costs, as do

5    many other services. Thus, even if a trade show was contractually able to switch its show to a new

6    city, it would likely not do so simply because Trade Show Cleaning Services became more expensive.

7

8         29.    Even if a trade show wanted to switch cities, it is exceedingly difficult to do so. There

9    are very few facilities the size of the SDCC Facility in the United States, and these facilities in

10   Chicago, Las Vegas, and Orlando are very busy. The available dates at these facilities, even five years

11   from now, are few. A trade association wishing to switch location from San Diego would thus have to

12   accept an inferior date if one is even available. And since trade shows are typically held during the

13   same week each year, an association is not likely to accept a different date.

14

15        30.    Further, the logistics involved with switching a show location a year or two in advance

16   are numerous and daunting. It would simply not make sense to switch cities based solely on cleaning

17   cost increases. It is competition between Trade Show Cleaning Service vendors that keeps prices in

18   check and not competition from other convention cities.

19        31.    The unique size of the SDCC Facility combined with high switching costs and

20   contractual barriers as well as the need for local Trade Show Cleaning employees makes San Diego

21   the relevant geographic market as no SDCC customer is likely to switch to or select another

22   geographic area solely in response to a sustained Trade Show Cleaning price increase.

23

24                    **SDCC HAS MONOPOLY POWER IN THE TRADE SHOW**
                            **CLEANING SERVICES MARKET**

25

26        32.    SDCC has the power of a classic monopolist as it and it alone controls who has

27   physical access to its building. SDCC's power to exclude, if not challenged by this Court, is thus

28   absolute. Even short of total exclusion, SDCC has the power through its control of the SDCC Facility

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  to impose discriminatory conditions on an outside contractor such as UNITED that could impede if

2  not eliminate competition.

3      33.    Proof of SDCC's monopoly power is obvious from the result of its exclusion of

4  UNITED. SDCC did not merely try to exclude UNITED, it did so completely and directly. Service

5  has declined since UNITED's exclusion and UNITED's costs have risen and will be passed on to

6

7  customers where contractually possible. Further, while UNITED is currently servicing its San Diego

8  contractual commitments (at a loss financially) it is not pursuing new business opportunities anymore,

9  leaving that market entirely to the SDCC.

10     34.    This reality was quickly realized by the trade show industry as a whole and is

11  evidenced by letters sent by experts in the trade show industry to SDCC voicing opposition to this

12  ridiculous policy.   True and correct copies of these letters are attached hereto as Exhibits A through

13  E. SDCC's complete foreclosure of competition for Trade Show Cleaning Services in San Diego and

14  its inevitable anticompetitive effect clearly looms over the trade show industry as a whole:

15

16      • "By taking the decision out of our hands to select this very important -- and visible service --
         you could be taking away our ability to negotiate competitive pricing models for our client, as
17       well as the relationship to a valuable member of our service level team environment." (June
         27, 2007 Ltr from SmithBucklin Corp. to SDCC, attached as Ex. A)
18

19      • "While I believe we have used the SDCC cleaning services over the past years, it was by
         choice.  Imposing an exclusive of any type isn't in the best interest of Nielsen or its
20       customers.  Nielsen manages its shows based on the specific needs and requirements of
         customers and having this flexibility is a key ingredient to a successful show. . . . In our
21       experience, exclusive services ultimately become more expensive and less service oriented as
         it takes the competitive nature out of the business." (June 22, 2007 Letter from Nielsen
22       Business Media to SDCC, attached as Ex. B)

23
        • "[T]here are many components that make a successful show and it is our responsibility to
24       manage these components.  We determine  . . .  the services provided to our
         exhibitors.  Sometimes we make these determinations based on service, sometimes only on
25       price, and sometimes on both, but in any case these decisions are the right of the show
         manager, not the facility. . . . Please know that the imposition of an exclusive service will be
26       in contradiction to the wishes of your customers and it typically reduces service levels and
         takes competitive pricing options away.  We have found over the years that the show
27       manager's ability to choose a contractor and control price helps . . . provide better service at

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

competitive prices." (June 14, 2007 Letter from Bobit Business Media to SDCC, attached as Ex. C)

- "While we understand the need for facility managers to generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors of their choice. This is particularly true for large shows whose complexities demand carefully selected and integrated vendor partners who have a thorough understanding of each show's special needs. This includes cleaning services . . . . Show organizers spend years cultivating relationships and advantageous pricing with their chosen suppliers. In-house exclusives arbitrarily increase costs to show organizers -- and therefore exhibitors -- while decreasing the quality of the service provided due to lack of competition." (July 20 Letter from Society of Independent Show Organizers to SDCC, attached as Ex. D)

- "[O]ur clients would love to have the San Diego Convention Center competitively bid for the opportunity to be the official cleaning contractor. However, an exclusive situation does not promote competition and service." (July 26, 2007 Letter from Tradeshowlogistics to SDCC, attached as Ex. E)

35.    The fact that the SDCC can implement such a policy in the face of such overwhelming customer opposition without fear of losing business is *prima facie* evidence of its monopolistic strangle-hold on the Trade Show Cleaning Service market in San Diego and its ability, unless this Court intervenes, to completely foreclose the market to its competitors.

36.    Richard Simon, President of UNITED, has had numerous conversations with Brad Gessner, General Manager of the SDCC Facility, where Gessner has complained that UNITED's prices are too low and specifically urged UNITED to raise its prices. SDCC has made its intentions clear and the industry's fears an inevitable reality regarding price increases.

37.    Even without exercising its power to exclude, SDCC has strong market power. The market for Trade Show Cleaning Services in San Diego has developed into a fairly stable duopoly. According to SDCC, SDCC services 60% of the trade shows in the SDCC Facility and UNITED services the remainder. Other competitors have tried to enter the San Diego market but currently do not have a material share of the market.

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

## THE TRADE SHOW CLEANING SERVICE
## MARKET CONTRACTING PROCESS

38.     UNITED has invested heavily in its San Diego operations in order to service general contractors and trade show licensees operating at the SDCC Facility.

39.     General contractors such as GES and Champion have been the beneficiaries of this investment and the vigorous competition on service and price that has historically existed between SDCC and UNITED.  Despite the best efforts of SDCC to obtain business with GES, Champion and others, these companies have entered into long-term written contracts with UNITED to provide Trade Show Cleaning Services for those trade shows operated and managed by them in San Diego.  A redacted copy of the UNITED – GES Trade Show Cleaning Services contract is attached hereto as Exhibit F, and a redacted copy of the UNITED – Champion Trade Show Cleaning Services contract is attached hereto as Exhibit G.

40.     UNITED's contracts are national in scope.  The structure of these contracts is based upon the two components of Trade Show Cleaning Services provided by UNITED described in paragraphs 18 and 19:  Facility Cleaning and Booth Cleaning.  During a trade show, companies such as UNITED perform both types of cleaning services, but do so under slightly different contractual arrangements.

41.     Facility Cleaning is paid for out of the general fees received by the general contractor.  Facility Cleaning is billed on a pre-negotiated, fully-loaded, hourly basis.  In San Diego, UNITED contracts with GES and Champion to provide Facility Cleaning at a fully-loaded hourly rate of $16.30.  This rate is calculated based on UNITED's costs of paying its own labor and it includes costs associated with the time spent by UNITED's supervisory employees, who do not bill their time to the general contractor, equipment depreciation and other overhead, including benefits and UNITED's profit margin.

42.    UNITED contracts for Facility Cleaning require it to provide estimates in advance of each specific trade show.  For instance, UNITED's contract with Champion provides:

> "UNITED will provide Champion account exec with an estimate of the pre show, post show and aisle porter costs prior to the show...*This estimate will be a not exceed figure.*  UNITED shall invoice Champion for that amount or less based on hourly cost..."

(Ex. F, ¶ 9.)  UNITED's estimates are based on the overall square footage of the common areas for a particular show and the fully-loaded hourly rates required to clean those areas.  UNITED is not allowed to bill for hours in excess of this estimate.  Since UNITED is paid pursuant to this estimate, the efficiency of the workforce is particularly important for this phase.  UNITED's estimates were made prior to the announcement of SDCC's policy but nonetheless are still binding.

43.    In order for UNITED to service its San Diego contracts today, SDCC charges UNITED $17 an hour for labor and gives UNITED no input into the number of workers used or the hours worked.  This $17 figure is the same price SDCC charges its own customers.  Thus, even where UNITED is still technically the contractor, SDCC is earning a profit on the back of UNITED while UNITED has to suffer a loss.

44.    Booth Cleaning is provided to specific exhibitors upon request and is paid for on a flat per square foot basis.  Each requesting exhibitor at a trade show pays the fee to the general contractor.  UNITED receives a fixed percent of the cleaning fees paid by exhibitors to the general contractor to do the Booth Cleaning.  In San Diego, UNITED contracts with GES and Champion to receive roughly 50% of the general contractor's revenue from these fees.  From that 50%, UNITED has to pay its overhead and operating costs, including paying its local San Diego employees.  The remainder of any revenue constitutes UNITED's Booth Cleaning profit margin.  SDCC has charged UNITED 100% of the Booth Cleaning revenue it receives from its customers to use SDCC labor for Booth Cleaning.

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

## SDCC'S FAILED EFFORTS TO RAISE ITS MARKET SHARE
## THROUGH COMPETITION ON SERVICE AND PRICE

45.    Since the inception of the SDCC Facility, SDCC has been offering to sell Trade Show Cleaning Services in direct competition with UNITED and others.  During this time, SDCC has aggressively tried to solicit business from UNITED's customers, such as GES and Champion.  These efforts have failed.

46.    SDCC has on at least two separate prior occasions tried to make Trade Show Cleaning Services an exclusive in-house service at the SDCC Facility, but only now in 2007 has such an effort actually been implemented.  In 1990 and 2000, SDCC tried to mandate the use of SDCC employees for all Trade Show Cleaning Services within the SDCC Facility.  In both instances SDCC threatened that any general contractor failing to use SDCC employees for Trade Show Cleaning Services would be precluded from providing electrical services.  Electrical services would instead be provided exclusively by SDCC.  Due to the fact that electrical services generate higher revenue for general contractors than Trade Show Cleaning Services, SDCC blatantly attempted to use its control over the SDCC Facility as leverage to destroy competition for Trade Show Cleaning Services.  These exclusionary efforts failed because of customer outrage.

