1   James R. Lance (147173)
       jlance@knlh.com
2   Jacob M. Slania (200652)
       jslania@knlh.com
3   Dylan O. Malagrino (228052)
       dmalagrino@knlh.com
4   **KIRBY NOONAN LANCE & HOGE LLP**
    600 West Broadway, Suite 1100
5   San Diego, California  92101-3387
    Telephone (619) 231-8666
6   Facsimile (619) 231-9593

7   Jeffrey A. Leon [PRO HAC VICE PENDING]
    Kristopher J. Stark [PRO HAC VICE PENDING]
8   **UNGARETTI & HARRIS LLP**
    3500 Three First National Plaza
9   Chicago, Illinois  60602-4224
    Telephone (312) 977-4400
10  Facsimile (312) 977-4405

11  Attorneys for Plaintiff
    UNITED NATIONAL MAINTENANCE, INC.
12

13
                        **UNITED STATES DISTRICT COURT**
14
                      **SOUTHERN DISTRICT OF CALIFORNIA**
15

16
    UNITED NATIONAL MAINTENANCE,          CASE NO. 07-CV-2172 BEN (JMA)
17  INC., a Nevada corporation,
                                          **MEMORANDUM OF POINTS AND**
18                 Plaintiff,             **AUTHORITIES IN SUPPORT OF**
                                          **MOTION FOR PRELIMINARY**
19          vs.                           **INJUNCTION**

20  SAN DIEGO CONVENTION CENTER           **Date:  01/07/08**
    CORPORATION, INC., a California       **Time:  10:30 a.m.**
21  corporation,                          **Ctrm:  3**
                                          **Judge:  Hon. Roger T. Benitez**
22                 Defendant.

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

KNLH\499742.1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND............................................................................... 2

    A.    THE SAN DIEGO TRADE SHOW AND CONVENTION MARKET............. 2

    B.    THE TRADE SHOW CLEANING SERVICES MARKET................................ 3

    C.    HISTORY OF COMPETITION FOR TRADE SHOW CLEANING
        SERVICES IN SAN DIEGO. ........................................................................... 3

    D.    SDCC'S SHAM "SECURITY" JUSTIFICATION. ........................................... 4

    E.    COMPETITORS SUCH AS UNITED CANNOT OPERATE
        PROFITABLY UNDER THE POLICIES AND CONDITIONS
        ESTABLISHED BY SDCC. ............................................................................. 7

III. UNITED IS ENTITLED TO INJUNCTIVE RELIEF. ......................................... 8

    A.    UNITED HAS A STRONG LIKELIHOOD OF SUCCEEDING ON
        THE MERITS OF ITS CLAIMS. .................................................................... 9

        1.    United has a Strong Likelihood of Succeeding on the Merits of its
            Attempted Monopolization Claim. ......................................................... 9

            a.    SDCC has Market Power in the Trade Show Cleaning
                Services Market in San Diego............................................... 9

                i.    The Product Market is Trade Show Cleaning
                    Services of the Type Offered by United and SDCC.......... 9

                ii.    The Geographic Market is the SDCC-Controlled
                    Facility in San Diego. ..................................................... 12

            b.    SDCC has Engaged in Exclusionary Conduct which Gives
                it a Dangerous Probability of Obtaining a Monopoly of the
                Trade Show Cleaning Services Market in San Diego................. 13

            c.    SDCC's Exclusionary Conduct is not Excused by its Sham
                "Security" Policy Confabulation.................................................. 15

        2.    United has a Strong Likelihood of Succeeding on the Merits of its
            Essential Facilities Claim. .................................................................... 17

        3.    United has a Strong Likelihood of Succeeding on the Merits of its
            Group Boycott Claim............................................................................ 18

        4.    United has a Strong Likelihood of Succeeding on the Merits of its
            Exclusive Dealing Claim. ..................................................................... 19

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

KNLH\499742.1

i

B.     UNITED WILL SUFFER IRREPARABLE INJURY IF THIS COURT DOES NOT ISSUE A PRELIMINARY INJUNCTION. ................................... 20

     1.     SDCC Claims That United's Prayers for Monetary Relief are Barred by the Local Government Antitrust Act and State Sovereign Immunity. ............................................................. 21

     2.     The Atrophy of United's Workforce Threatens its Ability to Reestablish Itself as a Competitor When it Ultimately Prevails on the Merits. ......................................................................... 23

C.     THE BALANCE OF THE HARDSHIPS TIPS SHARPLY IN UNITED'S FAVOR. .......................................................................... 24

IV. CONCLUSION ................................................................................ 25

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1

## **TABLE OF AUTHORITIES**

2

3

### **Federal Cases**

4 Ala. Airlines, Inc. v. United Airlines, Inc.,
     948 F.2d 536 (9th Cir. 1992) ................................................................. 17

5

America Passage Media Corp. v. Cass Communications, Inc.,
6      750 F.2d 1470 (9th Cir. 1985) ............................................................. 18

7 Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,
     738 F.2d 1509 (10th Cir.1984) ....................................................... 15, 17

8

Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,
9      472 U.S. 585 (1985) ................................................................. 15, 16, 17

10 Bernhardt v. L.A. County,
     339 F.3d 920 (9th Cir. 2003) ............................................................... 24

11

12 Big Bear Lodging Association, v. Snow Summit, Inc.,
     182 F.3d 1096 (9th Cir. 1999) ............................................................. 19

13 Brown Shoe Co. v. U.S.,
     370 U.S. 294 (1962) ...................................................................... 10, 12

14

15 Byers v. Bluff City News Co.,
     609 F.2d 843 (6th Cir. 1980) ............................................................... 17

16 Cal. v. Sutter Healy System,
     130 F. Supp. 2d 1109 (C.D. Cal. 2001) ................................................ 10

17

18 City of Anaheim v. S. Cal. Edison Co.,
     955 F.2d 1373 (9th Cir. 1992) ............................................................. 17

19 Confederated Tribes of Siletz Indians of Or. v. Weyerhauser Co.,
     411 F.3d 1030 (9th Cir. 2005) ............................................................. 14

20

21 Earth Island Institute v. U.S. Forest Serv.,
     442 F.3d 1147 (9th Cir. 2006) ..................................................... 7, 21, 24

22 Eastman Kodak Co. v. Image Technical Services,
     504 U.S. 451 (1992) ................................................................... *passim*

23

24 Fineman v. Armstrong World Industrial, Inc.,
     980 F.3d 171 (3d Cir. 1992) ................................................................ 19

25 Fishman v. Estate of Wirtz,
     807 F.2d 520 (7th Cir. 1986) ....................................................... 12, 17, 18

26 Foremost International Tours, Inc. v. Qantas Airways, Ltd.,
     379 F. Supp. 88 (D.C. Haw. 1974) ...................................................... 23

27

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

Glendale Neighborhood Association v. Greensboro Housing Authority,
901 F. Supp. 996 (M.D.N.C. 1995) ................................................................. 21

Hahn v. Ore. Physicians' Serv.,
868 F.2d 1022 (9th Cir. 1988) ....................................................................... 19

Hecht v. Pro-Football, Inc.,
570 F.2d 982 (D.C. Cir. 1977) ................................................................. 17, 18

Iconix, Inc., v. Tokuda,
457 F. Supp. 2d 969 (N.D. Cal. 2006) ........................................................... 21

Kan. Health Care Association v. Kan. Department of Social &
Rehabilitation Services,
31 F.3d 1536 (10th Cir. 1994) ....................................................................... 22

L.A. Mem'l Coliseum Commission v. National Football League,
726 F.2d 1381 (9th Cir. 1984) ................................................................. 11, 16

L.A. Mem'l Coliseum v. National Football League,
634 F.2d 1197 (9th Cir. 1980) ....................................................................... 22

Lands Council v. McNair,
494 F.3d 771 (9th Cir. 2007) ................................................................. 8, 9, 21

MCI Communications Corp. v. AT&T,
708 F.2d 1081 (7 Cir.1983) .......................................................................... 17

MCM Partners, Inc. v. Andrews-Bartlett & Associate,
62 F.3d 967 (7th Cir. 1995) ..................................................................... 12, 19

Montauk-Caribbean Airways, Inc. v. Hope,
784 F.2d 91 (2d Cir. 1986) ........................................................................... 22

Nike, Inc. v. McCarthy,
379 F.3d 576 (9th Cir. 2004) ........................................................................ 24

Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,
472 U.S. 284 (1985) ..................................................................................... 19

Oltz v. St. Peter's Community Hospital,
861 F.2d 1440 (9th Cir. 1988) ...................................................................... 20

Optinrealbig.com v. Ironport System, Inc.,
323 F. Supp. 2d 1037 (N.D. Cal. 2004) ......................................................... 21

Ottertail Power Co. v. U.S.,
410 U.S. 366, 35 L. Ed. 2d 359 (1973) ......................................................... 17

Paramount Land Co. v. Cal. Pistachio Commission,
491 F.3d 1003 (9th Cir. 2007) .................................................................. 8, 21

