# Exhibit 5

Aug-03-2007 01:09 PM GES Exposition Services 0                          1/3

1  James R. Lance (147173)
   jlance@knlh.com
2  Jacob M. Slania (200652)
   jslania@knlh.com
3  Jason M. Kirby (213370)
   jkirby@knlh.com
4  KIRBY NOONAN LANCE & HOGE LLP
   600 West Broadway, Suite 1100
5  San Diego, California 92101-3387
   Telephone (619) 231-8666
6  Facsimile (619) 231-9593

7  Attorneys for Plaintiff

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                    FOR THE COUNTY OF SAN DIEGO

11

12  UNITED NATIONAL MAINTENANCE,           CASE NO. 37-2007-00072054-CU-BT-CTL
    INC., a Nevada Corporation,
13                                         DECLARATION OF THOMAS W.
             Plaintiff,                    ROBBINS IN SUPPORT OF PLAINTIFF'S
14                                         APPLICATION FOR A TEMPORARY
         vs.                               RESTRAINING ORDER AND ORDER TO
15                                         SHOW CAUSE RE: PRELIMINARY
    SAN DIEGO CONVENTION CENTER            INJUNCTION
16  CORPORATION, INC., a California
    corporation; and DOES 1-20, inclusive, DATE:    August 6, 2007
17                                         TIME:    8:15 a.m.
             Defendant.                    DEPT.    C-71
18                                         JUDGE: The Hon. Ronald S. Prager
                                           Action Filed: July 30, 2007
19

20         I, Thomas W. Robbins, declare as follows:

21         1.    I am the Vice President and General Manager – California Region for GES

22  Exposition Services, Inc. ("GES"), and I am authorized to make this declaration on GES' behalf. I

23  make this declaration in connection with UNITED NATIONAL MAINTENANCE, INC.'s

24  ("UNITED NATIONAL") application for a temporary restraining order and order to show cause

25  regarding a preliminary injunction. All facts stated herein are true of my own personal

26  knowledge, and if called as a witness I could and would testify competently thereto.

27  ///

28
    KNLHW70342.1                           -1-
                          DECLARATION OF TOM ROBBINS

2.       I am responsible for the California operations of GES, including the San Diego operations.

3.       GES has a long established business relationship with UNITED NATIONAL, whereby UNITED NATIONAL performs the booth cleaning, janitorial, and related services ("Booth Cleaning Services") at trade shows held nationwide, including those trade shows held at the San Diego Convention Center (hereinafter referred to as "Convention Facility") for which GES is the general contractor or otherwise responsible for the Booth Cleaning Services.

4.       GES has historically had the right to choose the company it wants to perform the Booth Cleaning Services for trade shows held at the Convention Facility for which GES acts as the general contactor.

5.       Attached to this Declaration as Exhibit A is a true and correct copy of a letter, dated May 18, 2007, received by GES from San Diego Convention Center Corporation, Inc. (hereinafter referred to as "SDCC") (and such letter's attachment) concerning Booth Cleaning Services for trade shows at the Convention Facility.

6.       On or about November 2006, I attended a lunch with Brad Gessner, General Manager of SDCC. Also present at the lunch was Larry Colby, a GES representative, and Robert D'Onofrio, an SDCC employee. During the lunch Mr. Gessner distributed written materials and told us that SDCC was soliciting GES' San Diego business for Booth Cleaning Services. During the first quarter of 2007, I responded to SDCC and told SDCC that GES would honor its written contract with UNITED NATIONAL for the Booth Cleaning Services to be performed at the Convention Facility, and that GES would not enter into a contract for Booth Cleaning Services with SDCC at that time.

///
///
///
///
///
///

KNLKW70342.1

-2-

DECLARATION OF TOM ROHUNS

Kirby No oman Lance & Hoge LLP
600 West Broadway, Suite 1300 S
an Diego, California 92101    -3367



7.    UNITED NATIONAL has performed the Booth Cleaning Services for GES for trade shows at the Convention Facility in a good, proper, timely, efficient, and workmanlike manner.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration is executed at _Cypress_____, California, on this _3_ day of August 2007.

Thomas W. Robbins

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 • San Diego, California 92101 • -3587

KNLH\703542.1

-4-

DECLARATION OF TOM ROBBINS

5

# Exhibit 6



**San Diego**
**Convention Center**
**Corporation**

*WWW.VISITSANDIEGO.COM*
111 WEST HARBOR DRIVE, SAN DIEGO, CA 92101
PHONE 619.525.5000 · FAX 619.525.5005

May 18, 2007

Mr. Ron Brown
Champion Exposition Services, Inc.
10215 South Painter Avenue
Santa Fe Springs, CA 90670

Dear Ron,

This letter is formal notification that effective July 1, 2007, the San Diego Convention Center Corporation (SDCCC) will institute a new cleaning services policy and program for events held in the Convention Center.

The program offers two (2) options for service contractors.  SDCCC staff will perform all cleaning for events. The first option allows a service contractor to participate by administering cleaning services for an event. This includes processing the event orders and collecting payments. In return, the contractor will receive an equal share of the certain revenue generated. A sample of the contract that will be required is attached for your review. Alternatively, if you choose not to participate, SDCCC will administer all facets of the cleaning program and retain all revenue.

We considered many factors before deciding to implement this program.  Security concerns related to ensuring that the staff are properly screened, credentialed and trained, and consistency of cleaning quality were the main factors that led to this decision. It is important to note that SDCCC performs criminal background checks and requires a drug test for every potential new hire, in addition to providing extensive training and supervision of its employees. This produces an excellent staff providing exemplary services.

Additionally, on July 1, 2007 the City of San Diego's "Living Wage Ordinance" goes into effect requiring employers providing services within the Convention Center to

6

84

Mr. Ron Brown
May 18, 2007
Page 2

pay a minimum wage of $10.34 per hour plus, in the absence of health coverage, an additional $2.07 per hour health benefit payment. SDCCC is required to ensure and enforce compliance with this law.

Ron, please feel free to call me at (619)525-5429 if you have any questions.

Sincerely,

Brad Gessner
General Manager

cc:    Carol Wallace, President & CEO

TOTAL P.09

6

# Exhibit 7

## DECLARATION OF WILLIAM CALLAGHAN

I, William Callaghan, declare and would testify under oath as follows:

1.    I am the President of Century Security ("Century") and am responsible for the day to day management of over 400 security guards that provide security to trade shows and conventions nationwide, including Las Vegas and Orlando.  All facts stated herein are true and are of my own personal knowledge.

2.    I was a member of the Chicago Police Department for 33 years, finishing my career as Commander of Intelligence and was primarily responsible for terrorism and related security issues.  I have lead joint-security details with the FBI and Secret Service, overseeing security at events in Chicago such as the World Cup in 1994 and the Democratic Convention in 1996 and was the Commander of Intelligence for the FBI and Chicago Police Department's joint Terrorism Task Force.  On several occasions, I have received training at the FBI academy in Quantico, Virginia.

3.    I also have more than 20 years of experience with crowd control and event security at sporting events and trade shows.  Throughout the 1980s and 1990s, I ran event security at Comiskey Park for the Chicago White Sox and at the Chicago Stadium and United Center for the Chicago Bulls and Blackhawks and supervised security for trade shows and conventions at McCormick Place.

4.    After leaving the Chicago Police Department in 1998, I started working for Century.  Century provides security to conventions and trade shows at various venues including the Orange County Convention Center in Orlando and the Las Vegas Convention Center, two of the largest convention centers in the United States.  I am as familiar as anyone with the security vulnerabilities facing convention centers and the

1

security methods used to limit these vulnerabilities. I am a recognized security expert in the trade show industry. Attached as Exhibit A is a copy of my resume.

5.    I have been informed that the San Diego Convention Center Corporation ("SDCC") has adopted a policy barring outside cleaning labor from the San Diego Convention Center ("SDCC Facility") and that it has given security concerns as the reason for the policy. In addition, I have reviewed the affidavit of Carol Wallace, Chief Executive and President of the SDCC, and read her security justification for barring cleaning labor from the SDCC Facility. The part that caught my interest was where Ms. Wallace states

> "Our assessment of areas of vulnerability indicated the use of outside cleaning crews should be eliminated. Consequently, the determination was made to adopt and implement a policy that required use of [SDCC] staff for all cleaning in the building. This policy…does require that the actual cleaning work be performed by persons who have gone through [SDCC's] employment process, which includes considerable vetting and background checks, and extensive training after being hired. This provides a substantially increased level of safety and security in the [SDCC Facility] than previously existed."

(Wallace Decl. ¶ 7)

6.    As a trade show and crowd control security expert, I can say that the policy implemented by SDCC, which is limited to cleaning personnel, makes absolutely no sense. Employment by the SDCC does nothing to improve security. What ensures better security is following universal security protocols, meaning that if inside and outside employees are all subject to the same screening procedures, security risks will be minimized.

7.    In my experience, cleaning crews pose a low security risk compared to other laborers. Cleaning contractors typically have a greater degree of knowledge and control over their staff than other providers of labor. This is due to the fact that the

7

2

87

majority of the workforce that services the various other trades for these shows are typically temporary employees that come off of call lists at union halls. From show to show or even day to day there is a high amount of turnover for the hundreds and sometimes thousands of employees that come off of these call lists for general labor, freight hauling, rigging and even electrical work. The show manager, general contractor and convention center have no idea who these people are let alone what their background is and whether or not they pose a security risk. Cleaning crews are much different because they are smaller and, day in and day out, are typically made up of and managed by the same groups of people. In my experience, cleaning employees present one of the lowest levels of security concerns walking the convention center floor.

8.    Cleaning is very small part of the total workforce needed to put on a trade show. In my experience, cleaning makes up less than 5% of this workforce. Only providing background checks and other security protocols on such a small percentage of the overall workforce makes no contribution to event security whatsoever. As a security professional, I recognize that a security protocol must be applied universally to everyone or it is useless.

9.    While Ms. Wallace sees cleaning crews, such as those of United National Maintenance, Inc. ("United"), as a security concern because "[SDCC] has no direct relationship, and consequently, minimal knowledge or control over their activities or operations in [SDCC Facility]"; she appears to be completely comfortable giving all other employees, including those of her preferred vendors, complete access to the SDCC Facility. (Wallace Decl. ¶ 5.) Preferred vendor relationships are common throughout convention centers in the United States. This direct contractual relationship is purely

7

3

economic and is not related to security oversight. I am not aware of any security related requirements needed to obtain this preferred status that would enhance security at the SDCC Facility.

10.     What I don't see in her affidavit is a requirement to provide background checks on anyone else's employees, preferred or not. I believe this is because SDCC does not require that employees of other trades be given background checks as a requirement to enter the SDCC Facility. SDCC does claim that providing background checks to SDCC employees is a reason for barring outside cleaning crews from the SDCC Facility. It would be very easy to conduct background checks on the employees of outside cleaning crews. I have reviewed the application packet that United requires all of its employees to fill out as a condition of employment. United's application provides more than enough information to run the most comprehensive of background checks.

11.     There are lots of ways that you can more effectively minimize security risks that don't require locking out outside laborers. I understand that United offered to conduct background checks on its own employees and to match any other security protocols instituted by the SDCC. This would be more than satisfactory in my opinion.

12.     I have also been made aware that even though SDCC lacks a badging program requiring picture identification, United badges its employees anyway. United badges all of its employees working at the SDCC Facility with computer generated photo identification, identifying them as an employee of United. This type of badging is an important tool used to minimize security risks. Badging of all workers is a prevalent security protocol that has been instituted at many convention centers, like Orlando's Orange County Convention Center and the Las Vegas Convention Center. Unlike these

7

4

two facilities, there is no requirement at the SDCC Facility for the show manager or SDCC Facility itself to issue computer generated photo IDs to employees given access to the Facility. If the SDCC really wanted to address security, it would be simple to implement a similar badging policy and apply it to **all** employees that are given access to the Facility. In my opinion, if United employees are badged and background checked, they would pose a very low security risk and would certainly not pose any more of a security risk than badged and background checked employees of the SDCC.

13.    The fact that United badges its employees, to me, makes them less of a security risk than the many other laborers allowed to wander the SDCC Facility. If all laborers given access to the SDCC Facility are required to have background checks and follow badging protocols, I would be comfortable knowing those employees were working a show where I was running security.

Pursuant to 17 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___11/12/07___
                      Date

                                                William M Callaghan
                                        _____
                                                William Callaghan

5

7

90

**Exhibit 7-A**

**Commander William M. Callaghan (Ret.)**
**Chicago Police Department**

| | |
|---|---|
| **1998-Present** | Upon retiring from the Chicago Police Department I joined the security firm of SOA Security and Consultants of Las Vegas, Nevada.  In June of 2001, I was asked to manage the Century Security firm in Orlando, Florida.  This firm managed most of the trade show at the Orlando Convention Center.  In April of 2002 I was named President of Century Security and re-named the company, SOA of Florida, Inc.  Presently Employment over 400 security guards.  Responsible for the day to day Operation of a multi-million dollar business. |
| **1965-1998** | I joined the Chicago Police Department in 1965 and rose through the ranks as a Sergeant, Leiutentent, Captain and Commander. During my 33 years of service I was involved in the following assignments.  As a patrolmen I was assigned general duties, such as taking reports, directing traffic, responding to calls, arresting offenders and testifying in court.  In 1976, I was promoted to Sergeant and assigned to a tactical unit working on crime patterns and other specific crime suppressing assignments.  In 1981, I was promoted to Lieutenant and assigned to various tactical units, gang crimes, narcotics and watch commander.  In 1989, I was promoted to Commander in the Detective Division and placed with the responsibility of the successful investigations of crimes and apprehensions of criminals.  In 1992, I was re-assigned as Commander of the Intelligence  unit.  In that capacity I had the overall responsibility of investigations of any individual, group or organization reasonably suspected to be engaged in criminal activity.  This included all terrorism and organized crime investigations which involved specialized training in First Amendment and laisoning for the police department with all Federal agencies.  In this capacity I had an in depth investigation into my background done by the F.B.I. so that I had a clearance for classified information. |

**Training and Credentials**

- Northwestern University Traffic Institute Executive Management Program, a sixteen week course on community policing
- The FBI academy in Quanico, Virginia, for preparation for the 1994 World Soccer championship games (Chicago was the opening ceremony site)
- D.E.A. drug training at the FBI academy, a three week course for drug commanders
- Illinois State policy academy for Management Dimension course for police command
- The School on Terrorism and Narcotics throughout the World, at the University of Illinois, at Chicago

7A

- Crisis Management school, University of Illinois, competing against police officials from around the world in a four-week course

### Awards and Accomplishments

- The city of Chicago was placed under 1978 Federal Court consent decree limiting 1st Amendment related investigations by the City of Chicago, including the Police Department. In 1998, I testified for the City why the decree hampered many investigations and detailed how and why. The City won relief in the Consent Decree in arguments with the A.C.L.U. and the Peoples Law Office.
- Co-chaired with FEMA, table top exercise for the City of Chicago, emergency responders for the 1994 World Cup.
- Co-chaired with Secret Service the 1996 Democratic Convention in Chicago and was responsible for the overall security of all attendees. Co-chaired with Illinois Emergency Management Association, a tabletop exercise for the City of Chicago for emergency responders, for the 1996 Democratic Convention.
- Prepared a table top exercise for the City of Chicago, for emergency responders after the Oklahoma Federal building bombing.

- I have investigated and testified in cases involving murder, rape, robbery, burglary, kidnapping, narcotics, auto theft, racketeering, prostitution, gambling, interstate theft of securities and autos, and many other criminal violations during my career.

- I have worked with F.B.I., A.T.F., I.R.S., both criminal and civil, Secret Service, D.E.A. Illinois State Police, and many local and other State police. In doing so I have been on or in charge of numerous criminal tasks forces.

- I formed and participated in the 1st criminal intelligence narcotic court ordered wiretap overhear. This resulted in over 23 indictments and subsequent successful prosecutions in each case (most pled guilty).

- Received over three hundred (300) honorable mentions and department commendations from the Chicago Department and complimentary letters of appreciation from the F.B.I., D.E.A., Secret Service, A.T.F., the United States Attorney, the local States Attorney and many local law enforcement agencies and citizens.

### Tradeshow Conferences

I have worked in the TRADE SHOW industry for over 20 years beginning in 1980 in Chicago at McCormick Place, as a security supervisor and most recently as a security consultant. In the last three years I have added trade show managing to my experience. The following is a compilation of trade show and cities I have worked.

| | |
|---|---|
| Chicago: | Big Machinery Show |
| | Food Marketing Show |
| | Restaurant Show |
| | Consumer Electronics Show |
| | Pittsburg Conference Show |
| | Auto Show |
| | Boat Show |
| | Taste of Chicago Show |
| | |
| New Orleans: | National Assn. of Television Producers Execs |
| | Wireless computer Show |
| | Pittsburg Conference Show |
| | American College of Cardiology |
| | |
| Las Vegas: | MAGIC summer and winter shows |
| | JCK Jewelry Show |
| | Prime Time Jewelry Show |
| | National Assn. of Broadcasters |
| | Consumer Electronics Show |
| | Comdex Show |
| | AAPEX Automobile Parts Show |
| | INFOCOM Electronics Show |
| | National Assn. of Television Producers |
| | |
| Anaheim: | American College of Cardiology |
| | INFOCOM Electronics Show |
| | |
| Orlando: | Pittsburg Conference Show |
| | JCK Jewelry Show |
| | Photo Marketing Show |
| | Bobbin World Show |
| | Hot Summer Boat show |
| | Florida Trucking Show |
| | Southern Women Show |
| | Air Medical Transport Show |
| | NAFEM Show |
| | |
| Atlanta: | Pittsburg Conference Show |

More detailed and specific information including documents and certificates are available upon request.

7A

93

# Exhibit 8

## DECLARATION OF CHARLES BUDDY LINN

I, Charles Buddy Linn, declare and would testify under oath as follows:

1.      I am a Regional Vice President of United National Maintenance, Inc. ("United") responsible for the Western United States, including San Diego.  I am responsible for, among other things, hiring employees to perform cleaning, janitorial, maintenance and related services (defined hereinafter as "Trade Show Cleaning Services") at large trade shows and conventions at various venues, including the San Diego Convention Center (hereinafter as "SDCC Facility").  I have been performing these duties at the SDCC Facility since it opened in 1989.  Everything in this affidavit is true and it comes from my own personal knowledge.

