**Exhibit 10**

8/3/01

## CONVENTION SERVICES AGREEMENT

This Agreement is made and entered into this _9_ day of August, 2001, by and between GES Exposition Services, Inc. ("GES") and United National Maintenance Inc. ("United"). The duration of this Agreement is five (5) years, May 1, 2001 – April 30, 2006 ("Term"). Unless either party notifies the other party at least six (6) months prior to end of the Term, this Agreement shall automatically renew for an additional term of five (5) years according to the provisions of Section 3, herein.

### INTRODUCTION

GES is engaged in providing a wide range of services to conventions, special events, expositions, displays, trade shows, corporate meetings and the like (collectively, "Shows"), including the delivery of decorating services, carpentry services and supplying materials in the erecting and dismantling of exhibits and displays in hotels and convention facilities. Additionally, the performance of drayage and storage services, the furnishing of furniture, equipment and accessories, and the providing of cleaning/janitorial service, and other services are provided by GES as the General Service Contractor for the Shows. United is engaged in providing cleaning/janitorial services for Shows and at times acts as a subcontractor to GES.

IT IS, THEREFORE, AGREED:

1.  **CONTRACTING FOR GENERAL CLEANING SERVICES.**

    **(A)**    GES agrees to use its reasonably commercial efforts to be designated as the cleaning/janitorial contractor for all Shows at which GES is performing or delivering other services (including, without limitation, any of the services referenced in the first introductory paragraph of this Agreement) and which are located in the Territory, as defined in Section 1(C) below. In each instance during the Term, where GES is so designated as cleaning/janitorial contractor and where GES has the right to bill the applicable customers for any Cleaning Services performed, as defined below, GES agrees to retain United to perform and supervise all such Cleaning Services provided that (i) United agrees to perform and supervise such Cleaning Services at the price applicable to the subject customer established by GES, (ii) United agrees to furnish all necessary labor, equipment and supplies at its sole cost and expense, and (iii) GES' right to retain United is not restricted by law, or Show management's relationship with another cleaning service provider. When a venue claims exclusivity and seeks to prohibit the Cleaning Services of United, GES may permit United to challenge the venue policy at United's expense, but GES is under no obligation to challenge such venue's policy on behalf of United.

    **(B)**    Cleaning Services. For purposes of this Agreement, "Cleaning Services" shall include all standard cleaning and janitorial functions provided in accordance with the past performance between the parties, and shall also include nightly vacuuming of aisle and

United / GES Agreement

CONFIDENTIAL

10

exhibit space, "porter" services and the removal of refuse materials from aisle and exhibit space before (move in), during (aisle porters), and after (move out) each Show ("trashing") where required.

**(C)**    Territory.  For the purpose of this Agreement, GES has established that the territories of operation for United shall include all cities, and venues therein, in which GES currently operates within the United States, except Shows where the Show Management has a contractual relationship with another cleaning service provider and the city of Las Vegas, Nevada (unless Show Management has a contractual relationship with United), and any other geographical area which the parties may hereafter mutually agree should be included in the scope of this Agreement (collectively, "Territory").

    1.    When a venue imposes a legal surcharge or tax, GES will add this cost to the exhibitor's invoice and collect same from the exhibitor and pay the venue.

**(D)**    Performance.  United shall (i) perform first class, quality service as recognized in the exposition industry, (ii) furnish all necessary labor equipment and supplies at its sole cost and expense, (iii) use its best efforts to hire suitable individuals for employment to perform hereunder, (iv) use its best efforts to promote the services of GES, as described in the Introduction, to customers of United; and (v) comply with all applicable local, state or federal laws, statutes, ordinances, codes, rules and regulations in the performance of its obligations hereunder.

**2.    PRICING.**

**(A)**    The "Total Adjusted Gross Revenue" for a Show shall mean all Cleaning Services revenue, including without limitation, any exhibit or other revenues billed or received by GES in connection with or relating to the performance of Cleaning Services for such Show, but after deducting revenue from Exhibitor Porter Services as described in Section 2(B), bad debts and any other adjustments agreed between United and GES in advance.  For each Show, United shall be entitled to receive

**(B)**    In the case of porter services performed by United for exhibitors and other third parties to a particular Show ("Exhibitor Porter Services"), United shall also be entitled to receive, in addition to its percentage payment under Section 2(A), the following:  (1) a priority reimbursement, which shall be deducted from the Cleaning Services revenues collected by GES with respect to such Show, and which shall be based on the hours of Exhibitor Porter Services performed multiplied by the hourly rate established in Schedule A, attached hereto and incorporated herein ("Porter Labor"); and (2)

(C)    In the case of any "direct porter" or "trashing" (such as aisle porter or trash removal) services performed by United, GES shall pay United per Schedule B for the hours expended in performing such services.

(D)    In the case of move in (pre-show) and move out (post show) services performed by United, GES shall pay United per Schedule B for the hours expended in performing such services.

(E)    In the case of any GES gem booths, GES shall pay United

(F)    In the case of carpet packages, GES shall pay United the following for carpet packages with and without rental systems. Carpet packages without rental systems will be calculated as follows: '

(G)    In the case of GES aisle and show management area carpet vacuuming in the primary convention center only, United will perform that service ⟨                                    All hotel locations directly related to the Show will be charged according to the Direct Labor Rate provided in Schedule B.

(H)    In the case of a Package arrangement booth cleaning, GES shall pay United

(I)    In the case of vacuuming GES carpet (both booth and aisle) in centers where it will not conflict with Union Jurisdiction, after close of an event and if time permits, GES shall pay United
aisle) in centers w

(J)    Notwithstanding any other terms of this Section 2, if there is material change in United's labor force (such as a change from non-union to union workers), the parties agree to renegotiate appropriate changes in United's compensation hereunder. In the event the parties cannot reach a mutual agreement on such compensation, either party may terminate this Agreement upon thirty (30) days written notice, but such termination shall apply only to the particular Show(s) where a mutual agreement could not be reached.

(K)    GES shall provide the exhibitor revenue to the United's representative at the Show site. Within ten (10) days of the Show, United shall present to GES an invoice for

REDACTED

exhibitor billing and all aisle and trashing charges. All payments are due to United within thirty (30) days of the date on the invoice.

1.  Settlement Process. Within six (6) months of a Show, the parties shall make appropriate adjustments on a future United invoice or resulting GES payment to reconcile any credits or repayments given to such Show's management or exhibitor for incorrect billing by GES.

2.  Advance Payment. United may from time to time make a request to the Chief Financial Officer of GES for advance payment for trashing and/or booth cleaning charges on a Show. When the request is made and approved by GES, it will be in the form of an advance payment request to GES' Chief Financial Officer with a copy to the local city marked, "For Notification Purpose Only Do Not Pay." United will send this request via facsimile to GES' Chief Financial Officer who will transfer the amount requested within three (3) business days to United, if such request is approved.

    (L)

    (M)     Price increases for the hourly rates provided in Schedules A and B will be figured as of the base hourly rate provided in such Schedules. Price increases for the hourly rates provided in Schedules A and B shall not increase in any single year during the

1.  If there is an increase in the national or local minimum wage ("Wage Increase"), United will pass this Wage Increase along to GES as a direct cost and shall not add any profit or additional increase to such Wage Increase. This provision shall apply only to the labor force that, at the time of the Wage Increase, was paid the national or local minimum wage affected by the Wage Increase.

2.  The parties agree to renegotiate the percentage split provided in Section 2(A) if any one of the following occur:

REDACTED

10

166

**3.    TERM.** Unless this Agreement is terminated earlier as provided herein, this Agreement shall have a term commencing on May 1, 2001 ("Commencement Date") and ending five (5) years following the Commencement Date on April 30, 2006 (the "Term"). **Unless either party notifies the other party at least six (6) months prior to the end of the Term, this Agreement automatically renews for a successive five-year period beyond the Term from May 1, 2006 through April 30, 2011 ("Renewal Term").**

**4.    INDEPENDENT CONTRACTOR.** With respect to the services to be performed by United pursuant to this Agreement, United acknowledges that it is an independent subcontractor of GES, and that nothing in this Agreement shall be construed to create or imply employment, partnership or joint venture relationship. GES is interested only in the results obtained by United, and United shall have sole control over the manner and means of its performance under this Agreement. GES shall not have the right to require United to take any action that might jeopardize the relationship of independent contractor between GES and United. United shall be solely responsible for its employees, agents and representatives, who shall be at United's own risk, expense and supervision.

GES shall not have the right to obstruct, overturn or otherwise interfere with any decision on the part of United to terminate any employment, partnership or other relationship between United and any other party with respect to the services to be performed under this Agreement. Except as set forth in this Agreement, neither party is granted any right or authority to assume or create any obligations or responsibilities, express or implied, on behalf of or in the name of/or the other party, or to bind the other party in any manner whatsoever.

**5.    NO SUBCONTRACTING OF SERVICES.** United agrees to perform pursuant to the terms of this Agreement without the use of contract labor (unless properly supervised by a United employee who is on the premises of the Show venue during the use of such labor) or subcontractors, except by written permission of GES. United and its sister companies and Affiliates, as defined in Section 10(E), shall not be considered subcontractors.

**6.    CONFLICT OF INTEREST.** United shall not (i) on its own behalf or on behalf of a competitor of GES, solicit directly or indirectly the business of clients of GES; (ii) take any action to impair or jeopardize GES' relationship with its customers and (iii) promote directly or indirectly the services of a competitor of GES. Upon violation of this Section 6, GES may terminate this Agreement upon giving notice to United.

**7.    INSURANCE REQUIREMENT.** United will maintain during the Term and Option Term, if applicable, the following insurance requirements:

United / GES Agreement                     Page 5                          CONFIDENTIAL

REDACTED

(A)    Worker's Compensation Insurance:
Part I--Statutory coverage in all operating States.
Part II--$100,000 per Accident.
$100,000 per Employee for Disease.
$500,000 per Policy Aggregate for Disease.
GES Exposition Services shall be named as an additional insured.

