**Exhibit 14**



# SAN DIEGO
## Convention Center

## GENERAL POLICIES, RULES, AND REGULATIONS



# WE ARE COMMITTED TO MAKING YOUR EVENT A SUCCESS.

*A knowledgeable Event Manager is assigned to assist you throughout the planning process. While the information listed in this brochure is current, please know that policies occasionally change. Please consult your Event Manager for specific information. (References to show management throughout this booklet may also be defined as the licensee or licensee's designee.)*

## AMERICANS WITH DISABILITIES ACT (ADA) COMPLIANCE

The Convention Center is ADA compliant. As new standards are introduced, it is our goal to implement those changes or upgrades in a timely manner. In accordance with the ADA, we are responsible for permanent premises access accommodations, such as, but not limited to, wheelchair lifts, elevator standards, door width standards and restroom accessibility. It is the licensee's responsibility to provide non-permanent accessibility requirements, such as, but not limited to, hearing-assisted or visually-assisted devices, and temporary seating accessibility and/or interpreters.

## AFFIXING OF DECORATIVE MATERIALS

Nothing may be taped, nailed, stapled, tacked or otherwise affixed to ceilings, walls, painted surfaces, fire sprinklers, columns or windows. Please inform all show management staff and speakers, as well as exhibitors. Check with your Event Manager for further information on appropriate displaying methods in the Convention Center. Damages resulting from the improper use of these materials will be charged directly to show management.

## AIR CONDITIONING AND HEATING

Air-conditioning and/or heating are provided during published event hours. Requests for air conditioning and/or heating during non-event periods will be charged at the prevailing rate.

## ANIMALS

With the exception of guide, signal or service animals, animals are not allowed in the facility without prior written approval. Approval is based on whether the animal is legitimately part of a show, exhibit or activity requiring the use of animals. If allowed, show management is ultimately responsible for the liability and sanitary needs associated with the animals.

## CARPETS & WALL COVERINGS

### CARPET & WALL COVERINGS
Show management is responsible for all damage during an event. Show management will be responsible for cleaning costs associated with the removal of stains. If carpet/wall coverings cannot be sufficiently cleaned or if the damage is severe (cuts, rips or tears), show management will be responsible for the replacement cost of the carpet or wall covering.

### EXHIBIT DISPLAYS
Exhibitors are responsible for providing or arranging for their own carpeting in the booth area. Tabletop displays may be allowed in a carpeted area without additional treatments. However, any carpeted area used for commercial exhibits or substantial displays must have additional protective carpet laid over the Center's carpet to protect it from inordinate wear and tear or damage. For further clarification, see your Event Manager.

## CONVENTION STAFFING SERVICES

To ensure continuity in our service delivery to licensee, the San Diego Convention Center offers preferred Convention Staffing Services to support your Registration Services and Room Monitor requirements. We have a core group of staff who know the Center and are destination specialists. Our staff is professionally uniformed, experienced, highly trained and provided developmental training on a continuing basis.

Please contact our Housing and Convention Staffing Services at (619) 525-5236 for a detailed proposal and scheduling.

## COPYRIGHTS AND PROPRIETARY MATERIAL

ASCAP, BMI, dramatist fees, copyright license fees, patent fees, or any other fee or royalty attached to copyrighted or proprietary material are show management's responsibility. Please ensure that the appropriate reporting and payment of fees cover all presentations associated with an event. The Corporation is not responsible for any violation for infringement rights of any owner or presented material.

## CRATE STORAGE

Exhibit Floor Crate storage is allowed on the exhibit floors under the following conditions and with Fire Marshal Approval:

- In areas no larger than ten (10) feet by fifty (50) feet and no higher than eight (8) feet.
- Ten (10) feet of clear aisle space must separate adjacent storage areas.
- Areas must be within licensed space.
- Provide paths of travel to common exits.
- Marked exitways.
- Separated from exhibit space by pipe and drape, or other traditional service contractor supplied materials.
- Kept neat, clean and orderly throughout the course of your time in the facility.
- Predefined on your floor plans.

## DESTINATION MANAGEMENT SERVICES

To ensure the highest level of service and quality, the Convention Center maintains a preferred list of authorized destination management company (DMC) service providers. Only San Diego based, pre-qualified DMC providers, referred to as "Preferred DMC Providers" are permitted to provide DMC services at the Convention Center.

A list of pre-qualified DMC providers can be located online at www.visitsandiego.com/meetingplanners/services.cfm or contact your Convention Services Manager or Event Manager.

## LOADING DOCK

Limited storage of empties is available on the dock. All dock storage must be in compliance with the Convention Center's ability to contain flame spread. Please check with your Event Manager for details. All rampways and entrances must be kept clear at all times. The Convention Center reserves the right to define the number of docks available for storage of event equipment and empties.

The Convention Center's storage program is defined by the availability of dock space and the capacity of its fire suppression system and response time of our nearby fire stations.

If a fire watch is required, any costs associated would be the responsibility of the licensee.

## DOCK AND FRONT DRIVE

The Asset Protection Division has responsibility and control for the dock area, as well as the front drive. Base level services are provided at these locations. Services beyond the base level may be accommodated at additional cost to show management. Please inform your Event Manager of your needs.

## ELECTRICAL SERVICES

The Convention Center requires that all electrical work inside or attached to disconnect switches, panels, motor control centers, panel boards, and other electrical equipment controlled by the Center, be performed by

14

Convention Center Electrical Staff or approved utility services contractors only.

Please contact your electrical service contractor regarding the provision of and fees associated with 24-hour electrical service for event exhibit/trade show areas.

## EQUIPMENT RENTAL

The Convention Center's equipment inventory is usually adequate to accommodate several simultaneous events and current prices can be found in our General Pricing Information. Please let your Event Manager know what your needs are as soon as possible. When the inventory is exhausted, show management must make arrangements for additional equipment at its own expense.

## EXCLUSIVE SERVICES

Please see your license agreement for a list of those services. In addition, your Event Manager can provide a list of vendors for other services.

## FACILITY CLEANING

### EXHIBIT FLOOR
In an effort to enhance security and maintain high standards of cleanliness, only SDCCC employees are permitted to provide event cleaning within the center.

The Convention Center delivers a "broom clean" floor. We expect show management to deliver it back in the same condition. There will be an additional charge assessed for cleaning tape residue on the floor and for bulk trash removal at the conclusion of your Event. Please see your Event Manager for more details.

The Convention Center provides a mid-day and overnight re-fresh for General Session areas located in exhibit halls. Any additional cleaning service needs resulting from production or session activities shall be provided by the Convention Center and are billable at the prevailing rates.

### MEETING ROOMS
Meeting rooms designated as "no access" are not cleaned nor are deliveries made until show management staff is in the room. Meeting rooms designated as "general access" are cleaned on our schedule and deliveries are made per show management requests.

### PUBLIC SPACES
The Convention Center cleans all public spaces, i.e., restrooms, lobbies, pre-function spaces, etc.

## FIRE MARSHAL

Exhibitors, service contractors and show management must comply with all federal, state and local fire and building codes that apply to public assembly facilities.

An in-house, full-time Fire Marshal is assigned to the Convention Center by the City of San Diego to insure compliance. Depending on the type of event, show schedule, the number of attendees or use of pyrotechnics, some events may be required to have additional standby fire personnel on duty during show hours at show management expense.

Special Event Permits for Exhibits, Tents, Lasers, Open Flame, Pyro or special requests are required and will be reviewed by the Fire Marshal. See your Event Manager for these permit applications.

## FIRST AID

It is show management's responsibility to make arrangements for first aid services for events at the Convention Center. However, should event demographics or numbers demonstrate the need for such coverage, the Convention Center reserves the right to require show management to engage first aid services for an event. You may contact your Event Manager for a list of providers.

## FLOOR PLANS

All floor plans must be approved by the Fire Marshal and the Convention Center prior to move-in.

Floor plans shall be submitted with a Special Event Permit Application available from your Event Manager.

Digital copies on PDF format and/or Auto CAD compatible (dwg or dxf file extension) or six hard copies of the exhibit floor plans for your event should be submitted to the Convention Center at least six (6) months prior to your official move-in date. It is recommended that the general service contractor generate the floor plans and send them to us directly. "No freight aisles" must be identified on exhibit hall floor plans.

Please note these basic rules:

- Aisles between display areas are ten (10) feet.
- Nothing may intrude into the aisle space.
- One hundred (100) linear feet of contiguous display space are allowable before a cross aisle must be present.
- Aisles must be configured to provide clear access to exit ways.
- There must be twenty (20) feet of clearance in front of all exits.
- The travel distance within any booth or exhibit enclosure to an exit access may not be greater than fifty (50) feet.
- Booths greater than 100gsf may require additional Fire Marshal review and approval.

The following items must be designated on your floor plans:

- Booth spaces and what is in the booths (i.e., exhibit booths).
- Bulk spaces.

- Enclosed areas in a booth or bulk space (Enclosed areas, i.e., closets, offices, etc., need to be equipped with a UL approved battery-operated smoke detector and a 2A10BC Fire Extinguisher).
- Proposed crate storage areas.
- Multi-level booths.

All multi-level booths must be designated on your floor plan. Please note the following rules that apply to multi-level booths:

- A drawing from a U.S. licensed structural engineer of a multi-level booth must be submitted to the Fire Marshal at least ninety (90) days in advance of the first move-in day to allow sufficient time for any needed corrections.
- One 2A10BC-type fire extinguishers must be on each level of the display, easily available and unobstructed from view.
- All areas under multi-level booths must be equipped with a UL approved battery operated smoke detector attached to the ceiling or understructure.
- No ceilings are allowed on the top most level.
- If any deck is designed to hold over 10 people, a second staircase is required for emergency evacuations.
- All stairways must be at least three (3) feet in width and must be equipped with a handrail on at least one side.

## FOOD AND BEVERAGE SAMPLES

Food and beverage product exhibitors who are germane to events and are lawful manufacturers or distributors of food and/or beverage products may distribute samples. Samples must be distributed from those specific exhibitor booth locations only. Samples may not exceed two (2) ounces by weight of a solid product, and four (4) ounces by volume of a non-alcoholic beverage product. All alcoholic beverage sampling must be serviced by the Convention Center's Food and Beverage Department. Approval for distribution of samples must be obtained prior to an event. Please see your Catering, (619)525-5800, or Event Manager for additional information prior to the event.

## FREIGHT DELIVERIES

The Convention Center will not accept delivery of show materials or freight. Freight carriers should deliver freight to the attention of shiw management's official service contractor or show management. Delivery address should reference the name of the event location (i.e., hall or meeting room) and show contact name.

## GAS CYLINDERS

All gas cylinders must be securely fastened to a carriage or to a fixed location at all times, and may be subject to Fire Marshal review.

2

14

## GENERAL PRICING INFORMATION

The General Pricing Information booklet is provided to assist with the preparation of your event. Pricing and information regarding ancillary services are included. Pricing is subject to change.

## GUEST SERVICES

We provide a complimentary number of Guest Services staff for your event. Uniformed Guest Services staff serve as greeters at the front door and as information and direction specialists in the lobbies. Guest Services staff beyond the complimentary level are available at billable rates. Please contact your Event Manager for additional information.

## HELIUM BALLOONS

Helium balloons may not be distributed or sold inside the facility. With the prior approval of your Event Manager, helium balloons may be used when they are permanently affixed to authorized displays. If helium balloons are released for any reason within the facility, labor costs associated with the removal of the balloons will be charged to show management at the prevailing rate. Helium balloons distributed outside the facility shall not be permitted inside the building. Additionally, helium balloons may not be released into the outside environment from the premises of the Convention Center.

## IN-HOUSE SOUND

In-house sound system is managed exclusively by our preferred A/V Provider, MSI. Use of the house sound system should be arranged for through MSI in conjunction with your Event Manager. We do not allow outside equipment to be operated from the house sound system. Microphone rental is available through MSI at the prevailing rate.

There are some incentives when utilizing MSI as your comprehensive A/V provider. For further information, see your Event Manager.

There is an additional fee for use of facility equipment or audio lines for broadcasts and recording. Please ask your Event Manager for the details and appropriate fees.

## KEYS

To avoid unanticipated delays, please contact your Event Manager with your needs. If security locks are required, room locks will be recorded at an additional charge. There will be a $25 per key fee assessed for any keys not returned.

## LICENSE AGREEMENT

The San Diego Convention Center Corporation's License Agreement is the governing document for an event.

## LIGHTING

A "50%" level of lighting is provided in all licensed spaces during move-in and move-out. One (1) hour prior to the opening of an event, "100%" lighting will be provided. At the close of an event day, "50%" lighting level will be restored. If a "100%" lighting level is necessary before or after show hours, please contact your Event Manager to make arrangements and to inquire about the prevailing fees.

## LOAD LIMITS

The main exhibit floor load limit is 350 pounds per square foot distributed load; the lower lobbies are 100 pounds per square foot; the upper level lobbies, mezzanine and ballrooms are 150 pounds per square foot; and the Sails Pavilion is 150 pounds per square foot.

