WILSON PETTY KOSMO & TURNER LLP
REGINA A. PETTY (106163)
SOTERA L. ANDERSON (211025)
550 West C Street, Suite 1050
San Diego, California 92101
Telephone: (619) 236-9600
Facsimile: (619) 236-9669
E-mail: rpetty@wpkt.com
E-mail: sanderson@wpkt.com

Attorneys for Defendant
SAN DIEGO CONVENTION CENTER
CORPORATION, INC.

FILED
NOV 26 2007
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED NATIONAL MAINTENANCE INC, A NEVADA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>SAN DIEGO CONVENTION CENTER CORPORATION, INC., A CALIFORNIA CORPORATION,<br><br>Defendant. | Case No. 07-CV-2172 BEN (JMA)<br><br>**DEFENDANT SAN DIEGO CONVENTION CENTER CORPORATION, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR AN ORDER SHORTENING TIME TO HEAR PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Complaint Filed: November 13, 2007<br><br>Date:<br>Time:<br>Dept.: 3<br>Judge: Hon. Roger T. Benitez<br>Trial Date: Not Set |

Defendant SAN DIEGO CONVENTION CENTER CORPORATION, INC. ("SDCCC") hereby respectfully submits its opposition to Plaintiff's *ex parte* application for an order shortening time to hear Plaintiff's motion for preliminary injunction as follows:

///

///

///

# I. INTRODUCTION

This Court should deny Plaintiff's request for an expedited briefing schedule and hearing date.

Plaintiff is blatantly forum shopping. It is attempting to achieve what it could not in state court. A state court judge denied Plaintiff's request for a Temporary Restraining Order. The Plaintiff opted to forego seeking a Preliminary Injunction in state court after being given a hearing date by the state court judge. The state court judge was inevitably preparing to sustain SDCCC's Demurrer but, before it could do so, Plaintiff dismissed the state court action and now seeks the very same remedy it was denied in state court and opted not to pursue further. Plaintiff's outright forum shopping should not be condoned or rewarded.

Moreover, Plaintiff has failed to show immediate irreparable harm warranting a hearing on an expedited basis. Plaintiff's four and a half month delay in seeking injunctive relief serves to contradict Plaintiff's allegations of irreparable harm. Even more, Plaintiff is not scheduled to perform any cleaning services until January 2008, therefore, there is no immediate and continuing harm warranting an expedited hearing schedule.

Finally, the balancing of hardships and SDCCC's real concern over security outweighs Plaintiff's business interests, particularly when Plaintiff continues to do business in the Convention Center. Plaintiff's profit over people concern in requesting an expedited hearing is unwarranted and is outweighed by SDCCC's safety concerns.

# II. PROCEDURAL BACKGROUND

On July 30, 2007, Plaintiff filed a Complaint in the San Diego Superior Court, case number 37-2007-00072054-CU-BT-CTL ("state court action"), against SDCCC for Injunctive Relief and Damages asking the court to enjoin SDCCC from implementing its new security policy. (Complaint filed in the San Diego Superior Court ["state court Complaint"].)

As part of the state court action, Plaintiff requested a Temporary Restraining Order which the Court denied. (Minute Order in the state court action.) The Court found that Plaintiff failed to show a reasonable probability that it would prevail on the merits. (*Id.*) The Court set a hearing date for Plaintiff's request for a preliminary injunction for September 12, 2007. (*Id.*) Plaintiff chose not to

1  pursue the request for preliminary injunction. (Declaration of Sotera L. Anderson ["Anderson
2  decl."].)
3      SDCCC then filed a Demurrer to Plaintiff's Complaint arguing Plaintiff's case is barred by
4  the governmental immunity doctrine and Plaintiff's failure to follow proper administrative
5  procedures under the Tort Claims Act. (Demurrer in the state court case.) Plaintiff's Opposition to
6  SDCCC's Demurrer was due November 15, 2007. (Anderson decl.) Rather than file an Opposition
7  to SDCCC's Demurrer, Plaintiff served SDCCC with a Complaint filed in federal Court ("federal
8  court action"). (Anderson decl.; Complaint filed in the United States District Court ["federal court
9  Complaint"].) The federal court action is essentially same as the state court action, with the
10 exception that Plaintiff is now asserting violations of the Sherman Act in an effort to ensure federal
11 court jurisdiction. (federal court Complaint.)
12     Now, as part of the federal court action, Plaintiff is attempting to usurp the state court's
13 denial of the Temporary Restraining Order and find a way around its failure to pursue a preliminary
14 injunction in state court when it was afforded the opportunity to do so.

