1  WILSON PETTY KOSMO & TURNER LLP
   REGINA A. PETTY (106163)
2  SOTERA L. ANDERSON (211025)
   550 West C Street, Suite 1050
3  San Diego, California 92101
   Telephone: (619) 236-9600
4  Facsimile: (619) 236-9669
   **E-mail:** rpetty@wpkt.com
5  **E-mail:** sanderson@wpkt.com

6  Attorneys for Defendant
   SAN DIEGO CONVENTION CENTER
7  CORPORATION, INC.

8

9                **UNITED STATES DISTRICT COURT**

10              **SOUTHERN DISTRICT OF CALIFORNIA**

11

12 UNITED NATIONAL MAINTENANCE INC,      Case No. 07-CV-2172 BEN (JMA)
   A NEVADA CORPORATION,
13                                        **DEFENDANT'S MEMORANDUM OF**
                                          **POINTS AND AUTHORITIES IN**
                  Plaintiff,              **OPPOSITION TO PLAINTIFF'S**
14                                        **MOTION FOR PRELIMINARY**
        v.                                **INJUNCTION**
15
   SAN DIEGO CONVENTION CENTER            Complaint Filed: November 13, 2007
16 CORPORATION, INC., A CALIFORNIA
   CORPORATION,                           Date:      January 7, 1008
17                                        Time:      10:30 a.m.
                  Defendant.              Dept.:     3
18                                        Judge:     Hon. Roger T. Benitez
                                          Trial Date: Not Set
19

20

21

22

23

24

25

26

27

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

1

## **TABLE OF CONTENTS**

2  I. INTRODUCTION ..................................................................................................1

3  II. PROCEDURAL BACKGROUND ........................................................................2

4  III. FACTUAL BACKGROUND ...............................................................................3

5       A.     SDCC Is A Publicly-Owned Entity That Stands In The Shoes Of The City Of San Diego.........................................................................................3

6       B.     Security Assessment Raises Concerns For SDCCC .........................................4

7       C.     Security Assessment Leads SDCCC To Implement A Security Program ...............6

8            1.     The First Step In The Security Program Was To Ensure SDCCC Employees Undergo Thorough Background Checks And Emergency Training.........................................................................6

9

10            2.     The Next Step In The Security Program Was To Implement Security Policies Addressing Outside Vendors, Beginning With The Most Vulnerable Of Trades - Cleaning Services ...................................7

11

12       D.     SDCCC's Security Policy Fosters Competition, Rather Than Inhibits It ...............9

13       E.     Plaintiff Continues To Service Cleaning Contracts For The Convention Center .........................................................................................9

14

15  IV. PLAINTIFF HAS NO REASONABLE PROBABILITY OF SUCCESS ON THE MERITS ..............................................................................................11

16

17       A.     SDCCC Cannot Be Liable Under The Antitrust Laws As Its Security Policy Concerns The Public Welfare And Not Interstate Trade Or Commerce ........................................................................................11

18

19       B.     SDCCC's Security Policy Is Pro-Competitive And, Therefore, Plaintiff Will Not Be Able to Prove That It Suffered The Requisite Antitrust Injury .........14

20       C.     SDCCC Has Not Denied Plaintiff Access To The Convention Center And There Can Be No Essential Facilities Claim.........................................15

21

22       D.     SDCCC Has Not Boycotted Plaintiff Or Required Exclusive Cleaning Contracts With SDCCC ..................................................................15

23       E.     As A Public Entity, SDCCC Is Immune From Liability For Plaintiff's State Claims ................................................................................16

24

25            1.     Interference With Contract And Interference With Prospective Business Advantage Are Common Law Torts Which, As A Matter Of Law, May Not Be Brought Against Public Entities ...........................18

26

27            2.     SDCCC Is Immune From Liability Under The Unfair Practices Act ........18

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

V. PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IF PRELIMINARY
     INJUNCTION IS NOT ISSUED AS PLAINTIFF IS CURRENTLY PROFITING
     FROM THE SECURITY POLICY ..................................................................................19

VI. BALANCE OF HARDSHIPS FAVOR DENIAL OF THE PRELIMINARY
     INJUNCTION - SDCCC SIMPLY CANNOT PUT PLAINTIFF'S PROFITS
     OVER THE SECURITY OF PEOPLE'S LIVES AND THE CITY'S PROPERTY ........21

VII. THE SCOPE OF PLAINTIFF'S PROPOSED PRELIMINARY INJUNCTION IS
     TOO EXPANSIVE .........................................................................................................21

VIII. SECURITY BOND OR UNDERTAKING IS ABSOLUTELY NECESSARY ..................22

IX. CONCLUSION...........................................................................................................................23

Case No. 07-CV-2172 BEN (JMA)

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

1

## <u>TABLE OF AUTHORITIES</u>

2

**State Cases**

3

*Austin v. Regents of University of California*

4
89 Cal. App. 3d 354 (1979) ...................................................................17

5
*Cal. Med. Ass'n v. Regents of the Univ. of Cal.*
79 Cal. App. 4th 542 (2000) .................................................................18

6
*Colome v. State Athletic Com.*
47 Cal. App. 4th 1444 (1996) ...............................................................16

7

8
*Community Memorial Hospital v. County of Ventura*
50 Cal. App. 4th 199 (1996) .................................................................18

9
*Harshbarger v. City Colton*
197 Cal. App. 3d 1335 (1988) ........................................................17, 18

10

11
*Janis v. Cal. State Lottery Com.*
68 Cal. App. 4th 824 (1998) .................................................................18

12
*Michael J. v. Los Angeles County Dept. of Adoptions*
201 Cal. App. 3d 859 (1988) ..........................................................17, 18

13
*Santa Monica Rent Control Bd. v. Bluvshtein*
230 Cal. App. 3d 308 (1991) .................................................................18

14

15
*Tokeshi v. State of California*
217 Cal. App. 3d 999 (1990) .................................................................16

16
*Trinkle v. Cal. State Lottery*
71 Cal. App. 4th 1198 (1999) ..........................................................16, 18

17
**Federal Cases**

18
*Adidas Am., Inc. v. NCAA*

19
40 F. Supp. 2d 1275 (D. Kan. 1999) .....................................................12

20
*American Column & Lumber Co. v. United States*
257 U.S. 377 (1921) ..............................................................................13

21
*Atlantic Richfield Co. v. USA Petroleum Co.*

22
495 U.S. 328 (1990) ...........................................................................2, 14

23
*Bigelow v. Calumet & H. Min. Co.*
167 F. 721 (6th Cir. 1909) .....................................................................12

24
*Brunswich Corp. v. Pueblo Bowl-O-Mat, Inc.*
429 U.S. 477 (1977) ..............................................................................14

25

26
*Daniel v. Am. Bd. of Emergency Med.*
235 F. Supp. 2d 194 (D.N.Y. 2000) ......................................................12

27
*Dymo Indus. V. Tapeprinter, Inc.*
326 F. 2d 141, 143 (9th Cir. 1964) .........................................................1

28
*Ford Wholesale Co. v. Fibreboard Paper Products Corp.*
493 F. 2d 1204 (9th Cir. 1974) ..............................................................13

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

*Givemepower Corp. v. Pace Compumetrics, Inc.*
  2007 U.S. Dist. LEXIS 20886 (S.D. Cal. 2007) ................................................1, 20

*Locker v. American Tobacco Co.*
  121 A.D. 443 (N.Y. App. Div. 1907) .......................................................12

*Lynch v. Magnavox Co.*
  94 F. 2d 883 (9th Cir. 1938) ...............................................................12

