1 | James R. Lance (147173)
   jlance@knlh.com
2 | Jacob M. Slania (200652)
   jslania@knlh.com
3 | Dylan O. Malagrino (228052)
   dmalagrino@knlh.com
4 | **KIRBY NOONAN LANCE & HOGE LLP**
   600 West Broadway, Suite 1100
5 | San Diego, California 92101-3387
   Telephone (619) 231-8666
6 | Facsimile (619) 231-9593

7 | Jeffrey A. Leon (*Pro Hac Vice*)
   jleon@uhlaw.com
8 | Kristopher J. Stark (*Pro Hac Vice*)
   kjstark@uhlaw.com
9 | **UNGARETTI & HARRIS LLP**
   3500 Three First National Plaza
10 | Chicago, Illinois 60602-4224
    Telephone (312) 977-4400
11 | Facsimile (312) 977-4405

12 | Attorneys for Plaintiff
    UNITED NATIONAL MAINTENANCE, INC.

13 |

14 | **UNITED STATES DISTRICT COURT**

15 | **SOUTHERN DISTRICT OF CALIFORNIA**

16 |

17 | UNITED NATIONAL MAINTENANCE, INC., a Nevada corporation,

18 |                          Plaintiff,

19 | vs.

20 |

21 | SAN DIEGO CONVENTION CENTER CORPORATION, INC., a California corporation,

22 |                          Defendant.

23 |

24 |

25 |

26 |

27 |

28 |

---

CASE NO. 07-CV-2172 BEN(JMA)

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**Complaint Filed: November 13, 2007**

| | |
|---|---|
| Date: | **January 7, 2008** |
| Time: | **10:30 a.m.** |
| Dept.: | **3** |
| Judge: | **Hon. Roger T. Benitez** |
| Trial Date: | **Not Set** |

---

*Kirby Noonan Lance & Hoge LLP*
600 West Broadway, Suite 1100 San Diego, California 92101-3387

**TABLE OF CONTENTS**

Page

I.  UNITED IS LIKELY TO PREVAIL ON THE MERITS OF ITS ANTITRUST LAWSUIT. ..................................................................................................1

    A.  SDCC's Alleged Motive to Protect the Public Welfare Does Not Immunize It from the Antitrust Laws. ...........................................................1

    B.  SDCC's Business Activities Satisfy the Sherman Act's Interstate Commerce Element. ..........................................................................2

    C.  SDCC's Exclusionary Conduct Fails the Reasonableness Test Set Forth by the Supreme Court in *Aspen Skiing* and *Kodak*, and United Has Suffered Antitrust Injury Therefrom. ...........................................................4

        1.  SDCC's Actions Have Denied United Access to the Convention Center and Has Denied United the Ability to Compete. ...................4

            a.  The Uncontroverted Evidence Establishes that United is Losing Money and Cannot Compete Against SDCC Under SDCC's Current Policies. ...................................................5

            b.  The Undisputed Evidence Demonstrates That SDCC's Policy Increases Price, Reduces Quality and Restricts Consumer Choice. ....................................................6

        2.  SDCC's Actions Are Not Reasonable in Light of Available Less-Restrictive Alternatives. ...............................................7

II.  UNITED IS AND WILL CONTINUE TO BE IRREPARABLY INJURED IF THE COURT DOES NOT ISSUE A PRELIMINARY INJUNCTION; THE BALANCE OF THE HARDSHIPS FAVORS UNITED. ........................................8

III.  CONCLUSION. ..............................................................................................10

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adidas America, Inc. v. NCAA,*
    40 F. Supp. 2d 1275 (D. Kan. 1999) .................................................................. 4

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) .......................................................................................... 6

*City of Lafayette, Louisiana v. Louisiana Power & Light Co.,*
    435 U.S. 389 (1978) .......................................................................................... 2

*Cmty. Communications Co. v. City of Boulder, Colorado,*
    455 U.S. 40 (1982) ............................................................................................ 2

*Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961) .......................................................................................... 2

*Givemepower Corp. v. Pace Compumetrics, Inc.,*
    2007 WL 951350 (S.D. Cal.) ............................................................................ 9

*Hamilton Coll. Ch. of Alpha Delta Phi v. Hamilton Coll.,*
    128 F.3d 59 (2d Cir. 1997) ............................................................................... 4

*Heart of Atlanta Motel, Inc. v. U.S.,*
    379 U.S. 241 (1964) .......................................................................................... 3

*Hinckley v. Kelsey-Hayes Co.,*
    866 F. Supp. 1034 (E.D. Mich. 1994) .............................................................. 9

*Hospital Bldg. Co. v. Trustees of Rex Hosp.,*
    425 U.S. 738 (1976) .......................................................................................... 4

*Inflight Newspapers, Inc. v. Magazines In-Flight, LLC,*
    990 F. Supp. 119 (E.D.N.Y. 1997) .................................................................. 9

*Lisa Frank, Inc. v. Impact Int'l, Inc.,*
    799 F. Supp. 980 (D. Ariz. 1992) .................................................................... 9

*McLain v. Real Estate Bd. of New Orleans, Inc.,*
    444 U.S. 202 (1980) ....................................................................................... 3, 4

*National Water Works Co. v. City of Kansas,*
    28 F. 921 (C.C. Mo. 1886) .............................................................................. 1

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

*Oakland Tribune, Inc. v. Chronicle Publishing Co.,*
    762 F.2d 1374 (9th Cir. 1985)............................................................................9

*Parker v. Brown,*
    317 U.S. 341 (1943) ........................................................................................2

*Playboy Enters., Inc. v. Netscape Communications Corp.,*
    55 F. Supp. 2d 1070 (C.D. Cal. 1999) .............................................................9

*Porsche Cars N. Am., Inc. v. Manny's Porshop, Inc.,*
    972 F. Supp. 1128 (N.D. Ill. 1997) ..................................................................9

*Rubbermaid Commercial Prods., Inc. v. Contico Int'l, Inc.,*
    836 F. Supp. 1247 (W.D. Va. 1993) .................................................................9

