1   James R. Lance (147173)
    Jacob M. Slania (200652)
2   Dylan O. Malagrino (228052)
    **KIRBY NOONAN LANCE & HOGE LLP**
3   600 West Broadway, Suite 1100
    San Diego, California  92101-3387
4   Telephone (619) 231-8666
    Facsimile (619) 231-9593
5
    Theodore R. Tetzlaff (*Pro Hac Vice*)
6   Jeffrey A. Leon (*Pro Hac Vice*)
    Kristopher J. Stark (*Pro Hac Vice*)
7   **UNGARETTI & HARRIS LLP**
    3500 Three First National Plaza
8   Chicago, Illinois  60602-4224
    Telephone (312) 977-4400
9   Facsimile (312) 977-4405

10  Attorneys for Plaintiff
    UNITED NATIONAL MAINTENANCE, INC.
11

12              **UNITED STATES DISTRICT COURT**

13            **SOUTHERN DISTRICT OF CALIFORNIA**

14

15  UNITED NATIONAL MAINTENANCE,          CASE NO. 07-CV-2172 BEN(JMA)
    INC., a Nevada corporation,
16                                        **DECLARATION OF DYLAN O.**
                Plaintiff,                **MALAGRINO IN SUPPORT OF**
17                                        **PLAINTIFF'S OPPOSITION TO**
        vs.                               **DEFENDANT'S MOTION TO DISMISS**
18                                        **PLAINTIFF'S COMPLAINT PURSUANT**
    SAN DIEGO CONVENTION CENTER           **TO FEDERAL RULES OF CIVIL**
19  CORPORATION, INC., a California       **PROCEDURE, RULES 12(B)(1) AND**
    corporation,                          **12(B)(6)**
20
                Defendant.                **Complaint Filed:  November 13, 2007**
21
                                          Date:      January 28, 2008
22                                        Time:      10:30 a.m.
                                          Dept.:     3
23                                        Judge:     Hon. Roger T. Benitez
                                          Trial Date: None Set
24

25      I, Dylan Malagrino, declare as follows:

26      1.      I am an attorney duly licensed to practice before all courts in the State of

27  California, and I am an associate attorney at Kirby Noonan Lance & Hoge LLP, attorneys of

28  record herein for Plaintiff United National Maintenance, Inc. ("Plaintiff").  All facts stated herein

1   are true and correct of my own personal knowledge and if called as a witness I could and would

2   testify competently thereto.

3       2.    Attached hereto as Exhibit 1 is a true and correct copy of three pages from San

4   Diego Convention Center Corporation, Inc.'s webpage.

5       3.    Attached hereto as Exhibit 2 is a true and correct copy of the transcript of the

6   January 7, 2008 hearing on United National Maintenance, Inc.'s Motion for a Preliminary

7   Injunction.

8       I declare under penalty of perjury under the laws of the State of California that the

9   foregoing is true and correct and that this Declaration was executed on January 14, 2008, at

10  San Diego, California.

11

12

13  Dylan O. Malagrino

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

**TABLE OF CONTENTS FOR EXHIBITS CITED
IN MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL
PROCEDURE, RULES 12(B)(1) AND 12(B)(6)**

| Exhibit No. | Document Description | Page(s) |
|---|---|---|
| Exhibit 1 | Three pages from San Diego Convention Center Corporation, Inc.'s webpage | 4–6 |
| Exhibit 2 | Transcript of the January 7, 2008 Hearing on United National Maintenance, Inc.'s Motion for a Preliminary Injunction | 7–39 |

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California  92101-3387

# EXHIBIT 1

Home | Facility Information | Events Calendar | Press Room | Jobs & Vendors | Maps & Parking | Search

 

**San Diego Convention Center**

ATTENDEES >    EXHIBITORS >
                MEETING PLANNERS >
                COMMUNITY/PUBLIC >



Facility Information

Hotel Information

Convention Services

Building and Event Services

Meeting Planner Tools

The Destination

Meet The Team
 Sales Team
 Event Management
 Convention Services

Green Meetings

Come for the convention. Stay for the vacation.

## MEET YOUR SALES TEAM

The San Diego Convention Center's one and only goal is to make your event experience flawless from start to finish. Our expert team is knowledgeable in making any event a huge success. We invite you to discover why meeting planners and attendees consistently rank our staff as one of best. Below you'll find a listing of each of our sales staff with their contact information.



**Sales Team**

**San Diego Office**



**Sandra Butler-Moreno, CMP**
Executive Vice President, Sales & Marketing
*30 year industry veteran, including 15 years as VP Convention Sales & Services, SDCVB*

619.525.5256        sandra.moreno@visitsandiego.com



**Andy Mikschl, CMP**
Senior Vice President of Sales
*21 years San Diego Hotel & SDCC Sales Management*

619.525.5282        andy.mikschl@visitsandiego.com



**Maureen Eberle, CMP**
Associate Vice President Sales
*22 years SDCC & SDCVB Sales Management*

619.525.5281          maureen.eberle@visitsandiego.com



**Sylvia Harrison, CMP**
Director of Sales
*20 years San Diego Hotel & SDCC Sales Management*

619.525.5219          sylvia.harrison@visitsandiego.com



**Anne Hartley**
Director of National Accounts
*22 years San Diego Hotel & SDCC Sales Management*

619.525.5230          anne.hartley@visitsandiego.com



**Joy Peacock Jones, CMP**
Director of National Accounts
*17 years SDCC Sales Management*

619.525.5216          joy.jones@visitsandiego.com



**Lucy Lopez, CMP**
Director of National Accounts
*16 years in industry*

619.525.5223          lucy.lopez@visitsandiego.com



**Dave Matta**
Director of National Accounts
*10 years in industry*

619.525.5283          david.matta@visitsandiego.com



**Jaleh Browder**
Sales Representative
*18 years in industry*

619.525.5284          jaleh.browder@visitsandiego.com



**Jonathan Landau**
Advertising Sales Associate
*5 years in industry*

619.525.5261          jonathan.landau@visitsandiego.com

### Midwest Regional Office: Chicago, IL



**Angie Ranalli, CMP**
Vice President Sales Midwest Region
*22 years SDCVB, SDCC & Hotel National Sales Management*

312.943.5399          angie.ranalli@visitsandiego.com

### Eastern Regional Office: Washington, D.C.



**Phyllis Bradley Azama, CMP**
Vice President Sales Eastern Region
*22 years SDCVB & SDCC Sales Management*

703.647.6880          phyllis.azama@visitsandiego.com



**Lenay Gore**
Director of National Accounts
*26 years in Convention Center, Hotel and General Contracting Sales Management*

703.647.6883          lenay.gore@visitsandiego.com



**Lynn Whitehead, CMP**
Director of National Accounts
*17 years SDCVB & SDCC Sales Management*

703.647.6880          lynn.whitehead@visitsandiego.com

▲ Top

**About Us | Contact | Site Map | Email Sign-Up | Industry Partners | Advertising | FAQs**

©2005 - 2008 San Diego Convention Center Corporat
All Rights Reserved. PRIV

# EXHIBIT 2

1

1
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

2

3
HONORABLE ROGER T. BENITEZ
UNITED STATES DISTRICT JUDGE PRESIDING

4
--------------------------------------------------------------

5
UNITED NATIONAL MAINTENANCE                )
INC., A NEVADA CORPORATION,                )

6                                          )

7                    PLAINTIFF,            )
                                           )

8    VS.                                   )   NO. 07-CV-2172-BEN
                                           )

9    SAN DIEGO CONVENTION CENTER           )
     CORPORATION, INC., A                  )
10   CALIFORNIA CORPORATION,               )
                                           )

11                   DEFENDANT.            )

12
--------------------------------------------------------------

13                          MOTION HEARING

14
--------------------------------------------------------------

15

16

17                REPORTER'S TRANSCRIPT OF PROCEEDINGS
                          JANUARY 7, 2008
18                       SAN DIEGO, CALIFORNIA

19

20

21

22
                     GAYLE WAKEFIELD, RPR, CRR
23                     OFFICIAL COURT REPORTER
                      UNITED STATES COURTHOUSE
24                  940 FRONT STREET, ROOM 4145
                 SAN DIEGO, CALIFORNIA  92101-8900
25                     PH:  619-239-0652
                     GAYLE5@SBCGLOBAL.NET

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:        THEODORE R. TETZLAFF
                                JEFFREY A. LEON
 3                             KRISTOPHER J. STARK
                               UNGARETTI & HARRIS
 4                             3500 THREE FIRST NATIONAL PLAZA
                               CHICAGO, IL.  60602-4224
 5

 6                             JAMES R. LANCE
                               JACOB M. SLANIA
 7                             KIRBY NOONAN LANCE & HOGE LLP
                               600 WEST BROADWAY, SUITE 1100
 8                             SAN DIEGO, CA.  92101-3387

 9
      FOR THE DEFENDANT:        REGINA A. PETTY
10                             WILSON PETTY KOSMO & TURNER LLP
                               550 WEST C STREET, SUITE 1050
11                             SAN DIEGO, CA.  92101-3532

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

JANUARY 7, 2008

1

2     THE CLERK:  TWELVE ON CALENDAR, 07-CV-2172, UNITED

3  NATIONAL MAINTENANCE, INC. VS. SAN DIEGO CONVENTION CENTER

4  CORP., SET FOR MOTION HEARING.

5     MR. LANCE:  JIM LANCE, FROM KIRBY NOONAN LANCE & HOGE,

6  ON BEHALF OF THE PLAINTIFF, UNITED NATIONAL.

7     I WOULD LIKE TO INTRODUCE TO THE COURT TED TETZLAFF.

8  HE'S WITH UNGARETTI & HARRIS, OUR CO-COUNSEL.  HE HAS A PRO

9  HOC VICE APPLICATION PENDING, YOUR HONOR.

10     THE COURT:  WHO IS EVERYBODY ELSE?

11     MR. TETZLAFF:  MY COLLEAGUES, MR. JEFF LEON,

12  KRISTOPHER STARK.  MR. LANCE'S COLLEAGUE, JAKE SLANIA.  AND

13  MR. SIMON, WHO IS THE CEO OF UNITED NATIONAL MAINTENANCE, ON

14  OUR SIDE, YOUR HONOR.

15     THE COURT:  THE APPLICATION WILL BE GRANTED, BY THE

16  WAY.

17     MR. TETZLAFF:  THANK YOU.

18     MS. PETTY:  GOOD MORNING, YOUR HONOR, REGINA PETTY,

19  WILSON PETTY KOSMO & TURNER, FOR SAN DIEGO CONVENTION CENTER

20  CORPORATION.

21     THE COURT:  ALL RIGHT, EVERYBODY PLEASE BE SEATED.

22     NOW, I THOUGHT THAT THE CONVENTION CENTER WAS A

23  SUBSIDIARY OR AN AGENCY OF THE CITY OF SAN DIEGO, IS IT?

24     MS. PETTY:  YES, YOUR HONOR, THE CITY OF SAN DIEGO IS

25  THE SOLE SHAREHOLDER IN THIS ENTITY.  IT'S A PUBLIC BENEFIT

9

4

CORPORATION ORGANIZED UNDER CALIFORNIA LAW USING A VEHICLE

THAT MUNICIPALITIES CAN USE TO RUN VARIOUS BUSINESS

ENTERPRISES.

