1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11 | UNITED NATIONAL MAINTENANCE, INC., a Nevada Corporation,

12

Plaintiff,

13        vs.

14 | SAN DIEGO CONVENTION CENTER

15 | CORPORATION, INC., a California Corporation,

16

Defendant.

CASE NO. 07-CV-2172 BEN (JMA)

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**[Doc. # 3]**

17

18

### I. INTRODUCTION

        This action arises out of a new policy implemented by Defendant San Diego Convention

19

20 Center Corporation ("Defendant" or "SDCCC"), mandating the exclusive use of SDCCC's

21 employees for all trade show cleaning services performed at the San Diego Convention Center

22 ("the Center" or "the SDCCC facility"). Plaintiff United National Maintenance, Inc. ("Plaintiff" or

23 "United") alleges violations of the antitrust laws and related state law claims. Plaintiff filed a

24 motion for a preliminary injunction with respect to the antitrust causes of action. Defendant

25 opposed the motion. On January 7, 2008, the Court conducted oral argument. For the reasons that

26 follow, Plaintiff's motion for a preliminary injunction is denied.

27

### II. FACTS

28

        The Complaint alleges as follows: SDCCC manages and operates the Center. The SDCCC

facility is the only one in the San Diego metropolitan area capable of holding major trade shows. (Ver. Compl. ¶ 10). SDCCC's primary business is leasing the facility, pursuant to license agreements, to entities that conduct trade shows. *Id.* These entities hire general contractors, such as GES Exposition Services ("GES") and Champion Exposition Services ("Champion"), to organize and manage staging trade shows, including maintenance, decorating, registration, and installation and dismantlement of exhibition spaces. (Ver. Compl. ¶ 13). The general contractors, in turn, hire subcontractors to perform services required for the shows. United is one such subcontractor.

United provides specialized cleaning, janitorial, maintenance and related services ("trade show cleaning services") for convention facilities nationwide, including the SDCCC facility. (Ver. Compl. ¶ 22). Trade show cleaning services are specialized and not interchangeable with general janitorial services. (Decl. of Jacob M. Slania in Sup. of Pl.'s Mot. for Prelim. Inj., Ex. 4 ("Epstein Decl.") ¶¶ 5-6).[1]

United and SDCCC have directly competed for trade show cleaning services contracts at the SDCCC facility since 1989. (Ver. Compl. ¶ 15). United had a 40% share of the market, and SDCCC had the other 60%. In the fall of 2006 - spring of 2007, SDCCC offered its services to United's customers, including GES and Champion. (Ver. Compl. ¶ 47). SDCCC's offers were declined. *Id.*

Effective July 1, 2007, SDCCC implemented a new security policy. Under the policy, all trade show cleaning services at the SDCCC facility were to be performed by SDCCC's employees. (Ver. Compl. ¶ 50). Now, outside vendors such as United can participate in the provision of trade show cleaning services by administering the services, including processing the event orders and collecting payment. SDCCC cited security concerns as the reason for the policy. United views the security justification of the policy as a sham.

United originally brought this action in state court. The state court denied Plaintiff's

---

[1]Defendant's objections to the declaration based on relevance, lack of foundation and personal knowledge, speculative evidence, and improper lay opinion are overruled. The declaration is relevant to the issues raised in the motion; Epstein's personal knowledge may be inferred from his position, *See In re Kaypro,* 218 F.3d 1070, 1075 (9th Cir. 2000); the information is not speculative; and Epstein's opinion is proper under Rule 701.

1  application for a temporary restraining order, but set a date for a hearing on a preliminary

2  injunction motion.  A motion for a preliminary injunction was never filed in state court.  After

3  SDCCC filed a demurrer, Plaintiff dismissed the state court case.  The present federal case was

4  filed on November 13, 2007.

5                                    III. LEGAL STANDARD

6          A preliminary injunction is appropriate when the plaintiff shows "either: (1) a likelihood of

7  success on the merits and the possibility of irreparable injury; or (2) that serious questions going to

8  the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor." *Lands*

9  *Council v. Martin (Lands Council II),* 479 F.3d 636, 639 (9th Cir. 2007) (citation omitted).  These

10  two alternatives are "extremes of a single continuum" in which "the greater the relative hardship to

11  the party seeking the preliminary injunction, the less probability of success must be shown." *Clear*

12  *Channel Outdoor Inc. v. City of Los Angeles,* 340 F.3d at 813 (internal punctuation and quotation

13  marks omitted).  Courts also consider whether the advancement of the public interest favors

14  granting injunctive relief.  *See Burlington N. R.R. v. Department of Revenue,* 934 F.2d 1064, 1074

15  n. 6 (9th Cir. 1991).

