James R. Lance (147173)
Jacob M. Slania (200652)
**KIRBY NOONAN LANCE & HOGE LLP**
350 Tenth Avenue, Suite 1300
San Diego, California 92101-8700
Telephone (619) 231-8666
Facsimile (619) 231-9593

Theodore R. Tetzlaff (*Pro Hac Vice*)
Kristopher J. Stark (*Pro Hac Vice*)
**UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
Chicago, Illinois 60602-4224
Telephone (312) 977-4400
Facsimile (312) 977-4405

Attorneys for Plaintiff
UNITED NATIONAL MAINTENANCE, INC.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED NATIONAL MAINTENANCE, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAN DIEGO CONVENTION CENTER CORPORATION, INC., a California corporation,<br><br>Defendant. | CASE NO. 07-CV-2172 BEN(JMA)<br><br>**UNITED NATIONAL MAINTENANCE, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO SAN DIEGO CONVENTION CENTER CORPORATION, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Date: March 22, 1010<br>Time: 10:30 a.m.<br>Judge: Hon. Roger T. Benitez<br>Crtrm: 3<br><br>Complaint Filed: November 13, 2007<br>Trial Date: None Set |

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

# **TABLE OF CONTENTS**

**Page**

1.  INTRODUCTION ................................................................................................ 1

2.  FACTUAL BACKGROUND ............................................................................... 2

    A.  The San Diego Trade Show and Convention Market. ............................... 2

    B.  The Trade Show Cleaning Market. ........................................................... 2

    C.  History of Competition for Trade Show Cleaning in San Diego. .............. 3

    D.  SDCCC'S Exclusive Policy. ..................................................................... 4

        1.  Competitors Such as United Cannot Operate Profitably Under the
            Exclusive Policy. ......................................................................... 4

        2.  SDCCC'S Sham "Security" Justification. ...................................... 6

3.  SDCCC'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED ................ 8

    A.  The Applicable Legal Standard for SDCCC's Motion Addressed to United's
        Claims. ..................................................................................................... 8

    B.  There Are Triable Issues of Material Fact as to Whether SDCCC Is Liable
        for Attempted Monopolization. ................................................................ 9

        1.  There Are Genuine Issues of Material Fact Regarding The
            Dangerous Probability Of Monopoly Element. .............................. 9

            a.  Defining the Relevant Market. ........................................... 9

                i.   The Product Market. .............................................. 10

                ii.  The Geographic Market. ........................................ 11

            b.  SDCCC Owns a Dominant Share of the Relevant Market. ............. 13

            c.  United Faces Significant Barriers to Market Entry. ...................... 13

        2.  There Are Genuine Issues of Material Fact Regarding The Antitrust
            Injury Element of United's Attempted Monopolization Claim. ................. 14

    C.  There Are Triable Issues of Material Fact Regarding United's Essential
        Facilities Claim. ....................................................................................... 16

        1.  United Can Establish A Traditional Essential Facilities Claim. ................. 16

        2.  United Can Establish Its claim in the Context of Refusal to Deal. ............. 16

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

D.  There is a Triable Issue of Material Fact as to Whether SDCCC is Liable for Group Boycott. ................................................................................................ 18

    1.  *Per se* violation of § 1. ........................................................................ 18

    2.  Violation of the "Rule of Reason" under § 1 ...................................... 20

E.  There is a Triable Issue of Material Fact as to Whether SDCCC is Liable for Exclusive Dealing. ............................................................................................ 21

F.  United Properly Plead a Tying Claim, and There is a Triable Issue of Material Fact as to Whether SDCCC is Liable for Tying. ..................................... 22

    1.  United Plead a Tying Claim. .............................................................. 22

    2.  United Can Establish A Tying Violation. ........................................... 22

        a.  *Per Se* Tying Violation. ........................................................... 23

        b.  United Can Prove a Rule of Reason Tying Violation. .................... 24

G.  There is a Triable Issue of Material Fact as to Whether SDCCC is Liable for Interference with Contract. ................................................................................ 24

    1.  SDCCC Disrupted United's Contract With GES. ................................ 24

    2.  United Can Show A Breach of the GES Contract. ............................... 25

    3.  United Can Show Both Breach and Disruption of the Champion Contract. ......................................................................................... 26

H.  There is a Triable Issue of Material Fact as to Whether SDCCC is Liable for Interference with Prospective Economic Advantage. ............................................ 27

I.  There is a Triable Issue of Material Fact as to Whether SDCCC has Violated California Business and Professions Code Sections 17200 *et seq.* .......... 27

J.  SDCCC is not Entitled to Summary Adjudication of Its Tenth or Twenty-Third Affirmative Defense. ................................................................................ 28

    1.  SDCCC Is not Entitled to Summary Adjudication of Its Tenth Affirmative Defense Because SDCCC Is not Immune from Antitrust Liability Under the State Action Doctrine. ........................................... 29

        a.  SDCCC is not the State Acting as Sovereign. ................................ 29

        b.  SDCCC's Policy was not Enacted Pursuant to Clearly Articulated and Affirmatively Expressed State Policy .................... 29

        c.  There Is Clearly a Factual Issue Regarding If SDCCC is a Private Entity, and Must Therefore Demonstrate Active State Supervision. ....................................................................... 31

        d.  SDCCC Cannot Demonstrate that the State Actively Supervises Its Anticompetitive Conduct. ........................................ 33

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1

2.    Summary Adjudication of SDCCC's Twenty-Third Affirmative
Defense is not Appropriate Because United is Entitled to Monetary
Relief. .................................................................................................... 33

a.    California does not Treat SDCCC as a Governmental Entity. ......... 34

b.    Taxpayers do not Bear the Burden of an Antitrust Award
Against the SDCCC. .................................................................... 34

4.    CONCLUSION ........................................................................................................ 35

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.,*
    834 F. Supp. 1216 (D. Alaska 1991) .................................................................... 34

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP,*
    592 F.3d 991 (9th Cir. 2010) ............................................................................... 21

*Andrews v. Mobile Aire Estates,*
    125 Cal. App. 4th 578 (2005) .............................................................................. 24

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985) ................................................................................... 14, 17

*Atlantic Exposition Services, Inc. v. SMG,*
    262 F.App'x 449 (3d Cir. 2008) .......................................................................... 13

*Big Bear Lodging Ass'n. v. Snow Summit, Inc.,*
    182 F.3d 1096 (9th Cir. 1999) ............................................................................. 18

*Christy Sports, LLC v. Deer Valley Resort Co. Ltd.,*
    555 F.3d 1188 (10th Cir. 2009) ........................................................................... 11

*City of Anaheim v. So. Cal. Edison Co.,*
    955 F.2d 1373 (9th Cir. 1992) ............................................................................. 16

*Datagate v. Hewlett-Packard Co.,*
    60 F.3d 1421 ....................................................................................................... 23

*Eastman Kodak Co. v. Image Technical Svcs.,*
    504 U.S. 451 (1992) .................................................................................. 8, 22, 23

*Elliot v. United Center,*
    126 F.3d 1003 (7th Cir. 1997) ............................................................................. 13

*Fantenot v. Upjohn Co.*
    780 F.2d 1190 (5th Cir. 1986) ................................................................. 28, 31, 35

*Fishman v. Estate of Wirtz,*
    807 F.2d 520 (7th Cir. 1986) ............................................................................... 13

*Hornsby Oil Co., Inc. v. Champion Spark Plug, Co., Inc.*
    714 F.2d 1384 (5th Cir. 1983) ............................................................................. 10

*Huntleigh USA Corp. v. United States,*
    525 F.3d 1370 (Fed. Cir. 2008) .......................................................................... 31

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

*Knapp v. Palisades Charter High School,*
    146 Cal. App. 4th 708 (2007)................................................................... 32, 34

*Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.,*
    940 F.2d 397 (9th Cir. 1991)................................................................... 29, 30

*Los Angeles Memorial Coliseum Com'n v National Football League,*
    726 F.2d 1381 (9th Cir. 1984)................................................................. 10, 20

*MCM Partners, Inc. v. Andrews-Bartlett & Assoc., Inc.,*
    62 F.3d 967 (7th Cir. 1995).............................................................................. 13

*Medic Air Corp v. Air Ambulance Authority*
    843 F.2d (9th Cir. 1988).................................................................................. 33

*MetroNet Services Corp. v. Qwest Corp.,*
    383 F.3d 1124 (9th Cir. 2004)......................................................................... 16

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,*
    924 F.2d 1484 (9th Cir. 1991)......................................................................... 11

*N. Pac. Ry. Co. v. United States,*
    356 U.S. 1 (1958)............................................................................................. 23

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.,*
    182 F.3d 157 (2nd Cir. 1999)........................................................................ 8, 9

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,*
    210 F.3d 1099 (9th Cir. 2000)........................................................................... 8

*Nugget Hydroelectric L.P. v. Pacific Gas & Electric Co.,*
    981 F.2d (9th Cir. 1992).................................................................................. 33

*Otter Tail Power Co. v. United States,*
    410 U.S. 366 (1973)........................................................................................ 17

*Pacific Gas & Electric Co. v. Bear Stearns & Co.,*
    50 Cal.3d 1118 (1990)......................................................................... 24, 25, 26

*Paladin Association, Inc. v. Montana Power Co.,*
    328 F.3d 1145 (9th Cir. 2003)................................................................... 15, 18

*Poller v. Columbia Broadcasting System, Inc.,*
    368 U.S. 464 (1962).......................................................................................... 8

*Quelimane Co. v. Stewart Title Guaranty Co.,*
    19 Cal.4th 26 (1998)........................................................................................ 24

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.,*
    51 F.3d 1421........................................................................................... passim

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

*Risetto v. Plumbers and Steamfitters Local 343,*
   94 F.3d 597 (9th Cir. 1996)...................................................................................... 12

*Silver v. N.Y. Stock Exch.,*
   373 U.S. 341 (1963) ...................................................................................... 18, 19, 21

*Snake River Valley Elec. Ass'n v. Pacificorp,*
   238 F.3d 489 .......................................................................................................... 33

*Tanaka v. Univ. of Southern California,*
   252 F.3d 1059 (9th Cir. 2001) ................................................................................ 11

*Tarabishi v. McAlester Regional Hosp.,*
   951 F.2d 1558 (10th Cir. 1991)......................................................................... 34, 35

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,*
   875 F.2d 1369 (9th Cir. 1989).................................................................................. 12

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,*
   676 F.2d 1291 (9th Cir. 1982).................................................................................. 21

*U.S. v. White County Bridge Commission,*
   275 F.2d 529 (1960).................................................................................................. 22

*Wells v. One2One Learning Found.,*
   39 Cal.4th 1164 ............................................................................................ 31, 32, 34

*White v. Arco/Polymers, Inc.,*
   720 F.2d 1391 (5th Cir. 1983).................................................................................. 12

*Woods Exploration & Producing Co. v. Aluminum Co. of America,*
   438 F.2d 1286 (5th Cir. 1971).................................................................................. 13

**STATUTES**

15 U.S.C. § 1 .............................................................................................................passim

15 U.S.C. §14 ................................................................................................................ 17

15 U.S.C. § 34(1) .................................................................................................... 33, 35

15 U.S.C. § 15 ................................................................................................................ 34

California Business and Professions Code Sections 17200 *et seq.* ...................... 1, 27, 28

**OTHER AUTHORITIES**

Fed. R. Civ. Pro. 56 .............................................................................................. 8, 9, 31

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

# 1. INTRODUCTION

Plaintiff United National Maintenance, Inc. ("United") provides specialized cleaning and maintenance ("Trade Show Cleaning") for trade shows held at convention facilities nationwide. United has provided Trade Show Cleaning at the San Diego Convention Center (the "Facility") since it opened in 1989, in direct competition with Defendant San Diego Convention Center Corporation, Inc. ("SDCCC").[1]  After its unsuccessful solicitation of United's key customers in late 2006 and early 2007, SDCCC decided to take a more aggressive approach to grab United's customers and revenue.  Effective July 1, 2007, SDCCC implemented a policy excluding its competitors from performing Trade Show Cleaning in the Facility unless:  (1) the competitor exclusively uses SDCCC employees; and (2) the competitor agrees that all revenues which would otherwise go to said competitor for Booth Cleaning (the only work which produces any significant profit) must be paid to SDCCC ("Exclusive Policy").  The Exclusive Policy not only barred United's workers and all other non-SDCCC employees from performing Trade Show Cleaning at the Facility, it also immediately achieved SDCCC's goal of increasing its revenues.  In the first year of this anti-competitive policy, SDCCC achieved Booth Cleaning revenues of $959,019, when the pre-policy budget was only $357,500 – an incredible increase of $601,519.  (Declaration of Jacob M. Slania ("Slania Dec."), Ex. 77.)  Simply stated, this Exclusive Policy is a money grab which violates federal antitrust laws and California tort law.

