1  James R. Lance (147173)
   Jacob M. Slania (200652)
2  **KIRBY NOONAN LANCE & HOGE LLP**
   350 Tenth Avenue, Suite 1300
3  San Diego, California  92101-8700
   Telephone (619) 231-8666
4  Facsimile (619) 231-9593

5  Theodore R. Tetzlaff (*Pro Hac Vice*)
   Kristopher J. Stark (*Pro Hac Vice*)
6  **UNGARETTI & HARRIS LLP**
   3500 Three First National Plaza
7  Chicago, Illinois  60602-4224
   Telephone (312) 977-4400
8  Facsimile (312) 977-4405

9  Attorneys for Plaintiff
   UNITED NATIONAL MAINTENANCE, INC.
10

11
                    **UNITED STATES DISTRICT COURT**
12
                  **SOUTHERN DISTRICT OF CALIFORNIA**
13

14
   UNITED NATIONAL MAINTENANCE,        | CASE NO. 07-CV-2172 BEN(JMA)
15 INC., a Nevada corporation,          |
                                        | **DECLARATION OF DR. JOHN S.**
16            Plaintiff,                 | **HEKMAN IN SUPPORT OF UNITED**
                                        | **NATIONAL MAINTENANCE, INC.'S**
17      vs.                             | **OPPOSITION TO SAN DIEGO**
                                        | **CONVENTION CENTER**
18 SAN DIEGO CONVENTION CENTER          | **CORPORATION, INC.'S MOTION FOR**
   CORPORATION, INC., a California       | **SUMMARY JUDGMENT, OR IN THE**
19 corporation,                         | **ALTERNATIVE SUMMARY**
                                        | **ADJUDICATION**
20            Defendant.                 |
                                        | Date:        March 22, 2010
21                                       | Time:        10:30 a.m.
                                        | Judge:       Hon. Roger T. Benitez
22                                       | Crtrm:       3
23                                       | Complaint Filed: November 13, 2007
                                        | Trial Date:   None Set
24

25      I, John S. Hekman, declare as follows:

26      1.      I have personal knowledge of the facts set forth herein and, if called as a witness, I

27 could and would testify competently to these facts under oath.

28

---
KNLH707499.1                                            07-CV-2172 BEN(JMA)

2.      I am a Principal at LECG, a firm that provides consulting and expert testimony in economics, finance and accounting. Since 1990, I have testified in federal and state courts on such matters as price fixing, patent infringement, trade secrets, real estate finance and general economic damages. I have defined relevant markets in antitrust matters. I have analyzed allegations of exclusionary behavior by market participants. I have assessed the degree of market power by defendants accused of the abuse of market power. I earned a MBA in finance and a Ph.D. in economics at the University of Chicago. I have taught economics and finance at the University of Southern California, The University of North Carolina, Boston College and The University of Chicago. In addition, I have published a number of papers in academic and professional journals. I was also an economist with the Federal Reserve in Boston and Atlanta.  My curriculum vitae is attached to this report as Exhibit 1.

3.      Previously in this matter, on November 13, 2007, I submitted a Declaration in connection with Plaintiffs Complaint for Injunctive Relief. I also submitted a Response to Defendant's Opposition to Motion for Preliminary Injunction. I have been asked by counsel for Plaintiff United National Maintenance, Inc. to provide several opinions. First, I have been asked to define the relevant geographic and product markets in this matter. Second, I have been asked to determine whether Defendant San Diego Convention Center Corporation, Inc. ("SDCCC") has market power or monopoly power in the relevant market. Third, I have been asked to determine whether SDCCC has exercised market power or monopoly power by instituting its policy under which SDCCC's cleaning services labor is used exclusively for trade shows. Finally, I have been asked to determine whether consumer harm has resulted from SDCCC's exclusive cleaning services policy.

4.      The materials I have reviewed in connection with forming my opinions include the Complaint for Injunctive Relief and Damages; Defendant's Objections to Evidence Submitted by Plaintiff; the Memoranda of Points and Authorities in Support and in Opposition to the application for a restraining order; the Declarations of Carol Wallace, Dessi Nintcheva, Thomas Robbins, Jason Kirby, Richard Simon, Charles Linn, Larry Colby, William Callaghan and Mark Epstein; the SDCCC cleaning services contract with United Service Companies; certain correspondence

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

between market participants and SDCCC from 1990 to 2000; correspondence from market participants related to SDCCC's 2007 actions; 2006 Exhibitor Application and Contract, Internet Telephony Conference & Expo; the SDCCC website; additional materials from my own research; the depositions of Charles Linn, Richard Simon, Gabriel Ramirez, Raymond Santos and Mark Epstein; the August 2009 Mayor's Citizen Task Force Report on the SDCCC; Defendant's Memorandum of Points and Authorities in Opposition to Plaintiffs Motion for Preliminary Injunction, with the Declarations of Chuck Gutensohn, Carol Wallace, Brad Gessner, T.M. Mazzocco, and Sotera Anderson; SDCCC's Responses to Plaintiffs First Set of Interrogatories; SDCCC's Amended Responses to Plaintiffs First Set of Interrogatories; United's Responses to Defendant's First Set of Interrogatories; and the SDCCC 2008 Annual Report. A complete list of the materials I have reviewed is attached to this Declaration as Exhibit 2.

     5.     I have reached the following opinions:

     a.     The economically meaningful relevant product market is trade show cleaning services at the San Diego Convention Center Facility (the "Facility").

     b.     The relevant geographic market is large convention centers in the San Diego metropolitan area, or, equivalently, the Facility.

     c.     SDCCC has market power in the trade show cleaning services market at the Facility.

     d.     The demand for large trade show services facing SDCCC is inelastic with respect to price. Trade show cleaning services is a small portion of the price of large trade show services. As a result, a price increase in the trade show cleaning services market will have a small impact on the price of large trade show services and would be unlikely to cause a loss of SDCCC's trade show business.

     e.     SDCCC exercised its market power when it excluded non-SDCCC cleaning services workers from the Facility.

     f.     The effects of SDCC's denying United National and other cleaning services access to the Facility are highly anti-competitive.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

g.      SDCCC has eliminated current and future competition and has effectively raised prices for trade show cleaning services in connection with its exclusion of non-SDCCC cleaning employees.

h.      The Facility is an essential facility for competitors in the trade show cleaning market, and SDCCC has denied access to this Facility for competitors in the market.

i.      SDCCC has used its market power in the national trade show market to engage in an anticompetitive tie. The tying good is the Facility, and the tied good is trade show cleaning services.

j.      SDCCC has leveraged its monopoly power in the San Diego large trade show market to exclude competitors in the trade show cleaning services market.

k.      Because trade shows contract for space at SDCCC many years in advance, trade show consumers are "locked in" to higher prices charged for cleaning services, and are further unlikely to switch because trade show cleaning services are a small percentage of the total expenditure for trade show services.

l.      The manner in which SDCCC has excluded competition is a form of "raising rivals' costs", which is recognized by economics as an anti-competitive practice.

m.      I conclude from the "no economic sense" test that there is no pro-competitive justification for SDCCC's actions.

n.      Consumers in the market for trade show cleaning services have been harmed. Consumers have had their choices in the market reduced to a single supplier, i.e. SDCCC. And the prices charged by SDCCC are higher than those charged by United National.

6.      <u>Market Definition and Market Power</u>.  Prior to SDCCC's imposition of exclusive cleaning services in the Facility, United and SDCCC were competitors in the provision of trade show cleaning services. To determine whether SDCCC's action was anticompetitive, it is necessary to define the relevant market in which they compete. After the relevant market has been defined, SDCC's market share in that relevant market can be measured. With the measured market share it is then possible to conclude whether SDCCC's actions in that market are anticompetitive.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

7.      Economists have identified the primary elements of market definition as, first, the definition of the specific products or services that, in this case, SDCCC and United sell. Products or services that have a high cross-price elasticity of demand are considered to be in the same market. A high cross-price elasticity of demand between services A and B means that if the price of A rises, the demand for B will rise by a significant amount. In the present case, a high cross-elasticity of demand would mean that if SDCCC raised its charges for trade show cleaning services, the customers (i.e. the decorators who contract for trade show cleaning services) would switch their business to one of SDCCC's competitors such as United. If this switching were to occur in a free market, then an economist would conclude that the services of SDCCC and United are close substitutes. The cross-elasticity would be estimated in the trade show cleaning market by measuring the percentage increase in the demand for United's services for a given percentage increase in SDCCC's trade show cleaning services charges. Products and services that are close substitutes using this measure are judged to be in the same market.

8.      The second primary element of the market definition is geographic. Competition in some markets is national in scope. For example, if a mortgage lender located in Southern California raises its mortgage rates above competitive levels, consumers (the borrowers) can switch to other mortgage lenders that are located anywhere in the country. This reduces the ability of mortgage lenders in any one location to charge above-competitive rates.

9.      Other markets are much smaller geographically; the geographic market for a Safeway grocery store in San Diego is limited to the area in which consumers would switch to another grocery store if the Safeway raised its prices above the competitive level. The geographic market in this case would include part of San Diego but obviously not include the rest of the U.S. In this case, the size of the market is determined by the willingness of consumers to travel to competitors as well as the ability of competitors to enter the market. If there is an Albertson's grocery store located near to the Safeway,

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1    then it would probably be in the same market. But an Albertson's located in Los Angeles would not be

2    in the same market for the obvious reason that it cannot supply the consumer with groceries in

3    San Diego except at an uneconomic cost. Finally, it is possible for new competitors to enter the market

4    in response to a price increase. In this case, the question would be whether a competitor would

5    establish a new grocery store in the local market when Safeway raised its prices above the competitive

6    level.

7

8         10.    The Product Market.  The Federal Trade Commission ("FTC") and Department of

9    Justice's ("DOJ") 1992 Horizontal Merger Guidelines (Merger Guidelines) were developed in

10   conjunction with economists and are generally accepted by economists as appropriate economic

11   tools to be used by economists defining relevant markets and market power. The FTC/DOJ

12   guidelines define a product market to be a group of products that are related such that a

13   hypothetical profit-maximizing firm that was the only seller of those products (the monopolist)

14   could profitably impose at least a "small but significant and non-transitory" increase in or markup

15   of price over the competitive level.[1] This minimum price markup that could be maintained for a

16   significant period of time is typically taken to be 5 percent. This is sometimes called the

17   "hypothetical monopolist test" or the "SNIP" test.

18         11.    When the market has been defined correctly, then it is possible to measure the

19   market power of a firm in that market. In the present case, when the market in which SDCCC and

20   United compete has been properly defined, it is possible to measure whether SDCCC has market

21   power in that market and therefore has the ability to harm competition. If the market is defined too

22   broadly, then SDCCC will appear not to have market power. For example, if the market was

23   defined as all commercial cleaning services in the entire U.S., then SDCCC would appear to have

24   a very small market share in that market and market actions by SDCCC would be unlikely to have

25   an effect on competition. On the other hand, if the market is defined too narrowly, then SDCCC

26   _____

27         [1] U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section 1.1,
     <http://www.ftc.gov/bc/docs/horizmer.htm> (17 October 2005).

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

would be considered to have too much market power. The market would be defined too narrowly if it failed to take into account some potential competition that would be present to take business away from SDCCC if SDCCC raised its prices above the competitive level.

12. The ability of a hypothetical monopolist to maintain a price increase as described above is analyzed by the competitive response that would result from the price increase. On the demand side, the response comes from buyers who switch to substitute products or services when the monopolist raises price. And on the supply side, the response comes from the ability of firms producing other products and services to begin producing the monopolist's product or service. The supply response also comes from new firms entering the industry because the price has risen.

13. On the demand side, the market test asks, if the monopolist imposed the "significant and non-transitory" 5% price increase, whether buyers of the service could switch to other services in such numbers that the loss of sales by the monopolist would make the price increase unprofitable. If this is probable then the service would be in the same product market, and the market has not been defined broadly enough. Conversely, if the loss of sales is not enough to make the price increase unprofitable for the monopolist, then the product market is not too broad. The relevant market is the group of services just large enough that a monopolist could profitably raise price because buyers would be unwilling or unable to switch to other services.[2]

14. The supply side market test looks to see whether other suppliers could enter the market or switch to producing the service produced by the monopolist in such a way that a price increase would not be sustained. The market definition asks whether a 5% increase in price by the hypothetical monopolist would cause more firms to enter the market within one to two years, thus bringing price down and making the price increase by the monopolist unprofitable.[3]  If other firms are able to start producing the product or service that the hypothetical monopolist produces, then

---

[2] A well-known example of this test is the market for cellophane. If buyers switching to wax paper in response to an increase in the price of cellophane do not make the price increase unprofitable, then wax paper is not in the same antitrust market as cellophane.

[3] The test requires both that there be entry of other firms and that the increase in supply be sufficient to bring the price back to a competitive level.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   the market definition is too narrow.  The relevant market is the group of sellers such that a

2   monopolist could profitably raise price because no more sellers would be able to enter the market

3   in a reasonable period of time.

4       B. The Trade Show Cleaning Services Market

5       15.     I have concluded that the relevant product market definition is "trade show cleaning

6   services at major convention centers." To begin at the most general level, SDCCC and United

7   provide "cleaning services." More specifically, they provide trade show cleaning services to

8   contractors that are termed "decorators". The decorators are trade show contractors who plan and

9   execute trade shows on behalf of exhibitors at large convention centers.[4] Typically, a convention

10  center signs a contract with an exhibitor such as a trade group; the exhibitor hires a trade show

11  organizer; the organizer contracts with a decorator; and the decorator contracts with the trade show

12  cleaning services firm, among others.[5]  The role of the decorator is to provide drapery, carpeting,

13  registration, graphics and props.[6] The question of product market definition relates to how specific

14  the cleaning services are. The hypothetical question is, if a firm in the market-SDCCC, United or

15  others raised its price above competitive levels, could another firm enter the market to compete

16  with them? The testimony in this case has been that the services to the trade shows are so

17  specialized that only trade show cleaning services firms would be able to compete for the business

18  of the decorators. That is, a commercial cleaning firm that did not have the specialized expertise in

19  trade show cleaning, move-in cleaning and move-out cleaning, would not be able to obtain

20  business from the decorators.

21      16.     United also provides trade show cleaning services at hotels and smaller exhibition

22  halls. However, testimony has shown that this is not in the same relevant market as the large trade

23  shows. Trade shows at SDCCC use up to fifty of United's workers. SDCCC does not compete with

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

---

25      [4] http://www.champion-nationwide.com/

26      [5] Deposition of Raymond Santos, pages 98-99; deposition of Mark Epstein page 23-24.
    Mr. Epstein also added that in some cases his firm, Champion, had an agreement with show their
27  booths.

28      [6] Deposition of Mark Epstein, page 42.

the smaller hotel convention facilities in the San Diego area for trade shows. By contrast, the hotels in the San Diego area that have trade shows require "one, max two other people."[7] Therefore, looking from the demand side of the market, the demanders or users of the services of the relevant market are the organizers of trade shows at convention centers. From the supply side, the providers of trade show cleaning services are those firms that have developed the specialized experience to be able to enter the market. Charles Linn, Vice President of the Western Division of United, listed all of the trade show cleaning firms that had competed with United in California. These included SDCC, Century Cleaning, Team Cleaning, and Show Ready.[8]  SDCC, Century Cleaning and United are the only trade show cleaning services that Linn is aware of that performed work at SDCC.[9]

17.     The evidence I have reviewed indicates that the number of firms that supply trade show cleaning services is limited, because the type of cleaning performed by United National at the SDCCC is not standard space cleaning. Because this cleaning appears to be specialized in a number of ways, United does not compete with ordinary janitorial services and similar firms. In fact, United has a separate company, United Maintenance Company, Inc., that provides janitorial services.[10]  If it were the case that janitorial services and trade show cleaning services were interchangeable, then United's trade show cleaning and janitorial work could be merged, and the same workers could be used for both. On the contrary, Rick Simon testified that trade show cleaning is "a totally different skill set, totally different labor requirement, and the trade show business is itinerant in nature. So you have a lot of demand for a lot of people in a short period of time. And the knowledge and skill set of cleaning an office building versus a trade show is the

---

[7] Deposition of Rick Simon, page 32. deposition of Mark Epstein page 23-24.

[8] Deposition of Charles Linn, page 40.

[9] Ibid, pages 104-105

[10] Deposition of Rick Simon, pages 20-21.

KNLH\707499.1

07-CV-2172 BEN(JMA)

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  difference between, you know, flying a Piper Cub and a jet aircraft."[11] He further explains that

2  this knowledge and skill is primarily at the supervisory level.

3      18.    One of United's primary customers in the trade show cleaning market is Champion

4  Exposition Services, a large general contractor for trade shows. Champion signs contracts with

5  trade associations to manage and organize their trade shows across the U.S.[12] Mark Epstein,

6  Champion's president, strongly supports the description of United and other firms in the trade

7  show cleaning market as highly specialized:

8          "While a janitorial firm hired to clean office space in a commercial
           building can expect each office to be the same size and in similar
9          condition every day, each trade show is unique in size,
           configuration, and its cleaning needs. Based on the scope and size of
10         a particular trade show, a provider of Trade Show Cleaning Services
           must constantly react to ever changing demands that involve the
11         amount and location of manpower and equipment at any given
           moment. A provider of Trade Show Cleaning Services must
12         ultimately have a tremendous amount of logistical expertise and
           must anticipate needs proactively based on the past experience of
13         the Trade Show Cleaning Services management. No two trade
           shows are the same from the perspective of Trade Show Cleaning
14         Services.[13]

15     19.    There are two main functions performed by firms in the trade show cleaning

16  market. The first is "facilities cleaning", which is cleaning aisles and common areas at SDCCC

17  during the move-in phase and construction of exhibits at conventions as well as during the move-

18  out phase. The second function is "booth cleaning", which is described as cleaning exhibit booths

19  during shows and during the night. Facilities cleaning is specialized in part because it must be

20  performed during a short window of time between trade shows. At times the show moving in and

21  the one moving out overlap, requiring even more experience to make the process run smoothly.

22  United states that its cleaning services are individually tailored to the needs of each type of show

23  and exhibitor. United National revenues from cleaning services at SDCCC were approximately

24  $500,000 per year.

25  ──────────────

26      [11] Ibid., page 21.

27      [12] Affidavit of Mark Epstein, page 1.
        [13] Affidavit of Mark Epstein, page 2.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

20. The special need filled by the cleaning contractors was acknowledged by SDCCC. In a June, 2000 letter to the Trade Show Contractors Association, the SDCCC's Director states: "As you know, with the existing and increasing level of business at the Convention Center, the time between move-out of one show and move-in of the next show is often extremely compressed. Time frames to return a clean floor will likewise often be compressed. You also know that we often run overlaps of move-outs and move-ins. The service contractors have been primary and key players in making those overlaps happen."[14] Move-outs and move-ins are complicated processes. According to United's Charles Linn, a move-in typically takes one to three days.[15] When United does not have enough workers in a particular city for a large trade show, they do not hire local cleaning workers.[16] Instead, they bring in their own workers from other cities, presumably at considerable cost. United's workers other than supervisors are part-time, not salaried, so it is not because they are already being paid that they are used. Rather, it illustrates the specialized nature of the work.

21. The other aspect of the product market is whether new firms could enter the market in response to a hypothetical price increase. If so, then a dominant firm in the market such as SDCCC might not have significant market power. The testimony I have read as well as the past record of the SDCCC indicates that there has been no new entry into the trade show cleaning services market at the SDCCC. This is due to the specialized nature of the work as well as to the relationships that have been built up over the years between the cleaning services firms and the decorators for whom they work. Mark Epstein of Champion states "Due to the expertise and specialized knowledge required, I would not consider even an extremely price competitive bid from a traditional janitorial services firm to provide Trade Show Cleaning Services."[17] Mary Beth Rebedeau of the Society of Independent Show Organizers referred to how specialized the cleaning

---

[14] Letter from Joe Psulk to Marty Cymbal, June 20, 2000, page 2.

[15] Deposition of Charles Linn, page 80.

[16] Deposition of Charles Linn, page 85.

[17] Affidavit of Mark Epstein, page 2.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  services are in her letter to SDCCC: "While we understand the need for facility managers to

2  generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors

3  of their choice. This is particularly true for large shows whose complexities demand carefully

4  selected and integrated vendor partners who have a thorough understanding of each show's special

5  needs. This includes cleaning services .... Show organizers spend years cultivating relationships

6  and advantageous pricing with their chosen suppliers. In-house exclusives arbitrarily increase

7  costs to show organizers -- and therefore exhibitors -- while decreasing the quality of the service

8  provided due to lack of competition."[18]  Anecdotal evidence from customers can be an important

9  source of information for market definition. It can confirm what economic analysis of the market

10  situation indicates. In this case, United National's customers explain why they need certain kinds

11  of services that are not available from conventional cleaning firms, and this is borne out by the

12  market evidence that conventional cleaning firms have not obtained contracts for Trade Show

13  Cleaning Services at SDCCC.

14       22.    The specialization of United's services as well as the investment United has made

15  in developing a relationship with their customers represent barriers to entry for potential new firms

16  in the trade show cleaning services market. United CEO Rick Simon estimated that it would

17  require an initial investment of over $250,000 for a firm to enter the trade show cleaning market in

18  San Diego.[19]  A hypothetical new entrant into the market would need time to develop the skills

19  necessary to perform on a level with United or other market competitors. This learning time is

20  more significant than the actual cost of equipment and supplies to open a cleaning business. The

21  knowledge and experience reside in the supervision and coordination of the work process. Gabriel

22  Ramirez, the Manager of United's San Diego operations, explained that new workers receive only

23  a brief training before beginning to do basic cleaning tasks.[20]  However, it is knowing what to do

24  and how to coordinate what needs to be done that is significant. There is a long learning curve

25

26      [18] June 22, 2007 letter from Mary Beth Rebedeau to SDCC.

27      [19] Deposition of Rick Simon, page 239.

    [20] Deposition of Gabriel Ramirez, page 58.

28

1  down which firms would have to travel in order to be as efficient and therefore as competitive as

2  United in doing this work. "Learning by doing" is a process that takes time, and therefore in the

3  short run there would be no competitors able to enter the market. Century Trade Show Service,

4  one of United's competitors in other areas, attempted to enter the San Diego market but was

5  unsuccessful.[21] So even if it were possible for new firms to bid on cleaning contracts at the

6  Facility, it is unlikely, from what I have seen, that there would be entry of new firms. However,

7  SDCCC is using its control over access to the center to eliminate all alternative cleaning firms.

8  This is an absolute barrier to entry.

9      C. The Geographic Market

10      23.    The relevant geographic market is large convention centers in the San Diego

11  metropolitan area. Since the Facility is the only large convention center in the area, the market can

12  be defined equivalently as the Facility. The two main aspects of this definition are, first, that the

13  trade show cleaning services firms in this market require large convention centers in which to

14  operate, and, second, that trade show cleaning services are provided by workers who live within

15  commuting distance of the convention centers where the work is performed.

16      24.    The issue of convention centers as the focus of the trade show cleaning services

17  market was addressed above in the product market section. The market is limited to the San Diego

18  area because workers who are trained to perform the cleaning services in this market cannot

19  profitably come from areas outside the local San Diego labor market and be competitive with

20  those workers who are located in the local market. The competition is among providers of trade

21  show cleaning services in the local labor market. Providers outside the local market area could

22  only compete with those located in San Diego if they could commute to San Diego to provide

23  services or if the trade shows were willing to switch their shows from San Diego to another city in

24  response to an increase in the price of trade show cleaning services in San Diego. The first

25  possibility is highly unlikely because the cost of non-San Diego cleaning services providers

26

27      [21] Deposition of Rick Simon, page 240.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1    commuting to San Diego to work would be prohibitive. The second possibility is also highly

2    unlikely because the cost of trade show cleaning services is a very small part of the overall cost of

3    putting on a trade show. Trade show exhibitors would not be willing to move to another city to

4    save a small fraction of the trade show cost.

5        25.    The issue of whether the relevant market is properly defined as trade show cleaning

6    services at the Facility involves the ability of other firms (the supply side of the market) or trade

7    show exhibitors (the demand side of the market) to react to an increase in price by SDCCC. In the

8    language of the FTC/DOJ antitrust guidelines, the hypothetical monopolist test asks whether a

9    hypothetical 5% increase in price by the monopolist, maintained for a significant period of time,

10   would elicit a sufficient competitive response to restrain the monopolist, making the attempted

11   price increase unprofitable. This ability of competition to "discipline" an increase in price can be

12   analyzed by the supply response and the demand response.

13       26.    The buyers, or demanders, of trade show cleaning services are ultimately the

14   exhibitors at trade shows. However, the exhibitors are not the direct buyers of cleaning services.

15   United National contracts with a decorator; the decorator is hired by a trade show organizer; the

16   trade show organizer is hired by a trade association or other exhibitor. The trade association

17   chooses the city and convention center where the show will be held, but the exhibitor-members of

18   the association pay the fees that go to the organizer and finally to the cleaning contractor, United.

19   The exhibitors do not choose the convention city.

20       27.    In this way, the trade show cleaning services market is in a vertical relationship to

21   the market for large trade shows. A monopolist who was the only seller of trade show cleaning

22   services in San Diego would face potential competition from other convention centers, if the

23   decorators that hire cleaning firms in San Diego could move to other venues. However, there are a

24   number of reasons why it is unlikely that decorators could switch to other convention centers to

25   restrain SDCCC's ability to raise price in the Trade Show Cleaning Services market.

