1    WRIGHT & L'ESTRANGE
     A Partnership Including Professional Corporations
2        John H. L'Estrange, Jr. (SBN 049594)
         jlestrange@wllawsd.com
3        Joseph T. Ergastolo (SBN 137807)
         jte@wllawsd.com
4        Andrew E. Schouten (SBN 263684)
         aschouten@wllawsd.com
5    401 West A Street, Suite 2250
     San Diego, California 92101
6    (619) 231-4844   Fax:  (619) 231-6710

7    Attorneys for Defendant
     San Diego Convention Center
8    Corporation, Inc.

9                  **UNITED STATES DISTRICT COURT**

10               **SOUTHERN DISTRICT OF CALIFORNIA**

11   UNITED NATIONAL MAINTENANCE      )    **CASE NO. 07-cv-2172-AJB**
     INC., a Nevada Corporation        )
12                                     )    **DEFENDANT SAN DIEGO**
                   Plaintiff,          )    **CONVENTION CENTER**
13                                     )    **CORPORATION, INC.'S**
           v.                          )    **MEMORANDUM OF CONTENTIONS**
14                                     )    **OF FACT AND LAW**
     SAN DIEGO CONVENTION CENTER       )
15   CORPORATION, INC., a California   )    Complaint Filed:  November 13, 2007
     Corporation                       )    Courtroom:        A
16                   Defendant.        )    Judge:            Hon. Anthony J. Battaglia
                                       )    Pretrial Conf.:   February 4, 2011
17                                     )    Time:             10:30 a.m.
                                       )    Trial Date:       March 21, 2011
18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

I.  **CONTENTIONS OF MATERIAL FACT** ............................................. 1

A.  SUMMARY OF FACTS AND CLAIMS ................................. 1

B.  CLEANING SERVICES AND THE TRADE SHOW INDUSTRY ....... 2

   1.  **SDCCC Operates the Building on Behalf of the City of San Diego** ....................................................... 2

   2.  **SDCCC Competes In The National Market For Hosting Trade Shows** ........................................................ 3

      a.  **SDCCC's Primary Product Offering is Trade Show Exhibition Space** ....................................... 3

      b.  **SDCCC Competes for Trade Shows in the United States and Beyond** ................................... 4

   3.  **Trade Show Cleaning Is A Component Of Trade Show Production** ...................................................... 4

      a.  **Trade Shows are Produced by Several Different Players** ............................................. 4

      b.  **The Exhibit Floor and the Building Must be Cleaned During Shows** ................................. 5

      c.  **Competition Between SDCCC And UNM Is Extremely Narrow in Scope** ............................. 5

C.  TRADE SHOW CONTRACTS AND RELATIONSHIPS AT THE BUILDING BEFORE JULY 1, 2007 .................................... 6

   1.  **SDCCC's Building Licenses Govern Use Of The Building** ...... 6

   2.  **UNM Performs Cleaning Services Pursuant To Exclusive, Nationwide Contracts With Decorators** .......................... 6

      a.  **The Decorator Contracts Contain Conditions Precedent that Relieve the Parties of Performance Under Certain Circumstances** ............................. 6

      b.  **UNM did not Perform if the Conditions Precedent were not Met** ................................................. 7

D.  SDCCC'S CLEANING SERVICES POLICY; HOW AND WHY ......... 7

i

1.  SDCCC Implements Its Policy By Amending The
    Building's Regulations ............................................ 8

2.  SDCCC Charges All Cleaning Services Customers
    The Same Prices ................................................... 8

3.  SDCCC Implemented Its Cleaning Services Policy For
    Three Reasons ..................................................... 8

    a.  The Policy Improves Overall Security by Reducing
        Threat Vulnerabilities and Enhancing Emergency
        Preparedness ................................................. 9

        i.  Assessments and War Games Revealed that
            SDCCC Could Reduce the Building's
            Vulnerabilities By Controlling Access .............. 9

        ii. SDCCC Employees are Trained to Respond to
            Emergencies at the Building; Outside
            Contractors are Not................................. 10

    b.  The Policy Permits Better Quality Control and Brand
        Management .................................................. 10

    c.  The Policy Increases Productive Efficiency ............ 11

4.  SDCCC Implemented The Policy Knowing Little To
    Nothing Of UNM's Contract And Business Arrangements ...... 12

E.  TRADE SHOW CONTRACTS AND RELATIONSHIPS AT THE
    BUILDING BEFORE JULY 1, 2007 ................................ 12

    1.  UNM Enters Into A Contractual Relationship With
        SDCCC ....................................................... 12

    2.  UNM Raises Its Prices To GES For Facility Cleaning, But
        The Contract Is Otherwise Unaffected .................. 13

    3.  UNM Negotiates A New Booth Cleaning Split With
        Champion In 2008, And A Wholly New Contract In 2010 ...... 13

    4.  UNM Concludes A New Contract With Show Manager
        Nielsen Business Media To Provide Nationwide Cleaning
        Services At Nielsen Shows ............................... 14

    5.  UNM Modifies Its Oral Contracts With Paradice And
        Brede National ............................................. 14

    6.  SDCCC's License Agreements Are Otherwise Unaffected ...... 14

7.   Decorator, Licensee and Show Manager Contracts Are
Unchanged ................................................ 14

F.   SDCCC'S POLICY DOES NOT HARM COMPETITION OR
INTERFERE WITH UNM'S REASONABLE BUSINESS
EXPECTATIONS ................................................ 15

1.   The Policy Has No Effect In The Relevant, Economically
Significant Market ...................................... 15

a.   The Relevant Product Market is Trade Show
Exhibition Space ................................. 15

b.   The Relevant Geographic Market is
the United States ................................. 15

c.   The Policy has no Effect on Exhibition Space
Nationwide ...................................... 15

2.  The Policy Has No Effect In UNM's "Market" ................. 15

a.   UNM's "Market" is Erroneously Defined and
Economically Meaningless ................................. 15

i.   UNM's Product Market Ignores Whole
Segments and Reasonably Interchangeable
Substitutes ............................................ 16

ii.   UNM's Geographic Market is an Artificial
Construct, and Inconsistent with Its Own
Business Practices or Claimed Damages ............16

b.   Even if its "Market" is Valid, UNM Cannot Show that
the Policy Harmed Competition in that Market .............17

i.   The Policy does not Restrict Consumer Choice ....17

ii.   The Policy Results in Greater Efficiencies ..........18

iii.   The Policy does not Restrict Production at the
Building ................................................ 18

iv.   The Policy does not Increase
Consumer Prices ...................................... 18

v.   The Policy does not Diminish
Service Quality ...................................... 20

3.   The Policy Is Not Exclusionary Conduct By SDCCC
Resulting From Control Of An Essential Facility .................... 20

iii

4.   The Policy Does Not Impair UNM's Reasonable Business Expectations ................................................................ 21

     a.   The Policy is Consistent with UNM's Expectations Arising before July 1, 2007, in that UNM is Relieved of Performance under These Circumstances ................................................................ 21

     b.   UNM's Expectations Arising after July 1, 2007 are Unreasonable if They are Inconsistent with the Existing SDCCC Policy ................................................ 21

5.   UNM, Not The Policy, Is To Blame For UNM's Harm, If Any ......................................................................... 21

II.   **CONTENTIONS OF LAW** ............................................................. 22

  A.   UNM's ANTITRUST CLAIMS ............................................. 22

     1.   Section 2 Monopolization ("Essential Facilities") ................. 22

       a.   Monopoly Power in the Relevant Market .................. 22

         i.   Definition of the Relevant Market .................. 22

           (1)   Relevant Product Market .................... 22

           (2)   Relevant Geographic Market ............... 23

         ii.   Monopoly Power ....................................... 24

           (1)   Direct Evidence ............................. 24

           (2)   Circumstantial Evidence .................... 24

       b.   Willful Acquisition or Maintenance of Monopoly Power Through Exclusionary or Anticompetitive Conduct ............................................................ 24

         i.   "Essential Facilities" ................................ 25

         ii.   Unilateral Refusal to Deal ............................ 26

         iii.   Absence of a Legitimate Business Justification .......................................... 26

       c.   Causal Antitrust Injury ..................................... 27

     2.   Section 2 Attempted Monopolization ............................. 28

       a.   Specific Intent to Monopolize ............................. 28

iv

|  |  | b. | Predatory or Anticompetitive Conduct ..................... | 28 |

|  |  |  | i. | Essential Facilities and Unilateral Refusal to Deal ...................................... | 28 |
|  |  |  | ii. | Monopoly Leveraging ................................ | 29 |
|  |  |  | iii. | Price-Squeeze ......................................... | 29 |
|  |  |  | iv. | Absence of Legitimate Business Justification ........................................... | 29 |
|  |  | c. | Dangerous Probability of Monopolization ................. | 29 |
|  |  |  | i. | Relevant Market ..................................... | 30 |
|  |  |  | ii. | Ability to Lessen or Destroy Competition ........ | 30 |
|  | 3. | Antitrust Remedies ................................................. | 30 |
|  |  | a. | Damages ............................................................... | 30 |
|  |  | b. | Injunctive Relief .................................................. | 30 |
| B. | UNM'S TORTIOUS INTERFERENCE CLAIMS ........................ | 31 |
|  | 1. | Intentional Interference With Contract ............................. | 31 |
|  |  | a. | Valid and Existing Contract .................................. | 31 |
|  |  | b. | Knowledge ............................................................ | 31 |
|  |  | c. | Intentional Acts Designed to Interfere ...................... | 31 |
|  |  | d. | Actual Disruption ............................................... | 32 |
|  |  | e. | Causation ........................................................... | 33 |
|  | 2. | Intentional Interference With Prospective Economic Advantage ...................................................... | 33 |
|  |  | a. | Relationship with the Probability of Future Economic Benefit ..................................... | 33 |
|  |  | b. | Knowledge ............................................................ | 33 |
|  |  | c. | Intentional and Wrongful Acts Designed to Interfere ............................................................ | 34 |
|  |  | d. | Actual Disruption ............................................... | 34 |

v

    e.    **Economic Harm Proximately Caused by the Defendant's Acts** ................................................. 34

   3.    **Economic Interference Damages** ...................... 35

C.    **SDCCC'S AFFIRMATIVE DEFENSES** ...................... 35

   1.    **Antitrust Defenses** ...................................... 35

      a.    **State Action Immunity** ...................... 35

         i.    **Active State Supervision** ............... 35

         ii.    **"Clearly Articulated" State Policy** ............... 35

            (1)    **Authorization of Anticompetitive Conduct** .................................. 36

            (2)    **Intent to Displace Competition** ............. 36

      b.    **Local Government Antitrust Act** ............................ 36

   2.    **Economic Interference Justification Defenses** ...................... 37

      a.    **Balancing Test** ...................................... 37

      b.    **Legally Protected Interest** ...................... 37

   3.    **Additional Defenses** ...................................... 38

      a.    **Estoppel** ...................................... 38

      b.    **Waiver** ...................................... 38

      c.    **Mitigation** ...................................... 38

III.    **ADJUDICATED AND ABANDONED ISSUES** ...................... 39

IV.    **EXHIBITS** ...................................... 39

V.    **WITNESSES** ...................................... 39

Case No. 07-cv-2172-AJB

1

## TABLE OF AUTHORITIES

2

## CASES

3

### FEDERAL

4

<u>Alaska Airlines, Inc. v. United Airlines, Inc.</u>, 948 F.2d 536 (9th Cir. 1991)................................ 29

5

<u>Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP</u>, 592 F.3d 991
       (9th Cir. 2010)...................................................................................................... 22, 27

6

7

<u>Ambulance Service of Reno, Inc. v. Nevada Ambulance Services, Inc.</u>, 819 F.2d
       910 (9th Cir. 1987)............................................................................................ 35

8

<u>Anaheim v. So. Cal. Edison Co.</u>, 955 F.2d 1373 (9th Cir. 1992) ................................ 26

9

<u>Aspen Skiing Co. v. Aspen Highlands Skiing Corp.</u>, 472 U.S. 585 (1985) ................ 26

10

<u>AT&T Corp. v. Iowa Utilities Bd.</u>, 525 U.S. 366 (1999)............................................ 31

11

<u>Bigelow v. RKO Radio Pictures, Inc.</u>, 327 U.S. 251 (1946) ...................................... 30

12

<u>Brown Shoe Co. v. United States</u>, 370 U.S. 294 (1962)............................................ 23

13

<u>Brown v. Ticor Title Ins. Co.</u>, 982 F.2d 386 (9th Cir. 1992)...................................... 35

14

<u>Cal. Computer Products, Inc. v. IBM Corp.</u>, 613 F.2d 727 (9th Cir. 1979) ............... 27

15

<u>Calculators Hawaii, Inc. v. Brandt, Inc.</u>, 724 F.2d 1332 (9th Cir. 1983).............. 26, 27

16

<u>California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.</u>, 445 U.S. 97
       (1980)................................................................................................................. 35

17

18

<u>City of Rohnert Park v. Harris</u>, 601 F.2d 1040 (9th Cir. 1979) .................................. 30

<u>Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.</u>, 611 F.3d 495.
       (9th Cir. 2010)...................................................................................................... 27

19

<u>Commercial Data Servers v. IBM Corp.</u>, 262 F.Supp.2d 50 (S.D.N.Y. 2003)........... 23

20

21

<u>Doe v. Abbott Labs.</u>, 571 F.3d 930 (9th Cir. 2009) .................................................. 29

22

<u>Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.</u>, 773 F.2d 1506 (9th Cir.
       1985) ................................................................................................................. 30

