1  James R. Lance (147173)
   Jacob M. Slania (200652)
2  **KIRBY NOONAN LANCE & HOGE LLP**
   350 Tenth Avenue, Suite 1300
3  San Diego, California 92101-8700
   Telephone (619) 231-8666
4  Facsimile (619) 231-9593

5  Theodore R. Tetzlaff (*Pro Hac Vice*)
   Kristopher J. Stark (*Pro Hac Vice*)
6  **UNGARETTI & HARRIS LLP**
   3500 Three First National Plaza
7  Chicago, Illinois 60602-4224
   Telephone (312) 977-4400
8  Facsimile (312) 977-4405

9  Attorneys for Plaintiff
   UNITED NATIONAL MAINTENANCE, INC.
10

11

12                **UNITED STATES DISTRICT COURT**

                  **SOUTHERN DISTRICT OF CALIFORNIA**
13

14
   UNITED NATIONAL MAINTENANCE,              CASE NO. 07-CV-2172 BEN(JMA)
15 INC., a Nevada corporation,
                                             **PLAINTIFF UNITED NATIONAL**
16              Plaintiff,                    **MAINTENANCE, INC.'S**
                                             **MEMORANDUM OF CONTENTIONS**
17         vs.                               **OF FACT AND LAW**

18 SAN DIEGO CONVENTION CENTER               **Complaint Filed: November 13, 2007**
   CORPORATION, INC., a California
19 corporation,                              Judge:      Hon. Anthony J. Battaglia
                                             Crtrm:      A
20              Defendant.                   Trial Date: March 21, 2011

21

22

23

24

25

26

27

28

KNLH\769477.1                                          07-CV-2172 BEN(JMA)

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

# TABLE OF CONTENTS

**Page**

1.   INTRODUCTION ............................................................................................ 1

2.   BACKGROUND AND OVERVIEW ............................................................ 2

    A.   The San Diego Trade Show and Convention Market ........................... 2

    B.   The Trade Show Cleaning Market ...................................................... 3

    C.   Trade Show Cleaning Services Include Two Types of Services:  Facility Cleaning and Booth Cleaning ............................................................... 3

    D.   History of Competition for Trade Show Cleaning in San Diego .......... 4

    E.   SDCCC's Exclusive Policy ................................................................. 4

3.   CONTENTIONS OF FACT AND LAW IN SUPPORT  OF UNITED'S CLAIMS ..................................................................................................... 5

    A.   Attempted Monopolization .................................................................. 5

        1.   The Exclusive Policy controls prices and destroys competition. ............. 5

        2.   There is no justification for SDCCC's anti-competitive conduct. ............ 5

        3.   There is a dangerous probability that SDCCC will achieve monopoly power. ................................................................................ 8

            a.   The relevant market ....................................................... 8

            b.   Dominant share of the relevant market. ........................ 9

            c.   Barriers to entry ........................................................... 10

        4.   There is a causal antitrust injury to United. ........................... 10

    B.   Essential Facilities ............................................................................ 12

    C.   Interference with Contract ................................................................. 14

        1.   GES Contract ........................................................................ 14

        2.   Champion Contract ............................................................... 15

    D.   Interference with Prospective Economic Advantage ......................... 15

4.   SDCCC'S AFFIRMATIVE DEFENSES ..................................................... 15

    A.   Valid Business Justification .............................................................. 16

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

B.      State Action Doctrine ........................................................................................ 16

C.      Local Government Exemption .......................................................................... 18

5.   CONTENTIONS OF FACT AND LAW IN SUPPORT OF UNITED'S
DAMAGES............................................................................................................... 20

6.   ABANDONED ISSUES............................................................................................ 22

7.   LIST OF WITNESSES.............................................................................................. 23

8.   LIST OF EXHIBITS.................................................................................................. 23

9.   CONCLUSION.......................................................................................................... 23

1

2

## TABLE OF AUTHORITIES

3

**CASES**

Page(s)

4

*Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.,*
5       834 F. Supp. 1216 (D. Alaska 1991)..................................................................................... 18

6  *California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.*
7       (1980) 445 U.S. 97 .............................................................................................................. 16

8  *Chicago Bd. of Trade v. United States,*
      246 U.S. 231 (1918) ............................................................................................................. 6

9  *City of Anaheim v. So. Cal. Edison Co.,*
10       955 F.2d 1373 (9th Cir. 1992)............................................................................................. 12

11  *Hornsby Oil Co., Inc. v. Champion Spark Plug, Co., Inc.,*
      714 F.2d 1384 (5th Cir. 1983).............................................................................................. 8
12

13  *Knapp v. Palisades Charter High School,*
      146 Cal. App. 4th 708 (2007)........................................................................................ 18, 19

14  *Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.,*
15       940 F.2d 397 (9th Cir. 1991)............................................................................................... 17

16  *Los Angeles Memorial Coliseum Com'n v National Football League,*
      726 F.2d 1381 (9th Cir. 1984).............................................................................................. 8
17

18  *Medic Air Corp v. Air Ambulance Authority,*
      843 F.2d (9th Cir. 1988)...................................................................................................... 17

19  *MetroNet Services Corp. v. Qwest Corp.,*
20       383 F.3d 1124 (9th Cir. 2004)............................................................................................. 12

21  *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,*
      924 F.2d 1484 (9th Cir. 1991)............................................................................................... 9
22

23  *Mozart Co. v. Mercedes-Benz of North America, Inc.,*
      833 F.2d 1342 (9th Cir. 1987).............................................................................................. 6

24  *Nugget Hydroelectric L.P. v. Pacific Gas & Electric Co.,*
25       981 F.2d (9th Cir. 1992)...................................................................................................... 17

26  *Otter Tail Power Co. v. United States,*
      410 U.S. 366 (1973) ...................................................................................................... 12, 13
27

28  *Pacific Gas & Electric Co. v. Bear Stearns & Co.,*
      50 Cal.3d 1118 (1990)................................................................................................... 14, 15

-iii-

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

*Paladin Association, Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003)................................................................................................. 10

*PMC, Inc. v. Saban Entertainment, Inc.*,
  45 Cal. App. 4th 579 (1996).................................................................................................. 15

*Quelimane Co. v. Stewart Title Guaranty Co.*,
  19 Cal.4th 26 (1998)............................................................................................................. 14

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995)........................................................................................ 5, 8, 9, 10

*Snake River Valley Elec. Ass'n v. Pacificorp*,
  238 F.3d 489 (9th Cir. 2001).................................................................................................. 17

*Tarabishi v. McAlester Regional Hosp.*,
  951 F.2d 1558 (10th Cir. 1991).......................................................................................... 18, 19

