1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                         SOUTHERN DISTRICT OF CALIFORNIA

10
11   UNITED NATIONAL MAINTENANCE,        )     Civil No.07cv2172 AJB
     INC., a Nevada Corporation,         )
                                         )     PRETRIAL ORDER
12                        Plaintiff,     )
                                         )
13   v.                                  )
                                         )
14   SAN DIEGO CONVENTION CENTER         )
     CORPORATION, INC., a California     )
15   Corporation,                        )
                                         )
                          Defendants.    )
16   _____ )

17        Following pretrial proceedings pursuant to Federal Rule of Civil Procedure 16 and Civil Local

18   Rule 16.1(f)(6), IT IS ORDERED:

19                                       I.

20        This is an antitrust action for alleged violations of Section 2 of the Sherman Act (attempted

21   monopolization and essential facilities), as well as a tort action for alleged interference with contractual

22   and prospective economic relations.

23        A.    Parties

24        The parties to this action are as follows:

25             1.    Plaintiff United National Maintenance, Inc. ("United" or "Plaintiff").

26             2.    Defendant San Diego Convention Center Corporation, Inc. ("SDCCC" or

27   "Defendant").

28        B.    Pleadings

                                          1

The pleadings giving rise to the issues in this case are as follows:

1.    Verified Complaint for Injunctive Relief and Damages filed November 13, 2007 (Dkt. No. 1).

2.    Defendant San Diego Convention Center Corporation, Inc.'s Corrected First Amended Answer to Plaintiff's Complaint filed May 6, 2009 (Dkt. No. 77).

3.    The parties' respective Memoranda of Facts and Contentions of Law (Dkt. Nos. 132-133).

C.    Statement of the Case

1.    United's Version

United provides specialized cleaning and maintenance services for trade shows held at convention facilities nationwide ("Trade Show Cleaning Services").  United has provided Trade Show Cleaning Services at the San Diego Convention Center (the "Building") since the Building opened in 1989, in direct competition with Defendant SDCCC.

Effective July 1, 2007, after unsuccessfully soliciting United's key customers, SDCCC implemented a policy excluding United, and any other competitor, from performing Trade Show Cleaning Services in the Building unless:  (1) only SDCCC employees were used to perform Trade Show Cleaning Services; and (2) all Trade Show Cleaning Services profits earned by United (or any other competitor) were paid to SDCCC ("Exclusive Policy").  The Exclusive Policy barred United's workers, and all other non-SDCCC employees, from performing Trade Show Cleaning Services at the Building, and immediately achieved SDCCC's goal of increasing its revenues.

United contends that the Exclusive Policy is a money grab by SDCCC that violates Federal antitrust law and California tort law.  Accordingly, United alleges four causes of action against SDCCC for implementing the Exclusive Policy, two antitrust violations under Section 2 of the Sherman Act for attempted monopolization and essential facilities, and two California state law interference claims, for interference with contract and interference with prospective economic advantage.

Under the terms of the Exclusive Policy, United must continue operating in San Diego at a huge loss so as to preserve its national contracts with its largest customers.  United seeks an award in this case making it whole for its past financial losses, trebled damages, punitive damages, attorney's

fees, costs and an injunction precluding or prohibiting SDCCC from enforcing the Exclusive Policy, or any similar policy, on a going forward basis; or if the Court denies injunctive relief, for an award of damages for all future shows at the Building for which United will be precluded from performing Trade Show Cleaning Services.

           2.     SDCCC's Version

This is a private action for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. Plaintiff United National Maintenance alleges that Defendant San Diego Convention Center Corporation, Inc.'s operation, management, and control of the San Diego Convention Center ("Building") violates Section 2 of the Sherman Act, 15 U.S.C. § 2. Additionally, Plaintiff brings claims for intentional interference with contract and intentional interference with prospective economic advantage for which it seeks damages and injunctive relief.  SDCCC denies any liability on all causes of action and asserts that Plaintiff is not entitled to any damages or injunctive relief. In addition, SDCCC asserts several affirmative defenses, some applicable to all claims, and some particular to the antitrust or tortious interference claims.

      D.     Causes of Action, Items of Damages and Affirmative Defenses

           1.     United's Version

The parties will try the following causes of action, items of damages, and affirmative defenses:

           1.     First Claim: Attempted Monopolization

                (a)     Elements

The elements of United's first claim for attempted monopolization are as follows:

                      (i)     SDCCC's specific intent to control prices or destroy competition;

                      (ii)     SDCCC's predatory or anticompetitive conduct directed at creating a monopoly (i.e. to control prices or destroy competition);

                      (iii)     a dangerous probability of success (i.e. achieving monopoly power); and

                      (iv)     causal antitrust injury to United.

                (b)     Items of Damages

1    United seeks the following items of damages in connection with its attempted

2  monopolization claim:

3    (i)    Actual damages;

4    (ii)    Legal Fees;

5    (iii)    Costs, including pre-judgment interest;

6    (iv)    Treble damages; and

7    (v)    Injunctive relief, or alternatively an award for future damages.

8    (c)    Defenses

9    SDCCC denies that its Exclusive Policy is an attempted monopolization of the

10  relevant market.  SDCCC also asserts the following affirmative defenses to Plaintiff's attempted

11  monopolization claim:

12    (i)    State Action Immunity.  To qualify for immunity under the State

13  Action doctrine SDCCC must establish that its anticompetitive conduct was (1) actively supervised by

14  the state; and (2) authorized by an affirmatively expressed state policy;

15    (ii)    Local Government Antitrust Act ("LGAA").  This act immunizes

16  local government entities from antitrust damages awards.   Local government is defined under the

17  LGAA as (1) a city, county, parish, town, township, village or any other general function governmental

18  unit established by state law; or (2) a school district, sanitary district or any other special function

19  governmental unit established by state law in one or more states.  To qualify as a special governmental

20  unit SDCCC must demonstrate that:  (1) California law treats SDCCC as a governmental entity; (2)

21  SDCCC has limited geographical jurisdiction; and (3) taxpayers would bear the burden of any antitrust

22  damage award.

23    2.    Second Claim: Essential Facilities

24    (a)    Elements

25    The essential facilities doctrine imposes on the owner of a facility, that cannot

26  reasonably be duplicated and which is essential to competition in a given market, a duty to make that

27  facility available to its competitors on a nondiscriminatory basis.  The elements of United's second claim

28  for essential facilities are as follows:

4

1                   (i)      SDCCC's control of an essential facility or resource in the relevant

2 market;

3                   (ii)     United's inability practically or reasonably to duplicate the

4 essential facility;

5                   (iii)    SDCCC unjustifiably denied United use of the facility; and

6                   (iv)    the feasibility of providing access to the facility.

7           (b)    Items of Damages

8 United seeks the following items of damages in connection with its essential facilities claim:

9                   (i)      Actual damages;

10                   (ii)     Legal fees;

11                   (iii)    Costs, including pre-judgment interest;

12                   (iv)    Treble damages; and

13                   (v)     Injunctive relief, or alternatively an award for future damages.

14           (c)    Defenses

15                SDCCC denies that its Exclusive Policy is exclusionary conduct which

16 results from control of an essential facility.  SDCCC also asserts the following affirmative defenses to

17 United's claim for essential facilities:

18                   (i)      State Action Immunity.  To qualify for immunity under the State

19 Action doctrine SDCCC must establish that its anticompetitive conduct was (1) actively supervised by

20 the state; and (2) authorized by an affirmatively expressed state policy;

21                   (ii)     Local Government Antitrust Act.  This act immunizes local

22 government entities from antitrust damages awards.   Local government is defined under the LGAA as

23 (1) a city, county, parish, town, township, village or any other general function governmental unit

24 established by state law; or (2) a school district, sanitary district or any other special function govern-

25 mental unit established by state law in one or more states.  To qualify as a special governmental unit

26 SDCCC must demonstrate that:  (1) California law treats SDCCC as a governmental entity; (2) SDCCC

27 has limited geographical jurisdiction; and (3) taxpayers would bear the burden of any antitrust damage

28 award.

