1 | James R. Lance (147173)
Jacob M. Slania (200652)
2 | **KIRBY NOONAN LANCE & HOGE LLP**
350 Tenth Avenue, Suite 1300
3 | San Diego, California 92101-8700
Telephone (619) 231-8666
4 | Facsimile (619) 231-9593

5 | Theodore R. Tetzlaff (*Pro Hac Vice*)
Kristopher J. Stark (*Pro Hac Vice*)
6 | **UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
7 | Chicago, Illinois 60602-4224
Telephone (312) 977-4400
8 | Facsimile (312) 977-4405

9 | Attorneys for Plaintiff
UNITED NATIONAL MAINTENANCE, INC.
10

11

12 | **UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**
13

14

| | |
|---|---|
| UNITED NATIONAL MAINTENANCE, INC., a Nevada corporation, | CASE NO. 07-CV-2172 AJB |
| Plaintiff, | **DECLARATION OF JACOB M. SLANIA IN SUPPORT OF PLAINTIFF'S MOTIONS IN LIMINE** |
| vs. | |
| SAN DIEGO CONVENTION CENTER CORPORATION, INC., a California corporation, | Judge: Hon. Anthony J. Battaglia
Date: March 11, 2011
Time: 1:30 p.m.
Crtrm.: A |
| Defendant. | Complaint Filed: November 13, 2007
Trial Date: March 21, 2011 |

I, Jacob M. Slania, declare as follows:

1.    I am an attorney duly licensed to practice before this Court and all courts in the

State of California, and I am a partner at Kirby Noonan Lance & Hoge LLP, attorneys of record

herein for Plaintiff United National Maintenance, Inc. ("United"). All facts stated herein are true

*(left margin vertical text)* Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  and correct of my own personal knowledge and if called as a witness I could and would testify
2  competently thereto.

3         2.     I make this declaration in support of United's Motions *in Limine* Nos. 1-9.

4         3.     Effective July 1, 2007, Defendant San Diego Convention Center Corporation, Inc.
5  ("SDCCC") implemented an exclusive policy prohibiting workers from all outside companies
6  from performing Trade Show Cleaning Services[1] at the San Diego Convention Center (the
7  "Facility"), as evidenced by the letters attached hereto as Exhibits 1 and 2.

8         4.     Prior to implementation, SDCCC stated its exclusive policy was being applied to
9  Trade Show Cleaning for "security" reasons. These statements began before July 1, 2007.
10 Attached hereto as Exhibits 1 and 2 are copies of letters from SDCCC stating that its exclusive
11 policy for Trade Show Cleaning Services was being implemented for security reasons.

12        5.     SDCCC has now admitted there actually is a financial motive to the
13 implementation of its exclusive policy. Attached hereto as Exhibit 3 is a copy of SDCCC's
14 interrogatory responses. In response to Interrogatory No. 17, at p. 14:19-21, SDCCC admits there
15 was a financial motive to implement its exclusive policy for Trade Show Cleaning Services.

16        6.     After United filed the instant case on November 13, 2007 (Dkt. No. 1), and during
17 discovery SDCCC hired a private investigator to look into United's San Diego labor force.
18 SDCCC's private investigator conducted an investigation in 2009, and as a result of that
19 investigation SDCCC discovered that some of United's San Diego-based employees had alleged
20 discrepancies regarding their social security numbers. I learned of this investigation through
21 communications with opposing counsel and through my participation at the depositions of James
22 McGee and Manuela Rocha. Attached hereto as Exhibit 4 is a copy of correspondence from

23

24
      [1] Trade Show Cleaning Services are specialized cleaning and maintenance for trade shows held at
25 convention facilities nationwide. These services are comprised of two components, Facility Cleaning and
   Booth Cleaning. Facility Cleaning is the cleaning of all common areas used by a trade show during the
26 move-in phase (including construction and installation of the booths and show exhibits) and the move-out
   phase (including dismantling the booths and exhibits and vacating the premises). Daily porter cleaning is
27 also a component of Facility Cleaning. Booth Cleaning is the cleaning of individual booths and contiguous
   aisle space during a show, and it is provided to exhibitors upon request.
28

*Left margin:* Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  opposing counsel to SDCCC's expert on security, James McGee, reflecting the alleged

2  discrepancies in the social security numbers for United's San Diego labor force. It is my

3  understanding opposing counsel obtained this information, at least in part, from SDCCC's private

4  investigator. According to United's security expert, Candice Wright, the federal government has

5  oversight responsibilities on this issue, but there is no evidence that they questioned United

6  regarding these employees or their social security numbers. Attached hereto as Exhibit 5 is a copy

7  of excerpts of her deposition testimony on this topic.

8       7.       During depositions evidence was elicited that SDCCC does not have a policy that

9  requires outside contract employees to only speak English at the Facility. Attached hereto as

10  Exhibit 6 are copies of excerpts of the Deposition of Brad Gessner eliciting such testimony.

11  According to Charles Gutensohn, whose deposition I attended, SDCCC never "considered"

12  extending that policy to all people working at the Facility, including contractors. Attached hereto

13  as Exhibit 7 are copies of excerpts of his deposition testimony on this topic.

14       8.       According to deposition testimony I have reviewed, the business of United Temps

15  is to supply temporary staffing and payroll services. Despite being subsidiaries to the same parent,

16  United Temps is a wholly distinct legal entity from United. Both United and United Temps are

17  separate corporations, file separate tax returns, and have their own set of officers. United Temps

18  has an office in Las Vegas, Nevada. In contrast, United's headquarters is in Chicago (which I have

19  visited, as has opposing counsel, Joseph Ergastolo). United Temps does not have a presence in

20  San Diego and never has, and it has no employees in San Diego. While United Temps employees

21  have occasionally been used at other locations, United Temps employees were never used at the

22  Facility. Prior to 2007, United used United Temps to assist with payroll services. United Temps

23  also provided similar payroll services for other United Service Companies entities, as well as third

24  parties. Mr. Simon analogized United Temps to ADP, a well-known payroll company used

25  nationally. Although United's employees received paychecks from United Temps, they were

26  employed and managed by Plaintiff United. Mr. Simon explained this as follows:

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

-3-

Q.    Prior to 2008, Mr. Ramirez was an employee of United Temps; right?

A.    For payroll purposes, yes.

Q.    What other purposes are there for which a person would be an employee?

A.    Operational purposes.  Would you tell me, then, that everybody that uses ADP for their payroll processing those employees are ADP employees or they're employees of the employer that supervises them, directs the work site efforts?  I would suggest to you that the people that direct the work site effort are the employer.

The contract with the customer is with United National, the employees are under the guidance of United National, the shirt, the uniform that he wears says United National on it.  Gabby Ramirez' business cards for 14 years have said United National Maintenance on it, regardless of where he gets a paycheck from.

Mr. Simon further explained that United Temps would issue payroll and then submit a billing statement to United for payment, similar to a lease.  Attached hereto as Exhibits 8 and 9 are excerpts of the deposition of United's President, Richard Simon.  Attached hereto as Exhibit 10 are excerpts of the deposition of Jorge Ortiz, United's San Diego Estimator.  Attached hereto as Exhibit 11 are excerpts of the deposition of Raymond Santos, United's Vice President.  All four of these deposition excerpts provide the factual support for the statements contained in this paragraph, and I have reviewed their deposition transcripts.

9.    SDCCC conducted discovery in this action regarding the cleaning policies at other convention facilities in the United States.  SDCCC questioned witnesses regarding the cleaning policies at convention facilities in places such as New York, Boston, Las Vegas, Florida, Houston, Phoenix, Portland and Alabama.  For example, SDCCC questioned Raymond Santos, United's Senior Operations Vice-President, about the policies of these other convention facilities, if United has tried to seek employment with those convention facilities, and whether United has considered filing a lawsuit against those convention facilities for antitrust violations.  Similarly, SDCCC questioned Richard Simon, United's President, about exclusive policies at other convention facilities.  Attached hereto as Exhibits 11 and 8/9, respectively, are excerpts of the depositions of

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1    Mr. Santos and Mr. Simon.  SDCCC also questioned other United employees regarding cleaning
2    policies at other convention facilities, and I attended those depositions.

3        10.    Nowhere in any of its discovery responses has SDCCC ever stated that its
4    exclusionary policy was implemented, or justified, because of the policies in existence at other
5    convention facilities.  Similarly, in its Rule 26 Disclosures SDCCC never stated that any evidence
6    supporting its affirmative defenses comes from policies at other convention facilities.

7        11.    During discovery evidence was elicited that SDCCC handles its own operations,
8    has its own budget, and hires its own executive management and employees.  United previously
9    provided significant evidence on this point in its opposition to SDCCC's motion for summary
10   judgment/summary adjudication, as well as referencing the evidence in its opposition
11   memorandum of points and authorities on p.32:8-23 [Dkt. No. 95].  Rather than again providing
12   all of this voluminous evidence to the Court, I am referring the Court and counsel to the discussion
13   in United's opposition brief as well as to my declaration in support of United's opposition, at
14   paragraph 18 and Exhibit P thereto [Dkt. No. 95-3 and 95-4], and United's request for judicial
15   notice [Dkt. No. 95-1], and incorporating the same herein by this reference.

16       12.    During discovery evidence was also elicited that SDCCC is responsible for its own
17   financial management, the City of San Diego has no obligation to fund SDCCC's operations, nor is
18   the City of San Diego liable for SDCCC's debts.  United previously provided significant evidence
19   on this point in its opposition to SDCCC's motion for summary judgment/summary adjudication,
20   as well as referencing the evidence in its opposition memorandum of points and authorities on
21   p.32:8-23 [Dkt. No. 95].  Rather than again providing all of this voluminous evidence to the
22   Court, I am referring the Court to the discussion in United's opposition brief as well as to my
23   declaration in support of United's opposition, at paragraph 18 and Exhibit P thereto [Dkt. No. 95-3
24   and 95-4], and United's request for judicial notice [Dkt. No. 95-1], and incorporating the same
25   herein by this reference.

26       13.    At the outset of this case United brought a motion for a preliminary injunction
27   [Dkt. No. 3] which was denied [Dkt. No. 49].  At that time no formal discovery had been
28   conducted and no live testimony was provided for the Court's consideration.  Trial of this case will

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  involve presentation of significant additional evidence that was not presented on United's motion.

2  The parties engaged in extensive document production, Rule 26 disclosures, written and expert

3  discovery and over 35 deposition sessions.  The parties have also identified over 1000 trial

4  exhibits and more than 50 potential trial witnesses.

5          14.     United filed a prior lawsuit against SDCCC, titled *United National Maintenance,*

6  *Inc. v. San Diego Convention Center Corporation, Inc.*, Case No. 37-2007-00072054-CU-BT-

7  CTL, in the Superior Court of the State of California, County of San Diego.  A copy of United's

8  Complaint in the state court case was marked as trial exhibit number 506, and SDCCC refers to

9  this case in its first motion *in limine*.  (Dkt. No. 140-4, p. 3:12-13.)  In that state court case United

10  brought a motion for a preliminary injunction, and after the motion was denied United dismissed

11  the case without prejudice.  No discovery was conducted in that case, and no live testimony was

12  presented to the Court on United's motion.  The federal antitrust claims being pursued in the

13  current case were not alleged in the prior state case.

14          15.     During discovery evidence was elicited that SDCCC refers to its employee training

15  program as the "San Diego Spirit."  Attached hereto as Ex. 12 is a copy of excerpts from the

16  SDCCC employee handbook calling its employee training program the "San Diego Spirit."

17       I declare under penalty of perjury under the laws of the United States of America that

18  the foregoing is true and correct and that this Declaration was executed on February 16, 2011,

19  at San Diego, California.

20

21                            Jacob M. Slania

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

*United National Maintenance v. San Diego Convention Center Corporation, Inc.*

(Case No: 07-CV-2172 AJB)

**TABLE OF CONTENTS OF EXHIBITS TO**

**DECLARATION OF JACOB M. SLANIA**

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | May 18, 2007 letter from SDCCC General Manager Brad Gessner to Ron Brown. | 1-8 |
| 2 | June 25, 2007 letter from SDCCC's Beatrice Kemp to Mark Valley. | 9 |
| 3 | SDCCC's interrogatory responses. | 10-25 |
| 4 | Correspondence from SDCCC's counsel to SDCCC expert, dated October 7, 2009. | 26-27 |
| 5 | Deposition Excerpts of United's Security Expert Candice Wright. | 28-31 |
| 6 | Deposition Excerpts of SDCCC's General Manager Brad Gessner. | 32-35 |
| 7 | Deposition Excerpts of Charles Gutensohn. | 36-39 |
| 8 | Deposition Excerpts of United's President Richard Simon, dated July 17, 2009. | 40-48 |
| 9 | Deposition Excerpts of United's President Richard Simon, dated September 22, 2006. | 49-64 |
| 10 | Deposition Excerpts of Jorge Ortiz. | 65-69 |
| 11 | Deposition Excerpts of United's Vice President Raymond Santos. | 70-90 |
| 12 | Excerpts of SDCCC employee handbook. | 91-111 |

KNLH\796605.1

# EXHIBITS 1-12

# EXHIBIT 1

**San Diego Convention Center Corporation**

WWW.VISITSANDIEGO.COM
111 WEST HARBOR DRIVE, SAN DIEGO, CA 92101
PHONE 619.525.5000 · FAX 619.525.5005

May 18, 2007

Mr. Ron Brown
Champion Exposition Services, Inc.
10215 South Painter Avenue
Santa Fe Springs, CA 90670

Dear Ron,

This letter is formal notification that effective July 1, 2007, the San Diego Convention Center Corporation (SDCCC) will institute a new cleaning services policy and program for events held in the Convention Center.

The program offers two (2) options for service contractors. SDCCC staff will perform all cleaning for events. The first option allows a service contractor to participate by administering cleaning services for an event. This includes processing the event orders and collecting payments. In return, the contractor will receive an equal share of the certain revenue generated. A sample of the contract that will be required is attached for your review. Alternatively, if you choose not to participate, SDCCC will administer all facets of the cleaning program and retain all revenue.

We considered many factors before deciding to implement this program. Security concerns related to ensuring that the staff are properly screened, credentialed and trained, and consistency of cleaning quality were the main factors that led to this decision. It is important to note that SDCCC performs criminal background checks and requires a drug test for every potential new hire, in addition to providing extensive training and supervision of its employees. This produces an excellent staff providing exemplary services.

Additionally, on July 1, 2007 the City of San Diego's "Living Wage Ordinance" goes into effect requiring employers providing services within the Convention Center to

EXHIBIT
1
B. Gessner, Vol I

UNM000403

EX 1 p1

Mr. Ron Brown
May 18, 2007
Page 2

pay a minimum wage of $10.34 per hour plus, in the absence of health coverage, an additional $2.07 per hour health benefit payment. SDCCC is required to ensure and enforce compliance with this law.

Ron, please feel free to call me at (619)325-5429 if you have any questions.

Sincerely,

Brad Gessner
General Manager

cc:    Carol Wallace, President & CEO

TOTAL P.09

UNM000404

Ex 1 p2

*SAMPLE CONTRACT*

### SAN DIEGO CONVENTION CENTER CORPORATION, INC.
### CLEANING SERVICES CONTRACT
#### with
#### <CONTRACTOR>
#### CONTRACT NO. <contract #>-4

This Contract is entered into on July 1, 2007, by and between the SAN DIEGO CONVENTION CENTER CORPORATION, INC. ("Corporation"), a California nonprofit corporation with primary offices located at 111 West Harbor Drive, in San Diego City and County, California and <contractor>, with primary offices located at <address> ("Service Contractor"), individually referred to herein as a "party" or collectively as the "parties".

**Recitals**

Corporation operates and manages the San Diego Convention Center ("Center") and licenses the use of the Center to entities and individuals desiring to hold events therein ("Licensees");

Service Contractor is engaged in the business of providing certain general event decorating, move-in and move-out services for conventions, trade shows and other events held in the Center ("Event") and requires cleaning services in connection therewith;

Pursuant to Corporation's business policy, all cleaning services required for Events must be performed by Corporation's employees;

This Contract sets forth the terms and conditions under which Corporation will provide and Service Contractor will administer cleaning services;

NOW THEREFORE, in consideration of the mutual covenants and conditions herein, the parties agree as follows: .

**Section 1.     TERM.** This Contract shall commence effective July 1, 2007 and terminate on June 30, 2010. This Contract may be extended for two (2) additional one (1) year periods on mutually acceptable terms and conditions.

**Section 2.     RESPONSIBILITIES**

**201.     Corporation's Responsibilities.**     Corporation shall provide all cleaning services ("Services") required by Service Contractor or its clientele in connection with Events held in the Center. The following Services shall be available:

San Diego Convention Center Corporation Cleaning Services Contract – Contract No. <1>
<Contractor>

Page 1.

UNM000405

Ex 1 p3

**SAMPLE CONTRACT**

201.1 **Booth Cleaning.** This cleaning will be provided to those exhibitors who order it and will be performed in accordance with the order. Booth cleaning will include overnight cleaning of the interior of the exhibit booth, including vacuuming, carpet cleaning, dusting, and trash removal.

201.2 **Porter Service.** This cleaning will be provided to those exhibitors ordering it and will include periodic cleaning of the interior of the exhibit booth during exhibit hours and overnight cleaning, including vacuuming, carpet cleaning, dusting, and trash removal.

201.3 **Aisle Cleaning (Move-in and Move-Out).** This cleaning will be performed during Event move-in and move-out, and will include vacuuming and cleaning aisle carpet and removing trash from the aisle area (not from exhibit booths).

201.4 **Aisle and Registration Area Cleaning during Event.** Upon request, the aisles and registration areas will be cleaned during the Event, including vacuuming and trash remove.

201.5 **Package Cleaning.** Corporation will provide cleaning of the entire exhibit area, including vacuuming, carpet cleaning, dusting, and trash removal in the exhibit booths and aisles.

202. **Service Contractor's Responsibilities.** Service Contractor shall coordinate the cleaning services required for an Event, including processing orders for cleaning services, processing billing for the Services and collecting payments from users of the Services.

**SECTION 3.   SERVICE RATES, COMMISSIONS and FINANCIAL REQUIREMENTS**

301. **Service Rates.** Corporation shall be paid for the Services as follows:

    (a)    **Booth Cleaning and Porter Service.** Corporation shall be paid fifty percent (50%) of the Gross Revenue (as defined in Section 3.2) generated by Service Contractor from third party users of the Services; but in no event shall Corporation be paid less than Seventeen Dollars ($17.00) per man hour for the Services performed.

    (b)    **Move-in and Move-Out Cleaning.** Corporation shall be paid Seventeen dollars ($17.00) per man-hour for these services.

    (c)    **Aisle and Registration Area Cleaning during Event.** Charges for this cleaning will be determined by Corporation based on the Event requirement.

UNM000406

Ex 1 p 4

**SAMPLE CONTRACT**

(d)   Package Cleaning. Corporation will perform these services at a daily rate of $.04 per square feet of the Event exhibit area.

302.   Gross Revenue. Gross Revenue is the amount billed to third parties by Service Contractor for cleaning services, excluding sales taxes. Gross Revenue shall not be reduced by refunds made by Service Contractor.

303.   Summary Service Order. At least five (5) business days prior to the first move-in day of each Event for which Service Contractor is the primary provider of decorating services, Service Contractor shall submit to Corporation's Project Manager, a summary service order for all cleaning required for the Event, in a format acceptable to Corporation.

304.   Booth Cleaning Revenue Report. On the last move-out day of each Event, Service Contractor shall submit to Corporation a detailed report of all orders for Cleaning Services for the Event, in a format acceptable to Corporation.

