James R. Lance (147173)
Jacob M. Slania (200652)
**KIRBY NOONAN LANCE & HOGE LLP**
350 Tenth Avenue, Suite 1300
San Diego, California 92101-8700
Telephone (619) 231-8666
Facsimile (619) 231-9593

Theodore R. Tetzlaff (*Pro Hac Vice*)
Kristopher J. Stark (*Pro Hac Vice*)
**UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
Chicago, Illinois 60602-4224
Telephone (312) 977-4400
Facsimile (312) 977-4405

Attorneys for Plaintiff
UNITED NATIONAL MAINTENANCE, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED NATIONAL MAINTENANCE, INC., a Nevada corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>SAN DIEGO CONVENTION CENTER CORPORATION, INC., a California corporation,<br><br>        Defendant. | CASE NO. 07-CV-2172 AJB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S *DAUBERT* MOTION NO. 1 OF 3 TO EXCLUDE OPINION TESTIMONY OF PLAINTIFF'S EXPERT JOHN S. HEKMAN, PH.D. CONCERNING RELEVANT MARKET DEFINITION AND MONOPOLY POWER**<br><br>Judge:  Hon. Anthony J. Battaglia<br>Date:    March 11, 2011<br>Time:   1:30 p.m.<br>Crtrm.:  A<br><br>Complaint Filed: November 13, 2007<br>Trial Date: March 21, 2011 |

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

# **TABLE OF CONTENTS**

**Page**

1. INTRODUCTION ................................................................................................ 1

2. SDCCC'S MOTION IS PROCEDURALLY DEFECTIVE ........................................... 2

    A.   SDCCC'S Motion is Untimely. ......................................................................... 2

    B.   SDCCC's Motion Violates Local Rule 7.1(h). .................................................. 4

3. SDCCC's *DAUBERT* MOTION TO EXCLUDE DR. HEKMAN'S
   TESTIMONY SHOULD BE DENIED ...................................................................... 4

    A.   The Applicable Legal Standard. ...................................................................... 4

    B.   SDCCC Already Lost This Issue. .................................................................... 5

    C.   Dr. Hekman's Opinions Regarding the Relevant Market Are Proper. ............... 6

        1)   Dr. Hekman's Product Market Definition is Based on Reliable
             Data and Recognized Methodology. .................................................... 7

            (a)   Dr. Hekman Properly Analyzed the Product Market ................... 7

            (b)   SDCCC Misinterprets Dr. Hekman's Cross-Elasticity
                  Testing ...................................................................................... 7

            (c)   Dr. Hekman Reviewed All Available Data To Determine
                  Which Products Should be Included in the Product Market ......... 9

            (d)   Dr. Hekman Properly Applies the Cross-Elasticity of
                  Demand Analysis ..................................................................... 10

                (i)    Dr. Hekman Utilized a Hypothetical Model ................... 10

                (ii)   Dr. Hekman Did Not "Reverse Engineer" His
                       Product Market Definition ............................................. 11

                (iii)  Dr. Hekman Did Consider Buyers' Likely
                       Reactions to an Increase in Price .................................. 12

                (iv)   Separate Consideration of Booth Cleaning and
                       Facilities Cleaning is Not Required ................................ 13

                (v)    SDCCC's Argument is a Red Herring ............................. 13

        2)   Dr. Hekman's Geographic Market Definition is Based on Reliable
             Data and Recognized Methodology. .................................................. 13

            (a)   Dr. Hekman's Geographic Market Definition is Not
                  Merely Based on Where the Services are Performed ................. 14

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1          (b)    Dr. Hekman's Analysis Considers Alternatives ........................... 15

2          (c)    Dr. Hekman's Lock-In Analysis is Proper and Helpful.............. 16

3      D.    Dr. Hekman's Market Power Opinion is Reliable Because it is Based on
             Reliable and Sound Opinions. .......................................................................... 16

4      E.    Dr. Hekman Relied on Proper Evidence in Forming his Expert Opinions. ....... 17

5   4.    DR. HEKMAN'S TESTIMONY WILL ASSIST THE TRIER OF FACT ................... 19

6   5.    CONCLUSION............................................................................................................. 20

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1

2

## **TABLE OF AUTHORITIES**

3

**Page(s)**

**CASES**

*Corey Airport Servs v. City of Atlanta,*
    632 F. Supp. 2d 1246 (N.D. GA 2008) ............................................................. 9, 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) ....................................................................................... passim

*Feliciano-Hill v. Principi,*
    439 F. 3d 18 (1st Cir. 2006) ................................................................................ 2, 4

*Hornsby Oil Co., Inc. v. Champion Spark Plug, Co., Inc.*
    714 F.2d 1384 (5th Cir. 1983) ................................................................................. 7

*In re Scrap Metal Antitrust Litigation,*
    527 F.3d 517 (6th Cir. 2008) ............................................................................ 5, 19

*Los Angeles Memorial Coliseum Com'n v National Football League,*
    726 F.2d 1381 (9th Cir. 1984) ............................................................................. 6, 7

*McLaughlin Equip. Co. v. Newcourt Credit Group, Inc.,*
    2004 U.S. Dist. LEXIS 13939 (S.D. Ind. 2004) .................................................. 18

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,*
    924 F.2d 1484 (9th Cir. 1991) ............................................................................... 13

*Paddack v. Dave Christensen, Inc.,*
    745 F.2d 1254 (9th Cir. 1984) ............................................................................... 17

*Primrose Operating Co. v. National American Insurance Co.,*
    382 F.3d 546 (5th Cir. 2004) ................................................................................. 16

*Rebel Oil Co., Inc. v. Atlantic Richfield Co,*
    51 F.3d 1421 (9th Cir. 1995) ................................................................................... 7

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,*
    875 F.2d 1369 (9th Cir. 1989) ............................................................................... 14

*United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi,*
    80 F.3d 1074 (5th Cir. 1996) ................................................................................... 5

*Webster v. Fulton County, Georgia,*
    85 F. Supp. 2d 1375 (N.D. Ga. 2000) ................................................................. 2, 4

*Woods Exploration & Producing Co. v. Aluminum Co. of America,*
    438 F.2d 1286 (5th Cir. 1971) ............................................................................... 15

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

KNLH\823280.1

-iii-

07-CV-2172 AJB

1

**OTHER AUTHORITIES**

2

FRE702.................................................................................................................................. 4, 5

3

FRE 702 and 703 ...................................................................................................................... 19

4

FRE 703 .................................................................................................................................... 17

5

Local Rule 7-1(i)(1), (2) ............................................................................................................ 6

6

Local Rule 7.1(h).................................................................................................................. 1, 4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

# 1. INTRODUCTION

Defendant San Diego Convention Center Corporation, Inc. ("SDCCC") challenges Plaintiff United National Maintenance, Inc.'s ("United") economist and antitrust expert Dr. John Hekman.  SDCCC moves to exclude Dr. Hekman's opinions defining the relevant market and that SDCCC possesses market power within the relevant market.  SDCCC's motion is procedurally deficient, and Dr. Hekman's opinions are the product of reliable principles and methodologies reasonably applied to the facts of this case.  For these reasons, as explained in greater detail below, SDCCC's motion should be denied.