47.    Throughout the past year, SDCC has engaged in an active campaign to secure contracts with GES, Champion and other UNITED customers.  SDCC tried to compete on price and service, but these competitive offerings were rejected on their merits and UNITED retained the business.

48.    These rejections caused SDCC to again fallback on anticompetitive methods, such as coercion and threats of business interruption, to raise its market share.  On information and belief, SDCC threatened that, if general contractors did not give the Trade Show Cleaning business to SDCC, the general contractors would lose certain benefits related to early move-in and use of the loading docks.  Despite using its absolute control over the SDCC Facility as a method to solicit and coerce UNITED's customers to give the entirety of their business to SDCC, SDCC's sales pitch failed.

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California  92101-3387

**SDCC'S PRETEXTUAL EFFORT TO CORNER THE MARKET FOR**
**TRADE SHOW CLEANING SERVICES**

49.    Despite being repeatedly rebuffed, SDCC remained determined to capture the profits UNITED earns from Trade Show Cleaning Services for itself. Rather than competing in a free and competitive manner, SDCC again resorted to nakedly exclusionary conduct.

50.    In May 2007, UNITED learned that SDCC had notified general contractors that effective July 1, 2007, all Trade Show Cleaning Services within the SDCC Facility would have to be performed by SDCC employees. This policy eliminated the general contractors' right to use UNITED and other providers of Trade Show Cleaning Services. The policy was limited solely to Trade Show Cleaning Services and was not applied to exclude the many thousands of other employees of outside contractors who regularly have access to the SDCC Facility.

51.    This new policy was only adopted after Champion, GES and others had already entered into long-term contracts with SDCC Facility trade show association customers, and after the general contractors in turn had entered into Trade Show Cleaning Services contracts on a long term basis with UNITED. SDCC Facility licensees and customers, and their general and sub-contractors, were thus locked into the SDCC Facility at the time this policy edict was announced.

52.    The reason SDCC offered for this policy was entirely a pretext to cloak its efforts to gain total control of the Trade Show Cleaning Services market in San Diego. Specifically, SDCC asserted that allowing UNITED employees access to the SDCC Facility posed security risks. The timing of the implementation of this policy is suspicious, to say the least. Outside Trade Show Cleaning Service employees have been excluded pursuant to this "security" policy only a short time after SDCC's aggressive efforts at legitimate competition were rejected.

53.    SDCC does not require that any of the employees of the numerous other outside contractors be given security screening. Hundreds, if not thousands, of non-SDCC laborers enter the SDCC Facility to do the work required to put on a trade show in the SDCC Facility including

1   employees of the trade associations and general contractors and outside vendors including I&D

2   contractors, electricians, plumbers, carpenters, freight handlers, carpet installers, display houses,

3   decorators, sign hangers, advertisers, florists, photographers, caterers, riggers, and other general labor.

4   Thus, upon information and belief, only 3% of the labor force servicing a trade show at the SDCC

5   Facility is subject to this policy.

6

7          54.    The discriminatory application of this policy to UNITED makes no sense and will do

8   nothing to improve security at the SDCC Facility.  For example, the employees of I&D contractors

9   pose a much greater security concern.  Normally, these companies are numerous, small, tend to go out

10  of business with regularity and, at any given time, there could be dozens of these companies working

11  in the SDCC Facility.  I&D employees are provided unfettered access to the SDCC Facility and are

12  not subject to any of the SDCC's alleged security protocols.

13

14          55.    Since Trade Show Cleaning Service providers typically have a greater degree of

15  knowledge and control over their staff than other providers of labor given access to a convention

16  center, Trade Show Cleaning employees pose a low security risk compared to these other laborers.

17  This is due to the fact that the majority of the workforce that services the various other trades for these

18  shows are, upon information and belief, typically spot or temporary labor that come off of call lists at

19  union halls.  Upon information and belief, due to the itinerant nature of the trade show industry, there

20  is a high amount of turnover for each trade show of the hundreds and sometimes thousands of

21  employees that come off of these call lists for general labor, freight hauling, rigging and even

22

23  electrical work.  Upon information and belief, the show manager, general contractor and convention

24  center do not run background checks on these laborers and have no idea who these people are let alone

25  what their background is, let alone whether any of these laborers pose a security risk.  Trade Show

26  Cleaning crews, like that of UNITED, are much different because they are smaller and because they

27

28

**Kirby Noonan Lance & Hoge LLP**
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1   come off of a common employment roster and therefore are typically made up of and managed by the

2   same groups of people that are granted access to the SDCC Facility for any given show.

3       56.    For the past 19 years, UNITED has not had a single security issue at the SDCC

4   Facility. To date, SDCC has not brought a single security issue to UNITED's attention and has not,

5   despite requests from UNITED, disclosed the security issues UNITED's employees allegedly

6   presented. SDCC has claimed that these security concerns arise from their belief that UNITED may

7   use temporary workers. This claims is absolutely false. UNITED does not use temporary workers

8   and all employees are hired with the intention to be long-term employees. This is clearly illustrated

9   by the fact that, as of June 2007, the majority of UNITED employees in San Diego had been

10  employed by UNITED for at least two and up to seventeen years.

11      57.    UNITED made exhaustive efforts to assuage SDCC's purported security concerns, all

12  of which were rejected without explanation. UNITED offered, at its own expense, to subject its

13  employees to the same background checks and security protocols SDCC uses, or to even let SDCC run

14  the background checks and security protocols itself. All of the information necessary to run the most

15  comprehensive of background checks is readily available due to UNITED's requirement that each

16  employee fill-out a 23 page application packet.

17      58.    These less restrictive alternatives were brought to SDCC's attention again by general

18  contractors, trade associations and others in the trade show industry. In letters written to SDCC

19  voicing opposition to this policy, some of these experts in the industry stated the obvious to SDCC:

20  "Would it not be more appropriate to establish guidelines for these companies to work within, rather than restrict them from doing business in your facility?"[September 21, 2007, Letter from Exhibition Services & Contractors Association, to SDCC, attached as Ex. H];

21  "It is apparent the SDCCC feels a need to establish guidelines for cleaning contractors that provide a professional, secure and quality environment. The TSCA supports SDCCC in mutually establishing these guidelines. The mandatory requirement of these guidelines to eliminate client choice we do not support. Respectfully, we ask that SDCCC withdraw the new cleaning services policy and program. Once again, the TSCA will work with SDCCC to

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

remove the concerns stated."[June 6, 2007, Letter from Trade Show Contractors Association of Southern California, to SDCC, attached as Ex. I].

Despite the efforts of UNITED and the industry to come to a reasonable compromise, SDCC refused any dialogue with UNITED and rejected these offers without explanation.

59.    The practices of many other convention centers provide tangible examples of how to ensure security while allowing companies like UNITED to have their employees serve a facility.  For example, McCormick Place in Chicago, the largest convention center in the United States, allows wide association and exhibitor latitude to select contractors, including Trade Show Cleaning. McCormick Place has instituted a mandatory badge program which requires a person accessing the show floor to wear a security badge issued by McCormick Place that includes a picture and name. The Orange County Convention Center in Orlando requires a badge issued by either show management or the Orlando Convention Center.  Orlando is the second largest convention center in the United States.  The Las Vegas Convention Center, the third largest in the United States, uses a similar badge process.  Even though SDCC lacks such a badging program, UNITED badges its employees anyway by providing each employee with computer generated photo identification, identifying them as an employee of UNITED.  Security professionals believe that it is not necessary to exclude employees of outside contractors to ensure security at convention facilities.  Indeed, there is no inherent security benefit from using only inside employees.  A computer generated photo badging program of all labor, inside or outside satisfied security professionals concerns.

60.    This is in sharp contrast to the SDCC Facility where all that is needed to get full access to any given trade show or convention is a show management issued wrist band.  Security or the registration desk is given a list of all laborers that will need access to the SDCC Facility and the general contractor or show manager is then given a corresponding number of wrist bands to pass out to those employees.  Upon information and belief, no further security screening is performed.  Despite all of this, UNITED employees, all of whom are badged with photo identification and have offered to

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California  92101-3387

go through all of the same security screening and procedures conducted on SDCC employees, are barred from the SDCC Facility.

61.    SDCC instead is allowing UNITED to service its contracts, but requiring UNITED to use SDCC's employees and accept terms that ensure that UNITED cannot profitably serve its clients. Indeed, SDCC captures all of the profits as it were the service contractor.

62.    Specifically, on or about June 25, 2007, SDCC wrote a letter to UNITED informing UNITED that UNITED could continue to provide services at the SDCC Facility only if UNITED used SDCC employees to perform Trade Show Cleaning Services.

63.    On information and belief, SDCC knew that UNITED would lose money if it had to abide by SDCC's conditions because of the terms of UNITED's contracts with its clients and because of the price at which SDCC would make its employees available to UNITED.

64.    Under SDCC's new mandate, SDCC requires UNITED to surrender to SDCC the full 50% of the Booth Cleaning revenue UNITED earns under its contracts with the general contractors, such as GES and Champion, and possibly more if the SDCC's labor costs exceeded the 50%. SDCC's terms thus require UNITED to give SDCC 100% of the Booth Cleaning revenue it receives in San Diego and possibly more.

65.    Not only does SDCC's new mandate force UNITED to surrender the entirety of its Booth Cleaning revenue, it also ignores UNITED's pre-negotiated contractual estimates (as described in paragraphs 41 to 43) and commands that SDCC be compensated at a higher fully-loaded hourly rate than UNITED is contracted to charge its customers for Facility Cleaning. Under its current long-term contracts, UNITED gives customers, such as GES and Champion, Facility Cleaning estimates based on a fully-loaded, blended, hourly rate for the service which includes UNITED's direct labor cost, supervisor time, overhead and profit and based on this estimate UNITED cannot be paid for hours worked in excess of this estimate. Under these terms, UNITED is compensated at a rate of $16.30 per

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

man hour for Facility Cleaning. Under SDCC's mandate, UNITED must pay $17.00 per man hour for Facility Cleaning services. Also, SDCC ignores UNITED's estimates and unilaterally brings in more labor than UNITED and its customers contracted for to perform each job. While turning a profit under these contractual terms hinges on the efficiency of UNITED's workforce, SDCC employees have no such incentive and UNITED has no way to discipline SDCC employees. UNITED must cover the difference between the SDCC mandate and its own freely negotiated contracts at a complete loss.