Pine Ridge Recycling, Inc. v. Butts County, Ga.,
864 F. Supp. 1338 (M.D. Ga. 1994) .............................................................. 23

Kirby Noonan Lance & Hoge LLP

600 West Broadway, Suite 1100 San Diego, California 92101-3387

<u>Rebel Oil Co., Inc. v. Atlantic Richfield Co.,</u>
   51 F.3d 1421 (9th Cir.1995) ........................................................................... 9

<u>Roland Machine Co. v. Dresser Industrial, Inc.,</u>
   749 F.2d 380 (7th Cir. 1984) ....................................................................... 20

<u>Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of N.Y.,</u>
   749 F.2d 124 (2d Cir. 1984) ........................................................................ 24

<u>Serono Laboratories, Inc. v. Shalala,</u>
   974 F. Supp. 29 (D.D.C. 1997) ................................................................... 22

<u>Serono Laboratories, Inc. v. Shalala,</u>
   158 F.3d 1313 (D.C. Cir. 1998) .................................................................. 22

<u>Siegel v. Chicken Delight, Inc.,</u>
   448 F.2d 43 (9th Cir. 1971) ........................................................................ 16

<u>Southeast Ala. Conservation Council v. U.S. Army Corps of Eng'rs,</u>
   472 F.3d 1097 (9th Cir. 2006) .................................................................... 24

<u>Spectrum Sports v. McQuillan,</u>
   506 U.S. 447 (1993) ...................................................................................... 8

<u>Tampa Electric Co. v. Nashville Coal Co.,</u>
   365 U.S. 320 (1961) .................................................................................... 20

<u>Temple University v. White,</u>
   941 F.2d 201 (3d Cir. 1991) ....................................................................... 22

<u>Tucker v. Apple Computer,</u>
   493 F. Supp. 2d 1090 (N.D. Cal. 2006) ....................................................... 9

<u>Twin City Sportsservice, Inc. v. Charley O. Finley & Co.,</u>
   676 F.2d 1291 (9th Cir. 1982) .................................................................... 20

<u>U.S. v. Microsoft,</u>
   253 F.3d 34 (D.D.C. Cir. 2001) .................................................................. 14

<u>U.S. v. Terminal R.R. Association,</u>
   224 U.S. 383, 32 S. Ct. 507 (1912) ............................................................ 17

<u>U.S. v. Dentsply International, Inc.,</u>
   399 F.3d 181 (3d Cir. 2005) ....................................................................... 20

<u>Warren v. City of Athens, Ohio,</u>
   411 F.3d 697 (6th Cir. 2005) ...................................................................... 24

<u>Wisconsin v. Stockbridge-Munsee Community,</u>
   67 F. Supp. 2d 990 (E.D. Wis. 1999) ......................................................... 22

<u>Woerner v. U.S. Small Business Admin.,</u>
   739 F. Supp. 641 (D.D.C. 1990) ................................................................. 22

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

Woods Exploration & Producing Co. v. Aluminum Co. of America,
    438 F.2d 1286 (5th Cir. 1971) ........................................................................... 12

### State Cases

Apt. Source of Phila. v. Phila. Newspapers,
    1998 WL 191649 (Civ. A. No. 98-5472) ........................................................... 18

Wilson v. S.F. Redev. Agency,
    19 Cal. 3d 555 (1977) ....................................................................................... 22

### Docketed Cases

Weaver South Pacific Publications, Inc. v. San Diego Convention Center Corp., Inc.,
    Case No. 37-2007-71586-CU-BC-CTL ............................................................. 21

### Federal Statutes

The Sherman Act, 15 U.S.C. §§ 1, 2 ...................................................................... 9, 19

The Sherman Act, 15 U.S.C. § 1  ........................................................................... 9, 19

The Sherman Act, 15 U.S.C. § 2  ........................................................................... 9, 19

Federal Local Government Antitrust Immunity Act, 15 U.S.C. §§ 35, 36 ................... 2

Federal Local Government Antitrust Immunity Act, 15 U.S.C. § 35(a) ..................... 22

### State Statutes

Cal. Govt. Code § 53051 ........................................................................................... 22

### Secondary Sources

S. Salop, *Exclusionary Conduct, Effect on Consumers and the Flawed Profit-Sacrifice
    Standard*, 73 Antitrust L.J. 311, 315 (2006) ...................................................... 14

13 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE
    § 65.22[1][b] (3d ed. 2007) .......................................................................... 21, 22

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

# I. **INTRODUCTION**

Plaintiff United National Maintenance, Inc. ("United") has brought this multi-count antitrust suit to halt the unlawful actions of Defendant San Diego Convention Center Corporation ("SDCC") which threaten to create a monopoly over the sale of Trade Show Cleaning Services to large trade shows  and conventions held at the San Diego Convention Center ("SDCC Facility").

For the last 19 years, United and SDCC have engaged in intense competition to sell Trade Show Cleaning Services to trade shows held at the SDCC Facility, and, as a result, customers have received better prices and service.  Before SDCC's unlawful actions, United had a 40% market share of Trade Show Cleaning Service contracts for shows held at the SDCC Facility, and SDCC had the remaining 60%.  The SDCC has now chosen to stop competing against United: it has barred United's employees from entering the SDCC Facility and has instead mandated the exclusive use of SDCC employees.  With United employees locked out, SDCC can obtain an airtight, 100%, market share.  There is, therefore, a near certainty that United will be able to prevail on the merits of its claims.

The purpose of SDCC's policy is to acquire a monopoly that, in spite of repeated attempts, it has not been able to achieve by legal, competitive, means.  It has nonetheless tried to justify its actions by claiming the actions were necessary to ensure security at the SDCC Facility.  This justification is a sham, confabulated to defend nakedly anticompetitive conduct. SDCC has only applied its "security" policy to United's employees, not to the thousands of other employees of outside contractors with similar access to the Facility.  SDCC's refusal of United's numerous offers to allow SDCC to run security checks on United's employees or allow United to do so is proof enough of SDCC's real intentions.

United simply cannot wait for a trial to prove its claims, as it is being irreparably injured by SDCC's unlawful activities in two ways:  First, United's ability to compete in the future, even if the policy is ultimately rescinded, is at risk as United's long-term employees, whose knowledge and efficiency allow United to compete effectively and to offer lower prices, are being forced to seek other employment.  Second, the SDCC has forced United to accept terms for using SDCC's

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1    employees which ensure United loses money each time a show is held at the Facility, and SDCC

2    has emphatically asserted, on numerous occasions, that it is immune from damages at law and will

3    predictably do so here given the presence of the federal Local Government Antitrust Immunity

4    Act. 15 U.S.C. §§ 35, 36. This asserted unavailability of damages and the retardation of United's

5    ability to reconstitute, combined with a strong likelihood of success on the merits, requires an

6    injunction to stop SDCC's unlawful behavior immediately.

7                              **II.  FACTUAL BACKGROUND**

8      **A.    THE SAN DIEGO TRADE SHOW AND CONVENTION MARKET.**

9          SDCC manages and operates the SDCC Facility, which is the only facility capable of

10   holding major trade shows in or around the San Diego metropolitan area. (Ver. Compl. ¶ 10,

11   attached hereto as Ex. 1.) The SDCC Facility offers over 615,000 square feet of exhibit space

12   and over 1,000,000 square feet of combined exhibit and meeting space making it the eleventh

13   largest convention center in the United States. (*Id.*) The SDCC Facility is truly "one of the

14   top meeting places in the world." (Wallace Decl. ¶ 3, attached hereto as Ex. 2.)[1]  There is no

15   alternative to the SDCC Facility in or around San Diego, and alternatives nationwide are few

16   and likely unavailable due to long-term advance scheduling. (Ver. Compl. ¶ ¶ 10, 12; Epstein

17   Decl. ¶¶ 7-8, attached hereto as Ex. 4.)

18         SDCC's primary business is to lease the SDCC Facility, pursuant to license agreements, to

19   entities that hold trade shows there. (Ver. Compl. ¶ 10.) The licensees (typically trade

20   associations) generally hire general contractors, such as GES Exposition Services ("GES") and

21   Champion Exposition Services ("Champion"), to organize and manage the large number of

22   logistical and service-oriented challenges involved with staging a trade show, including

23   maintenance, electrical, decorating, registration and the installation and dismantlement of

24   exhibition spaces, all of which need to be accomplished in very narrow time windows. (Ver.

25   _____

26   [1]  The next largest facility suitable for trade shows in the San Diego market will be the Hilton
     San Diego Convention Center, offering 165,000 square feet of meeting space, and that facility does
27   not open until November 2008. (Hilton Website, attached as Ex. 3 at p. 72.)