2.      I am intimately familiar with security procedures and the access of all outside service providers such as United at facilities throughout the Western United States, including the convention centers in Las Vegas, Los Angeles and San Francisco.  I have personally been present at the setup and dismantling of hundreds of shows at such facilities.  The facts stated in this affidavit are based on my experiences and first hand knowledge.

### Trade Show Cleaning Services is a Small Security Risk.

3.      In July 2007, the San Diego Convention Center Corporation ("SDCC") implemented a policy that completely bars our employees from physically entering the SDCC Facility.

4.      The reason SDCC has given for this new policy is some unspecified security concerns.  But because of my first hand knowledge of the type of contractors that work in the SDCC Facility and the type of access these persons have, this policy does

1

8

94

nothing to improve security at the SDCC Facility. SDCC's policy is only applied to our employees and is not applied to employees of trade associations, show management, general contractors, or outside laborers including but not limited to freight haulers, electricians, decorators, installation and dismantlement contractors, florists and stage hands. I have first hand knowledge that there can easily be thousands of these outside laborers given access to the SDCC Facility for a full-hall show over the course of several days. While this policy is only applied to our employees and none of these other outside contractors, a United cleaning crew would make up less than 5% of that workforce. Also, this policy does nothing to screen the thousands of employees of exhibitors or show attendees who also can wander the SDCC Facility.

5.    I am also familiar with the way displays and exhibits are delivered to the SDCC Facility. For a full-hall show there can be hundreds of truckloads of freight unloaded at the docks of the building. None of these truck drivers and their contents are not screened. It is not difficult for the truck drivers to gain access to the building while their truck is being unloaded, and there is no centralized supervision of this process. The same is true for moving out all of the freight at the end of a show. All of that freighted material is moved in and out of the building by another large independent workforce of freight haulers. The SDCC does not institute background checks for the freight haulers or truck drivers.

6.    Getting access to the SDCC Facility is not difficult. SDCC does not have a photo badging system like many other convention centers have. All you need is a wrist band, which is not hard to get. Before each show, the show manager or general contractor will provide security or the registration desk with a list of employees that will

8

2

95

need access to the SDCC Facility. The show manager or general contractor is then given a corresponding number of wrist bands to pass out to those employees. No further security screening is performed. All outside laborers with a wrist band gain complete access to the SDCC Facility. In light of all of this, there is no way that barring just our employees improves security at the SDCC Facility.

### United's Trade Show Cleaning Services Staff is not a Security Risk.

7.    I have read the affidavit of Carol Wallace, the President and Chief Executive Officer of the SDCC, that was filed in state court. Ms. Wallace claims that United's alleged use of temporary labor is the justification for applying this "security" policy solely against United. Ms. Wallace specifically says:

I am informed, and believe, and thereon allege that [United] primarily uses temporary staff to perform cleaning at the [SDCC Facility]...Our assessment of areas of vulnerability indicated that the use of outside cleaning crews should be eliminated."

(Wallace Decl. ¶¶ 5-7.)

8.    I do not know who is informing Ms. Wallace, but, unlike Ms. Wallace, I have first hand knowledge of the status of all United employees in San Diego and can unequivocally say that her statement is false. We do not use temporary workers and all employees are hired with the intention to be long-term employees. As of June 1, 2007, the majority of our employees in San Diego had been employed by United for at least two and up to seventeen years. Attached as Exhibit A is a list of United's employees in San Diego listing the hiring date of each employee.

9.    In fact, on the few occasions we have needed extra people in San Diego, we have not hired temporary workers. Rather, we have chosen to eat the cost of bringing in and housing low wage United workers from other cities such as Las Vegas or Los

8

3

Angeles to work a show at the SDCC Facility. We do this because the learning curve is too great for a temporary worker who would be unable to perform in an efficient manner. We simply do not use temporary workers.

10.     Had Ms. Wallace truly been so concerned about our alleged use of temporary labor, she or someone from the SDCC could have asked us about it. They never did.

11.     The SDCC has never, in my 19 years of working in San Diego, informed me or anyone at United of a single security issue involving our employees. When we heard about this policy, we offered to run background checks or any other necessary security procedures on United employees. As you can see from the job application that each of our employees is required to fill out, all of the necessary information needed to run a background check is easily available and could have been provided to SDCC. Attached as Exhibit B is a copy of United's 23 page Employment Application. This offer was ignored and SDCC instead chose to bar our employees from the SDCC Facility.

### United has Lost its Workforce in San Diego.

12.     Prior to the implementation of SDCC's "security" policy, United had a highly trained and efficient work force of 51 employees in San Diego. More than thirty of our employees had worked for United for at least 2 years, and some have worked for United for 14 years. Since the policy was implemented in June 2007, we have lost 47 of these 51 employees. We have lost nearly all of our workforce because they were not working and we cannot pay them to not work. Obviously, they have little choice but to seek other employment. I and my staff have worked very hard to stay in constant contact with our employees to see if we will be able to convince them comeback if United is

8

97

allowed to return to work in the SDCC Facility. I believe that if the SDCC's policy is lifted soon, we will be able to get many of them back but it is pretty clear to me that as more time passes, it will become more difficult for us to get them back.

13.     Without our highly trained and efficient workers, we cannot compete in the San Diego market. The success of our business is based on the high level of efficient service we provide show managers and general contractors. This service is based on the experience of our employees with specific types and sizes of trade shows held at the Convention Facility. Based on the learning by doing nature of this business, our employees, many of whom have served as supervisors, have been trained to know where they need to be and what they need to do at any given moment during a show. We need our employees to offer competitive prices and service in San Diego.

<strong><u>United is No Longer Pursuing New Business in San Diego.</u></strong>

14.     Over a year ago, I met with Richard Simon, President of United, to develop and implement a plan to compete for more business and increase United's market share in the San Diego market. We specifically, were planning to solicit show management for business at trade shows serviced by SDCC by offering on competitive terms for price and service. Since the SDCC has put this "security" policy into effect, all of these efforts have come to a complete stop. We are no longer competing for new business in San Diego.

15.     I don't see how anyone other than SDCC can compete for business in San Diego right now because SDCC won't let our employees or anyone else's into the Convention Facility. All we are doing in San Diego right now is meeting our already existing contracts by paying SDCC for the use of their employees.

8

5

98

**SDCC Workforce is Inefficient and Costly.**

16.     Since the "security" policy was implemented, United has been allowed to carry out its contracts only by using SDCC labor. We have no control over how many or which employees SDCC assigns to a given show and we have little ability to perform oversight and supervision. Our employees have an incentive to be efficient and if they aren't efficient we can discipline them. We have no ability to do so with SDCC employees.

17.     Also, before each show, United gives our customers estimates based on a fully-loaded, blended, hourly rate for the service which includes United's direct labor cost, overhead and profit and based on this estimate United cannot be paid for hours worked in excess of this estimate. This means that we can only turn a profit if our workers perform efficiently.

18.     SDCC ignores our estimates and forces us to abide by SDCC terms. Despite these estimates, SDCC brings in more labor than United would bring in to perform each job and have used 20 employees for a show where United's contractual estimate was to use 12 employees. While we have to be efficient to meet and ultimately make money under these estimates, SDCC employees do not share this concern and we have no way to incentivize or discipline them.

8

99

Pursuant to 17 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on  11/11/07
             Date

                                     Charles Buddy Linn

7

# Exhibit 8-A

Employee History- San Diego, CA

| | | |
|---|---|---|
| 1. | Elba Epinoza | 1990 - 17 years |
| 2. | Henry Solano | 1995 - 12 years |
| 3. | Jerry Trejo | 1995 - 12 years |
| 4. | Socorro Rocha | 1996 - 11 years |
| 5. | Manuela Rocha | 1996 - 11 years |
| 6. | Hilda Acuña | 1996 - 11 years |
| 7. | Aracely Montenegro | 1996 - 11 years |
| 8. | Alain Gilbert | 1996 - 11 years |
| 9. | Jamie Quintana | 1997 - 10 years |
| 10. | Gabriel Ramirez | 1996 - 11 years |
| 11. | Jorge Ortiz | 19980 - 9 years |
| 12. | Ahian Gilbert | 1999 - 8 years |
| 13. | Maria L. Ramirez | 2000 - 7 years |
| 14. | Celia Solano | 2000 - 7 years |
| 15. | Hugo Gonzalez | 2001 - 6 years |
| 16. | Cristina Camacho | 2001 - 6 years |
| 17. | Maria Barroso | 2002 - 5 years |
| 18. | Osvelia Gilbert | 2002 - 5 years |
| 19. | Rosa Juarez | 2003 - 4 years |
| 20. | Pedro Tilapa | 2003 - 4 years |
| 21. | Felicitas Jimenez | 2004 - 3 years |
| 22. | James Hatfield | 2003 - 4 years |
| 23. | Mariana Hernandez | 2004 - 3 years |
| 24. | Ariel Rocha | 2004 - 3 years |
| 25. | Julio Villalobos | 2004 - 3 years |
| 26. | Francisco Ramirez | 2005 - 2 years |
| 27. | Alfredo Ramirez | 2005 - 2 years |
| 28. | Roxana Arizmendi | 2005 - 2 years |
| 29. | Delifino Jimenez | 2005 - 2 years |
| 30. | Oscar Navarro | 2005 - 2 years |
| 31. | Olga Loyo | 2005 - 2 years |
| 32. | Alejandro Castillo | 2005 - 2 years |
| 33. | Evelyn Ramirez | 2005 - 2 years |
| 34. | Humberto Sanchez | 2005 - 2 years |
| 35. | Magaly Sanchez | 2005 - 2 years |
| 36. | Jesus A. Hernandez | 2005 - 2 years |
| 37. | Esmeralda Ramirez | 2006 - 1 year |
| 38. | Rosario Ramirez | 2006 - 1 year |
| 39. | Maria Carrillo | 2006 - 1 year |
| 40. | Jose H. Zavala | 2006 - 1 year |
| 41. | Rodolfo Famania | 2006 - 1 year |
| 42. | Guadalupe Silvia | 2006 - 1 year |
| 43. | Maria Delgado | 2006 - 1 year |
| 44. | Arian Simones | 2006 - 11 months |
| 45. | Maria  Jimenez | 2006 - 11 months |
| 46. | Santos Jr. Benitez | 2006 - 11 months |
| 47. | Laura Mendoza | 2006 - 10 months |
| 48. | Antonio Guizar | 2007 - 10 months |
| 49. | Fidela Ramirez | 2007 - 10 months |
| 50. | Pablo D. Ramirez | 2007 - 5 months |
| 51. | Pedro Ivan Tadeo | 2007 - 5months |

8A

**Exhibit 8-B**

08/06/2007  11:53    9229373    ●              ●              PAGE 02/24

## Employment Application

**Date** _____

PLEASE PRINT ALL INFORMATION
REQUESTED EXCEPT SIGNATURE

**Name** _____

| Last | First | Middle | Maiden |

**Present address** _____

Number          Street          City          State          Zip

**How long** _____

**Telephone (    )** _____ - _____

**Position applied for (1)** _____

**Wage desired (2)** _____
**(Be Specific)**

**Social Security No.** _____ - _____ - _____

**Are you under the age of 18?** ☐ YES  ☐ NO

**Days/hours available to work**
No Pref. _____    Thur _____
Mon _____        Fri _____
Tue _____        Sat _____
Wed _____        Sun _____

**How many hours can you work weekly?** _____

**Can you work nights?** _____

**Employment desired**   ☐ FULL-TIME ONLY   ☐ PART-TIME ONLY   ☐ FULL- OR PART-TIME

**When available for work?** _____

| TYPE OF SCHOOL | NAME OF SCHOOL | LOCATION | NUMBER OF YEARS COMPLETED | MAJOR & DEGREE |
|---|---|---|---|---|
| High School | | | | |
| College | | | | |
| Professional School | | | | |

**DO YOU HAVE A DRIVER'S LICENSE?**   ☐ YES   ☐ NO

**What is your means of transportation to work?** _____

**Driver's license number** _____                    **State of issue** _____
☐ Operator   ☐ Commercial (CDL)   ☐ Chauffeur

**Expiration date** _____

**Have you had any accidents during the past three years?** _____   **How many?** _____

**PERSON TO BE NOTIFIED IN CASE OF EMERGENCY**

**Name** _____   **Telephone (___)** _____

**Address** _____   **Relationship** _____

8B

102

08/06/2007 11:53    9229373                                PAGE 03/24

## Employment Application

**PLEASE PRINT ALL INFORMATION REQUESTED EXCEPT SIGNATURE**

Please list two references other than relatives or previous employers.

| | |
|---|---|
| Name _____ | Name _____ |
| Position _____ | Position _____ |
| Company _____ | Company _____ |
| Address _____ | Address _____ |
| Telephone ( ) _____ | Telephone ( ) _____ |

### MILITARY

HAVE YOU EVER BEEN IN THE ARMED FORCES?        ☐ YES  ☐ NO
ARE YOU NOW A MEMBER OF THE NATIONAL GUARD?    ☐ YES  ☐ NO
Specialty _____   Date Entered _____   Discharge Date _____

Please list your work experience for the past five years beginning with your most recent job held. If you were self-employed, give firm name.

| Work Experience | | Name of last Supervisor | Employment dates | Pay or salary |
|---|---|---|---|---|
| Name of Employer | | | From | Start |
| Address | | | To | Final |
| City, State, Zip Code | | | | |
| Phone Number | | Your Last Job Title | | |

Reason for leaving (be specific)

Please list your work experience for the past five years beginning with your most recent job held. If you were self-employed, give firm name. Use back if necessary.

| Work Experience | | Name of last Supervisor | Employment dates | Pay or salary |
|---|---|---|---|---|
| Name of Employer | | | From | Start |
| Address | | | To | Final |
| City, State, Zip Code | | | | |
| Phone Number | | Your Last Job Title | | |

Reason for leaving (be specific):

May we contact your present employer?        ☐ YES  ☐ NO
Did you complete this application yourself?   ☐ YES  ☐ NO  If not, who did? _____

### OFFICE USE ONLY:

Supervisor Name: _____

Date Hired: _____

Rate of Pay: _____

Job Location: _____

Applicant Signature: _____        Date: _____

8B

08/06/2007  11:53   9229373                                    PAGE  05/24

# LISTS OF ACCEPTABLE DOCUMENTS

| LIST A | | LIST B | | LIST C |
|---|---|---|---|---|
| Documents that Establish Both Identity and Employment Eligibility | **OR** | Documents that Establish Identity | **AND** | Documents that Establish Employment Eligibility |

**LIST A**

Documents that Establish Both Identity and Employment Eligibility

U.S. Passport (unexpired or expired)

Certificate of U.S. Citizenship (Form N-560 or N-561)

Certificate of Naturalization (Form N-550 or N-570)

Unexpired foreign passport, with I-551 stamp or attached Form I-94 indicating unexpired employment authorization

Permanent Resident Card or Alien Registration Receipt Card with photograph (Form I-151 or I-551)

Unexpired Temporary Resident Card (Form I-688)

Unexpired Employment Authorization Card (Form I-688A)

Unexpired Reentry Permit (Form I-327)

Unexpired Refugee Travel Document (Form I-571)

0. Unexpired Employment Authorization Document issued by DHS that contains a photograph (Form I-688B)

**OR**

**LIST B**

Documents that Establish Identity

1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address

2. ID card issued by federal, state or local government agencies or entities, provided it contains a photograph or information such as name, date of birth, gender, height, eye color and address

3. School ID card with a photograph

4. Voter's registration card

5. U.S. Military card or draft record

6. Military dependent's ID card

7. U.S. Coast Guard Merchant Mariner Card

8. Native American tribal document

9. Driver's license issued by a Canadian government authority

For persons under age 18 who are unable to present a document listed above:

10. School record or report card

11. Clinic, doctor or hospital record

12. Day-care or nursery school record

**AND**

**LIST C**

Documents that Establish Employment Eligibility

1. U.S. social security card issued by the Social Security Administration (other than a card stating it is not valid for employment)

2. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350)

3. Original or certified copy of a birth certificate issued by a state, county, municipal authority or outlying possession of the United States bearing an official seal

4. Native American tribal document

5. U.S. Citizen ID Card (Form I-197)

6. ID Card for use of Resident Citizen in the United States (Form I-179)

7. Unexpired employment authorization document issued by DHS (other than those listed under List A)

Illustrations of many of these documents appear in Part 8 of the Handbook for Employers (M-274)

Form I-9 (Rev. 05/31/05)Y Page 3

8B

105

06/06/2007  11:53   9229373                                    PAGE  06/24

# Form W-4 (2007)

**Purpose.** Complete Form W-4 so that your employer can withhold the correct federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7 and sign the form to validate it. Your exemption for 2007 expires February 18, 2008. See Pub. 505, Tax Withholding and Estimated Tax.

**Note.** You cannot claim exemption from withholding if (a) your income exceeds $850 and includes more than $300 of unearned income (for example, interest and dividends) and (b) another person can claim you as a dependent on their tax return.

**Basic instructions.** If you are not exempt, complete the **Personal Allowances Worksheet** below. The worksheets on page 2 adjust your withholding allowances based on

itemized deductions, certain credits, adjustments to income, or two-earner/multiple job situations. Complete all worksheets that apply. However, you may claim fewer (or zero) allowances.

**Head of household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals.

**Tax credits.** You can take projected tax credits into account in figuring your allowable number of withholding allowances. Credits for child or dependent care expenses and the child tax credit may be claimed using the **Personal Allowances Worksheet** below. See Pub. 919. How Do I Adjust My Tax Withholding, for information on converting your other credits into withholding allowances.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, consider making estimated tax payments using Form 1040-ES, Estimated Tax

for Individuals. Otherwise, you may owe additional tax. If you have pension or annuity income, see Pub. 919 to find out if you should adjust your withholding on Form W-4 or W-4P.

**Two earners/Multiple jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 for the highest paying job and zero allowances are claimed on the others.

**Nonresident alien.** If you are a nonresident alien, see the Instructions for Form 8233 before completing this Form W-4.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 919 to see how the dollar amount you are having withheld compares to your projected total tax for 2007. See Pub. 919, especially if your earnings exceed $130,000 (Single) or $180,000 (Married).