(B)    Commercial General Liability on an occurrence basis (not claims made) with minimum limits of:
Bodily injury and Property Damage - $1,000,000 per occurrence.
Personal injury and Advertising Liability - $1,000,000 per occurrence.
General Aggregate - $1,000,000.
Products & Completed Operations Aggregate - $1,000,000.
No endorsement attached reducing coverage provided by the Basic policy Form CG0001 and GES shall be named as an additional insured.

(C)    All the policies indicated in this Section 7 shall be evidenced to GES by standard ACCORD Certificates of Insurance but with the provision of thirty (30) days notice of cancellation.

8.    **INDEMNIFICATION.** United shall indemnify, defend (by counsel reasonably satisfactory to GES) and hold harmless GES from and against claims, damages, and costs (including reasonable attorney's fees for the defense thereof) arising out of or attributed to the operations and services performed by United, its agents, employees and subcontractors, except for the sole negligence of GES.

9.    **NOTICES.** All notices and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of transmittal), or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service, in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may designate by notice to the other parties):

If to GES:    GES Exposition Services, Inc.
950 Grier Drive
Las Vegas, Nevada 89119
Attn:   President/Chief Executive Officer
Facsimile: 702-263-3402

a copy to:    Viad Corp
1850 North Central Avenue
Phoenix, Arizona 85077-1012
Attn:   General Counsel
Facsimile:  602-207-5480

United / GES Agreement                   Page 6                        CONFIDENTIAL

If to United:   United National Maintenance, Inc.
                1550 South Indiana Avenue
                Chicago, Illinois 60605
                Attn: Richard A. Simon
                Facsimile: 312-922~~XXXX~~-225



## 10.   DEFAULT AND TERMINATION.

(A)   <u>Claims</u>.  In the event GES claims that there is default in any of the obligations or conditions set forth in this Agreement, GES shall notify United of such claim of default in writing pursuant to Section 9.

(B)   <u>Failure to Notify</u>.  The failure on the part of GES to notify United of a claim of default in accordance with this Section 10 shall not be deemed a waiver of GES' rights at a subsequent time.

(C)   <u>United's Time to Cure.</u>   United shall correct a claim of default within twenty-four (24) hours of written notice of such default from GES to United if the default is in connection with an on-going Show ("On-Going Show Default"), or within thirty (30) days after written notice if the default is of any other nature ("Other Default").  If United cannot cure a default within the specified time, but can provide GES with good cause why such default cannot be cured within the specified time, United will not be in default if United commenced performance within the specified time period and thereafter diligently completes performance.  In the event United fails to correct an Other Default to the reasonable satisfaction of GES within the time specified, or such greater period as GES may permit, or incurs more than three (3) On-Going Show Defaults within a thirty (30) day period and fails to correct any one of those On-Going Show Defaults to the reasonable satisfaction of GES within the time specified, or such greater period as GES may permit, GES may, in its sole discretion, exercise one or more of the following remedies: immediately terminate this Agreement upon written notice to United; exercise any other right or remedy which may be available under law; or proceed pursuant to the dispute resolution procedure of Section 11 to enforce the terms hereof or to recover damages for the breach hereof.  No express or implied waiver by GES of any event of default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent event of default.

(D)   <u>Bankruptcy or Insolvency</u> .  If a decree or order by a court having jurisdiction shall be issued (a) adjudging United bankrupt or insolvent, or (b) approving as properly filed a petition seeking reorganization of United under any section of the National Bankruptcy Act, as amended, or (c) ordering or approving the winding up or liquidation of Concessionaire's affairs, or (d) appointing a receiver or a liquidator or a trustee in bankruptcy for United or its property, then GES may terminate this Agreement.  Further, if United shall institute proceedings to be adjudicated a voluntary bankruptcy or shall consent to the filing of any bankruptcy or insolvency proceedings against it, or shall file a petition or answer a consent order seeking reorganization under any state insolvency law, or shall admit in writing its inability to pay its debts generally as they become due, or take any action

10

169

in furtherance of any of the aforesaid purposes, then GES may immediately terminate this Agreement without notice.

**(E)** <u>Change of Ownership</u>. As a material inducement for GES to enter into this long-term agreement, United shall give GES ninety (90) days advance notice before any of the following occur: (1) United or a substantial portion of its assets is sold to a person or entity which is not currently an Affiliate of United; (2) United is merged with an entity not currently an Affiliate of United; or (3) United otherwise has a change in ownership or control other than existing shareholders (collectively "Change of Ownership"). Upon receiving notice by United of a Change of Ownership, GES shall have sixty (60) days to provide notice of GES' approval of such Change of Ownership, which shall not be unreasonably withheld.    In the event GES gives notice of its disapproval of the Change of Ownership and it occurs, this Agreement shall terminate with ten (10) days advance notice by GES. In the event GES or a substantial portion of its assets is sold to a person or entity not currently an Affiliate of Viad Corp, the new owner shall have the right to terminate this Agreement after April 30, 2006 and with ninety (90) days advance notice. An "Affiliate" shall mean an entity that controls, is controlled by or is under common control with a party hereto.

**(F)** <u>Labor Dispute</u>. In the event United experiences a labor dispute of its employees or contractors during which time GES' business is disrupted in any way including, but not limited to, a failure of GES' employees or contractors to cross the picket line of United's workers or the employees or any other employer working in connection with a particular Show who fail to cross the picket line of United's workers, GES has the right to suspend this Agreement, upon notice to United, for such Show and hire a substitute cleaning service provider for such Show, only. The parties shall, in good faith, negotiate the appropriate compensation for the Cleaning Services provided by United up to GES' notice of suspension.

**11.    DISPUTE RESOLUTION.** Any dispute arising out of or relating to this Agreement ("Dispute") shall be resolved in accordance with the following procedures:

**(A)** <u>Negotiation</u>. The parties shall attempt in good faith to resolve any Dispute promptly by negotiation between executives who have authority to settle the dispute and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement.

**(B)** <u>Mediation</u>. If the Dispute has not been resolved by negotiation as provided herein, the parties shall endeavor to settle the dispute by mediation before resorting to litigation. Mediation shall be governed by the then current Center for Public Resources ("CPR") Model Procedure for Mediation of Business Disputes in effect on the date of this Agreement. The neutral third party mediator will be selected from the CPR Panels of Neutrals, with the assistance of CPR, unless the parties agree otherwise.

**(C)** <u>Exception</u>. Notwithstanding the foregoing, in the event that the Dispute has arisen out of litigation or other court or regulatory action or proceeding against any party hereto by a third party, the Dispute shall not be subject to Sections 11(A) or 11(B).

**(D)** Equitable Remedies. At any time, a party may seek injunctive, specific performance or other equitable or similar judicial relief if in its judgment such action is necessary to avoid irreparable damage, to preserve the status quo or to otherwise preserve the benefits and rights created by this Agreement. The parties may adjudicate in any court of competent jurisdiction any causes of action and claims for damages arising out of such request.

**12.    MODIFICATION.** No modification, amendment or waiver of the provisions of this Agreement shall be effective unless in writing specifically referring hereto and signed by both parties.

**13.    WAIVER OF BREACH.** The waiver by either party of a breach of any provision of this Agreement by the other party shall not operate or be construed as a waiver of any subsequent breach.

**14.    ASSIGNABILITY AND BINDING EFFECT.** Subject to Section 10(E), neither party shall assign its rights or delegate the performance of its obligations hereunder without the prior written consent of the other party. Subject to the provisions of the preceding sentence, all the terms of this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns.

**15.    GOVERNING LAW.** This Agreement and the right of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Nevada. The unenforceability or invalidity of any provision of this Agreement shall not affect the enforceability or validity of the balance of this Agreement.

**16.    GOOD FAITH, COOPERATION, AND DUE DILIGENCE.** The parties covenant, warrant and represent to each other good faith, complete cooperation, due diligence and honesty in fact in the performance of all obligations of the parties pursuant to this Agreement. All promises and covenants are mutual and dependent.

**17.    CAPTIONS.** Captions contained in this Agreement are inserted for convenience only and in no way define, limit, or extend the scope or intent of any provision of this Agreement.

**18.    ENTIRE AGREEMENT SUPERCEDING EFFECT.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof. No modifications, changes or additions to this Agreement (including any modifications which may be made on a "per Show" basis) shall be valid unless they are in writing and signed by both parties hereto. Effective as of the Commencement Date, this Agreement supersedes any prior agreement between the parties in all respects to the extent of the subject matter hereof.

**19.    AUTHORITY TO ENTER TRANSACTION.** The parties hereto represent and warrant to each other that (i) the representative signing this Agreement on behalf of such

party ("Representative") has the absolute and unrestricted right, power and authority to execute this Agreement, and thereby bind such party to perform such party's obligations and covenants under this Agreement, and (ii) the execution and delivery by Representative of this Agreement, and the consummation by such party of the transactions contemplated herein, have been duly authorized by such party, and no further authorization is necessary.

    **20.**   **REMEDIES CUMULATIVE.**  All remedies at law or in equity available to either party shall be cumulative and the exercise of any one or more of such remedies shall not preclude the exercise of any others.

    **21.**   **SURVIVAL.**  No termination of this Agreement, either with or without cause, shall release either party hereto from their obligations contained in Sections 2, 8 and 11, which shall survive such termination for a period of two (2) years.

    **22.**   **COUNTERPARTS.**  This Agreement may be executed in two counterparts, each of which shall be deemed an original but both of which shall constitute one and the same instrument.  In addition, this Agreement may contain two counterparts of the signature page and this Agreement may be executed by the affixing of the signatures of each of the parties to one of such counterpart signature pages; both such counterpart signature pages shall read as though one, and they shall have the same force and effect as though both the signers signed a single signature page.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first set forth above.