## LOST, LEFT BEHIND, OR ABANDONED ARTICLES

A lost and found location may be operated at show management's discretion. Our Guest Services operates a hotline for inquiries regarding Lost & Found items, which is also available for your use. Every effort shall be made by our staff to see that property found or turned in is handled in such a way as to provide the best possible opportunity for return of that property to its rightful owner. Please note that because we do not store show materials, unclaimed items may be disposed of at the conclusion of the move out.

## MEETING ROOMS

### LIGHTING
Lighting presets and changes should be discussed with your Event Manager.

### OCCUPANCY
Maximum occupancies are assigned for each of the meeting rooms by fire code. Please adhere to set limits.

### ROOM REFRESH
One mid-day and overnight room refresh is provided for each meeting room in use. The refresh includes straightening of tables and chairs, trash disposal, replacement of the speaker's water and checking replacement of bulk water in the room. Additional charges may be assessed for excessive trash. If you have a dedicated refresh schedule requirements beyond our usual mid-day refresh, appropriate labor charges will apply in relation to the scope of the work to be done. Your Event Manager can assist you with a room refresh schedule.

### SET-UP
To the extent of our inventory, a one-time set-up within each of your licensed meeting rooms is provided. This includes a riser, head table, lectern, tables, chairs, and one easel in the room. Changes to the one-time set and

additional room sets/changeovers will be charged to show management accordingly.

### WATER SERVICE
Water service is provided at the speaker's location and a reasonable number of places at the head table in the meeting rooms. A five-gallon water cooler is provided in the back of the room. Another five gallons of water is provided for the water cooler at the mid-day room refresh. For additional water service, contact the Food and Beverage Department.

## MERCHANDISE FEE (NOVELTIES)

Except as otherwise stipulated in the applicable License Agreement, the Convention Center retains the exclusive right to approve, sell and/or collect a commission from any event-related novelty or merchandise item. For those events of a nature that meets the potential criteria for any exemption, a request for such exemption of specific items must be submitted to the Convention Center. The Convention Center will issue written approval to exempt these sales from exclusive rights after review and concurrence that the items are specifically germane to the nature or purpose of the Licensee or its Event. Please note that the proposed sale of any items competing with those regularly offered at our concession stands or specialty carts will not be allowed.

## MOTORIZED CARTS

For safety reasons, motorized carts, including Segways, are not allowed in any public areas including the lobby. Wheel coverings are required on the tires when traveling in carpeted areas. To reduce the risk of accidents, please exercise due caution when operating motorized carts in approved areas. ADA needs will be accommodated.

## PARKING

### PUBLIC
On-site, private vehicle parking at the Convention Center is available in the underground 1,900-space garage through an outside parking management company, not controlled by the Convention Center. Daily rates apply. Note there is no overnight or 24-hour parking. Off-site, private vehicle parking is also available at numerous parking lots located nearby. Visit www.visitsandiego.com for more information.

### DOCK
Only on a limited and most restricted basis are any on-site parking permits issued for the loading docks or front drive. Any parking permits issued for the dock or front drive are under the condition that the holder of the permit assumes all liability. Please see your Event Manager for additional assistance with parking requirements or for special arrangements.

14

## PRODUCTION SERVICES

Meeting Services Incorporated (MSI) is the Convention Center's preferred comprehensive Audio Visual Services Provider. They can arrange for a full variety of Audio Visual Services and equipment as well as sophisticated multi-media services. MSI maintains on-site offices and has an extensive inventory with a local warehouse site. Contact MSI at (619) 525-5444.

The SDCCC requires all companies providing Production Services to be approved prior to doing any business within the Center. A production service company is any company who provides any combination of the following services:

• Entertainment

• Event Scenic and Graphic Design

• Event Lighting , Audio, Video and Graphic Design

• Stage Design and Décor

• Event Décor

All approved production service companies must pay the SDCCC five percent (5%) of gross billings to Licensees

Exemptions. PSC's will not be required to pay the 5% commission when:

1. working for one of SDCCC's "Preferred DMC's"

2. arranging for all audio/visual needs through MSI, SDCCC's preferred audio visual service provider

Please contact your Event Manager for further details.

## PYROTECHNICS & LASERS

A special permit is required for the use of pyrotechnics and/or lasers. Each situation must be individually pre-approved by your Event Manager and the Fire Marshal. If approved, the use of pyrotechnics and/ or lasers will be strictly controlled and continuously monitored. Standby Fire Personnel may be required. Licensee will be charged by the Convention Center for the cost of standby personnel.

## RECYCLING

Recycling is part of the Convention Center's operating philosophy. Convention Center recycles paper, cardboard, plastic, wood pallets and more! Please contact your Event Manager, or visit www.visitsandiego.com, for more details.

## RESTAURANT RESERVATIONS AND VENUE SERVICES

The Convention Center is pleased to provide complimentary Restaurant Reservation Services for your attendees. In addition, ticket sales for city tours and other attractions will be available for purchase. A booth, centrally located in Lobby B2, is staffed during peak event times. We will setup additional kiosks to satisfy guest demands as warranted by building activity. Additional off-site booth services may be arranged for through our Restaurant and Venue Services Manager at (619) 525-5291.

## RIGGING

MSI, the Convention Center's in-house A/V contractor, exclusively provides all rigging points for event, show and production hanging. Show management or their designated Service Contractor shall contact MSI for information regarding load limits and arrange for the provision of the rigging points. All costs associated with rigging are the responsibility of the licensee or their designee. As a general procedure, our contractor provides standing general liability insurance coverage in case of damages due to faulty rigging. Please ask your Event Manager for more details.

## SAFETY

The Convention Center's goal is to provide a safe environment for you and everyone associated with your event. Please help us meet our goal by adhering to the basic safety related policies, which follow in this section:

• All show and exhibitor equipment must be UL approved. Extension cords shall be three-wire with ground and shall service one appliance or device. Multi-plug adapters must be UL approved and have an overload internal circuit breaker. Home-type "cube" taps are prohibited. Spliced wires are heat generators and are prohibited.

• Cooking/warming devices shall be electric and shall be UL or FM approved. Cooking/warming devices and heated products need to be four (4) feet away from the front of the display, or have a shield 18 inches high, 1/4 inch thick across the front and down the sides of the demonstration area. A 2A10BC fire extinguisher must be in the booth and readily available near the demonstration area.

• The use of welding equipment, open flames, decorative candles or smoke emitting devices or material is prohibited. Exceptions may be made with prior approval by the Fire Marshal.

• All display materials must be flame retardant according to California fire codes. A fire retardancy certificate of the display materials and the exhibitor booth construction must be posted or readily available within the exhibit. If smoke detectors are required for exhibit enclosures or for multi-level exhibit booths, or if the Fire Marshal deems necessary, special fire watch coverage will be in effect and billable when the exhibit or show is closed for business.

• Exits, entrances, air supply vents, ramps, sidewalks, hallways, stairways, elevators, escalators and aisleways must be kept clear at all times. Exit signs must be kept visible at all times. Fire extinguishers, fire protection valves and fire hose cabinets must be kept clear at all times.

• The use of burning fluids, oils, camphene, liquid oxygen, ethylene, kerosene, gasoline or anything else of like nature is discouraged in the facilities. If your event absolutely requires the use of hazardous materials, maximum limits and controls will be placed on use of such materials. Those maximum limits and controls include our reserved right to curtail the use of the materials.

• In the event that an alarm goes off, please know that we do not deactivate any alarm until the proper emergency response team is on-site, verifies the cause of the alarm and then deactivates the alarm. We operate at a maximum safety level that helps us to insure life safety. In case of an emergency following an alarm, we will activate our public address system and provide direction to everyone in the facility. When the public address system starts to operate, please listen and follow the directions. Doing anything else will increase the hazard and will put you and your attendees at risk.

• Electrical equipment shall be installed, operated and maintained in a manner that does not create a hazard to life or property. Sufficient access and working space must be provided for all electrical equipment and must comply with current N.E.C. standards.

• No spray painting is allowed on the premises.

• No saw cutting is allowed inside the Convention Center

• The Convention Center does NOT allow any "hard construction" type of activities to be executed on the exhibit floor or within the building such as but not limited to material sawing, painting, welding, soldering, etc. without PRIOR written approval.

## SALES AND USE TAXES AND LICENSES

Please see your license agreement.

## PUBLIC SAFETY & EVENT SECURITY SERVICES

FACILITY PUBLIC SAFETY
The Convention Center Public Safety Staff retains control of all public spaces including lobbies, docks and all perimeter areas on a 24-hour basis. Basic services are provided for asset protection. Any additional services that you request in our controlled areas are at additional cost to show management at the current billable rates.

14

We reserve the right to eject disorderly persons or any person who is causing disruption to an event and/or the conduct of business.

## EVENT SECURITY SERVICES

The licensee is encouraged to contract for event security staffing within its licensed space. All security staffing and emergency response planning is subject to Corporation review and should be discussed with your Event Manager as there are detailed requirements for Event Security Providers. Contact your Event Manager for more information.

## SMOKING

The Convention Center is a non-smoking facility. By state law, and in the interest of public health, the San Diego Convention Center has adopted a non-smoking policy. There are designated areas outside the building where smoking is permitted.

## TICKETING/BOX OFFICE

Ticketing Sales should be arranged for directly by the Licensee. You are welcome to use a vendor of your choice. Ticket taker staff is provided exclusively by the Convention Center. Please contact your Event Manager to communicate your vendor for Box Office Staffing and arrange for Ticket Taking Staff.

## TRUCK MARSHALLING

Truck marshalling is not available at the Convention Center site. Show management's official service contractor makes all provisions for truck marshalling.

## UNION REGULATIONS

The San Diego Convention Center Corporation has entered into a Jurisdiction agreement with its Union Labor Partners; Painters & Allied Trades, International Alliance of Theatrical Stage Employees, International Brotherhood of Electrical Workers and The Teamsters to perform specific work in certain areas of the Convention Center that are "Exhibit" or "Production" in nature. This includes the activities of Move In, Installation, Dismantling and Move Out of Trade Shows, Conventions, Exhibits, Corporate Events and Theatrical Events. The current Areas of Jurisdiction are Exhibit Halls A-H, Ballrooms 6 & 20 and the Sails Pavilion.

Please note that this jurisdiction does not encompass work ordinarily performed by the San Diego Convention Center Corporation Employees or the Center's third party contractors. It also does not apply to work performed by the licensee's employees under their respective payroll who are specifically engaged to perform this work on a continuing basis for their organization. Please contact your Event Manager for more details.

## USE OF PUBLIC SPACE & INTERIOR SIGNAGE

### PUBLIC SPACE

The desired use of any public, non-licensed area needs to be fully discussed with your Event Manager to determine the feasibility of the proposed use.

The areas adjacent to the Escalators and common Lobby/Foyer/Landing areas are not allocated to a particular event and are considered integral to maintaining the ingress/egress requirements necessary to facilitate overall building traffic. As a general rule, exits, restrooms, phones, box offices, and other lobby specialty services as well as amenities can not be obstructed.

Options for registration and other public space uses should be explored with your Event Manager. Once space has been determined as appropriate and available, a floor plan outlining the proposed usage must be submitted for Fire Marshal approval at least six (6) months in advance of load-in.

### INTERIOR SIGNAGE

The desired display of association or event-related signage needs to be fully discussed with your Event Manager to determine the feasibility of the proposed signage. Because of numerous multiple facility users, your Event Manager needs to be consulted prior to any signage being produced.

Generally, the installation of signage should be in correlation to your licensed space. However, because there are often multiple events, some high traffic areas such as the Upper Level Lobbies may be subject to additional considerations.

There are several key areas where signage opportunities are allocated to a particular licensed space. These include the Escalator Units at the Ground and Upper Level, Upper Level Landings, Cityside & Bayside, Center Section of the Upper Level Lobbies, Mezzanine Foyer and Bayside Lobby. However, all proposed signage must be reviewed by your Event Manager for approval.

Event specific advertising opportunities may be available and we will work with associations or events to accommodate "Sponsorship" programs. These activities require advance approval, have certain guidelines and should be discussed with your Event Manager.

## VEHICLES ON DISPLAY

Vehicles on display must adhere to the following rules:
- No more than 1/4 tank of gas or five gallons, whichever is less.
- A locking gas cap or tape over the gas cap.

- Batteries shall be disconnected in an approved manner.
- A drip pan under the vehicle's drive train (motor to differential).
- Keys delivered to event security.
- Vehicles shall not be moved during show hours.
- Refueling is prohibited in the facility.
- Floor plans must indicate where vehicles are to be located.

## WALLS

The Convention Center has operable walls in our meeting rooms, ballrooms and exhibit halls. The walls separate leased spaces into a desired configuration. Once the walls are set per show management's specifications, a charge will be incurred for any additional wall movement. Please allow sufficient time to meet your needs.

## WASTE DISPOSAL

Show management is obligated to pay the cost of all trash hauls. Show management is responsible for proper and regulated disposal of any and all toxic or biohazard goods, materials and substances, and must comply with all applicable laws. Please note that California has strict policies with regard to regulated waste disposal. If someone associated with your event ignores regulatory mandates, it becomes show management's responsibility. Please ask your Event Manager for the names of local providers who handle toxic and/or bio-hazardous substances/materials.