### III. FACTUAL BACKGROUND

16     Since its opening in 1989, SDCCC has managed, marketed and operated the San Diego
17 Convention Center ("Convention Center") on behalf of the City of San Diego ("City") and the San
18 Diego Unified Port District. (Declaration of Carol Wallace ["Wallace decl."], ¶2.) SDCCC is a non-
19 profit public corporation created by the City for the sole purpose of managing and operating the
20 Convention Center. (Wallace decl., ¶2) The City is SDCCC's sole member and appoints the board
21 of directors. SDCCC is subject to California's open meeting laws (the "Brown Act") and other laws
22 governing the conduct of business of a public entity. (Wallace decl., ¶2) All of SDCCC's decision
23 makers must comply with the Political Reform Act and the San Diego Ethics Ordinance. (Wallace
24 decl., ¶2) In all respects, SDCCC functions as a public entity performing a service for the City and
25 the public. (Wallace decl., ¶2)
26     The Convention Center is one of the top meeting facilities in the world. (Wallace decl., ¶3)
27 Each year, hundreds of thousands of persons attend events and activities in the building. (Wallace
28 decl, ¶3) SDCCC licenses use of the Convention Center to individuals and entities (Licensees) as a

1  venue for public and private events. (Wallace decl., ¶3) As the operator of the Convention Center,
2  SDCCC has the authority and the responsibility to establish business policies related to Convention
3  Center operations and the Licensees' use of the facility. (Wallace decl., ¶3)
4      The protection of the public, as well as SDCCC's personnel and property, is SDCCC's most
5  important responsibility. (Wallace decl., ¶4) Following the terrorist attacks of September 11, 2001,
6  SDCCC's management became concerned about security of the Convention Center. (Wallace decl.,
7  ¶4) Concurrently, the convention and meetings industry launched an industry-wide assessment on
8  the security of these public facilities. (Wallace decl., ¶4) In 2003, SDCCC engaged a firm to
9  conduct a security audit of the Convention Center. (Wallace decl., ¶4) In July 2003, the report
10 received from the consultant raised a number of alarming scenarios related to building access and
11 security, and recommended the development and implementation of a sweeping security plan.
12 (Wallace decl., ¶4) SDCCC determined that the building was particularly vulnerable to
13 unsupervised access by unscreened service workers hired through third party vendors. (Wallace
14 decl., ¶4) The overwhelming concern was that SDCCC had no control over the hiring and screening
15 procedures utilized by third party vendors in staffing outside crews servicing the building. (Wallace
16 decl., ¶4) At that point, SDCCC began a process of enhancing security through the implementation
17 of a wide range of operational policies and procedures. (Wallace decl., ¶4) SDCCC decided to adopt
18 a security policy to ensure all crews entering the Convention Center were screened appropriately.
19 (Wallace decl., ¶4) This process is ongoing. (Wallace decl., ¶4)
20     A key component of building security is management's knowledge about and control over
21 individuals who have virtually unfettered access to the facility. (Wallace decl., ¶5) Hundreds of
22 persons work in the Convention Center as employees of SDCCC and its in-house service
23 contractors, as well as persons employed by entities hired by Licensees to provide services for
24 conventions, tradeshows, conferences, meetings, consumer shows, and other events. (Wallace decl.,
25 ¶5) In conjunction with licensing the space, SDCCC provides a wide range of services required by
26 users in connection with their events. (Wallace decl., ¶5) Some services are provided by businesses
27 housed within the Convention Center pursuant to contracts with SDCCC. (Wallace decl., ¶5) Other
28 services are provided by outside third parties who contract with SDCCC and operate under policies

and procedures in the contract. (Wallace decl., ¶5) Finally, other services providers are hired by the Licensee and these parties may subcontract work to other entities or individuals. (Wallace decl., ¶5) This latter category poses the most concern with regard to security because SDCCC has no direct relationship with these parties and, consequently, SDCCC has minimal knowledge or control over their activities or operations in the Convention Center. Plaintiff falls into this category. (Wallace decl., ¶5)

SDCCC management has developed and implemented significant operational changes in connection with its security program for the Convention Center, with the overall objective of reducing vulnerability by increasing knowledge and control over the activities of persons within the building. (Wallace decl., ¶6) SDCCC's security policy applies to all trades, not just Plaintiff's trade. (Wallace decl., ¶6) That said, to ensure SDCCC's policy is effective and manageable, SDCCC started implementing the policy with the most vulnerable of trade services, the cleaning services, including Plaintiff. (Wallace decl., ¶6)