*Metropolitan Opera Co. v. Hammerstein*
  162 A.D. 691 (N.Y. App. Div. 1914) .......................................................12

*Moore v. United States*
  85 F. 465 (8th Cir 1898) ...................................................................13

*National Waterworks Co. v. Kansas*
  28 F. 921 (U.S. Court of Appeals 1886) ..................................................11

*Oakland Tribune, Inc. v. Chronicle Publishing Co.*
  762 F. 2d 1374 (9th Cir. 1985) ...........................................................20

*Orval Sheppard Real Estate Co. v. Valinda Freed & Associates, Inc.*
  608 F. Supp. 354 (MD Ala 1985) .........................................................13

*Playboy Enters., Inc. v. Netscape Communications Corp.*
  55 F. Supp. 2d 1070 (C.D. Cal. 1999) ...................................................20

*Robinson v. Suburban Brick Co.*
  127 F. 804 (4th Cir 1904) ...............................................................13

*Sugar Institute, Inc. v. United States*
  297 U.S. 553 (1936) .......................................................................13

*Union Bridge Co. v. United States*
  204 U.S. 364 (1907) .......................................................................11

*United States  v. Lopez*
  514 U.S. 549 (1995) .......................................................................12

*United States v. Colgate & Co.*
  250 U.S. 300 (1919) .......................................................................13

*United States v. Crescent Amusement Co.*
  31 F. Supp 730 (C.D. Tenn 1940) .......................................................12

*United States v. Patten*
  226 U.S. 525 (1913) .......................................................................13

*United States v. Union P. R. Co.*
  226 U.S. 61 (1912) .......................................................................12

**State Statutes**

California Civil Code section 3294 ..........................................................17

California Government Code section 54950 ................................................17

California Government Code section 811.2 .............................................17, 18

California Government Code section 815 .........................................2, 16, 17, 18

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

California Government Code section 818...............................................................17

California Government Code sections 810-996.6....................................................2, 16

**Federal Statutes**

15 United States Code section 1 ...........................................................................12

15 United States Code section 2 ...........................................................................12

15 United States Code section 4 ...........................................................................14

**Rules**

Federal Rules of Civil Procedure rule 65................................................................22

**Other Authorities**

California Business and Professions Code section 17000 ........................................16, 18

California Business and Professions Code section 17506 ........................................18

California Business and Professions Code sections 17201........................................18

Clayton Act section 4...........................................................................................14

The Sherman Act section 1 ..................................................................................16

The Sherman Act section 2 ..................................................................................12

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

1    Defendant SAN DIEGO CONVENTION CENTER CORPORATION, INC. (hereinafter

2    "Defendant" or "SDCCC") submits its opposition to Plaintiff's Motion for Preliminary Injunction as

3    follows:

**I.**

**INTRODUCTION**

6    SDCCC, an arm of the City of San Diego, may not be enjoined from enacting policies and

7    procedures which serve to control the security of this publicly-owned meeting facility.  "A

8    preliminary injunction represents the exercise of a very far reaching power never to be indulged

9    except in a case clearly warranting it."  *Dymo Indus. V. Tapeprinter, Inc.*, 326 F. 2d 141, 143 (9th

10   Cir. 1964).  This case is not such a case.

11   The preliminary injunction should be denied because it constitutes nothing less than forum

12   shopping.  The Plaintiff brought these same types of claims in California State Court and sought to

13   obtain a Temporary Restraining Order ("TRO").  The Superior Court denied the TRO and gave

14   Plaintiff the opportunity to seek a Preliminary Injunction, which Plaintiff declined to do.  SDCCC

15   thereafter filed a Demurrer to Plaintiff's Complaint in the Superior Court.  No doubt realizing that

16   SDCCC was going to prevail on its Demurrer, Plaintiff dismissed that state court action and decided

17   to try for a "second bite at the proverbial apple" by going forum shopping.

18   Plaintiff's failure to seek a Preliminary Injunction in state court after being given a hearing

19   date is reason, in and of itself, to deny the motion.  *Givemepower Corp. v. Pace Compumetrics, Inc.*,

20   2007 U.S. Dist. LEXIS 20886 (S.D. Cal. 2007) (finding a two month delay in seeking injunctive

21   relief evidence of lack of irreparable harm).

22   Entry of a Preliminary Injunction would impermissibly change the status quo.  Since July, six

23   months ago, the status quo has been one in which third party cleaning contractors are required to use

24   SDCCC employees to perform cleaning services.  Although the Plaintiff has followed these security

25   procedures for months, it now seeks to turn back the clock and change existing security protocols.

26   Preliminary Injunctions are designed to maintain the status quo and Plaintiff is now attempting to

27   change the status quo.

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

1    Plaintiff's antitrust claims have no chance of success on the merits. Among other reasons,

2    the claims do not involve interstate commerce; nor do they involve trade or commerce, two essential

3    elements of any Sherman Act Claim. Plaintiff is challenging the July 2007, implementation of a

4    personnel protocol which was designed to enhance the facility's security and safety. An injunction

5    barring the enforcement of the personnel protocol will have the effect of surrendering or impairing

6    SDCCC's authority to adopt measures that will best assure the security and safety of a public

7    facility. The antitrust laws cannot be stretched to cover this activity.

8    Plaintiff also seek relief which the antitrust laws cannot provide and, as a result, its claims

9    must fail. There can be no doubt but that the challenged safety policy promotes and increases

10    competition. Because of the policy, entities who were previously unable to compete against Plaintiff

11    for cleaning business, as they had no qualified staff and know how to do so, are now free to compete.

12    These new entrants will be able to offer the services of a experienced and capable cleaning staff.

13    This new competition increases exhibitor options and will no doubt spur price competition. It is this

14    increased competition which SDCCC believes is actually at the heart of this action. As the Supreme

15    Court has held, however, the federal antitrust laws are not designed to protect competitors from

16    competition and cannot be used to stifle it. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S.

17    328, 334 (1990).

18    Finally, SDCCC is immune from all of the state law claims asserted by Plaintiff under

19    California's Tort Claims Act. California Government Code sections 810-996.6. Section 815(a)

20    plainly provides that "except as otherwise provided by statute….[a] public entity is not liable for any

21    injury, whether such injury arises out of act or omission of the public entity or a public employee or

22    any other person."

23    For all of these reasons, and as more fully set forth below, Plaintiff's Motion for Preliminary

24    Injunction should be denied.

25    # II.

26    ## PROCEDURAL BACKGROUND

27    On July 30, 2007, Plaintiff filed a Complaint in the San Diego Superior Court, case number

28    37-2007-00072054-CU-BT-CTL ("state court action"), against SDCCC for Injunctive Relief and

1   Damages asking the court to enjoin SDCCC from implementing its new security policy.  (Complaint

2   filed in the San Diego Superior Court ["state court Complaint"].)

3          As part of the state court action, the Court denied Plaintiff's request for a Temporary

4   Restraining Order.  (Minute Order in the state court action.)  The Court found that Plaintiff failed to

5   show a reasonable probability that it would prevail on the merits.  (*Id.*)  The Court set a hearing date

6   for Plaintiff's request for a preliminary injunction on September 12, 2007.  (*Id.*)  Plaintiff

7   inexplicably opted to forego seeking a preliminary injunction.  (Declaration of Sotera L. Anderson

8   ["Anderson decl."].)

9          SDCCC filed its Demurrer to the state court Complaint which asserted in part that Plaintiff's

10  action is barred by the governmental immunity doctrine.  (Demurrer in the state court case.)  Rather

11  than oppose SDCCC's Demurrer, Plaintiff choose to walk away from the case.  (Anderson decl.)