*Summit Health, Ltd. v. Pinhas,*
    500 U.S. 322 (1991) ........................................................................................4

*U.S. v. American Bldg. Maint. Indus.,*
    422 U.S. 271 (1975) ........................................................................................3

*U.S. v. Darby,*
    312 U.S. 100 (1941) ........................................................................................3

*Union Bridge Co v. U.S.,*
    204 U.S. 364 (1907) ........................................................................................2

*Western Waste Serv. Sys. v. Universal Waste Control,*
    616 F.2d 1094 (9th Cir. 1980)..........................................................................3

*Wickard v. Filburn,*
    317 U.S. 111 (1942) ........................................................................................3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1       San Diego Convention Center Corporation, Inc.'s ("SDCC") principal defense to this antitrust

2  suit is to assert it is immune because its actions have assertedly been taken to protect the public

3  welfare. Significantly, SDCC does little to challenge United National Maintenance, Inc.'s ("United")

4  antitrust analysis and does not controvert United's evidence – it simply maintains it does not apply

5  because of its asserted immunity. But because there is no clearly articulated policy from the

6  California legislature to displace competition for services in California convention centers, and given

7  that SDCC's rates are not supervised by the State, SDCC's actions cannot qualify for immunity.

8       Because SDCC is not immune, the restrictions SDCC has imposed in the name of security

9  must meet the reasonableness and less restrictive alternative tests required by the Supreme Court in its

10  *Kodak* and *Aspen Skiing* decisions. These tests require that SDCC accomplish an otherwise legitimate

11  goal such as security in a manner that restricts competition as little as possible. SDCC's security

12  explanations do not pass the *Aspen Skiing/Kodak* test because SDCC has not submitted a single piece

13  of evidence establishing that the security screening applied to SDCC employees cannot feasibly be

14  applied to United's employees. Indeed, even the federal building in San Diego uses cleaning crews

15  from a contractor similar to United.

16       As to irreparable injury, SDCC simply cannot claim immunity to damages under the Local

17  Government Antitrust Act ("LGAA") and California Tort Claims Act (as it has done in its separately

18  filed Rule 12 motions) while asserting that United's continuing financial losses are not irreparable.

19  Nor does SDCC controvert the evidence that if United does not receive an injunction, it will not be

20  able to viably reconstitute itself. On this record, a preliminary injunction should be entered.

21  **I. UNITED IS LIKELY TO PREVAIL ON THE MERITS OF ITS ANTITRUST LAWSUIT.**

22      **A.    SDCC's Alleged Motive to Protect the Public Welfare Does Not Immunize It from**

23            **the Antitrust Laws.**

24       SDCC asserts that it "cannot be liable under the antitrust laws as its security policy concerns

25  the public welfare." (SDCC PI Resp. at 11.) SDCC's sole cited authority for this proposition is

26  *National Water Works Co. v. City of Kansas*, 28 F. 921, 922 (C.C. Mo. 1886) – a 121 year old breach

27

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  of contract dispute that predated the passage of the Sherman Act by four years.[1]  The subsequently

2  enacted Sherman Act only confers immunity on defendants who meet the narrow standards required

3  for "State Action" immunity: (1) the identification of a clearly articulated state legislative policy to

4  supplant competition for services at convention centers, *and* (2) active supervision by the state of the

5  rates SDCC charges.  *Parker v. Brown*, 317 U.S. 341, 351 (1943).  SDCC is not immune simply

6  because it might be a quasi-governmental entity because:

> In 1972, there were 62,437 different units of local government in this country.  Of this number 23,885 were special districts which had a defined goal or goals for the provision of one or several services. ... If municipalities were free to make economic choices counseled solely by their own parochial interests and without regard to their anticompetitive effects, a serious chink in the armor of antitrust protection would be introduced...[and would cause] serious economic dislocation . . . .

11  *City of Lafayette, Louisiana v. Louisiana Power & Light Co.*, 435 U.S. 389, 407–8, (1978).  SDCC

12  fails to identify any such clearly articulated policy to supplant competition in its preliminary

13  injunction response because there is none and the State of California did not "'contemplate[]' the

14  specific anticompetitive actions" taken by SDCC.  *Cmty. Communications Co. v. City of Boulder,*

15  *Colorado*, 455 U.S. 40, 52 (1982).  The matters for which SDCC seeks judicial notice do not establish

16  such a policy.  SDCC similarly fails to allege that its maintenance service rates are actively supervised

17  by the State of California.  It thus cannot establish state action immunity, and there is simply no legal

18  basis for SDCC's claimed "public welfare" immunity absent the presence of state action immunity.

19  **B.     SDCC's Business Activities Satisfy the Sherman Act's Interstate Commerce Element.**

21  SDCC asserts its actions are beyond the jurisdiction of the Sherman Act because "cleaning

22  services is a purely local activity with a purely local effect" and because SDCC's activities are "non-

23  commercial."  (PI Resp. at p. 13.)  Neither argument is supported by the facts or the law.

---

25  [1] SDCC also cites *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127

26  (1961), which is innaposite as it dealt with the application of the antitrust laws to political actions such as petitioning or lobbying government.  Similarly innaposite is SDCC's citation of *Union Bridge*

27  *Co v. U.S.*, 204 U.S. 364 (1907), which concerned whether an order by the Secretary of War to make alterations to a bridge constituted a taking for purposes of eminent domain.

*Kirby Noonan Lance & Hoge LLP*
*600 West Broadway, Suite 1100 San Diego, California 92101-3387*

1    SDCC's first argument is predicated on a view of interstate commerce that was squarely

2  rejected in 1942 by the Supreme Court in *Wickard v. Filburn* and its progeny, which find

3  Congressional power under the Commerce Clause to be extensive and far reaching.[2] 317 U.S. 111

4  (1942) (interstate commerce affected by farmer who grows his own wheat); *U.S. v. Darby*, 312 U.S.

5  100 (1941) (interstate commerce affected by local labor and employment practices); *Heart of Atlanta*

6  *Motel, Inc. v. U.S.*, 379 U.S. 241 (1964) (interstate commerce affected by discrimination of a single

7  family owned motel because they may service out of state travelers).