THE COURT:  AND IT HAS ITS SEPARATE COUNSEL AS OPPOSED

TO USING THE CITY ATTORNEY'S OFFICE?

MS. PETTY:  CURRENTLY, IT DOES HAVE SEPARATE COUNSEL.

IT HAS HAD PERIODS OF TIME WHERE THERE WAS SOME LEGAL SERVICES

PROVIDED THROUGH OR WITH THE ASSISTANCE OF THE CITY ATTORNEY'S

OFFICE, BUT IT DOES HAVE ITS OWN BOARD OF DIRECTORS AND A

GENERAL MANAGER, AND CURRENTLY USES THE STRUCTURE OF HAVING

ITS OWN LEGAL SERVICES.

THE COURT:  OKAY.  GOOD ENOUGH.  ALL RIGHT, LET'S SEE,

WE HAVE A REQUEST OR AN APPLICATION FOR A PRELIMINARY

INJUNCTION TO BE ISSUED, IF I'M NOT MISTAKEN.

COUNSEL, I'M SORRY, BUT WE ARE RUNNING LATE TODAY.  WE

HAVE A PRETTY GOOD CALENDAR.  SO ARE THERE ANY DISPUTED ISSUES

OF FACT IN THIS CASE OR IN THIS APPLICATION?

MR. TETZLAFF:  IF I MIGHT, YOUR HONOR, TED TETZLAFF.

I BELIEVE, FOR THE PURPOSES OF RESOLVING THIS APPLICATION,

THIS MOTION, THE PLAINTIFF HAS FILED EXTENSIVE EXHIBITS AND

AFFIDAVITS IN SUPPORT OF ITS COMPLAINT, ALONG WITH AN OPINION

OF AN EXPERT.  THE DEFENDANTS HAVE NOT PLED TO PUT THOSE ITEMS

AT ISSUE.