16                                    IV. DISCUSSION

17          As a preliminary matter, the Complaint alleges both antitrust and state law claims.

18  Plaintiff's motion for a preliminary injunction was based solely on the antitrust causes of action.

19  Plaintiff's counsel confirmed this during oral argument.  Defendant's opposition also addresses the

20  state causes of action.  Because the motion does not raise state law claims as a basis for injunctive

21  relief, no determinations regarding the state law claims are made in this Order.

22          **A.    Merits of Claims**

23          Plaintiff has not shown sufficient likelihood of success on the merits to support the

24  issuance of a preliminary injunction.  Similarly, although there appear to be some questions

25  regarding the merits of Plaintiff's claims, these questions are not serious enough to warrant

26  immediate injunctive relief.

27                  **1.    Applicability of the Sherman Act**

28          SDCCC first challenges the applicability of the Sherman Act to United's claims.  This

                                        - 3 -

1    challenge fails.  Under the Act, any contract "in restraint of trade or commerce among the several

2    States, or with foreign nations" is illegal.  15 U.S.C. § 1.  Further, "[e]very person who shall

3    monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to

4    monopolize any part of the trade or commerce among the several States, or with foreign nations" is

5    guilty of a felony.  15 U.S.C. § 2.

6          SDCCC agues that the Sherman Act does not apply because the policy at issue does not

7    concern commerce or, at the very least, interstate commerce.  This Court disagrees.  The Sherman

8    Act outlaws monopolization of trade or commerce.  *See* 15 U.S.C. § 2.  The challenged policy

9    regulates the use of cleaning services at a large convention center.  The exchange of services for

10   money is "'commerce' in the most common usage of that word."  *See Goldfarb v. Virginia State*

11   *Bar,* 421 U.S. 773, 787-88 (1975).  Although the rationale behind the new policy may have been

12   security, the activity regulated by the policy is commercial.

13         Further, the commercial activity at issue is interstate.  The Sherman Act prohibits contracts

14   in restraint of trade or commerce "among the several States, or with foreign nations."  15 U.S.C.

15   §1.  The jurisdictional requirement of the Sherman Act may be satisfied if the challenged activity is

16   either "in" interstate commerce or has "a substantial effect" on interstate commerce.  *McLain v.*

17   *Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 242-43 (1980).  For the second test, a "more

18   particularized showing of an effect on interstate commerce caused by the alleged [antitrust

19   violations]" is not necessary.  *Id.*

20         Here, SDCCC argues that the cleaning activity at issue is localized to San Diego.  The

21   cleaning services are performed at the Center, and United's workforce does not cross city or state

22   lines.  The activity, however, appears to have a substantial effect on interstate commerce.  United is

23   a national company offering services across the country.  United has alleged, and SDCCC has not

24   contested, that the majority of SDCCC conventions are organized and contracted for by out-of-

25   state entities; attendees often arrive in San Diego from other states; businesses such as United

26   perform services at the facility pursuant to national contracts; United is a Nevada Corporation with

27   a Chicago, Illinois principal place of business, and its activities in San Diego are directed by out-

28   of-state personnel.  Based on the above, the challenged policy most likely regulates an activity that

1   has a substantial effect on interstate commerce.  Accordingly, the Sherman Act applies to

2   Plaintiff's claims.

3                    **2.    State Action Immunity**

4        SDCCC has asserted, but not established that it is shielded by immunity from both an

5   award of damages and injunctive relief for the alleged antitrust violations.

6        Plaintiff acknowledges that damages against SDCCC may not be available.  Under 15

7   U.S.C. § 35(a), damages sought for antitrust violations are not recoverable against local

8   governments.  For the purposes of this motion, SDCCC has made a sufficient showing that it is a

9   part of the City and therefore has the status of a municipality.  SDCCC is a non-profit public

10  corporation created by the City of San Diego for the sole purpose of managing and operating the

11  SDCCC facility.  (Declaration of Carol Wallace in Sup. of Def.'s Mot. for Prelim. Inj. ("Wallace

12  Decl.") ¶ 2).  The City is the only member of the corporation and appoints the board of directors.

13  *Id.*  The construction of the facility was financed with public funds.  *Id.*  Approximately four

14  billion of SDCCC's operating revenue comes from a budget subsidy allocated from the City's