United sued SDCCC for anti-trust violations, including attempted monopolization, essential facilities, group boycott, exclusive dealing, tying, and the business torts of interference with contract and with prospective economic advantage, and violation of California Business & Professions Code § 17200.  SDCCC initially took the position BEFORE this Court that the Exclusive Policy was implemented for Homeland Security reasons.  It turns out that SDCCC's Homeland Security argument merely was an attempt to justify the Exclusive Policy and to mislead

---

[1] SDCCC wears two different hats which are relevant to this case.  SDCCC is the operator of a Trade Show Cleaning business within the Facility.  SDCCC also is the operator/manager of the Facility through a contract with THE Lessee of the Facility, the City of San Diego. The facility is owned by the San Diego Unified Post District.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   the Court.  After it became clear during discovery that the security argument would not withstand

2   scrutiny, SDCCC changed its tune – de-emphasizing the security argument and admitting that one

3   of the primary reasons for this anti-competitive policy was to increase revenue.

4        SDCCC filed its motion for summary judgment ("Motion") attacking each of United's

5   claims.  SDCCC also seeks summary adjudication of its Tenth and Twenty-Third Affirmative

6   Defenses for immunity under the State Action Doctrine and Local Government Antitrust Act.  As

7   set forth in detail below, each of SDCCC's arguments fails and SDCCC's Motion should be denied

8   in its entirety.

9                    **2.  FACTUAL BACKGROUND**

10       **A.    The San Diego Trade Show and Convention Market.**

11       SDCCC has managed and operated the Facility since it opened in 1989.  ("Slania Dec."

12  Ex. A at 112:16-20.)  The Facility offers over 615,000 square feet of exhibit space and over

13  1,000,000 square feet of combined exhibit and meeting space, making it the eleventh largest

14  convention center in the United States.  (Slania Dec., Ex. 5.)  There is no alternative to the Facility

15  in or around San Diego. (Slania Dec., Ex. 2 at ¶¶7-8.)  SDCCC leases the Facility to entities that

16  hold trade shows.  (Slania Dec., Ex. 79 at ¶3.)  The licensees (typically trade associations) hire

17  general contractors (aka "decorators"), such as GES Exposition Services ("GES") and Champion

18  Exposition Services ("Champion"), to organize and manage the trade show.  (Slania Dec., Ex. 2 at

19  ¶ 3.)  These general contractors usually hire subcontractors such as United to perform many of the

20  services required for each show.  (*Id.* at ¶¶ 3-4.)

21       **B.    The Trade Show Cleaning Market.**

22       United provides Trade Show Cleaning at convention facilities nationwide.

23  (Accompanying Declaration of Richard Simon ("Simon Dec."), ¶ 2.)  United invests locally in

24  each city, hiring a work force and purchasing equipment dedicated for use in that city.  (Slania

25  Dec. Ex. D at 19:17-22:3.)  United is uniquely qualified to provide Trade Show Cleaning because

26  its employees have knowledge and experience with each type of trade show and United's service is

27  precisely tailored for each show type and type of exhibit.  (*Id.;* Slania Dec., Ex. 2 at ¶ 5.)  United

28  knows how to deploy and utilize a constantly fluctuating number of man-hours in very narrow

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   time windows.  (Slania Dec., Ex. 2 at ¶¶5-6; Ex. D at 24:3-21.)  Trade Show Cleaning is a unique

2   product that is not interchangeable with general janitorial services, a fact recognized by the

3   customer base.[2]  (Slania Dec., Ex. C at 21:5-20; Ex. 2 at ¶¶5-6.)

4        United provides two types of Trade Show Cleaning: Facility Cleaning and Booth Cleaning.

5   (Simon Dec. ¶5.)  Facility Cleaning addresses the common areas of the Facility during all phases

6   of a show.  (Id.)  The general contractor pays an hourly rate for this service to compensate United

7   for its direct labor cost, overhead and profit.  (Slania Dec., Ex. D at 217:24-219:7.)  Booth

8   Cleaning is paid by the individual exhibitors for cleaning their designated space.  (Slania Dec., Ex.

9   C at 146:23-147:5; Simon Dec., ¶5.)  United is paid 50% of the revenue paid by the exhibitors,

10  with the other 50% going to the general contractor.  (Id.)

11       United has written national contracts to provide Trade Show Cleaning to GES and

12  Champion.  (Slania Dec. Exs., 83 and 84.)  When SDCCC implemented the Exclusive Policy in

13  2007, United was charging GES and Champion $16.30 per hour for Facility Cleaning in San

14  Diego and 50% of the total revenue from exhibitors for Booth Cleaning.  (Id.; Simon Dec., ¶7.)

15       **C.     History of Competition for Trade Show Cleaning in San Diego.**

16       SDCCC and United have directly competed to perform Trade Show Cleaning since the

17  Facility opened.  (Slania Dec., Ex. C at 172:8-16.)  The beneficiaries of the competition include

18  show managers, exhibitors and general contractors. Until July 1, 2007, the general contractors,

19  including GES and Champion, have always had the absolute right to choose the company to

20  perform Trade Show Cleaning at the Facility. (Slania Dec., Ex. 2 at ¶10; Ex. 85, ¶5.)

21       In 2006 and early 2007, SDCCC attempted to increase its share of the cleaning business by

22  aggressively soliciting United's two major customers, GES and Champion.  (Slania Decl. Ex. 1 at

23  ¶9; Ex. 2 at ¶11.)  SDCCC's solicitation efforts failed.  (Id.)

24

25

26

27  [2] Trade Show Cleaning should not be confused with the general janitorial cleaning of the Facility's restrooms and non-exhibit hall areas.

28

**D.      SDCCC'S Exclusive Policy.**

Following its unsuccessful efforts to convince United's customers to change horses, SDCCC instituted an Exclusive Policy on July 1, 2007 which accomplished the same goal by making it impossible to compete with SDCCC for the Trade Show Cleaning.  (Slania Dec. Ex. E at 124:20-125:11, Accompanying Declaration of Bill Daddano ("Daddano Dec."), ¶ 3).  This anti-competitive policy clearly is an "Exclusive" even though SDCCC objects to the term because it knows that the Moscone Center unsuccessfully attempted to institute an exclusive cleaning policy in 1989.  United obtained an injunction barring implementation of the exclusive at the Moscone Center and provided this information to SDCCC. (Simon Dec. at ¶¶ 11-12.)  Armed with this knowledge, SDCCC attempted to disguise its new anti-competitive policy. (Slania Dec., Ex. 5).  First SDCCC's own document shows that SDCCC would be the exclusive provider of cleaning services staffing. (Slania Dec., Ex. 6.) Then, before announcing its policy SDCCC removed the word "exclusive." (Slania Dec., Ex. 7.) Instead of a blanket exclusion, SDCCC offered to allow United and its other competitors to continue to work at the San Diego Convention Center but only if they used SDCCC labor and gave SDCCC almost all of their profit. (Slania Dec., Ex. 85 at ¶8).

**1.      Competitors Such as United Cannot Operate Profitably Under the Exclusive Policy.**

SDCCC knew that Champion and GES had long-term contracts with United to provide Trade Show Cleaning nationwide. (Slania Dec., ¶8, and Ex. F at 22:6-23:16; Ex. 1 at ¶ 9; Ex. 2 at ¶ 11.) SDCCC used its knowledge of these contracts to implement the Exclusive Policy in a manner that guaranteed United would lose money in San Diego and thus could not compete.

For Facility Cleaning, United must pay SDCCC a flat $17 per hour rate even though SDCCC knew that United was contractually bound to charge GES and Champion less. (Slania Dec., Ex. D at 87:28-29.)  United also is constrained by the estimates it provides the general contractor prior to each show, and United cannot bill for hours worked in excess of its contractual estimate; placing a premium on the efficiency of the workforce. (Slania Dec., Ex. 81 at ¶¶16-18.) Under the Exclusive Policy, United has no control over how many employees are dispatched by SDCCC for a show, and it cannot incentivize SDCCC's workers to be more efficient.  (*Id.*)

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    Trade Show Cleaning companies make the vast majority of their profit from Booth

2    Cleaning.  Historically, Booth Cleaning revenue has been split 50/50 between the General

3    Contractor and the Trade Show Cleaning Company.  (Simon Dec., ¶ 5.)  Under the Exclusive

4    Policy, however, any competitor of SDCCC for Trade Show Cleaning must agree to pay 50% of

5    the Booth Cleaning Revenue to SDCCC.[3]  Therfore, unless United is able to increase its

6    percentage of Booth Cleaning revenue, there is no profit for United.  (Simon Dec., ¶ 11.)

7    However, United's customers have no reason to reduce their percentage in order to increase the

8    percentage to United.  (*Id.* at ¶ 12.)  For example, if United requests more than 50% of the Booth

9    Cleaning revenue from a General Contractor, the General Contractor would simply hire SDCCC

10   because it would get the service cheaper and the same people (SDCCC employees) will be

11   performing the work.  In sum, the SDCCC policy is a creative but thinly-veiled exclusive which

12   has the same result as the Moscone exclusive which was enjoined: the elimination of any

13   competitors to the in-house cleaning business.

14   To substantiate this fact, filed herewith is a declaration of the President of Century Trade

15   Show Services, Inc.  Century is a Trade Show Cleaning company which would like to compete to

16   provide such services at the Facility but cannot do so because the Exclusive Policy prevents any

17   possibility of making a profit.  (Daddano Dec., ¶ 3.)