26       28.    First, buyers are unlikely to discipline a SDCCC price increase because of a "third-

27   party payer" effect in the market. The ultimate buyer of trade show cleaning services as well as

28   other costs of trade shows is the exhibitor. But the contracting of cleaning services is done by the

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  decorator, such as Champion. Increases in the price of trade show cleaning services are paid by the

2  decorator, but these increases are passed along to the exhibitor, which reduces the impact of the

3  price increase. Further, the choice of a location for the trade show is made by the trade association,

4  which is not the final buyer of the services. As a result of this third-party payer structure, it is

5  unlikely that a higher price charged by SDCCC for cleaning services would affect the choice of

6  location for conventions and thus provide competitive pressure on SDCCC. Mark Epstein of

7  Champion agreed that it is unusual for a trade show to change venues.[22]

8       29.    Second, decorators are unlikely to "discipline" price increases by SDCCC in

9  cleaning services because there are no similarly-sized convention centers in San Diego or nearby

10 that can host the large conventions that use the Facility.  SDCCC has monopoly power in the large

11 trade show market in the San Diego region and also has market power in the national trade show

12 market. The Facility, with over 600,000 square feet of exhibit space, is one of the largest

13 convention centers in the United States.[23]  There is no other convention center of remotely

14 comparable size in the San Diego area. The next largest meeting area in San Diego is the Hilton

15 San Diego Bayfront Hotel, across from the Facility. It opened in December 2008 with 165,000

16 square feet of meeting space, but it is mostly designed to satisfy the demand for hotel rooms for

17 the SDCCC.[24]

18      30.    Third, it is unlikely that decorators buying cleaning services would discipline a

19 SDCCC price increase for trade show cleaning services by switching to venues in other cities. The

20 cost of exhibit cleaning is a very small portion of the total cost of putting on a convention, so that

21 a monopolist in San Diego would not experience significant limits on its ability to raise price due

22 to the possibility that contractors would move to other cities.

23

24 ─────────────

   [22] Deposition of Mark Epstein, page 57.

25 [23] "San Diego Convention Center Market Demand Analysis", Jennifer Sutherland,
26 PricewaterhouseCoopers, March 2009, p. 6. http://www.conventioncentertaskforce.org/
   index.shtml.

27 [24] http://vvww.portofsandiego.org/component/content/article/219-hilton-san-diego-
   bayfront-hotel-news/457-hilton¬convention-center-hotel-to-open-in-fall-2008.html
28

31.     Fourth, buyers are unlikely to discipline a SDCCC price increase because of the long term planning that is necessary for the large trade shows that SDCCC serves. These shows are often committed for five, ten or fifteen years in advance.[25] This reduces the ability of contractors and trade shows to move to other convention centers.

D. Market Power

32.     The relevant market is trade show cleaning services at the Facility. Before the imposition of the cleaning services exclusive, SDCCC had 50% or more of the trade show cleaning services market at the Center.[26] After the exclusive in 2007, SDCCC has had a 100% market share of Trade Show Cleaning Services, based on its exclusive use of SDCCC workers for cleaning services in the Facility as well as the cleaning services revenue it has received. Both before and after the imposition of the exclusive, SDCCC has possessed market power, also known as monopoly power, in the trade show cleaning services market in San Diego. SDCCC has the ability to exercise market power for three reasons. First, SDCCC has the power to exclude competitors without the likelihood that new competitors could enter the market. Second, SDCCC has the power to set a price floor for trade show cleaning services at the center by requiring all outside firms to use SDCCC employees at wages set by SDCCC. Third, SDCCC has the power to raise price in the market. Currently, SDCCC has control over 100% of the market, since it controls access to the Facility and is dictating pricing in the market regardless of the level of involvement that United is permitted to have.

IV. SDCCC has Engaged in Exclusionary Conduct in the Market.

33.     SDCCC has effectively excluded United and other competitors from the trade show cleaning services market at the Facility. The exclusion was accomplished by the use of SDCCC's control over access to the Facility . In May 2007 United National was notified that as of July 1 all trade show cleaning services at the Facility would be performed by SDCCC employees. In June of

---

[25] E.G. UNM011963

[26] According to statements by SDCCC and United, SDCCC's share of the cleaning market at the Facility was as high as 60% before July 2007.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

2007 United National was notified that it could work at the Facility, but that it would have to use SDCCC employees to fulfill the terms of its contracts, at a labor rate of $17 per hour.[27] United's workers are barred from working at the Facility.

34.     While SDCCC allows United and others to contract with decorators for the provision of cleaning services at the Facility, it is SDCCC's workers who do the work, and SDCCC appropriates all of the revenue that previously was paid to United. United obtains contracts with Champion and other decorators that provide services to associations using the Facility for shows. Champion is paid a fee for booth cleaning services. Champion retains approximately 50% of the fee for its services and provides the remaining 50% to United for the booth cleaning. United performs booth cleaning under its contract for this fixed amount. For facilities cleaning, United estimates the number of hours that will be needed for individual exhibitor booth cleaning on a fully-loaded hourly fee basis. United has produced its billing records and trade show schedules from July 2007 through August 1, 2009.[28]  The hourly rates in these schedules cover not only the labor used to perform cleaning but also materials and United's management of the services. This is done on a "not-to-exceed" basis. United does not control how many hours SDCCC bills United for the work done by its employees. When the hours billed by SDCCC are greater than the not-to-exceed amount United has contracted for, United absorbs the additional cost. If the actual labor hours are less than what was estimated, United is compensated only for the actual hours.

A. SDCCC Has Excluded Competition Entirely From the Facility.

35.     SDCCC has forced United and other competitors in the market to operate at a loss. United has continued to fulfill its contracts for trade show cleaning services at the Facility, but it is no longer competing for new business in San Diego.[29]  United attempts to obtain business from decorators that operate nationwide. In doing so, United attempts to clean as many shows as

---

[27] Deposition of Mark Epstein, page 57.

[28] UNM011966-UNMO28947.

[29] Deposition of Rick Simon, page 31.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1  possible for each decorator. This means that United may clean for a decorator in San Diego and

2  lose money by doing so if it helps to keep the nationwide business of that decorator.[30]

3      36.    SDCCC has argued that it is not excluding competition because it has not excluded

4  United from the Facility, only United's cleaning staff. This is entirely misleading and inaccurate,

5  in my opinion. United cannot control the pricing of the services that it would provide in the

6  market, since SDCCC dictates the hourly labor rates and takes all of the booth cleaning revenue

7  that United formerly received. Further, United's employees are not permitted to work in the

8  Facility. The only way that United could "compete" in the Facility would be processing paperwork

9  and requests for cleaning services. This is not competition in any meaningful sense, and since

10  SDCCC would control 100% of the pricing in the market and all of the cleaning staff, there is no

11  competition at all from the point of view of industrial organization economics.

12      37.    The manner in which SDCCC has attempted to exclude competitors in the market

13  for trade show cleaning services at the Facility is by leveraging its monopoly power in the market

14  for large convention services in San Diego. Because SDCCC has market power in the San Diego

15  large convention services market, it can require convention exhibitors to use SDCCC's cleaning

16  services exclusively or raise the price without suffering a significant loss of business in its primary

17  market. SDCCC serves very large trade shows that have only a small number of alternative venues

18  to choose from nationwide. This lack of alternative venues for large trade shows means that the

19  SDCCC has a relatively inelastic demand for its services, especially after a trade association has

20  booked a date for ten or more years in advance. Inelastic demand for a product or service such as

21  large trade shows means that if the price of the service rises, consumers of the service (such as

22  general contractors and show organizers) will not tend to look elsewhere for a convention center

23  but will tend to pay the higher price. The inelastic demand experienced by SDCCC for trade

24  shows means that if SDCCC succeeds in excluding all competition in the trade show cleaning

25

26

27      [30] Ibid., page 86.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   services market, SDCCC can raise the price of cleaning services that is ultimately paid by trade

2   show exhibitors without losing business in the large trade show market.

3       38.    Because of the long-term nature of SDCCC's contracts with large convention trade

4   shows, extending ten or fifteen years in some cases, the exclusionary action that SDCCC has taken

5   with regard to trade show cleaning services has "locked in" customers who use these services. In

6   economic terms, a lock-in occurs in a situation where a consumer contracts with a seller for goods

7   or services over an extended period of time. For the duration of the contract, the buyer is "locked

8   in" to whatever downstream services are needed. The seller can take advantage of the lock-in to

9   raise the prices of the services that are needed during the term of the contract. The buyer cannot go

10  elsewhere to purchase those services because of the lock-in. In the situation being considered here,

11  SDCCC has locked in the consumers of trade show cleaning services for the duration of the ten or

12  fifteen years that some trade shows have contracted.

13      39.    A number of trade show industry participants have responded to SDCCC's

14  exclusionary acts by writing letters to oppose the new policy. Some of these participants state that

15  they try to avoid convention centers that have "exclusives", and some threaten to take their

16  business elsewhere.[31]   However, it is a measure of SDCCC's market power in large trade shows

17  that none of these participants has taken any business away from SDCCC so far. And in spite of

18  the implicit threat by these market participants to oppose SDCCC's imposition of an exclusive,

19  SDCCC went ahead with their exclusionary action. This also indicates how much market power

20  SDCCC possesses.

21      B. SDCCC Has Attempted to Monopolize the Market by Raising Rivals' Costs.

22

23

24
_____

25      [31] For example, Pat Dwyer, Sr. Manager of Trade Show Services for SmithBucklin, states
    in a letter to SDCCC, "...one of the considerations we view as an imposition to our selection [of a
26  venue] is the lack of choice of contractors to meet our highest level of service and accountability..
    While there are many factors that enter into the decisions to select a future site for our clients, one
27  of the aspects which definitely would weigh in as less desirable is an exclusive service where there
    is no need to appoint one." June 27, 2007 letter from Pat Dwyer to SDCCC.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

40.     SDCCC argues that it is still allowing United and others to "compete" in the trade show cleaning services market at the Facility.[32]  While United still fulfills its contracts with decorators at the Facility, SDCCC has in reality excluded competition by "raising rivals' costs."[33] In this case, SDCCC is appropriating all the booth cleaning revenue that would have been received by United, and "allowing" United to compete in the market only by using SDCCC's employees and by accepting no revenue. Thus, SDCCC has raised the costs of United and other potential competitors to be greater than revenue.

41.     The raising rivals' costs action taken by SDCCC is an example of what Scheffman and Higgins refer to as "cost-effective" strategies by monopolists. They say: "Some kinds of cost-raising strategies can obviously be very cost-effective--e.g., actions that lead to governmental actions that exclude your rivals, or impair their ability to compete with you."[34]

C. The Facility is an Essential Facility for Competitors in the Trade Show Cleaning Services Market.

42.     Since the relevant market is trade show cleaning services at the Facility, the Facility is an essential facility for firms that supply trade show cleaning services. An essential facility is a resource possessed by one firm that other competitors must have access to in order to compete with that firm. Another name for an essential facility is a bottleneck. An example would be the only railroad bridge over a river for many miles. If the railroad that owns the bridge refuses to deal with competing railroads that need to use the bridge, competition is harmed. The Facility is an essential facility because it is the only venue for large trade shows in the San Diego area. It would be prohibitively expensive for United to build another 600,000 square foot convention

[32] Deposition of Rick Simon, page 189.

[33] See for example Carlton, Dennis and Jeffrey Perloff, Modern Industrial Organization, 4th Ed, Boston: Pearson, Addison-Wesley, 2005, pp. 371-377; Thomas G. Krattenmaker & Steven C. Salop, Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price, 96 Yale L.J. 209 (1986); Steven Salop and David Scheffman, Raising Rivals' Costs, 73 American Econ. Rev. Papers and Proceedings 267 (May 1983); David Scheffman and Richard Higgins, 20 Years of Raising Rivals' Costs: History, Assessment, and Future, Federal Trade Commission, http://wwwfic.gov/be/RRCGMU.pdf

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    center in order to compete with SDCCC. United National and other firms in this market cannot

2    compete in the market unless they have access to the Facility.  Control over this essential facility

3    in the market for trade show cleaning services gives SDCCC the ability to exclude all of its

4    competitors from the market. SDCCC's actions are anticompetitive because it uses control over the

5    essential facility in the market for trade show cleaning services to exclude competitors.

6         D. SDCCC's Action Is Anticompetitive Because It Constitutes a Tying Arrangement.

7         43.    SDCCC has market power in the national trade show market. It has used its market

8    power in trade show services as a "tying good" to exclude competition in the local market for trade

9    show cleaning services at the Facility . Forcing the consumer to purchase the tied good results in

10   harm to consumers in that those consumers pay higher prices and those who would have wished to

11   purchase trade show cleaning services from a competitor of SDCCC are prevented from doing so.

12   Consumer choice is restricted.[35]

13        44.    Trade show cleaning services are tied to or bundled with trade shows in that

14   SDCCC requires that those who conduct trade shows at the Facility must also use SDCCC

15   employees for cleaning services and pay SDCCC for those services. SDCCC has the ability to

16   force trade show participants to buy cleaning services from the center because of its market power

17   in the trade show market. If the market for trade shows were very competitive, then it would not

18   be possible for SDCCC to restrict consumers' choice of cleaning services and to raise the price of

19   those services. But SDCCC has enough market power in the trade show market to be able to tie

20   cleaning services to the trade show market. The support for this market power opinion comes from

21   a number of sources. Currently, the City of San Diego is studying the possibility of expanding the

22   convention center. In connection with this effort, a number of analyses have been done of

23   SDCCC's strength in the market for trade shows.[36] The report of Heywood Sanders, the economist

24

25      [34] Sheffman and Higgins, 20 Years of Raising Rivals' Costs, page 5.

26      [35] http://www.ftc.gov/bc/antitrust/tying_sale.shtm.

27      [36] "Draft Mayor's Citizen Task Force on the San Diego Convention Center Project";
     http://www.conventioncentertaskforce.org.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1 | retained to study the trade show and convention center market, is dated May 2009.[37]  Mr. Sanders

2 | concludes that:

3 | a.   The Facility is operating at or above practical maximum capacity

4 | b.   loss of potential business most frequently due to lack of available

5 | dates/space

6 | c.   San Diego's hotel supply has continued to expand

7 | d.   Competitors are moving forward with enhancements

8 | e.   Past and potential customers have expressed interest in an expanded Facility

9 | f.   Past events have and existing events are at risk of outgrowing the Facility

10 | g.   There is room night loss from these events outgrowing the Facility

11 | h.   Center has outperformed many of its competitors and the industry[38]

12 | In these circumstances, SDCCC has the ability to engage in an anticompetitive tie because trade

13 | show cleaning services are a small portion of the total cost of a trade show.

14 | 45.   Other concurring opinions regarding the strength of SDCCC's market position are

15 | provided by PricewaterhouseCoopers, Economic Research Associates and Piper Jaffray

16 | Company.[39]  They emphasize the fact that SDCCC has operated well above the average capacity

17 | utilization of competing large convention centers. This is a strong sign of high demand for the

18 | Facility.

19 | 46.   A more analytical approach is provided by the San Diego County Taxpayers

20 | Association. This study concludes that the cost of expanding the Facility could be financed in part

21 | by higher taxes on convention center visitors. These taxes, on airport taxis, hotel rooms,

22 | restaurants, rental cars and tourist attractions, would amount to increases in the total price paid by

23 | Facility visitors. If SDCCC did not have market power in the trade show market, then it would

24 | 

25 | [37] "State of the Convention and Trade Show Industry and Convention Center
Performance", Heywood Sanders, May 2009;

26 | http://www.conventioncentertaskforce.org/MCTFdocs-presentations.shtml.

27 | [38] Draft Mayor's Task Force Report, page 12.

[39] www.conventioncentertaskforce.org.

28 | 

*Kirby Noonan Lance & Hoge LLP*
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

lose trade show business if taxes on convention visitors were raised. The fact that the proposed taxes are estimated to produce substantial tax revenue is testimony to the power that SDCCC has to raise price without losing significant business. This is the measure of market power.

47.    In sum, SDCCC has a degree of market power in the national trade show market sufficient to make it possible to engage in an anticompetitive tying arrangement. This has allowed SDCCC to exclude competitors from the trade show cleaning services market by tying cleaning services to the use of the convention center.

V. The Security Explanation by SDCCC for Excluding United Fails the "No Economic Sense Test"

48.    Actions by firms that tend to exclude their rivals can sometimes have pro-competitive explanations. It is important to examine the possibility of a pro-competitive reason for the exclusionary actions taken by SDCCC before concluding that the actions were anti-competitive. The economics literature refers to the "no economic sense" test to examine whether there is any normal business justification other than exclusion for actions such as those by SDCCC.[40] I have considered all of the statements by representatives of SDCCC and by other participants in the market that were provided to me to examine the issue of a possible pro-competitive reason for the exclusion.

49.    First, I considered the possibility of enhanced efficiency in the market for trade show cleaning services if SDCCC employees have an exclusive. My conclusion is that there is no enhanced efficiency justification for the conduct of SDCCC. Exclusive cleaning services at the Facility will not reduce cost to consumers or provide a higher quality product. This is the only conclusion that can be reached given that:

a.    The letters from contractors and show producers are unanimous in their opposition to an exclusive arrangement.

---

[40] Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1      b.      SDCCC has not even attempted to provide an argument that exclusive

2  cleaning services is more efficient. Instead, the change has been explained as a security matter.

3      50.     Second, I considered whether SDCCC was carrying out a general shift in its

4  security policy by restricting all non-SDCCC employees from using the Facility. Economists have

5  no special ability to measure the need for security at a facility such as SDCCC. However, an

6  economist can observe the incentive for the owner of an essential facility such as the SDCCC to

7  use a pretext to exclude its competitors in a market such as trade show cleaning services where the

8  SDCCC is a competitor in the market. The economist can weigh the consistency of the behavior of

9  the SDCCC in applying its security policy against the behavior in which types of non-SDCCC

10  employees are excluded.

11      51.     I have read the deposition of United CEO Rick Simon. He testified that he

12  contacted Brad Gessner of SDCCC in April 2007 after he learned that the exclusionary policy was

13  being implemented.[41] Mr. Simon offered to follow the same screening process for employees as

14  that used by SDCCC. Simon reminded Gessner that United also owns a security company and is

15  very knowledgeable about security matters. He said that he, Simon, was from a law enforcement

16  background; that United employed a number of former federal agents; and that their security

17  company had engagements that exceeded the security requirements of SDCCC. For example,

18  United works on the Hyatt Regency security detail when the U.S. President comes to the Chicago

19  Hyatt. They also worked with the Secret Service when the Pope was in Denver. United vetted 300

20  employees for that engagement and the Secret Service did not reject one of them. He explained

21  that United uses a superior screening device to that used by SDCCC—Live Scan Fingerprint. And

22  he offered to buy a $12,000 machine to fingerprint all of United's employees at the Facility. But

23  Mr. Gessner was unmoved by any of these facts. He just insisted that SDCCC would use its own

24  cleaning employees.

25

26

27      [41] Deposition of Rick Simon, pages 188-191.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

52.     I have also read the declaration of William Callaghan, President of Century Security and an expert in convention floor security according to the documents I have seen. Mr. Callaghan concludes that SDCCC's policy of excluding only non-SDCCC cleaning employees "makes absolutely no sense:[42] He finds that the policy makes no sense from a security point of view because, among other reasons, cleaning employees tend to be lower security risks than other non-SDCCC employees who are not covered by the policy; because cleaning employees are only 5% or less of the outside employees accessing convention centers; because SDCCC does not require outside employees to wear badges, while United National does require badges; and because United National has offered to run background checks on its employees, which SDCCC has refused.[43]

53.     I have also read the declaration of Charles Buddy Linn, the Regional Vice President of United National, who is familiar with the security policies of not only SDCCC but other major convention centers. He provides more detail on the level of security at the Facility compared to other centers in his experience. SDCCC does not use a photo ID system for security, and its monitoring of outside employees accessing the facility is lax." Further, Mr. Linn provides evidence that SDCCC's claim that United was a security risk because it was using temporary employees is false.[44]

54.     From my own analysis as well as the evidence provided by Mr. Simon, Mr. Callaghan and Mr. Linn, I conclude that contrary to the idea of a general shift in security policy, cleaning services has been singled out for restrictions. SDCCC competes with outside trade show cleaning services firms such as United. In contrast, SDCCC does not compete directly with many other service providers who work on trade shows. Other non-SDCCC contract employees have not been similarly excluded from the Facility on grounds of security concerns.  Examples of

---

[42] William Callaghan Declaration, November 2007, par. 6.

[43] Callaghan Declaration, par. 7, 8, 10, 12, Charles Buddy Linn Declaration, November 2007, par. 4.

[44] Linn Declaration, par. 7, 8.

1  the other services performed by non-SDCCC workers are: drayage, cartage, furniture, booth and

2  floor decorations, signs, photographs, telephone services, electricians, plumbers, and carpenters.[45]

3       55.     SDCCC justifies its exclusion of competing cleaning suppliers on the basis of

4  security concerns at the Facility. If this justification is a sham, as alleged by United National, then

5  there is no pro-competitive justification for the exclusionary restrictions by SDCCC. The

6  restrictions do not lower costs; on the contrary, the restrictions result in higher prices in the

7  cleaning services market. Similarly, the quality of service is not increased; no justification other

8  than the asserted security concern has been advanced. The restrictions also do not increase

9  consumer choice or services available; rather, they reduce the choice of services.

10       56.     SDCCC could have used a less restrictive alternative to accomplish their stated

11  goal of improving security at the Facility. They could have subjected United's employees to

12  background checks. They could have accepted Rick Simon's offer to provide a fingerprint scanner.

13  They could have provided enhanced security training or requirements. They could have worked

14  with United, using United's proven expertise in security technology and security issues, to ensure

15  that United's employees were no more of a security risk than their own booth cleaning employees.

16       57.     According to Mark Epstein of Champion, the employees of United National have

17  been employed by the company for long periods of time and have had no security problems at the

18  center. In contrast, employees of some other contractors who work in the convention center are "a

19  huge security black hole."[46] Yet these contractors have not been targeted in the way that United

20  National has. In particular, he mentions I&D employees (Installation and Dismantle) as being a

21  "transient" work force that "comes and goes", whose workers have never been seen before by the

22  contractors. There is "no screening at all" for these I&D employees.[47]

23       VI. Harm to Consumers.

24

25      [45] Terms and Conditions, 2006 Exhibitor Application & Contract, Internet Telephony

26  Conference & Expo, item 6; Linn Declaration, par. 4.

27      [46] Affidavit of Mark Epstein, page 5.

    [47] Deposition of Mark Epstein, page 88.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

58.     Consumers have been harmed first of all because SDCCC is charging higher prices in the trade show cleaning market in connection with its exclusion of all non-SDCCC cleaning employees. The terms of the relationship with United National dictated by SDCCC in July 2007 represent a price increase for cleaning services. United National previously estimated the hours needed for facilities cleaning at the fully loaded labor rate of $16.35 in order to provide a not-to-exceed amount for services at particular exhibitor spaces. SDCCC has raised the hourly rate, not including United National's management and other costs, to $17. Thus, SDCCC has raised rates already to the extent that the hours expended are less than the not-to-exceed hours. In addition, when United National's current locked-in contract rates expire, SDCCC will be charging more for the same number of hours estimated for purposes of setting a not-to-exceed amount. In addition, SDCCC has effectively raised prices for booth cleaning. Mark Epstein testified that Champion's costs have increased because Champion was not previously paying for aisle and carpet cleaning services that United had provided free of charge in conjunction with booth cleaning.[48]   Currently, United National is locked into its contracts to provide booth cleaning, even though it passes all of its booth-cleaning revenue on to SDCCC. Also, it appears that SDCCC is not using supervisors for cleaning jobs where United has the contract and uses its own supervisor. If United is not allowed to compete at the Facility and ceases to operate there, it seems likely that SDCCC will have to use one or more supervisors on contracts that were previously handled by United. The charges for these supervisors will constitute another increase in price.

59.     Harm to the competitive process is demonstrated by, among other things, the statements by market participants. Because of the exercise of monopoly power by the SDCCC, there is no longer any competition on the merits for exhibit cleaning services.  Letters expressing the displeasure of the trade show industry with the actions of SDCCC include:

---

[48] Deposition of Mark Epstein, page 100.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1           a.      Joint Statement of the Society of Independent Show Organizers, the

2 International Association for Exhibition Management, and the Major American Trade Show

3 Organizers.

4           b.      Richard Simon, President of United Service Companies.

5           c.      Joe Loggia, Chief Executive of Advanstar Communications.

6           d.      Patricia Dwyer, Senior Manager of Convention and Trade Show Services,

7 SmithBucklin Corporation.

8           e.      Barbara Myers, Conferences and Meeting Services Director, APCO

9 International

10           f.      B.J. Enright, President, Trade Show Logistics.

11           g.      Ken McAvoy, Senior Vice President, Reed Exhibitions.

12           h.      Mary Kay Sustek, Senior Vice President, Neilson Business Media.

13           i.      Martin Cymbal, President, Trade Show Contractors Association of Southern

14 California.

15           j.      Ty F. Bobit, President, Bobit Business Media.

16           k.      Mary Beth Rebedeau, Executive Director, Society of Independent Show

17 Organizers.

18      60.      Letters from trade show participants are clear in stating the harm they see in

19 SDCCC's policy:

20           a.      Pat Dwyer of SmithBucklin states: "By taking the decision our of our hands

21 to select this very important -- and visible service -- you could be taking away our ability to

22 negotiate competitive pricing models for our client, as well as the relationship to a valuable

23 member of our service level team environment."[49]

24           b.      Mary Kay Sustek of Nielson Business Media states: "While I believe we

25 have used the SDCCC cleaning services over the past years, it was by choice. Imposing an

26

27     [49] Letter from Pat Dwyer to SDCCC, June 27, 2007.