23

24

<u>Eastman Kodak Co. v. Image Tech. Servs.</u>, 504 U.S. 451 (1992) ............................. 23

<u>eBay Inc. v. MercExchange, LLC</u>, 547 U.S. 388 (2006) ........................................... 31

25

<u>Forsyth v. Humana, Inc.</u>, 114 F.3d 1467 (9th Cir. 1997)........................................... 24

26

<u>Glen Holly Entertainment, Inc. v. Tektronix Inc.</u>, 352 F.3d 367 (9th Cir. 2003) ....... 27

27

<u>Hass v. Oregon State Bar</u>, 883 F.2d 1453 (9th Cir. 1989) ........................................ 36

28

1  Heerwagen v. Clear Channel Communs., 435 F.3d 219 (2d Cir. 2006) ................................. 23, 24

2  Image Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195 (9th Cir. 1997)........ 23, 25, 26, 27, 29

3  In re IBM Peripheral EDP Devices Antitrust Litig., 481 F.Supp. 965
       (N.D. Cal. 1979)................................................................................................................... 27

4  In re Live Concert Antitrust Litig., 247 F.R.D. 98 (C.D. Cal. 2007)............................................ 30

5  Lucas Auto. Engineering, Inc. v. Bridgestone/Firestone, Inc., 140 F.3d 1228
       (9th Cir. 1998)..................................................................................................................... 30

6  Malcolm v. Marathon Oil Co., 642 F.2d 845, (5th Cir. 1981) ..................................................... 38

7  McGahee v. Northern Propane Gas Co., 858 F.2d 1487 (11th Cir. 1988)................................... 30

8  MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124 (9th Cir. 2004) ........................... 22, 25, 26

9  Mid-South Grizzlies v. NFL, 720 F.2d 772 (3d Cir. 1983) ........................................................ 26

10  Newcal Indus. v. Ikon Office Solution, 513 F.3d 1038 (9th Cir. 2008) ..................................... 24

11  Oahu Gas Service, Inc. v. Pacific Resources, Inc., 838 F.2d 360 (9th Cir. 1988)...................... 26

12  Pac Bell Tel. Co. v. linkLine Communications, Inc., 129 S. Ct. 1109, (2009)........................... 29

13  Paladin Associates, Inc. v. Montana Power Co., 328 F.3d 1145, 1163 n. 22 (9th
       Cir. 2003) ............................................................................................................ 22, 25, 28

14  Palms Springs Medical Clinic, Inc. v. Desert Hospital, 628 F.Supp. 454
       C.D. Cal. (1986)................................................................................................................ 36

15  Paragould Cablevision, Inc. v. Paragould, 930 F.2d 1310 (8th Cir. 1991)................................. 36

16  Pittsburg County Rural Water District No. 7 v. City of McAlester, 358 F.3d 694
       (10th Cir. 2004)................................................................................................................. 25

17  Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421 (9th Cir. 1995) ..................... 23, 24, 27, 30

18  Southern Motor Carriers Rate Conf. v. United States, 471 U.S. 48 (1985)................................ 36

19  Spectrum Sports v. McQuillan, 506 U.S. 447 (1993) ............................................................ 28, 29

20  Summit Machine Tool Mfg. Corp. v. Victor CNC Systems, Inc., 7 F.3d 1434
       (9th Cir. 1993).................................................................................................................. 32

21  Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320 (1961) ............................................... 24

22  Tanaka v. University of Southern California, 252 F.3d 1059 (9th Cir. 2001)...................... 22, 23

23  Times-Picayune Pub. Co. v. United States, 345 U.S. 594 (1953)............................................... 28

24  Town of Hallie v. City of Eau Claire, 471 U.S. 34 (1985) .................................................... 35, 36

25  Transamerica Computer Co. v. IBM Corp., 698 F.2d 1377 (9th Cir. 1983)................................ 28

1    Traweek v. San Francisco, 920 F.2d 589 (9th Cir. 1990) ................................................ 35, 36

2    United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377 (1956) .............................. 22, 23

3    United States v. Grinnell Corp., 384 U.S. 563 (1966) ..................................................... 22, 24, 25

4    United States v. Microsoft Corp., 253 F.3d 34 (D.C. Cir. 2001) .......................................... 26, 27

5    United States v. Philadelphia Nat'l Bank, 374 U.S. 321 (1963) ....................................................... 23

6    Verizon Communs., Inc. v. Law Offices of Curtis v. Trinko, LLP, 540 U.S. 398
7        (2004) .......................................................................................... 24, 25, 26, 31

     William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., 668 F.2d 1014
8        (9th Cir. 1981) .............................................................................................................. 28

9
     **STATE**
10
     Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture
11       Partners, 52 Cal.App.4th 867 (1997) .......................................................................... 34

12
     Blank v. Kirwan, 39 Cal.3d 311 (1985) ......................................................................................... 33
13
     City of Ukiah v. Fones, 64 Cal.2d 104 (1966) .............................................................................. 38
14
     Crest Catering Co. v. Superior Court, 62 Cal.2d 274 (1965) ...................................................... 38
15
     Davis v. Nadrich, 174 Cal.App.4th 1 (2009) ................................................................................ 32
16
     Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal.4th 376 (1995) ........................... 32, 34
17
     Driscoll v. City of Los Angeles, 67 Cal.2d 297 (1967) ................................................................ 38
18
     Dryden v. Tri-Valley Growers, 65 Cal.App.3d 990 (1977) ......................................................... 31
19
     Duff v. Engelberg, 237 Cal.App.2d 505 (1965) ........................................................................... 35
20
     Elsbach v. Mulligan, 58 Cal.App.2d 354 (1943) ......................................................................... 35
21
     Environmental Planning & Info. Council v. Superior Court, 36 Cal.3d 188 (1984) .................. 37
22
     Farmers Ins. Exchange v. Zerin, 53 Cal.App.4th 445 (1997) ...................................................... 32
23
     Freeman & Mills, Inc. v. Belcher Oil Co., 11 Cal.4th 85 (1995)................................................. 31
24
     Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc., 95 Cal.App.4th 1249
25       (2002)............................................................................................................................... 34

26   Guillory v. Godfrey, 134 Cal.App.2d 628 (1955)......................................................................... 35

27   Herron v. State Farm Mut. Ins. Co., 56 Cal.2d 202 (1961) ......................................................... 37

28   Hunter v. Croysdill, 169 Cal.App.2d 307 (1959).......................................................................... 38

1  Imperial Ice Co. v. Rossier, 18 Cal.2d 33 (1941) ........................................ 31

2  Kasparian v. County of Los Angeles, 38 Cal.App.4th 242 (1995) .............................. 32

3  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134 (2003) .......................... 31, 33, 34

4  Lowell v. Mother's Cake & Cookie Co., 79 Cal.App.3d 13 (1978)............................... 37

5  Oldcastle Precast, Inc. v. Lumbermens Mut. Cas. Co., 170 Cal.App.4th 554
        (2009) ................................................................................ 38

6  PMC, Inc. v. Saban Entertainment, Inc., 45 Cal.App.4th 579 (1996) ........................... 31, 33, 34

7  Pool v. City of Oakland, 42 Cal.3d 1051 (1986) .............................................. 38

8  Quelimane Co. v. Stewart Title Guar. Co., 19 Cal.4th 26 (1998)............................... 32

9  Ramona Manor Convalescent Hospital v. Care Enterprises, 177 Cal.App.3d 1120
        (1986) ................................................................................ 32

10 Richardson v. La Rancherita of La Jolla, Inc., 98 Cal.App.3d 73 (1979)....................... 37

11 Roth v. Rhodes, 25 Cal.App.4th 530 (1994)................................................... 33

12 Seaman's Direct Buying Service, Inc. v. Standard Oil Co., 36 Cal.3d 752 (1984)............... 31

13 Shamblin v. Berge, 166 Cal.App.3d 118 (1985)............................................... 31

14 Short v. Nevada Joint Union High School Dist., 163 Cal.App.3d 1087 (1985) .................. 32

15 Springer v. Singleton, 256 Cal.App.2d 184 (1967) .......................................... 31

16 Tate v. Canonica, 180 Cal.App.2d 898 (1960) ............................................... 33

17 Thrifty-Tel, Inc. v. Bezenek, 46 Cal.App.4th 1559 (1996)................................... 38

18 Westside Ctr. Assocs. v. Safeway Stores 23, Inc., 42 Cal.App.4th 507 (1996).................. 33

19 Woods v. Fox Broadcasting Sub., Inc., 129 Cal.App.4th 344 (2005)............................ 32

20 Youst v. Longo, 43 Cal.3d 64 (1987) ....................................................... 33

21
22
23
24
25
26
27
28

1

**STATUTES**

2    15 U.S.C. § 34 .................................................................................................. 36

3    15 U.S.C. § 35(a) .............................................................................................. 36

4    Cal. Civ. Code § 3294(a) .................................................................................. 35

5    Cal. Civ. Code § 3333 ....................................................................................... 35

6    Cal. Govt. Code § 818 ....................................................................................... 35

7    Cal. Gov't Code § 37500 ..................................................................................... 2

8    Cal. Gov't Code §37501 ...................................................................................... 2

9    Cal. Gov't Code § 37502 ..................................................................................... 2

10   Cal. Gov't Code § 37503 ..................................................................................... 2

11   Cal. Gov't Code § 37504 ..................................................................................... 2

12   Cal. Gov't Code § 37505 ..................................................................................... 2

13   Cal. Gov't Code § 37506 ..................................................................................... 2

14   Civil Local Rule 16.1(f)(2) .................................................................................. 1

15   Civil Local Rule 16.1(f)(2)(b) ............................................................................ 39

16   Civil Local Rule 16.1(f)(2)(c) ............................................................................ 39

17

**OTHER AUTHORITIES**

18   I Antitrust Law Developments at 556-562 ABA Section of Antitrust Law
         (6th ed. 2007) ............................................................................................. 23

19

20

21

22

23

24

25

26

27

28

1    Defendant San Diego Convention Center Corporation ("SDCCC") provides the

2   following Memorandum of Contentions of Fact and Law pursuant to Civil Local Rule 16.1(f)(2),

3   and this Court's August 10, 2010 Scheduling Order (Dkt. No. 121).  As required by Local Rule

4   16.1(f), this memorandum provides a concise summary of the material facts and points of law

5   upon which SDCCC intends to rely at trial and does not purport to be exhaustive or address

6   every item of evidence SDCCC may offer at trial.  Further, and pursuant to Local Rule 16.1(f),

7   this memorandum sets forth the issues raised by the pleadings that have been abandoned by the

8   parties, as well as a list of the exhibits and witnesses that SDCCC expects to offer at trial.

9                                                **I.**

10                          **CONTENTIONS OF MATERIAL FACT**

11   **A.     SUMMARY OF FACTS AND CLAIMS**

12         This dispute concerns a policy implemented by SDCCC for the provision of cleaning

13   services at conventions, trade shows and other events at the San Diego Convention Center

14   ("Building").  Remaining for trial are plaintiff United National Maintenance, Inc.'s ("UNM's")

15   two antitrust claims under section 2 of the Sherman Act, and claims for intentional interference

16   with contract and prospective economic advantage. Also remaining for trial are certain

17   affirmative defenses asserted by SDCCC.

18         The policy, which became effective on July 1, 2007, mandates that only SDCCC

19   employees may perform event-related cleaning services at the Building. SDCCC implemented

20   this policy for three reasons: (1) augmenting security and emergency preparedness; (2)

21   maintaining quality control and brand value; and (3) improving efficiency, i.e., increasing

22   revenues and reducing expenses. Competing cleaning service providers, such as UNM, may still

23   operate at the Building, so long as they use SDCCC labor. SDCCC charges customers and

24   competitors the same price for the labor.

25         Prior to July 1, 2007, UNM never paid SDCCC any monies to conduct business on

26   SDCCC's property. UNM never invested in the Building.  Instead, UNM gained access to the

27   Building by signing nationwide, exclusive contracts with trade show industry members and by

28   threatening litigation similar to this action.  However, the property rights of the Building's

1   owner necessarily circumscribe UNM's reasonable expectations.  The City leases the Building

2   from its owner, the San Diego Unified Port District ("Port"). The City also owns SDCCC, a non-

3   profit public benefit corporation that was formed for the sole purpose of managing the Building

4   on the City's and the Port's behalf. As the property manager, SDCCC took reasonable steps to

5   protect its patrons, its property, and its bottom line.  As such, SDCCC is not liable for UNM's

6   "damages" and it is not required to share the Building.  Even if SDCCC had acted improperly, it

7   would be immune from liability. It is a local government unit formed under, and operating

8   pursuant to, provisions of California's Government Code.

9        In brief, UNM cries foul because its free ride at the Building came to an end.

10  **B.**     **CLEANING SERVICES AND THE TRADE SHOW INDUSTRY.**

11       **1.**     **SDCCC Operates the Building on Behalf of the City of San Diego.**

12        The City created SDCCC as a non-profit public benefit corporation for the sole purpose

13  of managing, operating, and maintaining the Building for the public's benefit. SDCCC's primary

14  activity is licensing the Building for conventions, trade shows, and other events. It is also a

15  partially-integrated vertical enterprise. In addition to licensing, SDCCC provides numerous

16  services at the Building, including: (1) convention registration and support services; (2) clerical

17  services; (3) cashiering; (4) catering service; (5) security and asset protection services; (6)

18  telecommunications and data services; (7) audio/visual and information technology services; (8)

19  on-site business and overnight delivery services; (9) special event and production design

20  services; and (10) cleaning and housekeeping services. SDCCC either uses its in-house staff or

21  teams with preferred vendors or subcontractors to provide these services. Cleaning revenues

22  have never accounted for more than 5.1% of SDCCC's Event Revenues on an annual basis.