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
  875 F.2d 1369 (9th Cir. 1989).................................................................................................. 9

*Wells v. One2One Learning Found.*,
  39 Cal.4th 1164 (2006).......................................................................................................... 19

*Youst v. Longo*,
  43 Cal.3d 64 (1987).............................................................................................................. 15

**STATUTES**

15 U.S.C. § 14 ......................................................................................................................... 12

15 U.S.C. § 34(1) .................................................................................................................... 18

15 U.S.C. § 34(1)(B) ............................................................................................................... 18

California Business and Professions Code § 17200 ...................................................................... 22

California Civil Code Section 3294 ........................................................................................... 22

Clayton Antitrust Act, 15 U.S.C. § 15 .................................................................................. 18, 20

**OTHER AUTHORITIES**

Local Rule 16.1(f)(2)................................................................................................................. 1

Local Rule 16.1(f)(2)(c) .......................................................................................................... 23

Local Rule 16.1(f)(2)(d).......................................................................................................... 23

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  Plaintiff United National Maintenance, Inc. ("United") hereby submits its

2 Memorandum of Contentions of Fact and Law pursuant to Local Rule 16.1(f)(2) of the United

3 States District Court, Southern District of California.

## 1. INTRODUCTION

5  United provides specialized cleaning and maintenance for trade shows held at

6 convention facilities nationwide ("Trade Show Cleaning"). United has provided Trade Show

7 Cleaning at the San Diego Convention Center (the "Facility") since the Facility opened in

8 1989, in direct competition with Defendant San Diego Convention Center Corporation, Inc.

9 ("SDCCC").[1] After unsuccessfully soliciting United's key customers in late 2006 and early

10 2007, SDCCC decided to take a more aggressive approach to grab United's customers and

11 revenue. Effective July 1, 2007, SDCCC implemented a policy excluding United, and any

12 other competitor, from performing Trade Show Cleaning in the Facility unless: (1) only

13 SDCCC employees were used to perform Trade Show Cleaning; and (2) all Trade Show

14 Cleaning profits earned by United (or any other competitor) were paid to SDCCC ("Exclusive

15 Policy"). The Exclusive Policy barred United's workers and all other non-SDCCC employees

16 from performing Trade Show Cleaning at the Facility, and immediately achieved SDCCC's

17 goal of increasing revenues. Simply stated, the Exclusive Policy is a money grab which

18 violates Federal antitrust laws and California tort law.

19  United alleges four causes of action against SDCCC for implementing the Exclusive

20 Policy, including antitrust violations, interference with contract and interference with

21 prospective economic advantage. Under the terms of the Exclusive Policy, United's

22 San Diego operations are operating in the red, but United must continue operating in

23 San Diego at a huge loss so as to preserve its national contracts with its largest customers.

24 United seeks an award in this case making it whole for its past financial losses, trebled

25

26 [1] SDCCC wears two different hats which are relevant to this case. SDCCC is the operator of a Trade Show Cleaning business within the Facility. SDCCC also is the operator/manager of the Facility through a

27 contract with the Lessee of the Facility, the City of San Diego. The facility is owned by the San Diego Unified Post District.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  damages, punitive damages, attorney's fees and an injunction prohibiting SDCCC's exclusion
2  of United from performing Trade Show Cleaning in the future, or an award of future
3  damages.

## 2. BACKGROUND AND OVERVIEW

### A.    The San Diego Trade Show and Convention Market

SDCCC has managed and operated the Facility since it opened in 1989. Its primary business is to lease the Facility, pursuant to license agreements, to various trade associations for daily periods to hold trade shows. The Facility is unique in that it is the only true convention center in San Diego. It offers over 615,000 square feet of exhibit space and over 1,000,000 square feet of combined exhibit and meeting space, making it the 11th largest convention center in the United States. Many in the trade show industry view the facility as one of the top five convention centers in the United States. Because of its elite status, trade associations must typically sign a contract with SDCCC at least five years or even 15 years in advance to secure a preferable date for their trade show.

Trade associations that license the Facility are essentially handed the keys to an empty building. They typically hire general contractors, such as GES Exposition Services ("GES") and Champion Exposition Services ("Champion"), to organize and manage their trade show at the Facility. Organizing and managing trade shows at the Facility is no small job. There are a tremendous number of logistical challenges for general contractors, including setting up and taking down a trade show in very narrow time windows.

Since the Facility opened 21 years ago, the general contractors, including but not limited to GES and Champion, have hired subcontractors to perform many of the services associated with trade shows, such as electrical work, exhibit installation and dismantling ("I&D") and Trade Show Cleaning Services. The general contractors often hire United to perform Trade Show Cleaning. In fact, United has long term contracts with both GES and Champion for Trade Show Cleaning Services nationwide.

KNLH\769477.1                                    -2-                           07-CV-2172 BEN(JMA)

1

**B.     The Trade Show Cleaning Market**

2          Trade Show Cleaning is a specialized product that is not reasonably interchangeable
3   with other janitorial or custodial services.  Traditional janitorial service firms, can expect their
4   work areas to be the same size and in a relatively similar condition each day.  In trade show
5   cleaning, however,  the size, scope and cleaning needs of each trade show are unique.  In order
6   to successfully handle a large show, a provider of trade show cleaning services must have a
7   tremendous amount of trade show experience.  They must anticipate needs proactively because
8   of the specific logistical challenges each show brings.  Trade show cleaning has become a
9   speciality market because traditional janitorial firms cannot provide Trade Show Cleaning
10  Services in an efficient and effective manner.

11          United is a national service provider of Trade Show Cleaning Services.  It provides
12  services to customers that promote trade shows wherever they are held in the United States,
13  including the shows produced at the San Diego Convention Center Facility.  The knowledge
14  and experience gained from working shows in many cities with its customers enables United
15  to provide a specialized level of service that its customers value.  Ultimately, the complexities
16  of these shows demand carefully selected and integrated vendor partners, such as United, who
17  have a thorough understanding of each show's special needs.