3.      Third Claim: Interference with Contract

(a)      Elements

The elements of United's third claim for interference with contract are as follows:

(i)      A valid contract between United and a third party;

(ii)      SDCCC's knowledge of this contract;

(iii)      SDCCC's intentional acts designed to induce a breach or disruption of the contractual relation-ship;

(iv)      actual breach or disruption of the contractual relationship (which occurs when the contract is breached or when performance is made more costly or burdensome); and

(v)      resulting damages.

(b)      Items of Damages

United seeks the following items of damages in connection with its interference with contract claim:

(i)      Actual damages;

(ii)      Exemplary and punitive damages;

(iii)      Legal fees;

(iv)      Costs, including pre-judgment interest; and

(v)      Injunctive relief, or alternatively an award for future damages.

(c)      Defenses

SDCCC denies that it interfered with United's contracts.  SDCCC also asserts the following affirmative defenses to United's claim for interference with contract:

(i)      Justification.  To establish this defense SDCCC must prove either (1) that the balance weighs in favor of the importance, social and private, of the objective advanced by the interference over the importance of the interest interfered with; or (2) that SDCCC acted to protect a legally valid interest by showing that SDCCC has a legally protected interest, that SDCCC acted in good faith to protect that interest, and that SDCCC used otherwise lawful and appropriate means to protect that interest.

(ii)      Estoppel.  To establish this defense SDCCC must prove:  (1) a representation or concealment of material facts; (2) made with knowledge, actual or virtual, of the facts; (3) to a party ignorant, actually

07cv2172

1  and permissibly, of the truth; (4) with the intention, actual or virtual, that the ignorant party act on it ;

2  and (5) that the ignorant party relied on it.

3  (iii)     Waiver.  This is the intentional relinquishment of a known right after knowledge of the true

4  facts.  A waiver may occur by an intentional relinquishment or as the result of an act which is so

5  inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been

6  relinquished.

7  (iv)     Mitigation.  To establish this defense SDCCC must demonstrate that United's conduct was

8  unreasonable and aggravated United's harm.  SDCCC must also demonstrate the amount of United's

9  losses which might have been prevented by reasonable efforts and expenditures.

10  4.        Fourth Claim: Interference with Prospective Economic Advantage

11  (a)       Elements

12  The elements of United's fourth claim for interference with prospective economic advantage are as

13  follows:

14  (i)       An economic relationship between United and a third party with the probability of future

15  economic benefit to United;

16  (ii)      SDCCC's knowledge of the relationship;

17  (iii)     SDCCC's intentional and wrongful acts designed to disrupt the relationship;

18  (iv)      actual disruption; and

19  (v)       economic harm proximately caused by SDCCC's acts.

20  (b)       Items of Damages

21  United seeks the following items of damages in connection with its interference claim:

22  (i)       Actual damages;

23  (ii)      Exemplary and punitive damages;

24  (iii)     Legal fees;

25  (iv)      Costs, including pre-judgment interest; and

26  (v)       Injunctive relief, or alternatively an award for future damages.

27  (c)       Defenses

28

07cv2172

1    SDCCC denies that its Exclusive Policy impairs Plaintiff's reasonable business expectations.  SDCCC

2    also asserts the following affirmative defenses to United's claim for interference with contract:

3    (i)      Justification.  To establish this defense SDCCC must prove either (1) that the balance weighs in

4    favor of the importance, social and private, of the objective advanced by the interference over the

5    importance of the interest interfered with; or (2) that SDCCC acted to protect a legally valid interest by

6    showing that SDCCC has a legally protected interest, that SDCCC acted in good faith to protect that

7    interest, and that SDCCC used otherwise lawful and appropriate means to protect that interest.

8    (ii)     Estoppel.  To establish this defense SDCCC must prove:  (1) a representation or concealment of

9    material facts; (2) made with knowledge, actual or virtual, of the facts; (3) to a party ignorant, actually

10   and permissibly, of the truth; (4) with the intention, actual or virtual, that the ignorant party act on it ;

11   and (5) that the ignorant party relied on it.

12   (iii)    Waiver.  This is the intentional relinquishment of a known right after knowledge of the true

13   facts.  A waiver may occur by an intentional relinquishment or as the result of  an act which is so

14   inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been

15   relinquished.

16   (iv)     Mitigation.  To establish this defense SDCCC must demonstrate that United's conduct was

17   unreasonable and aggravated United's harm.  SDCCC must also demonstrate the amount of United's

18   losses which might have been prevented by reasonable efforts and expenditures.

19   2.       SDCCC's Objection

20   SDCCC objects to United's description of the Causes of Action, Items of Damages and Affirmative

21   Defenses, on two grounds.  First, the Designation of Causes of Action, Items of Damages and Affirma-

22   tive Defenses is inappropriate for a Pre-Trial Order.  Second, SDCCC disagrees with United's character-

23   ization of the Causes of Actions, Items of Damages and Affirmative Defenses.

24   II.

25   Federal jurisdiction and venue are invoked upon the following grounds:

26   Jurisdiction is properly based on federal questions pursuant to 15 U.S.C. § 26, 15 U.S.C. § 15 and 28

27   U.S.C. §§ 1331 and 1337, because United has brought this action to restrain violations of 15 U.S.C. § 2

28   and to recover damages.  The Court has supplemental jurisdiction over United's state claims pursuant to

07cv2172

28 U.S.C. § 1367 because such claims arise out of the same core of operative facts as the federal

antitrust claims and are so related to the federal antitrust claims that they form part of the same case or

controversy.

SDCCC transacts business in San Diego and the acts complained of, which United contends are

unlawful, were committed in San Diego in the Southern District of California.  Therefore, this Court has

jurisdiction over SDCCC and venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and

(2) and 15 U.S.C.§ 22.  There is no dispute as to either jurisdiction or venue.

III.

The following facts are admitted for the purposes of this action and require no proof:

1.      This Court has personal jurisdiction over SDCCC.

2.      A substantial part of the alleged events and omissions giving rise to United's claims occurred in

and around San Diego, California, which is within the Southern District of California.

3.      United is a corporation organized and existing under the laws of the State of Nevada, authorized

and qualified to transact business in California.

4.      SDCCC is a corporation organized and existing under the laws of the State of California,

authorized and qualified to transact business in California, with its principal place of business in San

Diego, California.

5.      United is engaged in the business of providing cleaning, janitorial, maintenance and related

services to trade shows and conventions nationwide, including at the Building.

6.      SDCCC was incorporated on October 31, 1984 and has managed, marketed and operated the

Building continuously since 1989.

7.      SDCCC is a non-profit public benefit corporation, with the sole shareholder being the City of

San Diego.

8.      SDCCC operates and manages the Building located at 111 West Harbor Drive, San Diego,

California, on behalf of the City of San Diego pursuant to a management agreement.  The City of San

Diego leases the Building from the San Diego Unified Port District.  The Building offers over 615,000

square feet of exhibit space and over 1,000,000 square feet of combined exhibit and meeting space.

07cv2172

9.      SDCCC's primary business is to lease the Building, pursuant to license agreements, to various trade associations/organizations for daily periods to hold trade shows, conventions and other events.

10.      Trade shows are produced by professional associations or trade show managers acting on their behalf.  Trade associations or managers typically hire general contractors, such as GES Exposition Services ("GES"), Champion Exposition Services ("Champion") or Freeman Decorating Services, Inc., to organize and manage their trade shows at the Building.   These contractors are commonly referred to as "Decorators."  All three of these Decorators, as well as other Decorators, provide similar services at convention centers nationwide.