305.   Payment for Services. After each Event, Corporation will submit an invoice to Service Contractor for payment of the Services provided. Service Contractor shall pay invoice within thirty (30) days of receipt. Late payments shall be subject to a service charge of one and one-half percent (1.5%) per month.

306.   Corporation's Right to Audit. Corporation, with ten (10) business days prior notice, shall have the right to audit all of Service Contractor's books, files, documents and records (electronic, paper, or other form of data storage) related to the Services provided pursuant to this Contract, including, but not limited to, documents and records on ordering, billing, and collection of revenue for the Services provided by Corporation and calculation of Gross Revenue. In the event the audit discloses an underpayment to Corporation, Contractor shall pay this deficiency, immediately upon Corporation's demand. If such deficiency is more than one percent (1%) of the amount that should have been paid to Corporation, Contractor shall pay the actual cost of the audit.

307.   Financial Records. Contractor shall retain all books, files, documents and records described in Section 305, for audit purposes, for a period of five (5) years.

**SECTION 4.   GENERAL PERFORMANCE OBLIGATIONS**

401.   General Standards of Performance. Corporation's Services shall be provided in a manner that demonstrates the highest degree of customer service, quality control and professional collaboration. The Services shall be delivered in a congenial and professional manner.

402.   Written Work Orders Required. All Services requested by Service Contractor shall be pursuant to written contracts and/or written work orders that specifically detail all labor,

UNM000407

Ex 1 p5

**SAMPLE CONTRACT**

equipment, and materials requested to provide the Services, and the rates to be paid for the Services.

**403. Marketing and Contracts for Services.** Service Contractor shall market Cleaning Services in a manner acceptable to and approved by Corporation.

**404. On-Site Personnel.** Service Contractor shall have an operations representative on-site in the Facility whenever Services are being requested.

**405. Project Manager.** The parties' respective designated representatives shall be the day-to-day contact persons during the performance of Services. Service Contractor's representative is <contact>. Corporation's Project Manager is its Facility Services Manager. Corporation's Project Manager shall be provided the Summary Service Order and the Booth Cleaning Revenue Report. Corporation's Project Manager may not: (a) award, renew, terminate or cancel the Contract, or (b) sign any documents, other than confirmation of a service order, binding the Corporation.

**406. Non-Competition.** Service Contractor hereby warrants and agrees that neither Service Contractor nor any person or entity under Service Contractor's control, including but not limited to, an officer, agent, employee, subcontractor or licensee, shall provide any service or conduct any business in the Center which competes or conflicts with the Services provided by Corporation.

**SECTION 5.  GENERAL PROVISIONS**

**501. Independent Contractor Status No Agency Relationship.** Service Contractor is and shall remain an independent contractor. Neither Service Contractor nor its agents or employees shall act as officers, agents, or employees of Corporation. Service Contractor has no authority to assume or create any commitment or obligation on behalf of Corporation, or to bind Corporation in any manner.

**502. Force Majeure.** The performance obligations of either party shall be suspended during the period such performance is prevented by acts of God; war; riot; invasion; fire; accident; strike or walkout; government interference, regulation, appropriation, or rationing; or by inability to secure materials required for the Services because of the foregoing conditions. The obligation to perform shall resume immediately upon cessation of the force majeure condition(s).

**503. Notices.** Notices required by this Contract shall be deemed to have been communicated when either: (1) personally delivered; or (2) on the second (2nd) business day after mailing by overnight delivery, postage prepaid, and addressed:

| | |
|---|---|
| to Corporation: | with copies to: |
| President and Chief Executive Officer | General Manager |

San Diego Convention Center Corporation Cleaning Services Contract – Contract No. <#>
<Contractor>

Page 4.

UNM000408

Ex 1 p 6

*SAMPLE CONTRACT*

San Diego Convention Center
Corporation, Inc.
111 West Harbor Drive
San Diego, California 92101-7899

San Diego Convention Center
Corporation, Inc.
111 West Harbor Drive
San Diego, California 92101-7899

*or to Service Contractor addressed:*
< >

504.  Subordination.  This Contract and Corporation's obligations herein shall be subordinate to any ground and premises leases, and to all obligations created or given by Corporation with respect to the Facility.  Service Contractor hereby covenants and agrees that it will, at any time required by Corporation, give and execute all further assurances as may be reasonably required to evidence and effectuate this subordination provision.

505.  Binding on Successors and Assigns.  This Contract shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

506.  Assignment and Subcontracting.  Notwithstanding the foregoing, no party shall assign its performance obligations in this Contract, whether by assignment or novation, without the prior written consent of the other party, and any purported assignment, without prior written consent, shall be void and a material breach.

507.  Modifications and Amendments.  This Contract cannot be amended or modified unless made in writing and signed by both parties.

508.  Singular, Plural, and Gender.  As used herein, the singular shall include the plural and the masculine shall include the feminine or neuter.

509.  Headings.  All section and paragraph headings are for reference and convenience only and do not alter, amend, explain, interpret or affect the Contract terms.

510.  Applicable Law.  This Contract is made and entered into in the State of California and its interpretation and enforcement, and the construction of its terms, shall be governed by California law.

511.  Attorneys' Fees.  If legal action, including arbitration or action for declaratory relief, is brought by either party to interpret or enforce any provisions of this Contract, the prevailing party shall be entitled to an award of reasonable attorneys' fees and other costs incurred, the award of which may be determined in the same action or a separate action brought for that purpose.

512.  Entire Agreement.  This Contract represents the sole and entire agreement between Corporation and Service Contractor, and supersedes all prior negotiations, representations,

UNM000409

Ex 1 p 7

**SAMPLE CONTRACT**

agreements, arrangements or understandings, either oral or written, between or among the parties hereto, relating to the subject matter of this Contract.

**513. Partial Invalidity.** If any term or provision of this Contract is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Contract shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

**IN WITNESS WHEREOF,** the parties have duly executed duplicate originals of this Contract.

< contractor >                          San Diego Convention Center
                                        Corporation, Inc.


By _____             By _____
                                           Brad Gessner
Its:                                   Its:   General Manager

Approved as to form and legality by SDCCC's General Counsel 5/2007

UNM000410

Ex 1 ¥ 8

# EXHIBIT 2



**San Diego
Convention Center
Corporation**

WWW.VISITSANDIEGO.COM
111 WEST HARBOR DRIVE, SAN DIEGO, CA 92101
PHONE 619-525-5000 • FAX 619-525-5005

June 25, 2007

Mark R. Valley
Statland & Valley
221 North La Salle Street
Suite 764
Chicago, Il 60601

Re:    Booth Cleaning Services at the San Diego Convention Center

Dear Mr. Valley:

Your letter of May 29, 2007 to, Brad Gessner, has been referred to me for a response.
Apparently your client misunderstands the policy implemented by this corporation. It does
not deprive your client of it's ability to perform work in the San Diego Convention Center.
It only requires that employees of this corporation be used to provide the services. As the
operator of the building, this corporation has every right – and indeed an obligation – to
ensure the safety and security of the public and users of the Center.  This policy resulted
from more than four (4) years of careful and thoughtful study of the need, and the means,
to increase security in this prominent public facility.  That is the primary reason for the
policy.

We have every right to implement this new policy, and the result will be that the San
Diego Convention Center is a safer and consistently cleaner environment.  I am confident
of its legality.

Very truly yours,

Beatrice W. Kemp
Vice President & General Counsel

BWK:s
cc: Carol Wallace, President & CEO
    Brad Gessner, General Manager

UNM000399

**EXHIBIT**

**11**

B. Gessner, Vol I

Ex 2 p 9

# EXHIBIT 3

1    WRIGHT & L'ESTRANGE
     A Partnership Including Professional Corporations
2        John H. L'Estrange, Jr. (SBN 049594)
         jlestrange@wllawsd.com
3        Joseph T. Ergastolo (SBN 137807)
         jte@wllawsd.com
4    401 West A Street, Suite 2250
     San Diego, California 92101
5    (619) 231-4844  Fax: (619) 231-6710

6    Attorneys for Defendant
     San Diego Convention Center
7    Corporation, Inc.

RECEIVED

JUN 3 0 2008

KIRBY NOONAN LANCE & HOGE LLP

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10   UNITED NATIONAL MAINTENANCE          )   CASE NO. 07-cv-2172-BEN (JMA)
     INC., A Nevada Corporation           )
11                                        )   DEFENDANT SAN DIEGO
                        Plaintiff,        )   CONVENTION CENTER
12         v.                             )   CORPORATION, INC.'s OBJECTIONS
                                          )   AND RESPONSES TO AMENDED
13   SAN DIEGO CONVENTION CENTER          )   FIRST SET OF INTERROGATORIES
     CORPORATION, INC., A California       )   PROPOUNDED BY PLAINTIFF
14   Corporation                          )   UNITED NATIONAL MAINTENANCE,
                        Defendant.        )   INC.
15                                        )

16   PROPOUNDING PARTY:  UNITED NATIONAL MAINTENANCE, INC. ("UNM")

17   RESPONDING PARTY:    SAN DIEGO CONVENTION CENTER CORP., INC. ("SDCCC")

18   SET NO.:              ONE (1) (AMENDED)

19         Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules

20   of the United States District Court for the Southern District of California, SDCCC, through its

21   undersigned counsel, responds to UNM's first set of interrogatories ("the Interrogatories"), as

22   follows:

23                        GENERAL OBJECTIONS

24         1.    SDCCC objects to the Interrogatories as excessively broad, unduly burdensome,

25   irrelevant and not reasonably calculated to lead to the discovery of admissible evidence,

26   particularly to the extent they request that SDCCC: (a) provide information that is exclusively

27   the possession, custody or control of third parties; (b) provide information for which discovery

28



EXHIBIT
40
B. Gessner PMK

1  from plaintiff is required before a complete answer can be provided; and (c) provide

2  information concerning any events not relevant to any triable issues in this case.

3      2.    SDCCC objects to the Interrogatories and instructions to the extent they purport

4  to impose obligations that exceed the scope of the Federal Rules of Civil Procedure and the

5  Local Rules for the United States District Court for the Southern District of California.

6      3.    SDCCC objects to the definition of "Defendant" as overly broad and seeking to

7  impose discovery obligations beyond those required by the Federal Rule of Civil Procedure and

8  the Local Rules for the United States District Court for the Southern District of California.

9  SDCCC will respond to the Interrogatories solely on behalf of SDCCC.

10      4.    SDCCC objects that the Interrogatories are improperly cumulative, duplicative,

11  and overly burdensome to the extent multiple interrogatories pertain to the same information,

12  contentions, and facts.

13      5.    SDCCC objects to the Interrogatories to the extent they seek information subject

14  to the attorney-client privilege, attorney work product immunity, any confidentiality agreement

15  or any other applicable confidentially restriction, doctrine, privilege, or immunity.

16      6.    SDCCC objects to the Interrogatories to the extent that they call for information

17  which is subject to confidentially agreements, protective orders, and/or any other obligation

18  pursuant to which SDCCC is required to protect and/or maintain the confidentially of any third

19  party's documents or information.  Inadvertent disclosure of any confidential information shall

20  not operate as a waiver of any applicable confidentiality protections or obligations.

21      7.    The provision of any information in response to the Interrogatories shall not be

22  deemed to result in a waiver –as to the information provided or any other documents or

23  information not provided – of any: (a) applicable privilege, immunity, doctrine or claim of

24  confidentiality; (b) designation of the document as confidential or any similar designation

25  pursuant to any confidentially agreement, stipulation or order; (c) objection stated herein; or (d)

26  objection to the relevance or admissibility of the document.  By undertaking to respond to the

27  Interrogatories, SDCCC does not represent that any responsive information exists or is within

28  its possession, custody, or control.

Ex 3 p11

1           8.     SDCCC objects to the Interrogatories as premature to the extent they seek

2    information in the nature of expert discovery. SDCCC will provide that information, as

3    appropriate, during the appropriate phase of discovery or as otherwise provided by court order.

4           9.     SDCCC objects to the Interrogatories' definitions and instructions to the extent

5    that they call for information readily available in the public domain or public record (including

6    but not limited to published articles, court decisions, or public court filings), within plaintiff's

7    own files or knowledge, or otherwise accessible to plaintiff. SDCCC's provision of such

8    information to plaintiff would be unduly burdensome and would cause SDCCC to incur

9    unnecessary expense.

10          10.    SDCCC objects to the Interrogatories' definitions and instructions as premature

11    to the extent they seek all facts in support of a contention, claim or defense or the identity of all

12    persons or entities with responsive information. SDCCC continues to search for and recover

13.    information that may be responsive to the Interrogatories. SDCCC reserves the right to amend

14    or supplement its responses to the Interrogatories, pursuant to Federal Rule of Civil Procedure

15    26(e), should such amendments appear appropriate or necessary, and will reasonably

16    supplement in accordance with the Federal Rules of Civil Procedure and the Local Rules of the

17    United States District Court for the Southern District of California.

18          11.    These general objections shall be incorporated into each of the following

19    individual response as if fully set forth therein.

20    **SPECIFIC OBJECTIONS AND REPONSES**

21    **INTERROGATORY NO. 1:**

22         Identify all persons who provided, aided, and/or assisted in providing information

23    responsive to these Interrogatories.

24    **RESPONSE TO INTERROGATORY NO. 1:**

25         Subject to and without waiving its General Objections, SDCCC responds as follows:

26    Carol Wallace
    San Diego Convention Center

27    111 West Harbor Drive
    San Diego, CA 92101

28

3

1  Brad Gessner
   San Diego Convention Center
2  111 West Harbor Drive
   San Diego, CA 92101
3
   Ron King
4  San Diego Convention Center
   111 West Harbor Drive
5  San Diego, CA 92101

6  Joshua Layne
   San Diego Convention Center
7  111 West Harbor Drive
   San Diego, CA 92101
8
   Tom Mazzocco
9  San Diego Convention Center
   111 West Harbor Drive
10 San Diego, CA 92101

11 John H. L'Estrange, Jr
   Wright & L'Estrange
12 401 West A Street, Suite 2250
   San Diego, CA 92101
13
   Joseph T. Ergastolo
14 Wright & L'Estrange
   401 West A Street, Suite 2250
15 San Diego, CA 92101

16 **INTERROGATORY NO. 2:**

17      Identify all current and former members of Defendant's board of directors from 2001 to

18 the present.

19 **RESPONSE TO INTERROGATORY NO. 2:**

20      In addition to the General Objections, SDCCC objects to interrogatory no. 2 that some

21 of the information sought is publically available at

22 www.visitsandiego.com\resources\publications.

23      Subject to and without waiving the foregoing objections, SDCCC responds that it will

24 produce, pursuant to Federal Rule of Civil Procedure 33(d), materials sufficient to identify the

25 current and former members of its board of directors from 2001 to 2003 and 2005 to 2008.

26      The 2004 board members were:

27      April Boling

28      Wilmer Cooks, Jr.

4

1    Christine Frahm

2    Robert Gleason

3    Dan McAllister

4    Eric Rivera

5    Reint Reinders (ex officio Convis)

6    Duke Sobek (ex officio HMA)

7    Kevin Tilden

8    The 2009 board members are:

9    Chris Cramer

10   Bob Nelson

11   Alexis Gutierrez

12   Cheryl Kendrick

13   Bryan Min

14   Nikki Clay

15   Duke Sobek

16   Victoria Hobbs

17   **INTERROGATORY NO. 3:**

18   Identify all persons responsible for managing Defendant's budget.

19   **RESPONSE TO INTERROGATORY NO. 3:**

20   In addition to the General Objections, SDCCC objects to interrogatory no. 3 on the

21   ground that it seeks information that is not relevant to this action or reasonably calculated to

22   lead to the discovery of admissible evidence.  SDCCC further objects to this interrogatory on

23   the grounds that it is vague and ambiguous.

24   Subject to and without waiving the foregoing objections, SDCCC responds that the

25   following persons have some responsibility for managing SDCCC's budget:

26   • Each division manager;

27   • Each department director (for departments that have a budget);

28   • Each Vice President;

5

1        • The President and Chief Executive Officer;

2        • Budget Committee of the Board of Directors; and

3        • Board of Directors

4    **INTERROGATORY NO. 4:**

5        Identify all persons involved in creating Defendant's Security Policy.

6    **RESPONSE TO INTERROGATORY NO. 4:**

7        In addition to the General Objections, SDCCC objects to interrogatory no. 4 on the

8    ground that it is vague, ambiguous, and susceptible to more than one interpretation or

9    definition.

10       Subject to and without waiving the foregoing objections, SDCCC responds as follows

11   for the Security Policy as defined by UNM in the Interrogatories:

12       Carol Wallace
         San Diego Convention Center
13       111 West Harbor Drive
         San Diego, CA 92101
14

15       Brad Gessner
         San Diego Convention Center
16       111 West Harbor Drive
         San Diego, CA 92101

17       Robert DeNofrio
         San Diego Convention Center
18       111 West Harbor Drive
         San Diego, CA 92101
19

20       Tony Brito
         Neighborhood House Association
21       5660 Copley Drive
         San Diego, CA 92111

22       Joe Psuik
         1176 Carlene Avenue
23       Loveland, CO 80537

24       Charles Gutensohn
         No street address
25       Kabul, Afghanistan

26       Bea Kemp
         c/o San Diego Convention Center
27       111 West Harbor Drive
         San Diego, CA 92101
28

6

Ex 3 p15

**INTERROGATORY NO. 5:**

Identify and state the qualifications for all security consultants and their employees involved in assessing or analyzing security at the Convention Facility.

**RESPONSE TO INTERROGATORY NO. 5:**

In addition to the General Objections, SDCCC objects to interrogatory no. 5 as overly broad and unduly burdensome in that it is not limited to a specific time period.

Subject to and without waiving the foregoing objections, SDCCC responds that it will produce, pursuant to Federal Rule of Civil Procedure 33(d), materials sufficient to identify all security consultants involved in assessing or analyzing security at the San Diego Convention Center after September 11, 2001.

**INTERROGATORY NO. 6:**

Identify all persons with knowledge of Plaintiff's Trade Show Cleaning Service prices.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to the General Objections, SDCCC objects to interrogatory no. 6 on the ground that it is vague, ambiguous, and susceptible to more than one interpretation or definition.

Subject to and without waiving the foregoing objections, SDCCC responds that no SDCCC employee has knowledge of the prices plaintiff charges to its customers for trade show cleaning services.

**INTERROGATORY NO. 7:**

Identify all persons involved in negotiating and/or deciding the terms Plaintiff would be offered in its One Show Contracts.

**RESPONSE TO INTERROGATORY NO. 7:**

In addition to the General Objections, SDCCC objects to interrogatory no. 7 on the ground that it is vague and ambiguous because the phrase "One Show Contracts" is not defined.

Subject to and without waiving the foregoing objections, SDCCC responds that the following persons were involved in negotiating and/or deciding on terms for the contracts between UNM and SDCCC after July 1, 2007:

7

Ex 3 p16

1

2

3

Brad Gessner
San Diego Convention Center
111 West Harbor Drive
San Diego, CA 92101

Carol Wallace
San Diego Convention Center
111 West Harbor Drive
San Diego, CA 92101

Robert DeNofrio
San Diego Convention Center
111 West Harbor Drive
San Diego, CA 92101

Sara Zetts
San Diego Convention Center
111 West Harbor Drive
San Diego, CA 92101

Richard Simon

**INTERROGATORY NO. 8:**

Identify all persons with knowledge of Plaintiff's offer to run background checks on its

employees.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the General Objections, SDCCC objects to interrogatory no. 8 on the

ground that it seeks information that is not relevant to this action or reasonably calculated to

lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, SDCCC responds as follows:

Brad Gessner
San Diego Convention Center
111 West Harbor Drive
San Diego, CA 92101

Carol Wallace
San Diego Convention Center
111 West Harbor Drive
San Diego, CA 92101

Richard Simon

Anthony D'Angelo

///

///

8

Ex 3 p17

**INTERROGATORY NO. 9:**

Identify all persons with knowledge of Plaintiff's alleged use of temporary workers at the Convention Facility.