*Daubert* motions must be brought within a reasonable time after the close of discovery, and *Daubert* motions should be placed on calendar well before the trial date is calendared. SDCCC failed to comply with these requirements, choosing instead to sandbag United with its late challenges to Dr. Hekman's opinions.  By waiting until the eve of trial to file its challenges, SDCCC has waived its objections to Dr. Hekman.  Also, SDCCC attempts to circumvent Local Rule 7.1(h), using 46 pages of text in its attack on Dr. Hekman.  For these independent reasons SDCCC's motion should be denied.

In this *Daubert* motion, SDCCC argues that Dr. Hekman's opinions regarding the relevant market are inadmissible because his methodologies are unreliable and because he did not properly apply his methodologies to appropriate data.  SDCCC is wrong.  Dr. Hekman employed generally accepted methodologies used by economists when analyzing the relevant market.  Then, Dr. Hekman applied those methodologies to the facts of this case to develop his opinions.  Dr. Hekman opines that the relevant product market is for Trade Show Cleaning Services[1] at the San Diego Convention Center (the "Facility"), and that the relevant geographic

---

[1] Trade Show Cleaning Services are specialized cleaning and maintenance for trade shows held at convention facilities nationwide.  These services are comprised of two components, Facility Cleaning and Booth Cleaning.  Facility Cleaning is the cleaning of all common areas used by a trade show during the move-in phase (including construction and installation of the booths and show exhibits) and the move-out phase (including dismantling the booths and exhibits and vacating the premises).  Daily porter cleaning is also a component of Facility Cleaning.  Booth Cleaning is the cleaning of individual booths and contiguous aisle space during a show, and it is provided to exhibitors upon request.  The definition of Trade (footnote continued)

1    market is large convention facilities in San Diego. He also opines that SDCCC possesses

2    market power in the relevant market. His opinions are the product of reliable principles and

3    methods that Dr. Hekman appropriately applied to the facts of this case. Accordingly,

4    Dr. Hekman's opinions are admissible, and SDCCC's motion should be denied on this ground.

5                    **2. SDCCC'S MOTION IS PROCEDURALLY DEFECTIVE**

6            **A.    SDCCC'S Motion is Untimely.**

7            The purpose of *Daubert* motions is to address concerns regarding the reliability of

8    expert testimony before the testimony is presented to the jury. *Daubert v. Merrell Dow*

9    *Pharmaceuticals, Inc.,* 509 U.S. 579, 593-94 (1993); *see also Webster v. Fulton County,*

10   *Georgia,* 85 F. Supp. 2d 1375, 1377 (N.D. Ga. 2000). However, any party raising such a

11   challenge *must do so in a timely fashion or the objection is waived. Webster,* 85 F. Supp. 2d

12   at 1377 (emphasis added). In fact, the request "should be made within a reasonable time after

13   the close of discovery if the grounds for the objection can be reasonably anticipated." *Id.*

14   Furthermore, parties have an obligation to object to an expert's testimony in a timely fashion

15   so that the expert's proposed testimony can be evaluated with care. *Feliciano-Hill v. Principi,*

16   439 F. 3d 18, 24-25 (1st Cir. 2006). Failing to bring a *Daubert* challenge until the eve of trial

17   is improper and is a sufficient ground to deny such a motion. *Webster,* 85 F. Supp. 2d at 1377;

18   *see also Feliciano-Hill,* 439 F. 3d at 25. SDCCC completely ignored the timeliness

19   requirement for its *Daubert* challenges to Dr. Hekman.

20           Dr. Hekman first appeared as an expert witness on United's behalf on November 13,

21   2007, submitting a declaration in support of United's motion for a preliminary injunction.

22   (*See,* the accompanying declaration of Jacob M. Slania ("Slania Decl."), ¶ 3, Ex. 1.) He also

23   submitted a supplemental declaration on December 27, 2007. (*Id.,* ¶ 4, Ex. 2.) Consistent

24   with his declarations, Dr. Hekman was designated as United's antitrust expert on May 1, 2009.

25   (*Id.,* ¶ 5, Ex. 3.) Then, Dr. Hekman issued his written reports. Dr. Hekman's initial written

26   _____

27   Show Cleaning Services shall apply throughout all three of United's Oppositions to SDCCC's
     *Daubert* motions.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   report is dated September 30, 2009 and his supplemental report is dated November 12, 2009.

2   (*Id.*, ¶ 6, Exs. 4, 5.) Thereafter, Dr. Hekman was deposed by SDCCC on December 10, 2009.

3   (*Id*. at ¶ 7.)  Additionally, on March 1, 2010, Dr. Hekman submitted a declaration in support of

4   United's opposition to SDCCC's motion for summary judgment. (*Id.*, ¶ 8, Ex. 7.) (Dkt. No.

5   95-9.)

6          Expert discovery was conducted until December, 2009. (Slania Decl., at ¶ 9.)  On

7   January 20, 2010 SDCCC filed its motion for summary judgment. (Dkt. No. 92.) Also, on

8   February 3, 2010 SDCCC filed a *Daubert* motion challenging United's damages expert,

9   Dr. Patrick Kennedy. (Dkt. No. 93.) The current trial date of March 21, 2011 was initially

10  calendared on October 21, 2010. (Dkt. No. 129.)