66.    UNITED has to accept SDCC's terms in San Diego because of the nature of its contracts with Champion and GES. Both have told UNITED that it will be considered in breach of its national contracts if it does not perform in San Diego. UNITED must serve the contracts in San Diego at a loss to preserve its business nationwide.

67.    By virtue of managing and operating the SDCC Facility and competing with UNITED for Trade Show Cleaning Services for nearly 19 years, SDCC had complete knowledge of UNITED's Trade Show Cleaning Services contracts with GES and Champion. SDCC, armed with such knowledge, is effectively extorting and right now UNITED is defenseless against the SDCC terms, and customers will ultimately pay the increased price.

68.    The SDCC's new terms are higher than what it could charge in competition with UNITED. Prior to notifying UNITED of its new Trade Show Cleaning Services policy, SDCC sent a written proposal to UNITED's customers regarding its ability to provide Trade Show Cleaning Services on nearly the same terms offered by UNITED. SDCC has also told the general contractors that if they do not accept SDCC's proposal that SDCC will provide all Trade Show Cleaning Services and retain 100% of all Booth Cleaning revenue. This would prove extremely detrimental to the general contractors, such that the general contractors are faced with no option, or they stand to lose all Trade Show Cleaning Service revenues.

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

69.     Clearly, UNITED cannot operate under SDCC's mandatory proposal. SDCC's proposal leaves no revenue for UNITED to operate at the SDCC Facility.  By requiring UNITED to surrender 100% of its Booth Cleaning revenue, and at the same time pay the SDCC at a higher rate for Facility Cleaning than it charges its customers, SDCC's proposal to UNITED is, at best, an offer to commit financial suicide in the San Diego market.  Moreover, the SDCC's mandate irreparably harms UNITED, giving it no choice but to operate at a complete loss in the San Diego market or to withdraw from the market altogether thereby breaching its national contracts with GES and Champion.

## FIRST CAUSE OF ACTION

### (ATTEMPTED MONOPOLIZATION)

70.     UNITED realleges and incorporates herein by this reference each and every one of the allegations contained in paragraphs 1 through 69 as though fully set forth herein.

71.     At all times mentioned herein, UNITED has been engaged in providing Trade Show Cleaning Services at the SDCC Facility, and UNITED competed with other businesses to provide those services.

72.     The SDCC is the sole operator and manager of the SDCC Facility.  As the sole operator and manager SDCC controls the SDCC Facility in San Diego, and thus has sufficient economic power to coerce trade associations and general contractors to exclusively use the Trade Show Cleaning Services of SDCC.

73.     Beginning at least as early as 2007, and continuing through the present date, SDCC has willfully engaged in a course of conduct intended to give SDCC a monopoly on Trade Show Cleaning Services in the City of San Diego in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  This offense will continue or recur unless the relief requested is granted.

74.     SDCC's absolute requirement that all Trade Show Cleaning Services be performed exclusively by SDCC personnel restrains the trade associations, as licensees of the SDCC Facility, as

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  well as the general contractors, from selecting the service provider of its choice to perform Trade

2  Show Cleaning Services.  Indeed, the SDCC requirement effectively mandates that the licensees

3  contract with SDCC to perform these services.

4      75.    SDCC specifically intends to achieve a monopoly and dominance in the market for

5  Trade Show Cleaning Services in San Diego.  SDCC's policy has the effect of restraining,

6

7  suppressing, and eliminating competition for such services in the City of San Diego.

8      76.    SDCC's attempt to monopolize is being accomplished through means other than

9  SDCC's superior skill or business acumen.  The SDCC policy is nakedly exclusionary and its true

10 intent is to capture the profits earned by UNITED for itself and to bar UNITED and any other

11 market entrants from competing against SDCC on the merits of the service offered.

12

13     77.    The trade associations, general contractors, UNITED and the general public have

14 been, and will be, deprived of the benefit of free, competitive providers of such services and have

15 been, and will be, forced to enter into exclusive agreements with SDCC to provide these services.

16 The response of trade associations, general contractors and others in the trade show industry

17 empirically evidences the anticompetitive purpose and effect of SDCC's policy.   (Ex. A - E)

18     78.    Defendants' continuing wrongful conduct as alleged hereinabove, unless and until

19 restrained by order of this court, will cause great and irreparable harm to the competitive process

20 itself, and to UNITED in particular, including, but not limited to, UNITED not being permitted to

21 work at trade shows at the SDCC Facility, and thereby being forced to fire its entire staff in San

22 Diego. UNITED will also be unable to comply with its contractual obligations with established

23

24 customers (i.e., GES and Champion) to provide Trade Show Cleaning Services.

25     79.    UNITED has no adequate remedy at law for the injuries currently being suffered or

26 which will result in the future from Defendants' continued wrongful conduct.  In addition, damages

27 have resulted and will result from said wrongful acts including, but not limited to, the loss in excess of

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  $500,000 annually in revenue from the San Diego market, and the corresponding laying off of at least

2  51 full and/or part-time San Diego based employees.  General contractors, trade associations, and

3  other members of the public will be forced to file similar suits unless this Court restrains Defendants.

4        80.    The foregoing wrongful acts of Defendants constitute violations of Section 2 of the

5  Sherman Act, entitling UNITED to, among other things, preliminary and permanent injunctive relief.

6

7                          **SECOND CAUSE OF ACTION**

8                            (ESSENTIAL FACILITIES)

9        81.    UNITED realleges and incorporates herein by this reference each and every one of the

10  allegations contained in paragraphs 1 through 80 as though fully set forth herein.

11        82.    The SDCC Facility is the only convention center of its size in San Diego.  The SDCC

12  Facility cannot practicably be duplicated, and it is the only place in San Diego that the Trade Show

13  Cleaning Services offered by UNITED can be provided.  The San Diego Convention Center is

14  therefore an essential facility to UNITED without which it cannot operate as a going concern in the

15

16  San Diego geographic market for Trade Show Cleaning Services.

17        83.    At present, UNITED can only use this essential facility under SDCC's mandatory

18  proposal which leaves no revenue for UNITED to operate at the SDCC Facility.  SDCC's mandatory

19  proposal to commit financial suicide has effectively excluded UNITED and all other providers of

20  Trade Show Cleaning Services from competing for providing Trade Show Cleaning Services at the

21

22  SDCC Facility and ultimately the San Diego market.

23        84.    Rather than continuing to compete in a free and competitive the market by offering to

24  sell Trade Show Cleaning Services in competition with UNITED, SDCC decided instead to deny this

25  essential facility to the rest of the market.  SDCC's requirement that only SDCC personnel provide

26  Trade Show Cleaning Services at the SDCC Facility has not only inflicted a severe handicap on

27  market entrants such as UNITED but has precluded such providers from the market altogether.

28

85.    By refusing to give direct competitors like UNITED access to the SDCC Facility, SDCC has monopolized the San Diego market in direct violation of Section 2 of the Sherman Act, entitling UNITED to, among other things, preliminary and permanent injunctive relief.

### THIRD CAUSE OF ACTION

### (GROUP BOYCOTT)

86.    UNITED realleges and incorporates herein by this reference each and every one of the allegations contained in paragraphs 1 through 85 as though fully set forth herein.

87.    Beginning in at least 2007, and continuing to the present date, SDCC, through its officers, agents, and co-conspirators organized, promoted, and engaged in a contract, combination and conspiracy in unreasonable restraint of interstate trade and commerce by forcing licensees and general contractors to agree to exclusively hire SDCC employees for Trade Show Cleaning Services at the SDCC. This conduct is likely to continue and recur unless the relief requested is granted.

88.    For purposes of forming and effectuating this contract, combination, and conspiracy SDCC and its co-conspirators engaged in the following:

Made a mandatory policy whereby all Trade Show Cleaning Services will be provided by SDCC personnel at the SDCC Facility; and

Through its absolute control of the SDCC Facility has and will continue to force all general contractors and trade associations to contractually abide by this requirement, effectively excluding all other providers of Trade Show Cleaning Services from the market.

89.    This contract, combination and conspiracy has had and will continue to have the following effects:

Price and service competition among independent and competing providers of Trade Show Cleaning Services has all but been eliminated;

Trade associations, their members and customers, and general contractors, and the general public have been denied the benefits of free and open competition in the purchase of Trade Show Cleaning Services in the San Diego market; and

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

KNLH\497699.1

-24-

Trade associations, their members and customers, and general contractors are threatened with having to pay higher prices for Trade Show Cleaning Services at the SDCC Facility.

90.    SDCC has refused to deal with UNITED, except on price terms established by SDCC; terms which would only permit UNITED to operate without revenue and ultimately at a loss.   This refusal to deal constitutes an unlawful group boycott in the Trade Show Cleaning Services market in violation of Section 1 of the Sherman Act and has been carried out for no other reason than to protect and further SDCC's own economic self-interests.

91.    The foregoing wrongful acts of Defendants constitute violations of Section 2 of the Sherman Act, entitling UNITED to, among other things, preliminary and permanent injunctive relief.

## FOURTH CAUSE OF ACTION

### (EXLCUSIVE DEALING)

92.    UNITED realleges and incorporates herein by this reference each and every one of the allegations contained in paragraphs 1 through 91 as though fully set forth herein.

93.    SDCC's mandatory policy and corresponding agreements with trade shows, general contractors and others pursuant to which such companies agree to only use SDCC personnel for Trade Show Cleaning Services are contracts which give SDCC exclusive control of the Trade Show Cleaning Services market in San Diego.

94.    These exclusive contracts, and the policy requirement that only SDCC personnel can be used for Trade Show Cleaning Services, are, as stated, infinite in duration.   These contracts and policies unreasonably restrict competition and thus violate Section 1 of the Sherman Act.   These agreements unreasonably restrain trade and restrict the access of SDCC's competitors, such as UNITED, to the entirety of the Trade Show Cleaning Services market in San Diego.

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

95. The sole purpose and effect of these agreements are to restrain trade and competition in San Diego's Trade Show Cleaning Services market. These agreements violate Section 1of the Sherman Act, 15 U.S.C. § 1.