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

Kirby Noonan Lance & Hoge LLP

600 West Broadway, Suite 1100 San Diego, California 92101-3387

1    Compl. ¶ 13; Epstein Decl. ¶ 3.)  These general contractors usually hire subcontractors, such as

2    United, to perform services required by these shows. (Ver. Compl. ¶ 14; Epstein Decl. ¶¶ 3-4.)

3        **B.    THE TRADE SHOW CLEANING SERVICES MARKET.**

4            United is not a general janitorial services firm. (Ver. Compl. ¶¶ 16, 19; Epstein Decl.

5    ¶ 5.)  Rather, it provides specialized cleaning, janitorial, maintenance and related services

6    (hereinafter referred to as "Trade Show Cleaning Services") to trade shows held at convention

7    facilities nationwide, including the SDCC Facility.  (Ver. Compl. ¶ 22; Epstein Decl. ¶ 5.)

8    United invests locally in each city and hires a work force and purchases equipment dedicated

9    for use in that city. (Ver. Compl. ¶¶ 22, 25.)  United is able to provide its service because it

10   and its employees have knowledge and experience with each type of trade show and its service

11   is precisely tailored for each show type and the size and type of exhibit.  (Ver. Compl. ¶ 22;

12   Epstein Decl. ¶ 5.)  United and SDCC must know in advance how to deploy and utilize a

13   constantly fluctuating number of man-hours in very narrow and specific time windows.  (Ver.

14   Compl. ¶ 21; Epstein Decl.  ¶¶ 5-6.)  Trade Show Cleaning Services is thus a unique product

15   that is not interchangeable with general janitorial services, a fact recognized by the customer

16   base. (Epstein Decl.  ¶¶ 5-6.)

17           United provides two types of Trade Show Cleaning Services: Facility Cleaning and Booth

18   Cleaning. (Ver. Compl. ¶¶ 17-19; Epstein Decl. ¶¶ 4-5.)  The Facility Cleaning portion addresses

19   the common areas of the Facility during all phases of a show (Ver. Compl. ¶ 18.)  The general

20   contractor pays a fully-loaded, blended, hourly rate for the service which includes United's direct

21   labor cost, overhead and profit.  (*Id.* ¶¶ 41-43.)  The Booth Cleaning portion is offered to and paid

22   for by the individual exhibitors for cleaning their booth areas. (*Id.* ¶¶ 18, 44.)  United is paid a

23   fixed amount for these services that does not vary by the hours United actually works. (*Id.* ¶¶ 18,

24   44.)

25       **C.    HISTORY OF COMPETITION FOR TRADE SHOW CLEANING
             SERVICES IN SAN DIEGO.**

26

27           Since the construction of the SDCC Facility in 1989, SDCC and United have directly

28   competed to sell Trade Show Cleaning Services in San Diego.  (Ver. Compl. ¶ 15.)  The

1  beneficiaries are the customers of such services, including but not limited to GES and

2  Champion, who have always had the absolute right to select companies to perform services

3  associated with San Diego trade shows, including Trade Show Cleaning Services. (Ver.

4  Compl. ¶ 15; Epstein Decl. ¶ 10.)

5  The SDCC has, from time to time, attempted to use its control over the SDCC Facility

6  to capture United's customers, such as GES and Champion, by requiring the use of SDCC

7  employees. (Ver. Compl. ¶ 46.) On at least two separate occasions, in 1990 and 2000, SDCC

8  threatened to make Trade Show Cleaning Services an exclusive in-house service at the SDCC

9  Facility, and threatened to bar any general contractor from providing electrical services who

10  failed to use SDCC employees for Trade Show Cleaning Services would be precluded from

11  providing electrical services. (*Id.*) These efforts failed because of industry outrage over the

12  inevitable rise in price and deterioration in service that would result from such anticompetitive

13  tactics. (*Id.*)

14  In the fall of 2006 and early spring of 2007, SDCC undertook an aggressive effort to

15  compete with United by offering its services to United's customers including, GES and

16  Champion. (Robbins Decl. ¶9, attached hereto as Ex. 5; Epstein Decl. ¶ 11.) SDCC's

17  competitive offerings were rejected on their merits. (Robbins Decl. ¶9.; Epstein Decl. ¶ 11.)

18  Shortly after its failed efforts at legal competition, SDCC abruptly implemented a new

19  "security" policy which forced itself on the customer base that had so recently rejected it.

20  (Epstein Decl. ¶ 12.)

21  **D.    SDCC'S SHAM "SECURITY" JUSTIFICATION.**

22  On May 18, 2007, SDCC formally announced to general contractors such as Champion

23  a new "security" policy and program made effective on July 1, 2007:

24  **SDCC staff will perform all cleaning events…We considered many factors before deciding to implement this program. Security concerns related to ensuring that**

25  **the staff are properly screened, credentialed and trained, and consistency of cleaning quality were the main factors that led to this decision. It is important to**

26  **note that SDCCC performs criminal background checks and requires a drug test for every potential new hire, in addition to providing extensive training and**

27  **supervision of its employees. This produces an excellent staff providing exemplary services.**

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

KNLH\499742.1                    -4-                    CASE NO. 07-CV-2172 BEN (JMA)

1    (May 18, 2007, Letter from Brad Gessner attached hereto as Ex. 6. at p. 84.)  This policy was

2    announced only a short time after Champion and GES rejected SDCC's competitive offers.

3    (Ver. Compl. ¶ 50; Epstein Decl. ¶ 12.)

4         SDCC's "security" policy is a sham.  It is applied solely to providers of Trade Show

5    Cleaning Services, despite the fact that Trade Show Cleaning Service employees roughly

6    constitutes 3% of the outside labor required to operate and manage a trade show. (Ver. Compl.

7    ¶ 53; Callaghan Decl. ¶ 8, attached hereto as Ex. 7; Linn Decl. ¶ 4, attached hereto as Ex. 8.)

8    Thus, employees of trade associations, general contractors and the long list of other outside

9    vendors including electricians, exhibit installers, freight handlers, carpet installers, display

10   houses, decorators, sign hangers, advertisers, florists, caterers, and other general labor are

11   exempt from SDCC's policy. (Ver. Compl. ¶ 53; Epstein Decl. ¶ 15; Callaghan Decl. ¶ 8; Linn

12   Decl. ¶ 4.)  The discriminatory application of this policy to United will do nothing to improve

13   security at the SDCC Facility. (Epstein Decl. ¶ 17; Callaghan Decl. ¶ 6.)  Indeed,

14   "Employment by the SDCC does nothing to improve security.  What ensures better security is

15   following universal security protocols, meaning that if inside and outside employees are all

16   subject to the same screening procedures, security risks will be minimized." (Callaghan Decl.

17   ¶ 6.)  Instead, SDCC's application of this policy solely against its lone competitor strongly

18   suggests an anticompetitive animus. (Hekman Decl. ¶¶ 44-47, attached hereto as Ex. 9.)

19        Making the discriminatory application of this policy even more suspicious is the fact

20   that, in the 19 years United has provided Trade Show Cleaning Services at the SDCC Facility,

21   SDCC has not brought a single security issue to United's attention. (Ver. Compl. ¶ 56; Epstein

22   Decl. ¶ 11; Linn Decl. ¶ 11.)  Unlike the large, itinerant workforce of spot and temporary

23   workers that come off of call lists at union halls, such as freight haulers, riggers and

24   electricians, Trade Show Cleaning crews, like that of UNITED, are smaller and their

25   employees come off of a common employment roster and therefore are typically made up of and

26   managed by the same groups of people that are granted access to the SDCC Facility for

27   any given show.  (Ver. Compl. ¶ 55; Callaghan Decl. ¶¶ 7-8.)  United does not use temporary

28   workers and the entirety of its workforce comes from a common roster of local, W-2,

*Kirby Noonan Lance & Hoge LLP*
*600 West Broadway, Suite 1100 San Diego, California 92101-3387*

1  employees.[2]  (Linn Decl. ¶ 8.)  If United needs to supplement its work force, temporary

2  workers are not used.  Rather, United brings in its own employees from other cities.  (*Id.*)

3  Thus, except for employee turnover which has been minimal at United, the same United

4  employees are the ones entering and working in the SDCC Facility.  (*Id.*)

5      Furthermore, every one of those employees is wearing a United computer, generated

6  photo ID, which United has long required of its employees, even though the SDCC Facility

7  does not.[3] (Ver. Compl. ¶ 59; Callaghan Decl. ¶ 12.) Lastly, United's offer to pay for and

8  subject its employees to the same background checks and screening SDCC uses, or to even let

9  SDCC run these identical checks itself, was refused without explanation. (Ver. Compl. ¶ 58;

10 Linn Decl. ¶ 11.)  An expert in the field of trade show security states that if "United employees

11 are badged and background checked, they would pose a very low security risk and would

12 certainly not pose any more of a security risk than badged and background checked employees

13 of the SDCC." (Callaghan Decl. ¶ 12.)