## Personal Allowances Worksheet (Keep for your records.)

A  Enter "1" for yourself if no one else can claim you as a dependent . . . . . . . . . . . . . . . . . . **A** ____

B  Enter "1" if:
- You are single and have only one job; or
- You are married, have only one job, and your spouse does not work; or
- Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less.
} . . . . . **B** ____

C  Enter "1" for your spouse. But, you may choose to enter "-0-" if you are married and have either a working spouse or more than one job. (Entering "-0-" may help you avoid having too little tax withheld.) . . . . . . . . . . . . **C** ____

D  Enter number of dependents (other than your spouse or yourself) you will claim on your tax return . . . . . . . . . . . . **D** ____

E  Enter "1" if you will file as head of household on your tax return (see conditions under Head of household above) . . . . . . . . . . **E** ____

F  Enter "1" if you have at least $1,500 of child or dependent care expenses for which you plan to claim a credit . . . . . **F** ____
(Note. Do not include child support payments. See Pub. 503, Child and Dependent Care Expenses, for details.)

G  **Child Tax Credit** (including additional child tax credit). See Pub 972, Child Tax Credit, for more information.
- If your total income will be less than $57,000 ($85,000 if married), enter "2" for each eligible child.
- If your total income will be between $57,000 and $84,000 ($85,000 and $119,000 if married), enter "1" for each eligible child plus "1" additional if you have 4 or more eligible children. . . . . . . . . . . . . . . **G** ____

H  Add lines A through G and enter total here. (Note. This may be different from the number of exemptions you claim on your tax return.) ▶ **H** ____

For accuracy, complete all worksheets that apply.
- If you plan to itemize or claim adjustments to income and want to reduce your withholding, see the **Deductions and Adjustments Worksheet** on page 2.
- If you have more than one job or are married and you and your spouse both work and the combined earnings from all jobs exceed $40,000 ($25,000 if married) see the **Two-Earners/Multiple Jobs Worksheet** on page 2 to avoid having too little tax withheld.
- If neither of the above situations applies, stop here and enter the number from line H on line 5 of Form W-4 below.

- - - - - - - - - Cut here and give Form W-4 to your employer. Keep the top part for your records. - - - - - - - - -

## Employee's Withholding Allowance Certificate

Form **W-4**

Department of the Treasury
Internal Revenue Service

▶ Whether you are entitled to claim a certain number of allowances or exemption from withholding is subject to review by the IRS. Your employer may be required to send a copy of this form to the IRS.

OMB No. 1545-0074

**2007**

| 1  Type or print your first name and middle initial.   Last name | 2  Your social security number |
|---|---|

| Home address (number and street or rural route) | 3  ☐ Single  ☐ Married  ☐ Married, but withhold at higher Single rate.<br>Note. If married, but legally separated, or spouse is a nonresident alien, check the "Single" box. |
|---|---|
| City or town, state, and ZIP code | 4  If your last name differs from that shown on your social security card, check here. You must call 1-800-772-1213 for a replacement card. ▶ ☐ |

| 5  Total number of allowances you are claiming (from line H above or from the applicable worksheet on page 2) | 5 | |
|---|---|---|
| 6  Additional amount, if any, you want withheld from each paycheck | 6 | $ |

7  I claim exemption from withholding for 2007, and I certify that I meet both of the following conditions for exemption.
- Last year I had a right to a refund of all federal income tax withheld because I had no tax liability and
- This year I expect a refund of all federal income tax withheld because I expect to have no tax liability.

If you meet both conditions, write "Exempt" here . . . . . . . . . ▶ | 7 | |

Under penalties of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief, it is true, correct, and complete.

Employee's signature
(Form is not valid
unless you sign it.) ▶ _____     Date ▶ _____

| 8  Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.) | 9  Office code (optional) | 10  Employer identification number (EIN) |
|---|---|---|

For Privacy Act and Paperwork Reduction Act Notice, see page 2.    Cat. No. 10220Q    Form **W-4** (2007)

8B

106

08/06/2007  11:53   9229373                                    PAGE  07/24

Page 2

**Form W-4 (2007)**

## Deductions and Adjustments Worksheet

**Note.** Use this worksheet *only* if you plan to itemize deductions, claim certain credits, or claim adjustments to income on your 2007 tax return.

| | | | |
|---|---|---|---|
| 1 | Enter an estimate of your 2007 itemized deductions. These include qualifying home mortgage interest, charitable contributions, state and local taxes, medical expenses in excess of 7.5% of your income, and miscellaneous deductions. (For 2007, you may have to reduce your itemized deductions if your income is over $156,400 ($78,200 if married filing separately). See Worksheet 2 in Pub. 919 for details.) | 1 | $ |
| 2 | Enter: { $10,700 if married filing jointly or qualifying widow(er) / $7,850 if head of household / $5,350 if single or married filing separately } | 2 | $ |
| 3 | Subtract line 2 from line 1. If zero or less, enter "-0-" | 3 | $ |
| 4 | Enter an estimate of your 2007 adjustments to income, including alimony, deductible IRA contributions, and student loan interest | 4 | $ |
| 5 | Add lines 3 and 4 and enter the total. (Include any amount for credits from Worksheet 8 in Pub. 919) | 5 | $ |
| 6 | Enter an estimate of your 2007 nonwage income (such as dividends or interest) | 6 | $ |
| 7 | Subtract line 6 from line 5. If zero or less, enter "-0-" | 7 | $ |
| 8 | Divide the amount on line 7 by $3,400 and enter the result here. Drop any fraction | 8 | |
| 9 | Enter the number from the Personal Allowances Worksheet, line H, page 1 | 9 | |
| 10 | Add lines 8 and 9 and enter the total here. If you plan to use the Two-Earners/Multiple Jobs Worksheet, also enter this total on line 1 below. Otherwise, stop here and enter this total on Form W-4, line 5, page 1 | 10 | |

## Two-Earners/Multiple Jobs Worksheet (See Two earners/multiple jobs on page 1.)

**Note.** Use this worksheet only if the instructions under line H on page 1 direct you here.

| | | | |
|---|---|---|---|
| 1 | Enter the number from line H, page 1 (or from line 10 above if you used the Deductions and Adjustments Worksheet) | 1 | |
| 2 | Find the number in Table 1 below that applies to the LOWEST paying job and enter it here. However, if you are married filing jointly and wages from the highest paying job are $50,000 or less, do not enter more than "3." | 2 | |
| 3 | If line 1 is more than or equal to line 2, subtract line 2 from line 1. Enter the result here (if zero, enter "-0-") and on Form W-4, line 5, page 1. Do not use the rest of this worksheet | 3 | |

**Note.** If line 1 is *less* than line 2, enter "-0-" on Form W-4, line 5, page 1. Complete lines 4-9 below to calculate the additional withholding amount necessary to avoid a year-end tax bill.

| | | | |
|---|---|---|---|
| 4 | Enter the number from line 2 of this worksheet | 4 | |
| 5 | Enter the number from line 1 of this worksheet | 5 | |
| 6 | Subtract line 5 from line 4 | 6 | |
| 7 | Find the amount in Table 2 below that applies to the HIGHEST paying job and enter it here | 7 | $ |
| 8 | Multiply line 7 by line 6 and enter the result here. This is the additional annual withholding needed | 8 | $ |
| 9 | Divide line 8 by the number of pay periods remaining in 2007. For example, divide by 26 if you are paid every two weeks and you complete this form in December 2006. Enter the result here and on Form W-4, line 6, page 1. This is the additional amount to be withheld from each paycheck | 9 | $ |

### Table 1

| Married Filing Jointly | | All Others | |
|---|---|---|---|
| If wages from LOWEST paying job are— | Enter on line 2 above | If wages from LOWEST paying job are— | Enter on line 2 above |
| $0 - $4,500 | 0 | $0 - $6,000 | 0 |
| 4,501 - 9,000 | 1 | 6,001 - 12,000 | 1 |
| 9,001 - 18,000 | 2 | 12,001 - 19,000 | 2 |
| 18,001 - 22,000 | 3 | 19,001 - 26,000 | 3 |
| 22,001 - 26,000 | 4 | 26,001 - 35,000 | 4 |
| 26,001 - 32,000 | 5 | 35,001 - 50,000 | 5 |
| 32,001 - 38,000 | 6 | 50,001 - 65,000 | 6 |
| 38,001 - 46,000 | 7 | 65,001 - 80,000 | 7 |
| 46,001 - 55,000 | 8 | 80,001 - 90,000 | 8 |
| 55,001 - 60,000 | 9 | 90,001 - 120,000 | 9 |
| 60,001 - 65,000 | 10 | 120,001 and over | 10 |
| 65,001 - 75,000 | 11 | | |
| 75,001 - 95,000 | 12 | | |
| 95,001 - 105,000 | 13 | | |
| 105,001 - 120,000 | 14 | | |
| 120,001 and over | 15 | | |

### Table 2

| Married Filing Jointly | | All Others | |
|---|---|---|---|
| If wages from HIGHEST paying job are— | Enter on line 7 above | If wages from HIGHEST paying job are— | Enter on line 7 above |
| $0 - $65,000 | $510 | $0 - $35,000 | $510 |
| 65,001 - 120,000 | 850 | 35,001 - 80,000 | 850 |
| 120,001 - 170,000 | 950 | 80,001 - 150,000 | 950 |
| 170,001 - 300,000 | 1,120 | 150,001 - 340,000 | 1,120 |
| 300,001 and over | 1,190 | 340,001 and over | 1,190 |

**Privacy Act and Paperwork Reduction Act Notice.** We ask for the information on this form to carry out the Internal Revenue laws of the United States. The Internal Revenue Code requires this information under sections 3402(f)(2)(A) and 6109 and their regulations. Failure to provide a properly completed form will result in your being treated as a single person who claims no withholding allowances; providing fraudulent information may also subject you to penalties. Routine uses of this information include giving it to the Department of Justice for civil and criminal litigation, to cities, states, and the District of Columbia for use in administering their tax laws, and using it in the National Directory of New Hires. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by Code section 6103.

The average time and expenses required to complete and file this form will vary depending on individual circumstances. For estimated averages, see the instructions for your income tax return.

If you have suggestions for making this form simpler, we would be happy to hear from you. See the instructions for your income tax return.

8B

08/06/2007  11:53    9229373                                              PAGE  08/24



**Employment
Development
Department**
State of California

This form can be used to manually compute your withholding allowances, or you can electronically compute them at www.taxes.ca.gov/de4.xls (Microsoft Excel required).

## EMPLOYEE'S WITHHOLDING ALLOWANCE CERTIFICATE

Type or Print Your Full Name

Your Social Security Number

Home Address (Number and Street or Rural Route)

Filing Status Withholding Allowances
- [ ] SINGLE or MARRIED (with two or more incomes)
- [ ] MARRIED (one income)
- [ ] HEAD OF HOUSEHOLD

City, State, and ZIP Code

1. Number of allowances for Regular Withholding Allowances, Worksheet A _____

   Number of allowances from the Estimated Deductions, Worksheet B _____
   Total Number of Allowances (A + B) when using the California
   Withholding Schedules for 2006 _____

   **OR**

2. Additional amount of state income tax to be withheld each pay period (if employer agrees), Worksheet C _____

*Under the penalties of perjury, I certify that the number of withholding allowances claimed on this certificate does not exceed the number to which I am entitled or, if claiming exemption from withholding, that I am entitled to claim the exempt status.*

Signature_____                Date_____

Employer's Name and Address                   California Employer Account Number

---- cut here ----

Give the top portion of this page to your employer and keep the remainder for your records.

## YOUR CALIFORNIA PERSONAL INCOME TAX MAY BE UNDERWITHHELD IF YOU DO NOT FILE THIS DE 4 FORM

*IF YOU RELY ON THE FEDERAL W-4 FOR YOUR CALIFORNIA WITHHOLDING ALLOWANCES, YOUR CALIFORNIA STATE PERSONAL INCOME TAX MAY BE UNDERWITHHELD AND YOU MAY OWE MONEY AT THE END OF THE YEAR.*

**PURPOSE:** This certificate, DE 4, is for California personal income tax withholding purposes only. The DE 4 is used to compute the amount of taxes to be withheld from your wages, by your employer, to accurately reflect your state tax withholding obligation.

You should complete this form if either:

(1) You claim a different marital status, number of regular allowances, or different additional dollar amount to be withheld for California personal income tax withholding than you claim for federal income tax withholding or,

(2) You claim additional allowances for estimated deductions.

THIS FORM WILL NOT CHANGE YOUR FEDERAL WITHHOLDING ALLOWANCES.

The Federal Form W-4 is applicable for California withholding purposes if you wish to claim the same marital status, number of regular allowances, and/or the same additional dollar amount to be withheld for state and federal purposes. However, if federal tax brackets and withholding methods do not reflect state personal income tax withholding tables. If you rely on

the number of withholding allowances you claim on your Federal W-4 withholding allowance certificate for your state income tax withholding, you may be significantly underwithheld. This is particularly true if your household income is derived from more than one source.

**CHECK YOUR WITHHOLDING:** After your W-4 and/or DE 4 takes effect, compare the state income tax withheld with your estimated total annual tax. For state withholding, use the worksheets on this form and for federal withholding use the Internal Revenue Service (IRS) Publication 919 or federal withholding calculations.

**EXEMPTION FROM WITHHOLDING:** If you wish to claim exempt, complete the federal Form W-4. You may only claim exempt from withholding California income tax if you did not owe any federal income tax last year and you do not expect to owe any federal income tax this year. The exemption automatically expires on February 15 of the next year. If you continue to qualify for the exempt filing status, a new Form W-4 designating EXEMPT must be submitted before February 15. If you are not having federal income tax withheld this year but expect to have a tax liability next year, the law requires you to give your employer a new Form W-4 by December 1.

CU

DE 4 Rev. 32 (1-06) (INTERNET)                Page 1 of 4

8B

108

IF YOU NEED MORE DETAILED INFORMATION, SEE THE INSTRUCTIONS THAT CAME WITH YOUR LAST CALIFORNIA INCOME TAX RETURN OR CALL YOUR LOCAL FRANCHISE TAX BOARD OFFICE.

IF YOU ARE CALLING FROM WITHIN THE UNITED STATES                    1-800-852-5711

IF YOU ARE CALLING FROM OUTSIDE THE UNITED STATES    (Not Toll Free)    (916) 845-6500

                                                                    1-800-822-6268
FOR THE HEARING IMPAIRED

The *California Employer's Guide* (DE 44) provides the income tax withholding tables. This publication may be found on EDD's Web site at www.edd.ca.gov/taxrep/taxform.htm. To assist you in calculating your tax liability, please visit the Franchise Tax Board's Web site at: www.ftb.ca.gov/individuals/tax_table/index.asp.

**NOTIFICATION:** Your employer is required to send a copy of your DE 4 to the Franchise Tax Board (FTB) if it meets any of the following conditions:
• You claim more than 10 withholding allowances
• You claim exemption from state or federal income tax
• You make major changes to DE 4, such as crossing out words or writing more than is asked
• You admit that the DE 4 is false

IF THE IRS INSTRUCTS YOUR EMPLOYER TO WITHHOLD FEDERAL INCOME TAX BASED ON A CERTAIN WITHHOLDING STATUS, YOUR EMPLOYER IS REQUIRED TO USE THE SAME WITHHOLDING STATUS FOR STATE INCOME TAX WITHHOLDING IF YOUR WITHHOLDING ALLOWANCES FOR STATE PURPOSES MEET THE REQUIREMENTS LISTED UNDER "NOTIFICATION." IF YOU FEEL THAT THE FEDERAL DETERMINATION IS NOT CORRECT FOR STATE WITHHOLDING PURPOSES, YOU MAY REQUEST A REVIEW.

To do so, write to:
    Franchise Tax Board
    W-4 Unit, MSJ-40
    Sacramento CA 95812-2952

Your letter should contain the basis of your request for review. You will have the burden of showing the federal determination incorrect for state withholding purposes. The Franchise Tax Board (FTB) will limit its review to that issue. FTB will notify both you and your employer of its findings. Your employer is then required to withhold state income tax as instructed by FTB. In the event FTB or IRS finds there is no reasonable basis for the number of withholding exemptions that you claimed on your W-4/DE 4, you may be subject to a penalty.

**PENALTY:** You may be fined $500 if you file, with no reasonable basis, a DE 4 that results in less tax being withheld than is properly allowable. In addition, criminal penalties apply for willfully supplying false or fraudulent information or failing to supply information requiring an increase in withholding. This is provided for by Section 19176 of the California Revenue and Taxation Code.

DE 4 Rev. 32 (1-06) (INTERNET)                  Page 2 of 4                    8B

## INSTRUCTIONS — 1 — ALLOWANCES

When determining your withholding allowances, you must consider your personal situation:
— Do you claim allowances for dependents or blindness?
— Are you going to itemize your deductions?
— Do you have more than one income coming into the household?

**TWO-EARNER/TWO-JOBS:** When earnings are derived from more than one source, underwithholding may occur. If you have a work-ing spouse or more than one job, it is best to check the box "SINGLE or MARRIED (with two or more incomes)." Figure the total number of allowances you are entitled to claim on all jobs using only one DE 4 form. Claim allowances with one employer. Do not claim the same allowances with more than one employer. Your withholding will usually be most accurate when all allowances are claimed on the DE 4 or W-4 filed for the highest paying job and zero allowances are claimed for the others.

**MARRIED BUT NOT LIVING WITH YOUR SPOUSE:** You may check the "Head of Household" marital status box if you meet all of the following tests:
(1)   Your spouse will not live with you at any time during the year;
(2)   You will furnish over half of the cost of maintaining a home for the entire year for yourself and your child or stepchild who qualifies as your dependent; and
(3)   You will file a separate return for the year.

**HEAD OF HOUSEHOLD:** To qualify, you must be unmarried or legally separated from your spouse and pay more than 50% of the costs of maintaining a home for the entire year for yourself and your dependent(s) or other qualifying individuals. Cost of maintaining the home includes such items as rent, property insurance, property taxes, mortgage interest, repairs, utilities, and cost of food. It does not include the individual's personal expenses or any amount which represents value of services performed by a member of the household of the taxpayer.

### REGULAR WITHHOLDING ALLOWANCES

**WORKSHEET A**

(A) Allowance for yourself — enter 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . (A) _____

(B) Allowance for your spouse (if not separately claimed by your spouse) — enter 1 . . . . . . . . . . . (B) _____

(C) Allowance for blindness — yourself — enter 1 . . . . . . . . . . . . . . . . . . . . . (C) _____

(D) Allowance for blindness — your spouse (if not separately claimed by your spouse) — enter 1 . . . . . . . . (D) _____

(E) Allowance(s) for dependent(s) — do not include yourself or your spouse . . . . . . . . . (E) _____
  E-1. Please enter the number of dependents for which you are claiming allowances: _____
  E-2. Please multiply the number entered in E-1 by 3 and enter on line E*

(F) Total — add lines (A) through (E) above . . . . . . . . . . . . . . . . . . . . . . . . (F) _____

## INSTRUCTIONS — 2 — ADDITIONAL WITHHOLDING ALLOWANCES

If you expect to itemize deductions on your California income tax return, you can claim additional withholding allowances. Use Worksheet B to determine whether your expected estimated deductions may entitle you to claim one or more additional withholding allowances. Use last year's FTB 540 form as a model to calculate this year's withholding amounts.