GES EXPOSITION SERVICES, INC.

BY: _____

NAME: PAUL DYKSTRA

TITLE: President

UNITED NATIONAL MAINTENANCE, INC.

BY: _____

NAME: Richard A Simon

TITLE: President

## SCHEDULE A

## PORTER LABOR FOR EXHIBITOR PORTER SERVICES

City                                    Labor Rate in U.S. Dollars

Atlanta
Baltimore
Chicago
Cleveland, Ohio
Dallas
Denver
Washington, D.C.
Detroit
Houston
Indianapolis
Los Angeles/Anaheim
Las Vegas
Miami
Milwaukee
Minneapolis
Nashville
New Orleans
Orlando/Tampa
Philadelphia
Phoenix/Tucson
Portland
Reno
Sacramento
San Antonio
San Diego
Salt Lake City
Seattle
Santa Clara
San Francisco
San Jose
St. Louis

## SCHEDULE B

### DIRECT HOURLY LABOR RATE

| City | Labor Rate (in U.S. dollars) | Supervisor Rate (in U.S. dollars) |
|---|---|---|
| Atlanta | | |
| Baltimore | | |
| Chicago | | |
| Cleveland, Ohio | | |
| Dallas | | |
| Washington, D.C. | | |
| Detroit | | |
| Houston | | |
| Indianapolis | | |
| Los Angeles/Anaheim | | |
| Las Vegas | | |
| Miami | | |
| Milwaukee | | |
| Minneapolis | | |
| Nashville | | |
| New Orleans | | |
| Orlando/Tampa | | |
| Philadelphia | | |
| Phoenix/Tucson | | |
| Portland | | |
| Reno | | |
| Sacramento | | |
| Salt Lake City | | |
| San Antonio | | |
| San Diego | | |
| Seattle | | |
| Santa Clara | | |
| San Francisco | | |
| San Jose | | |
| St. Louis | | |

SCHEDULE C

**BILLING FORM**

NAME: _____

DATE: _____

LOCATION: _____

Due United
National Maintenance

1. GROSS CLEANING REVENUE                              $ _____
2. SUBTRACT GES PORTER SERVICE REVENUE  -  $ _____
3.                                                   = $ _____
4.                                                   x  50%              = _____
5.

6. PORTER LABOR   number of _____ HRS   X   $ _____ per hr.   = _____
7.
8. GES PORTER SERVICE REVENUE (Line 2)       $ _____
9. SUBTRACT PORTER LABOR  (Line 6)       -  $ _____
10.                                                  = $ _____
11.                                                  x  50%              = _____

11. TOTAL AMOUNT DUE                          $ _____

**Exhibit 11**



*United* **Service** *Companies®*

United Maintenance Company, Inc.
United National Maintenance, Inc.
United Security Services, Inc.
United Supply Service, Inc.
United Temps, Inc.

June 21, 2005

Mr. Mark Epstein
Champion Exposition Services
139 Campanelli Drive
Middleborough, MA   02346

Dear Mark,

Per our conversation of June 21, 2005, please accept the following, as the agreement by and between Champion Exposition Services and United National Maintenance Inc., for exhibitor and common area cleaning services for shows produced by Champion.  This agreement will remain in effect for five (5) years from the commencement date of July 1, 2005 and expiration date of June 30, 2010.

During this time Champion will use its best efforts to secure cleaning service to all shows that it is the contractor for and designate United as the cleaning contractor.

Further:

1. United will bill Champion                          for exhibitor ordered vacuuming.
2. United will bill Champion                          for exhibitor ordered vacuuming when show management orders 100% cleaning.
3. Carpet Shampooing will be done at
4. Poster areas, restaurant and other bulk carpeted non-exhibit areas will be billed back at the hourly labor rate for that city (see Direct Hourly Labor Rate - Addendum 1).
5. United will clean registration, Show management offices, exhibitor service area and remove trash from exhibit areas at no charge on all show days.
6. United will provide to the Champion account executive on-site, a daily report of labor hours for sign-off, should said A/E or his designee be available (by area; move-in, move out, aisle porters, etc.).
7. On shows where United's revenue (                          does not cover United's labor cost, United will bill Champion (

1550 S. Wabash Avenue, Chicago, IL 60605 • 312 922 8558 • 800 248 8558 • Fax 312 922 8500
www.unitedinc.com

11

**REDACTED**

176

8. Invoices will be sent to Champion within fourteen (14) days of the close of the show using the show date, as the date of invoice and payment is due within 30 days.

9. United will provide the Champion account exec with an estimate of the pre-show, post-show and aisle porter costs prior to the show should the Champion A/E request such estimate. This estimate will be a not to exceed figure. United shall invoice Champion (or the customer at Champions direction) for that amount or less based on the hourly cost in Addendum (1).

10. United shall perform two types of Porter service for Champion: 1) Periodic Porter Service and 2) Hourly Porter service.  The rates and conditions for each service are noted below:
Periodic Porter Service –

Hourly Porter Service – will be billed back at the hourly rate for that city (see Direct Hourly Labor Rate-Addendum 1).

11. The hourly billing rate (Direct Hourly Labor Rate-Addendum 1) and the footage rate will stay in effect for the duration of this contract unless there is a federal, state or local minimum wage increase or non-union becomes union or there is a substantial union increase at any one venue, at which time an increase may be requested by United and approved by Champion.

Approved and accepted by:

_____
Mark Epstein
Champion Exposition Services

Approved and accepted by:

_____
Richard A. Simon
United National Maintenance

12. Champion requires at the close of every show that U.M. provide the on-site A/E pre-and post-show recaps for review + sign off.

13. All estimates provided under #9 above. to include estimate for pre-show and post-show cleaning.

11

REDACTED

177

●                        ●

## CHAMPION
### Direct Hourly Labor Rate - Addendum 1

| City | Labor | Supervisor |
|---|---|---|
| Atlanta | | |
| Baltimore | | |
| Chicago | | |
| Cleveland, Ohio | | |
| Dallas | | |
| Denver | | |
| Washington D.C. | | |
| Detroit | | |
| Houston | | |
| Indianapolis | | |
| Los Angeles/Anaheim | | |
| Las Vegas | | |
| Miami | | |
| Milwaukee | | |
| Minneapolis | | |
| Nashville | | |
| New Orleans | | |
| Orlando/Tampa | | |
| Philadelphia | | |
| Phoenix/Tucson | | |
| Portland | | |
| Reno | | |
| Sacramento | | |
| San Antonio | | |
| San Diego | | |
| Salt Lake City | | |
| Seattle | | |
| Santa Clara | | |
| San Francisco | | |
| San Jose | | |
| St. Louis | | |
| Moscone CC only* | | |

**REDACTED**

11

**Exhibit 12**

## DECLARATION OF RICHARD SIMON

I, Richard Simon, declare and would testify as follows:

1.    I am the President of United National Maintenance, Inc. ("United") and I am authorized to make this declaration on United's behalf. All facts stated herein are true and are of my own personal knowledge.

2.    On or about June 2007, I contacted a number of general contractors, trade associations, and trade show producers informing them of the San Diego Convention Center Corporation's (hereinafter referred to as "SDCC") security policy barring outside maintenance workers from entering the San Diego Convention Center and from requiring the exclusive use of SDCC workers for cleaning, janitorial, maintenance, and related services ("Trade Show Cleaning Services"). A large number of those I contacted were opposed to and concerned with the SDCC's security policy. The following people wrote letters to SDCC expressing their opposition to this policy:   Joe Loggia, CEO of Advanstar Communications; Patricia Dwyer, Senior Manager of Trade Show Services at Smith Bucklin; Barbara Meyers, Conference and Meeting Service Director at APCO International; B.J. Enright, President of Tradeshowlogistics; Ken McAvoy, Senior Vice President of Reed Exhibitions; Mary Kay Sustek, Senior Vice President at Nielsen Business Media; Martin Cymbal, President of Trade Show Contractors Association of Southern California; Ty Bobit, President and CEO of Bobit Business Media; and Mary Beth Rebedeau, Executive Director of the Society of Independent Show Organizers. True and correct copies of these letters are attached hereto as Exhibits 12A to 12I.

1

12

179

3.    In addition, I wrote a letter to the Mayor of San Diego, Jerry Sanders, voicing United's opposition to the SDCC's policy.  A true and correct copy of this letter is attached hereto as Exhibit 12 J.

Pursuant to 17 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___11/14/07___
                    Date

_____
            Richard Simon

2

12

180

# Exhibit 12-A

# SMITHBUCKLIN

smithbucklin.com

Patricia A. Dwyer                    SmithBucklin Corporation      Phone: +1.312.673.5941
Senior Manager, Convention & Trade Show Services    401 North Michigan Avenue    Fax: +1.312.644.0575
                                     Chicago, Illinois  60611 USA    pdwyer@SmithBucklin.com

June 27, 2007

Mr. Brad Gessner, General Manager
San Diego Convention Center
111 W. Harbor Drive
San Diego, CA  92101

Dear Mr. Gessner:

I am writing on behalf of our prospective trade show clients who have, or would, consider San Diego as a future destination for their respective trade shows.  It has recently come to my attention that your Center is considering imposing an exclusive service for your cleaning contractor.  Having dealt with many building contractors around the nation, from large first class exhibit facilities -- such as San Diego -- to small third-tier city's venues, one of the considerations we view as an imposition to our selection is the lack of choice of contractors to meet our highest level of service and accountability.

By taking the decision out of our hands to select this very important -- and very visible service -- you could be taking away our ability to negotiate competitive pricing models for our client, as well as the relationship to a valuable member of our service level team environment.