## YOUR CONTRACTORS

Show management must provide a list of contractors that will be used during the event at least thirty (30) days prior to the first move-in day. The list assists us with the preplanning of services and security programs.

## LASTLY...

Every event is different and the General Policies, Rules and Regulations cannot conceivably cover every possible scenario. If there is anything that is not covered expressly in this handbook, please know that the Convention Center reserves the right to determine necessary considerations on an as-needed basis. Our sole effort is to insure the success of your event and safeguard the safety and experience of all our visitors. We know that you will appreciate our efforts.

*(These general policies, rules and regulations are subject to change.)*

San Diego Convention Center

WWW.VISITSANDIEGO.COM
111 WEST HARBOR DRIVE, SAN DIEGO, CA 92101
619.525.5000 • FAX 619.525.5005

# Exhibit 15

WILSON PETTY KOSMO & TURNER LLP
REGINA A. PETTY (106163)
DESSI P. NINTCHEVA (207699)
550 West C Street, Suite 1050
San Diego, California 92101
Telephone: (619) 236-9600
Facsimile: (619) 236-9669

Attorneys for Defendant
SAN DIEGO CONVENTION CENTER
CORPORATION, INC.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF SAN DIEGO

| | |
|---|---|
| UNITED NATIONAL MAINTENANCE, INC. a Nevada Corporation, <br><br> Plaintiff, <br><br> v. <br><br> SAN DIEGO CONVENTION CENTER CORPORATION, INC.; and DOES 1 through 20, inclusive, <br><br> Defendants. | Case No. 37-2007-00072054-CU-BT-CTL <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** <br><br> Complaint Filed: July 30, 2007 <br><br> Date: August 6, 2007 <br> Time: 8:15 a.m. <br> Dept.: 71 <br> Judge: Hon. Ronald S. Prager <br> Trial Date: Not Set |

## I.

### INTRODUCTION

The granting of Temporary Restraining Order preventing Defendant, San Diego Convention Center Corporation, Inc. (SDCCC), from implementing its security policy is an extreme remedy that is absolutely unwarranted. The consequences of such order would be devastating not only to SDCCC, but the San Diego public. Security is the number one priority for SDCC, which manages and operates the largest building of its kind in the city of San Diego. In order to ensure security and public safety, effective July 1, 2007, SDCCC adopted a policy that requires all cleaning crews

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

1   servicing the premises to be staffed with SDCCC employees. (Declaration of Carol Wallace
2   ("Wallace Decl."), SDCCC President and CEO, ¶ 7.) This policy was driven by SDCCC's
3   determination to implement enhanced security measure in the building. The security policy allows
4   SDCCC to properly screen, credential, train and supervise workers who have unfettered access to all
5   areas on the exhibit floor. Security is not a revenue issue for SDCCC. In order to ensure security,
6   SDCCC employees are subject to criminal background checks, drug tests, extensive training and
7   supervision.
8           United National Maintenance, Inc. ("Plaintiff") seeks to enjoin SDCCC from implementing
9   its security policy. It claims that the new policy cuts into its profit margins and prevents it from
10   recruiting workers from an unscreened pool of applicants. Plaintiff's ex parte application should be
11   denied for several reasons. First, Plaintiff's entire Complaint is barred by governmental immunity,
12   and thus. Plaintiff has no reasonable probability of success on the merits. Second, Plaintiff has
13   failed to show that it will suffer irreparable harm if this application is denied. Conspicuously
14   missing from Plaintiff's 90-page application is any admissible evidence that Plaintiff will suffer any
15   harm should the Court deny the emergency relief requested. (SDCCC's Objections to Evidence in
16   Support of Plaintiff's Ex Parte Application.) In fact, under the new cleaning services security policy,
17   Plaintiff may continue to service its clients using SDCCC staff to perform the work. Contrary to
18   Plaintiff's assertions, the SDCCC's proposed contract does not require Plaintiff to surrender one
19   hundred percent of its revenue in exchange for using SDCCC cleaning staff. Plaintiff's
20   interpretation of the contract is wrong and the alleged implications of the new SDCCC policy are
21   extremely exaggerated and absolutely unfounded. Plaintiff has not made a showing of irreparable
22   harm warranting an immediate injunction. Absent such showing, Plaintiff's application should be
23   denied. Alternatively, at the very minimum, SDCCC should be allowed to adequately brief the
24   issues raised in Plaintiff's application on a properly noticed motion.
25                                          II.
26                      **FACTUAL AND PROCEDURAL BACKGROUND**
27           The San Diego Convention Center Corporation is a non-profit public benefit corporation
28   whose purpose is to operate and manage the San Diego Convention Center ("Convention Center").

2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE
APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

15

210

1  The City of San Diego, a municipal corporation, is the sole member of SDCCC. (Request for

2  Judicial Notice, Exh. A; Wallace Decl., ¶ 2.)

3      SDCC licenses the use of the Convention Center building to entities and individuals desiring

4  to hold conventions, trade shows or other events. (*Id.* at ¶3.) The trade associations hire contractors

5  to manage and organize the trade shows, and set up booths and exhibits in the Center. The general

6  contractors utilize various services of third party vendors, such as Plaintiff, for purposes of providing

7  cleaning and other related services. (*Id.* at ¶6.)

8      Following the terrorist attacks of September 11, 2001, security has become the number one

9  priority in managing and operating the San Diego Convention Center. (*Id.* at ¶ 4.) Over the last four

10 years, SDCCC conducted a study of the need and means for increasing security in the Convention

11 Center building. (*Id.*) In the course of carefully studying the various aspects of the Convention

12 Center operations, SDCCC determined that the building was particularly vulnerable to unsupervised

13 access by unscreened service workers hired through third party vendors.(*Id.* at ¶¶4-7.) The

14 overwhelming concern was that SDCCC had no control over the hiring and screening procedures

15 utilized by third party vendors in staffing outside cleaning crews servicing the building. As a result,

16 a new policy was adopted requiring all cleaning crews to be staffed by SDCCC employees, who are

17 subject to extensive security screening and training. (*Id.* at ¶7.)

18     On July 30, 2007, Plaintiff, a third party cleaning vendor, filed a Complaint against SDCCC

19 for Injunctive Relief and Damages asking the court to enjoin SDCCC from implementing its new

20 cleaning services security policy. Revenue losses is the main basis for Plaintiff's complaint which

21 alleges unfair business practices, violation of the anti-trust laws, interference with prospective

22 economic advantage and interference with contract. Two days after filing the Complaint, on August

23 1, 2007, Plaintiff advised SDCCC that an ex parte hearing has been scheduled regarding TRO and

24 OSC why Permanent Injunction should not issue. On Friday afternoon, August 3, 2007, SDCC was

25 served with a 90-page ex parte application for the 8:15 hearing on Monday morning. (Declaration of

26 Dessi Nintcheva, ¶¶4-5.)

27

28

_____

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE
APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

15

211

**III.**

**PLAINTIFF'S TRO APPLICATION SHOULD BE DENIED BECAUSE (1) THE ENTIRE ACTION IS BARRED BY GOVERNMENTAL IMMUNITY AND (2) PLAINTIFF HAS PROVEN NO EVIDENCE OF IRREPARABLE HARM**

A.    **Ex Parte TROs Are Extreme Measures and Should be Denied Absent Exigent Circumstances**

An ex parte applicant "must make an affirmative factual showing in a declaration containing competent testimony based upon personal knowledge of irreparable harm, immediate danger, or any other statutory basis for granting ex parte relief. (Cal. Rules of Court, rule 3.1202.)

A Temporary Restraining Order may issue only in extraordinary circumstances if: (1) Plaintiff has established the probable validity of the claim; (2) an undertaking is filed; and (3) there is a probability that the property will disappear or become substantially impaired in valued. (C.C.P. § 513.010(b).)  In ruling on a TRO application for a preliminary injunction, this court must consider the following factors:  (1) whether it is reasonably probable that plaintiff will prevail on the merits; and (2) whether Plaintiff will suffer greater injury if the injunction is denied than defendant will suffer if it is granted. (See e.g., *Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4[th] 618, 633; *Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206; see also,) **A trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim.** (*O'Connell v. Superior Court* (2006) 141 Cal. App. 4th 1452, 1463.)

A preliminary injunction is issued after hearing on a noticed motion. (Weil & Brown, Civ. Proc. Before Trial, ¶ 9:558.)  It's purpose is to preserve the status quo and prevent irreparable harm pending trial on the merits.  The burden is on the Plaintiff to establish all elements necessary to support issuance of a preliminary injunction. (*O'Connell v. Sup.Ct.* (2006) 141 Cal.App.4[th] 1452, 1481.)

4
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

15

212

**B.    The Ex Parte TRO Application Should Be Denied As There is No Evidence of Immediate Danger and Plaintiff Has Failed to Prove Irreparable Harm**

Plaintiff has presented no competent evidence that justifies granting an ex parte TRO. It is unclear from Plaintiff's Ex Parte Application "what is the fire" here that warrants extraordinary measures, such as an ex parte TRO, and what is the harm that plaintiff will suffer if a TRO is denied. Conspicuously missing from Plaintiff's moving papers is proof that Plaintiff will suffer any harm, let alone, irreparable harm or immediate danger, should the court deny this application. The security policy adopted by SDCCC does not prohibit Plaintiff from conducting business at the Convention Center. (Wallace Decl., ¶ 7; Exh. 4 to Plaintiff's Ex Parte Application.) On July 23, 2007, SDCCC advised Plaintiff: "We do not intend to jeopardize your contract with your clients. That is why this policy permits you to continue to service those clients, but simply requires that you use SDCCC staff to perform the work." (*Id.*) SDCCC further stated, "we are currently willing to discuss terms and conditions under which we can provide staffing for United." (*Id.*) In response, Richard Simon (on behalf of Plaintiff), acknowledged receipt and willingness to discuss the offer, but instead of following through on SDCCC's offer chose to file a lawsuit. (*Id.*)

Furthermore, Plaintiff's argument that the new policy will drive Plaintiff out of business is speculative at best. The undisputed facts show that Plaintiff can continue to provide services to its customers for the upcoming shows without need for a TRO. Under SDCCC's cleaning services security policy, Plaintiff must simply use cleaning personnel from a pre-screened pool of SDCCC employees. (Wallace Decl., ¶ 7.) Plaintiff's entire application is based upon speculative and unfounded claims of projected revenue losses, which do not constitute competent evidence required to prove irreparable harm. Plaintiff claims its profit margins will shrink and its operations will be destroyed, if SDCCC requires Plaintiff to use its staff in administering cleaning services. (Plaintiff's Brief, p. 6.) As Richard Simon stated in an email to SDCC: "please know that your labor **may cost more than my labor currently**, that said, we are willing to discuss all options." (Exh. 4 to Ex Parte Application.)

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

1   Based upon the information provided by Plaintiff, it is impossible to quantify the

2   implications of the new SDCCC policy on Plaintiff's business as compared to the status quo. The

3   moving papers do not identify the specific financial terms of Plaintiff's current contracts and cost of

4   labor. Thus, it is impossible to determine the status quo as it relates to Plaintiff's existing contracts

5   and how the requirement to utilize SDCCC cleaning staff will affect Plaintiff's business in the

6   future. Instead of providing concrete evidence of its projected revenue losses based upon its current

7   labor costs and profit margins, Plaintiff submitted a slew of carefully crafted declarations and letters

8   riddled with unfounded, speculative, hearsay statements that constitute improper opinion. (SDCCC's

9   Objections to Evidence In Support of TRO.)

10   Moreover, Plaintiff's claims are premised upon misinterpretation of SDCCC's proposed

11   contract, which allegedly requires Plaintiff to surrender 100% of Plaintiff's booth cleaning revenue.

12   (Plaintiff's Brief, p. 3.) Plaintiff is wrong. The contract clearly states: "Corporation shall be paid

13   **fifty percent** of the Gross Revenue generated by Service Contractor from third party users of the

14   Services; **but in no event** shall Corporation be paid **less than Seventeen Dollars** per man hour for

15   the Services performed." (Exh. 5 to Ex Parte Application ("Sample Contract"), p. 2.) With regard to

16   Aisle Cleaning services **only**, which includes move-in and move-out services performed by SDCCC

17   (outside of exhibit booths), SDCCC requires a payment of $17 per man-hour. Nowhere does

18   SDCCC's sample contract require payment of one hundred percent of Plaintiff's booth cleaning

19   revenue. Thus, Plaintiff's application for ex parte TRO should be denied because Plaintiff has made

20   no showing of irreparable harm or immediate danger as Plaintiff is free to continue to conduct

21   business in the Convention Center and service its existing contracts by utilizing SDCCC cleaning

22   staff.