Some Licensees require cleaning services in the exhibit areas used during their event. (Wallace decl., ¶7) These services fall into two (2) categories: (1) general cleaning of the exhibit hall; and, (2) cleaning of individual exhibit booths at the exhibitor's request. SDCCC has always employed a full complement of cleaning staff and often provides both of these services. (Wallace decl., ¶7) However, the Licensee has the option of using an outside third party to arrange for and administer and/or perform the cleaning. (Wallace decl., ¶7) Ordinarily, this service is arranged by a company that organizes and manages the exhibit hall for a Licensee (General Contractor), such as GES and Champion. (Wallace decl., ¶7) SDCCC's experience with third party cleaning vendors has been that the cleaning service crews are not made up of a permanent or, at least, a long-term workforce. (Wallace decl., ¶7) Rather, the crews are often temporary staff. (Wallace decl., ¶7) SDCCC's is informed and believes that Plaintiff primarily uses temporary staff to perform cleaning at the Convention Center, which causes SDCCC great concern. (Wallace decl., ¶7) Therefore, SDCCC does not have confidence that the employees are properly screened to ensure the safety of the Convention Center, its licensees and the public at large. (Wallace decl., ¶7)

-5-     Case No. 07-CV-2172 BEN (JMA)
DEFENDANT SAN DIEGO CONVENTION CENTER CORPORATION, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S EX PARTE APPLICATION

1  SDCCC's assessment of areas of vulnerability indicated the use of outside cleaning crews
2  should be eliminated. (Wallace decl., ¶8) Consequently, the determination was made to adopt and
3  implement a policy that required use of SDCCC staff for all cleaning in the building. (Wallace decl.,
4  ¶8). This policy does not prohibit a third party from administering and providing the service, nor
5  does it eliminate the Licensee's options, but it does require that the actual cleaning work be
6  performed by persons who have gone through SDCCC's employment screening process, which
7  includes considerable vetting and background checks, and extensive training after being hired.
8  (Wallace decl., ¶8) This provides a substantially increased level of safety and security in the
9  Convention Center than previously existed. (Wallace decl., ¶8)

10  Prior to the policy's July 1, 2007, effective date, notice was given to all known General
11  Contractors, including Champion and GES. (Wallace decl., ¶9) Not wanting to prevent Plaintiff
12  from conducting business at the Convention Center, but still wanting to ensure SDCCC's safety
13  concerns were met, SDCCC has mandated that Plaintiff use SDCCC's permanent, previously
14  screened workforce when Plaintiff is selected by a Licensee or General Contractor and has offered to
15  discuss terms and conditions that would facilitate this relationship. (Wallace decl., ¶9) Plaintiff and
16  SDCCC have since entered into seven contracts whereby SDCCC provides all of the actual cleaning
17  services and necessary supplies, while Plaintiff provides the administrative support (i.e., negotiating
18  and securing the contracts and collecting the revenues), and the two share in the revenue 50-50.
19  (Wallace decl., ¶9) Despite the parties coming to an agreement by which both SDCCC's security
20  concerns are met and Plaintiff's business interests are met, Plaintiff nonetheless filed a lawsuit in the
21  San Diego Superior Court. (Wallace decl., ¶9)
22  Plaintiff contends SDCCC's policy will interfere with its contracts with Champion and GES.
23  (Wallace decl., ¶10) That is not the case. (Wallace decl., ¶10) Even prior to this policy, there were
24  events where Champion and GES served as General Contractor and SDCCC provided all cleaning
25  services for the event. (Wallace decl., ¶10) Plaintiff's ability to provide its cleaning service is not
26  guaranteed by its contracts with GES and Champion. (Wallace decl., ¶10)
27
28

SDCCC's policy is consistent with the practices of many public meeting facilities, and is less stringent than some which retain absolute exclusivity for all cleaning services and do not permit entities such as Plaintiff to participate in any manner. (Wallace decl., ¶11)

Abrogation of SDCCC's policy would seriously and negatively impact SDCCC's efforts to provide the maximum possible security measures for this prominent public facility. (Wallace decl., ¶12)

From November 28, 2007, to January 7, 2008, there are 18 events scheduled at the Convention Center. Of those 18 events, Plaintiff only has cleaning service contracts for two of the events and those events occur after the first of the year. (Wallace decl. ¶13.)

## IV. LEGAL ARGUMENT

### A. The State Court Has Already Rejected Plaintiff's Request And This Court Should Not Condone Plaintiff's Blatant Forum Shopping

Plaintiff has been forum shopping as it faced state court defeats. Plaintiff seeks to have its motion for preliminary injunction briefed and heard on an expedited basis. In fact, if it had its way, it would have the motion heard by November 28, 2007, giving SDCCC less than six court days to oppose a motion that requests extreme and harsh relief. What Plaintiff fails to mention is that it was already afforded an opportunity to seek injunctive relief in state court and was turned down. Now, in the face of yet another defeat, just days away from the state court judge sustaining SDCCC's Demurer, Plaintiff seeks to usurp the state court's prior ruling denying a Temporary Restraining Order and to bypass the state court's inevitable ruling sustaining SDCCC's Demurrer, by taking a second bite at the apple. Plaintiff seeks the very same relief in federal court that it was denied in state court. The Court should not condone Plaintiff's blatant forum shopping.