12  Plaintiff dismissed the state court action but now seeks the very same relief it was denied in state

13  court.

14         The instant federal court action is essentially same as the state court action, with the nominal

15  difference that the federal Complaint refers to the Sherman Act in a feeble effort to present a

16  colorable basis for seeking federal court jurisdiction over a local public corporation.  In short,

17  Plaintiff is attempting to usurp the state court's denial of the Temporary Restraining Order and find a

18  way around its failure to pursue a preliminary injunction in state court when it was afforded the

19  opportunity to do so.

20                                           **III.**

21                              **FACTUAL BACKGROUND**

22  A.     **SDCC Is A Publicly-Owned Entity That Stands In The Shoes Of The City Of
        San Diego**
23

24         Since its opening in 1989, SDCCC has managed, marketed and operated the San Diego

25  Convention Center ("Center") on behalf of the City of San Diego ("City") and the San Diego

26  Unified Port District.  (Declaration of Carol Wallace ["Wallace decl."], ¶2.)  SDCCC is a non-profit

27  public corporation created by the City for the sole purpose of managing and operating the Center.

28  (Wallace decl., ¶2)  The City is SDCCC's sole member and appoints the board of directors.

1   (Wallace decl., ¶2)  The corporate by-laws provide that SDCCC has fiscal accountability to the City.

2   (Wallace decl., ¶2)  The construction of the Center was financed with public funds and

3   approximately $4 million of SDCCC's operating revenue comes from a budget subsidy allocated

4   from the City's general fund.   (Wallace decl., ¶2)  SDCCC is subject to California's open meeting

5   laws (the "Brown Act") and other laws governing the conduct of business of a public entity.

6   (Wallace decl., ¶2)  All of SDCCC's directors and senior executives must comply with the state's

7   Political Reform Act and the City of San Diego's Ethics Ordinance.  (Wallace decl., ¶2)  The Center

8   is specifically designated as one of the municipal sites that is covered by the "living wage" ordinance

9   adopted by the San Diego City Council.  (Wallace decl., ¶2)

10         The Center is one of the top meeting facilities in the world.  (Wallace decl., ¶3)  Nearly one

11   million out-of-town and local guests currently attend business or recreational events in the building

12   each year.  (Wallace decl., ¶3)  SDCCC licenses use of the Center to individuals and entities

13   (Licensees) as a venue for public and private events.  (Wallace decl., ¶3)  As the operator of the

14   Center, SDCCC has the authority and the responsibility to establish business policies related to

15   Center operations and the Licensees' use of the facility.  (Wallace decl., ¶3)

16         The Center is a high value terrorist target because of its location, population capacity and

17   symbolism.  (Declaration of Charles Gutensohn ["Gutensohn decl."], ¶6)  The Center's meeting

18   clients include lucrative terrorist targets such as political, religious and industry organizations which

19   increase the site's threat level.  (Gutensohn decl., ¶6)  For specific information on the Center's high

20   value for terrorist target, SDCCC refers the Court to Mr. Gutensohn's declaration concurrently being

21   filed under seal.  (Gutensohn decl., ¶6)

22   **B.**     **Security Assessment Raises Concerns For SDCCC**

23         The protection of the public, as well as SDCCC's personnel and property, is one of SDCCC's

24   primary responsibilities.  (Wallace decl., ¶4)  Public facilities where large numbers of people

25   congregate are identified as priority sites for activation of a higher level of security at the local, state

26   and federal levels of government.  (Wallace decl., ¶4)  SDCCC's responsibility to provide a safe and

27   secure public facility outweighs vendor operational preferences. (Wallace decl., ¶4)

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

1        Prior to 2001, security at meeting facilities focused on theft and unauthorized entry.

2    (Gutensohn decl., ¶2)  Following the terrorist attacks of September 11, 2001, security concerns at

3    SDCCC and throughout the public meeting facilities community have expanded to include every

4    operational procedure associated with the facilities.  (Gutensohn decl., ¶2)  The principal strategic

5    goal of the SDCCC is to achieve optimum safety and security for our employees, contractors, clients

6    and visitors.  (Gutensohn decl., ¶2)  SDCCC initially focused on the development of an emergency

7    response plan.  (Gutensohn decl., ¶2)  Emergency Preparedness training is mandatory for all SDCCC

8    employees. (Gutensohn decl., ¶2)

9        In 2003, SDCCC engaged a private firm to conduct a security audit of the center's

10    operations.  (Gutensohn decl., ¶3)  The consultant's confidential physical security assessment's

11    conclusions are contained in Mr. Gustensohn's declaration concurrently being filed under seal.

12    (Gutensohn decl., ¶3)  One of the consultant's vulnerability findings related to uncontrolled facility

13    access by contractors and vendors.  (Gutensohn decl., ¶3)

14        Subsequent to 9/11, the International Association of Assembly Managers (IAAM) formed the

15    Safety and Security Task Force.  (Gutensohn decl., 4)  The Task Force is responsible for an ongoing

16    project to conduct research and to assess public facilities to develop a series of safety and security

17    protocols.  (Gutensohn decl., 4)  These protocols include "best practices" position statements and

18    training materials related to safety and security at public assembly facilities. (Gutensohn decl., 4)

19    SDCCC has proactively utilized these "best practices" and engaged other resources to develop a

20    comprehensive strategy to address security and safety at the SDCCC.  (Gutensohn decl., 4)  A

21    cornerstone of an effective security strategy is vulnerability assessment.  (Gutensohn decl., 4)  The

22    analysis of threat scenarios assisted SDCCC in identifying security concerns and prioritizing security

23    needs.  (Gutensohn decl., 4)  This evaluative process has been underway for several years.

24    (Gutensohn decl., 4)

25        In 2005 and 2006, Mr. Gutensohn attended the Academy of Venue Safety and Security

26    (AVSS) sponsored by the IAAM.  (Gutensohn decl., 5)  Coincidentally, SDCCC was used as a target

27    location for a threat scenario training exercise to assess building access vulnerabilities so that a

28    facility can institute measures to "harden your target." (Gutensohn decl., 5)  The exercise

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

1    participants concluded that cleaning vendor employees posed an area of vulnerability for the Center.

2    (Gutensohn decl., 5)

3        For additional specific information related to vulnerability assessments of the Center,

4    SDCCC refers the Court to Mr. Gutensohn's declaration concurrently being filed under seal.

5    (Gutensohn decl., ¶7)

6        The various security assessments completed for the SDCCC show that a key component of

7    building security is that management obtain knowledge about and control over individuals who have

8    virtually unfettered access to the facility.  (Gutensohn decl., ¶8)

9        **C.    Security Assessment Leads SDCCC To Implement A Security Program**

10        For several years, SDCCC's management has been engaged in an evaluation process to

11    upgrade security and safety at the facility through the development and implementation of

12    significant policy and operational changes to its overall security program.  (Wallace decl., ¶5)  These

13    efforts have been undertaken with the assistance of private and governmental consultants and in

14    cooperation with law enforcement.  (Wallace decl., ¶5)  SDCCC has revised many policies,

15    restructured Guest Services and Asset Protection, improved operational and monitoring procedures,

16    expanded training on security matters and utilized employee incentive programs to instill a culture of

17    security at the Center.   (Wallace decl., ¶5)  SDCCC is unable to do everything at once. (Wallace

18    decl., ¶5)   Potential measures to reduce security risks and prioritization for implementation are

19    evaluated in terms of many factors including availability, affordability and feasibility of application

20    to the Center's operation. (Wallace decl., ¶5)