8    The nexus with interstate commerce here is not determined simply by looking at where the

9  cleaning service is performed.  Rather, the test is the "effect on interstate commerce generated by

10  [defendant's business] activities" and not the "more particularized showing of an effect on interstate

11  commerce caused by [defendant's alleged antitrust violations]." *McLain v. Real Estate Bd. of New*

12  *Orleans, Inc.*, 444 U.S. 202, 242–43 (1980); *see also Western Waste Serv. Sys. v. Universal Waste*

13  *Control*, 616 F.2d 1094, 1097 (9th Cir. 1980) (sufficient for "'defendants' business activities,

14  independent of the violations, [to] affect interstate commerce.").

15    Here, United has alleged, and SDCC does not contest, the following facts from Paragraph 9 of

16  United's Verified Complaint concerning the business activities of SDCC and United:

17       (1) The business of attracting and servicing conventions is at the core of interstate
         commerce. (2) The vast majority of SDCC conventions are organized and contracted
18       for by out-of-state entities.  (3) Attendees at SDCC shows overwhelmingly travel to
         San Diego from out of state.  (4) Businesses such as United perform services at the
19       SDCC Facility pursuant to national contracts. (5) United is a Nevada Corporation with
         a Chicago, Illinois principal place of business, and its San Diego activities are directed
20       by out-of-state personnel.

21  The Sherman Act has consistently been held applicable to activities that are even more local than

22  those at issue here.[3]

23  _____

24  [2] The Ninth Circuit has observed that "[i]t is well established that the reach of the Sherman Act is as
    inclusive as the constitutional limits of Congress' power to regulate interstate commerce" and "[a]s
25  judicial construction of the scope of the commerce clause has expanded so has the reach of the
    Sherman Act." *Western Waste*, 616 F.2d at 1096 (citations omitted).  There is thus no difference
26  between the general reach of Congress under the commerce clause and the reach of the Sherman Act.

27  [3] The Supreme Court has held that the Sherman Act applies "to local activities which, although are not
    themselves within the flow of interstate commerce, substantially affect interstate commerce." *U.S. v.*
28  (footnote continued)

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California  92101-3387

1    SDCC's second argument relies on two cases involving educational institutions. (PI Resp. at

2    p. 12)  There is no authority applying this line of "educational exception" cases for non-commercial

3    activities outside of the education context, and even educational institutions are subject to the Sherman

4    Act in most instances outside of setting curriculum or other "core" education functions because

5    "Congress intended the antitrust laws to apply to a wide array of commercial conduct . . . ." *Hamilton*

6    *Coll. Ch. of Alpha Delta Phi v. Hamilton Coll.*, 128 F.3d 59, 63 (2d Cir. 1997) (refusing to apply

7    exemption to policy requiring students to live in university owned housing).  As, SDCC's own cases

8    establish courts use an "objective test" to determine whether there was a commercial motivation to the

9    educational institution's challenged conduct because:

> [i]t is not difficult to conceive of a facially non-commercial activity that confers an intentional and direct economic or competitive benefit to an antitrust defendant . . . . the court must determine whether the [educational institutions] receive a direct economic or competitive benefit from the enforcement [of the challenged rule].

13    *Adidas America, Inc. v. NCAA*, 40 F. Supp. 2d 1275, 1286 (D. Kan. 1999).  Here, SDCC does not and

14    cannot dispute that it is receiving a direct economic benefit from its security policy by avoiding

15    competition from United, and by earning, by its own admission, a "small margin of profitability" from

16    requiring use of SDCC employees.  (PI Resp. at 19.)

17    **C.    SDCC's Exclusionary Conduct Fails the Reasonableness Test Set Forth by the Supreme Court in *Aspen Skiing* and *Kodak*, and United Has Suffered Antitrust Injury Therefrom.**

19    **1.    SDCC's Actions Have Denied United Access to the Convention Center and Has Denied United the Ability to Compete.**

21    While SDCC defends on the grounds of national security, it also argues in its brief that

22    (1) United is not losing money and can be competitive under SDCC's current terms, and (2) that

24    *American Bldg. Maint. Indus.*, 422 U.S. 271, 278 (1975).  The Sherman Act has been applied to a single surgeon.  *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991) (claim of exclusion by a local hospital in interstate commerce); *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738 (1976) (monopolization of hospital services within a single state is interstate commerce because of the purchase of medicine and supplies from out of state sellers, receipt of revenue from out-of-state insurers, and funding of the expansion by out-of-state lenders); *McLain*, 444 U.S. at 246 (1980) (brokerage fees on the local sale of houses affects interstate commerce).

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  SDCC's policy actually increases competition. These arguments rely entirely on SDCC's self-serving

2  affidavits and ignore the numerous customer protest letters and United's actual books and records

3  showing the financial impact of SDCC's policies. (Ver. Compl. ¶ 34.)

   **a.  The Uncontroverted Evidence Establishes that United is Losing**

4  **Money and Cannot Compete Against SDCC Under SDCC's**

5  **Current Policies.**

6  SDCC asserts, without any evidentiary support, that its policy "does not prohibit a third party

7  vendor from obtaining cleaning service contracts, nor does it eliminate the Licensee's vendor

8  options."[4]  (PI Resp. at pp. 9, 15.) These assertions ignore the practical effect on competition that

9  flows from the fact that SDCC now controls the price of labor making competition impossible. (*See*

10 Ver. Compl. ¶¶ 33, 64–69; PI Mem. Ex. 9.)

11 SDCC claims that United is only losing money under SDCC's terms because of United's "poor

12 business sense." (PI Resp. at p. 19.) SDCC does not address the detailed evidence and calculations

13 United presented, which shows exactly how it loses money on both "facility" and "booth" cleaning.

14 For facility cleaning, United pays $17 per hour of labor to SDCC but only collects $16.30 from its

15 customers. (Ver. Compl., ¶ 65.)  No math could avoid a direct $.70 per hour loss for each hour

16 worked. SDCC also ignores that United is bound under its national contracts by its labor man-hour