SO IN RESPONSE TO YOUR QUESTION, I WOULD -- AT THIS

STAGE, I DON'T BELIEVE THERE'S ANY -- WHILE THERE'S A

1    MEMORANDUM IN OPPOSITION, AND THERE ARE CERTAIN AFFIDAVITS

2    THAT THEY'VE FILED, THE LARGE VOLUME OF OUR PAPERS HAVE NOT

3    BEEN RESPONDED TO YET.

4         AS FAR AS A COUPLE OF ISSUES, THE IMMUNITY ISSUES THAT

5    THEY'VE RAISED, SORT OF THE NATURE OF THE AFFIRMATIVE

6    DEFENSES, BUT BY WAY OF A MOTION TO STRIKE AND A MOTION TO

7    DISMISS, THOSE ARE BEING BRIEFED.  OUR BRIEF IS DUE NEXT

8    MONDAY, AND I BELIEVE IT'S SET FOR A HEARING AT A DATE PERHAPS

9    TWO WEEKS AFTER THAT.  THOSE MOTIONS, I THINK IT WOULD BE SAFE

10   TO SAY, ARE DISPUTED, BUT I HOPE THAT'S RESPONSIVE TO YOUR

11   QUESTION.

12        THE COURT:  WOULD YOU AGREE THAT IF, IN FACT, THE

13   DEFENDANT'S ENTITLED TO IMMUNITY, YOU WOULD NOT HAVE ANY

14   CHANCES OF SUCCESS ON THE MERITS, RIGHT?

15        MR. TETZLAFF:  NO, YOUR HONOR.

16        THE COURT:  YOU DON'T AGREE WITH THAT, OKAY.  WHY IS

17   THAT?

18        MR. TETZLAFF:  IF I MIGHT RESPOND TO THAT BRIEFLY,

19   EVEN THOUGH THEY'RE BEING BRIEFED.  THIS PRESENT MOTION FOR

20   PRELIMINARY INJUNCTION IS BROUGHT UNDER THE FEDERAL ANTI-TRUST

21   ACT, AND UNDER THAT ACT ALONE.

22        THE COURT:  OKAY.

23        MR. TETZLAFF:  THERE ARE TWO FORMS OF POSSIBLE

24   IMMUNITY TO THE PROHIBITIONS OR THE REQUIREMENTS OF THE

25   FEDERAL ANTI-TRUST ACT.  ONE IS IN THE NATURE OF STATE ACTION.

1  THE OTHER WOULD BE UNDER THE SO-CALLED LOCAL GOVERNMENT

2  ANTI-TRUST IMMUNITY ACT.

3      WE'RE BACK TO THE FIRST ONE, THE STATE ACTION

4  REQUIREMENT.  UNDER THE LAW, TO QUALIFY FOR EXEMPTION OF THE

5  STATE ACTION, THERE MUST BE A CLEAR EXPRESSION OF

6  LEGISLATIVE -- STATE LEGISLATIVE INTENT TO EXEMPT CERTAIN

7  CONDUCT FROM COMPETITIVE PRINCIPLES, ON THE ONE HAND, AND

8  SECONDLY, THERE MUST BE A PERVASIVE FORM OF REGULATION OF THE

9  CONDUCT THAT RESULTS, SUCH AS RATE REGULATION.  WHILE THIS

10  MATTER HAS BEEN -- WHILE THE MOTION HAS BEEN MADE BY THE

11  DEFENDANTS IN THIS REGARD, AND IS BEING BRIEFED, THERE'S BEEN

12  NO SUGGESTION IN THE RECORD TO DATE THAT EITHER OF THOSE

13  REQUIREMENTS ARE MADE FOR STATE ACTION.

14      THE RELEVANCE OF THAT IS THAT ONLY THROUGH STATE

15  ACTION IMMUNITY WOULD THE DEFENDANT BE ELIGIBLE TO BE IMMUNE

16  NOT ONLY FROM DAMAGES BUT ALSO FROM AN INJUNCTION.

17      THE OTHER FORM OF IMMUNITY, THE LOCAL GOVERNMENT

18  ANTI-TRUST IMMUNITY ACT, ONLY EXEMPTS THE DEFENDANT, SHOULD

19  THE DEFENDANT QUALIFY, FROM DAMAGES LIABILITY.  IT DOES NOT

20  EXEMPT THEM FROM IMMUNITY LIABILITY.

21      THEY CONTEND --

22      THE COURT:  I'M SORRY, FROM IMMUNITY --

23      MR. TETZLAFF:  PARDON ME, FROM LIABILITY.  I MISSPOKE.

24  IT DOES NOT EXEMPT THEM FROM SUBSTANTIVE LIABILITY FOR

25  VIOLATION OF THE ANTI-TRUST LAWS.  THEY CAN BE SUBJECTED TO

12

1    INJUNCTION.   WHILE, IF THEY QUALIFY, THEY CANNOT BE SUBJECTED

2    TO DAMAGES.   THAT'S THE DIFFERENCE BETWEEN THE TWO FORMS.

3          SO THAT EVEN IF THEY WERE TO QUALIFY, WHICH WE CONTEND

4    THEY CANNOT, BUT AT THIS POINT THAT HAS NOT BEEN DETERMINED,

5    THEY WOULD, AT BEST, BE EXEMPT FROM DAMAGES LIABILITY AND NOT

6    FROM INJUNCTIVE ACTION, NOT BE RESPONSIBLE TO INJUNCTIVE

7    ACTION.   THEY WOULD NOT BE EXEMPT FROM AN INJUNCTION THIS

8    COURT MIGHT ENTER.

9          THE COURT:   OKAY.

10          MR. TETZLAFF:   THAT BECOMES PARTICULARLY RELEVANT,

11    JUDGE, BECAUSE WHILE WE'VE ALLEGED IRREPARABLE HARM TO OUR

12    BUSINESS, AND TO THE COMPETITIVE -- TO THE COMPETITION HERE,

13    THE DEFENDANTS HAVE CONTENDED THAT --

14          THE COURT:   LET ME ASK YOU ABOUT THAT FOR JUST A

15    SECOND.

16          MR. TETZLAFF:   YES.

17          THE COURT:   AS I UNDERSTAND IT, THE DEFENDANT IN THIS

18    CASE HASN'T BARRED YOU -- OR YOUR CLIENT, I SHOULD SAY, FROM

19    SUBMITTING BIDS FOR THESE CONTRACTS, RIGHT?   I MEAN, THEY

20    HAVEN'T BARRED YOU FROM BIDDING ON THE CONTRACTS OR PROVIDING

21    THE SERVICES.   WHAT THEY HAVE FORBIDDEN YOU FROM IS USING

22    EMPLOYEES THAT ARE NOT ALREADY DEFENDANT'S EMPLOYEES.   ISN'T

23    THAT BASICALLY WHAT'S GOING ON?

24          MR. TETZLAFF:   THAT'S THE ESSENCE OF IT, BUT IT GETS

25    TO BE RATHER COMPLICATED.   THEY SIMPLY SAID OUR WORK FORCE

13

8

1    CANNOT ENTER THEIR PREMISES.

2         THE COURT:  AND WHY?

3         MR. TETZLAFF:  THE OSTENSIBLE PURPOSE, THE ONLY ONE

4    WE'VE BEEN TOLD, IS FOR SECURITY PURPOSES, PURSUANT TO A

5    SECURITY POLICY THAT THE CONVENTION CENTER HAS IMPLEMENTED.

6         THE COURT:  AND YOU THINK THAT'S UNREASONABLE?

7         MR. TETZLAFF:  MAKE NO MISTAKE, YOUR HONOR, WE BELIEVE

8    THAT WHEN WE LOOK AT THE ALLEGATIONS OF OUR COMPLAINT, THE

9    EXHIBITS, THE AFFIDAVITS, AND THE FACTS, THAT THAT IS, WITH

10   ALL DUE RESPECT, A SHAM.

11        IF THE OBJECTIVE WAS A SECURITY POLICY HERE, WE WOULD

12   SEE MUCH MORE PUT IN PLACE SIX YEARS AFTER SEPTEMBER '01.

13   WHAT HAPPENED IN JULY, WHEN THIS POLICY THAT WE'RE HERE ABOUT

14   WAS PUT INTO PLACE, WAS --

15        THE COURT:  JULY OF THIS YEAR?

16        MR. TETZLAFF:  JULY OF '07, YES.

17        THE COURT:  '07, I'M SORRY.

18        MR. TETZLAFF:  IT WAS TARGETED AGAINST ONLY THE

19   CLEANING SERVICES, THE 50 PEOPLE THAT WORK FOR US.  THESE ARE

20   FAR FROM THE ONLY PEOPLE WHO WORK IN SIMILAR WAYS IN THAT

21   FACILITY.

22        THE COURT:  LIKE WHAT?

23        MR. TETZLAFF:  CARPENTERS, TEAMSTERS.

24        THE COURT:  CARPENTERS WHO WORK FOR?

25        MR. TETZLAFF:  CONTRACTORS THAT SET UP EXHIBITS AND

14

1    BOOTHS AND TRADE SHOWS. IT DOESN'T EXTEND TO THE RIGGERS, TO

2    THE DECORATORS. IT DOESN'T EXTEND TO THE RESTAURANT PEOPLE.

3    WHEN WE LOOK AT -- THERE ARE -- IF WE HAD 50 PEOPLE IN THAT

4    FACILITY, THERE ARE A THOUSAND OTHER PEOPLE IN THAT FACILITY

5    THAT HAVE SIMILAR ACCESS TO WHAT OUR CLEANING SERVICE

6    EMPLOYEES HAD.

7        AND IT WAS INTERESTING ALSO THAT THAT POLICY WOULD BE

8    PUT IN PLACE ONLY ON JULY 1ST OF LAST YEAR, AFTER THE

9    CONVENTION CENTER EXECUTIVE, WHO IS RESPONSIBLE FOR RUNNING

10   THE CLEANING SERVICES, HAD A CONVERSATION WITH ONE OF OUR --

11   WITH THE CEO OF ONE OF OUR BEST CUSTOMERS, CHAMPION, OFFERED

12   THE CONVENTION CENTER'S CLEANING SERVICES TO THAT INDIVIDUAL.

13   THAT INDIVIDUAL SAID, "NO, WE'RE QUITE SATISFIED WITH UNITED'S

14   SERVICES." AFTER THE CONVERSATION BECAME CONTENTIOUS, THE

15   GENTLEMAN FROM THE CONVENTION BUREAU -- FROM THE CONVENTION

16   CENTER SAID, "WELL YOU'LL HEAR MORE FROM US." THE NEXT THING

17   THEY SAW WAS THIS POLICY.

18       JUDGE, THE BEST SUMMARY OF WHAT HAPPENED, AND OF THE

19   ANTI-TRUST AND ANTI-COMPETITIVE NATURE OF IT, IS IN MR. MARK

20   EPSTEIN'S AFFIDAVIT, WHICH IS IN EXHIBIT 4 TO OUR COMPLAINT,

21   PARAGRAPHS 11 TO 15. THAT'S WHY WE'RE HERE, JUDGE. THESE ARE

22   SERIOUS ALLEGATIONS. THIS IS A SERIOUS MATTER, WITH SERIOUS

23   CONSEQUENCES FOR LOTS OF PEOPLE. FOR OUR COMPANY, IT'S

24   EFFECTIVELY OUT OF BUSINESS IN THIS MARKET. FOR OUR

25   EMPLOYEES, THE 50 PEOPLE WHO --

1       THE COURT:  BY "THIS MARKET" YOU'RE TALKING ABOUT IN
2   SAN DIEGO?
3       MR. TETZLAFF:  YES, YOUR HONOR.
4       THE COURT:  BECAUSE WHAT THIS COMPANY DOES IS CLEANING
5   SERVICES IN OTHER CONVENTION CENTERS?
6       MR. TETZLAFF:  YES, ALL AROUND THE COUNTRY.  THEY
7   PROVIDE CLEANING SERVICES, MAINTENANCE SERVICES, RELATED
8   SERVICES, AND SECURITY SERVICES EVEN.  WE'RE NO STRANGERS TO
9   SECURITY.  WE'RE AS CONCERNED ABOUT SECURITY AS ANYBODY IN SAN
10   DIEGO, AS I CAN ASSURE YOU, AND ANYBODY IN THE CONVENTION
11   CENTER IS.
12       THE SAME PEOPLE WHO HAVE BEEN BARRED FROM GOING INTO
13   THIS CONVENTION CENTER, YOUR HONOR, I WOULD OFFER TO PROVE, IF
14   WE WERE AT A HEARING, THEY GO TO CAMP PENDLETON AND QUANTICO
15   AND CLEAN THE MILITARY'S MOST SECRET TRADE SHOWS, WHERE THE
16   NEWEST WEAPONS ARE INTRODUCED TO THE BRANCHES OF OUR MILITARY
17   AND TO OUR FOREIGN ALLIES WHO ARE PERMITTED TO SEE THESE.
18       THIS IS NOT ABOUT SECURITY, YOUR HONOR.  WE WELCOME --
19       THE COURT:  LET ME ASK YOU A QUESTION.
20       MR. TETZLAFF:  YES, YOUR HONOR.
21       THE COURT:  IF, YOU KNOW, GOD FORBID, THERE SHOULD BE
22   SOMETHING THAT HAPPENS, THERE'S A BOMB OR SOMETHING THAT GOES
23   OFF IN THE CONVENTION CENTER, AND EITHER THE PREMISES ARE
24   DESTROYED OR PEOPLE ARE INJURED, WHO WILL BEAR THE ULTIMATE
25   RESPONSIBILITY, I GUESS MORALLY AND LEGALLY, BUT WHO WILL BEAR