15  general fund.  *Id.*  The facility is designated as a municipal site.  *Id.*  United claims that SDCCC is

16  not a part of the City, but a "quasi-governmental entity."  United does not support its position by

17  any facts.  Therefore it appears that SDCCC will be successful in establishing its status as a

18  municipality, and damages on the antitrust claims will not be recoverable.  Injunctive relief,

19  however, is still available under 15 U.S.C. § 35(a).  *See id.*

20       SDCCC argues that the new policy is immune to any challenge because the policy was "a

21  valid and reasonable exercise of its authority to establish measures to effectively protect a major

22  public facility."  (Def.'s Opp. at 10).  Defendant relies on *National Waterworks Co. v. City of*

23  *Kansas,* 28 F. 921 (C.C. Mo. 1886).  The plaintiff in *National Waterworks* contracted with the city

24  to lay pipes below a public street, and was required by the city to move the pipes so that the city

25  could dig a sewer.  The court held that "[s]ewerage is a matter unquestionably affecting largely the

26  public health, and no municipality can make a contract divesting or abridging its full control over

27  such matters."  *Id.* at 923.

28       SDCCC's suggestion that any action taken by a city in furtherance of public welfare is

1   immune from antitrust laws is too broad and not supported by law.  The Sherman Act was passed

2   after the decision in *National Waterworks.*  It is true that the Sherman Act was not designed "to

3   restrain state action."  *Parker v. Brown,* 317 U.S. 341, 351 (1943).  "The threshold inquiry in

4   determining if an anticompetitive activity is state action of the type the Sherman Act was not meant

5   to proscribe is whether the activity is required by the State acting as sovereign."  *Goldfarb,* 421

6   U.S. at 790.  Therefore, to be entitled to state action immunity, a municipality must demonstrate

7   that the challenged activity was carried out "pursuant to a clearly expressed state policy."  *Town of*

8   *Hallie v. City of Eau Claire,* 471 U.S. 34, 40 (1985).  If the actor is not a municipality but a private

9   party, it must additionally show that its conduct was actively supervised by the state.  *See F.T.C. v.*

10  *Ticor Title Ins. Co.,* 504 U.S. 621, 631 (1992).

11       As concluded above, SDCCC has made a sufficient showing regarding its status as a

12  municipality.  SDCCC, however, has not relied on the *Parker* line of cases and has not attempted

13  to demonstrate that the challenged activity followed "a clearly expressed state policy."  SDCCC

14  makes a general argument that its actions were taken to protect public safety and security without

15  citing any California authority.  That is not enough to demonstrate a "clear" policy promoted by the

16  State of California.  Assuming that SDCCC is a private party, there has also been no showing of

17  active supervision of its security policy by the state.  Therefore, for the purposes of this motion,

18  SDCCC has not established that it is entitled to state action immunity from injunctive relief.

19              **3.    Antitrust Claims**

20       The Court now turns to the merits of the alleged antitrust violations. United asserts four

21  causes of action under the Sherman Act: attempted monopolization, essential facilities, group

22  boycott, and exclusive dealing.

23              **a.    Attempted Monopolization**

24       United has not shown sufficient likelihood of success on the merits or serious questions

25  going to the merits of this claim.  "The traditional claim for attempted monopolization arises when

26  the danger of monopolization is clear and present, but before a full-blown monopolization has

27  necessarily been accomplished."  *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 542

28  (9th Cir. 1991).  To prove its attempted monopolization claim under § 2 of the Sherman Act,

1    United must show: "(1) a specific intent to monopolize a relevant market - *i.e.,* an intent to control

2    prices or destroy competition in a relevant market; (2) predatory or anticompetitive conduct

3    designed to control prices or destroy competition; (3) a dangerous probability of success - *i.e.,* a

4    probability of achieving monopoly power in the relevant market; and (4) causal antitrust injury."

5    *Paladin Associates, Inc. v. Montana Power Co.,* 328 F.3d 1145, 1163 (9th Cir. 2003) (citation

6    omitted).  Monopolization claims can only be evaluated with reference to properly defined

7    geographic and product markets.  *See Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d

8    1369, 1373 (9th Cir. 1989).