18   SDCCC has put United between the proverbial "rock and a hard place."  If United ends its

19   operations in San Diego, United will breach its nationwide contracts with Champion and GES,

20   placing its national business at risk.  (Slania Dec., Ex. 85 at ¶18.)  Therefore, United is forced to

21   commit financial suicide in the San Diego market to preserve its national contracts.  (Slania Dec.,

22   Ex. 81 at ¶¶14-15, Ex. 85 at ¶¶11, 18.)

23

24

25   [3] Under the Exclusive Policy, United must pay SDCCC all of the gross revenue it earns for Booth
26   Cleaning (50% of the fees paid by exhibitors to the general contractor) or $17 per man-hour of
     labor used, whichever is greater.  (Slania Dec., Ex. D at 84:9-87:12; and Ex. 85 at ¶8.)  The 50% is
27   almost always more than the hourly rate, but SDCCC is guaranteed *100% or more* of United's
     revenue for Booth Cleaning.  (*Id.*; Slania Dec., Ex. 507 at ¶¶28-29.)

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

### 2.    SDCCC'S Sham "Security" Justification.

On May 18, 2007, SDCCC's General Manager Brad Gessner formally stated SDCC's "security" justification for implementing its Exclusive Policy:

> **SDCCC staff will perform all cleaning events…We considered many factors before deciding to implement this program.  Security concerns related to ensuring that the staff are properly screened, credentialed and trained, and consistency of cleaning quality were the main factors that led to this decision.  It is important to note that SDCCC performs criminal background checks and requires a drug test for every potential new hire, in addition to providing extensive training and supervision of its employees.  This produces an excellent staff providing exemplary services.**

(Slania Dec., Ex. 7.)

SDCCC's "security" justification for its Exclusive Policy is a sham.  The Exclusive Policy is applied solely to providers of Trade Show Cleaning, despite the fact that Trade Show Cleaning Service employees constitute roughly 5% of the outside labor required to operate and manage a trade show.  (Slania Dec., Ex. 81 at ¶4.)  Thus, employees of trade associations, general contractors and the long list of other outside vendors including electricians, exhibit installers, freight handlers, carpet installers, display houses, decorators, sign hangers, advertisers, florists, caterers, and other general labor are exempt from SDCCC's Exclusive Policy.  (*Id.*)  In addition, much of this labor force is unionized, and the unions do not even perform background checks on these laborers.  (Slania Dec., Ex. I at 12:13-18; Ex. J at 11:2-12:2; 12:19-21; Ex. K at 29:1-30:21.)

The discriminatory application of the Exclusive Policy only to United (and other cleaning companies) does not improve security at the Facility.  (Slania Dec., Ex. L at 159:14-160:17.)  Indeed, "Employment by the SDCCC does nothing to improve security.  What ensures better security is following universal security protocols, meaning that if inside and outside employees are all subject to the same screening procedures, security risks will be minimized."  (Slania Dec., Ex. R at ¶6.)  Instead, SDCCC's application of the Exclusive Policy solely against its competitors for Trade Show Cleaning Service Shows an anticompetitive animus.  (Slania Dec., Ex. 507, ¶¶44-47.)

Making application of the Exclusive Policy even more suspicious is that SDCCC never brought a single security issue to United's attention while United worked at the Facility.  (Slania Dec., Ex. D at 178:16-24; Ex. N at 309:5-8.)  United does not use temporary workers and the

1  entirety of its workforce comes from a common roster of local W-2 employees. (Slania Dec., Ex.

2  81,¶ 8.) If United needs to supplement its work force, temporary workers are not used. Rather,

3  United brings in its own employees from other cities. (*Id.*) Thus, except for minimal employee

4  turnover, the same United employees were the ones entering and working in the Facility. (*Id.*)

5       United also offered to pay for and subject its employees to the same background checks

6  and screening SDCCC uses, or to even let SDCCC run these identical checks on United's workers.

7  (Slania Dec., Ex. C at 188:5-192:6.) An expert in the field of trade show security states that if

8  "United employees are badged and background checked, they would pose a very low security risk

9  and would certainly not pose any more of a security risk than badged and background checked

10  employees of the SDCCC." (Callaghan Dec., ¶12.) SDCCC rejected United's proposal. (Slania

11  Dec., Ex. C at 188:5-192:6.)

12       United even offered to subject its employees who work at the Facility to a more stringent

13  security protocol than that used by SDCCC on its employees. (Slania Dec., Ex. D at 178:2-180:8.)

14  The proposal was drafted by Mr. Anthony D'Angelo, a retired FBI expert on homeland security.

15  (*Id.*; Slania Dec., Ex. D at 38:1-39:20; 144:15-147:11.) SDCCC rejected his proposal without

16  explanation. (Slania Dec., Ex. D at 178:2 - 180:8.)

17       Additionally, SDCCC had numerous security assessments performed on the Facility.

18  (Slania Dec., Ex. M at 14:4-15:8.) Those assessments identified numerous security concerns,

19  none of which had anything to do with United or Trade Show Cleaning Service contractors.[4]

20  (Slania Dec., Ex. S at 72:24-73:24.) Importantly, the Exclusive Policy did nothing to alleviate the

21  concerns identified in the assessments. (*Id.*)

22       Faced with this overwhelming evidence, SDCCC now says that there was a financial

23  motivation to implement the Exclusive Policy. (Slania Dec., Ex. E at 110:3-8, 197:2-6; Ex. Q at

24  14:19-21.) In fact, SDCCC's own documents demonstrate that the Exclusive Policy has put

25

26  [4] United is not detailing the specific risk areas in this opposition because the assessments are

27  subject to "Attorneys Eyes Only" protection under the subject protective order. To the extent the
   Court wishes to see the assessments United will provide them to the Court.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  approximately $1,000,000 in additional Trade Show Cleaning revenue into SDCCC coffers to

2  date.  (Slania Dec., Exs. 77 and 78.)  This directly contradicts the positions SDCCC took before

3  this Court when opposing United's motion for a preliminary injunction, both in its written

4  opposition and during oral argument.  (United's Request for Judicial Notice ("United's RJN") Exs.

5  A, B.)  More importantly, the change in the claimed reason shows SDCCC's anti-competitive

6  motivation.  Unable to compete fairly, SDCCC found a way to use its power over the facility to

7  exclude its competitors.

8       Given all of this evidence it is clear that the Exclusive Policy was not instituted for

9  "security" reasons.  Rather, the Exclusive Policy is to prevent United and others from competing

10  with SDCCC for Trade Show Cleaning at the Facility.

11  **3. SDCCC'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED**

12       **A.     The Applicable Legal Standard for SDCCC's Motion Addressed to
                United's Claims.**

13

14       Summary judgment is used "sparingly" in antitrust cases.  *See Poller v. Columbia*

15  *Broadcasting System, Inc.,* 368 U.S. 464, 472 (1962).  The party moving for summary judgment

16  bears both an initial burden of production and the ultimate burden of persuading the court that

17  there is "no genuine issue as to any material fact" and that the movant is entitled to judgment as a

18  matter of law.  Fed. R. Civ. Pro. 56(c).

19       Because summary judgment is a "drastic device," cutting off a party's right to present its

20  case to a jury, the moving party bears a "heavy burden" of demonstrating the absence of any

21  triable issue of material fact.  *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.,* 182 F.3d

22  157, 160 (2nd Cir. 1999).  Any doubts as to the existence of a "genuine issue of material fact" must

23  be resolved against the moving party.  *Id.*  Also, any inferences to be drawn from the evidence

24  must be viewed in the light most favorable to United.  *See Eastman Kodak Co. v. Image Technical*

25  *Svcs.,* 504 U.S. 451, 456 (1992).

26       Only if SDCCC carries its initial burden must United respond.  *See Nissan Fire & Marine*

27  *Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102-1103 (9th Cir. 2000).  United can set forth,

28  by affidavit or as provided in Rule 56, facts demonstrating that there exists a genuine issue (or

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1  issues) for trial.  Fed. R. Civ. Pro. 56(e)(2).  All reasonable inferences from the evidence submitted

2  must be viewed in United's favor, and if "reasonable men might reach different conclusions, the

3  motion should be denied and the case tried on the merits."  *Nationwide,* 182 F.3d at 160-161.

      **B.**      **There Are Triable Issues of Material Fact as to Whether SDCCC Is**
4                **Liable for Attempted Monopolization.**

6          To prove its attempted monopolization claim, United must show:  (1) SDCCC's specific

7  intent to control prices or destroy competition; (2) SDCCC's predatory or anticompetitive conduct

8  directed at creating a monopoly; (3) a dangerous probability of achieving monopoly power; and

9  (4) causal antitrust injury to United stemming from SDCCC's violation of the Sherman Act.  *Rebel*

10  *Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1432-1433 9th Cir. (1995).  SDCCC's Motion

11  does not challenge United's ability to establish the first two elements.[5]  SDCCC only argues that

12  United cannot establish the third or fourth elements.  SDCCC is wrong.  There are genuine issues

13  of material fact on both elements that preclude the grant of summary adjudication.

      **1.**      **There Are Genuine Issues of Material Fact Regarding The Dangerous**
14                **Probability Of Monopoly Element.**

16          United can establish a dangerous probability of monopoly by showing that SDCCC has

17  market power.  United can make this showing by:  (1) defining the relevant market; (2) showing

18  that SDCCC owns a dominant share of the relevant market; and (3) showing that potential

19  competitors (such as Century or United) face significant barriers to entry and that existing

20  competitors lack the capacity to increase output in the short run.  *Rebel,* 51 F.3d at 1433-34.

      **a.**      **Defining the Relevant Market.**

22          The definition of the relevant market is a **factual** inquiry for the jury, and the court may

23  not weigh evidence or judge witness credibility for purposes of summary judgment.  *Id.* at 1435

24  (emphasis added).  The relevant market has two components:  (1) the product market and (2) the

---

[5] United need not affirmatively demonstrate its ability to meet the first two elements because that
is SDCCC's burden and any issues raised for the first time in a reply brief are waived.  Fed. R.
Civ. P. Rule 56(c); *see Bazauye v. INS,* 79 F.3d 118, 120 (9th Cir. 1996).

geographic market.  *Los Angeles Memorial Coliseum Com'n v National Football League*, 726 F.2d 1381, 1392 (9th Cir. 1984).

### i.    *The Product Market.*

The product market encompasses producers which, because of the similarity of their products, have the actual or potential ability to take significant amounts of business away from each other.  *Id.; Rebel*, 51 F.3d at 1434.  Products fall within the same market if they are "reasonably interchangeable" for the same or similar uses.  *Coliseum*, 726 F.2d at 1393.  "The outer boundaries of the product market are drawn in terms of the presence of substitutes to which consumers will turn in response to price changes…and the ability of other existing producers…to expand output from their present facilities…"  *Hornsby Oil Co., Inc. v. Champion Spark Plug, Co., Inc.*  714 F.2d 1384, 1393 (5th Cir. 1983).

Here, there is a genuine issue of material fact regarding the product market.  United retained Dr. John Hekman as an expert to opine on many topics, including the relevant product market.[6]  He reviewed an extensive amount of evidence, including but not limited to SDCCC documents, interrogatory responses and deposition testimony.  (Accompanying Declaration of John Hekman ("Hekman Dec."), ¶ 4, Ex. 2.)  Based on the evidence reviewed, and his experience, Dr. Hekman concluded that the relevant product market is "Trade Show Cleaning at major convention centers." (Hekman Dec., ¶15.)  He also concluded that United and SDCCC are producers in the same market because their products, Trade Show Cleaning at the Facility, are reasonably interchangeable and SDCCC has taken significant business from United by implementing its unlawful Exclusive Policy.  (Hekman Dec., ¶¶15-22, 34.)  *See Coliseum*, 726 F.2d at 1393; *Rebel*, 51 F.3d at 1434.