28

exclusive of any type isn't in the best interest of Nielsen or its customers. Nielsen manages its shows based on the specific needs and requirements of customers and having this flexibility is a key ingredient to a successful show. . . . In our experience, exclusive services ultimately become more expensive and less service oriented as it takes the competitive nature out of the business."[50]

c.    Ty Bobit of Bobit Business Media states: "Please know that the imposition of an exclusive service will be in contradiction to the wishes of your customers and it typically reduces service levels and takes competitive pricing options away. We have found over the years that the show manager's ability to choose a contractor and control price helps . .. provide better service at competitive prices."[51]

d.    Mary Beth Rebedeau of the Society of Independent Show Organizers states: "While we understand the need for facility managers to generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors of their choice. This is particularly true for large shows whose complexities demand carefully selected and integrated vendor partners who have a thorough understanding of each show's special needs. This includes cleaning services .    . Show organizers spend years cultivating relationships and advantageous pricing with their chosen suppliers. In-house exclusives arbitrarily increase costs to show organizers -- and therefore exhibitors -- while decreasing the quality of the service provided due to lack of competition."[52]

e.    B.J. Enright of Tradeshowlogistics states: "[O]ur clients would love to have the San Diego Convention Center competitively bid for the opportunity to be the official cleaning contractor. However, an exclusive situation does not promote competition and service."[53]

f.    John Mooney of SISO wrote: "Our opposition to exclusives is based on the historical fact that competition among suppliers provides the best service at the lowest cost. Exclusives have the reverse effect."[54]

---

[50] Letter from Mary Kay Sustek to SDCCC, June 22, 2007.

[51] June 14, 2007 letter from Ty Bobit to SDCCC.

[52] July 20, 2007 letter from Mary Beth Rebedeau to SDCCC.

[53] July 26, 2007 letter from B.J. Enright to SDCCC.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1         g.     Michael Muldoon, of the Convention Management Group, wrote to say

2   "Please know that food and beverage events, like the shows we manage, have extraordinary

3   cleaning requirements. Our relationship with United Services Companies has been extremely

4   important to the production of these events. We have not been as successful working in facilities

5   that require the hiring of "exclusive contractors" and we avoid "exclusive shops."[55]

6       61.     The conclusion I have reached from, among other things, my experience as an

7   economist as well as the statements from market participants quoted here is that SDCCC's

8   exclusion of competition in trade show cleaning services at the Facility, if it continues, will

9   produce higher prices and a lower quality of service. The experiences cited by Nielson Business

10  Services, Bobit Business Media, the Society of Independent Show Organizers and the Convention

11  Management Group all support this conclusion. The experiences of these organizations provide a

12  natural experiment that, while insufficient by themselves to provide a definitive prediction for

13  SDCCC, nevertheless points toward harm for consumers as a result of SDCCC's exclusion.

14      VII. Conclusion

15      62.     For all of the reasons stated above, I believe that the actions of SDCCC in

16  excluding competition in the market for trade show cleaning services in the Facility are highly

17  anti-competitive. Based on the documents I have examined, I also believe that there is no pro-

18  competitive justification for the SDCCC's actions. My opinions have been formed based on the

19  documents that I have seen.

20      VIII. Response to the Hayes Declaration

21      63.     I have read and reviewed the declaration submitted by John B. Hayes in support of

22  SDCCC's motion for summary judgment. His declaration is quite similar to the expert report he

23  submitted in this case. I responded to his comments in my rebuttal report, and I will also do so

24  here.

25

26

27  [54] March 31, 2000 letter from John Mooney to Carol Wallace.

28  [55] March 13, 2000 letter from Michael Muldoon to Carol Wallace.

64.     Dr. Hayes says bundling and tying are commonplace and rarely harm competition. This is because most bundling and tying is the harmless variety such as shoes and shoelaces, or cars and tires. Because many consumer products have multiple parts and features, we can label all of these products with multiple features "bundling" or "tying." For example, automobiles have radios, carpeting, windshield wipers, and countless other separable parts that could conceptually be labeled part of a "bundle." Since these are the types of examples that Dr. Hayes refers to when he says that bundling and tying are "common," I assume that this is what he means. That in no way means that there are not anti-competitive tying arrangements in situations where consumers may wish to purchase products or services separately. So I reject the "everybody does it" explanation as being in any way relevant to the SDCCC policy being considered here.

65.     Dr. Hayes points out that bundling and tying are different economic concepts in that bundling "refers to selling two or more products together for a single price," while tying is selling one product "in conjunction with another." However, he confuses these concepts in his "shoelaces and shoes" and "cars and tires" analysis, because they are examples of bundling, not tying. My analysis identified SDCCC's policy as tying in that SDCCC ties trade show services (the tying good) and trade show cleaning services (the tied good). SDCCC may have priced some of their services as a bundle, where the cost of cleaning services was not separately stated, but I am not aware of any such instance. As a general matter and for the situation as it has been explained in the depositions that I have read, the SDCCC policy is a case of tying.

66.     I strongly disagree with Dr. Hayes' attempt to label the SDCCC policy as "bundling" as opposed to tying. He states:  "exclusive provider arrangements are economically equivalent to pure bundling when the tied good is always purchased in conjunction with the tying good." I take this to mean that he is saying that everyone who conducts a trade show at SDCCC uses cleaning services, so these two services are like shoes and shoelaces. If Hayes can bridge this gap, making SDCCC's policy one of bundling, not tying, then it follows that he can use all of the justifications for bundling that can be found in the economics literature.

67.     However, SDCCC's policy is not bundling. For cleaning and exhibiting to be a bundle, two elements must be present, at a minimum. One is that the quantity of trade show

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

cleaning services must be in fixed proportions to the quantity of exhibitor services. In the case of buying shoes, the laces are not separately priced because everyone needs exactly two shoelaces with a pair of shoes. But in the Facility, everyone does not use the exact same amount of cleaning services. That is why cleaning services are not "bundled" into the price of trade show services. Cleaning services are separately calculated and then added to the cost of other services being purchased.[56]

68.     The second element that must be present for cleaning and exhibiting to be a bundle is that every consumer must purchase the bundle. If some consumers purchase trade show exhibitor services while choosing not to purchase cleaning services, then it is not a bundle. And in fact, some of the exhibitors at SDCCC trade shows do choose not to purchase some cleaning services.[57] Not all exhibitors purchase booth cleaning services. United works the floor of conventions to convince exhibitors who have not signed up for booth cleaning that they should purchase it.

69.     In sum, the SDCCC policy does not pass Dr. Hayes' shoes-and-shoelaces, cars-and-tires test. The characterization of exclusive provider arrangements at convention centers as equivalent to "pure bundling" is wrong. Because SDCCC is not "bundling," the discussion of the benign effects of bundling that follows is largely irrelevant.

70.     The fact that some other convention centers tie cleaning services and trade show services is irrelevant to the issue in this case. The provision of cleaning services by some convention centers is properly seen as a form of vertical integration, that is, of a firm producing a service (trade show services) that also produces one or more of the inputs used in the service (cleaning services). Other convention centers that do not provide exclusive cleaning services are less vertically integrated. The element that is important in the present case is that until 2007 there

---

[56] See for example the deposition of Charles Linn, page 39; deposition of Gabriel Ramirez, page 47; page 133-136; deposition of Raymond Santos, pages 17-21;

[57] See, for example, the deposition of Raymond Santos, page 147.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  was a functioning market for trade show cleaning services at SDCCC. The exclusion of

2  competitors from this market was anti-competitive and harmful to consumers.

3      71.    SDCCC's policy is not bundling, so the arguments for the possible efficiency of

4  bundling do not apply. Hayes says that bundling can eliminate the inefficiency of double margins.

5  This point is wrong because the double margin problem applies to situations where two

6  complementary products are supplied by separate firms and both have market power. The present

7  case is different because in 2007 SDCCC supplied both cleaning services as well as trade show

8  services. The double margin problem would not occur, because if United exercised market power

9  and raised the price of cleaning services, SDCCC could supply those services itself.

10      72.    In paragraphs 28 and 29, Dr. Hayes says that there can be efficiencies associated

11  with SDCCC's tying policy. He does not provide any analysis or data to back this up in SDCCC's

12  case, but he suggests that SDCCC's security justification for the exclusive policy could provide

13  efficiencies. Also, he points out that I have not done a cost-benefit study to back up my statements

14  about whether security was the reason for the change in policy. I stated clearly that I was not

15  providing an opinion about security per se, but rather I was pointing out that the security argument

16  lacked credibility because United had higher security standards than SDCCC and had offered to

17  address any deficiency that SDCCC could name.

18      73.    Dr. Hayes agrees with my position regarding market power as a necessary element

19  for SDCCC to be able to tie trade show cleaning services to trade show services. However, he says

20  the threshold question is whether SDCCC possesses "substantial" market power in the national

21  trade show market. This is incorrect. Market power means the power to influence price. The power

22  to influence price can vary from the maximum achievable by a monopolist (the only seller in a

23  market) all the way down to zero pricing power (in so-called atomistic competition).  Market

24  power does not need to be "substantial," it only needs to be "sufficient."[58]

25

26

27      [58] Ahlborn, Evans & Padilla, "The Antitrust Economics of Tying:  A Farewell To Per Se
    Illegality, p. 287.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

74.     The question for the SDCCC policy being considered here is whether SDCCC has a sufficient amount of pricing power in the trade show market that it can exclude competitors from the trade show cleaning market and raise price in that market. The amount by which price can be raised in the show cleaning market is the "small but significant and non-transitory" price increase (SNIP) that is the test used in the FTC/DOJ Antitrust Guidelines that I referred to in my report and that Dr. Hayes refers to in his report. This is because raising the price of cleaning services will raise the total price paid at the Facility by consumers of trade show services. If SDCCC has enough pricing power to raise that total price by raising the price of cleaning services, then consumer harm will result.

75.     The SNIP test normally refers to the ability to raise and maintain price 5% or more. So the question becomes, how much pricing power in the trade show market does it take to have an anticompetitive effect in the trade show cleaning services market? The answer is, not much. According to the figures reported by Dr. Hayes, trade show cleaning services accounts for no more than 5.1% of the total cost of trade show services at SDCC.[59] A 5% increase in the price of trade show cleaning services represents an increase in the total price of trade show services (including the cleaning services) of only 0.3% (three-tenths of one percent). SDCCC needs very little pricing power to be able to raise price by three-tenths of one percent. As a result, it is my opinion that Dr. Hayes is incorrect when he states that the issue is whether SDCCC "possesses substantial market power."

76.     In discussing the nature of the national market for trade shows in which SDCCC competes, Dr. Hayes says that I am wrong to emphasize the size of the Facility as a major factor in its market competitiveness. He presents SDCCC data that he reads to say that only 6 shows used the entire Facility, and only 9 shows (3.6% of the total number of shows) used 75% of the Facility in FY 2009. Using the number of shows rather than show revenues or the percent of space rented on an annual basis is misleading in this regard. For example, the 9 shows that he references that

---

[59] Hayes Declaration, paragraph 26.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1   each used 75% or more of the Facility cannot overlap; if each of these shows used two weeks at

2   the SDCC, including show time, set-up and break-down, then they would use 18 weeks of the

3   year. This is 35% of the year in which SDCCC has shows that are too big for most convention

4   centers. Whether or not the 35% figure that I present as a rough estimate is correct, it is clear that

5   the percent of the time that Facility is tied up with a large show is much more than the 3.6%

6   provided by Dr. Hayes.

7        77.    The market analysis undertaken by ERA for the Convention Center Task Force

8   shows how misleading the figures used by Dr. Hayes are. He uses a total of 248 "events" at the

9   Facility in 2009. ERA has a figure of 249 for 2009, so they agree fairly well.[60] However, 153 of

10  the 249 are labeled "Meetings, community events, food & Bev." Since the Facility has 118,700

11  square feet of "meeting room" space in addition to its 615,700 square feet of exhibit space, it is

12  misleading to be comparing the number of meetings with the number of conventions. ERA reports

13  72 "National/State Conventions and Trade Shows" and "Corporate Conventions" as "Primary

14  Events," while the 153 meetings and community events are labeled "secondary events."

15       78.    In sum, I disagree with the attempt by Dr. Hayes to characterize SDCCC as having

16  only a few large conventions and to have mostly smaller shows that compete with smaller

17  convention centers. It makes no sense to argue as he does that "SDCCC competes with much

18  smaller facilities for the vast majority of the events that it hosts."[61] If that were the case, why

19  would the City of San Diego be contemplating an expansion of the SDCCC in order to increase its

20  capacity to host large trade shows? The task force reports speak of the loss of potential business

21  due to lack of available space and of events that already have or will in the future outgrow the

22  available space.[62]

23       79.    Dr. Hayes' own discussion of the market refutes his conclusion that SDCCC mainly

24  competes with much smaller facilities. In paragraph 35 he quotes the ERA report's conclusion that

25

26       [60] ERA presentation, Convention Center Task Force, Table 5.

27       [61] Hayes Declaration, paragraph 34.

28       [62] PricewaterhouseCoopers report, Jennifer Sutherland, March 2009, page 6.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

21 convention centers represent "the predominant competitive markets" for SDCCC.  These 21 centers are the large centers throughout the U.S., not the "much smaller" centers referenced by Dr. Hayes. In paragraph 36 Dr. Hayes quotes SDCC's Carol Wallace saying that SDCCC competes with convention centers in 13 U.S. cities.

80.     Most significantly with regard to the position of SDCCC in the convention and trade show market, the presentation to the convention center task force by board chairman Chris Cramer and CEO Carol Wallace is in my opinion totally at variance with the analysis presented by Dr. Hayes.[63]  For example, they say:

Chris Cramer remarks

Over the last 20 years, the corporation has established a proven track record: Maximizing the building's economic potential attracting many of the nation's most lucrative conventions

We are fortunate to have a customer base, largely driven by medical association meetings, that continues to have a strong economic performance and a necessity to continue to host their annual meetings.

Carol Wallace remarks

[referring to an exhibit with four quadrants to illustrate different types of uses of the center]

Our primary goal is to attract events that generate significant economic impact for the city of San Diego

The Center specifically targets high-end events to maximize economic impact for the city and produce significant revenues for the Center. Good examples are medical shows which attract attendees who have more disposable income, are likely to bring their families and come for the convention and extend their stay into a vacation. These events also have large budgets, host many off site events and have the need for ancillary services which generate substantial revenue for the facility.

In the upper left hand quadrant, are events that are good for the city, but don't necessarily generate revenues for the facility. These events provide positive media exposure for the city and economic benefits. Examples are high profile political conventions or offshoot events surrounding events like the Superbowl.

[63] Presentation by Chris Cramer and Carol Wallace, Convention Center Task Force, February 2009.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

> In the two lower quadrants are events that don't generate significant economic benefits for the city. On the left, these include conventions, tradeshows and events, with smaller budgets — so they don't generate money for the facility either. And, they typically don't attract attendees who stay as many nights. If they do, they usually don't spend much money.
>
> The lower right quadrant represents consumer shows and local events. While these events may attract a large number of local attendees, they don't attract overnight visitors.

These remarks by Chris Cramer and Carol Wallace directly contradict Dr. Hayes' description of the market served by SDCCC and the Facility. It is clear that the primary market in which they see SDCCC competing is for larger national conventions.

81.    After arguing that SDCCC competes with many smaller convention centers, Dr. Hayes then estimates SDCC's market share by using the 20 convention centers that are larger than the Facility. This results in an estimated market share for SDCCC of 3% to 5%. His conclusion from this market share estimate is that "SDCCC does not possess market power in the nationwide market for hosting trade shows."[64] As I pointed out above, in order to have an anticompetitive effect on the market for trade show cleaning services, SDCCC only needs to be able to raise price by three-tenths of one percent. A market share of 3% to 5%, in addition to all of the other indicators of market power that are contained in the analyses done for the Convention Center Task Force, provide sufficient market power to be able to have this anticompetitive effect.

82.    Dr. Hayes also objects to the opinion that SDCCC is an essential facility for the trade show cleaning market. His basis for this objection is his claim that I have addressed the incorrect market, because he contends that SDCCC competes with other convention centers for business. In so arguing he completely ignores that trade show cleaning is a market, and for it to occur cleaning staff must have access to the Facility. Therefore, my opinion that SDCCC is an essential facility remains.

83.    Dr. Hayes argues that since SDCCC instituted its exclusive policy in 2007 it has not raised its labor rates for trade show cleaning. In my opinion this has no relevance for whether

---

[64] Hayes Declaration, paragraph 46.

1   the exclusion of competitors was an anticompetitive act. Since the exclusion was immediately

2   challenged and litigated, it is not surprising that SDCCC has not made any move to raise its rates.

3   The significant point is that if SDCCC is successful in excluding competition, it will have the

4   ability to raise rates without losing business to a competitor in the trade show cleaning market.

5        84.    If Dr. Hayes is arguing that SDCCC cannot raise its prices because of national

6   competition for trade shows, he is ignoring his own data. In exhibits 16 and 17 of Dr. Hayes'

7   declaration, and exhibit 18 of his report, Dr. Hayes acknowledges that the labor rates for trade

8   show cleaning at some venues is as high as $26 per hour, compared to the $17 per hour rate

9   charged by SDCCC. This data belies Dr. Hayes' argument on this point.

10        85.    Attached hereto as Exhibits 3 and 4 are my initial expert report and rebuttal report,

11   respectively.

12        I declare under penalty of perjury under the laws of the State of California that the

13   foregoing is true and correct and that this Declaration is executed this _____ day of February, 2010

14   in Los Angeles, California.

16   _____
     John S. Hekman, Ph.D.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  the exclusion of competitors was an anticompetitive act. Since the exclusion was immediately

2  challenged and litigated, it is not surprising that SDCCC has not made any move to raise its rates.

3  The significant point is that if SDCCC is successful in excluding competition, it will have the

4  ability to raise rates without losing business to a competitor in the trade show cleaning market.

5      84.    If Dr. Hayes is arguing that SDCCC cannot raise its prices because of national

6  competition for trade shows, he is ignoring his own data. In exhibits 16 and 17 of Dr. Hayes'

7  declaration, and exhibit 18 of his report, Dr. Hayes acknowledges that the labor rates for trade

8  show cleaning at some venues is as high as $26 per hour, compared to the $17 per hour rate

9  charged by SDCCC. This data belies Dr. Hayes' argument on this point.

10     85.    Attached hereto as Exhibits 3 and 4 are my initial expert report and rebuttal report,

11  respectively.

12     I declare under penalty of perjury under the laws of the State of California that the

13  foregoing is true and correct and that this Declaration is executed this 28th day of February, 2010

14  in Los Angeles, California.

15

16  _John S Hekman_

    John S. Hekman, Ph.D.

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*
(Case No: 07-CV-2172 BEN(JMA))

TABLE OF CONTENTS OF EXHIBITS TO
DECLARATION OF DR. JOHN S. HEKMAN IN SUPPORT OF UNITED NATIONAL
MAINTENANCE, INC.'S OPPOSITION TO SAN DIEGO CONVENTION CENTER
CORPORATION, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE SUMMARY ADJUDICATION

| **Exhibit** | **Page Nos.** | **Description** |
|---|---|---|
| 1 | 1-10 | John S. Hekman Curriculum Vitae |
| 2 | 11-14 | John S. Hekman list of materials reviewed in this matter |
| 3 | 15-62 | John S. Hekman Report dated September 30, 2009 |
| 4 | 63-83 | John S. Hekman Rebuttal Report dated November 12, 2009 |

KNLH\708123.1

# EXHIBIT 1

# LECG

## John S. Hekman

550 South Hope Street                    EXHIBIT 1
Suite 2150
Los Angeles, California 90071
Tel. (424) 204-8872
Fax (213) 243-3710
E-mail: jhekman@lecg.com

### EDUCATION

Ph.D., Economics, University of Chicago
M.B.A., Finance, University of Chicago
BA, History, Valparaiso University

### EMPLOYMENT

Principal, LECG, LLC, 2004-present.

Lecturer, MBA program, University of Southern California, 1989-present.  Department of Finance and Business Economics.

Past Positions:

Principal, Economic Analysis LLC, 2000-03.

Principal, LECG, LLC, 1998-2000.

Director, Altschuler, Melvoin and Glasser LLP, 1996-98.

Vice President (1993-96), Senior Economist (1992), Economic Analysis Corporation.

Senior Economist, Micronomics, Inc., 1990-92.

Executive Vice President and Director of U.S. Economic Forecasting, Claremont Economics Institute, 1986-90.  Editor, *The Main Street Journal* Investment letter.

Associate Professor of Finance, University of North Carolina, Chapel Hill 1981-86, (academic tenure granted, 1985).

Visiting Scholar, Federal Reserve Bank of Atlanta, 1981-84.

Economist, Federal Reserve Bank of Boston, 1980.

Research Associate, Harvard-MIT Joint Center For Urban Studies, 1978.

# LeCG

Assistant Professor of Economics, Boston College, 1975-81.

Instructor, University of Chicago, 1974-75.

## RECENT ENGAGEMENTS

*Official Committee of Unsecured Creditors v. Credit Suisse, Cayman Islands, et al.* Retained by J. Thomas Beckett of Parsons Behle & Latimer regarding the bankruptcy of the Yellowstone Mountain Club, April 2009.

*Morton v. Morton.* California Superior Court for the County of Los Angeles. Retained by Thomas Nolan of Skadden, Arps, Meagher & Flom, November 2008 regarding the value of a large land parcel in Las Vegas, March 2009.

*Gartner, Inc. v. Parikh, et al.* United States District Court for the Central District of California. Retained by Thomas Mackey of Jackson Lewis, August 2008.

*Auerbach Acquisition Associates v. Greg Daily et al.* California Superior Court for the County of Los Angeles. Retained by Pierce O'Donnell of O'Donnell and Associates, April 2008.

*Stephen Shoemaker v. Daniels, Fine, Israel, Schonbuch & Lebovits.* California Superior Court for the County of Los Angeles. Retained by Sandra Block of Robie & Mattai, February, 2008.

Retained by Fremont Investment and Loan in connection with the sub-prime mortgage crisis, January 2008.

*Catherine Blaylock, et al. v. First American Title Insurance Company.* United States District Court, Western District of Washington. Retained by Stephen Rummage of Davis Wright Tremaine, November 2007.

*Janice Howland v. First American Title Insurance.* United States District Court, Northern District of Illinois, Eastern Division. Retained by Douglas Mansfield of Jones, Day, November 2007.

*United National Maintenance Inc. v. San Diego Convention Center Corp.* United States District Court for the Southern Distict of California, County of San Diego. Retained by Jeffrey Leon of Ungaretti & Harris, LLP, October, 2007; Jacob Slania of Kirby Noonan Lance & Hoge, August 2009.

*Julius Chang and Howard Chen v. Charles Schwab & Company,* California Superior Court, County of San Francisco. Retained by Daniel Newland of Seyfarth Shaw LLP, October, 2007.

# LECG

*Eric Seiken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San Diego.   Retained by Kevin Quinn of Thorsnes Bartolatta McGuire, September, 2007.

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et al,* California Superior Court, County of San Mateo.   Retained by Joel Wolosky of Hodgson Russ, March 2007.

*James Ripley v. Wyoming Medical Center et al.*   United States District Court for the District of Wyoming.   Retained by Stephen Kline of Kline Law Office PC, January 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District of California.   Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman, November 2006.

*Caruso Affiliated Holdings v. General Growth Properties, Inc.*   California Superior Court for the County of Los Angeles.   Retained by Henry Shields of Irell & Manella, September 2006.

*Breakdown Services Ltd. v. Now Casting, Inc.*   California Superior Court, County of Los Angeles.   Retained by Stephen P. Krakowsky, September 2006.

*RitterRanch Development LLC, debtor.  Los Angeles County Waterworks District No. 40 v. Robbin Itkin et al.,*   United States District Court Central District of California.   Retained by Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller, May 2006.

*Pamela Cunningham and Reet Caldwell v. Mattel, Inc.*   Circuit Court, Third Judicial Circuit, Madison County, Illinois.   Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges, October 2004.


## TESTIMONY

*United National Maintenance Inc. v. San Diego Convention Center Corp.*   California Superior Court, County of San Diego.   Retained by Jeffrey Leon of Ungaretti & Harris, and Jacob Slania of Kirby Noonan Lance & Hoge.   Testimony filed December 2007; deposition December 2009.

*Ricardo Alfonso Leon, et al. v. Jose Francisco Leon, et al.*   California Superior Court for the County of Los Angeles.   Retained by Paul Workman of Holland and Knight.   Deposition August 2009.

*Beth Robbins v. Essex Management Corp., et al.*   California Superior Court for the County of Los Angeles.   Retained by Jeremy Dwork of Daley & Heft.   Deposition September, 2008; trial October 2009.

Exhibit 1

Page 3

# LECG

*Official Committee of Unsecured Creditors v. Credit Suisse, Cayman Islands Branch, et al.* United States Bankruptcy Court for the District of Montana. Retained by J.Thomas Beckett of Parsons, Behle & Latimer. Deposition April 2009; trial testimony May 2009.

*Morton v. Morton.* California Superior Court for the County of Los Angeles. Retained by Thomas Nolan of Skadden, Arps, Meagher & Flom. Deposition March 2009.

*Bullock v. Philip Morris, Inc.* California Superior Court for the County of Los Angeles. Retained by Robert McCarter of Arnold & Porter. Deposition March 2009.