23        SDCCC qualifies as a tax-exempt organization under section 501(c)(3) of the Internal

24  Revenue Code. California cities have statutory authority to construct and maintain public

25  assembly or convention halls. See Cal. Gov't Code § 37500- 37506. Pursuant to that authority,

26  cities may: (1) acquire land (by condemnation or otherwise), and construct and maintain a public

27  assembly or convention hall upon it, and incur indebtedness for such purpose, id. at §37501; and

28  / / /

1  (2) by an ordinance setting forth its powers and duties, appoint a commission or other entity to

2  supervise and manage its construction and use. Id. at § 37506.

3        This Court previously found that SDCCC is a "state actor" under federal law and a

4  "governmental entity" under California Law (see Dkt. No. 120 at 4, 15-16).  Under SDCCC's

5  governing documents, the City is SDCCC's sole member and appoints each voting member of

6  the Board of Directors.  If SDCCC dissolves, its assets are distributed to the City. SDCCC is

7  subject to City audits, and must give public notice of meetings. The City's oversight of SDCCC

8  extends to its operations. SDCCC officials meet with the Mayor's office every month and, twice

9  a year, SDCCC presents the City with a report detailing SDCCC's finances, performance, and

10  economic impact on the City and its coffers.

11      **2.**      **SDCCC Competes In The National Market For Hosting Trade Shows.**

12          **a.**      **SDCCC's Primary Product Offering is Trade Show Exhibition Space.**

13        SDCCC's primary product is space suitable for hosting trade shows, conventions, and

14  other meetings. SDCCC's customers are trade associations, corporations, political organizations

15  and other promoters (alternatively "Associations" or "Licensees"), such as the State Bar of

16  California, Comic-Con International, and the Society for Neuroscience, which license the

17  Building from SDCCC for a specific period. Associations host these shows so that dues-paying

18  members, employees and other industry players "(Attendees"), may attend educational sessions,

19  participate in meetings, discussions, socialize, exhibit or purchase industry-related products and

20  services, and otherwise stay current in the field. Attendees are the ultimate consumers of the

21  convention and trade show experience and associated activities.

22        Associations choose between convention centers offering suitable space based on a range

23  of factors that include cost, location, availability, and size. The Building is a world-class

24  convention center.  It features 819,815 square feet of usable exhibit (615,701 sq. ft.) and meeting

25  space (204,114 sq. ft). This makes it the 13th largest convention center in the nation, and the

26  21st largest exhibition hall, including convention centers and hotels. The San Diego area is

27  recognized as a top destination for conventions and trade shows.

28  / / /

1
      **b.**      **SDCCC Competes for Trade Shows in the United States and Beyond.**

2
      Different sources estimate that SDCCC's primary competitors are alternately 13, 21, or

3
51 convention centers located in North America. Each year, SDCCC tracks 140 to 170 trade

4
shows for which it competes to host. In 2006-2009, SDCCC successfully attracted only 14.05%

5
of its target list, with the remainder hosted by venues in 51 different cities located in the United

6
States, Canada, Germany, Spain, and Japan. SDCCC maintains two regional sales offices in

7
Alexandria, Virginia and Chicago, Illinois.

8
      SDCCC faces very stiff competition in this national market. Assuming that the

9
competitive market includes the top 21 convention centers in the country: (1) SDCCC has only

10
an estimated 3-5% share of the national market based on capacity; (2) the market is

11
unconcentrated, registering an estimated value of only 476-586 on the Herfindahl-Hirschman

12
Index ("HHI"), a common measure of market concentration; and (3) both values are likely

13
overstated given that: (a) the bigger facilities are able to attract more and larger shows than

14
SDCCC, and (b) SDCCC faces significant competition from smaller venues.

15
      **3.**      **Trade Show Cleaning Is A Component Of Trade Show Production.**

16
      **a.**      **Trade Shows are Produced by Several Different Players.**

17
      Trade shows are produced by Associations or by professional trade show managers

18
("Show Managers") acting on their behalf. Producing a successful convention and trade show

19
requires, among other things, determining workshop topics that would interest Attendees,

20
collecting Attendee registration fees, and hiring the keynote speaker.

21
      Licensees or Show Managers hire a service contractor to provide, coordinate, and market

22
event-related production and other services at the Building. The service contractor is referred to

23
as a "Decorator." Among other things, Decorators provide carpet, furniture, and registration

24
counter rentals, as well as drayage, rigging, electrical, and cleaning services. Decorators may

25
perform some of the work themselves or hire subcontractors.   Three principal Decorators

26
provide these services at the Building: Champion Exposition Services ("Champion"), Freeman,

27
and Global Experience Specialists ("GES"). All three provide similar services at convention

28
/ / /

4

1  centers, hotels and conference centers, and other venues across the United States. Smaller

2  Decorators also operate at the Building.

3        Decorators not only coordinate show production for Licensees and Show Managers, but

4  also provide event-related services to Exhibitors. Exhibitors attend trade shows to market their

5  wares and services directly to Attendees and other industry players. Exhibitors register with

6  Licensees or Show Managers to rent a booth at a show, and enter into contracts with Decorators

7  for, among other things, booth installation, electrical, and cleaning services.

8               **b.**      **The Exhibit Floor and the Building Must be Cleaned During Shows.**

9        Trade show cleaning services fall into three categories, which the parties have called

10  "Facility Cleaning," "Booth Cleaning," and "Building Cleaning" for purposes of this litigation.

11  Facility Cleaning addresses the cleaning of licensed areas in the Building. It includes the trade

12  show exhibit floor, aisles between Exhibitor booths, and move-in and move-out phases, i.e., the

13  construction, installation, and breakdown of exhibits. Booth Cleaning addresses the cleaning of

14  individual exhibits and Exhibitor booths. Additional cleaning services, including the cleaning

15  and maintenance of restrooms, non-exhibition meeting rooms, nonpublic areas such as loading

16  docks, and the Building grounds, is called "Building Cleaning." The same equipment is

17  generally used for all three types of cleaning.

18               **c.**      **Competition Between SDCCC And UNM Is Extremely Narrow in**

19                      **Scope.**

20        SDCCC and UNM compete to sell Booth and Facility Cleaning to Decorators at the

21  Building. Facility Cleaning is sold to Decorators at flat, per hour rates. Decorators sell Booth

22  Cleaning Services directly to Exhibitors. Providers like SDCCC and UNM generally split Booth

23  Cleaning revenues with Decorators.

24        UNM provides cleaning services for many (but not all) GES and Champion events at the

25  Building. Freeman, which accounts for about 60% of the events at the Building, contracts with

26  SDCCC for cleaning services.  Smaller Decorators are split between UNM and SDCCC.

27  / / /

28

5

1    UNM does not perform Building Cleaning. SDCCC performs this work at no cost

2  because it concerns common areas of the Building or its infrastructure that SDCCC does not

3  license, or which are shared by multiple Licensees.

4  **C.    TRADE SHOW CONTRACTS AND RELATIONSHIPS AT THE BUILDING
         BEFORE JULY 1, 2007.**
5

6    Contracts for cleaning services are but one small piece of the larger system of contractual

7  and business relationships at play in any given trade show. Prior to July 1, 2007, SDCCC would

8  license the Building to a Licensee for the latter's trade show and convention. The Licensee or

9  Show Manager then entered into a contract with a Decorator. Decorators designated themselves

10  as a show's exclusive cleaning services provider, and then subcontracted the work to UNM or

11  SDCCC. Decorators resold Booth Cleaning services to Exhibitors, and Facility Cleaning

12  services to Associations.

13  **1.    SDCCC's Building Licenses Govern Use Of The Building.**

14    SDCCC's generic license agreement sets forth the rights granted to Licensees, the rights

15  retained by SDCCC, and the terms and conditions governing usage of the Building. The license

16  requires the Licensee comply with SDCCC's Policies, Rules and Regulations ("PRRs") for the

17  Building's use. The Licensee acknowledges the PRRs may be amended before the event, and

18  consents to any future changes.

19  **2.    UNM Performs Cleaning Services Pursuant To Exclusive, Nationwide
         Contracts With Decorators.**
20

21    UNM has oral and written contracts for subcontracting cleaning services with Decorators

22  at thirty or more cities nationwide. UNM increases its business by cultivating personal

23  relationships with Decorators and signing exclusive, nationwide contracts with them. The

24  contracts do not contain any provisions specific to the Building.

25  **a.    The Decorator Contracts Contain Conditions Precedent that Relieve
         the Parties of Performance Under Certain Circumstances.**
26

27    UNM entered into a contract with GES in 2006. The GES contract covers all venues

28  where GES currently operates within the United States, "except Shows where the Show

1   Management has a contractual relationship with another cleaning service provider." GES agrees

2   to retain UNM "to perform and supervise" cleaning services at any given show at a covered

3   venue if certain conditions are met, including UNM must agree to perform at the price set by

4   GES and to furnish all necessary labor, equipment, and supplies at its sole expense, and that

5   "GES' right to retain [UNM] is not restricted by law, or Show management's relationship with

6   another cleaning service provider." Finally, the GES contract sets forth different Facility

7   Cleaning rates applicable to 33 cities. Before July 1, 2007, UNM's pricing to GES for Facility

8   Cleaning at the Building was $16.74 and $17.43 per hour for general and supervisory labor,

9   respectively. UNM split Booth Cleaning revenues evenly with GES.

10          UNM entered into a contract with Champion in 2005 ("2005 Champion contract"). It

11   covers "exhibitor and common area cleaning services for shows produced by Champion."

12   Champion is obligated to "use its best efforts to secure cleaning service to all shows that it is the

13   contractor for and designate [UNM] as the cleaning contractor." The 2005 Champion contract

14   sets forth the procedures for billing, payment, and the agreed-to pricing for different areas of the

15   trade show floor, including rates for 34 cities. UNM charged Champion $0.10 per square foot

16   per night for Booth Cleaning and $14.80 to $16.30 per hour for general and supervisory labor,

17   respectively, for Facility Cleaning.

18          For over 30 years UNM performed cleaning services pursuant to oral contracts for

19   smaller Decorators Brede National, Paradice, Blaine and George Fern. These oral agreements

20   contain largely the same terms as the written GES contract. Blaine did not retain UNM for work

21   at the Building—or at any venue—for more than one year prior to July 1, 2007.

22          **b.      UNM did not Perform if the Conditions Precedent were not Met.**

23          Before July 1, 2007, UNM did not perform cleaning services for any of its contractual

24   partners at venues where cleaning services were performed exclusively by the venue, or where a

25   Show Manager specified another cleaning company.

26   **D.     SDCCC'S CLEANING SERVICES POLICY; HOW AND WHY.**

27          From its opening in 1989 until 2007, SDCCC gave Decorators the choice of using the

28   Building's employees or outside labor to do event-related cleaning at the Building. Effective

7

1    July 1, 2007, SDCCC implemented a new cleaning services policy, which provides that only

2    SDCCC employees may perform event-related cleaning services at the Building.

3        **1.    SDCCC Implements Its Policy By Amending The Building's Regulations.**

4        SDCCC changed its policy by amending its PRRs, which are incorporated by reference

5    into each of its licenses. Thus, Licensees are obligated to ensure that only SDCCC labor is

6    utilized on event-related cleaning at the Building.

7        The new cleaning policy is not what is referred to in the industry as an "exclusive."

8    Under an "exclusive," Associations and Exhibitors must use the centers' cleaning staff or

9    exclusive provider, and are billed directly for that service by the venue. Neither the Decorators

10   nor UNM are allowed to sell cleaning at shows in such venues.

11       In contrast, SDCCC's policy permits outside vendors and sub-contractors such as UNM

12   to continue to sell cleaning services at the Building provided they use SDCCC employees to

13   perform the work.  In this respect, SDCCC provides UNM with an input—cleaning services—

14   which it resells to Decorators.  Decorators are involved in, and profit from, the arrangement,

15   purchasing cleaning services directly from SDCCC or through a middleman such as UNM, and

16   reselling those services to Licensees and Exhibitors.

17       **2.    SDCCC Charges All Cleaning Services Customers The Same Prices.**

18       SDCCC sells cleaning services pursuant to contracts with Licensees, Show Managers,

19   Decorators, or resellers like UNM. Under standard contractual terms, SDCCC charges $17 per

20   hour for Facility Cleaning, but that price includes general labor only; SDCCC provides

21   supervisory labor for free. As to Booth Cleaning, SDCCC charges fifty percent (50%) of the

22   gross revenue generated by Decorators from resales of that service to Exhibitors. SDCCC offers

23   all customers the same price, regardless of whether UNM is involved or not. Consistent with its

24   earlier practice, SDCCC does not charge for Building Cleaning.

25       **3.    SDCCC Implemented Its Cleaning Services Policy For Three Reasons.**

26       After a lengthy, wholly internal review process, SDCCC adopted its policy, which was

27   motivated by three reasons: (1) augmenting security and emergency preparedness;

28   / / /

(2) maintaining quality control and brand value; and (3) improving efficiency, i.e., increasing revenues and reducing expenses.

### a.      The Policy Improves Overall Security by Reducing Threat Vulnerabilities and Enhancing Emergency Preparedness.

A primary reason for the policy was increased security. In the context of public assembly facilities, like the Building, this means: (1) reducing vulnerabilities to terrorist and other malevolent attacks; and (2) ensuring adequate emergency preparedness and mitigation.