18

**C.     Trade Show Cleaning Services Include Two Types of Services:  Facility Cleaning and Booth Cleaning**

19

20          United provides two types of Trade Show Cleaning services,  Facility Cleaning and
21  Booth Cleaning.  Facility Cleaning is the cleaning of all common areas used by a trade show
22  during the move-in phase (which includes construction and installation of the booths and show
23  exhibits) and the move-out phase (comprised of dismantling the booths and exhibits and
24  vacating the premises).  Daily porter cleaning also is a component of Facility Cleaning.
25  United bills Facility Cleaning to its customer on an hourly basis.  Prior to implementation of
26  the Exclusive Policy, United charged the General Contractors $16.30 per hour for Facility
27  Cleaning.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    Booth Cleaning is the cleaning of individual booths and contiguous aisle space during a
2  show.  Booth Cleaning is provided to specific exhibitors upon request.  This service is tailored
3  to ensure that the unique needs of each individual exhibitor and each exhibitor pays the
4  general contractor on a per square foot basis.  The general contractor then splits the Booth
5  Cleaning revenue 50/50 with the cleaning subcontractor.  Booth Cleaning is where cleaning
6  subcontractors like United make most of their profit.

7  **D.  History of Competition for Trade Show Cleaning in San Diego**

8    SDCCC and United competed head to head for the business of Trade Show Cleaning
9  Services from 1989 when the Facility opened until July 1, 2007.  The beneficiaries of the
10 competition included show managers, exhibitors and general contractors.  Until July 1, 2007,
11 the general contractors, including GES and Champion, always had the unfettered right to
12 choose which company would perform its Trade Show Cleaning at the Facility.

13   In 2006 and early 2007, SDCCC unsuccessfully attempted to increase its share of the
14 cleaning business by aggressively soliciting United's two major customers, GES and
15 Champion.  When SDCCC's solicitation efforts failed, it insituted another plan to get the
16 business.

17 **E.  SDCCC's Exclusive Policy**

18   Following its unsuccessful efforts to solicit United's customers, SDCCC instituted the
19 Exclusive Policy effective July 1, 2007, making it impossible to compete with SDCCC for
20 Trade Show Cleaning.  The Exclusive Policy excludes United and all other competitors from
21 using their own employees to perform Trade Show Cleaning in the Facility.  The Exclusive
22 Policy requires United, and all other Trade Show Cleaning companies, to use SDCCC
23 employees to perform all cleaning at the Facility.  United must pay SDCCC $17.00 per hour
24 for each hour a SDCCC employee works on Facility Cleaning.  For United, this is a $.70 per
25 hour loss.  But, that is not the only financial detriment to United.  Under the Exclusive Policy
26 SDCCC also requires United (and all other competitors) to pay to SDCCC their 50% share of
27 the Booth Cleaning revenue.  In short, SDCCC is taking all of the Booth Cleaning revenue,
28 and more than all of the Facility Cleaning revenue, from cleaning subcontractors like United.

1    By implementing the Exclusive Policy, SDCCC immediately achieved the goal it could
2  not accomplish through lawful competition, significantly increasing its revenue. In the first
3  year of this anti-competitive policy, SDCCC nearly tripled its Booth Cleaning revenues.
4  Through December 4, 2009, SDCCC had taken $500,000 in Trade Show Cleaning profit from
5  United and the losses increase with every show.

## 3. CONTENTIONS OF FACT AND LAW IN SUPPORT OF UNITED'S CLAIMS

8    United has asserted four causes of action against SDCCC: (1) attempted
9  monopolization, (2) essential facilities, (3) interference with contract and (4) interference with
10  prospective business advantage. SDCCC challenged each of these causes of action by way of
11  a Motion for Summary Judgment and/or Adjudication. SDCCC's Motion was denied as to
12  these claims. United is confident that at trial it can and will establish every element for each
13  cause of action.

### A.   Attempted Monopolization

15    To prove its attempted monopolization claim, United must show: (1) SDCCC's specific
16  intent to control prices or destroy competition; (2) SDCCC's predatory or anticompetitive
17  conduct directed at creating a monopoly; (3) a dangerous probability of achieving monopoly
18  power; and (4) causal antitrust injury to United stemming from SDCCC's violation of the
19  Sherman Act. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1432-1433 (9th Cir.
20  1995). United can so demonstrate.

### 1.   The Exclusive Policy controls prices and destroys competition.

22    SDCCC has not disputed that United can satisfy the first element of this cause of
23  action. SDCCC's Exclusive Policy mandates the price for Trade Show Cleaning (*i.e.*, controls
24  the pricing) and mandates that only SDCCC employees perform the Trade Show Cleaning
25  (*i.e.*, reducing competition by eliminating performance from competitors).

### 2.   There is no justification for SDCCC's anti-competitive conduct.

27    There is no denying that the Exclusive Policy prohibits outsiders from performing
28  Trade Show Cleaning of the Facility. SDCCC attempts to justify implementation of the

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  Exclusive Policy, arguing that it was established because of a purported "security" concern
2  regarding United employees. SDCCC's purported justification is that, in light of the
3  September 11, 2001 attacks, Trade Show Cleaning personnel pose a security risk at the
4  Facility, and that specifically includes United. This argument has no merit.

5  Courts have "recognized that antitrust defendants may demonstrate a business
6  justification for an otherwise per se illegal tying arrangement." *Mozart Co. v. Mercedes-Benz*
7  *of North America, Inc.*, 833 F.2d 1342, 1348 (9th Cir. 1987). However, the defendant must
8  show that the policy was implemented for a legitimate purpose and a less restrictive alternative
9  is not available. *Id.* at 1349. Generally, courts look to the "history of the restraint, the evil
10  believed to exist, the reason for adopting the particular remedy, [and] the purpose or end
11  sought to be attained" in assessing the legitimacy of a business justification. *Chicago Bd. of*
12  *Trade v. United States*, 246 U.S. 231, 238 (1918).

13  SDCCC's security argument is not legitimate, but rather a pretext to hide the true
14  reason for implementing the Exclusive Policy – money. The evidence clearly establishes that
15  the primary reason for this anti-competitive policy was to increase revenue.

16  United will present evidence that the Exclusive Policy is applied solely to providers of
17  Trade Show Cleaning despite the fact that Trade Show Cleaning Service employees constitute
18  only about 5% of the outside labor required to operate and manage a trade show. Almost all
19  of the workers on site are exempt from SDCCC's Exclusive Policy, including employees of
20  trade associations, general contractor, employees, electricians, exhibit installers, freight
21  handlers, carpet installers, display houses, decorators, sign hangers, advertisers, florists,
22  caterers, and other general labor. In addition, much of this labor force is unionized, and the
23  unions admittedly do not perform background checks on these workers. It is not just
24  coincidence that SDCCC permits these non-SDCCC employees to work at the Facility in
25  trades that do not compete against SDCCC. If there was a true security concern, SDCCC
26  would apply its Exclusive Policy across the board.