11.      The Decorators hire subcontractors to perform many of the various services associated with trade shows, including electrical, exhibit installation, exhibit dismantling, drayage, and other services.

IV.

The reservations as to the facts recited in paragraph III above are as follows:

1.      None

The parties note that while an admitted fact may not be contested at trial by evidence or argument to the contrary, an admitted fact does not provide grounds for the exclusion or limitation of any consistent evidence or argument at trial.

V.

A.      United's Statement

United contends that it is appropriate to include in this category the Court's findings of fact made pursuant to Federal Rule of Civil Procedure 56(g), which provides that if the Court does not grant summary judgment on an issue in full, it may deem any material fact genuinely not in dispute as established in the case.  The facts that United contends are Rule 56(g) findings are noted herein with a citation to the Court's Order Denying in Part and Granting in Part Defendant's Motion for Summary Judgment ("MSJ Order") (Dkt. No. 120).  United further contends that, pursuant to the doctrine of collateral estoppel/issue preclusion, it is appropriate to include in this category the Court's findings in its Order Denying Defendant's Motion in Limine to Exclude Expert Testimony by Patrick Kennedy ("Kennedy Order") (Dkt. No. 119).

07cv2172

Accordingly, the following facts, though not admitted, are not to be contested at the trial by evidence to the contrary.

1.      SDCCC's alleged security concerns are not related in any way to homeland security or a fear of terrorism.  (MSJ Order at 5:12-15.)

2.      SDCCC did not receive federal grant money through the Office of Homeland Security in order to make the Building more safe.  (MSJ Order at 5:15-17.)

3.      The Exclusive Policy was not a foreseeable consequence of the Executive Order signed on February 7, 2003 creating California's Office of Homeland Security.  (MSJ Order at 5:19-20.)

4.      For purposes of the Local Government Antitrust Act, there is no evidence that the San Diego taxpayers would bear the burden of any antitrust damage award against SDCCC.  (MSJ Order at 6:1-14.)

5.      In 2005, the City of San Diego adopted the Living Wage Ordinance ("LWO"), SDMC § 22.4205, et seq.  The LWO applies to a variety of entities in the City of San Diego, including SDCCC.  The LWO provides that certain categories of employees be provided a minimum level of compensation, $10 per hour, which would be adjusted with annual increases based on the cost of living.  That minimum level of compensation was higher than the amount that SDCCC was paying its Trade Show Cleaning employees.  Thus, as of the effective date of the LWO to SDCCC, July 1, 2007, SDCCC's labor costs for its Trade Show Cleaning operation increased greatly.  Importantly, the LWO does not apply to United.  (Kennedy Order at 5:15-16.)

6.      The opinion testimony of Patrick F. Kennedy, Ph.D., United's damages expert, on lost profits damages is admissible.  (Kennedy Order at 7:3-4.)

B.      SDCCC'S Statement

SDCCC objects to United's uncontested facts. SDCCC contends that it is appropriate to include, in this category, the Court's findings of fact made pursuant to Federal Rule of Civil Procedure 56(g), which provides that if the Court does not grant summary judgment motion in full, it may deem any material fact not genuinely in dispute as established in the case.  See California Dept. of Toxic Substances Control v. Interstate Non-Ferrous Corp., 298 F.Supp.2d 930, 939 (E.D.Cal. 2003) (construing predecessor provision Fed. R. Civ. P. 56(d)(1)).  The facts that SDCCC contends are Rule 56(g) findings are

07cv2172

denoted below with a citation to the Court's Order Granting in Part and Denying in Part Defendant's Motion For Summary Judgment ("Order") (Dkt. No. 120).

Accordingly, the following facts, though not admitted, are not to be contested at the trial by evidence to the contrary:

1.      A substantial part of the alleged events and omissions giving rise to UNM's claims occurred in, or substantially affect, interstate commerce.

2.      SDCCC's Articles of Incorporation were executed by an Assistant City Attorney for the City of San Diego (Order at 3:27-4:2).

3.      SDCCC's Articles of Incorporation state that Defendant is a "nonprofit public benefit corporation."  (Order at 3:27-4:2.)

4.      SDCCC's Articles of Incorporation state that Defendant was created by the City for the sole purpose of managing and operating the Convention Center (Order at 3:27-4:2; 15:26-28).

5.      SDCCC's Articles of Incorporation provide that Defendant is vested with City property and that such property re-vests with the City upon termination of Defendant (Order at 4:2-4).

6.      SDCCC receives funding from the City, is subject to independent audits, and must give public notice of meetings (Order at 4:5-7).

7.      SDCCC is a state actor for purposes of the state action doctrine (Order at 4:14-17).

8.      SDCCC's Articles of Incorporation provide that Defendant is vested with the authority to "operate and manage the San Diego Convention Center." (Order at 5:4 -6.)

9.      SDCCC implemented the Cleaning Services Policy on its own accord (Order at 12:5-6).

10.      No other entity is a party to, or a beneficiary under, SDCCC's Cleaning Services Policy (Order at 12:8-9).

11.      The Cleaning Services Policy is a result of SDCCC's unilateral action (Order at 12:9-10; 13:1-2).

12.      The Cleaning Services Policy is not the result of any concerted activity or alleged conspiratorial conduct (Order at 12:9-10; 13:1-2).

13.      SDCCC is a government entity (Order at 15:21-26).

14.      SDCCC is not a "person" within the meaning of Cal. Bus. & Prof. Code §17200, et seq. (Order at 15:21-26).

07cv2172

VI.

A.      United's Issues of Fact

The following issues of fact, and no others, remain to be litigated upon the trial:

1.      Trade Show Cleaning is a specialized product that is not reasonably interchangeable with other janitorial or custodial services.

2.      There are two distinct components to Trade Show Cleaning Services: (1) cleaning of the aisles and common areas of the Building ("Facility Cleaning"); and (2) cleaning of individual exhibit booths ("Booth Cleaning").

3.      Facility Cleaning is the cleaning of all common areas utilized by a trade show throughout the move-in phase of a trade show (which includes construction and installation of the booths and show exhibits), and through the move-out phase (comprised of dismantling the booths and exhibits and vacating the premises).  During these phases all relevant common areas must be cleaned in time for the next scheduled event.  Daily porter cleaning also is a component of Facility Cleaning.

4.      Booth Cleaning is the cleaning of individual booths and exhibits and contiguous aisle space during the show, including overnight hours.

5.      Facility Cleaning is provided by Trade Show Cleaning subcontractors to Decorators at flat, per hour rates.  Decorators sell Booth Cleaning services directly to the trade show exhibitors.  Decorators also collect the Booth Cleaning revenues directly from the exhibitors, and then split the Booth Cleaning revenues 50/50 with the Trade Show Cleaning subcontractor.  Also, on occasional shows, the Trade Association will pay for all Booth Cleaning for the show's exhibitors.  In these situations, the Decorator collects the Booth Cleaning revenue from the Trade Association and then splits it with the Trade Show Cleaning subcontractor.

6.      United provides a specialized level of Trade Show Cleaning Service based on its knowledge and experience from working shows in many cities, including the Building.

7.      Trade Show Cleaning Service contractors such as United can only profitably educate and train a separate workforce of their own at each location.  Margins are too thin and customers will not pay the expense of traveling and housing many low wage workers.

07cv2172

8.     Presently, it is not profitable for United to move employees from city to city to compete for Trade Show Cleaning contracts as a regular business model.  Therefore, United trains and maintains a workforce at each location.

9.     The distinct nature and requirements of Trade Show Cleaning Services ensure high entry barriers, including large start-up costs, upfront training, specialized knowledge and the difficulty of obtaining repetitive "learning-by-doing" skills in this business.

10.     Because the Building is one of the top five trade show venues in the United States, trade associations must typically sign a contract with SDCCC years in advance to secure a preferable date.