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the General Objections, SDCCC objects to interrogatory no. 9 on the ground that it seeks information that is not relevant to this action or reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, SDCCC responds as follows: Carol Wallace.

**INTERROGATORY NO. 10:**

Identify every category of person who can enter the Convention Facility without undergoing a security check, including but not limited to a background check.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the General Objections, SDCCC objects to interrogatory no. 10 as overly broad and unduly burdensome, and on the grounds that it is vague, ambiguous and susceptible to more than one interpretation or definition and is not limited to any particular time period.

Subject to and without waiving the foregoing objections, SDCCC responds as follows, with respect to its current practice:

The only persons who can enter the San Diego Convention Center without undergoing a security check are guests at certain public shows.

**INTERROGATORY NO. 11:**

Identify every trade show under contract with Defendant from inception of the Security Policy as far into the future as such contracts exist.

**RESPONSE TO INTERROGATORY NO. 11:**

In addition to the General Objections, SDCCC objects to interrogatory no. 11 as overly broad and unduly burdensome, and on the grounds that it seeks information that is not relevant to this action or reasonably calculated to lead to the discovery of admissible evidence.

///

9

1    Subject to and without waiving the foregoing objections, SDCCC responds as follows:

2    Attached to this response is a list of every trade show under contract with SDCCC dated

3 from July 1, 2007. The list is designated "For Counsel Only" pursuant to the parties' protective

4 order entered by the Court on March 23, 2009.

5 **INTERROGATORY NO. 12:**

6    Identify all services provided directly by Defendant to users of the Convention Facility.

7 **RESPONSE TO INTERROGATORY NO. 12:**

8    In addition to the General Objections, SDCCC objects to interrogatory no. 12 on the

9 grounds that it is vague, ambiguous, and susceptible to more than one interpretation or

10 definition and is not limited to any particular time period.

11    Subject to and without waiving the foregoing objections, SDCCC responds that it

12 currently contracts for the following services directly with licensees of the San Diego

13 Convention Center:

14    1.    Convention Services Manager (assists licensee with securing hotel room blocks,

15        city services, etc.);

16    2.    Event Manager (main contact on site prior to and during the event);

17    3.    Lobby staffing;

18    4.    Security guard - front drive.

19    5.    Cleaning Services

20 **INTERROGATORY NO. 13:**

21    Identify all businesses housed within the Convention Facility pursuant to contracts with

22 Defendant.

23 **RESPONSE TO INTERROGATORY NO. 13:**

24    In addition to the General Objections, SDCCC objects to interrogatory no. 13 on the

25 grounds that it is vague, ambiguous and susceptible to more than one interpretation or definition

26 and is not limited to any particular time period.

27 ///

28 ///

Ex 3 p 19

1    Subject to and without waiving the foregoing objections, SDCCC responds that the

2    following vendors currently have on site operations at the San Diego Convention Center,

3    pursuant to contracts with the San Diego Convention Center:

4        1.    FedEx Office;

5        2.    Smart City Networks;

6        3.    Centerplate Food Services;

7        4.    A V Concepts;

8    **INTERROGATORY NO. 14:**

9    Identify every agreement Defendant has entered into to provide trade show cleaning

10   services to users of the Convention Facility from January 1, 2001 to the present.

11   **RESPONSE TO INTERROGATORY NO. 14:**

12   In addition to the General Objections, SDCCC objects to interrogatory no. 14 on the

13   grounds that it seeks information that is not relevant to this action or reasonably calculated to

14   lead to the discovery of admissible evidence.  SDCCC further objects to this interrogatory on

15   the ground that it is overbroad and burdensome as to time.

16   Subject to and without waiving the foregoing objections, SDCCC responds that it will

17   produce, pursuant to Federal Rule of Civil Procedure 33(d), documents sufficient to identify

18   every agreement SDCCC has entered into to provide Trade Show cleaning services to users of

19   the San Diego Convention Center from January 1, 2003 to the present.

20   **INTERROGATORY NO. 15:**

21   Identify all persons involved in drafting, editing, or approving the May 18, 2007 letter

22   announcing the Security Policy.

23   **RESPONSE TO INTERROGATORY NO. 15:**

24   In addition to the General Objections, SDCCC objects to interrogatory no. 15 on the

25   grounds that it is vague, ambiguous and susceptible to more than one interpretation or

26   definition.

27   ///

28   ///

11

Ex 3 p 20

1    Subject to and without waiving the foregoing objections, SDCCC responds as follows:

2    Brad Gessner
     San Diego Convention Center
3    111 West Harbor Drive
     San Diego, CA 92101
4

5    Carol Wallace
     San Diego Convention Center
6    111 West Harbor Drive
     San Diego, CA 92101

7    Robert DeNofrio
     San Diego Convention Center
8    111 West Harbor Drive
     San Diego, CA 92101
9

10   Joe Psuik
     1176 Carlene Avenue
11   Loveland, CO 80537

12   Charles Gutensohn
     No street address
13   Kabul, Afghanistan

14   Tony Brito
     Neighborhood House Association
15   5660 Copley Drive
     San Diego, CA 92111

16   Bea Kemp
     c/o San Diego Convention Center
17   111 West Harbor Drive
     San Diego, CA 92101
18

19   **INTERROGATORY NO. 16:**

20       Identify all sources of funding for Defendant's budget.

21   **RESPONSE TO INTERROGATORY NO. 16:**

22       In addition to the General Objections, SDCCC objects to interrogatory no. 16 as overly

23   broad and unduly burdensome, and on the ground that it seeks information that is not relevant to

24   this action or reasonably calculated to lead to the discovery of admissible evidence. SDCCC

25   further objects to this Interrogatory on the grounds that it is vague, ambiguous and susceptible

26   to more than one interpretation or definition and is not limited to any particular time period.

27   ///

28   ///

Ex 3 p21

1    Subject to and without waiving the foregoing objections, SDCCC responds that it will

2  produce, pursuant to Federal Rule of Civil Procedure 33(d), SDCCC's fiscal year 2009 budget,

3  which identifies sources of funding for SDCCC.

4  **INTERROGATORY NO. 17:**

5    State each and every reason why Defendant implemented the Security Policy.

6  **RESPONSE TO INTERROGATORY NO. 17:**

7    Subject to its General Objections, and limited to the definition of Security Policy

8  contained in the Interrogatories, SDCCC responds as follows:

9    Since the opening of the San Diego Convention Center in 1989, SDCCC has been

10  concerned about the safety and security of its facility and everyone entering the facility. Those

11  security concerns increased after September 11, 2001, and caused SDCCC to retain third party

12  consultants to assess security procedures at the San Diego Convention Center and make

13  recommendations for improvements. Those outside assessments took place in 2003, 2005 and

14  2006. One of the key recommendations from each of the assessments was to attempt to limit

15  access to the San Diego Convention Center while continuing to permit it to function as a public

16  meeting facility.

17    In June 2005, Chuck Gutenshon, then head of security at SDCCC, attended a training

18  conference in Dallas, Texas, put on by the Association for Venue Safety and Security

19  ("AVSS"), a group within the International Association of Assembly Managers ("IAAM").

20    Joe Psuik, then Chief Operating Officer of the SDCCC, also attended the Dallas

21  conference, as an instructor. To better train public facility personnel, Joe Psuik and others

22  conducted table-top war games. The table-top war games included scripts for aggressors and

23  defenders, with a mock terrorism exercise. The exercise for the convention center employed

24  attendees was an event at the San Diego Convention Center.

25    Gutensohn and other San Diego Convention Center employees participated in the table-

26  top war game with the San Diego Convention Center as the target. During the exercise, which

27  lasted the majority of two full days of the conference, it became clear to Gutensohn and others

28  that controlling access to the convention center was critical to prevent terrorist acts. (The

13

Ex3 p22

1   aggressors in the war game infiltrated third party vendors providing services to the San Diego

2   Convention Center.  Among the vendors discussed during the exercise were the cleaning crews,

3   because the skills for the cleaning crews are easily learned and could easily be infiltrated.)

4        After the conference, Joe Psuik (who was the coordinator for the convention center

5   table-top war game) and Chuck Gutensohn reported back to Carol Wallace and Brad Gessner

6   that SDCCC needed to better control access to the Convention Center.  His concerns regarding

7   access led to many changes in procedures at the Convention Center, including the

8   implementation of the Security Policy.

9        In addition to the security concerns, SDCCC was not satisfied with the performance of

10  the rank and file UNM employees on site at the San Diego Convention Center providing

11  cleaning services.  Some of the UNM employees did not speak English and, therefore, could not

12  communicate effectively with SDCCC personnel in the case of an emergency.  (Unlike some

13  other third party vendors who are not on the event floor, the cleaning crews are physically

14  present while the events are taking place.)  SDCCC was not satisfied by the work performance

15  of the UNM employees or the less than professional appearance of the UNM employees.

16  SDCCC was also concerned that the appearance of the UNM employees would leave a bad

17  impression of the San Diego Convention Center on those attending events at the San Diego

18  Convention Center.

19       Finally, SDCCC implemented the security policy, as defined by UNM, because there

20  was no cost and it increased revenue, thus reducing SDCCC's financial reliance on the City of

21  San Diego for marketing, promotion and/or capital projects.

22  **INTERROGATORY NO. 18:**

23       Identify all persons or categories of persons to whom Defendant's Security Policy

24  applies.

25  **RESPONSE TO INTERROGATORY NO. 18:**

26       In addition to the General Objections, SDCCC objects to interrogatory no. 18 on the

27  ground that it is vague and ambiguous.

28  ///

14

## VERIFICATION

I am President and Chief Executive Officer of Defendant San Diego Convention Center Corporation, Inc. and am authorized to make this verification on its behalf. I have read the foregoing Objections and Responses to Amended First Set of Interrogatories Propounded by Plaintiff United National Maintenance, Inc. and know the contents thereof. I am informed and believe that the matters stated therein are true and on that ground declare under penalty of perjury that the foregoing is true and correct.

Executed on June 26, 2009, at San Diego, California.

Carol Wallace

Carol Wallace

Ex 3 p24

| UNITED STATES DISTRICT COURT,<br>SOUTHERN DISTRICT OF CALIFORNIA | FOR COURT USE ONLY |
|---|---|
| TITLE OF CASE (Abbreviated) UNITED NATIONAL<br>MAINTENANCE, INC. v. SAN DIEGO CONVENTION CENTER<br>CORP., INC. | |
| ATTORNEY(S) NAME AND ADDRESS AND TEL. & FAX NOS.<br>John H. L'Estrange, Jr., Esq. (SBN 049594)     (619) 231-4844<br>WRIGHT & L'ESTRANGE           Fax:   (619) 231-6710<br>401 West A Street, Suite 2250<br>San Diego, CA 92101 | |

| ATTORNEY(S)<br>FOR:<br>Defendant | HEARING:   DATE       TIME       DEPT | CASE NUMBER<br>07-cv-2172 BEN (JMA) |
|---|---|---|

| CERTIFICATE OF SERVICE |
|---|

I am a resident of the State of California over the age of 18 years, and not a party to the within action. My business address is 401 West A Street, Suite 2250, San Diego, CA 92101. On June 29, 2009, I served the following:

**DEFENDANT SAN DIEGO CONVENTION CENTER CORPORATION, INC.'s OBJECTIONS AND RESPONSES TO AMENDED FIRST SET OF INTERROGATORIES PROPOUNDED BY PLAINTIFF UNITED NATIONAL MAINTENANCE, INC.**

**X**____ **U.S. MAIL:** I placed a copy in a separate envelope, with postage fully prepaid, for each addressee named herein for collection and first class mailing on the below indicated date. I am readily familiar with Wright & L'Estrange's practices of for collection and processing of correspondence for mailing with the United States Postal Service.

| James R. Lance, Esq.<br>Jacob M. Slania, Esq.<br>Dylan O. Malagrino, Esq.<br>KIRBY NOONAN LANCE & HOGE, LLP<br>350 Tenth Avenue, Suite 1300<br>San Diego, CA 92101<br>Attorney for Plaintiff, United National Maintenance | Theodore Tetzlaff, Esq.<br>Kristopher J. Stark, Esq.<br>UNGARETTI & HARRIS<br>3500 Three First National Plaza<br>Chicago, IL 60602-4224<br>Attorney for Plaintiff, United National Maintenance |
|---|---|

Executed on June 29, 2009, at San Diego, California. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

*Terry E. Dumas*
Terry E. Dumas

Case No. 07-CV-2172 BEN (JMA)

Ex 3 p 25

# EXHIBIT 4

WRIGHT & L'ESTRANGE
A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS
LAWYERS
401 WEST A STREET, SUITE 2250
SAN DIEGO, CALIFORNIA 92101
(619) 231-4844 · FAX (619) 231-6710
www.wllawsd.com

Writer's e-mail address:
jte@wllawsd.com

October 7, 2009

Via Federal Express

James A. McGee
22426 Fox Run Drive
Pass Christian, MS  39571

Re:   United National Maintenance, Inc. vs. San Diego Convention
       Center Corporation, Inc..

Dear Mr. McGee:

Enclosed are 51 files containing information regarding United National Maintenance employees identified in the exhibit to the Buddy Lynn Declaration dated November 11, 2007.

Also enclosed is a single page chart summarizing the information in the 51 files.

Please let me know if you have any questions.

Very truly yours,

Joseph T. Ergastolo

JTE/rvj
Encls.

Exhibit _____ 5/8
Witness: _McGee_
Date: _12/15/09_
Laura Taylor Martin, CSR 4158

Ex 4 p 26

| NAME | HAVE SSN | SOURCE (PF/ EX. 82) | MATCH |
|---|---|---|---|
| 1 ELBA ESPINOZA | Y | PF | N |
| 2 HENRY SOLANO | Y | PF | Y |
| 3 JERRY TREJO | Y | PF | Y |
| 4 SOCORRO ROCHA | N | NA | NA |
| 5 MANUELA ROCHA | Y | PF | N |
| 6 HILDA ACUÑA | Y | PF | Y |
| 7 ARACELY MONTENEGRO | N | NA | NA |
| 8 ALAIN GILBERT | Y | PF | Y |
| 9 JAIME QUINTANA | Y | 82 | N |
| 10 GABRIEL RAMIREZ | Y | PF | Y |
| 11 JORGE ORTIZ | N | NA | NA |
| 12 AHAIN GILBERT | Y | PF | Y |
| 13 MARIA L. RAMIREZ | Y | PF | Y |
| 14 CELIA SOLANO | Y | PF | Y |
| 15 HUGO GONZALEZ | Y | PF | N |
| 16 CHRISTINA CAMACHO | Y | PF | N |
| 17 MARIA BARROSO | Y | PF | N |
| 18 OSVELIA GILBERT | Y | PF | Y |
| 19 ROSA JUAREZ | Y | PF | N |
| 20 PEDRO TILAPA | Y | PF | N |
| 21 FELICITAS JIMENEZ | Y | PF | N |
| 22 JAMES HATFIELD | N | NA | NA |
| 23 MARIANA HERNANDEZ | Y | PF | N |
| 24 ARIEL ROCHA | Y | PF | Y |
| 25 JULIO VILLALOBOS | N | NA | NA |
| 26 FRANCISCO RAMIREZ | Y | PF | N |
| 27 ALFREDO RAMIREZ | Y | PF | Y |
| 28 ROXANA ARIZMENDI | Y | PF | N |
| 29 DELFINO JIMENEZ | Y | PF | Y |
| 30 OSCAR NAVARRO | Y | PF | N |
| 31 OLGA LOYO | Y | PF | Y |
| 32 ALEJANDRO CASTILLO | Y | PF | Y |
| 33 EVELYN RAMIREZ | Y | PF | Y |
| 34 HUMBERTO SANCHEZ | Y | PF | N |
| 35 MAGALY SANCHEZ | Y | 82 | N |
| 36 JESUS A. HERNANDEZ | Y | PF | N |
| 37 ESMERALDA RAMIREZ | Y | PF | Y |
| 38 ROSARIO RAMIREZ | Y | PF | N |
| 39 MARIA CARRILLO | Y | PF | Y |
| 40 JOSE H. ZAVALA | Y | PF | Y |
| 41 RODOLFO FAMANIA | Y | PF | N |
| 42 GUADALUPE SILVA | Y | PF | N |
| 43 MARIA DELGADO | Y | PF | Y |
| 44 ARIAN SIMONES | Y | PF | N |
| 45 MARIA JIMENEZ | N | NA | NA |
| 46 SANTOS JR. BENITEZ | Y | PF | Y |
| 47 LAURA MENDOZA | Y | PF | N |
| 48 ANTONIO GUIZAR | N | NA | NA |
| 49 FIDELA RAMIREZ | Y | PF | N |
| 50 PABLO D. RAMIREZ | N | NA | NA |
| 51 PEDRO IVAN TADEO | Y | PF | N |

# EXHIBIT 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


UNITED NATIONAL MAINTENANCE,
INC., a Nevada corporation,

    Plaintiff,

     vs.

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a
California corporation,

    Defendant.

No. 07-CV-2172 BEN
(JMA)

# ORIGINAL

---

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order


DEPOSITION OF CANDICE WRIGHT

San Diego, California

Thursday, December 17, 2009


Reported by:
JEANNE M. GARLOW
CSR No. 3456

Job No. 125917

Ex 5 p 28

1   that's the only way he would have had it.  So it would

2   have been in the documents produced.

3        Q.    Just have a few questions regarding the

4   rebuttal report.

5        A.    Okay.

6        Q.    Turn to page 4 of the report.  The third

7   full paragraph states, "However, I have been informed

8   that if UNM is notified by the Social Security

9   Administration that an employee's Social Security

10  number is inaccurate, the employee is notified and

11  given the opportunity to resolve the issue as

12  prescribed by law.  If the employee does not correct

13  the problem, they are no longer allowed to work for

14  the company."

15            Where did you obtain that information?

16       A.    From Mr. Simon.

17       Q.    When did you obtain that information from

18  Mr. Simon?

19       A.    Well, it would have been prior to writing

20  this.

21       Q.    How much --

22       A.    Sometime between --

23       Q.    -- prior?

24       A.    -- the time that I received the expert

25  report from Mr. McGee and when I prepared this.

                                                            210

Ex5 p29

1        Q.    So sometime between October 21st, 2009 and

2   November 11th, 2009?

3        A.    Correct.

4        Q.    You spoke to Mr. Simon regarding this

5   specific issue or something other than this specific

6   issue -- strike that.

7              Did you speak to Mr. Simon regarding

8   anything else other than the Social Security number

9   issue in preparation for the supplemental report --

10  the rebuttal report?

11       A.    Not to my knowledge.

12       Q.    Why did you contact him?

13       A.    Because I didn't understand their policy on

14  Social Security numbers.

15       Q.    Whose policy?

16       A.    United.

17       Q.    Did Mr. Simon tell you that this policy was

18  in effect as of July 1, '07?

19       A.    No.

20       Q.    Do you know when it became effective?

21       A.    I do not.

22             (Previously marked Exhibit 81 first

23  referenced.)

24  BY MR. ERGASTOLO:

25       Q.    Have you take a look at what was previously

                                                    211

Ex 5 p30

I, CANDICE WRIGHT, do hereby declare
under penalty of perjury that I have read the
foregoing transcript; that I have made such
corrections as noted herein, in ink, initialed by me,
or attached hereto; that my testimony contained here,
as corrected, is true and correct.