11         Given the procedural and factual history regarding Dr. Hekman's involvement in this

12  case, it is clear that SDCCC did not bring its *Daubert* challenges within a reasonable time after

13  the close of discovery. Expert discovery was completed in December, 2009. At that juncture

14  SDCCC was well aware of Dr. Hekman's testimony, and had been aware of his testimony for

15  quite some time. SDCCC knew the grounds for any challenge to Dr. Hekman when SDCCC

16  filed its initial *Daubert* challenge to United's damages expert, and SDCCC could have easily

17  brought its challenges to Dr. Hekman at that time. Additionally, SDCCC could have

18  challenged Dr. Hekman's testimony after its motion for summary judgment was denied in

19  part,[2] or once trial was calendared. From November, 2007 until October 2010 nothing

20  changed about Dr. Hekman's testimony or opinions.

21         Rather than bring its challenges to his testimony in a timely fashion, SDCCC

22  sandbagged United by waiting until the eve of trial to assert its *Daubert* challenges.  In so

23  doing, SDCCC waited well over one year after expert discovery was completed before filing

24  its *Daubert* motions. Accordingly, SDCCC waived any and all objections to Dr. Hekman and

25

26

27         [2] The Order denying SDCCC's motion for summary judgment in part was issued on
    August 3, 2010. (Dkt. No. 120.)

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  his testimony, and SDCCC's motion should be denied. *Webster,* 85 F. Supp. 2d at 1377;

2  *Feliciano-Hill,* 439 F. 3d at 25.

3  **B.    SDCCC's Motion Violates Local Rule 7.1(h).**

4  SDCCC filed three *Daubert* motions attacking Dr. Hekman.  SDCCC's First *Daubert*

5  motion is addressed to five of Dr. Hekman's opinions.  (Dkt. No. 140 – 18 at p. 7:11-22.)

6  SDCCC's second *Daubert* motion is addressed to five different opinions from Dr. Hekman.

7  (Dkt. No. 140-19 at p. 7:9-20.)  SDCCC's third *Daubert* motion is addressed to two of

8  Dr. Hekman's other opinions.  (Dkt. No. 140-20 at p. 7:9-16.)  SDCCC's *Daubert* motions do

9  not attack opinions from any other experts, and SDCCC acknowledges that the successive

10  motions are based on the first motion.  Essentially, SDCCC has filed one motion challenging

11  12 of Dr. Hekman's opinions.

12  SDCCC's decision to challenge 12 opinions would not be problematic if SDCCC

13  complied with Local Rule 7.1(h).  SDCCC did not do so.  SDCCC used 46 pages of text in its

14  motion, violating Local Rule 7.1(h)'s 25 page limit.  SDCCC was on notice of this page

15  limitation having previously sought permission to file a brief in excess of 25 pages. (Dkt.

16  No. 89.)  However, consistent with their gamesmanship in filing these motions late, SDCCC

17  ignored Local Rule 7.1(h) and characterized its challenges as three separate motions.  Such

18  tactics are improper, and SDCCC's motion should be denied for violating Local Rule 7.1(h).

19  **3. SDCCC's *DAUBERT* MOTION TO EXCLUDE DR. HEKMAN'S**
   **TESTIMONY SHOULD BE DENIED**

20

21  **A.    The Applicable Legal Standard.**

22  Federal Rule of Evidence 702 allows the testimony of an expert witness if it will assist

23  the trier of fact to understand the evidence or determine a fact in issue.  Expert opinions are

24  admissible where (1) the testimony is based upon sufficient facts or data, (2) the testimony is

25  the product of reliable principles and methods, and (3) the witness has applied the principles

26  and methods reliably to the facts of the case.  FRE 702.

27  The Federal Rules of Evidence assign to the trial judge the task of ensuring that an

28  expert's testimony both rests on a reliable foundation and is relevant to the task at hand.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  *Daubert,* 509 U.S. 579. The *Daubert* Court identified several non-exclusive factors to
2  consider in assessing the reliability of expert testimony. These include whether the expert's
3  technique or theory can be or has been tested, whether the technique or theory has been subject
4  to peer review and publication, the known or potential rate of error of the technique or theory
5  when applied, and whether the technique or theory has been generally accepted in the
6  scientific community. *Id.* at 593-594. These factors are meant to be helpful, not definitive,
7  and may be tailored to the facts of a particular case. *In re Scrap Metal Antitrust Litigation*,
8  527 F.3d 517, 529 (6th Cir. 2008).

9        But, the trial court's "gatekeeping" role is not intended to serve as a replacement for the
10  adversary system, and vigorous cross-examination and presentation of contrary evidence are
11  the traditional and appropriate means of attacking admissible evidence. *Daubert,* 509 U.S. at
12  596; *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d
13  1074, 1078 (5th Cir. 1996). Rule 702 does not permit a judge to weigh conflicting expert
14  testimony or exclude expert testimony because it seems doubtful, nor should the Court
15  determine whether the conclusions are correct. *In re Scrap Metal Antitrust Litigation,*
16  527 F.3d at 529-530. So long as the expert testimony is reliable and relevant, it should be
17  admitted for the trier of fact. FRE 702.

18        **B.    SDCCC Already Lost This Issue.**

19        On January 20, 2010 SDCCC filed its motion for summary judgment. (Dkt. No. 92.)
20  In its motion SDCCC contended that United could not define the relevant market and that
21  United could not demonstrate monopoly power. (Dkt. No. 120 at p. 7:6-7.) SDCCC
22  challenges Dr. Hekman's opinions on these issues here.

23        As part of its opposition to SDCCC's motion for summary judgment, United submitted
24  a declaration from Dr. Hekman. (Dkt. No. 95-9.) In his declaration Dr. Hekman offered the
25  same opinions that are contained in his expert reports. (See, Slania Decl. Ex. 7, ¶¶ 3-62, and
26  compare to Ex. 4, ¶¶ 2-62; also Ex. 7, ¶¶ 64-81, and compare to Ex. 5, ¶¶ 2-21.) Keenly aware
27  of this damning evidence, SDCCC objected to Dr. Hekman's opinions as being unreliable and
28  contradictory. (Dkt. No. 99-2 at p. 11:13 – 12:7.) In fact, one of SDCCC's specific objections

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  was to Dr. Hekman's opinion that "the relevant product market definition is 'trade show

2  cleaning services at major convention center.'" (Dkt. No. 99-2 at p. 11:8 – 12:2.) These are

3  the same challenges being advanced by SDCCC in its motion.