96. These agreements constitute violations of Section 1 of the Sherman Act, entitling UNITED to, among other things, preliminary and permanent injunctive relief.

## FIFTH CAUSE OF ACTION

(Interference with Contract Against All Defendants)

97. UNITED realleges and incorporates herein by this reference each and every one of the allegations contained in paragraphs 1 through 96 as though fully set forth herein.

98. As alleged in paragraph 15 above, UNITED has established contractual business relationships with GES and with Champion, whereby UNITED provides the Trade Show Cleaning Services for trade shows at the SDCC Facility for which GES or Champion are the general contractors.

99. SDCC knew of the above described contractual business relationships existing between UNITED and the general contractors. SDCC has known of said business relationships for many years by virtue of its operation and management of the SDCC Facility.

100. The aforementioned acts of SDCC, mandating that only SDCC personnel are authorized to perform Trade Show Cleaning Services at the SDCC Facility, and requiring payments be made to SDCC in conjunction therewith, demonstrates SDCC's intent to disrupt and destroy UNITED'S established contractual business relationships. SDCC committed these acts with the intent to harm UNITED financially, and to induce the general contractors to sever their business relationships with UNITED, and to terminate UNITED's San Diego business. SDCC's stated reason for requiring its employees to perform Trade Show Cleaning Services, a "security" issue is pretextual and false.

KNLH\497699.1

101.    As a proximate result of SDCC's conduct, UNITED has and will suffer irreparable injury and will sustain damages, including but not limited to the loss of at least $500,000 annually in San Diego based revenue, as well as the loss of its San Diego based employees.

102.    The aforementioned acts of Defendant were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages pursuant to California Civil Code section 3294 in an amount according to proof at trial.

## SIXTH CAUSE OF ACTION

(Interference with Prospective Business Advantage Against All Defendants)

103.    UNITED realleges and incorporates herein by this reference each and every one of the allegations contained in paragraphs 1 through 102 as though fully set forth herein.

104.    UNITED has prospective business relationships with other general contractors, including but not limited to Brede National, Paradice, and others, for Trade Show Cleaning Services at the SDCC Facility.

105.    SDCC knew of the above described prospective business relationships existing between UNITED and other general contractors. SDCC has known of said business relationships for many years by virtue of its operation and management of the SDCC Facility.

106.    The aforementioned acts of SDCC, mandating that only SDCC personnel are authorized to perform Trade Show Cleaning Services at the SDCC Facility, and requiring payments be made to SDCC in conjunction therewith, demonstrate SDCC's intent to disrupt and destroy UNITED'S prospective business relationships. SDCC committed these acts with the intent to harm UNITED financially, and to induce the general contractors to sever their business relationships with UNITED, and to terminate UNITED's San Diego business. SDCC stated reason for requiring its employees to perform Trade Show Cleaning Services, a "security" issue, is pretextual and false.

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

107. The above described acts of UNITED are wrongful by a measure other than the interference itself, because the acts constitute violations of California Business and Professions Code §§16700, et seq. and 17000, et seq.

108. As a proximate result of SDCC's conduct, UNITED has and will suffer irreparable injury and will sustain damages, including but not limited to the loss of at least $500,000 annually in San Diego based revenue, as well as the loss of its San Diego based employees.

109. The aforementioned acts of Defendants were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages pursuant to California Civil Code section 3294 in an amount according to proof at trial.

**SEVENTH CAUSE OF ACTION**

(Violation of Business and Professions Code §§17000, et seq., Against All Defendants)

110. UNITED realleges and incorporates herein by this reference each and every one of the allegations contained in paragraphs 1 through 109 as though fully set forth herein.

111. The aforementioned acts of Defendants constitute violations of the Unfair Business Practices Act, sections 17000, et seq., of the Business and Professions Code. As a proximate result of the above mentioned acts of Defendants, UNITED has and will continue to sustain irreparable harm, entitling UNITED to damages and preliminary and permanent injunctive relief pursuant to Business and Professions Code section 17203.

112. The aforementioned acts were done by Defendants willfully and maliciously and with the intent to injure and oppress UNITED and, by reason thereof, UNITED is entitled to exemplary and punitive damages in an amount according to proof at trial, pursuant to Civil Code section 3294.

WHEREFORE, UNITED prays for judgment against Defendant as follows:

1.      For an order requiring Defendant to show cause, if any, why they should not be enjoined as set forth below, during the pendency of this action;

2.      That the Court issue a preliminary and permanent injunction, enjoining Defendant and their agents, servants, and employees, and all persons acting under, in concert with, or for them, from directly or indirectly or in any manner (a) entering into Trade Show Cleaning agreements for the San Diego Convention Center which require that SDCC employees and/or personnel to be used as the exclusive, in-house provider of Trade Show Cleaning Services and (b) engaging in unlawful restraints of trade, unfair business practices, and interference with both contractual and prospective business relationships by prohibiting general contractors and trade associations from utilizing the company of their choice to provide Trade Show Cleaning Services at the SDCC Facility;

3.      For compensatory damages in an amount according to proof at trial;

4.      That said damages be trebled pursuant to the Sherman Act (on Cause of Action One, Two, Three, and Four);

5.      For exemplary and punitive damages in an amount according to proof at trial;

6.      For interest thereon at the maximum legally permissible rate;

7.      For reasonable attorney's fees as allowable by law;

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

8.   For costs of suit herein incurred; and

9.   For such other and further relief as the Court may deem just and proper.

DATED: November 13, 2007

By: _____
    Attorneys for Plaintiff
    UNITED NATIONAL MAINTENANCE, INC.

James R. Lance (147173)
Jacob M. Slania (200652)
Dylan O. Malagrino (228052)
**KIRBY NOONAN LANCE & HOGE LLP**
600 West Broadway, Suite 1100
San Diego, California 92101-3387
Tel: (619) 231-8666
Fax: (619) 231-9593

Jeffrey A. Leon [PRO HAC VICE PENDING]
Kristopher J. Stark [PRO HAC VICE PENDING]
**UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
Chicago, IL 60602-4224
Tel: (312) 977-4400
Fax: (312) 977-4405

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

## VERIFICATION

The undersigned, Richard A. Simon, being authorized to give this verification, hereby certifies under penalty of perjury, that the statements set forth in VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.  Executed this 13th day of November, 2007 at Chicago, Illinois.

Richard A. Simon
Title: President,
United National Maintenance, Inc.


SUBSCRIBED AND SWORN TO
Before me this 13th day of November, 2007

Notary Public

```
OFFICIAL SEAL
BARBARA A. BROWN
NOTARY PUBLIC. STATE OF ILLINOIS
MY COMMISSION EXPIRES 12-30-2008
```

-31-
COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES IN VIOLATION OF
THE SHERMAN AND CLAYTON ACTS

EXHIBIT A

# SMITHBUCKLIN

smithbucklin.com

Patricia A. Dwyer
Senior Manager, Convention & Trade Show Services

SmithBucklin Corporation
401 North Michigan Avenue
Chicago, Illinois 60611 USA

Phone: +1.312.673.6941
Fax: +1.312.644.0675
pdwyer@SmithBucklin.com

June 27, 2007

Mr. Brad Gessner, General Manager
San Diego Convention Center
111 W. Harbor Drive
San Diego, CA 92101

Dear Mr. Gessner:

I am writing on behalf of our prospective trade show clients who have, or would, consider San Diego as a future destination for their respective trade shows. It has recently come to my attention that your Center is considering imposing an exclusive service for your cleaning contractor. Having dealt with many building contractors around the nation, from large first class exhibit facilities – such as San Diego – to small third-tier city's venues, one of the considerations we view as an imposition to our selection is the lack of choice of contractors to meet our highest level of service and accountability.

By taking the decision out of our hands to select this very important – and very visible service – you could be taking away our ability to negotiate competitive pricing models for our client, as well as the relationship to a valuable member of our service level team environment.

While there are many factors that enter into the decisions to select a future site for our clients, one of the aspects which definitely would weigh in as less desirable is an exclusive service where there is no need to appoint one. I completely understand that there are services within a building that make a great deal more sense to have as exclusives – electrical, plumbing, telephone, but the choice of our general service contractor and ancillary service contractors is solely based on their ability to meet our requirements. As a trade show manager with over 30 years in the industry, I pride myself in selecting service providers who have been loyal to me and my clients over many years. I know that I can trust the service that they are going to give to me and my exhibitors. Please allow me – and all other trade show managers – to continue to honor our long-standing commitments to excellence by making the judgment on a show by show basis.

I shall look forward to hearing that the decision has been reviewed based on client's disapproval of this appointment. If I can be of any assistance or provide additional insight, please contact me at any time.
Sincerely,

Pat Dwyer
Senior Manager, Convention & Trade Show Services
cc: Richard A. Simon, United Service Companies

2025 M Street, NW
Washington, DC 20036 USA

540 Maryville Centre Drive
St. Louis, MO 63141 USA



Mary Kay Sustek
Nielsen Business Media
14685 Avion Parkway, Suite 400, Chantilly, VA 20151
Tel: (703) 488-2704
Email: marykay.sustek@nielsen.com

June 22, 2007

Mr. Brad Gessner
General Manager
San Diego Convention Center Corporation
111 West Harbor Drive
San Diego, CA  92101

Dear Mr. Gessner:

Nielsen Business Media (formerly VNU Expositions) has enjoyed many years of staging shows, specifically the Action Sports Retailer shows, as well as a variety of others at your facility. It has come to our attention that the SDCC is considering imposing an exclusive service policy on cleaning.

While I believe we have utilized the SDCC cleaning services over the past years, it was by choice. Imposing an exclusive of any type isn't in the best interest of Nielsen or its customers. Nielsen manages its shows based on the specific needs and requirements of customers and having this flexibility is a key ingredient to a successful show. As show manager, we have to manage all of our service areas, as well as what impacts our customers.

In our experience, exclusive services ultimately become more expensive and less service oriented, as it takes the competitive nature out of the business. This is what keeps all service partners in balance with what their customers truly want and need and enables customers, show managers and venues to enjoy the successes.

We at Nielsen urge you to reconsider this and keep the options open for your customers. This will continue to keep your venue at the top of the desirable list as it has been for so many years.

Thanks for your time.