14

15

16

_____

17 [2] Carol Wallace, President and CEO of SDCC claims that United's alleged use of temporary labor is

18 the justification for applying this "security" policy solely against United. Ms. Wallace specifically
   says: "I am informed, and believe, and thereon allege that [United] primarily uses temporary staff to

19 perform cleaning at the [SDCC Facility]…Our assessment of areas of vulnerability indicated that the
   use of outside cleaning crews should be eliminated." (Wallace Decl. ¶¶ 5-7.) Had anyone from SDCC

20 bothered to ask United if it used temporary labor, they would have discovered this statement to be

21 absolutely false. (Linn Decl. ¶ 8.)
   [3] The three largest convention centers in the United States all allow outside Trade Show Cleaning

22 Service employees to have access to their facilities. (Ver. Compl. ¶ 59; Callaghan Decl. ¶ 12.)
   McCormick Place in Chicago, the Las Vegas Convention Center and Orlando's Orange County

23 Convention Center utilize badging programs for all employees that will have access to the facility.

24 (Ver. Compl. ¶ 59; Callaghan Decl. ¶ 12.)  This applies to all workers, not just Trade Show
   Cleaning Service workers. (Ver. Compl. ¶ 59; Callaghan Decl. ¶ 12.) This program involves the

25 need for pre-registration and photo identification and the badge is issued by the general contractor

26 or the convention center itself. (Ver. Compl. ¶ 59; Callaghan Decl. ¶ 12.)  If such a program is
   feasible in the two of the largest convention centers in the United States, all of which pose greater

27 security risks, it is clearly feasible for SDCC to implement a similar program and shows the
   absurdity of the SDCC's "security" policy. (Callaghan Decl. ¶ 12.)

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

**E.    COMPETITORS SUCH AS UNITED CANNOT OPERATE PROFITABLY UNDER THE POLICIES AND CONDITIONS ESTABLISHED BY SDCC.**

SDCC was fully aware when it announced its new policy that Champion and GES had long-term contracts with United to provide Trade Show Cleaning Services nationwide. (Ver. Compl. ¶ 67.) Attached hereto, as Exhibits 10 and 11, are redacted versions of these contracts. While SDCC ultimately allowed United to service its San Diego contracts by using SDCC employees, SDCC used its knowledge of the terms of these contracts to implement the policy in a manner that guaranteed United would lose money in San Diego and thus could not compete. (*Id.*) SDCC only allows United to meets its contractual obligations to GES and Champion by forcing United to pay supra-competitive prices for the use of SDCC employees. (Ver. Compl. ¶¶ 61-66.) United must pay SDCC the entirety of the gross revenue it earns from its agreements for Booth Cleaning (generally 50% of the fees paid to the general contractor) or $17 per man-hour of labor used, whichever is greater. (*Id.* ¶ 64.) This constitutes *100% or more* of United's revenue for Booth Cleaning and is strongly suggestive that SDCC has the power and the inclination to unilaterally impose higher prices absent the presence of United. (*Id.* ¶ 64; Hekman Decl. ¶¶ 28-29, 48.)

United's costs for using SDCC's employees for Facility Cleaning are even worse: United is forced to pay SDCC a flat $17 per hour rate even though, under United's current contracts with GES and Champion, United can only charge $16.30 per man hour of labor. (Ver. Compl. ¶ 65.) The $16.30 rate is obviously a competitive one intended to capture United's costs of paying its own employees, as well as overhead costs and profit. (*Id.* ¶ 41.) United is also constrained by the estimates it provides the general contractor prior to each show. (*Id.* ¶¶ 42, 65.)[4] Further, United cannot bill for hours worked in excess of its contractual estimate; placing a premium on the efficiency of the workforce is particularly important. (*Id.*

---

[4] *See* Ex. 11 ("UNITED will provide Champion account exec with an estimate of the pre show, post show and aisle porter costs prior to the show…This estimate will be a not exceed figure. UNITED shall invoice Champion for that amount or less based on hourly cost…" at p. 177.)

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

¶ 42; Linn Decl. ¶¶ 16-18.)  United has no control over how many employees are dispatched for a show, and it cannot incentivize SDCC's workers to be more efficient. (Ver. Compl. ¶ 65; Linn Decl. ¶ 16.)  By requiring United to pay it a higher hourly rate than it can bill its customers, SDCC has ensured that United cannot operate profitably.  (Ver. Compl. ¶ 69.)

SDCC has put United between the proverbial "rock and a hard place," since SDCC knows if United ends its operations in San Diego before its contracts expire, United will breach its nationwide master contracts with Champion and GES.  (Ver. Compl. ¶¶ 66, 69.)  Breaching these nationwide contracts puts its entire national business at serious risk.  (*Id.*)  United is ultimately forced to commit financial suicide in the San Diego market to preserve its national contracts, and it has stopped seeking any new business in San Diego as a result of SDCC's actions. (*Id.* ¶¶ 33, 69; Linn Decl. ¶¶ 14-15.)

### III.  UNITED IS ENTITLED TO INJUNCTIVE RELIEF.

United is entitled to a preliminary injunction halting SDCC's improper conduct because United has: (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury if a preliminary injunction is not granted, and (3) a balance of hardships favoring United.  *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1158 (9th Cir. 2006).

The "now familiar" Ninth Circuit standard for giving weight to these factors favors a preliminary injunction here because United can show *either* (1) a probability of success on the merits and the possibility of irreparable injury, or (2) serious questions going to the merits exist and the balance of the hardships tips sharply in the United's favor.  *See also Paramount Land Co. v. Cal. Pistachio Comm'n*, 491 F.3d 1003, 1008 (9th Cir. 2007).  These prongs are not separate tests, but rather "extremes of a single continuum," *Lands Council v. McNair*, 494 F.3d 771, 775 (9th Cir. 2007) or "two points on a sliding scale." *Paramount*, 491 F.3d at 1008.  In other words, "the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be shown" by that party. *Lands Council*, 494 F.3d at 775.  Under either prong, the relevant considerations overwhelmingly favor United.

Kirby Noonan Lance & Hoge LLP

600 West Broadway, Suite 1100 San Diego, California 92101-3387

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California  92101-3387

A.    **UNDERLINED HAS A STRONG LIKELIHOOD OF SUCCEEDING ON
THE MERITS OF ITS CLAIMS.**

SDCC's outrageous conduct is actionable under at least four causes of action arising under Sections 1 and 2 of the Sherman Act: attempted monopolization, essential facilities, group boycott and exclusive dealing. 15 U.S.C. §§ 1, 2.  Although United need only establish that it is likely to succeed on the merits with respect to one of these claims, United is likely to win all of them.

1.    **United has a Strong Likelihood of Succeeding on the Merits of its Attempted Monopolization Claim.**

SDCC's actions, if not halted by this Court, have a near certainty of resulting in a monopoly in violation 15 U.S.C. § 2  because SDCC has "(1) a specific intent to monopolize a relevant market...; (2) engaged in predatory or anticompetitive conduct designed to control prices or destroy competition; (3) a dangerous probability of success, i.e. probability of achieving monopoly power in the relevant market..." *Tucker v. Apple Computer*, 493 F. Supp. 2d 1090, 1102 (N.D. Cal. 2006) *quoting Palladin Assocs. v. Mont. Power Co.,* 328 F.3d 1145 (9th Cir. 2003).

a.    **SDCC has Market Power in the Trade Show Cleaning Services Market in San Diego.**

The definition of the relevant market will determine whether or not SDCC has the power to obtain a monopoly. (Hekman Decl. ¶¶ 5-6.) Since the Trade Show Cleaning Service offered by United and SDCC is a distinct product which lacks reasonably interchangeable substitutes, and because the competition for this service is limited geographically to San Diego, and specifically to the SDCC Facility, SDCC can successfully monopolize the market for Trade Show Cleaning Services. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.1995); (Hekman Decl. ¶¶ 18-19.)

i.    **The Product Market is Trade Show Cleaning Services of the Type Offered by United and SDCC.**

1    Product market definition requires this Court to consider whether customers such as

2  Champion and GES would have substitutes available if the prices of United or SDCC were to

3  rise.  (Hekman Decl. ¶¶ 9-10.)  *See Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962)("The

4  outer boundaries of a product market are determined by the reasonable interchangeability of

5  use or cross-elasticity of demand between the product itself and the substitutes for it.").  Stated

6  differently, this Court must determine "the extent to which consumers will change their

7  consumption of one product in response to a price change in another." *Eastman Kodak Co. v.*

8  *Image Technical Servs.*, 504 U.S. 451, 469 (1992).  The price change typically used in this

9  analysis is the SSNIP test:  a Small but Significant Non-transitory Increase In Price, typically

10  defined as a 5% price increase.  (Hekman Decl. ¶¶ 9-12); *see e.g., Cal. v. Sutter Healy Sys.,*

11  130 F. Supp. 2d 1109, 1120, 1128-32 (C.D. Cal. 2001)(using 5% increase for price of hospital

12  services as threshold for determining product market substitutes).

13    Here, there is little doubt that United currently restrains SDCC's ability to impose a

14  price increase.  (Hekman Decl. ¶¶ 13, 18.)  With United unable to compete against SDCC, the

15  question is whether a 5% or greater price increase would cause customers to shift to another

16  product or other similar types of service providers.  (*Id.* ¶ 11.)  The evidence here strongly

17  indicates that no shift will occur, especially since SDCC will not let the employees of any

18  other type of cleaning service provider enter the Facility.  (*Id.* ¶ 18.)  The question of

19  alternatives is thus largely academic.