Do not include deferred compensation, qualified pension payments or flexible benefits, etc., that are deducted from your gross pay but are not taxed on this worksheet.

You may reduce the amount of tax withheld from your wages by claiming one additional withholding allowance for each $1,000, or fraction of $1,000, by which you expect your estimated deductions to exceed your allowable standard deduction.

### ESTIMATED DEDUCTIONS

**WORKSHEET B**

1. Enter an estimate of your itemized deductions for California taxes for this tax year as listed in the schedules in the FTB 540 form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1. _____

2. Enter 36,508 if married filing joint, head of household, or qualifying widow(er) with dependent(s) or $3,254 if single or married filing separately . . . . . . . . . . . . . . . . . . . . . . . . . = 2. _____

3. Subtract line 2 from line 1, enter difference . . . . . . . . . . . . . . . . . . . . . . . . . = 3. _____

4. Enter an estimate of your adjustments to income (alimony payments, IRA deposits) . . . . . . . . . . = 4. _____

5. Add line 4 to line 3, enter sum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = 5. _____

6. Enter an estimate of your nonwage income (dividends, interest income, alimony receipts) . . . . . . . . = 6. _____

7. If line 5 is greater than line 6 (if less, see below);
   Subtract line 6 from line 5, enter difference . . . . . . . . . . . . . . . . . . . . . . . . . = 7. _____

8. Divide the amount on line 7 by $1,000, round any fraction to the nearest whole number . . . . . . . . 8. _____
   Enter this number on line 1 of the DE 4. Complete Worksheet C, if needed.

9. If line 6 is greater than line 5;
   Enter difference from line 6 (nonwage income) . . . . . . . . . . . . . . . . . . . . . . 9. _____

10. Enter amount from line 5 (deductions) . . . . . . . . . . . . . . . . . . . . . . . . . . 10. _____

11. Subtract line 10 from line 9, enter difference . . . . . . . . . . . . . . . . . . . . . . 11. _____
   Complete Worksheet C

*Recent legislation increased allowances for dependents but not other exemption allowances.
Dependent allowances are approximately equal to three allowances.

DE 4 Rev. 32 (1-06) [INTERNET]                      Page 3 of 4

8B                    CU

08/06/2007  11:53     9229373                                      PAGE  11/24

## WORKSHEET C                          TAX WITHHOLDING AND ESTIMATED TAX

1.  Enter estimate of total wages for tax year 2006 · · · · · · · · · · · · · · · · · · · · · · · · ·   1. _____
2.  Enter estimate of nonwage income (line 6 of Worksheet B) · · · · · · · · · · · · · · · · · ·   2. _____
3.  Add line 1 and line 2. Enter sum · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·   3. _____
4.  Enter itemized deductions or standard deduction (line 1 or 2 of Worksheet B, whichever is largest) · · · ·   4. _____
5.  Enter adjustments to income (line 4 of Worksheet B) · · · · · · · · · · · · · · · · · · · · · · · ·   5. _____
6.  Add line 4 and line 5. Enter sum · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·   6. _____
7.  Subtract line 6 from line 3. Enter difference · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·   7. _____
8.  Figure your tax liability for the amount on line 7 by using the 2006 tax rate schedules · · · · · · · · · · ·   8. _____
9.  Enter personal exemptions (line F of Worksheet A x $87) · · · · · · · · · · · · · · · · · ·   9. _____
10. Subtract line 9 from line 8. Enter difference · · · · · · · · · · · · · · · · · · · · · · · · · · · ·  10. _____
11. Enter any tax credits. (See FTB Form 540) · · · · · · · · · · · · · · · · · · · · · · · · · · · ·  11. _____
12. Subtract line 11 from line 10. Enter difference. This is your total tax liability · · · · · · · · · · ·  12. _____
13. Calculate the tax withheld and estimated to be withheld during 2006. Contact your employer to
    request the amount that will be withheld on your wages based on the marital status and number of
    withholding allowances you will claim for 2006. Multiply the estimated amount to be withheld by
    the number of pay periods left in the year. Add the total to the amount already withheld for 2006 · · · · · ·  13. _____
14. Subtract line 13 from line 12. Enter difference. If this is less than zero, you do not need to have additional
    taxes withheld · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·  14. _____
15. Divide line 14 by the number of pay periods remaining in the year. Enter this figure on line 2 of the DE 4 · ·  15. _____

NOTE: Your employer is not required to withhold the additional amount requested on line 2 of your DE 4. If your employer does
not agree to withhold the additional amount, you may increase your withholdings as much as possible by using the "single" status
with "zero" allowances. If the amount withheld still results in an underpayment of state income taxes, you may need to file quarterly
estimates on Form 540-ES with the FTB to avoid a penalty.

### THESE TABLES ARE FOR CALCULATING WORKSHEET C AND FOR 2006 ONLY

| SINGLE OR MARRIED WITH DUAL EMPLOYERS | | | |
|---|---|---|---|
| IF THE TAXABLE INCOME IS | | COMPUTED TAX IS | |
| OVER | BUT NOT OVER | OF AMOUNT OVER . . . | PLUS* |
| $      0 | $    6,319 | 1.0% $      0 | $      0.00 |
| $   6,319 | $  14,979 | 2.0% $   6,319 | $     63.19 |
| $ 14,979 | $  23,641 | 4.0% $ 14,979 | $    236.39 |
| $ 23,641 | $  32,819 | 6.0% $ 23,641 | $    582.87 |
| $ 32,819 | $  41,476 | 8.0% $ 32,819 | $ 1,133.55 |
| $ 41,476 | $999,999 | 9.3% $ 41,476 | $ 1,826.11 |
| $999,999 | and over | -10.3% $999,999 | $90,956.76 |

| MARRIED FILING JOINT OR QUALIFYING WIDOW(ER) TAXPAYERS | | | |
|---|---|---|---|
| IF THE TAXABLE INCOME IS | | COMPUTED TAX IS | |
| OVER | BUT NOT OVER | OF AMOUNT OVER . . . | PLUS* |
| $      0 | $  12,638 | 1.0% $      0 | $      0.00 |
| $ 12,638 | $  29,958 | 2.0% $ 12,638 | $    126.38 |
| $ 29,958 | $  47,282 | 4.0% $ 29,958 | $    472.76 |
| $ 47,282 | $  65,636 | 6.0% $ 47,282 | $ 1,165.74 |
| $ 65,636 | $  82,952 | 8.0% $ 65,636 | $ 2,257.10 |
| $ 82,952 | $999,999 | 9.3% $ 82,952 | $ 3,652.22 |
| $999,999 | and over | 10.3% $999,999 | 588,937.59 |

| HEAD OF HOUSEHOLD TAXPAYERS | | | |
|---|---|---|---|
| IF THE TAXABLE INCOME IS | | COMPUTED TAX IS | |
| OVER | BUT NOT OVER | OF AMOUNT OVER . . . | PLUS* |
| $      0 | $  12,644 | 1.0% $      0 | $      0.00 |
| $ 12,644 | $  29,959 | 2.0% $ 12,644 | $    126.44 |
| $ 29,959 | $  38,619 | 4.0% $ 29,959 | $    472.74 |
| $ 38,619 | $  47,796 | 6.0% $ 38,619 | $    819.14 |
| $ 47,796 | $  56,459 | 8.0% $ 47,796 | $ 1,369.76 |
| $ 56,459 | $999,999 | 9.3% $ 56,459 | $ 2,062.56 |
| $999,999 | and over | 10.3% $999,999 | $89,812.06 |

IF YOU NEED MORE DETAILED INFORMATION, SEE THE INSTRUCTIONS
THAT CAME WITH YOUR LAST CALIFORNIA INCOME TAX RETURN OR
CALL FRANCHISE TAX BOARD:

IF YOU ARE CALLING FROM WITHIN THE UNITED STATES       1-800-852-5711

IF YOU ARE CALLING FROM OUTSIDE THE UNITED STATES      (916) 845-6300
(Not Toll Free)

FOR THE HEARING IMPAIRED                                1-800-822-6268

*marginal tax

DE 4 information is collected for purposes of administering the Personal Income Tax law and under the Authority of Title 22 of the
California Code of Regulations and the Revenue and Taxation Code, including Section 18624. The Information Practices Act of 1977
requires that individuals be notified of how information they provide may be used. Further information is contained in the instructions
that came with your last California income tax return.

DE 4 Rev. 32 (1-06) (INTERNET)                Page 4 of 4                      CU

8B

08/06/2007  11:53    9229373    ●    ●    PAGE  12/24

# 2007 Form W-5

**Department of the Treasury
Internal Revenue Service**

## Instructions

### Purpose of Form

Use Form W-5 if you are eligible to get part of the earned income credit (EIC) in advance with your pay and choose to do so. See *Who Is Eligible To Get Advance EIC Payments?* below. The amount you can get in advance generally depends on your wages. If you are married, the amount of your advance EIC payments also depends on whether your spouse has filed a Form W-5 with his or her employer. However, your employer cannot give you more than $1,712 throughout 2007 with your pay. You will get the rest of any EIC you are entitled to when you file your tax return and claim the EIC.

If you do not choose to get advance payments, you can still claim the EIC on your 2007 tax return.

### What is the EIC?

The EIC is a credit for certain workers. It reduces the tax you owe. It may give you a refund even if you do not owe any tax.

### Who Is Eligible To Get Advance EIC Payments?

You are eligible to get advance EIC payments if all four of the following apply.

1. You (and your spouse, if filing a joint return) have a valid social security number (SSN) issued by the Social Security Administration. For more information on valid SSNs, see Pub. 596, Earned Income Credit (EIC).

2. You expect to have at least one qualifying child and to be able to claim the credit using that child. If you do not expect to have a qualifying child, you may still be eligible for the EIC, but you cannot receive advance EIC payments. See *Who is a Qualifying Child?* below.

3. You expect that your 2007 earned income and adjusted gross income (AGI) will each be less than $33,241 ($35,241 if you expect to file a joint return for 2007). Include your spouse's income if you plan to file a joint return. As used on this form, earned income does not include amounts inmates in

penal institutions are paid for their work, amounts received as a pension or annuity from a nonqualified deferred compensation plan or a nongovernmental section 457 plan, or nontaxable earned income.

4. You expect to be able to claim the EIC for 2007. To find out if you may be able to claim the EIC, answer the questions on page 2.

### How To Get Advance EIC Payments

If you are eligible to get advance EIC payments, fill in the 2007 Form W-5 at the bottom of this page. Then, detach it and give it to your employer. If you get advance payments, you must file a 2007 Form 1040 or 1040A income tax return.

You may have only one Form W-5 in effect at one time. If you and your spouse are both employed, you should file separate Forms W-5.

This Form W-5 expires on December 31, 2007. If you are eligible to get advance EIC payments for 2008, you must file a new Form W-5 next year.

*You may be able to get a larger credit when you file your 2007 return. For details, see Additional Credit on page 3.*

### Who is a Qualifying Child?

A qualifying child is any child who meets all three of the following conditions.

1. The child is your:

Son, daughter, stepchild, eligible foster child, brother, sister, half brother, half sister, stepbrother, stepsister, or a descendant of any of them (for example, your grandchild, niece, or nephew).

Note. An adopted child is always treated as your own child. An adopted child includes a child lawfully placed with you for legal adoption. An eligible foster child is any child placed with you by an authorized placement agency or by judgment, decree, or other order of any court of competent jurisdiction.

(continued on page 3)

---

▼ *Give the bottom part to your employer; keep the top part for your records.* ▼

.......................................... Detach here ..........................................

| Form **W-5** | Earned Income Credit Advance Payment Certificate | OMB No. 1545-0074 |
|---|---|---|
| Department of the Treasury
Internal Revenue Service | ▶ Use the current year's certificate only.
▶ Give this certificate to your employer.
▶ This certificate expires on December 31, 2007. | **2007** |
| Print or type your full name | | Your social security number |

**Note.** If you get advance payments of the earned income credit for 2007, you must file a 2007 federal income tax return. To get advance payments, you must have a qualifying child and your filing status must be any status except married filing a separate return.

1  I expect to have a qualifying child and be able to claim the earned income credit for 2007 using that child. I do not have another Form W-5 in effect with any other current employer, and I choose to get advance EIC payments . . . . .   ☐ Yes ☐ No

2  Check the box that shows your expected filing status for 2007:
☐ Single, head of household, or qualifying widow(er)    ☐ Married filing jointly

3  If you are married, does your spouse have a Form W-5 in effect for 2007 with any employer? . . . . . . . .   ☐ Yes ☐ No

Under penalties of perjury, I declare that the information I have furnished above is, to the best of my knowledge, true, correct, and complete.

Signature ▶                                                                                    Date ▶

Cat. No. 10227P

8B

08/06/2007  11:53    9229373                                    PAGE  13/24

Page 2

Form W-5 (2007)

## Questions To See if You May Be Able To Claim the EIC for 2007

⚠ You cannot claim the EIC if you file either Form 2555 or Form 2555-EZ (relating to foreign earned income) for 2007. You also cannot claim the EIC if you are a nonresident alien for any part of 2007 unless you are married to a U.S. citizen or resident, file a joint return, and elect to be taxed as a resident alien for all of 2007.

1  Do you expect to have a qualifying child? Read *Who Is a Qualifying Child?* that starts on page 1 before you answer this question. If the child is married, be sure you also read *Married child* on page 3.

☐ No. (STOP) You may be able to claim the EIC but you cannot get advance EIC payments.
☐ Yes. *Continue.*

⚠ If the child meets the conditions to be a qualifying child for both you and another person, see *Qualifying child of more than one person* on page 3.

2  Do you expect your 2007 filing status to be married filing a separate return?

☐ Yes. (STOP) You cannot claim the EIC.
☐ No. *Continue.*

(TIP) If you expect to file a joint return for 2007, include your spouse's income when answering questions 3 and 4.

3  Do you expect that your 2007 earned income and AGI will each be less than: $33,241 ($35,241 if married filing jointly) if you expect to have 1 qualifying child; $37,783 ($39,783 if married filing jointly) if you expect to have 2 or more qualifying children?

☐ No. (STOP) You cannot claim the EIC.
☐ Yes. *Continue.* But remember, you cannot get advance EIC payments if you expect your 2007 earned income or AGI will be $33,241 or more ($35,241 or more if married filing jointly).

4  Do you expect that your 2007 investment income will be more than $2,900? For most people, investment income is the total of their taxable interest, ordinary dividends, capital gain distributions, and tax-exempt interest. However, if you plan to file a 2007 Form 1040, see the 2006 Form 1040 instructions to figure your investment income.

☐ Yes. (STOP) You cannot claim the EIC.
☐ No. *Continue.*

5  Do you expect that you, or your spouse if filing a joint return, will be a qualifying child of another person for 2007?

☐ Yes. You cannot claim the EIC.
☐ No. You may be able to claim the EIC.

8B

113

08/06/2007  11:53   9229373

Form W-5 (2007)

2. At the end of 2007, the child is under age 19, or under age 24 and a student, or any age and permanently and totally disabled. A student is a child who during any 5 months of 2007 (a) was enrolled as a full-time student at a school or (b) took a full-time, on-farm training course given by a school or a state, county, or local government agency. A school includes a technical, trade, or mechanical school. It does not include an on-the-job training course, correspondence school, or Internet school.

3. The child lives with you in the United States for over half of 2007. But you do not have to meet this condition if (a) the child was born or died during the year and your home was this child's home for the entire time he or she was alive in 2007, or (b) the child is presumed by law enforcement authorities to have been kidnapped by someone who is not a family member and the child lived with you for over half of the part of the year before he or she was kidnapped.

Note. Temporary absences, such as for school, vacation, medical care, or detention in a juvenile facility, count as time lived at home. Members of the military on extended active duty outside the United States are considered to be living in the United States.

Married child. A child who is married at the end of 2007 is a qualifying child only if:

1. You may claim him or her as your dependent, or

2. You are the custodial parent and would be able to claim the child as your dependent, but the noncustodial parent claims the child as a dependent because:

a. You signed Form 8332, Release of Claim to Exemption for Child of Divorced or Separated Parents, or a similar statement, agreeing not to claim the child for 2007, or

b. You have a pre-1985 divorce decree or separation agreement that allows the noncustodial parent to claim the child and he or she gives at least $600 for the child's support in 2007.

Other rules may apply. See Pub. 501, Exemptions, Standard Deduction, and Filing Information, for more information on children of divorced or separated parents.

Qualifying child of more than one person. If the child meets the conditions to be a qualifying child of more than one person, only one person may treat that child as a qualifying child for 2007. If you and someone else have the same qualifying child, you and the other person(s) can decide which of you, if otherwise eligible, will take all of the following tax benefits based on the qualifying child: the child's dependency exemption, the child tax credit, head of household filing status, the credit for child and dependent care expenses, the exclusion for dependent care benefits, and the EIC. The other person cannot take any of the six tax benefits unless he or she has a different qualifying child.

If you and the other person cannot agree and more than one person claims the EIC or other benefits listed above using the same child, the tie-breaker rule applies. See Pub. 596, Earned Income Credit, Table 2. When More Than One Person Files a Return Claiming the Same Qualifying Child (Tie-Breaker Rule) and the instructions for Form 1040 or 1040A.



Caution. A qualifying child whom you use to claim the EIC must have a valid social security number unless he or she is born and dies in 2007.

**What If My Situation Changes?**

If your situation changes after you give Form W-5 to your employer, you will probably need to file a new Form W-5. For example, you must file a new Form W-5 if any of the following applies for 2007.

• You no longer expect to have a qualifying child. Check "No" on line 1 of your new Form W-5.

• You no longer expect to be able to claim the EIC for 2007. Check "No" on line 1 of your new Form W-5.

• You no longer want advance payments. Check "No" on line 1 of your new Form W-5.

• Your spouse files Form W-5 with his or her employer. Check "Yes" on line 3 of your new Form W-5.

Note. If you get advance EIC payments and find you are not eligible for the EIC, you must pay back these payments when you file your 2007 federal income tax return.

**Additional Information**

**How To Claim the EIC**

If you are eligible, claim the EIC on your 2007 tax return. See your 2007 tax return instruction booklet.