While there are many factors that enter into the decisions to select a future site for our clients, one of the aspects which definitely would weigh in as less desirable is an exclusive service where there is no need to appoint one.  I completely understand that there are services within a building that make a great deal more sense to have as exclusives -- electrical, plumbing, telephone, but the choice of our general service contractor and ancillary service contractors is solely based on their ability to meet our requirements.  As a trade show manager with over 30 years in the industry, I pride myself in selecting service providers who have been loyal to me and my clients over many years.  I know that I can trust the service that they are going to give to me and my exhibitors.  Please allow me -- and all other trade show managers -- to continue to honor our long-standing commitments to excellence by making the judgment on a show by show basis.

I shall look forward to hearing that the decision has been reviewed based on client's disapproval of this appointment.  If I can be of any assistance or provide additional insight, please contact me at any time.

Sincerely,

Pat Dwyer
Senior Manager, Convention & Trade Show Services
cc: Richard A. Simon, United Service Companies

2025 M Street, NW          540 Maryville Centre Drive
Washington, DC 20036 USA     St. Louis, MO 63141 USA

12A

181

**Exhibit 12-B**



Mary Kay Sustek
Nielsen Business Media
14685 Avion Parkway, Suite 400, Chantilly, VA 20151
Tel: (703) 488-2704
Email: marykay.sustek@nielsen.com

June 22, 2007

Mr. Brad Gessner
General Manager
San Diego Convention Center Corporation
111 West Harbor Drive
San Diego, CA   92101

Dear Mr. Gessner:

Nielsen Business Media (formerly VNU Expositions) has enjoyed many years of staging shows, specifically the Action Sports Retailer shows, as well as a variety of others at your facility.  It has come to our attention that the SDCC is considering imposing an exclusive service policy on cleaning.

While I believe we have utilized the SDCC cleaning services over the past years, it was by choice.  Imposing an exclusive of any type isn't in the best interest of Nielsen or its customers.  Nielsen manages its shows based on the specific needs and requirements of customers and having this flexibility is a key ingredient to a successful show.  As show manager, we have to manage all of our service areas, as well as what impacts our customers.

In our experience, exclusive services ultimately become more expensive and less service oriented, as it takes the competitive nature out of the business.  This is what keeps all service partners in balance with what their customers truly want and need and enables customers, show managers and venues to enjoy the successes.

We at Nielsen urge you to reconsider this and keep the options open for your customers.  This will continue to keep your venue at the top of the desirable list as it has been for so many years.

Thanks for your time.

Sincerely,

Mary Kay Sustek
Sr. Vice President

Cc:     David Loechner, Sr. Vice President, Retail Group, Nielsen Business Media
        Lori Jenks, Group Operations Director, Retail Group, Nielsen Business Media

12B

182

**Exhibit 12-C**



3520 Challenger Street
Torrance, California 90503
Telephone (310) 533-2400
Facsimile (310) 533-2500
www.bobit.com

PUBLICATIONS:
*Auto Group*
Automotive Fleet
Auto Rental News
Business Driver
Business Fleet
F&I Management & Technology
Fleet Association Directory
Fleet Financials
Government Fleet
Vehicle Leasing Today
Vehicle Remarketing

*Automotive Aftermarket*
Auto Trim & Restyling News
Mobile Electronics
Modern Tire Dealer
Precision Engine
Truck & SUV

*Ground Transportation*
Limousine & Chauffeured
Transportation
Metro
School Bus Fleet

*Protection*
Campus Safety
Police
Security Sales & Integration

*Beauty*
Nails
Viet Salon

CUSTOM PUBLISHING

ASSOCIATION MANAGEMENT

TRADE SHOWS & CONFERENCES:
BusCon
Car Rental Show
Conference of
Automotive Remarketing
F&I Conference & Expo
International LCT Show
LCT Eastern Conference
LCT Leadership Summit
TREXPO East
TREXPO West

WEBSITES:
atm.com
automotive-fleet.com
autorentalnews.com
bobitexpos.com
businessfleet.com
campussafetymagazine.com
fandimag.com
fleet-central.com
gfleet.com
lctmag.com
mr-mag.com
metro-magazine.com
moderntiredealer.com
nailsmag.com
policemag.com
precisionenginemag.com
schoolbusfleet.com
securitysales.com
ssileadtracker.com
tspmag.com
vehicleremarket.com

June 14, 2007

Mr. Brad Gessner
General Manager
San Diego Convention Center
111 W. Harbor Drive
San Diego, CA 92101

Dear Mr. Gessner,

We are a Southern California-based media company that produces a number of industry trade shows.

As you may know there are many components that make a successful show and it is our responsibility to manage these components. We determine the venue, the promotion, the hotels, the general contractor, and all of the services provided to our exhibitors. Sometimes we make these determinations based on service, sometimes only on price and sometimes on both, but in any case these decisions are the right of the show manager, not the facility.

I understand that you have an interest in imposing an exclusive cleaning service within the SDCC. Please know that the imposition of an exclusive service will be in contradiction to the wishes of your customers and it typically reduces service levels and takes competitive pricing options away. We have found over the years that the show manager's ability to choose a contractor and control price helps grow trade shows and provide better service at competitive prices. Therefore, should you implement this exclusive service please know your venue will become less desirable to our shows as a venue of choice and you may lose business.

I look forward to your possible reply.

Kindest regards,

Ty F. Bobit

President & CEO

TFB/b

12C

183

# Exhibit 12-D

JUL-25-2007 02:18 PM                                                    P.02



SISO
*The Voice of the For-Profit Show Producer*
SOCIETY OF INDEPENDENT SHOW ORGANIZERS

July 20, 2007

Mr. Brad Glessner, General Manager
San Diego Convention Center
1111 West Harbor Dr.
San Diego, CA  92101

Good Morning, Mr. Glessner,

My name is Mary Beth Rebedeau, and I am Executive Director of SISO, the
Society of Independent Show Organizers. Our 200 member companies produce
3000+ trade shows and conferences each year – meaning each of our members is
a potential client of your convention center. Our organization, together with
IAEE, (the International Association of Exhibitions and Events,) and MATSO
(Major American Trade Show Organizers), issued a position statement regarding
venues' exclusive appointed in-house vendors. See the enclosed statement.

While we understand the need for facility managers to generate revenue,
tradeshow organizers and their exhibitors must retain the right to select vendors
of their choice. This is particularly true for large shows whose complexities
demand carefully selected and integrated vendor partners who have a thorough
understanding of each show's special needs. This includes cleaning services and
security companies.

Show organizers spend years cultivating relationships and advantageous pricing
with their chosen suppliers. In-house exclusives arbitrarily increase costs to
show organizers - and therefore exhibitors - while decreasing the quality of the
service provided due to lack of competition.

Competition in a free market ensures the continued growth of the exhibition
industry. Based on US anti-trust statutes that prohibit agreements that
unreasonably lessen or restrict competition, exclusives have been successfully
challenged in both California and Florida courts. The attached joint statement
clearly outlines the reasons why exclusive arrangements are bad - bad for show
organizers, bad for exhibitors, and bad for attendees.

---

*7000 West Southwest Highway • Chicago Ridge, Il 60415*
*877-YES-SISO (Toll Free in the U.S.) • 708-361-0900 • Fax: 708-361-6166 • www.siso.org*

12D

184

While we respect the facility right to impose certain rules of conduct that are uniformly applied to every contractor and to have certificates of insurance in reasonable amounts from them, we cannot support any effort to suppress the right of the show manager to make their own choices on the service partners that provide services for their exhibitors. I urge you to carefully review the proposed changes in your building's policies - rather than restrict your customer's and potential customers' freedom of choice and therefore risk their alienation.

Thank you for reconsidering your proposal to prohibit your customers from choosing/using their preferred contractors. Exclusives are a lightening rod for controversy in this industry, and I believe that if you restrict a customer's choice, they will be less inclined to use your facility.

With Best Wishes,

*Mary Beth Rebedeau*

Mary Beth Rebedeau
Executive Director
Society of Independent Show Organizers

12D

185



## SISO, IAEM, and MATSO ISSUE JOINT INDUSTRY STATEMENT ON EXCLUSIVE SERVICES

Exhibition facilities that require show organizers to use only the hall's exclusive, appointed in-house vendors for services that are widely available in the marketplace are driving exhibitor costs needlessly higher, say the leaders of the Society of Independent Show Organizers (SISO), the International Association for Exhibition Management (IAEM) and the Major American Tradeshow Organizers (MATSO).

According to SISO Chairman James Bracken, Chairman of VNU Expositions, "exclusive services are defined as the requirement imposed by a facility that certain services needed by show management and/or exhibitors must be obtained from a single vendor selected by the facility for all events produced in the facility." Bracken added, "These kinds of restrictions intrude on the business relationships that many show organizers and vendors have established across a large number of events in order to lower operating costs and maintain a high level of quality control. Exclusive in-house requirements run counter to this and are exactly why the Federal government established anti-trust laws in the 19th century."

These three organizations have issued their first-ever joint statement that condemns the practice of in-house exclusives at a time when the focus of most show organizers is on reducing exhibitor's costs, increasing their return on investment, and enhancing the exhibition experience for all who participate.

SISO considers exclusive services as anticompetitive and potentially in violation of US antitrust statutes that prohibit agreements, which unreasonably lessen or restrict competition.

The "first wave" of exclusive services was successfully challenged in California and Florida courts in 1989 and 1992. While these favorable court rulings, which uphold a show organizer's freedom of choice, stemmed the

12D

growth of in-house exclusives, a "second-wave" is being driven by the significant expansion of facilities in the last three years as well as the extended economic slowdown that began in early 2001. Some facilities seem to be adopting exclusive in-house arrangements just to drive their revenues and operating margins.