23   C.   **Plaintiff Has No Probability of Prevailing on the Merits Because the Entire**
24        **Action is Barred by Governmental Immunity**

25   In 1963, the California Legislature enacted several interrelated laws known as the Tort

26   Claims Act. (*Tokeshi v. State of California* (1990) 217 Cal.App.3d 999, 1004; Gov. Code §§ 810-

27   895.8.) It is well settled under the Tort Claims Act that a "public entity" is not liable for tortuous

28   injury unless the liability is specifically imposed by statute or the Constitution itself. (See e.g.,

6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE
APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

15

214

1   *Trinkle v. Cal. State Lottery* (1999) 71 Cal. App. 4th 1198, 1202; see also, *Colome v. State Athletic*

2   *Com.* (1996) 47 Cal.App.4th 1444.) To implement this concept, Government Code section 815(a)

3   expressly states **"except as otherwise provided by statute**... [a] public entity is **not** liable for an

4   injury, whether such injury arises out of an act or omission of the public entity or a public employee

5   or any other person." (Gov. Code § 815(a) (emphasis added).) Thus, the Tort Claims Act provides

6   that all public entities are immune from liability **unless** the Legislature expressly provides for such

7   liability. (Gov. Code § 811.2 and 815(a).) Therefore, common law claims may not, as a matter of

8   law, be brought against public entities. (Gov. Code § 815(a); *Harshbarger v. City Colton* (1988) 197

9   Cal.App.3d 1335, 1339 ["Government Code section 815 abolished all common law or judicially

10  declared liability for public entities."]; *Michael J. v. Los Angeles County Dept. of Adoptions* (1988)

11  201 Cal.App.3d 859, 866 [claims against public entities must be based on statutes, not common law

12  tort theories of liability].)

13       Public entity as defined under Government Code section 811.2 "includes . . . a city . . . and

14  any other political subdivision or public corporation in the State." SDCCC is a public corporation,

15  established by the City of San Diego, a municipal corporation. (See SDCCC Articles of

16  Incorporation attached as Exhibit A to Request for Judicial Notice ) As a public benefit corporation,

17  SDCCC is designed to manage, market and sell the San Diego Convention Center. The only

18  member of this public corporation is the City of San Diego. (*Id.* at p. 3) As a public entity, SDCCC

19  is statutorily immune from liability (Gov. Code § 811.2 and 815(a)) and punitive damages (Gov.

20  Code, § 818 ["public entity is not liable for damages awarded under section 3294 of the Civil Code];

21  *Austin v. Regents of University of California* (1979) 89 Cal.App.3d 354, 358 [affirming trial court's

22  decision to strike punitive damages claim against public entity]).

23       As discussed below, all four causes of action alleged in the complaint are barred by

24  governmental immunity.

25              **I.    Public Entities Are Immune from Liability Under the Cartwright Act**

26

27       The law is clear that public entities, including municipal corporations, cannot be held liable

28  under the Cartwright Act (Business and Professions Code § 16700 et seq.). In *Penn v. City of San*

7

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

1 │ *Diego* (1987) 188 Cal. App. 3d 636, 643, the court held that the term corporation does not include

2 │ municipal corporations. Nowhere does the statute provide for liability by public entities and/or

3 │ public corporations. Absent express provisions in the statute, SDCCC cannot be held liable under

4 │ Business and Professions Code section 16700. Therefore, Plaintiff's first cause of action for

5 │ violation of Business and Professions Code § 16700 fails as a matter of law.

6 │         **2.**     **No Cause of Action Lies Against a Public Entity Under the**
                **Business and Professions Code section 17200**

7 │

8 │       Similarly, Plaintiff fourth cause of action for violation of Business and Professions Code

9 │ §17000 is barred by governmental immunity. Nowhere in the California Unfair Competition Law

10 │ ("UCL") is there a provision imposing governmental liability for violations of the UCL. The law is

11 │ clear that a "public entity" is not a "person" within the meaning of Business and Professions Code

12 │ section 17201 and therefore cannot be sued under the UCL. (*Cal. Med. Ass'n v. Regents of the Univ.*

13 │ *of Cal.* (2000) 79 Cal. App. 4th 542, 551.) Courts have held that public entities cannot be sued under

14 │ UCL even if they engage in commercial activity. (See e.g., *Trinkle, supra,* 71 Cal. App. 4th 1198,

15 │ 1202.) Thus, Plaintiff's fourth cause of action fails as a matter of law.

16 │         **3.**     **Governmental Immunity Bars Plaintiff's Common Law Tort**
                **Claims**

17 │       The Tort Claims Act provides that all public entities are immune from liability **unless** the

18 │ Legislature expressly provides for such liability. (Gov. Code § 811.2 and 815(a).) Plaintiff's

19 │ common law claims fails as a matter of law as a public corporation may not be sued on common law

20 │ theories of liability. (Gov. Code § 815(a); *Harshbarger, supra,* 197 Cal.App.3d at 1339

21 │ ["Government Code section 815 abolished all common law or judicially declared liability for public

22 │ entities."]; *Michael J., supra,* (1988) 201 Cal.App.3d 859, 866 [claims against public entities must

23 │ be based on statutes, not common law tort theories of liability].) The second and third causes of

24 │ action for interference with contract and interference with prospective business advantage are

25 │ common law tort claims that are barred by governmental immunity.

26 │         **4.**     **Plaintiff's Claims Are Procedurally Flawed**

27 │       In the limited circumstances where a damage claim against a public entity is authorized by

28 │ statute, the Tort Claims Act (Gov. Code section 810 et. seq.) requires plaintiff to submit a

---

8

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE
APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

1    compensation claim with the proper public entity. (Gov. Code § 905 et seq.)  Plaintiff has failed to

2    do so.  Thus, Plaintiff's claims are barred by failure to comply with the procedural requirements for

3    filing a claim against a public entity. (Weil & Brown, Civil Pro. Before Trial, ¶ 9:510; *Board of*

4    *Police Commrs. v. Sup. Ct.* (1985) 168 Cal.App.3d 420, 431-432.)

5          **D.**   **Public Security Concerns Outweigh Any Revenue Losses Claimed by Plaintiff**

6            Denial of Plaintiff's TRO application is also compelled by a balancing of the hardships.  In

7    its application, Plaintiff seeks to prohibit SDCCC from implementing its new cleaning service

8    security policy.  The only concern cited by Plaintiff is projected revenue losses.  Plaintiff's

9    application should be denied because the balance of hardship overwhelmingly weighs in favor of

10    defendant's security concerns as opposed to Plaintiff's speculative claims of revenue losses.

11
12          As discussed above, Plaintiff's claimed financial hardship for having to recruit cleaning

    workers from a pre-screened pool of SDCCC employees is highly speculative.  The security policy

13    adopted by SDCCC does not prohibit Plaintiff from conducting business at the Convention Center

14    and/or servicing its customers for the upcoming shows. (Wallace Decl., ¶7.)  Thus, Plaintiff will

15    suffer no substantial hardship by utilizing SDCCC staff rather than recruiting unscreened cleaning

16    workers through other vendors.

17

18          On the other hand, granting this injunction will be detrimental to public safety and will

19    seriously impact SDCCC's efforts to maximize the safety and security in the Convention Center.

20    There is no question that in today's environment of constant terrorist threats and national security

21    concerns, ensuring the security of a prominent public facility in San Diego (the only convention

22    center of its kind in San Diego county that hosts some of the largest conventions and trade shows in

23    the nation) is priceless and revenue concerns should not take priority over that.  SDCCC's cleaning

24    services policy is based upon a thorough and careful study of the various concerns involving the

25    safety and security in the building. (Wallace Decl., ¶6.)  The ability of general contractors to hire

26    third party vendors who subcontract work to other entities and individuals is of a particular concern,

27    because SDCCC has no direct relationship with the third party vendors and no control over their

28

9

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE
APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

15

1 | activities and operations in the Convention Center. (Id. at ¶5.) SDCCC's assessment of areas of

2 | vulnerability indicated the use of outside cleaning crews should be eliminated. (Id. at ¶7.)

4 |     Granting this injunction will allow third party vendors to continue to utilize unscreened

5 | service workers, who have not been properly vetted, and will prevent SDCC from securing the safety

6 | of the building. (Wallace Decl., ¶ 11.) Thus, the balance of the hardship clearly weighs in favor of

7 | denying the injunction.

**IV.**

**CONCLUSION**

    Based on the foregoing, Plaintiff's Application for Temporary Restraining Order should be denied as Plaintiff's has failed to meet its burden to show irreparable harm and there is no reasonable probability that Plaintiff will prevail on the merits.

Dated:    August 6, 2007    **WILSON PETTY KOSMO & TURNER LLP**

By: _____
Regina A. Petty
Dessi P. Nintcheva
Attorneys for Defendant
SAN DIEGO CONVENTION CENTER
CORPORATION, INC.

10

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFF'S EX PARTE
APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE:
PRELIMINARY INJUNCTION

15

218

**Exhibit 16**

1   WILSON PETTY KOSMO & TURNER LLP
    REGINA A. PETTY (106163)
2   SOTERA L. ANDERSON (211025)
    DESSI P. NINTCHEVA (207699)
3   550 West C Street, Suite 1050
    San Diego, California 92101
4   Telephone: (619) 236-9600
    Facsimile: (619) 236-9669
5
    Attorneys for Defendant
6   SAN DIEGO CONVENTION CENTER
    CORPORATION, INC.
7

                                    F I L E D
                                    Clerk of the Superior Court

                                    AUG 2 8 2007

                                    By: D. LIM, Deputy

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 IN AND FOR THE COUNTY OF SAN DIEGO

10                                               71586

11  WEAVER SOUTH PACIFIC PUBLICATIONS,    Case No. 37-2007-00715864-CU-BC-CTL
    INC.
12                                         DEFENDANT'S MEMORANDUM OF
              Plaintiff,                   POINTS AND AUTHORITIES IN
13                                         OPPOSITION TO PLAINTIFF'S
         v.                                REQUEST FOR ISSUANCE OF
14                                         PRELIMINARY INJUNCTION

15  SAN DIEGO CONVENTION CENTER           Complaint Filed: July 23, 2007
    CORPORATION, INC., a California non-profit
16  corporation; and DOES 1 through 20, inclusive,   Date:      September 5, 2007
                                                      Time:      1:30 p.m.
17            Defendants.                             Dept.:     66
                                                      Judge:     Hon. Charles R. Hayes
18                                                    Trial Date: Not Set

19

20

21

22

23

24

25

26

27

28                                                                            16

                                                                              219

    DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
       PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ........................... 2

    A.    Background................................................................................. 2

    B.    Plaintiff And SDCCC Enter Into A Written Contract ................ 3

    C.    SDCCC Provided Plaintiff With Customer Information and Publication
        and Content................................................................................. 5

    D.    SDCCC's Dissatisfaction With Plaintiff's Performance And Notice To
        Plaintiff....................................................................................... 6

    E.    SDCCC Terminates The Contract For Cause............................. 11

    F.    Plaintiff Brings Suit For Breach Of Contract Alleging Wrongful Early
        Termination................................................................................. 11

III.   LEGAL ARGUMENT ..................................................................... 12

    A.    Plaintiff Does Not Own Or Have The Right To Any "Proprietary
        Information" ................................................................................ 13

        1.    SDCCC Provided To Plaintiff The Very Information - Client
             Contacts and Publication Data - Plaintiff Claims As Its Own................... 13

        2.    Plaintiff Freely Transferred Its Rights To The Information To
             SDCCC, Effective At Signing. ..................................................... 15

    B.    The "Proprietary Information" At Issue Is Not Proprietary At All ...................... 18

        1.    Customer Information That Is Readily Available To The Public Is
             Not Proprietary ........................................................................... 18

        2.    Publishing "Process" Is Not Proprietary. ...................................... 19

    C.    Plaintiff Is Barred From Bringing The Instant Lawsuit And, As Such,
        Plaintiff Has No Reasonable Probability Of Prevailing ........................ 20

        1.    Plaintiff Has No Viable Cause Of Action For Unfair Competition
             Against A Public Entity................................................................. 21

        2.    Public Entities Are Immune From Liability Under The Cartwright
             Act ............................................................................................... 21

        3.    Plaintiff's Claims Are Barred For Plaintiff's Failure To Comply
             With The Claim Requirements Set Forth In The Tort Claims Act........... 21

        4.    Plaintiff Given Numerous Opportunities To Cure. ...................... 24

    D.    Plaintiff Has Failed To Meet Its Burden Showing It Will Suffer
        Significant Irreparable Harm If Preliminary Injunction Is Not Issued................. 25

16

220

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

IV.    CONCLUSION ................................................................26

16

221

ii

## TABLE OF AUTHORITIES

**State Cases**

*Anza Parking Corp. v. City of Burlingame*
    (1987) 195 Cal.App.3d 855 ................................................................16

*Baines Pickwick Limited v. City of Los Angeles*
    (1999) 72 Cal.App.4th 298 ...............................................................22

*Cal. Med. Ass'n v. Regents of the Univ. of Cal.*
    (2000) 79 Cal. App. 4th 542 ...........................................................21

*Cockerell v. Title Ins. & Trust Co.*
    (1954) 42 Cal.2d 284 ........................................................................16

*Colome v. State Athletic Com.*
    (1996) 47 Cal.App.4th 1444 ...........................................................20

*Continental Baking Co. v. Katz*
    (1968) 68 Cal.2d 512 ........................................................................12