### B. Plaintiff's Undue Delay In Seeking A Preliminary Injunction Serves To Contradict Plaintiff's Claim Of Immediate Irreparable Harm

While Courts might commonly hear motions for preliminary injunction on shortened notice, Courts typically do not do so where the Plaintiff has itself caused an unreasonable delay. In fact, where a Plaintiff has unduly delayed in seeking injunctive relief, such delay serves to contradict Plaintiff's allegations of irreparable harm. *See Oakland Tribune, Inc. v. Chronicle Publishing Co.*,

762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."). **A delay of even two months has been deemed too long and serves as evidence of lack of irreparable harm.** *See Givemepower Corp. v. Pace Compumetrics, Inc.*, 2007 U.S. Dist. LEXIS 20886 (S.D. Cal. 1007) (finding two month delay in seeking injunctive relief evidence of lack of irreparable harm); *Playboy Enters., Inc. v. Netscape Communications Corp.*, 55 F.Supp.2d 1070, 1090 (C.D. Cal. 1999) (finding five month delay in seeking injunctive relief "demonstrates the lack of any irreparable harm.").

Plaintiff claims its motion for a preliminary injunction should be heard on an expedited basis because waiting one more month, until January 7, will cause Plaintiff irreparable harm. Yet, Plaintiff itself has waited over four and a half months to seek an injunction. Such a delay in seeking injunctive relief serves to contradict Plaintiff's allegations of irreparable and imminent harm. Surely, if Plaintiff felt its alleged harm was so imminent, it would not have waited four and a half months to seek injunctive relief.

After denying Plaintiff's request for a Temporary Restraining Order, the state court judge gave Plaintiff a hearing date for its request for a preliminary injunction. Plaintiff chose not pursue a preliminary injunction, despite Plaintiff's assertions that it was in immediate danger of suffering irreparable harm. Instead, Plaintiff has waited four and a half months since it became aware of SDCCC's security policy to seek an injunction.

Plaintiff's delay in not seeking relief earlier should not now prejudice SDCCC by forcing it to throw opposing papers together on an expedited basis when Plaintiff has had four and a half months to do so. This is particularly true when the relief sought, injunctive relief, is an extreme measure of a far reaching power which should only be granted if Plaintiff is able to show it is reasonably probable that it can prevail on the merits, to which SDCCC should be given ample opportunity to oppose. Plaintiff's failure to seek injunctive relief when the state court presented Plaintiff with the opportunity to seek such, combined with Plaintiff's four and a half month delay speaks loudly against Plaintiff's assertions that it will suffer irreparable harm if the motion is not heard expeditiously, as opposed to the normal motion deadlines.

C. **Balancing Of Hardships And SDCCC's Concern Over Security Outweighs Plaintiff's Business Interests**

Plaintiff essentially asks that this Court, and SDCCC, place Plaintiff's business interests, namely, its financial interests, ahead of SDCCC's interest in saving lives and it requests that this be done on an expedited basis. Plaintiff's request for "profit over people" is disheartening, especially given the state of the union we find ourselves following 9-11. It is evident that Plaintiff simply does not appreciate the gravity of SDCCC's concern over security in its Convention Center and its obligation to take whatever policy steps are necessary to ensure the patrons can safely enjoy the Convention Center. SDCCC's number one priority is safety and security and it is even more so because it is one of the nation's top five most frequented Convention Centers, which Plaintiff acknowledges.

Plaintiff's claims that it will continue to lose revenue and business opportunities if its motion is not heard immediately, is disingenuous at best. From November 28 to the end of the year, when SDCCC's opposition to Plaintiff's motion for preliminary injunction would be due in normal course, Plaintiff is not even scheduled to provide any cleaning services at the Convention Center. Plaintiff currently has two contracts for cleaning services and those events do not occur until after the first of the year.

SDCCC requests that the Court deny Plaintiff's *ex parte* application and not put Plaintiff's interest in profits, over SDCCC's interest in securing people and property.

## V. CONCLUSION

Based on the foregoing, Plaintiff's *ex parte* application for an order shortening time to hear Plaintiff's motion for preliminary injunction should be denied in its entirety.

Dated: November 26, 2007

WILSON PETTY KOSMO & TURNER LLP

By: *Sotera P. Anderson*
REGINA A. PETTY
SOTERA L. ANDERSON

Attorneys for Defendant
SAN DIEGO CONVENTION CENTER CORPORATION