21        **1.    The First Step In The Security Program Was To Ensure SDCCC**
22        **Employees Undergo Thorough Background Checks And Emergency**
         **Training**

23        SDCCC began a process of enhancing security through the development and implementation

24    of significant operational changes in connection with its security program for the Center, with the

25    overall objective of reducing vulnerability by increasing knowledge and control over the activities of

26    persons within the building.  SDCCC first made changes in house.  For instance, SDCCC not only

27    thoroughly screens its employees but all employees are required to complete an Emergency

28    Preparedness class as well as a BioHazards class within their probationary period upon employment.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

1    (Gutensohn decl., ¶8)  The Center staff also receive Security Services Training.  (Gutensohn decl.,

2    ¶8)  In addition, SDCCC employees must also repeat instruction with refresher courses. (Gutensohn

3    decl., ¶8)  SDCCC also incorporates surveys, programs and assessments from the Office of

4    Homeland Security entities into its security programs and protocols, e.g., Buffer Zone Threat

5    Assessment, Tactical Survey, FSIVA Vulnerability Assessment, and Homeland Defense Operations

6    Planning System program.  (Gutensohn decl., ¶8)  All SDCCC employees take the San Diego Police

7    Department Courrse "Ultimate Force Multiplier." (Gutensohn decl., ¶8)

8            SDCCC currently employs 35 full time employees who perform cleaning services at the

9    facility.  (Declaration of T.M. Mazzocco ["Mazzocco decl."], ¶ 2) The average number of years of

10   service of those 35 employees is 14.9 years with the most senior employee being with SDCCC for

11   18.13 years. (Mazzocco decl., ¶ 2)

12               2.    **The Next Step In The Security Program Was To Implement Security**
                       **Policies Addressing Outside Vendors, Beginning With The Most**
13                     **Vulnerable Of Trades - Cleaning Services**

14           Once procedures were put in place to ensure that employees received proper and adequate

15   training, SDCCC next sought to enhance security by reviewing the status of outside vendors.  A

16   number of considerations relating to security resulted in the determination to adopt a policy that

17   required use of SDCCC staff for all cleaning in the building.  (Wallace decl., ¶6)

18           In conjunction with licensing the space, SDCCC provides a wide range of services required

19   by users in connection with their events.  (Gutensohn decl., ¶9)  Some services are provided by

20   businesses house within the Center pursuant to contracts with SDCCC.  (Gutensohn decl., ¶9)  Other

21   services are provided by outside third parties who contract with SDCCC and operate under policies

22   and procedures in the contract.  (Gutensohn decl., ¶9)  Finally, other services providers are hired by

23   the Licensee and these parties may subcontract work to other entities or individuals.  (Gutensohn

24   decl., ¶9)  This latter category poses the most concern with regard to security because SDCCC has

25   no direct relationship with these parties and, consequently, SDCCC has minimal knowledge or

26   control over their activities or operations within the Center.  (Gutensohn decl., ¶9)  Plaintiff falls into

27   this category.  (Gutensohn decl., ¶9)

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

1    In contrast to the stable cleaning services staff of the SDCCC, Plaintiff has a lack of

2    personnel continuity.  (Gutensohn decl., ¶10)  For specific instances of security or theft issues

3    involving Plaintiff, SDCCC refers the Court to Mr. Gutensohn's declaration concurrently being filed

4    under seal. (Gutensohn decl., ¶10)   Plaintiff's workers impair SDCCC ability to conduct loss

5    investigations because SDCCC does not have access to the workers.  (Gutensohn decl., ¶10)

6    Plaintiff's lax hiring, training and supervisory practices prevent the SDCCC from achieving

7    appropriate security accountability for people who work in the Center on a daily basis.  (Gutensohn

8    decl., ¶10)   This assessment was critical to adoption of the cleaning services staffing policy.

9    (Gutensohn decl., ¶10)   From a security perspective, the new policy is the right decision even if it

10   costs more money for the SDCCC.  (Gutensohn decl., ¶10)   The effectiveness of the SDCCC

11   security program will be compromised if the SDCCC is unable to require that cleaning service

12   vendors conduct business in a manner that meets SDCCC's standard of security at the building.

13   (Gutensohn decl., ¶10)   SDCCC anticipates that similar operational changes will be extended to

14   other contractors and vendors over time. (Gutensohn decl., ¶10)

15   The security provisions SDCCC implemented attempts to strike a balance between those

16   concerns and vendors who offer services in the facility.  Cleaning services fall into two categories:

17   (1) general cleaning of the exhibit hall and (2) cleaning of individual exhibit booths at the exhibitor's

18   request.  SDCCC has always employed a full complement of cleaning staff and often provides both

19   of these services.  However, SDCCC has also historically given the Licensee the option of using an

20   outside third party to arrange for, administer and/or perform the cleaning.  Ordinarily, this service is

21   arranged by a company that organizes and manages the exhibit hall for a licensee (General

22   Contractor).   (Gessner decl., ¶1)

23   The balance which SDCCC struck was that it would continue to permit third parties to

24   arrange for and contract for cleaning services and profit from those efforts.  However, SDCCC

25   decided that only those persons who were employees of SDCCC could actually perform the

26   cleaning.  Thus, SDCCC's security policy does not prevent third parties from operating, only which

27   employees could actually do the cleaning.   (Gessner decl., ¶4)

28

SDCCC's current policy is consistent with the practices of many public meeting facilities, and is less stringent than some which retain absolute exclusivity for all cleaning services.  (Wallace decl., ¶6)  (Gessner decl., ¶3)  For example, the Boston Convention Center in Massachusetts does not permit vendors to provide cleaning services at its facility.  (Wallace decl., ¶6)  (Gessner decl., ¶3)

### D.    SDCCC's Security Policy Fosters Competition, Rather Than Inhibits It

Although there may be security advantages from doing so, it was never my intention to bar Plaintiff or other cleaning vendors from doing business at the Center.  (Wallace decl., ¶7)  SDCCC's policy requiring the use of SDCCC employees to perform the actual cleaning services does not prohibit a third-party vendor from obtaining cleaning service contracts, nor does it eliminate the Licensee's vendor options for cleaning services.  (Wallace decl., ¶7) (Gessner decl., ¶4)   What the policy does do is substantially reduce security vulnerability by requiring the cleaning work be performed by persons who have gone through SDCCC's employment screening process, as well as its training procedures, which includes considerable vetting and background checks, and extensive training after being hired. (Wallace decl., ¶7) (Gessner decl., ¶4)     While the policy of requiring SDCCC employees to perform actual cleaning services was implemented for security reasons, it has a distinct pro-competitive impact.  It provides other smaller cleaning vendors a greater opportunity to compete for business because the actual cleaning services will be performed by SDCCC's highly trained staff.  (Wallace decl., ¶7)  (Gessner decl., ¶4)   This can only lead to greater competition and lower prices.  In addition, the policy promotes contractor compliance with the City's "living wage" ordinance. (Wallace decl., ¶7)

### E.    Plaintiff Continues To Service Cleaning Contracts For The Center

Plaintiff is the largest convention, tradeshow and event cleaning labor company in the United States.  (http://www.unitedhq.com/contact.asp) It provides services to over two-thousand events each year spanning the United States.  (*Id.*)

Prior to the policy's July 1, 2007, effective date, notice of the new policy was given to all known General contractors.  (Gessner decl., ¶5)   Not wanting to prevent Plaintiff from conducting business at the Center, but still wanting to ensure SDCCC's safety concerns were met, SDCCC has

1  mandated that Plaintiff use SDCCC's permanent, previously screened workforce when Plaintiff is

2  selected by a Licensee or general Contractor and has offered to discuss terms and conditions that