17 estimates for facility cleaning, and cannot bills its clients for hours worked in excess of those

18 estimates. SDCC does not address the evidence that SDCC workers have not been efficient and work

19 more hours that United can charge, making losses for those hours the full $17 hourly charge. *Id.*

20 SDCC continues to perpetuate confusion on the terms of its booth cleaning charges. SDCC

21 falsely asserts that "SDCC receives 50% of the proceeds for the [booth] cleaning services, and the

22 other 50% goes directly to" United. (PI Resp. at 19.) This is wrong. The general contractor, such as

23 Champion, receives 100% of the booth cleaning revenue and pays 50% of that revenue to United to

24 _____

25 [4] It thus reasons that United has not been denied use of an essential facility and that there is no

agreement among it and SDCC licensees not to work with United. United has already explained that

26 the SDCC is an essential facility and how United has been denied its use, as well as how SDCC's

license agreements requiring use of only SDCC labor constitute a group boycott (in particular, the

27 involuntary nature of the boycott is addressed). (*See* PI Mem. at p. 19 n. 15.) SDCC addresses none

of these arguments and cites no case law.

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1   perform the cleaning, keeping the other 50% for itself. (Ver. Compl. ¶¶ 61–66.)  Under SDCC's

2   current terms, United must give SDCC 100% of the 50% it receives, leaving nothing for United, not

3   even a penny.  (*Id.* at 64–65.)  Given that United still has overhead costs, it loses money on booth

4   cleaning, a service it is required to provide as a result of its national contracts.  (*Id.*)

5        United wrote Mr. Gessner to clarify that foregoing was in fact SDCC's position and

6   Mr. Gessner wrote back that United is required to pay 100% of the booth cleaning revenue it receives

7   from the general contractor.  United has paid, and SDCC has accepted exactly that amount.  (*See*

8   Ex. 1, attached hereto).

9              **b.      The Undisputed Evidence Demonstrates That SDCC's Policy
                         Increases Price, Reduces Quality and Restricts Consumer Choice.**

11        SDCC's assertion that its policy is "pro-competitive" and "fosters competition" is not

12  supported by citation to any evidence and is contradicted by the resounding industry condemnation it

13  has received from show organizers and exhibitors—the supposed beneficiaries of this enhanced

14  competition.[5]  (PI Mem. at pp. 14–15, Ex. 12A–12J; *see also* Hekman Decl., Ex. 2, attached hereto.)

15  Nor does SDCC cite any evidence contradicting Dr. Hekman's conclusion that SDCC's policy

16  grievously injures competition and will lead to higher prices and reduced quality.  (PI Mem. Ex. 9,

17  ¶¶ 28–29, 48.)  Higher prices and reduced quality are precisely the types of injury the antitrust laws

18  were intended to prevent, and form the core of what the courts recognize as antitrust injury.[6]  *See*

19  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

20  _____

21  [5] SDCC's objection to the admissibility of these letters is ill-founded as they are business records
    received by United in the normal course of business, and are probably also found in the files of SDCC
22  because they were addressed to Mr. Gessner.

23  [6] SDCC's theory of how it fosters competition also fails the *Aspen Skiing/Kodak* reasonableness test in
    that the objective can be achieved in a less-restrictive way. SDCC argues that "what [United] is doing
24  is hoping to maintain the monopoly it has on the market and deny the 'little guy' the opportunity to
    compete" because by allowing the "little guy" to use SDCC's specially trained labor, the "little guy"
25  can overcome customer reluctance. (PI Resp. at p. 14.) If what SDCC is saying is true, it could have
    made its labor available to any "little guy" that wanted to bid while allowing United's employees
26  access to the building at the same time.  SDCC also has the facts wrong here concerning United's
    alleged monopoly power: it was SDCC that had a 60% market share, and thus monopoly power,
27  *before* it implemented its exclusionary policy.  (Gessner Decl. ¶ 2.)

28

1          **2.      SDCC's Actions Are Not Reasonable in Light of Available Less-**
                   **Restrictive Alternatives.**

2

3          SDCC's security justification for excluding United's employees fails to survive the level of

4  scrutiny required by the Supreme Court in *Aspen Skiing* and *Kodak*. (*See* PI Mem. at p. 16–17.)

5  SDCC claims that its policy "will best assure the security and safety of a public facility," and that the

6  SDCC is a "high value terrorist target". (PI Resp. at p. 4.)

7          First, SDCC's claim that it is a "high value terrorist target" does not justify its exclusion of

8  United's employees.  SDCC concedes that:

9  •       the top 3 convention venues in the U.S. – Chicago, Orlando, and Las Vegas – all allow outside
           cleaning contractors access to the building using a photo-badging program.  (Ver. Compl.,
10         ¶ 59.)

11 •       these top three venues are all higher value targets than is the SDCC; all are much larger than
           the SDCC; and, all have an equal or greater reason to ensure facility security.  (*Id.*)
12
   •       United's sister companies regularly work in an environment in which its employees must be
13         background checked and badged and has done so for years without issue. (Simon Decl., Ex. 3,
           attached hereto.)
14

15         SDCC has sought to file its security evidence under seal.  Whatever its evidence is, SDCC will

16 not be able to controvert the feasibility and sufficiency of alternatives in use in these other cities that

17 would ensure security and allow United access to the building.  We doubt SDCC intends to argue that

18 the officials in Chicago, Las Vegas, Orlando, and elsewhere have made incompetent decisions when it

19 comes to security, or that the SDCC is at a greater risk than convention halls in those other cities.

20         Second, SDCC has failed to explain why United's employees pose such a high level of

21 security risk.  In a prior affidavit, SDCC claimed that the policy was applied to United because, "on

22 information and belief", United uses temporary employees. (*See* PI Mem., Ex. 2, ¶¶ 5–7.) There was

23 no mention of any other security concern.