16

1    THAT ULTIMATE RESPONSIBILITY, UNITED?

2        MR. TETZLAFF: WELL, YOUR HONOR, QUITE FRANKLY, IF OUR

3    EMPLOYEES CAUSE SOMETHING LIKE THAT TO HAPPEN, OF COURSE, WE

4    WOULD BE RESPONSIBLE FOR IT, IF WE WERE RESPONSIBLE FOR IT.

5        THE COURT: WHO DO YOU THINK THAT THE RESIDENTS OF THE

6    CITY OF SAN DIEGO, THAT HAVE CHARTERED THIS INSTITUTION, WHO

7    DO YOU THINK THEY WOULD TURN THEIR ANGER AGAINST OR HOLD

8    RESPONSIBLE FOR WHAT HAPPENED? DO YOU THINK IT WOULD BE

9    UNITED?

10       MR. TETZLAFF: IT'S A VERY SERIOUS AND VERY FAIR

11   QUESTION, YOUR HONOR. I THINK THEY WOULD LOOK AT ALL THE

12   FACTS AND CIRCUMSTANCES AND DECIDE WHAT HAPPENED.

13       I SUBMIT TO YOU, YOUR HONOR, THAT IF SECURITY REALLY

14   IS THE CONCERN, AND WE BELIEVE IT SHOULD BE, LET'S HAVE --

15   LET'S SEE THE SECURITY PROTOCOL AND THE POLICY. WE WANT TO

16   FOLLOW IT. SO FAR, ALL WE'VE SEEN -- THE ONLY PROTOCOL WE'VE

17   SEEN, THE ONLY RULE WE'VE SEEN, IS THAT OUR EMPLOYEES CAN'T GO

18   IN THERE TO WORK FOR THE CONVENTION CENTER. BUT GUESS WHAT,

19   THERE'S NOTHING IN THAT POLICY THAT SAYS THAT THOSE EMPLOYEES

20   CAN'T WALK THROUGH THE FRONT DOOR AND WALK ALL OVER THAT

21   CONVENTION CENTER. THIS ISN'T ABOUT SECURITY.

22       BUT LET ME SUGGEST, YOUR HONOR --

23       THE COURT: BUT WAIT A MINUTE, THE CLEANING OF THE

24   CONVENTION CENTER, I'M ASSUMING THAT THAT GOES ON AFTER HOURS.

25   I MEAN, SECURITY PROBLEMS ARE SECURITY PROBLEMS, BUT UNLESS

1    THEY HAVE A METAL DETECTOR AT THE FRONT GATE, WHICH WOULD BE

2    REALLY KIND OF SAD IF THEY HAD TO DO THAT, BUT IF THEY HAD A

3    METAL DETECTOR AT THE FRONT GATE, THEN PERHAPS THAT WOULD

4    SOLVE SOME OF THE PROBLEM, BUT WHAT THEY'RE REALLY CONCERNED

5    ABOUT IS AFTER HOURS, AREN'T THEY?

6         MR. TETZLAFF:  PERHAPS THEY ARE, YOUR HONOR, BUT

7    CLEANING GOES ON ALL THE TIME, YOU'RE RIGHT, AFTER HOURS, BUT

8    SO DOES THE SETUP WORK FOR THE CONVENTION BUSINESS, THE

9    TAKEDOWN WORK FOR THE CONVENTION BUSINESS.  NONE OF THOSE

10   PEOPLE ARE SUBJECT TO THE RESTRICTION THAT'S BEEN POSED ON

11   THESE.

12         YOUR HONOR, WE HAVEN'T SEEN THAT EX PARTE DECLARATION

13   OR THE AFFIDAVIT THAT I BELIEVE IT'S MR. GUTENSOHN FILED, BUT

14   I SUBMIT TO YOU, I EXPECT SOMEWHERE IN THERE, IF HE'S AS

15   SENSITIVE ABOUT THESE CONCERNS, SIX YEARS AFTER SEPTEMBER OF

16   '01, AS I BELIEVE HE IS, THERE'S DISCUSSION OF HOW YOU ACHIEVE

17   SECURITY IN A FACILITY LIKE THIS.  I SUGGEST I FULLY EXPECT

18   THAT THE ONLY MECHANISM FOR ACHIEVING IT IS NOT THROUGH SIMPLY

19   PUTTING EMPLOYEES ON THE CONVENTION CENTER PAYROLL.  I SUGGEST

20   THAT OTHER OPPORTUNITIES, OTHER VEHICLES ARE SERIOUSLY

21   SUGGESTED, SUCH AS PRIVATE CONTRACTORS, SUCH AS USED BY TSA,

22   PERHAPS EVEN IN THIS BUILDING.

23         I SUGGEST THAT WHAT WE PROBABLY DO HAVE IN PLACE WITH

24   THE CONVENTION CENTER CLEANING EMPLOYEES NOW IS A TRAINING

25   PROCESS THAT THE CONVENTION CENTER'S PUT IN PLACE, THAT WE

13

1    HAVE A SCREENING AND A CREDENTIALING THING, THAT'S BEING

2    APPLIED TO THOSE EMPLOYEES.  MAKE OUR PEOPLE -- PUT OUR PEOPLE

3    THROUGH THE SAME PROCESS.  WE WOULD WELCOME IT.  WE'LL EVEN

4    PAY FOR IT, BUT DON'T --

5        THE COURT:  I GUESS I WOULD BE CONCERNED BY THE FACT

6    THAT PEOPLE THAT YOU MIGHT SCREEN MIGHT GET THROUGH THE

7    CRACKS, IF YOU WILL, AND YOU MIGHT WIND UP WITH PEOPLE WHO ARE

8    NOT REALLY SECURE OR TRUSTWORTHY OR RELIABLE.  WHEREAS, THE

9    CITY -- IF THE CITY DOES IT, AND THEN THEY ARE, IN FACT, YOU

10   KNOW -- AND A PROBLEM DEVELOPS, IT'S THEIR PROBLEM.  THEY

11   STAND TO -- THEN THEY'LL HAVE TO TAKE THE HEAT FROM THE

12   CITIZENS.  BUT AS FOR YOU, IF SOMETHING HAPPENS AND SOMEBODY

13   GOES THROUGH THE CRACKS, YOU KNOW, YOU WALK AWAY FROM THIS AND

14   THERE'S NO, YOU KNOW, THERE'S NO REAL HARM TO YOU, RIGHT?

15       MR. TETZLAFF:  WELL, WITH ALL FAIRNESS, IF WE'RE

16   RESPONSIBLE FOR IT, I DON'T SEE ANYBODY WALKING AWAY FROM IT.

17   I CAN ASSURE -- I WOULD BE CONFIDENT THAT SOMEBODY WOULD COME

18   AFTER US.

19       YOU'RE QUITE RIGHT, IF IT'S A QUESTION OF WHO -- LOOK,

20   IF SOMETHING HAPPENS, WE ALL SUFFER.

21       THE COURT:  WELL, THAT'S TRUE, BUT -- THAT MAY BE

22   TRUE, BUT IF SOMETHING GOES WRONG AT AN AIRPORT, YOU KNOW, A

23   TSA CONTRACTOR MAY GET BLAMED, BUT IN THE END THE ULTIMATE

24   BLAME GOES TO THE DEPARTMENT OF TRANSPORTATION, AND THEN IT

25   KEEPS GOING UP THE CHAIN UNTIL IT GETS, TO, I GUESS, WHERE THE

1    BUCK STOPS.  BUT WITH YOU, YOU KNOW, IF YOU LET SOMEBODY FALL

2    THROUGH THE CRACKS, AND YOU LET SOMEBODY IN THERE WHO IS, YOU

3    KNOW, WHO REALLY IS NOT A GOOD SECURITY RISK, YOU KNOW, WHEN

4    IT'S ALL SAID AND DONE, YOUR COMPANY JUST SIMPLY FOLDS UP ITS

5    TENTS AND GOES SOMEWHERE ELSE.  WHEREAS, THE CITY -- THE

6    PEOPLE THAT ARE IN CHARGE OF PROTECTING THE CITY AND CITY

7    RESIDENTS, ETC., THEY CAN'T GO ANYWHERE.

8         MR. TETZLAFF:  ISN'T THIS THE DILEMMA THAT WE FACE ALL

9    THE TIME, YOUR HONOR, WHEN A PUBLIC AGENCY HAS TO DECIDE HOW

10   IT BEST PERFORMS ITS FUNCTION?

11        THE COURT:  THAT'S RIGHT.

12        MR. TETZLAFF:  WHETHER IT'S BEST DONE BY ITS OWN

13   EMPLOYEES OR CONTRACTING OUT.  WHAT I SUBMIT, YOUR HONOR --

14        THE COURT:  IT'S A DISCRETIONARY FUNCTION THAT THE

15   CITY HAS TO ABIDE BY, AND THEY HAVE TO MAKE A DECISION; IS

16   THIS SOMETHING THAT WE'RE WILLING TO CONTRACT OUT OR IS IT

17   SOMETHING THAT WE WANT TO RETAIN FOR OURSELVES?  AND IF WE

18   WANT TO CONTRACT IT OUT, UNDER WHAT TERMS DO WE FEEL

19   SUFFICIENTLY SECURE IN CONTRACTING IT OUT; ISN'T THAT RIGHT?

20        MR. TETZLAFF:  CERTAINLY, THERE'S DISCRETION INVOLVED,

21   BUT THE EXERCISE OF THAT DISCRETION ITSELF IS SUBJECT TO THE

22   LAW, AND, ON THE ONE HAND, THE CONVENTION CENTER CANNOT

23   PERMISSIBLY ENGAGE IN ANTI-COMPETITIVE CONDUCT IN MAKING THAT

24   DECISION, AS WE'VE SUGGESTED THEY HAVE, UNLESS THEY HAVE AN

25   IMMUNITY THAT APPLIES, AND WE SUGGEST THEY DON'T.

1    SECONDLY, EVEN AS -- THIS DECISION -- EVEN IF THIS

2    DECISION WERE TO BE MADE -- WELL, I'M SAYING THE COMPETITIVE

3    LAWS APPLY.  THERE'S NO EXEMPTION IN MAKING THESE DECISIONS

4    FROM THE ANTI-TRUST LAW.  THERE MAY BE OTHER LAWS THAT APPLY,

5    SUCH AS COMPETITIVE BIDDING PROCESSES.  I'M CONFIDENT THAT

6    THAT'S HOW WE'VE WOUND UP WITH SOME OF THE PRIVATE CONTRACTORS

7    THAT HAVE MADE THESE DECISIONS.  THERE'S NO EVIDENCE OF ANY OF

8    THAT HERE, YOUR HONOR.

9    THE COURT:  WHY CAN'T UNITED DO WHAT THE CITY IS, IN

10   ESSENCE, ASKING THEM TO DO, WHICH IS TO SAY, "HEY, BID ON THE

11   CONTRACT, BUT USE EMPLOYEES THAT WORK FOR US, THAT WE HAVE

12   ALREADY CHECKED OUT."

13   MR. TETZLAFF:  HERE'S THE PROBLEM WITH THAT; THEY

14   SAID, "USE OUR EMPLOYEES, AND THIS IS WHAT YOU'LL PAY US FOR

15   THOSE EMPLOYEES."  THEY'VE SAID IT'S A RATE -- LET ME JUST

16   FOCUS ON THE FACILITY CLEANING FOR A SECOND.  THEY'RE SETTING

17   THE PRICE AT 17 BUCKS AN HOUR THAT WE NEED TO PAY THEM.  NOW,

18   WE'VE ALREADY GOT CONTRACTS WHERE WE HAVE TO PAY 16.30, BUT

19   LET ME ELABORATE A LITTLE BIT ON WHAT'S IN THAT 16.30.  THAT

20   16.30 IS WHAT WE CALL A FULLY-LOADED COST.