9        United asserts that it offers a distinct product, namely trade show cleaning services, and

10   that the market for this product is geographically limited to the SDCCC facility because there are

11   no comparable facilities nearby.  United may be able to prove that the SDCCC facility is the

12   relevant geographic market.  The geographic market must both " 'correspond to the commercial

13   realities' of the industry and be economically significant."  *Brown Shoe,* 370 U.S. at 336-37.  Such

14   a market may be limited to a single metropolitan area or to a convention facility.  *See id; see also*

15   *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.,* 62 F.3d 967, 976 (7th Cir. 1995).

16       SDCCC facility may meet the definition of the relevant geographic market because there

17   are no other convention facilities of a comparable size in San Diego.  The facility is also often

18   reserved a long time in advance.  Therefore even if the price for trade show cleaning services

19   increased, the consumers may not be able to find another facility.  Also, consumers may not be

20   motivated to look for another facility because trade show cleaning services constitute a relatively

21   small part of the overall expenses at a trade show.  (Slania Decl., Ex. 9 ("Hekman Decl.") ¶ 25).[2]

22   Thus the Center may represent a self-contained market for trade show cleaning services.

23       United has also presented some evidence that trade show cleaning services are a distinct

24   product market.  United offered a declaration by Mark Epstein, the President of Champion, a

25   company that regularly contracts for trade show cleaning services on a large scale.  According to

26

27           [2]Defendant's objections to the Hekman Declaration based on relevance, lack of foundation,
28   speculation, and improper expert opinion are overruled.  The evidence is relevant; sufficient
     foundation was laid in the declaration; and the expert's opinion is offered in compliance with Rules
     702-704.  The Court does not rely on the declarant's statements as legal conclusions.

07cv2172

1  Epstein, traditional janitorial services cannot be substituted for trade show cleaning services

2  regardless of the price.  (Epstein Decl. ¶ 6).  United also offered an affidavit of John Hekman,

3  MBA, Ph.D.  Hekman opined that trade show cleaning services represent a distinct product market.

4  (Hekman Decl. ¶¶ 4, 15-18).  Even if trade show cleaning services were not a distinct product,

5  however, it appears that the new policy still mandates the exclusive use of SDCCC's employees

6  for all cleaning events at the Center.  (*See* Slania Decl., Ex. 6).

7      United argues that the mandatory exclusive use of SDCCC's employees for all trade show

8  cleaning services contracts results in a dangerous probability of SDCCC's monopoly in this

9  market.  According to United, SDCCC is trying to exclude competitors, in part, by raising their

10  costs.  (Pl.'s Mot. for Prelim Inj. at 13-14).  SDCCC currently determines the price of its cleaning

11  employees, the only cleaning workforce allowed into the Center, and charges $17 per hour.

12  United's existing contracts have a built-in rate of $16.30 per hour.  United therefore is servicing

13  these contracts at a loss.  SDCCC justifies its higher rate by the inclusion of the new minimum

14  wage amount, $10.34 per hour, and an additional $2.07 per hour for health benefit payment, in the

15  absence of health coverage.  (Slania Decl., Ex. 6).  The new minimum wage was set by the City's

16  living wage ordinance effective as of July 1, 2007.  *Id.*  United has not explained whether its own

17  rate includes the new minimum wage amount.  Therefore United has not shown that SDCCC's

18  prices are anticompetitively inflated.

19      As further evidence of SDCCC's alleged anticompetitive conduct, United also provided

20  several letters from its customers.  The letters voice discontent about the customers' current

21  inability to choose the provider of cleaning services and to negotiate the price for the contract.

22  (*See* Slania Decl., Exs. 12A - 12E).[3]  The letters express concerns regarding a possible decrease in

23  the quality of service and increase in costs.  *See id.*

24      SDCCC, however, raises a question regarding whether the new policy actually encourages

25

26      [3]Defendant's objections to these exhibits based on relevance, hearsay, lack of foundation and
27  personal knowledge, speculation, lack of authentication, misstating evidence, and best evidence rule
   are overruled.  The evidence is relevant; declarant's personal knowledge is inferred from their
28  positions; the information is not speculative; and the letters are authenticated by the declaration of
   Richard Simon, to which they are attached.  The letters appear to constitute the best evidence.  Finally,
   Defendant's contention that the letters misstate the evidence is not supported by any facts.

07cv2172

competition.  Antitrust laws are designed to protect competition, not competitors.  *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 338 (1990).  Numerous smaller companies will now have access to SDCCC's highly-trained professional workforce, and will be able to enter the trade show cleaning services market.  Therefore United may have difficulty in proving an antitrust injury.