---

[6] Expert opinion may defeat summary judgment if it appears the expert is competent to give an opinion and the factual basis for the opinion is disclosed.  *See Triton Energy Corp v. Square D Co.* 68 F.3d 1216, 1222 (9th Cir. 1995).  Dr. Hekman's curriculum vitae (Ex. 1 to Hekman Decl.) establishes his competency and the factual bases for his opinions are disclosed throughout his declaration.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    SDCCC contends that Dr. Hekman's opinion is valueless because relevant markets cannot

2   be limited to a single provider's services, relying on *Tanaka v. Univ. of Southern California*,

3   252 F.3d 1059, 1063 (9th Cir. 2001).  As set forth above, Dr. Hekman has referred to two different

4   providers, United and SDCCC, of Trade Show Cleaning.  Thus, *Tanaka* has no application here.

5    SDCCC also argues that Dr. Hekman's conclusion is flawed in light of *Christy Sports,*

6   *LLC v. Deer Valley Resort Co. Ltd.,* 555 F.3d 1188 (10th Cir. 2009).  *Christy* is distinguishable for

7   at least two reasons.  First, there were other nearby resorts from which skiers could ski and/or rent

8   skis, and if a monopolist chose to charge supracompetitive prices for ski rentals at the resort,

9   skiers could easily choose to ski at one of the other two resorts in Park City, or rent skis from

10  another location.  Here, the Facility is the only building in the San Diego area that is equipped to

11  host large trade shows and there are no other alternatives.  (Hekman Dec., ¶29; Slania Dec., Ex. 2

12  at ¶7).  Second, the resort's owner sold a parcel of land on which plaintiff operated subject to a

13  restrictive covenant.  *Id.* at 1190-91.  Fifteen years later the owner sought to enforce the restrictive

14  covenant, of which plaintiff was on notice.  *Id.*  Here there is no bargained for restrictive covenant

15  that SDCCC obtained in negotiations with United that it now seeks to enforce.  Also, SDCCC has

16  always competed with United for Trade Show Cleaning; this is not a new venture like *Christy.*

17    There are at least two providers of Trade Show Cleaning at the Facility, United and

18  SDCCC (Hekman Dec., ¶15; Slania Dec., Ex. C at 172:8-16.) A jury should decide how they fit

19  into the product market analysis. *See Rebel,* 51 F.3d at 1435. SDCCC's Motion should be denied.

20          **ii.**        ***The Geographic Market.***

21    The relevant geographic market is an area of effective competition where buyers can turn

22  to alternate sources of supply. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d

23  1484, 1490 (9th Cir. 1991) (internal quotation and citation omitted).  Assuming products are

24  substitutes, a geographic market is the area in which cross-elasticity of demand would be high

25  between them.  High cross-elasticity of demand exists where increases or decreases in one

26  product's price cause substantial increases or decreases in demand for the other product.  If buyers

27  in one geographic area do not change their consumption habits in response to a decrease in price

28  of a substitute product supplied in another geographic area, then the two areas probably do not fall

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

within the same geographic market. Cross-elasticity of demand would be low in that case. *See*

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1375-77 (9th Cir. 1989).

The key facts supporting a market limited to the Facility in San Diego are the long-term nature of contracts to use the Facility combined with the limited size and availability of alternatives. (Hekman Dec., ¶¶23-31; Slania Dec., Ex. 507 at ¶¶23-26.) Consumers of Trade Show Cleaning cannot and will not be able to turn to other facilities in or out of San Diego for their conventions, even if the price of Trade Show Cleaning were to rise substantially, because there are few facilities of a similar size as the Facility, and nothing even close to its size in San Diego. (Slania Dec., Ex. 2 at ¶7; Ex. 507 at ¶24.)

Thus, the relevant geographic market is large convention centers in the San Diego metropolitan area, of which there is only one, the Facility. (Hekman Dec., ¶ 23.) Indeed, the territory in which United and SDCCC compete is the Facility. In the past, general contractors could choose to use United's, SDCCC's or any other competitor's labor. Logically, if SDCCC substantially increased its prices for cleaning services, demand for United's cleaning services would increase. Thus, SDCCC's cleaning service and United's cleaning service fall within the same geographic market. *See Thurman*, 875 F.2d at 1375-77.

SDCCC argues that the market is nationwide, contradicting earlier statements SDCCC made to this Court:

- "SDCCC's security policy requiring the use of SDCCC employees to perform cleaning services is a purely **local** activity with a purely **local** affect."
- "Plaintiff will be unable to show that the **local** activity…"
- "… the actual cleaning services are only performed by SDCCC employees in San Diego and only at the Center."
- "… the relevant market is San Diego, which by definition is purely local."

(United's Request for Judicial Notice ("United's RJN"), Ex. A at 13:7, 17-20 (emphasis added).) SDCCC acknowledges the relevant geographic market is local when convenient. SDCCC should not be permitted to avoid its earlier statements to this Court. *Risetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600-601 (9th Cir. 1996); *see White v. Arco/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983). SDCCC's admissions demonstrate the existence of a disputed factual issue upon which SDCCC's Motion must be denied.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   SDCCC's reliance on *Atlantic Exposition Services, Inc. v. SMG*, 262 F.App'x 449 (3d Cir.

2   2008) and *Elliot v. United Center*, 126 F.3d 1003 (7th Cir. 1997) is misplaced.  Single facilities and

3   single convention centers can constitute relevant geographic markets. *See, e.g., MCM Partners,*

4   *Inc. v. Andrews-Bartlett & Assoc., Inc.*, 62 F.3d 967, 975-77 (7th Cir. 1995) (lone large

5   convention center in Chicago could be relevant market); *Fishman v. Estate of Wirtz*, 807 F.2d 520,

6   531 (7th Cir. 1986) (Chicago Stadium found to be the relevant geographic market); *Woods*

7   *Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1307 (5th Cir. 1971)

8   (geographic market limited to single natural gas field).  Furthermore, *Atlantic* is distinguishable

9   because in that case the court found there were other options for show producers, and no such

10  options exist here. *Atlantic,* 262 F. App'x at 452.  *Elliot* is also distinguishable because there were

11  other competitive venues for plaintiff and defendant did not compete against plaintiff. *Elliot*, 126

12  F.3d at 1005.  Thus, the same options do not exist here as did for plaintiffs in *Atlantic* and *Elliot.*

13  The foregoing evidence presents factual issues regarding the relevant geographic market

14  that should be decided by a jury. *Rebel* 51 F.3d at 1435. The Motion should be denied.

15    **b.  SDCCC Owns a Dominant Share of the Relevant Market.**

16  United can also establish that SDCCC owns a dominant share of the relevant market.

17  Before imposing the Exclusive Policy in 2007, SDCCC performed 50% or more of the Trade

18  Show Cleaning at the Facility.  (Hekman Decl., ¶ 32; Slania Dec., Ex. 507 at ¶320; Slania Dec.,

19  Ex. E at 88:3-90:7.)  After implementing the Exclusive Policy, SDCCC now performs 100% of the

20  Trade Show Cleaning in the Facility.  (Hekman Dec., ¶32.)  So, both before and after the Policy

21  was enacted, SDCCC possessed a dominant share of the relevant market. *See Rebel,* 51 F.3d at

22  1438 (holding that ownership of a 44% market share was sufficient to prove attempted monopoly).

23    **c.  United Faces Significant Barriers to Market Entry.**

24  The last item for United to show on this element of its attempted monopolization claim is

25  that it faces significant barriers to market entry and that existing competitors lack the capacity to

26  increase output in the short run. *Rebel,* 51 F.3d at 1439.  Entry barriers are "factors in the market

27  that deter entry while permitting incumbent firms to earn monopoly returns." *Id.;* quoting *Los*

28  *Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1427-28 (9th Cir. 1993).  Control of an

1  essential resource is a barrier to entry. *Rebel*, 51 F.3d at 1439.  Clearly that is present here,

2  because SDCCC controls entry to the Facility under its Exclusive Policy. (Slania Dec., Ex. 7.)

3          United also must demonstrate that existing competitors, if any, cannot increase their output

4  to capture market share from SDCCC if SDCCC increases prices. *See Rebel,* 51 F.3d at 1441.  If a

5  defendant prevents competitors from accessing the essential facility, then competitors cannot

6  increase production and cannot capture defendant's market share if defendant increases prices. *Id.*

7  That is precisely what SDCCC has done with its Exclusive Policy, precluded competitors from

8  providing Trade Show Cleaning at the Facility. (Slania Dec., Ex. 7; Daddano Dec., ¶ 3.)

9          Thus, SDCCC's control of the Facility, and of the workers who are authorized to perform

10  cleaning services there, is a significant barrier to United's entry into the market.  Because United

11  can demonstrate all elements necessary to demonstrate SDCCC's market power, or that there

12  remain unresolved factual issues on these elements, SDCCC's Motion should be denied.

13          **2.      There Are Genuine Issues of Material Fact Regarding The Antitrust
             Injury Element of United's Attempted Monopolization Claim.**

14

15          To defeat SDCCC's Motion on this point, United need only demonstrate a genuine issue

16  regarding its ability to prove a violation of § 2 of the Sherman Act.[7]  That is, is there a factual

17  issue that SDCCC's conduct unnecessarily harms both consumers and competitors, including

18  United?  The answer is yes.

19          First, it is not necessary for a plaintiff to show harm when the actions restrict competition

20  on some basis other than efficiency. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*

21  472 U.S. 585, 605 (1985).  SDCCC presented no evidence showing that precluding competition

22  for Trade Show Cleaning was done to promote efficiency.  Thus, SDCCC has not met its burden,

23  and its Motion should be denied.

24

25  _____

26  [7] Also, United must prove that SDCCC has market power in order to demonstrate that SDCCC's
     conduct harmed consumers and competitors, which it has done above in section 2B1. *Rebel,*
27  51 F.3d at 1434.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  Second, conduct harms consumer welfare if it increases product prices or decreases

2  product quality or availability, and causes inefficiency. *Paladin Association, Inc. v. Montana*

3  *Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003); *Rebel*, 51 F.3d at 1433. Allocative inefficiency

4  occurs when market participants who can use products most efficiently, lack access to those

5  products because of a defendant's conduct. See *Rebel*, 51 F.3d at 1433-34.