*Gartner, Inc. v. Parikh, et al.* United States District Court for the Central District of California. Retained by Thomas Mackey of Jackson Lewis, August 2008. Deposition October, 2008.

*Catherine Blaylock, et al. v. First American Title Insurance Company.* United States District Court, Western District of Washington. Retained by Stephen Rummage of Davis Wright Tremaine. Declaration filed January, 2008.

*Janice Howland v. First American Title Insurance.* United States District Court, Northern District of Illinois, Eastern Division. Retained by Douglas Mansfield of Jones, Day. Declaration filed January, 2008.

*Julius Chang and Howard Chen v. Charles Schwab & Company,* California Superior Court, County of San Francisco. Retained by Daniel Newland of Seyfarth Shaw LLP. Deposition October, 2007.

*Eric Seiken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San Diego. Retained by Kevin Quinn of Thorsnes Bartolatta McGuire. Class Certification Declaration submitted September, 2007; deposition November 2007.

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et al,* California Superior Court, County of San Mateo. Retained by Joel Wolosky of Hodgson Russ. Deposition April 2007.

*Dwight W. Crawford. v. Debra S. Katz, et al.,* Superior Court for the District of Columbia. Retained by Glenn M. Young of the Young Law Firm. Deposition April 2007.

*James Ripley v. Wyoming Medical Center et al.* United States District Court for the District of Wyoming. Retained by Stephen Kline of Kline Law Office PC. Deposition April 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District of California. Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman. Deposition February 2007.

*Breakdown Services Ltd. v. Now Casting, Inc.* California Superior Court, County of Los Angeles. Retained by Stephen P. Krakowsky. Deposition October 2006.

# LECG

*RitterRanch Development LLC, debtor. Los Angeles County Waterworks District No. 40 v. Robbin Itkin et al.,* United States District Court Central District of California. Retained by Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller. Deposition June 2006.

*Pamela Cunningham and Reet Caldwell v. Mattel, Inc.* Circuit Court, Third Judicial Circuit, Madison County, Illinois. Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges. Deposition February 2005.

*In re Cioffi,* California Superior Court, County of Santa Clara. Retained by William Russell of Lakin, Spears. Deposition and trial testimony January 2004.

*Ederel Sport, Inc. v. Gotcha International, L.P.* U.S. Bankruptcy Court, Central District of California. Retained by Michael Adele of Albert, Weiland & Golden. Deposition and trial testimony May 2003.

*In Re Fuqua Industries Shareholder Litigation,* Delaware Chancery Court Civil Action No. 11974. Retained by Lowell Sachnoff of Sachnoff & Weaver. Deposition March 2003.

*SPC/PomomaLLC v. Medianews Group, Inc.* Superior Court of California, County of Los Angeles. Retained by Steven Gardner of Cohon and Gardner. Deposition February 2003; trial testimony April 2003.

*MGM v. Midway Games, Inc.* U. S. District Court, Central District of California, Western Division. Retained by John Williams of Lord, Bissell & Brook. Report submitted October 2002.

*Freeman Industries LLC v. Eastman Chemical Company, et al.,* In the Law Court for Sullivan County at Kingsport, Tennessee. Retained by Aton Arbisser of Kaye Scholer. Class Certification Affidavit submitted September 2002.

*Keep v. State of California,* Superior Court of California, County of Los Angeles. Retained by Vladimir Shalkovich, Deputy Attorney General. Deposition October 2002.

*IMAX, LTD. v. Krikorian Premiere Theatres,* U.S. District Court for the Central District of California. Retained by Glenn Dassoff of Paul, Hastings, Janofsky & Walker. Deposition September 2002.

*Betty Bullock v. Phillip Morris, Inc. et al.;* California Superior Court, Los Angeles. Retained by Thomas Stoever of Arnold & Porter on behalf of defendant. Deposition May 2002.

*International Paper and Masonite v. Affiliated FM Insurance Co, et al.;* California Superior Court, San Francisco. Retained by Adam Murray of Howrey, Simon, Arnold & White. Deposition May 2001; trial testimony November 2001.

Exhibit 1

Page 5

# LeCG

*Copley Press, et al. v. Gray Davis, et al; Tony Strickland, et al. v. Gray Davis, et al.;* California Superior Court, San Diego County; retained by Timothy Muscat, Deputy Attorney General. Declaration in Support of Defendant's Opposition Brief submitted May 2001.

*Fitzgerald v. Silcott, et al.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Deposition January 2000; trial October 2001.

*Formal Complaint of Tesoro Alaska Petroleum Against Amerada Hess, et al.,* Federal Energy Regulatory Commission and Regulatory Commission of Alaska. Retained by John Donovan of Skadden, Arps, Slate Meagher & Flom. Testimony submitted November 2000.

*Alavi v. Kaiser Foundation Hospitals.* Retained by Walter Weiss. Arbitration testimony November 2000.

*Seguritan v. State of California, et al.* Los Angeles County Superior Court. Retained by Anne Hunter, Deputy Attorney General. Deposition July 2000.

*Lenehan v. Maryland Casualty.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Deposition May 2000.

*Hearing on Green Coke Pricing Issue for TAPS Quality Bank.* Federal Energy Regulatory Commission. Retained by John Donovan of Skadden, Arps, Slate, Meagher & Flom. Testimony May 2000.

*Tash v. Aviara Land Associates, L.P., et al.* San Diego Superior Court. Retained by Jerry Phillips of Richman, Mann, Chizever, Phillips & Duboff. Deposition April 2000; Trial testimony May 2000.

*First Pension Corp/Murray v. Belka.* California Superior Court, County of Orange. Retained by William Meeske of Latham & Watkins. Deposition February 2000.

*Rhonda Jalali v. Assembly of God, Teen Challenge et al.* California Superior Court. Retained by George Buehler of Howrey & Simon. Deposition and trial testimony July 1999.

*Alfred Martino, Jr. v. Northbrook Property and Casualty Company and St. Paul Fire and Marine Insurance Company,* Arbitration. Retained by Law Offices of J. Jeffrey Long. Testimony June 1999.

*Hugo Valdivia v. MCE Corporation, et al.,* California Superior Court for the County of Los Angeles. Retained by Andrew Jacobs of the Law Offices of Andrew Hoffman (CNA Insurance). Deposition November 1997; trial January 1998.

*Louisville Bedding Company v. Pillowtex Corporation,* United States District Court for the Western District of Kentucky. Retained by Hartwell Morse of Welsh & Katz. Deposition November, December 1997.

# LECG

*Infant and Nutritional Products, et al. v. BJ Family Food Center, et al,* California Superior Court for the County of Los Angeles. Retained by Farhad Novian of Novian & Novian. Deposition September 1997.

*William Gene Norman v. Herbalife International, et al.,* California Superior Court for the County of Los Angeles. Retained by Ward Benshoof of McClintock Weston Benshoof Rochefort Rubalcava MacCuish. Deposition April 1997.

*Jeffrey Alpert v. Gerald Busch, et al,* California Superior Court for the county of Los Angeles. Retained by Law Offices of Daniel Hoffman (CNA Insurance). Trial testimony November 1997.

*Janelle Flores v. Dapo Popoola, MD, et al.,* California Superior Court for the County of Los Angeles. Retained by Henry Tovmassian of Kehr, Crook, Tovmassian & Fox. Deposition September 1997.

*Ridgecrest Homeowners Association v. Nihon Lancre America, Inc., et al.,* California Superior Court for the County of Los Angeles. Retained by Ronald Caswell of Richmond, Lawrence, Mann, Greene, Chizever, Friedman & Phillips. Deposition June 1997.

*Harvey W. Stuart, et al. v. Kraft Foods, Inc. et al.,* United States District Court for the Eastern District of Wisconsin. Retained by Michael Freed of Much Shelist Freed Denenberg Ament Bell & Rubenstein. Affidavit November 1996; deposition and court testimony December 1996.

*Albert and Estelle Binder, et al. v. Thomas Gillespie, et al.,* United States District Court for the District of Idaho. Retained by Robert Bretz of Robert H. Bretz, PC. Affidavit December 1996.

*Ernst Paul Lehmann Patentwerk v. San-Val Discount, Inc.,* United States District Court, Central District of California. Retained by Douglas Adler of Skadden, Arps, Slate, Meagher & Flom. Affidavit submitted March 1996.

*JAR-PR Associates v. Unocal,* Superior Court of the State of California, County of Los Angeles. Retained by George Crook of Kehr, Crook, Tovmassian & Fox. Deposition and trial testimony, March 1996.

*Sarkis v. State of California,* California Superior Court, County of Kern. Retained by Deputy Attorney General Daniel Helfat. Deposition, January 1996.

*Casper Boso v. Chicago Bears.* Retained by Steven Wolf of Wolf & Ouimet to testify regarding the average career length of NFL players. Arbitration testimony November 1994.

*Styling Research Company v. Conair Corporation,* Superior Court of the State of California, County of Los Angeles. Retained by Phillip Belleville of Latham & Watkins. Deposition August 1992.

# LECG

*Medical Designs, Inc. v. Donjoy, Inc.,* United States District Court, Southern District of California.  Retained by Paul C. Van Slyke of Pravel, Gambrell, Hewitt, Kimball & Krieger. Deposition October 1991.

*California Grocers Association v. Bank of America,* Superior Court of the State of California for the County of Alameda, Northern District.  Retained by Arne Wagner of Bank of America.  Deposition May 1991.

## CONSULTANT

*Simpson Thatcher & Bartlett, New York, NY, Kenneth Logan;* Ronald Cleveland, et al. v. Viacom, Blockbuster, et al.  *United States District Court for the Western District of Texas, 2002.*

In Re Maguire Thomas Partners – Grand Place Tower, Ltd.  *United States Bankruptcy Court, Central District of California.  Retained by Bennett Silverman of Gibson, Dunn & Crutcher on behalf of Sumitomo Bank, 1999.*

Howrey & Simon, Washington, DC, Thomas Heyer; *Litton Systems, Inc. v. Honeywell, Inc.,* 1995-1996.

Thelen, Marrin, Johnson & Bridges, San Francisco, Steven V. O'Neal; *IBM v. Fasco Industries,* 1994-1995.

*Packard Bell Electronics, Inc. v. Teledyne Industries, Inc.,* Superior Court of the State of California, County of Los Angeles.  Retained by Ronald M. St. Marie of Ervin, Cohen & Jessup.  August 1995.

O'Melveny & Myers, Los Angeles, Charles Diamond, Randy Oppenheimer; *Exxon Valdez Oil Spill Litigation,* 1993-1994; 2000; 2002.

## PUBLICATIONS

"California Under Siege:  A Call for Perspective" (with Ken Agid, et al.), California Real Estate Roundtable, April 1991.

"Should We Reform Deposit Insurance?" *Los Angeles Times,* March 11, 1990, D3.

"New England's Economy in the 1980s" (with Lynn Browne), in *The Massachusetts Miracle,* David R. Lampe (ed.), The MIT Press: Cambridge, MA, 1988.

"Real Estate Returns and Inflation" (with David Hartzell and Mike Miles), *American Real Estate and Urban Economics Association Journal (AREUEA),* Spring 1987.

LECG

"Factors Affecting Manufacturing Location in North Carolina," in Dale Whittington (ed.), *High Hopes for High Tech: Microelectronics in North Carolina,* University of North Carolina Press, 1987.

"Diversification Categories in Investment Real Estate" (with David Hartzell and Mike Miles), *AREUEA Journal,* Summer 1986.

*Land Supply Monitoring: A Guide for Improving Public and Private Urban Development Decisions* (with D. Godshalk, S. Bollens, and M. Miles), Oelgeschlager, Gunn & Hain: Boston, 1985.

"Rental Price Adjustment and Investment in the Office Construction Market," *AREUEA Journal,* Spring 1985.

"Branch Plant Location and the Product Cycle in Computer Manufacturing," *Journal of Economics and Business,* May 1985.

"Venture Capital and Economic Development in the Southeast" (with Mike Miles), *Economic Review,* Federal Reserve Bank of Atlanta, July 1983.

"Optimal Allocation of Economic Development Funds" (with Mike Miles, et al.), N.C. Department of Natural Resources and Community Development, January 1983.

"What are Businesses Looking for? A Survey of Industrial Firms in the South," *Economic Review,* Federal Reserve Bank of Atlanta, June 1982.

"Behind the Sunbelt's Growth: Industrial Decentralization" (with Alan Smith), *Economic Review,* Federal Reserve Bank of Atlanta, March 1982.

"Impact of Environmental Regulations on Industrial Development in North Carolina" (with Raymond Burby, et al.), North Carolina Department of Natural Resources and Community Development, February 1982.

"The Evolution of New England Industry" (with John Strong), *New England Economic Review,* March-April 1981.

"New England's Economy in the 1980s" (with Lynn Browne), *New England Economic Review,* January-February 1981.

"Income, Labor Supply and Urban Residence," *American Economic Review,* September 1980.

"Is there a Case for Plant Closing Laws?" (with John Strong), *New England Economic Review,* July-August 1980.

# LECG

"The Product Cycle and New England Textiles," *Quarterly Journal of Economics,* June 1980.

"Can New England Hold Onto its High Technology Industry?" *New England Economic Review,* April 1980.

"Regions Don't Grow Old, Products Do," *The New York Times*, Sunday Business, November 4, 1979.

"What Attracts Industry to New England?" *New England Economic indicators,* December 1978.

"An Analysis of the Changing Location of Iron and Steel Production in the Twentieth Century," *American Economic Review*, March 1978.

# EXHIBIT 2

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

Exhibit 2


List of Materials Reviewed

1. Complaint for Injunctive Relief and Damages
2. Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction
3. Defendants Objections to Evidence Submitted by Plaintiff in Support of Plaintiff's Ex Parte Application for a Temporary Restraining Order
4. Letter from Aaron Bludworth to Brad Gessner, September 21, 2007.
5. Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order
6. Memorandum of Points and Authorities in Support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order.
7. Plaintiff's Ex Parte Application for a Temporary Restraining Order.
8. Proposed Temporary Restraining Order
9. Proposed Temporary Restraining Order and Order to Show Cause re Preliminary Injunction
10. Request for Judicial Notice in support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order
11. Declaration of Carole Wallace in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
12. Declaration of Dessi Nintcheva in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
13. Declaration of Thomas Robbins in Support of Plaintiff's Application for a Temporary Restraining Order
14. Declaration of Jason Kirby in Support of Plaintiff's Application for a Temporary Restraining Order
15. Declaration of Charles Buddy Linn in Support of Plaintiff's Application for a Temporary Restraining Order

Exhibit 2
Page 11

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

16. Declaration of Larry Colby in Support of Plaintiff's Application for a Temporary Restraining Order

17. Declaration of Mark Epstein in Support of Plaintiff's Application for a Temporary Restraining Order

18. Declaration of Mark Epstein, October 26, 2007

19. Declaration of Richard Simon in Support of Plaintiff's Application for a Temporary Restraining Order

20. San Diego Convention Center Corporation Cleaning Services Contract with United Service Companies 2007

21. UNM v. San Diego Convention Center Pleadings List

22. San Diego Convention Center 2006 Annual Report

23. San Diego Convention Center Corporation, Convention and Trade Show License Agreement

24. July 26, 2007 Letter from Richard Simon to Jerry Sanders

25. July 5, 2007 Letter from Joe Loggia to Brad Gessner

26. June 27, 2007 Letter from Pat Dwyer to Brad Gessner

27. June 18, 2007 Letter from Barbara Myers to Brad Gessner

28. July 26, 2007 Letter from B.J. Enright to Brad Gessner

29. June 14, 2007 Letter from Ken McAvoy to Brad Gessner

30. June 22, 2007 Letter from Mary Kay Sustek to Brad Gessner

31. June 8, 2007 Letter from Martin Cymbal to Brad Gessner

32. June 14, 2007 Letter from Ty Bobit to Brad Gessner

33. SISO, IAEM, AND MATSO ISSUE JOINT INDUSTRY STATEMENT ON EXCLUSIVE SERVICES

34. July 20, 2007 Letter from Mary Beth Rebedeau to Brad Gessner

35. June 20, 2000 Letter from Joe Psulk to Marty Cymbal

36. May 12, 2000 Letter from Beatrice Kemp to Mark Valley

37. March 31, 2000 Letter from John Mooney to Carole Wallace

38. March 13, 2000 Letter from Michael Muldoon to Carole Wallace

39. March 8, 2000 Letter from Brian Casey to Carole Wallace

40. March 7, 2000 Letter from Mary Beth Rebedeau to Carole Wallace

Exhibit 2
Page 12

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

41. March 2, 2000 Letter from James Bracken to Carole Wallace

42. March 1, 2000 Letter from Stephen Shuldenfrei to Carole Wallace

43. June 20, 1990 Letter from Hugh Mac Lean to Tom Liegler

44. June 13, 1990 Letter from Richard Simon to the San Diego Convention Center Board of Directors

45. May 11, 1990 Letter from Hugh Mac Lean to John Hartley

46. U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section 1.1, http://www.ftc.gov/bc/docs/horizmer.htm.

47. http://www.portofsandiego.org/projects/hiltonhotel/

48. Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.,* Boston: Pearson, Addison-Wesley, 2005.

49. Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price,* 96 Yale L.J. 209 (1986)

50. Steven Salop and David Scheffman, *Raising Rivals' Costs,* 73 American Economic Review Papers and Proceedings 267 (May 1983)

51. David Scheffman and Richard Higgins, *20 Years of Raising Rivals' Costs: History, Assessment, and Future,* Federal Trade Commission, *http://www.ftc.gov/be/RRCGMU.pdf*

52. Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

53. Terms and Conditions, 2006 Exhibitor Application & Contract, Internet Telephony Conference & Expo, item 6.

54. Declaration of Charles Buddy Linn, November 2007.

55. Declaration of William Callaghan, November 2007.

56. Deposition of Charles Linn, with exhibits.

57. Deposition of Richard Simon, with exhibits.

58. Deposition of Gabriel Ramirez, with exhibits.

59. Deposition of Raymond Santos, with exhibits.

60. Deposition of Mark Epstein, with exhibits.

61. Draft Mayor's Citizen Task Force on the San Diego Convention Center Project; http://www.conventioncentertaskforce.org/

Exhibit 2
Page 13

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

62. July 31, 2009 letter from John L'Estrange Jr. to Jake Slania.

63. United's Response to Defendant's First Set of Interrogatories.

64. Defendant's Amended Objections and Responses to First Set of Requests for Production of Documents.

65. Defendant's Objections and Responses to Amended First Set of Interrogatories.

66. United's four-page list of Contracts and Billing Information for SDCC Shows July 1, 2007 through August 1, 2009.

67. UNM008682-UNM 011963.

68. Declaration of Brad Gessner in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

69. Declaration of Carol Wallace in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

70. Declaration of T.M. Mazzocco in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

71. Declaration of Sotera L. Anderson in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

72. Defendant's Evidentiary Objections to Evidence Submitted by Plaintiff in Support of Plaintiff's Motion for Preliminary Injunction.

73. Request for Judicial Notice in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

74. San Diego Convention Center Articles of Incorporation

75. Public Improvement and Assessment Proceedings: Article 1: San Diego Tourism Marketing District.

76. City of San Diego Rules Implementing the Living Wage Ordinance

77. Memorandum of Points and Authorities in Support of Defendant's Demurrer to Plaintiff's Complaint

78. Expert Report of John Hayes

79. Deposition of John Hayes

80. Declaration of John Hayes

Exhibit 2
Page 14

# EXHIBIT 3

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

Case No. 37-2007-00072054-CU-BT-CTL

REPORT

of

John S. Hekman Ph.D.

In the Matter of

*United National Maintenance, Inc.*

*v.*

*San Diego Convention Center Corporation, Inc.*

September 30, 2009

Exhibit 3

Page 15

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

## TABLE OF CONTENTS

I. Introduction and Assignment...................................................................................................1

II. Summary of Opinions .............................................................................................................3

III. Market Definition and Market Power ...................................................................................4

   A. The Product Market ............................................................................................................6

   B. The Trade Show Cleaning Services Market.......................................................................8

   C. The Geographic Market ....................................................................................................13

   D.  Market Power ..................................................................................................................17

IV. SDCC has Engaged in Exclusionary Conduct in the Market. ...........................................17

   A. SDCC Has Excluded Competition Entirely From the Convention Center. .................19

   B. SDCC Has Attempted to Monopolize the Market by Raising Rivals' Costs.............21

   C. The San Diego Convention Center is an Essential Facility for Competitors in the Trade
     Show Cleaning Services Market..................................................................................22

   D. SDCC's Action Is Anticompetitive Because It Constitutes a Tying Arrangement. ...................22

V. The Security Explanation by SDCC for Excluding United Fails the "No Economic Sense
   Test".....................................................................................................................................25

VI. Harm to Consumers. .............................................................................................................29

VII. Conclusion............................................................................................................................32

Exhibit 3

Page 16

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

## I. Introduction and Assignment

1.       My name is John S. Hekman.  I am a Principal at LECG, a firm that provides consulting

and expert testimony in economics, finance and accounting.  Since 1990, I have testified in

federal and state courts on such matters as price fixing, patent infringement, trade secrets, real

estate finance and general economic damages.  I have defined relevant markets in antitrust

matters.  I have analyzed allegations of exclusionary behavior by market participants.  I have

assessed the degree of market power by defendants accused of the abuse of market power.  I

earned a MBA in finance and a Ph.D. in economics at the University of Chicago.  I have taught

economics and finance at the University of Southern California, The University of North

Carolina, Boston College and The University of Chicago.  In addition, I have published a number

of papers in academic and professional journals.  I was also an economist with the Federal

Reserve in Boston and Atlanta.  My billing rate in this matter is $440 per hour.  My curriculum

vitae is attached to this report as Exhibit 1.

2.       Previously in this matter, on November 13, 2007, I submitted a Declaration in connection

with Plaintiff's Complaint for Injunctive Relief.  I also submitted a Response to Defendant's

Opposition to Motion for Preliminary Injunction.  I have been asked by counsel for United

National Maintenance, Inc. to provide several opinions.  First, I have been asked to define the

relevant geographic and product markets in this matter.  Second, I have been asked to determine

whether the San Diego Convention Center has market power or monopoly power in the relevant

market.  Third, I have been asked to determine whether the Convention Center has exercised

market power or monopoly power by instituting its policy under which the Convention Center's

cleaning services labor is used exclusively for trade shows.  Finally, I have been asked to

1

Exhibit 3
Page 17

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

determine whether consumer harm has resulted from the Convention Center's exclusive cleaning services policy.

3.      The materials I have reviewed in connection with forming my opinions include the Complaint for Injunctive Relief and Damages; Defendant's Objections to Evidence Submitted by Plaintiff; the Memoranda of Points and Authorities in Support and in Opposition to the application for a restraining order; the Declarations of Carol Wallace, Dessi Nintcheva, Thomas Robbins, Jason Kirby, Richard Simon, Charles Linn, Larry Colby, William Callaghan and Mark Epstein; the SDCC cleaning services contract with United Service Companies; certain correspondence between market participants and SDCC from 1990 to 2000; correspondence from market participants related to SDCC's 2007 actions; 2006 Exhibitor Application and Contract, Internet Telephony Conference & Expo; the SDCC website; and additional materials from my own research.

4.      Since submitting my Declaration in this matter on November 13, 2007, I have reviewed additional materials.  These materials include the depositions of Charles Linn, Richard Simon, Gabriel Ramirez, Raymond Santos and Mark Epstein; the August 2009 Mayor's Citizen Task Force Report on the SDCC; Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction, with the Declarations of Chuck Gutensohn, Carol Wallace, Brad Gessner, T.M. Mazzocco, and Sotera Anderson; SDCC's Responses to Plaintiff's First Set of Interrogatories; SDCC's Amended Responses to Plaintiff's First Set of Interrogatories; United's Responses to Defendant's First Set of Interrogatories; and the SDCC 2008 Annual Report.  A complete list of the materials I have reviewed is attached to this Declaration as Exhibit 2.

Exhibit 3
Page 18

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

## II. Summary of Opinions

5.    I have reached the following opinions:

a) The economically meaningful relevant product market is trade show cleaning services at SDCC.

b) The relevant geographic market is large convention centers in the San Diego metropolitan area, or, equivalently, the SDCC.

c) SDCC has market power in the trade show cleaning services market at the SDCC.

d) The demand for large trade show services facing SDCC is inelastic with respect to price. Trade show cleaning services is a small portion of the price of large trade show services. As a result, a price increase in the trade show cleaning services market will have a small impact on the price of large trade show services and would be unlikely to cause a loss of SDCC's trade show business.

e) SDCC exercised its market power when it excluded non-SDCC cleaning services workers from the convention center.

f) The effects of SDCC's denying United National and other cleaning services access to the convention center are highly anti-competitive.

g) SDCC has eliminated current and future competition and has effectively raised prices for trade show cleaning services in connection with its exclusion of non-SDCC cleaning employees.

h) The convention center is an essential facility for competitors in the trade show cleaning market, and SDCC has denied access to this facility for competitors in the market.

3

Exhibit 3
Page 19

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

i) SDCC has used its market power in the national trade show market to engage in an anticompetitive tie. The tying good is the convention center, and the tied good is trade show cleaning services.

j) SDCC has leveraged its monopoly power in the San Diego large trade show market to exclude competitors in the trade show cleaning services market.

k) Because trade shows contract for space at SDCC many years in advance, trade show consumers are "locked in" to higher prices charged for cleaning services, and are further unlikely to switch because trade show cleaning services are a small percentage of the total expenditure for trade show services.

l) The manner in which SDCC has excluded competition is a form of "raising rivals' costs", which is recognized by economics as an anti-competitive practice.

m) I conclude from the "no economic sense" test that there is no pro-competitive justification for SDCC's actions.

n) Consumers in the market for trade show cleaning services have been harmed. Consumers have had their choices in the market reduced to a single supplier, i.e. SDCC. And the prices charged by SDCC are higher than those charged by United National.