### i.      Assessments and War Games Revealed that SDCCC Could Reduce the Building's Vulnerabilities By Controlling Access.

In the years leading up to the policy change, SDCCC conducted several vulnerability assessments of the Building in conjunction with public and private sector organizations, including the U.S. Department of Homeland Security ("DHS") and the California National Guard. The assessments revealed the Building's potential as a high-profile target for terrorists and other malevolent actors, and that it was vulnerable to incidents creating mass casualties or damaging critical infrastructure and assets.  The assessments also indicated that a key security objective at the Building is management's knowledge of, and control over, persons with access to public and non-public areas in the Building. Indeed, the FBI apprehended a terror suspect after conducting surveillance of the Building and other Southern California facilities.

SDCCC security personnel also participated in a "war game" exercise hosted by the DHS and the International Association of Assembly Managers. Participants in the war game studied vulnerabilities for public assembly facilities generally, but used the Building as the backdrop for this exercise. Participants were split into two teams, aggressors and defenders. The aggressors employed a multi-pronged attack, in which they successfully infiltrated the Building by posing as housekeeping, food service and Decorator-affiliated workers, and by disguising themselves as emergency workers to conduct follow-on attacks on first responders.

Based on the assessments and the war game results, SDCCC officials became increasingly concerned about their lack of control over third-party vendors, such as UNM. Because SDCCC already had a cleaning workforce in place and it could control that workforce,

1   a policy requiring use of its cleaning laborers would yield a tangible, albeit incremental,

2   reduction of vulnerabilities to attack.

3            ii.        **SDCCC Employees are Trained to Respond to Emergencies at the Building; Outside Contractors are Not.**

4

5            Requiring the use of SDCCC employees also yielded tangible emergency preparedness

6   benefits. Employees receive training on standard operating procedures designed to ensure the

7   safety and security of the Building and its guests through SDCCC's "San Diego Spirit"

8   orientation program, and the more intensive "Emergency Preparedness Training" course. Topics

9   covered by the orientation include safety expectations, emergency response and reporting,

10  Building access, uniform and identification protocols, evacuation procedures, and early

11  detection of hazards including fires, bombs and bomb threats, hazardous substances, and violent

12  disturbances. Outside contractors do not receive training under either program.

13           b.        **The Policy Permits Better Quality Control and Brand Management.**

14           Another primary concern behind the policy is quality control and brand management.

15  "San Diego Spirit," SDCCC's customer service philosophy, is a key branding factor underlying

16  the Building's competitive advantage as one of the world's leading convention centers. It is a

17  total service quality management program embodied by each SDCCC employee's personal

18  commitment to provide Building guests with the best service possible and proudly represent the

19  organization as well as San Diego.  SDCCC trains each employee/representative on the

20  program's comprehensive policies and guidelines on topics from team-building and

21  interpersonal relationships to employee appearance (including grooming and dress), conduct,

22  etiquette, and ethics. "Cleanliness" is a central tenet of the "San Diego Spirit" philosophy, in

23  that: "[t]he image each of us projects reflects on the entire team. Excellence is our minimum

24  standard in maintaining our facilities and in personal grooming, creating an exceptional first

25  impression for our guests."  Because the Building is essentially a stage where SDCCC's clients

26  promote their image and products, the "San Diego Spirit" is a fundamental component of

27  SDCCC's mission and operations. UNM's temporary employees are not trained in the "San

28  Diego Spirit."

1    UNM's level of service and cleanliness did not comply with the "San Diego Spirit" total

2    service quality management concept and practice. On occasion, entire UNM cleaning crews

3    failed to arrive for scheduled shows, or arrived late. UNM's failure to staff shows properly often

4    led to overflowing trash and recycling receptacles on the exhibit floor. UNM laborers' uniforms

5    consist of green and white t-shirts and non-denim dark pants. The laborers often appeared

6    slovenly, wearing dirty uniforms, or blue jeans. On some occasions, UNM laborers would turn

7    their dirty t-shirts inside out, and continue working.

8           **c.    The Policy Increases Productive Efficiency.**

9    Yet another reason for the policy was a desire to make SDCCC's operations more

10    efficient by increasing revenues and reducing expenses. SDCCC is always examining how it can

11    become more efficient, and the need to become more efficient took on greater urgency in 2005.

12    That year, the City adopted the Living Wage Ordinance ("LWO"), SDMC §22.4205, et seq. The

13    LWO set a minimum wage of $10 per hour, which would be adjusted with annual increases

14    based on the cost of living. SDCCC was exempt from the LWO's operation for the initial two

15    years. The City indicated to SDCCC that it would have to absorb increased costs due to the

16    LWO. Beginning in 2005, SDCCC reexamined its operations to find ways to increase revenues

17    and decrease expenses in anticipation of the LWO's impact.

18    SDCCC's cleaning services department faced significantly higher expenses.  As noted,

19    before July 1, 2007, SDCCC cleaning crews performed Building Cleaning during UNM events.

20    Building Cleaning is unprofitable, and is usually offset by revenue generated from Facility and

21    Booth Cleaning or Building license fees. SDCCC's cleaning services department frequently lost

22    money because UNM captured all of the revenue from Booth and Facility Cleaning at its shows,

23    and Building license fees were often reduced or waived to attract Associations. The LWO

24    resulted in higher labor costs, which would only worsen the cleaning services department's

25    bottom line. Given that SDCCC's employees were already performing Building Cleaning at

26    every show, a requirement that SDCCC's employees be used for all event-related cleaning

27    would permit the cleaning services department to become more efficient by realizing economies

28    / / /

1    of scope. Indeed, the cleaning services department determined that increased revenues from the

2    policy change would add more than $200,000 a year to SDCCC's bottom line.

### 4. SDCCC Implemented The Policy Knowing Little To Nothing Of UNM's Contract And Business Arrangements.

5    During its internal deliberations on the policy, SDCCC was generally aware that UNM

6    operated pursuant to nationwide contracts, but did not know any specifics of those contracts.

7    SDCCC solicited Champion's business in 2006, believing the UNM-Champion contract was

8    nearing the end of its term. Champion turned SDCCC down. In doing so, Champion shared a

9    copy of the 2005 Champion contract with SDCCC. Many of the contract's terms, including all

10   of the pricing terms, were redacted. As a result, the only terms known to SDCCC were the

11   contract's term, the billing and payment process, and the contract's best efforts clause. SDCCC

12   had no knowledge of the terms of the UNM contract with GES, or any other Decorator.

### E. TRADE SHOW CONTRACTS AND RELATIONSHIPS AT THE BUILDING AFTER JULY 1, 2007.

15   The contractual and business relationships concerning cleaning services at the Building

16   changed to a limited extent after SDCCC implemented its cleaning services policy. These are

17   discussed in chronological order.

### 1. UNM Enters Into A Contractual Relationship With SDCCC.

19   After the policy was instituted, UNM made arrangements to use SDCCC laborers to

20   perform cleaning services at trade shows at the Building where UNM was the designated

21   cleaning subcontractor.  UNM and SDCCC now enter into contracts by which UNM purchases

22   SDCCC cleaning services labor at the Building for resale to Decorators.  Although the contracts'

23   terms are materially the same, they are known as "One-Show Contracts" because UNM and

24   SDCCC enter into a separate contract on an event-to-event basis. The One-Show Contracts

25   provide that SDCCC will perform cleaning services for UNM, charged at the rate of $17 per

26   hour for Facility Cleaning and 50% of the revenue generated by Decorators for Booth Cleaning.

27   / / /

28   / / /

12

1    **2.    UNM Raises Its Prices To GES For Facility Cleaning, But The Contract Is**
     **Otherwise Unaffected.**

2

3        Before July 1, 2007, UNM charged GES for Facility Cleaning in San Diego at rates of

4   $16.74 and $17.43 per hour for general and supervisory labor, respectively.  UNM's hourly rates

5   vary from city to city, ranging from $17.13/$19.13 for Philadelphia to $13.42/$15.42 for

6   Houston.  In March, 2008, UNM increased its rates all over the United States.  The San Diego

7   rates increased to $17.24/$17.95. UNM again increased the rates to $17.75/$18.49 in January,

8   2009. The GES contract contemplated these rate increases, which corresponded to increases to

9   the legal minimum wage rates in all the states where UNM provides services for GES.  There

10  was no change in the 50% split of gross revenues received by GES for Booth Cleaning services.

11   **3.    UNM Negotiates A New Booth Cleaning Split With Champion In 2008, And**
     **A Wholly New Contract In 2010.**

12

13       As noted, the 2005 Champion contract provided that UNM would bill for Booth

14  Cleaning services on a per square foot basis. In late 2008, Champion agreed to an oral

15  modification of the 2005 Champion contract. Under this modification, UNM was permitted to

16  invoice Booth Cleaning services at 50% of the gross revenue received by Champion.  There was

17  no change in the Champion rate schedule for Facility Cleaning Services.

18       Champion and UNM entered into an entirely new contract effective July 1, 2010 ("2010

19  Champion contract"), which is similar to the GES contract. For all shows "taking place in

20  convention centers," Champion agrees to retain UNM to perform and supervise all cleaning

21  services at the show if, among other things, Champion has the right to subcontract cleaning

22  services and UNM agrees to perform and supervise the work at the contract's prices. According

23  to the 2010 Champion contract and despite the three-year existence of SDCCC's cleaning

24  services policy, UNM is required to perform cleaning services directly, and is prohibited from

25  using subcontractors without Champion's written permission.

26       UNM also raised its rates to Champion. UNM's rate schedule for Champion, like the one

27  in the GES contract, had a wide range of rates, stretching from $14.23/$16.36 for Dallas to

28  $24.35/$24.35 for the Moscone Convention Center in San Francisco.  Under the 2005 Champion

1    contract, UNM charged Champion $14.80/$16.30 per hour at all venues in San Diego. Those

2    hourly rates increased to $16.74 and $17.43 in the 2010 Champion contract.

3        **4.    UNM Concludes A New Contract With Show Manager Nielsen Business
         Media To Provide Nationwide Cleaning Services At Nielsen Shows.**

4

5        On February 1, 2009, more than 1½ years after SDCCC's cleaning services policy was

6    implemented, UNM entered into a written contract with Nielsen Business Media ("NBM"). For

7    some shows, NBM is a Licensee, and for others, a Show Manager.  Under the contract, NBM

8    agrees to "designate by Show [UNM] as the cleaning-janitorial contractor for the Show which it

9    requires cleaning services of [UNM] and have asked [UNM] to perform the services described

10   herein at those Shows." UNM agrees to "perform and supervise all required and requested

11   cleaning services," furnishing all necessary labor, equipment and supplies at its sole cost. Under

12   this contract, NBM and UNM cut out the middlemen Decorators and split Booth Cleaning

13   revenue between themselves, notwithstanding UNM's contracts with the Decorators.

14       **5.    UNM Modifies Its Oral Contracts With Paradice And Brede National.**

15       UNM negotiated different terms in its oral contracts with Paradice and Brede National

16   after SDCCC's cleaning services policy was implemented.  Pursuant to their new deal, UNM

17   and Paradice split the total of the consolidated cleaning revenue after SDCCC is paid its labor

18   costs on a per hour basis. UNM now charges Brede National $17 per hour for Facility Cleaning

19   and 50% of the Booth Cleaning revenue, which is equal to the rates SDCCC charges UNM.

20       **6.    SDCCC's License Agreements Are Otherwise Unaffected.**

21       As noted, the licensing agreements between SDCCC and Licensees incorporated

22   SDCCC's cleaning services policy after SDCCC amended its PRRs. The licenses were

23   otherwise unaffected by the policy.

24       **7.    Decorator, Licensee and Show Manager Contracts Are Unchanged.**

25       There was no change in the terms of the contract between Decorators, Licensees, and

26   Show Managers as a result of SDCCC's cleaning services policy.

27   / / /

28   / / /

14

F.   **SDCCC'S POLICY DOES NOT HARM COMPETITION OR INTERFERE WITH UNM'S REASONABLE BUSINESS EXPECTATIONS.**

1.     **The Policy Has No Effect In The Relevant, Economically Significant Market.**

The relevant product market is Trade Show Exhibition Space, and the geographic market is the United States. SDCCC's policy extends only to the Building. It does not require that SDCCC labor be used at any other convention center or venue. The new policy does not restrict or otherwise limit Associations' ability to license venues or produce trade shows in the economically significant market, which is the nationwide market for hosting trade shows.

a.     **The Relevant Product Market is Trade Show Exhibition Space.**

As explained above, the relevant product market is space suitable for hosting trade shows. SDCCC is recognized as a top choice for trade shows because of its attractive location in San Diego, state-of-the-art amenities and excellent customer service.

b.     **The Relevant Geographic Market is the United States.**

Different sources estimate that SDCCC's primary competitors are alternately 13, 21, or 51 convention centers, hotels, and exhibition halls located in the United States. SDCCC's Association customers are also located nationwide.

c.     **The Policy has no Effect on Exhibition Space Nationwide.**

SDCCC's policy extends only to the Building. It does not require that SDCCC labor be used at any other convention center or venue. It does not reduce the amount of exhibition space in the nationwide trade show market. The policy does not restrict or limit Associations' ability to license venues or produce trade shows in the national market.

2.     **The Policy Has No Effect In UNM's "Market"**

a.     **UNM's "Market" is Erroneously Defined and Economically Meaningless.**

UNM contends that the relevant market is trade show cleaning services at the Building. There is no independent market for cleaning services. Cleaning services are components of trade show hosting and production. They are bundled with other services and marketed as complements to exhibition space, which is sold nationwide. Cleaning services are purchased

15

1    only in conjunction with exhibition space, but exhibition space may be purchased without

2    purchasing cleaning services.  Competition for cleaning services occurs, if at all, within the

3    nationwide market for hosting trade shows.