27  In addition, SDCCC never brought a single security issue to United's attention while
28  United worked at the Facility. United does not use temporary workers and the entirety of its

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

workforce comes from a common roster of local W-2 employees. If United needs to supplement its work force, temporary workers are not used. Rather, United brings in its own employees from other cities. Except for minimal employee turnover, the same United employees are the ones entering and working in the Facility. Moreover, not one of United's employees was ever involved in any type of security incident at the Facility, and SDCCC's incident reports confirm this fact because there is no reported incident regarding a United employee.

In an effort to satisfy SDCCC's purported security concern, United offered to pay for and subject its employees to the same background checks and screening SDCCC uses for its own employees, or to even let SDCCC run these identical checks on United's workers. An expert in the field of trade show security states that if "United employees are badged and background checked, they would pose a very low security risk and would certainly not pose any more of a security risk than badged and background checked employees of the SDCCC." SDCCC rejected United's proposal.

United even offered to subject its employees who work at the Facility to a more stringent security protocol than that used by SDCCC on its employees. The proposal was drafted by Mr. Anthony D'Angelo, a retired FBI expert on homeland security. SDCCC rejected his proposal without explanation, while at the same time allowing other third party employees to work at the Facility without having any background checks performed. Once again, if there truly was a security concern, wouldn't SDCCC want to adopt a protocol that increased security? Apparently not.

Additionally, SDCCC had numerous security assessments performed on the Facility. Those assessments identified numerous security concerns, none of which had anything to do with United or Trade Show Cleaning Service contractors.

In sum, the Exclusive Policy did nothing to alleviate the concerns identified in the assessments. The overwhelming evidence establishes that the only motive to implement the Exclusive Policy was financial. SDCCC's own documents demonstrate that during the first two years of the Exclusive Policy it received well over $1,200,000 in additional Trade Show

KNLH\769477.1                                   -7-                        07-CV-2172 BEN(JMA)

1  Cleaning revenue that SDCCC had not received in prior years (and that number continues to
2  grow). Unable to compete fairly, SDCCC found a way to use its power over the Facility to
3  exclude its competitors. United will demonstrate the availability and reasonableness of many
4  other options if security was truly a concern. The bottom-line is that SDCCC did not have a
5  valid business justification for its anti-competitive conduct in implementing the Exclusive
6  Policy.

**3.    There is a dangerous probability that SDCCC will achieve monopoly power.**

9  United can establish a dangerous probability of obtaining monopoly power by showing
10  that SDCCC has market power. United can make this showing by: (1) defining the relevant
11  market; (2) showing that SDCCC owns a dominant share of the relevant market; and
12  (3) showing that potential competitors (such as United) face significant barriers to entry and
13  that existing competitors lack the capacity to increase output in the short run. *Rebel,* 51 F.3d
14  at 1433-34. As demonstrated below, all three elements are present here.

**a.    The relevant market.**

16  The relevant market has two components: (1) the product market and (2) the
17  geographic market. *Los Angeles Memorial Coliseum Com'n v National Football League*,
18  726 F.2d 1381, 1392 (9th Cir. 1984). The product market encompasses producers which,
19  because of the similarity of their products, have the actual or potential ability to take
20  significant amounts of business away from each other. *Id.; Rebel*, 51 F.3d at 1434. Products
21  fall within the same market if they are "reasonably interchangeable" for the same or similar
22  uses. *Coliseum*, 726 F.2d at 1393. "The outer boundaries of the product market are drawn in
23  terms of the presence of substitutes to which consumers will turn in response to price
24  changes...and the ability of other existing producers...to expand output from their present
25  facilities..." *Hornsby Oil Co., Inc. v. Champion Spark Plug, Co., Inc.*, 714 F.2d 1384, 1393
26  (5th Cir. 1983).

27  United will present evidence and expert testimony at trial to establish that the relevant
28  product market is Trade Show Cleaning at major convention centers. United and SDCCC are

1 producers in this same market because their products, Trade Show Cleaning at the Facility, are
2 reasonably interchangeable and SDCCC has taken significant business from United by
3 implementing its unlawful Exclusive Policy.

4 The relevant geographic market is an area of effective competition where buyers can
5 turn to alternate sources of supply. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
6 924 F.2d 1484, 1490 (9th Cir. 1991) (internal quotation and citation omitted). Assuming
7 products are substitutes, a geographic market is the area in which cross-elasticity of demand
8 would be high between them. High cross-elasticity of demand exists where increases or
9 decreases in one product's price cause substantial increases or decreases in demand for the
10 other product. If buyers in one geographic area do not change their consumption habits in
11 response to a decrease in price of a substitute product supplied in another geographic area,
12 then the two areas probably do not fall within the same geographic market. Cross-elasticity of
13 demand would be low in that case. *See Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
14 875 F.2d 1369, 1375-77 (9th Cir. 1989).

15 United will present evidence and expert testimony at trial to establish that the relevant
16 geographic market is limited to large convention centers in the San Diego metropolitan area,
17 of which there is only one, the Facility. Indeed, the territory in which United and SDCCC
18 compete is the Facility. Consumers of Trade Show Cleaning cannot and will not be able to
19 turn to other facilities in or out of San Diego for their conventions, even if the price of Trade
20 Show Cleaning were to rise substantially, because there are few facilities of a similar size as
21 the Facility, and nothing even close to its size in San Diego.

22 **b.     Dominant share of the relevant market.**

23 United will also establish that SDCCC owns a dominant share of the relevant market.
24 Before imposing the Exclusive Policy in 2007, SDCCC performed 50% or more of the Trade
25 Show Cleaning at the Facility. After implementing the Exclusive Policy, SDCCC now
26 performs 100% of the Trade Show Cleaning in the Facility. So, both before and after the
27 Policy was enacted, SDCCC possessed a dominant share of the relevant market. *See Rebel,*
28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

KNLH\769477.1                              -9-                         07-CV-2172 BEN(JMA)

51 F.3d at 1438 (holding that ownership of a 44% market share was sufficient to prove attempted monopoly).

### c. Barriers to entry.

Moreover, United faces significant barriers to market entry. Entry barriers are "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Rebel,* 51 F.3d at 1439 (quoting *Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1427-28 (9th Cir. 1993)). Control of an essential resource is a barrier to entry. *Rebel*, 51 F.3d at 1439. Clearly that is present here, because SDCCC controls entry to the Facility under its Exclusive Policy.

United also cannot increase its output to capture the market share from SDCCC if SDCCC increases its prices. *See Rebel,* 51 F.3d at 1441. If a defendant prevents competitors from accessing the essential facility, then competitors cannot increase production and cannot capture defendant's market share if defendant increases prices. *Id.* That is precisely what SDCCC has done with its Exclusive Policy – precluded competitors from providing Trade Show Cleaning at the Facility.