11.     The Building's total space of 2.6 million square feet makes it one of the largest convention facilities in the country.

12.     Trade shows are regularly held in the Building on an annual or rotating basis.

13.     Prior to July 1, 2007 SDCCC and United had competed for the business of Trade Show Cleaning Services at the Building ever since the Building opened in 1989.

14.     From the time the Building opened, United has maintained a workforce and equipment in San Diego to provide Trade Show Cleaning Services to San Diego, and specifically at the Building.  The size of the Building dictated that United's workforce be large enough to handle large trade shows that utilized the Building.

15.     In 1990 and 2000, SDCCC unsuccessfully tried to mandate the use of SDCCC employees for all Trade Show Cleaning Services within the SDCCC Building.  In both instances SDCCC threatened that any general contractor failing to use SDCCC employees for Trade Show Cleaning Services would be precluded from providing electrical services at trade shows.  Instead, electrical services would be provided exclusively by SDCCC.  Due to the fact that electrical services generate higher revenue for general contractors than Trade Show Cleaning Services, SDCCC blatantly attempted to use its control over the Building as leverage to destroy competition for Trade Show Cleaning Services.  These exclusionary efforts failed because of customer outrage.

16.     United has exclusive contracts for Trade Show Cleaning services with Decorators nationwide, including GES and Champion.

17.     In 2005, United entered into a contract with Champion for Trade Show Cleaning Services for all shows produced by Champion.  Pursuant to that contract, United charged $16.30 per hour for Facility Cleaning, and United split Booth Cleaning revenues with Champion on a per square foot basis.

18.     In 2006, United entered into a contract with GES for Trade Show Cleaning services at all venues where GES operates, including the Building.  Pursuant to that contract, United charged $16.74 per hour for Facility Cleaning, and United split Booth Cleaning revenues equally with GES.

19.     In 2006 and early 2007, in conjunction with facing the increasing labor costs associated with the effective date of the LWO, SDCCC unsuccessfully attempted to increase its share of the Trade Show Cleaning business by aggressively soliciting United's two major customers, GES and Champion.  Both GES and Champion informed SDCCC that they would continue to utilize United to perform Trade Show Cleaning Services at the Building, consistent with the national contracts United had with GES and Champion.

20.     Prior to implementation of the Exclusive Policy, Brad Gessner, SDCCC's general manager, spoke with Richard Simon, President of United, at which time Gessner complained that United's prices were too low and urged United to raise its prices.

21.     When SDCCC's efforts to solicit United's customers failed, SDCCC instituted a plan to obtain new business and increase revenues.  Effective July 1, 2007, SDCCC implemented its Exclusive Policy mandating that only SDCCC employees could perform Trade Show Cleaning Services at the Building (the "Exclusive Policy").

22.     The Exclusive Policy was adopted after Champion and GES (and likely other Decorators) already had entered into long-term contracts with the Building trade show association customers, and after the general contractors in turn had entered into Trade Show Cleaning Services contracts on a long term basis with United.  SDCCC Building licensees and customers, and their general and sub-contractors, were thus locked into the Building at the time SDCCC's Exclusive Policy was announced.

23.     SDCCC's goal in implementing the Exclusive Policy was to significantly increase its revenue.

24.     Pursuant to the Exclusive Policy, United must pay SDCCC $17 per hour for each hour that a SDCCC employee works on Facility Cleaning.

25.     Pursuant to the Exclusive Policy, United must pay its 50% share of the Booth Cleaning revenue to SDCCC.

26.     In the first year following implementation of the Exclusive Policy, SDCCC nearly tripled its Booth Cleaning revenues.  During the first two years of the Exclusive Policy, SDCCC received more than $1,200,000 in additional Trade Show Cleaning revenue that SDCCC had not received in prior years.

27.     Prior to the implementation of the Exclusive Policy, United's San Diego workforce consisted of 51 employees, including managers and supervisors, in the San Diego area.  Many of these employees were employed by United for the purpose of providing Trade Show Cleaning Services in San Diego at the Building.

28.     After the Exclusive Policy was implemented in July 2007, United lost 47 of its 51 San Diego based employees because they were not working and, therefore, United could not pay them, and they had to seek other work.

29.     A trade show cannot profitably change its show location in response to an increase in the cost of Trade Show Cleaning Services.

30.     Shows at the SDCCC Building are contracted for years in advance, thus the vast majority of trade shows held after implementation of the Exclusive Policy, and to be held at the SDCCC Building in the next several years, were/are already locked-in place by contract.

31.     Trade Show Cleaning Services is a very small component of trade show and exhibition costs. The costs for installation and dismantling ("I&D") services for the exhibit booths and electrical contracting dwarf Trade Show Cleaning, as do many other services.  Thus, even if a trade show was contractually able to switch its show to a new city, it would likely not do so simply because Trade Show Cleaning Services became more expensive.

32.     Even if a trade show wanted to switch cities, it is exceedingly difficult to do so.  There are very few facilities the size of the SDCCC Building in the United States, and these facilities are very busy. The available dates at these facilities, even five years from now, are limited.  A trade association wishing to switch location from San Diego would thus have to accept an inferior date, if one is even

available.  And since trade shows are typically held during the same week each year, an association is not likely to accept a different date.

33.     The logistics involved with switching a show location a year or two in advance are numerous and daunting.  It would simply not make sense to switch cities based solely on increases in cleaning costs.

34.     Prior to implementation of the Exclusive Policy, SDCCC conducted, and had  conducted, numerous vulnerability assessments on the Building .  None of the assessments identified Trade Show Cleaning Service subcontractors as a security risk, nor did the assessments identify United or its workers as a risk.  However, the assessments did identify numerous security risks at the Building.

35.     SDCCC did not have a legitimate business justification for implementing the Exclusive Policy.

36.     SDCCC's security and cleanliness justification for implementation of the Exclusive Policy was a pretext to cloak its efforts to gain total control of the Trade Show Cleaning Services market in San Diego and thereby substantially increase its revenues.

37.     Trade Show Cleaning contractors do not pose a safety or security risk at the San Diego Convention Center.

38.     The Exclusive Policy is applied solely to providers of Trade Show Cleaning Services despite the fact that Trade Show Cleaning Service employees constitute only about 5% of the outside labor required to operate and manage a trade show.

39.     Almost all of the workers at the Building are exempt from SDCCC's Exclusive Policy, including employees of trade associations, general contractors employees, electricians, exhibit installers, freight handlers, carpet installers, display houses, decorators, sign hangers, advertisers, florists, caterers and other general labor.  In addition, much of this labor force is unionized, and the unions admittedly do not perform background checks on these workers.

40.     SDCCC permits non-SDCCC employees to work at the Building in trades that do not compete against SDCCC.

41.     SDCCC never brought a single security issue to United's attention while United employees worked at the Building performing Trade Show Cleaning Services.  There are numerous security

incident reports that were filed at SDCCC while United worked at the Building, and none of the reports identify United as having been the cause of any security incident.

42.     Before the Exclusive Policy was implemented, United did not use temporary workers and the entirety of its workforce came from a common roster of local W-2 employees.  If United needed to supplement its work force, temporary workers were not used.  Except for minimal employee turnover, the same United employees were the ones entering and working in the Building.

43.     Not one of United's employees was ever involved in any type of security incident at the Building.

44.     United made exhaustive efforts to assuage SDCCC's purported security concerns, all of which were rejected without explanation.

45.     United offered to pay for and subject its employees to the same background checks and screening SDCCC uses for its own employees, or to let SDCCC run these identical checks on United's workers.  SDCCC rejected United's proposals.