EXECUTED this _4th_ day of _February_,
20_10_, at _LONG Beach_____, _Ca_____.
               (City)                    (State)


_Candice Wright_ (signature)

CANDICE WRIGHT

224

Ex 5 p 31

# EXHIBIT 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

       Plaintiff,

vs.                    No. 07-CV-2172 BEN (JMA)

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,

       Defendant.

**CERTIFIED COPY**

---

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order


DEPOSITION OF BRAD GESSNER

San Diego, California

Tuesday, July 14, 2009

Volume 2


Reported by:
MARGARET A. SMITH, RPR, CRR
CSR No. 9733

Job No. 116177

EX 6 p 32

07/14/09

| 09:23:08 | 1 | responsible for wasn't up to our standards. |
| 09:23:10 | 2 | So all of those things played into the |
| 09:23:17 | 3 | Convention Center team feeling that the United National |
| 09:23:20 | 4 | Maintenance crews were -- were not to our level of -- of |
| 09:23:27 | 5 | performance. |
| 09:23:30 | 6 | Q   Have you ever personally found other |
| 09:23:34 | 7 | employees -- strike that. |
| 09:23:35 | 8 | Have you ever personally found employees of |
| 09:23:37 | 9 | other entities, other than United National, in areas |
| 09:23:41 | 10 | they shouldn't be? |
| 09:23:42 | 11 | A   Yes, I have. |
| 09:23:43 | 12 | Q   Okay.  Have you had reports to you of employees |
| 09:23:45 | 13 | from other companies being in places that they |
| 09:23:49 | 14 | weren't -- |
| 09:23:52 | 15 | A   Hmm-mm. |
| 09:23:52 | 16 | Q   -- approved? |
| 09:23:53 | 17 | A   No. |
| 09:23:54 | 18 | Q   And which companies did you -- strike that. |
| 09:23:56 | 19 | Which companies have you found employees of -- |
| 09:23:59 | 20 | that are in areas they shouldn't be in? |
| 09:24:03 | 21 | A   It was only one other time, and it was an |
| 09:24:05 | 22 | audiovisual company. |
| 09:24:11 | 23 | Q   Which company? |
| 09:24:12 | 24 | A   I don't recall. |
| 09:24:19 | 25 | Q   Is speaking English a requirement to work at |

270

EX 6 p 33

| Time | Line | |
|---|---|---|
| 09:24:22 | 1 | the Convention Center? |
| 09:24:23 | 2 | A    For our employees, it is. |
| 09:24:24 | 3 | Q    Okay.  Is speaking English a requirement for |
| 09:24:25 | 4 | any contract employees working at the Convention Center? |
| 09:24:28 | 5 | A    No.  We have no requirements. |
| 09:24:30 | 6 | Q    Okay.  Are there other nonEnglish speaking |
| 09:24:33 | 7 | people who work in the Convention Center? |
| 09:24:35 | 8 | A    Not that I'm aware of. |
| 09:24:36 | 9 | Q    Okay.  So in your time at the Convention |
| 09:24:39 | 10 | Center, you've never come across any nonSan Diego |
| 09:24:43 | 11 | Convention Center employee who didn't speak English? |
| 09:24:44 | 12 | A    No, I haven't. |
| 09:24:46 | 13 | Q    So speaking English is not part of the vetting |
| 09:24:51 | 14 | program, is that correct, for nonSan Diego Convention |
| 09:24:54 | 15 | Center employees? |
| 09:24:55 | 16 | A    Correct. |
| 09:25:00 | 17 | Q    Is there a -- some type -- well, strike that. |
| 09:25:04 | 18 | You mentioned that you believe that some of the |
| 09:25:07 | 19 | United employees were slovenly at times. |
| 09:25:10 | 20 | Is that your testimony? |
| 09:25:11 | 21 | A    Yes. |
| 09:25:11 | 22 | Q    Okay.  Have you ever seen any other employees |
| 09:25:13 | 23 | working at the Convention Center who are nonSan Diego |
| 09:25:16 | 24 | Convention Center employees who were slovenly? |
| 09:25:18 | 25 | A    No. |

271

Ex 6 p 34

1        I, BRAD GESSNER, do hereby declare under penalty of

2    perjury that I have read the foregoing transcript; that

3    I have made any corrections as appear noted, in ink,

4    initialed by me, or attached hereto; that my testimony

5    as contained herein, as corrected, is true and correct.

6        EXECUTED this _27TH_ day of _AUGUST_,

7    20_09_, at _SAN DIEGO_, _CA_.
                (City)         (State)

8

9

10

11                _____
            BRAD GESSNER

12                VOLUME 2

13

14

15

16

17

18

19

20

21

22

23

24

25

318

EX 6 p 35

# EXHIBIT 7

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

        Plaintiff,

vs.                      No. 07-CV-2172 BEN (JMA)

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,

        Defendant.

**CERTIFIED COPY**

---

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order


VIDEOTAPED DEPOSITION OF CHARLES GUTENSOHN

San Diego, California

Thursday, October 1, 2009

Volume 1


Reported by:
MARGARET A. SMITH, RPR, CRR
CSR No. 9733

Job No. 121615

Ex 7 p 36

| | | |
|---|---|---|
| 15:26:07 | 1 | sheets every day so the Convention Center would know who |
| 15:26:09 | 2 | was -- |
| 15:26:10 | 3 | A    No. |
| 15:26:10 | 4 | Q    -- on site? |
| 15:26:11 | 5 | A    No, I did not. |
| 15:26:12 | 6 | Q    Why not? |
| 15:26:13 | 7 | A    I didn't think it was necessary. |
| 15:26:23 | 8 | Q    Did you ever tell anybody that the parking |
| 15:26:25 | 9 | garage was a large risk? |
| 15:26:27 | 10 | A    I'm sure I said it a number of times. |
| 15:26:42 | 11 | Q    Do you know if it's a requirement that |
| 15:26:44 | 12 | Convention Center employees speak English? |
| 15:26:48 | 13 | A    I believe it is.  I believe it is.  I know with |
| 15:26:54 | 14 | my own employees, we had a -- like a little written test |
| 15:26:58 | 15 | so we could see if they could actually write an incident |
| 15:27:02 | 16 | report, whatever.  And, of course, they had to speak -- |
| 15:27:07 | 17 | they all dealt with the public.  So they had to speak |
| 15:27:09 | 18 | English. |
| 15:27:10 | 19 | But my understanding was I thought that |
| 15:27:11 | 20 | everybody had to speak English. |
| 15:27:13 | 21 | Q    Did you ever think to implement that as a |
| 15:27:16 | 22 | security policy across the board, that everybody who was |
| 15:27:19 | 23 | working at the Convention Center, including contractors, |
| 15:27:23 | 24 | I&D houses, security personnel, that they all be |
| 15:27:27 | 25 | required to speak English? |

Ex 7 p37

| | | |
|---|---|---|
| 15:27:29 | 1 | **A**    I did not -- did not consider that. |
| 15:27:30 | 2 | **Q**    Why not? |
| 15:27:33 | 3 | **A**    It was just one issue.  It didn't -- it didn't |
| 15:27:35 | 4 | come to my mind. |
| 15:27:38 | 5 | **Q**    Was there ever a security concern because |
| 15:27:40 | 6 | individuals working on the floor couldn't speak English? |
| 15:27:46 | 7 | **A**    My concern was when we did evacuations, if you |
| 15:27:49 | 8 | couldn't understand what was being said, it could be a |
| 15:27:53 | 9 | serious problem, because we wanted to turn to not only |
| 15:27:58 | 10 | the -- the -- our own employees, but whoever was working |
| 15:28:02 | 11 | there to assist in getting people off the floor.  And we |
| 15:28:06 | 12 | did all those commands in English. |
| 15:28:19 | 13 | MR. SLANIA:  Let's take a couple minutes for me |
| 15:28:20 | 14 | to go through my notes. |
| 15:28:21 | 15 | (Recess.) |
| 15:33:58 | 16 | VIDEOGRAPHER:  We're back on the record at |
| 15:34:00 | 17 | 3:34 p.m. |
| 15:34:04 | 18 | MR. SLANIA:  I want to show you a document that |
| 15:34:06 | 19 | we'll mark as Exhibit No. 422.  It's a two-page email |
| 15:34:14 | 20 | string, Bates labeled SDCC 100695 and 696. |
| 15:34:22 | 21 | This is referencing a counterterrorism |
| 15:34:25 | 22 | training. |
| 15:34:26 | 23 | (Deposition Exhibit 422 marked.) |
| 15:34:28 | 24 | BY MR. SLANIA: |
| 15:34:29 | 25 | **Q**    And the last email on this references training |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Ex 7 p 38

1

2

3

4

5

6

7

8

9

10        I, CHARLES GUTENSOHN, do hereby declare under

11    penalty of perjury that I have read the foregoing

12    transcript; that I have made any corrections as appear

13    noted, in ink, initialed by me, or attached hereto; that

14    my testimony as contained herein, as corrected, is true

15    and correct.

16        EXECUTED this _3 RD_ day of _November_,

17    20_09_, at _Poway_____, _CALIFORNIA_.
                              (City)                          (State)

18

19

20

21                         _Charles X Gutens_____

22                         CHARLES GUTENSOHN

23

24

25

Ex 7 p 39

INDEX

# EXHIBIT 8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

    Plaintiff,

vs.                              No. 07-CV-2172 BEN (JMA)

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,

    Defendant.            **ORIGINAL**

_____

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order

DEPOSITION OF RICHARD SIMON

San Diego, California

Friday, July 17, 2009

Volume 1

Reported by:
MARGARET A. SMITH, RPR, CRR
CSR No. 9733

Job No. 116278

EX 8 p 40

| | | |
|---|---|---|
| 09:10:35 | 1 | A    No.   Carol Stein and I own each one of the |
| 09:10:37 | 2 | companies as a Subchapter S Corporation in stock. |
| 09:10:43 | 3 | Q    Each is a separate Subchapter S Corporation? |
| 09:10:46 | 4 | A    Correct. |
| 09:10:46 | 5 | Q    Each files a separate tax return? |
| 09:10:49 | 6 | A    Correct. |
| 09:10:50 | 7 | Q    Let me ask you some questions about United |
| 09:10:52 | 8 | Temps, Inc. |
| 09:10:54 | 9 | What is the business of that company? |
| 09:10:56 | 10 | A    Temporary staffing. |
| 09:11:01 | 11 | Q    In what kinds of businesses does it provide |
| 09:11:03 | 12 | temporary staffing? |
| 09:11:04 | 13 | A    Virtually any, but we're largely in the |
| 09:11:06 | 14 | hospitality industry with conventions, hotels.  But we |
| 09:11:10 | 15 | do also service a newspaper, a few arenas.  I think that |
| 09:11:17 | 16 | covers it. |
| 09:11:17 | 17 | Q    Does it provide staffing at Disney World in |
| 09:11:20 | 18 | Florida? |
| 09:11:21 | 19 | A    It does. |
| 09:11:21 | 20 | Q    For what kind of employees? |
| 09:11:23 | 21 | A    Housekeeping, kitchen help, some grounds |
| 09:11:26 | 22 | keeping, and laundry. |
| 09:11:27 | 23 | Q    Does it provide temporary workers at the |
| 09:11:30 | 24 | Imperial Palace in Las Vegas? |
| 09:11:33 | 25 | A    I don't believe so. |

16

Ex 8 p41

| 09:14:53 | 1 | show.  When the decorator and the unions are running |

09:14:53  1   show.  When the decorator and the unions are running

09:14:55  2   short of labor, we will provide some form of labor to

09:14:58  3   assist in the move-in.

09:15:00  4       Q    Do employees of United Temps, Inc., provide any

09:15:03  5   other services at any trade shows in the United States?

09:15:08  6       A    United Temps will assist in staffing.  United

09:15:14  7   National Maintenance has need in -- usually in Orlando

09:15:18  8   when they're running short in Orlando.  Occasionally in

09:15:21  9   Chicago.

09:15:24  10      Q    Is United Temps, Inc., qualified to do business

09:15:27  11  in California?

09:15:28  12      A    Yes.

09:15:29  13      Q    Does it have any presence in San Diego?

09:15:31  14      A    No.

09:15:32  15      Q    Has it ever?

09:15:33  16      A    No.

09:15:34  17      Q    Does United Temps, Inc., have any employees in

09:15:37  18  San Diego?

09:15:38  19      A    No.

09:15:39  20      Q    Let's talk about United Maintenance Company,

09:15:42  21  Inc.  What is the business of that entity?

09:15:44  22      A    Traditional janitorial work.  Office buildings,

09:15:47  23  hotels, hospitals.

09:15:49  24      Q    How do you define "traditional janitorial

09:15:52  25  work"?

                                                                          20

Ex 8 p42

09:26:43  1    and we pretty much know when we need people.  So we can

09:26:46  2    work around their -- they can work around our schedule

09:26:48  3    and vice versa.  Hence, we can do their job in San Diego

09:26:53  4    with about 50 regular employees.

09:26:55  5           So as to -- you know, when you say "part time,"

09:26:58  6    some of these people might work 30 hours a week for us

09:27:00  7    three weeks in a row and then might not work for three

09:27:02  8    or four weeks.  So I don't know where full time ends and

09:27:06  9    part time begins.

09:27:09 10    Q    Mr. Linn says in paragraph 12 of the

09:27:11 11    declaration on page 4 that, "Since the policy was

09:27:15 12    implemented in June 2007, we" -- meaning UNM -- "have

09:27:20 13    lost 47 of these 51 employees."

09:27:23 14           Is that consistent with your understanding?

09:27:27 15    A    I believe so.

09:27:33 16    Q    And it's your understanding none of these

09:27:35 17    people have ever worked for United Temps.  Is that

09:27:38 18    accurate?

09:27:39 19    A    Yes.

09:27:44 20    Q    Directing your attention to --

09:27:45 21    A    Mr. L'Estrange, let me just -- up until 2006, I

09:27:50 22    believe it was, United Temps provided payroll services

09:27:53 23    for United National, but they did not work for them.

09:27:57 24    They did not cross-work in -- in accounts but strictly

09:28:00 25    as a payroll service, much like you would have an ADP do

                                                                    30

Ex 8 p43

**RICHARD SIMON**                                      07/17/09

| | | |
|---|---|---|
| 09:28:04 | 1 | a payroll service. |
| 09:28:08 | 2 | Q    Okay.  I'll -- I will get to that in a moment. |
| 09:28:12 | 3 | A    Okay. |
| 09:28:12 | 4 | Q    Directing your attention to page 5 of this |
| 09:28:14 | 5 | exhibit, paragraph 14, the last two sentences reads, |
| 09:28:20 | 6 | "Since the SDCC has put this security policy in effect, |
| 09:28:26 | 7 | all of these efforts have come to a complete stop.  We |
| 09:28:28 | 8 | no longer -- we are no longer competing for new business |
| 09:28:32 | 9 | in San Diego." |
| 09:28:33 | 10 |       Was that true as of November of 2007? |
| 09:28:36 | 11 | A    That we were no longer competing in -- for new |
| 09:28:39 | 12 | business in San Diego? |
| 09:28:40 | 13 | Q    Yes. |
| 09:28:42 | 14 | A    Correct. |
| 09:28:42 | 15 | Q    You still do -- United National Maintenance |
| 09:28:45 | 16 | still does other business in San Diego.  Does it not? |
| 09:28:49 | 17 | A    Other, yes. |
| 09:28:50 | 18 | Q    Other -- by that, I mean other than the |
| 09:28:53 | 19 | San Diego Convention Center? |
| 09:28:54 | 20 | A    Correct. |
| 09:28:55 | 21 | Q    And are the people that are on this list, which |
| 09:28:57 | 22 | is attached to the Linn declaration, those workers that |
| 09:29:00 | 23 | you use for that other business at, like, the W Hotel or |
| 09:29:03 | 24 | the Del Mar Fairgrounds or the Hyatt or the Sheraton or |
| 09:29:07 | 25 | those places? |

31

Ex 8 p44

**RICHARD SIMON**                                              07/17/09

| | | |
|---|---|---|
| 09:30:38 | 1 | UNM2476. |
| 09:30:42 | 2 | (Deposition Exhibit 82 marked.) |
| 09:30:47 | 3 | BY MR. L'ESTRANGE: |
| 09:30:47 | 4 | Q    Take a look at that, if you would, please. |
| 09:31:09 | 5 | What is this document, if you know? |
| 09:31:10 | 6 | A    It appears to be a payroll journal. |
| 09:31:12 | 7 | Q    From United Temps, Inc.? |
| 09:31:15 | 8 | A    Yes. |
| 09:31:15 | 9 | Q    Is this what you were referring to earlier as |
| 09:31:17 | 10 | the payroll service that was provided by United Temps, |
| 09:31:20 | 11 | Inc., for United National Maintenance? |
| 09:31:22 | 12 | A    Yes. |
| 09:31:23 | 13 | Q    Does United Temps, Inc., provide that payroll |
| 09:31:25 | 14 | service for any place other than San Diego? |
| 09:31:27 | 15 | A    It no longer provides any payroll service for |
| 09:31:30 | 16 | United National.  United National has its own payroll. |
| 09:31:33 | 17 | But, yes, United Temps did provide and does still |
| 09:31:37 | 18 | provide payroll service for other entities, even those |
| 09:31:41 | 19 | not owned by United. |
| 09:31:42 | 20 | Q    Other than the payroll service that United |
| 09:31:43 | 21 | Temps at one time provided for United National in |
| 09:31:47 | 22 | San Diego, did it provide any other services for United |
| 09:31:50 | 23 | National? |
| 09:31:51 | 24 | A    No, sir. |
| 09:32:01 | 25 | Q    You mentioned that United Temps does provide |

33

Ex 8 p 45

| 11:02:32 | 1 | **A**   There was no discussion for me backing away. |

11:02:32   1       **A**   There was no discussion for me backing away.

11:02:35   2       **Q**   Okay.  All right.  So that -- that just never

11:02:38   3   came up in your negotiations with GES, what would happen

11:02:41   4   to National if the building decided to go in-house?

11:02:46   5       **A**   No.

11:02:47   6       **Q**   You understand there's an exclusive arrangement

11:02:48   7   for cleaning at the convention center in Boston.

11:02:51   8   Correct?

11:02:51   9       **A**   Yes.

11:02:52   10       **Q**   Have you made any attempt to get that business?

11:02:57   11       **A**   Well, it's funny that you should mention it,

11:02:59   12   because they contacted me no more than a month ago.

11:03:02   13       **Q**   To talk about what?

11:03:03   14       **A**   To talk about coming in to do cleaning in the

11:03:04   15   building and treating it as the rest of the convention

11:03:07   16   centers around the country, because their statement to

11:03:10   17   me is they're losing money on their in-house exclusive

11:03:13   18   arrangement.

11:03:14   19       **Q**   For cleaning?

11:03:15   20       **A**   Yes.

11:03:15   21       **Q**   Okay.  What about the Javits Center in

11:03:17   22   New York?

11:03:18   23       **A**   I have not.

11:03:18   24       **Q**   Pardon me?

11:03:19   25       **A**   I have not made any efforts.

103

Ex 8 p46

| | | |
|---|---|---|
| 11:03:21 | 1 | Q    Do they have an exclusive? |
| 11:03:22 | 2 | A    I don't know. |
| 11:03:23 | 3 | Q    Okay.  Do you do business in New York City? |
| 11:03:25 | 4 | A    We do not. |
| 11:03:27 | 5 | Q    Any reason why you don't? |
| 11:03:28 | 6 | A    Just choose not to be there. |
| 11:03:30 | 7 | Q    Do you do business in Las Vegas? |
| 11:03:32 | 8 | A    We do. |
| 11:03:36 | 9 | Q    There are two venues in Las Vegas that have |

11:03:38 10   in-house cleaning.  Right?