4      The Court overruled SDCCC's objections, stating:

5          Therefore, the opinion does not contradict other statements by the

6          expert wherein the expert discusses the product market on one
        hand, and the geographic market on the other hand.  Accordingly,

7          the Court overrules the objection . . .

8          As to the relevant product market, Plaintiff provides evidence that
        trade show cleaning services are a distinct product market . . .

9          Plaintiff also offered a declaration from its expert suggesting that
        trade show cleaning services represent a distinct product.

10         (Hekman Decl., ¶¶ 4, 15-22.)  Defendant similarly objects to
        Plaintiff's evidence, in particular Plaintiff's expert opinion, on the

11         grounds that such evidence is unreliable and contradictory.  For
        the same reasons stated above, the Court overrules these

12         objections.

13 (Dkt. No. 120 at p. 8:5-17.)

14     SDCCC already challenged Dr. Hekman's opinions on the relevant market as being

15 unreliable.  It is also clear that the Court considered and analyzed SDCCC's objections, and

16 found Dr. Hekman's opinions to be reliable.  SDCCC is regurgitating the same motion here,

17 taking an impermissible "second bite at the apple."[3]  This is improper and SDCCC's request

18 should not be considered by the Court.  For this reason, SDCCC's motion should be denied.

19     **C.**    <u>**Dr. Hekman's Opinions Regarding the Relevant Market Are Proper.**</u>

20     Two factors are considered when defining the relevant market: (1) the product market,

21 and (2) the geographic market.  *Los Angeles Memorial Coliseum Com'n v National Football*

22 *League*, 726 F.2d 1381, 1392 (9th Cir. 1984).  As explained in detail below, Dr. Hekman

23 applied reliable methodologies to the facts of this case when forming his opinions regarding

24 both the product market and the geographic market.

25

26     [3] Essentially SDCCC is bringing a motion for reconsideration without complying with

27 either the substantive or procedural requirements for such a motion under Local Rule 7-1(i)(1),
(2).

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1        1)    **Dr. Hekman's Product Market Definition is Based on Reliable Data
2          and Recognized Methodology.**

3        **(a)    Dr. Hekman Properly Analyzed the Product Market**

4        The product market encompasses producers which, because of the similarity of their

5   products, have the actual or potential ability to take significant amounts of business away from

6   each other. *Id.; Rebel Oil Co., Inc. v. Atlantic Richfield Co*, 51 F.3d 1421, 1434 (9th Cir.

7   1995). Products fall within the same market if they are "reasonably interchangeable" for the

8   same or similar uses. *Los Angeles Memorial Coliseum Com'n, 726* F.2d 1381, 1393. "The

9   outer boundaries of the product market are drawn in terms of the presence of substitutes to

10   which consumers will turn in response to price changes…and the ability of other existing

11   producers…to expand output from their present facilities…" *Hornsby Oil Co., Inc. v.*

12   *Champion Spark Plug, Co., Inc.* 714 F.2d 1384, 1393 (5th Cir. 1983).

13        Dr. Hekman clearly defines the relevant product market as "trade show cleaning

14   services at" the Facility. (Slania Decl., Ex. 4 at ¶¶ 5, 15.) Dr. Hekman's definition was made

15   after careful analysis and application of the 1992 Horizontal Merger Guidelines. (*Id.*, Ex. 4,

16   ¶¶ 10, 25.)

17        **(b)    SDCCC Misinterprets Dr. Hekman's Cross-Elasticity Testing**

18        SDCCC contends that Dr. Hekman's methodology is unreliable because he "fail[ed] to

19   quantify Facilities and Booth Cleanings' cross-elasticity of demand 'by performing any

20   econometric analysis of those…,'" and thus simply assumes, without any reliable analysis, that

21   facilities cleaning and booth cleaning are in the same market. (Motion, 5:5-7.) SDCCC

22   grossly misinterprets Dr. Hekman's analysis, and what is required to determine the relevant

23   product market.

24        As stated clearly in Dr. Hekman's analysis, the relevant product market is "trade show

25   cleaning services" at the Facility. It is not booth cleaning at the Facility, nor is it facilities

26   cleaning at the Facility. A study of the cross-elasticity of booth cleaning and facilities

27   cleaning is irrelevant for purposes of determining the market definition. After all, United

28

*Kirby Noonan Lance & Hoge LLP*
*350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700*

1  initiated this litigation to challenge SDCCC's exclusive policy relating to *all* Trade Show

2  Cleaning Services, not just booth cleaning or facilities cleaning.

3        The proper inquiry, and the inquiry made by Dr. Hekman, is the cross-elasticity of

4  Trade Show Cleaning Services performed by United and Trade Show Cleaning Services

5  performed by SDCCC.  Dr. Hekman explains, in detail, how the cross-elasticity test applies

6  here:

> Economists have identified the primary elements of market
> definition as, first, the definition of the specific products or
> services that, in this case, SDCC and United sell.  Products or
> services that have a high cross-elasticity of demand are
> considered to be in the same market.  A high cross-elasticity of
> demand between services A and B means that if the price of A
> rises, the demand for B will rise by a significant amount.  In the
> present case, a high cross-elasticity of demand would mean that if
> SDCC raised its charges for trade show cleaning services, the
> customers (i.e., the decorators who contract for trade show
> cleaning services) would switch their business to one of SDCC's
> competitors such as United.  If this switching were to occur in a
> free market, then an economist would conclude that the services
> of SDCC and United are close substitutes.  The cross-elasticity
> would be estimated in the trade show cleaning market by
> measuring the percentage increase in the demand for United's
> services for a given percentage increase in SDCC's trade show
> cleaning services charges.  Products and services that are close
> substitutes using this measure are judged to be in the same
> market.