Sincerely,

Mary Kay Sustek
Sr. Vice President

Cc:    David Loechner, Sr. Vice President, Retail Group, Nielsen Business Media
       Lori Jenks, Group Operations Director, Retail Group, Nielsen Business Media

**EXHIBIT C**



**Bobit**
Business Media

3520 Challenger Street
Torrance, California 90503
Telephone (310) 533-2400
Facsimile (310) 533-2500
www.bobit.com

PUBLICATIONS:
*Auto Group*
Automotive Fleet
Auto Rental News
Business Driver
Business Fleet
F&I Management & Technology
Fleet Association Directory
Fleet Financials
Government Fleet
Vehicle Leasing Today
Vehicle Remarketing

*Automotive Aftermarket*
Auto Trim & Restyling News
Mobile Electronics
Modern Tire Dealer
Precision Engine
Truck & SUV

*Ground Transportation*
Limousine & Chauffeured
Transportation
Metro
School Bus Fleet

*Protection*
Campus Safety
Police
Security Sales & Integration

*Beauty*
Nails
Viet Salon

CUSTOM PUBLISHING

ASSOCIATION MANAGEMENT

TRADE SHOWS & CONFERENCES:
BusCon
Car Rental Show
Conference of
Automotive Remarketing
F&I Conference & Expo
International LCT Show
LCT Eastern Conference
LCT Leadership Summit
TREXPO East
TREXPO West

WEBSITES:
atm.com
automotive-fleet.com
autorentalnews.com
bobitexpos.com
businessfleet.com
campussafetymagazine.com
fandimag.com
fleet-central.com
gfleet.com
lctmag.com
mr-mag.com
metro-magazine.com
moderntiredealer.com
nailsmag.com
policemag.com
precisionenginemag.com
schoolbusfleet.com
securitysales.com
ssdealsmarker.com
tspmag.com
vehicleremarket.com

June 14, 2007

Mr. Brad Gessner
General Manager
San Diego Convention Center
111 W. Harbor Drive
San Diego, CA 92101

Dear Mr. Gessner,

We are a Southern California-based media company that produces a number of industry trade shows.

As you may know there are many components that make a successful show and it is our responsibility to manage these components. We determine the venue, the promotion, the hotels, the general contractor, and all of the services provided to our exhibitors. Sometimes we make these determinations based on service, sometimes only on price and sometimes on both, but in any case these decisions are the right of the show manager, not the facility.

I understand that you have an interest in imposing an exclusive cleaning service within the SDCC. Please know that the imposition of an exclusive service will be in contradiction to the wishes of your customers and it typically reduces service levels and takes competitive pricing options away. We have found over the years that the show manager's ability to choose a contractor and control price helps grow trade shows and provide better service at competitive prices. Therefore, should you implement this exclusive service please know your venue will become less desirable to our shows as a venue of choice and you may lose business.

I look forward to your possible reply.

Kindest regards,

Ty F. Bobit

President & CEO


TFB/b



**SISO** *The Voice of the For-Profit Show Producer*
**SOCIETY OF INDEPENDENT SHOW ORGANIZERS**

July 20, 2007

Mr. Brad Glessner, General Manager
San Diego Convention Center
1111 West Harbor Dr.
San Diego, CA 92101

Good Morning, Mr. Glessner,

My name is Mary Beth Rebedeau, and I am Executive Director of SISO, the
Society of Independent Show Organizers. Our 200 member companies produce
3000+ trade shows and conferences each year – meaning each of our members is
a potential client of your convention center. Our organization, together with
IAEE, (the International Association of Exhibitions and Events,) and MATSO
(Major American Trade Show Organizers), issued a position statement regarding
venues' exclusive appointed in-house vendors. See the enclosed statement.

While we understand the need for facility managers to generate revenue,
tradeshow organizers and their exhibitors must retain the right to select vendors
of their choice. This is particularly true for large shows whose complexities
demand carefully selected and integrated vendor partners who have a thorough
understanding of each show's special needs. This includes cleaning services and
security companies.

Show organizers spend years cultivating relationships and advantageous pricing
with their chosen suppliers. In-house exclusives arbitrarily increase costs to
show organizers - and therefore exhibitors - while decreasing the quality of the
service provided due to lack of competition.

Competition in a free market ensures the continued growth of the exhibition
industry. Based on US anti-trust statutes that prohibit agreements that
unreasonably lessen or restrict competition, exclusives have been successfully
challenged in both California and Florida courts. The attached joint statement
clearly outlines the reasons why exclusive arrangements are bad - bad for show
organizers, bad for exhibitors, and bad for attendees.

---

While we respect the facility right to impose certain rules of conduct that are uniformly applied to every contractor and to have certificates of insurance in reasonable amounts from them, we cannot support any effort to suppress the right of the show manager to make their own choices on the service partners that provide services for their exhibitors. I urge you to carefully review the proposed changes in your building's policies - rather than restrict your customer's and potential customers' freedom of choice and therefore risk their alienation.

Thank you for reconsidering your proposal to prohibit your customers from choosing/using their preferred contractors. Exclusives are a lightening rod for controversy in this industry, and I believe that if you restrict a customer's choice, they will be less inclined to use your facility.

With Best Wishes,

*Mary Beth Rebedeau*

Mary Beth Rebedeau
Executive Director
Society of Independent Show Organizers

**EXHIBIT E**



July 26, 2007

Mr. Brad Gessner
General Manager
San Diego Convention Center
111 West Harbor Drive
San Diego, CA 92101

Dear Brad:

I'm sending this letter to express my concern about the San Diego Convention Center making cleaning exclusive to the facility.

We believe that Show Management should have the freedom of choice to select their contractors for all services. They deserve the right to control the cost and the quality of service they offer to their exhibitors.

In addition, many of our clients prefer to assemble a team to travel with their shows, and that team often includes their cleaning contractor. Many shows have special requirements and unique needs. They deserve not to have to re-educate their show teams every time they travel to a new city.

We certainly applaud the San Diego Convention Center offering additional services, such as cleaning. And, certainly our clients would love to have the San Diego Convention Center competitively bid for the opportunity to be the official cleaning contractor. However, an exclusive situation does not promote competition and service.

We hope you will reconsider your position.

Sincerely,

B. J. Enright
President

cc: Carol Wallace

EXHIBIT F

8/3/01

## CONVENTION SERVICES AGREEMENT

This Agreement is made and entered into this  *9*  day of August, 2001, by and between GES Exposition Services, Inc. ("GES") and United National Maintenance Inc. ("United").  The duration of this Agreement is five (5) years, May 1, 2001 – April 30, 2006 ("Term").  Unless either party notifies the other party at least six (6) months prior to end of the Term, this Agreement shall automatically renew for an additional term of five (5) years according to the provisions of Section 3, herein.

### INTRODUCTION

GES is engaged in providing a wide range of services to conventions, special events, expositions, displays, trade shows, corporate meetings and the like (collectively, "Shows"), including the delivery of decorating services, carpentry services and supplying materials in the erecting and dismantling of exhibits and displays in hotels and convention facilities.  Additionally, the performance of drayage and storage services, the furnishing of furniture, equipment and accessories, and the providing of cleaning/janitorial service, and other services are provided by GES as the General Service Contractor for the Shows.  United is engaged in providing cleaning/janitorial services for Shows and at times acts as a subcontractor to GES.

IT IS, THEREFORE, AGREED:

1.    <u>CONTRACTING FOR GENERAL CLEANING SERVICES</u>.

(A)    GES agrees to use its reasonably commercial efforts to be designated as the cleaning/janitorial contractor for all Shows at which GES is performing or delivering other services (including, without limitation, any of the services referenced in the first introductory paragraph of this Agreement) and which are located in the Territory, as defined in Section 1(C) below.  In each instance during the Term, where GES is so designated as cleaning/janitorial contractor and where GES has the right to bill the applicable customers for any Cleaning Services performed, as defined below, GES agrees to retain United to perform and supervise all such Cleaning Services provided that (i) United agrees to perform and supervise such Cleaning Services at the price applicable to the subject customer established by GES, (ii) United agrees to furnish all necessary labor, equipment and supplies at its sole cost and expense, and (iii) GES' right to retain United is not restricted by law, or Show management's relationship with another cleaning service provider. When a venue claims exclusivity and seeks to prohibit the Cleaning Services of United, GES may permit United to challenge the venue policy at United's expense, but GES is under no obligation to challenge such venue's policy on behalf of United.

(B)    <u>Cleaning Services</u>. For purposes of this Agreement, "Cleaning Services" shall include all standard cleaning and janitorial functions provided in accordance with the past performance between the parties, and shall also include nightly vacuuming of aisle and

United / GES Agreement                                                   **CONFIDENTIAL**

exhibit space, "porter" services and the removal of refuse materials from aisle and exhibit space before (move in), during (aisle porters), and after (move out) each Show ("trashing") where required.

    **(C)**   Territory.  For the purpose of this Agreement, GES has established that the territories of operation for United shall include all cities, and venues therein, in which GES currently operates within the United States, except Shows where the Show Management has a contractual relationship with another cleaning service provider and the city of Las Vegas, Nevada (unless Show Management has a contractual relationship with United), and any other geographical area which the parties may hereafter mutually agree should be included in the scope of this Agreement (collectively, "Territory").

         1.    When a venue imposes a legal surcharge or tax, GES will add this cost to the exhibitor's invoice and collect same from the exhibitor and pay the venue.

    **(D)**   Performance.  United shall (i) perform first class, quality service as recognized in the exposition industry, (ii) furnish all necessary labor equipment and supplies at its sole cost and expense, (iii) use its best efforts to hire suitable individuals for employment to perform hereunder, (iv) use its best efforts to promote the services of GES, as described in the Introduction, to customers of United; and (v) comply with all applicable local, state or federal laws, statutes, ordinances, codes, rules and regulations in the performance of its obligations hereunder.