20    Two types of evidence support a product market definition limited to Trade Show

21  Cleaning Services.  The first is customer evidence. (Hekman Decl. ¶¶ 14, 17.)  Mark Epstein is

22  President of Champion, one of the largest customers of Trade Show Cleaning Services in San

23  Diego and nationwide.  Mr. Epstein explained why general janitorial cleaning contractors

24  cannot perform the required level of service, and that he would not turn to such contractors

25  even in the face of a large price increase:

26  "…I would not consider even an extremely price competitive bid from a traditional janitorial
    services firm to provide Trade Show Cleaning Services…Champion and the trade show
27  industry recognize that these are specialized services that cannot be substituted for traditional
    janitorial services."

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  (Epstein Decl. ¶ 6.)[5]

2      The other type of evidence is economic. (Hekman Decl. ¶ 6.) The issue of cross-

3  elasticity of demand is frequently best considered by credentialed economists. (*Id.*) The

4  attached affidavit of Dr. John Hekman clearly establishes in detail his expert economic

5  opinion that Trade Show Cleaning Services is a distinct product market unto itself that is not

6  interchangeable with other services. (Hekman Decl. ¶¶ 13-14.)

7      In *Eastman Kodak Co. v. Image Technical Services, supra*, the Supreme Court found a

8  market very much like the market that exists here: a market limited to sellers of maintenance and

9  repair services specific to owners of Kodak-branded copy machines. 504 U.S. at 457. The Court

10 found a history of substantial competition between Kodak and independent servicing contractors

11 to provide services to owners of Kodak machines that ended when Kodak precipitously instituted

12 a policy refusing to sell parts to independent service companies or customers who used

13 independent service companies instead of Kodak. *Id.* at 458. The Court held that the market for

14 servicing Kodak copiers was a distinct product market for purposes of a monopolization claim:

15      "If the cost of switching is high, consumers who already have purchased the
        equipment, and are thus "locked-in" will tolerate some level of service price increases
16      before changing equipment brands. Under this scenario, a seller profitably could
        maintain supracompetitive prices in the aftermarket if the switching costs were high
17      relative to the increase in service prices, and the number of locked-in customers were
        high relative to the number of new purchasers."
18

19 *Id.* at 476. The *Kodak* situation is directly analogous to the present facts, where customers

20 (trade associations and/or general contractors) have leased the SDCC Facility years in advance

21 and are thus locked-in to accepting whatever terms SDCC mandates, including paying supra-

22 competitive prices. SDCC can impose these prices without fear of customers switching to

23 another venue or city, which is the hallmark of the confines of a product market. (Hekman

24 Decl. ¶ 34.)

25

26 [5] Such customer evidence has frequently been found to be determinative of market definition.
27 *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,* 726 F.2d 1381, 1393 (9th Cir. 1984).

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

**ii.**  **The Geographic Market is the SDCC-Controlled Facility in San Diego.**

The facts also overwhelmingly support finding that San Diego, and the SDCC Facility in particular, are the relevant geographic market. (Hekman Decl. ¶¶19-27.) There is ample precedent for such a limited market definition. The Supreme Court has instructed that "the geographic market selected must…correspond to the commercial realities of the industry and be economically significant. Thus, although the geographic market in some instances may encompass the entire nation, under other circumstances it may be as small as a single metropolitan area." *Brown Shoe*, 370 U.S. at 337.

Single facilities, including single convention centers, have also been found in the past to constitute relevant markets. *See, e.g., MCM Partners, Inc. v. Andrews-Bartlett & Assoc.*, 62 F.3d 967, 975-77 (7th Cir. 1995)(finding that the lone large convention center in Chicago could be the relevant market for the sale of rental equipment to trade shows); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986)(Chicago Stadium found to be the relevant geographic market for purposes of exclusion claims concerning professional basketball); *Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1307 (5th Cir. 1971) (geographic market limited to single natural gas field).

Here, the key facts supporting a market limited to the SDCC Facility in San Diego are the long-term nature of contracts to use the SDCC Facility combined with the limited size and availability of alternatives. (Hekman Decl. ¶¶ 24-26.) The simple fact is that consumers of Trade Show Cleaning Services cannot and will not be able to turn to other facilities inside or outside of San Diego to hold their conventions, even if the price of trade show cleaning services were to rise substantially, because there are few facilities the size of the SDCC Facility, and nothing even close in size in San Diego.[6] (Ver. Compl. ¶ 9; Epstein Decl. ¶ 7;

---

[6] Customers reserve the SDCC Facility many years in advance, they cannot now easily or inexpensively switch their upcoming shows to another facility because of such a contract. (Ver. Compl. ¶¶ 12, 27; Hekman Decl. ¶¶ 26-34.) Even if the contract was not a barrier to moving cities, (footnote continued)

Kirby Noonan Lance & Hoge LLP

600 West Broadway, Suite 1100 San Diego, California 92101-3387

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1   Hekman ¶¶ 19, 24.)  The fact that Trade Show Cleaning Services is a relatively small part of

2   the overall expenditures at a trade show also makes such a shift unlikely. (Hekman Decl. ¶

3   25.)  All of these facts led Dr. Hekman to conclude that the SDCC Facility in San Diego is the

4   relevant geographic market. (*Id.* ¶ 27.)

5        **b.    SDCC has Engaged in Exclusionary Conduct which Gives it a Dangerous
              Probability of Obtaining a Monopoly of the Trade Show Cleaning Services
6             Market in San Diego.**

7        SDCC's control of the SDCC Facility is absolute absent this Court's intervention.

8   Because United's (and any other actual or prospective competitors') employees have now

9   been physically denied access to the SDCC Facility, it follows that no company can compete

10  with SDCC. [7] (Hekman Decl. ¶¶ 30-31.) This behavior squarely meets the definition of

11  exclusionary conduct: "behavior which not only impairs rivals' opportunities, but does not

12  further competition on the merits or does so in an unnecessarily restrictive way." *Tucker,* 493

13  F. Supp. at 1100 *citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 605

14  (1985)*; see also Spectrum Sports v. McQuillan,* 506 U.S. 447, 459 (1993). SDCC's "security"

15  policy makes it impossible for any competitor to offer Trade Show Cleaning Services in the

16  long-term given the artificial cost advantages SDCC has conferred upon itself.[8] SDCC's

17  conduct thus "raises[s] the costs of competitors with the purpose and effect of causing them to

18  raise their prices or reduce their output, thereby allowing the excluding firm to profit by

19  setting a supracompetitive price." S. Salop, "Exclusionary Conduct, Effect on Consumers and

20  the Flawed Profit-Sacrifice Standard," 73 Antitrust L.J. 311, 315 (2006); *see also U.S. v.*

21

22  _____

23  the limited availability of space at similar-sized facilities and the need to accept less desirable dates as
    well as the logistics of notifying exhibitors and members of such a change make a switch unlikely and
    even impossible. (Hekman Decl. ¶¶ 21-25.)

24  [7] Proof of unfair or predatory acts, such as United's precluding it's rivals and potential market entrants
25  access to the market, is sufficient to prove the necessary intent to monopolize. *Spectrum Sports,* 506
    U.S. at 459.

26  [8] SDCC is controlling the cost of labor here and it is charging United more than the hourly wages its
27  employees actually earn.  Thus SDCC can always underbid United, and earn a profit whether it wins a
    bid or United does.

28

1    *Microsoft*, 253 F.3d 34, 64 (D.D.C. Cir. 2001)(stating that raising rivals costs is evidence of

2    exclusionary conduct); *Eastman Kodak*, 504 U.S. at 468-69; (Hekman Decl. ¶¶ 36-37). [9]

3           Nor should this Court take United's word concerning the likely competitive impact of

4    SDCC's new policy. The customers have spoken loudly in opposition to the new policy, and their

5    fears concerning increasing price and declining service appear to have an empirical basis:

6     •   "By taking the decision out of our hands to select this very important -- and visible
        service -- you could be taking away our ability to negotiate competitive pricing models
7        for our client ..." (June 27, 2007 Letter from SmithBucklin Corp. to SDCC, attached as
        Ex. 12A at p.181.)

8
9     •   "While I believe we have used the SDCC cleaning services over the past years, it was
        by choice. Imposing an exclusive of any type isn't in the best interest of Nielsen or its
        customers. Nielsen manages its shows based on the specific needs and requirements of
10       customers and having this flexibility is a key ingredient to a successful show. . . . In our
        experience, exclusive services ultimately become more expensive and less service
11       oriented as it takes the competitive nature out of the business." (June 22, 2007 Letter
        from Nielsen Business Media to SDCC, attached as Ex. 12B at p. 182.)

12
13    •   "[T]here are many components that make a successful show and it is our responsibility
        to manage these components. We determine…the services provided to our
14       exhibitors. Sometimes we make these determinations based on service, sometimes
        only on price, and sometimes on both, but in any case these decisions are the right of
15       the show manager, not the facility . . . Please know that the imposition of an exclusive
        service will be in contradiction to the wishes of your customers and it typically reduces
16       service levels and takes competitive pricing options away. We have found over the
        years that the show manager's ability to choose a contractor and control price helps . . .
17       provide better service at competitive prices." (June 14, 2007 Letter from Bobit
        Business Media to SDCC, attached as Ex. 12C at p. 183.)