**Additional Credit**

You may be able to claim a larger credit when you file your 2007 Form 1040 or 1040A because your employer cannot give you more than $1,712 throughout the year with your pay. You may also be able to claim a larger credit if you have more than one qualifying child. But you must file your 2007 tax return to claim any additional credit.

Privacy Act and Paperwork Reduction Act Notice. We ask for the information on this form to carry out the Internal Revenue laws of the United States. Internal Revenue Code sections 3507 and 6109 and their regulations require you to provide the information requested on Form W-5 and to give it to your employer if you want advance payment of the EIC. As provided by law, we may give the information to the Department of Justice and other federal agencies. In addition, we may give it to cities, states, and the District of Columbia so they may carry out their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism. Failure to provide the requested information may prevent your employer from processing this form; providing false information may subject you to penalties.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by Code section 6103.

The average time and expenses required to complete and file this form will vary depending on individual circumstances. For the estimated averages, see the instructions for your income tax return.

If you have suggestions for making this form simpler, we would be happy to hear from you. See the instructions for your income tax return.

Client Company: _____
United Division: _____

# United Service Companies
## Conditions of Maintaining Employment
### Equal Opportunity Employer

The following information contained in this Employment Agreement is necessary, but not limited to these conditions to maintain your employment with United. All sections of this agreement must be filled out completely and signed by you **BEFORE** you can be considered employed by United

One or more of the following conditions met by an employee constitutes a VOLUNTARY QUIT connected with the work available through United. Meeting any of the following conditions may result in being denied unemployment insurance benefits.

1) Failure to call United at each assignment's end, regardless of the reason of separation with a client, with notification of your availability.
2) Failure to call three (3) times weekly when not on assignment. The phone number to call is: (800) 572-0315.
3) Failure to notify United with your change of address or phone number.
4) Refusal or failure to accept suitable work assignment based upon pay, qualification or location.
5) The company receipt of an unemployment claim from you without prior notification of your availability serves as a notice of a voluntary quit.

Initialing of the following area verifies that the above named individual has received a copy of United's policies, has read, fully understands, and agrees to adhere to the policies incorporated herein and made a part of the employment application process.

INITIAL:

_____  I understand this is not for payroll purposes only
_____  I understand I am the employee of United
_____  I have received a United handbook

## Medical Authorization

By signing below I authorize full access to copies of medical records, radiology reports, drug/alcohol screenings, and documents of any kind related to my past or present injury /illness to United I hereby agree to release information and hold all such medical providers harmless from the release of this information as set forth in this authorization.

In signing below, I acknowledge the above listed policies and conditions of employment with United

_____        _____        _____
Employee Signature                       Date                         Phone Number

8B

115

Client Company: _____
Temps, Inc. Division: _____

# Service Companies
## Condiciones para Mantener el Empleo
### Empleador de Oportunidad Igual

La informacion contenida en el Arreglo de Empleo es necesario pero no limitado ha estas condiciones para mantener su empleo con United. Todas las secciones de este arreglo deben ser llenados completamente y firmados por usted **ANTES** de que puedas ser considerado un empleado de United.

Una o mas de las siguientes condiciones hecho por el empleado constituye a una RENUNCIA VOLUNTARIA en conexion con el trabajo disponible por United. Las siguentes condiciones pueden ser una causa de que le niegemos los beneficios del desempleo.

1) Falta de llamar a United. cuando su trabajo ha terminado sin importar la razon de separacion con el cliente, con notificacion de su disponibilidad.
2) Falta de llamar tres (3) veces semanales cuando no tiene trabajo. El numero para llamar es: (800) 572-0315.
3) Falta de notificar a United con su cambio de direccion o numero de telefono.
4) Negarse o fallar de aceptar un trabajo basado por pago, calificacion o localizacion.
5) Que la compania reciba un reclamo del desempleo sin antes recibir una notificacion de su disponibilidad sirbe como una notificacion de renuncia voluntaria.

Poniendo sus iniciales en las siguientes areas verifica que, usted, el individual nombrado arriba ha recibido una copia de la polisa de United, la ha leido, la entiendo completamente, y accepta seguir la polisa y hacerse lo parte del proceso de la aplicacion de empleo.
INICE:
_____ Yo entiendo que esto no es para el proposito de pago solamente.
_____ Yo entiendo que soy un empleado de United.
_____ Yo he recibido el libro de empleo de United.

## Autorizacion Medico

Firmando abajo yo autorizo acceso completo de mis records medicales, reportes de radiografia, chequeo de droga y alchol, y cualquier documento que este relacionado con accidentes o enfermedades, anteriores o presentes con United. Yo accepto dar esta informacion y no hacer culpables a los Proveedores medicos que den cualquier informacion como dicho en esta autorizacion.

Yo accepto la lista de las polisas y condiciones del empleo con United.

_____        _____        _____
Firma                          Fecha                          Numero de Telefono

8B

116

# United**Service** Companies®

United Maintenance
United National Maintenance
United Security Services
United Temps

## Consent to Drug & Alcohol Testing

I, _____, hereby, freely and voluntarily, give my consent to United Service Companies, 1550 S. Indiana Avenue, Chicago, Illinois and to the testing Laboratory _____ to perform the appropriate tests, as needed, to identify the presence of drugs and alcohol. I give my permission for the test results to be released to United Service Companies.

I acknowledge that United Service Companies is required by the facility at which I work to have the drug testing performed.

I further acknowledge that the company has provided me with an opportunity to ask questions related to the drug testing and that all my inquiries have been answered.

Signature _____ Date _____

Witness Signature _____ Date _____

## Consentimiento al examen de Droga y Alcohol

Yo, _____, libre y voluntariamente, doy mi consentimiento a United Service companies y al laboratorio, _____ realizar la prueba apropiada para adentificar la presencia de droga y alcohol. Doy mi permiso para que los resultados sean entregados a United Service Companies.

Yo reconozco que las instalaciones en las cual trabajo, requieren que United Service Companies me realice examenes de Drogas y Alcohol.

Yo reconozco que la compania me a dado la oportunidad de hacer preguntas relacionadas al examen de drogas y alcohol y todas mis preguntas han sido contestadas correctamente.

Nombre y Firma _____ Fecha _____     8B

Firma de Testigo _____ Fecha _____     118

312 922 8558 · 800 248 8558 · Fax 312. 922. 8599

# Release Form for Consumer and Other Reports

In connection with my application for employment and/or continued employment (including contract for services), I understand that consumer reports or investigative consumer reports, which may contain public record information, may be requested or made on me. I authorize release of the reports that are indicated across from my signature.

- Consumer Credit      X_____
- Criminal Records      X_____
- Driving Records      X_____
- Education      X_____
- Prior employer verification      X_____

These reports may include experience along with reasons for termination of past employment. Further, I understand that you will be requesting information from various Federal, State, Local and other agencies, which may include information about my past activities.

I hereby authorize any party or agency contacted by this employer to furnish the above-authorized information.

I have the right to make a request of CIC Applicant Background Checks, upon proper identification and the payment of any authorized fees, for the information in its files on me at the time of my request.

I further authorize ongoing procurement of the above-authorized reports at any time during my employment (or Contract).

Name (print)_____ Social Security #_____

Street Address _____

City_____ State_____ ZIP_____

Driver's License/Identification #_____ State_____

For Identification Purposes:

Date of Birth: Month_____ Day_____ Year_____ Race_____ Gender_____

Other or Former Names_____

Professional License: State_____ Type_____ Number_____

                                                      8B

Signature_____ Date_____ 119

08/06/2007  11:53    9229373                                    PAGE   28/24

# United**Service** Companies®

Richard A. Simon President/CEO

United Maintenance
United National Maintenance
United Security Services
United Temps

Employee # _____

NAME _____     SEX _____

ADDRESS _____     PHONE _____

_____

SOCIAL SECURITY NUMBER _____

PERSON TO NOTIFY IN CASE OF EMERGENCY _____

RELATIONSHIP _____

ADDRESS AND PHONE # _____

DATE HIRED _____     RATE $ _____

LOCATION _____

SIGNATURE _____

NUMERO DE EMPLEADO _____

NOMBRE _____     SEXO _____

DIRECCIÓN _____

_____     NUMERO DE TELEFONO _____

LUGAR DE NACIMIENTO _____     CUIDADANO _____

NUMERO DE SEGURO SOCIAL _____

PERSONA DE NOTIFICAR EN EMERGENCIA _____

RELACION _____

DIRECCIÓN Y TELEFONO _____

FECHA DE CONTRATACION _____     PAGO INICIAL _____

UBICACION _____

FIRMA _____

8B

120

1550 S. Indiana Avenue, Chicago, IL 60605 • 312. 922. 8558 • 800. 248. 8558 • Fax 312. 922. 8599

## Authorization Agreement for Automatic Paycheck
### ACH Credits

**United**                                                          *Employer*

I hereby authorize my Employer (named above) to initiate credit entries and to initiate, if necessary, debit entries and adjustments to any credit entries in error to my account(s) listed below.

Financial Institution Name          _____

ABA/Transit Number (first 9 digits) *          _____

Address          _____
                 _____

Account #

Type of Account     *(check one)*          checking ___  saving ___  Money Mkt ___

Indicate: New_____  or          _____ $ _____  or  % _____
                    C.

Account #

Type of Account     *(check one)*          checking ___  saving ___  Money Mkt ___

Indicate: New_____  or          _____ $ _____  or  % _____
                    C.

The authority is to remain in full force until Employer has received written notification from employee of its termination in such time manner as to afford Employer and Financial Institution a reasonable opportunity to act on it.
*(please print)*

Name_____

Social Security #_____

Employee #_____

Signature _____  Date_____

* ABA/Transit Number is the first nine digits that appears on your personal prior to your account number. Please attach a cancelled/voided check to verify accuracy. If you are depositing to a Savings Account, please attach a letter your bank, stating your account number and ABA/Transit Number.

8B

121



)irecto
*It pays to go direct.*

## NROLLMENT FORM – NetBank

| ame (Nombre) | M.I. (Inicial) | Last Name (Apellido) |
|---|---|---|

| ddress (Dirección postal) |
|---|

| ity (Ciudad) | State (Estado) | Zip Code (Código postal) |
|---|---|---|

| ome Phone (Teléfono residencial) | Work Phone (Teléfono del trabajo) |
|---|---|

| ocial Security Number (TIN) Número de seguro social) | Driver's License Number (Número de licencia de conducir) |
|---|---|

| ate of Birth (Month/Day/Year) Fecha de nacimiento, mes/día/año) | Secret Word (Palabra secreta) |
|---|---|

| ame of Company (Employer) Nombre de la compañía) | E-mail Address |
|---|---|

### Account Number

### Agreement and Signature (Acuerdo y Firma)

I authorize any employer (hereafter "Company") to deposit any amount owed to me by initiating a deposit to any account at the Financial Institution (hereafter "Bank") indicated in this form. Also, I authorize Bank to accept and deposit such amounts indicated to my account. In the event that the Company deposits an amount erroneously into my account, I authorize the Company and Bank to charge my account for an amount not to exceed the original amount of the erroneous deposit. This authorization is to remain in full force and effect until the Company and Bank receive written notice from me of its termination in such time and in such manner as to afford Company and Bank reasonable opportunity to act on it.

Autorizo a mi empleador (en adelante "Compañía) a hácer un depósito por la cantidad que se me debe mediante un depósito a mí cuenta en la Institución financiera (en adelante "Banco") indicada en esta forma. También autorizo al Banco a recibir y depositar dichas cantidad en mi cuenta. En la eventualidad de que la Compañía deposite en mi cuenta una cantidad por equivocación, autorizo a la Compañía y al Banco a cargar de mi cuenta una cantidad que no exceda el depósito equivocado. Esta autorización estará vigente hasta que la Compañía y el Banco reciba de mi parte una notificación por escrito para su cancelación, en tal tiempo y de tal manera que la Compañía y el Banco tengan tiempo razonable de cancelarlo de manera oportuna.

I, the Applicant, have been provided a copy of the Account Terms and Conditions, including the Electronic Funds Transfer Disclosure, Fund Availability Disclosure and Right to Financial Privacy Disclosure, and agree to all terms and conditions contained therein. I also certify that the TIN given above is correct and I am not subject to IRS backup withholding.

Yo, el solicitante, he sido provisto con una copia de las Declaraciones de Términos y Condiciones, Incluyendo Transferencias de Fondos Electrónicos y Derecho a Confidencialidad Bancaria, y acepto de acuerdo con todas las atribuciones y condiciones contenidas en las dichas declaraciones. También certifico que el número de identificación arriba mencionado es correcto y que no debo impuestos sobre la renta retenida.

| Customer Signature (Firma del Cliente) | Date (Fecha) |
|---|---|

8B

08/06/2007  11:53  9229373                                     PAGE  23/24

**EDD** Employment
Development
Department
State of California

## REPORT OF NEW EMPLOYEE(S)

See detailed instructions on reverse side.  Please type or print.
NOTE:  Report new employees within 20 days of start of work.

00340600

| DATE | CA EMPLOYER ACCOUNT NO. | BRANCH CODE | FEDERAL ID NO. |
|---|---|---|---|
| M M D D Y Y | 46449617 | | 364278173 |

BUSINESS NAME
United Temps, Inc.

CONTACT PERSON
James Collins

TELEPHONE NO.
800-246-8558

ADDRESS          STREET
1550 South Indiana Suite 300 Chicago, IL 60605

CITY          STATE          ZIP

MAIL TO:  Employment Development Department / P.O. Box 997016, Document Management Group, MIC 96
West Sacramento, CA 95799-7016 or Fax to (916) 319-4400
Page 1 of 8

DE 34 Rev. 5 (12-04) (INTERNET)

8B
123

## INSTRUCTIONS FOR COMPLETING THE REPORT OF NEW EMPLOYEE(S)

**WHO MUST BE REPORTED:**

Federal law requires all employers to report to EDD within 20 days of start of work all employees who are newly hired or rehired. This information is used to assist state and county agencies in locating parents who are delinquent in their child support obligations.

An individual is considered a new hire on the first day in which he/she performs services for wages. An individual is considered a rehire if the employer/employee relationship has ended and the returning individual is required to submit a W-4 form to the employer.

**WHAT MUST BE REPORTED ON THIS FORM:**

**Employer's:**
- California Employer Account Number on each form completed
- Branch Code - Complete only if employer was assigned a Branch Code number
- Federal Employer Identification Number
- Business name and address

**Employee's**
- First name, middle initial, and last name
- Social Security number
- Home address
- Start of work date (hire date)

**HOW TO COMPLETE THIS FORM:**

Please record information in the spaces provided. If you use a typewriter or printer, ignore the boxes and type in UPPER CASE as shown. Do not use dashes or slashes.

| EMPLOYEE FIRST NAME | MI | EMPLOYEE LAST NAME | | |
|---|---|---|---|---|
| IMOGENE | A | SAMPLE | | |
| SOCIAL SECURITY NO. | STREET NO. | STREET NAME | | UNIT/APT |
| 123456789 | 1234 | ANY STREET | | 312 |

If you must hand print this form, write each letter or number in a separate box as shown. Do not use commas or periods.

| EMPLOYEE FIRST NAME | MI | EMPLOYEE LAST NAME | | |
|---|---|---|---|---|
| I M O G E N E | A | S A M P L E | | |
| SOCIAL SECURITY NO. | STREET NO. | STREET NAME | | UNIT/APT |
| 1 2 3 4 5 6 7 8 9 | 1 2 3 4 | A N Y S T R E E T | | 3 1 2 |

**ADDITIONAL INFORMATION:**

To obtain information for submitting Reports of New Employee(s) on magnetic media, call (916) 654-6845.

If you have any questions concerning this reporting requirement, please contact your local Employment Tax Office (ETO) listed in your local telephone directory in the State Government section under "Employment Development Department" or call (916) 657-0529.

**TO OBTAIN ADDITIONAL DE 34s:**
- Contact your local ETO for less than 25 copies;
- Call (888) 745-3886 for 25 or more forms;
- Visit EDD's Home Page at www.edd.ca.gov/taxrep/taxordn2.htm.

**HOW TO REPORT:**

Please record the information in the spaces provided and mail it to the following address or FAX to (916) 319-4400.

**EMPLOYMENT DEVELOPMENT DEPARTMENT**
**Document Management Group, MIC 96**
**P.O. Box 997016**
**West Sacramento, CA  95799-7016**

8B

DE 34 Rev. 5 (12-04) (INTERNET)                    Page 2 of 2

124

**Exhibit 9**

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

**DECLARATION**

**of**

**Dr. John S. Hekman**

**LECG**

**In the Matter of**

*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

**November 13, 2007**

9

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

## TABLE OF CONTENTS

I. Qualifications, assignment, summary of conclusions.                     1

II. Market Definition and market power                                      4

A. The Product Market                                                       5

B. The Geographic Market.                                                  10

III. SDCC's exclusionary conduct in the market for Trade

  Show Cleaning Services at the convention center.                         13

A. SDCC Has Excluded Competition Entirely From the

Convention Center.                                                         14

B. SDCC Has Attempted to Monopolize the Market by

Raising Rivals' Costs.                                                     17

C. The San Diego Convention Center is an Essential Facility

for Competitors in the Trade Show Cleaning Services Market.                17

IV. The security explanation by SDCC for excluding United

fails the "No Economic Sense Test"                                         18

V. Harm to consumers.                                                      21

VI. Conclusion                                                             24

9

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

## I. Qualifications, assignment, summary of conclusions.

1.      My name is John S. Hekman. I am a Principal at LECG, a firm that provides
consulting and expert testimony in economics, finance and accounting. Since 1990, I
have testified in federal and state courts on such matters as price fixing, patent
infringement, trade secrets, real estate finance and general economic damages. I have
previously been engaged as a consultant or expert witness in such matters as the licensing
of celebrity names and images, the structuring of contracts for the release of motion
pictures, the video rental industry and other aspects of the entertainment business. I have
defined relevant markets in antitrust matters. I have analyzed allegations of exclusionary
behavior by market participants. I have assessed the degree of market power by
defendants accused of the abuse of market power. I earned a MBA in finance and a
Ph.D. in economics at the University of Chicago. I have taught economics and finance at
the University of Southern California, The University of North Carolina, Boston College
and The University of Chicago. In addition, I have published a number of papers in
academic and professional journals. I was also an economist with the Federal Reserve in
Boston and Atlanta. My billing rate in this matter is $400 per hour. My curriculum vitae
is attached to this report as Exhibit 1.