"IAEM believes that in-house exclusives arbitrarily increase costs to show organizers and exhibitors and rarely increase the quality of the service provided." In most instances, IAEM reports that service is inferior. Jackie Russo, Chairman of IAEM and Vice President of Kuehne & Nagel, Inc., Elk Grove Village, Illinois says, "IAEM supports the need for organizers to objectively review the need for facilities to control certain services on a case by case basis. We do not believe that it is appropriate to take services in-house primarily to generate additional revenues. We believe only competition in a free market ensures the continued growth of the exhibition industry. Exhibitors are speaking clearly to us: they want lower costs and higher value. In-house exclusives do not support this objective".

"While we understand the need for facility managers to generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors of their choice," said Jack Chalden, Chairman of MATSO and General Manager of SUPERCOMM. "This is particularly true for large shows, such as those represented by MATSO, whose complexities demand carefully selected and integrated vendor partners who have a thorough understanding of each show's special needs." MATSO represents the interests of the nation's largest tradeshows which range from 200,000 to 1.9 million net square feet of floorspace and typically are the premier events of an industry or sector.

Information about how major facilities manage vendor services will soon be posted on the SISO and IAEM web sites [www.siso.org and www.iaem.org]. The service will be called Freedom of Choice.

For questions, comments, etc. contact SISO Executive Director Mary Beth Rebedeau.

**SISO - Society of Independent Show Organizers**
7000 W. Southwest Highway - Chicago Ridge, Il  60415
(877)YES-SISO (toll free in the US) - (708)361-0900 ex. 204 - FAX (708)361-6166
www.siso.org

12D

187

**Exhibit 12-E**



July 26, 2007

Mr. Brad Gessner
General Manager
San Diego Convention Center
111 West Harbor Drive
San Diego, CA 92101

Dear Brad:

I'm sending this letter to express my concern about the San Diego Convention Center making cleaning exclusive to the facility.

We believe that Show Management should have the freedom of choice to select their contractors for all services. They deserve the right to control the cost and the quality of service they offer to their exhibitors.

In addition, many of our clients prefer to assemble a team to travel with their shows, and that team often includes their cleaning contractor. Many shows have special requirements and unique needs. They deserve not to have to re-educate their show teams every time they travel to a new city.

We certainly applaud the San Diego Convention Center offering additional services, such as cleaning. And, certainly our clients would love to have the San Diego Convention Center competitively bid for the opportunity to be the official cleaning contractor. However, an exclusive situation does not promote competition and service.

We hope you will reconsider your position.

Sincerely,

B. J. Enright
President

cc: Carol Wallace

12E

188

# Exhibit 12-F



# APCO International

*..Association Of Public-Safety Communications Officials-International, Inc.*

**EXECUTIVE DIRECTOR**
George S. Rice, Jr.
riceg@apcointl.org

**APCO INTERNATIONAL**
351 N. Williamson Boulevard
Daytona Beach, FL 32114-1112
Phone: 888-APCO911 OR 386-322-2500
www.apcointl.org

**OFFICE OF GOVERNMENT AFFAIRS**
1725 DeSales Street, N.W., Suite 808
Washington, D.C. 20036
Phone: 202-833-2700
dcoffice@apcointl.org

**BOARD OF OFFICERS**

**PRESIDENT**
Wanda S. McCarley,
Operations Manager
Tarrant County 911 District
100 East 15th Street
Fort Worth, TX 76102
Phone: 817-820-1185
president@apcointl.org

**PRESIDENT – ELECT**
Willis Carter
Chief of Communications
Shreveport Fire Department
1144 Texas Avenue
Shreveport, LA 71101
Phone: 318-675-2200
pres-elect@apcointl.org

**FIRST VICE PRESIDENT**
Chris Fischer
Director
Valley Communications
27519 108th Avenue, S.E.
Kent, WA 98030
Phone: 253-372-1510
first-vp@apcointl.org

**SECOND VICE PRESIDENT**
Richard A. Mirgon
Communications Director
Douglas County
1615 8th Street
Minden, NV 89423-4232
Phone: 775-782-9977
second-vp@apcointl.org

**INTERNATIONAL VICE PRESIDENT**
Ing. Manfred Blaha, Brigadier-General
Technology Advisor for the National
Crisis and Disaster Protection Mgmt.
Republic of Austria
Federal Ministry of the Interior, Dept. IV/8
ICT Infrastructure and Operations
Türkenstraße 22, A-1090 Vienna
Phone: +43-1-90600 / 88 308
international-vp@apcointl.org

June 18, 2007

Mr. Brad Gessner
General Manager
San Diego Convention Center
San Diego CA

Dear Mr. Gessner,

As you know from our industry there are many components that make a successful show and it is my charge as the show manager to manage these components. It is my charge to determine the venue, the promotion, the hotels, the general contractor, and all of the providers as well as service they provide MY exhibitors. Sometimes I make these determinations based on service, sometimes only on price and sometimes both, but in any case these decisions are the right of the show manager, not the facility.

I understand that you have an interest in imposing as an exclusive service "cleaning" in the SDCC, please know that this imposition of an exclusive service will be in contradiction to the wishes of your customer and as you already know in contrast to the good of the industry as it reduces service levels and takes competitive pricing options away. We have found over the years that the show manager ability to choose a contractor and control price helps grow our shows, provide better service at competitive prices.

Therefore should you continue with this exclusive service please know your venue will become less desirable to our shows as a venue of choice and you may loose business.

Also know that in my case we have long standing relationships and contracts with our providers and we intend to continue to use them and honor our contracts as they have been loyal to us and have honored their commitments.

I look forward to your reply that my information about your intended exclusive service is not correct and that we may continue to view your facility favorably.

Thank you

Barbara A. Myers
Conference & Meeting Services Director
APCO International

12F

**Exhibit 12-G**

June 14, 2007                                    **Ken McAvoy**
                                                 **Senior Vice President**


Re:    San Diego Convention Center
       Exclusive Services Contracts

Dear Mr. Gessner:

Reed Exhibitions is the largest trade show producer in North America and on a
global basis producing over 500 events world wide. We have included a
schedule of events as well as our latest annual report.

We would like to advise you that we are strongly opposed to the San Diego
Convention Center's proposal to have any services to our customers made
exclusive to the Center. We, as show producers want freedom of choice relative
to all services, especially cleaning, electrical, and other major exhibition items.

Competition for events and selection of venues is extremely competitive to say
the least. As a show producer we would look unfavorably on any change in the
current exclusive services at the San Diego Convention Center. We ask that you
not entertain the current change being considered for the Center in any manor
whatsoever.

Thank you for your time and consideration of the above. Please don't hesitate to
contact me personally if you need further discussion on this subject.

Very truly yours,



Ken McAvoy
Senior Vice President
Reed Exhibitions

Enc.   Calendar of Events
       Annual Report

# Exhibit 12-H



Joe LOGGIA
Chief Executive Officer

July 5, 2007


Mr. Brad Gessner
General Manager
San Diego Convention Center
2215 India Street
San Diego CA

Dear Mr. Gessner:

I understand that the SDCC is considering a requirement that all show organizers use the services of an exclusive cleaning vendor in the SDCC. As a show organizer, Advanstar Communications, Inc. strives for operational excellence in all our trade show events. A critical component for our success is managing all aspects of our business. This includes providing our senior management team and show managers the ability to choose appropriate vendors based on our specific requirements and the needs of our exhibitors. It is customary for Advanstar to contract and work directly with our service providers in order to provide the best service to our customers and is an important consideration when choosing a location.

Sincerely,

Joe Loggia

PHONE: 818-593-5000 • NY OFFICE: 212-951-6654 • FAX: 818-593-5024 • E-MAIL: jloggia@advanstar.com
6200 CANOGA AVENUE, 2nd FLOOR, WOODLAND HILLS, CA 91367 USA

# Exhibit 12-I

TSCA

**TRADE SHOW CONTRACTORS ASSOCIATION**
**OF**
**SOUTHERN CALIFORNIA**

BLAINE CONVENTION SERVICES
CENTURY TRADE SHOW SERVICES
CHAMPION EXPOSITION SERVICES
CONT'L TRADE SHOW FURNISHINGS
CZARNOWSKI EXHIBIT SERVICES
EDLEN ELECTRICAL EXHIBITION SVCS.
FREEMAN DECORATING COMPANY
GES EXPOSITION SERVICES
KIH DISPLAY
SDC CONVENTION SERVICES
TRADE SHOW ELECTRICAL
UNITED SERVICE COMPANIES

June 8, 2007

Mr. Brad Gessner
**San Diego Convention Center**
111 West Harbor Drive
San Diego, CA 92101

Dear Brad:

On behalf of the Trade Show Contractors Association of Southern California we have concerns regarding the formal notification received by our members relative to the new cleaning services policy and program instituted by the San Diego Convention Center.

We believe that it is in the best interest of our customers that they have a choice in the selection of any contracted services to include cleaning. We are aware the cleaning services are not handled directly by the General Service Contractors but subcontracted to companies who specialize in this service or as you indicate as one of your options, to subcontract those services to the San Diego Convention Center which some of the contractors presently do. Our clients entrust us to make this decision in their best interest. Your current policy and program takes that liberty and choice away.

The TSCA General Service Contractors and Cleaning Contractors do not have a problem with the San Diego Convention Center competing for this subcontract opportunity. The San Diego Convention Center policy dictates its utilization by the simple statement use us or loose the opportunity to provide cleaning services in the San Diego Convention Center. It is our understanding that our clients have the desire to select the contractor of choice not the Convention Center.