*Credit Bureau of San Diego, Inc. v. Johnson*
    (1943) 61 Cal.App.2d Supp. 834 ....................................................16

*Gatto v. County of Sonoma*
    (2002) 98 Cal.App.4th 744 ..............................................................22

*Harshbarger v. City Colton*
    (1988) 197 Cal.App.3d 1335 ..........................................................20

*Michael J. v. Los Angeles County Dept. of Adoptions*
    (1988) 201 Cal.App.3d 859 .............................................................20

*Mission Valley East, Inc. v. County of Kern*
    (1981) 120 Cal.App.3d 89 ...............................................................16

*Munoz v. State of California*
    (1995) 33 Cal.App.4th 1767 ...........................................................20

*O'Connell v. Superior Court*
    (2006) 141 Cal.App.4th 1452 .........................................................12

*Pacific Decision Sciences Corp. v. Superior Court (Maudlin)*
    (2004) 121 Cal.App.4th 1100 .........................................................12

*Penn v. City of San Diego*
    (1987) 188 Cal. App. 3d 636 ..........................................................21

iii

San Francisco Newspaper Printing Co., Inc. v. Superior Court (Miller)
   (1985) 170 Cal.App.3d 438 ...................................................................12

Simms v. NPCK Enterprises, Inc.
   (2003) 109 Cal.App.4th 233 ................................................................13

State of California v. Superior Court (Bodde)
   (2004) 32 Cal.4th 1234 .......................................................................20

Thayer Plymouth center, Inc. v. Chrysler Motors
   (1967) 255 Cal.App.2d 300 ................................................................12

Tokeshi v. State of California
   (1990) 217 Cal.App.3d 999 ................................................................20

TrafficSchoolOnline, Inc. v. Clarke
   (2003) 112 Cal.App.4th 736 ..............................................................22

Trinkle v. Cal. State Lottery
   (1999) 71 Cal. App. 4th 1198 ......................................................20, 21

United California Bank v. Behrends
   (1967) 251 Cal.App.2d 720 ................................................................16

Voorhies v. Greene
   (1983) 139 Cal.App.3d 989 ................................................................13

**Federal Cases**

Bell Atlantic Business Systems v. Storage Technology Corp.
   (1994) 1994 U.S. Dist. LEXIS 4471 .................................................25

Oakland Tribune, Inc. v. Chronicle Publishing Co.
   (9th Cir. 1985) 762 F.2d 1374 ...........................................................25

Ruckelshaud v. Monsanto Co.
   (1984) 467 U.S. 986 ...........................................................................18

**State Statutes**

California Civil Code section 3426.1(d)................................................18

Civil Code sections 1039, 1040, and 1044 ..........................................16

**Federal Statutes**

Government Code section 811.2 ....................................................20, 22

Government Code section 815(a) ..................................................20, 22

Government Code section 910 .............................................................20

iv

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1  Government Code section 945.4 ...................................................................................20

2  Government Code sections 905 and 945.4 ....................................................................22

3  Government Codes sections 811.2, 900.4, 905, 940.4, and 945.4 ................................21

4  **Treatises**

5  Weil & Brown, *Civil Procedure Before Trial*, §9:500 ...........................................12, 13

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

v
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

16

224

1    Defendant SAN DIEGO CONVENTION CENTER CORPORATION, INC. (hereinafter

2    "SDCCC") respectfully submits the following Memorandum of Points and Authorities in Opposition

3    to Plaintiff WEAVER SOUTH PACIFIC PUBLICATIONS, INC.'s (hereinafter "WEAVER")

4    request for issuance of preliminary injunction.

5                                    **I.    INTRODUCTION**

6          While Plaintiff's argument in support of preliminary injunction is convoluted and misleading,

7    it appears that the sole basis for Plaintiff's motion is that SDCCC had access to vaguely identified

8    "proprietary information" which Plaintiff asserts belongs to Plaintiff. Interestingly, however,

9    Plaintiff is **not** suing SDCCC for breach of fiduciary duty. Even more, Plaintiff is **not** suing SDCCC

10   for unfair competition or misappropriation of trade secrets. Rather, Plaintiff is only suing SDCCC

11   for breach of contract on the ground that SDCCC wrongfully and improperly terminated the

12   contract. This is the only basis for Plaintiff's breach of a services contract causes of action alleged

13   in the Complaint. The Court should not be side-tracked by Plaintiff's attempt to argue differently or

14   confuse the Court with facts and issues that are not directly pertinent to the actual causes of action

15   asserted in this matter. Injunctive relief is a remedy, not a cause of action.

16         There is no reasonable probability that Plaintiff will succeed on the merits of this case. There

17   are many problems with Plaintiff's request for issuance of preliminary injunction. *First,* SDCCC, not

18   Plaintiff, owns the rights to the subject "proprietary" information. Not only did SDCCC provide

19   Plaintiff with the information, but even if it didn't Plaintiff contracted its rights to any "proprietary"

20   information to SDCCC. *Second,* even if the information Plaintiff purports to be "proprietary" did

21   belong to Plaintiff, such information does not satisfy the requirements necessary for Plaintiff to label

22   it "proprietary" under California trade secret law. *Third,* SDCCC is a public entity and, as such,

23   Plaintiff is barred from bringing the instant action against SDCCC. *Fourth,* this is a breach of

24   contract action in which Plaintiff has no reasonable probability of prevailing. Plaintiff materially

25   breached the contract between itself and SDCCC from virtually the inception of the relationship.

26   SDCCC advised Plaintiff on a monthly basis of its deficiencies and gave Plaintiff more than a year

27   of opportunities to cure. Plaintiff repeatedly failed to do so resulting in SDCCC giving Plaintiff

28   written notification that it was terminating the contract, pursuant to the terms of the contract. *Finally,*

                                          1
          DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
          PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

16

225

PAGE 18/44                    ALPHA ATTORNEY SERV              6192536980    09:48  09/28/2007

1 | Plaintiff has not met its burden of showing it will suffer significant irreparable harm if preliminary
2 | injunction is not issued. This is particularly true when an injunction prohibiting SDCCC from using
3 | the "proprietary information" will not achieve the effect Plaintiff desires with respect to its contracts
4 | with third parties. Instead, preliminary injunction will accomplish the complete opposite. The only
5 | adequate remedy is monetary damages, if Plaintiff can overcome the many uphill battles it faces and
6 | somehow prevails at the time of trial.

7 | Plaintiff's request for issuance of preliminary injunction should, therefore, be denied
8 | outright.

9 | **II. FACTUAL AND PROCEDURAL BACKGROUND**

10 | **A. Background**

11 | The SDCCC is a not-for-profit public benefit corporation created by the City of San Diego
12 | (the City). (Declaration ["Decl."] of Carol Wallace ["Wallace"], ¶ 2). The City is SDCCC's sole
13 | member and appoints the board of directors. (Wallace Decl., ¶ 2). SDCCC is subject to California's
14 | opening meetings law (the "Brown Act") and other laws governing the conduct of business of a
15 | public entity. (Wallace Decl., ¶ 2). All of SDCCC's decision makers must comply with the Political
16 | Reform Act and the San Diego Ethics Ordinance. (Wallace Decl., ¶ 2). In all respects, SDCCC
17 | functions as a public entity performing a service for the City and the public. (Wallace Decl., ¶ 2).
18 | SDCCC's sole purpose is to manage and operate the San Diego Convention Center ("Center").
19 | (Wallace Decl., ¶ 3). Since its opening in 1989, SDCCC has managed, marketed and operated the
20 | Center on behalf of the City and the San Diego Unified Port District. (Wallace Decl., ¶ 3).

21 | The is one of the top meeting facilities in the world. (Wallace Decl., ¶ 4). Each year,
22 | hundreds of thousands of persons attend events and activities in the building. SDCCC licenses use
23 | of the Center to individuals and entities (Licensees) as a venue for public and private events.
24 | (Wallace Decl., ¶ 4). As the operator of the Center, one of SDCCC's responsibilities is to market
25 | and advertise the Center, as well as San Diego as a destination point, to prospective clientele.
26 | (Wallace Decl., ¶ 5). To accomplish its goal of marketing the Center, SDCCC publishes and
27 | distributes publications. (Wallace Decl., ¶ 5). For several years, SDCCC did so through its in-house
28 | advertising program using an extensive client list of advertisers, as well as, in collaboration with San

2
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

16

226

1  Diego Convention & Visitor's Bureau ("ConVis") with whom SDCCC shared its sales and
2  marketing responsibility. (Wallace Decl., ¶¶ 5 and 6; Decl. of Sandra Butler-Moreno ["Moreno"], ¶
3  2).
4  In 1990, ConVis, in collaboration with an advertising agency, developed a workbook, known
5  as the San Diego Meeting Planner Workbook ("Workbook"). (Moreno Decl., ¶ 3). ConVis, namely
6  Sandra Butler-Moreno, created and developed the content and advertorial style format layout for the
7  Workbook. (Moreno Decl., ¶ 3). In 1995, ConVis contracted with Plaintiff, among other this,
8  publish the Workbook. (Moreno Decl., ¶ 4). ConVis supplied Plaintiff with the Workbook data and
9  Plaintiff continued to use the same format and content design that Ms. Moreno created back in 1990
10 in publishing the Workbook. (Moreno Decl., ¶ 4).

11 **B.    Plaintiff And SDCCC Enter Into A Written Contract**

12 In 2005, SDCCC accepted sole responsibility for sales and marketing. (Wallace Decl., ¶ 6;
13 Moreno Decl., ¶ 5). Peter Koclanes, President and CEO of Weaver South Pacific Publications, Inc.,
14 contacted SDCCC to discuss the possibility of Plaintiff publishing the Workbook for SDCCC.
15 (Moreno Decl., ¶ 4). After several discussions, Plaintiff pitched its idea of having Plaintiff become
16 SDCCC's exclusive publisher and advertising agency as well as publishing the guide.  Plaintiff then
17 drafted and presented a proposal and contract to SDCCC for its consideration. (Moreno Decl., ¶ 7).
18 It included a 3-year term. (Moreno Decl., ¶ 7).
19 Plaintiff led SDCCC to believe that Plaintiff still had a business operation in San Diego.
20 (Moreno Decl., ¶ 8). In fact, Plaintiff's proposal represented that its local employee would work on
21 SDCCC's advertising program. (Moreno Decl., ¶ 8). Plaintiff represented that it still had in place
22 the contacts and resources required to perform SDCCC's publishing in San Diego. (Moreno Decl., ¶
23 8). There was no discussion of startup costs or initial investments by Plaintiff. (Moreno Decl., ¶ 8).
24 To help alleviate some of the burden placed on SDCCC in having to take on the sales and
25 marketing responsibility completely, SDCCC decided to enter into a contract with Plaintiff.
26 (Wallace Decl., ¶ 6). Rather than enter into a three-year contract as proposed by Plaintiff, the parties
27 entered into a five-year contract, as that is the policy of SDCCC. (Moreno Decl., ¶ 9 and 10).
28

---

3

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1  Plaintiff represented that it could deliver the publications with little involvement from SDCCC.

2  (Wallace Decl., ¶ 6; Moreno Decl., ¶ 8).

3          In April 2006, SDCCC entered into a five-year written agreement with Plaintiff entitled,

4  "Contract for Publishing and Advertising Services, Contract No. 06-1295-R" ("the contract").

5  (Wallace Decl., ¶ 7; Exhibit ["Exh."]. "A" to Notice of Lodgment ["NOL"]).  The contract was

6  executed by Carol Wallace, SDCCC's President and Chief Executive Officer, and Peter Koclanes,

7  Plaintiff's President and Chief Executive Officer.  (Wallace Decl., ¶ 7; Exh. "A" to NOL).  The final

8  product of the contract was a result of negotiation between SDCCC and Plaintiff. (Wallace Decl., ¶

9  7).

10         Under the terms of the contract, Plaintiff was obligated to perform certain "Services,"

11 meaning that Plaintiff was to provide advertising sales services and was to publish publications as

12 described in the contract which were designed to promote the use of the Center. (Wallace Decl., ¶ 8;

13 Exh. "A" to NOL).  Plaintiff was SDCCC's exclusive provider of such Services. (Wallace Decl., ¶ 8;

14 Moreno Decl., ¶ 10; Exh. "A" to NOL).  Specifically, the scope of Plaintiff's "Services," included:

15              a.  compile, edit, sell advertising in, and publish a printed
                publication designed for convention delegates, currently entitled
16              *San Diego Essential Delegate's Guide*, that will provide current
                and dynamic information about San Diego and may be customized
17              for selected Center events as designated by [SDCCC];
                b.  compile, edit, sell advertising in, and publish a printed
18              publication designed for meeting and convention planners,
                currently entitled the *San Diego Convention Center Workbook*,
19              that provides all essential resources required to plan an event at the
                Center;
20              c.  compile and produce electronic versions of both publications
21              for posting to [SDCCC]'s website and the event website; and,
                d.  sell advertising space for in the Restaurant Booth and the
22              Lobby Display Area, both of which are designated advertising
                display areas located in the Center.
23

24 (Wallace Decl., ¶ 8; Exh. "A" to NOL).