3  would facilitate this relationship.  (Gessner decl., ¶5)  Since the policy's July 1, 2007 effective date,

4  Plaintiff and SDCCC have entered into seven agreements whereby SDCCC provides all of the actual

5  cleaning services and necessary supplies for show contracts held by Plaintiff, while Plainitff

6  provides the administrative support (i.e., negotiation and securing the contracts and collecting the

7  revenues).  (Wallace decl., ¶8) (Gessner decl., ¶5)   Plaintiff receives 50% of the revenue from the

8  show contract even though Plaintiff has minimal overhead expenses because it no longer has

9  responsibility for the payroll for cleaning workers.  (Wallace decl., ¶8) (Gessner decl., ¶5)   SDCCC

10 cleaning services workers are paid in accordance with the City's "living wage" ordinance.  (Wallace

11 decl., ¶8)  Despite the parties reaching an agreement by which both SDCCC's security concerns are

12 met and Plaintiff's profit margins are increased, Plaintiff nonetheless filed this second lawsuit after

13 dropping the same lawsuit filed in the San Diego Superior Court in August 2007.  (Wallace decl., ¶8)

14 (Gessner decl., ¶5)

15         Plaintiff contends SDCCC's policy will interfere with its contracts with General Contractors,

16 such as Champion and GES.  (Gessner decl., ¶6)  That is not the case. (Gessner decl., ¶6)   Even

17 prior to this policy, there were events where Champion and GES served as General Contractors and

18 SDCCC provided all cleaning services for the event.  (Gessner decl., ¶6)  Plaintiff's ability to

19 provide its cleaning services is not guaranteed by its contracts with GES and Champion.   (Gessner

20 decl., ¶6)

21         SDCCC's policy is a valid and reasonable exercise of its authority to establish measures to

22 effectively protect a major public facility.  (Wallace decl., ¶9)  Abrogation of SDCCC's security

23 policy would seriously and negatively impair SDCCC's security program.  (Wallace decl., ¶9)

24 SDCCC cannot yield control over security matters to vendor choice.  (Wallace decl., ¶9)  SDCCC's

25 responsibility to provide a safe and secure public facility outweighs Plaintiff's business preferences.

26 (Wallace decl., ¶9)

27

28

IV.

**PLAINTIFF HAS NO REASONABLE PROBABILITY OF SUCCESS ON THE MERITS**

A.     **SDCCC Cannot Be Liable Under The Antitrust Laws As Its Security Policy Concerns The Public Welfare And Not Interstate Trade Or Commerce**

It is a well established rule that no cause of action can lie against a municipality who exercises its rights to control matters concerning the public welfare. *See National Waterworks Co. v. Kansas*, 28 F. 921, 923 (U.S. Court of Appeals 1886) (no municipality can contract away it right of control when it comes to issues related to public welfare); *see also Union Bridge Co. v. United States*, 204 U.S. 364, 395 (1907). In *National Waterworks*, plaintiff contracted with the city to lay pipes below a public street. *National Waterworks,* 28 F., at 922. A year later, plaintiff was required to move the pipes so the city could dig a sewer in the same location where plaintiff had previously laid its pipes. *Id*. at 922. Plaintiff sued the city arguing that the city had no right to compel plaintiff to move the pipes as the city was under contract with plaintiff for the laying of the pipes in their original position and location. *Id*. at 922. The city argued that the matter of sewerage is one affecting the public health and, therefore, it could not contract away the right to construct sewers in any part of the public streets. *Id*. at 922-923. The Court agreed with the city finding that "[s]ewage is a matter unquestionably affecting largely the public health, and no municipality can make a contract divesting or abridging its full control over such matters." *Id*. at 923.

In the instant matter, prior to SDCCC's security assessment Plaintiff was authorized to use its own employees to conduct cleaning services within the Center. But, SDCCC's permission for Plaintiff to do so was not unlimited or without restriction. It was subject to SDCCC's right and obligation to put into effect policies and procedures which put the public welfare, here safety and security, ahead of Plaintiff's interests for making profits. Protecting the Center and its occupants is a matter directly affecting the public welfare and SDCCC should be permitted to carry out that protection as it deems necessary. SDCCC's security policy does not involve trade or commerce, but rather the public welfare.

This goes right to the heart of the Plaintiff's ability to assert a claim under the federal antitrust laws. Under the antitrust laws, the activity complained of must involve trade or commerce.

1    15 U.S.C. section 2.  Section 2 of the Sherman Act, which prohibits monopolization, states in

2    pertinent part:  "Every person who shall monopolize, or attempt to monopolize, or combine or

3    conspire with any other person or persons, to monopolize any part of the **trade or commerce** among

4    the several States, or with foreign nations, shall be deemed guilty of a felony….."  15 U.S.C. section

5    2 (emphasis added).  As a result, if trade or commerce is not involved, there can be no violation of

6    the Sherman Act.  Section 1 (restraints of trade) contains similar provisions.  15 U.S.C. section 1.

7    While the Sherman Act applies to a whole host of economic activities, where the challenged activity

8    is not economic in nature it falls outside the scope of the antitrust laws, and more importantly,

9    outside the scope of Congressional authority to regulate under the United States Constitution.

10   *United States  v. Lopez,* 514 U.S. 549 (1995).  In deciding whether conduct involves trade or

11   commerce, the Courts focus on the nature of the conduct in light of the totality of surrounding

12   circumstances.  *Daniel v. Am. Bd. of Emergency Med.*, 235 F. Supp. 2d 194 (D.N.Y. 2000); *see also*

13   *Adidas Am., Inc. v. NCAA*, 40 F. Supp. 2d 1275 (D. Kan. 1999) (association's enforcement of bylaw

14   was deemed a noncommercial activity and, therefore, not subject to antitrust laws).  SDCCC's

15   conduct in establishing rules for public safety is not a commercial activity.  SDCCC's conduct is no

16   different from the airports prohibiting gate access to any person without a boarding pass or the City

17   of San Diego barring glass containers from Qualcomm Stadium.

18        While Plaintiff pretends otherwise, stripped to its essence, the Complaint challenges the steps

19   SDCCC took to protect public safety.  This conduct is not magically transformed into trade or

20   commerce because it may have "injured" Plaintiff (which SDCCC denies).

21        Equally importantly, this case does not involve interstate commerce.  The Sherman Act

22   applies only to interstate or foreign commerce.  *Lynch v. Magnavox Co.*, 94 F. 2d 883 (9th Cir.

23   1938); *United States v. Crescent Amusement Co.*, 31 F. Supp 730 (C.D. Tenn 1940); *Locker v.*

24   *American Tobacco Co.*, 121 A.D. 443 (N.Y. App. Div. 1907); *Metropolitan Opera Co. v.*

25   *Hammerstein*, 162 A.D. 691 (N.Y. App. Div. 1914).  It does "not apply to restraints or monopolies

26   as such, but only to those which directly and immediately, or those which necessarily, affect

27   commerce among the states or with foreign nations."  *Bigelow v. Calumet & H. Min. Co.,* 167 F. 721

28   (6th Cir. 1909); *United States v. Union P. R. Co.*, 226 U.S. 61 (1912); *United States v. Colgate &*

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

*Co.*, 250 U.S. 300 (1919); *American Column & Lumber Co. v. United States*, 257 U.S. 377 (1921); *Sugar Institute, Inc. v. United States*, 297 U.S. 553 (1936). **The Sherman Act does not apply where the trade or commerce affected is purely intrastate.** *United States v. Patten*, 226 U.S. 525 (1913) (emphasis added); *Robinson v. Suburban Brick Co.*, 127 F. 804 (4th Cir 1904). Further, **interstate commerce is not affected by contract which is to be wholly performed within a state**. *Moore v. United States*, 85 F. 465 (8th Cir 1898).