24         However, United has demonstrated with uncontroverted affidavits and employee work records

25 that it does not use temporary workers in San Diego. (*See*  PI Mem. at p. 6, Exs. 7, 7A–B.)  SDCC

26 now also raise new arguments: that there are unspecified "communication problems" with United

27 employees, that "United's workers oftentimes fail to comply with the Convention Center's

28 identification and credential requirements", and that "United's workers never turn in lost items" to the

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  lost and found. (Gessner Decl. ¶¶ 4–6.) These claims are not only unsupported by a single piece of

2  evidence such as a memo to file, email, or a dated incident, they are an insult to United's well-trained

3  and long-term workforce.

4        Further, SDCC concedes that over the last nineteen years it has never brought an issue touching

5  on safety or security to the attention of United's supervisors or management. (Linn Decl. ¶¶ 3–5, Ex. 4,

6  attached hereto.) If the concerns in Mr. Gessner's affidavit were of such significance, one would think

7  that SDCC would have told someone at United so that the issue could be corrected.  (*Id.*)

8        Finally, SDCC claims that it is not singling out United, and that it plans to roll out other

9  security procedures for other service trades.[7]  Putting aside the coincidence that United is the only

10 service provider that actually competes with SDCC,  there is no possible way that SDCC could take

11 in-house every service because over 1000 employees would have to be added to the SDCC payroll.

12 No other convention center has gone in that direction, and as the letters protesting just the exclusion of

13 maintenance attest, customers are likely to avoid the SDCC if SDCC took such a drastic step.

14 Therefore, if SDCC is to be taken at its word that it is planning enhanced security for other service

15 trades, those steps will have to involve badging and/or background checks.  There is no other way.

16 And if those procedures will work for other trades, they will clearly work for United's employees as

17 well.  Indeed, tellingly, SDCC's response is entirely silent on why it turned down United's effort to

18 allow SDCC to run background checks on United's employees.[8]

19 **II.  UNITED IS AND WILL CONTINUE TO BE IRREPARABLY INJURED IF THE COURT**
   **DOES NOT ISSUE A PRELIMINARY INJUNCTION; THE BALANCE OF THE**
20 **HARDSHIPS FAVORS UNITED.**

21       SDCC does not challenge the evidence of United's irreparable harm: (1) that United will soon

22 be unable to reconstitute a sufficiently experienced work force to efficiently compete in San Diego (PI

23 ──────────────────

24 [7] SDCC's claim that maintenance is the facility's greatest vulnerability is not plausible.  United's
   employees enter the SDCC building with brooms, mops, vacuum cleaners, and open topped
25 dumpsters. (Linn Decl. ¶ 6)  By contrast, thousands of trucks each year pull up to the docks containing
   unscreened drivers carrying tens of thousands of tons of unscreened cargo.  (*Id.*)
26

27 [8] Mr. Mazzocco's affidavit is notably vague about the "extensiveness" of the SDCC's screening
   procedures, and it is also silent on why those screening procedures could not be extended to United.
28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1    Mem., p. 24.); and, (2) that SDCC cannot assert immunity to damages while maintaining United's

2    financial losses are recoverable at law.[9]  SDCC instead accuses United of "forum shopping" and

3    "undue delay" in seeking preliminary injunctive relief, and claims that United is therefore unable to

4    establish irreparable injury.  This is not the law where the plaintiff establishes future injury (as United

5    has done here) that could be avoided with the entry of an injunction. *See, e.g., Inflight Newspapers,*

6    *Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 124 (E.D.N.Y. 1997) (three-month delay "not a

7    bar to granting [the] injunction"); *Porsche Cars N. Am., Inc. v. Manny's Porshop, Inc.*, 972 F. Supp.

8    1128, 1132-33 (N.D. Ill. 1997) (ten-year delay); *Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034,

9    1037, 1044 n.9 (E.D. Mich. 1994) (six-month delay); *Rubbermaid Commercial Prods., Inc. v. Contico*

10   *Int'l, Inc.*, 836 F. Supp. 1247, 1257 (W.D. Va. 1993) (eight-month delay); *Lisa Frank, Inc. v. Impact*

11   *Int'l, Inc.*, 799 F. Supp. 980, 1001 (D. Ariz. 1992) (seven-month delay).[10]

12        Nor has United has engaged in forum shopping.  The state claims have been pendently joined

13   here,[11] the focus of this action is on federal antitrust claims that cannot be pursued in state court.

14   Further, United engaged in a careful investigation of the viability of such federal claims. *Lisa Frank,*

15   799 F. Supp. at 1001 ("[f]actoring in the preparation time for this motion [for preliminary injunction],

16   it is apparent that any delay did not result from neglect."); *see also Inflight Newspapers*, 990 F. Supp.

17   ─────────────────────

18   [9] SDCC also concedes that courts considering preliminary injunctions where immunity has been
     asserted have consistently found monetary losses to constitute irreparable injuries that are not
19   recoverable at law. (PI Mem. at pp. 21–22.) SDCC cannot have it both ways.

20   [10] This fact distinguishes SDCC's authority, all of which involves injury that has already occurred and
     would not be exacerbated absent an injunction. *See Oakland Tribune, Inc. v. Chronicle Publishing*
21   *Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *Givemepower Corp. v. Pace Compumetrics, Inc.*, 2007 WL
     951350, at *7 (S.D. Cal.); *Playboy Enters., Inc. v. Netscape Communications Corp.*, 55 F. Supp. 2d
22   1070, 1090 (C.D. Cal. 1999).  Each of those cases found a low likelihood of succeeding on the merits,
     which is a significant factor in light of the "sliding scale" applied to preliminary injunction movants:
23   the lower the likelihood of success on the merits, the higher the threshold of irreparable injury must be
     shown. (*See* PI Mem. at p. 21.)

24
     [11] United has not moved for a preliminary injunction on the state law claims, as it did in seeking a
25   TRO in the state court proceeding.  SDCC's discussion of the state claims in its preliminary injunction
     response is thus puzzling and irrelevant and is best dealt with in the Rule 12 briefing occurring on
26   these issues.   Any TRO determination of irreparable harm hardly bars injunctive relief on a
     subsequent preliminary injunction. *See, e.g., Inflight Newspapers*, 990 F. Supp. at 124 (rejecting
27   argument that "because the court denied plaintiff a TRO . . . that somehow plaintiffs are now
     precluded from establishing irreparable harm to secure an injunction").