21   TO BREAK IT DOWN IN ROUGH TERMS, ABOUT $10 GOES TO THE

22   LABOR, AND ANOTHER TWO BUCKS GOES TO THE LABOR, SO ABOUT 12

23   BUCKS TO THE LABOR.  4.30 OF OUR 16.30 GOES FOR DEPRECIATION

24   ON OUR EQUIPMENT, OUR MANAGEMENT, OUR INSURANCE, AND OUR

25   OVERHEAD, SO OUR FULL-IN COST IS 16.30.  NOW, IF WE -- BUT THE

21

1    CONVENTION CENTER SAYS, "NO, USE OUR LABOR.  WE'LL GIVE IT TO

2    YOU FOR 17 BUCKS AN HOUR.  WE DIRECT IT.  IF YOU WANT TO

3    MANAGE IT, YOU'VE GOT TO ADD ANOTHER LAYER ON THAT."

4         REMEMBER, OUR COST, OUR MANAGEMENT INSURANCE COMPONENT

5    OF OUR 16.30 IS ABOUT 4.30, SO WE GOT TO PAY 17 BUCKS FOR

6    THEIR LABOR, AND 4.30 BUCKS MORE FOR OUR OTHER COSTS, THAT'S

7    21.30 NOW AGAINST 16.30.  BUT SIGNIFICANTLY, JUDGE, WHEN WE

8    ASKED THEM --

9         THE COURT:  BUT WOULDN'T ANY OTHER BIDDER HAVE THE

10    SAME PROBLEM, RIGHT?

11         MR. TETZLAFF:  THAT'S THE PROBLEM, JUDGE, THEY'VE

12    ELIMINATED THE ONE KEY PART HERE, RATE COMPETITION.  THEY'RE

13    SETTING THE PRICE BY SAYING WE HAVE TO USE THEIR WORK FORCE,

14    AND THIS IS THE PRICE THEY'RE AVAILABLE AT.  THEY'VE ENDED

15    COMPETITION.  IT'S NOT JUST ABOUT US THAT WE'RE TALKING ABOUT,

16    UNITED.  WE TOOK A COMPETITOR OUT OF THE PROCESS.  WE HAVE

17    CUSTOMERS HERE.  THAT IS A PART OF THE IRREPARABLE INJURY, THE

18    DAMAGE TO COMPETITION, THE DAMAGE TO THE COMPETITIVE PROCESS.

19    IT'S OVER.

20         THE COURT:  BUT LET ME STOP YOU BECAUSE I'M TRYING TO

21    FIGURE OUT SOME THINGS HERE.

22         THERE'S SOMETHING CALLED THE MILLER ACT, RIGHT?  ARE

23    YOU FAMILIAR WITH THE MILLER ACT?  THE MILLER ACT PROVIDES --

24         MR. TETZLAFF:  I'LL GET SMARTER ON IT.

25         THE COURT:  WELL, I JUST REMEMBER SOME VAGUE NOTIONS

1    OF IT, BUT IT SEEMS TO ME THAT THE MILLER ACT PROVIDES THAT

2    UNDER CERTAIN CONTRACTS, GOVERNMENT CONTRACTS, YOU HAVE TO PAY

3    A CERTAIN WAGE, AND THAT WAGE HAS BEEN SET BY I BELIEVE IT'S

4    THE FEDERAL GOVERNMENT, IF I'M NOT MISTAKEN, RIGHT?

5         MR. TETZLAFF:  YES.

6         THE COURT:  SO ANY TIME YOU'RE GOING TO BID ON A

7    CONTRACT TO WHICH THE MILLER ACT APPLIES, YOU HAVE THAT SAME

8    PROBLEM, DON'T YOU, BECAUSE YOU HAVE TO PAY YOUR EMPLOYEES

9    THAT MINIMUM WAGE THAT THEY'VE SET, RIGHT?  IS THAT RIGHT OR

10   WRONG?

11        MR. TETZLAFF:  WELL, I THINK I'M PRETTY CLOSE WITH

12   YOU.

13        THE COURT:  OKAY.

14        MR. TETZLAFF:  BUT WE'RE NOT TALKING ABOUT PAYING THAT

15   WAGE RATE TO THE EMPLOYEES HERE.  THEY BROKE DOWN WHERE THAT

16   17 BUCKS GOES.  THEY SAID $12 GO TO THE EMPLOYEES FOR HOURLY

17   RATE PLUS BENEFITS, AND THE OTHER 5 BUCKS GOES TO THEM FOR

18   THEIR MANAGEMENT, AND WHATEVER, AND A SMALL MARGIN OF PROFIT.

19   WE WOULD BE HAPPY TO PAY THAT SET RATE, 12 BUCKS, WHATEVER IT

20   IS THEY'RE PAYING TO LABOR, TO THE SAME LABOR.  WE WOULD BE

21   HAPPY TO DO THAT.  WE WOULD LIKE TO HAVE OUR WORK FORCE NOT,

22   WHAT WE THINK, UNFAIRLY SHUT OUT OF BUSINESS AFTER THESE YEARS

23   OF SERVICE, WITH NO COMPLAINTS ABOUT SECURITY.

24        BUT I DON'T THINK IT BOILS DOWN TO BEING THE RATE,

25   JUDGE, I THINK IT'S THE FACT THAT THEY'RE SETTING THE TOTAL

23

1    PRICE THAT WE HAVE TO PAY AND CHARGE OUR CUSTOMERS. AND IF

2    YOU ADD IN OUR OTHER COSTS --

3        THE COURT: WHO'S YOUR CUSTOMERS?

4        MR. TETZLAFF: THE CHAMPIONS, THE EXHIBITORS WHO WE'VE

5    SERVED OVER THE PAST 19 YEARS. ABOUT 40 PERCENT OF THE

6    CUSTOMERS THAT USE THIS FACILITY HAVE BEEN OURS, ABOUT 60

7    PERCENT THEIRS.

8        THE COURT: WAIT A MINUTE, BECAUSE I'M CONFUSED, AND I

9    APOLOGIZE. I'VE HAD A LONG DAY TODAY. BUT I THOUGHT YOUR

10   CUSTOMER WOULD BE, IN FACT, THE CITY BECAUSE YOU'RE PROVIDING

11   CLEANING SERVICES FOR THE CONVENTION CENTER, WHICH IS OWNED BY

12   THE CITY -- OR BY A CITY COMPANY, RIGHT? ISN'T THAT REALLY

13   YOUR CLIENT?

14       MR. TETZLAFF: NOT EXACTLY. BECAUSE WHAT HAPPENS IS

15   THE CITY, THE CONVENTION CENTER, LEASES OUT THAT BEAUTIFUL

16   FIRST-CLASS BUILDING TO A TRADE SHOW.

17       THE COURT: RIGHT, OKAY.

18       MR. TETZLAFF: THE TRADE SHOW THEN COMES AND THEY

19   DECIDE WHO THEY'RE GOING TO HIRE TO DO THE CLEANING, THE

20   CARPENTRY, THE RIGGING, ALL THOSE THINGS. ON CLEANING, 40

21   PERCENT OF THE TIME THEY'VE HIRED US, AND 60 PERCENT OF THE

22   TIME THEY'VE HIRED THEM. SO IT'S THAT TRADE SHOW THAT IS THE

23   CUSTOMER.

24       BASICALLY, WHAT THE CONVENTION CENTER DOES IS THEY

25   GIVE THE TRADE SHOW THE KEYS TO THE BUILDING FOR A PERIOD OF

24

1    TIME -- THERE ARE CONDITIONS, OF COURSE -- AND THEN IT'S THE

2    TRADE SHOW'S RESPONSIBILITY TO ORGANIZE AND SHOW WITHIN THAT

3    BUILDING.

4         BUT, JUDGE, WE'RE TRYING TO NARROW THIS TO THE MOST

5    MINIMAL KIND OF RELIEF POSSIBLE, BEING TOTALLY MINDFUL OF

6    SECURITY, AND YET AT THE SAME TIME --

7         THE COURT:  REMIND ME AGAIN WHAT IT IS YOU -- WHEN YOU

8    SAY "MINIMAL" RELIEF.

9         MR. TETZLAFF:  THAT'S TWO THINGS; LET OUR WORK FORCE

10   GO BACK TO WORK FOR US, FOR OUR BUSINESS, IN THAT BUILDING.

11   AND TWO, REQUIRE THE CONVENTION CENTER TO EXTEND TO OUR WORK

12   FORCE THE SAME KIND OF SCREENING THEY DO TO THEIR OWN, NOTHING

13   LESS.  IF THEY DON'T LIKE SOMEBODY, TOSS THEM.  WE'RE WILLING

14   TO SUBJECT TO THAT, TO PAY FOR THAT KIND OF SCREENING.  THEY

15   PUT THEIR OWN PEOPLE THROUGH IT.  WHATEVER THEY DO, IN TERMS

16   OF TRAINING, SCREENING, CREDENTIALING, WE'RE HAPPY TO SUBMIT

17   OUR PEOPLE TO THAT SAME THING.

18        THE COURT:  CAN I ASK YOU A QUESTION?

19        MR. TETZLAFF:  YES, YOUR HONOR.

20        THE COURT:  HOW'S THE TURNOVER IN YOUR COMPANY?

21        MR. TETZLAFF:  IT'S GOOD.  IT'S VERY MODEST.  I WOULD

22   SAY OF THE 50 PEOPLE THAT -- QUITE FRANKLY, THEY HAVEN'T BEEN

23   PAID SINCE -- THEY'VE BEEN ON THE SIDELINES FOR MONTHS NOW.

24   THEY'RE ONLY AVAILABLE BECAUSE OUR MANAGEMENT KEEPS IN CONTACT

25   WITH THEM.  THEY GOT TO GO PAY THEIR BILLS, SO THEY'RE GETTING

OTHER JOBS, BUT THEY LOVED WHAT THEY DID WITH US, AND THEY

WOULD LOVE COMING BACK. THEY LOVED WORKING IN THAT CENTER.

TURNOVER, OF -- ABOUT 30 OF THOSE EMPLOYEES ARE TRULY

FULL-TIME EMPLOYEES, MEANING IT'S THE ONLY THING THEY DO

FULL-TIME. THE OTHER 20 I CALL THIS A FULL-TIME/PART-TIME JOB

FOR THEM, MEANING THEY'VE GOT ANOTHER JOB, BUT ON A FULL-TIME

BASIS THEY'RE AVAILABLE IN THE EVENINGS, ON THE WEEKENDS.

THEY'RE AVAILABLE TO US FULL-TIME FOR PART OF THEIR TIME.

THAT'S THE 50 PEOPLE.

THE AVERAGE TENURE OF OUR PEOPLE RANGES BETWEEN TWO

AND FOUR-PLUS YEARS. WE HAVE PEOPLE THAT HAVE BEEN WITH US

FOR AS LONG AS 18 YEARS. THESE ARE GOOD PEOPLE. THEY'RE THE

ONES, AS WELL AS THE CUSTOMERS IN THE COMPETITION, THAT ARE

BEING HURT BY THIS BECAUSE THEY'VE BEEN SENT HOME FOR NO GOOD

REASON.

THE COURT: LET ME INTERRUPT YOU FOR JUST A SECOND.

MR. TETZLAFF: SURE.

THE COURT: COUNSEL, YOU KNOW, I HAVE A FEELING THAT

THIS GENTLEMAN IS REALLY, REALLY COMPETENT AND ABLE TO

REPRESENT HIS CLIENT, AND TO ME IT'S ALWAYS DISTRACTING WHEN

PEOPLE ARE HANDING EACH OTHER NOTES, AND STANDING UP AND

WHISPERING IN PEOPLE'S EARS, SO LET ME SUGGEST TO YOU THAT

PERHAPS -- I SAW YOU TRYING TO HAND HIM A NOTE. MAYBE YOU CAN

TALK ABOUT IT DURING A BREAK OR AT SOME OTHER TIME. I WOULD

APPRECIATE THAT, OKAY.