Probably most importantly, however, SDCCC's security justification for its new policy appears a valid defense to all of United's antitrust allegations.  "If there is a valid business justification for [defendant's] conduct, there is no antitrust liability.  Whether valid business reasons motivated an [alleged] monopolist's conduct is a question of fact."  *High Technology Careers v. San Jose Mercury News,* 996 F.2d 987, 990 (9th Cir. 1993) (citations omitted).

United attacks the security justification as a sham designed to cover SDCCC's attempts to monopolize the trade show cleaning services market.  Before the policy was implemented, SDCCC had approached some of United's customers with business solicitation, but SDCCC's offers were turned down.  The parties have submitted extensive evidentiary support regarding the security justification both before and after the oral argument, some of it filed under seal.

Security appears to be a top priority at the facility.  The Center is one of the top meeting venues in the world.  (Wallace Decl. ¶ 3).  It is attended by almost a million guests every year for public and private events.  *Id.*  SDCCC has the authority to establish the business policies related to the facility operations and the licensees' use of it.  *Id.*  The protection of the public is one of SDCCC's primary responsibilities.  The principal goal of SDCCC is to achieve optimum safety and security for its employees, contractors, clients, and visitors.  (Decl. of Charles Gutensohn in Sup. of Def.'s Opp. ("Gutensohn Decl.") ¶ 2; Wallace Decl. ¶ 4).

Prior to 2001, the security at meeting facilities focused on theft and unauthorized entry.  (Gutensohn Decl. ¶ 2).  After the terrorist attacks on September 11, 2001, security concerns expanded to include every operational procedure at the facility.  *Id.*  The Center is a high value terrorist target because of its location, attendance capacity and symbolism.  (Gutensohn Decl. ¶ 6).  The attendees include political religious and professional organizations, which may constitute convenient targets for terrorists.  *Id.*

07cv2172

1    In 2003, as part of its security strategy, SDCCC hired a private firm to conduct a security

2  assessment.  The assessment found that the uncontrolled access of contractors and vendors to the

3  facility was a vulnerability spot for SDCCC.  (Gutensohn Decl. ¶ 3).

4    In addition, in 2005 and 2006, Charles Gutensohn, the Security Manager for the Center,

5  attended the Academy of Venue Safety and Security sponsored by the International Association of

6  Assembly Managers.  (Gutensohn Decl. ¶ 5).  At the Academy, in a threat scenario training

7  exercise, the SDCCC facility was used as a target location.  (Gutensohn Decl. ¶ 5).  The purpose of

8  the exercise was to assess the vulnerability areas in the access to the building and identify the

9  measures to make the building a harder target.  *Id.*  The exercise participants concluded that

10  cleaning vendor employees were a vulnerability area for the facility.  *Id.*

11    For the past several years, SDCCC has been upgrading security at the Center.  SDCCC has

12  prioritized the steps based on their affordability and feasibility.  (Wallace Decl. ¶ 5).  All SDCCC

13  employees are screened; complete an Emergency Preparedness class and a BioHazards class during

14  their probationary period; receive Security Services Training; and repeat instruction through

15  refresher courses.  (Gutensohn Decl. ¶ 8).  SDCCC incorporates the surveys, programs and

16  protocols from the Office of Homeland Security into its own security programs.  *Id.*

17    SDCCC currently has 35 full time employees who perform cleaning services.  The average

18  number of years in service per employee is 14.9.  (Mazzocco Decl. ¶ 2).  United is hired for trade

19  show cleaning services not by SDCCC, but by the entities that put on trade shows.  SDCCC has no

20  direct relationship with United and has little knowledge or control over United's operations at the

21  facility.  (Gutensohn Decl. ¶ 9).  SDCCC maintains that United has a lack of personnel continuity,

22  although United disputes this fact.  (Gutensohn Decl. ¶ 10).

23    Plaintiff argues that the security justification is a pretext because it targets only a small part

24  of workforce engaged in servicing trade shows.  Cleaning employees constitute less that 5% of the

25  outside labor.  (*See, e.g.,* Slania Decl., Ex. 7 ¶ 8; Ex. 10 ¶ 4).  United also asserts it has never had

26  any security-related problems at the facility.  Despite their relatively small number, however,

27  cleaning employees have access to the entire facility, including access after hours.  Further, this

28  policy may present an efficient and feasible way to deal with security concerns related to this

1    particular category of employees.  SDCCC has its own cleaning staff and can control it directly.

2    SDCCC may not be able to afford to maintain a full in-house staff of other categories of

3    employees.