6  Evidence was elicited demonstrating harm to both consumers and competitors such as

7  United. *Id.* The consumer harm is reflected by the testimony from Champion personnel. They

8  testified that Champion's costs have increased because Champion now must pay for aisle and

9  carpet cleaning services that United previously provided free of charge. (Slania Dec., Ex. B at

10  100:1-101:12; Accompanying Declaration of Dan Pitts ("Pitts Dec.") at ¶¶7-8.) The same is true

11  of GES. (Accompanying declaration of Larry Colby ("Colby Dec.") ¶8; Accompanying

12  Declaration of Leland Kriz ("Kriz Dec.") ¶10.) Consumer harm also is reflected in numerous

13  letters from trade show consumers to the SDCCC, complaining that the Policy harms consumers

14  because the quality of cleaning services at the Facility has decreased due to the lack of

15  competition. (Hekman Dec., ¶¶59-60.) Also, Messrs. Ljundquist, Dickerson and Kriz all testified

16  that the quality of the cleaning services at the Facility declined once United's employees were

17  prohibited from working at the Facility. (Slania Dec., Ex. I at 30:18-31:9; Ex. J at 38:14-40:17;

18  Ex. F at 69:5-70:25; 169:17-21; 172:23-179:10.)

19  In addition, United was harmed by SDCCC's implementation of the Exclusive Policy, to

20  the tune of approximately $500,000 on its operations at the Facility. (Accompanying Declaration

21  of Patrick Kennedy ("Kennedy Dec."), ¶20.) Furthermore, no other competitor can even bid to

22  offer services with its own personnel. (Daddano Dec., ¶3.)

23  In that United can demonstrate harm to consumers and itself, it can show cognizable

24  antitrust injury resulting from SDCCC's implementation of the Exclusive Policy. The policy

25  excludes all actual and potential competitors, not just United. (Daddano Dec., ¶3.) The evidence

26  presented demonstrates, at a minimum, a genuine issue of material fact exists as to whether causal

27  antitrust injury exists. Therefore, SDCCC's Motion should be denied.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

**C.    There Are Triable Issues of Material Fact Regarding United's Essential Facilities Claim.**

**1.    United Can Establish A Traditional Essential Facilities Claim.**

"The 'essential facilities' doctrine imposes on the owner of a facility that cannot reasonably be duplicated and which is essential to competition in a given market a duty to make that facility available to its competitors on a nondiscriminatory basis." *MetroNet Services Corp. v. Qwest Corp.,* 383 F.3d 1124, 1128 (9th Cir. 2004) (internal citations omitted).  SDCCC only argues that United's claim fails because United has "access" to the Facility.  SDCCC is mistaken.

Neither United nor any other clearing company has meaningful access to the Facility. (Slania Dec., Ex. 85 ¶ 11; Daddano Dec., ¶ 3.)  The access given merely is a ruse to try to avoid liability.  By mandating that United can only work at the Facility on the condition that (1) United uses SDCCC's labor, and (2) SDCCC receives all of United's profit on the Booth Cleaning, SDCCC is making the Facility available in a discriminatory manner.  Indeed, since the Policy was implemented, United has been forced to operate at a loss of approximately $500,000 at the Facility to service its long-term contracts with its key customers. (Kennedy Dec., ¶20.)  United is not asking to have "access" to the Facility in the "most profitable manner."  Rather, it merely seeks access as was provided in the past: with the ability to use its own superior labor and without the outrageous theft of its profits. (Slania Dec., Ex. C at 171:5-8; Ex. 85 at ¶5.)  Clearly, it is feasible for SDCCC to provide this access to United because United had this "access" since the Facility opened in 1989 until implementation of the Policy in 2007. (*Id.*)  At a minimum, the access issue is a disputed factual issue precluding summary adjudication.

**2.    United Can Establish Its claim in the Context of Refusal to Deal.**

The power underlying SDCCC's control of the Facility is that SDCCC can parlay that control into a powerful mechanism to monopolize a market for services that depend on use of the essential facility. *See City of Anaheim v. So. Cal. Edison Co.,* 955 F.2d 1373, 1379 (9th Cir. 1992). The mechanism works through SDCCC's refusal to deal with competitors who can compete only if they have access to the Facility.  Because SDCCC can deny that access, SDCCC can "extend monopoly power from one stage of production to another..." *Id.*  Denial of access to an essential

1  facility is a form of refusal to deal and illegal under the Clayton Act (15 U.S.C. §14).  *See Aspen*,

2  738 F.2d at 1519.

3       In *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973), the Supreme Court

4  applied the elements of refusal to deal in the essential facilities context when an electric utility

5  monopolized the retail market for electricity.  Otter Tail, the defendant utility, refused to provide

6  access to its essential infrastructure (power grid), as well as refused to sell its own wholesale

7  electricity to municipal distributors and transport electricity from other electricity sellers to the

8  municipal distribution systems.  *Id.*, at 370.

9       The district court found defendant's conduct violated Section 2 of the Sherman Act and the

10  Supreme Court affirmed.  *Id.*, at 375, 377.  Otter Tail's denial of competitors' access to its

11  transmission grid deprived competitors of essential infrastructure and therefore precluded

12  competition in the retail energy market.  *Id.* at 375-77.  Otter Tail had a "strategic dominance" in

13  the transmission of power in most of its service area, which it used to foreclose potential entrants

14  into the retail market from obtaining electric power from outside sources of supply.  *Id.* at 377.

15  This harmed consumers, impeded competition on grounds other than efficiency, was allocatively

16  inefficient, and harmed municipalities and their utilities.  *Id.* at 377-78.

17       This case is analogous.  In *Otter Tail*, successful competition in the retail distribution of

18  electricity market required access to the power grid, which was an essential infrastructure.  Here,

19  successful competition in the Trade Show Cleaning market requires United being provided

20  meaningful access to the Facility.  Thus, access to the Facility plays an indispensable role in

21  United's Trade Show Cleaning business.  By implementing the Exclusive Policy SDCCC acquired

22  a "strategic dominance" in the Trade Show Cleaning Service market in San Diego, which it is

23  using to foreclose competitors (United & Century) from competing with the SDCCC for providing

24  cleaning services at the Facility.  This in turn is foreclosing (and harming) consumers (general

25  contractors) from choosing which company performs Trade Show Cleaning at the Facility.

26       As set forth above, at a minimum United can establish that genuine issues of material fact

27  exist as to whether SDCCC is liable for refusal to deal through the control of an essential facility.

28  Therefore, SDCCC's Motion should be denied.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

**D.    There is a Triable Issue of Material Fact as to Whether SDCCC is Liable for Group Boycott.**

Section 1 of the Sherman Act prohibits "every contract, combination...or conspiracy in restraint of trade or commerce among the several States." 15 U.S.C. § 1.  United alleges that SDCCC has engaged in a group boycott in violation of Section 1 of the Sherman Act.  United's claim can be subject to *per se* analysis or the rule of reason balancing framework.  *Big Bear Lodging Ass'n. v. Snow Summit, Inc.*, 182 F.3d 1096, 1101 (9th Cir. 1999).  SDCCC's Motion should be denied under both analytical frameworks.

**1.    *Per se* violation of § 1.**

A *per se* violation is one which "because of [its] pernicious effect on competition and lack of any redeeming virtue [is] conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use." *Paladin*, 328 F.3d at 1154.  To prove a *per se* violation of the Sherman Act, United must do the following:  (1) United must demonstrate an agreement, contract, combination, or conspiracy between two or more entities that restrains trade (noting that every commercial agreement is an agreement among two or more entities); (2) United must demonstrate that SDCCC cannot advance a plausible argument that its conduct enhances overall efficiency and makes markets more competitive; and (3) to win treble damages or an injunction United must establish causal antitrust injury to United, as was demonstrated in Section 3B2 above.  *Id.* at 1154-55, n.7.

Group boycotts are *per se* illegal if defendant cannot articulate plausible business justifications for the allegedly anticompetitive practices.  *Id.* at 1155.  In *Silver v. N.Y. Stock Exch.*, 373 U.S. 341 (1963), the Supreme Court found defendant New York Stock Exchange (NYSE) had illegally orchestrated a group boycott.  The NYSE's mandates to member firms to terminate wire connections with plaintiff constituted an agreement, conspiracy, or combination among two or more entities, and defendant's collective acts were unreasonable.  *Id.*, at 347, 365.  The *Silver* court cited three reasons why the boycott was *per se* unreasonable:

1)    NYSE's justifications of security enforcement and self-policing were implausible procompetitive business justifications.  *Id.* at 348-49;

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

2)     NYSE required other parties to exclude plaintiff from receipt of services which plaintiff could not do without. *Id.* at 344; and

3)     NYSE had market power because it controlled access to a market and service that plaintiff relied on, and because it exercised that power to plaintiff's detriment. *Id.*, at 348.

Consequently, the Supreme Court found defendant had engaged in an illegal group boycott under Section 1 of the Sherman Act. *Id.* at 365.

*Silver* is analogous here. NYSE canceled plaintiff Silver's wire connection so it was no longer able to service NYSE member firms, forcing the member firms to discontinue their affiliation with plaintiff. *Id.* at 347. Here, SDCCC has terminated the ability of United and others to provide general contractors at the Facility with Trade Show Cleaning. (Slania Dec., Ex. 7.) The *Silver* Court found the NYSE's mandate to its member firms constituted an agreement, conspiracy, or combination among two or more entities for purposes of violating Section 1 of the Sherman Act. *Id.* Similarly, SDCCC's Exclusive Policy is a mandate to general contractors at the Facility to discontinue using United's cleaning labor, which constitutes an agreement, conspiracy, or combination among two or more entities. (Slania Dec., Ex. 7.) Additionally, SDCCC's mandate to United that it enter into "One Show Contracts" to use SDCCC's labor to provide Trade Show Cleaning at the Facility also constitutes an agreement, conspiracy, or combination among two or more entities. (Slania Dec., Ex. 85 at ¶9.) Defendant NYSE's actions harmed plaintiff in the form of decreased business volume. *Id.*, at 344-345. Here, SDCCC's implementation of the Exclusive Policy has harmed United to the tune of $500,000. (Kennedy Dec., ¶20.)[8]

United has established all three elements of a *per se* violation of Section 1 of the Sherman Act. Therefore, a triable issue of material fact exists as to whether SDCCC is liable for group boycott and SDCCC's Motion should be denied.

---

[8] The Supreme Court was not persuaded by the NYSE's proffered security business justification for termination of plaintiff's wire connection. Here, the Court need not consider the SDCCC's proffered security justification for implementing the Exclusive Policy because SDCCC and the Facility are not subject to another federal statutory scheme like the parties were in *Silver*, such as the Exchange Act. However, even if it were, SDCCC's alleged implementation of the Exclusive Policy due to security concerns is a pretextural sham as described in section 2D2 above.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

### 2.    Violation of the "Rule of Reason" under § 1.

United can also demonstrate a group boycott in violation of the rule of reason. *Coliseum,* 726 F.2d at 1391.  To do so, United must show: (1) an agreement among two or more persons or distinct business entities that satisfies the multiple entity requirement of § 1 of the Sherman Act; (2) a showing that SDCCC intends to harm or unreasonably restrain competition; (3) a demonstration that SDCCC's conduct actually restrains competition; and (4) that anticompetitive effects of SDCCC's conduct outweigh procompetitive attributes of defendant's conduct. *Coliseum, supra,* 726 F.2d at 1391.  United must also show causal antitrust injury stemming from defendant's illegal conduct, which United demonstrated in Section 3B2 above.