## III. Market Definition and Market Power

6.      Prior to SDCC's imposition of exclusive cleaning services in the Convention Center, United and SDCC were competitors in the provision of trade show cleaning services. To determine whether SDCC's action was anticompetitive, it is necessary to define the relevant market in which they compete. After the relevant market has been defined, SDCC's market share in that relevant market can be measured. With the measured market share it is then possible to conclude whether SDCC's actions in that market are anticompetitive.

4

Exhibit 3
Page 20

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

7.    Economists have identified the primary elements of market definition as, first, the

definition of the specific products or services that, in this case, SDCC and United sell. Products

or services that have a high cross-price elasticity of demand are considered to be in the same

market. A high cross-price elasticity of demand between services A and B means that if the

price of A rises, the demand for B will rise by a significant amount. In the present case, a high

cross-elasticity of demand would mean that if SDCC raised its charges for trade show cleaning

services, the customers (i.e. the decorators who contract for trade show cleaning services) would

switch their business to one of SDCC's competitors such as United. If this switching were to

occur in a free market, then an economist would conclude that the services of SDCC and United

are close substitutes. The cross-elasticity would be estimated in the trade show cleaning market

by measuring the percentage increase in the demand for United's services for a given percentage

increase in SDCC's trade show cleaning services charges. Products and services that are close

substitutes using this measure are judged to be in the same market.

8.    The second primary element of the market definition is geographic. Competition in some

markets is national in scope. For example, if a mortgage lender located in Southern California

raises its mortgage rates above competitive levels, consumers (the borrowers) can switch to other

mortgage lenders that are located anywhere in the country. This reduces the ability of mortgage

lenders in any one location to charge above-competitive rates.

9.    Other markets are much smaller geographically; the geographic market for a Safeway

grocery store in San Diego is limited to the area in which consumers would switch to another

grocery store if the Safeway raised its prices above the competitive level. The geographic

market in this case would include part of San Diego but obviously not include the rest of the U.S.

In this case, the size of the market is determined by the willingness of consumers to travel to

5

Exhibit 3
Page 21

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

competitors as well as the ability of competitors to enter the market. If there is an Albertson's

grocery store located near to the Safeway, then it would probably be in the same market. But an

Albertson's located in Los Angeles would not be in the same market for the obvious reason that

it cannot supply the consumer with groceries in San Diego except at an uneconomic cost.

Finally, it is possible for new competitors to enter the market in response to a price increase. In

this case, the question would be whether a competitor would establish a new grocery store in the

local market when Safeway raised its prices above the competitive level.

**A. The Product Market**

10.     The FTC and DOJ's 1992 Horizontal Merger Guidelines (Merger Guidelines) were

developed in conjunction with economists and are generally accepted by economists as

appropriate economic tools to be used by economists defining relevant markets and market

power. The FTC/DOJ guidelines define a product market to be a group of products that are

related such that a hypothetical profit-maximizing firm that was the only seller of those products

(the monopolist) could profitably impose at least a "small but significant and non-transitory"

increase in or markup of price over the competitive level.[1] This minimum price markup that

could be maintained for a significant period of time is typically taken to be 5 percent. This is

sometimes called the "hypothetical monopolist test" or the "SNIP" test.

11.     When the market has been defined correctly, then it is possible to measure the market

power of a firm in that market. In the present case, when the market in which SDCC and United

compete has been properly defined, it is possible to measure whether SDCC has market power in

that market and therefore has the ability to harm competition. If the market is defined too

broadly, then SDCC will appear not to have market power. For example, if the market was

---

[1] U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section 1.1,
<http://www.ftc.gov/bc/docs/horizmer.htm> (17 October 2005).

Exhibit 3
Page 22

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

defined as all commercial cleaning services in the entire U.S., then SDCC would appear to have a very small market share in that market and market actions by SDCC would be unlikely to have an effect on competition. On the other hand, if the market is defined too narrowly, then SDCC would be considered to have too much market power. The market would be defined too narrowly if it failed to take into account some potential competition that would be present to take business away from SDCC if SDCC raised its prices above the competitive level.

12.     The ability of a hypothetical monopolist to maintain a price increase as described above is analyzed by the competitive response that would result from the price increase. On the demand side, the response comes from buyers who switch to substitute products or services when the monopolist raises price. And on the supply side, the response comes from the ability of firms producing other products and services to begin producing the monopolist's product or service. The supply response also comes from new firms entering the industry because the price has risen.

13.     On the demand side, the market test asks, if the monopolist imposed the "significant and non-transitory" 5% price increase, whether buyers of the service could switch to other services in such numbers that the loss of sales by the monopolist would make the price increase unprofitable. If this is probable then the service would be in the same product market, and the market has not been defined broadly enough. Conversely, if the loss of sales is not enough to make the price increase unprofitable for the monopolist, then the product market is not too broad. The relevant market is the group of services just large enough that a monopolist could profitably raise price because buyers would be unwilling or unable to switch to other services.[2]

---

[2] A well-known example of this test is the market for cellophane. If buyers switching to wax paper in response to an increase in the price of cellophane do not make the price increase unprofitable, then wax paper is not in the same antitrust market as cellophane.

7

Exhibit 3
Page 23

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

14.     The supply side market test looks to see whether other suppliers could enter the market or switch to producing the service produced by the monopolist in such a way that a price increase would not be sustained.  The market definition asks whether a 5% increase in price by the hypothetical monopolist would cause more firms to enter the market within one to two years, thus bringing price down and making the price increase by the monopolist unprofitable.[3]  If other firms are able to start producing the product or service that the hypothetical monopolist produces, then the market definition is too narrow.  The relevant market is the group of sellers such that a monopolist could profitably raise price because no more sellers would be able to enter the market in a reasonable period of time.

**B. The Trade Show Cleaning Services Market**

15.     I have concluded that the relevant product market definition is "trade show cleaning services at major convention centers." To begin at the most general level, SDCC and United provide "cleaning services." More specifically, they provide trade show cleaning services to contractors that are termed "decorators".  The decorators are trade show contractors who plan and execute trade shows on behalf of exhibitors at large convention centers.[4]  Typically, a convention center signs a contract with an exhibitor such as a trade group; the exhibitor hires a trade show organizer; the organizer contracts with a decorator; and the decorator contracts with the trade show cleaning services firm, among others.[5]  The role of the decorator is to provide drapery, carpeting, registration, graphics and props.[6]  The question of product market definition relates to how specific the cleaning services are.  The hypothetical question is, if a firm in the

---

[3] The test requires both that there be entry of other firms and that the increase in supply be sufficient to bring the price back to a competitive level.
[4] http://www.champion-nationwide.com/
[5] Deposition of Raymond Santos, pages 98-99; deposition of Mark Epstein page 23-24.  Mr. Epstein also added that in some cases his firm, Champion, had an agreement with show management [organizer] as well as agreements with individual exhibitors to clean their booths..
[6] Deposition of Mark Epstein, page 42.

8

Exhibit 3
Page 24

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

market—SDCC, United or others—raised its price above competitive levels, could another firm

enter the market to compete with them?  The testimony in this case has been that the services to

the trade shows are so specialized that only trade show cleaning services firms would be able to

compete for the business of the decorators.  That is, a commercial cleaning firm that did not have

the specialized expertise in trade show cleaning, move-in cleaning and move-out cleaning, would

not be able to obtain business from the decorators.

16.     United also provides trade show cleaning services at hotels and smaller exhibition halls.

However, testimony has shown that this is not in the same relevant market as the large trade

shows.  Trade shows at SDCC use up to fifty of United's workers.  SDCC does not compete with

the smaller hotel convention facilities in the San Diego area for trade shows.  By contrast, the

hotels in the San Diego area that have trade shows require "one, max two other people."[7]

Therefore, looking from the demand side of the market, the demanders or users of the services of

the relevant market are the organizers of trade shows at convention centers.  From the supply

side, the providers of trade show cleaning services are those firms that have developed the

specialized experience to be able to enter the market.  Charles Linn, Vice President of the

Western Division of United, listed all of the trade show cleaning firms that had competed with

United in California.  These included SDCC, Century Cleaning, Team Cleaning, and Show

Ready.[8]  SDCC, Century Cleaning and United are the only trade show cleaning services that

Linn is aware of that performed work at SDCC.[9]

17.     The evidence I have reviewed indicates that the number of firms that supply trade show

cleaning services is limited, because the type of cleaning performed by United National at the

SDCC is not standard space cleaning.  Because this cleaning appears to be specialized in a

---

[7] Deposition of Rick Simon, page 32. deposition of Mark Epstein page 23-24.
[8] Deposition of Charles Linn, page 40.
[9] Ibid., pages 104-105.

Exhibit 3
Page 25

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

number of ways, United does not compete with ordinary janitorial services and similar firms. In

fact, United has a separate company, United Maintenance Company, Inc., that provides janitorial

services.[10] If it were the case that janitorial services and trade show cleaning services were

interchangeable, then United's trade show cleaning and janitorial work could be merged, and the

same workers could be used for both. On the contrary, Rick Simon testified that trade show

cleaning is "a totally different skill set, totally different labor requirement, and the trade show

business is itinerant in nature. So you have a lot of demand for a lot of people in a short period

of time. And the knowledge and skill set of cleaning an office building versus a trade show is

the difference between, you know, flying a Piper Cub and a jet aircraft."[11] He further explains

that this knowledge and skill is primarily at the supervisory level.

18.     One of United's primary customers in the trade show cleaning market is Champion

Exposition Services, a large general contractor for trade shows. Champion signs contracts with

trade associations to manage and organize their trade shows across the U.S.[12]  Mark Epstein,

Champion's president, strongly supports the description of United and other firms in the trade

show cleaning market as highly specialized:

> "While a janitorial firm hired to clean office space in a commercial building can expect
> each office to be the same size and in similar condition every day, each trade show is
> unique in size, configuration, and its cleaning needs. Based on the scope and size of a
> particular trade show, a provider of Trade Show Cleaning Services must constantly
> react to ever changing demands that involve the amount and location of manpower and
> equipment at any given moment. A provider of Trade Show Cleaning Services must
> ultimately have a tremendous amount of logistical expertise and must anticipate needs
> proactively based on the past experience of the Trade Show Cleaning Services
> management. No two trade shows are the same from the perspective of Trade Show
> Cleaning Services.[13]

---

[10] Deposition of Rick Simon, pages 20-21.
[11] Ibid., page 21.
[12] Affidavit of Mark Epstein, page 1.
[13] Affidavit of Mark Epstein, page 2.

Exhibit 3
Page 26

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

19.      There are two main functions performed by firms in the trade show cleaning market.  The

first is "facilities cleaning", which is cleaning aisles and common areas at SDCC during the

move-in phase and construction of exhibits at conventions as well as during the move-out phase.

The second function is "booth cleaning", which is described as cleaning exhibit booths during

shows and during the night.  Facilities cleaning is specialized in part because it must be

performed during a short window of time between trade shows.  At times the show moving in

and the one moving out overlap, requiring even more experience to make the process run

smoothly.  United states that its cleaning services are individually tailored to the needs of each

type of show and exhibitor.  United National revenues from cleaning services at SDCC were

approximately $500,000 per year.

20.      The special need filled by the cleaning contractors was acknowledged by SDCC.  In a

June, 2000 letter to the Trade Show Contractors Association, the Convention Center Director

states: "As you know, with the existing and increasing level of business at the Convention

Center, the time between move-out of one show and move-in of the next show is often extremely

compressed.  Time frames to return a clean floor will likewise often be compressed.  You also

know that we often run overlaps of move-outs and move-ins.  The service contractors have been

primary and key players in making those overlaps happen."[14]  Move-outs and move-ins are

complicated processes.  According to Charles Linn, a move-in typically takes one to three

days.[15]  When United does not have enough workers in a particular city for a large trade show,

they do not hire local cleaning workers.[16]  Instead, they bring in their own workers from other

cities, presumably at considerable cost.  United's workers other than supervisors are part-time,

---

[14] Letter from Joe Psulk to Marty Cymbal, June 20, 2000, page 2.
[15] Deposition of Charles Linn, page 80.
[16] Deposition of Charles Linn, page 85.

11

Exhibit 3
Page 27

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

not salaried, so it is not because they are already being paid that they are used. Rather, it

illustrates the specialized nature of the work.

21.     The other aspect of the product market is whether new firms could enter the market in

response to a hypothetical price increase. If so, then a dominant firm in the market such as

SDCC might not have significant market power. The testimony I have read as well as the past

record of the SDCC indicates that there has been no new entry into the trade show cleaning

services market at the SDCC. This is due to the specialized nature of the work as well as to the

relationships that have been built up over the years between the cleaning services firms and the

decorators for whom they work. Mark Epstein of Champion states "Due to the expertise and

specialized knowledge required, I would not consider even an extremely price competitive bid

from a traditional janitorial services firm to provide Trade Show Cleaning Services."[17]  Mary

Beth Rebedeau of the Society of Independent Show Organizers referred to how specialized the

cleaning services are in her letter to SDCC: "While we understand the need for facility managers

to generate revenue, tradeshow organizers and their exhibitors must retain the right to select

vendors of their choice. This is particularly true for large shows whose complexities demand

carefully selected and integrated vendor partners who have a thorough understanding of each

show's special needs. This includes cleaning services . . . . Show organizers spend years

cultivating relationships and advantageous pricing with their chosen suppliers. In-house

exclusives arbitrarily increase costs to show organizers -- and therefore exhibitors -- while

decreasing the quality of the service provided due to lack of competition."[18]

---

[17] Affidavit of Mark Epstein, page 2. Anecdotal evidence from customers can be an important source of information for market definition. It can confirm what economic analysis of the market situation indicates. In this case, United National's customers explain why they need certain kinds of services that are not available from conventional cleaning firms, and this is borne out by the market evidence that conventional cleaning firms have not obtained contracts for Trade Show Cleaning Services at SDCC.
[18] June 22, 2007 letter from Mary Beth Rebedeau to SDCC.

12

Exhibit 3
Page 28

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

22.     The specialization of United's services as well as the investment United has made in

developing a relationship with their customers represent barriers to entry for potential new firms

in the trade show cleaning services market. United CEO Rick Simon estimated that it would

require an initial investment of over $250,000 for a firm to enter the trade show cleaning market

in San Diego.[19]  A hypothetical new entrant into the market would need time to develop the

skills necessary to perform on a level with United or other market competitors. This learning

time is more significant than the actual cost of equipment and supplies to open a cleaning

business. The knowledge and experience reside in the supervision and coordination of the work

process. Gabriel Ramirez, the Manager of United's San Diego operations, explained that new

workers receive only a brief training before beginning to do basic cleaning tasks.[20]  However, it

is knowing what to do and how to coordinate what needs to be done that is significant. There is

a long learning curve down which firms would have to travel in order to be as efficient and

therefore as competitive as United in doing this work. "Learning by doing" is a process that

takes time, and therefore in the short run there would be no competitors able to enter the market.

Century Trade Show Service, one of United's competitors in other areas, attempted to enter the

San Diego market but was unsuccessful.[21]  So even if it were possible for new firms to bid on

cleaning contracts at SDCC, it is unlikely, from what I have seen, that there would be entry of

new firms. However, the San Diego Convention Center is using its control over access to the

center to eliminate all alternative cleaning firms. This is an absolute barrier to entry.

**C. The Geographic Market**

23.     The relevant geographic market is large convention centers in the San Diego metropolitan

area. Since SDCC is the only large convention center in the area, the market can be defined

---

[19] Deposition of Rick Simon, page 239.
[20] Deposition of Gabriel Ramirez, page 58.
[21] Deposition of Rick Simon, page 240.

13

Exhibit 3
Page 29

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

equivalently as the SDCC. The two main aspects of this definition are, first, that the trade show cleaning services firms in this market require large convention centers in which to operate, and, second, that trade show cleaning services are provided by workers who live within commuting distance of the convention centers where the work is performed.

24.     The issue of convention centers as the focus of the trade show cleaning services market was addressed above in the product market section. The market is limited to the San Diego area because workers who are trained to perform the cleaning services in this market cannot profitably come from areas outside the local San Diego labor market and be competitive with those workers who are located in the local market. The competition is among providers of trade show cleaning services in the local labor market. Providers outside the local market area could only compete with those located in San Diego if they could commute to San Diego to provide services or if the trade shows were willing to switch their shows from San Diego to another city in response to an increase in the price of trade show cleaning services in San Diego. The first possibility is highly unlikely because the cost of non-San Diego cleaning services providers commuting to San Diego to work would be prohibitive. The second possibility is also highly unlikely because the cost of trade show cleaning services is a very small part of the overall cost of putting on a trade show. Trade show exhibitors would not be willing to move to another city to save a small fraction of the trade show cost.

25.     The issue of whether the relevant market is properly defined as trade show cleaning services at SDCC involves the ability of other firms (the supply side of the market) or trade show exhibitors (the demand side of the market) to react to an increase in price by SDCC. In the language of the FTC/DOJ antitrust guidelines, the hypothetical monopolist test asks whether a hypothetical 5% increase in price by the monopolist, maintained for a significant period of time,

14

Exhibit 3
Page 30

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

would elicit a sufficient competitive response to restrain the monopolist, making the attempted price increase unprofitable. This ability of competition to "discipline" an increase in price can be analyzed by the supply response and the demand response.

26.     The buyers, or demanders, of trade show cleaning services are ultimately the exhibitors at trade shows. However, the exhibitors are not the direct buyers of cleaning services. United National contracts with a decorator; the decorator is hired by a trade show organizer; the trade show organizer is hired by a trade association or other exhibitor. The trade association chooses the city and convention center where the show will be held, but the exhibitor-members of the association pay the fees that go to the organizer and finally to the cleaning contractor, United. The exhibitors do not choose the convention city.

27.     In this way, the trade show cleaning services market is in a vertical relationship to the market for large trade shows. A monopolist who was the only seller of trade show cleaning services in San Diego would face potential competition from other convention centers, if the decorators that hire cleaning firms in San Diego could move to other venues. However, there are a number of reasons why it is unlikely that decorators could switch to other convention centers to restrain SDCC's ability to raise price in the Trade Show Cleaning Services market.

28.     First, buyers are unlikely to discipline a SDCC price increase because of a "third-party payer" effect in the market. The ultimate buyer of trade show cleaning services as well as other costs of trade shows is the exhibitor. But the contracting of cleaning services is done by the decorator, such as Champion. Increases in the price of trade show cleaning services are paid by the decorator, but these increases are passed along to the exhibitor, which reduces the impact of the price increase. Further, the choice of a location for the trade show is made by the trade association, which is not the final buyer of the services. As a result of this third-party payer

15

Exhibit 3
Page 31

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

structure, it is unlikely that a higher price charged by SDCC for cleaning services would affect the choice of location for conventions and thus provide competitive pressure on SDCC. Mark Epstein of Champion agreed that it is unusual for a trade show to change venues.[22]

29.    Second, decorators are unlikely to "discipline" price increases by SDCC in cleaning services because there are no similarly-sized convention centers in San Diego or nearby that can host the large conventions that use SDCC. SDCC has monopoly power in the large trade show market in the San Diego region and also has market power in the national trade show market. The SDCC, with over 600,000 square feet of exhibit space, is one of the largest convention centers in the United States.[23] There is no other convention center of remotely comparable size in the San Diego area. The next largest meeting area in San Diego is the Hilton San Diego Bayfront Hotel, across from the SDCC. It opened in December 2008 with 165,000 square feet of meeting space, but it is mostly designed to satisfy the demand for hotel rooms for the SDCC.[24]

30.    Third, it is unlikely that decorators buying cleaning services would discipline a SDCC price increase for trade show cleaning services by switching to venues in other cities. The cost of exhibit cleaning is a very small portion of the total cost of putting on a convention, so that a monopolist in San Diego would not experience significant limits on its ability to raise price due to the possibility that contractors would move to other cities.

31.    Fourth, buyers are unlikely to discipline a SDCC price increase because of the long term planning that is necessary for the large trade shows that SDCC serves. These shows are often

---

[22] Deposition of Mark Epstein, page 57.
[23] "San Diego Convention Center Market Demand Analysis", Jennifer Sutherland, PricewaterhouseCoopers, March 2009, p. 6. http://www.conventioncentertaskforce.org/index.shtml.
[24] http://www.portofsandiego.org/component/content/article/219-hilton-san-diego-bayfront-hotel-news/457-hilton-convention-center-hotel-to-open-in-fall-2008.html

Exhibit 3
Page 32

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

committed for five, ten or fifteen years in advance.[25]  This reduces the ability of contractors and trade shows to move to other convention centers.

**D. Market Power**

32.     The relevant market is trade show cleaning services at the SDCC.  Before the imposition of the cleaning services exclusive, SDCC had 50% or more of the trade show cleaning services market at the Center.[26]  After the exclusive in 2007, SDCC has had a 100% market share of trade show cleaning services, based on its exclusive use of SDCC workers for cleaning services in the Center as well as the cleaning services revenue it has received.  Both before and after the imposition of the exclusive, SDCC has possessed market power, also known as monopoly power, in the trade show cleaning services market in San Diego.  SDCC has the ability to exercise market power for three reasons.  First, SDCC has the power to exclude competitors without the likelihood that new competitors could enter the market.  Second, SDCC has the power to set a price floor for trade show cleaning services at the center by requiring all outside firms to use SDCC employees at wages set by SDCC.  Third, SDCC has the power to raise price in the market.  Currently, SDCC has control over 100% of the market, since it controls access to the SDCC and is dictating pricing in the market regardless of the level of involvement that United is permitted to have.

**IV. SDCC has Engaged in Exclusionary Conduct in the Market.**

33.     SDCC has effectively excluded United and other competitors from the trade show cleaning services market at the SDCC.  The exclusion was accomplished by the use of SDCC's control over access to the Convention Center.  In May 2007 United National was notified that as of July 1 all trade show cleaning services at the Convention Center would be performed by

---

[25] Affidavit of Mark Epstein, page 3.
[26] According to statements by SDCC and United, SDCC's share of the cleaning market at the convention center was as high as 60% before July 2007.

Exhibit 3
Page 33

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

SDCC employees.  In June of 2007 United National was notified that it could work at the Convention Center, but that it would have to use SDCC employees to fulfill the terms of its contracts, at a labor rate of $17 per hour.[27]  United's workers are barred from working at the Center.

34.      While SDCC allows United and others to contract with decorators for the provision of cleaning services at the Center, it is SDCC's workers who do the work, and SDCC appropriates all of the revenue that previously was paid to United.  United obtains contracts with Champion and other decorators that provide services to associations using the San Diego Convention Center for shows.  Champion is paid a fee for booth cleaning services.  Champion retains approximately 50% of the fee for its services and provides the remaining 50% to United for the booth cleaning. United performs booth cleaning under its contract for this fixed amount.  For facilities cleaning, United estimates the number of hours that will be needed for individual exhibitor booth cleaning on a fully-loaded hourly fee basis. United has produced its billing records and trade show schedules from July 2007 through August 1, 2009.[28]  The hourly rates in these schedules cover not only the labor used to perform cleaning but also materials and United's management of the services.  This is done on a "not-to-exceed" basis.  United does not control how many hours SDCC bills United for the work done by its employees. When the hours billed by SDCC are greater than the not-to-exceed amount United has contracted for, United absorbs the additional cost. If the actual labor hours are less than what was estimated, United is compensated only for the actual hours.

---

[27] E.g. UNM011963.
[28] UNM011966-UNM028947.

18

Exhibit 3
Page 34

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

**A. SDCC Has Excluded Competition Entirely From the Convention Center.**

35.     SDCC has forced United and other competitors in the market to operate at a loss.  United has continued to fulfill its contracts for trade show cleaning services at SDCC, but it is no longer competing for new business in San Diego.[29]  United attempts to obtain business from decorators that operate nationwide.  In doing so, United attempts to clean as many shows as possible for each decorator.  This means that United may clean for a decorator in San Diego and lose money by doing so if it helps to keep the nationwide business of that decorator.[30]

36.     SDCC has argued that it is not excluding competition because it has not excluded United from the center, only United's cleaning staff.  This is entirely misleading and inaccurate, in my opinion. United cannot control the pricing of the services that it would provide in the market, since SDCC dictates the hourly labor rates and takes all of the booth cleaning revenue that United formerly received.  Further, United's employees are not permitted to work in the SDCC. The only way that United could "compete" in the center would be processing paperwork and requests for cleaning services.  This is not competition in any meaningful sense, and since SDCC would control 100% of the pricing in the market and all of the cleaning staff, there is no competition at all from the point of view of industrial organization economics.

37.     The manner in which SDCC has attempted to exclude competitors in the market for trade show cleaning services at SDCC's facility is by leveraging its monopoly power in the market for large convention services in San Diego.  Because SDCC has market power in the San Diego large convention services market, it can require convention exhibitors to use SDCC's cleaning services exclusively or raise the price without suffering a significant loss of business in its primary market.  SDCC serves very large trade shows that have only a small number of

---

[29] Deposition of Rick Simon, page 31.
[30] Ibid., page 86.