4          Broken down to its essence, UNM's "market" consists of a single building, wherein two

5    providers compete over six or seven resellers to provide only those cleaning services segments

6    that can be resold profitably to others. This is not a "market" in any meaningful sense.

7                    **i.**       **UNM's Product Market Ignores Whole Segments and**

8                            **Reasonably Interchangeable Substitutes.**

9          UNM unduly restricts the product market by ignoring Building Cleaning. Building

10   Cleaning uses the same personnel and equipment as Facility and Booth Cleaning. UNM,

11   however, ignores Building Cleaning because it chooses not to perform these services that are

12   otherwise indistinguishable from Facility and Booth Cleaning. Indeed, UNM admits that its

13   workforce performs Building Cleaning elsewhere, such as cleaning Las Vegas Hotel parking

14   lots, when the venue requires them to do so.

15         UNM further contends that the "trade show cleaning service" product market includes

16   only specialized providers (i.e., UNM and SDCCC). UNM justifies this distinction in that

17   Decorators, as the parties' primary customers and resellers of such services, demand specialists

18   familiar with trade show logistics. However, UNM's proposed product market ignores a host of

19   service providers or in-house cleaning departments that perform commercial cleaning at airports,

20   stadiums, concert halls, hospitals, and retail centers. These cleaning services require specialized

21   knowledge and logistical experience that could easily translate to the trade show context.

22                  **ii.**     **UNM's Geographic Market is an Artificial Construct, and**

                       **Inconsistent with Its Own Business Practices or Claimed**

23                          **Damages.**

24         UNM contends that the relevant geographic market "is large convention centers in the

25   San Diego metropolitan area or, equivalently, the [Building]." According to UNM, its

26   geographic market is proper given: (1) cleaning providers require large convention centers in

27   which to operate; and (2) consumers are limited by choices in the local labor market, which is

28   delineated by workers' commuting distance.

1    UNM never defines "large convention center." Additionally, a large convention center is

2    not necessary for providers' operations. UNM seeks damages for large and small shows alike,

3    including one that occupied no exhibition hall space and almost 32,000 square feet of meeting

4    space, which is equal to 3% of the Building. Indeed, the 15 largest shows accounted for 20% of

5    SDCCC's revenues from 2006 to 2009. During that same time, only 3% of trade shows used

6    100% of the Building's capacity, while only 5% used 75% of the Building's capacity. The bulk

7    of these shows could easily be hosted in other San Diego venues.

8    Nor does the labor market significantly constrain competition. UNM contends that the

9    relevant purchasing decision for cleaning services occurs after an Association has chosen a

10   venue, because Decorators' choices are restricted by the local labor pool. SDCCC operates only

11   inside the Building.  It has a group of permanent, unionized employees trained to provide

12   cleaning services at the Building. It does not compete with UNM at other San Diego venues, or

13   at any of the 30 or more cities nationwide where UNM operates.  UNM is a Nevada corporation

14   headquartered in Chicago. Before July 1, 2007, UNM staffed events at the Building using

15   workers from United Temps, an affiliated temporary agency.  UNM's workforce consisted of

16   trained supervisors and a roster of part time, temporary workers in San Diego, subject to

17   availability. UNM regularly (and profitably) transports San Diego-based temporary workers to

18   clean shows all over Southern California, Nevada, and Hawaii.

19          **b.    Even if its "Market" is Valid, UNM Cannot Show that the Policy**
               **Harmed Competition in that Market.**
20

21   Assuming UNM's market (trade show cleaning services solely at the Building) is proper,

22   SDCCC's policy has had no demonstrable, negative effect on consumers, prices, production, or

23   quality in such a flawed market.

24          **i.    The Policy does not Restrict Consumer Choice.**

25   The policy does not restrict or eliminate the types of cleaning services available at the

26   Building. For example, SDCCC has not eliminated daily Booth Cleaning as an option, forcing

27   Exhibitors to purchase Booth Cleaning packages. Nor does the policy reduce the number of

28   service providers that may operate in the Building. UNM is still free to service its contracts at

17

1    the Building as a reseller of SDCCC labor. Indeed, Decorators are not required to contract with

2    SDCCC for cleaning services. Licensees are still free to designate Decorators as their exclusive

3    cleaning providers. Because Exhibitors could not choose a cleaning provider before July 1,

4    2007, the policy does not affect Exhibitor's choice.

5                    **ii.        The Policy Results in Greater Efficiencies.**

6          Before July 1, 2007, UNM cleaned the trade show floor and SDCCC cleaned the

7    Building common areas for shows where UNM was designated as the cleaning contractor. More

8    laborers were needed to clean the Building, in the aggregate, for UNM events than for SDCCC

9    shows. Moreover, UNM would be required to bring its own equipment on site, while SDCCC's

10   equipment was already located in the Building. UNM often serviced up to five shows in one

11   day, creating bottlenecks for needed equipment. UNM employees found themselves ill-equipped

12   to perform a particular cleaning task at the Building in a timely fashion. For UNM's pre-July 1,

13   2007 shows, Licensees and Exhibitors did not pay for common area cleaning and maintenance;

14   instead, these operating costs were borne by SDCCC. Under the policy, cleaning service

15   revenues from actual users of the Building are applied, in part, to offset the cost of cleaning and

16   maintaining the Building's common areas.

17                   **iii.       The Policy does not Restrict Production at the Building.**

18         There is no evidence that Associations or Exhibitors have ordered less cleaning services

19   at the Building since the change in policy. Nor is there any evidence that Associations have

20   chosen different venues for their events. To the contrary, the primary constraint on the

21   production of trade show cleaning services is the Building's capacity (size and occupancy) to

22   host events. From 2003 to 2008, the Building has maintained approximately an occupancy rate

23   of almost 72%, which is very high by industry standards. SDCCC was forced to turn away 904

24   events (an average 151 per year) over the same period because the Building was already booked

25   or unavailable.

26                   **iv.        The Policy does not Increase Consumer Prices.**

27         SDCCC's policy has not led to higher consumer prices. Trade show cleaning services

28   can best be understood as inputs, i.e., resources or factors of production. As such, they are

                                                      18

production costs indirectly paid for by consumers. Booth Cleaning is a component of an Exhibitor's marketing budget; the cost for cleaning services is recovered in the sale of the Exhibitor's product or service. Similarly, an Association's Facility Cleaning costs may be covered by Attendees' registration fees. The ultimate consumers—Attendees—never purchase cleaning services directly. The policy has not increased Licensees' rental rates or Attendees' registration fees. UNM admits that Decorators have refused to pass along any increased costs to Associations or Exhibitors.

Nor is there any evidence that the overall costs of producing a trade show have increased. Decorators' production costs are unaffected by the policy. Before July 1, 2007, Decorators split gross revenues with UNM 50-50%. After July 1, 2007, Decorators retain 50% of the gross revenues regardless of whether SDCCC invoices the Decorator directly or indirectly through UNM. Decorators set Booth Cleaning prices for Exhibitors, which they sell on a square foot basis. Because SDCCC is paid as a percentage of revenue, its prices have no causal effect on Decorators' prices to Exhibitors.

SDCCC has not changed its hourly rates for Facility Cleaning since July 1, 2007. Beginning in 2008, UNM raised its rates for Facility Cleaning at all California venues, coinciding with increases to the state's legal minimum wage rates. Between July 1, 2007 and UNM's 2008 price increases, SDCCC's Facility Cleaning rates for non-supervisory labor were higher than those charged by UNM. Decorators flatly refused to pass along any increased costs to their customers.

Furthermore, UNM makes a substantial profit at the Building. SDCCC and UNM charge for different services in their Facility Cleaning rates. SDCCC charges its customers, including UNM, for overnight aisle cleaning, but not aisle cleaning during shows (unless the show is open to the public). UNM does the reverse, i.e., it never charges for overnight aisle cleaning, but always charges for in-show aisle cleaning. SDCCC does not charge for supervisor labor, while UNM does. The labor reuqired for in-show aisle cleaning (which SDCCC provides at no charge) is substantially greater than the labor for overnight aisle cleaning (which UNM provides at no charge). The policy has had no effect on these billing practices. Because UNM receives

19

supervisory and in-show aisle cleaning at no cost, it realizes a substantial profit from marking-up and reselling these services. Whether before or after July 1, 2007, the parties' billing practices generally result in higher Facility Cleaning bills for UNM customers than SDCCC customers.

**v.     The Policy does not Diminish Service Quality.**

There is no evidence of a reduction in quality of cleaning services at the Building. There is no empirical or survey evidence of consumer attitudes toward quality. There are no records of written complaints by Licensees, Decorators or Exhibitors. Despite conflicting anecdotal evidence, Decorators uniformly agree that there is no measurable difference in the quality of service following implementation of the policy.

**3.     The Policy Is Not Exclusionary Conduct By SDCCC Resulting From Control Of An Essential Facility.**

UNM contends that SDCCC controls a facility essential to a competitive market—the Building—and that it is using that control to exclude it from the downstream trade show cleaning services market at the Building. But UNM does not define the upstream market in which the allegedly essential facility is located.

Nor is UNM prevented from accessing the Building. Provided it pays its bills in a timely fashion, UNM is permitted to service its contracts in the Building. Indeed, UNM turns a profit at the Building despite SDCCC's policy.

Assuming UNM's definition of the geographic market ("large convention centers in the San Diego metropolitan area") is proper, the Building is not essential to competition in that market. It is not San Diego's only exhibition and meeting venue.  Including the Building, San Diego boasts more than 1,898,134 square feet of comparable exhibit and meeting space. Those venues include, by square footage: San Diego Concourse (300,000 sq. ft.), Town & Country Resort Hotel and Convention Center (225,000 sq. ft.), Hilton San Diego Bayfront Hotel (165,000 sq. ft.), Manchester Grand Hyatt San Diego (128,319 sq. ft.), Sheraton San Diego Resort & Marina (120,000 sq. ft.), San Diego Marriott Hotel & Marina (75,000 sq. ft.), and Hotel Del Coronado (65,000 sq. ft.). Combined, these alternative venues account for 56.8% of the total capacity of exhibition and meeting venue space in San Diego.  UNM performs or resells

20

1  cleaning services at all of these venues save the San Diego Concourse. UNM is able to operate

2  in the San Diego convention center market despite the policy.

    **4.**    **The Policy Does Not Impair UNM's Reasonable Business Expectations.**

4         UNM's reasonable business expectations arising before and after July 1, 2007 are not

5  impaired by the policy. It realizes a profit at the Building, and while its margins have decreased,

6  its returns are consistent with its reasonable business expectations.

    **a.**    **The Policy is Consistent with UNM's Expectations Arising before July 1, 2007, in that UNM is Relieved of Performance under These Circumstances.**

9         UNM admits that venues like the Building may dictate the scope of its work and that it is

10  obligated to perform only within boundaries set by the venue. UNM is not obligated to perform

11  under its contracts where a Licensee's or Show Manager's relationship with a different cleaning

12  services provider prevents Decorators from using UNM on a show. All Licensees have a

13  preexisting, contractual relationship with SDCCC, and enjoy only those rights granted them

14  under SDCCC's licenses. Licensees are subject to the policy as incorporated in their licenses,

15  which prevents the use of outside providers to perform event-related cleaning services.

    **b.**    **UNM's Expectations Arising after July 1, 2007 are Unreasonable if They are Inconsistent with the Existing SDCCC Policy.**

18         UNM modified existing contracts, or entered into new contracts after July 1, 2007.

19  Because these expectations did not exist before July 1, 2007, SDCCC could not impair them. In

20  other words, UNM could not reasonably expect to realize business opportunities at the Building

21  if those opportunities conflict with a policy that predates them.

    **5.**    **UNM, Not The Policy, Is To Blame For UNM's Harm, If Any.**

23         Decorators' contracts make UNM's obligation to perform contingent on their ability to

24  designate UNM as the cleaning sub-contractor for their shows. Some contracts provide

25  additional conditions that must be satisfied before UNM's duty to perform is triggered. Where a

26  venue's policies or licenses prevent these conditions precedent from being satisfied, UNM has

27  no reasonable expectation of performance. UNM does not perform the cleaning at Champion or

28  GES shows at venues that have truly "exclusive" policies on cleaning services. Decorators never

21

1    threatened UNM with breach of contract and UNM has not sued those venues for their policies.

2    Similarly, the GES, Brede, and Paradice contracts provide that UNM need not perform if it does

3    not agree to perform at the Decorators' prices or at its sole cost and expense. UNM chose to

4    perform after Decorators refused to absorb or pass on UNM's increased costs, forcing it to

5    realize a smaller profit margin at the Building.