### 4. There is a causal antitrust injury to United.

Conduct harms consumer welfare if it increases product prices or decreases product quality or availability, and causes inefficiency. *Paladin Association, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1156 (9th Cir. 2003); *Rebel*, 51 F.3d at 1433. Allocative inefficiency occurs when market participants who can use products most efficiently, lack access to those products because of a defendant's conduct. *See Rebel*, 51 F.3d at 1433-34.

United will present evidence at trial demonstrating harm to both consumers and competitors such as United, including testimony from personnel at Champion and GES, two of United's largest customers. The witnesses at Champion and GES will testify that their costs have increased because they must now pay SDCCC for certain cleaning that United previously provided free of charge.

-10-

1    Consumer harm also is reflected in numerous letters from trade show consumers to

2   SDCCC, complaining that the Exclusive Policy harms consumers because the quality of

3   cleaning services at the Facility has decreased due to the lack of competition.

4    In addition, United has been harmed by SDCCC's implementation of the Exclusive

5   Policy to the tune of approximately $500,000 as of December 4, 2009.[2]  Prior to the Exclusive

6   Policy, United was charging GES and Champion $16.30 per hour for Facility Cleaning in

7   San Diego and 50% of the total revenue from exhibitors for Booth Cleaning.  After imposition

8   of the Exclusive Policy, United must pay SDCCC a flat $17 per hour rate for Facility

9   Cleaning, even though SDCCC knew that United was contractually bound to charge GES and

10   Champion less.  United also is constrained by the estimates it provides the general contractor

11   prior to each show, and United cannot bill for hours worked in excess of its contractual

12   estimate; placing a premium on the efficiency of the workforce.  Under the Exclusive Policy,

13   United has no control over how many employees are dispatched by SDCCC for a show, and it

14   cannot incentivize SDCCC's workers to be more efficient.

15    Prior to the Exclusive Policy, Booth Cleaning revenue was split 50/50 between the

16   General Contractor and the Trade Show Cleaning Company.  This is how Trade Show

17   Cleaning companies make most of their profits.  However, under the Exclusive Policy, any

18   competitor of SDCCC for Trade Show Cleaning must agree to pay 50% of the Booth Cleaning

19   Revenue to SDCCC.  Therefore, unless United is able to increase its percentage of Booth

20   Cleaning revenue, there is no profit for United.

21    Finally, no other competitor can even bid to offer services with its own personnel.

22    Clearly, there is a causal antitrust injury to United, and United will prevail on this cause

23   of action.

24

25   _____

26   [2] Experts for United and SDCCC both prepared reports calculating United's damages.  Their reports

27   included trade shows through December 4, 2009.  The experts will be updating their reports through early
     2011 for trial.

28

1

## B. Essential Facilities

2 "The 'essential facilities' doctrine imposes on the owner of a facility that cannot
3 reasonably be duplicated and which is essential to competition in a given market a duty to
4 make that facility available to its competitors on a nondiscriminatory basis." *MetroNet*
5 *Services Corp. v. Qwest Corp.*, 383 F.3d 1124, 1128 (9th Cir. 2004) (internal citations
6 omitted).

7 In this case, neither United nor any other cleaning company has meaningful access to
8 the Facility. By mandating that United can only work at the Facility on the condition that
9 (1) United uses SDCCC's labor, and (2) SDCCC receives all of United's profit on the Booth
10 Cleaning and the hourly Facility Cleaning, SDCCC is making the Facility available in a
11 discriminatory manner. Indeed, since the Policy was implemented through December 4, 2009,
12 United was forced to operate at a loss of approximately $500,000 at the Facility to service its
13 long-term contracts with its key customers. United is not asking to have "access" to the
14 Facility in the "most profitable manner." Rather, United merely seeks access as was provided
15 in the past: with the ability to use its own superior labor and without the outrageous theft of
16 its profits. Clearly, it is feasible for SDCCC to provide this access to United because United
17 had this access since the Facility opened in 1989 until implementation of the Exclusive Policy
18 in 2007.

19 The power underlying SDCCC's control of the Facility is that SDCCC can parlay that
20 control into a powerful mechanism to monopolize a market for services that depend on use of
21 the essential facility. *See City of Anaheim v. So. Cal. Edison Co.*, 955 F.2d 1373, 1379 (9th
22 Cir. 1992). The mechanism works through SDCCC's refusal to deal with competitors who can
23 compete only if they have access to the Facility. Because SDCCC can deny that access,
24 SDCCC can "extend monopoly power from one stage of production to another..." *Id.* Denial
25 of access to an essential facility is a form of refusal to deal and illegal under the Clayton Act
26 (15 U.S.C. §14). *See Aspen*, 738 F.2d at 1519.

27 In *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973), the Supreme Court
28 applied the elements of refusal to deal in the essential facilities context when an electric utility

1 monopolized the retail market for electricity. Otter Tail, the defendant utility, refused to
2 provide access to its essential infrastructure (power grid), as well as refused to sell its own
3 wholesale electricity to municipal distributors and transport electricity from other electricity
4 sellers to the municipal distribution systems. *Id.*, at 370.

5   The district court found defendant's conduct violated Section 2 of the Sherman Act and
6 the Supreme Court affirmed. *Id.* at 375, 377. Otter Tail's denial of competitors' access to its
7 transmission grid deprived competitors of essential infrastructure and therefore precluded
8 competition in the retail energy market. *Id.* at 375-77. Otter Tail had a "strategic dominance"
9 in the transmission of power in most of its service area, which it used to foreclose potential
10 entrants into the retail market from obtaining electric power from outside sources of supply.
11 *Id.* at 377. This harmed consumers, impeded competition on grounds other than efficiency,
12 was allocatively inefficient, and harmed municipalities and their utilities. *Id.* at 377-78.

13   This case is analogous. In *Otter Tail*, successful competition in the retail distribution
14 of electricity market required access to the power grid, which was an essential infrastructure.
15 Here, successful competition in the Trade Show Cleaning market requires United be provided
16 meaningful access to the Facility. Thus, access to the Facility plays an indispensable role in
17 United's Trade Show Cleaning business. By implementing the Exclusive Policy SDCCC
18 acquired a "strategic dominance" in the Trade Show Cleaning Service market in San Diego,
19 which it is using to foreclose competitors (United & Century[3]) from competing with SDCCC
20 for providing Trade Show Cleaning Services at the Facility. This in turn is foreclosing (and
21 harming) consumers from choosing which company performs Trade Show Cleaning at the
22 Facility.