46.     United retained Anthony D'Angelo, a retired FBI subject matter expert on counterterrorism, to review and analyze SDCCC's alleged security concerns.  Mr. D'Angelo prepared a protocol that United and its employees were willing to undergo to assuage any true security concerns of SDCCC.  Mr. D'Angelo vetted this proposed protocol with the Director of Homeland Security for the State of California, Matthew Bettenhausen.  Mr. Bettenhausen approved the protocol, and confirmed that concerns from the Department of Homeland Security were not meant to discourage participation by or prohibit competition from private sector vendors at public venues, such as the Building.  United's proposed protocol is more stringent than the protocol SDCCC uses for its own Trade Show Cleaning employees.  United offered to have its employees comply with the protocol prepared by Mr. D'Angelo.  SDCCC rejected United's offer and protocol without explanation.

47.     There are other reasonable options available to SDCCC if security was truly the concern, rather than excluding Trade Show Cleaning subcontractors.  For example, SDCCC could force all outside workers to undergo the same screening and background checks that SDCCC employees undergo, or implement a more stringent screening and background check process than what SDCCC employees

undergo.  SDCCC also could require all outside workers to undergo the same emergency preparedness training that its employees receive.

48.     There is no reason why United's employees could not undergo the training that SDCCC provides to its Trade Show Cleaning employees.

49.     SDCCC has not performed background checks on all of its employees, including its Trade Show Cleaning employees.

50.     Many SDCCC Trade Show Cleaning employees have lengthy disciplinary records, and some have been fired.

51.     It is not necessary to exclude employees of outside contractors to ensure security at convention facilities.

52.     At the time the Exclusive Policy was implemented, SDCCC did not enforce its badging protocol on employees.  In fact, SDCCC did not begin enforcing such a protocol until June, 2008.  There is no reason why United employees could not comply with SDCCC's current badging protocol and work at the Building, like all other non-SDCCC employees.

53.     A computer generated photo badging program of all labor, inside or outside, satisfies security professionals' concerns at the Building.

54.     The security assessments identified numerous vulnerabilities at the Building, many of which continue to exist at the Building.  SDCCC has elected to not take steps to reduce or eliminate the admitted vulnerabilities identified in the assessments.

55.     The relevant product market is Trade Show Cleaning at major convention centers.

56.     The relevant geographic market is large convention centers in the San Diego metropolitan area, of which there is only one, the Building.

57.     The unique size of the Building combined with high switching costs and contractual barriers, as well as the need for local Trade Show Cleaning employees, makes San Diego the relevant geographic market, because no customer is likely to switch to or select another geographic area for their trade show solely in response to a sustained Trade Show Cleaning price increase.

07cv2172

58.     Consumers of Trade Show Cleaning cannot turn to other facilities in or out of San Diego for their conventions, even if the price of Trade Show Cleaning were to rise substantially, because there are few facilities of a similar size as the Building, and nothing close to its size in San Diego.

59.     SDCCC owns a dominant share of the relevant market, because no other entity is permitted to perform Trade Show Cleaning Services at the Building.  In fact, after implementing the Exclusive Policy, SDCCC now owns 100% of the relevant market and has foreclosed competition.

60.     SDCCC exercised its market power by excluding United and non-SDCCC Trade Show Cleaning personnel from the Building.

61.     SDCCC has eliminated current and future competition and has effectively raised prices for Trade Show Cleaning at the Building through implementation of the Exclusive Policy.

62.     SDCCC alone controls who has physical access to the Building.

63.     SDCCC has the power through its control of the Building to impose discriminatory conditions on an outside contractor, such as United, that could and has eliminated competition for Trade Show Cleaning Services at the Building.

64.     Under the Exclusive Policy, United faces significant barriers to market entry.  In fact, by controlling access to the Building, SDCCC has created an absolute barrier to market entry for all competitors.

65.     Under the Exclusive Policy, United cannot increase its output to capture the market share from SDCCC if SDCCC increases its prices.

66.     SDCCC has raised rivals' costs through implementation of the Exclusive Policy.

67.     The San Diego Convention Center is an essential facility to United, without which United cannot operate as a going concern in the San Diego geographic market for Trade Show Cleaning Services.

68.     As a result of the Exclusive Policy, United can only use the Building under SDCCC's mandatory Exclusive Policy, which leaves no revenue for United to operate at the Building.

69.     United has been harmed as a result of implementation of the Exclusive Policy.

70.     Prior to the Exclusive Policy, United was charging GES and Champion approximately $16.30 per hour for Facility Cleaning in San Diego.  After imposition of the Exclusive Policy, United must pay

SDCCC a flat $17 per hour rate for Facility Cleaning and must pay SDCCC the entire 50% United earns from Booth Cleaning.

71.     After SDCCC implemented the Exclusive Policy Champion agreed to alter its split with United for Booth Cleaning revenues to 50/50 in order to reduce the losses United was suffering under the Exclusive Policy.

72.     In both the Champion and GES contracts with United, there is a clause allowing United to increase its hourly pricing for Facility Cleaning because of cost of living increases, etc.  United exercised said clauses, as permitted by the contracts with both Champion and GES.

73.     When the Exclusive Policy was implemented SDCCC knew that United was contractually bound to charge GES and Champion less than $17 per hour for Facility Cleaning.  At that time SDCCC also knew that United only received 50% of the Booth Cleaning revenues, or less, and that by forcing United to pay that entire 50% to SDCCC under the Exclusive Policy, that United was being forced to give to SDCCC all of United's Booth Cleaning revenues at the Building.

74.     After July 1, 2007, the effective date of the Exclusive Policy, United was forced to use SDCCC employees to perform Trade Show Cleaning in order to perform United's contracts with Champion and GES.

75.     United and SDCCC entered into numerous one-show contracts for trade cleaning conventions after July 1, 2007.  United was forced to enter into those contracts so as to comply with the terms of United's contracts with Champion and GES.

76.     The terms of the one-show contracts are materially the same.

77.     Under the one-show contracts United must pay SDCCC $17.00 per hour for Facility Cleaning and all 50% of its Booth Cleaning Revenues.

78.     United's contracts for Facility Cleaning require United to provide estimates in advance of each specific trade show.  United's estimates are based on the overall square footage of the common areas for a particular show and the fully-loaded hourly rates required to clean those areas.  United is not allowed to bill for hours in excess of this estimate.

79.     United is constrained by the time estimates it provides the general contractor prior to each trade show, and United cannot bill for hours worked in excess of its contractual estimate.

80.     Under the Exclusive Policy, United has no control over how many employees are dispatched by SDCCC for a show, and it cannot incentivize SDCCC's workers to be more efficient.

81.     SDCCC did not comply with United's estimates and overstaffed certain events, and then charged United for the extra labor hours.  This caused United to suffer additional damages.

82.     Trade Show Cleaning companies make most of their profits through Booth Cleaning.

83.     United receives a fixed percent of the cleaning fees paid by exhibitors to the general contractor to perform the Booth Cleaning.

84.     In San Diego, United's contracts with GES and Champion call for United to receive roughly 50% of the general contractor's revenue from these fees.  From that 50%, United has to pay its overhead and operating costs, including paying its local San Diego employees.  The remainder of any revenue constitutes United's Booth Cleaning profit margin.

85.     Under the Exclusive Policy, any competitor of SDCCC for Trade Show Cleaning must agree to pay 50% of the Booth Cleaning Revenue to SDCCC.  Therefore, unless United was able to increase its percentage of Booth Cleaning revenue, there is no profit for United.

86.     Under the Exclusive Policy, SDCCC has charged United 100% of the Booth Cleaning revenue that United receives from the general contractors.

87.     Under the Exclusive Policy, no other competitor can bid to offer Trade Show Cleaning Services at the Building with its own personnel.

88.     Consumers have been harmed as a result of implementation of the Exclusive Policy through, at a minimum, lower quality of service, fewer options, and increased costs/prices.

89.     Under the Exclusive Policy, both Champion's and GES's costs have increased because they must now pay SDCCC for certain cleaning that United previously provided free of charge.