11:03:40 11       A    Yes.

11:03:41 12       Q    Which -- which are those?

11:03:42 13       A    Mandalay Bay and Sands Exposition Center.

11:03:46 14       Q    Have you made any attempts to get the business

11:03:48 15   at those places?

11:03:49 16       A    I have not.

11:03:50 17       Q    Any reason why you have not?

11:03:52 18       A    I would say much like the original Boston and

11:03:52 19   stuff.  We're not the policemen for the industry.

11:03:56 20       Q    Well, but it's a -- it's a business

11:03:58 21   opportunity, and you've elected not to pursue it?

11:04:00 22       A    I think the main difference is we've been here

11:04:02 23   for 20 years successfully, and we -- we were not in the

11:04:06 24   Sands Expo Center when it opened.

11:04:52 25           MR. L'ESTRANGE:  Okay.  I'm going to hand you a

104

Ex 8 p 47

RICHARD SIMON                                07/17/09

I, RICHARD SIMON, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _31_ day of _August_ , 20 _09_ , at _Chicago_ , _Illinois_ .
                        (City)              (State)

_____
RICHARD SIMON

287

Ex 8 p 48

# EXHIBIT 9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED NATIONAL MAINTENANCE,          No. 07-CV-2172 BEN(JMA)
INC., a Nevada Corporation,

       Plaintiff,

  vs.

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,

      Defendant.          **ORIGINAL**

---

Some Portions of This Transcript are Designated
Confidential - Pursuant to Protective Order

30(B)(6) VIDEOTAPED DEPOSITION OF RICHARD SIMON

San Diego, California

Tuesday, September 22, 2009

Reported by:
ANELA SHERADIN, RPR, CSR NO. 9128
Certified LiveNote Reporter

JOB NO. 120738

Ex 9 p 49

| | | |
|---|---|---|
| 09:58:32 | 1 | Q   Exhibit 378 for identification, I've handed to |
| | 2 | you, is a one-page e-mail.  It's dated December 11, |
| | 3 | 2008, from George Ortiz to Sue Thomas.  It bears |
| | 4 | production number UNM1003815. |
| 09:58:54 | 5 | Have you ever seen this document before? |
| 09:58:55 | 6 | A   Yes, sir. |
| 09:58:55 | 7 | Q   When did you see this? |
| 09:59:01 | 8 | A   I don't recall. |
| 09:59:04 | 9 | Q   But as far as you're aware, this is an accurate |
| | 10 | copy of an e-mail that was exchanged among UNM personnel |
| | 11 | regarding your business? |
| 09:59:12 | 12 | A   I believe so. |
| 09:59:13 | 13 | Q   Are you familiar with the incident that's |
| | 14 | referred to here concerning Fisher Scientific? |
| 09:59:18 | 15 | A   Yes. |
| 09:59:19 | 16 | Q   What happened at that show? |
| 09:59:21 | 17 | A   They asked us for an estimate to do cleaning. |
| | 18 | We told them the George R. Brown Convention Center has |
| | 19 | an exclusive there that they've had since the day |
| | 20 | they've opened the building and that we don't do work |
| | 21 | there. |
| 09:59:31 | 22 | Q   This was a request that was made by someone |
| | 23 | from GES; is that right? |
| 09:59:35 | 24 | A   Yes. |
| 09:59:36 | 25 | Q   Now, in this case, you have a contract with GES |

Page 53

Ex9 p50

|          | 1  | to provide services in Houston; true?                      |
|09:59:45  | 2  | A   We've never provided services in Houston.             |
|09:59:47  | 3  | Q   Not for hotels or any other venues?                   |
|09:59:49  | 4  | A   Never.                                                |
|09:59:51  | 5  | Q   Okay.  So why was it that -- as far as you            |
|          | 6  | know, would someone from GES have even asked you for an   |
|          | 7  | estimate?                                                 |
|10:00:00  | 8  | A   Probably a mistake on their part.  They asked         |
|          | 9  | us for estimates on all their shows.  They probably just  |
|          | 10 | fed it right through not thinking for a moment that this  |
|          | 11 | was the George Brown in Houston.                          |
|10:00:10  | 12 | Q   Have you ever attempted to market your services       |
|          | 13 | to any clients that did work at the George Brown Center   |
|          | 14 | in Houston to try to overcome the exclusive that the      |
|          | 15 | building has on cleaning?                                 |
|10:00:23  | 16 | A   We've had some conversations about it, yes.           |
|10:00:25  | 17 | Q   With whom have you had those conversations?           |
|10:00:27  | 18 | A   The previous general manager there.                   |
|10:00:30  | 19 | Q   Who was that?                                         |
|10:00:31  | 20 | A   Jordy Tollett.                                        |
|10:00:33  | 21 | Q   Did that person reject your offers?                   |
|10:00:35  | 22 | A   Loudly.                                               |
|10:00:37  | 23 | Q   In the case of the Houston Convention Center --       |
|          | 24 | the George R. Brown Center in Houston, when they talk     |
|          | 25 | about an exclusive there, does that mean that the         |

Ex 9 p51

                1   building charges the exhibitors for booth cleaning and

                2   retains all of the money?

10:00:54        3        A    Yes.

10:00:54        4        Q    They don't share any of those funds with the

                5   decorator or the trade show organizer?

10:00:58        6        A    Not that I know of.

10:00:59        7        Q    And is that your understanding of an exclusive

                8   on cleaning at places like Houston and Boston where the

                9   building simply retains all the money for booth

               10   cleaning?

10:01:09       11        A    I'm not -- I don't know what the Boston

               12   arrangement is.  I think so, but I know so in Houston.

10:01:15       13        Q    The last time we met and I took your deposition

               14   as a percipient witness you told me that you had been

               15   approached by someone from the -- I think it was the

               16   Heinz Center in Boston --

10:01:25       17        A    Yes.

10:01:26       18        Q    -- about United National Maintenance doing

               19   their cleaning there.  Do you remember that?

10:01:30       20        A    Yes.

10:01:30       21        Q    Was that a result of one of your marketing

               22   efforts to the Boston Convention Center?

10:01:35       23        A    . I don't know what it's the result of.  They

               24   called me.

10:01:38       25        Q    Are you still in negotiations with them to do

Page 55

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Ex9 p52

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | cleaning at their building?                              |
| 10:01:42 | 2  |     A    I wouldn't call it negotiations, but we're      |
|          | 3  | going to meet the day after tomorrow.                    |
| 10:01:46 | 4  |     Q    About the possibility that United will do their |
|          | 5  | cleaning?                                                |
| 10:01:49 | 6  |     A    We're going to have a talk.                     |
| 10:01:50 | 7  |     Q    Have you submitted a proposal to them?          |
| 10:01:52 | 8  |     A    No, sir.                                        |
| 10:01:53 | 9  |     Q    Do you know what their current pricing is?      |
| 10:01:56 | 10 |     A    No, sir.  The -- my proposal -- my conversation |
|          | 11 | with them the first time they called was to -- for us to |
|          | 12 | come in and to assume their exclusive because they were  |
|          | 13 | not making money which I rejected.                       |
| 10:02:08 | 14 |          Their second call was will you come in and do   |
|          | 15 | it under a traditional method that we currently do, and  |
|          | 16 | I said absolutely and that's what the -- I believe the   |
|          | 17 | subject of conversation the day after tomorrow is.       |
| 10:02:20 | 18 |     Q    What did you understand they meant when they    |
|          | 19 | asked if you would assume their exclusive?               |
| 10:02:24 | 20 |     A    Come in and work for them exclusively and do    |
|          | 21 | some sort of revenue sharing.  I guess they are having a |
|          | 22 | problem in managing labor and making money.              |
| 10:02:31 | 23 |     Q    Why was it that you rejected that proposal?     |
| 10:02:34 | 24 |     A    Because I don't believe in exclusives.          |
| 10:02:39 | 25 |     Q    Even in that case if it meant you making some   |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Ex 9 p 53

1    money?

10:02:42  2        A    I've turned down other exclusives.

10:02:45  3        Q    At what venues?

10:02:46  4        A    Well, originally, way back when, McCormick

5    Place.  We talked about several managers ago about us

6    coming in because we did most of the work there anyway.

10:02:56  7             When we first got into -- shortly after we got

8    into it with the same issue -- not got into it, but had

9    an issue with Moscone, their corporate had talked about

10   us doing certain venues on an exclusive basis, and

11   again, we turned them down.

10:03:14  12       Q    Have there been any venues that were not

13   exclusive and then changed their policy to be exclusive

14   other than the San Diego Convention Center where United

15   has done work?

10:03:24  16       A    Moscone.

10:03:26  17       Q    That was a brief episode back in the 1989, 1990

18   time period?

10:03:31  19       A    Yes, sir.

10:03:33  20       Q    Which is the subject of the litigation that UNM

21   filed against the Moscone Center?

10:03:39  22       A    Yes, sir.

10:03:44  23       Q    I'm handing you a document that's previously

24   been marked as Exhibit 138 for identification.  It's an

25   e-mail dated June 2, 2008.  The top e-mail is from

Page 57

Ex9 p54

1    way west to get a better accounting system and payroll

2    system through Chicago.

10:39:04  3         And lastly -- United Temps also much -- you are

4    familiar with ADP?  It would be no different than if we

5    used ADP, although United Temps is in the business of

6    temporary staffing in some locations and also payroll

7    service and employee leasing, so we were just servicing

8    ourselves internally.

10:39:25  9         And United Temps had also serviced U.S.

10    Aviation, United Maintenance for work outside the city

11    of Chicago.  It was our temporary staffing

12    company/payroll company.

10:39:35  13        In 2008 or 2000 or 2000 -- 2007, we -- we

14    started the payroll by company so each company has

15    its -- each operating company has its own payroll and

16    it's a complete set of books done because there was too

17    much intercompany billing.  It was driving everybody

18    nuts.

10:39:59  19        Q    United National Maintenance is a freestanding

20    company; correct?

10:40:01  21        A    Yes.

10:40:03  22        Q    It's a separate Subchapter S Corporation?

10:40:03  23        A    Yes.

10:40:03  24        Q    It has its own set of officers; right?

10:40:04  25        A    Yes.

Page 74

Ex 9 p55

| | | |
|---|---|---|
| 10:40:05 | 1 | Q    Its own bookkeepers? |
| 10:40:07 | 2 | A    Yes. |
| 10:40:09 | 3 | Q    And it files separate tax returns? |
| 10:40:10 | 4 | A    Yes. |
| 10:40:11 | 5 | Q    And same with United Temps, a freestanding |
| | 6 | company; right? |
| 10:40:15 | 7 | A    Same -- exact same. |
| 10:40:16 | 8 | Q    Now, when Mr. Linn testified, he mentioned that |
| | 9 | when he formed the operation here in San Diego he set up |
| | 10 | a company which I think he said was called LV |
| | 11 | Management. |
| 10:40:27 | 12 | A    Okay. |
| 10:40:28 | 13 | Q    That's not inconsistent with your understanding |
| | 14 | of what happened; right? |
| 10:40:32 | 15 | A    That's exactly consistent. |
| 10:40:35 | 16 | Q    Was that a separately incorporated entity here |
| | 17 | in San Diego? |
| 10:40:38 | 18 | A    Yes. |
| 10:40:39 | 19 | Q    Funded by United National? |
| 10:40:41 | 20 | A    Funded by us, yes. |
| 10:40:44 | 21 | Q    Mr. Linn was the president of that company? |
| 10:40:45 | 22 | A    Correct. |
| 10:40:46 | 23 | Q    How long did that form of operation exist in |
| | 24 | San Diego where LV Management was running it? |
| 10:40:52 | 25 | A    Probably 16, 15, 17 years. |

Ex 9 p 56

| 13:44:27 | 1 | A   Yes. |
| 13:44:28 | 2 | Q   But notwithstanding her choice, have you made |
| | 3 | any attempt to inject United into that process at the |
| | 4 | Action Sports Retailer show as you do with other |
| | 5 | Champion shows after July 1, 2007? |
| 13:44:40 | 6 | A   No. |
| 13:44:41 | 7 | Q   Why is that? |
| 13:44:43 | 8 | A   Because the customer said that they would |
| | 9 | prefer to do business with the SDCC on that show. |
| 13:45:00 | 10 | Q   We've talked before about Mandalay Bay and |
| | 11 | Sands in Las Vegas.  Those are two venues that have |
| | 12 | exclusive arrangements on cleaning; right? |
| 13:45:09 | 13 | A   Yes. |
| 13:45:10 | 14 | Q   And in both of those cases, the building |
| | 15 | charges for cleaning and keeps all of the revenue not |
| | 16 | sharing any of it with the decorator; is that accurate? |
| 13:45:17 | 17 | A   That's my understanding. |
| 13:45:17 | 18 | Q   And United is completely barred from the |
| | 19 | building there? |
| 13:45:21 | 20 | A   Correct. |
| 13:45:21 | 21 | Q   Have you made any attempt to get into the |
| | 22 | Mandalay Bay or Sands? |
| 13:45:25 | 23 | A   No, sir. |
| 13:45:29 | 24 | Q   Have you ever discussed with either Champion or |
| | 25 | GES the possibility of filing a lawsuit against Mandalay |

Page 164

Ex 9 p57

1     Bay or Sands in connection with their cleaning policy?

13:45:39  2         A    Nothing of substance.

13:45:42  3         Q    What have you discussed that you would not deem

4     of substance?

13:45:45  5         A    Just, you know, at some point that might be

6     something to look at, but we've never taken anything --

7     no action on it.

13:45:52  8         Q    Are there any considerations, to your

9     knowledge, given by any decorators to file a lawsuit

10    against any venues that have exclusive cleaning

11    policies?

13:46:05  12        A    I don't think I understand the question.

13:46:06  13        Q    Well, you filed a case in San Diego against the

14    San Diego Convention Center in connection with its

15    cleaning policy; right?

13:46:13  16        A    Yes, sir.

13:46:14  17        Q    Are you aware of any decorators that have ever

18    filed a suit against a building in connection with the

19    building's cleaning policy?

13:46:22  20        A    No, but I think, as we described before,

21    there's really only three instances that we've talked

22    about.  San Francisco, San Diego twice.  But there is no

23    decorator that I know of that has filed a suit.

13:46:37  24        Q    Is that because it's a relatively small part of

25    the total cost of a show?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Ex9 p58

|  | 1 | conclusion. |
| 14:45:22 | 2 | You can answer. |
| 14:45:23 | 3 | THE WITNESS:  They were employed by United |
|  | 4 | Temps.  We talked about this application thing.  Same |
|  | 5 | human beings, different colored paycheck. |
| 14:45:32 | 6 | BY MR. L'ESTRANGE: |
| 14:45:33 | 7 | Q    And different employer? |
| 14:45:36 | 8 | A    United National Maintenance instead of United |
|  | 9 | Temps.  It's still under the guidance and direction of |
|  | 10 | United National Maintenance.  Gabby Ramirez still hired, |
|  | 11 | fired, trained, supervised.  His supervisors below him |
|  | 12 | did the same thing.  No human beings changed, just the |
|  | 13 | paycheck changed. |
| 14:45:53 | 14 | Q    On January 1, 2008, Mr. Ramirez became an |
|  | 15 | employee of United National Maintenance, Inc.; right? |
| 14:46:00 | 16 | A    Yes. |
| 14:46:01 | 17 | Q    Prior to July 1, 2008, Mr. Ramirez was an |
|  | 18 | employee of United Temps; right? |
| 14:46:07 | 19 | A    For payroll purposes, yes. |
| 14:46:10 | 20 | Q    What other purposes are there for which a |
|  | 21 | person would be an employee? |
| 14:46:13 | 22 | A    Operational purposes.  Would you tell me, then, |
|  | 23 | that everybody that uses ADP for their payroll |
|  | 24 | processing those employees are ADP employees or they're |
|  | 25 | employees of the employer that supervises them, directs |

Page 200

Ex 9 p 59

```
          1   the work site efforts?  I would suggest to you that the
          2   people that direct the work site effort are the
          3   employer.
14:46:33  4        The contract with the customer is with United
          5   National, the employees are under the guidance of United
          6   National, the shirt, the uniform that he wears says
          7   United National on it.  Gabby Ramirez' business cards
          8   for 14 years have said United National Maintenance on it
          9   regardless of where he gets a paycheck from.
14:46:50 10        Q    What entity paid the employment taxes for Mr.
         11   Ramirez prior to January 1, 2008?
14:47:00 12        A    United Temps.
14:47:05 13        Q    Did United Temps then submit a billing
         14   statement to United National Maintenance for the payroll
         15   and payroll taxes --
14:47:12 16        A    Yes.
14:47:13 17        Q    -- it paid?
14:47:14 18        A    Yes.
14:47:14 19        Q    It was acting in the capacity as a --
         20   basically, a subcontractor relationship with United
         21   National Maintenance?
14:47:21 22        A    No, let me give you a better one than -- no,
         23   not a subcontractor because that would connotate that
         24   United Temps was actually doing the work, supervising
         25   the work.  It would be -- are you familiar with the term
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Ex9 p60

| | | |
|---|---|---|
| | 1 | litigation in San Diego; correct? |
| 17:07:47 | 2 | A    Yes. |
| 17:07:48 | 3 | Q    They knew about that from day one? |
| 17:07:50 | 4 | A    If they could have -- if we could have gotten |
| | 5 | past this litigation issue and this conduct in San Diego |
| | 6 | issue, I think that the transaction would have closed. |
| 17:07:58 | 7 | Q    Well, between the date you first had a |
| | 8 | communication with Trivest about a possible acquisition |
| | 9 | and the day they backed out of the deal, was there any |
| | 10 | new information that they received about the litigation |
| | 11 | that caused them to suddenly say stop, we're not going |
| | 12 | forward and then back out? |
| 17:08:15 | 13 | A    I don't know.  I think they just reviewed it as |
| | 14 | far as the totality of what happens in San Diego could |
| | 15 | happen in Anaheim, it could happen in so on. |
| 17:08:24 | 16 | Q    By litigation, you are referring to the lawsuit |
| | 17 | that you initiated against the convention center; |
| | 18 | correct? |
| 17:08:29 | 19 | A    As a -- as a response to the conduct of the San |
| | 20 | Diego Convention Center, yes. |
| 17:08:33 | 21 | Q    And you're also aware there are other buildings |
| | 22 | around the country with exclusives like the Heinz Center |
| | 23 | in Boston, the center in Houston, and other places where |
| | 24 | you simply have chosen not to challenge the exclusive |
| | 25 | provision; correct? |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Ex9 p61

17:08:49  1        A    And not one of them have anything to do with

          2    this income statement or the offer provided by Trivest.

17:08:55  3        Q    Well, that's because you've never received

          4    income from those places since you've never tried?

17:08:59  5        A    That's correct, but again, it has nothing to do

          6    with the offer at hand.

17:09:03  7        Q    Well --

17:09:04  8        A    The Boston Convention Center has nothing to do

          9    with this offer at hand.  We've never set foot in the

         10    Boston Convention Center.

17:09:11 11        Q    Because they have an exclusive.

17:09:12 12        A    That convention center we've been in for 20

         13    years.

17:09:15 14        Q    Well, your company had a certain value prior to

         15    the time -- immediately prior to the time you received

         16    this offer from Trivest; right?

17:09:23 17        A    Yes.

17:09:23 18        Q    And that value, in part, is reflected in the

         19    study by Mr. Barnes; correct?

17:09:29 20        A    Oh, I would say that the value was in the offer

         21    by Trivest.

17:09:33 22        Q    All right.  It's in the offer by Trivest.  The

         23    value of the company is no different today than it was

         24    then when Trivest made that offer; correct?

17:09:43 25             MR. LANCE:  Objection, calls for speculation.

EX9 p 62

1

2

3

4

5

6

7

8          I, RICHARD SIMON, do hereby declare under

9   penalty of perjury that I have read the foregoing

10   transcript; that I have made such corrections as noted

11   herein, in ink, initialed by me, or attached hereto;

12   that my testimony as contained herein, as corrected, is

13   true and correct.

14          EXECUTED this _25_ day of _November_,

15   20_09_, at _Chicago_____, ____IL____.
                    (City)                    (State)

16

17

18

19   _____

20          RICHARD SIMON 30 (b) (6)

21

22

23

24

25

Page 309

Ex9 p63

# EXHIBIT 10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

      Plaintiff,

   vs.                     No. 07-CV-2172 BEN (JMA)

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,

      Defendant.        **ORIGINAL**

_____

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order


DEPOSITION OF JORGE ORTIZ

San Diego, California

Wednesday, August 12, 2009


Reported by:
TAMEKA N. JONES
CSR No. 13417

Job No. 118434

Ex10 p64

```
 1    National Maintenance?