18  (Slania Decl., Ex. 4 at ¶ 7.)  The cross-elasticity test used by Dr. Hekman to define the

19  relevant product market examines the relationship between Trade Show Cleaning Services

20  provided by United and Trade Show Cleaning Services provided by SDCCC.  Dr. Hekman

21  concludes that there is a high cross-elasticity of demand between United's Trade Show

22  Cleaning Services and SDCCC's Trade Show Cleaning Services.  (*Id.*)  Thus, he properly

23  employed the generally accepted cross-elasticity test to determine the relevant product

24  market.[4]

25

26        ─────────────

27  [4] SDCCC offers no evidence to the contrary in its motion, focusing solely on a
comparison of facilities cleaning and booth cleaning.  (Motion, p. 4:1-5:18.)  As mentioned
above, SDCCC has misconstrued Dr. Hekman's analysis.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1
2

(c)   **Dr. Hekman Reviewed All Available Data To Determine Which Products Should be Included in the Product Market**

3   The relevant market is determined by actual and potential participants providing Trade

4   Show Cleaning Services prior to July, 2007.  According to testimony from SDCCC witnesses,

5   SDCCC and United were the major competitors[5] for Trade Show Cleaning Services in

6   San Diego.  (Slania Decl., ¶ 10, Ex. 8 at 409:5-14; ¶ 11, Ex. 9 at 412:19-413:12; 414:17-21;

7   415:14-24; 416:24-417:11.)[6]

8   SDCCC argues that Dr. Hekman blindly accepted United's market allegations.  SDCCC

9   is ignoring its own evidence.  Its witnesses confirm that there were two market participants,

10   United and SDCCC.  This evidence demonstrates that Dr. Hekman viewed the totality of the

11   circumstances, and did not simply accept United's allegations as true.

12   SDCCC contends that Dr. Hekman's report is unreliable because he did not consider

13   whether there were any substitute products.  SDCCC suggests that Dr. Hekman should have

14   performed a cross elasticity study to test whether other cleaning services are a substitute for

15   Trade Show Cleaning at the Facility.  As established by the evidence, Decorators do not

16   purchase other cleaning services; they only purchase Trade Show Cleaning Services.  (Slania

17   Decl., Ex. 4, ¶ 15; Slania Decl., ¶ 12, Ex. 10 at ¶¶ 4-6.)  Thus, there is no overlap between any

18   alternative sources, and accordingly there is no data to test regarding substitute products.

19   SDCCC also relies on *Corey Airport Servs v. City of Atlanta,* 632 F. Supp. 2d 1246,

20   1291 (N.D. GA 2008), rev'd on other grounds, 587 F.3d 1280 (11th Cir. 2009), to critique

21   Dr. Hekman.  SDCCC's reliance on *Corey*[7] is misplaced.  In *Corey,* involving the market for

22   selling advertising, plaintiff's antitrust expert only spent 11 days from retention until

23

24   [5] There is minimal evidence that other companies may have performed 5-10% of Trade Show Cleaning Services at the Facility prior to July, 2007.

25
26   [6] SDCCC admits that its share of the Trade Show Cleaning Services market at the Facility was as high as 60% prior to July 1, 2007. *(*Slania Decl., Ex. 9 at 415:14-24; 416:24-417:11.)

27   [7] *Corey* has not been cited as authority by any Appellate Court, California District Court, or any District Court within the Ninth Circuit.
28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    producing his report to analyze the case data. *Corey*, 632 F. Supp. 2d at 1290-91. Here,

2    Hekman has spent years on this case, analyzing all case data from both sides. Also, the expert

3    in *Corey* failed to analyze the presence of substitutes, and he failed to analyze any studies he

4    performed to reach his conclusions. *Corey*, 632 F. Supp. 2d at 1294096. Hekman did check

5    the cross-elasticity of demand for substitute products, and explained the studies he relied on in

6    multiple reports, declaration, and in his deposition. Lastly, the expert in *Corey* failed to abide

7    by the Merger Guidelines by not considering substitute products and consumer responses to

8    price increases. *Id.* at 1298. As set forth in section (d) below, Dr. Hekman did consider

9    substitute products and consumer responses to price increases. Given the wholly different

10   factual scenario, *Corey* is distinguishable from the present case.

11                      **(d)    Dr. Hekman Properly Applies the Cross-Elasticity of Demand
                                 Analysis**

12

13           To determine if other products should have been included in the product market,

14   Dr. Hekman performed an analysis of the cross-elasticity of demand by employing the Small

15   but Significant Non-Transitory Increase in Price ("SNIP") Test. This is otherwise known as

16   the "hypothetical monopolist test." Dr. Hekman explains in detail how he performed this test

17   consistent with the Merger Guidelines. (Slania Decl., Ex. 4, ¶¶ 10-14, 25-31; Ex. 5, ¶¶ 14-15.)

18           SDCCC contends that Dr. Hekman improperly applied the SNIP test[8] because he

19   (1) failed to posit a hypothetical monopolist; (2) reverse engineered his product market

20   definition; (3) failed to take into account buyers' reactions; and (4) failed to consider booth

21   cleaning in his analysis. SDCCC misrepresents Dr. Hekman's report and his analysis. As

22   demonstrated below, Dr. Hekman performed the SNIP test properly.

23                      **(i)    Dr. Hekman Utilized a Hypothetical Model**

24           SDCCC contends that Dr. Hekman improperly applied the SNIP test because he

25   applied the test to historical facts and not to a hypothetical situation. SDCCC misinterprets

26

27

28           [8] SDCCC's expert also utilized the SNIP test. (*See*, Slania Decl., Ex. 5, ¶ 14.)

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  Dr. Hekman's analysis.  It is not disputed that the SNIP test assumes a hypothetical

2  monopolist, and as stated in paragraphs 10, 12 and 13 of his report, Dr. Hekman assumed a

3  monopolist.  (Slania Decl., Ex. 4, ¶¶ 10, 12, 13.)  For illustrative purposes Dr. Hekman called

4  that monopolist SDCCC.  He could have just as easily called the monopolist United, or A, or

5  any other name, but for ease of reference and to clearly illustrate his method, the monopolist

6  was called SDCCC.  In its argument SDCCC focuses far too much on semantics, and not

7  enough on the test Dr. Hekman actually performed.  A hypothetical monopolist was used.

8                    **(ii)    Dr. Hekman Did Not "Reverse Engineer" His Product
                          Market Definition**

9

10      Under the Merger Guidelines, the SNIP test properly starts with the most narrow

11  product market definition:

12              "If, in response to the price increase, the reduction in sales of the
               product would be large enough that a hypothetical monopolist
13              would not find it profitable to impose such an increase in
               price,…the product that is the next-best substitute for the merging
14              firm's product [will be added]."