    **2.**    **PRICING.**

    **(A)**   The "Total Adjusted Gross Revenue" for a Show shall mean all Cleaning Services revenue, including without limitation, any exhibit or other revenues billed or received by GES in connection with or relating to the performance of Cleaning Services for such Show, but after deducting revenue from Exhibitor Porter Services as described in Section 2(B), bad debts and any other adjustments agreed between United and GES in advance.  For each Show, United shall be entitled to receive

    **(B)**   In the case of porter services performed by United for exhibitors and other third parties to a particular Show ("Exhibitor Porter Services"), United shall also be entitled to receive, in addition to its percentage payment under Section 2(A), the following:  (1) a priority reimbursement, which shall be deducted from the Cleaning Services revenues collected by GES with respect to such Show, and which shall be based on the hours of Exhibitor Porter Services performed multiplied by the hourly rate established in Schedule A, attached hereto and incorporated herein ("Porter Labor"); and (2)

**REDACTED**

**(C)**    In the case of any "direct porter" or "trashing" (such as aisle porter or trash removal) services performed by United, GES shall pay United per Schedule B for the hours expended in performing such services.

**(D)**    In the case of move in (pre-show) and move out (post show) services performed by United, GES shall pay United per Schedule B for the hours expended in performing such services.

**(E)**    In the case of any GES gem booths, GES shall pay United

**(F)**    In the case of carpet packages, GES shall pay United the following for carpet packages with and without rental systems.  Carpet packages without rental systems will be calculated as follows:

**(G)**    In the case of GES aisle and show management area carpet vacuuming in the primary convention center only, United will perform that service                         All hotel locations directly related to the Show will be charged according to the Direct Labor Rate provided in Schedule B.

**(H)**    In the case of a Package arrangement booth cleaning, GES shall pay United

**(I)**    In the case of vacuuming GES carpet (both booth and aisle) in centers where it will not conflict with Union Jurisdiction, after close of an event and if time permits, GES shall pay United
aisle) in centers w

**(J)**    Notwithstanding any other terms of this Section 2, if there is material change in United's labor force (such as a change from non-union to union workers), the parties agree to renegotiate appropriate changes in United's compensation hereunder.  In the event the parties cannot reach a mutual agreement on such compensation, either party may terminate this Agreement upon thirty (30) days written notice, but such termination shall apply only to the particular Show(s) where a mutual agreement could not be reached.

**(K)**    GES shall provide the exhibitor revenue to the United's representative at the Show site.  Within ten (10) days of the Show, United shall present to GES an invoice for

CONFIDENTIAL

**REDACTED**

exhibitor billing and all aisle and trashing charges. All payments are due to United within thirty (30) days of the date on the invoice.

1. <u>Settlement Process</u>. Within six (6) months of a Show, the parties shall make appropriate adjustments on a future United invoice or resulting GES payment to reconcile any credits or repayments given to such Show's management or exhibitor for incorrect billing by GES.

2. <u>Advance Payment</u>. United may from time to time make a request to the Chief Financial Officer of GES for advance payment for trashing and/or booth cleaning charges on a Show. When the request is made and approved by GES, it will be in the form of an advance payment request to GES' Chief Financial Officer with a copy to the local city marked, "<u>For Notification Purpose Only Do Not Pay</u>." United will send this request via facsimile to GES' Chief Financial Officer who will transfer the amount requested within three (3) business days to United, if such request is approved.

**(L)**

**(M)**   Price increases for the hourly rates provided in Schedules A and B will be figured as of the base hourly rate provided in such Schedules. Price increases for the hourly rates provided in Schedules A and B shall not increase in any single year during the

1. If there is an increase in the national or local minimum wage ("Wage Increase"), United will pass this Wage Increase along to GES as a direct cost and shall not add any profit or additional increase to such Wage Increase. This provision shall apply only to the labor force that, at the time of the Wage Increase, was paid the national or local minimum wage affected by the Wage Increase.

2. The parties agree to renegotiate the percentage split provided in Section 2(A) if any one of the following occur:

3.    **TERM.** Unless this Agreement is terminated earlier as provided herein, this Agreement shall have a term commencing on May 1, 2001 ("Commencement Date") and ending five (5) years following the Commencement Date on April 30, 2006 (the "Term"). **Unless either party notifies the other party at least six (6) months prior to the end of the Term, this Agreement automatically renews for a successive five-year period beyond the Term from May 1, 2006 through April 30, 2011 ("Renewal Term").**

4.    **INDEPENDENT CONTRACTOR.** With respect to the services to be performed by United pursuant to this Agreement, United acknowledges that it is an independent subcontractor of GES, and that nothing in this Agreement shall be construed to create or imply employment, partnership or joint venture relationship. GES is interested only in the results obtained by United, and United shall have sole control over the manner and means of its performance under this Agreement. GES shall not have the right to require United to take any action that might jeopardize the relationship of independent contractor between GES and United. United shall be solely responsible for its employees, agents and representatives, who shall be at United's own risk, expense and supervision.

GES shall not have the right to obstruct, overturn or otherwise interfere with any decision on the part of United to terminate any employment, partnership or other relationship between United and any other party with respect to the services to be performed under this Agreement. Except as set forth in this Agreement, neither party is granted any right or authority to assume or create any obligations or responsibilities, express or implied, on behalf of or in the name of/or the other party, or to bind the other party in any manner whatsoever.

5.    **NO SUBCONTRACTING OF SERVICES.** United agrees to perform pursuant to the terms of this Agreement without the use of contract labor (unless properly supervised by a United employee who is on the premises of the Show venue during the use of such labor) or subcontractors, except by written permission of GES. United and its sister companies and Affiliates, as defined in Section 10(E), shall not be considered subcontractors.

6.    **CONFLICT OF INTEREST**. United shall not (i) on its own behalf or on behalf of a competitor of GES, solicit directly or indirectly the business of clients of GES; (ii) take any action to impair or jeopardize GES' relationship with its customers and (iii) promote directly or indirectly the services of a competitor of GES. Upon violation of this Section 6, GES may terminate this Agreement upon giving notice to United.

7.    **INSURANCE REQUIREMENT.** United will maintain during the Term and Option Term, if applicable, the following insurance requirements:

United / GES Agreement                Page 5                    CONFIDENTIAL

**REDACTED**

(A)    Worker's Compensation Insurance:
Part I--Statutory coverage in all operating States.
Part II--$100,000 per Accident.
$100,000 per Employee for Disease.
$500,000 per Policy Aggregate for Disease.
GES Exposition Services shall be named as an additional insured.

(B)    Commercial General Liability on an occurrence basis (not claims made) with minimum limits of:
Bodily injury and Property Damage - $1,000,000 per occurrence.
Personal injury and Advertising Liability - $1,000,000 per occurrence.
General Aggregate - $1,000,000.
Products & Completed Operations Aggregate - $1,000,000.
No endorsement attached reducing coverage provided by the Basic policy Form CG0001 and GES shall be named as an additional insured.

(C)    All the policies indicated in this Section 7 shall be evidenced to GES by standard ACCORD Certificates of Insurance but with the provision of thirty (30) days notice of cancellation.

8.    **INDEMNIFICATION.**  United shall indemnify, defend (by counsel reasonably satisfactory to GES) and hold harmless GES from and against claims, damages, and costs (including reasonable attorney's fees for the defense thereof) arising out of or attributed to the operations and services performed by United, its agents, employees and subcontractors, except for the sole negligence of GES.

9.    **NOTICES.**  All notices and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of transmittal), or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service, in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may designate by notice to the other parties):

If to GES:    GES Exposition Services, Inc.
950 Grier Drive
Las Vegas, Nevada 89119
Attn:   President/Chief Executive Officer
Facsimile: 702-263-3402

a copy to:    Viad Corp
1850 North Central Avenue
Phoenix, Arizona 85077-1012
Attn:   General Counsel
Facsimile:  602-207-5480

If to United:   United National Maintenance, Inc.
                1550 South Indiana Avenue
                Chicago, Illinois 60605
                Attn:  Richard A. Simon
                Facsimile: 312-922-~~3558~~-225

## 10.    DEFAULT AND TERMINATION.

(A)    <u>Claims</u>.  In the event GES claims that there is default in any of the obligations or conditions set forth in this Agreement, GES shall notify United of such claim of default in writing pursuant to Section 9.

(B)    <u>Failure to Notify</u>.  The failure on the part of GES to notify United of a claim of default in accordance with this Section 10 shall not be deemed a waiver of GES' rights at a subsequent time.

(C)    <u>United's Time to Cure.</u>   United shall correct a claim of default within twenty-four (24) hours of written notice of such default from GES to United if the default is in connection with an on-going Show ("On-Going Show Default"), or within thirty (30) days after written notice if the default is of any other nature ("Other Default").  If United cannot cure a default within the specified time, but can provide GES with good cause why such default cannot be cured within the specified time, United will not be in default if United commenced performance within the specified time period and thereafter diligently completes performance.  In the event United fails to correct an Other Default to the reasonable satisfaction of GES within the time specified, or such greater period as GES may permit, or incurs more than three (3) On-Going Show Defaults within a thirty (30) day period and fails to correct any one of those On-Going Show Defaults to the reasonable satisfaction of GES within the time specified, or such greater period as GES may permit, GES may, in its sole discretion, exercise one or more of the following remedies: immediately terminate this Agreement upon written notice to United; exercise any other right or remedy which may be available under law; or proceed pursuant to the dispute resolution procedure of Section 11 to enforce the terms hereof or to recover damages for the breach hereof.  No express or implied waiver by GES of any event of default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent event of default.

(D)    <u>Bankruptcy or Insolvency</u> .  If a decree or order by a court having jurisdiction shall be issued (a) adjudging United bankrupt or insolvent, or (b) approving as properly filed a petition seeking reorganization of United under any section of the National Bankruptcy Act, as amended, or (c) ordering or approving the winding up or liquidation of Concessionaire's affairs, or (d) appointing a receiver or a liquidator or a trustee in bankruptcy for United or its property, then GES may terminate this Agreement.  Further, if United shall institute proceedings to be adjudicated a voluntary bankruptcy or shall consent to the filing of any bankruptcy or insolvency proceedings against it, or shall file a petition or answer a consent order seeking reorganization under any state insolvency law, or shall admit in writing its inability to pay its debts generally as they become due, or take any action

United / GES Agreement                    Page 7                         CONFIDENTIAL

in furtherance of any of the aforesaid purposes, then GES may immediately terminate this Agreement without notice.