18    •   "While we understand the need for facility managers to generate revenue, tradeshow
        organizers and their exhibitors must retain the right to select vendors of their
19       choice. This is particularly true for large shows whose complexities demand carefully
        selected and integrated vendor partners who have a thorough understanding of each
20       show's special needs. This includes cleaning services . . . . Show organizers spend
        years cultivating relationships and advantageous pricing with their chosen
21       suppliers. In-house exclusives arbitrarily increase costs to show organizers -- and
        therefore exhibitors -- while decreasing the quality of the service provided due to lack
22       of competition." (July 20, 2007 Letter from Society of Independent Show Organizers
        to SDCC, attached as Ex. 12D at p. 184.)

23

24   ―――――――――――――――――

25   [9] The courts do not require a finding of a 100% market share to find an attempt to monopolize,
   although SDCC's attainment of a 100% share is virtually guaranteed. *See e.g. Confederated Tribes of*
26   *Siletz Indians of Or. v. Weyerhauser Co.*, 411 F.3d 1030, 1043 (9th Cir. 2005)(holding that a firm with
   a 65% market share that unfairly paid above market prices for key materials needed by its smaller
27   rivals in order to drive them from the market had a dangerous probability of monopolization and
   therefore had attempted to monopolize).

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1    •      "[O]ur clients would love to have the San Diego Convention Center competitively bid
     for the opportunity to be the official cleaning contractor. However, an exclusive

2    situation does not promote competition and service." (July 26, 2007 Letter. from
     Tradeshowlogistics to SDCC, attached as Ex. 12E at 188.)

3

4    True and correct copies of these letters are attached to Exhibit 12, Richard Simon's

5    Declaration, as Exhibits 12A to 12J. The fact SDCC could implement such a policy without

6    fear of losing business in the face of such overwhelming customer opposition is proof by itself

7    of SDCC's market power.

8         c.     **SDCC's Exclusionary Conduct is not Excused by its Sham "Security"**
                     **Policy Confabulation.**

9

10        The Supreme Court has made clear that, where a party such as SDCC has market

11   power, courts must carefully scrutinize proffered justifications such as SDCC's unspecified

12   security concerns. The Court's analysis in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*

13   is virtually a script for this Court to follow in finding SDCC's proffered justification to be a

14   sham. 472 U.S. 585 (1985). *Aspen Skiing* considered the legality of a leading ski resort's

15   termination of a joint lift ticket it had sold for many years with two of its competitors. The

16   effect of this termination was to destroy the plaintiff's share of the market. *Id.* at 608. The

17   Court held that it was the burden of the defendant to "persuade the jury that its conduct was

18   justified by any normal business purpose" and that it had failed to do so. *Id.* The Court

19   specifically rejected the defendant's claim that its termination was justified because the joint

20   tickets' "usage could not be properly monitored" and the coupons "were administratively

21   cumbersome" because the evidence established that "[c]oupons . . . were no more burdensome

22   than the credit cards accepted at [defendant's] ticket windows." *Id.* at 609.

23        Similarly, in *Kodak*, the Court gave short shrift to Kodak's proffered justifications,

24   including a concern that customers would blame Kodak for equipment breakdowns that were

25   really a result of allegedly inferior service performed by non-Kodak service companies.

26   *Kodak*, 504 U.SS. at 582-85. The Court questioned Kodak's claim because "Kodak

27   simultaneously claims that its customers are sophisticated enough to make complex and subtle

28   lifecycle pricing decisions, and yet too obtuse to distinguish which breakdowns are due to bad

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  equipment and which are due to bad service. Kodak has failed to offer any reason why

2  informational sophistication should be present in one circumstance and not the other." *Id.* at

3  484. SDCC's justifications wilt under a similar level of scrutiny.

4      SDCC's prior efforts to impose a similar policy for economic reasons, and the timing

5  of this new policy coming so soon after it made a push to acquire its lone rivals' customers via

6  competition, are stark evidence that SDCC's purpose is to exclude competition and that its

7  proffered business justification is a sham. *Aspen*, 472 U.S. at 610-11; *Eastman Kodak*, 504

8  U.S. at 483.

9      The pretextual nature of SDCC's policy is illustrated by its discriminatory application.

10  The "security" policy is exclusively applied to Trade Show Cleaning Service labor which is

11  roughly only 3% of the outside labor force required to service a trade show at the SDCC

12  Facility. (Ver. Compl. ¶ 3; Linn Decl. ¶ 4; Callaghan Decl. ¶ 8.) Further, United has not had a

13  single security issue at the SDCC Facility in the nearly 20 years it has worked there. (Ver.

14  Compl. ¶ 56; Linn Decl. ¶ 11.) Discriminatorily applying this policy to SDCC's lone rival for

15  Trade Show Cleaning Services (despite the clear concerns raised by other vendors) will do

16  nothing for security at the SDCC Facility (Callaghan Decl. ¶ 6; Epstein Decl. ¶¶ 15-16) but it

17  will, not coincidentally, give SDCC the monopoly it has been seeking for so long. (Hekman

18  Decl. ¶¶ 27, 30.)

19      Even if this Court were to give limited legitimacy to SDCC's concerns, SDCC's policy

20  is still condemnable due to its failure to "[impair] competition in the least restrictive way."

21  *Aspen Skiing*, 472 U.S. at 605; *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 51 (9th Cir.

22  1971)("Restraint of trade can be justified only in the absence of less restrictive alternatives");

23  *L.A. Coliseum*, 726 F.2d at 1395-96. Less restrictive alternatives, such as security screening of

24  United's employees, are not only available to SDCC, they have been offered to be

25  implemented by and at United's expense. (Ver. Comp. ¶ ¶57-58.) This is again like *Aspen*

26  *Skiing*, where the defendant failed to explain or justify why it rejected the plaintiff's "offer to

27  hire, at its own expense, a reputable national accounting firm to audit usage of the joint lift

28  ticket." *Aspen Skiing,* 472 U.S. at 609.

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

**2.     United has a Strong Likelihood of Succeeding on the Merits of its Essential Facilities Claim.**

SDCC's "security" policy also runs afoul of the essential facilities doctrine,[10] which "imposes liability when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service the second firm must obtain to compete with the first." *Ala. Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 542 (9th Cir. 1992). Stated differently "a business…which controls a scarce facility has an obligation to give competitors reasonable access to it." *Byers v. Bluff City News Co.*, 609 F.2d 843, 846 (6th Cir. 1980). *See also, Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 992 (D.C. Cir. 1977)("[T]hose in possession of [essential facilities] must allow them to be shared on fair terms. It is an illegal restraint of trade to foreclose the scarce facility"). Notably, single buildings or facilities have been deemed essential facilities.[11] *See e.g., Fishman,* 807 F.2d at 532 (finding Chicago Stadium essential because it was "the only stadium in the Chicago metropolitan area during the relevant time period which suitable for exhibition of professional basketball"); *Hecht,* 570 F.2d at 989 (applying the doctrine to football stadium).

The main question to be answered is whether "control of the facility carries with it the power to eliminate competition." *City of Anaheim v. S. Cal. Edison Co.,* 955 F.2d 1373, 1380 n. 5 (9th Cir. 1992). By exercising its power to exclude independent Trade Show Cleaning Service employees, SDCC has eliminated Trade Show Cleaning Service competition. (Hekman Decl. ¶¶

---

[10] In the Ninth Circuit, United must prove the following in order to show that SDCC has violated the essential facilities doctrine: (1) SDCC is a monopolist or attempted monopolist with control over a facility that is essential; (2) United and/or other competitors are unable to practicably or reasonably duplicate the facility; (3) United has been denied access to the SDCC Facility by SDCC; (4) providing access to the SDCC Facility was previously feasible. *City of Anaheim v. S. Cal. Edison Co.,* 955 F.2d 1373, 1380 (9th Cir. 1992). In this case, all of these elements are beyond dispute.

[11] The essential facilities doctrine has been applied to a wide variety of other facilities. *See e.g., U.S. v. Terminal R.R. Ass'n,* 224 U.S. 383, 392-94, 32 S.Ct. 507, 56 L.Ed. 810 (1912) (railroads); *MCI Communications Corp. v. AT&T,* 708 F.2d 1081, 1093 (7 Cir.1983) (telecommunications networks); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509, 1521 (10th Cir.1984), *aff'd on other grounds,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (multi area lift ticket for ski mountains); *Ottertail Power Co. v. U.S.,* 410 U.S. 366, 35 L.Ed.2d 359 (1973) (electric utility).