2.      I have been asked by counsel for United National to analyze the actions of the San
Diego Convention Center ("SDCC") from the perspective of industrial organization
economics and to provide several opinions based on that analysis. I have been asked to
define the geographic markets as well as to determine whether the Trade Show Cleaning
Services provided by United and SDCC are part of a specialized product market that is

9

1

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

economically meaningful and distinct from other cleaning services. I have been asked to

determine whether SDCC has market power or monopoly power in this market and

whether SDCC has exercised such power. Finally, I have been asked to determine the

likely current and future effect on consumers in the relevant market of SDCC's action in

enforcing the exclusive use of SDCC employees for cleaning services.

3.      I have reviewed materials related to the case to form my opinions. These

materials include the Complaint for Injunctive Relief and Damages; Defendant's

Objections to Evidence Submitted by Plaintiff; the Memoranda of Points and Authorities

in Support and in Opposition to the application for a restraining order; the Declarations of

Carol Wallace, Dessi Nintcheva, Thomas Robbins, Jason Kirby, Richard Simon, Charles

Linn, Larry Colby, and Mark Epstein; the SDCC cleaning services contract with United

Service Companies; certain correspondence between market participants and SDCC from

1990 to 2000; correspondence from market participants related to SDCC's 2007 actions;

2006 Exhibitor Application and Contract, Internet Telephony Conference & Expo; the

SDCC website; and additional materials from my own research. A complete list of the

materials I have reviewed is attached to this Declaration as Exhibit 2.

4.      I recognize that there are additional materials likely to be provided to me during

the course of discovery, and I will revisit my opinions if necessary based on any new

information. However, the materials I have reviewed have allowed me to reach the

following opinions:

       a) The economically meaningful relevant product market is Trade Show Cleaning

       Services at SDCC.

       b) The relevant geographic market is the San Diego metropolitan area.

9

2

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

c) SDCC has market power in the Trade Show Cleaning Services market at the SDCC.

d) The demand for large trade show services facing SDCC is inelastic with respect to price. Trade Show Cleaning Services is a small portion of the price of large trade show services. As a result, a price increase in the Trade Show Cleaning Services market will have a small impact on the price of large trade show services and would be unlikely to cause a loss of SDCC's trade show business.

e) The effects of SDCC's denying United National and other cleaning services access to the convention center are highly anti-competitive.

f) SDCC has eliminated current and future competition and has effectively raised prices for Trade Show Cleaning Services in connection with its exclusion of non-SDCC cleaning employees.

g) The convention center is an essential facility for competitors in the trade show cleaning market, and SDCC has denied access to this facility for competitors in the market.

h) SDCC has leveraged its monopoly power in the San Diego large trade show market to exclude competitors in the Trade Show Cleaning Services market.

i) Because trade shows contract for space at SDCC many years in advance, trade show consumers are "locked in" to higher prices charged for cleaning services, and are further unlikely to switch because Trade Show Cleaning Services are a small percentage of the total expenditure for trade show services.

9

129

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

j) The manner in which SDCC has excluded competition is a form of "raising rivals' costs", which is recognized by economics as an anti-competitive practice.

k) I conclude from the "no economic sense" test that there is no pro-competitive justification for SDCC's actions.

l) Consumers in the market for Trade Show Cleaning Services have been harmed. Consumers have had their choices in the market reduced to a single supplier, i.e. SDCC. And the prices charged by SDCC are higher than those charged by United National.

## II. Market Definition and market power

5.      In order to assess whether the actions taken by SDCC against United National are anti-competitive, it is necessary to define the market in which SDCC and United compete. When the relevant market has been defined, an economist can measure the market or monopoly power that a firm such as SDCC has in that market and judge whether specific acts by that firm are anti-competitive.

6.      Economists have identified the primary elements of market definition as, first, the definition of the specific products or services that, in this case, SDCC and United sell. Products or services that have a high cross-price elasticity of demand are considered to be in the same market. A high cross-price elasticity of demand between services A and B means that if the price of A rises, the demand for B will rise by a significant amount. This shows that A and B are close substitutes. Products and services that are close substitutes using this measure are judged to be in the same market.

7.      The second primary element of the market definition is geographic. Some firms, for example GM or Ford, compete with other carmakers throughout the country in selling

9

4

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

their products, so that the relevant geographic context of the market is national. Other markets are much smaller geographically; a Del Taco in San Diego is not in the same geographic market as a Del Taco in Kansas City. For each product or service, the geographic market is the area in which the firms produce and sell.

8.      The use of monopoly power to interfere with the efficient functioning of a market without the result of lowering price or increasing quality is anti-competitive. In general, exclusionary conduct is any conduct that harms competitors and is not competition on the merits. A firm's actions are exclusionary if they tend to impair the opportunities of that firm's competitors in an unnecessarily restrictive way and do not enhance competition. Sometimes it is difficult to discern whether actions by a dominant firm that have the result of excluding competitors are anticompetitive. However, that is not the case with the actions of the SDCC with regard to the Trade Show Cleaning Services market at the SDCC. The effect of SDCC's actions was to exclude all competition, with no benefit to competition or to consumers.

## A. The Product Market

9.      The FTC and DOJ's 1992 Horizontal Merger Guidelines (Merger Guidelines) were developed in conjunction with economists and are generally accepted by economists as appropriate economic tools to be used by economists defining relevant markets and market power. The FTC/DOJ guidelines define a product market to be a group of products that are related such that a hypothetical profit-maximizing firm that was the only seller of those products (the monopolist) could profitably impose at least a "small but significant and non-transitory" increase in or markup of price over the competitive level.[1]

---

[1] U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section 1.1, <http://www.ftc.gov/bc/docs/horizmer.htm> (17 October 2005).

9

5

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

This minimum price markup that could be maintained for a significant period of time is typically taken to be 5 percent. This is sometimes called the "hypothetical monopolist test" or the "SNIP" test.

10.    The ability of a hypothetical monopolist to maintain a price increase as described above is analyzed by the competitive response that would result from the price increase. On the demand side, the response comes from buyers who switch to substitute products when the monopolist raises price. And on the supply side, the response comes from the ability of firms producing other products and services to begin producing the monopolist's product or service. The supply response also comes from new firms entering the industry because the price has risen.

11.    On the demand side, the market test asks, if the monopolist imposed the "significant and non-transitory" 5% price increase, whether buyers of the service could switch to other services in such numbers that the loss of sales by the monopolist would make the price increase unprofitable. If this is probable then the service would be in the same product market, and the market has not been defined broadly enough. Conversely, if the loss of sales is not enough to make the price increase unprofitable for the monopolist, then the product market is not too broad. The relevant market is the group of services just large enough that a monopolist could profitably raise price because buyers would be unwilling or unable to switch to other services.[2]

12.    The supply side market test looks to see whether other suppliers could enter the market or switch to producing the service produced by the monopolist in such a way that

---

[2] A well-known example of this test is the market for cellophane. If buyers switching to wax paper in response to an increase in the price of cellophane do not make the price increase unprofitable, then wax paper is not in the same antitrust market as cellophane.

9

6

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

a price increase would not be sustained. The market definition asks whether a 5%

increase in price by the hypothetical monopolist would cause more firms to enter the

market within one to two years, thus bringing price down and making the price increase

by the monopolist unprofitable.[3] If other firms are able to start producing the product or

service that the hypothetical monopolist produces, then the market definition is too

narrow. The relevant market is the group of sellers such that a monopolist could

profitably raise price because no more sellers would be able to enter the market in a

reasonable period of time.

13.      The evidence I have reviewed indicates that the number of firms that supply

Trade Show Cleaning Services is limited, because the type of cleaning performed by

United National at the SDCC is not standard space cleaning. Because this cleaning

appears to be specialized in a number of ways, United does not compete with ordinary

janitorial services and similar firms.

14.      One of United's primary customers in the trade show cleaning market is

Champion Exposition Services, a large general contractor for trade shows. Champion

signs contracts with trade associations to manage and organize their trade shows across

the U.S.[4] Mark Epstein, Champion's president, strongly supports the description of

United and other firms in the trade show cleaning market as highly specialized:

> "While a janitorial firm hired to clean office space in a commercial building can
> expect each office to be the same size and in similar condition everyday, each
> trade show is unique in size, configuration, and its cleaning needs. Based on the
> scope and size of a particular trade show, a provider of Trade Show Cleaning
> Services must constantly react to ever changing demands that involve the
> amount and location of manpower and equipment at any given moment. A
> provider of Trade Show Cleaning Services must ultimately have a tremendous

---

[3] The test requires both that there be entry of other firms and that the increase in supply be sufficient to bring the price back to a competitive level.
[4] Affidavit of Mark Epstein, page 1.

9

7

Dr. John S. Hekman Declaration
United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.

amount of logistical expertise and must anticipate needs proactively based on the past experience of the Trade Show Cleaning Services management. No two trade shows are the same from the perspective of Trade Show Cleaning Services.[5]

15.     There are two main functions performed by firms in the Trade Show Cleaning Market. The first is "facilities cleaning", which is cleaning aisles and common areas at SDCC during the move-in phase and construction of exhibits at conventions as well as during the move-out phase. The second function is "booth cleaning", which is described as cleaning exhibit booths during shows and during the night. Facilities cleaning is specialized in part because it must be performed during a short window of time between trade shows. At times the show moving in and the one moving out overlap, requiring even more experience to make the process run smoothly. United states that its cleaning services are individually tailored to the needs of each type of show and exhibitor. United National revenues from cleaning services at SDCC were approximately $500,000 per year.

16.     The special need filled by the cleaning contractors was acknowledged by SDCC. In a June, 2000 letter to the Trade Show Contractors Association, the Convention Center Director states: "As you know, with the existing and increasing level of business at the Convention Center, the time between move-out of one show and move-in of the next show is often extremely compressed. Time frames to return a clean floor will likewise often be compressed. You also know that we often run overlaps of move-outs and move-ins. The service contractors have been primary and key players in making those overlaps happen."[6]

---

[5] Affidavit of Mark Epstein, page 2.
[6] Letter from Joe Psulk to Marty Cymbal, June 20, 2000, page 2.

8

9

. 134

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

17.     The number of firms supplying Trade Show Cleaning Services in San Diego is

limited to those, primarily United National and SDCC, that have developed the expertise

over a number of years to be able to compete in the market. In the short run it is unlikely

that other janitorial firms could enter the market. Mark Epstein of Champion states "Due

to the expertise and specialized knowledge required, I would not consider even an

extremely price competitive bid from a traditional janitorial services firm to provide

Trade Show Cleaning Services."[7] Mary Beth Rebedeau of the Society of Independent

Show Organizers referred to how specialized the cleaning services are in her letter to

SDCC: "While we understand the need for facility managers to generate revenue,

tradeshow organizers and their exhibitors must retain the right to select vendors of their

choice. This is particularly true for large shows whose complexities demand carefully

selected and integrated vendor partners who have a thorough understanding of each

show's special needs. This includes cleaning services . . . . Show organizers spend years

cultivating relationships and advantageous pricing with their chosen suppliers. In-house

exclusives arbitrarily increase costs to show organizers -- and therefore exhibitors --

while decreasing the quality of the service provided due to lack of competition."[8]

18.     Competition for a hypothetical monopolist also could come from other firms

supplying cleaning services in San Diego. Barriers to entry make it more difficult for

new firms to enter. In this case, a major barrier is the lack of other firms with the

specialized cleaning experience possessed by United. As described above, the evidence I

---

[7] Affidavit of Mark Epstein, page 2. Anecdotal evidence from customers can be an important source of
information for market definition. It can confirm what economic analysis of the market situation indicates.
In this case, United National's customers explain why they need certain kinds of services that are not
available from conventional cleaning firms, and this is borne out by the market evidence that conventional
cleaning firms have not obtained contracts for Trade Show Cleaning Services at SDCC.
[8] June 22, 2007 letter from Mary Beth Rebedeau to SDCC.

9

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

reviewed indicates that there is a long learning curve down which firms would have to travel in order to be as efficient and therefore as competitive as United in doing this work. "Learning by doing" is a process that takes time, and therefore in the short run there would be no competitors able to enter the market. So even if it were possible for new firms to bid on cleaning contracts at SDCC, it is unlikely, from what I have seen, that there would be entry of new firms. However, the San Diego Convention Center is using its control over access to the center to eliminate all alternative cleaning firms. This is an absolute barrier to entry.

**B. The Geographic Market.**

19.    The relevant geographic market is the San Diego metropolitan area. Workers who are trained to perform the cleaning services in this market cannot come profitably from areas outside the local San Diego labor market and be competitive with those workers who are located in the local market, and trade shows are unable or unwilling to switch their shows from San Diego to another city in response to an increase in the price of Trade Show Cleaning Services.

20.    The issue of whether the relevant market is properly defined as Trade Show Cleaning Services at SDCC involves the ability of other firms (the supply side of the market) or trade show exhibitors (the demand side of the market) to react to an increase in price by SDCC. In the language of the FTC/DOJ antitrust guidelines, the hypothetical monopolist test asks whether a hypothetical 5% increase in price by the monopolist, maintained for a significant period of time, would elicit a sufficient competitive response to restrain the monopolist, making the attempted price increase unprofitable. This ability

9

10

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

of competition to "discipline" an increase in price can be analyzed by the supply response and the demand response.

21.    The buyers, or demanders, of Trade Show Cleaning Services are ultimately the exhibitors at trade shows. However, the exhibitors are not the direct buyers of cleaning services. United National contracts with a general contractor; the general is hired by a trade association. The trade association chooses the city and convention center where the show will be held, but the exhibitor-members of the association pay the fees that go to the general contractor and finally to the cleaning contractor, United. The exhibitors do not choose the convention city.

22.    In this way, the Trade Show Cleaning Services market is in a vertical relationship to the market for large trade shows. A monopolist who was the only seller of Trade Show Cleaning Services in San Diego would face potential competition from other convention centers, if the general contractors that hire cleaning firms in San Diego could move to other venues. However, there are a number of reasons why it is unlikely that contractors could switch to other convention centers to restrain SDCC's ability to raise price in the Trade Show Cleaning Services market.

23.    First, buyers are unlikely to discipline a SDCC price increase because of a "third-party payer" effect in the market. The ultimate buyer of Trade Show Cleaning Services as well as other costs of trade shows is the exhibitor. But the contracting of cleaning services is done by the general contractor, such as Champion. Increases in the price of Trade Show Cleaning Services are paid by the general contractor, but these increases are passed along to the exhibitor, which reduces the impact of the price increase. Further, the choice of a location for the trade show is made by the trade association, which is not the

9

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

final buyer of the services. As a result of this third-party payer structure, it is unlikely that a higher price charged by SDCC for cleaning services would affect the choice of location for conventions and thus provide competitive pressure on SDCC.

24    Second, general contractors are unlikely to "discipline" price increases by SDCC in cleaning services because there are no similarly-sized convention centers in San Diego or nearby that can host the large conventions that use SDCC. SDCC has monopoly power in the large trade show market in the San Diego region. The SDCC, with over 600,000 square feet of exhibit space, is one of the five largest convention centers in the United States. There is no other convention center of remotely comparable size in the San Diego area. The next largest meeting area in San Diego is the Hilton Convention Hotel, under construction across from the SDCC. It will have 106,000 square feet of meeting space, but it is mostly designed to satisfy the demand for hotel rooms for the SDCC.[9]

25.    Third, it is unlikely that contractors buying cleaning services would discipline a SDCC price increase for Trade Show Cleaning Services by switching to venues in other cities. The cost of exhibit cleaning is a very small portion of the total cost of putting on a convention, so that a monopolist in San Diego would not experience significant limits on its ability to raise price due to the possibility that contractors would move to other cities.

26.    Fourth, buyers are unlikely to discipline a SDCC price increase because of the long term planning that is necessary for the large trade shows that SDCC serves. These shows are often committed for five, ten or fifteen years in advance.[10] This reduces the ability of contractors and trade shows to move to other convention centers.

---

[9] http://www.portofsandiego.org/projects/hiltonhotel/
[10]Affidavit of Mark Epstein, page 3.

9

138

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

27.     I conclude that the SDCC does have market power or monopoly power in large

trade shows in the San Diego area as well as in the market for Trade Show Cleaning

Services at conventions in San Diego.  First, SDCC has the power to exclude competitors

without the likelihood that new competitors could enter the market.  Second, SDCC has

the power to set a price floor for Trade Show Cleaning Services at the center by requiring

all outside firms to use SDCC employees at wages set by SDCC.  Third, SDCC has the

power to raise price in the market.  Currently, SDCC has control over 100% of the

market, since it controls access to the SDCC and is dictating pricing in the market

regardless of the level of involvement that United is permitted to have.[11]

**III. SDCC's exclusionary conduct in the market for Trade Show Cleaning Services**
**at the convention center.**

28.     My reading of the evidence indicates that United National Maintenance obtains

contracts with Champion and other general contractors that provide services to

associations using the San Diego Convention Center for shows.  The exhibitors pay a fee

to Champion for booth cleaning services.  Champion retains approximately 50% of the

fee for its services and provides the remaining 50% to United for the booth cleaning.

United performs booth cleaning under its contract for this fixed amount.  For facilities

cleaning, United estimates the number of hours that will be needed for individual

exhibitor booth cleaning on a fully-loaded hourly fee basis.  The current contracts specify

an hourly rate of $16.35 to cover not only the labor used to perform cleaning but also for

materials and for United's management of the services.  This is done on a "not-to-

exceed" basis.  If the actual hours are greater than the not-to-exceed amount, United

---

[11] According to statements by SDCC and United, SDCC's share of the cleaning market at the convention center was as high as 60% before July 2007.

9

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

absorbs the additional cost. If the actual labor hours are less than what was estimated,

United is compensated only for the actual hours.

29.     In May 2007 United National was notified that as of July 1 all trade show

cleaning services at the Convention Center would be performed by SDCC employees. In

June of 2007 United National was notified that it could work at the Convention Center,

but that it would have to use SDCC employees to fulfill the terms of its contracts, at a

labor rate of $17 per hour. Furthermore, SDCC would take the entire 50% of booth

cleaning revenue that was contractually owed to United National. If the actual hours

expended were less than the number that would exhaust the 50% of booth-cleaning

revenue, then SDCC would keep the money that was left over. In other words, United

receives no revenue but is still responsible for seeing that the contract terms are satisfied.

Whatever supervisory or managerial resources are expended by United to fulfill the

contract are a 100% loss.