The factors communicated in your correspondence that influenced the implementation of this program were security issues, staff screening, training, credential identification and cleaning quality. The performance of SDCCC in background checks, drug testing, training and supervision is a positive consideration to subcontract SDCCC as the cleaning service provider. It is apparent the SDCCC feels a need to establish guidelines for cleaning contractors that provide a professional, secure and quality environment. The TSCA supports SDCCC in mutually establishing these guidelines. The mandatory requirement of these guidelines to eliminate client choice we do not support.

Respectfully, we ask that SDCCC withdraw the new cleaning services policy and program. Once again, the TSCA will work with SDCCC to remove the concerns stated.

Sincerely,

Trade Show Contractors Association of Southern California

Martin Cymbal
President

**Exhibit 12-J**

# *United*Service Companies ®

United Maintenance Company, Inc.
United National Maintenance, Inc.
United Security Services, Inc.
United Supply Service, Inc.
United Temps, Inc.


July 26, 2007



Honorable Jerry Sanders
Mayor, City of San Diego
202 "C" Street
11th floor
San Diego, CA 92101

Dear Mayor Sanders:

I am writing you; to let you know of an issue at the San Diego Convention Center, that if allowed to continue will reduce the success of the venue. It will be less desirable to the show managers, cost the venue and the city potential shows to be held there. It could possibly cost the facility and the city substantial monies in legal fees and judgments.

As you know, the show managers rent your facility and bring in hundreds of exhibiting companies and thousands of attendees for a show. Many of these shows relocate each year, so they are choosing new venues all of the time. Some of the shows stay in one location for years, but can move for any reason. What the show managers have in common is to have a team that they can rely on once a year to assemble all aspects of the show and install it into the facility in a compact time frame.

To accomplish this, these show mangers rely on a team that they build over time. They hire specific contractors to provide services such as: freight, electrical, exhibit installations... and cleaning. They have had a right to hire their own team based on service, reputation, price and even relationships. As you may imagine, there is much competition to be the provider of these services, which keeps the service standards high, the prices competitive and the choice where it belongs, with the customer. In short, **The American Free Enterprise System** at work as it has been since the framers hung the constitution on the wall.

You may be interested to learn that the free enterprise system is now being eliminated at the San Diego Convention Center, under the guise of a security issue. Please know that my company has been in business for over 40 years and has provided service to hundreds of events in the San Diego Convention Center, all without incident, security or otherwise.

My company has longstanding contracts with general contractors and show managers from across America that come to your city, based on good service, price and history with the

customer. When these people travel to a new venue, they do not need to educate a new team as to how they want something done. They have a company in place that goes with them every year and they have no issues or added work, such as to educate a new provider.

Your General Manager, Mr. Gessner, is now telling our customers that he needs to provide this service as a security issue; I say this is a guise, because:

1. The facility (S.D.C.C.) attempted this in 1990 and was unsuccessful, making it an "exclusive service". The facility was unsuccessful because the city officials realized to go against the wishes of the customer is not wise. I believe Mr. Gessner knows this same issue was litigated in San Francisco a few years earlier, which resulted in the facility signing a consent decree agreeing not to attempt to have exclusive services and other restrictions.
2. While he has said that he does not want to interfere with our contracts, he insists that we use his labor and will charge 50% of the gross revenue contracted for exhibit cleaning… funny that is exactly what we charge, and $17.00 an hour for hourly billed service, which is more than we charge. Or in the alternative, the customer must use the S.D.C.C. provided service and we are eliminated.
3. We have worked in the facility since the day it opened, we have never had any security issue brought to our attention, when we questioned what security issues there are… it was not open for discussion.
4. So far only the cleaning company is affected, are we the only big security risk?

As a side note, you should know that you and I have somewhat of a similar background, in that while building this company, I was a member of the Chicago Police Department. While not as successful as you, Mr. Mayor, I was a member of the supervisory ranks (please feel free to call Superintendent Phil Cline for a reference, if you would like) and have a good education in security, so I fail to see how giving the S.D.C.C. 50% of the revenue will solve the security issues, that they will not or cannot articulate to us.

We also a have a security company, licensed in several states working in substantial facilities. We will comply with any security requirements that are uniformly applied across the board to all contractors working in the facility.

Mr. Mayor, please know that this policy left unchecked will make your building less desirable as a venue of choice in the evaluation process when the customers select a site. As you can imagine, the loss of just one show every five years will have an economic impact on the city, far greater than all of the cleaning revenue Mr. Gessner may generate in that same five years.

Mayor Sanders, please know that the courts have ruled against this "exclusive" issue before and I suspect that the guise of security will not affect the outcome should this be brought before the court.

Please note that the various associations of show managers (your customers) have all put out position papers that are clearly against exclusive services provided by any facility. To

reinforce this for you, I have supplied just a few letters from the customers as well as the association position paper, please know that we have hundreds of customers that will write to you if needed, but that will only serve to put your facility in a bad light. (See enclosed letters)

Show managers believe to remove the competition from the process will lead to higher prices, less service and no redress for them, thereby reducing your facility in stature when they evaluate their site selection.

Today's show manager is an educated businessperson who understands the need to charge a fair rent to operate the facility. Conversely the operations staff has an obligation to the customer to keep the direct operational cost of the facility to a minimum. So, you are not looking for funds to operate this facility and using an exclusive service to gain funds.

From what I can observe, the facility would need to add more full time staff into a facility that is a part time venue.

As you can imagine, this company has hundreds of tax paying employees in California many of them are your constituents, some of who have been with our company for over 20 years. May I report to them that the American Free Enterprise System is still alive in the San Diego Convention Center?

If you have any questions, I am available by phone or in person whenever you may need me, thank you for your time.

Sincerely,

Richard A. Simon
President & CEO

**Exhibit 13**

**SAN DIEGO CONVENTION CENTER CORPORATION**
**CONVENTION AND TRADE SHOW LICENSE AGREEMENT**
License #

### SUMMARY OF BASIC TERMS

The following Basic Terms are incorporated into the License Agreement entered into by and between SAN DIEGO CONVENTION CENTER CORPORATION, INC. ("CORPORATION") and ("LICENSEE").

**LICENSEE:**

**LICENSEE'S ADDRESS:**

**LICENSEE'S CONTACT:**

**CONTACT PHONE:**

**EVENT:**

**LICENSE FEE:**

    The License Fee includes (1) the minimum License Fee for exhibit areas on Event days and (2) the License Fee, as applicable, for exhibit areas on non-Event days and other licensed areas as set forth below.

    At the time of the Event, CORPORATION shall re-calculate the License Fee associated with the exhibit areas for Event days. The License Fee for exhibit areas on Event days is the minimum License Fee for the exhibit areas as included below or ___ per net square foot used per Event day for exhibits, whichever is greater. Should the per net square footage amount for the exhibit area on Event days be greater than the minimum License Fee assessed for those areas for those days, LICENSEE shall pay to CORPORATION the difference between the minimum License Fee and the per net square footage License Fee.

    The net square footage License Fee shall not be assessed on normal aisle areas and on concession areas. Additionally, the net square footage License Fee shall not be assessed for LICENSEE's use of exhibit space for solely non-revenue generating purposes, up to a limit of five percent (5%) of the net square footage for exhibits. Any such usage in excess of five percent (5%) of the net square footage for exhibits shall be included in the calculation of the net square footage License Fee.

**OTHER FEES:**    **Ancillary Services Fee - Corporation May Require Payment of Deposits on the Ancillary Services Fee Prior to Licensee's Event.**

**CANCELLATION FEE:**    The cancellation fee payable pursuant to Section 7.1 is $_____

**DUE DATES:**    **IN ORDER TO CONFIRM YOUR SPACE, LICENSE FEE AND DATES, BOTH COPIES OF THIS AGREEMENT MUST BE EXECUTED AND RETURNED BY -**

    **Insurance Certificates and Additional Insured Endorsements are due -**

**DEPOSIT DUE DATES:**

**ADDITIONAL TERMS:**

**San Diego Convention Center  EXCLUSIVE LICENSED AREAS; LICENSE PERIODS:**

THIS LICENSE AGREEMENT ("Agreement") is entered into by and between the SAN DIEGO CONVENTION CENTER CORPORATION, INC., a California nonprofit corporation with corporate offices located at 111 West Harbor Drive, in San Diego City and County, California ("CORPORATION") and ("LICENSEE").

**SECTION 1     GRANT OF LICENSE; LICENSE PERIODS**

CORPORATION hereby grants to LICENSEE the exclusive right to use certain areas within the San Diego Convention Center and/or any other facility ("Facilities") as set forth in the Summary of Basic Terms (the "Licensed Areas"). LICENSEE, its guests, exhibitors, patrons or invitees, shall have the exclusive right to use the Licensed Areas during the dates and times set forth in the Summary of Basic Terms (the "License Periods") in connection with the Event set forth in the Summary of Basic Terms. LICENSEE, its guests, exhibitors, patrons or invitees also shall have the non-exclusive right to use the restrooms and other areas in the Facilities that are available for public or common use ("Common Areas") for ingress and egress to the Licensed Areas.

LICENSEE understands and agrees that this Agreement is a license for use of the specified Licensed Areas and Common Areas, and an agreement for services, and that it is not and does not constitute a lease or other rental agreement that would confer on LICENSEE any rights as a tenant under California landlord-tenant laws, including any rights to prior notice or cure under such laws, and LICENSEE's right to occupy and use the Licensed Areas, common areas and services may be terminated in accordance with the terms set forth in this Agreement.

In the event LICENSEE's use of the Licensed Areas commences prior to or extends beyond the time periods set forth in the Summary of Basic Terms, the License Periods shall be deemed to include such time periods and all terms and conditions of this Agreement shall apply to the extended periods. CORPORATION may charge an additional license fee for such extended use.