25         The contract sets forth requirements for the two publications.  (Wallace Decl., ¶ 9; Exh. "A"

26 to NOL).  For instance, the contract requires the publications be published on certain dates and sets

27 forth certain technical specifications, i.e., size, number of pages, binding, and when the electronic

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1   version should be made available. (Wallace Decl., ¶ 9; Exh. "A" to NOL). With respect to

2   advertising, SDCCC must approve all rates and discounts. (Wallace Decl., ¶ 10; Exh. "A" to NOL).

3       Further, by signing the contract Plaintiff expressly, freely and knowingly, agreed to a

4   separate proprietary provision assigning all property rights any way connected to Plaintiff's

5   "Services," to SDCCC. (Wallace Decl., ¶ 11; Exh. "A" to NOL). Specifically, Plaintiff agreed to

6   the following:

7           **4.1 Proprietary Rights.** [Plaintiff] agrees that *[SDCCC] is the*
            *sole and exclusive owner of all property rights,* including but not

8           limited to ... and other work product produced pursuant to this
            Contract. This *includes any and all designs, artwork, copy,*

9           *articles, material, reports, memoranda or notes, and any material*
            *provided by [SDCCC],* whether in written or electronic form,

10          which may be *prepared in the course of performing the Services*
            ("Work Product."). *[Plaintiff] hereby grants and assigns to*

11          *[SDCCC], ... all rights, title and interest in and to the Work*
            *Product,* including but not limited to ... and all other rights therein

12          of any nature whatsoever, whether now known or hereafter

13          devised, ... *This assignment is irrevocable and unconditional,*
            *and is made freely and knowingly by Contractor...*

14

15  (Wallace Decl., ¶ 11; Exh. "A" to NOL).

16      Finally, the contract allows SDCCC to terminate the contract for cause, meaning a material

17  breach on the part of the Plaintiff as that term is defined in the contract. (Wallace Decl., ¶ 12; Exh.

18  "A" to NOL). However, under section 7.1.2 of the contract, SDCCC must provide Plaintiff with five

19  business days to cure the material breach before terminating the contract. (Wallace Decl., ¶ 12; Exh.

20  "A" to NOL).

21  **C.    SDCCC Provided Plaintiff With Customer Information and Publication and**
        **Content**

22

23      As part of the contract negotiating process, SDCCC, who already had approximately 100

24  contracts with various advertisers, agreed to transfer its existing contracts to Plaintiff to provide an

25  opportunity for "bundling" – where an advertiser can purchase several advertising products -

26  thereby enhancing Plaintiff's sales capability. (Wallace Decl., ¶ 13; Moreno Decl., ¶ 9; Exh. "Y" to

27  NOL). Shortly after SDCCC and Plaintiff entered into the contract, SDCCC supplied Plaintiff with

28

5

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1   a multitude of data, including customer lists, both existing and potential. (Decl. of Steven Johnson

2   ["Johnson"],, ¶ 2; Exh. "Y" to NOL).

3       Over the 17 years SDCCC has been in business, it has developed relationships with many

4   vendors in the San Diego marketplace. SDCCC leveraged those relationships such that Plaintiff was

5   able to negotiate advertising contracts with the majority of new vendors. (Johnson Decl., ¶ 3; Exh.

6   "Y" to NOL).

7       With respect to the Workbook, the content was already in existence on SDCCC's website.

8   (Moreno Decl., ¶ 11). In fact, SDCCC estimates that it provided Plaintiff with approximately 85-

9   90% of the editorial content for the Workbook. (Johnson Decl., ¶ 5). Plaintiff copied the content

10  from the website and pasted it into a layout that could be printed in hard copy using a commercially

11  available desktop publishing software known as Querk. (Moreno Decl., ¶ 11). It also added

12  advertising to the Workbook. (Moreno Decl., ¶ 11). Plaintiff continued to use the same design,

13  layout and content of the Workbook that Ms. Moreno created back in 1990, which ConVis provided

14  to Plaintiff under the contract between Plaintiff and ConVis. (Moreno Decl., ¶ 11).

15      As for the Guide, SDCCC provided to Plaintiff an outline and format, as well as the vast

16  majority of the content, meaning editorials, advertorials, and photos. (Moreno Decl., ¶ 12; Johnson

17  Decl., ¶ 5; Exhs. "D, F, G, J, L, N, O, P, Q, and R" to NOL). SDCCC estimates that it provided

18  Plaintiff with approximately two-thirds, approximately 60%, of the editorial content for the Guide.

19  (Johnson Decl., ¶ 5). Plaintiff provided some photos and designed the graphics, i.e., border choice

20  and colors. (Moreno Decl., ¶ 12). Plaintiff then took the content SDCCC provided and inserted it

21  into their Querk software, that is, into the layout it created using the Querk software. (Moreno Decl.,

22  ¶ 12).

23  **D.    SDCCC's Dissatisfaction With Plaintiff's Performance And Notice To Plaintiff**

24      Plaintiff soon demonstrated that it did not have the skill or ability to produce the type of

25  quality product that SDCCC expected for when it entered into the contract with Plaintiff. (Moreno

26  Decl., ¶ 13; Johnson Decl., ¶ 6). SDCCC had to instruct Plaintiff what format and layout it would

27  like the publications to look like, provided Plaintiff with the content to insert into the publications

28  and then make numerous revisions when Plaintiff took matters into their own hands to insert

6

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1  information or data into the draft publications. (Johnson Decl., ¶¶ 5 and 6; Exhs. "D, F, G, J, L, N,
2  O, P, Q, and R" to NOL). Plaintiff's performance has been shockingly poor. (Moreno Decl., ¶ 13).
3  SDCCC has had to spend an inordinate amount of time doing the work that Plaintiff was hired to
4  perform under the contract. (Moreno Decl., ¶ 13). Following are just a few examples of Plaintiff's
5  material breach of the contract:
6      Failure to Effectively Sell Advertising.  Plaintiff represented that it could deliver the
7  advertisements and the publications with little involvement from SDCCC but was unable to
8  effectively sell advertising without considerable assistance from SDCCC. (Wallace Decl., ¶ 14;
9  Moreno Decl., ¶ 13).  Advertising Sales was a service which Plaintiff was specifically hired to
10 perform. (Wallace Decl., ¶ 13; Moreno Decl., ¶ 13). Failure to Meet Page Requirements.  Plaintiff
11 never met the page requirements of the contract. (Moreno Decl., ¶ 13). The first Guide was half the
12 size it should have been, Plaintiff having unilaterally cut 40 pages. (Moreno Decl., ¶ 13).  The
13 second Guide Plaintiff published was larger than the first one, but it still did not meet the
14 requirements set forth in the contract. (Moreno Decl., ¶ 13). Failure to Meet Deadlines.  The
15 publications' deadlines have been repeatedly and significantly delayed and even with additional time
16 they did not meet with contract requirements. (Moreno Decl., ¶ 13). Plaintiff published the first
17 Guide in August 2006, two months late. (Moreno Decl., ¶ 13).  Failure to Customize Content.
18 Plaintiff never met the contract requirements that Plaintiff produce customized content for up to 24
19 events held at the Center, and admitted that it did not have the capacity to do so. (Moreno Decl., ¶
20 13). The contract was not amended. (Moreno Decl., ¶ 13). Failure to Provide Virtual Publication on
21 Time.  Plaintiff has never provided SDCCC with a virtual publication within four days after hard
22 copies were distributed as required by the contract. (Johnson Decl., ¶ 6). Failure to Provide 5 Days
23 For Review.  Under the contract, Plaintiff was required to provide SDCCC with at least 5 days to
24 review drafts. (Moreno Decl., ¶ 13).Plaintiff oftentimes only provided SDCCC with a few days'
25 notice. (Moreno Decl., ¶ 13). On one occasion, Plaintiff gave SDCCC two business days before
26 sending the Guide to print. (Moreno Decl., ¶ 13; Exh. "K" to NOL). Disturbing Sales Tactics and
27 Jeopardizing Relationships with Advertisers.  The sales tactics Plaintiff employed were disturbing.
28 (Moreno Decl., ¶ 13).  Also, many advertisers have personally complained directly to SDCCC, about

1  Plaintiff and its sales practices and shortcomings. (Wallace Decl., ¶ 15; Moreno Decl., ¶ 13).

2  SDCCC has had to spend time contacting various advertisers to repair relationships damaged by

3  Plaintiff's disturbing conduct in trying to sell ad space in the publications. (Wallace Decl., ¶ 15;

4  Moreno Decl., ¶ 13; Johnson Decl., ¶¶ 6; Exh. "E" to NOL)  Advertisers that SDCCC had under

5  contract before hiring Plaintiff cancelled due to Plaintiff's poor customer relations and business

6  practices. (Moreno Decl., ¶ 13).  SDCCC has had to approve several publications for print despite

7  Plaintiff never meeting SDCCC's standards or the contract requirements because of the negative

8  impact of SDCCC's reputation and relationship with advertisers, including hotels, restaurants and

9  other industry partners, when paid advertising is not produced as promised and in a timely manner.

10  (Wallace Decl., ¶ 17).  Lack of Sensitivity.  SDCCC thoroughly explained its sensitive relationship

11  in the marketplace with ConVis. (Moreno Decl., ¶ 13).  Despite having knowledge of the fragile

12  relationship, early into the contract, Plaintiff sent out communications to prospective advertisers

13  taking a negative tone towards ConVis. (Moreno Decl., ¶ 13; Exhs. "H" to NOL).  Poor Quality.

14  Plaintiff's production work was shoddy, and the quality of the design and layout was poor, requiring

15  repeated corrections. (Moreno Decl., ¶ 13).  For instance, Plaintiff used photos to depict certain

16  destination spots in san Diego which were not actual photos of the locations.  As an example,

17  Plaintiff used a photo which was supposed to depict Coronado Beach but the photo was not a picture

18  of Coronado beach, the same with Mission Bay and Ocean Beach. (Moreno Decl., ¶ 13).

19      On numerous occasions SDCCC has made Plaintiff aware of SDCCC's many ongoing

20  concerns about Plaintiff's inability to produce and live up to SDCCC's standards and the

21  requirements set forth in the contract. (Moreno Decl., ¶ 14).  The following details some of those

22  communications:

23      On June 29, 2006, Ms. Moreno and Steven Johnson, Vice President of Public Affairs for

24  SDCCC, called Mr. Koclanes and detailed SDCCC's concerns with the performance of Plaintiff's

25  sales team in the marketplace, the enormous burden that had been placed on the SDCCC team due to

26  Plaintiff's failure to create, copy, and design materials or choose images that reflected the San Diego

27  marketplace. (Moreno Decl., ¶ 14; Johnson Decl., ¶ 6). During this call, Ms. Moreno clearly

28  expressed SDCCC's concern and surprise that what Plaintiff presented to SDCCC in selling the

8

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

PAGE 17/44          ALPHA ATTORNEY SERV          6192356580          09:48 09/28/2007

1   contract - Plaintiff's years of experience and understanding of the San Diego market, as well as

2   Plaintiff's representations that it could provide SDCCC with a high quality product produced by an

3   experienced team - was not, in fact, occurring. (Moreno Decl., ¶ 14; Johnson Decl., ¶ 6).    Mr.

4   Johnson and Ms. Moreno also expressed to Mr. Koclanes SDCCC's frustration with the

5   communications Plaintiff sent out to community stakeholders that inflamed and exasperated

6   relations with local hospitality stakeholders, without SDCCC's prior knowledge or approval.

7   (Moreno Decl., ¶ 14; Johnson Decl., ¶ 6).

8           On July 20, 2006, Heather Loader, Plaintiff's Director of Partner Relations, advised Ms.

9   Moreno that the first Guide was going to the printer the following week but that Plaintiff cut 40

10  pages out of the guide, which is close to 50% of the content for the guide. (Moreno Decl., ¶ 14).

11          On September 7, 2006, SDCCC had a face-to-face meeting with Lynne Craig, Plaintiff's new

12  Director of Partner Relations, and Vicke Phillips, Plaintiff's Editor, at SDCCC's offices. (Moreno

13  Decl., ¶ 14; Johnson Decl., ¶ 6). Some of the items discussed included Plaintiff's lack of

14  understanding about SDCCC's destination and brand, Plaintiff's poor image selection, Plaintiff's

15  inability to follow SDCCC's direction, Plaintiff setting unreasonable deadlines, and Plaintiff's

16  failure to communicate. (Moreno Decl., ¶ 14; Johnson Decl., ¶ 6; Exh. "M," to NOL).

17          On October 11, 2006, Mr. Johnson had a lunch meeting with Mr. Schmidt wherein Mr.

18  Johnson expressed SDCCC's ongoing challenges with the behavior of one of Plaintiff's sales

19  associate in the marketplace and the continued challenges on having to deal with angry stakeholders

20  due to Plaintiff's sales tactics. (Johnson Decl., ¶ 6).