Plaintiff will be unable to show that the local activity has a substantial affect on interstate commerce. *Ford Wholesale Co. v. Fibreboard Paper Products Corp.*, 493 F. 2d 1204 (9th Cir. 1974); *Orval Sheppard Real Estate Co. v. Valinda Freed & Associates, Inc.*, 608 F. Supp. 354 (MD Ala 1985). Plaintiff bases its interstate commerce argument on the contention that the organizations who book the Center are out of state, as well as on the contention that convention goers travel from out of state. By focusing on these two aspects, Plaintiff hopes to divert the Court's attention from the true focus of this issue. The proper focus is not one centered around the booking of the Center, but rather the "restraint" being complained of is the employment of persons to perform the actual cleaning services at the Center. This is an important distinction because the test for interstate commerce is that the alleged restraint has a direct and substantial affect on interstate commerce.

SDCCC's security policy requiring the use of SDCCC employees to perform cleaning services is a purely local activity with a purely local affect. That is, the actual cleaning services are only performed by SDCCC employees in San Diego and only at the Center. Plaintiff concedes that the relevant market is San Diego, which by definition is purely local. Complaint ¶ 23. Likewise, Plaintiff concedes that the workforce is purely local in nature and does not move city to city, let alone state to state. Complaint ¶¶ 23-26. Finally, the cleaning services trade is a very small component of trade shows and exhibit costs and the cost for employees to perform the actual cleaning is much less. Plaintiff agrees. Complaint ¶ 28.

In short, given all of these admissions in Plaintiff's own Complaint and moving papers, regulation of the performance of  the cleaning services not only does not involve trade or commerce, is completely local and also has no affect on interstate commerce. Because Plaintiff will be unable to establish jurisdiction under the Sherman Act, the preliminary injunction should be denied.

1
2

**B.**    **SDCCC's Security Policy Is Pro-Competitive And, Therefore, Plaintiff Will Not Be Able to Prove That It Suffered The Requisite Antitrust Injury**

3
4
5
6
7
8
9
10
11
12
13

In order to state a claim for damages under the antitrust laws, the Plaintiff must show that it has or will suffer antitrust injury.  Section 4 of the Clayton Act, which provides for damages under the antitrust laws requires that the a plaintiff demonstrate "antitrust injury."  15 U.S.C. section 4.  Antitrust injury has long been defined by the Supreme Court as the type of injury which the antitrust laws were designed to prevent.  The injury suffered must be "attributable to an anticompetitive aspect of the practice under scrutiny."  *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 US 328, 334 (1990); *Brunswich Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  The antitrust laws were not, however, designed to protect a competitor from injuries resulting from increased competition.  [cite]  It is also not enough for Plaintiff to prove that it suffered some injury due to an illegal scheme in the market place.  Rather, Plaintiff must prove that it has suffered an "antitrust injury" from anticompetitive conduct.  15 U.S.C. section 4.

14
15
16
17
18
19
20
21
22
23

Plaintiff is attempting to portray SDCCC's security policy as a means to monopolize some market, when, in fact, what Plaintiff is actually doing is hoping to maintain the monopoly it has on the market and deny the "little guy" the opportunity to compete.  SDCCC's security policy is a pro-consumer policy as it affords everyone, including the "little guy," and opportunity to compete, thereby spurring competition.  There is increased competition in prices.  Contractors typically do not want to hire the "little guy" because their staff are not fully trained on the special needs of cleaning services at Convention Centers.  However, with the implementation of SDCCC's security policy, the "little guy" has a chance to compete.  The "little guy" can compete for contracts with the contractors because the actual cleaning services will be performed by highly trained and screened cleaning staff - that of the SDCCC.

24
25

As a result, Plaintiff has not suffered "antitrust injury" because any injury it might suffer comes from increased competition.  As the antitrust laws were not designed to protect competitors

26
27
28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  from competition, Plaintiff is precluded from asserting any claim for damages under the antitrust

2  laws.[1]

3  **C.    SDCCC Has Not Denied Plaintiff Access To The Center And There Can Be No**
   **Essential Facilities Claim**

4

5  Plaintiff's second cause of action for Essential Facilities, likewise will fail.  First and

6  foremost, even if the Center was an essential facility, which it is not, to state a claim for essential

7  facility, Plaintiff must be denied access to the Center.  Plaintiff has not been denied access to the

8  Center.  SDCCC has not implemented a policy mandating that all cleaning service contracts be in-

9  house.  SDCCC has not ceased participation in a cooperative venture with Plaintiff.  Plaintiff is still

10 free to contract with third parties to provide cleaning services at the Center.  SDCCC's security

11 policy only provides that the actual services be performed by SDCCC personnel who have been

12 properly screened and trained on SDCCC emergency protocols.  Absent a demonstration that

13 Plaintiff has been denied access to an essential facility, this claim fails as a matter of law.

14 **D.    SDCCC Has Not Boycotted Plaintiff Or Required Exclusive Cleaning Contracts**
   **With SDCCC**

15 Plaintiff's third and fourth claims for Group Boycott and Exclusive Dealing likewise fail.

16

17 Plaintiff misses the point of these two causes of action and, again, focuses on the wrong issues.

18 Plaintiff does not claim that SDCCC has actually boycotted Plaintiff or entered into an exclusive

19 dealing arrangement which has precluded it.  Plaintiff also does not claim that SDCCC has forbidden

20 vendors from entering into contracts with Plaintiff.  Indeed, SDCCC encourages Plaintiff to compete

21 and enter contracts with vendors, as it also encourages other cleaning services to do so as well.

22 Rather, stripped to its essence, Plaintiff claims that SDCCC has boycotted cleaners who are not

23 employed by SDCCC and has forced vendors to use SDCCC employees to perform the actual

24 cleaning services.  Complaint ¶ 87.  This distinction is important as Plaintiff has no standing to assert

25 a boycott or exclusive dealing claim under the antitrust laws when the Plaintiff itself has not been

26 boycotted or injured by alleged exclusive dealing.  It does not matter if some other party has

27   [1]    Plaintiff goes to great lengths to attempt to establish a relevant market.  Plaintiff even submits an
   expert report.  However, establishing a relevant market is irrelevant and unnecessary for the purposes of Plaintiff's

28 Motion for Preliminary Injunction.  Even if SDCCC were to accept the relevant market allegations as true, which it does
   not, the preliminary injunction should be denied.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

1    suffered, if the anticompetitive conduct does not cause injury to the Plaintiff, the Plaintiff has no

2    standing and these two claims must be dismissed.

3        Moreover, boycott and exclusive dealing claims under section 1 of the Sherman Act requires

4    that SDCCC conspire with some third party.  This is because the very wording of Section 1

5    mandates that it is only violated if there is a "conspiracy" in restraint of trade.  And under clear

6    Supreme Court precedent such a conspiracy cannot exist between a corporation and its own

7    employees, officers and directors.  In other words, Section 1 is not violated if unitary conduct of

8    SDCCC is alleged.  While Plaintiff alleges that SDCCC has conspired with "co-conspirators"

9    (Complaint ¶ 87), no co-conspirator is named.

10        Accordingly, Plaintiff is unlikely to prevail on these claims and, therefore, the Court should

11    deny Plaintiff's motion for a preliminary injunction.