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1  at 124 (delay justified where plaintiff investigated claim). Acting with due care cannot be confused

2  with forum shopping.

3        SDCC's argument on the balance of the hardships boils down to a claim that, although United

4  might go out of business if an injunction is not entered, people may die. As has been conclusively

5  established above, there is no merit to this claim.

6        Further, United's injunction is carefully crafted to balance SDCC's security needs with its

7  business interests by requiring the United work force to be subjected to the very same security

8  screening procedures and badge-identification procedures that the SDCC employees are subjected to.

9  SDCC provides no reason why an injunction under these terms would harm its interests. It is

10  incumbent upon SDCC to come up with evidence at this stage, and SDCC has none.

11  **III. CONCLUSION.**

12        In light of the foregoing, United respectfully requests that this Court grant its request for

13  preliminary injunctive relief.

14  DATED: December 28, 2007

                             By:   s/Dylan O. Malagrino

15                                      Attorneys for Plaintiff

16                                      UNITED NATIONAL MAINTENANCE, INC.

                                    E-mail: dmalagrino@knlh.com

17

18

19

20

21

22

23

24

25

26

27

28

*Kirby Noonan Lance & Hoge LLP*
*600 West Broadway, Suite 1100 San Diego, California 92101-3387*

1  James R. Lance (147173)
   jlance@knlh.com
2  Jacob M. Slania (200652)
   jslania@knlh.com
3  Dylan O. Malagrino (228052)
   dmalagrino@knlh.com
4  **KIRBY NOONAN LANCE & HOGE LLP**
   600 West Broadway, Suite 1100
5  San Diego, California 92101-3387
   Telephone (619) 231-8666
6  Facsimile (619) 231-9593

7  Jeffrey A. Leon (*Pro Hac Vice*)
   jleon@uhlaw.com
8  Kristopher J. Stark (*Pro Hac Vice*)
   kjstark@uhlaw.com
9  **UNGARETTI & HARRIS LLP**
   3500 Three First National Plaza
10 Chicago, Illinois 60602-4224
   Telephone (312) 977-4400
11 Facsimile (312) 977-4405

12 Attorneys for Plaintiff
   UNITED NATIONAL MAINTENANCE, INC.

13

14        **UNITED STATES DISTRICT COURT**

15       **SOUTHERN DISTRICT OF CALIFORNIA**

16

17 UNITED NATIONAL MAINTENANCE,
   INC., a Nevada corporation,
18
          Plaintiff,
19
       vs.
20
   SAN DIEGO CONVENTION CENTER
21 CORPORATION, INC., a California
   corporation,
22
          Defendant.
23

CASE NO. 07-CV-2172 BEN(JMA)

**DECLARATION OF DYLAN O. MALAGRINO IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**Complaint Filed: November 13, 2007**

| | |
|---|---|
| **Date:** | **January 7, 2008** |
| **Time:** | **10:30 a.m.** |
| **Dept.:** | **3** |
| **Judge:** | **Hon. Roger T. Benitez** |
| **Trial Date:** | **Not Set** |

24

25

26

27

28

*(left margin, vertical text)* Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

KNLH\503568.1

07-CV-2172 BEN(JMA)

I, Dylan Malagrino, declare as follows:

1.     I am an attorney duly licensed to practice before all courts in the State of California, and I am an associate attorney at Kirby Noonan Lance & Hoge LLP, attorneys of record herein for Plaintiff United National Maintenance, Inc. ("Plaintiff"). All facts stated herein are true and correct of my own personal knowledge and if called as a witness I could and would testify competently thereto.

2.     Attached hereto as Exhibit 1 is a true and correct copy of email correspondences between Brad Gessner and Richard Simon on October 17, 2007.

3.     Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of John S. Hekman, dated December 27, 2007.

4.     Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Richard Simon, dated December 27, 2007.

5.     Attached hereto as Exhibit 4 is a true and correct copy of the Declaration of Charles Buddy Linn, dated December 27, 2007.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed on December 28, 2007, at San Diego, California.

Dylan D. Malagrino

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

**TABLE OF CONTENTS FOR EXHIBITS CITED
IN MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

| Exhibit No. | Document Description | Page(s) |
|---|---|---|
| Exhibit 1 | October 17, 2007 email correspondence between Brad Gessner and Richard Simon | 1-3 |
| Exhibit 2 | December 27, 2007 Declaration of John S. Hekman | 4-5 |
| Exhibit 3 | December 27, 2007 Declaration of Richard Simon | 6-8 |
| Exhibit 4 | December 27, 2007 Declaration of Charles Buddy Linn | 9-11 |

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

KNLH\503568.1

-i-

07-CV-2172 BEN(JMA)

# EXHIBIT 1

**Stark, Kristopher J.**

| | |
|---|---|
| **To:** | Simon, Richard |
| **Subject:** | RE: Detail Reports IDSA/AOA |

-----Original Message-----
From: Simon, Richard [mailto:rsimon@unitedhq.com]
Sent: Wednesday, October 17, 2007 7:12 PM
To: Stark, Kristopher J.; Leon, Jeffrey A.
Subject: FW: Detail Reports IDSA/AOA

Richard A. Simon
United Service Companies
1550 S. Indiana Avenue
Chicago, Illinois  60605

Phone: 312-922-8558
Fax: 312-922-8599

-----Original Message-----
From: Brad Gessner [mailto:brad.gessner@visitsandiego.com]
Sent: Wednesday, October 17, 2007 7:07 PM
To: Simon, Richard
Subject: RE: Detail Reports IDSA/AOA

You're correct Rick.

-----Original Message-----
From: Simon, Richard [mailto:rsimon@unitedhq.com]
Sent: Wednesday, October 17, 2007 4:53 PM
To: Brad Gessner
Subject: RE: Detail Reports IDSA/AOA

Some people thought it was not clear as "Billed to 3rd parties by
service contractor" could mean the amount of what I bill Champion.