26

1       MR. TETZLAFF:  I APOLOGIZE, YOUR HONOR.

2       THE COURT:  NO, IT'S ALL RIGHT.  IT HAPPENS ALL THE

3    TIME.  IT'S JUST KIND OF DISRUPTIVE SOMETIMES.  I'M TRYING TO

4    LISTEN TO YOU, AND HE'S HANDING YOU SOMETHING, SO GO AHEAD.

5       MR. TETZLAFF:  IT'S SORT OF DISRUPTIVE TO ME, TOO.

6       THE COURT:  THAT'S WHAT I THOUGHT.

7       MR. TETZLAFF:  I WOULD SAY THAT THIS IS NOT -- THIS

8    CASE IS NOT ABOUT A WHOLE LOT OF MONEY, BUT IT'S ABOUT A WHOLE

9    LOT OF WRONG ON SOME SIMPLE POINTS.

10      THE COURT:  OKAY.

11      MR. TETZLAFF:  AND THAT'S WHY WE'RE HERE.  THAT'S WHY

12   WE'RE ASKING YOU TO INTERVENE, YOUR HONOR.

13      THE COURT:  OKAY, THEN LET ME HEAR FROM THE DEFENDANT

14   IN THE CASE.

15      MS. PETTY:  I THINK IT'S MOST IMPORTANT AT THIS POINT

16   TO REMIND THE COURT OF WHAT WE'RE HERE ON TODAY, AND THAT IS A

17   MOTION FOR PRELIMINARY INJUNCTION.  FROM THE PAPERS THAT HAVE

18   BEEN PRESENTED, AND FROM THE STATEMENTS MADE BY COUNSEL FOR

19   THE PLAINTIFF TODAY, IT'S BECOME EVEN CLEARER THAT THERE IS NO

20   VALID ANTI-TRUST CLAIM BEING ASSERTED HERE.  OPPOSING COUNSEL

21   HAS CONCEDED THAT THE RELEVANT MARKET IS SAN DIEGO; THEREFORE,

22   THERE'S NOTHING THAT IMPACTS INTERSTATE COMMERCE, THEREBY

23   TRIGGERING THE APPLICABILITY OF THE FEDERAL ANTI-TRUST LAWS.

24      SECONDLY, OPPOSING COUNSEL HAS CONCEDED THE ULTIMATE

25   DISCRETIONARY --

27

1          THE COURT:  LET ME INTERRUPT YOU FOR JUST A SECOND.  I

2    DON'T KNOW THAT I BUY WHAT YOU JUST SAID BECAUSE I THINK I

3    HEARD COUNSEL SAY THAT THE CLIENTS ARE PEOPLE LIKE CHAMPION,

4    AND OTHER COMPANIES THAT ARE IN COMMERCE, NOT JUST IN SAN

5    DIEGO, RIGHT?

6          MS. PETTY:  THEY MAY BE BOOKING SHOWS IN OTHER PLACES

7    THAT HAVE THE SAME OR DIFFERENT POLICIES FROM US, BUT FOR

8    PURPOSES OF WHAT WE ARE TALKING ABOUT HERE, CLEANING SERVICES,

9    THAT IS A COMPLETELY LOCAL ACTIVITY.  THAT'S NOT TAKING PLACE

10   ACROSS INTERSTATE LINES OR HAVING AN IMPACT ITSELF ON

11   INTERSTATE COMMERCE.  THE CONVENTION CENTER ONLY OPERATES

12   WITHIN THE COUNTY AND CITY OF SAN DIEGO.  IT IS NOT OPERATING

13   ACROSS INTERSTATE LINES AND IMPACTING, AS A PUBLIC MEETING

14   FACILITY LOCATED HERE, INTERSTATE COMMERCE.

15         THE COURT:  MAYBE I'M TAKING TOO BROAD A VIEW OF THIS,

16   BUT, FOR EXAMPLE, YOU JUST HELD THE AUTO SHOW, RIGHT?

17         MS. PETTY:  YES, WE DID.

18         THE COURT:  NOW, YOU ASKED -- OR I ASSUME YOU

19   SOLICITED OR YOU WANTED THOSE CAR COMPANIES TO COME INTO

20   CALIFORNIA, TO COME INTO -- SPECIFICALLY, INTO SAN DIEGO,

21   RIGHT?

22         MS. PETTY:  YES.

23         THE COURT:  OKAY.  AND THOSE ARE -- MANY OF THOSE ARE

24   COMPANIES THAT ARE NOT LOCATED IN SAN DIEGO, RIGHT?

25         MS. PETTY:  CORRECT.  BUT THE SHOW ITSELF, WHAT IT

28

1    DELIVERS, HOW IT OPERATES, DOES NOT IMPACT INTERSTATE

2    COMMERCE.  WHEN A SHOW COMES HERE TO SAN DIEGO, IT IS BEING

3    OFFERED TO PERSONS WHO ARE HERE --

4         THE COURT:  RIGHT, AND WHO ARE --

5         MS. PETTY:  IN SAN DIEGO.

6         THE COURT:  -- MAYBE GOING TO BUY WHAT?  SAY, IN THE

7    AUTO SHOW CONTEXT, WHEN THEY GO TO THE CAR SHOW AND THEY SEE A

8    CAR, AND THEY GO, "OOH, I'VE GOT TO HAVE THAT," AND THEN THEY

9    GO AND THEY BUY IT.

10        MS. PETTY:  NOT AT THE AUTO SHOW, YOUR HONOR.

11        THE COURT:  NOT AT THE AUTO SHOW, THAT'S RIGHT, NOT

12   IMMEDIATELY AT THE AUTO SHOW.  SO THEY SAY, "I WANT TO BUY

13   THIS GM PRODUCT OR FORD PRODUCT OR TOYOTA PRODUCT," WHICH IS

14   MANUFACTURED, NOWADAYS, WHO KNOWS, BUT NOT IN SAN DIEGO

15   COUNTY, I BET, RIGHT?

16        MS. PETTY:  CORRECT.  AND IF THERE IS A SUBSEQUENT

17   BUSINESS TRANSACTION, AS, OF COURSE, THE COURT IS AWARE FROM

18   ITSELF HAVING BOUGHT VEHICLES OVER THE YEARS, THAT TRANSACTION

19   TAKES PLACE WITH A DEALER IN AUTOMOBILES, AND IF THERE IS AN

20   INTERSTATE IMPACT, THAT'S FROM A TRANSACTION OVER WHICH THE

21   CONVENTION CENTER IS NOT INVOLVED, GAINS NO BENEFIT FROM,

22   PLAYS NO ROLE IN, AND THE FACT THAT THIS MARKETING VEHICLE

23   THAT THE AUTOMOTIVE INDUSTRY USES TOOK PLACE AT OUR FACILITY

24   DOES NOT SUDDENLY PROPEL US INTO INTERSTATE COMMERCE.

25        WE ARE A LOCAL BUSINESS.  WHAT WE PROVIDE AS A

29

1    SERVICE, BY PROVIDING THIS PUBLIC FACILITY, WE ONLY PROVIDE

2    HERE.  IF YOU DON'T COME TO US TO DO IT, YOU DON'T GET TO DO

3    IT.  THAT'S WHY THERE IS NO INTERSTATE COMMERCE ELEMENT TO

4    THIS.

5        THE COURT:  SO YOU DON'T CONTEMPLATE THAT AS PART OF

6    RUNNING THE CONVENTION CENTER, EXHIBITORS AND OTHER PEOPLE

7    WILL TRAVEL TO SAN DIEGO AND BOOK HOTEL ROOMS, AND BUY FOOD IN

8    RESTAURANTS, AND MAYBE GO TO SEAWORLD, GO TO THE ZOO WHILE

9    THEY'RE HERE, THAT SORT OF THING?

10       MS. PETTY:  EXACTLY.  ALL OF THOSE SECONDARY THINGS

11   MAY HAPPEN BECAUSE OF ANY OF THE ACTIVITIES OF THOSE IN THE

12   HOSPITALITY INDUSTRY IN SAN DIEGO, INCLUDING THE CONVENTION

13   CENTER, BUT IS THE CONVENTION CENTER A PART OF THOSE

14   TRANSACTIONS?  IT IS NOT.

15       THE COURT:  OKAY.  ALL RIGHT.

16       MS. PETTY:  SO AS AN INDUSTRY, WE ARE, BY NATURE, ONLY

17   A LOCAL INDUSTRY.  WE'RE NOT -- TO COMPARE US TO SOMETHING

18   ELSE IN THE HOSPITALITY INDUSTRY THAT MIGHT MORE CLEARLY

19   DELINEATE THE DISTINCTION, HILTON HOTELS IS A NATIONAL CHAIN

20   OF HOTELS.  IT HAS PROPERTIES IN VARIOUS STATES ACROSS THE

21   COUNTRY, AND, INDEED, IT'S INTERNATIONAL.  WE DON'T.  WE HAVE

22   ONE FACILITY RIGHT HERE IN SAN DIEGO.  WE DON'T HAVE A NEW

23   YORK FACILITY.  WE DON'T HAVE A HOUSTON FACILITY.  WE DON'T