4           United further argues that even if SDCCC's security concerns were legitimate, the policy is

5    still unlawful because it fails to regulate the competition in the "least restrictive way."  (Pl's. Mot.

6    for Prelim. Inj. at 16).  The availability of less restrictive alternatives is a factor in determining the

7    reasonableness of a restraint on trade.  *See Los Angeles Memorial Coliseum Com'n v. National*

8    *Football League,* 726 F.2d 1381, 1396 (9th Cir. 1986)*; Siegel v. Chicken Delight, Inc.,* 448 F.2d

9    43, 51 (9th Cir. 1971)[4].  United offers to subject its workers to the background checks and security

10   protocols used by SDCCC, or to allow SDCCC itself run the protocols.  (Ver. Compl. ¶ 57).

11   United also cites the protocols used by other, larger convention facilities, such as the McCormick

12   Place in Chicago, Illinois; the Orange County Convention Center in Orlando, Florida; and the Las

13   Vegas Convention Center in Las Vegas, Nevada.  (Ver. Compl. ¶ 59).  These facilities require

14   vendor employees to wear badges.  *Id.*  SDCCC does not use a badge system.  United, however,

15   still provides its employees with badges and photo identification.  *Id.*

16          Having carefully considered the parties' arguments and evidentiary submissions regarding

17   the security rationale in the context of a motion for a preliminary injunction, the Court concludes

18   that the rationale appears legitimate.  Although United describes some possible alternatives to the

19   exclusive use of in-house employees, SDCCC's security policies and training are significantly

20   more thorough than a badging system.  Given the size of the facility and the potential magnitude of

21   threat to public safety, SDCCC's security protocols appear warranted.  This Court does not have

22   sufficient information regarding the security concerns and response to those at the other major

23   facilities discussed above to make a meaningful comparison.  Most likely, security measures are

24   designed and implemented on a case-by-case basis for every location.  Consequently, United does

25   not have a strong likelihood of success on the merits of its antitrust claims.  Under the alternative

26   test for injunctive relief, the rationale likely precludes serious questions going to the merits of the

27   _____

28         [4] *Siegel,* however, dealt with a tying violation, not an attempted monopolization claim.  *See id.*
     at 47.

1    antitrust claims.

2                             **b.    Essential Facilities Claim**

3              In addition to the legitimate business justification, the success of United's essential

4    facilities claim may be hindered by United's inability to prove one of the elements.  "Stated most

5    generally, the essential facilities doctrine imposes liability when one firm, which controls an

6    essential facility, denies a second firm reasonable access to a product or service that the second

7    firm must obtain in order to compete with the first."  *Alaska Airlines,* 948 F.2d at 542.  United has

8    not been denied access to the facility.  United may still provide trade show cleaning services at the

9    facility as long as it uses SDCCC's employees.

10                            **c.    Group Boycott Claim**

11             The group boycott claim does not appear viable.  Under § 1 of the Sherman Act, "[e]very

12   contract, combination ..., or conspiracy, in restraint of trade or commerce ... is declared to be

13   illegal." 15 U.S.C. § 1; *see also Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800,

14   812 (1988).  The Complaint alleges that SDCCC "through its officers, agents, and co-conspirators

15   organized, promoted, and engaged in a contract, combination and conspiracy in unreasonable

16   restraint of interstate trade and commerce by forcing licensees and general contractors to agree to

17   exclusively hire SDCCC employees for Trade Show Cleaning Services at the SDCC."  (Ver.

18   Compl. ¶ 87).

19             United may have difficulty proving the existence of a contract or agreement among SDCCC

20   and its co-conspirators.  United views as co-conspirators the trade associations and general

21   contractors who have had to abide by the new policy.  The new policy, however, was implemented

22   by SDCCC alone.  General contractors and trade associations follow the policy because it is

23   mandatory.  There is no evidence, however, that these contractors or associations ever entered into

24   any agreements with SDCCC regarding this policy or the exclusion of United from the Center.

25             In addition, United again argues denial of access to the Center.  *See Northwest Wholesale*

26   *Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 294 (1985) (noting that

27   boycotts "often cut off access to a supply, facility, or market necessary to enable the boycotted firm

28   to compete.").  United, however, continues to have access to the facility and to compete for bids, as

1    long as it uses SDCCC's employees.