After United demonstrates these elements, the trier of fact may then balance positive and negative effects on competition.  *Id.*  SDCCC's conduct violates the rule of reason if the anticompetitive effects of SDCCC's conduct outweigh any procompetitive benefits.  *Id.*

As discussed above, United can demonstrate an agreement between SDCCC and the general contractors (and/or SDCCC and United under the one-show contracts) prohibiting United from using its labor to perform Trade Show Cleaning at the Facility.  (See Section 3D1 above.)  Also shown above, by implementing the Exclusive Policy SDCCC intends to harm or unreasonably restrain competition in the Trade Show Cleaning market at the Facility.  (*Id.*)  And, as discussed above, SDCCC's conduct actually restrains competition because SDCCC now possesses 100% of the Trade Show Cleaning market at the Facility. (Hekman Dec., ¶32; Slania Dec., Ex. 507 at ¶32.)  Finally, the anticompetitive Policy is not supported by a legitimate business justification because the proffered security justification is a sham (Section 2D2 above) and the Policy has disabled competition in the relevant market. (Hekman Dec., ¶¶35-37; Daddano Dec. ¶ 3.)

At a minimum there are genuine factual issues for the jury to consider regarding whether SDCCC is liable for a group boycott in violation of the "rule of reason."  Accordingly, SDCCC's Motion should be denied.

**E.     There is a Triable Issue of Material Fact as to Whether SDCCC is Liable for Exclusive Dealing.**

"Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 996 (9th Cir. 2010). United contends the Exclusive Policy is an illegal exclusive dealing arrangement under Section 1 of the Sherman Act because it is an agreement between the SDCCC and all general contractors and Facility licensees that prevents them from purchasing United's labor for Trade Show Cleaning at the Facility.

An exclusive-dealing arrangement violates Section 1 if its effect is to unreasonably foreclose competition. *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1303-04 (9th Cir. 1982). "The reasonableness inquiry asks whether the restraint in question 'is one that promotes competition or one that suppresses competition.' " *Id.* If an agreement creates entry barriers into the market which foreclose competition in an unjustifiable manner, than it is unreasonable and violates section 1 of the Sherman Act. *See id.*

SDCCC argues that United's exclusive dealing claim fails because SDCCC acted unilaterally in promulgating the Exclusive Policy. SDCCC is mistaken. As discussed above, SDCCC's mandate to general contractors and Facility licensees that they must use SDCCC trade show cleaning labor (Slania Dec., Ex. 7.) constitutes an agreement, conspiracy, or combination among two or more entities. *See Silver*, 373 U.S. at 347.

SDCCC also argues that United cannot show an unreasonable restraint of trade under the Exclusive Policy because the general contractors are not required to retain SDCCC as the cleaning service provider, nor does it prohibit the general contractors from hiring United as a cleaning provider. This form over substance argument is devoid of merit and should be disregarded by the Court. It is undisputed that the contractors are required to use SDCCC's labor for Trade Show Cleaning at the Facility. (Slania Dec., Ex. E at 124:20-125:11; Ex. 7.) SDCCC's mandate forecloses competition because United is no longer able to compete with SDCCC in the Trade Show Cleaning Market Services in San Diego. Furthermore, no other competitors can enter the market because they are precluded from employing their labor at the Facility and must pay

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  SDCCC all of their Booth Cleaning revenue. (Daddano Dec. ¶3.) Before the Exclusive Policy

2  was implemented there were at least two firms that provided Trade Show Cleaning at the Facility.

3  Now, there is only one. (*Id.*; Slania Dec., Ex. E at 88:3-90:7; Hekman Dec., ¶¶35-37.) Clearly the

4  Exclusive Policy suppresses competition.

5       For these reasons, SDCCC's Motion should be denied.

6      **F.**    **United Properly Plead a Tying Claim, and There is a Triable Issue of**
7                **Material Fact as to Whether SDCCC is Liable for Tying.**

        **1.**     **United Plead a Tying Claim.**

8

9       United's tying claim is alleged in its claim for group boycott, and a court should look at the

10  substance of the pleading, rather than the form. *See U.S. v. White County Bridge Commission*,

11  275 F.2d 529, 535 (1960).[9] United's Complaint alleges: (1) beginning in 2007, SDCCC organized,

12  promoted, and engaged in a contract, combination and conspiracy in unreasonable restraint of

13  interstate trade and commerce by forcing licensees and general contractors to agree to exclusively

14  hire SDCCC employees (the tying product) for Trade Show Cleaning (the tied product) at the

15  Facility; (2) SDCCC has sufficient economic power in Trade Show Cleaning at the Facility to

16  coerce Decorators to exclusively hire SDCCC employees because it owns and control the Facility;

17  and (3) SDCCC's actions have resulted in tied market foreclosure and had an anticompetitive

18  impact in the Trade Show Cleaning market in San Diego. (Verif. Complaint, ¶¶ 32-37, 68-69, 87.)

19  Thus, United has properly plead a tying claim in violation of Section 1 of the Sherman Act.

20          **2.**     **United Can Establish A Tying Violation.**

21       "A tying arrangement is 'an agreement by a party to sell one product but only on the

22  condition that the buyer also purchases a different (or tied) product, or at least agrees that he will

23  not purchase that product from any other supplier.' " *Eastman Kodak Co.*, 504 U.S. at 461 (internal

24  citations omitted). "Such an arrangement violates § 1 of the Sherman Act if the seller has

25  _____

26  [9] SDCCC has suffered no prejudice because of the alleged failure to plead a tying claim.
27  SDCCC's expert addressed the tying claim in his report and deposition, and SDCCC addressed the
    merits of this tying claim in its MSJ.

28

'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Id.* at 462 (internal citations omitted).

### a.   *Per Se* Tying Violation.

To demonstrate a *per se* tying violation, United must show: (1) SDCCC tied together the sale of two distinct products or services; (2) SDCCC possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) the arrangement affects a "not insubstantial volume of commerce" in the tied product market. *Datagate v. Hewlett-Packard Co.,* 60 F.3d 1421, 1423-1424.  SDCCC only argues that United cannot establish the second element. The second element requires proof that the seller coerced a buyer to purchase the tied product.  *Id.* at 1426. Coercion is conduct that threatens to deprive customers of products or services that they need to compete, thereby forcing customers to purchase both the tying and tied products from defendant. *Id.*  The Supreme Court has found coercion when a defendant leveraged its "substantial economic power" in the tying market to force buyers to buy an undesirable product. *N. Pac. Ry. Co. v. United States,* 356 U.S. 1, 7 (1958).

Coercion is present here because the only way a Facility licensee can conduct a trade show at the Facility is if, through the general contractor, it agrees to use SDCCC cleaning labor.  Thus, SDCCC is using its dominant market power to force decorators to purchase an inferior and undesirable tied product, SDCCC cleaning labor.  (Slania Dec., Ex. I at 30:18-31:9; Ex. J at 38:14-40:17; Ex. F at 69:5-70:25; 169:17-21; 172:23-179:10.; Kriz Dec. ¶¶8-10).

SDCCC's expert Dr. Hayes[10] opined that the relevant market is the national trade show market and that SDCCC does not possess market power. (Hayes Dec., ¶9). **This opinion is unreasonable and should be disregarded in light of SDCCC's admission in its opposition to United's motion for a preliminary injunction that the relevant market is confined locally to San Diego.** (United's RJN Ex. A at 13:7, 17-20.)  Even if Dr. Hayes' opinion were reasonable,

---

[10] As set forth in United's accompanying Objections to Evidence, the entirety of Dr. Hayes' declaration is inadmissible and unreliable under Fed. R. Civ. Pro. 56(e)(1) and FRE § 603.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   there is a genuine issue of material fact regarding the relevant geographic market, making

2   summary adjudication inappropriate.

        **b.**      **United Can Prove a Rule of Reason Tying Violation.**

4           SDCCC also argues that United cannot demonstrate a rule of reason tying violation

5   because it cannot demonstrate that SDCCC plays enough of a role in the relevant market to

6   significantly impair competition.  In section 3B1a-c above, United demonstrated that there is a

7   genuine issue of fact regarding the relevant market being Trade Show Cleaning at the Facility, and

8   that SDCCC owns 100% of that market after implementing the Exclusive Policy.  And, in sections

9   2D2 and 3D2 above, United demonstrated that the anticompetitive effects of the Policy outweigh

10   SDCCC's proffered security justifications for enacting the Policy, which are a sham.  Thus, United

11   can demonstrate a rule of reason tying violation, and SDCCC's Motion should be denied.

        **G.**      **There is a Triable Issue of Material Fact as to Whether SDCCC is Liable for Interference with Contract.**

14           To demonstrate its claim for interference with contract, United must show: "(1) a valid

15   contract between (United) and a third party; (2) (SDCCC's) knowledge of this contract;

16   (3) (SDCCC's) intentional acts designed to induce a breach or disruption of the contractual

17   relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting

18   damages. *Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126 (1990).

19   SDCCC only argues that United cannot prove the fourth element of breach or disruption.

20           The question of breach or disruption is an issue for the trier of fact.  *See Andrews v. Mobile*

21   *Aire Estates*, 125 Cal. App. 4th 578, 583 (2005).  As SDCCC notes, actual breach or disruption

22   occurs when the contract is breached or when "plaintiff's performance is made more costly or

23   burdensome," as a result of defendant's interference. *Pacific Gas & Electric,* 50 Cal.3d at 1129.

24   United can show both a breach or disruptive interference.

        **1.**      **SDCCC Disrupted United's Contract With GES.**

26           Disruption to a contract is measured by impairment of a party's expected contractual

27   benefits. *See, Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 56-57 (1998).  After

28   unsuccessfully soliciting United's customer in an attempt to get the lucrative Booth Cleaning

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1 revenue, SDCCC simply took the revenue for its cleaning services department by instituting a new

2 policy in its role as the operator of the Facility.  By implementing the Exclusive Policy, SDCCC

3 disrupted United's expected contractual benefits.  Under its contracts with GES, United had

4 receieved 50% of the Booth Cleaning Revenue for many years before SDCCC implemented its

5 Exclusive Policy. (Simon Dec. ¶¶5, 8.)  The Exclusive Policy forces United to pay that entire 50%

6 to SDCCC.  (Slania Dec., Ex. D at 84:9-87:12; Ex. E at 181:3-16.; (Simon Dec. ¶8.)  Clearly, this

7 is a disruption of the United/GES contract.

8          In addition, performance of the contract also has become more expensive for United.

9 United has to pay more to SDCCC for SDCCC's labor than United would pay its own labor,

10 making performance more expensive for United.  (Slania Dec., Ex. D at 84:9-87:12.)  GES'

11 performance has also become more expensive.  (Colby Dec. ¶8; Kriz Dec. ¶10.)  An increase in

12 the costs of contract performance constitutes disruption.  *Pacific Gas & Electric,* 50 Cal. 3d at

13 1129.

14          SDCCC argues there is no disruption, contradicting its essential facilities argument, where

15 SDCCC admits United does not have the same access it once did, which is obviously a disruption.

16 Of course, because that argument does not suit them here, SDCCC conveniently ignores its earlier

17 stated position.  Such tactics, and argument, should not be condoned by this Court.

18          SDCCC clearly has disrupted United's contract with GES, and SDCCC's Motion should be

19 denied on that basis.

20          **2.      United Can Show A Breach of the GES Contract.**

21          Under its contract with GES, United agreed to "perform first class, quality service," furnish

22 all labor, equipment and supplies, and "use its best efforts to hire suitable individuals" to perform

23 the services under the contract.  (Slania Dec., Ex.83, ¶1(A, D).)  The Exclusive Policy makes it

24 impossible for United to comply with certain provisions of the GES contract because United can

25 no longer furnish the labor or use its best efforts to hire suitable individuals to perform the services

26 under the contract, a term expressly contracted for.  (*Id.*; Slania Dec., Ex. 85, ¶8.)