19

Exhibit 3
Page 35

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

alternative venues to choose from nationwide. This lack of alternative venues for large trade shows means that the SDCC has a relatively inelastic demand for its services, especially after a trade association has booked a date for ten or more years in advance. Inelastic demand for a product or service such as large trade shows means that if the price of the service rises, consumers of the service (such as general contractors and show organizers) will not tend to look elsewhere for a convention center but will tend to pay the higher price. The inelastic demand experienced by SDCC for trade shows means that if SDCC succeeds in excluding all competition in the trade show cleaning services market, SDCC can raise the price of cleaning services that is ultimately paid by trade show exhibitors without losing business in the large trade show market.

38.     Because of the long-term nature of SDCC's contracts with large convention trade shows, extending ten or fifteen years in some cases, the exclusionary action that SDCC has taken with regard to trade show cleaning services has "locked in" customers who use these services. In economic terms, a lock-in occurs in a situation where a consumer contracts with a seller for goods or services over an extended period of time. For the duration of the contract, the buyer is "locked in" to whatever downstream services are needed. The seller can take advantage of the lock-in to raise the prices of the services that are needed during the term of the contract. The buyer cannot go elsewhere to purchase those services because of the lock-in. In the situation being considered here, SDCC has locked in the consumers of trade show cleaning services for the duration of the ten or fifteen years that some trade shows have contracted.

39.     A number of trade show industry participants have responded to SDCC's exclusionary acts by writing letters to oppose the new policy. Some of these participants state that they try to avoid convention centers that have "exclusives", and some threaten to take their business

Exhibit 3
Page 36

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

elsewhere.[31]   However, it is a measure of SDCC's market power in large trade shows that none

of these participants has taken any business away from SDCC so far.   And in spite of the implicit

threat by these market participants to oppose SDCC's imposition of an exclusive, SDCC went

ahead with their exclusionary action.   This also indicates how much market power SDCC

possesses.

### B. SDCC Has Attempted to Monopolize the Market by Raising Rivals' Costs.

40.   SDCC argues that it is still allowing United and others to "compete" in the trade show

cleaning services market at the Center.[32]   While United still fulfills its contracts with decorators

at the Center, SDCC has in reality excluded competition by "raising rivals' costs."[33]   In this

case, SDCC is appropriating all the booth cleaning revenue that would have been received by

United, and "allowing" United to compete in the market only by using SDCC's employees and

by accepting no revenue.   Thus, SDCC has raised the costs of United and other potential

competitors to be greater than revenue.

41.   The raising rivals' costs action taken by SDCC is an example of what Scheffman and

Higgins refer to as "cost-effective" strategies by monopolists.   They say:   "Some kinds of cost-

raising strategies can obviously be very cost-effective—*e.g.*, actions that lead to governmental

actions that exclude your rivals, or impair their ability to compete with you."[34]

---

[31] For example, Pat Dwyer, Sr. Manager of Trade Show Services for SmithBucklin, states in a letter to SDCC,
"...one of the considerations we view as an imposition to our selection [of a venue] is the lack of choice of
contractors to meet our highest level of service and accountability...While there are many factors that enter into the
decisions to select a future site for our clients, one of the aspects which definitely would weigh in as less desirable is
an exclusive service where there is no need to appoint one." June 27, 2007 letter from Pat Dwyer to SDCC.
[32] Deposition of Rick Simon, page 189.
[33] See for example Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.*, Boston: Pearson,
Addison-Wesley, 2005, pp. 371-377; Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion:
Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209 (1986); Steven Salop and David Scheffman,
*Raising Rivals' Costs*, 73 American Econ. Rev. Papers and Proceedings 267 (May 1983); David Scheffman and
Richard Higgins, *20 Years of Raising Rivals' Costs: History, Assessment, and Future*, Federal Trade Commission,
*http://www.ftc.gov/be/RRCGMU.pdf*.
[34] Sheffman and Higgins, *20 Years of Raising Rivals' Costs*, page 5.

Exhibit 3
Page 37

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

**C. The San Diego Convention Center is an Essential Facility for Competitors in the Trade**

**Show Cleaning Services Market.**

42.    Since the relevant market is trade show cleaning services at the SDCC, the Convention

Center is an essential facility for firms that supply trade show cleaning services. An essential

facility is a resource possessed by one firm that other competitors must have access to in order to

compete with that firm. Another name for an essential facility is a bottleneck. An example

would be the only railroad bridge over a river for many miles. If the railroad that owns the

bridge refuses to deal with competing railroads that need to use the bridge, competition is

harmed. The SDCC is an essential facility because it is the only venue for large trade shows in

the San Diego area. It would be prohibitively expensive for United to build another 600,000

square foot convention center in order to compete with SDCC. United National and other firms

in this market cannot compete in the market unless they have access to the San Diego

Convention Center facilities. Control over this essential facility in the market for trade show

cleaning services gives SDCC the ability to exclude all of its competitors from the market.

SDCC's actions are anticompetitive because it uses control over the essential facility in the

market for trade show cleaning services to exclude competitors.

**D. SDCC's Action Is Anticompetitive Because It Constitutes a Tying Arrangement.**

43.    SDCC has market power in the national trade show market. It has used its market power

in trade show services as a "tying good" to exclude competition in the local market for trade

show cleaning services at SDCC. Forcing the consumer to purchase the tied good results in

harm to consumers in that those consumers pay higher prices and those who would have wished

22

Exhibit 3

Page 38

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

to purchase trade show cleaning services from a competitor of SDCC are prevented from doing

so. Consumer choice is restricted.[35]

44.        Trade show cleaning services are tied to or bundled with trade shows in that SDCC

requires that those who conduct trade shows at SDCC must also use SDCC employees for

cleaning services and pay SDCC for those services.  SDCC has the ability to force trade show

participants to buy cleaning services from the center because of SDCC's market power in the

trade show market.  If the market for trade shows were very competitive, then it would not be

possible for SDCC to restrict consumers' choice of cleaning services and to raise the price of

those services.  But SDCC has enough market power in the trade show market to be able to tie

cleaning services to the trade show market.  The support for this market power opinion comes

from a number of sources.  Currently, the City of San Diego is studying the possibility of

expanding the convention center.  In connection with this effort, a number of analyses have been

done of SDCC's strength in the market for trade shows.[36]  The report of Heywood Sanders, the

economist retained to study the trade show and convention center market, is dated May 2009.[37]

Mr. Sanders concludes that:

o  Center is operating at or above practical maximum capacity
o  Loss of potential business most frequently due to lack of available dates/space
o  San Diego's hotel supply has continued to expand
o  Competitors are moving forward with enhancements
o  Past and potential customers have expressed interest in an expanded Center
o  Past events have and existing events are at risk of outgrowing the Center
o  There is room night loss from these events outgrowing the Center
o  Center has outperformed many of its competitors and the industry[38]

---

[35] http://www.ftc.gov/bc/antitrust/tying_sale.shtm.
[36] "Draft Mayor's Citizen Task Force on the San Diego Convention Center Project";
http://www.conventioncentertaskforce.org.
[37] "State of the Convention and Trade Show Industry and Convention Center Performance", Heywood Sanders, May
2009; http://www.conventioncentertaskforce.org/MCTFdocs-presentations.shtml.
[38] Draft Mayor's Task Force Report, page 12.

Exhibit 3
Page 39

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

In these circumstances, SDCC has the ability to engage in an anticompetitive tie because trade show cleaning services are a small portion of the total cost of a trade show.

45.     Other concurring opinions regarding the strength of SDCC's market position are provided by PricewaterhouseCoopers, Economic Research Associates and Piper Jaffray Company.[39] They emphasize the fact that SDCC has operated well above the average capacity utilization of competing large convention centers.  This is a strong sign of high demand for San Diego's center.

46.     A more analytical approach is provided by the San Diego County Taxpayers Association. This study concludes that the cost of expanding the convention center could be financed in part by higher taxes on convention center visitors.  These taxes, on airport taxis, hotel rooms, restaurants, rental cars and tourist attractions, would amount to increases in the total price paid by convention center visitors.  If SDCC did not have market power in the trade show market, then it would lose trade show business if taxes on convention visitors were raised.   The fact that the proposed taxes are estimated to produce substantial tax revenue is testimony to the power that SDCC has to raise price without losing significant business.  This is the measure of market power.

47.     In sum, SDCC has a degree of market power in the national trade show market sufficient to make it possible to engage in an anticompetitive tying arrangement.  This has allowed SDCC to exclude competitors from the trade show cleaning services market by tying cleaning services to the use of the convention center.

---

[39] www.conventioncentertaskforce.org.

24

Exhibit 3
Page 40

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

## V. The Security Explanation by SDCC for Excluding United Fails the "No Economic Sense Test"

48.     Actions by firms that tend to exclude their rivals can sometimes have pro-competitive explanations. It is important to examine the possibility of a pro-competitive reason for the exclusionary actions taken by SDCC before concluding that the actions were anti-competitive. The economics literature refers to the "no economic sense" test to examine whether there is any normal business justification other than exclusion for actions such as those by SDCC.[40] I have considered all of the statements by representatives of SDCC and by other participants in the market that were provided to me to examine the issue of a possible pro-competitive reason for the exclusion.

49.     First, I considered the possibility of enhanced efficiency in the market for trade show cleaning services if SDCC employees have an exclusive. My conclusion is that there is no enhanced efficiency justification for the conduct of SDCC. Exclusive cleaning services at the Convention Center will not reduce cost to consumers or provide a higher quality product. This is the only conclusion that can be reached given that:

   1.  The letters from contractors and show producers are unanimous in their opposition to an exclusive arrangement.

   2.  SDCC has not even attempted to provide an argument that exclusive cleaning services is more efficient. Instead, the change has been explained as a security matter.

50.     Second, I considered whether SDCC was carrying out a general shift in its security policy by restricting all non-SDCC employees from using the center. Economists have no special ability to measure the need for security at a facility such as SDCC. However, an economist can

---

[40] Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

Exhibit 3
Page 41

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

observe the incentive for the owner of an essential facility such as the SDCC to use a pretext to

exclude its competitors in a market such as trade show cleaning services where the SDCC is a

competitor in the market. The economist can weigh the consistency of the behavior of the SDCC

in applying its security policy against the behavior in which types of non-SDCC employees are

excluded.

51.     I have read the deposition of United CEO Rick Simon. He testified that he contacted

Brad Gessner of SDCC in April 2007 after he learned that the exclusionary policy was being

implemented.[41] Mr. Simon offered to follow the same screening process for employees as that

used by SDCC. Simon reminded Gessner that United also owns a security company and is very

knowledgeable about security matters. He said that he, Simon, was from a law enforcement

background; that United employed a number of former federal agents; and that their security

company had engagements that exceeded the security requirements of SDCC. For example,

United works on the Hyatt Regency security detail when the U.S. President comes to the

Chicago Hyatt. They also worked with the Secret Service when the Pope was in Denver. United

vetted 300 employees for that engagement and the Secret Service did not reject one of them. He

explained that United uses a superior screening device to that used by SDCC—Live Scan

Fingerprint. And he offered to buy a $12,000 machine to fingerprint all of United's employees at

SDCC. But Mr. Gessner was unmoved by any of these facts. He just insisted that SDCC would

use its own cleaning employees.

52.     I have also read the declaration of William Callaghan, President of Century Security and

an expert in convention floor security according to the documents I have seen. Mr. Callaghan

concludes that SDCC's policy of excluding only non-SDCC cleaning employees "makes

---

[41] Deposition of Rick Simon, pages 188-191.

Exhibit 3
Page 42

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

absolutely no sense."[42]  He finds that the policy makes no sense from a security point of view

because, among other reasons, cleaning employees tend to be lower security risks than other non-

SDCC employees who are not covered by the policy; because cleaning employees are only 5%

or less of the outside employees accessing convention centers; because SDCC does not require

outside employees to wear badges, while United National does require badges; and because

United National has offered to run background checks on its employees, which SDCC has

refused.[43]

53.     I have also read the declaration of Charles Buddy Linn, the Regional Vice President of

United National, who is familiar with the security policies of not only SDCC but other major

convention centers.  He provides more detail on the level of security at SDCC compared to other

centers in his experience.  SDCC does not use a photo ID system for security, and its monitoring

of outside employees accessing the facility is lax.[44]  Further, Mr. Linn provides evidence that

SDCC's claim that United was a security risk because it was using temporary employees is

false.[45]

54.     From my own analysis as well as the evidence provided by Mr. Simon, Mr. Callaghan

and Mr. Linn, I conclude that contrary to the idea of a general shift in security policy, cleaning

services has been singled out for restrictions.  SDCC competes with outside trade show cleaning

services firms such as United.  In contrast, SDCC does not compete directly with many other

service providers who work on trade shows.  Other non-SDCC contract employees have not been

similarly excluded from the center on grounds of security concerns.  Examples of the other

---

[42] William Callaghan Declaration, November 2007, par. 6.
[43] Callaghan Declaration, par. 7, 8, 10, 12; Charles Buddy Linn Declaration, November 2007, par. 4.
[44] Linn Declaration, par. 4, 5.
[45] Linn Declaration, par. 7, 8.

Exhibit 3
Page 43

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

services performed by non-SDCC workers are: drayage, cartage, furniture, booth and floor decorations, signs, photographs, telephone services, electricians, plumbers, and carpenters.[46]

55.     SDCC justifies its exclusion of competing cleaning suppliers on the basis of security concerns at the center.  If this justification is a sham, as alleged by United National, then there is no pro-competitive justification for the exclusionary restrictions by SDCC.  The restrictions do not lower costs; on the contrary, the restrictions result in higher prices in the cleaning services market.  Similarly, the quality of service is not increased; no justification other than the asserted security concern has been advanced.  The restrictions also do not increase consumer choice or services available; rather, they reduce the choice of services.

56.     SDCC could have used a less restrictive alternative to accomplish their stated goal of improving security at the convention center.  They could have subjected United's employees to background checks.  They could have accepted Rick Simon's offer to provide a fingerprint scanner.  They could have provided enhanced security training or requirements.  They could have worked with United, using United's proven expertise in security technology and security issues, to ensure that United's employees were no more of a security risk than their own booth cleaning employees.

57.     According to Mark Epstein of Champion, the employees of United National have been employed by the company for long periods of time and have had no security problems at the center.  In contrast, employees of some other contractors who work in the convention center are "a huge security black hole."[47]  Yet these contractors have not been targeted in the way that United National has.  In particular, he mentions I&D employees (Installation and Dismantle) as

---

[46] Terms and Conditions, 2006 Exhibitor Application & Contract, Internet Telephony Conference & Expo, item 6; Linn Declaration, par. 4.
[47] Affidavit of Mark Epstein, page 5.

Exhibit 3
Page 44

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

being a "transient" work force that "comes and goes", whose workers have never been seen

before by the contractors. There is "no screening at all" for these I&D employees.[48]

## VI. Harm to Consumers.

58.      Consumers have been harmed first of all because SDCC is charging higher prices in the

trade show cleaning market in connection with its exclusion of all non-SDCC cleaning

employees. The terms of the relationship with United National dictated by SDCC in July 2007

represent a price increase for cleaning services. United National previously estimated the hours

needed for facilities cleaning at the fully loaded labor rate of $16.35 in order to provide a not-to-

exceed amount for services at particular exhibitor spaces. SDCC has raised the hourly rate, not

including United National's management and other costs, to $17. Thus, SDCC has raised rates

already to the extent that the hours expended are less than the not-to-exceed hours. In addition,

when United National's current locked-in contract rates expire, SDCC will be charging more for

the same number of hours estimated for purposes of setting a not-to-exceed amount. In addition,

SDCC has effectively raised prices for booth cleaning. Mark Epstein testified that Champion's

costs have increased because Champion was not previously paying for aisle and carpet cleaning

services that United had provided free of charge in conjunction with booth cleaning.[49]

Currently, United National is locked into its contracts to provide booth cleaning, even though it

passes all of its booth-cleaning revenue on to SDCC. Also, it appears that SDCC is not using

supervisors for cleaning jobs where United has the contract and uses its own supervisor. If

United is not allowed to compete at the center and ceases to operate there, it seems likely that

SDCC will have to use one or more supervisors on contracts that were previously handled by

United. The charges for these supervisors will constitute another increase in price.

---

[48] Deposition of Mark Epstein, page 88.
[49] Deposition of Mark Epstein, page 100.

Exhibit 3
Page 45

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

59.     Harm to the competitive process is demonstrated by, among other things, the statements

by market participants.  Because of the exercise of monopoly power by the SDCC, there is no

longer any competition on the merits for exhibit cleaning services.

Letters expressing the displeasure of the trade show industry with the actions of SDCC include:

1.  Joint Statement of the Society of Independent Show Organizers, the International
    Association for Exhibition Management, and the Major American Trade Show
    Organizers.
2.  Richard Simon, President of United Service Companies.
3.  Joe Loggia, Chief Executive of Advanstar Communications.
4.  Patricia Dwyer, Senior Manager of Convention and Trade Show Services,
    SmithBucklin Corporation.
5.  Barbara Myers, Conferences and Meeting Services Director, APCO International
6.  B.J. Enright, President, Trade Show Logistics.
7.  Ken McAvoy, Senior Vice President, Reed Exhibitions.
8.  Mary Kay Sustek, Senior Vice President, Neilson Business Media.
9.  Martin Cymbal, President, Trade Show Contractors Association of Southern
    California.
10. Ty F. Bobit, President, Bobit Business Media.
11. Mary Beth Rebedeau, Executive Director, Society of Independent Show
    Organizers.

60.     Letters from trade show participants are clear in stating the harm they see in SDCC's

policy:

- Pat Dwyer of SmithBucklin states: "By taking the decision our of our hands to
  select this very important -- and visible service -- you could be taking away our
  ability to negotiate competitive pricing models for our client, as well as the
  relationship to a valuable member of our service level team environment."[50]
- Mary Kay Sustek of Nielson Business Media states: "While I believe we have used
  the SDCC cleaning services over the past years, it was by choice.  Imposing an
  exclusive of any type isn't in the best interest of Nielsen or its customers.  Nielsen
  manages its shows based on the specific needs and requirements of customers and
  having this flexibility is a key ingredient to a successful show. . . . In our
  experience, exclusive services ultimately become more expensive and less service
  oriented as it takes the competitive nature out of the business."[51]
- Ty Bobit of Bobit Business Media states: "Please know that the imposition of an
  exclusive service will be in contradiction to the wishes of your customers and it
  typically reduces service levels and takes competitive pricing options away.  We

---

[50] Letter from Pat Dwyer to SDCC, June 27, 2007.
[51] Letter from Mary Kay Sustek to SDCC, June 22, 2007.

Exhibit 3

Page 46

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

     have found over the years that the show manager's ability to choose a contractor and control price helps . . . provide better service at competitive prices."[52]

- Mary Beth Rebedeau of the Society of Independent Show Organizers states: "While we understand the need for facility managers to generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors of their choice. This is particularly true for large shows whose complexities demand carefully selected and integrated vendor partners who have a thorough understanding of each show's special needs. This includes cleaning services . . . . Show organizers spend years cultivating relationships and advantageous pricing with their chosen suppliers. In-house exclusives arbitrarily increase costs to show organizers -- and therefore exhibitors -- while decreasing the quality of the service provided due to lack of competition."[53]

- B.J. Enright of Tradeshowlogistics states: "[O]ur clients would love to have the San Diego Convention Center competitively bid for the opportunity to be the official cleaning contractor. However, an exclusive situation does not promote competition and service."[54]

- John Mooney of SISO wrote: "Our opposition to exclusives is based on the historical fact that competition among suppliers provides the best service at the lowest cost. Exclusives have the reverse effect."[55]

- Michael Muldoon, of the Convention Management Group, wrote to say "Please know that food and beverage events, like the shows we manage, have extraordinary cleaning requirements. Our relationship with United Services Companies has been extremely important to the production of these events. We have not been as successful working in facilities that require the hiring of "exclusive contractors" and we avoid "exclusive shops."[56]

61.    The conclusion I have reached from, among other things, my experience as an economist as well as the statements from market participants quoted here is that SDCC's exclusion of competition in trade show cleaning services at the convention center, if it continues, will produce higher prices and a lower quality of service. The experiences cited by Nielson Business Services, Bobit Business Media, the Society of Independent Show Organizers and the Convention Management Group all support this conclusion. The experiences of these organizations provide a natural experiment that, while insufficient by themselves to provide a

---

[52] June 14, 2007 letter from Ty Bobit to SDCC.
[53] July 20, 2007 letter from Mary Beth Rebedeau to SDCC.
[54] July 26, 2007 letter from B.J.Enright to SDCC.
[55] March 31, 2000 letter from John Mooney to Carol Wallace.
[56] March 13, 2000 letter from Michael Muldoon to Carol Wallace.

Exhibit 3
Page 47

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

definitive prediction for SDCC, nevertheless points toward harm for consumers as a result of

SDCC's exclusion.

## VII. Conclusion

62.      For all of the reasons stated above, I believe that the actions of SDCC in excluding

competition in the market for trade show cleaning services in the convention center are highly

anti-competitive.  Based on the documents I have examined, I also believe that there is no pro-

competitive justification for the SDCC's actions.  My opinions have been formed based on the

documents that I have seen.  If more information becomes available, I reserve the right to amend

these opinions in the light of additional discovery.

John S. Hekman, Ph.D.        September 30, 2009

Exhibit 3
Page 48

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit I to Report of John S. Hekman*

## John S. Hekman

550 South Hope Street
Suite 2150
Los Angeles, California 90071
Tel. (424) 204-8872
Fax (213) 243-3710
E-mail: jhekman@lecg.com

### EDUCATION

Ph.D., Economics, University of Chicago
M.B.A., Finance, University of Chicago
BA, History, Valparaiso University

### EMPLOYMENT

Principal, LECG, LLC, 2004-present.

Lecturer, MBA program, University of Southern California, 1989-present.  Department of
Finance and Business Economics.

Past Positions:

Principal, Economic Analysis LLC, 2000-03.

Principal, LECG, LLC, 1998-2000.

Director, Altschuler, Melvoin and Glasser LLP, 1996-98.

Vice President (1993-96), Senior Economist (1992), Economic Analysis Corporation.

Senior Economist, Micronomics, Inc., 1990-92.

Executive Vice President and Director of U.S. Economic Forecasting, Claremont Economics
Institute, 1986-90.  Editor, *The Main Street Journal* Investment letter.

Associate Professor of Finance, University of North Carolina, Chapel Hill 1981-86,
(academic tenure granted, 1985).

Visiting Scholar, Federal Reserve Bank of Atlanta, 1981-84.

Economist, Federal Reserve Bank of Boston, 1980.

Research Associate, Harvard-MIT Joint Center For Urban Studies, 1978.

Assistant Professor of Economics, Boston College, 1975-81.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit I to Report of John S. Hekman*


Instructor, University of Chicago, 1974-75.

## RECENT ENGAGEMENTS

*Official Committee of Unsecured Creditors v. Credit Suisse, Cayman Islands, et al.* Retained by J. Thomas Beckett of Parsons Behle & Latimer regarding the bankruptcy of the Yellowstone Mountain Club, April 2009.

*Morton v. Morton.* California Superior Court for the County of Los Angeles. Retained by Thomas Nolan of Skadden, Arps, Meagher & Flom, November 2008 regarding the value of a large land parcel in Las Vegas, March 2009.

*Gartner, Inc. v. Parikh, et al.* United States District Court for the Central District of California. Retained by Thomas Mackey of Jackson Lewis, August 2008.

*Auerbach Acquisition Associates v. Greg Daily et al.* California Superior Court for the County of Los Angeles. Retained by Pierce O'Donnell of O'Donnell and Associates, April 2008.

*Stephen Shoemaker v. Daniels, Fine, Israel, Schonbuch & Lebovits.* California Superior Court for the County of Los Angeles. Retained by Sandra Block of Robie & Mattai, February, 2008.

Retained by Fremont Investment and Loan in connection with the sub-prime mortgage crisis, January 2008.

*Catherine Blaylock, et al. v. First American Title Insurance Company.* United States District Court, Western District of Washington. Retained by Stephen Rummage of Davis Wright Tremaine, November 2007.

*Janice Howland v. First American Title Insurance.* United States District Court, Northern District of Illinois, Eastern Division. Retained by Douglas Mansfield of Jones, Day, November 2007.

*United National Maintenance Inc. v. San Diego Convention Center Corp.* California Superior Court, County of San Diego. Retained by Jeffrey Leon of Ungaretti & Harris, LLP, October, 2007.

*Julius Chang and Howard Chen v. Charles Schwab & Company,* California Superior Court, County of San Francisco. Retained by Daniel Newland of Seyfarth Shaw LLP, October, 2007.

*Eric Seiken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San Diego. Retained by Kevin Quinn of Thorsnes Bartolatta McGuire, September, 2007.

Exhibit 3
Page 50

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et al*, California Superior Court, County of San Mateo.  Retained by Joel Wolosky of Hodgson Russ, March 2007.

*James Ripley v. Wyoming Medical Center et al.*  United States District Court for the District of Wyoming.  Retained by Stephen Kline of Kline Law Office PC, January 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District of California.  Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman, November 2006.

*Caruso Affiliated Holdings v. General Growth Properties, Inc.*  California Superior Court for the County of Los Angeles.  Retained by Henry Shields of Irell & Manella, September 2006.

*Breakdown Services Ltd. v. Now Casting, Inc.*  California Superior Court, County of Los Angeles.  Retained by Stephen P.  Krakowsky, September 2006.

*RitterRanch Development LLC, debtor.  Los Angeles County Waterworks District No. 40 v. Robbin Itkin et al.*, United States District Court Central District of California.  Retained by Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller, May 2006.