6                                              **II.**

7                                   **CONTENTIONS OF LAW**

8    **A.    UNM'S ANTITRUST CLAIMS.**

9         **1.    Section 2 Monopolization ("Essential Facilities").**

10        UNM must prove, by a preponderance of the evidence: (1) SDCCC's possession of

11   monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power

12   through exclusionary or anticompetitive conduct; and (3) causal antitrust injury. Allied

13   Orthopedic Appliances Inc. v. Tyco Health Care Group LP, 592 F.3d 991, 998 (9th Cir. 2010);

14   UNM asserts the "essential facilities" doctrine to satisfy the exclusionary conduct requirement.

15   MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124, 1129-30 (9th Cir. 2004).

16             **a.    Monopoly Power in the Relevant Market**

17             **i.    Definition of the Relevant Market**

18        To prove its "essential facilities" claim, UNM must properly define a relevant market.

19   Paladin Assocs. v. Montana Power Co., 328 F.3d 1145, 1163 (9th Cir. 2003). A relevant market

20   has two components: the product market and the geographic market.  Tanaka v. University of

21   Southern California, 252 F.3d 1059, 1063 (9th Cir. 2001).  It must also be economically

22   meaningful and reflect commercial realities. United States v. E. I. du Pont de Nemours & Co.,

23   351 U.S. 377, 400 (1956); United States v. Grinnell Corp., 384 U.S. 563, 572-73 (1966). What

24   constitutes a relevant market is a factual question for the jury. Image Tech. Servs. v. Eastman

25   Kodak Co., 125 F.3d 1195, 1203 (9th Cir. 1997) ("Image Tech. Servs. II").

26             **(1)    Relevant Product Market**

27        A relevant product market consists of all of those goods or services that a consumer

28   believes are reasonably interchangeable or reasonable substitutes for each other. Tanaka, 252

                                              22

1   F.3d at 1063; <u>Commercial Data Servers v. IBM Corp.</u>, 262 F.Supp.2d 50, 72 (S.D.N.Y. 2003)

2   (antitrust laws require only reasonable, not perfect, interchangeability). Reasonable

3   interchangeability is measured by, and is substantially synonymous with, cross-elasticity of

4   demand, <u>i.e.</u>, "the extent to which consumers will change their consumption of one product in

5   response to a price change in another." <u>Eastman Kodak Co. v. Image Tech. Servs.</u>, 504 U.S. 451,

6   469 (1992) ("<u>Kodak</u>"). If consumers would switch products in response to a small, but

7   significant price increase not due to external cost factors, then the products are in the same

8   market. <u>See du Pont</u>, 351 U.S. at 400. Other factors that a jury may consider in determining

9   reasonable interchangeability include: (1) consumers' views on whether the products are

10  interchangeable; (2) the relationship between the price of one product and sales of another; (3)

11  the presence or absence of specialized vendors; (4) the perceptions of either industry or the

12  public as to whether the products are in separate markets; (5) the views of the plaintiff and

13  defendant regarding who their respective competitors are; and (6) the existence or absence of

14  different customer groups or distribution channels. <u>Brown Shoe Co. v. United States</u>, 370 U.S.

15  294, 325 (1962); ABA Section of Antitrust Law, <u>I Antitrust Law Developments</u> at 556-562 (6th

16  ed. 2007) (hereinafter " <u>I Antitrust Law Developments</u>") (collecting cases).

17         A reasonable product market definition must also consider cross-elasticity of supply, <u>i.e.</u>,

18  the extent to which producers would be willing to shift resources to produce a different product

19  in response to price increases. <u>Rebel Oil Co. v. Atlantic Richfield Co.</u>, 51 F.3d 1421, 1434 (9th

20  Cir. 1995). "If producers of product X can readily shift their production facilities to produce

21  product Y, then the sales of both should be included in the relevant market." <u>Id.</u> at 1436.

22                         **(2)     Relevant Geographic Market**

23         The geographic market is the "area of effective competition" in which the seller operates

24  and purchasers can practicably turn for supplies. <u>United States v. Philadelphia Nat'l Bank</u>, 374

25  U.S. 321, 359 (1963). In other words, the relevant geographic market is the geographic area in

26  which a firm can increase its price without: (1) large numbers of customers quickly turning to

27  alternative supply sources outside the area; or (2) outside producers outside the area quickly

28  flooding the area with substitute products. <u>Heerwagen v. Clear Channel Communs.</u>, 435 F.3d

                                           23

1   219, 228 (2d Cir. 2006). The scope of a potential buyer's alternatives to avoid the alleged

2   antitrust harm defines the geographic market. Tampa Electric Co. v. Nashville Coal Co., 365

3   U.S. 320, 327 (1961). In addition, the courts have looked to the following factors: (1) actual

4   sales patterns; (2) physical delivery and distribution limitations; (3) transportation costs; (4)

5   governmental barriers to trade; (5) industry practices; and (6) price differences and relationships.

6   See I Antitrust Law Developments, at 598-604 (collecting cases).

### ii.   Monopoly Power.

8   Monopoly power, for the purposes of section 2 of the Sherman Act, is "the power to

9   control prices or exclude competition." Grinnell, 384 U.S. at 571. Monopoly power can be

10  proven directly or circumstantially. Rebel Oil, 51 F.3d at 1434.

### (1)   Direct Evidence.

12  Direct evidence of monopoly power may be shown with evidence of supracompetitive

13  prices and restricted output. Rebel Oil, 51 F.3d at 1434. A showing of one, but not the other, is

14  not sufficient. Forsyth v. Humana, Inc., 114 F.3d 1467, 1475-76 (9th Cir. 1997).

### (2)   Circumstantial Evidence.

16  To demonstrate monopoly power circumstantially, UNM must: (1) define the relevant

17  market, (2) show that the defendant owns a dominant share of that market, (3) show that there

18  are significant barriers to entry; and (4) show that existing competitors lack the capacity to

19  increase their output in the short run. Rebel Oil, 51 F.3d at 1434. A mere showing of substantial

20  or even dominant market share alone cannot establish monopoly power; UNM must establish

21  these or other factors supporting an inference of such power. Id. at 1439. Validly conferred

22  contractual rights, standing alone, are not a cognizable source of monopoly power. Newcal

23  Indus. v. Ikon Office Solution, 513 F.3d 1038, 1048 (9th Cir. 2008); Forsyth, 114 F.3d at 1476.

### b.   Willful Acquisition or Maintenance of Monopoly Power Through Exclusionary or Anticompetitive Conduct.

26  The possession of monopoly power is not, in itself, unlawful. Verizon Communs., Inc.

27  v. Law Offices of Curtis v. Trinko, LLP, 540 U.S. 398, 407 (2004). Thus, UNM must show

28  willful acquisition or maintenance of monopoly power by anticompetitive means, as

24

1    distinguished from growth or development as a consequence of a superior product, business

2    acumen, or historic accident. Grinnell, 384 U.S. at 570-71. "Such conduct does not refer to

3    ordinary means of competition, like offering better products or services, exercising superior skill

4    or business judgment, utilizing more efficient technology, or exercising natural competitive

5    advantages." Image Tech. Servs. II, 125 F.3d at 1211 n.6.

6                              i.    "Essential Facilities"

7            UNM has pleaded a Section 2 monopolization claim based on the essential facility

8    doctrine. The Supreme Court has never recognized this doctrine, and when presented with such a

9    claim, recently found "no need either to recognize it or to repudiate it." Trinko, 540 U.S. at 411.

10   Instead, the Court analyzed the claim as a unilateral refusal to deal. See id. at 406-11.

11           Assuming the "essential facilities" doctrine has survived Trinko, [1] it "imposes on the

12   owner of a facility that cannot reasonably be duplicated and which is essential to competition in

13   a given market a duty to make that facility available to its competitors on a nondiscriminatory

14   basis." MetroNet, 383 F.3d at 1128. "The doctrine does not guarantee competitors access to the

15   essential facility in the most profitable manner." Id. at 1130. Indeed, where access exists, the

16   doctrine serves no purpose.  Trinko, 540 U.S. at 411. Therefore, UNM must prove: (1) SDCCC

17   is a monopolist in control of an essential facility; (2) UNM, as SDCCC's competitor, is unable

18   reasonably or practically to duplicate the essential facility; (3) SDCCC has refused to provide

19   UNM access to the essential facility; (4) it is feasible for SDCCC to provide such access; and (5)

20   UNM incurred antitrust injury as a result of the denial of access.  Paladin, 328 F.3d at 1163 n.21.

21   "The fourth element [asks] whether there is a legitimate business justification for the refusal."

22   MetroNet, 383 F.3d at 1129 n.10. A facility is essential only if: (a) control of the facility carries

23   with it the power to eliminate competition in a downstream market, Paladin, 328 F.3d at 1163;

24   (b) it is absolutely vital to the plaintiff competitor's survival in the market, Pittsburg County

25   Rural Water District No. 7 v. City of McAlester, 358 F.3d 694, 721 (10th Cir. 2004); and

26   [1] The Ninth Circuit suggests the "essential facilities" doctrine may remain good law after
     Trinko. MetroNet, 383 F.3d at 1128-30. However, Trinko squarely controlled the outcome of
27   that case. Compare Trinko, 540 U.S. at 412-16 (no antitrust duty to deal; sharing of telephone
     exchange facilities regulated by FCC under Telecommunications Act of 1996), with MetroNet,
28   383 F.3d at 1129 (same). MetroNet's suggestion is therefore dicta.

1   (c) court-ordered sharing of the facility will, in fact, remedy competitive harm to the

2   downstream market, Mid-South Grizzlies v. NFL, 720 F.2d 772, 787 (3d Cir. 1983).

3         **ii.**    **Unilateral Refusal to Deal**

4         Because the "essential facilities" doctrine is no longer valid, UNM's monopolization

5   claim either fails or must be assessed under the unilateral refusal to deal rubric. See Trinko, 540

6   U.S. at 406-11, MetroNet, 383 F.3d at 1131-34. As a general matter, there is no antitrust duty to

7   aid, deal, or cooperate with, competitors. Trinko, 540 U.S. at 411; MetroNet, 383 F.3d at 1131.

8   UNM must therefore prove: (1) the refusal amounted to a termination of a voluntary, profitable

9   course of dealing between UNM and SDCCC; (2) such termination was contrary to SDCCC's

10   short-term economic interests; and (3) SDCCC's conduct makes sense only because it harms

11   competitors and enhances its long-term monopoly power. MetroNet, 383 F.3d at 1132. UNM

12   must also show that SDCCC refused to deal with it on the same terms as other customers. Id. at

13   1133 n. 14. A unilateral refusal is "irremediable by antitrust law" if the relief sought requires

14   the Court to act like a regulatory agency. Trinko, 540 U.S. at 415; MetroNet, 383 F.3d at 1133.

15         **iii.**    **Absence of a Legitimate Business Justification**

16         Conduct that is otherwise anticompetitive or predatory is not actionable if it is justified

17   by legitimate business reasons. Anaheim v. So. Cal. Edison Co., 955 F.2d 1373, 1379 (9th Cir.

18   1992) (essential facilities); Oahu Gas Service, Inc. v. Pacific Resources, Inc., 838 F.2d 360, 368

19   (9th Cir. 1988) (unilateral refusal to deal).

20         UNM must prove SDCCC's conduct lacks a legitimate business justification.

21   Calculators Hawaii, Inc. v. Brandt, Inc., 724 F.2d 1332, 1339 (9th Cir. 1983). If UNM

22   successfully establishes a prima facie section 2 case, SDCCC may proffer a legitimate business

23   justification for its conduct. Kodak, 504 U.S. at 483; Image Tech. Servs, 125 F.3d at 1212-13;

24   United States v. Microsoft Corp., 253 F.3d 34, 58-59 (D.C. Cir. 2001). A legitimate business

25   justification is a nonpretextual claim that the alleged monopolist's conduct is a form of

26   competition on the merits. Id. As a general rule, such a justification is valid if the challenged

27   practice increases efficiency, Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585,

28   605 (1985), or if it directly or indirectly enhances consumer welfare. Microsoft, 253 F.3d at 58-

1  59. The defendant's burden is only a burden of production; the plaintiff retains the ultimate

2  burden of persuasion. Id.;  Calculators Hawaii, 724 F.2d at 1339.

3    The burden then shifts to UNM to rebut an asserted business justification by

4  demonstrating either that the justification is pretextual or does not legitimately promote

5  competition. Image Tech. Servs. II, 125 F.3d at 1212.  Unlike section 1 claims, the Ninth Circuit

6  has rejected justification inquiries under Section 2 that second guess an alleged monopolist's

7  business judgment, including analyses that look to "least restrictive alternatives" or weigh as-

8  yet-unknown social gains against current competitive injuries.  Allied Orthopedic, 592 F.3d at

9  999-1000; Image Tech. Servs., Inc. v. Eastman Kodak Co., 903 F.2d 612, 620 (9th Cir. 1990)

10  ("Image Tech. Servs. I"), aff'd 504 U.S. 451 (1992); Cal. Computer Products, Inc. v. IBM Corp.,

11  613 F.2d 727, 744 (9th Cir. 1979); Allied Orthopedic Appliances, Inc. v. Tyco Health Care

12  Group L.P., 2008 U.S. Dist. LEXIS 112002 * 40-41 & n.22; 60-61 (C.D. Cal. 2008), aff'd, 592,

13  F.3d 991 (9th Cir. 2010); In re IBM Peripheral EDP Devices Antitrust Litig., 481 F.Supp. 965,

14  1021 (N.D. Cal. 1979).

15    **c.**  **Causal Antitrust Injury.**

16    A plaintiff must establish conduct that "actually causes injury to competition, beyond the

17  impact on the claimant."  Coalition for ICANN Transparency, Inc. v. VeriSign, Inc., 611 F.3d

18  495, 502-03 (9th Cir. 2010). Antitrust injury has five elements: "(1) unlawful conduct, (2)

19  causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful . . .

20  (4) that is of the type the antitrust laws were intended to prevent. . . . [and 5] that the injured

21  party be a participant in the same market as the alleged malefactors."  Glen Holly Entertainment,

22  Inc. v. Tektronix Inc., 352 F.3d 367, 372 (9th Cir. 2003).  Because anticompetitive conduct

23  "harms consumer welfare," a defendant's conduct "is of the type the antitrust laws were

24  intended to prevent" only when it: (1) harms allocative efficiency; and (2) either (a) raises prices

25  of goods above competitive levels, or (b) diminishes their quality.  Rebel Oil, 51 F.3d at 1433.

26  / / /

27  / / /

28  / / /

1        **2.**    **Section 2 Attempted Monopolization.**

2        To prove attempted monopolization, UNM must establish: (1) a specific intent to

3    monopolize a relevant market — i.e., an intent to control prices or destroy competition in a

4    relevant market; (2) predatory or anticompetitive conduct designed to control prices or destroy

5    competition; (3) a dangerous probability of success — i.e., a probability of achieving monopoly

6    power in the relevant market; and (4) causal antitrust injury.  Paladin, 328 F.3d at 1163 n. 22.

7        **a.**    **Specific Intent to Monopolize**

8        UNM must establish that SDCCC engaged in anticompetitive conduct with the "specific

9    intent to destroy competition or build monopoly."  Times-Picayune Pub. Co. v. United States,

10   345 U.S. 594, 626 (1953); Spectrum Sports v. McQuillan, 506 U.S. 447, 456, 459 (1993).

11   Specific intent may be proven either by direct evidence or by inference from evidence of

12   anticompetitive conduct.  William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., 668 F.2d

13   1014, 1027 (9th Cir. 1981). However, direct evidence of intent, uncorroborated by conduct, is

14   insufficient to support liability. Id. at 1028.

15       **b.**    **Predatory or Anticompetitive Conduct**

16       This element is the substantially similar to actual monopolization's conduct element,

17   above. Indeed, conduct that is not "willful acquisition or maintenance" of monopoly power

18   cannot constitute "predatory or anticompetitive conduct." See Transamerica Computer Co. v.

19   IBM Corp., 698 F.2d 1377, 1382 (9th Cir. 1983). As explained in section III, below, this Court

20   entered summary judgment in SDCCC's favor on UNM's tying, exclusive dealing, and group

21   boycott claims. Because UNM's attempted monopolization claim cannot be premised on

22   conduct underlying these claims, id., this element can be satisfied only by conduct particular to

23   attempted monopolization or UNM's remaining monopolization claim.

24       **i.**    **Essential Facilities and Unilateral Refusal to Deal**

25       These two types of allegedly anticompetitive conduct are fully discussed in sections

26   A.2.i-ii, supra.

27   / / /

28   / / /

28

1

ii.     **Monopoly Leveraging**

2      Monopoly leveraging constitutes the use of monopoly power in one market to acquire, or

3  attempt to acquire, monopoly power in a related product market. Image Tech. Servs., II, 125

4  F.3d at 1208. Leveraging is not an independent theory of liability.  Alaska Airlines, Inc. v.

5  United Airlines, Inc., 948 F.2d 536, 547 (9th Cir. 1991).  Thus, UNM must prove: (1) SDCCC is

6  an actual monopolist in the upstream market; and (2) SDCCC's anticompetitive conduct

7  (beyond leveraging) creates the "dangerous probability of success" of monopolization in the

8  downstream market. Id. at 545-47 & n.12.

9

iii.     **Price-Squeeze**

10      A partly vertically integrated firm that unilaterally "squeezes" its competitors' profit

11  margins may violate section 2. See, Pac Bell Tel. Co. v. linkLine Communications, Inc., 129 S.

12  Ct. 1109, 1118 (2009).  This theory requires that defendant operate in both an "upstream"

13  wholesale market and "downstream" retail market. Id.

14      A defendant's conduct must be analyzed separately in each market.  Doe v. Abbott Labs.,

15  571 F.3d 930, 934 (9th Cir. 2009). As to the wholesale market, section 2 is implicated only if the

16  defendant has an existing antitrust duty to deal with the plaintiff. linkLine, 129 S. Ct. at 1119-20.

17  As to the retail market, a plaintiff must demonstrate that: (1) the defendant's prices "are below

18  an appropriate measure of its rival's costs"; and (2) there is a "dangerous probability" the

19  defendant will be able to recoup its below-cost prices by raising prices after the plaintiff leaves

20  the market. Id. at 1120.  linkLine applies to price squeeze claims and their "functional

21  equivalent[s]." See Abbott Labs., 571 F.3d at 935 (bundled "monopoly leveraging" claim).

22

iv.     **Absence of Legitimate Business Justification**

23      This requirement was previously in section A.2.iii, supra.

24

c.     **Dangerous Probability of Monopolization**

25      "[T]o determine whether there is a dangerous probability of monopolization, courts have

26  found it necessary to consider the relevant market and the defendant's ability to lessen or destroy

27  competition in that market." Spectrum Sports, 506 U.S. at 456, 459.

28  / / /

29

1            **i.**      **Relevant Market**

2     This element discussed fully in section A.1., <u>supra</u>.

3            **ii.**      **Ability to Lessen or Destroy Competition**

4     This element is the same as the monopoly power component of an actual monopolization

5     claim, only to a lesser degree. <u>McGahee v. Northern Propane Gas Co.</u>, 858 F.2d 1487, 1505

6     (11th Cir. 1988). The monopoly power element is discussed fully in section A.3., <u>supra</u>. The

7     most significant difference concerns market share: "a minimum showing of market share

8     required in an attempt case is a lower quantum than the minimum showing required in an actual

9     monopolization case." <u>Rebel Oil</u>, 51 F.3d at 1438.

10        **3.**      **Antitrust Remedies**

11           **a.**      **Damages**

12    To recover damages under section 4 of the Clayton Act, 15 U.S.C. § 15(a), UNM must

13    prove: (1) injury-in-fact; (2) causation; and (3) antitrust injury. <u>In re Live Concert Antitrust</u>

14    <u>Litig.</u>, 247 F.R.D. 98, 133 (C.D. Cal. 2007). Injury-in-fact is shown by a loss to plaintiff's

15    business or property, while causation is established if the illegality is shown to be a material

16    cause of its injury. <u>Id.</u> If it establishes injury-in-fact and causation, a plaintiff proves the amount

17    of damages by providing the trier-of-fact with some basis from which to estimate reasonably,

18    and without undue speculation, the amount of damages flowing from the antitrust violations.

19    <u>See</u> <u>Bigelow v. RKO Radio Pictures, Inc.</u>, 327 U.S. 251, 264 (1946). An antitrust plaintiff who

20    is excluded from the relevant market is entitled to recover its lost profits. <u>Dolphin Tours, Inc. v.</u>

21    <u>Pacifico Creative Service, Inc.</u>, 773 F.2d 1506, 1511 (9th Cir. 1985).

22           **b.**      **Injunctive Relief**

23    To secure a permanent injunction under section 16 of the Clayton Act, 15 U.S.C. § 26,

24    UNM must also meet all the requirements for a damages claim, except that the injury itself need

25    only be threatened. <u>Lucas Auto. Engineering, Inc. v. Bridgestone/Firestone, Inc.</u>, 140 F.3d

26    1228, 1234 (9th Cir. 1998). Thus, UNM must prove: (1) a threatened loss or injury cognizable in

27    equity; (2) proximately resulting from the alleged antitrust violation; and (3) antitrust injury. <u>Id.</u>;

28    <u>City of Rohnert Park v. Harris</u>, 601 F.2d 1040, 1044 (9th Cir. 1979). UNM must also show its

1  entitlement to permanent injunctive relief, generally. See eBay Inc. v. MercExchange, LLC, 547

2  U.S. 388, 391 (2006).  Because it seeks to redress injury to the plaintiff and enforce the antitrust

3  laws, any equitable remedy must not be itself anticompetitive or too burdensome for the Court to

4  administer effectively.  Trinko, 540 U.S. at 407-08; AT&T Corp. v. Iowa Utilities Bd., 525 U.S.

5  366, 428-29 (1999) (Breyer, J. concurring and dissenting).

6  **B.      UNM'S TORTIOUS INTERFERENCE CLAIMS.**

7  **1.      Intentional Interference With Contract.**

8          UNM must prove the following elements of intentional interference with contract by a

9  preponderance of the evidence: (1) a valid and existing contract between plaintiff and a third

10  party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to

11  induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of

12  the contractual relationship; and (5) resulting damage.  Pac. Gas & Elec. Co. v. Bear Stearns &

13  Co., 50 Cal.3d 1118, 1126 (1990) ("PG&E").

14          **a.      Valid and Existing Contract**

15          UNM must demonstrate interference with a valid and existing contract. PMC, Inc. v.

16  Saban Entertainment, Inc., 45 Cal.App.4th 579, 601 (1996), overruled in part on other grounds

17  by Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1159 n. 11 (2003). A contract

18  is "valid," provided that it is "not illegal, opposed to public policy, or otherwise void."

19  Shamblin v. Berge, 166 Cal.App.3d 118, 124 (1985).

20          **b.      Knowledge**

21          A defendant must be shown to have knowledge of the existence of the contract.  Imperial

22  Ice Co. v. Rossier, 18 Cal.2d 33, 37 (1941). Actual knowledge of an existing contractual

23  relationship is necessary at the time of the alleged interference.  Dryden v. Tri-Valley Growers,

24  65 Cal.App.3d 990, 995 (1977); Springer v. Singleton, 256 Cal.App.2d 184, 189 (1967).

25          **c.      Intentional Acts Designed to Interfere**

26          UNM must prove SDCCC intended to interfere with UNM's contractual relationships.

27  Seaman's Direct Buying Service, Inc. v. Standard Oil Co., 36 Cal.3d 752, 767 (1984), overruled

28  on other grounds in Freeman & Mills, Inc. v. Belcher Oil Co., 11 Cal.4th 85, 98 (1995),

1   overruled on other grounds in <u>Della Penna v. Toyota Motor Sales, U.S.A., Inc.</u>, 11 Cal.4th 376,

2   393 n. 5 (1995).  "It is not enough that the actor intended to perform the acts which caused the

3   result—he or she must have intended to cause the result itself."  <u>Kasparian v. County of Los</u>

4   <u>Angeles</u>, 38 Cal.App.4th 242, 261 (1995); <u>Ramona Manor Convalescent Hospital v. Care</u>

5   <u>Enterprises</u>, 177 Cal.App.3d 1120, 1130-31 (1986).

6          This latter requirement is satisfied with evidence that the defendant "knows that the

7   interference is certain or substantially certain to occur as a result of his action."  <u>Quelimane Co.</u>

8   <u>v. Stewart Title Guar. Co.</u>, 19 Cal.4th 26, 56 (1998).  UNM must establish that SDCCC was

9   sufficiently aware of the details of the contracts at issue to form an intent to disrupt them.  <u>Davis</u>

10  <u>v. Nadrich</u>, 174 Cal.App.4th 1, 10 (2009).

11                 **d.      Actual Disruption**

12         Actual breach or disruption occurs when the contract is breached or when "plaintiff's

13  performance is made more costly or more burdensome," as a result of the defendant's

14  interference. <u>PG&E</u>, 50 Cal.3d at 1129. The plaintiff must also establish that the defendant's

15  intentional act was a cause in fact of the interference.  <u>Farmers Ins. Exchange v. Zerin</u>, 53

16  Cal.App.4th 445, 458 (1997). Thus, a plaintiff must establish: (1) the nature and extent of

17  plaintiff's reasonable expectations under the contract; and (2) that defendant's interfering act

18  actually disrupted those expectations. <u>See</u>, <u>e.g.</u>, <u>Summit Machine Tool Mfg. Corp. v. Victor</u>

19  <u>CNC Systems, Inc.</u>, 7 F.3d 1434, 1443 n.4 (9th Cir. 1993); <u>Quelimane</u>, 19 Cal.4th at 57; <u>Woods</u>

20  <u>v. Fox Broadcasting Sub., Inc.</u>, 129 Cal.App.4th 344, 356-57 (2005). A defendant's conduct is

21  not disruptive if the resulting conduct of the plaintiff and any contracting third parties is

22  consonant with the terms of the existing contract. <u>PG&E</u>, 50 Cal.3d at 1137; <u>Davis</u>, 174

23  Cal.App.4th at 10; <u>Short v. Nevada Joint Union High School Dist.</u>, 163 Cal.App.3d 1087, 1101

24  (1985).

25  / / /

26  / / /

27  / / /

28  / / /

32

1              e.       **Causation**

2          Finally, UNM must prove that SDCCC's intentional act proximately caused UNM's

3    damages.  Blank v. Kirwan, 39 Cal.3d 311, 330 (1985). UNM must therefore establish that

4    SDCCC's conduct was a substantial factor in causing it harm.  Tate v. Canonica, 180

5    Cal.App.2d 898, 907-12 (1960).

6          **2.       Intentional Interference With Prospective Economic Advantage.**

7          "The tort of interference with prospective business relations protects nonformalized or

8    anticipated business relationships which are reasonably certain to occur, but which are

9    nonetheless prospective." PMC, 45 Cal.App.4th at 601.  UNM must prove: (1) an economic

10   relationship between the plaintiff and a third party, with the probability of future economic

11   benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional and

12   wrongful acts designed to disrupt the relationship; (4) actual disruption; and (5) economic harm

13   proximately caused by defendant's acts.  Korea Supply, 29 Cal.4th at 1153.