23   United will prevail on this cause of action.

24

25

---

26 [3] Century Trade Show Services, Inc. is a Trade Show Cleaning company which would like to compete to
provide cleaning services at the Facility but cannot do so because the Exclusive Policy prevents any
27 possibility of making a profit.

28

     -13-     

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

## C. Interference with Contract

To demonstrate its claim for interference with contract, United must show: (1) a valid contract between United and a third party; (2) SDCCC's knowledge of this contract; (3) SDCCC's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damages. *Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126 (1990). Actual breach or disruption occurs when the contract is breached or when "plaintiff's performance is made more costly or burdensome," as a result of defendant's interference. *Pacific Gas & Electric,* 50 Cal.3d at 1129. At trial, United will establish both a breach and a disruption of its contractual relationships with both GES and Champion.

### 1. GES Contract

Under its contract with GES, United agreed to "perform first class, quality service," furnish all labor, equipment and supplies, and "use its best efforts to hire suitable individuals" to perform the services under the contract. The Exclusive Policy makes it impossible for United to comply with these provisions of the GES contract because United can no longer furnish the labor or use its best efforts to hire suitable individuals to perform the services under the contract, a term expressly contracted for.

The Exclusive Policy has also caused a disruption of United's expected contractual benefits with GES. Disruption to a contract is measured by impairment of a party's expected contractual benefits. *See Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 56-57 (1998). Under its contracts with GES, United had received 50% of the Booth Cleaning Revenue for many years before SDCCC implemented its Exclusive Policy. The Exclusive Policy forces United to pay that entire 50% to SDCCC. Clearly, this is a disruption of the United/GES contract.

In addition, performance of the contract also has become more expensive for United. United has to pay more to SDCCC for SDCCC's labor than United would pay its own labor, making performance more expensive for United. GES' performance has also become more expensive and their witnesses will so testify. An increase in the costs of contract performance

KNLH\769477.1                                    -14-                              07-CV-2172 BEN(JMA)

constitutes disruption. *Pacific Gas & Electric,* 50 Cal.3d at 1129.

## 2. Champion Contract

The United-Champion contract provides that Champion "will use its best efforts" to designate United as the cleaning contractor for trade shows at the Facility. Champion is no longer able to do so under the Exclusive Policy. This is undoubtedly a disruption of Champion's and United's expected benefits of the contract caused by the SDCCC. Additionally, as with GES, United has to pay more for SDCCC's labor, thereby increasing United's costs to perform. Similarly, Champion's costs have also increased.

United will prevail on its claim for Interference with Contract.

## D. Interference with Prospective Economic Advantage

"The tort of interference with prospective business relations protects nonformalized or anticipated business relationships which are reasonably certain to occur, but which are nonetheless prospective." *PMC, Inc. v. Saban Entertainment, Inc.*, 45 Cal. App. 4th 579, 601 (1996) (overruled on other grounds). To prevail on this claim, a plaintiff must show that it is "reasonably probable that the prospective economic advantage would have been realized but for defendant's interference." *Youst v. Longo*, 43 Cal.3d 64, 71 (1987).

United has continuing relationships with several general contractors, including Brede National and Paradice Decorating, with the probability of future economic benefit to United. United expects it would continue to work with these contractors in San Diego but for the Exclusive Policy. United has also entered into an economic relationship with Nielsen Business Media, a trade show organizer/manager. Under this arrangement, United has an expectation that Nielsen would designate United as the Trade Show Cleaning contractor for any and all shows at the Facility, but for the Exclusive Policy.

## 4. SDCCC'S AFFIRMATIVE DEFENSES

SDCCC only has actively pursued three of its affirmative defenses: Business Justification, State Action Doctrine and Local Government Exemption. None of these three

1  defenses has any merit.[4]  In fact, when denying SDCCC's Motion for Summary Judgment
2  and/or Adjudication as to the currently pending claims, the Court ruled that SDCCC did not
3  present evidence to establish these defenses. Since that ruling was issued, SDCCC has not
4  produced any new facts or evidence which would support these defenses.

5  **A.    Valid Business Justification**

6  As addressed in Section 3.A.2 above, SDCCC's Business Justification defense is
7  meritless.

8  **B.    State Action Doctrine**

9  SDCCC's tenth affirmative defense asserts that it is exempt from liability on the
10  antitrust claims under the "State Action Doctrine," which provides that states are immune from
11  antitrust laws.  State action immunity only applies if the challenged activity was "one clearly
12  articulated and affirmatively expressed as state policy." *California Retail Liquor Dealers*
13  *Assoc. v. Midcal Aluminum, Inc.* (1980) 445 U.S. 97, 105.

14  SDCCC argues that it is immune because the Exclusive Policy was enacted pursuant to
15  state and national policies of preventing terrorist attacks and securing public safety,
16  specifically pursuant to an Executive Order issued in February of 2003.  However, the Court
17  has already considered this defense on SDCCC's Motion for Summary Judgment and/or
18  Adjudication and ruled that SDCCC failed to produce any evidence explaining that its
19  "security concerns" related in any way to homeland security or a fear of terrorism, which was
20  the essence of the Executive Order.[5]  The State of California has never expressed that security
21  at the Facility was compromised by United's access thereto, and therefore only SDCCC labor
22  should be allowed to perform Trade Show Cleaning at the Facility.  Indeed, the State has made
23  no findings whatsoever with respect to security at the Facility.

24  

25  [4] Because SDCCC has not presented argument on any of its other defenses to date, United will not address
26  those defenses here. Regardless, United is confident that at trial the evidence will show that SDCCC's affirmative defenses have no merit.

27  [5] See August 3, 2010 Order [Doc. 120], p. 5:12-20.

28  

KNLH\769477.1                    -16-                    07-CV-2172 BEN(JMA)

The Exclusive Policy also does not qualify as a "foreseeable and logical result" of a State policy. *Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 400 (9th Cir. 1991). Even if the Governor mandated that security be tightened at the Facility, it would be absurd for SDCCC to limit the application to only Trade Show Cleaning Service workers as they did here. Furthermore, the "state policy" SDCCC relies on says nothing about eliminating competition through increased security. There are many feasible options that SDCCC has to increase security, if that is the true motivation. One would be to force all outside workers to undergo the same screening and background checks that SDCCC employees undergo. United offered to undergo this process, but it was rejected by SDCCC. Another would be to implement a more stringent screening and background check process than what SDCCC employees undergo. United had a retired FBI subject matter expert on homeland security prepare such a protocol, which was also rejected by SDCCC.