90.     Experts and leaders in the trade show industry are opposed to the Exclusive Policy.

91.     After implementation of the Exclusive Policy, the quality of Trade Show Cleaning Services at the Building decreased due to the lack of competition.

92.     After implementation of the Exclusive Policy, neither United nor any other cleaning company has meaningful access to the Building.

93.     SDCCC is making the Building available in a discriminatory manner.

94.     Since the Policy was implemented, United has been forced to operate at a loss at the Building to in order to maintain and service its long-term contracts with its key customers.  These damages will continue unless United is permitted to return to performing Trade Show Cleaning Services at the Building.

95.     By implementing the Exclusive Policy, SDCCC acquired a "strategic dominance" in the Trade Show Cleaning Service market in San Diego, which it is using to foreclose competitors from competing with SDCCC for providing Trade Show Cleaning Services at the Building.

96.     By implementing the Exclusive Policy, consumers can no longer choose which company performs Trade Show Cleaning at the Building.

97.     GES and Champion have entered into long-term written contracts with United to provide Trade Show Cleaning Services for those trade shows operated and managed by them in San Diego.

98.     The Exclusive Policy makes it impossible for United to comply with the provisions of its contract with GES because United can no longer furnish the labor or use its best efforts to hire suitable individuals to perform the services under the contract, a term expressly contracted for.

99.     The Exclusive Policy has interfered with and caused a disruption of United's expected contractual benefits with GES.

100.    Pursuant to the terms of the United-Champion contract, Champion is no longer able to "use its best efforts" to designate United as the cleaning contractor for trade shows at the Building.

101.    SDCCC's Exclusive Policy has interfered with and caused a disruption of the expected contractual benefits between Champion and United.

102.    After implementation of the Exclusive Policy, United has to pay more to SDCCC for SDCCC's labor than United would pay its own labor, making performance more expensive for United.

103.    United has continuing relationships with several general contractors, including Brede National, Blaine Convention Services and Paradice Decorating, with the probability of future economic benefit to United.

104.    United expects it would continue to work with Brede National, Blaine Convention Services and Paradice Decorating in San Diego at the Building but for the Exclusive Policy.

07cv2172

105.   United has entered into an economic relationship with Nielsen Business Media, a trade show organizer/manager.  Under this arrangement, United has an expectation that Nielsen would designate United as the Trade Show Cleaning contractor for any and all shows at the Building, but for the Exclusive Policy.

106.   The State of California has never expressed that security at the Building was compromised by United's access thereto and, therefore, only SDCCC labor should be allowed to perform Trade Show Cleaning at the Building.

107.   The Exclusive Policy also does not qualify as a "foreseeable and logical result" of a State policy.

108.   Various state and federal agencies have issued building/reports identifying threats to sports and entertainment venues, but United was never identified as a threat, or risk, to any venue, let alone the Building.

109.   There is no state statute that expressly authorizes judicial review of SDCCC's anticompetitive conduct to ensure SDCCC's compliance with federal and state law.

110.   There is no active state supervision of SDCCC's anticompetitive conduct.

111.   SDCCC is not registered as a public agency on the Roster of Public Agencies with the California Secretary of State.

112.   SDCCC is a state actor for purposes of the state action affirmative defense.

113.   SDCCC is not a "special function governmental unit" within the meaning of the Local Government Antitrust Act.

114.   SDCCC is not legally, operationally, or financially accountable to or controlled by the public.

115.   The City of San Diego has previously sued SDCCC claiming SDCCC was not a public entity.

116.   SDCCC is not listed as a department of the City of San Diego.

117.   SDCCC exercises both operational and financial autonomy from the City of San Diego because, among other reasons, it handles its own operations, has its own budget, and hires its own executive management and employees.

118.   SDCCC is responsible for its own financial management.

119.   The City of San Diego has no obligation to fund SDCCC's operations.

120.   The City of San Diego is not liable for SDCCC's debts.

07cv2172

121.   SDCCC creates its own budget and reports on its budget to the City of San Diego.

122.   SDCCC is not registered as a public agency on the Roster of Public Agencies with the California Secretary of State.

123.   SDCCC's operating revenues during fiscal year 2008 were $34.8 million, of which 87.7% came from self-generated revenues.

124.   Even though the City makes an annual investment in SDCCC (hoping for a larger return in tax revenues) the investment is entirely at the city's discretion and SDCCC has no rights to the City's investment.

125.   Taxpayers would not bear the burden of any antitrust damage award against SDCCC.

126.   On or about March 30, 2010, with an effective date of July 1, 2010, United and Champion renewed their nationwide, exclusive contract through June 30, 2015.

127.   United will have a renewed nationwide, exclusive contract with GES effective through 2015/2016 as of the time of trial.

128.   The amount of money United is entitled to recover as damages for lost profits in Facility Cleaning.

129.   The amount of money United is entitled to recover as damages for lost profits in Booth Cleaning.

130.   United's damages are offset by reducing an appropriate percentage for supplies and expenses that were avoided since United employees did not perform the cleaning services and by the cost of the aisle porter hours billed to the general services contractors because these services are not billed by SDCCC to United.

131.   United's damages continue to accrue as each trade show takes place at the Building for which United is precluded from working.

132.   United is entitled to treble damages.

133.   SDCCC engaged in malicious and oppressive conduct.

134.   United is entitled to the imposition of punitive or exemplary damages.

135.   United has paid for attorneys' fees and costs associated with this litigation, and those fees and costs will increase through trial.

07cv2172

136.     United is entitled to an injunction precluding or prohibiting SDCCC from enforcing the Exclusive Policy, or any similar policy, on a going forward basis; or, if the Court denies injunctive relief, for an award of future damages for all future shows at the Building for which United will be precluded from performing Trade Show Cleaning Services.

B.       SDCCC's Issues of Fact

The following issues of fact, and no others, remain to be litigated upon the trial:

Antitrust Claims and Defenses

1.       The economically significant, relevant market(s), consisting of:

a.       The relevant product market(s); and

b.       The relevant geographic market(s).

2.       Whether SDCCC possessed monopoly power in any economically significant, relevant market(s).

3.       Whether SDCCC willfully acquired or maintained its monopoly through predatory or anticompetitive conduct; specifically:

a.       Whether SDCCC refused to deal with Plaintiff and thereby denied Plaintiff access to a facility essential to competition in a relevant market; and/or

b.       Whether SDCCC refused to deal with Plaintiff in a manner contrary to SDCCC's short-run best interests, when such refusal is undertaken to harm competitors and to achieve or maintain monopoly power over the long run.

4.       Whether SDCCC's conduct lacked a legitimate business justification.

5.       Whether SDCCC had specific intent to control prices or destroy competition in an economically significant, relevant market.

6.       Whether SDCCC engaged in predatory or anticompetitive conduct to accomplish monopoliza-tion; specifically:

a.       Whether SDCCC engaged in conduct designed to control prices or exclude competitors with the effect of preventing or destroying competition in an economically significant, relevant market, and where such effect is not the result of a superior product, business acumen, or historic accident;

07cv2172

b.      Whether SDCCC refused to deal with Plaintiff and thereby denied Plaintiff access to a facility essential to competition in a relevant market; and/or

c.      Whether SDCCC refused to deal with Plaintiff in a manner contrary to SDCCC's short-run best interests, when such refusal is undertaken to harm competitors and to achieve or maintain monopoly power over the long run.

7.      Whether there is a dangerous probability of SDCCC's success in achieving monopolization of an economically significant relevant market.

8.      Whether SDCCC's conduct was the legal cause of the injuries alleged by Plaintiff.

9.      Whether Plaintiff suffered injury of the type that the antitrust laws were intended to prevent.

10.     Whether Plaintiff's injuries flow from an anticompetitive aspect of SDCCC's conduct, as opposed to aspects of SDCCC's conduct that are beneficial or neutral to competition.