 2         A    I don't know.

 3         Q    Have you ever had contact with her?

 4         A    Yes, when I was working.

 5         Q    Recently?

 6         A    No.

 7         Q    The second person is Jerry Trejo.  Are you

 8    familiar with that individual?

 9              MR. SLANIA:  The third person, you mean.

10    BY MR. L'ESTRANGE:

11         Q    I'm sorry, the third person.

12         A    I'm so bad at names.  There's so many Jerrys.

13    Is this list just for San Diego?

14         Q    I will represent to you, this list was provided

15    to us by your counsel as a list of the employees of

16    United National Maintenance in San Diego as of July 1,

17    2007.

18         A    Okay.  Jerry, Jerry -- I don't recall a Jerry.

19    I'd have to see him in person.

20         Q    Have have you seen this list before I've just

21    showed it to you today?

22         A    No.

23         Q    Have you ever heard of a company called United

24    Temps, Inc.?

25         A    Yes.
```

Ex 10 p 65

1     Q     What is your understanding of the business of

2   United Temps, Inc.?

3     A     They provided temp employment or temp jobs.

4     Q     Do they provide temp jobs in San Diego?

5     A     No.

6     Q     Have they ever?

7     A     No, not that I know of.

8     Q     Well, let me ask you to take a look at a

9   document previously marked as Exhibit 82 for

10   identification.

11     A     Okay.

12     Q     It's a multiple-page document, first page is

13   UNM002466 and the last page is 2476.  Have you ever seen

14   this before?

15     A     No.

16     Q     If you'll look at the very first person on page

17   1 of Exhibit 82, it's Henry Solano.

18     A     Yes.

19     Q     That's the same name as your father-in-law; is

20   that right?

21     A     Yes.

22     Q     Do you know if your father-in-law ever worked

23   for United Temps, Inc.?

24     A     I don't know.

25     Q     Have you ever  been in contact with anyone at

60

Ex10 p 66

1    United Temps, Inc. about providing labor for jobs on any

2    sites where you've worked, not limited to San Diego?

3        A    I've been to their office, but not to recruit

4    anybody.

5        Q    Where is their office?

6        A    Well, I went to the Las Vegas office.

7        Q    Does United Temps Inc. have an office in San

8    Diego?

9        A    Not that I know of, no.

10       Q    Have they ever?

11       A    Not that I know of either.

12       Q    Have they ever had any employees in San Diego?

13       A    Not that I know of.

14            MR. SLANIA:  You can put it down.  He's done.

15            THE WITNESS:  What?

16            MR. SLANIA:  You can put it down.  He's done

17    with the last one.

18    BY MR. L'ESTRANGE:

19       Q    I'm finished with that.  Next is Exhibit 116,

20    it's three pages, it bears Production Number UNM009880,

21    it's an employment application for Evelyn Ramirez and

22    there's a photograph of Ms. Ramirez on her Idaho

23    driver's license on the last page.

24            Have you ever seen this document before?

25       A    No.

61

EX 10 p 67

1                          * * *

2

3

4

5

6        DECLARATION OF PENALTY OF PERJURY

7

8

9        I, JORGE ORTIZ, do hereby declare under penalty

10   of perjury that I have read the foregoing transcript;

11   that I have made any corrections as appear noted, in

12   ink, initialed by me, or attached hereto; that my

13   testimony as contained herein, as corrected, is true and

14   correct.

15        EXECUTED this 22 day of September,

16   2009, at San Diego, California.
                        (City)              (State)

17

18                    _____

19                         JORGE ORTIZ

20

21

22

23

24

25

                                                    237

Ex10  p68

# EXHIBIT 11

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

          Plaintiff,

vs.                              No. 07-CV-2172 BEN (JMA)

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,

          Defendant.           **ORIGINAL**

_____

     Some Portions of this Transcript are Designated
       Confidential - Pursuant to Protective Order

           DEPOSITION OF RAYMOND SANTOS

               San Diego, California

             Thursday, July 23, 2009


Reported by:
MARGARET A. SMITH, RPR, CRR
CSR No. 9733

Job No. 116280

Ex 11 p 69

**RAYMOND SANTOS**                                                07/23/09

1       A     No.

2       Q     Do you use United Temps, Inc.'s, employees for

3   any UNM work?

4       A     In some cities?

5       Q     Yes.

6       A     Yes.

7       Q     In what cities?

8       A     We use it in Orlando and Atlanta.

9       Q     How is that different than the way you operate

10  in other cities where you don't use United Temps?

11      A     We use them as a temporary agency, as a labor

12  temporary agency.  So we just have to call them and tell

13  them we need 30 people.  And they send it over to us.

14      Q     Are the people they send over, people who are

15  trained by United Temps in doing trade shows and

16  cleaning work?

17      A     No.

18      Q     So the earlier example we had in San Diego was

19  that you would get a new recruit by the network that the

20  local manager had?

21      A     Yes.

22      Q     And then that person would report.  They would

23  sign the application.  There would be about a one-week

24  wait, and then they would come back and actually start

25  working.

79

Ex 11 p 70

1    in Las Vegas from United Temps, and they were not able

2    to produce it.  So Art had to stay at Magic to make sure

3    that we -- that we had enough labor to cover the show.

4        Q    Did you call up anybody on your San Diego

5    roster to cover the Las Vegas show?

6        A    No, we didn't.

7        Q    Is -- does United Temps normally operate in

8    Las Vegas?

9        A    Yes.

10       Q    Do they operate in California?

11       A    No.

12       Q    Have they ever?

13       A    No.

14       Q    And any reason why they have not operated in

15   California?

16       A    I have no idea, sir.

17            (Deposition Exhibit 136 marked.)

18   BY MR. L'ESTRANGE:

19       Q    Who is Mike Graney?

20       A    He's the vice-president in charge of United

21   Temps.

22       Q    Has he ever done any work for United National

23   Maintenance?

24       A    No.

25       Q    Has he -- did he come up through the ranks at

82

Ex 11 p 71

1    Mr. Graney has worked on a show?

2        A    No.

3        Q    Did you ask him after this particular instance

4    not to work on any shows for United National

5    Maintenance?

6        A    No, I didn't.

7        Q    Is he your peer within the organizational

8    chart?

9        A    Yes.

10       Q    Are there any buildings in the United States

11   that have an exclusive on cleaning services?

12       A    Yes, there are.

13       Q    How many that you know?

14       A    Right offhand, I know New York, Boston, and

15   Providence.

16       Q    New York, Boston, and Providence?

17       A    Yes.

18       Q    New York, at the Javits Center?

19       A    Yes.

20       Q    Is it Providence, Rhode Island?

21       A    Yes.

22       Q    What building is it there?

23       A    I don't recall the name of it.

24       Q    Has United National Maintenance ever done any

25   work in New York City?

EX 11 p 72

1      A      No.

2      Q      Is that a market that you have considered

3  entering but decided not to?

4      A      Yes.

5      Q      What was your reason for electing not to go

6  into New York?

7      A      That was many years ago.

8      Q      Was part of the basis for your decision the

9  fact that the Javits Center had an exclusive on

10  cleaning?

11      A      Yes.

12      Q      Does United National Maintenance do business in

13  Boston?

14      A      No.

15      Q      Have you ever?

16      A      No.

17      Q      The Boston Convention Center has an exclusive

18  on cleaning.  Is that true?

19      A      Yes.

20      Q      It's a relatively new building?

21      A      Yes.

22      Q      Prior to that building opening, did you have

23  any business in Boston?

24      A      No.

25      Q      Any reason why you stayed out of the Boston

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EX 11 p 73

1    market?

2         A    The same reason in New York.

3         Q    The exclusive on cleaning?

4         A    Yes.

5         Q    So have the -- has the Boston Convention Center

6    had an exclusive cleaning arrangement for some years?

7         A    Yes.

8         Q    What about Providence, Rhode Island, same

9    situation with an exclusive on cleaning?

10        A    Yes.

11        Q    For a number of years?

12        A    Yes.

13        Q    And so you've just elected not to go into that

14   market?

15        A    Yes.

16        Q    Is the Javits Center a publicly owned building,

17   or private?

18        A    It's privately owned, as far as I know.

19        Q    Okay.  What about the Convention Center in

20   Boston, is it a public facility, or privately owned?

21        A    It's a public facility.

22        Q    In Providence, Rhode Island, is it a public

23   facility, or privately owned?

24        A    Public.

25        Q    Are you aware of any threats of a lawsuit by

87

EX 11 p 74

1    United National Maintenance against the Javits Center in

2    New York concerning their exclusive cleaning

3    arrangement?

4        A    No.

5        Q    Are you aware of any threats of a lawsuit by

6    United National Maintenance against the convention

7    center in Boston regarding their exclusive cleaning

8    arrangement?

9        A    No.

10       Q    Are you aware of any threats of a lawsuit by

11   United National Maintenance against the convention

12   center in Providence, Rhode Island, as a result of their

13   exclusive cleaning arrangement?

14       A    No.

15       Q    Has United National Maintenance ever been

16   approached by the Javits Center to do cleaning there?

17       A    No.

18       Q    As far as you know --

19       A    Exactly.  I want to correct that.  As far as I

20   know, no.

21       Q    Well, actually, that's all I'm asking for in

22   this deposition here today is what you know.

23       A    Okay.  Okay.

24       Q    Are you aware of any inquiry by the convention

25   center in Boston to United National Maintenance to do

88

Ex 11 p 75

1    their cleaning?

2        A    No.

3        Q    And if there was such an inquiry from Boston, I

4    take it you would know about it?

5        A    Not necessarily.

6             MR. SLANIA:  Objection.  Calls for speculation.

7    BY MR. L'ESTRANGE:

8        Q    Are you aware of any inquiry from the

9    convention center in Providence, Rhode Island, to do

10   their cleaning?

11       A    No.

12            MR. L'ESTRANGE:  Exhibit 137 is a two-page

13   document.  It bears Production Nos. UNM00410 through --

14   excuse me -- UNM004210 through 4211.  The top email is

15   dated January 28, 2008, from Joyce Laurie to Richard

16   Simon.

17            (Deposition Exhibit 137 marked.)

18   BY MR. L'ESTRANGE:

19       Q    Have you ever seen this before?

20       A    No.

21       Q    Joyce Laurie is identified on page 2 of this

22   document as director of conventions and meetings for the

23   Automotive Oil Change Association.

24            Do you know her?

25       A    No.

89

EX 11 P 76

1        Q     Have you ever done any business with the

2    Automotive Oil Change Association?

3        A     No.

4        Q     Do you have any idea why she would be asking

5    for a list of convention centers that have exclusives on

6    cleaning?

7        A     No.

8        Q     The response here identifies the Javits Center,

9    which we've already talked about, and Boston, which

10   we've already talked about.  And it also mentions the

11   Sands and Mandalay Bay in Las Vegas.

12       A     Yes.

13       Q     Is it accurate, as far as you know, that both

14   the Sands and Mandalay Bay have exclusives on cleaning?

15       A     Yes.

16       Q     Those are both privately owned facilities?

17       A     Yes.

18       Q     Has United National Maintenance threatened to

19   sue either of those entities because of their exclusive

20   cleaning arrangements?

21       A     I would not know.

22       Q     But you're not aware of any such threats?

23       A     No.

24            MR. L'ESTRANGE:   Exhibit 138, two pages, bears

25   Production Nos. UNM1001275 through UNM1001276.   The top

90

Ex 11 p 77

RAYMOND SANTOS                                    07/23/09

1    the Moscone Center?

2        A    No.

3        Q    Have you told any show managers about the

4    litigation that United National Maintenance is currently

5    involved in in San Diego?

6        A    No.

7             MR. L'ESTRANGE:  I tell you what.  Why don't we

8    take a break.  You've been going at it a long time.

9             MR. SLANIA:  No problem.

10            MR. L'ESTRANGE:  It's 11 o'clock.  We'll take

11   ten minutes, go back, and then go until noon.  And then

12   we'll break.

13            (Recess.)

14            MR. L'ESTRANGE:  Back on the record.

15            Exhibit 141 that I've just marked has

16   Production Nos. UNM1029196 through 1029197.  The top

17   email is dated February 5, 2009 from Kristin Macedo to

18   George Ortiz, with copies to several people, including

19   Mr. Santos.

20            (Deposition Exhibit 141 marked.)

21   BY MR. L'ESTRANGE:

22       Q    Have you seen Exhibit 141 before?

23       A    Yes.

24       Q    At the bottom of page 1, the email is from

25   Kristin Macedo to "Hi Jorge."

103

EX11 p78

RAYMOND SANTOS                                    07/23/09

1           Who is Kristin Macedo?

2      A    Account executive with Champion.

3      Q    Okay.  It says, "Hi Jorge.  I just found out

4  that the Oregon Convention Center provides exclusive

5  cleaning services and does not allow outside cleaning

6  contractors to provide cleaning.  So we will not need

7  United to provide the cleaning for this event."

8           Is it an accurate statement that the Oregon

9  Convention Center provides exclusive cleaning services

10 and does not allow outside contractors like UNM to

11 provide cleaning?

12     A    Yes.

13     Q    How long has that been in effect?

14     A    I don't know.

15     Q    At one point, did United National Maintenance

16 provide cleaning services at the Oregon Convention

17 Center?

18     A    I don't know.  Seattle?  No.

19     Q    This is in Oregon.

20     A    Right.  I don't recall.

21     Q    So you know you've done business in Seattle?

22     A    Yes.

23     Q    And Kristin Macedo apparently believed that you

24 were available to do services in Oregon?

25     A    Right.

104

Ex 11 p79

1      Q      Is this place in Portland, Oregon?

2      A      I would -- I would -- I think so.   I am not

3   sure.

4      Q      Okay.  Have you ever had a manager that covered

5   Oregon?

6      A      I don't recall.

7      Q      Okay.  Are you familiar with the policy at the

8   Oregon Convention Center that provides for exclusive

9   cleaning?

10     A      No, I'm not.

11     Q      If I'm reading this correctly, this is a job

12  that United National Maintenance would have obtained but

13  for the policy at the Oregon Convention Center?

14     A      Right.  And that -- I want to add something to

15  that, that that happens often with account executives

16  that have no idea, and they're so used to sending us an

17  estimate.  And then we find out that the Center has an

18  exclusive.  And this is what happened here.  Kristin

19  thought that, you know, like with all the shows, you'll

20  send them the estimate, and she will get it done.

21     Q      So this is business that you've lost to the

22  exclusive at the Oregon Convention Center?

23     A      Yes.

24     Q      And when we talk about exclusive at a

25  convention center, we're talking about a policy at the

105

Ex 11 p 80

1    center stating that they provide the cleaning and no

2    outside contractors are allowed to do that?

3         A    Right.

4         Q    As far as you know, has United National

5    Maintenance threatened any lawsuit against the Oregon

6    Convention Center because of their exclusive cleaning

7    policy?

8         A    No.

9         Q    Has that been contemplated?

10        A    Not that I know of.

11        Q    Was this email exchange the first information

12   you had that the Oregon Convention Center had an

13   exclusive?

14        A    Yes.

15        Q    Do you have a presence in Houston, Texas?

16        A    No.

17        Q    Have you ever?

18        A    No.

19        Q    Any reason you've avoided the Houston market?

20        A    The convention center, we haven't avoided it.

21   We just don't do any business there.

22        Q    Any reason why?

23        A    The Houston Convention Center is exclusive on

24   cleaning.

25        Q    Has it always been?

106

Ex 11 p 81

```
 1    what I've just read.  And that's a request from

 2    Mr. Simon to GES to let him fight the exclusive at the

 3    George R. Brown Center in Houston.  Is that right?

 4        A    Yes.

 5        Q    Are you familiar with those -- any discussions

 6    Mr. Simon had with GES asking permission to fight that

 7    exclusive?

 8        A    No.

 9        Q    Are there any plans in the works at United

10    National Maintenance to fight the exclusive in Houston?

11        A    Not that I know of.

12        Q    So you've just essentially elected to walk away

13    from the business at the Houston Convention Center?

14             MR. SLANIA:  Misstates the testimony.

15             THE WITNESS:  Yes.

16    BY MR. L'ESTRANGE:

17        Q    Is that right?

18        A    Yes.

19             MR. L'ESTRANGE:  Okay.  Exhibit 145 has a cover

20    email of February 18, 2009 from James Davern to Raymond

21    Santos and Trina Tovar.  It bears Production Nos.

22    UNM1028201 through 8205.  And I'm --

23             (Deposition Exhibit 145 marked.)