15  Merger Guidelines, §1.11.  In his hypothetical scenario, Dr. Hekman correctly defines Trade

16  Show Cleaning Services as the most narrow product market.  From that starting point,

17  Dr. Hekman considered whether the market was broader and included other types of cleaning

18  services.  (Slania Decl., Ex. 4 at ¶¶ 11, 13, 15, 17.)  Because the consumers of Trade Show

19  Cleaning Services have not, as shown by the evidence in this case,[9] purchased any other

20  services from other cleaning firms, Dr. Hekman concluded those firms were properly excluded

21  from the market (this would include traditional janitorial firms).  (*Id.*, Ex. 4, ¶¶ 17, 18, 21.)

22  This methodology is consistent with the Merger Guidelines.  This also demonstrates that

23  Dr. Hekman did not start with a broad market definition, as SDCCC contends.

24

25  _____

26          [9] In addition to Mr. Epstein's testimony that he would not consider the cleaning services
    of a traditional janitorial firm, SDCCC witness also stated that only United and SDCCC
27  performed cleaning services at the Facility.  (Slania Decl., Ex. 10 at ¶ 6; Ex. 9 at 418:18-
    419:3; Ex. 4 at ¶ 21.)

28

1

2

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

### (iii)   Dr. Hekman Did Consider Buyers' Likely Reactions to an Increase in Price

3    Per the Merger Guidelines, all relevant evidence regarding the buyer's reaction to an

4  increase in price must be considered.  This includes (1) evidence that buyers have shifted or

5  are considering shifting their purchases to another product; (2) sellers' business decisions

6  based on buyers shifting purchases; (3) the influence of downstream competition; and (4) the

7  timing and costs of switching products.  Merger Guidelines §1.11.  Contrary to SDCCC's

8  contention, Dr. Hekman did consider each of these factors.

9    First, Dr. Hekman used the available evidence and testimony to show that buyers did

10  not switch from Trade Show Cleaning Services to alternative cleaning services.  The evidence

11  establishes that SDCCC employees now perform all Trade Show Cleaning Services for all

12  shows at the Facility.  (Slania Decl., Ex. 9 at 420:8-22.)  There is no evidence or data of any

13  switching, and this is confirmed by Mark Epstein's declaration.  (*Id.*, Ex. 10 at ¶ 6.)

14    Second, Dr. Hekman did consider sellers' business decisions.  At paragraphs 15 and 21

15  of his report, Dr. Hekman discussed how Trade Show Cleaning firms sell their services.  (*Id.*,

16  Ex. 4 at ¶¶ 15, 21.)

17    Third, Dr. Hekman considered the downstream market.  He concluded that there is no

18  market downstream from the Trade Show Cleaning Services firm.  In a vertical relationship

19  from exhibitors to Trade Show Cleaning Services, the cleaning service firm is the furthest

20  downstream because they provide the ultimate service.  (*Id.*, Ex. 4 at ¶¶ 26-27.)

21    Finally, Dr. Hekman considered the timing and costs of switching products.  At

22  paragraphs 17-21 of his report, he discussed the uniqueness of large format Trade Show

23  Cleaning Services and the difficulty a buyer would have in using an alternative cleaning

24  service in response to an increase in price.  (*Id.*, Ex. 4 at ¶¶ 17-21.)

25    The appropriate inquiries into a buyer's reaction to an increase in price were made.

26  Dr. Hekman's analysis complies with the Merger Guidelines and is reliable.

27

28

1

2

(iv)     **Separate Consideration of Booth Cleaning and
Facilities Cleaning is Not Required**

3      SDCCC contends that Dr. Hekman failed to consider both booth cleaning and facilities

4  cleaning as substitutes in his SNIP test analysis.  Once again, SDCCC misinterprets

5  Dr. Hekman's market definition to conclude that booth cleaning and facilities cleaning are

6  separate services that compete with each other in the same market.  But, booth cleaning and

7  facilities cleaning are separate services that do not compete with each other.  Collectively, they

8  comprise Trade Show Cleaning Services, which is what Dr. Hekman tested.  The relationship

9  of booth cleaning and facilities cleaning as it relates to the SNIP test is meaningless for

10  purposes of Dr. Hekman's analysis.

11

(v)     **SDCCC's Argument is a Red Herring**

12      SDCCC asks the Court to conduct a hyper-technical analysis of the SNIP Test, without

13  ever stating that Dr. Hekman's test result was wrong, *i.e.*, that the cross-elasticity of demand

14  analysis would produce additional products to include in the product market.  SDCCC cannot

15  make such an argument because Dr. Hekman's test and analyses were performed correctly.

16  There are no other products to include in the relevant product market here.

17

18

2)     **Dr. Hekman's Geographic Market Definition is Based on Reliable
Data and Recognized Methodology**

19      The relevant geographic market is an area of effective competition where buyers can

20  turn to alternate sources of supply.  *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,

21  924 F.2d 1484, 1490 (9th Cir. 1991) (internal quotation and citation omitted).  Assuming

22  products are substitutes, a geographic market is the area in which cross-elasticity of demand

23  would be high between the products.  High cross-elasticity of demand exists where increases

24  or decreases in one product's price cause substantial increases or decreases in demand for the

25  other product.  If buyers in one geographic area do not change their consumption habits in

26  response to a decrease in price of a substitute product supplied in another geographic area,

27  then the two areas probably do not fall within the same geographic market.  Cross-elasticity of

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  demand would be low in that case. *See Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,*

2  875 F.2d 1369, 1375-77 (9th Cir. 1989).

3      Dr. Hekman opines that the relevant geographic market is large convention centers in

4  the San Diego metropolitan area, of which there is only one, the Facility. Indeed, the territory

5  in which United and SDCCC compete is the Facility. In the past, general contractors could

6  choose to use United, SDCCC or any other competitor. Logically, if SDCCC substantially

7  increased its prices for cleaning services, demand for United's cleaning services would

8  increase. Thus, SDCCC's cleaning service and United's cleaning service fall within the same

9  geographic market. *See Thurman,* 875 F.2d at 1375-77.

10              **(a)**    **Dr. Hekman's Geographic Market Definition is Not Merely**

11                      **Based on Where the Services are Performed**

12      SDCCC alleges that Dr. Hekman's geographic market definition is improper because it

13  merely references where the services are to be performed, and is therefore a "results-oriented

14  analysis." Not so. Dr. Hekman provides considerable analysis regarding his conclusion,

15  including the types of services at issue, the services relationship to major trade shows, and

16  where trade shows take place. (Slania Decl., Ex. 4, ¶¶ 23-31.) Only after performing that

17  analysis does Dr. Hekman conclude that the geographic market is large convention centers in

18  the San Diego metropolitan area.