(E)   Change of Ownership.  As a material inducement for GES to enter into this long-term agreement, United shall give GES ninety (90) days advance notice before any of the following occur:  (1) United or a substantial portion of its assets is sold to a person or entity which is not currently an Affiliate of United; (2) United is merged with an entity not currently an Affiliate of United; or (3) United otherwise has a change in ownership or control other than existing shareholders (collectively "Change of Ownership").  Upon receiving notice by United of a Change of Ownership, GES shall have sixty (60) days to provide notice of GES' approval of such Change of Ownership, which shall not be unreasonably withheld.   In the event GES gives notice of its disapproval of the Change of Ownership and it occurs, this Agreement shall terminate with ten (10) days advance notice by GES.  In the event GES or a substantial portion of its assets is sold to a person or entity not currently an Affiliate of Viad Corp, the new owner shall have the right to terminate this Agreement after April 30, 2006 and with ninety (90) days advance notice.  An "Affiliate" shall mean an entity that controls, is controlled by or is under common control with a party hereto.

(F)   Labor Dispute.  In the event United experiences a labor dispute of its employees or contractors during which time GES' business is disrupted in any way including, but not limited to, a failure of GES' employees or contractors to cross the picket line of United's workers or the employees or any other employer working in connection with a particular Show who fail to cross the picket line of United's workers, GES has the right to suspend this Agreement, upon notice to United, for such Show and hire a substitute cleaning service provider for such Show, only.  The parties shall, in good faith, negotiate the appropriate compensation for the Cleaning Services provided by United up to GES' notice of suspension.

11.   DISPUTE RESOLUTION:  Any dispute arising out of or relating to this Agreement ("Dispute") shall be resolved in accordance with the following procedures:

(A)   Negotiation.  The parties shall attempt in good faith to resolve any Dispute promptly by negotiation between executives who have authority to settle the dispute and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement.

(B)   Mediation.  If the Dispute has not been resolved by negotiation as provided herein, the parties shall endeavor to settle the dispute by mediation before resorting to litigation.  Mediation shall be governed by the then current Center for Public Resources ("CPR") Model Procedure for Mediation of Business Disputes in effect on the date of this Agreement. The neutral third party mediator will be selected from the CPR Panels of Neutrals, with the assistance of CPR, unless the parties agree otherwise.

(C)   Exception.  Notwithstanding the foregoing, in the event that the Dispute has arisen out of litigation or other court or regulatory action or proceeding against any party hereto by a third party, the Dispute shall not be subject to Sections 11(A) or 11(B).

**(D)**    Equitable Remedies.  At any time, a party may seek injunctive, specific performance or other equitable or similar judicial relief if in its judgment such action is necessary to avoid irreparable damage, to preserve the status quo or to otherwise preserve the benefits and rights created by this Agreement. The parties may adjudicate in any court of competent jurisdiction any causes of action and claims for damages arising out of such request.

**12.    MODIFICATION.**  No modification, amendment or waiver of the provisions of this Agreement shall be effective unless in writing specifically referring hereto and signed by both parties.

**13.    WAIVER OF BREACH.**  The waiver by either party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach.

**14.    ASSIGNABILITY AND BINDING EFFECT.**  Subject to Section 10(E), neither party shall assign its rights or delegate the performance of its obligations hereunder without the prior written consent of the other party.  Subject to the provisions of the preceding sentence, all the terms of this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

**15.    GOVERNING LAW.**  This Agreement and the right of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Nevada. The unenforceability or invalidity of any provision of this Agreement shall not affect the enforceability or validity of the balance of this Agreement.

**16.    GOOD FAITH, COOPERATION, AND DUE DILIGENCE**.  The parties covenant, warrant and represent to each other good faith, complete cooperation, due diligence and honesty in fact in the performance of all obligations of the parties pursuant to this Agreement.  All promises and covenants are mutual and dependent.

**17.    CAPTIONS.**  Captions contained in this Agreement are inserted for convenience only and in no way define, limit, or extend the scope or intent of any provision of this Agreement.

**18.    ENTIRE AGREEMENT SUPERCEDING EFFECT.**  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof.  No modifications, changes or additions to this Agreement (including any modifications which may be made on a "per Show" basis) shall be valid unless they are in writing and signed by both parties hereto.  Effective as of the Commencement Date, this Agreement supersedes any prior agreement between the parties in all respects to the extent of the subject matter hereof.

**19.    AUTHORITY TO ENTER TRANSACTION.**  The parties hereto represent and warrant to each other that (i) the representative signing this Agreement on behalf of such

party ("Representative") has the absolute and unrestricted right, power and authority to execute this Agreement, and thereby bind such party to perform such party's obligations and covenants under this Agreement, and (ii) the execution and delivery by Representative of this Agreement, and the consummation by such party of the transactions contemplated herein, have been duly authorized by such party, and no further authorization is necessary.

    **20.**    **REMEDIES CUMULATIVE.** All remedies at law or in equity available to either party shall be cumulative and the exercise of any one or more of such remedies shall not preclude the exercise of any others.

    **21.**    **SURVIVAL.** No termination of this Agreement, either with or without cause, shall release either party hereto from their obligations contained in Sections 2, 8 and 11, which shall survive such termination for a period of two (2) years.

    **22.**    **COUNTERPARTS.** This Agreement may be executed in two counterparts, each of which shall be deemed an original but both of which shall constitute one and the same instrument. In addition, this Agreement may contain two counterparts of the signature page and this Agreement may be executed by the affixing of the signatures of each of the parties to one of such counterpart signature pages; both such counterpart signature pages shall read as though one, and they shall have the same force and effect as though both the signers signed a single signature page.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first set forth above.

GES EXPOSITION SERVICES, INC.

BY: _____

NAME: PAUL DYKSTRA

TITLE: President

UNITED NATIONAL MAINTENANCE, INC.

BY: _____

NAME: Richard A Simon

TITLE: President

## SCHEDULE A

## PORTER LABOR FOR EXHIBITOR PORTER SERVICES

City                                    Labor Rate in U.S. Dollars

Atlanta
Baltimore
Chicago
Cleveland, Ohio
Dallas
Denver
Washington, D.C.
Detroit
Houston
Indianapolis
Los Angeles/Anaheim
Las Vegas
Miami
Milwaukee
Minneapolis
Nashville
New Orleans
Orlando/Tampa
Philadelphia
Phoenix/Tucson
Portland
Reno
Sacramento
San Antonio
San Diego
Salt Lake City
Seattle
Santa Clara
San Francisco
San Jose
St. Louis

**SCHEDULE B**

**DIRECT HOURLY LABOR RATE**

| City | Labor Rate (in U.S. dollars) | Supervisor Rate (in U.S. dollars) |
|---|---|---|
| Atlanta | | |
| Baltimore | | |
| Chicago | | |
| Cleveland, Ohio | | |
| Dallas | | |
| Washington, D.C. | | |
| Detroit | | |
| Houston | | |
| Indianapolis | | |
| Los Angeles/Anaheim | | |
| Las Vegas | | |
| Miami | | |
| Milwaukee | | |
| Minneapolis | | |
| Nashville | | |
| New Orleans | | |
| Orlando/Tampa | | |
| Philadelphia | | |
| Phoenix/Tucson | | |
| Portland | | |
| Reno | | |
| Sacramento | | |
| Salt Lake City | | |
| San Antonio | | |
| San Diego | | |
| Seattle | | |
| Santa Clara | | |
| San Francisco | | |
| San Jose | | |
| St. Louis | | |

REDACTED

## SCHEDULE C

## BILLING FORM

NAME: _____

DATE: _____

LOCATION: _____

**Due United
National Maintenance**

1. **GROSS CLEANING REVENUE**       $ _____

2. **SUBTRACT GES PORTER SERVICE REVENUE**   - $ _____

3.       = $ _____

4.       x  50%       = _____

5.

6. **PORTER LABOR   number of** _____ **HRS   X   $** _____**per hr.**   = _____

7.

8. **GES PORTER SERVICE REVENUE (Line 2)**       $ _____

9. **SUBTRACT PORTER LABOR  (Line 6)**    - $ _____

10.       = $ _____

11.       x  50%       = _____

11. **TOTAL AMOUNT DUE**       $ _____



*United Maintenance Company, Inc.*
*United National Maintenance, Inc.*
*United Security Services, Inc.*
*United Supply Service, Inc.*
*United Temps, Inc.*

June 21, 2005

Mr. Mark Epstein
Champion Exposition Services
139 Campanelli Drive
Middleborough, MA   02346

Dear Mark,

Per our conversation of June 21, 2005, please accept the following, as the agreement by and between Champion Exposition Services and United National Maintenance Inc., for exhibitor and common area cleaning services for shows produced by Champion.  This agreement will remain in effect for five (5) years from the commencement date of July 1, 2005 and expiration date of June 30, 2010.

During this time Champion will use its best efforts to secure cleaning service to all shows that it is the contractor for and designate United as the cleaning contractor.

Further:

1.  United will bill Champion                                    for exhibitor ordered vacuuming.
2.  United will bill Champion                                    for exhibitor ordered vacuuming when show management orders 100% cleaning.
3.  Carpet Shampooing will be done at
4.  Poster areas, restaurant and other bulk carpeted non-exhibit areas will be billed back at the hourly labor rate for that city (see Direct Hourly Labor Rate - Addendum 1).
5.  United will clean registration, Show management offices, exhibitor service area and remove trash from exhibit areas at no charge on all show days.
6.  United will provide to the Champion account executive on-site, a daily report of labor hours for sign-off, should said A/E or his designee be available (by area; move in, move out, aisle porters, etc.).
7.  On shows where United's revenue (                                    does not cover United's labor cost, United will bill Champion ·

1550 S. Indiana Avenue, Chicago, IL 60605 • 312  922  8558 • 800  248  8558 • Fax 312. 922  8560
www.unitedinc.com

REDACTED

8. Invoices will be sent to Champion within fourteen (14) days of the close of the show using the show date, as the date of invoice and payment is due within 30 days.

9. United will provide the Champion account exec with an estimate of the pre-show, post-show and aisle porter costs prior to the show should the Champion A/E request such estimate. This estimate will be a not to exceed figure. United shall invoice Champion (or the customer at Champions direction) for that amount or less based on the hourly cost in Addendum (1).

10. United shall perform two types of Porter service for Champion: 1) Periodic Porter Service and 2) Hourly Porter service. The rates and conditions for each service are noted below:

Periodic Porter Service –

Hourly Porter Service – will be billed back at the hourly rate for that city (see Direct Hourly Labor Rate-Addendum 1).