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  30-34.)  United has lost 47 of its 51 employees (Ver. Compl. ¶ 26; Linn Decl. ¶ 12.), it is not

2  competing for new business (Ver. Compl. ¶ 33; Linn Decl. ¶¶ 14-15), and it is servicing its

3  existing contracts at a loss (Ver. Compl. ¶¶ 43, 65.)  SDCC's terms simply preclude any

4  possibility that United could offer lower prices than SDCC in the future.  (*Id.*)  This squarely

5  meets the definition of an essential facility which is found to exist "where denial of its use inflicts

6  a severe handicap on potential market entrants."[12] *Hecht*, 570 F.2d at 993; *compare Fishman*, 807

7  F.2d at 540("lack of access to Chicago Stadium inflicted severe handicap").  United has been so

8  severely handicapped by SDCC that it has been effectively confined to a wheel chair and SDCC

9  has even taken away the wheels.[13]

10      **3.    United has a Strong Likelihood of Succeeding on the Merits of its Group
        Boycott Claim.**

11

12      SDCC's actions barring United's employees are also illegal because SDCC forced

13  general contractors and trade associations to agree to exclude United employees as a condition

14  for using the SDCC Facility.[14]  The agreement between SDCC and the trade associations and

15  their general contractors constitutes a group boycott which is a violation of Section 1 of the

16  Sherman Act.  15 U.S.C. § 1.  The elements of a violation of Section 1 of the Sherman Act are

17  (1) the existence of a contract among two or more entities that (2) unreasonably restrains trade

18  _____

19  [12] A severe handicap would not exist if the SDCC Facility can be reasonably duplicated because "a
     facility will not be deemed essential if equivalent facilities exist…" *Apt. Source of Phila. v. Phila.*

20  *Newspapers,* 1998 WL 191649 at *7 (Civ. A. No. 98-5472).  However, the SDCC Facility cannot be
     duplicated. (*See supra* at p. 3).

21

     [13] Finally, it is clearly feasible to provide access to United's employees while continuing to ensure

22  Facility security.  Until recently, providing competitors, like United, access to the SDCC Facility had
     always been the case. (Ver. Compl. ¶ 14.)  As has already been exhaustively established, SDCC's

23  policy not only fails to ensure security because it singles out Trade Show Cleaning Service employees
     for exclusion while allowing access to thousands of others (*see supra* at p. 6); its objectives can be

24  achieved by screening United's employees as condition to enter the Facility.  (Ver. Compl. ¶ 57.)

25  [14] The SDCC's license agreement requires licensee trade associations to "comply with [SDCC]'s
     Policies, Rules and Regulations . . . ."  (SDCC Convention and Trade Show License at p. 198,

26  attached as Ex. 13)  The SDCC's General Policies, Rules and Regulations now state that "only SDCC
     employees are permitted to provide event cleaning within the center." (Attached as Ex. 14 at p. 205.)

27  Licensees thus have to agree not to use United's employees in order to use the SDCC Facility.

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

and (3) causes antitrust injury. *See e.g. Hahn v. Ore. Physicians' Serv.,* 868 F.2d 1022, 1025 (9th Cir. 1988).

The first element requires an agreement among two or more actors, a fact undeniably present here.[15] All of the other characteristics of a facially illegal group boycott are present here as well. A group boycott expressly violates Section 1 where access is denied to "a supply, facility, or market necessary to enable the boycotted firm to compete…and frequently the boycotting firms possessed a dominant position in the relevant market." *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,* 472 U.S. 284, 294 (1985); *see also, Big Bear Lodging Ass'n, v. Snow Summit, Inc.,* 182 F.3d 1096, 1103 (9th Cir. 1999). The SDCC and its unwilling co-conspirators have a dominant share of the trade show market in San Diego and the boycott has disadvantaged United and all other Trade Show Cleaning Services competitors by directly coercing their customers (the trade associations and general contractors) to agree not to use their employees. (Ver. Compl. 50; Epstein Decl. 12)

### 4. United has a Strong Likelihood of Succeeding on the Merits of its Exclusive Dealing Claim.

SDCC has forced trade association's and their general contractors to agree to exclusively use SDCC's employees to provide Trade Show Cleaning Services at the SDCC Facility. This agreement is permanent and constitutes an illegal exclusive dealing arrangement that unreasonably restrains trade in violation of Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2.

An exclusive agreement is illegal where "the [agreement] will foreclose competition in a substantial share of the line of commerce affected." *Tampa Electric Co. v. Nashville Coal*

---

[15] The fact that the trade associations and general contractors have been unwillingly coerced to enter into this agreement is irrelevant because "the 'combination or conspiracy element of Section 1 is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *MCM Partners, Inc. v. Andrews-Bartlett & Assoc.,* 62 F.3d 967 (7th Cir. 1995)(*see also Fineman v. Armstrong World Indus., Inc.,* 980 F.3d 171 (3d Cir. 1992)(group to boycott covers involuntary as well as voluntary agreements).

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1   *Co.*, 365 U.S. 320, 327 (1961). The matter of market definition has already been well

2   established (supra at pp. 9-13), as has SDCC's market power (*supra* at pp. 13-15). And, the

3   foreclosure of competition here is not only substantial – it is total.[16] (*See supra* at pp. 13-15);

4   *see, e.g., Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 392-95 (7th Cir. 1984)(

5   exclusive dealing agreement illegal where agreement excludes "significant competitor of the

6   defendant from doing business in a relevant market").

7           There is ample precedent in the Ninth Circuit for classifying SDCC's contractual

8   arrangement as an illegal exclusive dealing arrangement. In *Twin City Sportsservice, Inc. v.*

9   *Charley O. Finley & Co.,* 676 F.2d 1291 (9th Cir. 1982) the Court noted the anti-competitive

10  effects of a food vendor's long-term concession contracts: "[t]he magnitude of Sportservice's

11  concession franchise contracts, coupled with their considerable length…have locked up a large

12  portion of the concession franchise market for many years, placing a significant amount of

13  potential concession business beyond the grasp of any competitors." *Twin City Sportsservice,*

14  676 F.2d at 1304. United's permanent and irrevocable policy has similarly completely locked

15  up the Trade Show Cleaning Services market and placed it out of the grasp of its competitors,

16  including United. S*ee also Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1449 (9th Cir.

17  1988)(exclusive dealing agreement to provide all anesthesia services at a single hospital was

18  illegal where it foreclosed competition and eliminated price competition).

19  **B.      UNITED WILL SUFFER IRREPARABLE INJURY IF THIS COURT
            DOES NOT ISSUE A PRELIMINARY INJUNCTION.**

20

21          An injury is irreparable if "it cannot be addressed by a legal or equitable remedy

22  following trial." *Iconix, Inc., v. Tokuda*, 457 F. Supp. 2d 969, 975 (N.D. Cal. 2006), quoting

23  _____

24  [16] In fact, an exclusive dealing claim requires far less market power than does a monopolization claim.
    When determining the anticompetitive effects of a restraint, a court doesn't need to reach the

25  conclusion that "there is total foreclosure, but…whether the challenged practices bar a substantial
    number of rivals…severely restrict the markets ambit." *U.S. v. Dentsply Int'l, Inc.,* 399 F.3d 181, 191

26  (3d Cir. 2005)(holding that an exclusive dealing policy created by a company with market power

27  could violate Section 2 even when the agreement was terminable at will).

28

*Left margin:* Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  *Optinrealbig.com v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004); *see also*

2  13 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 65.22[1][b] (3d ed. 2007).

3  United's injury falls squarely within this definition.  Even if it did not, under the Ninth

4  Circuit's "sliding scale," United has a strong likelihood of succeeding on the merits of its

5  claims against SDCC, and, therefore, the burden it must carry with respect to showing the

6  possibility of irreparable injury is lower.  *See Lands Council*, 494 F.3d at 775; *Paramount*, 491

7  F.3d at 1008.

8         **1.**    **SDCC Claims That United's Prayers for Monetary Relief are Barred by the Local Government Antitrust Act and State Sovereign Immunity.**

9

10        SDCC has claimed sovereign immunity to damages at law in response to state court

11  lawsuits brought by United and by Weaver South Pacific Publications.[17]  SDCC explicitly

12  claims that, "[a]s a public entity, SDCC is statutorily immune from liability for state law

13  claims." (SDCC's Mem. of P. & A. in Opp'n to United's Mot. for a TRO at 214, attached

14  hereto as Ex. 15.)[18]   United thus has every expectation that SDCC will assert that it is

15  similarly immune to United's claims for monetary relief under its antitrust claims as a result of

16  the federal Local Government Antitrust Act, 15 U.S.C. § 35(a), which permits only injunctive

17

18

19  _____

20  [17] United does not concede in any way that SDCC is, in fact, immune from United's claims.  Only further discovery will determine whether SDCC, a public benefit corporation, has the characteristics

21  that qualify for immunity.  The mere possibility United will be unable to recover satisfies the irreparable injury requirement, as it constitutes the "*possibility* of irreparable harm." *Earth Island*,

22  442 F.3d at 1158-59 (admonishing the district court for requiring the plaintiff in that case to demonstrate a "significant threat of irreparable injury") (emphasis in original); *see also Glendale*

23  *Neighborhood Ass'n v. Greensboro Hous. Auth.*, 901 F. Supp. 996, 1001-02 (M.D.N.C. 1995) (finding irreparable injury where "[s]overeign immunity appears to be a *substantial* obstacle to [obtaining

24  monetary damages]") (emphasis added).