**A. SDCC Has Excluded Competition Entirely From the Convention Center.**

30.     The result of the actions by SDCC described above is to exclude all competition

in the Trade Show Cleaning Services market at the convention center. United National

will be forced to serve out the contracts with Champion and other general contractors that

it has already signed. However, when these contracts expire, United will not be able to

compete in the Trade Show Cleaning Services market at SDCC because it would lose

money in doing so. Nor is it likely that any general contractors would hire United under

the circumstances, namely that SDCC employees perform the work.

31.     SDCC has argued that it is not excluding competition because it has not excluded

United from the center, only United's cleaning staff. This is entirely misleading and

9

14

Case 3:07-cv-02172-BEN-JMA    Document 3-4    Filed 11/15/2007    Page 67 of 88

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

inaccurate, in my opinion. United cannot control the pricing of the services that it would

provide in the market, since SDCC dictates the hourly labor rates and takes all of the

booth cleaning revenue that United formerly received. Further, United's employees are

not permitted to work in the SDCC. The only way that United could "compete" in the

center would be processing paperwork and requests for cleaning services. This is not

competition in any meaningful sense, and since SDCC would control 100% of the pricing

in the market and all of the cleaning staff, there is no competition at all from the point of

view of industrial organization economics.

32.    The manner in which SDCC has attempted to exclude competitors in the market

for Trade Show Cleaning Services at SDCC's facility is by leveraging its monopoly

power in the market for large convention services in San Diego. Because SDCC has

market power in the San Diego large convention services market, it can require

convention exhibitors to use SDCC's cleaning services exclusively or raise the price

without suffering a significant loss of business in its primary market. SDCC serves very

large trade shows that have only a small number of alternative venues to choose from

nationwide. This lack of alternative venues for large trade shows means that the SDCC

has a relatively inelastic demand for its services, especially after a trade association has

booked a date for ten or more years in advance. Inelastic demand for a product or service

such as large trade shows means that if the price of the service rises, consumers of the

service (such as general contractors and show organizers) will not tend to look elsewhere

for a convention center but will tend to pay the higher price.

33.    The inelastic demand experienced by SDCC for trade shows means that if SDCC

succeeds in excluding all competition in the Trade Show Cleaning Services market,

9

15

141

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

SDCC can raise the price of cleaning services that is ultimately paid by trade show exhibitors without losing business in the large trade show market.

34.    Because of the long-term nature of SDCC's contracts with large convention trade shows, extending ten or fifteen years in some cases, the exclusionary action that SDCC has taken with regard to Trade Show Cleaning Services has "locked in" customers who use these services. In economic terms, a lock-in occurs in a situation where a consumer contracts with a seller for goods or services over an extended period of time. For the duration of the contract, the buyer is "locked in" to whatever downstream services are needed. The seller can take advantage of the lock-in to raise the prices of the services that are needed during the term of the contract. The buyer cannot go elsewhere to purchase those services because of the lock-in. In the situation being considered here, SDCC has locked in the consumers of Trade Show Cleaning Services for the duration of the ten or fifteen years that some trade shows have contracted.

35.    A number of trade show industry participants have responded to SDCC's exclusionary acts by writing letters to oppose the new policy. Some of these participants state that they try to avoid convention centers that have "exclusives", and some threaten to take their business elsewhere.[12] However, it is a measure of SDCC's market power in large trade shows that none of these participants has taken any business away from SDCC so far. And in spite of the implicit threat by these market participants to oppose SDCC's

---

[12] For example, Pat Dwyer, Sr. Manager of Trade Show Services for SmithBucklin, states in a letter to SDCC, "...one of the considerations we view as an imposition to our selection [of a venue] is the lack of choice of contractors to meet our highest level of service and accountability...While there are many factors that enter into the decisions to select a future site for our clients, one of the aspects which definitely would weigh in as less desirable is an exclusive service where there is no need to appoint one." June 27, 2007 letter from Pat Dwyer to SDCC.

9

16

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

imposition of an exclusive, SDCC went ahead with their exclusionary action. This also indicates how much market power SDCC possesses.

**B. SDCC Has Attempted to Monopolize the Market by Raising Rivals' Costs.**

36.     In a strictly technical sense, SDCC is allowing cleaning contractors to work in the relevant market at SDCC. SDCC may argue that they have not excluded United from the market. However, SDCC is using the strategy known as "raising rivals' costs" to exclude competition.[13] In this case, SDCC is appropriating all of the booth cleaning revenue that would have been received by United, and "allowing" United to compete in the market only by using SDCC's employees and by accepting no revenue. Thus, SDCC has raised the costs of United and other potential competitors to be greater than revenue.

37.     The raising rivals' costs action taken by SDCC is an example of what Scheffman and Higgins refer to as "cost-effective" strategies by monopolists. They say: "Some kinds of cost-raising strategies can obviously be very cost-effective—*e.g.,* actions that lead to governmental actions that exclude your rivals, or impair their ability to compete with you."[14]

**C. The San Diego Convention Center is an Essential Facility for Competitors in the Trade Show Cleaning Services Market.**

38.     Since the relevant market is Trade Show Cleaning Services at the SDCC, the Convention Center is an essential facility for firms that supply Trade Show Cleaning Services. An essential facility is a resource possessed by one firm that other competitors

---

[13] See for example Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.*, Boston: Pearson, Addison-Wesley, 2005, pp. 371-377; Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209 (1986); Steven Salop and David Scheffman, *Raising Rivals' Costs*, 73 American Econ. Rev. Papers and Proceedings 267 (May 1983); David Scheffman and Richard Higgins, *20 Years of Raising Rivals' Costs: History, Assessment, and Future*, Federal Trade Commission, *http://www.ftc.gov/be/RRCGMU.pdf.*
[14] Sheffman and Higgins, *20 Years of Raising Rivals' Costs*, page 5.

9

17

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

must have access to in order to compete with that firm. Another name for an essential

facility is a bottleneck. An example would be the only railroad bridge over a river for

many miles. If the railroad that owns the bridge refuses to deal with competing railroads

that need to use the bridge, competition is harmed. The SDCC is an essential facility

because it is the only venue for large trade shows in the San Diego area. It would be

prohibitively expensive for United to build another 600,000 square foot convention center

in order to compete with SDCC. United National and other firms in this market cannot

compete in the market unless they have access to the San Diego Convention Center

facilities. Control over this essential facility in the market for Trade Show Cleaning

Services gives SDCC the ability to exclude all of its competitors from the market.

**IV. The security explanation by SDCC for excluding United fails the "No Economic**

**Sense Test"**

39.    Actions by firms that tend to exclude their rivals can sometimes have pro-

competitive explanations. It is important to examine the possibility of a pro-competitive

reason for the exclusionary actions taken by SDCC before concluding that the actions

were anti-competitive. The economics literature refers to the "no economic sense" test to

examine whether there is any normal business justification other than exclusion for

actions such as those by SDCC.[15]  I have considered all of the statements by

representatives of SDCC and by other participants in the market that were provided to me

to examine the issue of a possible pro-competitive reason for the exclusion.

40.    First, I considered the possibility of enhanced efficiency in the market for Trade

Show Cleaning Services if SDCC employees have an exclusive. My conclusion is that

---

[15] Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

there is no enhanced efficiency justification for the conduct of SDCC. Exclusive

cleaning services at the Convention Center will not reduce cost to consumers or provide a

higher quality product. This is the only conclusion that can be reached given that:

1. The letters from contractors and show producers are unanimous in their
   opposition to an exclusive arrangement.

2. SDCC has not even attempted to provide an argument that exclusive cleaning
   services is more efficient. Instead, the change has been explained as a
   security matter.

41.    Second, I considered whether SDCC was carrying out a general shift in its

security policy by restricting all non-SDCC employees from using the center.

Economists have no special ability to measure the need for security at a facility such as

SDCC. However, an economist can observe the incentive for the owner of an essential

facility such as the SDCC to use a pretext to exclude its competitors in a market such as

Trade Show Cleaning Services where the SDCC is a competitor in the market. The

economist can weigh the consistency of the behavior of the SDCC in applying its security

policy against the behavior in which types of non-SDCC employees are excluded.

42.    I have read the declaration of William Callaghan, President of Century Security

and an expert in convention floor security according to the documents I have seen. Mr.

Callaghan concludes that SDCC's policy of excluding only non-SDCC cleaning

employees "makes absolutely no sense."[16] He finds that the policy makes no sense from

a security point of view because, among other reasons, cleaning employees tend to be

lower security risks than other non-SDCC employees who are not covered by the policy;

because cleaning employees are only 5% or less of the outside employees accessing

---

[16] William Callaghan Declaration, November 2007, par. 6.

9

19                                                                          145

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

convention centers; because SDCC does not require outside employees to wear badges, while United National does do this; and because United National has offered to run background checks on its employees, which SDCC has refused.[17]

43.     I have also read the declaration of Charles Buddy Linn, the Regional Vice President of United National, who is familiar with the security policies of not only SDCC but other major convention centers. He provides more detail on the level of security at SDCC compared to other centers in his experience. SDCC does not use a photo ID system for security, and its monitoring of outside employees accessing the facility is lax.[18] Further, Mr. Linn provides evidence that SDCC's claim that United was a security risk because it was using temporary employees is false.[19]

44.     From my own analysis as well as the evidence provided by Mr. Callaghan and Mr. Linn, I conclude that contrary to the idea of a general shift in security policy, cleaning services has been singled out for restrictions. SDCC competes with outside Trade Show Cleaning Services such as United. In contrast, SDCC does not compete directly with many other service providers who work on trade shows. Other non-SDCC contract employees have not been similarly excluded from the center on grounds of security concerns. Examples of the other services performed by non-SDCC workers are: drayage, cartage, furniture, booth and floor decorations, signs, photographs, telephone services, electricians, plumbers, and carpenters.[20]

45.     SDCC justifies its exclusion of competing cleaning suppliers on the basis of security concerns at the center. If this justification is a sham, as alleged by United

---

[17] Callaghan Declaration, par. 7, 8, 10, 12; Charles Buddy Linn Declaration, November 2007, par. 4.
[18] Linn Declaration, par. 4, 5.
[19] Linn Declaration, par. 7, 8.
[20] Terms and Conditions, 2006 Exhibitor Application & Contract, Internet Telephony Conference & Expo, item 6; Linn Declaration, par. 4.

9

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

National, then there is no pro-competitive justification for the exclusionary restrictions by SDCC. The restrictions do not lower costs; to the contrary, the restrictions result in higher prices in the cleaning services market. Similarly, the quality of service is not increased; no justification other than the asserted security concern has been advanced. The restrictions also do not increase consumer choice or services available; rather, they reduce the choice of services.

46.     SDCC could have used a less restrictive alternative to accomplish their stated goal of improving security at the convention center. They could have subjected United's employees to background checks. They could have provided enhanced security training or requirements. They could have worked with United to ensure that United's employees were no more of a security risk than their own booth cleaning employees.

47.     According to Mark Epstein of Champion, the employees of United National have been employed by the company for long periods of time and have had no security problems at the center. In contrast, employees of some other contractors who work in the convention center are "a huge security black hole."[21]  Yet these contractors have not been targeted in the way that United National has.

**V. Harm to consumers.**

48.     Consumers have been harmed first of all because SDCC is charging higher prices in the trade show cleaning market in connection with its exclusion of all non-SDCC cleaning employees. The terms of the relationship with United National dictated by SDCC in July 2007 represent a price increase for cleaning services. United National previously estimated the hours needed for facilities cleaning at the fully loaded labor rate of $16.35 in order to provide a not-to-exceed amount for services at particular exhibitor

---

[21] Affidavit of Mark Epstein, page 5.

9

21                                                                                                    147

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

spaces. SDCC has raised the hourly rate, not including United National's management

and other costs, to $17. Thus, SDCC has raised rates already to the extent that the hours

expended are less than the not-to-exceed hours. In addition, when United National's

current locked-in contract rates expire, SDCC will be charging more for the same number

of hours estimated for purposes of setting a not-to-exceed amount. In addition, SDCC

has effectively raised prices for booth cleaning. Currently, United National is locked into

its contracts to provide booth cleaning, even though it passes all of its booth-cleaning

revenue on to SDCC.

49.     Harm to the competitive process is demonstrated by, among other things, the

statements by market participants. Because of the exercise of monopoly power by the

SDCC, there is no longer any competition on the merits for exhibit cleaning services.

Letters expressing the displeasure of the trade show industry with the actions of SDCC

include:

1. Joint Statement of the Society of Independent Show Organizers, the International Association for Exhibition Management, and the Major American Trade Show Organizers.
2. Richard Simon, President of United Service Companies.
3. Joe Loggia, Chief Executive of Advanstar Communications.
4. Patricia Dwyer, Senior Manager of Convention and Trade Show Services, SmithBucklin Corporation.
5. Barbara Myers, Conferences and Meeting Services Director, APCO International
6. B.J. Enright, President, Trade Show Logistics.
7. Ken McAvoy, Senior Vice President, Reed Exhibitions.
8. Mary Kay Sustek, Senior Vice President, Neilson Business Media.
9. Martin Cymbal, President, Trade Show Contractors Association of Southern California.
10. Ty F. Bobit, President, Bobit Business Media.
11. Mary Beth Rebedeau, Executive Director, Society of Independent Show Organizers.

50.     Letters from trade show participants are clear in stating the harm they see in

SDCC's policy:

9

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

- Pat Dwyer of SmithBucklin states: "By taking the decision our of our hands to select this very important -- and visible service -- you could be taking away our ability to negotiate competitive pricing models for our client, as well as the relationship to a valuable member of our service level team environment."[22]

- Mary Kay Sustek of Nielson Business Media states: "While I believe we have used the SDCC cleaning services over the past years, it was by choice. Imposing an exclusive of any type isn't in the best interest of Nielsen or its customers. Nielsen manages its shows based on the specific needs and requirements of customers and having this flexibility is a key ingredient to a successful show. . . . In our experience, exclusive services ultimately become more expensive and less service oriented as it takes the competitive nature out of the business."[23]

- Ty Bobit of Bobit Business Media states: "Please know that the imposition of an exclusive service will be in contradiction to the wishes of your customers and it typically reduces service levels and takes competitive pricing options away. We have found over the years that the show manager's ability to choose a contractor and control price helps . . . provide better service at competitive prices."[24]

- Mary Beth Rebedeau of the Society of Independent Show Organizers states: "While we understand the need for facility managers to generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors of their choice. This is particularly true for large shows whose complexities demand carefully selected and integrated vendor partners who have a thorough understanding of each show's special needs. This includes cleaning services . . . . Show organizers spend years cultivating relationships and advantageous pricing with their chosen suppliers. In-house exclusives arbitrarily increase costs to show organizers -- and therefore exhibitors -- while decreasing the quality of the service provided due to lack of competition."[25]

- B.J. Enright of Tradeshowlogistics states: "[O]ur clients would love to have the San Diego Convention Center competitively bid for the opportunity to be the official cleaning contractor. However, an exclusive situation does not promote competition and service."[26]

- John Mooney of SISO wrote: "Our opposition to exclusives is based on the historical fact that competition among suppliers provides the best service at the lowest cost. Exclusives have the reverse effect."[27]

---

[22] Letter from Pat Dwyer to SDCC, June 27, 2007.
[23] Letter from Mary Kay Sustek to SDCC, June 22, 2007.
[24] June 14, 2007 letter from Ty Bobit to SDCC.
[25] July 20, 2007 letter from Mary Beth Rebedeau to SDCC.
[26] July 26, 2007 letter from B.J.Enright to SDCC.
[27] March 31, 2000 letter from John Mooney to Carol Wallace.

9

149

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

- Michael Muldoon, of the Convention Management Group, wrote to say "Please know that food and beverage events, like the shows we manage, have extraordinary cleaning requirements. Our relationship with United Services Companies has been extremely important to the production of these events. We have not been as successful working in facilities that require the hiring of "exclusive contractors" and we avoid "exclusive shops."[28]

51.     The conclusion I have reached from, among other things, my experience as an economist as well as the statements from market participants quoted here is that SDCC's exclusion of competition in Trade Show Cleaning Services at the convention center, if it continues, will produce higher prices and a lower quality of service. The experiences cited by Nielson Business Services, Bobit Business Media, the Society of Independent Show Organizers and the Convention Management Group all support this conclusion. The experiences of these organizations provide a natural experiment that, while insufficient by themselves to provide a definitive prediction for SDCC, nevertheless points toward harm for consumers as a result of SDCC's exclusion.

**VI. Conclusion**

52.     For all of the reasons stated above, I believe that the actions of SDCC in excluding competition in the market for Trade Show Cleaning Services in the convention center are highly anti-competitive. Based on the documents I have examined, I also believe that there is no pro-competitive justification for the SDCC's actions. My opinions have been formed based on the documents that I have seen. I understand that more information may become available in the future. If so, it may be necessary to amend these opinions in the light of additional discovery.

John S. Hekman, Ph.D.        November 13, 2007    Los Angeles, CA.

---

[28] March 13, 2000 letter from Michael Muldoon to Carol Wallace.

24

9

150

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

**List of Exhibits to Declaration of Dr. John S. Hekman**

1. Exhibit 1: Curriculum Vitae of Dr. John S. Hekman

2. Exhibit 2: List of Materials Reviewed

9

# JOHN S. HEKMAN

LECG, Inc.
2049 Century Park East, Suite 2300
Los Angeles, California 90067

Tel. (424) 204-8872
Fax (310) 556-0766
E-mail: jhekman@lecg.com
hekman@marshall.usc.edu

John S. Hekman's areas of expertise include antitrust, real estate and finance. He has testified in federal and state courts on such matters as price fixing, patent infringement, trade secrets, real estate finance and general economic damages. Dr. Hekman has conducted research involving such industries as oil and gas, steel, paper and wood products, and computers. In addition, he has published a number of articles in the areas of real estate finance and industry studies. Dr. Hekman was formerly an economist with the Federal Reserve and Associate Professor of Finance at the University of North Carolina. He holds a Ph.D. in economics and a MBA from the University of Chicago.

## EDUCATION

Ph.D., Economics, University of Chicago

M.B.A., Finance, University of Chicago

B.A., History, Valparaiso University

## PRESENT POSITION

LECG, LLC, 2004-present, Principal.

University of Southern California, 1989-present. Department of Finance and Business Economics: Lecturer, MBA program.

## EMPLOYMENT

Economic Analysis LLC, 2000-03, Principal.

LECG, LLC, 1998-2000, Principal.

Altschuler, Melvoin and Glasser LLP, 1996-98, Director.

Economic Analysis Corp., Vice President (1993-96); Senior Economist (1992).

Micronomics, Inc., 1990-92, Senior Economist.