**SECTION 2     SERVICES**

**2.1     Exclusive Services** The following services required by LICENSEE in connection with its Event and/or use of the Licensed Areas or the Facilities shall be provided exclusively by CORPORATION or providers under contract with CORPORATION ("Contract Providers"): Telecommunications/Data/Fiber/Internet; Security in Public Areas, Dock & Driveway; Sound (In-house system); Rigging Points; Food and Beverage/Novelties/Concession Sales/Exhibitor Booth Catering (except novelties and merchandise germane to the Event as approved by CORPORATION); and Business Service Centers in Public Areas. CORPORATION reserves the right to establish additional exclusive services as it may deem appropriate. CORPORATION shall advise LICENSEE of any such additional services. LICENSEE shall be required to utilize CORPORATION or its Contract Providers for the provision of these services, unless at the time of notification, LICENSEE has previously contracted with a third party to provide such services. LICENSEE shall pay Ancillary Services Fee for services provided by CORPORATION. LICENSEE shall have separate written contracts for exclusive services provided by Contract Providers and shall pay for such services in accordance with the terms and conditions therein.

**2.2     Approved Services** LICENSEE may obtain other services it requires from its own providers ("Service Contractors") in accordance with Section 8.4.

**2.3     Additional Services** CORPORATION may provide other services, equipment, materials, and staffing, upon LICENSEE's request, subject to its Policies, Rules and Regulations and the availability of inventory and staffing. LICENSEE shall pay an Ancillary Services Fee for such additional services.

**SECTION 3     LICENSE FEE, CHARGES FOR SERVICES; PAYMENT**

**3.1     License Fee** LICENSEE shall pay CORPORATION the License Fee set forth in the Summary of Basic Terms.

**3.2     Ancillary Services Fee** In addition to the License Fee, LICENSEE shall pay for services, to the extent used by LICENSEE, at the rates in effect on the first day of the Event. CORPORATION may require payment of deposits on the Ancillary Services Fee prior to LICENSEE's Event.

**3.3     Payment** The License Fee is due and payable upon execution of this Agreement. Alternatively, incremental deposits shall be made on the dates and in the amounts set forth in the Summary of Basic Terms. All deposits are non-refundable, unless this Agreement is canceled pursuant to the Force Majeure provision in Section 7.2. Any unpaid License Fee, Ancillary Services Fee, or other amounts owed to CORPORATION are due and payable upon demand or presentation of an invoice to LICENSEE. Invoices that remain unpaid after thirty (30) days, shall accrue interest on the unpaid balance at the rate of one and one-half percent (1.5%) per month.

San Diego Convention Center Corporation Convention/Trade Show License #                                    Page 2.

13

197

SECTION 4    POLICIES, RULES AND REGULATIONS
    LICENSEE agrees to comply with CORPORATION's Policies, Rules and Regulations governing the use of the Facilities and acknowledges receipt of a copy of the same. LICENSEE understands these Policies, Rules and Regulations may be amended prior to LICENSEE's Event and agrees to comply with any such amendments.

SECTION 5    INDEMNIFICATION; INSURANCE
    **5.1    Indemnification** LICENSEE shall indemnify, hold harmless and defend the CORPORATION, CITY OF SAN DIEGO, SAN DIEGO UNIFIED PORT DISTRICT, and their respective members, officers, directors, agents and employees from and against any and all liabilities, damages, actions, costs, losses, claims and expenses (including reasonable attorneys fees), arising out of, caused by or resulting from, in whole or in part, any act, omission, negligence, fault or violation of law or ordinance, associated with the use or occupancy of the Facilities by LICENSEE, its employees, agents, contractors, patrons, guests, exhibitors, licensees, invitees or any other person entering the Facilities with the implied or express permission of LICENSEE.
    **5.2    Insurance** Notwithstanding the indemnification requirements of Section 5.1, LICENSEE shall, at its sole cost and expense, procure and maintain the following types and limits of insurance, containing the additional insured endorsements and cancellation clause set forth herein. At a minimum, said insurance coverage shall be in effect from 12:01 a.m. on the first day of the License Period to 11:59 p.m. on the last day of the License Period. In the event the License Period is extended, as provided in this Agreement, then the period of coverage shall be extended to cover all periods during which the Facilities are used by LICENSEE. LICENSEE shall deliver certificates of insurance evidencing the following coverage and endorsements on or before the date set forth in the Summary of Basic Terms:
    (1)    **Commercial General Liability** policy with coverage as broad as ISO CG0001 in the occurrence form providing coverage against claims for bodily injury or death and property damage occurring in or upon or resulting from LICENSEE's use or occupancy of the Facilities and endorsed to include non-owned and hired automobile liability coverage (if LICENSEE does not maintain owned automobile liability coverage). Such insurance shall be primary and not require contribution from any of the additional insureds other insurance coverages, and shall afford immediate defense and indemnification, as named additional insureds, to CORPORATION, the CITY OF SAN DIEGO and SAN DIEGO UNIFIED PORT DISTRICT, to the limit of not less than ONE MILLION DOLLARS ($1,000,000.00);
    (2)    **Worker's Compensation Insurance** as required by law;
    (3)    For owned vehicles other than private passenger automobiles, **Commercial Automobile Liability** coverage with limits not less than $1,000,000.00 each occurrence combined single limit for bodily injury or death    and property damage.
The Commercial General Liability policy described above shall include the following **additional insured endorsement** language:

> SAN DIEGO CONVENTION CENTER CORPORATION, INC., CITY OF SAN DIEGO, SAN DIEGO UNIFIED PORT DISTRICT, AND THE MEMBERS, OFFICERS, DIRECTORS, AGENTS AND EMPLOYEES OF EACH OF THESE THREE ENTITIES ARE NAMED AS ADDITIONAL INSUREDS AND ARE PROVIDED THE SAME COVERAGE AS THE NAMED INSURED, INCLUDING THE COST OF DEFENSE, AGAINST CLAIMS FOR BODILY INJURY, DEATH, OR PROPERTY DAMAGE OCCURRING IN OR UPON, OR RESULTING FROM THE INSUREDS USE OR OCCUPANCY OF THE SAN DIEGO CONVENTION CENTER AND/OR THE SAN DIEGO CONCOURSE.

The cancellation clause for the above policies and certificate(s) shall read as follows:

> SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL MAIL 30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER.

    The parties agree and LICENSEE understands that the specified coverage or limits of insurance in no way limit the liability of the LICENSEE. LICENSEE shall maintain, with respect to each such policy or agreement, evidence of such insurance coverage and endorsements required by this Agreement.

     **5.3**    **Mutual Waiver of Subrogation**  CORPORATION and LICENSEE hereby waive any and every claim which may arise in their favor, for any and all loss of, or damage to, any of its property occurring during the License Period, if the loss or damage is covered by a special perils insurance policy.  This waiver is in addition to, and not in limitation or derogation of, any other waiver or release contained in this Agreement with respect to any loss or damage to property of either Party.

     CORPORATION and LICENSEE hereby agree to immediately provide written notice of the terms of this mutual waiver of subrogation to their respective insurers and, if necessary, instruct the insurer(s) to properly endorse the fire and extended insurance policies so as to prevent the invalidation of the policies due to this mutual waiver of subrogation.

     **5.4**    **Failure to Provide Proof of Insurance**  In the event LICENSEE fails to provide the required certificates of insurance by the due dates, CORPORATION shall have the right to cause policies meeting the requirements of this section to be issued in LICENSEE's name and the premiums for such insurance shall be payable by LICENSEE to CORPORATION as an Ancillary Services Fee in accordance with Section 3.2 of this Agreement.

**SECTION 6**    **BREACH; RIGHT TO CURE; REMEDIES**

     In the event LICENSEE fails to perform or comply with any of the material covenants or provisions of this Agreement, CORPORATION shall provide LICENSEE written notice to cure the default within a commercially reasonable time, as determined by CORPORATION, except notice and time to cure shall not be required when the breach involves public safety, immediate waste or damage to the Facilities or CORPORATION's equipment.   If LICENSEE fails to timely cure the default or if the breach involves public safety or property damage or waste, CORPORATION shall have the right, without further notice, to invoke any or all of the following remedies:

     (1)     require additional security from or for LICENSEE;

     (2)     terminate this Agreement and revoke the License granted hereunder;

     (3)     enter and take possession of the Licensed Areas and remove all persons and property, without instituting any legal proceedings;

     (4)     Withhold all payments made to CORPORATION and apply the same to offset CORPORATION's compensatory or liquidated damages; and,

     (5)     Institute legal proceedings to recover damages.

**SECTION 7**    **CANCELLATION BY LICENSEE; LIQUIDATED DAMAGES; FORCE MAJEURE**

     **7.1**    **Cancellation; Liquidated Damages**  If LICENSEE cancels its Event, its use of some portion of the Licensed Areas, some portion of its License Periods, or terminates this Agreement for any reason other than those set forth in Section 7.2, deposits paid shall be forfeited and applied to offset CORPORATION's liquidated damages as provided herein.

     The parties agree that the damages to CORPORATION resulting from cancellation of the Event or any portion of the Licensed Areas or License Periods, or termination of this Agreement, would be extremely difficult to determine because of the loss of revenue from ancillary and other services anticipated by this Agreement.  Because of this difficulty in determining the resulting damages, the parties agree that, in the event of cancellation or termination, LICENSEE shall pay to CORPORATION Liquidated Damages in the amount set forth below as determined by the type of cancellation and the proximity of the cancellation date to the Event move-in date.  LICENSEE agrees to pay the Liquidated Damages to CORPORATION within thirty (30) days of notice of cancellation.