21          On October 26, 2006, Mr. Johnson participated in a conference call with Mr. Koclanes, Ms.

22  Craig and either Mr. Green or Mr. Schmidt to again discuss SDCCC's ongoing issues with the

23  contract. (Johnson Decl., ¶ 6).    Mr. Johnson expressed SDCCC's frustration with the amount of

24  work it was being required to produce for the Workbook when Plaintiff was hired to do that work,

25  the short deadlines and ongoing challenges that this burden placed on my staff. (Johnson Decl., ¶ 6).

26  Mr. Johnson shared his frustration that the content development for the publications, which Plaintiff

27  was contractually supposed to handle, was being handled by SDCCC. (Johnson Decl., ¶ 6).

28

9

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO<br>PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1    In late December 2006, SDCCC received a box of the first issues of the Workbook and

2    discovered that the binding was of poor quality and bound incorrectly. (Johnson Decl., ¶ 6). Mr.

3    Johnson called Ms. Craig who indicated Plaintiff would reprint and bind the Workbook, which

4    delayed the time SDCCC would receive the finished product by three or more weeks. (Johnson

5    Decl., ¶ 6).

6        On January 16, 2007, SDCCC met with Ms. Craig and Mr. Schmidt and discussed the

7    challenges with the production of both the Guide and the Workbook. (Johnson Decl., ¶ 6).

8        On February 1, 2007, SDCCC met with Plaintiff's sales staff and design folks and once again

9    shared its ongoing frustrations with Plaintiff's performance and crafted and presented our

10   suggestions for significant changes to the upcoming Guide, which included a complete redesign to

11   help better shape the publication for value to SDCCC's attendees and advertisers. (Johnson Decl., ¶

12   6).

13       On February 20, 2007, Mr. Johnson communicated with Ms. Craig via email regarding his

14   ongoing frustration with Plaintiff's failure to deliver the electronic copy of the Workbook and Guide

15   within four (4) days after the hard copy of completed. (Johnson Decl., ¶ 6). SDCCC still has not

16   received its electronic copy of the Summer/Fall Guide. (Johnson Decl., ¶ 6' Exh. "S" to NOL).

17       Another area of concern with Plaintiff is its failure to accomplish one of the most basic of

18   tasks – mailing SDCCC's royalty checks to the proper address. (Johnson Decl., ¶ 6). Plaintiff

19   repeatedly mailed the checks to the wrong locations. On March 22, 2007, Mr. Johnson sent another

20   email to Plaintiff requesting that it correct this ongoing issue. (Johnson Decl., ¶ 6' Exh. "T" to

21   NOL).

22       In early June 2007, SDCCC received three boxes of the new Guides. (Johnson Decl., ¶ 6).

23   When Mr. Johnson opened the boxes, he discovered that there were multiple printing issues / quality

24   issues with registration and with maps falling out of the Guides. (Johnson Decl., ¶ 6). Mr. Johnson

25   spoke with Mr. Koclanes about these issues and also shared his deep frustration with his team and

26   SDCCC's continued frustration with Plaintiff's inability to meet performance or quality

27   expectations. (Johnson Decl., ¶ 6).

28

10

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO<br>PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1    Despite face-to-face meetings and telephone conversations, which focused on the need for

2   Plaintiff to make changes as it relates to SDCCC's ongoing frustration with Plaintiff's lack of

3   communication, performance, quality, customer relations, content creation, review and editing, as

4   well as, the ongoing failure by Plaintiff to submit accurate monthly commission reports or mail the

5   monthly checks to the correct location, Plaintiff's performance is still not up to par with SDCCC's

6   expectations and the contract requirements. (Moreno Decl., ¶ 15; Johnson Decl., ¶ 7).

7    **E.    SDCCC Terminates The Contract For Cause**

8    Frustrated by Plaintiff's continued failure to meet SDCCC's standards, SDCCC made the

9   decision to terminate its contract with Plaintiff. (Wallace Decl., ¶ 18). Prior to SDCCC sending

10   formal written notification of the termination to Plaintiff, SDCCC called Mr. Koclanes to discuss

11   SDCCC's decision to go a different direction and the reasons for the decision. (Wallace Decl., ¶ 18).

12   Mr. Koclanes was very understanding during the call and did not raise any objections. (Wallace

13   Decl., ¶ 18). Thereafter, SDCCC forwarded a formal written notice of the termination which set

14   forth the basis for the decision. (Wallace Decl., ¶ 19; Exh. "U" to NOL).

15    Some of the advertisers contacted SDCCC expressing delight in no longer having to deal

16   with Plaintiff. For instance, advertisers have stated the following upon learning that SDCCC

17   terminated the contract with Plaintiff: "This is great news I hated that company"; "Thank you!

18   Although we have not shared it with you, our experience with Weaver throughout the years has been

19   nothing but negative, and I am thrilled that you will in-sourcing this!"; and, "Thank you! This is

20   music to our ears…or eyes I guess." (Johnson Decl., ¶ 8).

21    **F.    Plaintiff Brings Suit For Breach Of Contract Alleging Wrongful Early**
         **Termination**

22

23    Plaintiff now brings suit against SDCCC, raising three causes of action and seeks certain

     remedies: Breach of Contract - SDCCC improperly terminated the contract early - seeking specific

24   performance of the contract and lost profits; Breach of Contract - SDCCC improperly terminated the

25   contract early - seeking contract damages; Declaratory Relief - seeking determination/declaration

26   that the contract is still in full force and effect.

27

28

                                            11
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

16

235

1   (Exh. "W" to NOL). In addition, Plaintiff seeks the remedy of injunctive relief with respect to

2   proprietary information. (Exh. "W" to NOL).

3                          **III.    LEGAL ARGUMENT**

4         A preliminary injunction is an order from the Court prohibiting a party from engaging in a

5   certain act or requiring that a party perform a certain act. Weil & Brown, Civ. Proc. Before Trial, ¶

6   9:500. The purpose of a preliminary injunction is to preserve the status quo and prevent irreparable

7   harm pending trial on the merits. *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528. That

8   said, a trial court must **not** grant a preliminary injunction, regardless of the balance of interim

9   **harm, unless it is "reasonably probable that the moving party will prevail on the merits."** *San*

10   *Francisco Newspaper Printing Co., inc. v. Superior Court (Miller)* (1985) 170 Cal.App.3d 438, 442

11   (emphasis added); see also *O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1463. The

12   burden is on the Plaintiff to establish all elements necessary to support issuance of a preliminary

13   injunction. *O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1481.

14         Plaintiff has no reasonable probability of prevailing on the merits. Plaintiff does not own or

15   have any rights to "proprietary information." The information Plaintiff claims to be "proprietary"

16   fails to qualify as such. Plaintiff's claims are barred due to SDCCC's status as a public entity. And,

17   SDCCC properly terminated the contract after Plaintiff materially breached the contract.

18   Additionally, Plaintiff has not shown that it will suffer significant irreparable harm if the preliminary

19   injunction is not issued.

20         Moreover, a preliminary injunction is a provisional remedy issued when other legal remedies,

21   like damages, are inadequate. Weil & Brown, Civ. Proc. Before Trial, ¶ 9:500. In fact, they are

22   rarely granted "where a suit for damages provides a clear remedy." See *Thayer Plymouth center,*

23   *Inc. v. Chrysler Motors* (1967) 255 Cal.App.2d 300, 307; *Pacific Decision Sciences Corp. v.*

24   *Superior Court (Maudlin)* (2004) 121 Cal.App.4th 1100, 1110. This is a breach of contract action

25   for which monetary damages are a clear and adequate remedy if Plaintiff prevails on the merits. As

26   such, the Court should deny Plaintiff's request for issuance of a preliminary injunction.

27

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

**A.    Plaintiff Does Not Own Or Have The Right To Any "Proprietary Information"**

Plaintiff makes a disingenuous claim of proprietary rights to material which rightfully belongs to SDCCC, not Plaintiff. SDCCC submits that it is the proper owner of the customer information and publication data not only because the contract makes it so, but because SDCCC is the one who provided the information and content to Plaintiff in the first instance. *Considering the parties hotly contest ownership rights to the proprietary information, the Court cannot issue preliminary injunction. "[W]here title to personal property is in dispute, courts will not issue preliminary injunctions to change possession of property pending trial."* Weil & Brown, Civ. Proc. Before Trial, ¶ 9:521 (emphasis added); *Voorhies v. Greene* (1983) 139 Cal.App.3d 989, 997-998; *Simms v. NPCK Enterprises, Inc.* (2003) 109 Cal.App.4th 233, 243.

> **1.    SDCCC Provided To Plaintiff The Very Information - Client Contacts and Publication Data - Plaintiff Claims As Its Own.**

Interestingly enough, the very customer information and design and content data that Plaintiff seeks to enjoin SDCCC from rightfully using actually originated from SDCCC. Plaintiff claims ownership to information and data that was not even Plaintiff's in the first instance and to which Plaintiff did not create on its own. We address each separately:

> a.    Customer Information

Plaintiff seeks to enjoin SDCC from contacting the customers listed in Plaintiff's "Goldmine" database. Yet, Plaintiff fails to advise the Court of one important fact - SDCCC supplied Plaintiff with most of the information contained in the database. Hence, what Plaintiff really seeks is to enjoin SDCCC from using its own information.

The customers in Plaintiff's database fall under four separate categories: (a) customers that SDCCC had advertising contracts with prior to the Plaintiff/SDCCC contract, of which SDCCC estimates to be at least 100; (b) customers whom SDCCC developed prior relationships with over the last 17 years and whom SDCCC leveraged to assist Plaintiff in obtaining contracts from; (c) customers that Plaintiff required SDCCC's assistance to secure contracts; and, (d) customers that Plaintiff secured all on its own during the Plaintiff/SDCCC contract. To compile the "Goldmine" database, SDCCC provided Plaintiff with information on customers in categories (a), (b), and

13

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1    sometimes (c) above. Attached to the Notice of Lodgment as Exhibit Y is a breakdown of the

2    customer categories. Of the 259 customers who advertised in the Workbook and/or Guides, Plaintiff

3    was only capable of securing 16 without any help from SDCCC and another 59 with SDCCC's

4    assistance. The remaining customers either already had advertising contracts with SDCCC or

5    SDCCC had a long-standing relationship with these customers and SDCCC used that relationship to

6    obtain contracts during the Plaintiff/SDCCC contract. Simply because SDCCC did not perform the

7    actual word processing function of cutting and pasting the information into the actual spreadsheet or

8    database, does not mean the information does not belong to SDCCC. In fact, Plaintiff could not

9    have compiled such a comprehensive list without the assistance of SDCCC. While SDCCC does not

10   object to not using the actual "Goldmine" spreadsheet, although under the contract the property

11   rights belong to SDCCC, it does object to not being able to contact those very customers contained

12   on the spreadsheet which SDCCC had a business relationship with prior to the Plaintiff/SDCCC

13   contract and continuing its long-standing relationship with those very customers.

14           b.     The Publications.

15       Like Plaintiff's attempt to prevent SDCCC from using its own customer data, Plaintiff also

16   seeks to enjoin SDCCC from using the very content it supplied to Plaintiff for use in the Workbook

17   and Guide. SDCCC's Workbook was essentially complete and being hosted on SDCCC's website

18   when Plaintiff came on board. Plaintiff simply had to cut and paste the content of the Workbook

19   from the website into a hard publication layout, which it did using a commercially available

20   publishing software (Querk), add some graphics like borders, and sell advertisements. However,

21   Plaintiff provided little to no substantive editorial content to the Workbook and Plaintiff offered

22   nothing unique or original from a content standpoint. 85-90% of the substantive content was

23   provided by SDCCC to Plaintiff.

24       With respect to the design, layout, and content of the Guide, Plaintiff wrongfully claims full

25   credit for the work of others, namely SDCCC. Exhibits F, G, N-R to the Notice of Lodgment,

26   multiple pages of content feedback, evidence SDCCC's transmittal of the actual content of the

27   Guides. The editorial content SDCCC provided to Plaintiff is SDCCC's own intellectual property.

28   And, candidly, Plaintiff does not have a team of creative genesis who develop such unique and high

14

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1  caliber products for publication. Plaintiff and SDCCC collaborated to create the design and layout

2  of the Guide and to fill and publish the publications. In fact, SDCCC had a more active role than it

3  had hoped for or anticipated when the two entered into the contract and oftentimes Plaintiff acted as

4  a mere word processor. However, given Plaintiff's continued unsatisfactory performance in carrying

5  out its Services to produce a quality publication, SDCCC had no choice but to intervene. Plaintiff

6  now seeks to take full credit where credit is hardly deserved and without identifying any unique

7  editorial content created exclusively by Plaintiff for use in the Guide, which is what is really at issue.

8          Plaintiff focuses on the "native" Querk files as if they have some special characteristic to

9  them that make them unique to Plaintiff when, in fact, the "native" Querk files are nothing more than

10  the raw data files in the Querk software. Querk is a commercially available publishing software the

11  Plaintiff chooses to use to assist it in formatting the publications it publishes, just as Indesign is a

12  commercially available publishing software that SDCCC chooses to use. The Querk software

13  creates Querk files, just as the Microsoft software creates Word files. You cannot read a Querk file

14  in the Indesign software just as you cannot read a Word Perfect file in the Microsoft software. The

15  "native" files Plaintiff refers to is nothing more than the actual original content SDCCC provided to

16  Plaintiff using one software who then reformatted the content by doing little more than cutting and

17  pasting the information into the Querk software to create a file. Simply because Plaintiff used a

18  certain software to reformat and design a layout, does not give Plaintiff rights to SDCCC's

19  intellectual editorial property. The bottom line, however, is that the actual content remains the same.