12    **E.    As A Public Entity, SDCCC Is Immune From Liability For Plaintiff's State**
          **Claims**

13

14        Plaintiff's fifth, sixth and seventh causes of action for Interference with Contract,

15    Interference with Prospective Business Advantage, and Violation of California Business and

16    Professions Code section 17000, are barred by the doctrine of governmental immunity.  Each of

17    Plaintiff's fifth, sixth and seventh causes of action have their basis in state law, either by state statute

18    or state common law.

19        In 1963, the California Legislature enacted several interrelated laws known as the Tort

20    Claims Act.  *Tokeshi v. State of California*, 217 Cal. App. 3d 999, 1004 (1990); California

21    Government Code, sections 810-996.6.  It is well settled under the Tort Claims Act that a "public

22    entity" is not liable for tortuous injury unless the liability is specifically imposed by statute or the

23    Constitution itself.  *See, e.g. Trinkle v. Cal. State Lottery*, 71 Cal. App. 4th 1198, 1202 (1999); *see*

24    *also Colome v. State Athletic Com.*, 47 Cal. App. 4th 1444 (1996).  To implement this concept,

25    California Government Code section 815, subdivision (a) expressly states "**except as otherwise**

26    **provided by statute… [a] public entity is <u>not</u> liable** for an injury, whether such injury arises out

27    of an act or omission of the public entity or a public employee or any other person."  California

28    Government Code, section 815 subdivision (a) (emphasis added).  "The statute amounts to a

1   legislative declaration that governmental immunity from suit is the rule and liability the exception.

2   Thus, **in the absence of some constitutional requirement, public entities may be liable only if a**

3   **statute declares them to be liable**." *Trinkle v. California State Lottery*, 71 Cal. App. 4th 1198,

4   1202 (1999); California Government Code, sections 811.2 and 815, subdivision (a).  Therefore,

5   **common law claims may not, as a matter of law, be brought against public entities**.  California

6   Government Code, section 815, subdivision. (a); *Harshbarger v. City Colton*, 197 Cal. App. 3d

7   1335, 1339 (1988) ("California Government Code section 815 abolished all common law or

8   judicially declared liability for public entities."); *Michael J. v. Los Angeles County Dept. of*

9   *Adoptions*, 201 Cal. App. 3d 859, 866 (1988) (claims against public entities must be based on

10  statutes, not common law tort theories of liability).

11          The term "public entity" is defined in the California Government Code.  Public entity under

12  California Government Code section 811.2 "includes . . . a city . . . and any other political

13  subdivision <u>or public corporation</u> in the State."  California Government Code, section 811.2.

14          SDCCC is a public corporation, established by the City of San Diego.  The City of San Diego

15  is SDCCC's sole member and appoints the board of directors.  SDCCC is subject to California's

16  open meetings law (the "Brown Act" contained in section 54950, *et seq.* of the Cal. Gov't Code) and

17  other laws governing the conduct of business of a public entity.  All of SDCCC's decision makers

18  must comply with the Political Reform Act and the San Diego Ethics Ordinance.  In all respects,

19  SDCCC functions as a public entity performing a service for the City and the public.  As a public

20  corporation, SDCCC's sole purpose is to manage, market and operate the Center for the benefit of

21  the City and the general public.

22          As a public entity, SDCCC is statutorily immune from liability (Cal. Gov't Code § 815, subd.

23  (a)) and punitive damages (Cal. Gov't Code § 818 ["public entity is not liable for damages awarded

24  under § 3294 of the Cal. Civ. Code]; *Austin v. Regents of University of California*, 89 Cal. App. 3d

25  354, 358 (1979) [affirming trial court's decision to strike punitive damages claim against public

26  entity]).

27          As discussed below, Plaintiff's fifth, sixth and seventh causes of action are barred as SDCCC

28  in immune from liability as a public entity.

1

### 1.    Interference With Contract And Interference With Prospective Business Advantage Are Common Law Torts Which, As A Matter Of Law, May Not Be Brought Against Public Entities

2

3    Plaintiff's fifth and sixth causes of action for Interference with Contract and Interference

4    with Prospective Business Advantage are not founded upon any statute, but rather common law

5    principles.  As noted above, the Tort Claims Act, as well as relevant case law, provide that all public

6    entities are immune from liability **unless** the Legislature expressly provides for such liability.

7    California Government Code, sections 811.2 and 815, subdivision (a).  Plaintiff's common law

8    claims fail as a matter of law as a public corporation may not be sued on common law theories of

9    liability.  California Government Code section 815, subdivision (a); *Harshbarger v. City Colton*, 197

10    Cal. App. 3d at 1339 ("California Government Code section 815 abolished all common law or

11    judicially declared liability for public entities."); *Michael J. v. Los Angeles County Dept. of*

12    *Adoptions*, 201 Cal. App. 3d 859, 866 (1988) (claims against public entities must be based on

13    statutes, not common law tort theories of liability).  Accordingly, Plaintiff's fifth and sixth causes of

14    action for Interference with Contract and Interference with Prospective Business Advantage are

15    barred by the doctrine of governmental immunity.

16    ### 2.    SDCCC Is Immune From Liability Under The Unfair Practices Act

17    Plaintiff's seventh cause of action is for violation of California Business and Professions

18    Code section 17000, which is a statute otherwise known as the Unfair Practices Act or the Unfair

19    Trade Practices Act.  Nowhere in the statute is there a provision imposing governmental liability for

20    violations of the Act.  The Unfair Practices Act applies to specific "persons" and the law is clear that

21    a "public entity" is not a "person" within the meaning of the Act and, therefore, cannot be sued

22    under the Act.  *See* California Business and Professions Code sections 17201 and 17506; *see also*

23    *Cal. Med. Ass'n v. Regents of the Univ. of Cal.,* 79 Cal. App. 4th 542, 551 (2000); *Janis v. Cal. State*

24    *Lottery Com.,* 68 Cal. App. 4th 824, 831 (1998), *citing Community Memorial Hospital v. County of*

25    *Ventura*, 50 Cal. App. 4th 199, 209 (1996); and *Santa Monica Rent Control Bd. v. Bluvshtein,* 230

26    Cal. App. 3d 308 (1991).  Courts have held that public entities cannot be sued under this Act even if

27    they engage in commercial activity.  *See, e.g. Trinkle v. Cal. State Lottery*, 71 Cal. App. 4th 1198,

28    1202.  Thus, SDCCC is protected by governmental immunity.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    Because there is no statute making public entities liable under the Unfair Practices Act, the

2    general rule of governmental immunity must prevail and Plaintiff's seventh cause of action fails as a

3    matter of law.

4                                                              **V.**

5    **PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IF PRELIMINARY**
     **INJUNCTION IS NOT ISSUED AS PLAINTIFF IS CURRENTLY PROFITING FROM THE**
6                                              **SECURITY POLICY**

7            Plaintiff's bold assertion that it will suffer irreparable harm if preliminary injunction is not

8    issued is disingenuous.  Plaintiff is currently profiting from SDCCC's security policy and is very

9    likely not taking in to consideration the July, 2007, living wage ordinance.  (Rules Implementing the

10   Living Wage Ordinance.)

11           Two basic types of cleaning services are provided at the Center - Facility Cleaning and Booth

12   Cleaning.  Booth Cleaning, the industry custom is that 50 percent of the proceeds go to the decorator

13   and the other 50 percent go to cleaning services.  Under SDCCC's contracts for cleaning services,

14   SDCCC receives 50 percent of the proceeds for the cleaning services, and the other 50 percent goes

15   directly to Plaintiff.  Of the 50 percent that SDCCC receives, it must deduct labor and costs.