 Consider I am a Service Contractor also of sorts (cleaning contractor
or service contractor) and Champion could be considered a 3rd party.

So I would be correct that the amount of "Gross revenue" is the total
amount of revenue sold on the show floor to exhibitors for cleaning
service to exhibitors and that would be considered 100% of the revenue.
Your payment is 50% of that.

Correct? Again not to argue just to be clear.

Richard A. Simon
United Service Companies
1550 S. Indiana Avenue
Chicago, Illinois  60605

Phone: 312-922-8558
Fax: 312-922-8599

1

1

-----Original Message-----
From: Brad Gessner [mailto:brad.gessner@visitsandiego.com]
Sent: Wednesday, October 17, 2007 6:45 PM
To: Simon, Richard; O'Hara, Merrily
Cc: Sara Zetts; Michael Hall; Ron King; Mark Emch; Robert DeNofrio
Subject: RE: Detail Reports IDSA/AOA

Rick- Please refer to our contract, Section 3-SERVICE RATES, COMMISSIONS
AND FINANCIAL REQUIREMENTS. I believe the language is very clear.
"Corporation shall be paid fifty percent (50%) of the gross revenue..."
"Gross revenue is the amount billed to third parties by Service
Contractor for cleaning services, excluding sales taxes.
Hope this helps.
Brad

-----Original Message-----
From: Simon, Richard [mailto:rsimon@unitedhq.com]
Sent: Wednesday, October 17, 2007 2:48 PM
To: Robert DeNofrio; O'Hara, Merrily
Cc: Sara Zetts; Michael Hall; Ron King; Brad Gessner
Subject: RE: Detail Reports IDSA/AOA

Brad,
I think we might be over paying you, the contract we signed with you
states we should pay you 50% of the gross receipts "we collect". The
monies we collect represent about 50% of the total monies of cleaning
service sold on the show floor. So if we pay you 50% of the total monies
of service sold on the show floor that would be 100% of what we collect
or more.

Is it your intent that we pay 50% of what we collect? OR 50% of the 100%
of the monies collected in total?

I am not arguing I just want to be clear.


Richard A. Simon
United Service Companies
1550 S. Indiana Avenue
Chicago, Illinois  60605

Phone: 312-922-8558
Fax: 312-922-8599


-----Original Message-----
From: Robert DeNofrio [mailto:Robert.Denofrio@visitsandiego.com]
Sent: Wednesday, October 17, 2007 10:53 AM
To: O'Hara, Merrily
Cc: Sara Zetts; Michael Hall; Ron King; Brad Gessner; Simon, Richard
Subject: Detail Reports IDSA/AOA

Merrily,

Thank you for providing us with the overall cleaning revenues for IDSA
and AOA.  As we spoke on Monday, we still require an individual break
down of all booths cleaned, square footage, and revenues received.

Also will you be partnering with us for American Academy of Religion and
Society of Biblical Literature, a Champion show moving into the Center
on November 15th?

Robert

-----Original Message-----
From: O'Hara, Merrily [mailto:mohara@unitedhq.com]

Sent: Monday, October 15, 2007 8:05 AM
To: Robert DeNofrio
Subject: ( 6) IDSA


the other one,
thanks,
Merrily

3

# EXHIBIT 2

*John S. Hekman, Ph.D.*
*Response to Defendant's Opposition to Motion for Injunction*

**Response to Defendant's Opposition to Motion for Preliminary Injunction**

John S. Hekman

I have read Defendant's Opposition to Motion for Preliminary Injunction, and I strongly disagree with its assertion that SDCC's implementation of restrictions on outside cleaning services is "pro-competitive." The basis for this assertion is that Plaintiff's firm can still operate in the SDCC, and that other cleaning firms can also compete with Plaintiff and with Defendant for cleaning contracts. This is completely contrary to the meaning of the word "competition" in antitrust economics. Defendant is saying that Plaintiff can compete for cleaning services at SDCC by using Defendant's cleaning services employees. The great majority of Plaintiff's employees are cleaning workers. These workers are barred from working at SDCC. Plaintiff cannot "compete" in the market by offering a lower rate or more services with these employees. The cleaning at SDCC is performed by one staff of employees, not by a range of competing firms.

The remainder of Plaintiff's employees are administrative. If Defendant is intending to argue that Plaintiff can "compete" by offering a lower cost of administrative staff, that makes no economic sense at all. I already pointed out in my Declaration that the labor rate negotiated by United National before the SDCC restrictions on cleaning staff was a rate that already included overhead and administration. Since the cleaning labor rate imposed by SDCC is higher than the rate charged by United National that included administrative cost, SDCC's restrictions have unambiguously reduced competition, not enhanced it.

Prepared by LECG                                                                                       1

*John S. Hekman, Ph.D.*
*Response to Defendant's Opposition to Motion for Injunction*

Defendant's use of the terms "competition" and "pro-competitive" are incorrect and misleading as a matter of economic principles. The effect of SDCC's actions in excluding non-SDCC employees from performing cleaning at SDCC is anti-competitive.

John S. Hekman, Ph.D.          Los Angeles, Ca.          December 27, 2007

12/27/07

Prepared by LECG                                                          2

5

# EXHIBIT 3

## DECLARATION OF RICHARD SIMON

I, Richard Simon, declare and would testify as follows:

1.     I am the President and Chief Executive Officer of United Service Companies, Inc. and of its subsidiary companies including: United National Maintenance, Inc., United Temps, Inc., United Maintenance Company, Inc., United Security, Inc. and am authorized to make this declaration on behalf of United Service Companies and each of the above subsidiaries. All facts stated herein are true and are of my own personal knowledge.

2.     Several hundred of the employees of United Service Companies' subsidiaries work in highly secure environments, and are required by the customer to be background checked and drug screened.  As these subsidiaries have run these checks for over 25 years without incident, United National Maintenance could readily implement comprehensive background and screening procedures for the employees of United National Maintenance.

3.     For example, over 150 employees of United Maintenance Company, Inc. Provide cleaning services to Delta Airlines at the Salt Lake City International Airport, a major transportation hub. An airport is obviously viewed as a greater terrorist target than is the San Diego Convention Center yet United Maintenance Company's employees have "all access" badges allowing access to secure areas such as the control tower and airplane hangars.  United Maintenance staff bring trucks onto the air field and have complete access to aircraft from the air side of the airport. Furthermore, United Maintenance Company employees must perform a security

lp

sweep of each plane and sign a certification attesting to this fact. The skill, qualifications and pay scale of these employees are very similar to the types of people employed by United National Maintenance in San Diego. The Airport Authority and the Transportation Security Administration require us to run background checks on these people and that our procedures comply with their security requirements.

4.    Employees of United Maintenance, Inc. and United Temps also provide cleaning and clerical services to two large sports stadiums that host major sporting and concert events: the United Center in Chicago and the Phillips Arena in Atlanta. These employees are also given access to restricted areas and required to go through comprehensive background checks and drug screening.

5.    Employees of United Temps, Inc. provide clerical staffing to Disney World, one of the marquee tourist attractions in the United States and a site with significant terrorism concern. In fact, the airspace over Disney World is one of the few non-military no-fly zones in the U.S. Despite the high level of concern (certainly higher than any concern SDCC might have) United Temps' employees have been allowed access to the park by being subjected to comprehensive background checking and drug screening and have done so without incident. Similarly, United Temps, Inc. employees also provide services to the Imperial Palace resort in Las Vegas, Nevada and all of these employees are also required to go through background checks and drug screening.

6.    United Security, Inc is a licensed security agency in several states and its employees provide security to the Hyatt Regency in Chicago, one of the largest convention hotels in the United States, and the W Hotel in Chicago. These employees

7

are also given access to restricted areas and required to go through comprehensive background checks and drug screening.

     7.    In conclusion, many of the subsidiaries of United Service Companies are trusted to provide labor to service some of the major venues and tourist attractions in the United States.  Where required, United Service Companies has readily and successfully implemented the necessary security procedures to ensure that the backgrounds of any of the employees of its subsidiaries will be comprehensively screened.  United National's employees in San Diego would not be an exception.

     Pursuant to 17 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on  12/27/07
        Date

_____
        Richard Simon

# EXHIBIT 4

## DECLARATION OF CHARLES BUDDY LINN

I, Charles Buddy Linn, declare and would testify under oath as follows:

1.    I am a Regional Vice President of United National Maintenance, Inc. ("United") responsible for the Western United States, including San Diego and am responsible for hiring employees to perform cleaning, janitorial, maintenance and related services (defined hereinafter as "Trade Show Cleaning Services") at the San Diego Convention Center.    All facts stated herein are true and are of my own personal knowledge.

2.    I have worked in San Diego and with the San Diego Convention Center Corporation ("SDCC") for the past 19 years.    During these 19 years, United's management staff, myself included, has always been in close contact with SDCC's managers and supervisors, including Brad Gessner, and they all know me and my supervisors and have my work phone number, cell phone number, fax number, business address and email address.    Brad Gessner knows that I should be informed of any complaints or concerns related to United's employees.

3.    I have read the affidavit of Brad Gessner, the General Manager of the SDCC, which points to alleged incidents involving United employees as his justification for applying this "security" policy solely against United.    I can personally state that over the last 19 years, SDCC has never brought a single issue dealing with safety or security to the attention of myself or any other supervisors or management at United.    Given my position at United, I am the person most likely to have received these complaints, and my staff is directed to refer such complaints to me.

9

4.     Specifically, I can state that I have never been informed of a single communication problem with United workers; or a single instance of a United worker failing to comply with the SDCC's identification and credential requirements; or of any instance in which United workers have been in areas where they are not supposed to be. In fact, no one at United has ever been informed that there are restricted areas at the Convention Center.    If SDCC had implemented a restricted area procedure, under no circumstances would United employees ever enter those areas.

5.     Nor have I ever been informed of a single instance of theft involving United's employees or any instance in which an employee failed to turn in items, backpacks included, to the lost and found.  United employees are instructed to pickup anything that appears to be lost and to turn it into security.

6.     Finally, I see that SDCC claims our employees are the greatest security vulnerability in the building.  This also makes no sense considering the fact that United employees enter the San Diego Convention Center with only brooms, mops, vacuum cleaners and open topped dumpsters and bag all trash in clear plastic bags.  This makes it impossible for any United employee to hide any items while entering or exiting the Convention Center.    In comparison, hundreds of trucks for any given show are allowed to pull up to the docks driven by unscreened drivers and carrying unscreened cargo in closed boxes.

2

Pursuant to 17 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _12-27-07_
           Date

                                             Charles Buddy Linn

3

11

## CERTIFICATE OF SERVICE

<u>United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.</u>
United States District Court Case No. 07-CV-2172 BEN (JMA)

I, the undersigned, declare: That I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and I am employed in the County of San Diego, California. My business address is 600 West Broadway, Suite 1100, San Diego, California 92101-3387.

On December 28, 2007, at San Diego, California, I served the following document(s) described as:

1.     **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION;**

2.     **DECLARATION OF DYLAN O. MALAGRINO IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

on the parties in said action as follows:

Regina A. Petty Esq.                          Attorneys for Defendant
email: rpetty@wpkt.com                  SAN DIEGO CONVENTION CENTER
Wilson, Petty, Kosmo & Turner LLP    CORPORATION, INC.
550 West C Street, Ste. 1050
San Diego, CA 92101
Telephone: (619) 236-9600
Facsimile: (619) 236-9669

☒     **ELECTRONIC TRANSMISSION:** I filed the foregoing document with the Clerk of Court for the U.S. District Court, Southern District of California, using the Electronic Case Filing ("ECF") system of the Court. The attorney listed above has consented to receive service by electronic means and was served a "Notice of Electronic Filing" sent by the CM/ECF system.

☒     **FEDERAL COURT:** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on December 28, 2007, at San Diego, California.

s/Dylan O. Malagrino

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

KNLH\503291.1                                    i                              07-CV-2172 BEN(JMA)