24   HAVE A BOSTON FACILITY.  WE ARE A LOCAL, PUBLIC ENTITY AND

25   NOTHING MORE.

1      THE COURT:  OKAY.  GO AHEAD, I'M SORRY TO INTERRUPT

2   YOU.

3      MS. PETTY:  NO, I APPRECIATE YOUR ASKING FOR

4   CLARIFICATION.

5      SECONDLY, THIS IS A DISCRETIONARY FUNCTION.  OPPOSING

6   COUNSEL HAS CONCEDED THAT CONVENTION CENTERS LIKE OURS CAN

7   CHOOSE TO DO ALL OF THESE KINDS OF CLEANING SERVICES IN-HOUSE

8   OR THEY CAN CHOOSE TO OUTSOURCE THEM, AND THE COURT HAS

9   INDICATED THAT IF THEY CHOOSE TO OUTSOURCE THEM IT CAN BE ON

10  THE TERMS THAT THEY THINK IS APPROPRIATE.

11      THIS IS THE -- THE EFFECT THAT UNITED IS NOW

12  COMPLAINING ABOUT ON ITS BUSINESS OPERATIONS IS NO DIFFERENT

13  THAN WHAT HAPPENED AFTER 9/11 TO VENDORS AT AIRPORTS.  AS THE

14  COURT HAS OBSERVED FROM ITS OWN EXPERIENCE, A MAJORITY OF

15  THOSE VENDORS --

16      THE COURT:  I CAN'T RELY ON MY OWN EXPERIENCE TO MAKE

17  A JUDGMENT IN THIS CASE.

18      MS. PETTY:  I APPRECIATE THAT, YOUR HONOR, I'M JUST

19  BEING PRACTICAL.

20      THE COURT:  AT LEAST THAT'S WHAT I'VE HEARD.  GO

21  AHEAD.

22      MS. PETTY:  BUT AS WE TELL JURIES, DON'T DIVORCE

23  YOURSELF FROM YOUR OWN COMMON SENSE WHEN DETERMINING A CASE.

24      THE COURT:  THAT ASSUMES FACTS NOT IN EVIDENCE THAT I

25  HAVE COMMON SENSE, BUT GO AHEAD.

26

1          MS. PETTY:  VENDORS SUDDENLY FOUND THEMSELVES, AFTER

2     9/11, LOCATED ON THE OTHER SIDE OF SCREENING DEVICES THAT

3     COULD ONLY BE PASSED DOWN BY PERSONS ACTUALLY CARRYING

4     BOARDING PASSES.  THOSE AIRPORT VENDORS' BUSINESSES WERE

5     SUBSTANTIALLY AFFECTED.  WOULD THEY HAVE PREFERRED NOT TO HAVE

6     THE BOARDING PASS ELEMENT HAPPEN, IF THEY COULD HAVE

7     CONTROLLED THAT DECISION, FROM PURELY A BUSINESS STANDPOINT?

8     THEY WOULD HAVE SAID, AS LONG AS YOU'RE SCREENING THEM THROUGH

9     METAL DETECTORS, THAT'S GOOD ENOUGH FOR US.  LET EVERYBODY ON

10    THROUGH, WHETHER THEY HAVE A BOARDING PASS OR NOT.  THAT WAS

11    NOT THE SECURITY JUDGMENT, HOWEVER.  THAT WAS MADE BY THE

12    FEDERAL GOVERNMENT WHICH IS RESPONSIBLE FOR RUNNING THAT

13    FACILITY.

14          WE HAVE AN ANALOGOUS RESPONSIBILITY WHEN IT COMES TO

15    RUNNING THE CONVENTION CENTER.

16          THE COURT:  WHAT DO YOU SAY TO COUNSEL'S COMMENTS,

17    HOWEVER, THAT THERE'S A WHOLE LOT OF OTHER PEOPLE -- I'M NOT

18    TALKING ABOUT THE PATRONS, BECAUSE THE PATRONS IS LIKE, YOU

19    KNOW, UNLESS YOU PUT METAL DETECTORS AT THE DOORS, ETC., YOU

20    KNOW, BUT WHAT DO YOU DO ABOUT THE OTHER PEOPLE THAT HE WAS

21    TALKING ABOUT, FOR EXAMPLE, THE CARPENTERS, THE ELECTRICIANS,

22    ALL OF THOSE OTHER FOLKS, DO YOU HAVE SIMILAR REQUIREMENTS FOR

23    THOSE FOLKS?

24          MS. PETTY:  ACTUALLY, THE COURT'S QUESTION ALREADY

25    ASTUTELY HIT UPON THE KEY DISTINCTION BETWEEN THOSE FOLKS, AND

1    THEN I'LL GO ON TO SOME OF THE OTHER THINGS THAT WE'VE ALREADY

2    IMPLEMENTED, AND THINGS THAT PERHAPS UNITED ITSELF IS NOT

3    AWARE OF BECAUSE IT'S NOT RESPONSIBLE FOR RUNNING THE

4    CONVENTION CENTER OVERALL, IT WOULDN'T HAVE ANY NEED TO BE

5    AWARE OF IT, AND THAT IS THIS; CLEANING PEOPLE HAVE THE

6    BROADEST, MOST UNRESTRICTED ACCESS DURING AFTER HOURS AND

7    BEFORE HOURS, WHERE THE MOST MISCHIEF CAN TAKE PLACE.

8         REGULATING THEIR CONDUCT IS LOW HANGING FRUIT.  IT'S

9    THE EASIEST TO ADDRESS FOR PURPOSES OF HARDENING THE TARGET OF

10   THE CONVENTION CENTER, TO USE SECURITY PARLANCE, BECAUSE WE

11   HAVE A STAFF THAT CAN DO THIS, THAT WE KNOW THAT WE HAVE

12   SCREENED.  WE HAVE BEEN REPEATEDLY WARNED THAT THIS IS SUCH AN

13   EASY ROUTE OF ACCESS, GIVEN THEIR UNRESTRICTED ACCESS TO THE

14   FACILITY, AND THEIR IRREGULARITY WITH WHICH THEY ARE USED AT

15   THE CONVENTION CENTER, MAKING IT MORE DIFFICULT FOR AN

16   OUTSIDER TO MAINTAIN A MORE REGULAR WORK FORCE, THAT IT ONLY

17   MAKES SENSE THAT YOU DO SOMETHING ABOUT THAT.

18        OTHER VENDORS DON'T HAVE UNBRIDLED ACCESS TO THE

19   CONVENTION CENTER.  FOR EXAMPLE, WHEN TRUCKS ARE ARRIVING AT

20   THE CONVENTION CENTER, THEY FIRST ARE SCREENED AT THE

21   MARSHALLING YARD.  THEIR CONTENTS ARE CHECKED.  THEIR DRIVER

22   IS CHECKED.  INFORMATION IS RADIOED AHEAD TO OUR LOADING DOCK

23   TO NOTIFY THE RECIPIENT AT THE LOADING DOCK OF WHO AND WHAT

24   SHOULD BE IN THAT TRUCK WHEN IT GETS TO THE CONVENTION CENTER,

25   BETWEEN THE MARSHALLING YARD AND THE LOADING DOCK.

THERE ARE INNUMERABLE WAYS IN WHICH WE HAVE
IMPLEMENTED SYSTEMS AND STRATEGIES TO ENHANCE SECURITY AND
CONTROL AND LIMIT BUILDING ACCESS THAT, IF WE LAID IT ALL OUT
TO YOU OR TO UNITED, WE WOULD BE, IN A SENSE, THROWING THOSE
POLICIES' EFFECTIVENESS INTO THE TRASH CAN.

THE COURT: WAIT A MINUTE, BUT YOU COULD MAKE THOSE
AVAILABLE TO ME, COULDN'T YOU?

MS. PETTY: AND WE DID DO SO WITH THE DECLARATION OF
MR. GUTENSOHN, WHICH HAS BEEN SUBMITTED TO THE COURT, AND
CERTAINLY IF THE COURT DESIRES TO HAVE MORE DETAIL ABOUT A
GREATER RANGE OF OUR SECURITY ACTIVITIES, WE WOULD BE HAPPY TO
PROVIDE THAT, BUT THERE ARE INNUMERABLE THINGS THAT WE HAVE
IMPLEMENTED SINCE 2001 THAT WE DON'T WANT TO LAY OUT TO A BAD
GUY.

THE COURT: I UNDERSTAND WHAT YOU'RE SAYING BECAUSE IT
DOESN'T MAKE A WHOLE LOT OF SENSE TO TELL THOSE WHO MIGHT WANT
TO HARM OTHERS WHAT YOUR PLAN IS FOR AVOIDING THEM DOING HARM
TO OTHERS, SO I UNDERSTAND WHERE YOU'RE COMING FROM.

NOW, WITH REGARDS TO THE DECLARATION, I BELIEVE YOU'VE
INDICATED PREVIOUSLY THAT YOU HAVE NO OBJECTION TO MAKING THAT
DECLARATION AVAILABLE TO PLAINTIFF'S COUNSEL.

MS. PETTY: I BELIEVE WE ASKED THE COURT TO LIMIT IT
TO IN-CAMERA REVIEW ONLY.

THE COURT: OKAY. I MISUNDERSTOOD THEN. I THOUGHT
THAT -- OKAY. GO AHEAD.

34

1    MS. PETTY:  SO THAT'S THE SECOND PROBLEM THAT WE HAVE

2    WITH IS THERE EVEN A VALID ANTI-TRUST CLAIM.  IS THIS A

3    DISCRETIONARY ACTIVITY THAT IS OUTSIDE THE SCOPE OF THE

4    ANTI-TRUST LAWS.

5    THE THIRD PROBLEM THAT WE FACE HERE IS THE SUPREME

6    COURT HAS REPEATEDLY CAUTIONED THE LOWER COURTS, IN RULING

7    UPON ANTI-TRUST CLAIMS, THAT IF -- IN ORDER TO ADDRESS THE

8    ANTI-TRUST THEORIES BEING ASSERTED BY THE PLAINTIFF, THE COURT

9    WOULD HAVE TO, IN EFFECT, STEP IN AND BECOME A REGULATORY

10   AGENCY OR MANAGE ITSELF THE DEFENDANT'S OPERATIONS, THEN THIS

11   IS OBVIOUSLY A CASE THAT FALLS OUTSIDE OF THE INTENDED PURPOSE

12   AND ROLE OF THE ANTI-TRUST LAWS.

13   THE KIND OF COMMENTS AND DISCUSSIONS AND QUESTIONS

14   THAT HAVE GONE ON THIS MORNING INDICATE THAT THIS IS A DISPUTE

15   OVER ONE OF INNUMERABLE, REASONABLE CHOICES THAT REASONABLE

16   MINDS MIGHT DISAGREE ABOUT WITH RESPECT TO OVERALL MANAGING

17   OUR SECURITY OPERATIONS.  IT IS UNLIKELY THAT A COURT IS

18   BETTER ABLE TO DO THAT THAN THOSE WHO ARE ACTUALLY

19   PROFESSIONALLY CHARGED WITH MANAGING THE CONVENTION CENTER,

20   BUT, IN ANY EVENT, SHOULD A COURT MANAGE THE CONVENTION

21   CENTER, AND WE SUBMIT THAT IT SHOULD NOT, THAT FEDERAL CASE

22   LAW, UNDER THE ANTI-TRUST LAW, DICTATES THAT OUTCOME.

23   THE COURT:  LET ME ASK YOU A QUESTION.  SOMEWHERE,

24   SOME TIME, I HEARD MENTION OF VENDORS AT AIRPORTS, BUT AREN'T

25   TSA EMPLOYEES -- AREN'T THEY CONTRACTED OUT?

1        MS. PETTY:  MY UNDERSTANDING WAS ONE OF THE THINGS

2   THAT OUR TAX DOLLARS WERE NOW PAYING FOR IS FOR THAT TO BE AN

3   AGENCY OF THE FEDERAL GOVERNMENT, AND THAT TSA EMPLOYEES ARE

4   NOW FEDERAL EMPLOYEES, IN ORDER TO MAXIMIZE CONTROL OVER THEM

5   AND ENHANCE SECURITY.

6        THE COURT:  YOU'RE RIGHT.  OKAY.

7        MS. PETTY:  HERE THERE IS NO LAW THAT UNITED HAS CITED

8   THAT IT IMPOSES UPON THE CONVENTION CENTER OR EVEN IF IT

9   WEREN'T A PUBLIC ENTITY, A PRIVATE BUSINESS, TO OPERATE

10   INTERNALLY THE CONVENTION CENTER IN ORDER TO PROVIDE SECONDARY

11   BUSINESS OPPORTUNITIES FOR OTHERS.  AND THAT, AT ITS CORE, IS

12   WHAT UNITED IS COMPLAINING ABOUT HERE.  THEY WANT TO DO

13   BUSINESS A CERTAIN WAY, IN A CERTAIN PLACE, AND THEY WANT TO

14   FORCE THE CONVENTION CENTER TO CREATE THAT BUSINESS

15   ENVIRONMENT FOR THEM.

16        THE SUPREME COURT HAS BEEN VERY CLEAR IN STATING THAT

17   THE ANTI-TRUST LAWS ARE NOT TO BE USED IN ORDER TO FORCE

18   ACTUAL OR PERCEIVED RIVALS TO GIVE YOU BUSINESS OPPORTUNITIES

19   THAT YOU CANNOT OTHERWISE CREATE FOR YOURSELVES.  THE PURPOSE

20   OF THE ANTI-TRUST LAW IS TO PREVENT THE CREATION OF MONOPOLY

21   POWER IN ORDER TO PREVENT OTHERS FROM COMPETING.  HERE WE

22   DON'T EVEN COME CLOSE TO DOING THAT.

23        WE ADDRESSED THE SECURITY CONCERN IN THE MOST NARROW

24   WAY THAT WE WERE ABLE TO CONCEIVE OF, AND THAT IS BY RETAINING

25   CONTROL OVER THE EMPLOYEES WHO ARE WORKING IN THE CLEANING

1    SERVICES ARENA.  WE HAVE PERMITTED UNITED AND OTHER CLEANING

2    COMPANIES TO CONTINUE TO BID FOR BUSINESS AND TO WORK AT THE

3    CONVENTION CENTER, AND WE WERE --

4         THE COURT:  WHERE'S THE BIDDING FIT IN?  IF YOU'RE

5    SETTING THE HOURLY RATE, I GUESS, AT I THINK IT WAS $17, I

6    THINK IS WHAT I HEARD SOMEONE SAY, WHERE DOES THE COMPETITION

7    COME IN?  I MEAN, SOMEBODY'S GOING TO SAY, "WELL, I KNOW THE

8    RATE IS $17 BUT, GUESS WHAT, I'M GOING TO BID $18," THAT

9    DOESN'T MAKE ANY SENSE.

10        MS. PETTY:  OR THEY CAN BID 17.  WE'RE NOT CHANGING

11   OUR PRICE DEPENDING ON WHETHER UNITED IS GOING AFTER THAT

12   BUSINESS OR NOT.  THAT'S NOT IMPACTING US.  THE ONLY EXTENT TO

13   WHICH OUR PRICE IS IMPACTED IS OUR LABOR COSTS ARE IMPACTED BY

14   THE LIVING WAGE ORDINANCE, WHICH HAS NOW BEEN ADOPTED IN SAN

15   DIEGO, AND WE DID NOTE THAT UNITED'S OPPOSITION PAPERS AND

16   MOVING PAPERS AND REPLY PAPERS COMPLETELY FAILED TO ADDRESS

17   THAT ISSUE, AND THAT THE PRICE INCREASE THAT HAS HAPPENED

18   FOLLOWED THE IMPLEMENTATION OF THE LIVING WAGE ORDINANCE, ON

19   OUR END AT LEAST.

20        IF UNITED'S PRICES HAVE NOT SEEN ANY INCREASE, WE ARE

21   CONCERNED THAT THEY ARE NOT COMPLYING WITH THE LIVING WAGE

22   ORDINANCE, WHICH DOES APPLY TO CONTRACTORS AND VENDORS IN

23   PUBLIC FACILITIES WITHIN THE SAN DIEGO -- WITHIN THE CITY OF

24   SAN DIEGO, AND THE CONVENTION CENTER IS SPECIFICALLY LISTED IN

25   THE ORDINANCE AS ONE OF THOSE FACILITIES.

1          THE COURT:  OKAY.

2          MS. PETTY:  SO MY LAST POINT THEN, UNLESS THE COURT

3     HAS ANY QUESTIONS, IS THAT THE SOLUTION HERE UNITED HAS

4     ALREADY ACCEPTED AND IMPLEMENTED.  SINCE JULY 1, WE HAVE

5     ENTERED SEVEN CONTRACTS WITH UNITED UNDER WHICH IT WAS THE

6     CLEANING COMPANY RETAINED BY THE SERVICE CONTRACTOR FOR THE

7     PARTICULAR SHOW, AND THEY HAVE BEEN OPERATING UNDER THAT

8     POLICY.

9          NOW, IT'S SIX MONTHS SINCE WE'VE IMPLEMENTED THE

10    POLICY.  FROM THE STANDPOINT OF WHY ARE WE HERE TODAY, WE'RE

11    HERE ON A MOTION FOR PRELIMINARY INJUNCTION.  THE STATUS QUO

12    WOULD BE CHANGED IF SIX MONTHS LATER A PRELIMINARY INJUNCTION

13    WERE GRANTED, AT THIS POINT IN TIME, BECAUSE UNITED AND THE

14    CONVENTION CENTER HAVE BEEN MAINTAINING A BUSINESS

15    RELATIONSHIP UNDER THE MODIFIED POLICY, FOR PURPOSES OF

16    SECURITY, AND THERE'S NO REASON TODAY TO CHANGE THE STATUS

17    QUO.

18         THE COURT:  SO THIS WOULD BE MORE OF A MANDATORY

19    INJUNCTION RATHER THAN A PROHIBITORY INJUNCTION, RIGHT?

20         MS. PETTY:  YES, IT WOULD, YOUR HONOR.

21         THE COURT:  OKAY.  ALL RIGHT, COUNSEL, I'M NOT GOING

22    TO HEAR A RESPONSE FROM YOU.  I APOLOGIZE, BUT I HAVE TO GO.

23    I HAVE A JUDGES MEETING THAT I HAVE TO GET TO.

24         BEFORE I LEAVE, COUNSEL HAS SAID THAT IT IS THEIR

25    POSITION THAT THIS IS ALL A SHAM, AND I THINK IT'S IMPORTANT

1    THAT AT LEAST I LOOK AT WHETHER OR NOT THIS IS A SHAM OR NOT.

2    ONE OF THE WAYS THAT I THINK I CAN DETERMINE WHETHER IT'S A

3    SHAM OR NOT IS BY, IN FACT, TAKING YOU UP ON YOUR OFFER TO

4    PROVIDE ME WITH OTHER POLICIES AND PROCEDURES THAT HAVE BEEN

5    IMPOSED -- OR IMPLEMENTED, I SHOULD SAY, BY THE SAN DIEGO

6    CONVENTION CENTER, AND SO I'M GOING TO GIVE YOU 10 DAYS TO

7    OBTAIN THOSE FOR ME, GET THEM TO ME.  I WILL THEN TAKE A LOOK

8    AT THEM, AND WE WILL ISSUE A WRITTEN ORDER ON THE PRELIMINARY

9    INJUNCTION THAT HAS BEEN REQUESTED, OKAY?  THANK YOU.

10         MS. PETTY:  THANK YOU, YOUR HONOR.

11   (THE HEARING CONCLUDED.)

12

13

14

15

16

17              C E R T I F I C A T E

18

19         I, GAYLE WAKEFIELD, CERTIFY THAT I AM A DULY
     QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
20   STATES DISTRICT COURT, THAT THE FOREGOING IS A TRUE AND
     ACCURATE TRANSCRIPT OF THE PROCEEDINGS AS TAKEN BY ME IN THE
21   ABOVE-ENTITLED MATTER ON JANUARY 7, 2008; AND THAT THE FORMAT
     USED COMPLIES WITH THE RULES AND REQUIREMENTS OF THE UNITED
22   STATES JUDICIAL CONFERENCE.

23

24   DATED:__1/10/08____          S/GAYLE WAKEFIELD
                                  GAYLE WAKEFIELD, RPR, CRR
25                                OFFICIAL COURT REPORTER

**Kirby Noonan Lance & Hoge LLP**
600 West Broadway, Suite 1100 San Diego, California 92101-3387

1

**CERTIFICATE OF SERVICE**

2

<u>United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.</u>
United States District Court Case No. 07-CV-2172 BEN (JMA)

3

4

I, the undersigned, declare: That I am, and was at the time of service of the papers herein referred to, over the age of eighteen years, and not a party to the action; and I am employed in the County of San Diego, California. My business address is 600 West Broadway, Suite 1100, San Diego, California 92101-3387.

5

6

On January 14, 2008, at San Diego, California, I served the following document(s) described as:

7

8

    **1.    PLAINTIFF UNITED NATIONAL MAINTENANCE, INC.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULES 12(B)(1) AND 12(B)(6); AND**

9

10

    **2.    DECLARATION OF DYLAN O. MALAGRINO IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE, RULES 12(B)(1) AND 12(B)(6)**

11

12

on the parties in said action as follows:

13

14

Regina A. Petty Esq.
email: rpetty@wpkt.com
Wilson, Petty, Kosmo & Turner LLP
550 West C Street, Ste. 1050
San Diego, CA 92101
Telephone: (619) 236-9600
Facsimile: (619) 236-9669

Attorneys for Defendant
SAN DIEGO CONVENTION CENTER
CORPORATION, INC.

15

16

17

18

☒    **ELECTRONIC TRANSMISSION:** I filed the foregoing document with the Clerk of Court for the U.S. District Court, Southern District of California, using the Electronic Case Filing ("ECF") system of the Court. The attorney listed above has consented to receive service by electronic means and was served a "Notice of Electronic Filing" sent by the CM/ECF system.

19

20

21

☒    **FEDERAL COURT:** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

22

23

Executed on January 14, 2008, at San Diego, California.

24

25

                     s/Dylan O. Malagrino

26

27

28

KNLH\503295.1