2                          **d.    Exclusive Dealing Claim**

3        As with the group boycott claim, United may have difficulty proving the existence of an

4    agreement to exclude United from the trade show cleaning services market.  United alleges that

5    SDCCC's policy and "corresponding agreements with trade shows, general contractors and others"

6    are "contracts which give SDCC exclusive control of the Trade Show Cleaning Services market in

7    San Diego."  (Ver. Compl. ¶ 93).

8        A contract is an exclusive-dealing arrangement if "the court believes it probable that

9    performance of the contract will foreclose competition in a substantial share of the line of

10   commerce affected."  *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327 (1961).  United

11   again argues that SDCCC forced general contractors and trade associations to agree to use

12   SDCCC's employees exclusively.  Plaintiff's motion states, "[SDCCC's] permanent and

13   irrevocable policy has ... completely locked up the Trade Show Cleaning Services market... ."

14   (Pl.'s Mot. at 20).  Plaintiff thus cannot but recognize that it was the policy unilaterally adopted by

15   SDCCC, and not an agreement among SDCCC and third parties, that affected United's market.

16   There are no allegations that a third party participated in the design or implementation of the policy

17   to exclude United from the relevant market.

18                          **B.    Injury and/or Balance of Hardships**

19       United has shown that part of its alleged injury may be irreparable.  United claims that

20   since the advent of the new policy, it has been losing both money on the existing contracts and its

21   employees.  For injunctive relief to be appropriate, the injury must be truly irreparable.  "Mere

22   injuries, however substantial, in terms of money, time and energy necessarily expended in the

23   absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective

24   relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a

25   claim of irreparable harm."  *Sampson v. Murray,* 415 U.S. 61, 90 (1974) (citations and internal

26   quotation marks omitted).

27       United's alleged financial losses on the existing contracts may be irreparable because there

28   may be no remedy at law available.  As a preliminary matter, there are some disputes regarding the

1    extent of United's monetary losses.  As mentioned above, SDCCC charges $17 per hour for its

2    workforce.  United's existing contracts have a built-in rate of $16.30 per hour.  United therefore

3    alleges that it is servicing its outstanding contracts at a loss.  SDCCC justifies its higher rate by the

4    inclusion of the new minimum wage amount, set by the City's living wage ordinance.  United has

5    not explained whether its own rate includes the new minimum wage amount.  Therefore it is not

6    clear whether the alleged financial injury was caused by SDCCC's anticompetitive conduct or

7    United's failure to comply with the ordinance.  Furthermore, SDCCC and United offer conflicting

8    explanations of how much United receives in proceeds for booth cleaning.  SDCCC claims that

9    United receives 50% of the proceeds, from which no labor costs have to be deducted.  United

10   maintains that the entire 50% has to be paid to SDCCC.

11        Assuming United is indeed losing money on the existing contracts, this money may not be

12   recoverable as damages.  SDCCC has claimed immunity from damages under 15 U.S.C. § 35(a),

13   which permits only injunctive relief against certain types of local governmental entities.  *See id.*

14   Without admitting that SDCCC is entitled to such immunity, United argues that the potential

15   unavailability of damages makes the alleged financial injury irreparable.  Considering that SDCCC

16   has a good chance of proving its status as a municipality, damages may indeed be unrecoverable.

17        United's other alleged injury, the loss of its workforce, does not appear irreparable.

18   Because United cannot use its own employees at the Center, the employees have not been paid and

19   have been leaving.  (Ver. Compl. ¶ 26; Slania Decl., Ex. 8 ("Linn Decl.") ¶ 12).[5]  United has lost

20   47 out of its 51 workers.  As more time passes, it may become more difficult to re-hire these

21   workers.  (Ver. Compl. ¶ 26; Slania Decl., Ex. 8 ¶ 12).  Plaintiff fears that it will go out of business

22   in San Diego without these employees.

23        This type of injury does not appear irreparable because despite some difficulty, the lost

24   workforce can be regained or replaced.  United acknowledges that it may be able to get these

25   employees back.  In addition, because United appears to claim that the facility is its main market in

26   San Diego, it is not clear what business it cannot service in the meantime.  Finally, in the event

27   _____

28        [5]Defendant's objections to this exhibit based on relevance, lack of foundation and speculation
     are overruled.  The evidence is relevant; declarant's personal knowledge is inferred from his position,
     *see In re Kaypro,* 218 F.3d at 1075; and the information is not speculative.

1  United prevails on the merits or develops new business, and none of its former employees are

2  available for re-hire, the company is likely to be able to find a new workforce. Even if trade show

3  cleaning services are indeed not interchangeable with regular cleaning services, there is no

4  evidence that trade show cleaning employees require extensive or costly training.

5      Under the alternative test, the balance of hardships does not tip sharply in United's favor.

6  On the contrary, such balance favors SDCCC. If the rationale behind SDCCC's policy is valid, the

7  rescission of the policy may result in substantially lowered security at the Center and a significant

8  threat to public safety. United's hardship, on the other hand, is purely financial. SDCCC's

9  potential hardship outweighs United's.

10     In addition, the delay between the implementation of the policy and the filing of this motion

11 further undermines United's claims of irreparable harm or hardship. "Plaintiff's long delay before

12 seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland*

13 *Tribune, Inc. v. Chronicle Pub. Co., Inc.,* 762 F.2d 1374, 1377 (9th Cir. 1985). The policy went

14 into effect on July 1, 2007. Plaintiff filed an action in state court and sought a TRO. After the

15 TRO was denied, Plaintiff was given a date for a preliminary injunction hearing. United did not

16 move for a preliminary injunction in state court. Instead, SDCCC filed a demurrer, and Plaintiff

17 dismissed its state action. The present federal action was not filed until November 13, 2007, four

18 and a half months after the policy became effective.

19     **C.      Public Interest Considerations**

20     Public interest weighs heavily against issuing the injunction. This case presents the

21 conflicting interests of free trade and public welfare, more specifically public safety. Antitrust

22 laws serve the public interest by encouraging effective competition. *See Image Technical Services,*

23 *Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1218 (9th Cir. 1997). At the same time, "[t]he

24 protection of the public safety is the first responsibility of local government and local officials have

25 an obligation to give priority to the provision of adequate public safety services." *See* Cal. Const.

26 Art. 13, § 35.

27     This Court is mindful of the importance of protecting free trade and commerce. The

28 importance of public safety at a large international convention facility, however, outweighs that

1  concern.  SDCCC has made a sufficient showing of potential risks and threats stemming from

2  inadequate security.  Where human lives may be a stake, the public interest lies in making

3  concerted efforts to protect them.  In the event of an actual incident, the City's liability will be

4  substantial.  Therefore a denial of the injunction will serve the public interest.

5          **D.    Nature of Relief Requested**

6          Denial of Plaintiff's motion is especially appropriate because the relief sought by Plaintiff

7  goes beyond maintaining the status quo.  "A prohibitory injunction preserves the status quo."

8  *Stanley v. University of Southern California,* 13 F.3d 1313, 1320 (9th Cir. 1994) (citation omitted).

9  A mandatory injunction "goes well beyond simply maintaining the status quo pendente lite [and] is

10  particularly disfavored."  *Anderson v. United States,* 612 F.2d 1112, 1114 (9th Cir. 1979) (citations

11  and internal quotation marks omitted).  The status quo is the new policy, implemented by

12  Defendant since July 2007.  United essentially wants this Court to order a rescission of the policy

13  and to order that United's employees be allowed access to the Center.  Therefore the injunction

14  sought by Plaintiff is mandatory.  *See Ali v. U.S.,* 932 F.Supp. 1206, 1207 (N.D. Cal. 1996)

15  (injunction found mandatory where a contractor debarred by the government sought to have the

16  debarment invalidated and to be allowed to bid on contracts).

17          When a mandatory preliminary injunction is requested, the district court should deny such

18  relief "unless the facts and law clearly favor the moving party."  *Stanley,* 13 F.3d at 1320 (citations

19  and internal quotation marks omitted).  The facts and law do not clearly favor enjoining SDCCC's

20  policy.  SDCC appears to have a legitimate security justification for the new policy.  Under the test

21  considering the likelihood of success on the merits and the existence of an irreparable injury, the

22  likelihood of United's success on the merits is greatly reduced by SDCCC's security justification

23  for its policy.  Therefore, although part of United's financial losses may not be recoverable as

24  damages, injunctive relief, especially mandatory relief, is not warranted.  Under the alternative test,

25  the security rationale eliminates serious questions going to the merits of the antitrust claims.  In

26  addition, the balance of hardships does not tip in favor of United.  Finally, the public interest

27  weighs against the issuance of an injunction.  Based on the above, a preliminary injunction shall

28  not issue.

1

## V.  CONCLUSION

2        Accordingly, Plaintiff's Motion for a Preliminary injunction is **DENIED.**

3        **IT IS SO ORDERED.**

4

5    **DATED:  February 19, 2008**

6                                                    _____

7                                                    **Hon. Roger T. Benitez**
                                                     **United States District Judge**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07cv2172