27          SDCCC argues that United did not have a legitimate expectation of performing the Trade

28 Show Cleaning at the Facility for GES under their contract.  SDCCC's argument does not hold

1   water.  United and GES have been working together at the facility for many years.  (Simon Dec.

2   ¶4.)  Certainly, there is an expectation that United would continue to work for GES but for the

3   Exclusive Policy.  GES and United entered into their contract for United to provide Trade Show

4   Cleaning with its labor for all shows at the Facility for which GES was the general contractor, in

5   exchange for receiving payment.  By implementing the Exclusive Policy, SDCCC has caused the

6   United/GES contract to be breached, thereby interfering with the contract.  Accordingly, SDCCC's

7   Motion should be denied on this ground.

8             **3.**      **United Can Show Both Breach and Disruption of the Champion**

                          **Contract.**

9

10         Under the Exclusive Policy United's 50% from Champion must be paid to SDCCC.

11   (Slania Dec., Ex. E at 181:3-16; Simon Dec. ¶8.)  This is a disruption, and actionable interference.

12         The United-Champion contract also provides that Champion "will use its best efforts" to

13   designate United as the cleaning contractor for trade shows at the Facility.  (*Id.*)  SDCCC urges a

14   strained interpretation of this provision to mean that United's providing cleaning services is

15   contingent upon Champion having the ability to designate United as the cleaning sub-contractor.

16   That language does not exist in the United-Champion contract nor it is a fair interpretation because

17   there is no reference to Champion's efforts being precluded by a third party's actions. (*Id.*)

18         Rather, SDCCC's implementation of the Exclusive Policy caused a breach of United's

19   contract with United because Champion could no longer "use its best efforts" to designate United

20   as the cleaning sub-contractor for shows at the Facility.  This is undoubtedly a disruption of

21   Champion's and United's expected benefits of the contract caused by the SDCCC.  The fact that it

22   was clear that Champion wanted United to continue to perform its contract after SDCCC enacted

23   the Exclusive Policy shows that United's performance of the cleaning services was an expected

24   benefit of the contract. (Slania Dec., Ex. 2 at ¶11.)  Accordingly, by implementing the Policy,

25   SDCCC intentionally interfered with the parties' expectations under the contract.

26         Also, as with GES, United has to pay more for SDCCC's labor, thereby increasing United's

27   costs to perform.  Similarly Champion's costs have increased.  (Pitts Dec. ¶¶7-8.)  This is

28   actionable disruption. *Pacific Gas & Electric, supra,* 50 Cal. 3d at 1129.  And, in arguing that

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

there is no disruption of the United-Champion contract, SDCCC again ignores its essential facilities argument, that United's access was reduced.

In that United can show a breach or disruption of its contract with Champion, SDCCC's Motion should be denied.

### H. There is a Triable Issue of Material Fact as to Whether SDCCC is Liable for Interference with Prospective Economic Advantage.

SDCCC contends that United's claim fails because United cannot prove it had a future economic benefit with anyone or disruption of that relationship. SDCCC is mistaken.

United has continuing relationships with general contractors Brede and Paradice with the probability of future economic benefit to United. (Slania Dec., Ex. C at 62:20-65:22; Simon Dec., ¶9.) SDCCC misconstrues deposition testimony from United's President, Rick Simon, on this topic. (Simon Dec., ¶9.) Clearly, United continues to work with Brede and Paradise nationwide and United expects it would continue to do so in San Diego but for the Exclusive Policy. (Slania Dec., Ex. C at 62:20-65:22; Simon Dec., ¶9.)

United has also entered into an economic relationship with Nielsen Business Media, a show organizer/manager. (Slania Dec., Ex. D at 36:3-37:9; Ex. 377; Simon Dec., ¶10.) Under this arrangement, United has an expectation that Nielsen would designate United as the Trade Show Cleaning contractor for any and all shows at the Facility, but for the Exclusive Policy. (*Id.*)

Due to the foregoing evidence, SDCCC's Motion should be denied.

### I. There is a Triable Issue of Material Fact as to Whether SDCCC has Violated California Business and Professions Code Sections 17200 *et seq.*

United alleges that SDCCC's actions violate Business and Professions Code § 17200 *et seq.* ("B&P Code § 17200" or "UCL"). Under B&P Code § 17204, a "person" can bring suit if that person "has suffered injury in fact and has lost money or property as a result of such unfair competition." SDCCC's only argument in its Motion as to this claim is that because SDCCC does not qualify as a "person" under the statute, it is immune. SDCCC is mistaken.

A person includes **corporations**. Bus & Prof. Code § 17201 (emphasis added). SDCCC admits it is a corporation. (SDCCC's RJN, ¶5, Ex. 4.) Despite the foregoing SDCCC contends it

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1 | is a governmental entity because it is subject to a City Ethics Ordinance. The facts show

2 | otherwise. As discussed in detail in Section J2 below, SDCCC is not a governmental entity. It is

3 | legally, operationally, and financially autonomous from the City of San Diego. The City sued

4 | SDCCC and alleged that SDCCC was not a public entity. (United's RJN, Ex. C at ¶8.) Also, the

5 | City's website identifies over fifty (50) departments which are part of the city; but SDCCC is not

6 | identified as one of them. (United's RJN, Ex. D.) Furthermore, SDCCC is not represented by the

7 | City Attorney and its Agent for Service of Process is not located at the City's Administration

8 | Building. (United's RJN, Ex. F.) The inference to be drawn from this evidence is that the City

9 | does not believe SDCCC is a governmental entity.

10 |        Also, SDCCC has not registered with the California Secretary of State on the Roster of

11 | Public Agencies. (United's RJN, Ex. E.) The inference to draw by failing to register is that

12 | SDCCC would not be considered a governmental entity entitled to immunity.

13 |        In light of the above evidence, at a minimum, there is a factual question if SDCCC

14 | qualifies as a person under Bus. & Prof. Code § 17200 *et seq.* Thus SDCCC's Motion should be

15 | denied.

16 | **J.    SDCCC is not Entitled to Summary Adjudication of Its Tenth or Twenty-Third Affirmative Defense.**

17 |

18 |        A defendant moving for summary judgment on an affirmative defense "must establish

19 | beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in his

20 | favor." *Fantenot v. Upjohn Co.* 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).

21 | Stated another way, SDCCC must demonstrate affirmatively, with evidence, that there is no triable

22 | issue of fact as to each and every element of its affirmative defense. If SDCCC fails to present

23 | evidence as to any element of its affirmative defenses then its motion must be denied. *Id.*

24 |

25 |

26 |

27 |

28 |

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1.   **SDCCC Is not Entitled to Summary Adjudication of Its Tenth Affirmative Defense Because SDCCC Is not Immune from Antitrust Liability Under the State Action Doctrine.**

SDCCC contends that the State Action Doctrine provides it immunity from liability for the Sherman Act violations resulting from enactment of the Exclusive Policy.[11]  Not so.

a.   **SDCCC is not the State Acting as Sovereign.**

SDCCC is not the state acting as sovereign because it is not the state legislature, is not a state court, is not the state executive branch, and is not under the direct and complete control of any of the three branches of state government.  *Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 400 (9th Cir. 1991).  SDCCC is a corporation.  Thus, SDCCC is not ipso facto immune from antitrust liability and can therefore be immune only if it acts pursuant to a clearly articulated and affirmatively expressed state policy.

b.   **SDCCC's Policy was not Enacted Pursuant to Clearly Articulated and Affirmatively Expressed State Policy.**

SDCCC cannot show that it acted pursuant to a clearly articulated and affirmatively expressed state policy for two reasons.  First, SDCCC cannot show that state law expressly authorizes its anticompetitive conduct in banning outside Trade Show Cleaning ostensibly for security purposes.  *See, Lancaster*, 940 F.2d at 400; *City of Eau Claire*, 471 U.S. at 42.  Second, SDCCC cannot demonstrate that its anticompetitive conduct is a foreseeable or logical consequence of state law.  *Lancaster,* 940 F.2d at 400.

SDCCC argues that it implemented the Exclusive Policy in response to a "directive from the Governor" to develop security activities throughout the state, and that the "order reflects the policy of the State acting as sovereign."  (SDCCC Ps&As, p.28:17-22.)  Specifically, SDCCC argues that the grant money it received pursuant to the Governor's directive was used to evaluate

---

[11] SDCCC made this same argument in its Motion to Dismiss pursuant to Rule 12(b), which this Court rejected.  SDCCC has presented no new evidence mandating a different outcome in this Motion, nor has SDCCC presented an affidavit under Local Rule 7.1(i)(1) setting forth any new or different facts or circumstances.  Accordingly, SDCCC's Motion should be denied as it relates to this affirmative defense.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1    the security weaknesses at the Facility, which resulted in implementation of the Exclusive Policy.

2    This argument fails because the Exclusive Policy was not enacted pursuant to a "clearly articulated

3    and affirmatively expressed" state policy to displace competition with regulation.  *See Lancaster*,

4    940 F.3d at 400.  The State did not clearly express that security at the Facility was compromised

5    by United's access thereto, and therefore only SDCCC labor would be allowed to perform Trade

6    Show Cleaning at the Facility.  Indeed, the State has made no finding whatsoever with respect to

7    the security at the Facility, and SDCCC presented no evidence otherwise.

8              The argument also fails because the assessments (whether or not paid in part from grant

9    funds) made no finding whatsoever that United, or any Trade Show Cleaning Service provider,

10   posed any type of a security risk.  (Slania Dec., Ex. M at 72:24-73:24.)  Moreover, SDCCC

11   presents no admissible evidence showing how the grant funds were spent on the assessments, if at

12   all.  In fact SDCCC personnel testified they were not charged money for the assessments.  (*Id.* at

13   148:24-150:19.)  For this reason the Motion should be denied.

14             The Exclusionary Policy also does not qualify as a "foreseeable and logical result" of a

15   State policy.  *Lancaster*, 940 F.2d at 400.  Even if the Governor mandated that security be

16   tightened at the Facility, it would be absurd for SDCCC to limit the application to only Trade

17   Show Cleaning Service workers as they did here.  Furthermore, the "state policy" SDCCC relies

18   on says nothing about eliminating competition through increased security.  There are many

19   feasible options that SDCCC has to increase security, if that is the true motivation.  One would be

20   to force all outside workers to undergo the same screening and background checks that SDCCC

21   employees undergo.  United offered to undergo this process, but it was rejected by SDCCC.

22   (Slania Dec., Ex. C at 188:5-192:6.)  Another would be to implement a more stringent screening

23   and background check process than what SDCCC employees undergo.  United had a retired FBI

24   subject matter expert on homeland security prepare such a protocol, which was also rejected by

25   SDCCC.  (Slania Dec., Ex. D at 178:2-180:8.; Ex. O at 38:1-39:20; 144:15-147:11.)

26             Importantly, SDCCC presented no **evidence** demonstrating what the foreseeable and

27   logical results would be from any state policy.  All SDCCC has provided this Court with is legal

28   rhetoric and argument, amounting to speculation, about what is "foreseeable and logical result" of

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1  the Governor's policy.  This failure to present evidence to establish this element of its affirmative

2  defense mandates denial of the Motion.  *Fantenot,* 780 F.2d at 1194.

3         Also, the present situation is easily distinguished from *Huntleigh USA Corp. v. United*

4  *States*, 525 F.3d 1370 (Fed. Cir. 2008), relied on by SDCCC.  Here, SDCCC is limiting the Policy

5  to Trade Show Cleaning for financial reasons, not the security concerns advanced in *Huntleigh.*

6  Also, in this case there are many less restrictive alternatives that SDCCC has rejected, but there

7  were no such alternatives in *Huntleigh.*

8         SDCCC also argues that it operates pursuant to authority granted cities under the

9  California Government Code to provide public assembly halls.  SDCCC argues further, without

10 presenting any evidence, that suppression of competition is a foreseeable result of the statutory

11 authority to provide a public assembly hall.  The actual evidence proves otherwise.  There was

12 competition in the Facility for Trade Show Cleaning from 1989 until 2007. (Slania Dec., Ex. 85

13 ¶5.)  SDCCC did not provide any evidence showing that any other public assembly hall in

14 California suppresses competition.  SDCCC is not permitted to do so in reply.  Fed. R. Civ.

15 Pro. 56(c); *Bazauye,* 79 F.3d at 120.  Because of SDCCC's failure to present any evidence to

16 establish this element of its affirmative defense its Motion should be denied.  *Fantenot,* 780 F.2d

17 at 1194.

18        Based on this evidence, there is undoubtedly a question of fact regarding whether SDCCC

19 acted pursuant to a "clearly articulated and affirmatively expressed" state policy when

20 implementing the Exclusive Policy, as well as whether the Exclusive Policy is a "foreseeable and

21 logical result" of the state policy.  Accordingly, the Motion should be denied.

22        **c.     There Is Clearly a Factual Issue Regarding If SDCCC is a Private
                   Entity, and Must Therefore Demonstrate Active State Supervision.**

23

24        At the outset, it is important to note that determining if a nonprofit public benefit

25 corporation is a public entity requires a fact intensive inquiry.  *Wells v. One2One Learning*

26 *Found.,* 39 Cal.4[th] 1164, 1201.  Here, viewing all of the facts demonstrates, at a minimum, a

27 factual issue for the jury to decide regarding SDCCC's status.

28

1    SDCCC is legally autonomous from the City of San Diego because it has a distinct identity

2    as a corporation which distinguishes it from the City of San Diego and renders it non-government.

3    *Id.* at 1200-01; *Knapp v. Palisades Charter High School*, 146 Cal. App. 4th 708, 717 (2007).

4    SDCCC's agent for service of process is an individual at the SDCCC, not the City of San Diego.

5    (United's RJN, Ex. F.)  Furthermore, the City of San Diego sued SDCCC and alleged SDCCC is

6    not a public entity.  (United's RJN, Ex. C at ¶8.)  If the City and SDCCC were autonomous the

7    City could not have sued SDCCC.

8            SDCCC is operationally autonomous from the City because it handles its own operations,

9    has its own budget, and hires its own executive management and employees.  *See Knapp*, 146 Cal.

10   App. 4th at 717.  (Slania Dec., ¶18, Ex. P at 22:4-21; 23:25-25:1; 27:25-28:10; 32:10-17; 50:17-

11   51:1; 56:24-61:19; 64:17-24.)  SDCCC has substantial operational freedom to control its daily

12   operations.  (Slania Dec., Ex. P at 22:4-12.)  Moreover, on the City's website the City identifies its

13   various departments and SDCCC is not identified.  (United's RJN, Ex. D.)

14           SDCCC also is financially autonomous from the City because SDCCC is responsible for

15   its own financial management and the City has no obligation to fund SDCCC's operations, nor is

16   the City liable for SDCCC's debts.  *See, Wells*, 9 Cal.4th at 1201.  SDCCC creates its own budget,

17   and only reports on its budget to the City.  (Slania Dec., Ex. P at 62:9-14; 64:2-65:7.)  Indeed,

18   SDCCC is one of the most self-sufficient convention center corporations in the United States.  The

19   SDCCC's operating revenues during fiscal year 2008 were $34.8 million, of which 87.7% came

20   from self-generated revenues.  (United's RJN, Ex. G at p. 84.)  Even though the City makes an

21   annual investment in SDCCC (hoping for a larger return in tax revenues) the investment is entirely

22   at the city's *discretion* and SDCCC has no rights to the City's investment.  (Slania Dec., Ex. P at

23   50:10-23; 53:11-16; 62:9-14.)

24           Because SDCCC is distinct from city government and is not a governmental

25   instrumentality under California law, it therefore is not immune from antitrust suit under the State

26   Action Doctrine.

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

d.   **SDCCC Cannot Demonstrate that the State Actively Supervises Its Anticompetitive Conduct.**

For its affirmative defense to succeed, as a private entity SDCCC must show active state supervision of anticompetitive conduct. SDCCC cannot do so. The Ninth Circuit has recognized direct legislative or executive oversight, executive branch oversight through executive departments, state or local agency oversight where agencies are responsible to the state legislative or executive departments and judicial review of anticompetitive conduct in state courts where state law authorizing anticompetitive conduct specifically prescribes judicial review of anticompetitive conduct as legitimate supervision. *Nugget Hydroelectric L.P. v. Pacific Gas & Electric Co.,* 981 F.2d at 429 (9th Cir. 1992); *Medic Air Corp v. Air Ambulance Authority* 843 F.2d at 1187 (9th Cir. 1988); *Snake River Valley Elec. Ass'n v. Pacificorp,* 238 F.3d 489 (9th Cir. 2001.*

SDCCC presented no evidence showing any oversight. SDCCC has not pointed to a state statute that expressly authorizes judicial review of SDCCC's anticompetitive conduct to ensure SDCCC's compliance with federal and state law. SDCCC presented no evidence on these point.

SDCCC did not present evidence to establish that there is no triable issue of fact as to each element of its affirmative defense. There are many factual questions to be analyzed. SDCCC's Motion for summary adjudication of its tenth affirmative defense should be denied.

2.   **Summary Adjudication of SDCCC's Twenty-Third Affirmative Defense is not Appropriate Because United is Entitled to Monetary Relief.**

SDCCC argues that United is not entitled to monetary relief under its antitrust claims because SDCCC is afforded immunity under the 1984 Local Government Antitrust Act ("LGAA"). Local government means "(A) a city, county, parish, town, township, village, or any other general function governmental unit established by State law, or (B) a school district, sanitary district, or any other special function governmental unit established by State law in one or more states…" 15 U.S.C. § 34(1). SDCCC cannot be a "general function governmental unit" because it serves a specific function as a convention center.

Therefore, in order for the LGAA to apply to the SDCCC, it must qualify as a "special function governmental unit" within the meaning of 15 U.S.C. § 34(1)(B). In order for SDCCC to

1  qualify as a "special function government unit" it must show three things: (1) that California law

2  treats it as a government entity, which in turn requires SDCCC to demonstrate it is legally,

3  operationally, or financially accountable to or controlled by the public; (*see Knapp,* 146 Cal. App.

4  4th at 710); (2) SDCCC must demonstrate that it has limited geographic jurisdiction, perhaps

5  substantially smaller than the state itself; (*see Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.,*

6  834 F. Supp. 1216, 1228 (D. Alaska 1991)); and (3) SDCCC must demonstrate that taxpayers

7  would bear the burden of antitrust damage awards against it (*see Tarabishi,* 951 F.2d at 1566).

8  SDCCC cannot demonstrate the first or third elements.

　　　　　a.　　**California does not Treat SDCCC as a Governmental Entity.**

10  　　SDCCC cannot demonstrate that California law treats it as government for two reasons.

11  First, the Court of Appeal in *Knapp,* 146 Cal. 4th at 710, 717, held categorically that state

12  law does not treat non-profit public benefit corporations as government.  SDCCC is a non-profit

13  public benefit corporation.  At a minimum, this is an area requiring an intensive factual inquiry.

14  *Wells,* 39 Cal.4th at 1201.  Furthermore, SDCCC has not registered on the California Roster of

15  Public Agencies.  (United's RJN, Ex. E.)  If SDCCC were a governmental entity presumably it

16  would have done so to be entitled to immunity under the California Tort Claim Act.  SDCCC's

17  failure to so register is strong evidence it is not a governmental entity.

18  　　Second, SDCCC cannot demonstrate that it is legally, operationally, or financially

19  accountable to or controlled by the public as set forth in Section J1 above.  The City sued SDCCC

20  claiming SDCCC was <u>not</u> a public entity (United's RJN, Ex. C ¶8), SDCCC is not listed as a City

21  department (United's RJN, Ex. E), and SDCCC exercises both operational and financial antonomy

22  (Slania Dec., Ex. P at 22:4-12; 56:24-61; 64:17-24).

23  　　Based on this evidence, SDCCC is not a governmental entity and cannot qualify for

24  immunity under the LGAA.

　　　　　b.　　**Taxpayers do not Bear the Burden of an Antitrust Award Against the SDCCC.**

26

27  　　A "special function governmental unit" is one that exposes taxpayers to antitrust liability

28  under the <u>Clayton Antitrust Act, 15 U.S.C. § 15</u>.  In *Tarabishi v. McAlester Regional Hosp.,*

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1   951 F.2d 1558 (10th Cir. 1991) the court defined eligibility for immunity under the LGAA based

2   on status as a "governmental instrumentality" and based on "effect on taxpayers." *Id.* at 1566.

3   That definition led the court to hold that an Oklahoma public trust hospital was not a special

4   function governmental unit under the LGAA, 15 U.S.C. § 34(1)(B).  While the court noted that no

5   single factor was determinative, it held "a significant consideration is where liability for an

6   antitrust damage award will actually fall, in light of the LGAA's obvious concern to limit the

7   imposition of treble damage awards on *taxpayers*." *Tarabishi*, 951 F.2d at 1566 (emphasis

8   added).  Because the taxpayers of Oklahoma were not liable for damage awards levied against the

9   public trust hospital, the LGAA did not exempt it from antitrust suits for damages. *Id.*

10          The evidence does not establish SDCCC's status as a governmental instrumentality.

11  SDCCC has presented no evidence that the taxpayers of California would be burdened by a

12  damage award against the SDCCC.  SDCCC's failure to present such evidence is grounds for

13  denial of the Motion. *Fantenot*, 780 F.2d at 1194.

14          SDCCC cannot demonstrate that it is a "special function governmental unit" that qualifies

15  for immunity under the LGAA because it cannot demonstrate California law treats it as a

16  "governmental instrumentality" and because it cannot demonstrate that SDCCC places the

17  taxpayers at risk of antitrust liability. Therefore, SDCCC is not immune under the LGAA and

18  SDCCC's Motion should be denied.

19                                    **4. CONCLUSION**

20          For the reasons set forth above, SDCCC's Motion should be denied.  If the Court finds that

21  United's tying claim was not sufficiently pled, United requests leave to amend its complaint.

22
    DATED: March 1, 2010                          KIRBY NOONAN LANCE & HOGE LLP
23

24
                                             By:  s/ _____
25                                                James R. Lance
                                                  Jacob M. Slania
26                                                Attorneys for Plaintiff UNITED NATIONAL
                                                  MAINTENANCE, INC.
27

28