*Pamela Cunningham and Reet Caldwell v. Mattel, Inc.* Circuit Court, Third Judicial Circuit, Madison County, Illinois.  Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges, October 2004.

**TESTIMONY**

*Ricardo Alfonso Leon, et al. v. Jose Francisco Leon, et al.*  California Superior Court for the County of Los Angeles.  Retained by Paul Workman of Holland and Knight.  Deposition August 2009.

*Official Committee of Unsecured Creditors v. Credit Suisse, Cayman Islands Branch, et al.* United States Bankruptcy Court for the District of Montana.  Retained by J.Thomas Beckett of Parsons, Behle & Latimer.  Deposition April 2009; trial testimony May 2009.

*Morton v. Morton.*  California Superior Court for the County of Los Angeles.  Retained by Thomas Nolan of Skadden, Arps, Meagher & Flom.  Deposition March 2009.

*Bullock v. Philip Morris, Inc.*  California Superior Court for the County of Los Angeles. Retained by Robert McCarter of Arnold & Porter.  Deposition March 2009.

*Gartner, Inc. v. Parikh, et al.*  United States District Court for the Central District of California.  Retained by Thomas Mackey of Jackson Lewis, August 2008.  Deposition October, 2008.

Exhibit 3
Page 51

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*Beth Robbins v. Essex Management Corp., et al.* California Superior Court for the County of Los Angeles. Retained by Jeremy Dwork of Daley & Heft. Deposition September, 2008.

*Catherine Blaylock, et al. v. First American Title Insurance Company.* United States District Court, Western District of Washington. Retained by Stephen Rummage of Davis Wright Tremaine. Declaration filed January, 2008.

*Janice Howland v. First American Title Insurance.* United States District Court, Northern District of Illinois, Eastern Division. Retained by Douglas Mansfield of Jones, Day. Declaration filed January, 2008.

*United National Maintenance Inc. v. San Diego Convention Center Corp.* California Superior Court, County of San Diego. Retained by Jeffrey Leon of Ungaretti & Harris, LLP. Testimony filed December 2007.

*Julius Chang and Howard Chen v. Charles Schwab & Company,* California Superior Court, County of San Francisco. Retained by Daniel Newland of Seyfarth Shaw LLP. Deposition October, 2007.

*Eric Seiken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San Diego. Retained by Kevin Quinn of Thorsnes Bartolatta McGuire. Class Certification Declaration submitted September, 2007; deposition November 2007.

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et al,* California Superior Court, County of San Mateo. Retained by Joel Wolosky of Hodgson Russ. Deposition April 2007.

*Dwight W. Crawford. v. Debra S. Katz, et al.,* Superior Court for the District of Columbia. Retained by Glenn M. Young of the Young Law Firm. Deposition April 2007.

*James Ripley v. Wyoming Medical Center et al.* United States District Court for the District of Wyoming. Retained by Stephen Kline of Kline Law Office PC. Deposition April 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District of California. Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman. Deposition February 2007.

*Breakdown Services Ltd. v. Now Casting, Inc.* California Superior Court, County of Los Angeles. Retained by Stephen P. Krakowsky. Deposition October 2006.

*RitterRanch Development LLC, debtor. Los Angeles County Waterworks District No. 40 v. Robbin Itkin et al.,* United States District Court Central District of California. Retained by Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller. Deposition June 2006.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*Pamela Cunningham and Reet Caldwell v. Mattel, Inc.* Circuit Court, Third Judicial Circuit, Madison County, Illinois. Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges. Deposition February 2005.

*In re Cioffi,* California Superior Court, County of Santa Clara. Retained by William Russell of Lakin, Spears. Deposition and trial testimony January 2004.

*Ederel Sport, Inc. v. Gotcha International, L.P.* U.S. Bankruptcy Court, Central District of California. Retained by Michael Adele of Albert, Weiland & Golden. Deposition and trial testimony May 2003.

*In Re Fuqua Industries Shareholder Litigation,* Delaware Chancery Court Civil Action No. 11974. Retained by Lowell Sachnoff of Sachnoff & Weaver. Deposition March 2003.

*SPC/PomomaLLC v. Medianews Group, Inc.* Superior Court of California, County of Los Angeles. Retained by Steven Gardner of Cohon and Gardner. Deposition February 2003; trial testimony April 2003.

*MGM v. Midway Games, Inc.* U. S. District Court, Central District of California, Western Division. Retained by John Williams of Lord, Bissell & Brook. Report submitted October 2002.

*Freeman Industries LLC v. Eastman Chemical Company, et al.,* In the Law Court for Sullivan County at Kingsport, Tennessee. Retained by Aton Arbisser of Kaye Scholer. Class Certification Affidavit submitted September 2002.

*Keep v. State of California,* Superior Court of California, County of Los Angeles. Retained by Vladimir Shalkovich, Deputy Attorney General. Deposition October 2002.

*IMAX, LTD. v. Krikorian Premiere Theatres,* U.S. District Court for the Central District of California. Retained by Glenn Dassoff of Paul, Hastings, Janofsky & Walker. Deposition September 2002.

*Betty Bullock v. Phillip Morris, Inc. et al.;* California Superior Court, Los Angeles. Retained by Thomas Stoever of Arnold & Porter on behalf of defendant. Deposition May 2002.

*International Paper and Masonite v. Affiliated FM Insurance Co, et al.;* California Superior Court, San Francisco. Retained by Adam Murray of Howrey, Simon, Arnold & White. Deposition May 2001; trial testimony November 2001.

*Copley Press, et al. v. Gray Davis, et al; Tony Strickland, et al. v. Gray Davis, et al.;* California Superior Court, San Diego County; retained by Timothy Muscat, Deputy Attorney General. Declaration in Support of Defendant's Opposition Brief submitted May 2001.

*Fitzgerald v. Silcott, et al.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Deposition January 2000; trial October 2001.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit I to Report of John S. Hekman*

*Formal Complaint of Tesoro Alaska Petroleum Against Amerada Hess, et al.,* Federal Energy Regulatory Commission and Regulatory Commission of Alaska. Retained by John Donovan of Skadden, Arps, Slate Meagher & Flom. Testimony submitted November 2000.

*Alavi v. Kaiser Foundation Hospitals.* Retained by Walter Weiss. Arbitration testimony November 2000.

*Seguritan v. State of California, et al.* Los Angeles County Superior Court. Retained by Anne Hunter, Deputy Attorney General. Deposition July 2000.

*Lenehan v. Maryland Casualty.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Deposition May 2000.

*Hearing on Green Coke Pricing Issue for TAPS Quality Bank.* Federal Energy Regulatory Commission. Retained by John Donovan of Skadden, Arps, Slate, Meagher & Flom. Testimony May 2000.

*Tash v. Aviara Land Associates, L.P., et al.* San Diego Superior Court. Retained by Jerry Phillips of Richman, Mann, Chizever, Phillips & Duboff. Deposition April 2000; Trial testimony May 2000.

*First Pension Corp/Murray v. Belka.* California Superior Court, County of Orange. Retained by William Meeske of Latham & Watkins. Deposition February 2000.

*Rhonda Jalali v. Assembly of God, Teen Challenge et al.* California Superior Court. Retained by George Buehler of Howrey & Simon. Deposition and trial testimony July 1999.

*Alfred Martino, Jr. v. Northbrook Property and Casualty Company and St. Paul Fire and Marine Insurance Company,* Arbitration. Retained by Law Offices of J. Jeffrey Long. Testimony June 1999.

*Hugo Valdivia v. MCE Corporation, et al.,* California Superior Court for the County of Los Angeles. Retained by Andrew Jacobs of the Law Offices of Andrew Hoffman (CNA Insurance). Deposition November 1997; trial January 1998.

*Louisville Bedding Company v. Pillowtex Corporation,* United States District Court for the Western District of Kentucky. Retained by Hartwell Morse of Welsh & Katz. Deposition November, December 1997.

*Infant and Nutritional Products, et al. v. BJ Family Food Center, et al,* California Superior Court for the County of Los Angeles. Retained by Farhad Novian of Novian & Novian. Deposition September 1997.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*William Gene Norman v. Herbalife International, et al.,* California Superior Court for the County of Los Angeles. Retained by Ward Benshoof of McClintock Weston Benshoof Rochefort Rubalcava MacCuish. Deposition April 1997.

*Jeffrey Alpert v. Gerald Busch, et al,* California Superior Court for the county of Los Angeles. Retained by Law Offices of Daniel Hoffman (CNA Insurance). Trial testimony November 1997.

*Janelle Flores v. Dapo Popoola, MD, et al.,* California Superior Court for the County of Los Angeles. Retained by Henry Tovmassian of Kehr, Crook, Tovmassian & Fox. Deposition September 1997.

*Ridgecrest Homeowners Association v. Nihon Lancre America, Inc., et al.,* California Superior Court for the County of Los Angeles. Retained by Ronald Caswell of Richmond, Lawrence, Mann, Greene, Chizever, Friedman & Phillips. Deposition June 1997.

*Harvey W. Stuart, et al. v. Kraft Foods, Inc. et al.,* United States District Court for the Eastern District of Wisconsin. Retained by Michael Freed of Much Shelist Freed Denenberg Ament Bell & Rubenstein. Affidavit November 1996; deposition and court testimony December 1996.

*Albert and Estelle Binder, et al. v. Thomas Gillespie, et al.,* United States District Court for the District of Idaho. Retained by Robert Bretz of Robert H. Bretz, PC. Affidavit December 1996.

*Ernst Paul Lehmann Patentwerk v. San-Val Discount, Inc.,* United States District Court, Central District of California. Retained by Douglas Adler of Skadden, Arps, Slate, Meagher & Flom. Affidavit submitted March 1996.

*JAR-PR Associates v. Unocal,* Superior Court of the State of California, County of Los Angeles. Retained by George Crook of Kehr, Crook, Tovmassian & Fox. Deposition and trial testimony, March 1996.

*Sarkis v. State of California,* California Superior Court, County of Kern. Retained by Deputy Attorney General Daniel Helfat. Deposition, January 1996.

*Casper Boso v. Chicago Bears.* Retained by Steven Wolf of Wolf & Ouimet to testify regarding the average career length of NFL players. Arbitration testimony November 1994.

*Styling Research Company v. Conair Corporation,* Superior Court of the State of California, County of Los Angeles. Retained by Phillip Belleville of Latham & Watkins. Deposition August 1992.

*Medical Designs, Inc. v. Donjoy, Inc.,* United States District Court, Southern District of California. Retained by Paul C. Van Slyke of Pravel, Gambrell, Hewitt, Kimball & Krieger. Deposition October 1991.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*California Grocers Association v. Bank of America*, Superior Court of the State of California for the County of Alameda, Northern District. Retained by Arne Wagner of Bank of America. Deposition May 1991.

## CONSULTANT

*Simpson Thatcher & Bartlett, New York, NY, Kenneth Logan;* Ronald Cleveland, et al. v. Viacom, Blockbuster, et al. *United States District Court for the Western District of Texas, 2002.*

In Re Maguire Thomas Partners – Grand Place Tower, Ltd. *United States Bankruptcy Court, Central District of California. Retained by Bennett Silverman of Gibson, Dunn & Crutcher on behalf of Sumitomo Bank, 1999.*

Howrey & Simon, Washington, DC, Thomas Heyer; *Litton Systems, Inc. v. Honeywell, Inc.,* 1995-1996.

Thelen, Marrin, Johnson & Bridges, San Francisco, Steven V. O'Neal; *IBM v. Fasco Industries*, 1994-1995.

*Packard Bell Electronics, Inc. v. Teledyne Industries, Inc.*, Superior Court of the State of California, County of Los Angeles. Retained by Ronald M. St. Marie of Ervin, Cohen & Jessup. August 1995.

O'Melveny & Myers, Los Angeles, Charles Diamond, Randy Oppenheimer; *Exxon Valdez Oil Spill Litigation*, 1993-1994; 2000; 2002.

## PUBLICATIONS

"California Under Siege: A Call for Perspective" (with Ken Agid, et al.), California Real Estate Roundtable, April 1991.

"Should We Reform Deposit Insurance?" *Los Angeles Times,* March 11, 1990, D3.

"New England's Economy in the 1980s" (with Lynn Browne), in *The Massachusetts Miracle,* David R. Lampe (ed.), The MIT Press: Cambridge, MA, 1988.

"Real Estate Returns and Inflation" (with David Hartzell and Mike Miles), *American Real Estate and Urban Economics Association Journal (AREUEA)*, Spring 1987.

"Factors Affecting Manufacturing Location in North Carolina," in Dale Whittington (ed.), *High Hopes for High Tech: Microelectronics in North Carolina,* University of North Carolina Press, 1987.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

"Diversification Categories in Investment Real Estate" (with David Hartzell and Mike Miles), *AREUEA Journal*, Summer 1986.

*Land Supply Monitoring: A Guide for Improving Public and Private Urban Development Decisions* (with D. Godshalk, S. Bollens, and M. Miles), Oelgeschlager, Gunn & Hain: Boston, 1985.

"Rental Price Adjustment and Investment in the Office Construction Market," *AREUEA Journal,* Spring 1985.

"Branch Plant Location and the Product Cycle in Computer Manufacturing," *Journal of Economics and Business,* May 1985.

"Venture Capital and Economic Development in the Southeast" (with Mike Miles), *Economic Review*, Federal Reserve Bank of Atlanta, July 1983.

"Optimal Allocation of Economic Development Funds" (with Mike Miles, et al.), N.C. Department of Natural Resources and Community Development, January 1983.

"What are Businesses Looking for?  A Survey of Industrial Firms in the South," *Economic Review*, Federal Reserve Bank of Atlanta, June 1982.

"Behind the Sunbelt's Growth:  Industrial Decentralization" (with Alan Smith), *Economic Review*, Federal Reserve Bank of Atlanta, March 1982.

"Impact of Environmental Regulations on Industrial Development in North Carolina" (with Raymond Burby, et al.), North Carolina Department of Natural Resources and Community Development, February 1982.

"The Evolution of New England Industry" (with John Strong), *New England Economic Review*, March-April 1981.

"New England's Economy in the 1980s" (with Lynn Browne), *New England Economic Review,* January-February 1981.

"Income, Labor Supply and Urban Residence," *American Economic Review*, September 1980.

"Is there a Case for Plant Closing Laws?" (with John Strong), *New England Economic Review*, July-August 1980.

"The Product Cycle and New England Textiles," *Quarterly Journal of Economics,* June 1980.

"Can New England Hold Onto its High Technology Industry?" *New England Economic Review,* April 1980.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit I to Report of John S. Hekman*

"Regions Don't Grow Old, Products Do," *The New York Times*, Sunday Business, November 4, 1979.

"What Attracts Industry to New England?" *New England Economic indicators*, December 1978.

"An Analysis of the Changing Location of Iron and Steel Production in the Twentieth Century," *American Economic Review*, March 1978.

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

Exhibit 2

List of Materials Reviewed

1. Complaint for Injunctive Relief and Damages
2. Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction
3. Defendants Objections to Evidence Submitted by Plaintiff in Support of Plaintiff's Ex Parte Application for a Temporary Restraining Order
4. Letter from Aaron Bludworth to Brad Gessner, September 21, 2007.
5. Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order
6. Memorandum of Points and Authorities in Support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order.
7. Plaintiff's Ex Parte Application for a Temporary Restraining Order.
8. Proposed Temporary Restraining Order
9. Proposed Temporary Restraining Order and Order to Show Cause re Preliminary Injunction
10. Request for Judicial Notice in support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order
11. Declaration of Carole Wallace in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
12. Declaration of Dessi Nintcheva in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
13. Declaration of Thomas Robbins in Support of Plaintiff's Application for a Temporary Restraining Order
14. Declaration of Jason Kirby in Support of Plaintiff's Application for a Temporary Restraining Order
15. Declaration of Charles Buddy Linn in Support of Plaintiff's Application for a Temporary Restraining Order

Exhibit 3
Page 59

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

16. Declaration of Larry Colby in Support of Plaintiff's Application for a Temporary Restraining Order

17. Declaration of Mark Epstein in Support of Plaintiff's Application for a Temporary Restraining Order

18. Declaration of Mark Epstein, October 26, 2007

19. Declaration of Richard Simon in Support of Plaintiff's Application for a Temporary Restraining Order

20. San Diego Convention Center Corporation Cleaning Services Contract with United Service Companies 2007

21. UNM v. San Diego Convention Center Pleadings List

22. San Diego Convention Center 2006 Annual Report

23. San Diego Convention Center Corporation, Convention and Trade Show License Agreement

24. July 26, 2007 Letter from Richard Simon to Jerry Sanders

25. July 5, 2007 Letter from Joe Loggia to Brad Gessner

26. June 27, 2007 Letter from Pat Dwyer to Brad Gessner

27. June 18, 2007 Letter from Barbara Myers to Brad Gessner

28. July 26, 2007 Letter from B.J. Enright to Brad Gessner

29. June 14, 2007 Letter from Ken McAvoy to Brad Gessner

30. June 22, 2007 Letter from Mary Kay Sustek to Brad Gessner

31. June 8, 2007 Letter from Martin Cymbal to Brad Gessner

32. June 14, 2007 Letter from Ty Bobit to Brad Gessner

33. SISO, IAEM, AND MATSO ISSUE JOINT INDUSTRY STATEMENT ON EXCLUSIVE SERVICES

34. July 20, 2007 Letter from Mary Beth Rebedeau to Brad Gessner

35. June 20, 2000 Letter from Joe Psulk to Marty Cymbal

36. May 12, 2000 Letter from Beatrice Kemp to Mark Valley

37. March 31, 2000 Letter from John Mooney to Carole Wallace

38. March 13, 2000 Letter from Michael Muldoon to Carole Wallace

39. March 8, 2000 Letter from Brian Casey to Carole Wallace

40. March 7, 2000 Letter from Mary Beth Rebedeau to Carole Wallace

Exhibit 3
Page 60

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

41. March 2, 2000 Letter from James Bracken to Carole Wallace

42. March 1, 2000 Letter from Stephen Shuldenfrei to Carole Wallace

43. June 20, 1990 Letter from Hugh Mac Lean to Tom Liegler

44. June 13, 1990 Letter from Richard Simon to the San Diego Convention Center
    Board of Directors

45. May 11, 1990 Letter from Hugh Mac Lean to John Hartley

46. U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section
    1.1, http://www.ftc.gov/bc/docs/horizmer.htm.

47. http://www.portofsandiego.org/projects/hiltonhotel/

48. Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.*,
    Boston: Pearson, Addison-Wesley, 2005.

49. Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising
    Rivals' Costs to Achieve Power Over Price,* 96 Yale L.J. 209 (1986)

50. Steven Salop and David Scheffman, *Raising Rivals' Costs,* 73 American
    Economic Review Papers and Proceedings 267 (May 1983)

51. David Scheffman and Richard Higgins, *20 Years of Raising Rivals' Costs:
    History, Assessment, and Future,* Federal Trade Commission,
    *http://www.ftc.gov/be/RRCGMU.pdf*

52. Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No
    Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

53. Terms and Conditions, 2006 Exhibitor Application & Contract, Internet
    Telephony Conference & Expo, item 6.

54. Declaration of Charles Buddy Linn, November 2007.

55. Declaration of William Callaghan, November 2007.

56. Deposition of Charles Linn, with exhibits.

57. Deposition of Richard Simon, with exhibits.

58. Deposition of Gabriel Ramirez, with exhibits.

59. Deposition of Raymond Santos, with exhibits.

60. Deposition of Mark Epstein, with exhibits.

61. Draft Mayor's Citizen Task Force on the San Diego Convention Center Project;
    http://www.conventioncentertaskforce.org/

Exhibit 3
Page 61

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

62. July 31, 2009 letter from John L'Estrange Jr. to Jake Slania.

63. United's Response to Defendant's First Set of Interrogatories.

64. Defendant's Amended Objections and Responses to First Set of Requests for Production of Documents.

65. Defendant's Objections and Responses to Amended First Set of Interrogatories.

66. United's four-page list of Contracts and Billing Information for SDCC Shows July 1, 2007 through August 1, 2009.

67. UNM008682-UNM 011963.

68. Declaration of Brad Gessner in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

69. Declaration of Carol Wallace in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

70. Declaration of T.M. Mazzocco in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

71. Declaration of Sotera L. Anderson in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

72. Defendant's Evidentiary Objections to Evidence Submitted by Plaintiff in Support of Plaintiff's Motion for Preliminary Injunction.

73. Request for Judicial Notice in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

74. San Diego Convention Center Articles of Incorporation

75. Public Improvement and Assessment Proceedings: Article 1: San Diego Tourism Marketing District.

76. City of San Diego Rules Implementing the Living Wage Ordinance

77. Memorandum of Points and Authorities in Support of Defendant's Demurrer to Plaintiff's Complaint

Exhibit 3
Page 62

# EXHIBIT 4

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

Case No. 37-2007-00072054-CU-BT-CTL

REBUTTAL REPORT

of

John S. Hekman Ph.D.

In the Matter of

*United National Maintenance, Inc.*

*v.*

*San Diego Convention Center Corporation, Inc.*

November 12, 2009

Exhibit 4
Page 63

1.       My name is John Hekman.  On September 30, 2009 I submitted a report in this matter.  I have been asked by counsel for United National Maintenance Inc. to respond to the expert reports of John Hayes and Thomas Lambert that were submitted on October 21, 2009.

**The Hayes Report**

My comments on the report of John Hayes are organized by reference to the paragraph numbers of his report.

*Hayes 18 to 24 (Tying and Bundling are different; bundling of convention center services is common)*

2.       Dr. Hayes says bundling and tying are commonplace and rarely harm competition.  This is because most bundling and tying is the harmless variety such as shoes and shoelaces, or cars and tires.  Because many consumer products have multiple parts and features, we can label all of these products with multiple features "bundling" or "tying".  For example, automobiles have radios, carpeting, windshield wipers, and countless other separable parts that could conceptually be labeled part of a "bundle."  Since these are the types of examples that Dr. Hayes refers to when he says that bundling and tying are "common", I assume that this is what he means.  That in no way means that there are not anti-competitive tying arrangements in situations where consumers may wish to purchase products or services separately.  So I reject the "everybody does it" explanation as being in any way relevant to the SDCC policy being considered here.

3.       Dr. Hayes points out that bundling and tying are different economic concepts in that bundling "refers to selling two or more products together for a single price", while tying is

Exhibit 4
Page 64

selling one product "in conjunction with another." However, he himself confuses these concepts in his footnote 22: "shoelaces and shoes" as well as "cars and tires" are examples of bundling, not tying. My analysis identified SDCC's policy as tying in that SDCC ties trade show services (the tying good) and trade show cleaning services (the tied good). SDCC may have priced some of their services as a bundle, where the cost of cleaning services was not separately stated, but I am not aware of any such instance. As a general matter and for the situation as it has been explained in the depositions that I have read, the SDCC policy is a case of tying.

4.      I strongly disagree with Dr. Hayes' attempt to label the SDCC policy as "bundling" as opposed to tying. He states (par. 21): "exclusive provider arrangements are economically equivalent to pure bundling when the tied good is always purchased in conjunction with the tying good." I take this to mean that he is saying that everyone who conducts a trade show at SDCC uses cleaning services, so these two services are like shoes and shoelaces. If Hayes can bridge this gap, making SDCC's policy one of bundling, not tying, then it follows that he can use all of the justifications for bundling that can be found in the economics literature.

5.      However, SDCC's policy is not bundling. For cleaning and exhibiting to be a bundle, two elements must be present, at a minimum. One is that the quantity of trade show cleaning services must be in fixed proportions to the quantity of exhibitor services. In the case of buying shoes, the laces are not separately priced because everyone needs exactly two shoelaces with a pair of shoes. But in the convention center, everyone does not use the exact same amount of cleaning services. That is why cleaning services are not "bundled" into the price of trade show

Exhibit 4
Page 65

services. Cleaning services are separately calculated and then added to the cost of other services being purchased.[1]

6.     The second element that must be present for cleaning and exhibiting to be a bundle is that every consumer must purchase the bundle. If some consumers purchase trade show exhibitor services while choosing not to purchase cleaning services, then it is not a bundle. And in fact, some of the exhibitors at SDCC trade shows do choose not to purchase some cleaning services.[2] Not all exhibitors purchase booth cleaning services. United works the floor of conventions to convince exhibitors who have not signed up for booth cleaning that they should purchase it.

7.     In sum, the SDCC policy does not pass Dr. Hayes' shoes-and-shoelaces, cars-and-tires test. The characterization of exclusive provider arrangements at convention centers as equivalent to "pure bundling" is wrong. Because SDCC is not "bundling", the discussion of the benign effects of bundling that follows is largely irrelevant.

*Hayes 23 to 25 (A number of other convention centers tie cleaning services and trade show services)*

8.     The fact that some other convention centers tie cleaning services and trade show services is irrelevant to the issue in this case. The provision of cleaning services by some convention centers is properly seen as a form of vertical integration, that is, of a firm producing a service (trade show services) that also produces one or more of the inputs used in the service (cleaning services). Other convention centers that do not provide exclusive cleaning services are less vertically integrated. The element that is important in the present case is that until 2007 there

---

[1] See for example the deposition of Charles Linn, page 39; deposition of Gabriel Ramirez, page 47; page 133-136; deposition of Raymond Santos, pages 17-21;
[2] See, for example, the deposition of Raymond Santos, page 147.

Exhibit 4
Page 66

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

was a functioning market for trade show cleaning services at SDCC. The exclusion of competitors from this market was anti-competitive and harmful to consumers.

*Hayes 26 to 28 (Bundling is often efficient)*

9.    SDCC's policy is not bundling, so the arguments for the possible efficiency of bundling do not apply. Hayes says that bundling can eliminate the inefficiency of double margins. This point is wrong because the double margin problem applies to situations where two complementary products are supplied by separate firms and both have market power. The present case is different because in 2007 SDCC supplied both cleaning services as well as trade show services. The double margin problem would not occur, because if United exercised market power and raised the price of cleaning services, SDCC could supply those services itself.

10.    In paragraphs 27 and 28, Dr. Hayes says that there can be efficiencies associated with SDCC's tying policy. He does not provide any analysis or data to back this up in SDCC's case, but he suggests that SDCC's security justification for the exclusive policy could provide efficiencies. Also, he points out that I have not done a cost-benefit study to back up my statements about whether security was the reason for the change in policy. I stated clearly in my report that I was not providing an opinion about security per se, but rather I was pointing out that the security argument lacked credibility because United had higher security standards than SDCC and had offered to address any deficiency that SDCC could name.

*Hayes 30 to 33 (No viable economic theory of harm)*

11.    Dr. Hayes argues that when the tying good (the SDCC) and the tied good (trade show cleaning) are consumed in fixed proportions, a monopolist over the tying good has an incentive to support competition in the market for the tied good. As already noted, trade show cleaning

Exhibit 4
Page 67

services are not used in fixed proportions to trade show services, so this theoretical argument does not apply. The article cited by Hayes to support his argument relates to fixed proportions. He also refers to a theoretical result that occurs if some consumers purchase the tied good without also purchasing the tying good. In this case, that would mean purchasing trade show cleaning services without purchasing the services of the convention center. This makes no sense at all.

12.     In concluding this discussion, Dr. Hayes reaches the opinion that no viable economic theory of harm has been offered. Apparently he reaches this conclusion because he cannot think of any theories of harm other than the ones he has mentioned. But he has dismissed the possibility of harm by interpreting the situation narrowly in terms of theories that refer to goods consumed in fixed proportions. This theory does not apply here, because this is not a fixed proportions situation. Therefore, Dr. Hayes' opinion that there is no viable economic theory of harm is unfounded.

*Hayes 34 to 43 (Nationwide market for trade shows)*

13.     Dr. Hayes agrees with my position regarding market power as a necessary element for SDCC to be able to tie trade show cleaning services to trade show services. However, he says the threshold question is whether SDCC possesses "substantial" market power in the national trade show market. This is incorrect. Market power means the power to influence price. The power to influence price can vary from the maximum achievable by a monopolist (the only seller in a market) all the way down to zero pricing power (in so-called atomistic competition).

14.     The question for the SDCC policy being considered here is whether SDCC has a sufficient amount of pricing power in the trade show market that it can exclude competitors from

Exhibit 4
Page 68

the trade show cleaning market and raise price in that market. The amount by which price can be raised in the show cleaning market is the "small but significant and non-transitory" price increase (SNIP) that is the test used in the FTC/DOJ Antitrust Guidelines that I referred to in my report and that Dr. Hayes refers to in his report. This is because raising the price of cleaning services will raise the total price paid at SDCC by consumers of trade show services. If SDCC has enough pricing power to raise that total price by raising the price of cleaning services, then consumer harm will result.

15.      The SNIP test normally refers to the ability to raise and maintain price 5% or more. So the question becomes, how much pricing power in the trade show market does it take to have an anticompetitive effect in the trade show cleaning services market? The answer is, not much. According to the figures reported by Dr. Hayes, trade show cleaning services accounts for no more than 5.1% of the total cost of trade show services at SDCC.[3] A 5% increase in the price of trade show cleaning services represents an increase in the total price of trade show services (including the cleaning services) of only 0.3% (three-tenths of one percent). SDCC needs very little pricing power to be able to raise price by three-tenths of one percent. As a result, it is my opinion that Dr. Hayes is incorrect when he states that the issue is whether SDCC "possesses substantial market power."

16.      In discussing the nature of the national market for trade shows in which SDCC competes, Dr. Hayes says that I am wrong to emphasize the size of SDCC as a major factor in its market competitiveness. He presents SDCC data that he reads to say that only 6 shows used the whole center, and only 9 shows (3.6% of the total number of shows) used 75% of the center in FY 2009. Using the number of shows rather than show revenues or the percent of space rented on an

---

[3] Hayes Report, paragraph 25.

Exhibit 4
Page 69

annual basis is misleading in this regard.  For example, the 9 shows that he references that each

used 75% or more of the center cannot overlap; if each of these shows used two weeks at the

SDCC, including show time, set-up and break-down, then they would use 18 weeks of the year.

This is 35% of the year in which SDCC has shows that are too big for most convention centers.

Whether or not the 35% figure that I present as a rough estimate is correct, it is clear that the

percent of the time that SDCC is tied up with a large show is much more than the 3.6% provided

by Dr. Hayes.

17.     The market analysis undertaken by ERA for the Convention Center Task Force shows

how misleading the figures used by Dr. Hayes are.  He uses a total of 248 "events" at SDCC in

2009.  ERA has a figure of 249 for 2009, so they agree fairly well.[4]  However, 153 of the 249 are

labeled "Meetings, community events, food & Bev."  Since SDCC has 118,700 square feet of

"meeting room" space in addition to its 615,700 square feet of exhibit space, it is misleading to

be comparing the number of meetings with the number of conventions.  ERA reports 72

"National/State Conventions and Trade Shows" and "Corporate Conventions" as "Primary

Events", while the 153 meetings and community events are labeled "secondary events."

18.     In sum, I disagree with the attempt by Dr. Hayes to characterize SDCC as having only a

few large conventions and to have mostly smaller shows that compete with smaller convention

centers.  It makes no sense to argue as he does that "SDCC competes with much smaller facilities

for the vast majority of the events that it hosts."[5]  If that were the case, why would the City of

San Diego be contemplating an expansion of the SDCC in order to increase its capacity to host

---

[4] ERA presentation, Convention Center Task Force, Table 5.
[5] Hayes Report, paragraph 37.

Exhibit 4
Page 70

*United Notional Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

large trade shows?  The task force reports speak of the loss of potential business due to lack of

available space and of events that already have or will in the future outgrow the available space.[6]

19.     Dr. Hayes' own discussion of the market refutes his conclusion that SDCC mainly

competes with much smaller facilities.  In paragraph 38 he quotes the ERA report's conclusion

that 21 convention centers represent "the predominant competitive markets" for SDCC.  These

21 centers are the large centers throughout the U.S., not the "much smaller" centers referenced

by Dr. Hayes.  In paragraph 39 Dr. Hayes quotes SDCC's Carol Wallace saying that SDCC

competes with convention centers in 13 U.S. cities.

20.     Most significantly with regard to the position of SDCC in the convention and trade show

market, the presentation to the convention center task force by board chairman Chris Cramer and

CEO Carol Wallace is in my opinion totally at variance with the analysis presented by Dr.

Hayes.[7]  For example, they say:

Chris Cramer remarks

> Over the last 20 years, the corporation has established a proven track record:
> Maximizing the building's economic potential attracting many of the nation's most
> lucrative conventions

> We are fortunate to have a customer base, largely driven by medical association
> meetings, that continues to have a strong economic performance and a necessity to
> continue to host their annual meetings.

Carol Wallace remarks

> [referring to an exhibit with four quadrants to illustrate different types of uses of the
> center]

> Our primary goal is to attract events that generate significant economic impact for the
> city of San Diego

---

[6] PricewaterhouseCoopers report, Jennifer Sutherland, March 2009, page 6.
[7] Presentation by Chris Cramer and Carol Wallace, Convention Center Task Force, February 2009.

Exhibit 4
Page 71

The Center specifically targets high-end events to maximize economic impact for the city and produce significant revenues for the Center. Good examples are medical shows which attract attendees who have more disposable income, are likely to bring their families and come for the convention and extend their stay into a vacation. These events also have large budgets, host many off site events and have the need for ancillary services which generate substantial revenue for the facility.

In the upper left hand quadrant, are events that are good for the city, but don't necessarily generate revenues for the facility. These events provide positive media exposure for the city and economic benefits. Examples are high profile political conventions or offshoot events surrounding events like the Superbowl.

In the two lower quadrants are events that don't generate significant economic benefits for the city. On the left, these include conventions, tradeshows and events, with smaller budgets – so they don't generate money for the facility either. And, they typically don't attract attendees who stay as many nights. If they do, they usually don't spend much money.

The lower right quadrant represents consumer shows and local events. While these events may attract a large number of local attendees, they don't attract overnight visitors.

These remarks by Chris Cramer and Carol Wallace directly contradict Dr. Hayes' description of the market served by SDCC. It is clear that the primary market in which they see SDCC competing is for larger national conventions.

*Hayes 44 to 49 (Market share and market power)*

21.     After arguing that SDCC competes with many smaller convention centers, Dr. Hayes then estimates SDCC's market share by using the 20 convention centers that are larger than SDCC. This results in an estimated market share for SDCC of 3% to 5%. His conclusion from this market share estimate is that "SDCC does not possess market power in the nationwide market for hosting trade shows."[8] As I pointed out above, in order to have an anticompetitive effect on the market for trade show cleaning services, SDCC only needs to be able to raise price by three-tenths of one percent. A market share of 3% to 5%, in addition to all of the other

---

[8] Hayes Report, paragraph 49.

Exhibit 4
Page 72

United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.
Rebuttal Report of John S. Hekman Ph.D.

indicators of market power that are contained in the analyses done for the Convention Center

Task Force, provide sufficient market power to be able to have this anticompetitive effect.

*Hayes 50 to 53 (Exercise of market power)*

22.     Dr. Hayes misreads a statement in my report to say that the small share of trade show

cleaning services in the total cost of a trade show constitutes a reason why SDCC has market

power in the trade show market.[9]  This is not what I said.  I discussed the sources of SDCC's

market power in the trade show market, and then I said: "In these circumstances, SDCC has the

ability to engage in an anticompetitive tie because trade show cleaning services are a small

portion of the total cost of a trade show."[10]  In other words, SDCC has sufficient market power to

engage in a tie, considering that trade show cleaning is a small share of trade show cost.  Dr.

Hayes read the word "because" to mean "as a result of" when what I meant by "because" was

"considering that."

23.     In paragraph 53, Dr. Hayes addresses my point that SDCC is capacity-constrained and is

seeking to expand its space so that it can accommodate more trade shows.  I interpret this fact to

mean that there is strong demand for trade shows at SDCC, and it supports my opinion that

SDCC has a degree of market power.  Dr. Hayes states that "Firms with market power seek to

*reduce* output in order to *increase* prices."  This interpretation of SDCC's situation is incorrect.

As a matter of economic theory, a firm with market power will produce a lower level of output

than the competitive level of output, and will charge a higher price.  However, that does not

mean that a firm with market power never wishes to increase its output.  In the case of SDCC,

we have a convention facility that has insufficient capacity because of the dynamics of the

---

[9] Hayes Report, paragraphs 51-52.
[10] Report of John S. Hekman, September 30, 2009, paragraph 44.

Exhibit 4
Page 73

market since the time the facility was built.  With reference to the economic theory of imperfect competition, it would be correct to say that there is an optimal size for the SDCC such that it could provide an output and price that satisfy the conditions of profit maximization where marginal revenue equals marginal cost.  Dr. Hayes' conclusion is incorrect because he did not include the capacity constraint.

*Hayes 54 to 58 (tax increases and market power)*

24.     Dr. Hayes disagrees with my opinion that the contemplated taxes on taxis, hotel rooms, and restaurants indicate that SDCC has market power.  He provides an example that is designed to show that higher tax revenues can be experienced even when there is a loss of business at SDCC.  He concludes that for this reason, higher tax revenues are not an indicator of strong demand or market power.  His analysis is incorrect, because he is assuming a completely different situation than that which exists in San Diego.  The purpose of the proposed expansion of SDCC is to accommodate the lost business that is now being turned away.  If the expansion occurs, there will be an increase in business at SDCC, not a decrease as assumed in Dr. Hayes' example.  The tax analysis that I was referring to projects both an increase in convention business, in hotel rooms booked, in taxi rides and in restaurant meals purchased, as well as an increase in tax receipts.  With both higher output of conventions as well as higher taxes on services, the total price paid by consumers for the conventions will rise.  It is this increase in price in the market that I was referring to as an indicator of market power for SDCC.

25.     Dr. Hayes also quotes the ERA report from the convention task force to say that consumers are very sensitive to hotel rates and that "the cost of hosting an event in San Diego (for hotel rooms and convention hall space rental) is considered to be prohibitively high by a

Exhibit 4
Page 74

number of respondents."[11]  Based on this and similar quotes, Dr. Hayes concludes that "SDCC would lose business if hotel and other taxes were increased." This is directly contrary to the assumptions of the sources from which he has taken his quotes. The convention task force concluded that an expansion of the SDCC is called for because of lost business at present, and the analysis of paying for part of the expansion with taxes on hotels and other services does not say that there would be less business as a result. Rather, the projections are for higher levels of business in spite of the taxes that increase the cost for users of the center.

*Hayes 59 (essential facility)*

26.    Dr. Hayes objects to the opinion that SDCC is an essential facility for the trade show cleaning market. His reason for this objection is his earlier opinion that no viable economic theory of harm has been offered. I refuted that opinion above. Therefore, my opinion that SDCC is an essential facility remains.

*Hayes 60 to 61 (lock in)*

27.    Booking of trade shows years in advance provides additional market power to SDCC in its tying policy with regard to cleaning services. Dr. Hayes does not disagree that advance booking provides a measure of market power. However, he does attempt to minimize the length of time for the advance booking. He says that only "a handful" of conventions are booked more than ten years in advance, and that 71% of "customers" book less than five years in advance. In my opinion, these details from SDCC do not change my opinion that advance booking provides additional market power. First of all, the number of events that are booked more than ten years in advance may be, and likely are, the largest and most important events for SDCC's

---

[11] Quoted in Hayes Report, paragraph 57.

Exhibit 4
Page 75

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

profitability.  As pointed out previously, the larger conventions may be few in number but large in importance.  Second, the counting of events here confuses once again what SDCC refers to as "primary" convention events with the more numerous "meetings" and other "secondary" events.  Dr. Hayes' opinion is contradicted by the statements of Carol Wallace and Chris Cramer for the convention task force:

> This facility serves as the foundation for our visitor industry.  Unlike the downturn we are seeing in leisure travel, the events hosted in the Convention Center are usually booked 3-5 years out minimizing the impact of the economic cycles on the performance.[12]

The fact that advance booking of conventions "minimizes the impact of the economic cycles on the performance" is a statement that advance booking locks in events and the associated revenue.  This makes my point.

*Hayes 62 to 68 (trade show cleaning services market definition)*

28.     Dr. Hayes' first objection to the product market definition for trade show cleaning services is that the market is defined to be "large convention centers" but the definition of a large center is not quantified.  My definition of large centers is meant to be consistent with the large convention centers with which SDCC sees itself competing.  The reports to the convention center task force are clear in identifying the relevant large centers.  Dr. Hayes wants to include smaller centers, saying that many of the events that occur at SDCC could be housed at smaller centers.  This opinion is contradicted by the facts.  No instance has been provided by Dr. Hayes of an event that chose a small center over SDCC.  He is relying exclusively on the square footage of SDCC and the space used by small events.  Also, as mentioned before, it is misleading to conflate the meetings and other secondary events with the large primary conventions.

---

[12] Presentation by Chris Cramer and Carol Wallace, Convention Center Task Force, February 2009, page 3.

Exhibit 4
Page 76

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

29.     The second objection to my product market definition is that United National

Maintenance does in fact take cleaning jobs in smaller hotel venues in San Diego.  However, this

fact does not mean that the smaller hotel spaces are in the same trade show cleaning services

market as the SDCC.  The testimony of the market participants that I cited in my report is that

the cleaning function is not the same at SDCC as compared to small venues, because of the

planning and supervision that goes into shows at SDCC.  Also, Gabriel Ramirez explained that

the scale of operation is not at all comparable between SDCC and hotels in the San Diego area

where United sometimes does show cleaning.  A hotel operation uses one or two people, while

large shows at SDCC use a substantially higher number of employees, sometimes in excess of

fifty.

30.     The reason for having this debate over which venues should be included in the market

definition is that it affects the estimated size of the market.  If smaller venues are included, then

the question becomes whether the additional cleaning firms that operate in those smaller venues

should be counted as competitors of SDCC and United in the defined trade show cleaning

services market.  What is implied by Dr. Hayes' argument that United does do cleaning at

smaller venues is that the other cleaning firms that work there should be included in the market.

But the testimony that I have read has not identified a single instance in which a small local

cleaning firm has had a contract at SDCC for a large trade show.  In my opinion, the facts clearly

show that the market should be defined as trade show cleaning services at the SDCC.

31.     Dr. Hayes objects to my geographic market definition.  He believes that it should be

greater than the San Diego metropolitan area.  He agrees with me that "knowledge and skill at

the supervisory level" is the key to explaining why United is different from standard cleaning

firms.  However, he argues that this supervisory skill could be imported from more distant

Exhibit 4
Page 77

locations such as Los Angeles, Phoenix or Las Vegas and combined with labor from San Diego to form a firm that could compete in the market at the SDCC. In my opinion this is an incomplete hypothetical. To illustrate, assume there is a firm A in Phoenix that does trade show cleaning services and has a supervisor with the same skills and experience as Gabriel Ramirez. Then for each contract that firm A obtains to work at SDCC, A's supervisor must commute to San Diego, recruit and train a cleaning team, and remain in San Diego for the duration of the trade show. This would make firm A's costs higher than those for United or SDCC. I do not see how firm A could compete with firms that are located in San Diego. Alternatively, if Dr. Hayes' hypothetical assumes that firm A's supervisor takes up residence in San Diego in order to work on shows at SDCC, then we are just dealing with a new firm entering the market in San Diego, and the geographic market is still defined as the San Diego metropolitan area. In either version of this hypothetical, I disagree that it changes my definition of the geographic market.

*Hayes 69 to 73 (SDCC has not raised its hourly rates for trade show cleaning since 2007)*

32.     Dr. Hayes argues that since SDCC instituted its exclusive policy in 2007 it has not raised its labor rates for trade show cleaning. In my opinion this has no relevance for whether the exclusion of competitors was an anticompetitive act. Since the exclusion was immediately challenged and litigated, it is not surprising that SDCC has not made any move to raise its rates. The significant point is that if SDCC is successful in excluding competition, it will have the ability to raise rates without losing business to a competitor in the trade show cleaning market.

33.     Dr. Hayes disagrees with my statement that SDCC "has effectively raised prices for booth cleaning."[13] My reason for this statement was the testimony of Mark Epstein, who explained that SDCC was charging for some aisle and carpet cleaning that United had not

---

[13] Hayes Report, paragraph 79.

Exhibit 4
Page 78

charged for. Dr. Hayes references the deposition of Charles Linn, where he was asked about another element of cleaning that United for which United billed charges but that SDCC did not. However, Mr. Linn said that he did not know if United was being paid for those charges.[14]

34.     In paragraph 77, Dr. Hayes asserts that SDCC billed a smaller total amount than did United for the 51 shows analyzed in Dr. Kennedy's economic damages report. This assertion is incorrect. SDCC did not bill for the same services as United. Therefore, this is comparing apples to oranges. United's billing includes the hours of laborers as well as supervisors. SDCC bills only for laborer hours. This is the reason that the total billing on United's shows, in which United provides supervisors but must use SDCC labor, is greater than SDCC's billing for those same shows. When United's supervisory charges are subtracted from its total billing, the resulting laborer charges are less than those of SDCC.[15] As a result, Dr. Hayes is incorrect in his conclusion.

35.     In paragraph 81, Dr. Hayes asserts that in the shows considered by Dr. Kennedy that took place between July 2007 and August 2009, United charged a higher average labor rate than SDCC. This is not relevant to the issue of increased price in my report. As of July 2007, SDCC was charging $17 per hour for its cleaning labor, while United was charging less than $16.30 to Champion and $16.74 to GES.[16] United's 2001 contract with GES, renewed in 2006, provided for a maximum 3% increase in labor rates per year. The 2005 Champion contract called for a fixed labor rate that could be adjusted if minimum wage rates in California were increased. After being fixed for five years, the California minimum wage increased 11.1% on January 1, 2007.

---

[14] Deposition of Charles Linn, page 243.
[15] Exhibit G, Report of Patrick Kennedy.
[16] Hayes Report, Exhibits 16 and 18.

Exhibit 4
Page 79

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

36.      After SDCC eliminated United's employees from working at SDCC in 2007, United initiated the litigation that is the subject of this report.  The rate that SDCC charges to United has to be considered in the light of the litigation.  It is not in SDCC's economic interest to raise labor rates for cleaning services while the litigation is pending, because raising rates would be an indicator of market or monopoly power.  However, the fact is that before the litigation was initiated, SDCC was charging more for cleaning labor than United was charging.  The replacement of United's labor with that of SDCC therefore constituted a price increase.

37.      In paragraph 82, Dr. Hayes disagrees with my opinion that there would be an increase in cleaning service charges if United's supervisory labor were to be replaced by that of SDCC.  He says that it is his "understanding" that SDCC does not charge a fee for supervisory labor.  What I do not see in Dr. Hayes' discussion of this issue is  a direct statement that if SDCC were to have incurred over 1,000 hours of supervisor labor as United did on the show s that were considered by Dr. Kennedy, that SDCC would not have charged for any of this time.  What can be said without any speculation is that for the cleaning labor (excluding supervisors) that is billed by both SDCC and United, SDCC billed a greater amount, and this represents an increase in price to the consumer.  To the extent that United absorbed these increases itself, the consumer of trade show cleaning services has not so far had to pay these increases.  However, to the extent that United's losses have been shared by the purchasers of the cleaning services, there has been an increase.

**The Lambert Report**

My comments regarding the Lambert Report are organized with reference to the Lambert Report's page numbers.

Exhibit 4
Page 80

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

*Lambert Report, page 18*

38.     Mr. Lambert asserts that my opinion regarding the higher prices charged by SDCC as a result of its exclusionary cleaning services policy is contradicted by the testimony of Richard Simon.[17] Mr. Simon said that Champion refused to alter United's contract to allow United to pass along the increased cost from SDCC. Mr. Simon's testimony does not contradict my conclusion regarding price increases. First of all, by quoting this testimony Mr. Lambert is agreeing that SDCC charged more than United in the cases referred to, which constitutes a price increase. For the most part, United has paid these price increases itself. But to the extent that decorators have shared the burden of the higher prices for some shows, the price increases have been passed along to the decorators. Second, the current situation in which SDCC loses money due to the price increases is temporary. In the long run it is likely that if SDCC prevails in its attempt to monopolize the cleaning services market at SDCC, either United will increase its rates to cover its losses or United will no longer contract to clean at SDCC if it cannot use its own employees to do so.

39.     Mr. Lambert also says that for the same reason cited above, i.e. that United did not pass along most of the price increase from SDCC, that as a result my opinion contradicts that of Dr. Kennedy.[18] This is incorrect. Dr. Kennedy has offset his damages calculations by the amounts of SDCC's price increases that were paid by decorators. Therefore, in my opinion it is still the case that SDCC did raise prices, and Dr. Kennedy has calculated damages in an appropriate way.

*Lambert Report, page 19*

---

[17] Lambert Report, page 18.
[18] Lambert Report, page 19.

Exhibit 4
Page 81

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

40.     I stated in my report that United sometimes brings in workers from other cities at considerable cost rather than hiring local cleaning workers.  Mr. Lambert says this has not been accounted for in Dr. Kennedy's damages calculations.[19]  I was reporting what had been testified to by United's employees.[20]  This did not refer to any specific show that was the basis for Dr. Kennedy's damages calculations.

41.     Mr. Lambert disagrees with my statement that "SDCC appropriates all of the revenue that previously was paid to United."[21]  SDCC takes the 50% of the booth-cleaning revenue that previously went to United.  For facilities cleaning, United bills the decorator for supervisory and labor hours estimated in advance of a show.  SDCC bills United for the labor hours worked by SDCC employees.  Overall, SDCC has billed more for labor hours than United has billed or been paid.  When SDCC's billing is less than United's billing for both labor and supervisory hours, then United receives some net revenue.

*Lambert Report pages 20-21*

42.     Mr. Lambert states that "the documents and testimony are entirely consistent that SDCCC supervisors <u>always</u> supervise SDCCC cleaning worker employees and that SDCCC <u>never</u> charges UNM for the supervisor labor hours."[22]  Because SDCC earns income at the center not only from trade show cleaning services but also from numerous other services and receives income from the rental of the center, the fact that SDCC does not specifically charge United for certain supervisor hours does not mean that SDCC is not receiving income for those supervisors' work from some other revenue source.

---

[19] Lambert Report, page 19.
[10] Deposition of Charles Linn, page 85.
[21] Lambert Report, page 19.
[12] Lambert Report, page 21.

Exhibit 4
Page 82

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

43.     Mr. Lambert disagrees with my statement that "SDCC has forced United and other competitors in the market to operate at a loss."[23]  He states: "As reflected in Exhibit D, UNM's documents produced indicate that UNM has been profitable on all shows since June 2008."[24]  It is not correct that United has been profitable on all shows since SDCC's exclusive policy was instituted.  I do not know why Mr. Lambert refers to shows starting with the arbitrary date of June 2008.  But his assumption of profitability fails to take account of United's cost of supervisory labor and of United's overhead costs.

John S. Hekman, Ph.D.                              Los Angeles, CA November 12, 2009

---

[23] Lambert Report, page 20.
[24] Lambert Report, page 20.

Exhibit 4
Page 83