14              a.       **Relationship with the Probability of Future Economic Benefit**

15         As a threshold element, UNM must establish: (1) the existence of an economic

16   relationship with some third party that contained the probability of future economic benefit to

17   the plaintiff, Roth v. Rhodes, 25 Cal.App.4th 530, 546 (1994); and (2) it was reasonably

18   probable that the lost economic benefit would have been realized but for the defendant's

19   interference, Youst v. Longo, 43 Cal.3d 64, 71 (1987). The probability of economic benefit to

20   plaintiff must be objectively reasonable and not speculative.  Id. at 74-75.  The economic benefit

21   must be specific and desired; it is not enough to show that a potentially beneficial relationship

22   could have developed between plaintiff and any third party.  Westside Ctr. Assocs. v. Safeway

23   Stores 23, Inc., 42 Cal.App.4th 507, 527-28 (1996).

24              b.       **Knowledge**

25         This element is substantially the same as in section C.2., above. See Korea Supply, 29

26   Cal.4th at 1159.

27   / / /

28   / / /

33

1

**c.    Intentional and Wrongful Acts Designed to Interfere**

2      Under this element, UNM must prove SDCCC's acts were both intentional and

3  wrongful.  See Korea Supply, 29 Cal.4th at 1159.  The intentional component is substantially the

4  same as in section C.3., above.  See id.  As to the wrongful component, "a plaintiff must [also]

5  plead and prove that the defendant's acts are wrongful apart from the interference itself."  Id. at

6  1154.  An act is independently wrongful if it is unlawful, i.e., it must be conduct proscribed by

7  some constitutional, statutory, regulatory, common law, or other determinable legal standard.

8  Id. at 1159 & n.11. Before it instructs the jury, the Court must determine whether the conduct at

9  issue: (1) is of the type that is wrongful; and (2) falls outside the privilege of fair competition.[2]

10  California Civil Jury Instructions (CACI) No. 2202 (citing Della Penna v. Toyota Motor Sales,

11  U.S.A., Inc., 11 Cal.4th 376, 393 (1995); PMC, Inc. v. Saban Entertainment, Inc., 45

12  Cal.App.4th 579, 603 (1996)). The Court must then instruct the jury on the elements of the

13  underlying wrongful conduct. Id. The jury thereafter determines whether the defendant, in fact,

14  engaged in the wrongful conduct alleged by the plaintiff. Id.

15      **d.    Actual Disruption**

16      This element is substantially the same as in section C.4., above. See Korea Supply, 29

17  Cal.4th at 1159.

18      **e.    Economic Harm Proximately Caused by the Defendant's Acts**

19      This element is substantially the same as in section C.5., above. See Korea Supply, 29

20  Cal.4th at 1159.

21  / / /

22

23  [2] The privilege applies where: (1) the plaintiff and defendant were engaged in economic competition; (2) the economic relationship between the plaintiff and a third party concerns a

24  matter involved in the competition between the plaintiff and defendant; (3) the defendant did not use wrongful means; (4) the defendant's purpose was at least in part to advance its interest in

25  competing with the plaintiff; and (5) the defendant's action did not create or continue an unlawful restraint of trade. Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square

26  Venture Partners, 52 Cal.App.4th 867, 880 (1997). By articulating the "independently wrongful" element, the California Supreme Court shifted the burden of proof from the defendant to the

27  plaintiff, rendering the affirmative defense of fair competition superfluous. See, Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc., 95 Cal.App.4th 1249, 1256-57 (2002). Thus,

28  analysis of the fair competition privilege bears only on the court's determination of whether conduct at issue is of a type that is independently wrongful. See CACI 2202.

34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 3.     Economic Interference Damages

If UNM proves its economic interference claims, it may recover damages for all proximately-caused harm. Cal. Civ. Code § 3333; <u>Duff v. Engelberg</u>, 237 Cal.App.2d 505, 508 (1965). The measure of tort damages for economic loss is reflected by loss of profits, expenses incurred, or similar concrete evidences of injury. <u>Elsbach v. Mulligan</u>, 58 Cal.App.2d 354, 366-67 (1943). Punitive damages may also be recovered if the defendant acted with malice, fraud, or oppression. Cal. Civ. Code § 3294(a); <u>Guillory v. Godfrey</u>, 134 Cal.App.2d 628, 633 (1955). Notwithstanding any other provisions of law, a public entity is not liable for punitive damages. Cal. Gov. Code § 818.

## C.     SDCCC'S AFFIRMATIVE DEFENSES

### 1.     Antitrust Defenses

#### a.     State Action Immunity

To qualify for immunity under the State Action Doctrine, SDCCC must establish that its allegedly anticompetitive conduct was: (1) actively supervised by the State; and (2) authorized by an affirmatively expressed state policy. <u>California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.</u>, 445 U.S. 97, 104-05 (1980).

#### i.     Active State Supervision

SDCCC must show it is a local government entity or a private entity actively supervised by State officials. <u>Town of Hallie v. City of Eau Claire</u>, 471 U.S. 34, 40-43 (1985); <u>Ambulance Service of Reno, Inc. v. Nevada Ambulance Services, Inc.</u>, 819 F.2d 910 (9th Cir. 1987).

#### ii.     "Clearly Articulated" State Policy

SDCCC also must demonstrate a "clearly articulated" state policy authorizing its allegedly anticompetitive conduct. <u>Traweek v. San Francisco</u>, 920 F.2d 589, 591 (9th Cir. 1990). It does so by proving that the State legislature: (1) authorized its challenged actions; and (2) intended to displace competition with regulation. <u>Id.</u> at 591-92; <u>Brown v. Ticor Title Ins. Co.</u>, 982 F.2d 386, 392 (9th Cir. 1992).

///
///

35

**(1)     Authorization of Anticompetitive Conduct**

Authorization may be found in legislation, as well as in decisions of a State Supreme Court, and regulatory agencies. Southern Motor Carriers Rate Conf. v. United States, 471 U.S. 48, 63-64 (1985), Hass v. Oregon State Bar, 883 F.2d 1453, 1457 (9th Cir. 1989). A State's failure to describe its policy in detail will not defeat immunity if the legislature's intent is otherwise clear. Southern Motor Carriers, 471 U.S. at 64

**(2)     Intent to Displace Competition**

Competition is displaced with regulation if the State statutes clearly contemplate that a local government entity may engage in anticompetitive conduct. Traweek, 920 F.2d at 592. However, the statute need not expressly compel the anticompetitive activity. Town of Hallie, 471 U.S. at 45-46; Hass, 883 F.2d at 1457-58. Instead, the State intended to displace competition if the allegedly anticompetitive conduct is foreseeable from the State's authorization, Traweek, 920 F.2d at 593, or if it specifically authorizes a proprietary function, Paragould Cablevision, Inc. v. Paragould, 930 F.2d 1310, 1312 (8th Cir. 1991). The Court may not undertake a substantive review of the state law. Traweek, 920 F.2d at 593. Individual actors' subjective motives and the efficacy or legality of efforts to comply with State law are irrelevant. Id.

**b.     Local Government Antitrust Act**

The Local Government Antitrust Act ("LGAA") immunizes local government entities from antitrust damage awards. 15 U.S.C. § 35(a).  The LGAA is broadly construed and applies to all aspects of local government entities' decision making and activities. Palms Springs Medical Clinic, Inc. v. Desert Hospital, 628 F. Supp. 454, 458 n. 3 (C.D. Cal. 1986).

"Local government" under the LGAA is defined as "(A) a city, county, parish, town, township, village, or any other general function governmental unit established by State law," or "(B) a school district, sanitary district, or any other special function governmental unit established by State law in one or more States." 15 U.S.C. § 34. To qualify as a "special government unit," a defendant must show that: (a) California law treats it as a government entity; (b) the defendant has limited geographic jurisdiction; and (c) taxpayers would bear the burden of any antitrust damage award (see Dkt. No. 120, at 6).

### 2.    Economic Interference Justification Defenses

The affirmative defense of justification applies to both economic interference claims. Environmental Planning & Info. Council v. Superior Court, 36 Cal.3d 188, 193-94 (1984). Courts employ a general balancing test or tests based on specific factual scenarios. Id. The ultimate question is whether an actor's conduct was fair and reasonable under the circumstances. Lowell v. Mother's Cake & Cookie Co., 79 Cal.App.3d 13, 21 (1978) (quoting Restatement (Second) of Torts § 767 & cmt. d).

#### a.    Balancing Test

The general test balances the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all of the circumstances, including the nature of the actor's conduct and the relationship between the parties. Herron v. State Farm Mut. Ins. Co., 56 Cal.2d 202, 206 (1961). Relevant factors include: (1) the nature of defendant's conduct; (2) defendant's motive; (3) the interest sought to be advanced by defendant; (4) the proximity or remoteness of defendant's conduct to the interference; (5) the relationship between the parties; (6) the nature of plaintiff's expectancy; and (7) the social interest in protecting the expectancy on the one hand, and defendant's freedom of action on the other. Lowell, 79 Cal.App.3d at 21 (1978).

#### b.    Legally Protected Interest

A defendant's interference may be justified if it acts to protect a legally valid interest. Richardson v. La Rancherita of La Jolla, Inc., 98 Cal.App.3d 73, 81 (1979). If the defendant "has a present, existing economic interest to protect, such as the ownership or condition of property, or a prior contract of his own . . . [it] is privileged to prevent performance of the contract of another which threatens [the interest]." Id. (quoting Prosser on Torts § 129 (4th ed. 1971)). To assert this defense, the defendant must show: (1) it has a legally protected interest, (2) it acted in good faith to protect that interest, and (3) it used otherwise lawful and appropriate means to protect that interest. Id. (citing Restatement (Second) of Torts § 773).

/ / /

/ / /

37

1

### 3.      Additional Defenses

2

#### a.      Estoppel

3      To prove equitable estoppel, SDCCC must show: "(1) a representation or concealment of

4   material facts; (2) made with knowledge, actual or virtual, of the facts; (3) to a party ignorant,

5   actually and permissibly, of the truth; (4) with the intention, actual or virtual, that the ignorant

6   party act on it; and (5) the ignorant party relied on it." Oldcastle Precast, Inc. v. Lumbermens

7   Mut. Cas. Co., 170 Cal.App.4th 554, 571 (2009). Equitable estoppel is a question of fact for the

8   Court to decide. Driscoll v. City of Los Angeles, 67 Cal.2d 297, 305 (1967).

9

#### b.      Waiver

10      "Waiver is the intentional relinquishment of a known right after knowledge of the facts."

11   City of Ukiah v. Fones, 64 Cal.2d 104, 107 (1966). "A waiver may occur (1) by an intentional

12   relinquishment or (2) as the result of an act which . . . is so inconsistent with an intent to enforce

13   the right as to induce a reasonable belief that such right has been relinquished." Crest Catering

14   Co. v. Superior Court, 62 Cal.2d 274, 278 (1965) (internal quotation marks omitted). SDCCC

15   must prove waiver by clear and convincing evidence. Ukiah, 64 Cal. 2d at 107-08.

16

#### c.      Mitigation

17      A defendant is not liable for post-injury consequences avoidable by the plaintiff who

18   uses reasonable care. Malcolm v. Marathon Oil Co., 642 F.2d 845, 863 n.30 (5th Cir. 1981)

19   (antitrust); Pool v. City of Oakland, 42 Cal.3d 1051, 1066 (1986) (intentional interference). A

20   plaintiff cannot recover losses it could have avoided through reasonable efforts. Thrifty-Tel, Inc.

21   v. Bezenek, 46 Cal.App.4th 1559, 1568-69 (1996). The defendant bears the burden of showing

22   that the plaintiff's conduct was unreasonable and aggravated its harm as well as the amount of

23   losses which might have been prevented by reasonable efforts and expenditures. Malcolm, 642

24   F.2d at 863; Hunter v. Croysdill, 169 Cal.App.2d 307, 318 (1959).

25   / / /

26   / / /

27   / / /

28   / / /

1

### III.

2

### ADJUDICATED AND ABANDONED ISSUES

3   Pursuant to Civil Local Rule 16.1(f)(2)(b), SDCCC submits the following issues raised

4   by the pleadings have been adjudicated or abandoned and will not be pursued at trial.[3]  This

5   Court entered summary judgment on four of UNM's claims, three pleaded and one unpleaded

6   (see Dkt. No. 120, at 11-13, 15-16).  Accordingly, SDCCC understands that UNM will not

7   pursue its Third, Fourth, Seventh, and unpleaded "tying" claims. Given the Court's summary

8   judgment order, SDCCC will not pursue its First, Second, Fifth, Seventh, Twelfth, Thirteenth,

9   Sixteenth, Twentieth, Twenty-Fifth, and Twenty-Sixth Affirmative Defenses at trial.

10   In addition, SDCCC will not challenge the Federal Rule of Civil Procedure 56(d)(1)

11   findings made by this Court in its summary judgment order.  These findings are summarized and

12   submitted herewith in Attachment 1.

13

### IV.

14

### EXHIBITS

15   Pursuant to Civil Local Rule 16.1(f)(2)(c), a list of exhibits that SDCCC expects to offer

16   or may offer at trial (other than demonstratives) is submitted herewith in Attachment 2.

17

### V.

18

### WITNESSES

19   Pursuant to Civil Local Rule 16.1(f)(2)(d), a list of witnesses that SDCCC expects to call

20   or may call at trial is submitted herewith in Attachment 3.

21   Dated:  December 17, 2010                    WRIGHT & L'ESTRANGE
                                                    Attorneys for Defendant
22                                                  San Diego Convention Center Corporation, Inc.

23

24                                                  By:  /s/ Joseph T. Ergastolo
                                                         Joseph T. Ergastolo
25                                                       jte@wllawsd.com

26

27

---

28   [3] SDCCC reserves its rights to appeal any issues that have been resolved against it by the Court.