Additionally, to succeed on this affirmative defense, as a private entity SDCCC must show active state supervision of anticompetitive conduct. SDCCC cannot do so. The Ninth Circuit has recognized the following as legitimate supervision: direct legislative or executive oversight, executive branch oversight through executive departments, state or local agency oversight where agencies are responsible to the state legislative or executive departments, and judicial review of anticompetitive conduct in state courts where state law authorizing anticompetitive conduct specifically prescribes judicial review of anticompetitive conduct. *Nugget Hydroelectric L.P. v. Pacific Gas & Electric Co.*, 981 F.2d at 429 (9th Cir. 1992); *Medic Air Corp v. Air Ambulance Authority*, 843 F.2d at 1187 (9th Cir. 1988); *Snake River Valley Elec. Ass'n v. Pacificorp*, 238 F.3d 489 (9th Cir. 2001). However, there is no state statute that expressly authorizes judicial review of SDCCC's anticompetitive conduct to ensure SDCCC's compliance with federal and state law.

The Court previously agreed with United in denying SDCCC's Motion for Summary Judgment and/or Adjudication on this affirmative defense. Since the Court issued its ruling in August of 2010, SDCCC has not produced any new evidence which would support this defense. Therefore, SDCCC will not prevail on its immunity defense because the Exclusive

Policy was not made pursuant to a clearly articulated state policy.

## C. Local Government Exemption

SDCCC argues that United is not entitled to monetary relief under its antitrust claims because SDCCC is afforded immunity under the 1984 Local Government Antitrust Act ("LGAA"). Local government means: "(A) a city, county, parish, town, township, village, or any other general function governmental unit established by State law, or (B) a school district, sanitary district, or any other special function governmental unit established by State law in one or more states..." 15 U.S.C. § 34(1). SDCCC cannot be a "general function governmental unit" because it serves a specific function as a convention center.

Therefore, in order for the LGAA to apply to the SDCCC, it must qualify as a "special function governmental unit" within the meaning of 15 U.S.C. § 34(1)(B). A "special function governmental unit" is one that exposes taxpayers to antitrust liability under the Clayton Antitrust Act, 15 U.S.C. § 15. In *Tarabishi v. McAlester Regional Hosp.*, 951 F.2d 1558 (10th Cir. 1991) the court defined eligibility for immunity under the LGAA based on status as a "governmental instrumentality" and based on "effect on taxpayers." *Id.* at 1566. That definition led the court to hold that an Oklahoma public trust hospital was not a special function governmental unit under the LGAA, 15 U.S.C. § 34(1)(B). While the court noted that no single factor was determinative, it held "a significant consideration is where liability for an antitrust damage award will actually fall, in light of the LGAA's obvious concern to limit the imposition of treble damage awards on *taxpayers*." *Id.* (emphasis added). Because the taxpayers of Oklahoma were not liable for damage awards levied against the public trust hospital, the LGAA did not exempt it from antitrust suits for damages. *Id.*

In order for SDCCC to qualify as a "special function government unit" it must show three things: (1) that California law treats it as a government entity, which in turn requires SDCCC to demonstrate it is legally, operationally, or financially accountable to or controlled by the public (*see Knapp v. Palisades Charter High School*, 146 Cal. App. 4th 708, 710 (2007)); (2) SDCCC must demonstrate that it has limited geographic jurisdiction, perhaps substantially smaller than the state itself (*see Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*,

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

834 F. Supp. 1216, 1228 (D. Alaska 1991)); and (3) SDCCC must demonstrate that taxpayers would bear the burden of antitrust damage awards against it (*see Tarabishi*, 951 F.2d at 1566).

SDCCC cannot demonstrate that California law treats it as government for two reasons. First, the Court of Appeal in *Knapp v. Palisades Charter High School*, 146 Cal.App.4th 708, 710 and 717 (2009), held categorically that state law does not treat non-profit public benefit corporations as government. SDCCC is a non-profit public benefit corporation. Furthermore, SDCCC has not registered on the California Roster of Public Agencies. If SDCCC were a governmental entity, presumably it would have done so to be entitled to immunity under the California Tort Claims Act.

Second, SDCCC cannot demonstrate that it is legally, operationally, or financially accountable to or controlled by the public. The City has previously sued SDCCC claiming SDCCC was not a public entity. SDCCC is not listed as a department of the City. SDCCC exercises both operational and financial autonomy because it handles its own operations, has its own budget, and hires its own executive management and employees. *See Knapp,* 146 Cal. App. 4th at 717. Moreover, SDCCC is responsible for its own financial management and the City has no obligation to fund SDCCC's operations, nor is the City liable for SDCCC's debts. *See Wells v. One2One Learning Found.*, 39 Cal.4th 1164, 1201 (2006). SDCCC creates its own budget and only reports on its budget to the City. Indeed, SDCCC is one of the most self-sufficient convention center corporations in the United States. SDCCC's operating revenues during fiscal year 2008 were \$34.8 million, of which 87.7% came from self-generated revenues. Even though the City makes an annual investment in SDCCC (hoping for a larger return in tax revenues) the investment is entirely at the city's *discretion* and SDCCC has no rights to the City's investment.

Finally, in denying SDCCC's Motion for Summary Judgment and/or Adjudication, the Court ruled that SDCCC has no evidence to prove that taxpayers would bear the burden of any antitrust damage award.

SDCCC cannot demonstrate that it is a "special function governmental unit" that qualifies for immunity under the LGAA because it cannot demonstrate California law treats it

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   as a "governmental instrumentality" and because it cannot demonstrate that SDCCC places the
2   taxpayers at risk of antitrust liability. Therefore, SDCCC will not prevail on this affirmative
3   defense at trial.

## 5. CONTENTIONS OF FACT AND LAW IN SUPPORT OF UNITED'S DAMAGES

6   Any person who is injured in his business or property by reason of an antitrust law
7   violation shall be entitled to recover threefold the damages sustained, including attorneys' fees
8   and costs. 15 U.S.C.A. § 15. Interest on actual damages also is recoverable.

9   United seeks damages for its lost profits as a result of the Exclusive Policy. United will
10  present expert witness Patrick F. Kennedy, Ph.D., an economist, to testify regarding the nature
11  and amount of its damages.[6]

12  As discussed above, United provides two types of Trade Show Cleaning Services:
13  Facility Cleaning and Booth Cleaning. Facility Cleaning is paid for out of the general fees
14  received by the general contractor. Facility Cleaning is billed on a pre-negotiated, fully-
15  loaded, hourly basis. In San Diego, prior to the Exclusive Policy, United contracted with GES
16  and Champion to provide Facility Cleaning at a fully-loaded hourly rate of $16.30. This rate
17  was calculated based on United's costs of paying its own labor and it includes costs associated
18  with the time spent by United's supervisory employees (who do not bill their time to the
19  general contractor), equipment depreciation and other overhead, including benefits and
20  United's profit margin.

21  In order for United to service its San Diego contracts today under the Exclusive Policy,
22  SDCCC charges United $17 an hour for labor and gives United no input into the number of
23  workers used or the hours worked. This $17 figure is the same price SDCCC charges its own
24  customers. Thus, even when United is still technically the contractor, SDCCC is earning a
25  profit on the back of United while United suffers a loss.

27  [6] On August 3, 2010, the Court ruled that Dr. Kennedy is qualified to testify as an expert witness in this
    matter and it denied SDCCC's motion in limine to exclude his testimony [Doc. 119].

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1      United's contracts for Facility Cleaning require United to provide estimates in advance
2  of each specific trade show. United's estimates are based on the overall square footage of the
3  common areas for a particular show and the fully-loaded hourly rates required to clean those
4  areas. United is not allowed to bill for hours in excess of this estimate. Since United is paid
5  pursuant to this estimate, the efficiency of the workforce is particularly important for this
6  phase. At trial, United will show that, in addition to charging a higher price, SDCCC did not
7  comply with United's estimates and overstaffed certain events, and then charged United for the
8  extra labor hours.

9      Booth Cleaning is provided to specific exhibitors upon request and is paid for on a flat
10  per square foot basis. Each requesting exhibitor at a trade show pays the fee to the general
11  contractor. United receives a fixed percent of the cleaning fees paid by exhibitors to the
12  general contractor to do the Booth Cleaning. In San Diego, United's contracts with GES and
13  Champion call for United to receive roughly 50% of the general contractor's revenue from
14  these fees. From that 50%, United has to pay its overhead and operating costs, including
15  paying its local San Diego employees. The remainder of any revenue constitutes United's
16  Booth Cleaning profit margin. Under the Exclusive Policy, SDCCC has charged United 100%
17  of the Booth Cleaning revenue that United receives from the general contractors.

18      United's damages are comprised of the following:

19      1.      Facility Cleaning: United's damages consist of the difference in the hourly rate
20  charged by SDCCC compared to United's internal labor rate for Facility Cleaning. As of
21  December 4, 2009, these damages total $75,618. These damages continue to accrue as trade
22  shows are held at the Facility. United will present updated damages evidence at the time of
23  trial.

24      2.      Booth Cleaning: Booth Cleaning and other non-hourly services are billed on a
25  per square foot basis. United's economic damages for Booth Cleaning are the amount that
26  United would have received to perform the Booth Cleaning, reduced by the labor cost that
27  United would have paid to perform the Booth Cleaning. As of December 4, 2009, these
28  damages total $447,470. Again, these damages grow as trade shows occur. United will

1 | present updated damages evidence at the time of trial.

2 |     Dr. Kennedy offset these damages by reducing an appropriate percentage for supplies
3 | and expenses that were avoided since United employees did not perform the cleaning services.
4 | Dr. Kennedy also offset the damages by the cost of the aisle porter hours billed to the general
5 | services contractors because these services are not billed by SDCCC to United.  Therefore,
6 | United's economic damages for losses on facility and booth cleaning are **$498,495** as of
7 | December 4, 2009.

8 |     United's contracts with GES and Champion continue for years, as will United's
9 | relationships with Nielsen Media, Paradice and other contractors.  If the Exclusive Policy
10 | continues, United will lose future profits.  At trial, United will present evidence regarding
11 | those future losses.

12 |     Pursuant to the Sherman Act, United will be entitled to treble damages, as well as
13 | recover its attorneys' fees and costs.  United is also entitled to punitive damages for SDCCC's
14 | malicious and oppressive conduct pursuant to California Civil Code Section 3294.

15 |     United is also seeking an injunction permitting United to again use its own employees
16 | to perform Trade Show Cleaning Services at the Facility.  Should an injunction be issued,
17 | United recognizes it will not also recover damages for future losses.

18 | **6. ABANDONED ISSUES**

19 |     United is pursing the four causes of action discussed above.[7]  Counsel for United has
20 | asked counsel for SDCCC to advise as to whether it is abandoning any of its defenses, but no
21 | response has been received.  SDCCC has only actively pursued three of its affirmative
22 | defenses.  United does not know if SDCCC intends to abandon the rest.

Side text: Kirby Noonan Lance & Hoge LLP, 350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

26 | [7] United's causes of action for group boycott, exclusive dealing, and violation of California Business and
27 | Professions Code § 17200 are no longer being pursued because SDCCC's motion for summary adjudication was granted as to these causes of action.

1

## 7. LIST OF WITNESSES

2       Pursuant to Local Rule 16.1(f)(2)(d), the list of witnesses United expects to or may call

3 is attached hereto as Exhibit A.[8]

## 8. LIST OF EXHIBITS

5       Pursuant to Local Rule 16.1(f)(2)(c), United's list of exhibits it expects to or may use is

6 attached hereto as Exhibit B.

## 9. CONCLUSION

8       For the above reasons, United requests a damages verdict for all of its lost profits, that

9 such amount be trebled, for punitive damages, that its costs and attorneys' fees be awarded,

10 and that SDCCC's affirmative defenses be denied.  United also prays that an injunction be

11 issued permitting United to use its employees to perform Trade Show Cleaning Services at the

12 Facility, or that United be awarded damages, and that those damages be trebled, for future lost

13 profits.

14 DATED: December 16, 2010            KIRBY NOONAN LANCE & HOGE LLP

15

16                                     By: *s/Jacob M. Slania*
                                            James R. Lance
17                                          Jacob M. Slania
                                            Attorneys for Plaintiff
18                                          UNITED NATIONAL MAINTENANCE, INC.

19

20

21

22

23

24

25

26

[8] Pursuant to Local Rule 16.1(f)(2)(d), Plaintiff's Witness List has set forth a brief narrative statement of
27 qualifications and substance of testimony for Plaintiff's expert witnesses only.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1

*United National Maintenance v. San Diego Convention Center Corporation, Inc.*

2

(Case No: 07-CV-2172 BEN(JMA))

3

**TABLE OF CONTENTS OF EXHIBITS TO**

**PLAINTIFF UNITED NATIONAL MAINTENANCE, INC'S MEMORANDUM OF**

4

**CONTENTIONS OF FACT AND LAW**

5

6

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| A | List of Witnesses United Expects to Present/May Call at Trial | 1-18 |
| B | List of Exhibits (United) | 19-138 |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

KNLH\796605.1