11.     Whether Plaintiff and SDCCC participate in the same economically significant, relevant antitrust market(s).

12.     Whether Plaintiff suffered a loss to its business or property.

13.     Whether SDCCC's alleged violation(s) of the antitrust laws was a material cause of Plaintiff's loss to its business or property.

14.     Whether Plaintiff's antitrust damages calculations are based on reasonable, non-speculative assumptions and estimates, which are not attributable to causes other than the alleged antitrust violation.

15.     Whether Plaintiff is entitled to recover its reasonable attorneys' fees and costs.

16.     Whether Plaintiff is entitled to a permanent injunction; specifically, whether: (a) Plaintiff has suffered an irreparable injury; (b) remedies available at law, such a monetary damages, are inadequate to compensate for that injury; (c) considering the balance of hardships between Plaintiff and SDCCC, a remedy in equity is warranted; and (d) the public interest would not be disserved by a permanent injunction.

17.     Whether SDCCC's alleged violation of the antitrust laws was authorized by an affirmatively expressed state policy which intended to displace competition with regulation.

18.     Whether SDCCC has limited geographic jurisdiction.

27

19.     Whether taxpayers would bear the burden of any antitrust damage award entered against SDCCC due to its alleged violation of the antitrust laws.

20.     Whether Plaintiff's conduct in attempting to avoid its loss or injury was unreasonable and aggravated its alleged harm, and the amount of losses, if any, that might have been prevented by reasonable efforts and expenditures on Plaintiff's part.

Economic Interference Torts and Defenses

1.     Valid and existing contract(s) between Plaintiff and GES.

2.     The terms of the contract(s) entered into between Plaintiff and GES.

3.     Whether SDCCC had actual knowledge of the existence of a valid and existing contract between Plaintiff and GES.

4.     Whether SDCCC engaged in intentional acts designed to induce a breach or disruption of the contractual relationship between Plaintiff and GES; that is, whether SDCCC engaged in the alleged conduct with the knowledge that interference was certain or substantially certain to occur as a result of its conduct.

5.     Whether, in light of Plaintiff's reasonable expectations, SDCCC's intentional acts actually breached or disrupted the contractual relationship between Plaintiff and GES.

6.     Whether SDCCC had actual knowledge of the existence of a valid and existing contract between Plaintiff and Champion.

7.     Valid and existing contract(s) between Plaintiff and Champion.

8.     The terms of the contract(s) entered into between Plaintiff and Champion.

9.     Whether SDCCC had actual knowledge of the existence of a valid and existing contract between Plaintiff and Champion.

10.     Whether SDCCC engaged in intentional acts designed to induce a breach or disruption of the contractual relationship between Plaintiff and Champion; that is, whether SDCCC engaged in the alleged conduct with the knowledge that interference was certain or substantially certain to occur as a result of its conduct.

11.     Whether, in light of Plaintiff's reasonable expectations, SDCCC's intentional acts actually breached or disrupted the contractual relationship between Plaintiff and Champion.

07cv2172

12.     Whether SDCCC's intentional acts of interference were a substantial factor in causing Plaintiff's actual, pecuniary damages.

13.     Whether a prospective economic relationship, i.e., an economic relationship with a probability of future economic benefit to Plaintiff, existed between Plaintiff and Brede National.

14.     Whether SDCCC had actual knowledge of the prospective economic relationship between Plaintiff and Brede National.

15.     Whether SDCCC engaged in intentional acts designed to induce a breach or disruption of the prospective economic relationship between Plaintiff and Brede National; that is, whether SDCCC engaged in the alleged conduct with the knowledge that interference was certain or substantially certain to occur as a result of its conduct.

16.     Whether SDCCC engaged in independently wrongful acts designed to induce a breach or disruption of the prospective economic relationship between Plaintiff and Brede National; that is, whether SDCCC's alleged conduct is a violation of California's Cartwright Act or Unfair Competition Law and falls outside of the privilege of fair competition.

17.     Whether, in light of Plaintiff's reasonable expectations, SDCCC's intentional acts actually breached or disrupted economic relationship with a probability of future economic benefit between Plaintiff and Brede National.

18.     Whether a prospective economic relationship, i.e., an economic relationship with a probability of future economic benefit to Plaintiff, existed between Plaintiff and Blaine Convention Services.

19.     Whether SDCCC had actual knowledge of the prospective economic relationship between Plaintiff and Blaine Convention Services.

20.     Whether SDCCC engaged in intentional acts designed to induce a breach or disruption of the prospective economic relationship between Plaintiff and Blaine Convention Services; that is, whether SDCCC engaged in the alleged conduct with the knowledge that interference was certain or substantially certain to occur as a result of its conduct.

21.     Whether SDCCC engaged in independently wrongful acts designed to induce a breach or disruption of the prospective economic relationship between Plaintiff and Blaine Convention Services;

07cv2172

that is, whether SDCCC's alleged conduct is a violation of California's Cartwright Act or Unfair Competition Law and falls outside of the privilege of fair competition.

22.     Whether, in light of Plaintiff's reasonable expectations, SDCCC's intentional acts actually breached or disrupted economic relationship with a probability of future economic benefit between Plaintiff and Blaine Convention Services.

23.     Whether a prospective economic relationship, i.e., an economic relationship with a probability of future economic benefit to Plaintiff, existed between Plaintiff and Paradice Decorating.

24.     Whether SDCCC had actual knowledge of the prospective economic relationship between Plaintiff and Paradice Decorating.

25.     Whether SDCCC engaged in intentional acts designed to induce a breach or disruption of the prospective economic relationship between Plaintiff and Paradice Decorating; that is, whether SDCCC engaged in the alleged conduct with the knowledge that interference was certain or substantially certain to occur as a result of its conduct.

26.     Whether SDCCC engaged in independently wrongful acts designed to induce a breach or disruption of the prospective economic relationship between Plaintiff and Paradice Decorating; that is, whether SDCCC's alleged conduct is a violation of California's Cartwright Act or Unfair Competition Law and falls outside of the privilege of fair competition.

27.     Whether, in light of Plaintiff's reasonable expectations, SDCCC's intentional acts actually breached or disrupted economic relationship with a probability of future economic benefit between Plaintiff and Paradice Decorating.

28.     Whether SDCCC's intentional acts of interference were a substantial factor in causing Plaintiff's actual, pecuniary damages.

29.     Whether SDCCC's conduct was justified in that it was fair and reasonable under the circumstances, balancing the importance, social and private, of the objective advanced by SDCCC's alleged interference against the importance of the interest interfered with, considering all of the circumstances, including the nature of the SDCCC's conduct and the relationship between the parties.

30.     Whether SDCCC's conduct was justified in that it has a legally protected interest, acted in good faith to protect that interest, and used otherwise lawful and appropriate means to protect that interest.

31.     Whether Plaintiff, armed with actual or virtual knowledge, represented or concealed material facts to SDCCC, who was actually and permissibly ignorant of the truth, with the actual or virtual intention that SDCCC act on it, and upon which SDCCC relied.

32.     Whether Plaintiff waived a known right after knowledge of the facts by intentional relinquishment or as the result of an act that is so inconsistent with the intent to enforce the right as to induce a reasonable belief that such right has been relinquished.

33.     Whether Plaintiff's conduct in attempting to avoid its loss or injury was unreasonable and aggravated its alleged harm, and the amount of losses, if any, that might have been prevented by reasonable efforts and expenditures on Plaintiff's part.

VII.

The exhibits to be offered at the trial, together with a statement of all admissions by and all issues between the parties with respect thereto, are as follows:

1.     A copy of the parties' joint trial exhibit list is attached hereto as Exhibit 1.

The parties have selected January 28, 2011 as the final date for their damage computations.  Because the parties will be generating additional documentation corresponding to events until this date, they anticipate adding such documents to these lists.  The parties have stipulated to filing full and complete trial exhibit lists for the Court's signature by no later than March 18 2011.

VIII.

Witnesses to be called by the parties are as follows:

1.     A list of witnesses Plaintiff intends to or may call at trial is attached hereto as Exhibit 2.

2.     SDCCC's objections to Plaintiff's witness list is attached hereto as Exhibit 3.

3.     Plaintiff's initial designation of deposition testimony that may be used at trial is attached hereto as Exhibit 4.

4.     Plaintiff's counter-designation of deposition testimony to SDCCC's initial designation of deposition testimony is attached hereto as Exhibit 5.

5.     SDCCC's objections to Plaintiff's initial designation of deposition testimony and counter-designation of deposition testimony is attached hereto as Exhibit 6.

6.     A list of witnesses SDCCC intends to or may call at trial is attached hereto as Exhibit 7.

07cv2172

7.    SDCCC's initial designation of deposition testimony that may be used at trial and SDCCC's counter-designation of deposition testimony to Plaintiff's initial designation of deposition testimony is attached hereto as Exhibit 8.

8.    Plaintiff's objections to SDCCC's witnesses, SDCCC's initial designation of deposition testimony, and SDCCC's counter-designation of deposition testimony is attached hereto as Exhibit 9.

IX.

A.    United's Issues of Law

The following issues of law, and no others, remain to be litigated upon the trial:

1.    Whether SDCCC is liable for attempted monopolization in violation of federal antitrust laws.

2.    Whether SDCCC is liable for violating the essential facilities doctrine.

3.    Whether SDCCC is liable for interfering with United's contractual relationships.

4.    Whether SDCCC is liable for interfering with United's prospective economic advantage.

5.    Whether United is entitled to recover damages on any and/or all of its claims.

6.    Whether United is entitled to treble damages.

7.    Whether United is entitled to recover punitive damages.

8.    Whether United is entitled to an award of attorneys' fees and/or costs.

9.    Whether United is entitled to injunctive relief precluding and prohibiting SDCCC from enforcing the Exclusive Policy, or any similar policy, on a going forward basis, or, if the Court denies injunctive relief, for an award of damages for all future shows at the Building for which United will be precluded from performing Trade Show Cleaning Services.

10.    Whether SDCCC is exempt from liability on the antitrust claims under the State Action Doctrine.

11.    Whether SDCCC is exempt from liability on the antitrust claims under the Local Government Antitrust Act.

12.    Whether United is barred from all or partial recovery due to the doctrine of justification.

13.    Whether United is barred from all or partial recovery due to the doctrine of estoppel.

14.    Whether United is barred from all or partial recovery due to the doctrine of waiver.

07cv2172

15.     Whether United is barred from all or partial recovery due to the doctrine of mitigation of damages.

16.     The Court's rulings on the parties' evidentiary objections.

B.      SDCCC's Issues of Law

The following issues of law, and no others, remain to be litigation upon the trial, according to SDCCC:

1.      Whether the expert opinion testimony supporting Plaintiff's proposed relevant market(s) will be helpful the jury, is based upon sufficient facts or data, and is the product of reliable principles and methods, reliably applied to the facts of the case.

2.      Whether a contractual "lock-in" is a relevant consideration for market definition or a cognizable source of monopoly power.

3.      Whether Plaintiff's "essential facilities" claim, separate and apart from a so-called unilateral refusal to deal, remains a viable theory of anticompetitive conduct.

4.      Whether SDCCC is required, as a matter of antitrust law, to provide Plaintiff with access to the Building merely because Plaintiff previously enjoyed such access.

5.      Whether under Section 2 of the Sherman Act, SDCCC's proffered business justifications may be evaluated by inquiries that second guess an alleged monopolist's business judgment, including analyses that look to "least restrictive alternatives" or balance as-yet-unknown social gains against current competitive injuries.

6.      Assuming Plaintiff establishes a prima facie Section 2 essential facilities violation premised on its proposed market definition, whether Plaintiff is entitled to any damages or equitable relief for want of antitrust injury (i.e., injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful), given that SDCCC's alleged possession of monopoly power is not, in itself, unlawful, and no remediable anticompetitive conduct exists where Plaintiff's access to the Building would merely grant Plaintiff a share SDCCC's alleged monopoly profits but would not expand output or increase market competitiveness.

7.      Whether Plaintiff is entitled to injunctive relief precluding and prohibiting SDCCC from enforcing the Cleaning Services Policy, or any similar policy, on a going forward basis, given that such

a remedy is inconsistent with antitrust's purpose, which is concerned with preventing or breaking up monopolies, not the compulsory sharing of monopolistic resources among competitors.

8.      Whether Plaintiff is entitled to injunctive relief precluding and prohibiting SDCCC from enforcing the Cleaning Services Policy, or any similar policy, on a going forward basis, given that the administrability of such a remedy would require the Court to take on the role of a central planner or regulator and determine the appropriate terms of dealing between the parties, with the undesirable result of depressing competitive advantage and innovation.

9.      Whether Plaintiff is entitled to common-law injunctive relief precluding and prohibiting SDCCC from enforcing the Cleaning Services Policy, or any similar policy, on a going forward basis, after a balancing competing social and individual interests and comparing the effects of granting and withhold-ing it and, in that connection, considering the comparative availability and advisability of other forms of amelioration to redress SDCCC's alleged tortious interference.

10.     The Court's construction of Plaintiff's contracts and advantageous economic relationships as a matter of law.

11.     Whether the Court must instruct the jury on the interference of prospective economic advantage pursuant to the directions contained in California Civil Jury Instruction (CACI) No. 2202, which provides that, before it can instruct the jury, the Court must first determine whether SDCCC's allegedly intentional acts: (1) are of the type that is "independently wrongful" as alleged by Plaintiff; and (2) fall outside the privilege of fair competition. If so, then the Court instructs the jury on the elements of the particular underlying wrongful conduct.

12.     Whether Plaintiff is entitled to common-law injunctive relief precluding and prohibiting SDCCC from enforcing the Cleaning Services Policy, or any similar policy, on a going forward basis, absent a commitment by Plaintiff to do equity by compensating SDCCC for the compulsory sharing of SDCCC's assets and despite Plaintiff's purported ability to quantify its lost future profits resulting from SDCCC's alleged tortious interference.

13.     Whether, by virtue of this Court's findings that SDCCC is a governmental entity for purposes of California state law (Dkt. 120 at 15:21 - 26), Plaintiff is not entitled to an award of punitive damages.

14.     Resolution of the parties' evidentiary objections.

07cv2172

X.

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order must supplement the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

XI.

This case will be tried by jury.

XII.

The trial of this case will not be bifurcated.

XIII.

Time estimate for trial is thirty to thirty-five days.

IT IS SO ORDERED.

DATED:  February 7, 2011

_____

Hon. Anthony J. Battaglia

U.S. Magistrate Judge

United States District Court

APPROVED AS TO FORM AND CONTENT:

DATED:  January ____, 2011          KIRBY NOONAN LANCE & HOGE LLP

        By:

35

1

2    /s/ James R. Lance /s/

3

4           James R. Lance

5    Jacob M. Slania

6    Attorneys for Plaintiff

7    UNITED NATIONAL MAINTENANCE, INC.

8

9

10

11   DATED:  January ___, 2011  WRIGHT & L'ESTRANGE

12

13

14

15           By:

16

17

18   /s/ John H. L'Estrange, Jr. /s/

19

20           John H. L'Estrange, Jr.

21   Joseph T. Ergastolo

22   Andrew E. Schouten

23   Attorneys for Defendant

24   SAN DIEGO CONVENTION CENTER CORPORATION, INC.

25

26

27

28

07cv2172