24    BY MR. L'ESTRANGE:

25        Q    Have you seen this document before?
```

118

Exh p 82

1      A      Yes.

2      Q      This is a list of shows in the state of

3   Florida?

4      A      A list of facilities.

5      Q      A list of facilities in Florida?

6      A      Right.

7      Q      And I'd like to direct your attention to pages

8   202 and 203.  They're part of a spreadsheet that came

9   apart in the printing process.  And if you look on

10  page 202, under the location on Line Item 36, the

11  facility that's listed as the Tampa Convention Center in

12  Tampa, Florida, is that a public, or a private facility?

13     A      It's a public facility.

14     Q      And if you look over to page 203, Line Item 36

15  says, "Building is Exclusive Cleaner."

16            Do you see that?

17     A      Yes.

18     Q      Does the Tampa Convention Center have an

19  exclusive cleaning policy?

20     A      As far as I know.

21     Q      How long has the Tampa Convention Center been

22  in operation?

23     A      I can't recall that, sir.

24     Q      Has United National Maintenance ever done work

25  at the Tampa Convention Center?

119

EX 11 P83

1    A    Yes, we've done work there.

2    Q    In the past?

3    A    Yes.

4    Q    Before this policy was put into effect?

5    A    I'm not sure.  But I think afterwards too,

6    after they claimed the exclusive.

7    Q    Is the exclusive more than a year old?

8    A    Yes.

9    Q    More than five years old?

10    A    I wouldn't know.

11    Q    So this convention center in Tampa was part of

12    your territory at the time they changed to an exclusive.

13    Right?

14    A    Yes.

15    Q    Did the convention center give any

16    justification for changing to an exclusive policy?

17    A    Not that I'm aware of.

18    Q    Did United National Maintenance lose business

19    as a result of the new policy there?

20    A    Yes.

21    Q    Substantial business?

22    A    Yes.

23    Q    Was there any attempt made to convince the

24    Tampa Convention Center to change the policy?

25    A    I wouldn't know.  You would have to ask Rick

120

EX11 P84

**RAYMOND SANTOS**                                    07/23/09

1    that.

2         Q    Was there any threat against the Tampa

3    Convention Center that if they didn't change, United

4    National would sue them?

5         A    Not that I'm aware of.

6         Q    Are you aware of any business that United has

7    done at the Tampa Convention Center since the policy was

8    changed to an exclusive?

9         A    I would have to research it.

10        Q    What decorators do work at the Tampa Convention

11   Center?

12        A    I would say all of -- all of them.

13        Q    So it's a main -- it's a big facility?

14        A    Yes.  Yes, it is.

15        Q    How would it rank in the United States in terms

16   of size?

17        A    I wouldn't know.

18        Q    They have their own in-house cleaning staff?

19        A    Yes.

20        Q    Do you know anything about their pricing?

21        A    No.

22        Q    Have any of the decorators that you've dealt

23   with made any complaints about the exclusive cleaning

24   policy in effect at the Tampa Convention Center?

25        A    Not that I'm aware of.

121

Ex11 p85

RAYMOND SANTOS                                  07/23/09

1        Q     Have any of the decorators you've dealt with

2   had any complaints about the quality of work done by the

3   in-house staff at the Tampa Convention Center?

4        A     Yes.

5        Q     What complaints with those?

6        A     Well, the quality of the work is not what they

7   were used to with United.

8        Q     The quality has dropped as far as the

9   decorators are concerned?

10       A     Yes.

11       Q     Have they objected to the convention center's

12  use of in-house staff?

13             MR. SLANIA:   Calls for speculation.

14  BY MR. L'ESTRANGE:

15       Q     That you know of?

16       A     Not that I know of.

17       Q     Well, the price -- the policy has been in

18  effect for at least a couple of years --

19       A     Yes.

20       Q     -- down there?

21             Did the Tampa Convention Center raise its

22  prices for cleaning after the policy went into effect?

23       A     I -- I wouldn't know.

24       Q     Have you made any attempt to research to find

25  out what they charge for their cleaning service?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EX11 886

1      A     No.

2      Q     Why is it that United National Maintenance

3   chose to challenge the change in the cleaning policy in

4   San Diego, whereas it didn't make any challenge to the

5   exclusive cleaning policies in any of these other venues

6   that you just talked about?

7      A     I don't know.

8           MR. SLANIA:  Calls for speculation.  Also could

9   invade the attorney-client privilege to the extent that

10  he's been privy to any conversations with counsel

11  regarding why decisions have been made.

12          If you know the answer to the question, then

13  you can answer without disclosing the contents of any

14  attorney-client privileged communications.  You can

15  answer the question.

16  BY MR. L'ESTRANGE:

17     Q     Have you had any discussions with Mr. Simon

18  about why he elected to file a lawsuit against San Diego

19  but, yet, has not filed a lawsuit against any of these

20  other convention centers for the exclusive cleaning

21  policy?

22          MR. SLANIA:  You can answer that if you had a

23  conversation with him and no attorney was present during

24  that conversation or where it was not disclosing the

25  contents of any other attorney-client privileged

123

EX 11 p89

1    communication.

2              THE WITNESS:  I have not had any discussions

3    with him regarding that.

4              (Record read.)

5              MR. L'ESTRANGE:  Exhibit 146 is a two-page

6    email.  It bears Production Nos. UNM1001810 through

7    1811.  The top email is dated November 10, 2007 from

8    George Ortiz to Greg McCormack.

9              (Deposition Exhibit 146 marked.)

10   BY MR. L'ESTRANGE:

11       Q    Have you seen these emails before?

12       A    Yes.

13       Q    This is an exchange between Champion and UNM

14   about a cleaning job at the Mandalay Bay in Las Vegas.

15   Correct?

16       A    Yes.

17       Q    And apparently, the account executive for

18   Champion asked why you hadn't provided an estimate for

19   this show?

20       A    Right.  That's correct.

21              MR. SLANIA:  Well --

22   BY MR. L'ESTRANGE:

23       Q    And the response --

24              MR. SLANIA:  Am I misreading this?  I'm sorry.

25              MR. L'ESTRANGE:  No.  The Champion manager said

                                                      124

EX11 p85

1          I, RAYMOND SANTOS, do hereby declare under penalty

2     of perjury that I have read the foregoing transcript;

3     that I have made any corrections as appear noted, in

4     ink, initialed by me, or attached hereto; that my

5     testimony as contained herein, as corrected, is true and

6     correct.

7          EXECUTED this 27th day of _____August_____,

8     20 09 , at ____Chicago____ , ____Illinois____ .
                        (City)                  (State)

9

10

11

12     _____
          RAYMOND SANTOS

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          195

Ex11 p89

# EXHIBIT 12

# Preamble

We are pleased to present to you our San Diego Convention Center Corporation Employee Handbook.

The San Diego Convention Center Corporation manages, markets, operates and maintains the San Diego Convention Center a premier convention and meeting venue which is host to business, educational and social activities that are integral to the economic well-being of the region. Our "San Diego Spirit" philosophy mandates our excellence, dedication, professionalism, pride, training and Total Service.

Because of your many outstanding traits, you have been chosen to represent the San Diego Convention Center Corporation. You are an important member of our team, and, as such, your most important duty is to maintain the highest standards of service to our guests. Everyone visiting our facilities is a VIP and should be treated as your personal guest.

The policies, procedures and guidelines contained in this handbook are inherent in the "San Diego Spirit." Please read them carefully and remember all of them. You will be expected to perform in accordance with this handbook. Failure to do so may result in termination of employment. The Corporation reserves the right to change, modify or amend its policies and procedures without notice, except as restricted by its collective bargaining agreements. Where employees are covered by a collective bargaining agreement, and where the policies, procedures and guidelines contained in this handbook are in conflict with the terms and conditions of the collective bargaining agreement, such terms and conditions of the collective bargaining agreement shall prevail.

As a key member of our championship team, you are a special representative of the Corporation to the many people that we serve. To maintain our high standards of excellence, it is important that you perform your role well at all times.

This handbook is not intended to create contractual rights or an employment contract, but is a guideline for the benefit of you and the Corporation. Your employment with the San Diego Convention Center Corporation is "at-will" and may be terminated by you or Corporation at any time. If your work place and job classification are covered by a collective bargaining agreement, that agreement supersedes any inconsistencies between the collective bargaining agreement and this handbook.

By striving to support the "San Diego Spirit," you will be able to greet our guests in a genuine and friendly manner by saying:

## "HELLO, MAY I HELP YOU"

SD 000332

Ex 12 f 90

# San Diego Convention Center Corporation
# Welcome to Our Team

Welcome to the San Diego Convention Center Corporation team. You are one of nearly 1,000 employees who represent our organization in a continuing program of providing "Total Service" to our clients, guests and colleagues. This philosophy is called the "San Diego Spirit."

You will be trained and assigned an important role—to proudly represent our organization, the city of San Diego and the entire San Diego area. Henceforth, you are an official host and everyone visiting our facilities is your guest. What you do and how you act creates an image that our guests will use to judge our entire staff, facilities and city—every member of our team is in a position to contribute towards our success. Therefore, your role is important and should be performed with strict adherence to each and every detail of appearance, speech, courtesy, efficiency, ethics and integrity. Be professional at all times. Our guests' initial impressions are lasting ones, and we never get a second chance to make a good first impression.

We are proud of our collective achievements and with your participation, look forward to setting even greater milestones of accomplishment in the future. It is great to have you as a key member of our team, and we invite you to be a part of the "San Diego Spirit."

# San Diego Convention Center Corporation
# "San Diego Spirit"

When people think of the San Diego Convention Center Corporation, the image that often comes to mind is of a unique building overlooking the marina. The San Diego Convention Center is known for hosting tradeshows, conventions, and political and religious gatherings. Yet the Corporation is much more than a world-class facility, it is also the workplace of the people who play host to its guests. In truth, we are the San Diego Convention Center Corporation and the embodiment of the "San Diego Spirit," which inspires our daily work habits, guides our performance and creates a unique working environment. As a member of our team, you will want to learn more about our "Spirit" philosophy and how it affects you.

Everyone visiting our facilities is a VIP and should be treated as your personal guest. They are the reason we are here. Your most important duty is to maintain the highest standards of service to our guests. Your presentation should be courteous, friendly, helpful and warm. Remember that your performance is the key to our success!

In many cases you will work behind the scenes and not in direct contact with guests. The "San Diego Spirit" also governs the manner in which we work with each other as well as our suppliers and industry partners. However, whether you work behind the scenes or directly with the public, the pride taken in performing your assigned duties truly affects everyone who visits our facilities.

The "San Diego Spirit" supports our team vision and values and is represented by the following personal attributes:

Honesty: We are truthful and honest. Our language and actions in the performance of our duties are above reproach. We conduct ourselves with the highest degree of integrity at all times.

SD 000333

Ex12 p91

**Cleanliness:** The image each of us projects reflects on the entire team. Excellence is our minimum standard in maintaining our facilities and in personal grooming, creating an exceptional first impression for our guests.

**Courtesy:** We treat our guests, clients and fellow employees with warmth, equality, understanding, politeness and sincere concern for each other's welfare.

**Knowledge:** We make every effort to keep ourselves well informed; and if we don't know the answer to a question, find the answer as soon as possible and relay it to our guest or client immediately. Every question about our facilities, their operation and services always deserves an intelligent answer.

**Teamwork:** We all take great pride in our team efforts to provide each guest with an enjoyable visit and a desire to return. We work together, each helping the other, to make our working lives safer, easier and more enjoyable.

**Respect:** We respect cultural and political symbols and rituals. Pay attention to your surroundings and honor our clients and guests by appropriately observing moments of silence, prayer, speakers, national anthems and presentations of flags.

A key opens a lock and makes what's inside accessible. The "San Diego Spirit" and the personal attributes, listed above, that make it come alive are inside each of us. Here are ten simple keys that can be used to unlock that spirit:

- Speak to people
- Smile at people
- Call people by name
- Be friendly and helpful
- Be cordial
- Radiate interest
- Praise generously
- Be considerate
- Be thoughtful
- Cooperate readily

In summary, strive for excellence in what you do, and how you do it. Look confident and present yourself to your colleagues and our guests as someone who knows what to do, and does it well. Ensure satisfaction for our guests, who are the lifeblood of our business. Dedicate yourself to giving our guests the best service and attention you can. Be professional at all times, not only in your interaction with guests, but also with your fellow team members. Take pride in your appearance and the quality of your work.

The Corporation provides training and guidance to help you achieve your goals – incorporate what you learn into your daily activities. With the strength of these principles, you will find your future with the San Diego Convention Center Corporation bright, meaningful and enjoyable.

We are here to serve individual people and organizations while serving the greater interests of the community at large. When we do our jobs well, the San Diego community benefits. We are truly

SD 000334

Ex 12 p 92

representing San Diego and it's important to keep in mind all the components of the "San Diego Spirit" – read them often.

# San Diego Convention Center Corporation
# Our Team Vision is …

The San Diego Convention Center Corporation facilities are recognized world wide as the sites of preference. We lead the industry with:

♦ innovative service, and programs that surpass customer expectations

♦ the friendliest and most helpful team

♦ technology to optimize customer satisfaction, facility operations and business opportunities

♦ facilities that are appealing and attractive, clean and well maintained

We attract, develop and retain the most talented team members who contribute to our growth and future. We are committed to fair and equitable treatment of all employees, to the creation of an environment that fosters the highest levels of integrity and professionalism, and to policies and programs that offer the opportunity for employees to develop meaningful and rewarding careers.

The spirit of hospitality guides our relationship with our guests.

We understand our customers' business, anticipate their needs, and dedicate resources to promote mutual success.

We are economically self-reliant through business development, optimizing revenues and improving operating efficiency.

Members of our community have a vested interest in our business. We continually partner with them to maintain support for our vision, goals, and contributions to the community.

*The art of presentation is our science.* Living this vision maintains our industry leadership and creates success for all.

SD 000335

EX 12  p93

# San Diego Convention Center Corporation
# Our Team Values are ...

*Employees*: Our employees are the key to our success. We are committed to their success through support, development, training, education and recognition.

*Integrity*: We are committed to a code of conduct based on trust, honesty, and treating everyone with respect and dignity.

*Leadership*: We value leaders who project a professional image, serve as a role model by promoting our vision and values; thereby setting the direction for the organization.

*Teamwork*: We create an environment that encourages the participation and cooperation of all team members to achieve the best results.

*Communication*: We believe that effective communication is essential to our success and encourage open and honest discussion which is timely, constructive and informative.

*Customer Service*: We are committed to not only meeting the needs but surpassing the expectations of every guest to our facilities. Through superior programs and services we ensure our mutual success. We take pride in developing lasting relationships.

*Results*: We value and encourage results in all areas of our organization. Each department and individual contributes to our overall success.

*Innovation*: We recognize our success is the result of creative thinking. To maintain our leadership role in the industry, we encourage new ideas which lead to improvements in all aspects of our organization.

*Diversity*: The collective blending of our talented people, business expertise, and unique services enrich and enhance our organization.

# San Diego Convention Center Corporation
# About the People
## Board of Directors

A nine-member Board of Directors establishes policy and direction for the Corporation. Seven members are appointed by San Diego City Council. Two non-voting members are appointed to represent support industries. One member is appointed from the Convention and Visitors Bureau (ConVis) to represent the convention and tourism industry and one member is appointed from the Hotel and Motel Association (HMA) to represent the hotel industry. The Corporation has a reciprocal appointment on each of these Boards to represent the Convention Center Corporation.

Chair
     Name:_____

SD 000336

EX 12 P94

Vice Chair
    Name:_____

Secretary
    Name:_____

Board Member
    Name:_____

Board Member
    Name:_____

Board Member
    Name:_____

Board Member
    Name:_____

Board Member
    Name:_____

ConVis Representative
    Name:_____

Hotel/Motel Association Representative
    Name:_____

## The People Who Work Here

### Corporate Departments

#### President & CEO
The President & CEO is responsible for overseeing all facets of the Corporation. The President & CEO's office is located at the Convention Center on the mezzanine floor of the west end of the Convention Center above Hall A.

President/Chief Executive Officer
        Name: Carol Wallace    Ext: 5101

### Finance
The Finance Department is responsible for corporate-wide accounting, budgeting and risk management. The Vice President of Finance is located in the Executive Offices and the remainder of the department is located on the ground level at the west end of the Convention Center.

Vice President Finance      Mark Emch    Ext 5301

SD 000337

EX 12 p 95

### Public Affairs

The Public Affairs Department is responsible for fielding inquiries from the media; assisting with promotion of client programs; conducting national, trade and local media programs; producing corporate and employee publications; and management and development of the corporate web sites. The department is located at the Convention Center on the ground level near the Executive Office Receptionist.

Vice President Public Affairs:   Steven Johnson          Ext: 5251

### Legal

The Legal Department is responsible for corporate-wide legal matters, contracting and procurement. The Legal Department is on the ground level at the west end of the Convention Center near Finance.

Vice President, General Counsel          Beatrice W. Kemp       Ext: 5130

### Human Resources

The Human Resources Department is responsible for employment processing, compensation/benefits, employee relations, labor relations, training/staff development, workers' compensation and payroll-personnel information. The department is located at the Convention Center on level P-1.

Vice President Human Resources          Thomas Mazzocco       Ext: 5150

### Sales & Marketing

This department is responsible for the sales and marketing of the Convention Center. The sales team iis located at the Convention Center on the mezzanine level of the east side of the Convention Center above Hall D.

Executive Vice President Sales and Marketing   Sandra Moreno        Ext: 5256
Vice President Sales Eastern Region (Washington D. C. office)  Phyllis Bradely-Azama
Vice President Mid-West Region (Chicago Ill. office) Angie Ranallie

### Corporate Operations

#### Senior Vice President & COO

The Senior Vice President & COO is responsible for overseeing all operational facets of the Corporation and the Corporations Information Systems. The Senior Vice President & COO's Office is located at the Convention Center on the mezzanine floor of the west end of the Convention Center above Hall A.

Senior Vice President/Chief Operation Officer    Joe Psuik        Ext: 5123
Information Systems Director
          Name:  Lynn Ewing           Ext: 5350

SD 000338

Ex 12 p 96

In addition to the various departments at the Convention Center, we have exclusive and preferred service partners who have on-site offices, as well as a fire marshal from the San Diego Fire Department.

### Convention Center Operation

Provides leadership and direction for operations, client services and maintenance at the Convention Center; supervising event and facility services, engineering, electrical, telecommunications, security and guest services, as well as the operational aspects of contracted services for food and beverage, audio/visual, business service, fire-safety, event security and information display service. Operations divisions are located throughout the Convention Center.

| General Manager | Brad Gessner | Ext: 5140 |
| Director Of Operations | Robert DeNoffrio | Ext: 5425 |
| Event Services Director | Ron King | Ext: 5405 |
| Convention Services Director | Dee Anne Snyder | Ext: 5428 |

## On-site Service Partners

### Audio/Visual

Meeting Services Inc. (MSI) is the Convention Center's exclusive contractor for in-house sound system and rigging points and the preferred contractor for all other audio/visual services at both the Convention Center and the Concourse.

| Director | : Matt LeVeque | Ext: 5446 |

### Business Service Center

Fed Ex/Kinkos is the exclusive service provider for business service in public areas and operates the Business Service Center located in the Grand Lobby of the Convention Center. Fed Ex/Kinkos offers shipping, mailing, faxing, photocopying, display materials and office supplies. They are open 7 days a week from 7 a.m. to 7 p.m., when the facility is in use.

| Manager | David Guzman | Ext: 5450 |

### Food & Beverage

Catering – Centerplate has the exclusive contract at the Convention Center to provide all food and beverage services for catered events including banquets, concessions, coffee breaks receptions and exhibitor booth catering. The Centerplate General Manager directs the staff members of catering/sales, banquet, kitchen, concessions and food and beverage accounting.

| General Manager/Food & Beverage Director | Nancy Murgillo | Ext: 5855 |

### Specialty Concession Services

A medley of concessions stands or carts are used at the Convention Center to complement the mix of food and beverage options, such as ethnic and American cuisine, specialty coffees, pretzels, pastries, ice cream, fruit smoothies and themed menu items.

SD 000339
Ex12 p97

**Smart City Network**
Smart City Network is the Convention Center's exclusive provider of telephone services and all voice and data connectivity and transmission to all clients and exhibitors in the Center.

General Manager/Telecommunications   Laureen Boykin          Ext: 5525

**Fire Department**
The San Diego Fire Department provides an on-site Fire Marshal to help ensure the safety of the Center.
Fire Marshal      Tamarah Castaneda          Ext: 5495

SD 000340
Ex 12 ρ 98

# San Diego Convention Center Corporation
# Employee Committees, Boards & Councils

Employees are encouraged to actively participate in various employee-based committees that contribute to our success. Each committee is made up of a cross-section of employees, representing diverse departments as well as both part-time and full-time staff. Employee participation on the various employee committees, boards and councils is voluntary.

### Employee Recreation Council

The Employee Recreation Council (ERC) is dedicated to providing recreation, enjoyment, refreshments and relaxation to employees of the Corporation and its contractors. Through recreational activities the ERC creates an atmosphere of team spirit, networking and friendship.

The ERC sponsors a monthly birthday celebration that rotates through the departments, a summer picnic, a holiday party, field trips and a variety of diverse organized sporting activities. Discounted tickets to selected Broadway shows and public dances are facilitated through the ERC.

ERC activities are funded through a combination of client-provided gratuities, employee contributions, and participation fees for some ERC sponsored events. Employee contributions are voluntary and can be automatically deducted from your paycheck. Participation at the Employee Recreation Council sponsored activities is strictly voluntary. Employees assume personal risk when participating at ERC sponsored events outside of the employee's work hours and not part of the employee's duties.

### The Employee of the Month Committee

The Employee of the Month Committee reviews nominees for employee of the month and recommends a single employee to be recognized each month. In addition to serving as a member of the Employee of the Month Committee, employees can participate in the Employee of the Month Program by nominating a co-worker for Employee of the Month recognition.

### Suggestion Program

The Suggestion Program is in place for employees to suggest better ways of doing things. Suggestions as far reaching as safety, efficiency, cost saving and environmental have been incorporated as a result of employee suggestions. The approved suggestions are highlighted at each month's All Employee Meeting and the employee receives special recognition.

### Safety Committees

There are Safety Committees at both the Convention Center and the Concourse. The Safety Committee meets regularly to discuss methods of reducing safety hazards and promoting safe practices and the Safety Issues Committee has members available every day who can answer questions about safety. Suggestions and inquiries are always welcome.

### Editorial Board

The Editorial Committee provides feedback, guidance and support of employee newsletters, including *Crew News* and *The UnConventional News*.

SD 000341

EX 12 p 99

# San Diego Convention Center Corporation
# Floor Plans & About the Facilities

The San Diego Convention Center Corporation, created in December 1984 by the City of San Diego, manages and operates the San Diego Convention Center San Diego Concourse. Web site: www.sdccc.org

### San Diego Convention Center
*Description:* The original Convention Center was a 760,000 square foot facility designed to attract and serve major conventions and trade shows and to provide a positive community asset. In June 1998 the voters approved the expansion of the Convention Center with a ceremonial groundbreaking that same month. The expansion cost $216 million and doubled the size of the existing building increasing the square footage to 2.6 million square feet of exhibit and meeting space.

*Location:* Offering views of San Diego's downtown skyline and waterfront, the Center is sited on 11 acres along San Diego Bay, with nearby amenities such as a marina, hotels, restaurants, Seaport Village, the Gaslamp Quarter and Horton Plaza. The address is 111 W. Harbor Drive, San Diego, CA 92101.

*Opened:* November 24, 1989. Construction of the original Convention Center began on March 23, 1987. The expansion opened September 15, 2001. Construction for the expansion began in August 1998.

*Owner:* The Center is on tidelands property administered by the San Diego Unified Port District. The Port District developed the original Convention Center and covered all costs. The expansion was funded by lease revenue bonds and is being repaid by the City with an annual $4.5 million contribution from the Port District. The facility is leased to the City of San Diego.

*Web site:* www.sdccc.org

SD 000342

Ex12 p 100

# San Diego Convention Center Corporation
# Grooming, Dress And Uniform Policies

The overall appearance of our organization is very important to the Corporation and our guests. When our clients and guests visit our facilities they are impressed with our attention to detail. These details include the cleanliness of the facilities to the professional appearance of our employees. Impressions such as these play a big part in the reason why clients initially book our facilities and why they keep bringing their events back. For these reasons we place a very strong emphasis on cleanliness and appearance. Whether you are working out front in an event or behind the scenes, the appearance of the overall organization continues to be one of the most important elements of the San Diego Convention Center Corporation.

Whether you are provided a uniform or wear your own attire, it is critical that you project a professional, neat, clean, and attractive appearance. This appearance also goes beyond just your clothes. It includes your hair, fingernails, jewelry, make-up, perfumes/colognes, hosiery/socks, and shoes.

Whether working in a Corporation-provided uniform or in personal attire, employees are required to take responsibility for ensuring a neat, clean and professional image. Employee appearance is important to the success of the Corporation and, therefore, it is important to maintain high standards and high expectations. Anything which could be considered distracting, unprofessional, offensive, or not in the best interest of the San Diego Convention Center Corporation will not be permitted.

## Uniforms:

Uniforms have been carefully developed to meet the Corporation's specifications for many positions. Employees working in those positions will be issued all required uniforms by the Wardrobe Division. It is the employee's responsibility to ensure that the issued uniforms are neat and clean at all times. When uniformed, you are responsible for the proper care and maintenance of your uniform. Any soiled, damaged or ill-fitting uniforms are to be returned to the Wardrobe Division for cleaning, repair or replacement.

Employees are required to change into their full uniform PRIOR to clocking in for work and before the staff briefing.

Your supervisor will advise you of the procedure for receiving and returning your uniforms. All uniforms are the property of the Corporation and are to be returned immediately upon request, resignation or termination from the Corporation.

## Personal Attire:

For those positions for which uniforms are not provided, employees are required to provide their own personal attire. It is the responsibility of employees to ensure they present themselves in an appropriately professional manner at all times while working within the facilities as well as when representing the Corporation off-site. While our day-to-day standard consists of traditional business attire of business suits/dresses, there are times when casual slacks with sports shirts/blouses may be acceptable. The appropriateness of the attire must be gauged to the employee's position, duties, activities, and interactions with clients, guests or others. As these

SD 000343

Ex 12 p101

may change from day-to-day, the appropriateness of the attire may also change. It is each employees' responsibility to use exceptional judgement in determining the appropriateness of their attire. If there is any question, it should be discussed – in advance with your supervisor. However as a general rule, if there is any doubt, conservative, more traditional business clothes are always appropriate.

Attire that is unacceptable includes, but is not limited to, jeans (except when appropriate), shorts, sweatpants, workout/running attire, t-shirts, tank tops, dresses or skirts that are inappropriately short, sheer clothing or clothing that otherwise is revealing, distracting, or provocative. Shirts with logo's or company names other than the Corporation's or its facilities are generally also inappropriate.

The Corporation reserves the right to determine the appropriateness of personal attire. Employees with appearance considered to be inappropriate will not be allowed to work and may be subject to disciplinary action.

<u>**Hats:**</u>

Only hats issued by the Corporation are to be worn. All other hats are prohibited.

<u>**Hair:**</u>

Hair should be clean, neatly combed, and well groomed. For male employees, hair must be not extend beyond midway of their ear and must be above their shirt collar.

Any extreme hair styling and color is unacceptable.

Appropriate hair confinement must be used in food service and preparation areas, as required by law.

<u>**Name Badges:**</u>

All employees are issued a photo identification badge. The badge is to be worn at all times so that it is clearly visible. Only photo identifications or other special event ribbons or pins issued or authorized by the Corporation are to be worn.

<u>**Jewelry:**</u>

Jewelry should be limited to maintain an appropriately professional appearance. Necklaces and bracelets should not be worn in uniform. For females, one set of earrings (one earring per ear) are acceptable; earrings may not dangle more than one inch below the ear. For males, earrings are not acceptable.

For safety reasons, further limitations and restrictions may be established for certain positions or assigning duties.

Any visible body piercing jewelry, except the above mentioned earrings for female employees, is not permitted at any time.

<u>**Perfume/Cologne:**</u>

SD 000344

Ex 12 p 108

If used, perfume, cologne, powders or any other scents must be used sparingly.

### Hosiery/Socks:

It is recommended that employees wear hosiery, stockings or socks as appropriate.

Uniformed employees will be advised of the required hosiery or socks that you will be required to provide.

### Fingernails:

Fingernails should be clean and presentable. Fingernails for female employees should be in appropriately professional colors or tones, if polished. Nails with designs or jewelry and unusually long fingernails will not be permitted.

### Makeup:

An appropriate professional business appearance is required at all times. Makeup that attracts attention is not acceptable.

Only a naturally appearing makeup is permitted. Foundation bases, powders and blushes should correspond with the employee's individual skin coloring. If mascara, eye shadow or eye liner are worn, they should be applied lightly. If lipstick is worn, it should be applied lightly and should compliment your appearance.

### Shoes:

Employees are required to provide their own shoes. For uniformed positions, employees will be advised of specific types of shoes that are required. For positions in which employees wear their own personal attire, appropriately professional shoes that coordinate with the attire is required.

All shoes should be in good condition, clean, polished and attractive. Extreme styles that attract special attention are not permitted. For safety purposes, shoes should have non-skid soles. Casual and sport sandals, and slippers are not permitted. For certain positions, steel-toed shoes may be required.

### Summary:

Managers and Supervisors may specify additional or alternative dress and grooming requirements based on the business needs of their departments. Additionally, special dress and/or grooming requirements may be established as necessary for employee safety.

The Corporation reserves the sole right to determine the appropriateness of employee appearance. The policies and guidelines developed in this handbook have been developed by the Corporation and may be changed at any time. Failure to adhere to these or any subsequently established or modified standards will result in appropriate disciplinary action.

SD 000345

Ex 12 p 103

# San Diego Convention Center Corporation Safety Guidelines

## Safety Policy Statement

The personal health and safety of each employee is of primary importance to the San Diego Convention Center Corporation. The prevention of occupationally related injuries and illnesses is of such consequence that it will be given precedence over operating productivity whenever necessary. The Corporation provides mechanical and physical facilities required for personal safety and health in keeping with the highest standards.

The San Diego Convention Center Corporation maintains a safety and health program conforming with the best practices in the industry. This program embodies the proper attitudes toward injury and illness prevention by every employee in order to be successful. It also requires cooperation in all safety and health matters, not only between supervisors and employees, but between employee's fellow workers. Only through such cooperative efforts can a safety record in the best interest of all be preserved.

Our objective is a safety and health program that will reduce or eliminate the number of occupational injuries and illnesses, with the objective of surpassing the best experience of others in our industry. Our goal is zero accidents and injuries.

The San Diego Convention Center Corporation safety program includes:

* Providing mechanical and physical safeguards.

* Conducting a program of safety and health hazard recognition, and to comply fully with all safety and health standards and regulations.

* Training all employees in good safety practices.

* Providing necessary personal protective equipment and instructions for its use and care.

* Developing and enforcing safety and health rules and requiring employees cooperate with these rules as a condition of employment.

* Investigating, promptly and thoroughly, every injury and non-injury incident to determine the cause(s) and to correct the problems so that it will not happen again.

We recognize that the responsibility for safety and health is shared:

* The Corporation is responsible, and accepts responsibility, for leadership of the safety and health program, for its effectiveness and improvement, and for providing the safeguards required to ensure safe conditions.

SD 000346

EX12 p104

- Our supervisors are responsible for developing the proper performance toward safety and health in themselves and in those they supervise, and for ensuring that all operations are performed with the utmost regard for the safety and health of all personnel involved, including themselves.

- Our employees are responsible for their safety and health, including compliance with all the rules and regulations, and for continuously practicing safety while performing their duties.

## Safe Practices

Your well-being and that of our guests, is of utmost importance. Prevent accidents before they happen. Safe working habits, attention to your work place and care of your tools and equipment will help make your job easier and more enjoyable.

Safety is your business. It's a basic part of the "San Diego Spirit." Make sure you understand all the safety rules and practices.

All employees shall follow safe practice rules, always be aware of safe operating procedures, and report all unsafe or hazardous conditions and practices to the supervisor. Supervisors shall insist on employees following and obeying every rule, regulation, and order as is necessary for the safe conduct of the work.

- Report immediately to your supervisor any unsafe condition, such as slippery floors, exposed wiring, or equipment left in halls.

- Notify your supervisor immediately about faulty equipment or damaged tools. Do not attempt to use them.

- Do not attempt to operate any equipment for which you are not properly trained.

- Dress properly to avoid accidents. Loose clothing, ragged sleeves, high heels, and thin or broken soles are dangerous and unacceptable.

- Be aware of potential safety hazards when using tools, equipment and materials.

- Put all furniture and equipment you use back in safe positions and locations.

- Do not run! It is safer to walk. Do not read while walking.

- When a medical emergency occurs involving anyone on the premises, immediately notify Guest Services and your supervisor.

- Watch for fire hazards. Report them immediately to Guest Services.

- No one shall knowingly be permitted or required to work while the employee's ability or alertness is so impaired by fatigue, illness or other causes that might expose the employee or others to harm or injury.

- Always obey warning signs.

SD 000347

EX12 P105

- Work should be planned in advance and supervised to prevent injuries in the handling of materials and in working together with equipment.

- Do not attempt to lift or push objects that MAY be too heavy for you. ASK FOR HELP when you need it. Lift all heavy objects the correct way. Bend at the knees, keep your torso erect, push up with your legs.

- Know where the exits are and learn the locations and use of the fire extinguishers in any area you are assigned to work.

- Read all instructions and warning labels BEFORE using any chemical products or solutions.

- Always turn on a light before entering a dark room.

- Do not stand in front of closed doors that may be suddenly opened and strike you.

- Observe "No Smoking" signs and rules for your protection, as well as others. Smoke only in authorized areas.

- Aisles, exits, corridors, fire extinguishers and electrical panels must be kept clear.

- All work areas will be kept in a clean and orderly condition by employees with assigned duties in said work areas. Employees shall inspect their work area prior to beginning work to identify potential hazards, inform the supervisor of any hazards that are found, and take appropriate supervised actions to abate or correct the hazard. All employees shall clean up and put away all equipment and materials utilized by the employee during their shift, as a daily part of the employee's work requirements.

- Damaged tools and equipment shall be removed from service until repaired.

- Employees who are taking medication, either over the counter or prescription, which causes drowsiness or impairs their ability to safely perform their duties, are required to inform their supervisor prior to starting work at the beginning of their shift.

## Safety Committees

The Management Safety Committee, Convention Center Employee Safety Committee and the Concourse Employee Safety Committee meet regularly to discuss methods of reducing safety hazards and promoting safe practices. Suggestions are always welcome.

## What To Do In Case Of Fire

If you discover a fire, immediately call Asset Protection at ext. 5911 and give the following information:

- Your name
- The specific location of the fire

SD 000348

EX 12 p 106

- A description of what is burning
- A description of how serious it is
- A description of how much area is affected by the fire

After reporting the fire to Asset Protection, report the incident to your supervisor. All fires within the facilities, regardless of type or size, are to be reported by dialing 5911 immediately.

In the event of a major fire, it is your responsibility to see that the guests in your area are evacuated calmly and efficiently. *Never* shout the word "fire." Remain clam and be very explicit in all your communications.

## What To Do In Case Of A Bomb Threat

In the event of a bomb threat, Asset Protection and the San Diego Police Department are directly responsible for the procedures that will be taken. Follow their instructions carefully.

Should you be requested to search your area, cover your area carefully. If you note any unusual package or item, do not touch it or use your radio. Immediately notify your supervisor or Asset Protection (5911) by the nearest phone available.

If it becomes necessary to evacuate, follow any instructions given to you carefully. Always remain calm and in command of your area. Never use any language that could cause panic, such as "bomb" or "explosion." Remember, at such a time, many lives may depend on your cool and efficient actions.

If you receive a bomb threat, try to get from the source the exact location of the bomb, when it is supposed to detonate and why. Then immediately call Asset Protection by dialing ext. 5911 and report your information, followed by notifying your supervisor.

## First Aid

If you discover a guest who appears to be seriously injured, follow these steps:

1.  Make the injured person as comfortable as possible *without moving him or her.*

2.  Notify Asset Protection by dialing ext. 5911 using the nearest phone. Give your name and the *specific location* of the injured person, the type of injury or illness and whether or not a wheelchair or stretcher is needed.

3.  Notify your supervisor.

4.  Return to the injured person until medical help arrives.

5.  Thoroughly inspect the area of the accident for possible contributing factors, such as torn or loose carpet, slick or wet floors, obstructions, broken or damaged fixtures, etc...Report your findings to Asset Protection.

If the injury to the guest is not serious, call Asset Protection, by dialing ext 5490, for first aid.

SD 000349

EX 12 p 107

## What To Do If You Are Injured

If you are injured while on duty, immediately notify your supervisor. If the injury is serious, notify Asset Protection by dialing ext. 5911, and then report to your supervisor. You will be referred to the appropriate medical facility for treatment.

## Injury and Illness Prevention Program

All employees are provided with a copy of the Corporation's Injury and Illness Prevention Program (IIPP). The Injury and Illness Prevention Program identifies:

- The individual responsible for the Corporation's Injury and Illness Prevention Program
- Safety committees, the members and responsibilities
- System ensuring employees comply with safe and health work practices, policies, rules and regulations
- The Corporation safety training program
- Hazard identification procedures
- Accident investigation procedures
- IIPP communication program
- Procedures for the correction of identified hazards

If you have not received a copy of the Corporation's Injury and Illness Prevention Program contact your supervisor or the Human Resources Department.

## Hazardous Substance Communications Program

All employees are provided with a copy of the Corporation's Hazardous Substance Communications Program. The Hazardous Substance Communications Program identifies:

- Container Labeling
- Material Safety Data Sheets (MSDS)
- Employee Information and Training
- List of Hazardous Substances (Right-To-Know Station)
- Hazardous Non-Routine Tasks
- Hazardous Substances in Unlabeled Pipes
- Informing of Contractors

If you have not received a copy of the Corporation's Hazardous Substance Communications Program contact your supervisor or the Human Resources Department.

# San Diego Convention Center Corporation Personnel Policies

Employee Handbook / Section 1 - Welcome
September 2006

1 -   19

SD 000350

EX 12 p 108

## GENERAL

The purpose of these Personnel Policies is to establish definition, philosophies and direction concerning policies and procedures of the San Diego Convention Center Corporation. The Corporation reserves the right to change, modify or amend it's personnel policies without notice, except as restricted by its collective bargaining agreements.

Since our business is a form of show business, when you're in the view of a guest - you are on *stage*. Put on your best performance at all times.

In many cases, you may find yourself working behind the scenes, out of direct contact with our guests. Even at these times, the pride you put in your work affects everyone who visits our facilities, as well as other who work here. Whether on stage or behind the scenes, be a true professional at all times.

As an employee, you will be expected to:

- Perform your duties in the true manner of the "San Diego Spirit" philosophy.

- Wear your valid Corporation employee photo identification badge at all times. You are an important representative of our total organization and deserve to be properly recognized.

- Be responsible for your appearance. You are officially representing our organization and your fellow workers; therefore always conduct yourself in a professional manner.

- Be punctual. Allot ample time to get to work so that you are well prepared to begin your assigned duties. Always allow extra time for the unexpected. Be in uniform, ready to go at line up time.

- Have a complete working knowledge of your immediate work area, the event being presented, and other events in progress.

- Understand and comply with instructions.

- Give only correct information. You are considered an "information expert." If you don't know the answer, ask your supervisor and relay the answer to the guest.

- Always be courteous with the guest. You may be asked the same questions in the same spot a hundred times during the day, but remember that, for each guest, it is the first time he or she has asked the question.

- Make and maintain eye contact with guests. Serve them well by answering questions intelligently, briefly and clearly. Know the "San Diego Spirit" Employee Handbook well.

- Always smile and maintain a positive attitude while on duty. You represent a great organization and should show your enthusiasm.

SD 000351

Ex 12 p 109

- Take time to offer helpful assistance to a guest who needs, or may appear to need your assistance. Handle common inquires or questions guest may have.

- Take time to help that child find his or her "lost" parent.

- Refer guest disorderly conduct and injuries to your supervisor or Guest Services.

- Observe and follow all rules and policies including time and location of breaks.

- Eat or drink only on your approved breaks and only in back of the house areas. Do not smoke in public areas. You may not chew gum or toothpicks.

- Do not sit, lean, slouch, lie or appear in any other position that demonstrates to our guests anything less than full attention to their needs.

- Avoid excessive conversation with guests or other employees.

- Don't engage in casual conversation with fellow employees except during authorized breaks or after hours. Remember, your are here to serve the guests.

- In walking through any area, pick up discarded paper, newspapers and other debris and put them in the nearest receptacle. Show pride in your facility. If you treat it with respect, others will too.

- Keep your work area organized and uncluttered.

- Remain at the work area assigned until permitted to leave or dismissed by your supervisor.

- If you are unable to come to work, notify your supervisor in ample time to be replaced.

- Report any changes of address, phone number to Human Resources and your supervisor.

- Report any changes to your hours of availability to your supervisor.

- Practice and maintain good safety habits and standards.

- Immediately advise your supervisor of lost and found articles. Upon direction from your supervisor, immediately turn the article over to your supervisor or take the article directly to Guest Services.

SD 000352

EX 12 P 110