19      Simply put, there are no other large convention facilities in San Diego to host large

20  trade shows. SDCCC acknowledges as much, as evidenced by its own market studies for the

21  Facility expansion project, and Dr. Hekman relied on this evidence. (Slania Decl., Ex. 4 at

22  ¶¶ 29, 44, 45; Slania Decl., ¶ 13, Exs. 11-13.) Furthermore, as the Court pointed out in its

23  ruling on SDCCC's motion for summary judgment, San Diego is the economically significant

24  market:

25          Here, Plaintiff's evidence on geographic market corresponds to
           the "commercial realities" of the industry and shows San Diego to

26          be the economically significant market. *Brown Shoe Co. v.*
           *United States,* 370 U.S. 294, 336-37 (1962)

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  (Dkt. No. 120 at 7:18-20.)  The Court also correctly noted that in other instances a market was

2  limited to "a single metropolitan area or convention facility" citing *MCM Partners, Inc. v.*

3  *Andrews-Bartlett Assoc., Inc.*, 62 F.3d 967, 975-77 (7th Cir. 1995) (single convention center in

4  Chicago as relevant market); *Woods Exploration & Producing Co. v. Aluminum Co. of*

5  *America*, 438 F.2d 1286, 1307 (5th Cir. 1971) (single natural gas field as relevant market).

6  (Dkt. No. 120 at 7:25-8:1.)

7       Not only is Dr. Hekman's geographic market opinion based on the facts of this case, it

8  is consistent with the law.

9                         **(b)       Dr. Hekman's Analysis Considers Alternatives**

10       SDCCC takes a couple of sentences from Dr. Hekman's report, located in separate

11  paragraphs, and argues Dr. Hekman's analysis is insufficient because he does not indicate

12  where consumers could go to avoid competitive harm.  SDCCC misses the point.

13  Dr. Hekman's definition of the geographic market – large convention centers in the San Diego

14  metropolitan area – clearly indicates that consumers could go to other large trade show venues

15  in San Diego.  It just happens that there are no other large trade show venues in San Diego.  If

16  there were other large trade show venues in the immediate geographic area, they would be

17  included in the market.

18       As for traveling to other locales, Dr. Hekman also took that into consideration.

19  However, given the low percentage of the cost of Trade Show Cleaning Services when

20  compared to an entire trade show, and the planning realities for a show, Dr. Hekman

21  concluded moving to other geographic markets was not feasible.  (Slania Decl., Ex. 4, ¶¶ 24,

22  27, 28, 30, 31.)  Clearly, Dr. Hekman considered other options.

23       SDCCC also criticizes Dr. Hekman's analysis of labor costs.  It is easily understood

24  that if a competitor has to pay travel expenses to move labor to San Diego, their labor costs

25  will be greater than a local company.  SDCCC takes issue with Dr. Hekman's analysis in this

26  regard.  Despite the common sense of Dr. Hekman's analysis, it is at worst an assumption

27  regarding labor costs.  An expert's assumption is something to be tested on cross-examination,

28

KNLH\823280.1                              -15-                              07-CV-2172 AJB

1  and faults in any assumptions go to the weight of the opinion, not its admissibility. *Primrose*

2  *Operating Co. v. National American Insurance Co.*, 382 F.3d 546, 562 (5th Cir. 2004).

3                  **(c)**     **Dr. Hekman's Lock-In Analysis is Proper and Helpful.**

4        As part of his analysis as to whether consumers will discipline monopoly prices,

5  Dr. Hekman considered the long-term nature of trade show contracts. SDCCC disputes this

6  part of his analysis, contending it is incorrect to define the market based on what transactions

7  have occurred in the market. As is evident from paragraph 31 of his report, Dr. Hekman is not

8  defining the market based on the presence of the contracts alone. Dr. Hekman simply refers to

9  the contracts to demonstrate the nature of the trade show market – where long range planning

10  has to occur, and reservations for convention facilities are made far in advance. (Slania Decl.,

11  Ex. 4 at ¶ 31.) In some instances, conventions are booked up to fifteen years in advance. (*Id.,*

12  Ex. 4 at ¶ 31; Ex. 10, ¶ 8.) Given that long range planners is a necessary character of the trade

13  show market, consumers may be unable to move future shows to alternative venues. Thus,

14  Dr. Hekman's lock-in analysis is proper, based on relevant evidence, and should be allowed.

15      **D.**    **Dr. Hekman's Market Power Opinion is Reliable Because it is Based on**
               **Reliable and Sound Opinions.**

16

17        Dr. Hekman opined that SDCCC possesses market power. SDCCC challenges this

18  opinion, claiming his prior opinions are inadequate, and that he failed to rely on appropriate

19  evidence. SDCCC is wrong on both counts.

20        For the reasons explained above, each and every of Dr. Hekman's product market and

21  geographic market opinions are reliable and admissible. His opinions are based on sound

22  evidence, including evidence provided by SDCCC, and are built upon sound methodology.

23  Because his definitions are proper, SDCCC's monopoly power is easily definable.

24        SDCCC contends that Dr. Hekman "uncritically adopts" United's allegations that

25  SDCCC had 50% of the trade show cleaning services market. However, SDCCC witnesses

26  testified that prior to July 1, 2007, SDCCC had 55-60% of the Trade Show Cleaning Services

27  at the Facility. (Slania Decl., Ex. 9, at 412:19-413:12.) The evidence Dr. Hekman relied on

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  comes directly from SDCCC's general manager. Thus, Dr. Hekman relied on appropriate
2  evidence originating from SDCCC.

3        Furthermore, Dr. Hekman correctly notes that SDCCC's antitrust expert, John Hayes,
4  agrees that SDCCC possesses market power. (*Id.*, Ex. 5 at ¶ 27.) While the experts may
5  disagree as to the extent of SDCCC's market power, the fact remains that the experts agree that
6  SDCCC does possess market power. Thus, it should be left to the jury to determine the extent
7  of that power.

8        **E.     Dr. Hekman Relied on Proper Evidence in Forming his Expert Opinions.**

9        At various times SDCCC contends that Dr. Heckman's opinions are unreliable because
10 he relied on hearsay, deposition testimony of United witnesses, and anecdotal evidence.
11 Relying almost entirely on unpublished or out-of-district cases, SDCCC fails to demonstrate
12 how the evidence Dr. Hekman relied on was unreliable, or what other available evidence
13 Dr. Hekman should have relied on.

14       Without citing any authority to support its argument, SDCCC argues that Dr. Hekman
15 improperly relied on hearsay. Contrary to SDCCC's assertions, FRE 703 not only permits an
16 expert to rely on hearsay in forming his opinion, but allows hearsay to be admitted to explain
17 the basis of his expert opinion. FRE 703; *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254,
18 1261-1262 (9th Cir. 1984). The fact that Dr. Hekman purportedly relied on hearsay to form his
19 opinions has no bearing on whether his opinions are reliable.

20       SDCCC also argues that Dr. Hekman's opinion is unreliable because he relied only on
21 anecdotal evidence, such as the deposition testimony of United witnesses. Once again, this
22 misrepresents the truth. While Dr. Hekman did rely partially on deposition testimony from
23 United witnesses, he also relied on evidence originating from SDCCC. Dr. Hekman relied on
24 SDCCC's market studies for the Facility expansion project. Some of these market studies
25 were performed by the consulting firm ERA, which used data provided by SDCCC, and
26 identified specific trade shows that were the target market of SDCCC. (Slania Decl., Ex. 5 at
27 ¶ 17.) The ERA report concludes that SDCCC competes with twenty-one large facilities
28 throughout the United States, none of which are in San Diego. (*Id.*, ¶ 19.) Dr. Hekman also

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

relied on statements by Chris Cramer and Carol Wallace of SDCCC. (*Id.*, ¶ 20.) SDCCC

suggests that Dr. Hekman did not consider other providers for Trade Show Cleaning Services.

However, the evidence from SDCCC witnesses demonstrates that no other providers existed.

(*Id.*, Ex. 8 at 409:5-14; Ex. 9 at 412:19-413:12; 414:17-21; 415:14-24.) There are numerous

instances when Dr. Hekman relies on SDCCC sources. (*See,* for example, Slania Decl., Ex. 4

at ¶¶ 3, 4, 29, 32, 44, 45; Ex. 5 at ¶¶ 17-20.)

Also, Dr. Hekman relies on evidence derived from uninterested third parties. For

instance, Dr. Hekman relies on Mark Epstein's declaration, sworn to under the penalty of

perjury. (*Id.*, Ex. 4 at ¶¶ 18, 21, 31, and 57.) Likewise, Dr. Hekman relies on deposition

testimony from Leland Matthew Kriz. (*See, Id.*, Ex. 6 at 205:8-18; 208:20-209:12; 211:18-

212:3.) This sworn testimony is not anecdotal by any means, and comes from unbiased

industry personnel. Similarly, Dr. Hekman relies on statements from industry personnel

regarding harm from SDCCC's exclusive policy. (*Id.*, Ex. 4 at ¶¶ 20, 21, 49, 59, 60, 61.)

SDCCC also relies on *McLaughlin Equip. Co. v. Newcourt Credit Group, Inc.*, 2004

U.S. Dist. LEXIS 13939 (S.D. Ind. 2004), an unpublished case,[10] for its contention that

Dr. Hekman's opinion is unreliable because he relied on anecdotal evidence. First, as pointed

out in the preceding paragraphs, Dr. Hekman considered relevant evidence from all sources.

Second, *McLaughlin* has no application here. The expert in *McLaughlin* conducted no cross-

elasticity testing (*McLaughlin*, 2004 U.S. Dist. LEXIS at 20), whereas Dr. Hekman did

perform such testing here as explained in section 3(1)(b) and (d), above. Also, contrary to the

expert in *McLaughlin* (2004 U.S. Dist. LEXIS at 18-19), as explained throughout Dr. Hekman

did analyze the available data.

The evidence relied on by Dr. Hekman is more than just merely anecdotal. It includes

depositions of reliable witnesses, and significantly, statements and documents made and

produced on behalf of SDCCC. The complete evidentiary record he reviewed, as described in

---

[10] *McLaughlin* has only been cited four times, all in unreported cases none of which are
in the Ninth Circuit.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   his reports, provided substantial data on the market condition relating to SDCCC and the

2   Trade Show Cleaning Services provided at the Facility.  This is the type of data reasonably

3   relied upon by experts to form opinions under FRE 702 and 703.

4   ### 4. DR. HEKMAN'S TESTIMONY WILL ASSIST THE TRIER OF FACT

5   Dr. Hekman is a well qualified and experienced economist.  He earned an MBA in

6   Finance and a Ph.D. in Economics at the University of Chicago.  He also taught Economics

7   and Finance at the University of Southern California, the University of North Carolina, the

8   University of Chicago, and Boston College.  He previously served as an economist with the

9   Federal Reserve and as an expert witness in both federal and state court for the last 20 years.

10  He published numerous papers in academic and professional journals.  (Slania Decl., Ex. 4,

11  ¶ 1.)  He is extremely well qualified to testify on the antitrust matters in dispute, and his

12  testimony will assist the jury.  In fact, Dr. Hekman's testimony assisted the Court when

13  considering SDCCC's motion for summary judgment.

14  As demonstrated above, Dr. Hekman's methodologies are sound and he reasonably

15  applied them to the facts this case.  As *Daubert* makes clear, SDCCC is free to cross-

16  examine Dr. Hekman as to the weight of his opinions.  *Daubert*, 509 U.S. at 596.  Importantly,

17  the Court need not concern itself with whether or not Dr. Hekman's conclusions are correct,

18  that is for the jury.  *In re Scrap Metal Antitrust Litigation,* 527 F.3d at 529-30.  Dr. Hekman's

19  expert testimony is reliable, based on the facts of this case, and should be permitted.

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

## 5. CONCLUSION

For the preceding reasons, Plaintiff United National Maintenance, Inc. respectfully requests that the Court deny Defendant's *Daubert* motion to exclude John S. Hekman, Ph.D.'s opinions regarding the relevant market definition and SDCCC's monopoly power.

DATED: March 4, 2011                 KIRBY NOONAN LANCE & HOGE LLP

By:  */s/ Jacob M. Slania*
    James R. Lance
    Jacob M. Slania
    Attorneys for Plaintiff
    UNITED NATIONAL MAINTENANCE, INC.