11. The hourly billing rate (Direct Hourly Labor Rate-Addendum 1) and the footage rate will stay in effect for the duration of this contract unless there is a federal, state or local minimum wage increase or non-union becomes union or there is a substantial union increase at any one venue, at which time an increase may be requested by United and approved by Champion.

Approved and accepted by:

Mark Epstein
Champion Exposition Services

Approved and accepted by:

Richard A. Simon
United National Maintenance

12. Champion requires at the close of every show that U.M. provide the on-site A/E pre- and post-show recaps for review + sign off.

13. All estimates provided under #9 above to include estimates for the pre-show and post-show cleaning.

REDACTED

## CHAMPION
### Direct Hourly Labor Rate - Addendum 1

| City | Labor | Supervisor |
|------|-------|------------|
| Atlanta | | |
| Baltimore | | |
| Chicago | | |
| Cleveland, Ohio | | |
| Dallas | | |
| Denver | | |
| Washington D.C. | | |
| Detroit | | |
| Houston | | |
| Indianapolis | | |
| Los Angeles/Anaheim | | |
| Las Vegas | | |
| Miami | | |
| Milwaukee | | |
| Minneapolis | | |
| Nashville | | |
| New Orleans | | |
| Orlando/Tampa | | |
| Philadelphia | | |
| Phoenix/Tucson | | |
| Portland | | |
| Reno | | |
| Sacramento | | |
| San Antonio | | |
| San Diego | | |
| Salt Lake City | | |
| Seattle | | |
| Santa Clara | | |
| San Francisco | | |
| San Jose | | |
| St. Louis | | |
| Moscone CC only* | | |

REDACTED

**EXHIBIT H**



**Exhibition Services &
Contractors Association**

*ESCA Board of Directors*
**Officers**
 Aaron Bludworth
    President
       Modern Exposition Services
Steve Hagstette
    President Elect
       Freeman
Chuck Grouzard
    Vice President
       GES Exposition Services
Tim McGill
    Secretary/Treasurer
       Hargrove, Inc.
Tom Drullinger
    Past President
       George Fern Company

*Board Members*
 Cecil Adams
    Shepard Exposition Services
Jay Atherton
    Freeman
Bill Casey
    Brede Exposition Services
Al Dyess
    Hi Tech Rental & Staging
Bob Lessin
    Tradeshow and Sign Crafts
Marcel Lucero
    Convention Services of
       the Southwest
Bruce Nable
    SER Exposition Services
Patrick Putzer
    Emerald Carpets
Greg Risner
    Roadway Express, Inc
Mark Zimmerman
    Georgia World Congress Center

*Headquarters Staff*
 Larry Arnaudet
    Executive Director
    ESCA Headquarters Office
    2340 E Trinity Mills Road Suite 100
    Carrollton, TX 75006
    Tel:  469.574.0698
    Fax: 469.574.0697
    www.ESCA.org

September 21, 2007

Mr. Brad Gessner
General Manager
San Diego Convention Center
111 West Harbor Drive
San Diego, CA  92101

Dear Brad:

It was nice seeing you in Salt Lake City and having a chance to
visit briefly about the new cleaning policy recently implemented in
your facility.    Larry and I appreciate your understanding the
position of the ESCA membership as relates to in-house exclusives.

ESCA understands and, in many ways, agrees with the concerns
that you have noted as reasons for the new policy. However, we do
not agree with the method that you are implementing to address
those concerns.    Please understand that our mutual clients trust
our member companies to select subcontractors that are best
suited for servicing the cleaning needs of their events, and in many
cases our members provide these services directly. Not only does
your new policy remove the freedom of choice and the market
driven pricing facilitated by that choice from our members and
clients, it also restricts some of our member companies from doing
business in your facility.    Would it not be more appropriate to
establish guidelines for these companies to work within, rather
than to restrict them from doing business in your facility?

We would also point out that some of these restricted member
companies are tax paying members of the San Diego community as
well as the Convention and Visitors Bureau and as such we feel it is
important that the convention center not enter into competitive
practices in conflict with services offered by its constituents.

Attached for your reference is ESCA's Position Statement on In-
House Exclusives and Surcharges on Services.    Please note that
your recent policy change is in direct conflict with ESCA's position
and we would appreciate an opportunity to meet and discuss
alternatives to this new policy.

I look forward to seeing you at ICCC in Boston.

Sincerely,
Exhibition Services & Contractors Association


Aaron Bludworth
President

AB/la.

cc:  ESCA Board of Directors
      Larry Arnaudet, Executive Director


ESCA
Exhibition Services &
Contractors Association

# POSITION STATEMENT

## IN-HOUSE EXCLUSIVES/SURCHARGES ON SERVICES

The Exhibition Services & Contractors Association, ESCA, is a professional trade association with over 160 general and specialty contractor member companies who provide services and materials to trade shows, exhibitions, conventions and corporate meetings throughout the United States, Canada and Mexico. The services provided to show management by ESCA's members include freight handling, furniture and carpet rental, labor for installation and dismantling, electrical services, cleaning, floral, rental, audio visual, and many other services. Many of our member companies operate on a national basis and, over the years, have developed long working relationships with their clients to provide certain services for them year after year, irrespective of the city where the activity is held.

There has been a recent trend for some publicly funded convention centers and other similar facilities to take these services "in-house" on an exclusive basis, or to impose an arbitrary surcharge on outside contractors who come into the facility to provide these services.

ESCA is opposed to the practice of publicly funded convention facilities imposing in-house exclusive restrictions on those services that can be provided by ESCA members for the following reasons:

1. Convention centers and other similar facilities that have been constructed using state or local tax funds and/or other revenue obligations should use space rental charges and bed taxes from the hotels to offset their expenses as opposed to the exclusive provision of support services to clients who lease the facility.

2. Most ESCA members are dues-paying members of their local convention and visitors' bureaus in multiple cities. Their membership is an indication of their support of the community and the efforts of the bureau to bring business to that community. All members of a bureau should be given the opportunity of competing for business, which comes to a community, which they support, given that both the bureau and the convention center, in most instances, receive a percentage of the room tax. The bureau receives bed tax and membership dues for the sales and marketing and service to groups, and the convention center receives a percentage of the room tax to pay on the bonded indebtedness of the center and/or operation of the facility.

3. Trade associations and show management firms over the years have established relationships with ESCA members to provide certain services for their show and its exhibitors. They expect a high level of service at a negotiated cost. When exclusive in-house services are provided by the facility and not negotiated with the show producer, the level of service is often lower and the cost is higher.

4. The private sector, in particular ESCA member firms, who pay taxes on a state and local level, are not being allowed the opportunity to bid on services when in-house exclusives are in place, which is contrary to the free enterprise system.

5. Equipment and training personnel are traditionally substandard when exclusive services are provided by facilities.

6. There could be a strong union reaction if using in-house exclusives jeopardizes their jobs.

1

Another revenue-seeking alternative adopted by some publicly funded and private convention facilities is the collection of a mandatory percentage surcharge on show management and exhibit-selected contracts that provide essential services to show management and exhibitors.

ESCA is also opposed to the practice of arbitrary surcharges placed on the services provided by its member firms for the following reasons:

> 1. Such surcharges unfairly inflate the cost of services to show management, trade associations and exhibitors. These groups are already contributing to the local economy through tax on such items as hotel rooms and food and beverage.

> 2. Since the invoice from the contractor has to include this mandatory surcharge, it also unfairly inflates the contractor's fee for services.

Unfair competition from government is the issue. ESCA does not believe that local/state government should be in the business of providing goods/services, which are available from private, for profit, tax-paying companies. ESCA also believes that any entity arbitrarily assessed surcharges on services its members supply is an unfair and unnecessary added expense that provides no benefit to the show organizer or exhibitor other than increased cost.

ESCA urges all users of convention facilities to examine those policies, which restrict show management's right to select contractors of their choice or assess surcharges on suppliers who provide services to the facilities users.



# TRADE SHOW CONTRACTORS ASSOCIATION
## OF
## SOUTHERN CALIFORNIA

June 8, 2007

Mr. Brad Gessner
San Diego Convention Center
111 West Harbor Drive
San Diego, CA 92101

Dear Brad:

On behalf of the Trade Show Contractors Association of Southern California we have concerns regarding the formal notification received by our members relative to the new cleaning services policy and program instituted by the San Diego Convention Center.

We believe that it is in the best interest of our customers that they have a choice in the selection of any contracted services to include cleaning. We are aware the cleaning services are not handled directly by the General Service Contractors but subcontracted to companies who specialize in this service or as you indicate as one of your options, to subcontract those services to the San Diego Convention Center which some of the contractors presently do. Our clients entrust us to make this decision in their best interest. Your current policy and program takes that liberty and choice away.

The TSCA General Service Contractors and Cleaning Contractors do not have a problem with the San Diego Convention Center competing for this subcontract opportunity. The San Diego Convention Center policy dictates its utilization by the simple statement use or loose the opportunity to provide cleaning services in the San Diego Convention Center. It is our understanding that our clients have the desire to select the contractor of choice not the Convention Center.

The factors communicated in your correspondence that influenced the implementation of this program were security issues, staff screening, training, credential identification and cleaning quality. The performance of SDCCC in background checks, drug testing, training and supervision is a positive consideration to subcontract SDCCC as the cleaning service provider. It is apparent the SDCCC feels a need to establish guidelines for cleaning contractors that provide a professional, secure and quality environment. The TSCA supports SDCCC in mutually establishing these guidelines. The mandatory requirement of these guidelines to eliminate client choice we do not support.

Respectfully, we ask that SDCCC withdraw the new cleaning services policy and program. Once again, the TSCA will work with SDCCC to remove the concerns stated.

Sincerely,

Trade Show Contractors Association of Southern California

Martin Cymbal
President

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 144462    — SR**

**November 14, 2007
10:51:50**

**Civ Fil Non-Pris**
USAO #.: 07CV2172 CIV. FIL.
Judge..: ROGER T BENITEZ
Amount.:                    $350.00 CK
Check#.: BC#79077

**Total—>  $350.00**

FROM: UNITED NAT. MAINT. V. SD CCC
      CIVIL FILING