25  [18] In those proceedings, SDCC has taken the position that government immunity bars United's state law cause of action (Ex. 15 at pp. 214-17.)  SDCC has also asserted that defense in other litigation as

26  well.  (*See* Defendant's Mem. of P. & A. in Opp'n to Pl.'s Req. for Issuance of Prelim. Inj., *Weaver*

27  *South Pacific Publications, Inc. v. San Diego Convention Center Corp., Inc.*, Case No. 37-2007-71586-CU-BC-CTL, at pp. 244, attached as Ex. 16.)

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1   actions against certain types of local governmental entities.[19]   This is, thus, not the typical

2   circumstance where alleged lost revenues "would be compensable by a damage award should

3   [the defendant] ultimately prevail on the merits," since SDCC asserts that no damages award

4   is possible. *L.A. Mem'l Coliseum v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir.

5   1980).[20]   SDCC cannot claim that it is immune to damages while, at the same time, claiming

6   that United's monetary losses are not irreparable because it has adequate remedies at law.

7          Indeed, it is well established that monetary losses are an irreparable injury if damages are

8   unavailable because of governmental immunity.[21]   The possible unavailability of damages under

9   the LGAA has specifically been found to make monetary injuries irreparable:

> [The developer] incurs substantial monetary loss with each day it is delayed in
> obtaining a [state] permit. In light of the [LGAA], [the developer] can not recover
> damages from the county defendants. Hence, any money damages cannot be regained.

---

[19] Under the LGAA, "[n]o damages . . . may be recovered under [the pertinent provisions of the Clayton Act] from any local government . . ." 15 U.S.C. § 35(a).  Plaintiffs can only pursue declaratory and injunctive relief against defendants who fall within the protection of the Act. *See, e.g.*, *Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 95 (2d Cir. 1986) (LGAA does not apply to claims for injunctive relief).

[20] Nothing argued herein establishes SDCC's status as a Public Agency as that term is used in California Government Code Section 53050 *et seq.* because SDCC has never registered as a public agency on the Roster of Public Agencies with the California Secretary of State. [Attached hereto as Exhibit 17 is a true and correct copy of a certificate dated November 8, 2007, issued by the California Secretary of State establishing that the SDCC is not registered on the California Roster of Public Agencies].  Thus, whether or not SDCC qualifies for sovereign immunity or Local Government antitrust immunity, SDCC may not assert the failure of United to comply with the notice requirement Tort Claims Act as a defense to any of the claims asserted in the Complaint. Cal. Govt. Code § 53051; *Wilson v. S.F. Redev. Agency*, 19 Cal.3d 555, 560-62 (1977).

[21] *See, e.g.*, *Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994) ("Because the Eleventh Amendment bars a legal remedy in damages . . . the court held that plaintiffs' injury was irreparable.  We agree."); *Temple Univ. v. White*, 941 F.2d 201, 215 (3d Cir. 1991) ("[T]he Eleventh Amendment bar to an award of retroactive damages against the [defendant], clearly establishes that any legal remedy is unavailable . . . .") (citation omitted); *Wisconsin v. Stockbridge-Munsee Cmty.*, 67 F. Supp. 2d 990, 1019-20 (E.D. Wis. 1999) (irreparable injury where tribal immunity barred damages claim against Native American tribe); *Serono Labs., Inc. v. Shalala*, 974 F. Supp. 29, 35-36 (D.D.C. 1997) (irreparable injury where "any loss by [the plaintiff] is not recoverable due to governmental immunity"), *vacated on other grounds*, 158 F.3d 1313 (D.C. Cir. 1998); *Woerner v. U.S. Small Bus. Admin.*, 739 F. Supp. 641, 650 (D.D.C. 1990) ("[The plaintiffs] claim, persuasively, irreparable injury because the government is immune from damage suits . . . .").

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  *Pine Ridge Recycling, Inc. v. Butts County, Ga.*, 864 F. Supp. 1338, 1342 (M.D. Ga. 1994).

2  As in *Pine Ridge*, SDCC's asserted lack of an adequate remedy at law renders United's injury

3  irreparable.

4      **2.**    **The Atrophy of United's Workforce Threatens its Ability to Reestablish**

5              **Itself as a Competitor When it Ultimately Prevails on the Merits.**

6        In addition to the possibility of being unable to obtain compensation for its monetary

7  losses from SDCC, United faces the further, more devastating, prospect of forever losing its

8  San Diego market share if this Court declines to grant the requested preliminary injunctive

9  relief. This outcome would be irreparably harmful not just to United, *see Am. Passage Media*

10  *Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("The threat of

11  being driven out of business is sufficient to establish irreparable harm."), but also to

12  consumers of trade show cleaning services who rely on the competitive process to maintain

13  fair prices and quality service, *see Foremost Int'l Tours, Inc. v. Qantas Airways, Ltd.*, 379 F.

14  Supp. 88, 97 (D.C. Haw. 1974) ("Courts should be particularly concerned with threats to the

15  existence of a moving party's business in the area of antitrust. An award of only money

16  damages in lieu of preserving a competitor disserves the public interest."), *aff'd*, 525 F.2d 281

17  (9th Cir. 1975).

18        Because SDCC's "security" policy requires United to utilize SDCC employees to service

19  its contracts, United's highly trained and efficient workforce has not been working and is not

20  being paid. (Ver. Compl. ¶ 26; Linn Decl. ¶ 12.) These loyal, long-term, employees had have

21  little choice but to seek other employment. (Ver. Compl. ¶ 26; Linn Decl. ¶ 12.) United has

22  already lost 47 of its 51 employees and the more time that passes, the more difficult it will be for

23  United to get them back (Ver. Compl. ¶ 26; Linn Decl. ¶ 12.) United will go out of business in

24  San Diego without these employees, (Ver. Compl. ¶ 26; Linn Decl. ¶ 13.) which clearly qualifies

25  as an irreparable injury. *See Warren v. City of Athens, Ohio*, 411 F.3d 697, 711 (6th Cir. 2005)

26  ("financial ruin" of business qualifies as irreparable harm); *Roso-Lino Beverage Distribs, Inc. v.*

27  *Coca-Cola Bottling Co. of N.Y.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (irreparable harm from loss

28

*Kirby Noonan Lance & Hoge LLP*
*600 West Broadway, Suite 1100 San Diego, California 92101-3387*

of "ongoing business representing many years of effort and the livelihood of its husband and wife owners").

## C.   THE BALANCE OF THE HARDSHIPS TIPS SHARPLY IN UNITED'S FAVOR.

A further equitable consideration is whether the balance of hardships tips sharply in the plaintiff's favor. *See, e.g., Earth Island*, 442 F.3d at 1177; *Bernhardt v. L.A. County*, 339 F.3d 920, 930-31 (9th Cir. 2003). Generally, a preliminary injunction is warranted if the harm to the party seeking the injunction is greater than the harm to the party against whom the injunction is being sought. *See, e.g., Southeast Ala. Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100-01 (9th Cir. 2006) (balance of hardships favored movant conservation group in action seeking to enjoin construction of a dam where construction did not have to begin immediately); *Nike, Inc. v. McCarthy*, 379. F.3d 576, 587 (9th Cir. 2004) (balance of hardships favored movant in non-compete action where injunction would not pose significant hardship for former employee).

Here, because the balance of hardships tips sharply in United's favor, United is entitled to a preliminary injunction. SDCC will suffer no negative consequences if it is enjoined from implementing its "security" policy against United.[22] Conversely, if SDCC is *not* enjoined from doing so, United will suffer overwhelming hardship, as discussed above. (*See supra* at pp. 21-24.)

---

[22] For the past 19 years, United has not been involved in a single security-related incident at the SDCC Facility. (Ver. Compl. ¶ 56.) In addition, while the limited applicability of the "security" policy belies its necessity (*Id.* ¶ 50), United has repeatedly offered to subject its employees to the background checks and other precautions that SDCC has mandated in furtherance of the policy (*Id.* ¶ 57.) Thus, to the extent there is, in fact, a legitimate security risk that needs to be addressed, United has indicated its willingness and capability to address that risk in the precise manner proposed by SDCC.

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

## IV. CONCLUSION

In light of the foregoing, United respectfully requests that this Court grant its request for preliminary injunctive relief.

DATED:

By:  /s/Jacob M. Slania
Attorneys for Plaintiff
UNITED NATIONAL MAINTENANCE, INC.

James R. Lance (147173)
Jacob M. Slania (200652)
Dylan O. Malagrino (228052)
**KIRBY NOONAN LANCE & HOGE LLP**
600 West Broadway, Suite 1100
San Diego, California  92101-3387
Tel: (619) 231-8666
Fax: (619) 231-9593

Jeffrey A. Leon [PRO HAC VICE PENDING]
Kristopher J. Stark [PRO HAC VICE PENDING]
**UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
Chicago, IL 60602-4224
Tel: (312) 977-4400
Fax: (312) 977-4405

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387