9

Claremont Economics Institute, 1986-90, Executive Vice President and Director of U.S. Economic Forecasting.  Editor, *The Main Street Journal* Investment letter.

University of North Carolina, Chapel Hill 1981-86, Associate Professor of Finance (academic tenure granted, 1985).

Federal Reserve Bank of Atlanta, 1981-84, Visiting Scholar.

Federal Reserve Bank of Boston, 1980, Economist.

Harvard-MIT Joint Center For Urban Studies, 1978, Research Associate.

Boston College, 1975-81, Assistant Professor of Economics.

University of Chicago, 1974-75, Instructor.

## TESTIMONY

*Julius Chang and Howard Chen  v. Charles Schwab & Company,* California Superior Court, County of San Francisco.  Retained by Daniel Newland of Seyfarth Shaw LLP.  Deposition October, 2007.

*Eric Seiken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San Diego.  Retained by Kevin Quinn of Thorsnes Bartolatta McGuire.  Class Certification Declaration submitted September, 2007.

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et al,* California Superior Court, County of San Mateo.  Retained by Joel Wolosky of Hodgson Russ.  Deposition April 2007.

*James Ripley v. Wyoming Medical Center et al.*  United States District Court for the District of Wyoming.  Retained by Stephen Kline of Kline Law Office PC.  Deposition April 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District of California.  Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman.  Deposition February 2007.

*Breakdown Services Ltd. v. Now Casting, Inc.* California Superior Court, County of Los Angeles.  Retained by Stephen P.  Krakowsky.  Deposition October 2006.

*RitterRanch Development LLC, debtor.  Los Angeles County Waterworks District No. 40 v. Robbin Itkin et al.,* United States District Court Central District of California.  Retained by Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller.  Deposition June 2006.

9

*Pamela Cunningham and Reet Caldwell v. Mattel, Inc.* Circuit Court, Third Judicial Circuit, Madison County, Illinois. Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges. Deposition February 2005.

*In re Cioffi,* California Superior Court, County of Santa Clara. Retained by William Russell of Lakin, Spears. Deposition and trial testimony January 2004.

*Ederel Sport, Inc. v. Gotcha International, L.P.* U.S. Bankruptcy Court, Central District of California. Retained by Michael Adele of Albert, Weiland & Golden. Deposition and trial testimony May 2003.

*In Re Fuqua Industries Shareholder Litigation,* Delaware Chancery Court Civil Action No. 11974. Retained by Lowell Sachnoff of Sachnoff & Weaver. Deposition March 2003.

*SPC/PomomaLLC v. Medianews Group, Inc.* Superior Court of California, County of Los Angeles. Retained by Steven Gardner of Cohon and Gardner. Deposition February 2003; trial testimony April 2003.

*MGM v. Midway Games, Inc.* U. S. District Court, Central District of California, Western Division. Retained by John Williams of Lord, Bissell & Brook. Report submitted October 2002.

*Freeman Industries LLC v. Eastman Chemical Company, et al.,* In the Law Court for Sullivan County at Kingsport, Tennessee. Retained by Aton Arbisser of Kaye Scholer. Class Certification Affidavit submitted September 2002.

*Keep v. State of California,* Superior Court of California, County of Los Angeles. Retained by Vladimir Shalkovich, Deputy Attorney General. Deposition October 2002.

*IMAX, LTD. v. Krikorian Premiere Theatres,* U.S. District Court for the Central District of California. Retained by Glenn Dassoff of Paul, Hastings, Janofsky & Walker. Deposition September 2002.

*Betty Bullock v. Phillip Morris, Inc. et al.;* California Superior Court, Los Angeles. Retained by Thomas Stoever of Arnold & Porter on behalf of defendant. Deposition May 2002.

*International Paper and Masonite v. Affiliated FM Insurance Co, et al.;* California Superior Court, San Francisco. Retained by Adam Murray of Howrey, Simon, Arnold & White. Deposition May 2001; trial testimony November 2001.

*Copley Press, et al. v. Gray Davis, et al; Tony Strickland, et al. v. Gray Davis, et al.;* California Superior Court, San Diego County; retained by Timothy Muscat, Deputy Attorney General. Declaration in Support of Defendant's Opposition Brief submitted May 2001.                                                                                           9

*Fitzgerald v. Silcott, et al.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Deposition January 2000; trial October 2001.

*Formal Complaint of Tesoro Alaska Petroleum Against Amerada Hess, et al.,* Federal Energy Regulatory Commission and Regulatory Commission of Alaska. Retained by John Donovan of Skadden, Arps, Slate Meagher & Flom. Testimony submitted November 2000.

*Alavi v. Kaiser Foundation Hospitals.* Retained by Walter Weiss. Arbitration testimony November 2000.

*Seguritan v. State of California, et al.* Los Angeles County Superior Court. Retained by Anne Hunter, Deputy Attorney General. Deposition July 2000.

*Lenehan v. Maryland Casualty.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Deposition May 2000.

*Hearing on Green Coke Pricing Issue for TAPS Quality Bank.* Federal Energy Regulatory Commission. Retained by John Donovan of Skadden, Arps, Slate, Meagher & Flom. Testimony May 2000.

*Tash v. Aviara Land Associates, L.P., et al.* San Diego Superior Court. Retained by Jerry Phillips of Richman, Mann, Chizever, Phillips & Duboff. Deposition April 2000; Trial testimony May 2000.

*First Pension Corp/Murray v. Belka.* California Superior Court, County of Orange. Retained by William Meeske of Latham & Watkins. Deposition February 2000.

*Edelman v. Minkler.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Trial testimony April 2000; deposition January 1999.

*Rhonda Jalali v. Assembly of God, Teen Challenge et al.* California Superior Court. Retained by George Buehler of Howrey & Simon. Deposition and trial testimony July 1999.

*Alfred Martino, Jr. v. Northbrook Property and Casualty Company and St. Paul Fire and Marine Insurance Company,* Arbitration. Retained by Law Offices of J. Jeffrey Long. Testimony June 1999.

*Dawn Place v. Thillaiyamp Sri Jaerajah,* California Superior Court for the County of Kern. Retained by Law Offices of J. Jeffrey Long. Trial testimony June 1998.

*Hugo Valdivia v. MCE Corporation, et al.,* California Superior Court for the County of Los Angeles. Retained by Andrew Jacobs of the Law Offices of Andrew Hoffman (CNA Insurance). Deposition November 1997; trial January 1998.

9

*Louisville Bedding Company v. Pillowtex Corporation*, United States District Court for the Western District of Kentucky. Retained by Hartwell Morse of Welsh & Katz. Deposition November, December 1997.

*Infant and Nutritional Products, et al. v. BJ Family Food Center, et al*, California Superior Court for the County of Los Angeles. Retained by Farhad Novian of Novian & Novian. Deposition September 1997.

*William Gene Norman v. Herbalife International, et al.*, California Superior Court for the County of Los Angeles. Retained by Ward Benshoof of McClintock Weston Benshoof Rochefort Rubalcava MacCuish. Deposition April 1997.

*Jeffrey Alpert v. Gerald Busch, et al*, California Superior Court for the county of Los Angeles. Retained by Law Offices of Daniel Hoffman (CNA Insurance). Trial testimony November 1997.

*Janelle Flores v. Dapo Popoola, MD, et al.*, California Superior Court for the County of Los Angeles. Retained by Henry Tovmassian of Kehr, Crook, Tovmassian & Fox. Deposition September 1997.

*Ridgecrest Homeowners Association v. Nihon Lancre America, Inc., et al.*, California Superior Court for the County of Los Angeles. Retained by Ronald Caswell of Richmond, Lawrence, Mann, Greene, Chizever, Friedman & Phillips. Deposition June 1997.

*Harvey W. Stuart, et al. v. Kraft Foods, Inc. et al.*, United States District Court for the Eastern District of Wisconsin. Retained by Michael Freed of Much Shelist Freed Denenberg Ament Bell & Rubenstein. Affidavit November 1996; deposition and court testimony December 1996.

*Albert and Estelle Binder, et al. v. Thomas Gillespie, et al.*, United States District Court for the District of Idaho. Retained by Robert Bretz of Robert H. Bretz, PC. Affidavit December 1996.

*Ernst Paul Lehmann Patentwerk v. San-Val Discount, Inc.*, United States District Court, Central District of California. Retained by Douglas Adler of Skadden, Arps, Slate, Meagher & Flom. Affidavit submitted March 1996.

*JAR-PR Associates v. Unocal,* Superior Court of the State of California, County of Los Angeles. Retained by George Crook of Kehr, Crook, Tovmassian & Fox. Deposition and trial testimony, March 1996.

*Sarkis v. State of California*, California Superior Court, County of Kern. Retained by Deputy Attorney General Daniel Helfat. Deposition, January 1996.

9

*Casper Boso v. Chicago Bears.*  Retained by Steven Wolf of Wolf & Ouimet to testify regarding the average career length of NFL players.  Arbitration testimony November 1994.

*Styling Research Company v. Conair Corporation*, Superior Court of the State of California, County of Los Angeles.  Retained by Phillip Belleville of Latham & Watkins.  Deposition August 1992.

*Medical Designs, Inc. v. Donjoy, Inc.,* United States District Court, Southern District of California.  Retained by Paul C. Van Slyke of Pravel, Gambrell, Hewitt, Kimball & Krieger.  Deposition October 1991.

*California Grocers Association v. Bank of America*, Superior Court of the State of California for the County of Alameda, Northern District.  Retained by Arne Wagner of Bank of America.  Deposition May 1991.

## CONSULTANT

Simpson Thatcher & Bartlett, New York, NY, Kenneth Logan;  *Ronald Cleveland, et al. v. Viacom, Blockbuster, et al.*  United States District Court for the Western District of Texas, 2002.

*In Re Maguire Thomas Partners – Grand Place Tower, Ltd.*  United States Bankruptcy Court, Central District of California.  Retained by Bennett Silverman of Gibson, Dunn & Crutcher on behalf of Sumitomo Bank, 1999.

Howrey & Simon, Washington, DC, Thomas Heyer; *Litton Systems, Inc. v. Honeywell, Inc.,* 1995-1996.

Thelen, Marrin, Johnson & Bridges, San Francisco, Steven V. O'Neal; *IBM v. Fasco Industries,* 1994-1995.

*Packard Bell Electronics, Inc. v. Teledyne Industries, Inc.*, Superior Court of the State of California, County of Los Angeles.  Retained by Ronald M. St. Marie of Ervin, Cohen & Jessup.  August 1995.

O'Melveny & Myers, Los Angeles, Charles Diamond, Randy Oppenheimer; *Exxon Valdez Oil Spill Litigation,* 1993-1994; 2000; 2002.

## REFEREE

| | |
|---|---|
| *American Economic Review* | *Journal of Political Economy* |
| *Quarterly Journal of Economics* | *Journal of Industrial Economics* |
| *International Regional Science Review* | *Southern Economic Journal* |
| *Journal of Regional Science* | *AREUEA Journal*              9 |

John S. Hekman _____ Page 7

*Journal of the American Planning Association*      *Financial Management*

## PUBLICATIONS

"California Under Siege: A Call for Perspective" (with Ken Agid, et al.), California Real Estate Roundtable, April 1991.

"Should We Reform Deposit Insurance?" *Los Angeles Times,* March 11, 1990, D3.

"New England's Economy in the 1980s" (with Lynn Browne), in *The Massachusetts Miracle,* David R. Lampe (ed.), The MIT Press: Cambridge, MA, 1988.

"Real Estate Returns and Inflation" (with David Hartzell and Mike Miles), *American Real Estate and Urban Economics Association Journal (AREUEA),* Spring 1987.

"Factors Affecting Manufacturing Location in North Carolina," in Dale Whittington (ed.), *High Hopes for High Tech: Microelectronics in North Carolina,* University of North Carolina Press, 1987.

"Diversification Categories in Investment Real Estate" (with David Hartzell and Mike Miles), *AREUEA Journal*, Summer 1986.

*Land Supply Monitoring: A Guide for Improving Public and Private Urban Development Decisions* (with D. Godshalk, S. Bollens, and M. Miles), Oelgeschlager, Gunn & Hain: Boston, 1985.

"Rental Price Adjustment and Investment in the Office Construction Market," *AREUEA Journal,* Spring 1985.

"Branch Plant Location and the Product Cycle in Computer Manufacturing," *Journal of Economics and Business,* May 1985.

"Venture Capital and Economic Development in the Southeast" (with Mike Miles), *Economic Review*, Federal Reserve Bank of Atlanta, July 1983.

"Optimal Allocation of Economic Development Funds" (with Mike Miles, et al.), N.C. Department of Natural Resources and Community Development, January 1983.

"What are Businesses Looking for? A Survey of Industrial Firms in the South," *Economic Review*, Federal Reserve Bank of Atlanta, June 1982.

"Behind the Sunbelt's Growth: Industrial Decentralization" (with Alan Smith), *Economic Review*, Federal Reserve Bank of Atlanta, March 1982.

"Impact of Environmental Regulations on Industrial Development in North Carolina" (with Raymond Burby, et al.), North Carolina Department of Natural Resources and Community Development, February 1982.

"The Evolution of New England Industry" (with John Strong), *New England Economic Review*, March-April 1981.

"New England's Economy in the 1980s" (with Lynn Browne), *New England Economic Review,* January-February 1981.

"Income, Labor Supply and Urban Residence," *American Economic Review*, September 1980.

"Is there a Case for Plant Closing Laws?" (with John Strong), *New England Economic Review*, July-August 1980.

"The Product Cycle and New England Textiles," *Quarterly Journal of Economics,* June 1980.

"Can New England Hold Onto its High Technology Industry?" *New England Economic Review,* April 1980.

"Regions Don't Grow Old, Products Do," *The New York Times*, Sunday Business, November 4, 1979.

"What Attracts Industry to New England?" *New England Economic indicators,* December 1978.

"An Analysis of the Changing Location of Iron and Steel Production in the Twentieth Century," *American Economic Review*, March 1978.

## BOOK REVIEWS

Southern Capitalism, in *The Journal of Regional Science,* vol. 27, no. 4, 1987.

The Deindustrialization of America, in *UNC Business,* February 1983.

Three books on industrial location, in *Journal of the American Planning Association,* June 1982.

Free to Choose, in *Harvard Business Review*, September 1980.

*October, 2007*

9

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2*

Exhibit 2

List of Materials Reviewed

1. Complaint for Injunctive Relief and Damages
2. Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction
3. Defendants Objections to Evidence Submitted by Plaintiff in Support of Plaintiff's Ex Parte Application for a Temporary Restraining Order
4. Letter from Aaron Bludworth to Brad Gessner, September 21, 2007.
5. Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order
6. Memorandum of Points and Authorities in Support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order.
7. Plaintiff's Ex Parte Application for a Temporary Restraining Order.
8. Proposed Temporary Restraining Order
9. Proposed Temporary Restraining Order and Order to Show Cause re Preliminary Injunction
10. Request for Judicial Notice in support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order
11. Declaration of Carole Wallace in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
12. Declaration of Dessi Nintcheva in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
13. Declaration of Thomas Robbins in Support of Plaintiff's Application for a Temporary Restraining Order
14. Declaration of Jason Kirby in Support of Plaintiff's Application for a Temporary Restraining Order
15. Declaration of Charles Buddy Linn in Support of Plaintiff's Application for a Temporary Restraining Order

9

160

1

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2*

16. Declaration of Larry Colby in Support of Plaintiff's Application for a Temporary Restraining Order
17. Declaration of Mark Epstein in Support of Plaintiff's Application for a Temporary Restraining Order
18. Declaration of Mark Epstein, October 26, 2007
19. Declaration of Richard Simon in Support of Plaintiff's Application for a Temporary Restraining Order
20. San Diego Convention Center Corporation Cleaning Services Contract with United Service Companies 2007
21. UNM v. San Diego Convention Center Pleadings List
22. San Diego Convention Center 2006 Annual Report
23. San Diego Convention Center Corporation, Convention and Trade Show License Agreement
24. July 26, 2007 Letter from Richard Simon to Jerry Sanders
25. July 5, 2007 Letter from Joe Loggia to Brad Gessner
26. June 27, 2007 Letter from Pat Dwyer to Brad Gessner
27. June 18, 2007 Letter from Barbara Myers to Brad Gessner
28. July 26, 2007 Letter from B.J. Enright to Brad Gessner
29. June 14, 2007 Letter from Ken McAvoy to Brad Gessner
30. June 22, 2007 Letter from Mary Kay Sustek to Brad Gessner
31. June 8, 2007 Letter from Martin Cymbal to Brad Gessner
32. June 14, 2007 Letter from Ty Bobit to Brad Gessner
33. SISO, IAEM, AND MATSO ISSUE JOINT INDUSTRY STATEMENT ON EXCLUSIVE SERVICES
34. July 20, 2007 Letter from Mary Beth Rebedeau to Brad Gessner
35. June 20, 2000 Letter from Joe Psulk to Marty Cymbal
36. May 12, 2000 Letter from Beatrice Kemp to Mark Valley
37. March 31, 2000 Letter from John Mooney to Carole Wallace
38. March 13, 2000 Letter from Michael Muldoon to Carole Wallace
39. March 8, 2000 Letter from Brian Casey to Carole Wallace
40. March 7, 2000 Letter from Mary Beth Rebedeau to Carole Wallace

9

161

2

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2*

41. March 2, 2000 Letter from James Bracken to Carole Wallace

42. March 1, 2000 Letter from Stephen Shuldenfrei to Carole Wallace

43. June 20, 1990 Letter from Hugh Mac Lean to Tom Liegler

44. June 13, 1990 Letter from Richard Simon to the San Diego Convention Center Board of Directors

45. May 11, 1990 Letter from Hugh Mac Lean to John Hartley

46. U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section 1.1, http://www.ftc.gov/bc/docs/horizmer.htm.

47. http://www.portofsandiego.org/projects/hiltonhotel/

48. Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.,* Boston: Pearson, Addison-Wesley, 2005.

49. Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price,* 96 Yale L.J. 209 (1986)

50. Steven Salop and David Scheffman, *Raising Rivals' Costs,* 73 American Economic Review Papers and Proceedings 267 (May 1983)

51. David Scheffman and Richard Higgins, *20 Years of Raising Rivals' Costs: History, Assessment, and Future,* Federal Trade Commission, *http://www.ftc.gov/be/RRCGMU.pdf*

52. Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

53. Terms and Conditions, 2006 Exhibitor Application & Contract, Internet Telephony Conference & Expo, item 6.

54. Declaration of Charles Buddy Linn, November 2007.

55. Declaration of William Callaghan, November 2007.

9

162

3