LIQUIDATED DAMAGES PAYABLE UPON CANCELLATION OF EVENT

| Event Move-in Date from Cancellation Date | Amount of Liquidated Damages |
|---|---|
| More than 5 years | First License Fee Deposit |
| 2 to 5 years | 50% of Cancellation Fee |
| Less than 2 years | 100% of Cancellation Fee |

LIQUIDATED DAMAGES PAYABLE UPON PARTIAL CANCELLATION (LICENSED AREAS AND/OR LICENSE PERIODS)

| Event Move-in Date from Cancellation Date | Amount of Liquidated Damages |
|---|---|
| More than 3 years | None |
| 2 to 3 years | 50% of License Fee for the canceled Licensed Area or License Period |
| Less than 2 years | 100% of License Fee for the canceled Licensed Area or License Period |

San Diego Convention Center Corporation Convention/Trade Show License #              Page 2.

13

199

If CORPORATION is able to obtain replacement business, LICENSEE shall be entitled to an offset in the amount of the replacement license fee, against the amount of liquidated damages. Replacement business means new events that are booked to use the canceled space and dates, or events already booked in the Facilities that expand to use the canceled space and dates. Events that are already booked in the Facilities that move into the canceled space and dates shall not be considered replacement business.

      7.2     **Force Majeure** Either party may terminate or suspend it obligations under this Agreement if such obligations are delayed, prevented or rendered impractical as a result of fire, flood, riot, earthquake, casualty, civil commotion, Act of God, or any law, ordinance, rule or regulation which becomes effective after the date of this Agreement, provided and to the extent such occurrence is beyond the reasonable control of the party whose performance is affected. In such event the affected party shall not be liable to the other for delay or failure to perform its obligations, except there shall be a prorata reduction in any fees payable or otherwise due under this Agreement and/or a refund of any deposits paid.

## SECTION 8     LICENSEE'S RIGHTS AND OBLIGATIONS

      8.1     **Inspection** LICENSEE shall have the right to inspect the Facilities and the Licensed Areas prior to executing this agreement to determine that they are reasonably suited for the uses contemplated by LICENSEE. LICENSEE shall have the right to a joint inspection prior to and after the License Period to assess the condition of the Facilities and the Licensed Areas and to determine damage, if any, resulting from LICENSEE's activities. CORPORATION warrants that the Facilities and Licensed Areas will be in a suitable condition for the uses contemplated by the LICENSEE during the Licensed Periods.

      8.2     **Compliance with Laws** Each party shall promptly comply and cause its agents, servants, employees, contractors, patrons, guests, licensees or invitees to promptly comply with all applicable laws, ordinances, rules, and regulations of all federal, state, county and city governments, departments, commissions, boards and officers.

      8.3     **Licenses and Permits** LICENSEE shall obtain any licenses and permits required by federal, state, county, or city laws and shall permit inspection by appropriate agencies or departments.

      8.4     **Service Contractors** At least thirty (30) days prior to the beginning of License Period, LICENSEE shall submit to CORPORATION a list of all persons or entities who will provide a service to or on behalf of LICENSEE during the License Period (herein "Service Contractors"). CORPORATION may require its approval of certain Service Contractors prior to services being rendered.

      8.5     **Non-discrimination** LICENSEE acknowledges and understands that CORPORATION has a comprehensive policy of non-discrimination in all aspects of its business activities. LICENSEE agrees that, in connection with its Event and its use of the Facilities and Licensed Areas, neither LICENSEE, nor its agents, employees, exhibitors or contractors shall discriminate against any person with respect to employment, contracting, admission, or services or privileges offered to attendees of LICENSEE's Event, in violation of Federal, State or local laws.

      8.6     **Defacement of Facility; Damage to Equipment** LICENSEE shall pay the actual cost to replace, repair and/or restore, any defacement or damage to the Facilities or CORPORATION's equipment (ordinary wear and tear excepted) caused by LICENSEE, its agents, employees, exhibitors, or invitees. Payment shall be made within thirty (30) days of written demand by CORPORATION.

      8.7     **Payment of Taxes** LICENSEE acknowledges and understands that state and/or local taxing authorities may impose a tax or other assessment on LICENSEE's use of the Facilities (a possessory use tax) and that LICENSEE shall be solely liable for payment of this, and any other taxes levied on its use of the Facilities.

      8.8     **Sale of Novelties and Merchandise** Notwithstanding CORPORATION's exclusive rights with respect to the sale of novelties and merchandise, LICENSEE may distribute or sell items that are specifically germane to the nature or purpose of LICENSEE or its Event, as determined by CORPORATION, provided CORPORATION's prior written approval is obtained.

## SECTION 9     RIGHT OF ENTRY; EJECTION OF DISORDERLY PERSONS; SECURITY

      9.1     **Corporation's Right of Entry** The Facilities, including the Licensed Areas, shall at all times be under the charge and control of the CORPORATION, whose duly authorized representatives shall have the right to enter the Licensed Areas at any time, provided such entry does not interfere with LICENSEE's use.

      9.2     **Ejection of Disorderly Persons** CORPORATION shall have the right to refuse entrance to, or remove and eject from the Facilities, any person associated with LICENSEE or present at LICENSEE's Event whose conduct is objectionable, disorderly, disruptive, or in violation of any law. The indemnification provisions of this Agreement shall apply to any claim or cause of action arising from such ejectment.

      9.3     **Security Levels** CORPORATION shall provide required and requested security service at the loading dock entrances, front driveway, and in all public areas. CORPORATION shall have the sole right to determine the minimum level of all security required for LICENSEE's Event.

San Diego Convention Center Corporation Convention/Trade Show License #                     Page 2.

13

200

**SECTION 10    GENERAL PROVISIONS**

**10.1    Abandoned Equipment and Lost or Misplaced Articles**  Any equipment or personal property belonging to LICENSEE or its agents, servants, employees, contractors, invitees, patrons, guests, which remains in the Facilities or the Licensed Areas after the License Period, shall be deemed abandoned and may be disposed of by CORPORATION at LICENSEE's sole expense.  CORPORATION shall assume no responsibility for losses caused by theft, disappearance or abandonment of equipment or personal property.

**10.2    Applicable Law, Venue and Jurisdiction**  This Agreement shall be governed by and construed in accordance with California law.  Any action by a party to this Agreement to enforce or interpret the terms hereof shall be maintained in the San Diego County Superior Court or the Federal District Court for the Southern District of California. LICENSEE consents to the foregoing and agrees that this Agreement has been entered into in the State of California which constitutes sufficient minimum contacts with CORPORATION to permit the Courts of California to assert jurisdiction over LICENSEE in any action brought by CORPORATION.

**10.3    Attorneys Fees**  The prevailing party in any action or proceeding brought to enforce or interpret any provision of this Agreement or to recover damages resulting from breach shall be awarded reasonable attorneys fees in addition to any other remedy.

**10.4    Delivery of Notices**  All notices shall be in writing and shall be deemed to have been given upon personal delivery or the next day following deposit of same in any United States mail post office box, with first class postage pre-paid and addressed as follows:

To CORPORATION:    San Diego Convention Center Corporation
                                   Attention:  President & CEO
                                   111 West Harbor Drive
                                   San Diego, California 92101.
To LICENSEE:          At the address set forth in the Summary of Basic Terms.

**10.5    Partial Invalidity**  If any provision of this Agreement is declared invalid or unenforceable, the remaining provisions shall continue in full force and effect to the fullest extent permitted by law.

**10.6    Assignment; Subletting Licensed Areas**  LICENSEE shall not assign this Agreement or any interest herein or permit the use of the Licensed Areas or any part thereof by any other party, except that LICENSEE shall have the right to permit its exhibitors to use the Licensed Areas in conjunction with LICENSEE's Event.  Any substantive change in the nature of LICENSEE's Event, without CORPORATION's prior written consent, shall constitute a material breach of this Agreement.

**10.7    Americans with Disabilities Act (ADA)**  CORPORATION acknowledges and agrees that it is responsible for complying with the ADA requirements for the permanent building access accommodations such as, but not limited to, permanently installed wheelchair ramps, elevator standards, permanent seating accessibility, door width standards and rest room accessibility. LICENSEE acknowledges it is responsible for complying with ADA non-permanent accessibility requirements such as, but not limited to, accessibility of non-permanent seating and auxiliary aids for the visually impaired, hearing impaired and mobility impaired.

**10.8    Right to Quiet Enjoyment**  CORPORATION warrants that the Licensed Areas shall be operational and free from any substantial interference or disturbance directly related to any construction work on the Facilities.  In the event construction causes a substantial interference with LICENSEE's Event, CORPORATION shall use its best efforts to mitigate any disruption.  In no event, however, will CORPORATION be liable for any consequential damages to LICENSEE, including claims for lost or reduced income resulting from the interference or disturbance.  CORPORATION's liability, if any, shall be limited to a return of the License Fee for any period of time that LICENSEE is unable to use the Licensed Areas because of the interference or disturbance.

**10.9    Survival**  The indemnification provisions set forth in this Agreement and all provisions hereof which by their terms must necessarily be performed after the termination of this Agreement or expiration of the License Period shall survive such termination or expiration.

**10.10    Amendments to Agreement**  This Agreement may not be amended or modified except in writing signed by the parties; provided however that if LICENSEE requests (verbal or in writing) an amendment to any of the terms set forth in the Summary of Basic Terms and CORPORATION agrees to such change and confirms the change in writing to LICENSEE, said change shall be incorporated into this Agreement and have the same effect as a signed amendment hereto.

San Diego Convention Center Corporation Convention/Trade Show License #                                                Page 2.

13

201

**10.11    Effective Date of Agreement**  The effective date of this Agreement shall be the date it is executed by the CORPORATION.

LICENSEE:                                                    SAN DIEGO CONVENTION CENTER CORPORATION

By: _____        By: _____

[Authorized by LICENSEE to execute this Agreement on its behalf]        **Carol C. Wallace, President & CEO**

Name: _____

Title: _____

Date: _____        Date: _____

Approved as to form by Corporation's General Counsel (9/20/2000)

San Diego Convention Center Corporation Convention/Trade Show License #                    Page 2.

13

202