20  The actual content was provided, in large part, upwards of 60%, by SDCCC itself and Plaintiff

21  cannot hide being a "process" or commercially available software program to steal SDCCC's

22  editorial content and prevent SDCCC from using its own work product.

23          **2.     Plaintiff Freely Transferred Its Rights To The Information To SDCCC, Effective At Signing.**

24

25          Even assuming, *arguendo*, that SDCCC did not compile the customer information or assist in

26  the design layout, content and publication, SDCCC is still the rightful owner of such under the terms

27  of the contract between SDCCC and Plaintiff, and such ownership interest commences upon

28  execution of the contract by the parties.

15

16

1     A contract is an agreement between parties "to do or not to do a certain" act. Civ. Code §

2  1549. "The right to make lawful contracts are rights enjoyed by the citizens under the protection of

3  the Fourteenth Amendment of the Constitution of the United States." *Credit Bureau of San Diego,*

4  *Inc. v. Johnson* (1943) 61 Cal.App.2d Supp. 834, 840. In fact, "[i]t is the policy of this state that *all*

5  *property, and personal rights of any kind, are freely transferable,* unless expressly prohibited by

6  law." *Anza Parking Corp. v. City of Burlingame* (1987) 195 Cal.App.3d 855 (emphasis added); Civ.

7  Code §§ 1039, 1040, and 1044; *Cockerell v. Title Ins. & Trust Co.* (1954) 42 Cal.2d 284, 292;

8  *Mission Valley East, Inc. v. County of Kern* (1981) 120 Cal.App.3d 89, 96; *United California Bank*

9  *v. Behrends* (1967) 251 Cal.App.2d 720, 725.

10     SDCCC and Plaintiff voluntarily entered into a lawful written agreement containing an entire

11  separate section addressing proprietary rights, Section 4. The pertinent language of Section 4

12  follows:

13        **4.1 Proprietary Rights.** [Plaintiff] <u>agrees</u> that *[SDCCC] is the sole and exclusive owner of all property rights*, including but not limited to ... work product produced pursuant to this Contract. This *includes any and all designs, artwork, copy, articles, material, reports, memoranda or notes, and any material provided by [SDCCC],* whether in written or electronic form, which may be *prepared in the course of performing the Services* ("Work Product."). *[Plaintiff]* <u>*hereby grants and assigns*</u> *to [SDCCC],* ... *all rights, title and interest in and to the Work Product,* including but not limited to ... and all other rights therein of any nature whatsoever, whether now known or hereafter devised, ... *This assignment is irrevocable and* <u>*unconditional,*</u> *and is made* <u>*freely and knowingly*</u> *by Contractor...*

21     Upon executing the contract, Plaintiff voluntarily agreed that SDCCC "is the sole and

22  exclusive owner of all property rights," respecting Plaintiff's "Services" under the contract.

23  Plaintiff's "Services" under the contract includes all Work Product prepared to ensure Plaintiff meets

24  its obligations to sell advertising and publish the Workbook and Guide under the contract. As such,

25  it includes the design of the publications, content of the publications, and advertising sale

26  information, including customer information. Plaintiff further expressly acknowledged that it made

27  this assignment "freely and knowingly." SDCCC is the true owner of the "proprietary" information

28  and data at issue pursuant to the terms of the contract. The Court cannot enjoin SDCCC from using

16

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1  | property that rightfully belongs to SDCCC.  Likewise, the Court cannot modify the terms of the
2  | contract that the parties, who are sophisticated corporations, knowingly and freely agreed upon.
3  |      It should be noted that Plaintiff has not once challenged the validity of the proprietary clause
4  | in the contract.  Instead, Plaintiff attempts to argue that the proprietary clause only goes into effect at
5  | the end of the contract's five-year term.  The problem is that is not what the parties contemplated or
6  | agreed upon at the time they freely entered into the contract, as evidenced by the actual language of
7  | the proprietary clause.  Throughout Section 4, the parties use the present tense without any
8  | qualifying language or placement of conditions whatsoever.  Specifically, the first sentence of
9  | Section 4 begins, "[Plaintiff] *agrees* that [SDCCC] is the sole and exclusive owner of all property
10 | rights…"  The third sentence of Section 4 begins, "[Plaintiff] *hereby grants and assigns* to
11 | [SDCCC]… all rights, title and interest in and to the Work Product…"  These sentences do not state
12 | that Plaintiff agrees that sometime in the future it will grant or assign these rights to SDCCC.  They
13 | do not state, "Plaintiff grants at the end of the contract's five-year term, …"  They also do not use
14 | similar language found in that very same section of the contract - "Upon termination or expiration of
15 | this Contract…"  Rather, the parties refer to the here and now.  Plaintiff was free to negotiate
16 | different language but chose not to do so.  Plaintiff cannot now use the legal system to modify the
17 | terms of the contract it so freely entered into over a year and a half ago.  In fact, the transferring of
18 | Plaintiff's ownership rights to SDCCC was specifically and expressly deemed to be "irrevocable"
19 | and "unconditional," as evidence by the last sentence of the first paragraph in Section 4.1.
20 |      Plaintiff cites to several cases in which Courts have issued preliminary injunctions preventing
21 | former employees from engaging in unfair competition by using customer information.  However,
22 | the facts of each of those cases are distinguishable.  In those cases, the employers did not contract its
23 | rights to the information to the employees, but rather the employers owned the customer
24 | information.  Here, however, the facts are completely different and do not warrant preliminary
25 | injunction.  Here, Plaintiff lawfully contracted its rights to proprietary information to SDCCC.
26 | Therefore, SDCCC owns such information outright.
27 |
28 |

17

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

16

**B.    The "Proprietary Information" At Issue Is Not Proprietary At All**

Plaintiff's entire motion for preliminary injunction is based on the false premise that the subject "proprietary information," that is, customer identity and Plaintiff's publishing "process," is actually proprietary in the first instance. It is not. There is nothing proprietary about the identity of advertising customers who SDCCC already had contracts with and have placed ads in publications that are open to the public. There is also nothing proprietary to cutting and pasting information into a commercially available publishing software, such as Querk.

California Civil Code section 3426.1(d) defines a "trade secret" as information that: (1) derives independent economic value, actual or potential, *from not being generally known to the public* or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Cal. Civ. Code § 3426.1(d) (emphasis added); *see also, Ruckelshaud v. Monsanto Co.* (1984) 467 U.S. 986 ("[b]ecause of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others.").

      **1.    Customer Information That Is Readily Available To The Public Is Not Proprietary**

Plaintiff argues that the information contained in the "Goldmine" database contains proprietary information; that is, customer information. The basis for Plaintiff's argument is that Plaintiff went to great efforts to compile a list of its customers and customer information, which SDCCC can now use to obtain economic benefit. The customer information Plaintiff refers to is not propriety information.

The spreadsheets Plaintiff provided to SDCCC contained general information about customers, name, address, point of contact, what type of ad they purchased (booth, lobby, publication), the size of the ad, and the price they paid for the ads. All of the information is public knowledge. After all, the customers purchase ad space to ensure they are known to the public, which is the whole point of advertising. Likewise, ad placement is not confidential, anyone who picks up a Workbook or Guide knows where the ad is placed. Additionally, the majority of the customer

18

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1    information contained on Plaintiff's spreadsheet either came directly from SDCCC for inclusion into
2    the spreadsheet or had to be approved by SDCCC, i.e, rates and discounts.  Finally, Plaintiff forgets
3    that it was in business with a public entity, whose books, information and otherwise, are open for
4    public viewing, including the sales records Plaintiff provided to SDCCC showing the rates it charged
5    the customers and how much of a royalty and/or commission SDCCC received.
6        Considering the customer information contained in the spreadsheets Plaintiff forwarded to
7    SDCCC either originated from SDCCC or is available to the public, such information cannot be
8    classified as "proprietary," for the very nature of the information is public knowledge.
9        **2.    Publishing "Process" Is Not Proprietary.**
10        Plaintiff goes to great lengths to describe the "process" it goes through to publish the
11    Workbook and Guide.  However, the "process" of creating a booklet layout using a commercially
12    available publishing software, and cutting, pasting and reformatting content is by no means
13    "proprietary" or creative or unique to Plaintiff and by no stretch of the imagination should it take 22
14    years to develop and master such a process.
15        The "process" Plaintiff uses has no independent economic value as it is so widely used and
16    Plaintiff undertook no steps to ensure its "secrecy" from the outside world.  In fact, in the context it
17    was being used here, the publishing software itself walks a user through the "process" of creating a
18    layout for a book.  Once the layout is created, the user need only format, cut and paste the
19    information into the layout.    Also, the process of producing several drafts, allowing revisions, and
20    producing a final draft is not a "process" that is unique to Plaintiff and we would venture has been
21    around through the ages.  Yet, Plaintiff seeks to enjoin SDCCC from using the content of the
22    Workbook and Guide arguing that the "process" used to publish such a guide is proprietary in
23    nature.
24        What is significant is not the "process" Plaintiff used to create the final products, as much as
25    the "content" used in the final products.  To the extent that SDCCC provided the majority of the
26    content to Plaintiff for insertion into the final products, SDCCC owns that content data and has no
27    bearing on the actual "process" Plaintiff undergoes to format a final publications.  Plaintiff cannot
28

19

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

1   hide behind the auspices of a proprietary "process" that does not exist in order to prevent SDCCC

2   from using the "content" it provided to Plaintiff in the first instance.

3       C.    **Plaintiff Is Barred From Bringing The Instant Lawsuit And, As Such, Plaintiff
             Has No Reasonable Probability Of Prevailing**

4           In 1963, the California Legislature enacted several interrelated laws known as the Tort

5   Claims Act. *Tokeshi v. State of California* (1990) 217 Cal.App.3d 999, 1004; Gov. Code §§ 810-

6   996.6. It is well settled under the Tort Claims Act that a "public entity" is not liable for tortuous

7   injury unless the liability is specifically imposed by statute or the Constitution itself. See e.g.,

8   *Trinkle v. Cal. State Lottery* (1999) 71 Cal. App. 4th 1198, 1202; see also, *Colome v. State Athletic*

9   *Com.* (1996) 47 Cal.App.4th 1444. To implement this concept, Government Code section 815(a)

10  expressly states "except as otherwise provided by statute... *[a] public entity is not liable for an*

11  *injury*, whether such injury arises out of an act or omission of the public entity or a public employee

12  or any other person." Gov. Code § 815(a) (emphasis added). Thus, the Tort Claims Act provides

13  that *all public entities are immune from liability unless the Legislature expressly provides for such*

14  *liability.* Gov. Code § 811.2 and 815(a). Therefore, common law claims may not, as a matter of law,

15  be brought against public entities. Gov. Code § 815(a); *Harshbarger v. City Colton* (1988) 197

16  Cal.App.3d 1335, 1339 ["Government Code section 815 abolished all common law or judicially

17  declared liability for public entities."]; *Michael J. v. Los Angeles County Dept. of Adoptions* (1988)

18  201 Cal.App.3d 859, 866 [claims against public entities must be based on statutes, not common law

19  tort theories of liability]. Further, for contractual claims, a plaintiff cannot maintain a lawsuit

20  seeking monetary damages against a "public entity" unless and until the plaintiff first presents a

21  proper claim with the entity and the entity rejects the claim. Gov. Code § 945.4; see *Munoz v. State*

22  *of California* (1995) 33 Cal.App.4th 1767, 1776. The Tort Claims Act sets forth the specific

23  procedures and requirements for filing claims with public entities. See Gov. Code § 910, et seq.

24  *Failure to comply with the claims requirements and procedures set forth in the Tort Claims Act*

25  *bars the claim against the public entity.* See *State of California v. Superior Court (Bodde)* (2004) 32

26  Cal.4th 1234, 1239 (allowing action to proceed is an error of law).

27

28

20

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S REQUEST FOR ISSUANCE OF PRELIMINARY INJUNCTION

**Exhibit 17**

# State of California
## Secretary of State

# CERTIFICATE OF NON-FILING

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That I am the Official Custodian of records for the Office of the Secretary of State. In that capacity I have conducted a diligent search and have failed to find any records of a filing in this office in accordance with Section 53051 of the Government Code of the State of California for the following:

## San Diego Convention Center Corporation, Inc.

Failure to locate a filing for a particular entity does not indicate that a particular entity is required to file information pursuant to Government Code Section 53051 or that a particular entity is in violation of the law for failure to file. A "public agency" required to file pursuant to Government Code Section 53051 is defined as a "district, public authority, public agency, and any other political subdivision or public corporation in the state, but does not include the state or a county, city and county, or city."

IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this 8th day of November 2007



**DEBRA BOWEN**
Secretary of State

SF-4235A

*NP-25 (REV 01/2007)*

17

245