16   Plaintiff, on the other hand, no longer needs to do so and pockets the entire 50 percent, which was

17   not the case prior to SDCCC's security policy.  Plaintiff is, in actuality, making more money than it

18   had been previously.

19           With respect to Facility Cleaning, Facility Cleaning is charged on a per labor hour basis.  As

20   of July 1, 2007, San Diego passed the living wage ordinance which requires laborers to be paid

21   $12.25 per hour.  Considering the living wage ordinance, overhead charges, and a small margin of

22   profitability, SDCCC charges $17.00 per labor hour.  SDCCC's price is currently only $0.70 higher

23   than Plaintiff's $16.30 per labor hour charge that Plaintiff agreed upon with vendors prior to the

24   living wage ordinance being passed in San Diego.  If Plaintiff is losing money on Facility Cleaning,

25   it is because Plaintiff has failed to take into consideration the living wage ordinance.  Plaintiff's

26   failure in this regard cannot be attributed to SDCCC, but Plaintiff's poor business sense.

27           Finally, if Plaintiff was so concerned about suffering irreparable injury, it would not have

28   waited so long to move for preliminary injunction which, in and of itself, is indicative of no harm.

                                                  -19-                    Case No. 07-CV-2172 BEN (JMA)

1    Where a Plaintiff has unduly delayed in seeking injunctive relief, such delay serves to contradict

2    Plaintiff's allegations of irreparable harm. *See Oakland Tribune, Inc. v. Chronicle Publishing Co.*,

3    762 F. 2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction

4    implies a lack of urgency and irreparable harm."). **A delay of even two months has been deemed**

5    **too long and serves as evidence of lack of irreparable harm.** *See Givemepower Corp. v. Pace*

6    *Compumetrics, Inc.*, 2007 U.S. Dist. LEXIS 20886 (S.D. Cal. 1007) (finding two month delay in

7    seeking injunctive relief evidence of lack of irreparable harm); *Playboy Enters., Inc. v. Netscape*

8    *Communications Corp.*, 55 F. Supp. 2d 1070, 1090 (C.D. Cal. 1999) (finding five month delay in

9    seeking injunctive relief "demonstrates the lack of any irreparable harm.").

10    Plaintiff waited over four and a half months to seek an injunction. Such a delay in seeking

11    injunctive relief serves to contradict Plaintiff's allegations of irreparable and imminent harm. Surely,

12    if Plaintiff felt its alleged harm was so imminent and irreparable, it would not have waited four and a

13    half months to seek injunctive relief.

14    After denying Plaintiff's request for a Temporary Restraining Order, the state court judge

15    gave Plaintiff a hearing date for its request for a preliminary injunction. Plaintiff chose not pursue a

16    preliminary injunction, despite Plaintiff's assertions that it was in immediate danger of suffering

17    irreparable harm. Instead, Plaintiff has waited four and a half months since it became aware of

18    SDCCC's security policy to seek an injunction.

19    Injunctive relief is an extreme measure of a far reaching power which should only be granted

20    if Plaintiff is able to show it is reasonably probable that it can prevail on the merits, which, as noted

21    above, it simply has not shown. Plaintiff's failure to seek injunctive relief when the state court

22    presented Plaintiff with the opportunity to seek such, combined with Plaintiff's four and a half

23    month delay, speaks loudly against Plaintiff's assertions that it will suffer irreparable harm if the

24    Court does not grant its motion for preliminary injunction.

25

26

27

28

## VI.

### BALANCE OF HARDSHIPS FAVOR DENIAL OF THE PRELIMINARY INJUNCTION - SDCCC SIMPLY CANNOT PUT PLAINTIFF'S PROFITS OVER THE SECURITY OF PEOPLE'S LIVES AND THE CITY'S PROPERTY

Plaintiff essentially asks that this Court, and SDCCC, place Plaintiff's business interests, namely, its financial interests, ahead of SDCCC's interest in saving lives and promoting competition. Plaintiff's request for "profit over people" is disheartening, especially given the state of the union we find ourselves following 9-11. It is evident that Plaintiff simply does not appreciate the gravity of SDCCC's concern over security and its obligation to take whatever steps are necessary to ensure the patrons can safely enjoy the Center. SDCCC's number one priority is safety and security and it is even more so because it is one of the nation's top five most frequented convention centers, which Plaintiff acknowledges.

The balancing of hardships and SDCCC's real concern over security outweighs Plaintiff's business interests, and desire to stop competition, particularly when Plaintiff continues to do business in the Center. It is easy for Plaintiff to say SDCCC will not suffer any negative consequences when Plaintiff does not bear the responsibility or the burden of protecting the occupants of the Center and the facility itself. It is easy for Plaintiff to place its profits over the fine people of the City of San Diego and those who travel to this destination to attend events at the Center. But, the bottom line is that SDCCC operates and manages the Center and, in doing so, bears the responsibility of taking steps to ensure the safety of the people and property. It is the City of San Diego and SDCCC, not Plaintiff, who will have to answer to the community and nation at large if a security breach occurs; not Plaintiff. SDCCC is not willing to put Plaintiff's interest in profits over the safety and concern for the people and property under its care. Likewise, this Court should also not be willing to do so.

## VII.

### THE SCOPE OF PLAINTIFF'S PROPOSED PRELIMINARY INJUNCTION IS TOO EXPANSIVE

Preliminary injunctions are meant to maintain the statute quo. For half a year, since July 2007, the status quo has been that SDCCC employees perform the actual cleaning. Plaintiff

now seeks to change the status quo, not maintain it.  The purpose and function of preliminary injunctions are not to change the status quo.  As such, the Court should deny Plaintiff's motion in order to, in fact, maintain the status quo.

Also, the scope of the preliminary injunction Plaintiff seeks is far too expansive and seek more relief than is permitted at a preliminary injunction stage.  For instance, Plaintiff seeks to have SDCCC's security policy rescinded before a trial on the merits has been had.  It is also apparent that Plaintiff obviously does not understand that the screening process alone is not enough.  The training SDCCC employees undergo is just as imperative as the screening process.  SDCCC should not be expected to screen **and train** employees of other companies.  Plaintiff also seeks to tell SDCCC how to run its business which is entirely inappropriate.  Specifically, Plaintiff cannot prevent SDCCC from conducting legal, proper and appropriate business and implementing business policies as it sees fit for the benefit of the Center and the City.  Finally, Plaintiff wants to bar SDCCC from discussing its security concerns with Plaintiff's employees with others.  This request is akin to the President of the United States being forbidden from warning America and San Diego about intelligence that terrorists are planning an attack on San Diego so that appropriate precautions may be taken.  Plaintiff's request is simply absurd and should be denied entirely.

## VIII.

## SECURITY BOND OR UNDERTAKING IS ABSOLUTELY NECESSARY

Should this court decide to issue a Preliminary Injunction against SDCCC, Rule 65(c) of the Federal Rules of Civil Procedure mandates that Plaintiff post a bond or undertaking.  Fed. R. Civ. Pro. 65(c).  While SDCCC may not suffer financial harm, the potential devastating effects that could occur require Plaintiff to post a security bond.  But, what financial value does one place on life and property such as the Center?

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION

1
2

# IX.

## CONCLUSION

3        Based on the foregoing, Plaintiff's Motion for Preliminary Injunction should be denied in its
4    entirety.

5

6    Dated:    December 20, 2007        **WILSON PETTY KOSMO & TURNER LLP**

7

8                                By:    <u>/s/ Sotera L. Anderson</u>
9                                      REGINA A. PETTY
                                  SOTERA L. ANDERSON

10                                     Attorneys for Defendant
11                                     SAN DIEGO CONVENTION CENTER
                                  CORPORATION

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION