James R. Lance (147173)
Jacob M. Slania (200652)
**KIRBY NOONAN LANCE & HOGE LLP**
350 Tenth Avenue, Suite 1300
San Diego, California  92101-8700
Telephone (619) 231-8666
Facsimile (619) 231-9593

Theodore R. Tetzlaff (*Pro Hac Vice*)
Kristopher J. Stark (*Pro Hac Vice*)
**UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
Chicago, Illinois  60602-4224
Telephone (312) 977-4400
Facsimile (312) 977-4405

Attorneys for Plaintiff
United National Maintenance, Inc.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED NATIONAL MAINTENANCE, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAN DIEGO CONVENTION CENTER CORPORATION, INC., a California corporation,<br><br>Defendant. | CASE NO. 07-CV-2172 BEN (JMA)<br><br>**DECLARATION OF JACOB M. SLANIA IN SUPPORT OF PLAINTIFF UNITED NATIONAL MAINTENANCE, INC.'S OPPOSITION TO DEFENDANT SAN DIEGO CONVENTION CENTER CORPORATION, INC.'S *DAUBERT* MOTIONS NUMBERS 1-3**<br><br>Judge: Hon. Anthony J. Battaglia<br>Courtroom: A<br>Date: March 22, 2010<br>Time: 1:30 p.m.<br><br>Complaint Filed: November 13, 2007<br>Trial Date: March 21, 2011 |

I, Jacob M. Slania, declare as follows:

1.      I am an attorney duly licensed to practice before this Court and all courts in the State of California, and I am a partner at Kirby Noonan Lance & Hoge LLP, attorneys of record herein for Plaintiff United National Maintenance, Inc. ("United").  All facts stated

*Kirby Noonan Lance & Hoge LLP*
*600 West Broadway, Suite 1100 San Diego, California 92101-3387*

1 | herein are true and correct of my own personal knowledge and if called as a witness I could
2 | and would testify competently thereto.

3 |     2.    I make this declaration in support of United's Opposition to San Diego
4 | Convention Center Corporation, Inc.'s, ("SDCCC") *Daubert* Motions Numbers 1 through 3.

5 |     3.    Attached hereto as Ex. 1 is a true and correct copy of the November 13, 2007
6 | declaration of Dr. John S. Hekman. This declaration was submitted in support of United's
7 | motion for a preliminary injunction. This declaration is also marked as Trial Ex. 507.

8 |     4.    Attached hereto as Ex. 2 is a true and correct copy of the December 27, 2007
9 | supplemental declaration of Dr. Hekman. This declaration was submitted in conjunction with
10 | United's reply filings in support of its motion for a preliminary injunction. This declaration is
11 | also marked as Trial Ex. 508.

12 |     5.    Dr. Hekman was designated as United's antitrust expert on May 1, 2009.
13 | Attached hereto as Ex. 3 is a true and correct copy of United's initial designation of expert
14 | witnesses. The designation is also marked as Trial Ex. 336.

15 |     6.    Dr. Hekman issued two written reports in this case. His initial report is dated
16 | September 30, 2009, and his supplemental report is dated November 12, 2009. True and
17 | correct copies of the reports are attached hereto as Ex. 4 and 5, respectively. Dr. Hekman's
18 | initial report is also marked as Trial Ex. 446. Dr. Hekman's supplemental report is also
19 | marked as Trial Ex. 447.

20 |     7.    Dr. Hekman was deposed by SDCCC on December 10, 2009. I attended his
21 | deposition, which lasted approximately five hours. A copy of Dr. Hekman's deposition
22 | transcript is attached hereto as Ex. 6.

23 |     8.    Dr. Hekman also submitted a declaration in support of United's opposition to
24 | SDCCC's motion for summary judgment. His declaration is dated March 1, 2010, and a true
25 | and correct copy of his declaration is attached hereto as Ex. 7.

26 |     9.    Expert discovery in this case was conducted through December, 2009.

27 |     10.    Carol Wallace is SDCCC's President and CEO. I have reviewed her deposition
28 | transcripts. Attached hereto as Ex. 8 are relevant excerpts from her deposition testimony.

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

Kirby Noonan Lance & Hoge LLP
600 West Broadway, Suite 1100 San Diego, California 92101-3387

11.     Brad Gessner is SDCCC's general manager.  I have reviewed his deposition transcripts.  Attached hereto as Ex. 9 are relevant excerpts of his deposition testimony.

12.     Mark Epstein signed a declaration dated October 26, 2007.  The declaration has been marked as Trial Ex. 2.  A true and correct copy of this declaration is attached hereto as Ex. 10.

13.     SDCCC had market studies conducted for its expansion project, some of which were marked as trial exhibits.  Trial Ex. 1018, titled San Diego Convention Center Market Demand Analysis, was prepared by Pricewaterhouse Coopers, and a copy of this study is attached hereto as Ex. 11.  Trial Ex. 1021, titled DRAFT Mayor's Citizen Task Force, Final Report, is dated August 2009, and a copy of this report is attached as Ex. 12.  Trial Ex. 1315 is another report from the Mayor's Citizen Task Force, dated February 24, 2009, and a copy is attached hereto as Ex. 13.

14.     Richard A Simon is United's President.  I have reviewed his deposition transcripts, copies of relevant excerpts of which are attached hereto as Ex. 14.

15.     I attended Mark Epstein's deposition.  He testified he was the former President of Champion Exposition Services.  Attached hereto as Ex. 15 are copies of relevant excerpts of his deposition transcript.

16.     I attended Leland Matthew Kriz's deposition.  Attached hereto as Ex. 16 are copies of relevant excerpts of his deposition transcript.

17.     I attended the deposition of Leif Ljungquist.  Attached hereto as Ex. 17 are copies of relevant excerpts of his deposition transcript.

18.     I attended the deposition of David Dickerson.  Attached hereto as Ex. 18 are copies of relevant excerpts of his deposition transcript.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on March 4 , 2011, at San Diego, California.

Jacob M. Slania

1

*United National Maintenance v. San Diego Convention Center Corporation, Inc.*

2

(Case No: 07-CV-2172 AJB)

3

**TABLE OF CONTENTS OF EXHIBITS TO**

**DECLARATION OF JACOB M. SLANIA IN**

4

**OPPOSITION TO DAUBERT MOTIONS 1-3**

5

6

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | November 13, 2007 Declaration of Dr. Hekman | 1-38 |
| 2 | December 27, 2007 Declaration of Dr. Hekman | 39-40 |
| 3 | United's Initial Designation of Expert Witnesses | 41-45 |
| 4 | Dr. Hekman's September 30, 2009 report | 46-93 |
| 5 | Dr. Hekman's November 12, 2009 report | 94-114 |
| 6 | Dr. Hekman's deposition transcript | 115-281 |
| 7 | March 1, 2010 Declaration of Dr. Hekman | 282-407 |
| 8 | Deposition Excerpts of Carol Wallace | 408-410 |
| 9 | Deposition Excerpts of Brad Gessner | 411-424 |
| 10 | October 26, 2007 Declaration of Mark Epstein | 425-430 |
| 11 | SDCCC Market Demand Analysis report | 431-439 |
| 12 | August 2009 DRAFT Mayor's Citizen Task Force report | 440-520 |
| 13 | February 24, 2009 Mayor's Citizen Task Force report | 521-539 |
| 14 | Deposition excerpts of Richard Simon | 540-543 |
| 15 | Deposition excerpts of Mark Epstein | 544-548 |
| 16 | Deposition excerpts of Leland Matthew Kriz | 549-561 |
| 17 | Deposition excerpts of Leif Ljungquist | 562-566 |
| 18 | Deposition excerpts of David Dickerson | 567-570 |

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Kirby Noonan Lance & Hoge LLP**
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

KNLH\826001.1

# EXHIBITS 1-18

# EXHIBIT 1

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

**DECLARATION**

of

**Dr. John S. Hekman**

**LECG**

**In the Matter of**

*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

**November 13, 2007**

**EXHIBIT**

*507*

*Hekman Ph. D.*

9

125

**Ex 1 p 1**

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

TABLE OF CONTENTS

I. Qualifications, assignment, summary of conclusions.          1

II. Market Definition and market power                          4

A. The Product Market                                           5

B. The Geographic Market.                                       10

III. SDCC's exclusionary conduct in the market for Trade

Show Cleaning Services at the convention center.                13

A. SDCC Has Excluded Competition Entirely From the

Convention Center.                                              14

B. SDCC Has Attempted to Monopolize the Market by

Raising Rivals' Costs.                                          17

C. The San Diego Convention Center is an Essential Facility

for Competitors in the Trade Show Cleaning Services Market.     17

IV. The security explanation by SDCC for excluding United

fails the "No Economic Sense Test"                              18

V. Harm to consumers.                                           21

VI. Conclusion                                                  24

128

Ex 1 p 2

Trial Exhibit 507  Page 2

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

**I. Qualifications, assignment, summary of conclusions.**

1.      My name is John S. Hekman.  I am a Principal at LECG, a firm that provides consulting and expert testimony in economics, finance and accounting.  Since 1990, I have testified in federal and state courts on such matters as price fixing, patent infringement, trade secrets, real estate finance and general economic damages.  I have previously been engaged as a consultant or expert witness in such matters as the licensing of celebrity names and images, the structuring of contracts for the release of motion pictures, the video rental industry and other aspects of the entertainment business.  I have defined relevant markets in antitrust matters.  I have analyzed allegations of exclusionary behavior by market participants.  I have assessed the degree of market power by defendants accused of the abuse of market power.  I earned a MBA in finance and a Ph.D. in economics at the University of Chicago.  I have taught economics and finance at the University of Southern California, The University of North Carolina, Boston College and The University of Chicago.  In addition, I have published a number of papers in academic and professional journals.  I was also an economist with the Federal Reserve in Boston and Atlanta.  My billing rate in this matter is $400 per hour.  My curriculum vitae is attached to this report as Exhibit 1.

2.      I have been asked by counsel for United National to analyze the actions of the San Diego Convention Center ("SDCC") from the perspective of industrial organization economics and to provide several opinions based on that analysis.  I have been asked to define the geographic markets as well as to determine whether the Trade Show Cleaning Services provided by United and SDCC are part of a specialized product market that is

9

1                                                     127

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*
economically meaningful and distinct from other cleaning services. I have been asked to
determine whether SDCC has market power or monopoly power in this market and
whether SDCC has exercised such power. Finally, I have been asked to determine the
likely current and future effect on consumers in the relevant market of SDCC's action in
enforcing the exclusive use of SDCC employees for cleaning services.

3.　　I have reviewed materials related to the case to form my opinions. These
materials include the Complaint for Injunctive Relief and Damages; Defendant's
Objections to Evidence Submitted by Plaintiff; the Memoranda of Points and Authorities
in Support and in Opposition to the application for a restraining order; the Declarations of
Carol Wallace, Dessi Nintcheva, Thomas Robbins, Jason Kirby, Richard Simon, Charles
Linn, Larry Colby, and Mark Epstein; the SDCC cleaning services contract with United
Service Companies; certain correspondence between market participants and SDCC from
1990 to 2000; correspondence from market participants related to SDCC's 2007 actions;
2006 Exhibitor Application and Contract, Internet Telephony Conference & Expo; the
SDCC website; and additional materials from my own research. A complete list of the
materials I have reviewed is attached to this Declaration as Exhibit 2.

4.　　I recognize that there are additional materials likely to be provided to me during
the course of discovery, and I will revisit my opinions if necessary based on any new
information. However, the materials I have reviewed have allowed me to reach the
following opinions:

　　a) The economically meaningful relevant product market is Trade Show Cleaning
　　Services at SDCC.

　　b) The relevant geographic market is the San Diego metropolitan area.

2

9

128

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

c) SDCC has market power in the Trade Show Cleaning Services market at the SDCC.

d) The demand for large trade show services facing SDCC is inelastic with respect to price. Trade Show Cleaning Services is a small portion of the price of large trade show services. As a result, a price increase in the Trade Show Cleaning Services market will have a small impact on the price of large trade show services and would be unlikely to cause a loss of SDCC's trade show business.

e) The effects of SDCC's denying United National and other cleaning services access to the convention center are highly anti-competitive.

f) SDCC has eliminated current and future competition and has effectively raised prices for Trade Show Cleaning Services in connection with its exclusion of non-SDCC cleaning employees.

g) The convention center is an essential facility for competitors in the trade show cleaning market, and SDCC has denied access to this facility for competitors in the market.

h) SDCC has leveraged its monopoly power in the San Diego large trade show market to exclude competitors in the Trade Show Cleaning Services market.

i) Because trade shows contract for space at SDCC many years in advance, trade show consumers are "locked in" to higher prices charged for cleaning services, and are further unlikely to switch because Trade Show Cleaning Services are a small percentage of the total expenditure for trade show services.

9

3                                                              129

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

j) The manner in which SDCC has excluded competition is a form of "raising

rivals' costs", which is recognized by economics as an anti-competitive practice.

k) I conclude from the "no economic sense" test that there is no pro-competitive

justification for SDCC's actions.

l) Consumers in the market for Trade Show Cleaning Services have been harmed,

Consumers have had their choices in the market reduced to a single supplier, i.e.

SDCC. And the prices charged by SDCC are higher than those charged by United

National.

**II. Market Definition and market power**

5.     In order to assess whether the actions taken by SDCC against United National are

anti-competitive, it is necessary to define the market in which SDCC and United

compete. When the relevant market has been defined, an economist can measure the

market or monopoly power that a firm such as SDCC has in that market and judge

whether specific acts by that firm are anti-competitive.

6.     Economists have identified the primary elements of market definition as, first, the

definition of the specific products or services that, in this case, SDCC and United sell.

Products or services that have a high cross-price elasticity of demand are considered to be

in the same market. A high cross-price elasticity of demand between services A and B

means that if the price of A rises, the demand for B will rise by a significant amount.

This shows that A and B are close substitutes. Products and services that are close

substitutes using this measure are judged to be in the same market.

7.     The second primary element of the market definition is geographic. Some firms,

for example GM or Ford, competes with other carmakers throughout the country in selling

9

130

4

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

their products, so that the relevant geographic context of the market is national. Other markets are much smaller geographically; a Del Taco in San Diego is not in the same geographic market as a Del Taco in Kansas City. For each product or service, the geographic market is the area in which the firms produce and sell.

8.     The use of monopoly power to interfere with the efficient functioning of a market without the result of lowering price or increasing quality is anti-competitive. In general, exclusionary conduct is any conduct that harms competitors and is not competition on the merits. A firm's actions are exclusionary if they tend to impair the opportunities of that firm's competitors in an unnecessarily restrictive way and do not enhance competition. Sometimes it is difficult to discern whether actions by a dominant firm that have the result of excluding competitors are anticompetitive. However, that is not the case with the actions of the SDCC with regard to the Trade Show Cleaning Services market at the SDCC. The effect of SDCC's actions was to exclude all competition, with no benefit to competition or to consumers.

**A. The Product Market**

9.     The FTC and DOJ's 1992 Horizontal Merger Guidelines (Merger Guidelines) were developed in conjunction with economists and are generally accepted by economists as appropriate economic tools to be used by economists defining relevant markets and market power. The FTC/DOJ guidelines define a product market to be a group of products that are related such that a hypothetical profit-maximizing firm that was the only seller of those products (the monopolist) could profitably impose at least a "small but significant and non-transitory" increase in or markup of price over the competitive level.[1]

---

[1] U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section 1.1, <http://www.ftc.gov/bc/docs/horizmer.htm> (17 October 2005).

8

Ex 1 p 7

Trial Exhibit 507  Page 7

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

This minimum price markup that could be maintained for a significant period of time is typically taken to be 5 percent. This is sometimes called the "hypothetical monopolist test" or the "SNIP" test.

10.    The ability of a hypothetical monopolist to maintain a price increase as described above is analyzed by the competitive response that would result from the price increase. On the demand side, the response comes from buyers who switch to substitute products when the monopolist raises price. And on the supply side, the response comes from the ability of firms producing other products and services to begin producing the monopolist's product or service. The supply response also comes from new firms entering the industry because the price has risen.

11.    On the demand side, the market test asks, if the monopolist imposed the "significant and non-transitory" 5% price increase, whether buyers of the service could switch to other services in such numbers that the loss of sales by the monopolist would make the price increase unprofitable. If this is probable then the service would be in the same product market, and the market has not been defined broadly enough. Conversely, if the loss of sales is not enough to make the price increase unprofitable for the monopolist, then the product market is not too broad. The relevant market is the group of services just large enough that a monopolist could profitably raise price because buyers would be unwilling or unable to switch to other services.[2]

12.    The supply side market test looks to see whether other suppliers could enter the market or switch to producing the service produced by the monopolist in such a way that

---

[2] A well-known example of this test is the market for cellophane. If buyers switching to wax paper in response to an increase in the price of cellophane do not make the price increase unprofitable, then wax paper is not in the same antitrust market as cellophane.

9

6

132

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

a price increase would not be sustained. The market definition asks whether a 5%

increase in price by the hypothetical monopolist would cause more firms to enter the

market within one to two years, thus bringing price down and making the price increase

by the monopolist unprofitable.[3] If other firms are able to start producing the product or

service that the hypothetical monopolist produces, then the market definition is too

narrow. The relevant market is the group of sellers such that a monopolist could

profitably raise price because no more sellers would be able to enter the market in a

reasonable period of time.

13.    The evidence I have reviewed indicates that the number of firms that supply

Trade Show Cleaning Services is limited, because the type of cleaning performed by

United National at the SDCC is not standard space cleaning. Because this cleaning

appears to be specialized in a number of ways, United does not compete with ordinary

janitorial services and similar firms.

14.    One of United's primary customers in the trade show cleaning market is

Champion Exposition Services, a large general contractor for trade shows. Champion

signs contracts with trade associations to manage and organize their trade shows across

the U.S.[4]  Mark Epstein, Champion's president, strongly supports the description of

United and other firms in the trade show cleaning market as highly specialized:

> "While a janitorial firm hired to clean office space in a commercial building can
> expect each office to be the same size and in similar condition everyday, each
> trade show is unique in size, configuration, and its cleaning needs. Based on the
> scope and size of a particular trade show, a provider of Trade Show Cleaning
> Services must constantly react to ever changing demands that involve the
> amount and location of manpower and equipment at any given moment. A
> provider of Trade Show Cleaning Services must ultimately have a tremendous

---

[3] The test requires both that there be entry of other firms and that the increase in supply be sufficient to
bring the price back to a competitive level.
[4] Affidavit of Mark Epstein, page 1.

9

7

133

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

amount of logistical expertise and must anticipate needs proactively based on the past experience of the Trade Show.Cleaning Services management. No two trade shows are the same from the perspective of Trade Show Cleaning Services.[5]

15.    There are two main functions performed by firms in the Trade Show Cleaning Market. The first is "facilities cleaning", which is cleaning aisles and common areas at SDCC during the move-in phase and construction of exhibits at conventions as well as during the move-out phase. The second function is "booth cleaning", which is described as cleaning exhibit booths during shows and during the night. Facilities cleaning is specialized in part because it must be performed during a short window of time between trade shows. At times the show moving in and the one moving out overlap, requiring even more experience to make the process run smoothly. United states that its cleaning services are individually tailored to the needs of each type of show and exhibitor. United National revenues from cleaning services at SDCC were approximately $500,000 per year.

16.    The special need filled by the cleaning contractors was acknowledged by SDCC. In a June, 2000 letter to the Trade Show Contractors Association, the Convention Center Director states: "As you know, with the existing and increasing level of business at the Convention Center, the time between move-out of one show and move-in of the next show is often extremely compressed. Time frames to return a clean floor will likewise often be compressed. You also know that we often run overlaps of move-outs and move-ins. The service contractors have been primary and key players in making those overlaps happen."[6]

---

[5] Affidavit of Mark Epstein, page 2.
[6] Letter from Joe Paulk to Marty Cymbal, June 20, 2000, page 2.

8

9

. 134

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

17.     The number of firms supplying Trade Show Cleaning Services in San Diego is limited to those, primarily United National and SDCC, that have developed the expertise over a number of years to be able to compete in the market. In the short run it is unlikely that other janitorial firms could enter the market. Mark Epstein of Champion states "Due to the expertise and specialized knowledge required, I would not consider even an extremely price competitive bid from a traditional janitorial services firm to provide Trade Show Cleaning Services."[7] Mary Beth Rebedeau of the Society of Independent Show Organizers referred to how specialized the cleaning services are in her letter to SDCC: "While we understand the need for facility managers to generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors of their choice. This is particularly true for large shows whose complexities demand carefully selected and integrated vendor partners who have a thorough understanding of each show's special needs. This includes cleaning services . . . . Show organizers spend years cultivating relationships and advantageous pricing with their chosen suppliers. In-house exclusives arbitrarily increase costs to show organizers — and therefore exhibitors — while decreasing the quality of the service provided due to lack of competition."[8]

18.     Competition for a hypothetical monopolist also could come from other firms supplying cleaning services in San Diego. Barriers to entry make it more difficult for new firms to enter. In this case, a major barrier is the lack of other firms with the specialized cleaning experience possessed by United. As described above, the evidence I

---

[7] Affidavit of Mark Epstein, page 2. Anecdotal evidence from customers can be an important source of information for market definition. It can confirm what economic analysis of the market situation indicates. In this case, United National's customers explain why they need certain kinds of services that are not available from conventional cleaning firms, and this is borne out by the market evidence that conventional cleaning firms have not obtained contracts for Trade Show Cleaning Services at SDCC.
[8] June 22, 2007 letter from Mary Beth Rebedeau to SDCC.

9

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

reviewed indicates that there is a long learning curve down which firms would have to travel in order to be as efficient and therefore as competitive as United in doing this work. "Learning by doing" is a process that takes time, and therefore in the short run there would be no competitors able to enter the market. So even if it were possible for new firms to bid on cleaning contracts at SDCC, it is unlikely, from what I have seen, that there would be entry of new firms. However, the San Diego Convention Center is using its control over access to the center to eliminate all alternative cleaning firms. This is an absolute barrier to entry.

**B. The Geographic Market.**

19.     The relevant geographic market is the San Diego metropolitan area. Workers who are trained to perform the cleaning services in this market cannot come profitably from areas outside the local San Diego labor market and be competitive with those workers who are located in the local market, and trade shows are unable or unwilling to switch their shows from San Diego to another city in response to an increase in the price of Trade Show Cleaning Services.

20.     The issue of whether the relevant market is properly defined as Trade Show Cleaning Services at SDCC involves the ability of other firms (the supply side of the market) or trade show exhibitors (the demand side of the market) to react to an increase in price by SDCC. In the language of the FTC/DOJ antitrust guidelines, the hypothetical monopolist test asks whether a hypothetical 5% increase in price by the monopolist, maintained for a significant period of time, would elicit a sufficient competitive response to restrain the monopolist, making the attempted price increase unprofitable. This ability

9

10                                                                     138

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*
of competition to "discipline" an increase in price can be analyzed by the supply response
and the demand response.

21.     The buyers, or demanders, of Trade Show Cleaning Services are ultimately the
exhibitors at trade shows. However, the exhibitors are not the direct buyers of cleaning
services. United National contracts with a general contractor; the general is hired by a
trade association. The trade association chooses the city and convention center where the
show will be held, but the exhibitor-members of the association pay the fees that go to the
general contractor and finally to the cleaning contractor, United. The exhibitors do not
choose the convention city.

22.     In this way, the Trade Show Cleaning Services market is in a vertical relationship
to the market for large trade shows. A monopolist who was the only seller of Trade
Show Cleaning Services in San Diego would face potential competition from other
convention centers, if the general contractors that hire cleaning firms in San Diego could
move to other venues. However, there are a number of reasons why it is unlikely that
contractors could switch to other convention centers to restrain SDCC's ability to raise
price in the Trade Show Cleaning Services market.

23.     First, buyers are unlikely to discipline a SDCC price increase because of a "third-
party payer" effect in the market. The ultimate buyer of Trade Show Cleaning Services
as well as other costs of trade shows is the exhibitor. But the contracting of cleaning
services is done by the general contractor, such as Champion. Increases in the price of
Trade Show Cleaning Services are paid by the general contractor, but these increases are
passed along to the exhibitor, which reduces the impact of the price increase. Further, the
choice of a location for the trade show is made by the trade association, which is not the

9

11

137

**Ex 1 p 13**

**Trial Exhibit 507  Page 13**

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

final buyer of the services. As a result of this third-party payer structure, it is unlikely that a higher price charged by SDCC for cleaning services would affect the choice of location for conventions and thus provide competitive pressure on SDCC.

24      Second, general contractors are unlikely to "discipline" price increases by SDCC in cleaning services because there are no similarly-sized convention centers in San Diego or nearby that can host the large conventions that use SDCC. SDCC has monopoly power in the large trade show market in the San Diego region. The SDCC, with over 600,000 square feet of exhibit space, is one of the five largest convention centers in the United States. There is no other convention center of remotely comparable size in the San Diego area. The next largest meeting area in San Diego is the Hilton Convention Hotel, under construction across from the SDCC. It will have 106,000 square feet of meeting space, but it is mostly designed to satisfy the demand for hotel rooms for the SDCC.[9]

25.      Third, it is unlikely that contractors buying cleaning services would discipline a SDCC price increase for Trade Show Cleaning Services by switching to venues in other cities. The cost of exhibit cleaning is a very small portion of the total cost of putting on a convention, so that a monopolist in San Diego would not experience significant limits on its ability to raise price due to the possibility that contractors would move to other cities.

26.      Fourth, buyers are unlikely to discipline a SDCC price increase because of the long term planning that is necessary for the large trade shows that SDCC serves. These shows are often committed for five, ten or fifteen years in advance.[10] This reduces the ability of contractors and trade shows to move to other convention centers.

---

[9] http://www.portofsandiego.org/projects/hiltonhotel/
[10] Affidavit of Mark Epstein, page 3.

12

9

138

**Ex 1 p 14**

**Trial Exhibit 507  Page 14**

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

27.    I conclude that the SDCC does have market power or monopoly power in large trade shows in the San Diego area as well as in the market for Trade Show Cleaning Services at conventions in San Diego.  First, SDCC has the power to exclude competitors without the likelihood that new competitors could enter the market.  Second, SDCC has the power to set a price floor for Trade Show Cleaning Services at the center by requiring all outside firms to use SDCC employees at wages set by SDCC.  Third, SDCC has the power to raise price in the market.  Currently, SDCC has control over 100% of the market, since it controls access to the SDCC and is dictating pricing in the market regardless of the level of involvement that United is permitted to have.[11]

**III. SDCC's exclusionary conduct in the market for Trade Show Cleaning Services at the convention center.**

28.    My reading of the evidence indicates that United National Maintenance obtains contracts with Champion and other general contractors that provide services to associations using the San Diego Convention Center for shows.  The exhibitors pay a fee to Champion for booth cleaning services.  Champion retains approximately 50% of the fee for its services and provides the remaining 50% to United for the booth cleaning. United performs booth cleaning under its contract for this fixed amount.  For facilities cleaning, United estimates the number of hours that will be needed for individual exhibitor booth cleaning on a fully-loaded hourly fee basis.  The current contracts specify an hourly rate of $16.35 to cover not only the labor used to perform cleaning but also for materials and for United's management of the services.  This is done on a "not-to-exceed" basis.  If the actual hours are greater than the not-to-exceed amount, United

---

[11] According to statements by SDCC and United, SDCC's share of the cleaning market at the convention center was as high as 60% before July 2007.

.9

13

139

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*
absorbs the additional cost. If the actual labor hours are less than what was estimated, United is compensated only for the actual hours.

29.     In May 2007 United National was notified that as of July 1 all trade show cleaning services at the Convention Center would be performed by SDCC employees. In June of 2007 United National was notified that it could work at the Convention Center, but that it would have to use SDCC employees to fulfill the terms of its contracts, at a labor rate of $17 per hour. Furthermore, SDCC would take the entire 50% of booth cleaning revenue that was contractually owed to United National. If the actual hours expended were less than the number that would exhaust the 50% of booth-cleaning revenue, then SDCC would keep the money that was left over. In other words, United receives no revenue but is still responsible for seeing that the contract terms are satisfied. Whatever supervisory or managerial resources are expended by United to fulfill the contract are a 100% loss.

**A. SDCC Has Excluded Competition Entirely From the Convention Center.**

30.     The result of the actions by SDCC described above is to exclude all competition in the Trade Show Cleaning Services market at the convention center. United National will be forced to serve out the contracts with Champion and other general contractors that it has already signed. However, when these contracts expire, United will not be able to compete in the Trade Show Cleaning Services market at SDCC because it would lose money in doing so. Nor is it likely that any general contractors would hire United under the circumstances, namely that SDCC employees perform the work.

31.     SDCC has argued that it is not excluding competition because it has not excluded United from the center, only United's cleaning staff. This is entirely misleading and

14

9

140

Ex 1 p 16

Trial Exhibit 507  Page 16

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

inaccurate, in my opinion. United cannot control the pricing of the services that it would provide in the market, since SDCC dictates the hourly labor rates and takes all of the booth cleaning revenue that United formerly received. Further, United's employees are not permitted to work in the SDCC. The only way that United could "compete" in the center would be processing paperwork and requests for cleaning services. This is not competition in any meaningful sense, and since SDCC would control 100% of the pricing in the market and all of the cleaning staff, there is no competition at all from the point of view of industrial organization economics.

32.     The manner in which SDCC has attempted to exclude competitors in the market for Trade Show Cleaning Services at SDCC's facility is by leveraging its monopoly power in the market for large convention services in San Diego. Because SDCC has market power in the San Diego large convention services market, it can require convention exhibitors to use SDCC's cleaning services exclusively or raise the price without suffering a significant loss of business in its primary market. SDCC serves very large trade shows that have only a small number of alternative venues to choose from nationwide. This lack of alternative venues for large trade shows means that the SDCC has a relatively inelastic demand for its services, especially after a trade association has booked a date for ten or more years in advance. Inelastic demand for a product or service such as large trade shows means that if the price of the service rises, consumers of the service (such as general contractors and show organizers) will not tend to look elsewhere for a convention center but will tend to pay the higher price.

33.     The inelastic demand experienced by SDCC for trade shows means that if SDCC succeeds in excluding all competition in the Trade Show Cleaning Services market,

9

15

141

Ex 1 p 17

Trial Exhibit 507  Page 17

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

SDCC can raise the price of cleaning services that is ultimately paid by trade show exhibitors without losing business in the large trade show market.

34.    Because of the long-term nature of SDCC's contracts with large convention trade shows, extending ten or fifteen years in some cases, the exclusionary action that SDCC has taken with regard to Trade Show Cleaning Services has "locked in" customers who use these services. In economic terms, a lock-in occurs in a situation where a consumer contracts with a seller for goods or services over an extended period of time. For the duration of the contract, the buyer is "locked in" to whatever downstream services are needed. The seller can take advantage of the lock-in to raise the prices of the services that are needed during the term of the contract. The buyer cannot go elsewhere to purchase those services because of the lock-in. In the situation being considered here, SDCC has locked in the consumers of Trade Show Cleaning Services for the duration of the ten or fifteen years that some trade shows have contracted.

35.    A number of trade show industry participants have responded to SDCC's exclusionary acts by writing letters to oppose the new policy. Some of these participants state that they try to avoid convention centers that have "exclusives", and some threaten to take their business elsewhere.[12] However, it is a measure of SDCC's market power in large trade shows that none of these participants has taken any business away from SDCC so far. And in spite of the implicit threat by these market participants to oppose SDCC's

---

[12] For example, Pat Dwyer, Sr. Manager of Trade Show Services for SmithBucklin, states in a letter to SDCC, "…one of the considerations we view as an imposition to our selection [of a venue] is the lack of choice of contractors to meet our highest level of service and accountability…While there are many factors that enter into the decisions to select a future site for our clients, one of the aspects which definitely would weigh in as less desirable is an exclusive service where there is no need to appoint one." June 27, 2007 letter from Pat Dwyer to SDCC.

16

8

142

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

imposition of an exclusive, SDCC went ahead with their exclusionary action. This also indicates how much market power SDCC possesses.

**B. SDCC Has Attempted to Monopolize the Market by Raising Rivals' Costs.**

36.    In a strictly technical sense, SDCC is allowing cleaning contractors to work in the relevant market at SDCC. SDCC may argue that they have not excluded United from the market. However, SDCC is using the strategy known as "raising rivals' costs" to exclude competition.[13] In this case, SDCC is appropriating all of the booth cleaning revenue that would have been received by United, and "allowing" United to compete in the market only by using SDCC's employees and by accepting no revenue. Thus, SDCC has raised the costs of United and other potential competitors to be greater than revenue.

37.    The raising rivals' costs action taken by SDCC is an example of what Scheffman and Higgins refer to as "cost-effective" strategies by monopolists. They say: "Some kinds of cost-raising strategies can obviously be very cost-effective—*e.g.*, actions that lead to governmental actions that exclude your rivals, or impair their ability to compete with you."[14]

**C. The San Diego Convention Center is an Essential Facility for Competitors in the Trade Show Cleaning Services Market.**

38.    Since the relevant market is Trade Show Cleaning Services at the SDCC, the Convention Center is an essential facility for firms that supply Trade Show Cleaning Services. An essential facility is a resource possessed by one firm that other competitors

---

[13] See for example Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.*, Boston: Pearson, Addison-Wesley, 2005, pp. 371-377; Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209 (1986); Steven Salop and David Scheffman, *Raising Rivals' Costs*, 73 American Econ. Rev. Papers and Proceedings 267 (May 1983); David Scheffman and Richard Higgins, *20 Years of Raising Rivals' Costs: History, Assessment, and Future*, Federal Trade Commission, http://www.ftc.gov/be/RRCGMU.pdf.
[14] Scheffman and Higgins, *20 Years of Raising Rivals' Costs*, page 5.

9

17

143

**Ex 1 p 19**

Trial Exhibit 507 Page 19

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

must have access to in order to compete with that firm. Another name for an essential facility is a bottleneck. An example would be the only railroad bridge over a river for many miles. If the railroad that owns the bridge refuses to deal with competing railroads that need to use the bridge, competition is harmed. The SDCC is an essential facility because it is the only venue for large trade shows in the San Diego area. It would be prohibitively expensive for United to build another 600,000 square foot convention center in order to compete with SDCC. United National and other firms in this market cannot compete in the market unless they have access to the San Diego Convention Center facilities. Control over this essential facility in the market for Trade Show Cleaning Services gives SDCC the ability to exclude all of its competitors from the market.

**IV. The security explanation by SDCC for excluding United fails the "No Economic Sense Test"**

39.     Actions by firms that tend to exclude their rivals can sometimes have pro-competitive explanations. It is important to examine the possibility of a pro-competitive reason for the exclusionary actions taken by SDCC before concluding that the actions were anti-competitive. The economics literature refers to the "no economic sense" test to examine whether there is any normal business justification other than exclusion for actions such as those by SDCC.[15] I have considered all of the statements by representatives of SDCC and by other participants in the market that were provided to me to examine the issue of a possible pro-competitive reason for the exclusion.

40.     First, I considered the possibility of enhanced efficiency in the market for Trade Show Cleaning Services if SDCC employees have an exclusive. My conclusion is that

---

[15] Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

9

18

144

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

there is no enhanced efficiency justification for the conduct of SDCC. Exclusive cleaning services at the Convention Center will not reduce cost to consumers or provide a higher quality product. This is the only conclusion that can be reached given that:

1. The letters from contractors and show producers are unanimous in their opposition to an exclusive arrangement.

2. SDCC has not even attempted to provide an argument that exclusive cleaning services is more efficient. Instead, the change has been explained as a security matter.

41. Second, I considered whether SDCC was carrying out a general shift in its security policy by restricting all non-SDCC employees from using the center. Economists have no special ability to measure the need for security at a facility such as SDCC. However, an economist can observe the incentive for the owner of an essential facility such as the SDCC to use a pretext to exclude its competitors in a market such as Trade Show Cleaning Services where the SDCC is a competitor in the market. The economist can weigh the consistency of the behavior of the SDCC in applying its security policy against the behavior in which types of non-SDCC employees are excluded.

42. I have read the declaration of William Callaghan, President of Century Security and an expert in convention floor security according to the documents I have seen. Mr. Callaghan concludes that SDCC's policy of excluding only non-SDCC cleaning employees "makes absolutely no sense."[16] He finds that the policy makes no sense from a security point of view because, among other reasons, cleaning employees tend to be lower security risks than other non-SDCC employees who are not covered by the policy; because cleaning employees are only 5% or less of the outside employees accessing

---

[16] William Callaghan Declaration, November 2007, par. 6.

9

19

145

Ex 1 p 21

Trial Exhibit 507  Page 21

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

convention centers; because SDCC does not require outside employees to wear badges, while United National does do this; and because United National has offered to run background checks on its employees, which SDCC has refused.[17]

43.     I have also read the declaration of Charles Buddy Linn, the Regional Vice President of United National, who is familiar with the security policies of not only SDCC but other major convention centers. He provides more detail on the level of security at SDCC compared to other centers in his experience. SDCC does not use a photo ID system for security, and its monitoring of outside employees accessing the facility is lax.[18] Further, Mr. Linn provides evidence that SDCC's claim that United was a security risk because it was using temporary employees is false.[19]

44.     From my own analysis as well as the evidence provided by Mr. Callaghan and Mr. Linn, I conclude that contrary to the idea of a general shift in security policy, cleaning services has been singled out for restrictions. SDCC competes with outside Trade Show Cleaning Services such as United. In contrast, SDCC does not compete directly with many other service providers who work on trade shows. Other non-SDCC contract employees have not been similarly excluded from the center on grounds of security concerns. Examples of the other services performed by non-SDCC workers are: drayage, cartage, furniture, booth and floor decorations, signs, photographs, telephone services, electricians, plumbers, and carpenters.[20]

45.     SDCC justifies its exclusion of competing cleaning suppliers on the basis of security concerns at the center. If this justification is a sham, as alleged by United

[17] Callaghan Declaration, par. 7, 8, 10, 12; Charles Buddy Linn Declaration, November 2007, par. 4.
[18] Linn Declaration, par. 4, 5.
[19] Linn Declaration, par. 7, 8.
[20] Terms and Conditions, 2006 Exhibitor Application & Contract, Internet Telephony Conference & Expo, Item 6; Linn Declaration, par. 4.

9

20

146

*Dr. John S. Hekman Declaration*
*United National Maintenance, Ino. v. San Diego Convention Center Corporation, Inc.*

National, then there is no pro-competitive justification for the exclusionary restrictions by SDCC. The restrictions do not lower costs; to the contrary, the restrictions result in higher prices in the cleaning services market. Similarly, the quality of service is not increased; no justification other than the asserted security concern has been advanced. The restrictions also do not increase consumer choice or services available; rather, they reduce the choice of services.

46.    SDCC could have used a less restrictive alternative to accomplish their stated goal of improving security at the convention center. They could have subjected United's employees to background checks. They could have provided enhanced security training or requirements. They could have worked with United to ensure that United's employees were no more of a security risk than their own booth cleaning employees.

47.    According to Mark Epstein of Champion, the employees of United National have been employed by the company for long periods of time and have had no security problems at the center. In contrast, employees of some other contractors who work in the convention center are "a huge security black hole."[21] Yet these contractors have not been targeted in the way that United National has.

**V. Harm to consumers.**

48.    Consumers have been harmed first of all because SDCC is charging higher prices in the trade show cleaning market in connection with its exclusion of all non-SDCC cleaning employees. The terms of the relationship with United National dictated by SDCC in July 2007 represent a price increase for cleaning services. United National previously estimated the hours needed for facilities cleaning at the fully loaded labor rate of $16.35 in order to provide a not-to-exceed amount for services at particular exhibitor

---

[21] Affidavit of Mark Epstein, page 5.

9

21

147

Ex 1 p 23

Trial Exhibit 507  Page 23

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

spaces. SDCC has raised the hourly rate, not including United National's management and other costs, to $17. Thus, SDCC has raised rates already to the extent that the hours expended are less than the not-to-exceed hours. In addition, when United National's current locked-in contract rates expire, SDCC will be charging more for the same number of hours estimated for purposes of setting a not-to-exceed amount. In addition, SDCC has effectively raised prices for booth cleaning. Currently, United National is locked into its contracts to provide booth cleaning, even though it passes all of its booth-cleaning revenue on to SDCC.

49.     Harm to the competitive process is demonstrated by, among other things, the statements by market participants. Because of the exercise of monopoly power by the SDCC, there is no longer any competition on the merits for exhibit cleaning services. Letters expressing the displeasure of the trade show industry with the actions of SDCC include:

1. Joint Statement of the Society of Independent Show Organizers, the International Association for Exhibition Management, and the Major American Trade Show Organizers.
2. Richard Simon, President of United Service Companies.
3. Joe Loggia, Chief Executive of Advanstar Communications.
4. Patricia Dwyer, Senior Manager of Convention and Trade Show Services, SmithBucklin Corporation.
5. Barbara Myers, Conferences and Meeting Services Director, APCO International
6. B.J. Enright, President, Trade Show Logistics.
7. Ken McAvoy, Senior Vice President, Reed Exhibitions.
8. Mary Kay Sustek, Senior Vice President, Neilson Business Media.
9. Martin Cymbal, President, Trade Show Contractors Association of Southern California.
10. Ty F. Bobit, President, Bobit Business Media.
11. Mary Beth Rebedeau, Executive Director, Society of Independent Show Organizers.

50.     Letters from trade show participants are clear in stating the harm they see in SDCC's policy:

22

9

148

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

- Pat Dwyer of SmithBucklin states: "By taking the decision our of our hands to select this very important -- and visible service -- you could be taking away our ability to negotiate competitive pricing models for our client, as well as the relationship to a valuable member of our service level team environment."[22]
- Mary Kay Sustek of Nielson Business Media states: "While I believe we have used the SDCC cleaning services over the past years, it was by choice. Imposing an exclusive of any type isn't in the best interest of Nielsen or its customers. Nielsen manages its shows based on the specific needs and requirements of customers and having this flexibility is a key ingredient to a successful show. . . . In our experience, exclusive services ultimately become more expensive and less service oriented as it takes the competitive nature out of the business."[23]
- Ty Bobit of Bobit Business Media states: "Please know that the imposition of an exclusive service will be in contradiction to the wishes of your customers and it typically reduces service levels and takes competitive pricing options away. We have found over the years that the show manager's ability to choose a contractor and control price helps . . . provide better service at competitive prices."[24]
- Mary Beth Rebedeau of the Society of Independent Show Organizers states: "While we understand the need for facility managers to generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors of their choice. This is particularly true for large shows whose complexities demand carefully selected and integrated vendor partners who have a thorough understanding of each show's special needs. This includes cleaning services . . . . Show organizers spend years cultivating relationships and advantageous pricing with their chosen suppliers. In-house exclusives arbitrarily increase costs to show organizers -- and therefore exhibitors -- while decreasing the quality of the service provided due to lack of competition."[25]
- B.J. Enright of Tradeshowlogistics states: "[O]ur clients would love to have the San Diego Convention Center competitively bid for the opportunity to be the official cleaning contractor. However, an exclusive situation does not promote competition and service."[26]
- John Mooney of SISO wrote: "Our opposition to exclusives is based on the historical fact that competition among suppliers provides the best service at the lowest cost. Exclusives have the reverse effect."[27]

---

[22] Letter from Pat Dwyer to SDCC, June 27, 2007.
[23] Letter from Mary Kay Sustek to SDCC, June 22, 2007.
[24] June 14, 2007 letter from Ty Bobit to SDCC.
[25] July 20, 2007 letter from Mary Beth Rebedeau to SDCC.
[26] July 26, 2007 letter from B.J. Enright to SDCC.
[27] March 31, 2000 letter from John Mooney to Carol Wallace.

8

23

140

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

> • Michael Muldoon, of the Convention Management Group, wrote to say "Please know that food and beverage events, like the shows we manage, have extraordinary cleaning requirements. Our relationship with United Services Companies has been extremely important to the production of these events. We have not been as successful working in facilities that require the hiring of "exclusive contractors" and we avoid "exclusive shops."[28]

51.     The conclusion I have reached from, among other things, my experience as an economist as well as the statements from market participants quoted here is that SDCC's exclusion of competition in Trade Show Cleaning Services at the convention center, if it continues, will produce higher prices and a lower quality of service. The experiences cited by Nielson Business Services, Bobit Business Media, the Society of Independent Show Organizers and the Convention Management Group all support this conclusion. The experiences of these organizations provide a natural experiment that, while insufficient by themselves to provide a definitive prediction for SDCC, nevertheless points toward harm for consumers as a result of SDCC's exclusion.

**VI. Conclusion**

52.     For all of the reasons stated above, I believe that the actions of SDCC in excluding competition in the market for Trade Show Cleaning Services in the convention center are highly anti-competitive. Based on the documents I have examined, I also believe that there is no pro-competitive justification for the SDCC's actions. My opinions have been formed based on the documents that I have seen. I understand that more information may become available in the future. If so, it may be necessary to amend these opinions in the light of additional discovery.

*[signature: John S Hekman]*

John S. Hekman, Ph.D.        November 13, 2007    Los Angeles, CA.

---

[28] March 13, 2000 letter from Michael Muldoon to Carol Wallace.

9

24

150

*Dr. John S. Hekman Declaration*
*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*

### List of Exhibits to Declaration of Dr. John S. Hekman

1. Exhibit 1:  Curriculum Vitae of Dr. John S. Hekman

2. Exhibit 2:  List of Materials Reviewed

9

151

**Ex 1 p 27**

# JOHN S. HEKMAN

LECG, Inc.
2049 Century Park East, Suite 2300
Los Angeles, California 90067

Tel. (424) 204-8872
Fax (310) 556-0766
E-mail: jhekman@lecg.com
hekman@marshall.usc.edu

John S. Hekman's areas of expertise include antitrust, real estate and finance. He has testified in federal and state courts on such matters as price fixing, patent infringement, trade secrets, real estate finance and general economic damages. Dr. Hekman has conducted research involving such industries as oil and gas, steel, paper and wood products, and computers. In addition, he has published a number of articles in the areas of real estate finance and industry studies. Dr. Hekman was formerly an economist with the Federal Reserve and Associate Professor of Finance at the University of North Carolina. He holds a Ph.D. in economics and a MBA from the University of Chicago.

## EDUCATION

Ph.D., Economics, University of Chicago

M.B.A., Finance, University of Chicago

B.A., History, Valparaiso University

## PRESENT POSITION

LECG, LLC, 2004-present, Principal.

University of Southern California, 1989-present. Department of Finance and Business Economics: Lecturer, MBA program.

## EMPLOYMENT

Economic Analysis LLC, 2000-03, Principal.

LECG, LLC, 1998-2000, Principal.

Altschuler, Melvoin and Glasser LLP, 1996-98, Director.

Economic Analysis Corp., Vice President (1993-96); Senior Economist (1992).

Micronomics, Inc., 1990-92, Senior Economist.

9

152

Ex 1 p 28

Claremont Economics Institute, 1986-90, Executive Vice President and Director of U.S. Economic Forecasting. Editor, *The Main Street Journal* Investment letter.

University of North Carolina, Chapel Hill 1981-86, Associate Professor of Finance (academic tenure granted, 1985).

Federal Reserve Bank of Atlanta, 1981-84, Visiting Scholar.

Federal Reserve Bank of Boston, 1980, Economist.

Harvard-MIT Joint Center For Urban Studies, 1978, Research Associate.

Boston College, 1975-81, Assistant Professor of Economics.

University of Chicago, 1974-75, Instructor.

## TESTIMONY

*Julius Chang and Howard Chen v. Charles Schwab & Company,* California Superior Court, County of San Francisco. Retained by Daniel Newland of Seyfarth Shaw LLP. Deposition October, 2007.

*Eric Setken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San Diego. Retained by Kevin Quinn of Thorsnes Bartolatta McGuire. Class Certification Declaration submitted September, 2007.

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et al,* California Superior Court, County of San Mateo. Retained by Joel Wolosky of Hodgson Russ. Deposition April 2007.

*James Ripley v. Wyoming Medical Center et al.* United States District Court for the District of Wyoming. Retained by Stephen Kline of Kline Law Office PC. Deposition April 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District of California. Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman. Deposition February 2007.

*Breakdown Services Ltd. v. Now Casting, Inc.* California Superior Court, County of Los Angeles. Retained by Stephen P. Krakowsky. Deposition October 2006.

*RitterRanch Development LLC, debtor. Los Angeles County Waterworks District No. 40 v. Robbin Itkin et al.,* United States District Court Central District of California. Retained by Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller. Deposition June 2006.

9

153

*Pamela Cunningham and Rest Caldwell v. Mattel, Inc.* Circuit Court, Third Judicial Circuit, Madison County, Illinois. Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges. Deposition February 2005.

*In re Cioffi,* California Superior Court, County of Santa Clara. Retained by William Russell of Lakin, Spears. Deposition and trial testimony January 2004.

*Ederel Sport, Inc. v. Gotcha International, L.P.* U.S. Bankruptcy Court, Central District of California. Retained by Michael Adele of Albert, Weiland & Golden. Deposition and trial testimony May 2003.

*In Re Fuqua Industries Shareholder Litigation,* Delaware Chancery Court Civil Action No. 11974. Retained by Lowell Sachnoff of Sachnoff & Weaver. Deposition March 2003.

*SPC/PomomaLLC v. Medianews Group, Inc.* Superior Court of California, County of Los Angeles. Retained by Steven Gardner of Cohon and Gardner. Deposition February 2003; trial testimony April 2003.

*MGM v. Midway Games, Inc.* U. S. District Court, Central District of California, Western Division. Retained by John Williams of Lord, Bissell & Brook. Report submitted October 2002.

*Freeman Industries LLC v. Eastman Chemical Company, et al.,* In the Law Court for Sullivan County at Kingsport, Tennessee. Retained by Aton Arbisser of Kaye Scholer. Class Certification Affidavit submitted September 2002.

*Keep v. State of California,* Superior Court of California, County of Los Angeles. Retained by Vladimir Shalkovich, Deputy Attorney General. Deposition October 2002.

*IMAX, LTD. v. Krikorian Premiere Theatres,* U.S. District Court for the Central District of California. Retained by Glenn Dassoff of Paul, Hastings, Janofsky & Walker. Deposition September 2002.

*Betty Bullock v. Philip Morris, Inc. et al.;* California Superior Court, Los Angeles. Retained by Thomas Stoever of Arnold & Porter on behalf of defendant. Deposition May 2002.

*International Paper and Masonite v. Affiliated FM Insurance Co, et al.;* California Superior Court, San Francisco. Retained by Adam Murray of Howrey, Simon, Arnold & White. Deposition May 2001; trial testimony November 2001.

*Copley Press, et al. v. Gray Davis, et al; Tony Strickland, et al. v. Gray Davis, et al.;* California Superior Court, San Diego County; retained by Timothy Muscat, Deputy Attorney General. Declaration in Support of Defendant's Opposition Brief submitted May 2001.

9

154

*Fitzgerald v. Silcott, et al.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Deposition January 2000; trial October 2001.

*Formal Complaint of Tesoro Alaska Petroleum Against Amerada Hess, et al.,* Federal Energy Regulatory Commission and Regulatory Commission of Alaska. Retained by John Donovan of Skadden, Arps, Slate Meagher & Flom. Testimony submitted November 2000.

*Alavi v. Kaiser Foundation Hospitals.* Retained by Walter Weiss. Arbitration testimony November 2000.

*Seguritan v. State of California, et al.* Los Angeles County Superior Court. Retained by Anne Hunter, Deputy Attorney General. Deposition July 2000.

*Lenehan v. Maryland Casualty.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Deposition May 2000.

*Hearing on Green Coke Pricing Issue for TAPS Quality Bank.* Federal Energy Regulatory Commission. Retained by John Donovan of Skadden, Arps, Slate, Meagher & Flom. Testimony May 2000.

*Tash v. Aviara Land Associates, L.P., et al.* San Diego Superior Court. Retained by Jerry Phillips of Richman, Mann, Chizever, Phillips & Duboff. Deposition April 2000; Trial testimony May 2000.

*First Pension Corp/Murray v. Belka.* California Superior Court, County of Orange. Retained by William Meeske of Latham & Watkins. Deposition February 2000.

*Edelman v. Minkler.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Trial testimony April 2000; deposition January 1999.

*Rhonda Jalali v. Assembly of God, Teen Challenge et al.* California Superior Court. Retained by George Buehler of Howrey & Simon. Deposition and trial testimony July 1999.

*Alfred Martino, Jr. v. Northbrook Property and Casualty Company and St. Paul Fire and Marine Insurance Company,* Arbitration. Retained by Law Offices of J. Jeffrey Long. Testimony June 1999.

*Dawn Place v. Thillaiyamp Sri Jaerajah,* California Superior Court for the County of Kern. Retained by Law Offices of J. Jeffrey Long. Trial testimony June 1998.

*Hugo Valdivia v. MCE Corporation, et al.,* California Superior Court for the County of Los Angeles. Retained by Andrew Jacobs of the Law Offices of Andrew Hoffman (CNA Insurance). Deposition November 1997; trial January 1998.

θ

155

**Ex 1 p 31**

Trial Exhibit 507  Page 31

*Louisville Bedding Company v. Pillowtex Corporation*, United States District Court for the Western District of Kentucky. Retained by Hartwell Morse of Welsh & Katz. Deposition November, December 1997.

*Infant and Nutritional Products, et al. v. BJ Family Food Center, et al*, California Superior Court for the County of Los Angeles. Retained by Farhad Novian of Novian & Novian. Deposition September 1997.

*William Gene Norman v. Herbalife International, et al.*, California Superior Court for the County of Los Angeles. Retained by Ward Benshoof of McClintock Weston Benshoof Rochefort Rubalcava MacCuish. Deposition April 1997.

*Jeffrey Alpert v. Gerald Busch, et al*, California Superior Court for the county of Los Angeles. Retained by Law Offices of Daniel Hoffman (CNA Insurance). Trial testimony November 1997.

*Janelle Flores v. Dapo Popoola, MD, et al.*, California Superior Court for the County of Los Angeles. Retained by Henry Tovmassian of Kehr, Crook, Tovmassian & Fox. Deposition September 1997.

*Ridgecrest Homeowners Association v. Nihon Lancre America, Inc., et al.*, California Superior Court for the County of Los Angeles. Retained by Ronald Caswell of Richmond, Lawrence, Mann, Greene, Chizever, Friedman & Phillips. Deposition June 1997.

*Harvey W. Stuart, et al. v. Kraft Foods, Inc. et al.*, United States District Court for the Eastern District of Wisconsin. Retained by Michael Freed of Much Shelist Freed Denenberg Ament Bell & Rubenstein. Affidavit November 1996; deposition and court testimony December 1996.

*Albert and Estelle Binder, et al. v. Thomas Gillespie, et al.*, United States District Court for the District of Idaho. Retained by Robert Bretz of Robert H. Bretz, PC. Affidavit December 1996.

*Ernst Paul Lehmann Patentwerk v. San-Val Discount, Inc.*, United States District Court, Central District of California. Retained by Douglas Adler of Skadden, Arps, Slate, Meagher & Flom. Affidavit submitted March 1996.

*JAR-PR Associates v. Unocal*, Superior Court of the State of California, County of Los Angeles. Retained by George Crook of Kehr, Crook, Tovmassian & Fox. Deposition and trial testimony, March 1996.

*Sarkis v. State of California*, California Superior Court, County of Kern. Retained by Deputy Attorney General Daniel Helfat. Deposition, January 1996.

9

156

*Casper Boso v. Chicago Bears.* Retained by Steven Wolf of Wolf & Ouimet to testify regarding the average career length of NFL players. Arbitration testimony November 1994.

*Styling Research Company v. Conair Corporation,* Superior Court of the State of California, County of Los Angeles. Retained by Phillip Belleville of Latham & Watkins. Deposition August 1992.

*Medical Designs, Inc. v. Donjoy, Inc.,* United States District Court, Southern District of California. Retained by Paul C. Van Slyke of Pravel, Gambrell, Hewitt, Kimball & Krieger. Deposition October 1991.

*California Grocers Association v. Bank of America,* Superior Court of the State of California for the County of Alameda, Northern District. Retained by Arne Wagner of Bank of America. Deposition May 1991.

## CONSULTANT

Simpson Thatcher & Bartlett, New York, NY, Kenneth Logan; *Ronald Cleveland, et al. v. Viacom, Blockbuster, et al.* United States District Court for the Western District of Texas, 2002.

*In Re Maguire Thomas Partners -- Grand Place Tower, Ltd.* United States Bankruptcy Court, Central District of California. Retained by Bennett Silverman of Gibson, Dunn & Crutcher on behalf of Sumitomo Bank, 1999.

Howrey & Simon, Washington, DC, Thomas Heyer; *Litton Systems, Inc. v. Honeywell, Inc.,* 1995-1996.

Thelen, Marrin, Johnson & Bridges, San Francisco, Steven V. O'Neal; *IBM v. Fasco Industries,* 1994-1995.

*Packard Bell Electronics, Inc. v. Teledyne Industries, Inc.,* Superior Court of the State of California, County of Los Angeles. Retained by Ronald M. St. Marie of Ervin, Cohen & Jessup. August 1995.

O'Melveny & Myers, Los Angeles, Charles Diamond, Randy Oppenheimer; *Exxon Valdez Oil Spill Litigation,* 1993-1994; 2000; 2002.

## REFEREE

*American Economic Review*               *Journal of Political Economy*
*Quarterly Journal of Economics*         *Journal of Industrial Economics*
*International Regional Science Review*   *Southern Economic Journal*
*Journal of Regional Science*            *AREUEA Journal*                9

                                                                      157

John S. Hekman                                                          Page 7

*Journal of the American Planning Association*          *Financial Management*

## PUBLICATIONS

"California Under Siege: A Call for Perspective" (with Ken Agid, et al.), California Real Estate Roundtable, April 1991.

"Should We Reform Deposit Insurance?" *Los Angeles Times,* March 11, 1990, D3.

"New England's Economy in the 1980s" (with Lynn Browne), in *The Massachusetts Miracle,* David R. Lampe (ed.), The MIT Press: Cambridge, MA, 1988.

"Real Estate Returns and Inflation" (with David Hartzell and Mike Miles), *American Real Estate and Urban Economics Association Journal (AREUEA),* Spring 1987.

"Factors Affecting Manufacturing Location in North Carolina," in Dale Whittington (ed.), *High Hopes for High Tech: Microelectronics in North Carolina,* University of North Carolina Press, 1987.

"Diversification Categories in Investment Real Estate" (with David Hartzell and Mike Miles), *AREUEA Journal,* Summer 1986.

*Land Supply Monitoring: A Guide for Improving Public and Private Urban Development Decisions* (with D. Godshalk, S. Bollens, and M. Miles), Oelgeschlager, Gunn & Hain: Boston, 1985.

"Rental Price Adjustment and Investment in the Office Construction Market," *AREUEA Journal,* Spring 1985.

"Branch Plant Location and the Product Cycle in Computer Manufacturing," *Journal of Economics and Business,* May 1985.

"Venture Capital and Economic Development in the Southeast" (with Mike Miles), *Economic Review,* Federal Reserve Bank of Atlanta, July 1983.

"Optimal Allocation of Economic Development Funds" (with Mike Miles, et al.), N.C. Department of Natural Resources and Community Development, January 1983.

"What are Businesses Looking for? A Survey of Industrial Firms in the South," *Economic Review,* Federal Reserve Bank of Atlanta, June 1982.

"Behind the Sunbelt's Growth: Industrial Decentralization" (with Alan Smith), *Economic Review,* Federal Reserve Bank of Atlanta, March 1982.

"Impact of Environmental Regulations on Industrial Development in North Carolina" (with Raymond Burby, et al.), North Carolina Department of Natural Resources and Community Development, February 1982.

"The Evolution of New England Industry" (with John Strong), *New England Economic Review*, March-April 1981.

"New England's Economy in the 1980s" (with Lynn Browne), *New England Economic Review*, January-February 1981.

"Income, Labor Supply and Urban Residence," *American Economic Review*, September 1980.

"Is there a Case for Plant Closing Laws?" (with John Strong), *New England Economic Review*, July-August 1980.

"The Product Cycle and New England Textiles," *Quarterly Journal of Economics*, June 1980.

"Can New England Hold Onto its High Technology Industry?" *New England Economic Review*, April 1980.

"Regions Don't Grow Old, Products Do," *The New York Times*, Sunday Business, November 4, 1979.

"What Attracts Industry to New England?" *New England Economic Indicators*, December 1978.

"An Analysis of the Changing Location of Iron and Steel Production in the Twentieth Century," *American Economic Review*, March 1978.

## BOOK REVIEWS

Southern Capitalism, in *The Journal of Regional Science*, vol. 27, no. 4, 1987.

The Deindustrialization of America, in *UNC Business*, February 1983.

Three books on industrial location, in *Journal of the American Planning Association*, June 1982.

Free to Choose, in *Harvard Business Review*, September 1980.

*October, 2007*

9

159

Ex 1 p 35

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2*

Exhibit 2

List of Materials Reviewed

1. Complaint for Injunctive Relief and Damages
2. Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction
3. Defendants Objections to Evidence Submitted by Plaintiff in Support of Plaintiff's Ex Parte Application for a Temporary Restraining Order
4. Letter from Aaron Bludworth to Brad Gessner, September 21, 2007.
5. Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order
6. Memorandum of Points and Authorities in Support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order.
7. Plaintiff's Ex Parte Application for a Temporary Restraining Order.
8. Proposed Temporary Restraining Order
9. Proposed Temporary Restraining Order and Order to Show Cause re Preliminary Injunction
10. Request for Judicial Notice in support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order
11. Declaration of Carole Wallace in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
12. Declaration of Dessi Nintcheva in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
13. Declaration of Thomas Robbins in Support of Plaintiff's Application for a Temporary Restraining Order
14. Declaration of Jason Kirby in Support of Plaintiff's Application for a Temporary Restraining Order
15. Declaration of Charles Buddy Linn in Support of Plaintiff's Application for a Temporary Restraining Order

9

160

1

**Ex 1 p 36**

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2*

16. Declaration of Larry Colby in Support of Plaintiff's Application for a Temporary Restraining Order

17. Declaration of Mark Epstein in Support of Plaintiff's Application for a Temporary Restraining Order

18. Declaration of Mark Epstein, October 26, 2007

19. Declaration of Richard Simon in Support of Plaintiff's Application for a Temporary Restraining Order

20. San Diego Convention Center Corporation Cleaning Services Contract with United Service Companies 2007

21. UNM v. San Diego Convention Center Pleadings List

22. San Diego Convention Center 2006 Annual Report

23. San Diego Convention Center Corporation, Convention and Trade Show License Agreement

24. July 26, 2007 Letter from Richard Simon to Jerry Sanders

25. July 5, 2007 Letter from Joe Loggia to Brad Gessner

26. June 27, 2007 Letter from Pat Dwyer to Brad Gessner

27. June 18, 2007 Letter from Barbara Myers to Brad Gessner

28. July 26, 2007 Letter from B.J. Enright to Brad Gessner

29. June 14, 2007 Letter from Ken McAvoy to Brad Gessner

30. June 22, 2007 Letter from Mary Kay Sustek to Brad Gessner

31. June 8, 2007 Letter from Martin Cymbal to Brad Gessner

32. June 14, 2007 Letter from Ty Bobit to Brad Gessner

33. SISO, IAEM, AND MATSO ISSUE JOINT INDUSTRY STATEMENT ON EXCLUSIVE SERVICES

34. July 20, 2007 Letter from Mary Beth Rebedeau to Brad Gessner

35. June 20, 2000 Letter from Joe Psulk to Marty Cymbal

36. May 12, 2000 Letter from Beatrice Kemp to Mark Valley

37. March 31, 2000 Letter from John Mooney to Carole Wallace

38. March 13, 2000 Letter from Michael Muldoon to Carole Wallace

39. March 8, 2000 Letter from Brian Casey to Carole Wallace

40. March 7, 2000 Letter from Mary Beth Rebedeau to Carole Wallace

9

161

2

Ex 1 p 37

Trial Exhibit 507  Page 37

*United National Maintenance, v. San Diego Convention Center Corporation*
*Exhibit 2*

41. March 2, 2000 Letter from James Bracken to Carole Wallace

42. March 1, 2000 Letter from Stephen Shuldenfrei to Carole Wallace

43. June 20, 1990 Letter from Hugh Mac Lean to Tom Liegler

44. June 13, 1990 Letter from Richard Simon to the San Diego Convention Center Board of Directors

45. May 11, 1990 Letter from Hugh Mac Lean to John Hartley

46. U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section 1.1, http://www.ftc.gov/bc/docs/horizmer.htm.

47. http://www.portofsandiego.org/projects/hiltonhotel/

48. Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.,* Boston: Pearson, Addison-Wesley, 2005.

49. Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price,* 96 Yale L.J. 209 (1986)

50. Steven Salop and David Scheffman, *Raising Rivals' Costs,* 73 American Economic Review Papers and Proceedings 267 (May 1983)

51. David Scheffman and Richard Higgins, *20 Years of Raising Rivals' Costs: History, Assessment, and Future,* Federal Trade Commission, http://www.ftc.gov/be/RRCGMU.pdf

52. Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

53. Terms and Conditions, 2006 Exhibitor Application & Contract, Internet Telephony Conference & Expo, item 6.

54. Declaration of Charles Buddy Linn, November 2007.

55. Declaration of William Callaghan, November 2007.

9

162

3

Ex 1 p 38

# EXHIBIT 2

*John S. Hekman, Ph.D.*
*Response to Defendant's Opposition to Motion for Injunction*

## Response to Defendant's Opposition to Motion for Preliminary Injunction

### John S. Hekman

I have read Defendant's Opposition to Motion for Preliminary Injunction, and I strongly disagree with its assertion that SDCC's implementation of restrictions on outside cleaning services is "pro-competitive." The basis for this assertion is that Plaintiff's firm can still operate in the SDCC, and that other cleaning firms can also compete with Plaintiff and with Defendant for cleaning contracts. This is completely contrary to the meaning of the word "competition" in antitrust economics. Defendant is saying that Plaintiff can compete for cleaning services at SDCC by using Defendant's cleaning services employees. The great majority of Plaintiff's employees are cleaning workers. These workers are barred from working at SDCC. Plaintiff cannot "compete" in the market by offering a lower rate or more services with these employees. The cleaning at SDCC is performed by one staff of employees, not by a range of competing firms.

The remainder of Plaintiff's employees are administrative. If Defendant is intending to argue that Plaintiff can "compete" by offering a lower cost of administrative staff, that makes no economic sense at all. I already pointed out in my Declaration that the labor rate negotiated by United National before the SDCC restrictions on cleaning staff was a rate that already included overhead and administration. Since the cleaning labor rate imposed by SDCC is higher than the rate charged by United National that included administrative cost, SDCC's restrictions have unambiguously reduced competition, not enhanced it.

Prepared by LECG



EXHIBIT
508
Hekman Ph.D.

1

4

**Ex 2 p 39**

**Trial Exhibit 508  Page 1**

*John S. Hekman, Ph.D.*
*Response to Defendant's Opposition to Motion for Injunction*

Defendant's use of the terms "competition" and "pro-competitive" are incorrect and misleading as a matter of economic principles. The effect of SDCC's actions in excluding non-SDCC employees from performing cleaning at SDCC is anti-competitive.

John S. Hekman, Ph.D.          Los Angeles, Ca.          December 27, 2007

Ex 2 p 40

Trial Exhibit 508  Page 2

# EXHIBIT 3

James R. Lance (147173)
Jacob M. Slania (200652)
Julianne Hull (246719)
**KIRBY NOONAN LANCE & HOGE LLP**
350 Tenth Avenue, Suite 1300
San Diego, California 92101-8700
Telephone (619) 231-8666
Facsimile (619) 231-9593

Theodore R. Tetzlaff (*Pro Hac Vice*)
Kristopher J. Stark (*Pro Hac Vice*)
**UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
Chicago, Illinois 60602-4224
Telephone (312) 977-4400
Facsimile (312) 977-4405

Attorneys for Plaintiff
UNITED NATIONAL MAINTENANCE, INC.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED NATIONAL MAINTENANCE, INC., a Nevada corporation, | CASE NO. 07-CV-2172 BEN(JMA) |
| Plaintiff, | |
| vs. | Complaint Filed: November 13, 2007 |
| SAN DIEGO CONVENTION CENTER CORPORATION, INC., a California corporation, | **PLAINTIFF'S INITIAL DESIGNATION OF EXPERT WITNESSES** |
| Defendant. | Date: May 1, 2009<br>Judge: Hon. Roger T. Benitez<br>Crtrm: 3<br>Trial Date: None Set |

KNLH597972.1

EXHIBIT
**336**
M. D'Angelo

07-CV-2172 BEN(JMA)

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    Plaintiff United National Maintenance, Inc. ("Plaintiff") designates the following expert

2  witnesses pursuant to the requirements of Rule 26 and as ordered by the Court:

3
       (1)    William M. Callaghan
4             15926 Vista Verde
              Montverde, FL 34756
5             (407) 4002-8117

6      (2)    Anthony D'Angelo
              United National Maintenance, Inc.
7             1550 S. Indiana Avenue
              Chicago, IL 60605
8             Tel: (312) 922-8558

9      (3)    John S. Hekman
              LECG
10            550 South Hope Street
              Suite 2150
11            Los Angeles, CA 90071
              Tel: (424) 204-8872
12
       (4)    Patrick F. Kennedy, PhD
13            LECG
              655 West Broadway
14            San Diego, CA 92101
              Tel: (619) 687-0001
15
       (5)    Charles ("Buddy") Linn
16            United National Maintenance, Inc.
              30520 Rancho California Rd., Ste. 107-110
17            Temecula, CA 92591
              Tel: (800) 699-7083
18
       (6)    Cary Mack, JD, CPA
19            LECG
              655 West Broadway
20            San Diego, CA 92101
              Tel: (619) 687-0001
21
       (7)    Richard Simon
22            United National Maintenance, Inc.
              1550 S. Indiana Avenue
23            Chicago, IL 60605
              Tel: (312) 922-8558
24
       (8)    Candice Wright
25            Long Beach Police Department
              400 W. Broadway
26            Long Beach, CA 90808
              Tel: (562) 243-7052
27

28

KNLH\597972.1                    -2-                    07-CV-2172 BEN(JMA)

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan L...ce & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-4700

1

2    1.    Mr. Callaghan is expected to offer expert testimony regarding the establishment

3  and implementation of security protocols for conventions/events at convention centers and

4  other trade show facilities. Mr. Callaghan is also expected to testify regarding the security

5  policy implemented by Defendant at the San Diego City Convention Center ("SDCC"), as well

6  as Plaintiff's proposed security policy for implementation at the SDCC. Mr. Callaghan will

7  also be prepared to testify in response to any expert witness on the subject of security

8  designated by Defendant. Mr. Callaghan's rate for testimony is $200 per hour. Attached

9  hereto as Exhibit 1 is Mr. Callaghan's Curriculum Vitae setting forth his qualifications.

10   2.    Mr. D'Angelo is expected to offer expert testimony regarding effective security

11  protocols and sufficient counterterrorism protection at convention centers. Mr. D'Angelo is

12  also expected to testify regarding the security policy implemented by Defendant at the SDCC

13  and Plaintiff's proposed security policy for implementation at the SDCC. Mr. D'Angelo will

14  also be prepared to testify in response to any expert witness on the subject of security

15  designated by Defendant. Mr. D'Angelo's rate for expert testimony is $125 per hour.

16   3.    Mr. Hekman is expected to provide expert testimony on such matters as

17  exclusionary behavior by market participants, the relevant geographical markets, whether

18  Defendant has market power or monopoly power in the relevant geographic markets, and

19  whether Defendant has exercised such power. Mr. Hekman is also expected to provide expert

20  testimony regarding the likely effect of Defendant's behavior on consumers in the relevant

21  geographic market. Mr. Hekman will also be prepared to testify in response to any expert

22  witness designated by Defendant on similar topics. Mr. Hekman's rate for testimony is $400

23  per hour. Attached hereto as Exhibits 2 is Mr. Hekman's Curriculum Vitae setting forth his

24  qualifications.

25   4.    Mr. Kennedy is expected to provide expert testimony regarding Plaintiff's

26  economic damages, including but not limited to, the valuation of Plaintiff's lost profits. Mr.

27  Kennedy will also be prepared to testify in response to any expert witness on the subject of

28  damages designated by Defendant. Mr. Kennedy's rate for testimony is $400 per hour.

1  Attached hereto as Exhibit 3 is the Curriculum Vitae of Mr. Kennedy setting forth his

2  qualifications.

3      5. Mr. Linn is expected to offer expert testimony regarding contracting work for trade

4  shows at convention centers, including the business of providing booth cleaning, janitorial and

5  related services (hereinafter referred to as "Booth Cleaning Services") at convention centers.

6  Mr. Linn is also expected to offer expert testimony regarding the hiring of employees to

7  perform Booth Cleaning Services at convention centers. Mr. Linn will also be prepared to

8  testify in response to any expert designated by Defendant on similar topics. Mr. Linn's rate for

9  expert testimony is $125 per hour.

10      6.      Mr. Mack, in conjunction with Mr. Kennedy, is expected to provide expert

11  testimony regarding Plaintiff's economic damages, including but not limited to, the valuation

12  of Plaintiff's lost profits. Mr. Mack will also be prepared to testify in response to any expert

13  witness on the subject of damages designated by Defendant. Mr. Mack's rate for testimony is

14  $425 per hour. Attached hereto as Exhibit 4 is the Curriculum Vitae of Mr. Mack setting forth

15  his qualifications.

16      7.      Mr. Simon is expected to provide expert testimony regarding the trade show

17  industry, including the business relationships among the trade show manager, the convention

18  center or facility, and contractors performing work at the trade show. Mr. Simon is also

19  expected to testify regarding the financial relationship between the convention center or

20  facility and the contractors performing the work at the facility. Additionally, Mr. Simon is

21  expected to testify about the security protocols implemented by Plaintiff to ensure a safe and

22  secure working environment. Mr. Simon will also be prepared to testify in response to any

23  expert witness designated by Defendant on similar topics. Mr. Simon's rate for expert

24  testimony is $150 per hour.

25      8.      Ms. Wright is expected to offer expert testimony regarding security protocols

26  within the public and private sectors' critical infrastructures. Ms. Wright is also expected to

27  testify regarding the sufficiency of the security policy implemented by Defendant at the

28  SDCC, as well as the sufficiency of Plaintiff's proposed security policy for implementation at

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

KNLH\597972.1                              -4-                    07-CV-2172 BEN(JMA)

**Ex 3 p 44**

Kirby Noonan L▲ace & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-4700

1 | the SDCC. Ms. Wright will also be prepared to testify in response to any expert witness on

2 | the subject of security designated by Defendant. Ms. Wright's rate for testimony is $100.00

3 | per hour. Attached hereto as Exhibit 5 is Ms. Wright's Curriculum Vitae setting forth her

4 | qualifications.

5 |      Plaintiff reserves the right to name or call any retained experts as the need arises during

6 | the course of discovery and investigation in preparation for the trial in this action. Plaintiff

7 | will provide appropriate notice of any additional experts and those experts will be made

8 | available for deposition prior to the trial and within the time frame set by the Court for

9 | depositions of expert witnesses.

10 |      Because discovery in this action has not yet been completed and because the

11 | depositions of fact and expert witnesses have not yet been taken, Plaintiff reserves the right to

12 | serve a supplemental exchange of expert witnesses. Furthermore, the Court's January 27, 2009

13 | Case Management Conference Order provides a supplemental expert designation date of May

14 | 29, 2009. This supplemental exchange, if any, may identify additional persons whose

15 | testimony may be offered in evidence at trial. The supplemental exchange, if any, may also

16 | re-designate or substitute certain persons who were previously identified as expert witnesses in

17 | this action.

18 |

19 | DATED: May 1, 2009            KIRBY NOONAN LANCE & HOGE LLP

20 |

21 |

22 |      By: *Jacob M. Slania*

23 |         James R. Lance
        email: jlance@knlh.com
        Jacob M. Slania

24 |         email: jslania@knlh.com
        Julianne Hull

25 |         email: jhull@knlh.com
        Attorneys for Plaintiff UNITED NATIONAL

26 |         MAINTENANCE, INC.

27 |

28 |

# EXHIBIT 4

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

Case No. 37-2007-00072054-CU-BT-CTL


REPORT

of

John S. Hekman Ph.D.


In the Matter of

*United National Maintenance, Inc.*

*v.*

*San Diego Convention Center Corporation, Inc.*


September 30, 2009



EXHIBIT

4446

J. Hays

Ex 4 p 46

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

### TABLE OF CONTENTS

I. Introduction and Assignment ........................................................................................................ 1

II. Summary of Opinions .................................................................................................................. 3

III. Market Definition and Market Power ........................................................................................ 4

    A. The Product Market .............................................................................................................. 6

    B. The Trade Show Cleaning Services Market .......................................................................... 8

    C. The Geographic Market ...................................................................................................... 13

    D. Market Power ...................................................................................................................... 17

IV. SDCC has Engaged in Exclusionary Conduct in the Market. ................................................. 17

    A. SDCC Has Excluded Competition Entirely From the Convention Center. ....................... 19

    B. SDCC Has Attempted to Monopolize the Market by Raising Rivals' Costs. ..................... 21

    C. The San Diego Convention Center is an Essential Facility for Competitors in the Trade
       Show Cleaning Services Market. .......................................................................................... 22

    D. SDCC's Action Is Anticompetitive Because It Constitutes a Tying Arrangement. ........... 22

V. The Security Explanation by SDCC for Excluding United Fails the "No Economic Sense
    Test". ........................................................................................................................................ 25

VI. Harm to Consumers. ................................................................................................................. 29

VII. Conclusion. .............................................................................................................................. 32

Ex 4 p 47

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

### I. Introduction and Assignment

1.      My name is John S. Hekman. I am a Principal at LECG, a firm that provides consulting

and expert testimony in economics, finance and accounting. Since 1990, I have testified in

federal and state courts on such matters as price fixing, patent infringement, trade secrets, real

estate finance and general economic damages. I have defined relevant markets in antitrust

matters. I have analyzed allegations of exclusionary behavior by market participants. I have

assessed the degree of market power by defendants accused of the abuse of market power. I

earned a MBA in finance and a Ph.D. in economics at the University of Chicago. I have taught

economics and finance at the University of Southern California, The University of North

Carolina, Boston College and The University of Chicago. In addition, I have published a number

of papers in academic and professional journals. I was also an economist with the Federal

Reserve in Boston and Atlanta. My billing rate in this matter is $440 per hour. My curriculum

vitae is attached to this report as Exhibit 1.

2.      Previously in this matter, on November 13, 2007, I submitted a Declaration in connection

with Plaintiff's Complaint for Injunctive Relief. I also submitted a Response to Defendant's

Opposition to Motion for Preliminary Injunction. I have been asked by counsel for United

National Maintenance, Inc. to provide several opinions. First, I have been asked to define the

relevant geographic and product markets in this matter. Second, I have been asked to determine

whether the San Diego Convention Center has market power or monopoly power in the relevant

market. Third, I have been asked to determine whether the Convention Center has exercised

market power or monopoly power by instituting its policy under which the Convention Center's

cleaning services labor is used exclusively for trade shows. Finally, I have been asked to

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

determine whether consumer harm has resulted from the Convention Center's exclusive cleaning

services policy.

3.      The materials I have reviewed in connection with forming my opinions include the

Complaint for Injunctive Relief and Damages; Defendant's Objections to Evidence Submitted by

Plaintiff; the Memoranda of Points and Authorities in Support and in Opposition to the

application for a restraining order; the Declarations of Carol Wallace, Dessi Nintcheva, Thomas

Robbins, Jason Kirby, Richard Simon, Charles Linn, Larry Colby, William Callaghan and Mark

Epstein; the SDCC cleaning services contract with United Service Companies; certain

correspondence between market participants and SDCC from 1990 to 2000; correspondence

from market participants related to SDCC's 2007 actions; 2006 Exhibitor Application and

Contract, Internet Telephony Conference & Expo; the SDCC website; and additional materials

from my own research.

4.      Since submitting my Declaration in this matter on November 13, 2007, I have reviewed

additional materials. These materials include the depositions of Charles Linn, Richard Simon,

Gabriel Ramirez, Raymond Santos and Mark Epstein; the August 2009 Mayor's Citizen Task

Force Report on the SDCC; Defendant's Memorandum of Points and Authorities in Opposition

to Plaintiff's Motion for Preliminary Injunction, with the Declarations of Chuck Gutensohn,

Carol Wallace, Brad Gessner, T.M. Mazzocco, and Sotera Anderson; SDCC's Responses to

Plaintiff's First Set of Interrogatories; SDCC's Amended Responses to Plaintiff's First Set of

Interrogatories; United's Responses to Defendant's First Set of Interrogatories; and the SDCC

2008 Annual Report. A complete list of the materials I have reviewed is attached to this

Declaration as Exhibit 2.

2

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

**II. Summary of Opinions**

5.   I have reached the following opinions:

a) The economically meaningful relevant product market is trade show cleaning services at SDCC.

b) The relevant geographic market is large convention centers in the San Diego metropolitan area, or, equivalently, the SDCC.

c) SDCC has market power in the trade show cleaning services market at the SDCC.

d) The demand for large trade show services facing SDCC is inelastic with respect to price.  Trade show cleaning services is a small portion of the price of large trade show services.  As a result, a price increase in the trade show cleaning services market will have a small impact on the price of large trade show services and would be unlikely to cause a loss of SDCC's trade show business.

e) SDCC exercised its market power when it excluded non-SDCC cleaning services workers from the convention center.

f) The effects of SDCC's denying United National and other cleaning services access to the convention center are highly anti-competitive.

g) SDCC has eliminated current and future competition and has effectively raised prices for trade show cleaning services in connection with its exclusion of non-SDCC cleaning employees.

h) The convention center is an essential facility for competitors in the trade show cleaning market, and SDCC has denied access to this facility for competitors in the market.

3

**Ex 4 p 50**

Trial Exhibit 446  Page 5

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

i) SDCC has used its market power in the national trade show market to engage in an anticompetitive tie. The tying good is the convention center, and the tied good is trade show cleaning services.

j) SDCC has leveraged its monopoly power in the San Diego large trade show market to exclude competitors in the trade show cleaning services market.

k) Because trade shows contract for space at SDCC many years in advance, trade show consumers are "locked in" to higher prices charged for cleaning services, and are further unlikely to switch because trade show cleaning services are a small percentage of the total expenditure for trade show services.

l) The manner in which SDCC has excluded competition is a form of "raising rivals' costs", which is recognized by economics as an anti-competitive practice.

m) I conclude from the "no economic sense" test that there is no pro-competitive justification for SDCC's actions.

n) Consumers in the market for trade show cleaning services have been harmed. Consumers have had their choices in the market reduced to a single supplier, i.e. SDCC. And the prices charged by SDCC are higher than those charged by United National.

**III. Market Definition and Market Power**

6.   Prior to SDCC's imposition of exclusive cleaning services in the Convention Center, United and SDCC were competitors in the provision of trade show cleaning services. To determine whether SDCC's action was anticompetitive, it is necessary to define the relevant market in which they compete. After the relevant market has been defined, SDCC's market share in that relevant market can be measured. With the measured market share it is then possible to conclude whether SDCC's actions in that market are anticompetitive.

4

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

7.      Economists have identified the primary elements of market definition as, first, the

definition of the specific products or services that, in this case, SDCC and United sell. Products

or services that have a high cross-price elasticity of demand are considered to be in the same

market. A high cross-price elasticity of demand between services A and B means that if the

price of A rises, the demand for B will rise by a significant amount. In the present case, a high

cross-elasticity of demand would mean that if SDCC raised its charges for trade show cleaning

services, the customers (i.e. the decorators who contract for trade show cleaning services) would

switch their business to one of SDCC's competitors such as United. If this switching were to

occur in a free market, then an economist would conclude that the services of SDCC and United

are close substitutes. The cross-elasticity would be estimated in the trade show cleaning market

by measuring the percentage increase in the demand for United's services for a given percentage

increase in SDCC's trade show cleaning services charges. Products and services that are close

substitutes using this measure are judged to be in the same market.

8.      The second primary element of the market definition is geographic. Competition in some

markets is national in scope. For example, if a mortgage lender located in Southern California

raises its mortgage rates above competitive levels, consumers (the borrowers) can switch to other

mortgage lenders that are located anywhere in the country. This reduces the ability of mortgage

lenders in any one location to charge above-competitive rates.

9.      Other markets are much smaller geographically; the geographic market for a Safeway

grocery store in San Diego is limited to the area in which consumers would switch to another

grocery store if the Safeway raised its prices above the competitive level. The geographic

market in this case would include part of San Diego but obviously not include the rest of the U.S.

In this case, the size of the market is determined by the willingness of consumers to travel to

5

Ex 4 p 52

Trial Exhibit 446  Page 7

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

competitors as well as the ability of competitors to enter the market. If there is an Albertson's
grocery store located near to the Safeway, then it would probably be in the same market. But an
Albertson's located in Los Angeles would not be in the same market for the obvious reason that
it cannot supply the consumer with groceries in San Diego except at an uneconomic cost.
Finally, it is possible for new competitors to enter the market in response to a price increase. In
this case, the question would be whether a competitor would establish a new grocery store in the
local market when Safeway raised its prices above the competitive level.

A. The Product Market

10.     The FTC and DOJ's 1992 Horizontal Merger Guidelines (Merger Guidelines) were
developed in conjunction with economists and are generally accepted by economists as
appropriate economic tools to be used by economists defining relevant markets and market
power. The FTC/DOJ guidelines define a product market to be a group of products that are
related such that a hypothetical profit-maximizing firm that was the only seller of those products
(the monopolist) could profitably impose at least a "small but significant and non-transitory"
increase in or markup of price over the competitive level.[1] This minimum price markup that
could be maintained for a significant period of time is typically taken to be 5 percent. This is
sometimes called the "hypothetical monopolist test" or the "SNIP" test.

11.     When the market has been defined correctly, then it is possible to measure the market
power of a firm in that market. In the present case, when the market in which SDCC and United
compete has been properly defined, it is possible to measure whether SDCC has market power in
that market and therefore has the ability to harm competition. If the market is defined too
broadly, then SDCC will appear not to have market power. For example, if the market was

[1] U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section 1.1,
<http://www.ftc.gov/bc/docs/horizmer.htm> (17 October 2005).

6

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

defined as all commercial cleaning services in the entire U.S., then SDCC would appear to have a very small market share in that market and market actions by SDCC would be unlikely to have an effect on competition. On the other hand, if the market is defined too narrowly, then SDCC would be considered to have too much market power. The market would be defined too narrowly if it failed to take into account some potential competition that would be present to take business away from SDCC if SDCC raised its prices above the competitive level.

12.     The ability of a hypothetical monopolist to maintain a price increase as described above is analyzed by the competitive response that would result from the price increase. On the demand side, the response comes from buyers who switch to substitute products or services when the monopolist raises price. And on the supply side, the response comes from the ability of firms producing other products and services to begin producing the monopolist's product or service. The supply response also comes from new firms entering the industry because the price has risen.

13.     On the demand side, the market test asks, if the monopolist imposed the "significant and non-transitory" 5% price increase, whether buyers of the service could switch to other services in such numbers that the loss of sales by the monopolist would make the price increase unprofitable. If this is probable then the service would be in the same product market, and the market has not been defined broadly enough. Conversely, if the loss of sales is not enough to make the price increase unprofitable for the monopolist, then the product market is not too broad. The relevant market is the group of services just large enough that a monopolist could profitably raise price because buyers would be unwilling or unable to switch to other services.[2]

---

[2] A well-known example of this test is the market for cellophane. If buyers switching to wax paper in response to an increase in the price of cellophane do not make the price increase unprofitable, then wax paper is not in the same antitrust market as cellophane.

7

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

14.     The supply side market test looks to see whether other suppliers could enter the market or

switch to producing the service produced by the monopolist in such a way that a price increase

would not be sustained.  The market definition asks whether a 5% increase in price by the

hypothetical monopolist would cause more firms to enter the market within one to two years,

thus bringing price down and making the price increase by the monopolist unprofitable.[3]  If other

firms are able to start producing the product or service that the hypothetical monopolist

produces, then the market definition is too narrow.  The relevant market is the group of sellers

such that a monopolist could profitably raise price because no more sellers would be able to enter

the market in a reasonable period of time.

**B. The Trade Show Cleaning Services Market**

15.     I have concluded that the relevant product market definition is "trade show cleaning

services at major convention centers." To begin at the most general level, SDCC and United

provide "cleaning services." More specifically, they provide trade show cleaning services to

contractors that are termed "decorators".  The decorators are trade show contractors who plan

and execute trade shows on behalf of exhibitors at large convention centers.[4]  Typically, a

convention center signs a contract with an exhibitor such as a trade group; the exhibitor hires a

trade show organizer; the organizer contracts with a decorator; and the decorator contracts with

the trade show cleaning services firm, among others.[5]  The role of the decorator is to provide

drapery, carpeting, registration, graphics and props.[6]  The question of product market definition

relates to how specific the cleaning services are.  The hypothetical question is, if a firm in the

---

[3] The test requires both that there be entry of other firms and that the increase in supply be sufficient to bring the price back to a competitive level.
[4] http://www.champion-nationwide.com/
[5] Deposition of Raymond Santos, pages 98-99; deposition of Mark Epstein page 23-24. Mr. Epstein also added that in some cases his firm, Champion, had an agreement with show management [organizer] as well as agreements with individual exhibitors to clean their booths..
[6] Deposition of Mark Epstein, page 42.

8

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

market—SDCC, United or others—raised its price above competitive levels, could another firm enter the market to compete with them? The testimony in this case has been that the services to the trade shows are so specialized that only trade show cleaning services firms would be able to compete for the business of the decorators. That is, a commercial cleaning firm that did not have the specialized expertise in trade show cleaning, move-in cleaning and move-out cleaning, would not be able to obtain business from the decorators.

16.     United also provides trade show cleaning services at hotels and smaller exhibition halls. However, testimony has shown that this is not in the same relevant market as the large trade shows. Trade shows at SDCC use up to fifty of United's workers. SDCC does not compete with the smaller hotel convention facilities in the San Diego area for trade shows. By contrast, the hotels in the San Diego area that have trade shows require "one, max two other people."[7] Therefore, looking from the demand side of the market, the demanders or users of the services of the relevant market are the organizers of trade shows at convention centers. From the supply side, the providers of trade show cleaning services are those firms that have developed the specialized experience to be able to enter the market. Charles Linn, Vice President of the Western Division of United, listed all of the trade show cleaning firms that had competed with United in California. These included SDCC, Century Cleaning, Team Cleaning, and Show Ready.[8] SDCC, Century Cleaning and United are the only trade show cleaning services that Linn is aware of that performed work at SDCC.[9]

17.     The evidence I have reviewed indicates that the number of firms that supply trade show cleaning services is limited, because the type of cleaning performed by United National at the SDCC is not standard space cleaning. Because this cleaning appears to be specialized in a

---

[7] Deposition of Rick Simon, page 32. deposition of Mark Epstein page 23-24.
[8] Deposition of Charles Linn, page 40.
[9] Ibid., pages 104-105.

9

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

number of ways, United does not compete with ordinary janitorial services and similar firms. In

fact, United has a separate company, United Maintenance Company, Inc., that provides janitorial

services.[10] If it were the case that janitorial services and trade show cleaning services were

interchangeable, then United's trade show cleaning and janitorial work could be merged, and the

same workers could be used for both. On the contrary, Rick Simon testified that trade show

cleaning is "a totally different skill set, totally different labor requirement, and the trade show

business is itinerant in nature. So you have a lot of demand for a lot of people in a short period

of time. And the knowledge and skill set of cleaning an office building versus a trade show is

the difference between, you know, flying a Piper Cub and a jet aircraft."[11] He further explains

that this knowledge and skill is primarily at the supervisory level.

18.    One of United's primary customers in the trade show cleaning market is Champion

Exposition Services, a large general contractor for trade shows. Champion signs contracts with

trade associations to manage and organize their trade shows across the U.S.[12]   Mark Epstein,

Champion's president, strongly supports the description of United and other firms in the trade

show cleaning market as highly specialized:

> "While a janitorial firm hired to clean office space in a commercial building can expect
> each office to be the same size and in similar condition every day, each trade show is
> unique in size, configuration, and its cleaning needs. Based on the scope and size of a
> particular trade show, a provider of Trade Show Cleaning Services must constantly
> react to ever changing demands that involve the amount and location of manpower and
> equipment at any given moment. A provider of Trade Show Cleaning Services must
> ultimately have a tremendous amount of logistical expertise and must anticipate needs
> proactively based on the past experience of the Trade Show Cleaning Services
> management. No two trade shows are the same from the perspective of Trade Show
> Cleaning Services.[13]

---

[10] Deposition of Rick Simon, pages 20-21.
[11] Ibid., page 21.
[12] Affidavit of Mark Epstein, page 1.
[13] Affidavit of Mark Epstein, page 2.

10

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

19.     There are two main functions performed by firms in the trade show cleaning market. The first is "facilities cleaning", which is cleaning aisles and common areas at SDCC during the move-in phase and construction of exhibits at conventions as well as during the move-out phase. The second function is "booth cleaning", which is described as cleaning exhibit booths during shows and during the night. Facilities cleaning is specialized in part because it must be performed during a short window of time between trade shows. At times the show moving in and the one moving out overlap, requiring even more experience to make the process run smoothly. United states that its cleaning services are individually tailored to the needs of each type of show and exhibitor. United National revenues from cleaning services at SDCC were approximately $500,000 per year.

20.     The special need filled by the cleaning contractors was acknowledged by SDCC. In a June, 2000 letter to the Trade Show Contractors Association, the Convention Center Director states: "As you know, with the existing and increasing level of business at the Convention Center, the time between move-out of one show and move-in of the next show is often extremely compressed. Time frames to return a clean floor will likewise often be compressed. You also know that we often run overlaps of move-outs and move-ins. The service contractors have been primary and key players in making those overlaps happen."[14]  Move-outs and move-ins are complicated processes. According to Charles Linn, a move-in typically takes one to three days.[15]  When United does not have enough workers in a particular city for a large trade show, they do not hire local cleaning workers.[16]  Instead, they bring in their own workers from other cities, presumably at considerable cost. United's workers other than supervisors are part-time,

---

[14] Letter from Joe Psulk to Marty Cymbal, June 20, 2000, page 2.
[15] Deposition of Charles Linn, page 80.
[16] Deposition of Charles Linn, page 85.

11

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

not salaried, so it is not because they are already being paid that they are used. Rather, it illustrates the specialized nature of the work.

21.     The other aspect of the product market is whether new firms could enter the market in response to a hypothetical price increase. If so, then a dominant firm in the market such as SDCC might not have significant market power. The testimony I have read as well as the past record of the SDCC indicates that there has been no new entry into the trade show cleaning services market at the SDCC. This is due to the specialized nature of the work as well as to the relationships that have been built up over the years between the cleaning services firms and the decorators for whom they work. Mark Epstein of Champion states "Due to the expertise and specialized knowledge required, I would not consider even an extremely price competitive bid from a traditional janitorial services firm to provide Trade Show Cleaning Services."[17] Mary Beth Rebedeau of the Society of Independent Show Organizers referred to how specialized the cleaning services are in her letter to SDCC: "While we understand the need for facility managers to generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors of their choice. This is particularly true for large shows whose complexities demand carefully selected and integrated vendor partners who have a thorough understanding of each show's special needs. This includes cleaning services . . . . Show organizers spend years cultivating relationships and advantageous pricing with their chosen suppliers. In-house exclusives arbitrarily increase costs to show organizers -- and therefore exhibitors -- while decreasing the quality of the service provided due to lack of competition."[18]

---

[17] Affidavit of Mark Epstein, page 2. Anecdotal evidence from customers can be an important source of information for market definition. It can confirm what economic analysis of the market situation indicates. In this case, United National's customers explain why they need certain kinds of services that are not available from conventional cleaning firms, and this is borne out by the market evidence that conventional cleaning firms have not obtained contracts for Trade Show Cleaning Services at SDCC.
[18] June 22, 2007 letter from Mary Beth Rebedeau to SDCC.

12

Ex 4 p 59

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

22.     The specialization of United's services as well as the investment United has made in developing a relationship with their customers represent barriers to entry for potential new firms in the trade show cleaning services market. United CEO Rick Simon estimated that it would require an initial investment of over $250,000 for a firm to enter the trade show cleaning market in San Diego.[19] A hypothetical new entrant into the market would need time to develop the skills necessary to perform on a level with United or other market competitors. This learning time is more significant than the actual cost of equipment and supplies to open a cleaning business. The knowledge and experience reside in the supervision and coordination of the work process. Gabriel Ramirez, the Manager of United's San Diego operations, explained that new workers receive only a brief training before beginning to do basic cleaning tasks.[20] However, it is knowing what to do and how to coordinate what needs to be done that is significant. There is a long learning curve down which firms would have to travel in order to be as efficient and therefore as competitive as United in doing this work. "Learning by doing" is a process that takes time, and therefore in the short run there would be no competitors able to enter the market. Century Trade Show Service, one of United's competitors in other areas, attempted to enter the San Diego market but was unsuccessful.[21] So even if it were possible for new firms to bid on cleaning contracts at SDCC, it is unlikely, from what I have seen, that there would be entry of new firms. However, the San Diego Convention Center is using its control over access to the center to eliminate all alternative cleaning firms. This is an absolute barrier to entry.

C. The Geographic Market

23.     The relevant geographic market is large convention centers in the San Diego metropolitan area. Since SDCC is the only large convention center in the area, the market can be defined

[19] Deposition of Rick Simon, page 239.
[20] Deposition of Gabriel Ramirez, page 58.
[21] Deposition of Rick Simon, page 240.

13

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

equivalently as the SDCC. The two main aspects of this definition are, first, that the trade show

cleaning services firms in this market require large convention centers in which to operate, and,

second, that trade show cleaning services are provided by workers who live within commuting

distance of the convention centers where the work is performed.

24.     The issue of convention centers as the focus of the trade show cleaning services market

was addressed above in the product market section. The market is limited to the San Diego area

because workers who are trained to perform the cleaning services in this market cannot

profitably come from areas outside the local San Diego labor market and be competitive with

those workers who are located in the local market. The competition is among providers of trade

show cleaning services in the local labor market. Providers outside the local market area could

only compete with those located in San Diego if they could commute to San Diego to provide

services or if the trade shows were willing to switch their shows from San Diego to another city

in response to an increase in the price of trade show cleaning services in San Diego. The first

possibility is highly unlikely because the cost of non-San Diego cleaning services providers

commuting to San Diego to work would be prohibitive. The second possibility is also highly

unlikely because the cost of trade show cleaning services is a very small part of the overall cost

of putting on a trade show. Trade show exhibitors would not be willing to move to another city

to save a small fraction of the trade show cost.

25.     The issue of whether the relevant market is properly defined as trade show cleaning

services at SDCC involves the ability of other firms (the supply side of the market) or trade show

exhibitors (the demand side of the market) to react to an increase in price by SDCC. In the

language of the FTC/DOJ antitrust guidelines, the hypothetical monopolist test asks whether a

hypothetical 5% increase in price by the monopolist, maintained for a significant period of time,

14

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

would elicit a sufficient competitive response to restrain the monopolist, making the attempted price increase unprofitable. This ability of competition to "discipline" an increase in price can be analyzed by the supply response and the demand response.

26.    The buyers, or demanders, of trade show cleaning services are ultimately the exhibitors at trade shows. However, the exhibitors are not the direct buyers of cleaning services. United National contracts with a decorator; the decorator is hired by a trade show organizer; the trade show organizer is hired by a trade association or other exhibitor. The trade association chooses the city and convention center where the show will be held, but the exhibitor-members of the association pay the fees that go to the organizer and finally to the cleaning contractor, United. The exhibitors do not choose the convention city.

27.    In this way, the trade show cleaning services market is in a vertical relationship to the market for large trade shows. A monopolist who was the only seller of trade show cleaning services in San Diego would face potential competition from other convention centers, if the decorators that hire cleaning firms in San Diego could move to other venues. However, there are a number of reasons why it is unlikely that decorators could switch to other convention centers to restrain SDCC's ability to raise price in the Trade Show Cleaning Services market.

28.    First, buyers are unlikely to discipline a SDCC price increase because of a "third-party payer" effect in the market. The ultimate buyer of trade show cleaning services as well as other costs of trade shows is the exhibitor. But the contracting of cleaning services is done by the decorator, such as Champion. Increases in the price of trade show cleaning services are paid by the decorator, but these increases are passed along to the exhibitor, which reduces the impact of the price increase. Further, the choice of a location for the trade show is made by the trade association, which is not the final buyer of the services. As a result of this third-party payer

15

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

structure, it is unlikely that a higher price charged by SDCC for cleaning services would affect

the choice of location for conventions and thus provide competitive pressure on SDCC. Mark

Epstein of Champion agreed that it is unusual for a trade show to change venues.[22]

29.    Second, decorators are unlikely to "discipline" price increases by SDCC in cleaning

services because there are no similarly-sized convention centers in San Diego or nearby that can

host the large conventions that use SDCC. SDCC has monopoly power in the large trade show

market in the San Diego region and also has market power in the national trade show market.

The SDCC, with over 600,000 square feet of exhibit space, is one of the largest convention

centers in the United States.[23]  There is no other convention center of remotely comparable size

in the San Diego area. The next largest meeting area in San Diego is the Hilton San Diego

Bayfront Hotel, across from the SDCC. It opened in December 2008 with 165,000 square feet of

meeting space, but it is mostly designed to satisfy the demand for hotel rooms for the SDCC.[24]

30.    Third, it is unlikely that decorators buying cleaning services would discipline a SDCC

price increase for trade show cleaning services by switching to venues in other cities. The cost

of exhibit cleaning is a very small portion of the total cost of putting on a convention, so that a

monopolist in San Diego would not experience significant limits on its ability to raise price due

to the possibility that contractors would move to other cities.

31.    Fourth, buyers are unlikely to discipline a SDCC price increase because of the long term

planning that is necessary for the large trade shows that SDCC serves. These shows are often

---

[22] Deposition of Mark Epstein, page 57.
[23] "San Diego Convention Center Market Demand Analysis", Jennifer Sutherland, PricewaterhouseCoopers, March
2009, p. 6. http://www.conventioncentertaskforce.org/index.shtml.
[24] http://www.portofsandiego.org/component/content/article/219-hilton-san-diego-bayfront-hotel-news/457-hilton-
convention-center-hotel-to-open-in-fall-2008.html

16

Ex 4 p 63

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

committed for five, ten or fifteen years in advance.[25]  This reduces the ability of contractors and
trade shows to move to other convention centers.

**D. Market Power**

32.     The relevant market is trade show cleaning services at the SDCC. Before the imposition
of the cleaning services exclusive, SDCC had 50% or more of the trade show cleaning services
market at the Center.[26]  After the exclusive in 2007, SDCC has had a 100% market share of trade
show cleaning services, based on its exclusive use of SDCC workers for cleaning services in the
Center as well as the cleaning services revenue it has received. Both before and after the
imposition of the exclusive, SDCC has possessed market power, also known as monopoly power,
in the trade show cleaning services market in San Diego. SDCC has the ability to exercise
market power for three reasons. First, SDCC has the power to exclude competitors without the
likelihood that new competitors could enter the market. Second, SDCC has the power to set a
price floor for trade show cleaning services at the center by requiring all outside firms to use
SDCC employees at wages set by SDCC. Third, SDCC has the power to raise price in the
market. Currently, SDCC has control over 100% of the market, since it controls access to the
SDCC and is dictating pricing in the market regardless of the level of involvement that United is
permitted to have.

**IV. SDCC has Engaged in Exclusionary Conduct in the Market.**

33.     SDCC has effectively excluded United and other competitors from the trade show
cleaning services market at the SDCC. The exclusion was accomplished by the use of SDCC's
control over access to the Convention Center. In May 2007 United National was notified that as
of July 1 all trade show cleaning services at the Convention Center would be performed by

---

[25]Affidavit of Mark Epstein, page 3.
[26] According to statements by SDCC and United, SDCC's share of the cleaning market at the convention center was
as high as 60% before July 2007.

17

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

SDCC employees.  In June of 2007 United National was notified that it could work at the
Convention Center, but that it would have to use SDCC employees to fulfill the terms of its
contracts, at a labor rate of $17 per hour.[27]   United's workers are barred from working at the
Center.

34.      While SDCC allows United and others to contract with decorators for the provision of
cleaning services at the Center, it is SDCC's workers who do the work, and SDCC appropriates
all of the revenue that previously was paid to United.  United obtains contracts with Champion
and other decorators that provide services to associations using the San Diego Convention Center
for shows.  Champion is paid a fee for booth cleaning services.  Champion retains approximately
50% of the fee for its services and provides the remaining 50% to United for the booth cleaning.
United performs booth cleaning under its contract for this fixed amount.  For facilities cleaning,
United estimates the number of hours that will be needed for individual exhibitor booth cleaning
on a fully-loaded hourly fee basis. United has produced its billing records and trade show
schedules from July 2007 through August 1, 2009.[28]   The hourly rates in these schedules cover
not only the labor used to perform cleaning but also materials and United's management of the
services.  This is done on a "not-to-exceed" basis.  United does not control how many hours
SDCC bills United for the work done by its employees. When the hours billed by SDCC are
greater than the not-to-exceed amount United has contracted for, United absorbs the additional
cost.  If the actual labor hours are less than what was estimated, United is compensated only for
the actual hours.

---

[27] E.g. UNM011963.
[28] UNM011966-UNM028947.

18

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

**A. SDCC Has Excluded Competition Entirely From the Convention Center.**

35.     SDCC has forced United and other competitors in the market to operate at a loss. United
has continued to fulfill its contracts for trade show cleaning services at SDCC, but it is no longer
competing for new business in San Diego.[29] United attempts to obtain business from decorators
that operate nationwide. In doing so, United attempts to clean as many shows as possible for
each decorator. This means that United may clean for a decorator in San Diego and lose money
by doing so if it helps to keep the nationwide business of that decorator.[30]

36.     SDCC has argued that it is not excluding competition because it has not excluded United
from the center, only United's cleaning staff. This is entirely misleading and inaccurate, in my
opinion. United cannot control the pricing of the services that it would provide in the market,
since SDCC dictates the hourly labor rates and takes all of the booth cleaning revenue that
United formerly received. Further, United's employees are not permitted to work in the SDCC.
The only way that United could "compete" in the center would be processing paperwork and
requests for cleaning services. This is not competition in any meaningful sense, and since SDCC
would control 100% of the pricing in the market and all of the cleaning staff, there is no
competition at all from the point of view of industrial organization economics.

37.     The manner in which SDCC has attempted to exclude competitors in the market for trade
show cleaning services at SDCC's facility is by leveraging its monopoly power in the market for
large convention services in San Diego. Because SDCC has market power in the San Diego
large convention services market, it can require convention exhibitors to use SDCC's cleaning
services exclusively or raise the price without suffering a significant loss of business in its
primary market. SDCC serves very large trade shows that have only a small number of

---

[29] Deposition of Rick Simon, page 31.
[30] Ibid., page 86.

19

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

alternative venues to choose from nationwide. This lack of alternative venues for large trade shows means that the SDCC has a relatively inelastic demand for its services, especially after a trade association has booked a date for ten or more years in advance. Inelastic demand for a product or service such as large trade shows means that if the price of the service rises, consumers of the service (such as general contractors and show organizers) will not tend to look elsewhere for a convention center but will tend to pay the higher price. The inelastic demand experienced by SDCC for trade shows means that if SDCC succeeds in excluding all competition in the trade show cleaning services market, SDCC can raise the price of cleaning services that is ultimately paid by trade show exhibitors without losing business in the large trade show market.

38.      Because of the long-term nature of SDCC's contracts with large convention trade shows, extending ten or fifteen years in some cases, the exclusionary action that SDCC has taken with regard to trade show cleaning services has "locked in" customers who use these services. In economic terms, a lock-in occurs in a situation where a consumer contracts with a seller for goods or services over an extended period of time. For the duration of the contract, the buyer is "locked in" to whatever downstream services are needed. The seller can take advantage of the lock-in to raise the prices of the services that are needed during the term of the contract. The buyer cannot go elsewhere to purchase those services because of the lock-in. In the situation being considered here, SDCC has locked in the consumers of trade show cleaning services for the duration of the ten or fifteen years that some trade shows have contracted.

39.      A number of trade show industry participants have responded to SDCC's exclusionary acts by writing letters to oppose the new policy. Some of these participants state that they try to avoid convention centers that have "exclusives", and some threaten to take their business

20

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

elsewhere.[31]  However, it is a measure of SDCC's market power in large trade shows that none

of these participants has taken any business away from SDCC so far.  And in spite of the implicit

threat by these market participants to oppose SDCC's imposition of an exclusive, SDCC went

ahead with their exclusionary action.  This also indicates how much market power SDCC

possesses.

**B. SDCC Has Attempted to Monopolize the Market by Raising Rivals' Costs.**

40.     SDCC argues that it is still allowing United and others to "compete" in the trade show

cleaning services market at the Center.[32]  While United still fulfills its contracts with decorators

at the Center, SDCC has in reality excluded competition by "raising rivals' costs."[33]  In this

case, SDCC is appropriating all the booth cleaning revenue that would have been received by

United, and "allowing" United to compete in the market only by using SDCC's employees and

by accepting no revenue.  Thus, SDCC has raised the costs of United and other potential

competitors to be greater than revenue.

41.     The raising rivals' costs action taken by SDCC is an example of what Scheffman and

Higgins refer to as "cost-effective" strategies by monopolists. They say: "Some kinds of cost-

raising strategies can obviously be very cost-effective—*e.g.*, actions that lead to governmental

actions that exclude your rivals, or impair their ability to compete with you."[34]

---

[31] For example, Pat Dwyer, Sr. Manager of Trade Show Services for SmithBucklin, states in a letter to SDCC, "...one of the considerations we view as an imposition to our selection [of a venue] is the lack of choice of contractors to meet our highest level of service and accountability...While there are many factors that enter into the decisions to select a future site for our clients, one of the aspects which definitely would weigh in as less desirable is an exclusive service where there is no need to appoint one." June 27, 2007 letter from Pat Dwyer to SDCC.

[32] Deposition of Rick Simon, page 189.

[33] See for example Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.*, Boston: Pearson, Addison-Wesley, 2005, pp. 371-377; Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209 (1986); Steven Salop and David Scheffman, *Raising Rivals' Costs*, 73 American Econ. Rev. Papers and Proceedings 267 (May 1983); David Scheffman and Richard Higgins, *20 Years of Raising Rivals' Costs: History, Assessment, and Future*, Federal Trade Commission, http://www.ftc.gov/be/RRCGMU.pdf.

[34] Scheffman and Higgins, *20 Years of Raising Rivals' Costs,* page 5.

**Ex 4 p 68**

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

**C. The San Diego Convention Center is an Essential Facility for Competitors in the Trade Show Cleaning Services Market.**

42.     Since the relevant market is trade show cleaning services at the SDCC, the Convention Center is an essential facility for firms that supply trade show cleaning services. An essential facility is a resource possessed by one firm that other competitors must have access to in order to compete with that firm. Another name for an essential facility is a bottleneck. An example would be the only railroad bridge over a river for many miles. If the railroad that owns the bridge refuses to deal with competing railroads that need to use the bridge, competition is harmed. The SDCC is an essential facility because it is the only venue for large trade shows in the San Diego area. It would be prohibitively expensive for United to build another 600,000 square foot convention center in order to compete with SDCC. United National and other firms in this market cannot compete in the market unless they have access to the San Diego Convention Center facilities. Control over this essential facility in the market for trade show cleaning services gives SDCC the ability to exclude all of its competitors from the market. SDCC's actions are anticompetitive because it uses control over the essential facility in the market for trade show cleaning services to exclude competitors.

**D. SDCC's Action Is Anticompetitive Because It Constitutes a Tying Arrangement.**

43.     SDCC has market power in the national trade show market. It has used its market power in trade show services as a "tying good" to exclude competition in the local market for trade show cleaning services at SDCC. Forcing the consumer to purchase the tied good results in harm to consumers in that those consumers pay higher prices and those who would have wished

22

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman. Ph.D.*

to purchase trade show cleaning services from a competitor of SDCC are prevented from doing

so. Consumer choice is restricted.[35]

44.      Trade show cleaning services are tied to or bundled with trade shows in that SDCC

requires that those who conduct trade shows at SDCC must also use SDCC employees for

cleaning services and pay SDCC for those services.  SDCC has the ability to force trade show

participants to buy cleaning services from the center because of SDCC's market power in the

trade show market.  If the market for trade shows were very competitive, then it would not be

possible for SDCC to restrict consumers' choice of cleaning services and to raise the price of

those services.  But SDCC has enough market power in the trade show market to be able to tie

cleaning services to the trade show market.  The support for this market power opinion comes

from a number of sources.  Currently, the City of San Diego is studying the possibility of

expanding the convention center.  In connection with this effort, a number of analyses have been

done of SDCC's strength in the market for trade shows.[36]  The report of Heywood Sanders, the

economist retained to study the trade show and convention center market, is dated May 2009.[37]

Mr. Sanders concludes that:

o  Center is operating at or above practical maximum capacity
o  Loss of potential business most frequently due to lack of available dates/space
o  San Diego's hotel supply has continued to expand
o  Competitors are moving forward with enhancements
o  Past and potential customers have expressed interest in an expanded Center
o  Past events have and existing events are at risk of outgrowing the Center
o  There is room night loss from these events outgrowing the Center
o  Center has outperformed many of its competitors and the industry[38]

---

[35] http://www.ftc.gov/bc/antitrust/tying_sale.shtm.
[36] "Draft Mayor's Citizen Task Force on the San Diego Convention Center Project";
http://www.conventioncentertaskforce.org.
[37] "State of the Convention and Trade Show Industry and Convention Center Performance", Heywood Sanders, May
2009; http://www.conventioncentertaskforce.org/MCTF-docs-presentations.shtml.
[38] Draft Mayor's Task Force Report, page 12.

23

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

In these circumstances, SDCC has the ability to engage in an anticompetitive tie because trade

show cleaning services are a small portion of the total cost of a trade show.

45.     Other concurring opinions regarding the strength of SDCC's market position are

provided by PricewaterhouseCoopers, Economic Research Associates and Piper Jaffray

Company.[39] They emphasize the fact that SDCC has operated well above the average capacity

utilization of competing large convention centers. This is a strong sign of high demand for San

Diego's center.

46.     A more analytical approach is provided by the San Diego County Taxpayers Association.

This study concludes that the cost of expanding the convention center could be financed in part

by higher taxes on convention center visitors. These taxes, on airport taxis, hotel rooms,

restaurants, rental cars and tourist attractions, would amount to increases in the total price paid

by convention center visitors. If SDCC did not have market power in the trade show market,

then it would lose trade show business if taxes on convention visitors were raised.   The fact that

the proposed taxes are estimated to produce substantial tax revenue is testimony to the power

that SDCC has to raise price without losing significant business. This is the measure of market

power.

47.     In sum, SDCC has a degree of market power in the national trade show market sufficient

to make it possible to engage in an anticompetitive tying arrangement. This has allowed SDCC

to exclude competitors from the trade show cleaning services market by tying cleaning services

to the use of the convention center.

---

[39] www.conventioncentertaskforce.org.

24

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

**V. The Security Explanation by SDCC for Excluding United Fails the "No Economic Sense Test"**

48.     Actions by firms that tend to exclude their rivals can sometimes have pro-competitive explanations. It is important to examine the possibility of a pro-competitive reason for the exclusionary actions taken by SDCC before concluding that the actions were anti-competitive. The economics literature refers to the "no economic sense" test to examine whether there is any normal business justification other than exclusion for actions such as those by SDCC.[40] I have considered all of the statements by representatives of SDCC and by other participants in the market that were provided to me to examine the issue of a possible pro-competitive reason for the exclusion.

49.     First, I considered the possibility of enhanced efficiency in the market for trade show cleaning services if SDCC employees have an exclusive. My conclusion is that there is no enhanced efficiency justification for the conduct of SDCC. Exclusive cleaning services at the Convention Center will not reduce cost to consumers or provide a higher quality product. This is the only conclusion that can be reached given that:

    1. The letters from contractors and show producers are unanimous in their opposition to an exclusive arrangement.

    2. SDCC has not even attempted to provide an argument that exclusive cleaning services is more efficient. Instead, the change has been explained as a security matter.

50.     Second, I considered whether SDCC was carrying out a general shift in its security policy by restricting all non-SDCC employees from using the center. Economists have no special ability to measure the need for security at a facility such as SDCC. However, an economist can

---

[40] Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

25

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

observe the incentive for the owner of an essential facility such as the SDCC to use a pretext to

exclude its competitors in a market such as trade show cleaning services where the SDCC is a

competitor in the market. The economist can weigh the consistency of the behavior of the SDCC

in applying its security policy against the behavior in which types of non-SDCC employees are

excluded.

51.    I have read the deposition of United CEO Rick Simon. He testified that he contacted

Brad Gessner of SDCC in April 2007 after he learned that the exclusionary policy was being

implemented.[41] Mr. Simon offered to follow the same screening process for employees as that

used by SDCC. Simon reminded Gessner that United also owns a security company and is very

knowledgeable about security matters. He said that he, Simon, was from a law enforcement

background; that United employed a number of former federal agents; and that their security

company had engagements that exceeded the security requirements of SDCC. For example,

United works on the Hyatt Regency security detail when the U.S. President comes to the

Chicago Hyatt. They also worked with the Secret Service when the Pope was in Denver. United

vetted 300 employees for that engagement and the Secret Service did not reject one of them. He

explained that United uses a superior screening device to that used by SDCC—Live Scan

Fingerprint. And he offered to buy a $12,000 machine to fingerprint all of United's employees at

SDCC. But Mr. Gessner was unmoved by any of these facts. He just insisted that SDCC would

use its own cleaning employees.

52.    I have also read the declaration of William Callaghan, President of Century Security and

an expert in convention floor security according to the documents I have seen. Mr. Callaghan

concludes that SDCC's policy of excluding only non-SDCC cleaning employees "makes

---

[41] Deposition of Rick Simon, pages 188-191.

26

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

absolutely no sense."[42]  He finds that the policy makes no sense from a security point of view

because, among other reasons, cleaning employees tend to be lower security risks than other non-

SDCC employees who are not covered by the policy; because cleaning employees are only 5%

or less of the outside employees accessing convention centers; because SDCC does not require

outside employees to wear badges, while United National does require badges; and because

United National has offered to run background checks on its employees, which SDCC has

refused.[43]

53.     I have also read the declaration of Charles Buddy Linn, the Regional Vice President of

United National, who is familiar with the security policies of not only SDCC but other major

convention centers.  He provides more detail on the level of security at SDCC compared to other

centers in his experience.  SDCC does not use a photo ID system for security, and its monitoring

of outside employees accessing the facility is lax.[44]  Further, Mr. Linn provides evidence that

SDCC's claim that United was a security risk because it was using temporary employees is

false.[45]

54.     From my own analysis as well as the evidence provided by Mr. Simon, Mr. Callaghan

and Mr. Linn, I conclude that contrary to the idea of a general shift in security policy, cleaning

services has been singled out for restrictions.  SDCC competes with outside trade show cleaning

services firms such as United.  In contrast, SDCC does not compete directly with many other

service providers who work on trade shows.  Other non-SDCC contract employees have not been

similarly excluded from the center on grounds of security concerns.  Examples of the other

---

[42] William Callaghan Declaration, November 2007, par. 6.
[43] Callaghan Declaration, par. 7, 8, 10, 12; Charles Buddy Linn Declaration, November 2007, par. 4.
[44] Linn Declaration, par. 4, 5.
[45] Linn Declaration, par. 7, 8.

27

**Ex 4 p 74**

**Trial Exhibit 446  Page 29**

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

services performed by non-SDCC workers are: drayage, cartage, furniture, booth and floor
decorations, signs, photographs, telephone services, electricians, plumbers, and carpenters.[46]

55.     SDCC justifies its exclusion of competing cleaning suppliers on the basis of security
concerns at the center. If this justification is a sham, as alleged by United National, then there is
no pro-competitive justification for the exclusionary restrictions by SDCC. The restrictions do
not lower costs; on the contrary, the restrictions result in higher prices in the cleaning services
market. Similarly, the quality of service is not increased; no justification other than the asserted
security concern has been advanced. The restrictions also do not increase consumer choice or
services available; rather, they reduce the choice of services.

56.     SDCC could have used a less restrictive alternative to accomplish their stated goal of
improving security at the convention center. They could have subjected United's employees to
background checks. They could have accepted Rick Simon's offer to provide a fingerprint
scanner. They could have provided enhanced security training or requirements. They could
have worked with United, using United's proven expertise in security technology and security
issues, to ensure that United's employees were no more of a security risk than their own booth
cleaning employees.

57.     According to Mark Epstein of Champion, the employees of United National have been
employed by the company for long periods of time and have had no security problems at the
center. In contrast, employees of some other contractors who work in the convention center are
"a huge security black hole."[47] Yet these contractors have not been targeted in the way that
United National has. In particular, he mentions I&D employees (Installation and Dismantle) as

---

[46] Terms and Conditions, 2006 Exhibitor Application & Contract, Internet Telephony Conference & Expo, item 6;
Linn Declaration, par. 4.
[47] Affidavit of Mark Epstein, page 5.

28

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

being a "transient" work force that "comes and goes", whose workers have never been seen before by the contractors. There is "no screening at all" for these I&D employees.[48]

### VI. Harm to Consumers.

58.     Consumers have been harmed first of all because SDCC is charging higher prices in the trade show cleaning market in connection with its exclusion of all non-SDCC cleaning employees. The terms of the relationship with United National dictated by SDCC in July 2007 represent a price increase for cleaning services. United National previously estimated the hours needed for facilities cleaning at the fully loaded labor rate of $16.35 in order to provide a not-to-exceed amount for services at particular exhibitor spaces. SDCC has raised the hourly rate, not including United National's management and other costs, to $17. Thus, SDCC has raised rates already to the extent that the hours expended are less than the not-to-exceed hours. In addition, when United National's current locked-in contract rates expire, SDCC will be charging more for the same number of hours estimated for purposes of setting a not-to-exceed amount. In addition, SDCC has effectively raised prices for booth cleaning. Mark Epstein testified that Champion's costs have increased because Champion was not previously paying for aisle and carpet cleaning services that United had provided free of charge in conjunction with booth cleaning.[49] Currently, United National is locked into its contracts to provide booth cleaning, even though it passes all of its booth-cleaning revenue on to SDCC. Also, it appears that SDCC is not using supervisors for cleaning jobs where United has the contract and uses its own supervisor. If United is not allowed to compete at the center and ceases to operate there, it seems likely that SDCC will have to use one or more supervisors on contracts that were previously handled by United. The charges for these supervisors will constitute another increase in price.

---

[48] Deposition of Mark Epstein, page 88.
[49] Deposition of Mark Epstein, page 100.

29

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

59.     Harm to the competitive process is demonstrated by, among other things, the statements

by market participants. Because of the exercise of monopoly power by the SDCC, there is no

longer any competition on the merits for exhibit cleaning services.

Letters expressing the displeasure of the trade show industry with the actions of SDCC include:

1. Joint Statement of the Society of Independent Show Organizers, the International Association for Exhibition Management, and the Major American Trade Show Organizers.
2. Richard Simon, President of United Service Companies.
3. Joe Loggia, Chief Executive of Advanstar Communications.
4. Patricia Dwyer, Senior Manager of Convention and Trade Show Services, SmithBucklin Corporation.
5. Barbara Myers, Conferences and Meeting Services Director, APCO International
6. B.J. Enright, President, Trade Show Logistics.
7. Ken McAvoy, Senior Vice President, Reed Exhibitions.
8. Mary Kay Sustek, Senior Vice President, Neilson Business Media.
9. Martin Cymbal, President, Trade Show Contractors Association of Southern California.
10. Ty F. Bobit, President, Bobit Business Media.
11. Mary Beth Rebedeau, Executive Director, Society of Independent Show Organizers.

60.     Letters from trade show participants are clear in stating the harm they see in SDCC's

policy:

- Pat Dwyer of SmithBucklin states: "By taking the decision our of our hands to select this very important -- and visible service -- you could be taking away our ability to negotiate competitive pricing models for our client, as well as the relationship to a valuable member of our service level team environment."[50]
- Mary Kay Sustek of Nielson Business Media states: "While I believe we have used the SDCC cleaning services over the past years, it was by choice. Imposing an exclusive of any type isn't in the best interest of Nielsen or its customers. Nielsen manages its shows based on the specific needs and requirements of customers and having this flexibility is a key ingredient to a successful show. . . . In our experience, exclusive services ultimately become more expensive and less service oriented as it takes the competitive nature out of the business."[51]
- Ty Bobit of Bobit Business Media states: "Please know that the imposition of an exclusive service will be in contradiction to the wishes of your customers and it typically reduces service levels and takes competitive pricing options away. We

---

[50] Letter from Pat Dwyer to SDCC, June 27, 2007.
[51] Letter from Mary Kay Sustek to SDCC, June 22, 2007.

30

**Ex 4 p 77**

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

have found over the years that the show manager's ability to choose a contractor and control price helps . . . provide better service at competitive prices."[52]

- Mary Beth Rebedeau of the Society of Independent Show Organizers states: "While we understand the need for facility managers to generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors of their choice. This is particularly true for large shows whose complexities demand carefully selected and integrated vendor partners who have a thorough understanding of each show's special needs. This includes cleaning services . . . . Show organizers spend years cultivating relationships and advantageous pricing with their chosen suppliers. In-house exclusives arbitrarily increase costs to show organizers -- and therefore exhibitors -- while decreasing the quality of the service provided due to lack of competition."[53]

- B.J. Enright of Tradeshowlogistics states: "[O]ur clients would love to have the San Diego Convention Center competitively bid for the opportunity to be the official cleaning contractor. However, an exclusive situation does not promote competition and service."[54]

- John Mooney of SISO wrote: "Our opposition to exclusives is based on the historical fact that competition among suppliers provides the best service at the lowest cost. Exclusives have the reverse effect."[55]

- Michael Muldoon, of the Convention Management Group, wrote to say "Please know that food and beverage events, like the shows we manage, have extraordinary cleaning requirements. Our relationship with United Services Companies has been extremely important to the production of these events. We have not been as successful working in facilities that require the hiring of "exclusive contractors" and we avoid "exclusive shops."[56]

61.    The conclusion I have reached from, among other things, my experience as an economist as well as the statements from market participants quoted here is that SDCC's exclusion of competition in trade show cleaning services at the convention center, if it continues, will produce higher prices and a lower quality of service. The experiences cited by Nielson Business Services, Bobit Business Media, the Society of Independent Show Organizers and the Convention Management Group all support this conclusion. The experiences of these organizations provide a natural experiment that, while insufficient by themselves to provide a

---

[52] June 14, 2007 letter from Ty Bobit to SDCC.
[53] July 20, 2007 letter from Mary Beth Rebedeau to SDCC.
[54] July 26, 2007 letter from B.J.Enright to SDCC.
[55] March 31, 2000 letter from John Mooney to Carol Wallace.
[56] March 13, 2000 letter from Michael Muldoon to Carol Wallace.

Ex 4 p 78

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

definitive prediction for SDCC, nevertheless points toward harm for consumers as a result of
SDCC's exclusion.

**VII. Conclusion**

62.     For all of the reasons stated above, I believe that the actions of SDCC in excluding
competition in the market for trade show cleaning services in the convention center are highly
anti-competitive.  Based on the documents I have examined, I also believe that there is no pro-
competitive justification for the SDCC's actions.  My opinions have been formed based on the
documents that I have seen.  If more information becomes available, I reserve the right to amend
these opinions in the light of additional discovery.

John S. Hekman, Ph.D.        September 30, 2009

32

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

## John S. Hekman

550 South Hope Street
Suite 2150
Los Angeles, California 90071
Tel. (424) 204-8872
Fax (213) 243-3710
E-mail: jhekman@lecg.com

### EDUCATION

Ph.D., Economics, University of Chicago
M.B.A., Finance, University of Chicago
BA, History, Valparaiso University

### EMPLOYMENT

Principal, LECG, LLC, 2004-present.

Lecturer, MBA program, University of Southern California, 1989-present. Department of
Finance and Business Economics.

Past Positions:

Principal, Economic Analysis LLC, 2000-03.

Principal, LECG, LLC, 1998-2000.

Director, Altschuler, Melvoin and Glasser LLP, 1996-98.

Vice President (1993-96), Senior Economist (1992), Economic Analysis Corporation.

Senior Economist, Micronomics, Inc., 1990-92.

Executive Vice President and Director of U.S. Economic Forecasting, Claremont Economics
Institute, 1986-90.  Editor, *The Main Street Journal* Investment letter.

Associate Professor of Finance, University of North Carolina, Chapel Hill 1981-86,
(academic tenure granted, 1985).

Visiting Scholar, Federal Reserve Bank of Atlanta, 1981-84.

Economist, Federal Reserve Bank of Boston, 1980.

Research Associate, Harvard-MIT Joint Center For Urban Studies, 1978.

Assistant Professor of Economics, Boston College, 1975-81.

Ex 4 p 80

Trial Exhibit 446  Page 35

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

Instructor, University of Chicago, 1974-75.

## RECENT ENGAGEMENTS

*Official Committee of Unsecured Creditors v. Credit Suisse, Cayman Islands, et al.* Retained by J. Thomas Beckett of Parsons Behle & Latimer regarding the bankruptcy of the Yellowstone Mountain Club, April 2009.

*Morton v. Morton.* California Superior Court for the County of Los Angeles. Retained by Thomas Nolan of Skadden, Arps, Meagher & Flom, November 2008 regarding the value of a large land parcel in Las Vegas, March 2009.

*Gartner, Inc. v. Parikh, et al.* United States District Court for the Central District of California. Retained by Thomas Mackey of Jackson Lewis, August 2008.

*Auerbach Acquisition Associates v. Greg Daily et al.* California Superior Court for the County of Los Angeles. Retained by Pierce O'Donnell of O'Donnell and Associates, April 2008.

*Stephen Shoemaker v. Daniels, Fine, Israel, Schonbuch & Lebovits.* California Superior Court for the County of Los Angeles. Retained by Sandra Block of Robie & Mattai, February, 2008.

Retained by Fremont Investment and Loan in connection with the sub-prime mortgage crisis, January 2008.

*Catherine Blaylock, et al. v. First American Title Insurance Company.* United States District Court, Western District of Washington. Retained by Stephen Rummage of Davis Wright Tremaine, November 2007.

*Janice Howland v. First American Title Insurance.* United States District Court, Northern District of Illinois, Eastern Division. Retained by Douglas Mansfield of Jones, Day, November 2007.

*United National Maintenance Inc. v. San Diego Convention Center Corp.* California Superior Court, County of San Diego. Retained by Jeffrey Leon of Ungaretti & Harris, LLP, October, 2007.

*Julius Chang and Howard Chen v. Charles Schwab & Company,* California Superior Court, County of San Francisco. Retained by Daniel Newland of Seyfarth Shaw LLP, October, 2007.

*Eric Saiken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San Diego. Retained by Kevin Quinn of Thorsnes Bartolatta McGuire, September, 2007.

**Ex 4 p 81**

**Trial Exhibit 446  Page 36**

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et al,* California Superior Court, County of San Mateo. Retained by Joel Wolosky of Hodgson Russ, March 2007.

*James Ripley v. Wyoming Medical Center et al.* United States District Court for the District of Wyoming. Retained by Stephen Kline of Kline Law Office PC, January 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District of California. Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman, November 2006.

*Caruso Affiliated Holdings v. General Growth Properties, Inc.* California Superior Court for the County of Los Angeles. Retained by Henry Shields of Irell & Manella, September 2006.

*Breakdown Services Ltd. v. Now Casting, Inc.* California Superior Court, County of Los Angeles. Retained by Stephen P. Krakowsky, September 2006.

*RitterRanch Development LLC, debtor. Los Angeles County Waterworks District No. 40 v. Robbin Itkin et al.,* United States District Court Central District of California. Retained by Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller, May 2006.

*Pamela Cunningham and Reet Caldwell v. Mattel, Inc.* Circuit Court, Third Judicial Circuit, Madison County, Illinois. Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges, October 2004.

**TESTIMONY**

*Ricardo Alfonso Leon, et al. v. Jose Francisco Leon, et al.* California Superior Court for the County of Los Angeles. Retained by Paul Workman of Holland and Knight. Deposition August 2009.

*Official Committee of Unsecured Creditors v. Credit Suisse, Cayman Islands Branch, et al.* United States Bankruptcy Court for the District of Montana. Retained by J.Thomas Beckett of Parsons, Behle & Latimer. Deposition April 2009; trial testimony May 2009.

*Morton v. Morton.* California Superior Court for the County of Los Angeles. Retained by Thomas Nolan of Skadden, Arps, Meagher & Flom. Deposition March 2009.

*Bullock v. Philip Morris, Inc.* California Superior Court for the County of Los Angeles. Retained by Robert McCarter of Arnold & Porter. Deposition March 2009.

*Gartner, Inc. v. Parikh, et al.* United States District Court for the Central District of California. Retained by Thomas Mackey of Jackson Lewis, August 2008. Deposition October, 2008.

Ex 4 p 82

Trial Exhibit 446  Page 37

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*Beth Robbins v. Essex Management Corp., et al.* California Superior Court for the County of Los Angeles. Retained by Jeremy Dwork of Daley & Heft. Deposition September, 2008.

*Catherine Blaylock, et al. v. First American Title Insurance Company.* United States District Court, Western District of Washington. Retained by Stephen Rummage of Davis Wright Tremaine. Declaration filed January, 2008.

*Janice Howland v. First American Title Insurance.* United States District Court, Northern District of Illinois, Eastern Division. Retained by Douglas Mansfield of Jones, Day. Declaration filed January, 2008.

*United National Maintenance Inc. v. San Diego Convention Center Corp.* California Superior Court, County of San Diego. Retained by Jeffrey Leon of Ungaretti & Harris, LLP. Testimony filed December 2007.

*Julius Chang and Howard Chen v. Charles Schwab & Company,* California Superior Court, County of San Francisco. Retained by Daniel Newland of Seyfarth Shaw LLP. Deposition October, 2007.

*Eric Seiken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San Diego. Retained by Kevin Quinn of Thorsnes Bartolatta McGuire. Class Certification Declaration submitted September, 2007; deposition November 2007.

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et al,* California Superior Court, County of San Mateo. Retained by Joel Wolosky of Hodgson Russ. Deposition April 2007.

*Dwight W. Crawford. v. Debra S. Katz, et al.,* Superior Court for the District of Columbia. Retained by Glenn M. Young of the Young Law Firm. Deposition April 2007.

*James Ripley v. Wyoming Medical Center et al.* United States District Court for the District of Wyoming. Retained by Stephen Kline of Kline Law Office PC. Deposition April 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District of California. Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman. Deposition February 2007.

*Breakdown Services Ltd. v. Now Casting, Inc.* California Superior Court, County of Los Angeles. Retained by Stephen P. Krakowsky. Deposition October 2006.

*RitterRanch Development LLC, debtor. Los Angeles County Waterworks District No. 40 v. Robbin Itkin et al.,* United States District Court Central District of California. Retained by Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller. Deposition June 2006.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*Pamela Cunningham and Reet Caldwell v. Mattel, Inc.* Circuit Court, Third Judicial Circuit, Madison County, Illinois. Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges. Deposition February 2005.

*In re Cioffi,* California Superior Court, County of Santa Clara. Retained by William Russell of Lakin, Spears. Deposition and trial testimony January 2004.

*Ederel Sport, Inc. v. Gotcha International, L.P.* U.S. Bankruptcy Court, Central District of California. Retained by Michael Adele of Albert, Weiland & Golden. Deposition and trial testimony May 2003.

*In Re Fuqua Industries Shareholder Litigation,* Delaware Chancery Court Civil Action No. 11974. Retained by Lowell Sachnoff of Sachnoff & Weaver. Deposition March 2003.

*SPC/PomomaLLC v. Medianews Group, Inc.* Superior Court of California, County of Los Angeles. Retained by Steven Gardner of Cohon and Gardner. Deposition February 2003; trial testimony April 2003.

*MGM v. Midway Games, Inc.* U. S. District Court, Central District of California, Western Division. Retained by John Williams of Lord, Bissell & Brook. Report submitted October 2002.

*Freeman Industries LLC v. Eastman Chemical Company, et al.,* In the Law Court for Sullivan County at Kingsport, Tennessee. Retained by Aton Arbisser of Kaye Scholer. Class Certification Affidavit submitted September 2002.

*Keep v. State of California,* Superior Court of California, County of Los Angeles. Retained by Vladimir Shalkovich, Deputy Attorney General. Deposition October 2002.

*IMAX, LTD. v. Krikorian Premiere Theatres,* U.S. District Court for the Central District of California. Retained by Glenn Dassoff of Paul, Hastings, Janofsky & Walker. Deposition September 2002.

*Betty Bullock v. Phillip Morris, Inc. et al.;* California Superior Court, Los Angeles. Retained by Thomas Stoever of Arnold & Porter on behalf of defendant. Deposition May 2002.

*International Paper and Masonite v. Affiltated FM Insurance Co, et al.;* California Superior Court, San Francisco. Retained by Adam Murray of Howrey, Simon, Arnold & White. Deposition May 2001; trial testimony November 2001.

*Copley Press, et al. v. Gray Davis, et al; Tony Strickland, et al. v. Gray Davis, et al.;* California Superior Court, San Diego County; retained by Timothy Muscat, Deputy Attorney General. Declaration in Support of Defendant's Opposition Brief submitted May 2001.

*Fitzgerald v. Silcott, et al.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Deposition January 2000; trial October 2001.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit I to Report of John S. Hekman*

*Formal Complaint of Tesoro Alaska Petroleum Against Amerada Hess, et al.,* Federal Energy Regulatory Commission and Regulatory Commission of Alaska. Retained by John Donovan of Skadden, Arps, Slate Meagher & Flom. Testimony submitted November 2000.

*Alavi v. Kaiser Foundation Hospitals.* Retained by Walter Weiss. Arbitration testimony November 2000.

*Segurltan v. State of California, et al.* Los Angeles County Superior Court. Retained by Anne Hunter, Deputy Attorney General. Deposition July 2000.

*Lenehan v. Maryland Casualty.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Deposition May 2000.

*Hearing on Green Coke Pricing Issue for TAPS Quality Bank.* Federal Energy Regulatory Commission. Retained by John Donovan of Skadden, Arps, Slate, Meagher & Flom. Testimony May 2000.

*Tash v. Aviara Land Associates, L.P., et al.* San Diego Superior Court. Retained by Jerry Phillips of Richman, Mann, Chizever, Phillips & Duboff. Deposition April 2000; Trial testimony May 2000.

*First Pension Corp/Murray v. Belka.* California Superior Court, County of Orange. Retained by William Meeske of Latham & Watkins. Deposition February 2000.

*Rhonda Jalali v. Assembly of God, Teen Challenge et al.* California Superior Court. Retained by George Buehler of Howrey & Simon. Deposition and trial testimony July 1999.

*Alfred Martino, Jr. v. Northbrook Property and Casualty Company and St. Paul Fire and Marine Insurance Company,* Arbitration. Retained by Law Offices of J. Jeffrey Long. Testimony June 1999.

*Hugo Valdivia v. MCE Corporation, et al.,* California Superior Court for the County of Los Angeles. Retained by Andrew Jacobs of the Law Offices of Andrew Hoffman (CNA Insurance). Deposition November 1997; trial January 1998.

*Louisville Bedding Company v. Pillowtex Corporation,* United States District Court for the Western District of Kentucky. Retained by Hartwell Morse of Welsh & Katz. Deposition November, December 1997.

*Infant and Nutritional Products, et al. v. BJ Family Food Center, et al,* California Superior Court for the County of Los Angeles. Retained by Farhad Novian of Novian & Novian. Deposition September 1997.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*William Gene Norman v. Herbalife International, et al.,* California Superior Court for the
County of Los Angeles. Retained by Ward Benshoof of McClintock Weston Benshoof
Rochefort Rubalcava MacCuish. Deposition April 1997.

*Jeffrey Alpert v. Gerald Busch, et al,* California Superior Court for the county of Los
Angeles. Retained by Law Offices of Daniel Hoffman (CNA Insurance). Trial testimony
November 1997.

*Janelle Flores v. Dapo Popoola, MD, et al.,* California Superior Court for the County of Los
Angeles. Retained by Henry Tovmassian of Kehr, Crook, Tovmassian & Fox. Deposition
September 1997.

*Ridgecrest Homeowners Association v. Nihon Lancre America, Inc., et al.,* California
Superior Court for the County of Los Angeles. Retained by Ronald Caswell of Richmond,
Lawrence, Mann, Greene, Chizever, Friedman & Phillips. Deposition June 1997.

*Harvey W. Stuart, et al. v. Kraft Foods, Inc. et al.,* United States District Court for the
Eastern District of Wisconsin. Retained by Michael Freed of Much Shelist Freed Denenberg
Ament Bell & Rubenstein. Affidavit November 1996; deposition and court testimony
December 1996.

*Albert and Estelle Binder, et al. v. Thomas Gillespie, et al.,* United States District Court for
the District of Idaho. Retained by Robert Bretz of Robert H. Bretz, PC. Affidavit December
1996.

*Ernst Paul Lehmann Patentwerk v. San-Val Discount, Inc.,* United States District Court,
Central District of California. Retained by Douglas Adler of Skadden, Arps, Slate, Meagher
& Flom. Affidavit submitted March 1996.

*JAR-PR Associates v. Unocal,* Superior Court of the State of California, County of Los
Angeles. Retained by George Crook of Kehr, Crook, Tovmassian & Fox. Deposition and
trial testimony, March 1996.

*Sarkis v. State of California,* California Superior Court, County of Kern. Retained by Deputy
Attorney General Daniel Helfat. Deposition, January 1996.

*Casper Boso v. Chicago Bears.* Retained by Steven Wolf of Wolf & Ouimet to testify
regarding the average career length of NFL players. Arbitration testimony November 1994.

*Styling Research Company v. Conair Corporation,* Superior Court of the State of California,
County of Los Angeles. Retained by Phillip Belleville of Latham & Watkins. Deposition
August 1992.

*Medical Designs, Inc. v. Donjoy, Inc.,* United States District Court, Southern District of
California. Retained by Paul C. Van Slyke of Pravel, Gambrell, Hewitt, Kimball & Krieger.
Deposition October 1991.

Ex 4 p 86

Trial Exhibit 446  Page 41

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*California Grocers Association v. Bank of America*, Superior Court of the State of California for the County of Alameda, Northern District. Retained by Arne Wagner of Bank of America. Deposition May 1991.

## CONSULTANT

*Simpson Thatcher & Bartlett, New York, NY, Kenneth Logan;* Ronald Cleveland, et al. v. Viacom, Blockbuster, et al. *United States District Court for the Western District of Texas, 2002.*

In Re Maguire Thomas Partners – Grand Place Tower, Ltd. *United States Bankruptcy Court, Central District of California. Retained by Bennett Silverman of Gibson, Dunn & Crutcher on behalf of Sumitomo Bank, 1999.*

Howrey & Simon, Washington, DC, Thomas Heyer; *Litton Systems, Inc. v. Honeywell, Inc.,* 1995-1996.

Thelen, Marrin, Johnson & Bridges, San Francisco, Steven V. O'Neal; *IBM v. Fasco Industries,* 1994-1995.

*Packard Bell Electronics, Inc. v. Teledyne Industries, Inc.*, Superior Court of the State of California, County of Los Angeles. Retained by Ronald M. St. Marie of Ervin, Cohen & Jessup. August 1995.

O'Melveny & Myers, Los Angeles, Charles Diamond, Randy Oppenheimer; *Exxon Valdez Oil Spill Litigation,* 1993-1994; 2000; 2002.

## PUBLICATIONS

"California Under Siege: A Call for Perspective" (with Ken Agid, et al.), California Real Estate Roundtable, April 1991.

"Should We Reform Deposit Insurance?" *Los Angeles Times,* March 11, 1990, D3.

"New England's Economy in the 1980s" (with Lynn Browne), in *The Massachusetts Miracle,* David R. Lampe (ed.), The MIT Press: Cambridge, MA, 1988.

"Real Estate Returns and Inflation" (with David Hartzell and Mike Miles), *American Real Estate and Urban Economics Association Journal (AREUEA)*, Spring 1987.

"Factors Affecting Manufacturing Location in North Carolina," in Dale Whittington (ed.), *High Hopes for High Tech: Microelectronics in North Carolina,* University of North Carolina Press, 1987.

**Ex 4 p 87**

Trial Exhibit 446  Page 42

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

"Diversification Categories in Investment Real Estate" (with David Hartzell and Mike Miles), *AREUEA Journal*, Summer 1986.

*Land Supply Monitoring: A Guide for Improving Public and Private Urban Development Decisions* (with D. Godshalk, S. Bollens, and M. Miles), Oelgeschlager, Gunn & Hain: Boston, 1985.

"Rental Price Adjustment and Investment in the Office Construction Market," *AREUEA Journal*, Spring 1985.

"Branch Plant Location and the Product Cycle in Computer Manufacturing," *Journal of Economics and Business*, May 1985.

"Venture Capital and Economic Development in the Southeast" (with Mike Miles), *Economic Review*, Federal Reserve Bank of Atlanta, July 1983.

"Optimal Allocation of Economic Development Funds" (with Mike Miles, et al.), N.C. Department of Natural Resources and Community Development, January 1983.

"What are Businesses Looking for? A Survey of Industrial Firms in the South," *Economic Review*, Federal Reserve Bank of Atlanta, June 1982.

"Behind the Sunbelt's Growth:  Industrial Decentralization" (with Alan Smith), *Economic Review*, Federal Reserve Bank of Atlanta, March 1982.

"Impact of Environmental Regulations on Industrial Development in North Carolina" (with Raymond Burby, et al.), North Carolina Department of Natural Resources and Community Development, February 1982.

"The Evolution of New England Industry" (with John Strong), *New England Economic Review*, March-April 1981.

"New England's Economy in the 1980s" (with Lynn Browne), *New England Economic Review*, January-February 1981.

"Income, Labor Supply and Urban Residence," *American Economic Review*, September 1980.

"Is there a Case for Plant Closing Laws?" (with John Strong), *New England Economic Review*, July-August 1980.

"The Product Cycle and New England Textiles," *Quarterly Journal of Economics*, June 1980.

"Can New England Hold Onto its High Technology Industry?" *New England Economic Review*, April 1980.

**Ex 4 p 88**

**Trial Exhibit 446  Page 43**

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

"Regions Don't Grow Old, Products Do," *The New York Times*, Sunday Business, November 4, 1979.

"What Attracts Industry to New England?" *New England Economic Indicators*, December 1978.

"An Analysis of the Changing Location of Iron and Steel Production in the Twentieth Century," *American Economic Review*, March 1978.

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

Exhibit 2

List of Materials Reviewed

1. Complaint for Injunctive Relief and Damages
2. Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction
3. Defendants Objections to Evidence Submitted by Plaintiff in Support of Plaintiff's Ex Parte Application for a Temporary Restraining Order
4. Letter from Aaron Bludworth to Brad Gessner, September 21, 2007.
5. Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order
6. Memorandum of Points and Authorities in Support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order.
7. Plaintiff's Ex Parte Application for a Temporary Restraining Order.
8. Proposed Temporary Restraining Order
9. Proposed Temporary Restraining Order and Order to Show Cause re Preliminary Injunction
10. Request for Judicial Notice in support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order
11. Declaration of Carole Wallace in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
12. Declaration of Dessi Nintcheva in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
13. Declaration of Thomas Robbins in Support of Plaintiff's Application for a Temporary Restraining Order
14. Declaration of Jason Kirby in Support of Plaintiff's Application for a Temporary Restraining Order
15. Declaration of Charles Buddy Linn in Support of Plaintiff's Application for a Temporary Restraining Order

1

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

16. Declaration of Larry Colby in Support of Plaintiff's Application for a Temporary Restraining Order

17. Declaration of Mark Epstein in Support of Plaintiff's Application for a Temporary Restraining Order

18. Declaration of Mark Epstein, October 26, 2007

19. Declaration of Richard Simon in Support of Plaintiff's Application for a Temporary Restraining Order

20. San Diego Convention Center Corporation Cleaning Services Contract with United Service Companies 2007

21. UNM v. San Diego Convention Center Pleadings List

22. San Diego Convention Center 2006 Annual Report

23. San Diego Convention Center Corporation, Convention and Trade Show License Agreement

24. July 26, 2007 Letter from Richard Simon to Jerry Sanders

25. July 5, 2007 Letter from Joe Loggia to Brad Gessner

26. June 27, 2007 Letter from Pat Dwyer to Brad Gessner

27. June 18, 2007 Letter from Barbara Myers to Brad Gessner

28. July 26, 2007 Letter from B.J. Enright to Brad Gessner

29. June 14, 2007 Letter from Ken McAvoy to Brad Gessner

30. June 22, 2007 Letter from Mary Kay Sustek to Brad Gessner

31. June 8, 2007 Letter from Martin Cymbal to Brad Gessner

32. June 14, 2007 Letter from Ty Bobit to Brad Gessner

33. SISO, IAEM, AND MATSO ISSUE JOINT INDUSTRY STATEMENT ON EXCLUSIVE SERVICES

34. July 20, 2007 Letter from Mary Beth Rebedeau to Brad Gessner

35. June 20, 2000 Letter from Joe Psulk to Marty Cymbal

36. May 12, 2000 Letter from Beatrice Kemp to Mark Valley

37. March 31, 2000 Letter from John Mooney to Carole Wallace

38. March 13, 2000 Letter from Michael Muldoon to Carole Wallace

39. March 8, 2000 Letter from Brian Casey to Carole Wallace

40. March 7, 2000 Letter from Mary Beth Rebedeau to Carole Wallace

2

Ex 4 p 91

Trial Exhibit 446  Page 46

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

41. March 2, 2000 Letter from James Bracken to Carole Wallace

42. March 1, 2000 Letter from Stephen Shuldenfrei to Carole Wallace

43. June 20, 1990 Letter from Hugh Mac Lean to Tom Liegler

44. June 13, 1990 Letter from Richard Simon to the San Diego Convention Center
    Board of Directors

45. May 11, 1990 Letter from Hugh Mac Lean to John Hartley

46. U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section
    1.1, http://www.ftc.gov/bc/docs/horizmer.htm.

47. http://www.portofsandiego.org/projects/hiltonhotel/

48. Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.*,
    Boston: Pearson, Addison-Wesley, 2005.

49. Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising
    Rivals' Costs to Achieve Power Over Price*, 96 Yale L.J. 209 (1986)

50. Steven Salop and David Scheffman, *Raising Rivals' Costs*, 73 American
    Economic Review Papers and Proceedings 267 (May 1983)

51. David Scheffman and Richard Higgins, *20 Years of Raising Rivals' Costs:
    History, Assessment, and Future*, Federal Trade Commission,
    *http://www.ftc.gov/be/RRCGMU.pdf*

52. Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No
    Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

53. Terms and Conditions, 2006 Exhibitor Application & Contract, Internet
    Telephony Conference & Expo, item 6.

54. Declaration of Charles Buddy Linn, November 2007.

55. Declaration of William Callaghan, November 2007.

56. Deposition of Charles Linn, with exhibits.

57. Deposition of Richard Simon, with exhibits.

58. Deposition of Gabriel Ramirez, with exhibits.

59. Deposition of Raymond Santos, with exhibits.

60. Deposition of Mark Epstein, with exhibits.

61. Draft Mayor's Citizen Task Force on the San Diego Convention Center Project;
    http://www.conventioncentertaskforce.org/

3

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

62. July 31, 2009 letter from John L'Estrange Jr. to Jake Slania.

63. United's Response to Defendant's First Set of Interrogatories.

64. Defendant's Amended Objections and Responses to First Set of Requests for Production of Documents.

65. Defendant's Objections and Responses to Amended First Set of Interrogatories.

66. United's four-page list of Contracts and Billing Information for SDCC Shows July 1, 2007 through August 1, 2009.

67. UNM008682-UNM 011963.

68. Declaration of Brad Gessner in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

69. Declaration of Carol Wallace in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

70. Declaration of T.M. Mazzocco in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

71. Declaration of Sotera L. Anderson in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

72. Defendant's Evidentiary Objections to Evidence Submitted by Plaintiff in Support of Plaintiff's Motion for Preliminary Injunction.

73. Request for Judicial Notice in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction.

74. San Diego Convention Center Articles of Incorporation

75. Public Improvement and Assessment Proceedings: Article 1: San Diego Tourism Marketing District.

76. City of San Diego Rules Implementing the Living Wage Ordinance

77. Memorandum of Points and Authorities in Support of Defendant's Demurrer to Plaintiff's Complaint

4

# EXHIBIT 5

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

Case No. 37-2007-00072054-CU-BT-CTL

REBUTTAL REPORT

of

John S. Hekman Ph.D.

In the Matter of

*United National Maintenance, Inc.*

*v.*

*San Diego Convention Center Corporation, Inc.*

November 12, 2009



EXHIBIT

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

1.      My name is John Hekman.  On September 30, 2009 I submitted a report in this matter.  I
have been asked by counsel for United National Maintenance Inc. to respond to the expert
reports of John Hayes and Thomas Lambert that were submitted on October 21, 2009.

**The Hayes Report**

My comments on the report of John Hayes are organized by reference to the paragraph numbers
of his report.

*Hayes 18 to 24 (Tying and Bundling are different; bundling of convention center services is*
*common)*

2.      Dr. Hayes says bundling and tying are commonplace and rarely harm competition.  This
is because most bundling and tying is the harmless variety such as shoes and shoelaces, or cars
and tires.  Because many consumer products have multiple parts and features, we can label all of
these products with multiple features "bundling" or "tying".  For example, automobiles have
radios, carpeting, windshield wipers, and countless other separable parts that could conceptually
be labeled part of a "bundle." Since these are the types of examples that Dr. Hayes refers to when
he says that bundling and tying are "common", I assume that this is what he means.  That in no
way means that there are not anti-competitive tying arrangements in situations where consumers
may wish to purchase products or services separately.  So I reject the "everybody does it"
explanation as being in any way relevant to the SDCC policy being considered here.

3.      · Dr. Hayes points out that bundling and tying are different economic concepts in that
bundling "refers to selling two or more products together for a single price", while tying is

1

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

selling one product "in conjunction with another." However, he himself confuses these concepts
in his footnote 22: "shoelaces and shoes" as well as "cars and tires" are examples of bundling,
not tying. My analysis identified SDCC's policy as tying in that SDCC ties trade show services
(the tying good) and trade show cleaning services (the tied good). SDCC may have priced some
of their services as a bundle, where the cost of cleaning services was not separately stated, but I
am not aware of any such instance. As a general matter and for the situation as it has been
explained in the depositions that I have read, the SDCC policy is a case of tying.

4.       I strongly disagree with Dr. Hayes' attempt to label the SDCC policy as "bundling" as
opposed to tying. He states (par. 21): "exclusive provider arrangements are economically
equivalent to pure bundling when the tied good is always purchased in conjunction with the tying
good." I take this to mean that he is saying that everyone who conducts a trade show at SDCC
uses cleaning services, so these two services are like shoes and shoelaces. If Hayes can bridge
this gap, making SDCC's policy one of bundling, not tying, then it follows that he can use all of
the justifications for bundling that can be found in the economics literature.

5.       However, SDCC's policy is not bundling. For cleaning and exhibiting to be a bundle,
two elements must be present, at a minimum. One is that the quantity of trade show cleaning
services must be in fixed proportions to the quantity of exhibitor services. In the case of buying
shoes, the laces are not separately priced because everyone needs exactly two shoelaces with a
pair of shoes. But in the convention center, everyone does not use the exact same amount of
cleaning services. That is why cleaning services are not "bundled" into the price of trade show

2

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

services. Cleaning services are separately calculated and then added to the cost of other services being purchased.[1]

6.      The second element that must be present for cleaning and exhibiting to be a bundle is that every consumer must purchase the bundle. If some consumers purchase trade show exhibitor services while choosing not to purchase cleaning services, then it is not a bundle. And in fact, some of the exhibitors at SDCC trade shows do choose not to purchase some cleaning services.[2] Not all exhibitors purchase booth cleaning services. United works the floor of conventions to convince exhibitors who have not signed up for booth cleaning that they should purchase it.

7.      In sum, the SDCC policy does not pass Dr. Hayes' shoes-and-shoelaces, cars-and-tires test. The characterization of exclusive provider arrangements at convention centers as equivalent to "pure bundling" is wrong. Because SDCC is not "bundling", the discussion of the benign effects of bundling that follows is largely irrelevant.

*Hayes 23 to 25 (A number of other convention centers tie cleaning services and trade show services)*

8.      The fact that some other convention centers tie cleaning services and trade show services is irrelevant to the issue in this case. The provision of cleaning services by some convention centers is properly seen as a form of vertical integration, that is, of a firm producing a service (trade show services) that also produces one or more of the inputs used in the service (cleaning services). Other convention centers that do not provide exclusive cleaning services are less vertically integrated. The element that is important in the present case is that until 2007 there

---

[1] See for example the deposition of Charles Linn, page 39; deposition of Gabriel Ramirez, page 47; page 133-136; deposition of Raymond Santos, pages 17-21;
[2] See, for example, the deposition of Raymond Santos, page 147.

3

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

was a functioning market for trade show cleaning services at SDCC. The exclusion of

competitors from this market was anti-competitive and harmful to consumers.

*Hayes 26 to 28 (Bundling is often efficient)*

9.   SDCC's policy is not bundling, so the arguments for the possible efficiency of bundling

do not apply. Hayes says that bundling can eliminate the inefficiency of double margins. This

point is wrong because the double margin problem applies to situations where two

complementary products are supplied by separate firms and both have market power. The

present case is different because in 2007 SDCC supplied both cleaning services as well as trade

show services. The double margin problem would not occur, because if United exercised market

power and raised the price of cleaning services, SDCC could supply those services itself.

10.   In paragraphs 27 and 28, Dr. Hayes says that there can be efficiencies associated with

SDCC's tying policy. He does not provide any analysis or data to back this up in SDCC's case,

but he suggests that SDCC's security justification for the exclusive policy could provide

efficiencies. Also, he points out that I have not done a cost-benefit study to back up my

statements about whether security was the reason for the change in policy. I stated clearly in my

report that I was not providing an opinion about security per se, but rather I was pointing out that

the security argument lacked credibility because United had higher security standards than

SDCC and had offered to address any deficiency that SDCC could name.

*Hayes 30 to 33 (No viable economic theory of harm)*

11.   Dr. Hayes argues that when the tying good (the SDCC) and the tied good (trade show

cleaning) are consumed in fixed proportions, a monopolist over the tying good has an incentive

to support competition in the market for the tied good. As already noted, trade show cleaning

4

services are not used in fixed proportions to trade show services, so this theoretical argument does not apply. The article cited by Hayes to support his argument relates to fixed proportions. He also refers to a theoretical result that occurs if some consumers purchase the tied good without also purchasing the tying good. In this case, that would mean purchasing trade show cleaning services without purchasing the services of the convention center. This makes no sense at all.

12.     In concluding this discussion, Dr. Hayes reaches the opinion that no viable economic theory of harm has been offered. Apparently he reaches this conclusion because he cannot think of any theories of harm other than the ones he has mentioned. But he has dismissed the possibility of harm by interpreting the situation narrowly in terms of theories that refer to goods consumed in fixed proportions. This theory does not apply here, because this is not a fixed proportions situation. Therefore, Dr. Hayes' opinion that there is no viable economic theory of harm is unfounded.

*Hayes 34 to 43 (Nationwide market for trade shows)*

13.     Dr. Hayes agrees with my position regarding market power as a necessary element for SDCC to be able to tie trade show cleaning services to trade show services. However, he says the threshold question is whether SDCC possesses "substantial" market power in the national trade show market. This is incorrect. Market power means the power to influence price. The power to influence price can vary from the maximum achievable by a monopolist (the only seller in a market) all the way down to zero pricing power (in so-called atomistic competition).

14.     The question for the SDCC policy being considered here is whether SDCC has a sufficient amount of pricing power in the trade show market that it can exclude competitors from

5

the trade show cleaning market and raise price in that market. The amount by which price can be raised in the show cleaning market is the "small but significant and non-transitory" price increase (SNIP) that is the test used in the FTC/DOJ Antitrust Guidelines that I referred to in my report and that Dr. Hayes refers to in his report. This is because raising the price of cleaning services will raise the total price paid at SDCC by consumers of trade show services. If SDCC has enough pricing power to raise that total price by raising the price of cleaning services, then consumer harm will result.

15.    The SNIP test normally refers to the ability to raise and maintain price 5% or more. So the question becomes, how much pricing power in the trade show market does it take to have an anticompetitive effect in the trade show cleaning services market? The answer is, not much. According to the figures reported by Dr. Hayes, trade show cleaning services accounts for no more than 5.1% of the total cost of trade show services at SDCC.[3] A 5% increase in the price of trade show cleaning services represents an increase in the total price of trade show services (including the cleaning services) of only 0.3% (three-tenths of one percent). SDCC needs very little pricing power to be able to raise price by three-tenths of one percent. As a result, it is my opinion that Dr. Hayes is incorrect when he states that the issue is whether SDCC "possesses substantial market power."

16.    In discussing the nature of the national market for trade shows in which SDCC competes, Dr. Hayes says that I am wrong to emphasize the size of SDCC as a major factor in its market competitiveness. He presents SDCC data that he reads to say that only 6 shows used the whole center, and only 9 shows (3.6% of the total number of shows) used 75% of the center in FY 2009. Using the number of shows rather than show revenues or the percent of space rented on an

---

[3] Hayes Report, paragraph 25.

*United Notional Maintenance Inc. v. Son Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

annual basis is misleading in this regard. For example, the 9 shows that he references that each

used 75% or more of the center cannot overlap; if each of these shows used two weeks at the

SDCC, including show time, set-up and break-down, then they would use 18 weeks of the year.

This is 35% of the year in which SDCC has shows that are too big for most convention centers.

Whether or not the 35% figure that I present as a rough estimate is correct, it is clear that the

percent of the time that SDCC is tied up with a large show is much more than the 3.6% provided

by Dr. Hayes.

17.     The market analysis undertaken by ERA for the Convention Center Task Force shows

how misleading the figures used by Dr. Hayes are. He uses a total of 248 "events" at SDCC in

2009. ERA has a figure of 249 for 2009, so they agree fairly well.[4] However, 153 of the 249 are

labeled "Meetings, community events, food & Bev." Since SDCC has 118,700 square feet of

"meeting room" space in addition to its 615,700 square feet of exhibit space, it is misleading to

be comparing the number of meetings with the number of conventions. ERA reports 72

"National/State Conventions and Trade Shows" and "Corporate Conventions" as "Primary

Events", while the 153 meetings and community events are labeled "secondary events."

18.     In sum, I disagree with the attempt by Dr. Hayes to characterize SDCC as having only a

few large conventions and to have mostly smaller shows that compete with smaller convention

centers. It makes no sense to argue as he does that "SDCC competes with much smaller facilities

for the vast majority of the events that it hosts."[5] If that were the case, why would the City of

San Diego be contemplating an expansion of the SDCC in order to increase its capacity to host

---

[4] ERA presentation, Convention Center Task Force, Table 5.
[5] Hayes Report, paragraph 37.

7

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

large trade shows?  The task force reports speak of the loss of potential business due to lack of available space and of events that already have or will in the future outgrow the available space.[6]

19.    Dr. Hayes' own discussion of the market refutes his conclusion that SDCC mainly competes with much smaller facilities.  In paragraph 38 he quotes the ERA report's conclusion that 21 convention centers represent "the predominant competitive markets" for SDCC.  These 21 centers are the large centers throughout the U.S., not the "much smaller" centers referenced by Dr. Hayes.  In paragraph 39 Dr. Hayes quotes SDCC's Carol Wallace saying that SDCC competes with convention centers in 13 U.S. cities.

20.    Most significantly with regard to the position of SDCC in the convention and trade show market, the presentation to the convention center task force by board chairman Chris Cramer and CEO Carol Wallace is in my opinion totally at variance with the analysis presented by Dr. Hayes.[7]  For example, they say:

Chris Cramer remarks

> Over the last 20 years, the corporation has established a proven track record: Maximizing the building's economic potential attracting many of the nation's most lucrative conventions

> We are fortunate to have a customer base, largely driven by medical association meetings, that continues to have a strong economic performance and a necessity to continue to host their annual meetings.

Carol Wallace remarks

> [referring to an exhibit with four quadrants to illustrate different types of uses of the center]

> Our primary goal is to attract events that generate significant economic impact for the city of San Diego

---

[6] PricewaterhouseCoopers report, Jennifer Sutherland, March 2009, page 6.
[7] Presentation by Chris Cramer and Carol Wallace, Convention Center Task Force, February 2009.

8

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

The Center specifically targets high-end events to maximize economic impact for the city and produce significant revenues for the Center. Good examples are medical shows which attract attendees who have more disposable income, are likely to bring their families and come for the convention and extend their stay into a vacation. These events also have large budgets, host many off site events and have the need for ancillary services which generate substantial revenue for the facility.

In the upper left hand quadrant, are events that are good for the city, but don't necessarily generate revenues for the facility. These events provide positive media exposure for the city and economic benefits. Examples are high profile political conventions or offshoot events surrounding events like the Superbowl.

In the two lower quadrants are events that don't generate significant economic benefits for the city. On the left, these include conventions, tradeshows and events, with smaller budgets -- so they don't generate money for the facility either. And, they typically don't attract attendees who stay as many nights. If they do, they usually don't spend much money.

The lower right quadrant represents consumer shows and local events. While these events may attract a large number of local attendees, they don't attract overnight visitors.

These remarks by Chris Cramer and Carol Wallace directly contradict Dr. Hayes' description of the market served by SDCC. It is clear that the primary market in which they see SDCC competing is for larger national conventions.

*Hayes 44 to 49 (Market share and market power)*

21.     After arguing that SDCC competes with many smaller convention centers, Dr. Hayes then estimates SDCC's market share by using the 20 convention centers that are larger than SDCC. This results in an estimated market share for SDCC of 3% to 5%. His conclusion from this market share estimate is that "SDCC does not possess market power in the nationwide market for hosting trade shows."[8] As I pointed out above, in order to have an anticompetitive effect on the market for trade show cleaning services, SDCC only needs to be able to raise price by three-tenths of one percent. A market share of 3% to 5%, in addition to all of the other

---

[8] Hayes Report, paragraph 49.

9

Ex 5 p 103

Trial Exhibit 447  Page 10

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

indicators of market power that are contained in the analyses done for the Convention Center

Task Force, provide sufficient market power to be able to have this anticompetitive effect.

*Hayes 50 to 53 (Exercise of market power)*

22.     Dr. Hayes misreads a statement in my report to say that the small share of trade show

cleaning services in the total cost of a trade show constitutes a reason why SDCC has market

power in the trade show market.[9] This is not what I said.  I discussed the sources of SDCC's

market power in the trade show market, and then I said: "In these circumstances, SDCC has the

ability to engage in an anticompetitive tie because trade show cleaning services are a small

portion of the total cost of a trade show."[10] In other words, SDCC has sufficient market power to

engage in a tie, considering that trade show cleaning is a small share of trade show cost.  Dr.

Hayes read the word "because" to mean "as a result of" when what I meant by "because" was

"considering that."

23.     In paragraph 53, Dr. Hayes addresses my point that SDCC is capacity-constrained and is

seeking to expand its space so that it can accommodate more trade shows.  I interpret this fact to

mean that there is strong demand for trade shows at SDCC, and it supports my opinion that

SDCC has a degree of market power.  Dr. Hayes states that "Firms with market power seek to

*reduce* output in order to *increase* prices." This interpretation of SDCC's situation is incorrect.

As a matter of economic theory, a firm with market power will produce a lower level of output

than the competitive level of output, and will charge a higher price.  However, that does not

mean that a firm with market power never wishes to increase its output.  In the case of SDCC,

we have a convention facility that has insufficient capacity because of the dynamics of the

---

[9] Hayes Report, paragraphs 51-52.
[10] Report of John S. Hekman, September 30, 2009, paragraph 44.

10

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekmon Ph.D.*

market since the time the facility was built. With reference to the economic theory of imperfect competition, it would be correct to say that there is an optimal size for the SDCC such that it could provide an output and price that satisfy the conditions of profit maximization where marginal revenue equals marginal cost. Dr. Hayes' conclusion is incorrect because he did not include the capacity constraint.

*Hayes 54 to 58 (tax increases and market power)*

24.    Dr. Hayes disagrees with my opinion that the contemplated taxes on taxis, hotel rooms, and restaurants indicate that SDCC has market power. He provides an example that is designed to show that higher tax revenues can be experienced even when there is a loss of business at SDCC. He concludes that for this reason, higher tax revenues are not an indicator of strong demand or market power. His analysis is incorrect, because he is assuming a completely different situation than that which exists in San Diego. The purpose of the proposed expansion of SDCC is to accommodate the lost business that is now being turned away. If the expansion occurs, there will be an increase in business at SDCC, not a decrease as assumed in Dr. Hayes' example. The tax analysis that I was referring to projects both an increase in convention business, in hotel rooms booked, in taxi rides and in restaurant meals purchased, as well as an increase in tax receipts. With both higher output of conventions as well as higher taxes on services, the total price paid by consumers for the conventions will rise. It is this increase in price in the market that I was referring to as an indicator of market power for SDCC.

25.    Dr. Hayes also quotes the ERA report from the convention task force to say that consumers are very sensitive to hotel rates and that "the cost of hosting an event in San Diego (for hotel rooms and convention hall space rental) is considered to be prohibitively high by a

11

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

number of respondents."[11]  Based on this and similar quotes, Dr. Hayes concludes that "SDCC would lose business if hotel and other taxes were increased." This is directly contrary to the assumptions of the sources from which he has taken his quotes. The convention task force concluded that an expansion of the SDCC is called for because of lost business at present, and the analysis of paying for part of the expansion with taxes on hotels and other services does not say that there would be less business as a result. Rather, the projections are for higher levels of business in spite of the taxes that increase the cost for users of the center.

*Hayes 59 (essential facility)*

26.     Dr. Hayes objects to the opinion that SDCC is an essential facility for the trade show cleaning market. His reason for this objection is his earlier opinion that no viable economic theory of harm has been offered. I refuted that opinion above. Therefore, my opinion that SDCC is an essential facility remains.

*Hayes 60 to 61 (lock in)*

27.     Booking of trade shows years in advance provides additional market power to SDCC in its tying policy with regard to cleaning services. Dr. Hayes does not disagree that advance booking provides a measure of market power. However, he does attempt to minimize the length of time for the advance booking. He says that only "a handful" of conventions are booked more than ten years in advance, and that 71% of "customers" book less than five years in advance. In my opinion, these details from SDCC do not change my opinion that advance booking provides additional market power. First of all, the number of events that are booked more than ten years in advance may be, and likely are, the largest and most important events for SDCC's

---

[11] Quoted in Hayes Report, paragraph 57.

12

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

profitability. As pointed out previously, the larger conventions may be few in number but large

in importance. Second, the counting of events here confuses once again what SDCC refers to as

"primary" convention events with the more numerous "meetings" and other "secondary" events.

Dr. Hayes' opinion is contradicted by the statements of Carol Wallace and Chris Cramer for the

convention task force:

> This facility serves as the foundation for our visitor industry. Unlike the downturn
> we are seeing in leisure travel, the events hosted in the Convention Center are
> usually booked 3-5 years out minimizing the impact of the economic cycles on the
> performance.[12]

The fact that advance booking of conventions "minimizes the impact of the economic cycles on

the performance" is a statement that advance booking locks in events and the associated revenue.

This makes my point.

*Hayes 62 to 68 (trade show cleaning services market definition)*

28.    Dr. Hayes' first objection to the product market definition for trade show cleaning

services is that the market is defined to be "large convention centers" but the definition of a large

center is not quantified. My definition of large centers is meant to be consistent with the large

convention centers with which SDCC sees itself competing. The reports to the convention center

task force are clear in identifying the relevant large centers. Dr. Hayes wants to include smaller

centers, saying that many of the events that occur at SDCC could be housed at smaller centers.

This opinion is contradicted by the facts. No instance has been provided by Dr. Hayes of an

event that chose a small center over SDCC. He is relying exclusively on the square footage of

SDCC and the space used by small events. Also, as mentioned before, it is misleading to

conflate the meetings and other secondary events with the large primary conventions.

---

[12] Presentation by Chris Cramer and Carol Wallace, Convention Center Task Force, February 2009, page 3.

13

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

29.     The second objection to my product market definition is that United National

Maintenance does in fact take cleaning jobs in smaller hotel venues in San Diego. However, this

fact does not mean that the smaller hotel spaces are in the same trade show cleaning services

market as the SDCC. The testimony of the market participants that I cited in my report is that

the cleaning function is not the same at SDCC as compared to small venues, because of the

planning and supervision that goes into shows at SDCC. Also, Gabriel Ramirez explained that

the scale of operation is not at all comparable between SDCC and hotels in the San Diego area

where United sometimes does show cleaning. A hotel operation uses one or two people, while

large shows at SDCC use a substantially higher number of employees, sometimes in excess of

fifty.

30.     The reason for having this debate over which venues should be included in the market

definition is that it affects the estimated size of the market. If smaller venues are included, then

the question becomes whether the additional cleaning firms that operate in those smaller venues

should be counted as competitors of SDCC and United in the defined trade show cleaning

services market. What is implied by Dr. Hayes' argument that United does do cleaning at

smaller venues is that the other cleaning firms that work there should be included in the market.

But the testimony that I have read has not identified a single instance in which a small local

cleaning firm has had a contract at SDCC for a large trade show. In my opinion, the facts clearly

show that the market should be defined as trade show cleaning services at the SDCC.

31.     Dr. Hayes objects to my geographic market definition. He believes that it should be

greater than the San Diego metropolitan area. He agrees with me that "knowledge and skill at

the supervisory level" is the key to explaining why United is different from standard cleaning

firms. However, he argues that this supervisory skill could be imported from more distant

14

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

locations such as Los Angeles, Phoenix or Las Vegas and combined with labor from San Diego

to form a firm that could compete in the market at the SDCC. In my opinion this is an

incomplete hypothetical. To illustrate, assume there is a firm A in Phoenix that does trade show

cleaning services and has a supervisor with the same skills and experience as Gabriel Ramirez.

Then for each contract that firm A obtains to work at SDCC, A's supervisor must commute to

San Diego, recruit and train a cleaning team, and remain in San Diego for the duration of the

trade show. This would make firm A's costs higher than those for United or SDCC. I do not see

how firm A could compete with firms that are located in San Diego. Alternatively, if Dr. Hayes'

hypothetical assumes that firm A's supervisor takes up residence in San Diego in order to work

on shows at SDCC, then we are just dealing with a new firm entering the market in San Diego,

and the geographic market is still defined as the San Diego metropolitan area. In either version

of this hypothetical, I disagree that it changes my definition of the geographic market.

*Hayes 69 to 73 (SDCC has not raised its hourly rates for trade show cleaning since 2007)*

32.     Dr. Hayes argues that since SDCC instituted its exclusive policy in 2007 it has not raised

its labor rates for trade show cleaning. In my opinion this has no relevance for whether the

exclusion of competitors was an anticompetitive act. Since the exclusion was immediately

challenged and litigated, it is not surprising that SDCC has not made any move to raise its rates.

The significant point is that if SDCC is successful in excluding competition, it will have the

ability to raise rates without losing business to a competitor in the trade show cleaning market.

33.     Dr. Hayes disagrees with my statement that SDCC "has effectively raised prices for

booth cleaning."[13] My reason for this statement was the testimony of Mark Epstein, who

explained that SDCC was charging for some aisle and carpet cleaning that United had not

---

[13] Hayes Report, paragraph 79.

charged for. Dr. Hayes references the deposition of Charles Linn, where he was asked about another element of cleaning that United for which United billed charges but that SDCC did not. However, Mr. Linn said that he did not know if United was being paid for those charges.[14]

34.     In paragraph 77, Dr. Hayes asserts that SDCC billed a smaller total amount than did United for the 51 shows analyzed in Dr. Kennedy's economic damages report. This assertion is incorrect. SDCC did not bill for the same services as United. Therefore, this is comparing apples to oranges. United's billing includes the hours of laborers as well as supervisors. SDCC bills only for laborer hours. This is the reason that the total billing on United's shows, in which United provides supervisors but must use SDCC labor, is greater than SDCC's billing for those same shows. When United's supervisory charges are subtracted from its total billing, the resulting laborer charges are less than those of SDCC.[15] As a result, Dr. Hayes is incorrect in his conclusion.

35.     In paragraph 81, Dr. Hayes asserts that in the shows considered by Dr. Kennedy that took place between July 2007 and August 2009, United charged a higher average labor rate than SDCC. This is not relevant to the issue of increased price in my report. As of July 2007, SDCC was charging $17 per hour for its cleaning labor, while United was charging less than $16.30 to Champion and $16.74 to GES.[16] United's 2001 contract with GES, renewed in 2006, provided for a maximum 3% increase in labor rates per year. The 2005 Champion contract called for a fixed labor rate that could be adjusted if minimum wage rates in California were increased. After being fixed for five years, the California minimum wage increased 11.1% on January 1, 2007.

---

[14] Deposition of Charles Linn, page 243.
[15] Exhibit G, Report of Patrick Kennedy.
[16] Hayes Report, Exhibits 16 and 18.

16

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

36.    After SDCC eliminated United's employees from working at SDCC in 2007, United

initiated the litigation that is the subject of this report. The rate that SDCC charges to United has

to be considered in the light of the litigation. It is not in SDCC's economic interest to raise labor

rates for cleaning services while the litigation is pending, because raising rates would be an

indicator of market or monopoly power. However, the fact is that before the litigation was

initiated, SDCC was charging more for cleaning labor than United was charging. The

replacement of United's labor with that of SDCC therefore constituted a price increase.

37. ·    In paragraph 82, Dr. Hayes disagrees with my opinion that there would be an increase in

cleaning service charges if United's supervisory labor were to be replaced by that of SDCC. He

says that it is his "understanding" that SDCC does not charge a fee for supervisory labor. What I

do not see in Dr. Hayes' discussion of this issue is a direct statement that if SDCC were to have

incurred over 1,000 hours of supervisor labor as United did on the show s that were considered

by Dr. Kennedy, that SDCC would not have charged for any of this time. What can be said

without any speculation is that for the cleaning labor (excluding supervisors) that is billed by

both SDCC and United, SDCC billed a greater amount, and this represents an increase in price to

the consumer. To the extent that United absorbed these increases itself, the consumer of trade

show cleaning services has not so far had to pay these increases. However, to the extent that

United's losses have been shared by the purchasers of the cleaning services, there has been an

increase.

**The Lambert Report**

My comments regarding the Lambert Report are organized with reference to the Lambert

Report's page numbers.

17

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

*Lambert Report, page 18*

38.    Mr. Lambert asserts that my opinion regarding the higher prices charged by SDCC as a result of its exclusionary cleaning services policy is contradicted by the testimony of Richard Simon.[17] Mr. Simon said that Champion refused to alter United's contract to allow United to pass along the increased cost from SDCC. Mr. Simon's testimony does not contradict my conclusion regarding price increases. First of all, by quoting this testimony Mr. Lambert is agreeing that SDCC charged more than United in the cases referred to, which constitutes a price increase. For the most part, United has paid these price increases itself. But to the extent that decorators have shared the burden of the higher prices for some shows, the price increases have been passed along to the decorators. Second, the current situation in which SDCC loses money due to the price increases is temporary. In the long run it is likely that if SDCC prevails in its attempt to monopolize the cleaning services market at SDCC, either United will increase its rates to cover its losses or United will no longer contract to clean at SDCC if it cannot use its own employees to do so.

39.    Mr. Lambert also says that for the same reason cited above, i.e. that United did not pass along most of the price increase from SDCC, that as a result my opinion contradicts that of Dr. Kennedy.[18] This is incorrect. Dr. Kennedy has offset his damages calculations by the amounts of SDCC's price increases that were paid by decorators. Therefore, in my opinion it is still the case that SDCC did raise prices, and Dr. Kennedy has calculated damages in an appropriate way.

*Lambert Report, page 19*

---

[17] Lambert Report, page 18.
[18] Lambert Report, page 19.

18

Ex 5 p 112

Trial Exhibit 447  Page 19

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

40.     I stated in my report that United sometimes brings in workers from other cities at

considerable cost rather than hiring local cleaning workers. Mr. Lambert says this has not been

accounted for in Dr. Kennedy's damages calculations.[19] I was reporting what had been testified

to by United's employees.[20] This did not refer to any specific show that was the basis for Dr.

Kennedy's damages calculations.

41.     Mr. Lambert disagrees with my statement that "SDCC appropriates all of the revenue that

previously was paid to United."[21] SDCC takes the 50% of the booth-cleaning revenue that

previously went to United. For facilities cleaning, United bills the decorator for supervisory and

labor hours estimated in advance of a show. SDCC bills United for the labor hours worked by

SDCC employees. Overall, SDCC has billed more for labor hours than United has billed or been

paid. When SDCC's billing is less than United's billing for both labor and supervisory hours,

then United receives some net revenue.

*Lambert Report pages 20-21*

42.     Mr. Lambert states that "the documents and testimony are entirely consistent that

SDCCC supervisors <u>always</u> supervise SDCCC cleaning worker employees and that SDCCC

<u>never</u> charges UNM for the supervisor labor hours."[22] Because SDCC earns income at the center

not only from trade show cleaning services but also from numerous other services and receives

income from the rental of the center, the fact that SDCC does not specifically charge United for

certain supervisor hours does not mean that SDCC is not receiving income for those supervisors'

work from some other revenue source.

---

[19] Lambert Report, page 19.
[20] Deposition of Charles Linn, page 85.
[21] Lambert Report, page 19.
[22] Lambert Report, page 21.

19

Ex 5 p 113

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

43.     Mr. Lambert disagrees with my statement that "SDCC has forced United and other competitors in the market to operate at a loss."[23] He states: "As reflected in Exhibit D, UNM's documents produced indicate that UNM has been profitable on all shows since June 2008."[24] It is not correct that United has been profitable on all shows since SDCC's exclusive policy was instituted. I do not know why Mr. Lambert refers to shows starting with the arbitrary date of June 2008. But his assumption of profitability fails to take account of United's cost of supervisory labor and of United's overhead costs.

_____

John S. Hekman, Ph.D.                    Los Angeles, CA November 12, 2009

_____

[23] Lambert Report, page 20.
[24] Lambert Report, page 20.

20

# EXHIBIT 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

       Plaintiff,

vs.                              No. 07-CV-2172 BEN (JMA)

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,

       Defendant.            **ORIGINAL**

---

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order


DEPOSITION OF JOHN S. HEKMAN, PH.D.

San Diego, California

Thursday, December 10, 2009

Volume 1


Reported by:
MARGARET A. SMITH, RPR, CRR
CSR No. 9733

Job No. 125915

```
 1                 UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   UNITED NATIONAL MAINTENANCE, INC.,
     a Nevada corporation,
 5
                      Plaintiff,
 6
     vs.                            No. 07-CV-2172 BEN (JMA)
 7
     SAN DIEGO CONVENTION CENTER
 8   CORPORATION, INC., a California
     corporation,
 9
                      Defendant.
10

11

12   ─────────────────────────────────────────

13

14

15        DEPOSITION OF JOHN S. HEKMAN, PH.D., taken on

16   behalf of the Defendant, at 401 West A Street,

17   Suite 2250, San Diego, California, beginning at

18   9:28 a.m. and ending at 2:33 p.m. on Thursday,

19   December 10, 2009, before Margaret A. Smith, Certified

20   Shorthand Reporter, No. 9733.

21

22

23

24

25
```

Ex 6 p 116

2

```
 1    APPEARANCES:

 2    For Plaintiff United National Maintenance, Inc.,
      a Nevada corporation:
 3
           KIRBY NOONAN LANCE & HOGE LLP
 4         BY:  JACOB SLANIA, ESQUIRE
           350 Tenth Avenue, Suite 1300
 5         San Diego, California  92101-8702
           (619) 231-8666
 6
      For Defendant San Diego Convention Center
 7    Corporation, Inc., a California corporation:

 8         WRIGHT & L'ESTRANGE
           BY:  JOHN H. L'ESTRANGE, JR., ESQUIRE
 9         401 West A Street, Suite 2250
           San Diego, California  92101
10         (619) 231-4811

11    Also Present:

12         Deanna Johnson

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          INDEX

2    WITNESS                                    EXAMINATION

3    JOHN S. HEKMAN, PH.D.
     VOLUME 1

4              BY MR. L'ESTRANGE                        5

5

6                         EXHIBITS

7    DEFENDANT'S                                      PAGE

8    503   Document entitled "Notice of Deposition of      6
           John S. Hekman"

9

     504   Documents described as collection of          138
10         billing statements from LECG, LLC

11   505   Copy of handwritten notes by Dr. Hekman       143

12   506   Document entitled "Complaint for Injunctive   144
           Relief and Damages (Violation of Cartwright
13         Act); Interference with Prospective
           Economic Advantage; Violation of Unfair
14         Practices Act"

15   507   Document entitled "Declaration of Dr. John    153
           S. Hekman" dated November 13, 2007
16

     508   Document entitled "Response to Defendant's    155
17         Opposition to Motion for Preliminary
           Injunction"

18

19

20        (Previously marked Exhibits 193, 375, 433, 446
          and 447 were referenced within this transcript.)

21

22

23

24

25

4

1       San Diego, California; Thursday, December 10, 2009;

2                    9:28 a.m. - 2:33 p.m.

3

4                    JOHN S. HEKMAN, PH.D.

5    having been administered an oath, was examined and

6    testified as follows:

7

8                         EXAMINATION

9    BY MR. L'ESTRANGE:

10       Q     Please state and spell your full name.

11       A     John S. Hekman, H-e-k-m-a-n.

12       Q     Where do you reside?

13       A     In Pasadena, California.

14       Q     What is your current business affiliation?

15       A     LECG.

16       Q     What is your role in that company?

17       A     My title is principal.

18       Q     What does that mean?  Are you an owner?

19       A     It's a title.  It's a title taken by most of

20    the experts in the firm, but it doesn't have any further

21    meaning.  The firm is public, and so there is no issue

22    of partnership or that sort of thing.  So it's -- I

23    really couldn't tell you any more about what the title

24    means.

25       Q     Do you own shares in LECG?

5

```
 1        A    A few.

 2        Q    You understand that you're being called here

 3   today as an expert witness?

 4        A    Yes.

 5        Q    Did you receive a copy of the notice of

 6   deposition?

 7        A    I did.

 8        Q    Did you review it?

 9        A    I did.

10        Q    Did you produce all the documents in your

11   custody or control that are responsive --

12        A    I did.

13        Q    -- as requested?

14        A    I believe I did.

15             MR. L'ESTRANGE:  Let me mark as Exhibit 503 a

16   copy of the Notice of Deposition.

17             (Deposition Exhibit 503 marked.)

18             MR. SLANIA:  Thank you.

19             MR. L'ESTRANGE:  Uh-huh.

20   BY MR. L'ESTRANGE:

21        Q    I would invite your attention to the bottom of

22   the first page.  The first category of documents

23   requested is your current CV.

24             Did you bring that with you today?

25        A    I did.
```

6

1    Q    Is that CV that you brought with you today any

2    different from the one that was included in your report

3    that was filed in the United National Maintenance case?

4    A    It's possible that it is.  It might have been

5    updated by one -- probably one testimony since -- since

6    the time I filed the report.

7    Q    Did you bring with you each report prepared by

8    you, or at your direction, with respect to the UNM

9    versus San Diego Convention Center case?

10   A    Yes, I did.

11   Q    We have seen one report that was issued in

12   approximately September of 2009 and then a rebuttal

13   report.  Are there any other reports that you have

14   besides those two?

15   A    I have a declaration that I prepared in 2007,

16   and a two-page additional declaration that I don't

17   recall exactly when that fit in, but also I think in

18   late 2007.

19   Q    That was a rebuttal declaration in the federal

20   action?

21   A    I think so.

22   Q    Have you prepared any other reports besides the

23   four items you've just identified?

24   A    No.  I -- I don't believe it's a report, but I

25   prepared a couple of pages of questions for Dr. Hayes.

7

1    And I brought those also.

2         Q    Is that in the file that you provided this

3    morning?

4         A    Yes.

5         Q    The third item is the entire contents of your

6    file with respect to the incident case, including all

7    documents received from UNM, UNM's counsel, or any of

8    UNM's representatives; and all documents which the

9    deponent has compiled independent of UNM and/or UNM's

10   counsel.

11        Did you bring with you today all things

12   responsive to that request?

13        A    I did.

14        Q    Are there any documents that are in your file

15   in this case which have been destroyed or shredded?

16        A    No.

17        Q    What is the document retention policy at LECG

18   concerning work papers for expert engagements, if there

19   is a policy?

20        A    I'm not familiar with the -- with the company's

21   policy.  I'm sure they have one.

22        It's been my policy over the last 15 years or

23   so not to retain testimony or reports in cases that have

24   been concluded.

25        Q    Between the time of an engagement in a case

JOHN S. HEKMAN, PH.D.                          12/10/09

1   until the case is concluded, you do retain all papers

2   generated in connection with the engagement?

3        A    Yes.

4        Q    So in the case of this engagement as expert

5   witness for United National Maintenance, following your

6   normal policy, you would have retained all the papers

7   you generated.  Is that right?

8        A    That's correct.

9        Q    And you have brought with you today paper

10  printouts of all your computer files as well, except the

11  items on the zip drive, which are copies of documents

12  you received from UNM, and, of course, Counsel?

13       A    I don't think that's accurate.  I printed out

14  certain things from the file that I anticipated you

15  might want to go through here in hard copy.  And I can

16  tell you what those categories are.

17            What I didn't print out was, in particular, all

18  of the case filings, depositions, declarations that were

19  provided to me electronically.  And I just, you know,

20  used those electronically.

21       Q    So we have two categories of responsive

22  documents:  One category are items in electronic form on

23  the device you brought with you today which consist of

24  mainly depositions, court papers, and things of that

25  nature.

9

1              That's one category of documents you brought.

2    Is that right?

3        A     No.   It's the entire file.   So it also includes

4    what is here in hard copy.   It's just everything that

5    was in the file.

6        Q     Okay.   And what did you print out from the

7    entire file that you produced in paper form?

8        A     Number one, I printed out all of my reports.

9              Number two, I printed out email correspondence

10   from the case.

11             Number three, I printed out invoices that have

12   been provided to the client.

13             I also have a couple of pages of handwritten

14   notes.

15             And I don't recall any other categories of

16   things that I printed out.   I'd have to look through the

17   file to see if there's anything else.

18       Q     But regardless of what you decided to print

19   out, on the thumb drive you brought, everything in your

20   file is recorded in electronic form?

21       A     Correct.

22       Q     Is that something that you're going to leave

23   with us or give us the ability to copy it?

24       A     I can give you the flash drive.

25       Q     Okay.

                                                              10

1              No. 4 is, "All correspondence which was

2      prepared, signed, sent, received, drafted, or delivered

3      to the deponent, or any other person which refers or

4      relates to the deponent's engagement as an expert in

5      this action."

6              Did you bring all such documents in your file?

7      A      Yes.

8      Q      Would that include an engagement letter?

9      A      I didn't see an engagement letter when I went

10     through my -- it's either on the electronic drive or

11     else I didn't have it.

12             I don't always receive them.  They go to the

13     head office, and then this was a little bit confusing

14     because of the engagement two years ago with a different

15     law firm.  I'm not sure there was a new engagement

16     agreement with the present firm.

17             So I -- I don't -- and I know I didn't print it

18     out.  So I don't -- I don't -- I don't know where the

19     engagement letter is.

20     Q      When you refer to engagement with another law

21     firm, you're referring to the law firm of Ungaretti &

22     Harris?

23     A      Yes.

24     Q      Are all the papers that you generated in

25     connection with that engagement on the thumb drive that

11

1    you have produced today?

2        A    Yes.

3        Q    Have you communicated from time to time with

4    lawyers for United National Maintenance by way of email?

5        A    In the last three months, yes.

6        Q    Have you printed copies of those emails as part

7    of the files that you produced in paper form today?

8        A    Yes.

9        Q    No. 5 is "The deponent's time records and

10   billing invoices which refer or relate to the amount of

11   time spent regarding the deponent's engagement as an

12   expert in the instant action."

13            Did you bring all such responsive documents?

14       A    Yes.

15       Q    How do you keep your time as a normal practice

16   at LECG?  Is it on a computer or in paper form?  Please

17   explain to me how you record your time.

18       A    I provide it to an administrative person with

19   LECG, who puts it into the billing system that the

20   company has.  So I don't have my billing records.  They

21   go into the company's system, and then bills are

22   generated at the end of the month.

23       Q    Is the time that you provide to the

24   administrator in paper form or electronic form?

25       A    I send her an email each week summarizing my

12

1    hours on whatever cases I worked on.

2        Q    Is it your normal practice to record time each

3    day as you put in the time on a particular project?

4        A    Yes.

5        Q    Were there any other persons at LECG who worked

6    on this engagement?

7        A    There were in 2007.  As far as this year, I

8    don't believe anyone else did work on it.

9        Q    Who else worked on it in 2007?

10       A    Kevin Green, who is -- who was a principal at

11   the firm.  And I'm not sure if we had any research

12   assistance as far as producing charts and tables or

13   anything.

14            I -- I could tell from the billing records, but

15   I know that Kevin Green had some time on the case.

16       Q    Did Mr. Green maintain any files for this

17   engagement?

18       A    No, he didn't.

19       Q    Did you check with him to confirm that?

20       A    He's no longer with the firm, but I -- I recall

21   that the way it worked was that I was working on the

22   case and I consulted with him a few times on it and he

23   didn't have any files.

24       Q    You were the responsible principal at LECG for

25   this engagement?

13

1        A     Yes.

2        Q     And Mr. Green essentially worked under -- under

3   you?

4        A     No.  The relationship was that Dr. Green had

5   worked a number of times with Jeff Leon of Ungaretti &

6   Harris.  And so he received the call, looking for an

7   antitrust expert for this case.

8              He brought me into it.  And since Mr. Leon had

9   worked with Kevin a number of times, he wanted to keep

10  Kevin in the loop and discussing it in the early days of

11  the case.  So that was why Kevin was part of it.

12       Q     He was the relationship principal, if you will?

13       A     That sounds right.

14       Q     The next item is any -- well, let me back up a

15  bit.

16             Do you have any time records for Kevin Green

17  that are among the documents produced today?

18       A     Just the -- there is a detail of hours in the

19  bills, and Kevin's hours are in there.

20       Q     Item No. 6 is, "Any and all exemplars, charts,

21  diagrams, photographs, or other demonstrative tools that

22  deponent has prepared, used, or intends to use at the

23  trial in the instant action."

24             Do you have any such responsive documents?

25       A     Whatever I have is in the file.  That would

14

1   just constitute the -- right now, the exhibits, I guess,

2   to my -- to my reports.

3        Q    Have you prepared any demonstrative aids that

4   you would intend to use at the trial?

5        A    Nothing other than what's been attached to the

6   reports.

7        Q    Is that something you're contemplating might be

8   requested of you closer to the time of trial?

9        A    I hadn't thought about it, but I would expect

10  that we would have discussion about what demonstratives

11  would be, but there has been no discussion of that so

12  far.

13       Q    No. 7 is, "Any and all reports, memoranda,

14  publications, treatises, graphs, drawings, work papers,

15  photographs, correspondence, and any other documents in

16  the deponent's possession which provide any information

17  regarding the basis of the deponent's opinion in the

18  instant action."

19            Have you brought all such documents?

20       A    Yes.

21       Q    Were there any such documents that would have

22  been responsive to Item No. 7 that were at one time in

23  existence but are no longer in existence because they

24  were destroyed?

25       A    No.

1     Q    No. 8, "Any and all research the deponent has

2   performed with respect to his engagement as an expert in

3   the instant action."

4          Have you brought all such documents?

5     A    When it says "research," that means research

6   that's written down?

7     Q    Any kind of research.

8     A    Yes.  I brought everything.

9     Q    So, for example, if you would do computerized

10  research, looking for something on Google or looking at

11  a site for a particular company, would you have made a

12  record of that search?

13    A    If I did an online search for something -- for

14  example, looking for the website of the task force on

15  the convention -- I don't normally print out the pages

16  of results from the Google search unless there's some

17  reason to do so, you know.

18    Q    Well, let's use that as an example.  If you had

19  done some online research and looked up a report on the

20  San Diego Convention Center and wanted to get data from

21  that report to put into your report, would you have made

22  a written note of the information in the report that you

23  found on line and then later incorporated it into your

24  formal report?

25    A    I might do that in some cases, but in this

16

1    case, I didn't because I worked entirely on line with my

2    report open.  So any note I wanted to make, I made in

3    the document that I was preparing for the report and it

4    became part of the report.

5        Q    No. 9, "Any and all documents reviewed by

6    deponent in preparation for his deposition."  Have you

7    brought all such documents?

8        A    Yes.

9        Q    Did you review the rough draft of Dr. Hayes'

10   deposition in preparation for this deposition today?

11       A    Yes.

12       Q    Did you make any notes on that rough draft?

13       A    No.

14       Q    Did you communicate anything from that -- your

15   review of that rough draft to counsel for UNM?

16       A    In my discussion with Mr. Lance yesterday, we

17   discussed the deposition that he had taken, if that's

18   what you're referring to.

19       Q    Yes.  What did you discuss with Mr. Lance?

20       A    Some of the answers that Dr. Hayes had made to

21   questions.  And since the -- part of the deposition was

22   going through my rebuttal report and asking for his

23   responses to it, we discussed some of -- some of those

24   answers.

25       Q    Do you remember any answers in particular that

1    you discussed with Mr. Lance?

2        A    Well, I was interested in what he had said

3    about bundling and tying.  So we discussed that.  I was

4    interested in what he had said about the two markets

5    involved, and so we discussed that.  And -- and we

6    discussed issues of pricing, of, you know, whether

7    prices were raised or whether they would be raised and

8    so forth.

9             Those were the -- those were the major areas

10   that we discussed.

11       Q    Well, first, as it relates to the issue of

12   bundling and tying, what was your response to the

13   testimony by Dr. Hayes on that topic?

14       A    Well, I don't remember just what I said, but

15   my -- my response is generally that I noted that

16   Dr. Hayes agreed that this was a case of tying.  I noted

17   that there was some confusion about defining bundling

18   and tying and what were instances of one or the other,

19   but that the answers that he gave, I thought, in a

20   sense, confirmed the opinions that I had put in my

21   report.

22       Q    Did you agree with the answers Dr. Hayes gave

23   in his deposition regarding the issues of bundling and

24   tying?

25             MR. SLANIA:  I just want to make something

1    clear for the record.  The first question was, "What was

2    your response?"  And now, "Did you?"  So you're asking

3    him to recall what he told Mr. Lance yesterday, or do

4    you want him to tell you what he's thinking now?

5            MR. L'ESTRANGE:  I'd like him to tell me what

6    he's thinking now.

7            MR. SLANIA:  Okay.  Because the way you phrased

8    it and the way I understood his answer was he was trying

9    to recall what he said yesterday, in response to your

10   question.

11           THE WITNESS:  Well, your question covers a lot

12   of ground.  I -- I agree with some of the things that

13   Dr. Hayes said.  I disagree with other things.

14           I mean, I think in a number of situations, he

15   was asked, "What's your response to this paragraph in

16   Hekman's rebuttal report?"

17           And he would say, "I think it's wrong.  I

18   disagree with it."  And then when he got down to the

19   details, I didn't see that he did disagree with it.

20           So it's not possible for me to characterize

21   whether I agree or disagree with him.  It would have to

22   be done on a sentence-by-sentence basis, I think.

23   BY MR. L'ESTRANGE:

24       Q    Do you disagree with Dr. Hayes as it relates to

25   the definition of the relevant markets that are

1    pertinent to this case?

2        A    I'm not sure that he has defined the relevant

3    market.  And so I think he has mainly expressed some

4    criticisms of my definition, but I don't recall that he

5    had a specific -- a specific definition of the relevant

6    market, especially for the trade show cleaning services.

7        Q    Have you had communication with any of United

8    National Maintenance's other experts in connection with

9    this engagement?

10       A    I had some communication with Patrick Kennedy.

11       Q    When was that?

12       A    A couple times before my report was filed and a

13   couple of times before my rebuttal report was filed.

14       Q    That would have been in 2009?

15       A    Yes.

16       Q    Was the first conversation that you had with

17   him on the telephone?

18       A    Yes.

19       Q    Who else was on the line?

20       A    I'm trying to recall, because I -- I think I --

21   at most, I had one conversation with Patrick on the

22   phone.  And the other conversations that I had about any

23   questions that I had about the damages were -- were with

24   someone that he's working with there.

25            So in answer to your question, the time that I

JOHN S. HEKMAN, PH.D.                        12/10/09

1    talked with Patrick Kennedy, it was only the two of us

2    on the phone.

3         Q    How long did the conversation last?

4         A    Probably a minute.

5         Q    Tell me, as best you can recall, what was

6    discussed.

7         A    I think it was literally just that he said he

8    was doing the damages report and that he understood I

9    would be doing the antitrust report and that we could

10   talk later about what was going to be in the reports.

11        But we never did.

12        Q    Is your report in this case on a computer

13   system that is owned and operated by LECG?

14        A    Yes.

15        Q    And on that computer system, can you access the

16   reports and files of other personnel who work for the

17   company?

18        A    To a certain degree, but not -- not

19   universally.

20        Q    For example, would you be able to access

21   electronically Dr. Kennedy's report in this case?

22        A    Yes, I could.

23        Q    And have you done so?

24        A    Yes.  I would -- I -- well, let's see.  I may

25   have had an email to me.  And I believe I looked at it

                                                          21

```
 1    on the computer system before my report was filed.  So I

 2    read it when it was a couple of days from being filed.

 3        Q    You read Dr. Kennedy's report on the main

 4    server for LECG.  Is that what you're saying?

 5        A    Well, downloaded it.

 6             Let's see.  Downloaded it?  No.  I opened it on

 7    the server.  So I guess that's what it would be.  Yeah,

 8    it would be on the server.

 9        Q    And, likewise, would Dr. Kennedy have had

10    access to your report?

11        A    He could have.  I don't know whether he looked

12    at it or not.

13        Q    There were no restrictions, though, that would

14    have prevented his access.  Correct?

15        A    No.

16        Q    I am correct?

17        A    You are correct.

18        Q    Who was the assistant that was working with

19    Dr. Kennedy that you spoke with?

20        A    His name was Jonathan Atun, A-t-u-n.

21        Q    He's in the San Diego office of LECG?

22        A    Yes.

23        Q    How many conversations did you have with

24    Mr. Atun?

25        A    Three or four.
```

22

1           MR. SLANIA:  And I think "Jonathan" is

2    J-o-n-a-t-h-a-n.  There's no "H" before the "N."

3           THE REPORTER:  Thank you.

4    BY MR. L'ESTRANGE:

5       Q    In each of those instances, was it just you and

6    Mr. Atun on the phone?

7       A    Yes.

8       Q    Were the topics you discussed the same in all

9    the telephone calls?

10      A    No.  I think we probably covered more than one

11   topic.

12      Q    Do any one of the phone calls stand out in your

13   recollection in terms of what you discussed with him?

14      A    Well, in printing out the emails, I saw that I

15   had asked him whether he had copies of United's

16   contracts with the decorators, because I had asked him

17   for his understanding what the contract was as far as

18   annual provision for increases or the length of the

19   contract and so forth.

20           And he provided me information on that, and

21   then he emailed me a couple contracts, which I -- and

22   I -- I've printed out that email and those -- whatever

23   contracts he sent me are on my electronic file.

24      Q    What other information did he provide, other

25   than the contracts?

                                                          23

1      A     Answers to my questions about pricing issues

2   and about what they were finding in terms of whether all

3   of the trade shows had the same provisions or whether

4   they were different.  And so we just had a general

5   discussion about how the pricing was done and whether it

6   was always done the same or whether it was done

7   differently, that sort of thing.

8      Q     Is this pricing between UNM and the decorators

9   you're talking about?

10     A     Yes.

11     Q     What was your conclusion, after discussing this

12  with Mr. Atun, in terms of what the pricing was?

13     A     My conclusion is what I stated in my report and

14  in my -- and in my rebuttal report as far as I had a

15  description of the booth cleaning and the move-in and

16  move-out expenses and the wage rates.  That information,

17  I checked with Jonathan, since he was involved with

18  doing the damages work, and -- and checked with the

19  Kennedy report to make sure I was getting it correct.

20     Q     Did you review any files from United National

21  Maintenance for particular shows that would show the

22  billing from United National to decorators?

23     A     I reviewed the exhibits to the Kennedy report,

24  which had billing files, if that's what you're referring

25  to.

1      Q    Well, what I'm asking is did you review the

2   original documents that were in the files of UNM

3   regarding billing between UNM and the decorators for

4   particular shows?

5      A    Yes, I've looked at some of it.

6      Q    A sampling?

7      A    Yes.  Yes.

8      Q    Are those files in your file that you're

9   producing to us today?

10     A    Yes.

11     Q    So if we look in this thumb drive, we should

12  find on there some UNM documents for very specific shows

13  with the documentation showing how much UNM billed to

14  the decorator.  Is that right?

15     A    Well, I'm not recalling -- I believe so, yeah.

16  That's my recollection, that I looked at documents that

17  were bills prepared by UNM and also bills sent by the

18  Convention Center to United.

19     Q    Who selected the documents in this sample you

20  reviewed?

21     A    Well, I was provided -- I'm not sure whether I

22  was provided all of the underlying billing documents.  I

23  know that I got a large number of documents provided to

24  me by the client.  And since I was not using those very

25  directly in my report, I don't recall which ones they

25

1    were.  I think -- I think it was all of the billing

2    documents, but I couldn't -- I couldn't tell you.

3         Q    Did you create any compilation or summary of

4    data on the source documents provided to you by UNM?

5         A    No.  I mean, I -- with my report, I had a list

6    of documents reviewed.  And I -- and I included all the

7    documents that had been provided to me.  Some of them, I

8    reviewed, you know, more than others.

9              MR. SLANIA:  Was that question source documents

10   provided by UNM?

11             MR. L'ESTRANGE:  Yes.  That was the question.

12             THE WITNESS:  And I'm not seeing the

13   distinction here.

14   BY MR. L'ESTRANGE:

15        Q    Well, let me tell you what he's talking about.

16             You received documents from UNM's counsel.

17   Correct?

18        A    Yes.

19        Q    Did you receive any documents directly from

20   UNM?

21        A    No.

22        Q    Restating my question to encompass documents

23   from UNM's counsel, did you make any summary or

24   compilation of the data in those documents?

25        A    No.

26

1      Q    Was any such summary or compilation made by the

2   San Diego office of LECG in connection with

3   Dr. Kennedy's opinion that was made available to you?

4      A    Not that I can recall.  And if I had looked at

5   it much, I think I would recall it.  So if it was, I

6   just don't recall seeing it.

7      Q    What other topics did you discuss with Mr. Atun

8   besides the relationship between UNM and the decorators

9   you've just described?

10      A    The two things that I can recall discussing

11   with him were, first of all, talking with him about how

12   pricing works, and, as I said before, whether it's

13   always the same, reviewing my understanding of the

14   pricing to see if I had made any mistakes.

15           And, secondly, when I was doing my rebuttal

16   report, the -- the pricing formulas that were in the

17   contracts so I could see what sort of increases in wage

18   rates were allowed under those contracts, when the

19   contracts expired, et cetera.

20      Q    You understand that the opposing economic

21   expert in this case is John Hayes.  Right?

22      A    Yes.

23      Q    And you understand he's with Charles River and

24   Associates?

25      A    Yes.

27

```
1        Q    Have you ever heard of that company before?

2        A    Yes.

3        Q    Have you done work with Charles River before?

4        A    No, I don't believe so.

5        Q    Have you ever been opposed to an expert from

6   Charles River on another case?

7        A    I don't believe so.  It's possible.

8        Q    Before the Convention Center served its

9   Designation of Expert Witness identifying Dr. Hayes, had

10   you ever heard of him?

11       A    No.

12       Q    Have you made any investigation into Dr. Hayes'

13   background?

14       A    No, I haven't.

15       Q    Have you reviewed his credentials?

16       A    Those that were attached to his report, yes.

17       Q    What is your opinion as to his expertise in the

18   areas in which he's purporting to give an opinion?  Do

19   you think he's qualified to do so?

20       A    I think he's -- he seems to be qualified as an

21   antitrust expert, yes.

22       Q    Okay.  You disagree with some of his opinions,

23   I take it?

24       A    Yes.

25       Q    Do you have any disagreement with the
```

28

1    methodology that was used by Dr. Hayes to arrive at his

2    opinions?

3        A    I'm not sure what methodology you're referring

4    to.

5        Q    The methodology that was disclosed in his

6    report, namely, the accumulation of data, summarizing

7    and compiling it, and then drawing certain conclusions

8    from that summary and compilation?

9             MR. SLANIA:  Hold on.

10            Are you also including the manner in which he

11   framed the issues for his methodology?

12            MR. L'ESTRANGE:  Yes.

13            MR. SLANIA:  Okay.  So --

14   BY MR. L'ESTRANGE:

15       Q    All -- all aspects of his methodology.  It's an

16   open-ended question, whether you agree or disagree with

17   his methodology.  And if you disagree, please tell me in

18   what respect.

19       A    Well, I'm still having trouble with the word

20   "methodology."

21       Q    Okay.

22       A    Because I understand it to be distinguishing

23   between different ways of undertaking analysis.  And I

24   don't see that there was a particular methodology.  I

25   see that he analyzed the evidence, as he saw it, and

29

1    expressed opinions.

2              So I -- I just don't know how to answer your

3    question.

4         Q    Well, you know that Dr. Hayes collected and

5    summarized certain data.  Right?

6         A    Yes.

7         Q    And you saw that summary and compilation in the

8    exhibits to his report.  Correct?

9         A    Yes.

10        Q    Do you have any quarrel with the data that he

11   collected in connection with his assignment?

12             MR. SLANIA:  Are you including not just his

13   collection of data, but the data he chose to collect?

14             MR. L'ESTRANGE:  Yeah.  That's right.

15             MR. SLANIA:  Okay.  So that's one objection.

16             The other is related to something different

17   from what he stated in his rebuttal report?  Are you

18   asking to repeat what's in his rebuttal report, which

19   states his differences, objections, however you want to

20   describe them, with the Hayes report?

21             MR. L'ESTRANGE:  Well, let's withdraw that

22   question and start over.

23   BY MR. L'ESTRANGE:

24        Q    These questions that I'm asking you are broader

25   than the specifics which are in your rebuttal report.

30

1    What I'm trying to find out is if you had any

2    disagreement with the general approach that Dr. Hayes

3    used.  And I'll go at it in a detailed fashion so that

4    you can answer the question in parts, rather than in a

5    whole broad spectrum.

6            So, first of all, you know that he collected

7    data, as disclosed in his report.  Correct?

8    A    Yes.

9    Q    Is there any data that you think he should have

10   considered that he did not consider?

11   A    Yes.

12   Q    What data is that?

13   A    I think that he should have taken account of

14   the work of the center expansion task force.

15           I think he should have analyzed -- you know,

16   done more analysis of the market in which the Convention

17   Center operates by -- by interviewing personnel from the

18   Convention Center and collecting more information about

19   the contracts that the Convention Center has with

20   decorators.

21           And, in particular, with regard to his

22   criticisms of my report, saying that the Convention

23   Center does not bill for supervisor hours, he would have

24   been in a position to get information from the center to

25   clarify that issue.  So I think that in general, he did

31

```
1   not look at all the data and issues that he could have.

2           And one further thing that I would note,

3   since -- since I made an issue of it, he did not attempt

4   to discriminate between large and small shows and how

5   important they were for the revenue and profitability of

6   the Convention Center, but rather lump them all in

7   together.

8           So those are the things that I can recall

9   offhand.

10      Q    Okay.  Well, the first deficiency you have

11  identified is that he failed to interview people at the

12  Convention Center to ask them questions about the

13  market.  Is that a --

14      A    Yes.

15      Q    -- fair summary?

16          Who is it that you believe he should have

17  interviewed that he did not?

18      A    Well, I think Carol Wallace and Kris Kremer

19  would have been individuals who could have -- he could

20  have asked them what is the strength of the center in

21  the market in which it competes; talked to them about

22  pricing of trade shows at the San Diego center versus

23  their competitors; asked them who are your major

24  competitors, where do you -- where do you lose shows, to

25  what centers do you lose shows; which shows are
```

32

1    profitable, which ones are not profitable, et cetera.

2              So some of those type of issues.

3      Q    And what relevance would that data have to the

4    identification of the relevant market?

5              MR. SLANIA:   I think it misstates testimony.

6              But you can answer.   Go ahead and answer.

7              THE WITNESS:   It would -- it would help to

8    identify the national trade show market, and in

9    particular, whether San Diego has any pricing power or

10   market power in that -- in that national market.

11   BY MR. L'ESTRANGE:

12     Q    Next you say that he failed to evaluate the

13   contracts between the Convention Center and decorators.

14             Is that right?

15     A    Yes.

16     Q    What contracts do you believe there are between

17   the Convention Center and decorators?

18     A    My understanding is that as of the first half

19   of 2007, the Convention Center had approximately a

20   50-percent share of the trade show cleaning services

21   market, and United and possibly others had the other

22   50 percent.   So I assume that there are contracts that

23   could be reviewed that would show what similarities or

24   differences there were to the contracts that United had.

25             And also, the attempts that the Convention

33

1    Center made to -- to increase its market share by

2    getting some of United's clients to switch over to the

3    center and what types of pricing or other incentives

4    they were giving them to try to gain that market share.

5        Q    So you're referring primarily to contracts

6    between the Convention Center and the decorators for

7    cleaning services.   True?

8        A    Yes.

9        Q    And the principal contracting party the

10   Convention Center was engaged with regarding cleaning

11   service was Freeman.   True?

12       A    I don't recall specifically, but I'll take your

13   word for that.

14       Q    Well, have you been given the opportunity to

15   review the contracts with Freeman?

16       A    With the contracts -- review the contracts that

17   have been produced?

18       Q    Let me restate the question.   It was poorly

19   worded.

20            Were you given the opportunity to review the

21   contracts between the San Diego Convention Center and

22   Freeman Decorating concerning the provision of cleaning

23   services by the Convention Center to Freeman?

24       A    I don't recall if those are part of my file,

25   but I don't recall looking at them.

1    Q    Did you ask to see any contracts between the
2  Convention Center and decorators?
3    A    No, I don't recall asking to do that.
4    Q    Do you think that's something that would have
5  been useful to your opinion, had it been provided to
6  you?
7    A    I think it would have been useful information,
8  yes.
9    Q    It's your understanding that those contracts
10 were never provided by the Convention Center during
11 discovery?
12   A    No.  I don't know if they were or not.
13   Q    It's just -- it didn't occur to you to ask for
14 them.  Is that what happened?
15   A    That's correct.
16   Q    Now, you also said that Dr. Hayes did not
17 thoroughly examine whether the Convention Center bills
18 for supervisor hours.  Is that right?
19   A    Yes.
20   Q    And by "supervisor hours," you're talking about
21 employees of the Convention Center who supervise the
22 cleaning activities.  Right?
23   A    Yes.
24   Q    Is it your understanding that the Convention
25 Center bills anyone for those supervisor hours?

35

1        A      I don't know who they -- who they bill.   It's

2    my understanding that the Convention Center uses some of

3    the same cleaning employees to do booth cleaning, and so

4    forth, that do general Convention Center cleaning, and

5    that that there are supervisors.   And how those

6    supervisors are billed, I don't know where -- where

7    their -- how the center structures their pricing in

8    order to be compensated for those employees.

9        Q      Is that something you felt would have been

10   useful in forming your opinion, how the center bills for

11   supervisor hours?

12       A      I don't know if it would have helped my opinion

13   or not.   I think -- since there was a criticism that

14   Dr. Hayes made of my conclusions in which his -- his

15   criticism was to say that the center does not bill for

16   supervising the booth cleaning, et cetera, I think

17   that's something that has been left unspecified.

18            So if he wants to make that criticism, I think

19   he -- it's incumbent on him to find out more about that,

20   because I was explaining why there was a difference

21   between the billing of San Diego Convention Center and

22   the -- and United, because United -- United's costs

23   include the costs of supervision, as well as labor.   And

24   I was making the point that, well, the Convention Center

25   has the cost of supervision and labor also, but it's

1    structured differently.

2        Q    Well, it has the cost of supervision and labor

3    at the Convention Center, but the Convention Center does

4    not bill for the supervisors, as far as you know.  Is

5    that right?

6            MR. SLANIA:  Misstates the evidence.

7            THE WITNESS:  Yeah, all I know is the statement

8    that Dr. Hayes made in his report, which he didn't cite

9    any -- any testimony or anything for.

10   BY MR. L'ESTRANGE:

11       Q    Have you seen any evidence to suggest that the

12   Convention Center charges decorators for the work done

13   by the Convention Center's cleaning supervisors?

14       A    No.  I don't -- I don't know how the Convention

15   Center structures their billing to various contractors.

16       Q    Is that something you would have liked to have

17   seen in connection with the formation of your opinion?

18       A    I didn't find it necessary to form my opinion,

19   but in answering the criticism of Dr. Hayes, it's now

20   become more important.

21       Q    You also said that Dr. Hayes failed to make a

22   distinction between large and small shows in his

23   analysis of the relevant market.

24            Is that accurate?

25       A    Yes.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGY
877.955.3855                              Ex 6 p 151

1      Q    How do you define a large or small show, as

2    you've used it in that context?

3      A    Well, I'm relying on the divisions that were

4    made by the documents from -- that I reviewed from the

5    Convention Center task force.  And there was a

6    presentation by Chris Cramer and Carol Wallace in which

7    they divided all of the events of the Convention Center

8    into four categories.

9          And they talked about the ones that were

10   important, the larger shows that were important and that

11   were more profitable and brought in more business for

12   the city.  And then they talked about the smaller

13   meetings and small shows that were -- that were

14   unimportant.

15         And it was my opinion, from reviewing all of

16   those documents about -- that discuss the market for the

17   San Diego Convention Center, that the larger shows were

18   ones for which they compete with other large convention

19   centers and were ones that were the reason for the

20   expansion of the center that's being contemplated, and

21   were more profitable.

22         And so I think that in doing an analysis of

23   whether there's any pricing power in the -- any market

24   power for the Convention Center, you would naturally

25   want to focus on a difference between those different

1    categories of shows that -- that were brought out.

2        Q    I'm going to hand you a document that was

3    previously marked for identification as Exhibit --

4        A    Is it okay if I get a little more coffee?

5        Q    Oh, sure.

6             -- 446.

7             MR. L'ESTRANGE:  It's -- okay if we take a

8    break at 10:30?

9             MR. SLANIA:  Sure.

10            MR. L'ESTRANGE:  And then I can chat with

11   Deanna and see what's there.

12            MR. SLANIA:  Sure.

13            MR. L'ESTRANGE:  See what the smoking guns are

14   that are in that folder.

15            Ready to go back?

16   BY MR. L'ESTRANGE:

17       Q    Exhibit 446, I've just handed you, Doctor, is a

18   copy of your report dated September 30, 2009.  And I

19   would like to invite your attention to the section with

20   your CV, which begins on page 1 of 10 and it follows

21   page 32.

22            You received your bachelor's in history from

23   Valparaiso University.  Is that right?

24       A    Yes.

25       Q    What year was that?

39

```
 1        A     1969.
 2        Q     And your M.B.A. in finance from the University
 3   of Chicago?
 4        A     Yes.
 5        Q     What was the emphasis, if any, in your M.B.A.
 6   program?
 7        A     Well, finance and accounting.
 8        Q     Okay.  And then you received your Ph.D. also
 9   from the University of Chicago.  Is that true?
10        A     Yes.
11        Q     What was the area of emphasis in your Ph.D.
12   program?
13        A     It was industry studies and urban and regional
14   economics.
15        Q     Are you familiar with the specialty called
16   industrial organization?
17        A     Yes.
18        Q     Did you have any specialty or studies in the
19   area of industrial organization?
20        A     Yes, I did do studies in that area.
21        Q     That's a separate area of emphasis, though, and
22   it would be in a Ph.D. program.  Is that right?
23        A     Right.
24        Q     But that was not what you chose.  Correct?
25        A     Right.
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOL        Ex 6 p 154
877.955.3855

1    Q    Let's look at page 2, which talks about recent

2    engagements.  And you've listed a number of cases that

3    go from page 2 of 10 through page -- well, many pages

4    beyond that.

5         Within the last ten years, have you ever been

6    engaged to give expert opinion testimony to define a

7    relevant market in any antitrust context?

8    A    Yes.

9    Q    Approximately how many times in the last ten

10   years have you been asked to do that?

11   A    I suppose between five and ten times.

12   Q    Out of how many total engagements during that

13   period?

14   A    In the last ten years?

15   Q    Yes.

16   A    I suppose over ten years, it would be 80 to 100

17   engagements or something.

18   Q    So it was somewhere between 5 and 10 percent of

19   your engagements in the last ten years would have been

20   involved the definition of a relevant market in an

21   antitrust case.  Is that right?

22   A    Yes.  I think that's -- that's correct.

23   Q    Were you engaged in any other antitrust cases

24   that did not involve definition of a relevant market,

25   such as, say, a price-fixing case?

1       A     Yes.

2       Q     And how many such engagements did you have

3   during that ten-year period?

4       A     Another possibly three to five cases, something

5   like that.

6       Q     Looking at the list that begins on page 2 of

7   10, the first item listed is the "Official Committee of

8   Unsecured Creditors versus Credit Suisse," et cetera.

9             What was your engagement in that case?  What

10  were you asked to do?

11      A     I was asked to analyze the ability of the

12  Yellowstone Mountain Club to repay a loan from -- from

13  Credit Suisse, and as part of that, to define the

14  relevant market in which the -- this development was

15  selling its product.

16      Q     Was that -- were there any antitrust claims in

17  that case?

18      A     No, I don't believe so.

19      Q     So what was the purpose of defining the

20  relevant market?  What issue did that address?

21      A     It addressed the issue of projected sales of

22  property by the Yellowstone Mountain Club and whether it

23  was likely that they could have provided enough cash

24  flow to repay the loan to Credit Suisse.

25      Q     The next case is "Morton V. Morton."  What was

1    the nature of that action?

2        A    It was valuing some land that was part of the

3    Hardrock Cafe and Hotel in Las Vegas.

4        Q    Was that in a divorce action?

5        A    It was part -- yes, I believe it was part of

6    the -- a divorce issue.

7        Q    The next is "Gartner versus" --

8        A    Parikh.

9        Q    -- "Parikh."

10            What was the claim in that case?

11       A    Theft of trade secrets.  And I don't recall

12   what the other claims were, but it was a group of people

13   who had taken a line of business from Gartner and

14   established a new company.  And Gartner was the

15   plaintiff, claiming that business had been stolen from

16   them, as well as trade secrets and so forth.

17       Q    Looking down this list, can you identify for me

18   the cases which involve claims under the antitrust laws

19   in which you were asked to give an opinion regarding the

20   relevant market.

21       A    On page 3, the second one from the top was an

22   antitrust claim in the relevant market.  The next one,

23   "American Medical Response," was an antitrust claim with

24   a relevant market.

25            Caruso, the third -- the next one, was also an

1    antitrust claim with a relevant market.

2           Breakdown Services, the next one, was an

3    antitrust claim with a relevant market.

4           Then it kind of starts over again with

5    testimony.  So I'd have to skip to -- do you want me to

6    find earlier ones than that?

7       Q   Well, you don't have to go back more than ten

8    years.

9       A   So let's see.  Skipping then to page 5.  One,

10   two, three, four, five, the sixth one down, SPC Pomona,

11   versus Media News, was an antitrust claim and a relevant

12   market.

13          MGM -- I guess that was not.

14          Some of these, I'm just not recalling whether

15   some of the claims were antitrust claims.  I remember

16   estimating markets, but the next one that I can

17   definitely recall would be near the bottom of page 6,

18   Louisville Bedding versus Pillowtex, were antitrust

19   claims and relevant market.

20          Infant and Nutritional Products was an

21   antitrust market.

22          MR. SLANIA:  You don't want him to go beyond

23   '97?

24          MR. L'ESTRANGE:  No need to go beyond that.

25          THE WITNESS:  Now I'm back about ten years.

```
 1              MR. L'ESTRANGE:  Okay.  Thank you.

 2              THE WITNESS:  Thank you.

 3   BY MR. L'ESTRANGE:

 4       Q    Let's go to the next exhibit, 433.  This is the

 5   report by Dr. Hayes.  Based on what you've testified so

 6   far -- I assume you have read Dr. Hayes' report.

 7   Correct?

 8       A    Yes.

 9       Q    I'd like to invite your attention to page 2 of

10   that report.  Near the heading Roman II, "Summary of

11   Opinions," Dr. Hayes says he's formed the following

12   opinions, which are identified as "A" through "F."

13              The first opinion is, "SDCC competes to host

14   trade shows with a large number of convention centers

15   located throughout the United States."

16              Do you disagree with that opinion?

17       A    No, I don't disagree, depending on the

18   definition of a large number.  But I think that he --

19   that he used a number later on.  So I don't think I

20   disagree with that.

21       Q    The second opinion is, "The relevant market for

22   consideration of this competition is the nationwide

23   market for hosting trade shows."

24              Do you disagree with that opinion?

25       A    Well, I do in that it's not specific to what
```

45

1    type of trade shows.  At least, all -- I don't think

2    that San Diego competes for small, regional trade shows

3    in another part of the country.  I think it's not

4    specified very well what trade shows they compete with.

5        Q    So that's your criticism, that it fails to

6    distinguish between different types of trade shows that

7    might be the subject of this competition?

8        A    Yes.  I think he says elsewhere, when he

9    estimates a market share for San Diego, he uses

10   something like 20 or 22 large convention centers and

11   then estimates the market share.  So that seems to be --

12   that might be inconsistent with No. B here, because "B"

13   is not very specific.

14       Q    So your only quarrel with "B" is that it's not

15   specific enough?

16       A    Yes.

17       Q    Item C, "SDCC accounts for less than 5 percent

18   of the sales in this market and does not possess market

19   power."

20            Do you disagree with that opinion?

21       A    Yes.

22       Q    What's the basis of your disagreement?

23       A    All of the analysis that I did, and all of the

24   analysis done by the consultants to the San Diego

25   Convention Center that are the basis for projecting a

46

1   couple hundred million dollars of expansion, and -- and

2   the fact that even with a 5 percent market share, they

3   would have enough pricing power to have an

4   anticompetitive effect in the trade show cleaning

5   services market.

6       Q    Have you made any effort to measure the market

7   share of the San Diego Convention Center in the national

8   market for hosting trade shows?

9       A    No, I have not.

10      Q    Is that something you believe would be

11  necessary to form your opinions?

12      A    I didn't feel that it was necessary in order to

13  demonstrate that all the relevant parties believe they

14  have enough draw to San Diego that there would be some

15  pricing power in the trade show cleaning services

16  market.

17          So I didn't think that I had to do a full study

18  of the elasticity of demand and the -- and the national

19  market for trade shows in order to demonstrate that.

20      Q    Item D, "Bundling or tying SDCC cleaning staff

21  to trade shows at SDCC can harm competition only if the

22  Center possesses substantial" market "power in the

23  nationwide market for hosting trade shows.  Since SDCC

24  does not possess such market power, SDCC's new cleaning

25  services policy cannot harm competition."

47

1           Do you agree with that opinion?

2      A    No.

3      Q    What's the basis of your disagreement?

4      A    As I stated in my rebuttal report, I don't

5   believe it's necessary to have, quote/unquote,

6   "substantial market power" in order to have an

7   anticompetitive effect in the trade show cleaning

8   services market and everything else I said about why

9   there is some market power that San Diego has.

10     Q    In his deposition, Dr. Hayes testified that it

11  was his opinion that tying is a subset of bundling.  Do

12  you remember reading that part of his deposition?

13     A    Yes.

14     Q    Do you agree with that?

15     A    As a matter of taxonomy, yes.

16     Q    Okay.  Next, Item E, "Dr. Hekman's economic

17  theory of harm does not fit the facts and does not

18  explain how SDCC's new cleaning services policy could

19  harm competition, even if SDCC possessed substantial

20  market power in the nationwide market for hosting trade

21  shows."

22          Do you agree with that opinion?

23     A    No.

24     Q    What's the basis of your disagreement?

25     A    I don't really understand what he means here.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIE
877.955.3855                              Ex 6 p 162

1    I mean, that's a very general statement that my economic

2    theory of harm does not fit the facts.  I think it would

3    take a lot of fleshing out of that to know what he means

4    and what I disagree with.

5           But I don't agree with it.  I, in my report and

6    my rebuttal report, have argued that -- that I do have

7    an economic theory of harm and that it does support the

8    idea that there's anticompetitive effects.

9      Q    It's your opinion, then, that there was harm to

10   competition?

11     A    Yes.

12     Q    In what market?

13     A    In the trade show cleaning services market at

14   the Convention Center.

15     Q    Has there been harm to competition in any other

16   market?

17     A    I haven't studied any other -- any other market

18   to know whether there's been harm in another market.

19     Q    Item F, "SDCC's prices for trade show cleaning

20   services have not changed since the new cleaning

21   services policy was adopted.  UNM's prices have

22   increased modestly for reasons unrelated to SDCC's new

23   cleaning services policy."

24           Do you agree with that conclusion?

25     A    As a matter of the facts, I believe that's

49

1    true.

2        Q    Okay.  I'd like to direct your attention to

3    page 5, Paragraph 17, in Dr. Hayes' report.

4        A    I'd like to clarify my answer in that he's

5    specifically saying SDCC's prices have not changed.  My

6    understanding of that is that the labor rates have not

7    changed.  The issue in this case, of course, is whether

8    the prices for services that United contracts for but

9    that are provided by the labor of SDCC.

10        So as long as it's understood that I'm not

11   including that in No. F that he's just talking about --

12   I understand him to be talking about the labor rates of

13   SDCC.

14       Q    Well, as I understand it, when UNM charges

15   decorators for cleaning services, there are two

16   components:  One is what's called facility cleaning, and

17   the other component is booth cleaning.  Right?

18       A    That's right.

19            MR. SLANIA:  It's vague and ambiguous as to

20   what you mean by "facility cleaning."

21   BY MR. L'ESTRANGE:

22       Q    I think -- you've used the term "facility

23   cleaning" in your report.  Correct?

24       A    It's been used, yeah, by me and by a number of

25   people.  Maybe not everybody understands it exactly the

                                                    50

1    same.  But the way I understand it, there's often

2    division into those two general groups, yeah.

3        Q    And facility cleaning, as you understand it, is

4    cleaning of common areas, other than booth cleaning,

5    like aisles and registration area and things like that?

6        A    Well, there's move-in and move-out cleaning and

7    there's overnight cleaning of aisles and so forth.  All

8    of those are done, as I understand it, on an hourly

9    basis.  Whereas, the booth cleaning is carved out

10   separately and is estimated in a different way.

11       Q    The move-in cleaning, the move-out cleaning,

12   the aisle cleaning, and the aisle porter service, that

13   all falls under the heading of facility cleaning.

14   Right?

15       A    That's my understanding.

16       Q    Okay.  And that's charged by the cleaning

17   contractor, whether it's UNM or the Convention Center,

18   on an hourly basis.  Right?

19       A    That's how they bill for it.  That's how I

20   understand it, yeah.

21       Q    And the booth cleaning, on the other hand, is

22   charged as 50 percent of whatever it is the decorator

23   charges the exhibitor for that service.  Right?

24       A    Well, I believe that -- that United, for

25   example, in their -- the way they operated was that they

51

```
 1    estimated booth cleaning and then they received
 2    50 percent of that amount that was charged to the
 3    decorator.
 4         Q    Correct me if I'm wrong, but, as I understand
 5    it, the decorator decides what price to charge to the
 6    exhibitor for booth cleaning.  Right?
 7         A    Oh, I see what you're saying.
 8              Yes.
 9         Q    And then the decorator gives a report after the
10    show to the cleaning contractor of how many booths were
11    cleaned and what the total revenues were that they
12    collected?
13              MR. SLANIA:  That might misstate the evidence.
14    BY MR. L'ESTRANGE:
15         Q    They give a report as to how much revenue they
16    collected?
17              MR. SLANIA:  Okay.  That's a different
18    question.
19              THE WITNESS:  Yes.
20    BY MR. L'ESTRANGE:
21         Q    Okay.  And then essentially there's a 50/50
22    split between the decorator and the cleaning contractor
23    on that booth cleaning revenue, based on that report?
24         A    As I've been told, it's in most cases, yeah.
25    Most, if not all cases, that's how it's done.
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLO(
877.955.3855                          Ex 6 p 166

1        Q     And are you aware that there's been any change

2    in that pricing since the change in policy took place at

3    the Convention Center in July of 2007?

4        A     Well, you have to distinguish between pricing

5    in terms of, you know, billing at an hourly rate versus

6    estimating hours versus how much gets billed.  So

7    sometimes pricing is used in these reports to say how

8    much got charged by United versus SDCC and sometimes

9    pricing refers to the -- the billing of the hourly rates

10   and that sort of thing.

11       Q     Well, let's just focus on the booth cleaning,

12   because for booth cleaning, the hourly rates of the

13   contractor do not come into effect.  Right?

14       A     Right.

15       Q     And as to booth cleaning, the 50/50 split

16   between the decorator and the cleaning contractor has

17   remained unchanged since July of 2007.  Am I right?

18       A     Yes.

19       Q     Okay.  And as far as the facility cleaning

20   charges are concerned, when UNM was doing the contract

21   with its own labor force, it was done by agreement

22   pursuant to an hourly rate that was charged by UNM to

23   the decorator.  Correct?

24       A     Yes.

25       Q     And then when the policy changed and SDCC came

```
 1    into the picture to provide the labor, there were
 2    one-show contracts between SDCC and United National for
 3    every show where United provided the cleaning services
 4    using SDCC's labor.
 5              Do you know what I'm talking about?
 6        A    I got a little bit lost in that last sentence
 7    of the last question.
 8        Q    Okay.  First of all, let's -- we're talking
 9    about facility cleaning prior to July 1, 2007.
10              In those instances where United National
11    Maintenance was the contractor for the cleaning
12    services, they billed for that service to the decorator
13    according to contractual terms on an hourly basis.
14        A    Yes.
15        Q    And then after July 1, 2007, on those shows
16    where United National was the contractor, there was a
17    labor component provided by the Convention Center, and
18    then SDCC would bill UNM, and UNM would bill the
19    contractor.
20        A    Yes.
21              MR. SLANIA:  To the -- that is correct.  But I
22    don't want you to be assuming that UNM would bill the
23    contractor whatever SDCC billed UNM.
24              MR. L'ESTRANGE:  That assumption was not built
25    into the question.
```

1          MR. SLANIA:   Okay.

2    BY MR. L'ESTRANGE:

3          Q    If you interpreted it that way, I didn't intend

4    it.

5          A    No.  But I'm glad it's been clarified.

6               No, I didn't interpret it that way.  I know

7    that they did not simply pass through the bills of SDCC.

8          Q    There was some difference in the bills between

9    UNM and the decorator, on the one hand; and SDCC and

10   UNM, for the same show.

11         A    Yes.

12         Q    And have you made an analysis of the

13   differences in those billings on a show-by-show basis?

14         A    No.

15         Q    Has anyone in LECG made such an analysis?

16         A    Yes.  I don't know exactly what Patrick Kennedy

17   has done, but I know that he has analyzed all the shows.

18   And so I'm not familiar with exactly what analysis, you

19   know, he's reported on from that.

20         Q    Okay.  Now, going back to the facility

21   cleaning, since July 1, 2007, are you aware that the

22   Convention Center has increased the hourly charges for

23   the labor that it provides to UNM to do facility

24   cleaning?

25         A    No.  I believe it has remained at $17 an hour.

1    But that means that work that would have been performed

2    by United at less than $17 an hour is now being

3    performed by the Convention Center at $17 per hour.

4       Q    Are you aware whether UNM has raised its hourly

5    rates to decorators for facility cleaning work after

6    July 1, 2007?

7       A    I'm aware that they have.  And, as I understand

8    it, that's because of provisions in their contracts that

9    allow a certain increase per year.

10      Q    And those increases are not limited to

11   San Diego?

12      A    Right.  They may be -- they are somewhat

13   different in California than in other locations, but

14   they are -- there are increases in other locations, too,

15   I'm aware.

16      Q    And is it your understanding that currently the

17   hourly rate that UNM charges to Champion and GES for

18   cleaning services at the San Diego Convention Center is

19   more than $17 an hour for labor, as distinguished from

20   supervisors?

21           MR. SLANIA:  I believe that misstates the

22   evidence.

23           THE WITNESS:  I've seen individual invoices and

24   so forth.  I'm not aware of -- I haven't done an

25   analysis of what it is on a general basis for '08 and

56

1    '09.

2    BY MR. L'ESTRANGE:

3        Q    Okay.   Directing your attention to Dr. Hayes'

4    report, page 5, Paragraph 17, read the first sentence.

5    It says, "The new cleaning services policy at SDCC did

6    not alter these basic arrangements between exhibitor,

7    decorator, and cleaning services subcontractor."

8            Do you agree with that statement?

9            MR. SLANIA:   Please, if you're going to ask him

10   one sentence about a paragraph, I would ask the witness

11   to please make sure you understand what the cleaning

12   services -- the basic arrangements that are being

13   referred to earlier.   And if you want to refer to your

14   rebuttal report to see whether or not you had any

15   criticisms of that paragraph, feel free to do so.

16           THE WITNESS:   Yeah, I think I'd have to

17   understand what he means by "these basic arrangements."

18   It certainly changed arrangements, but he's referring to

19   something that he said didn't change.

20   BY MR. L'ESTRANGE:

21       Q    Well, it didn't change the arrangement between

22   UNM and the decorator.   Correct?

23       A    It didn't change their contract, if that's what

24   you mean.   I think there's been testimony that they

25   remained with the same contracts.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOG
877.955.3855                         Ex 6 p 171

1      Q    Now, you've referred to a tying claim in this

2   case.  What do you mean by that?

3      A    That the Convention Center is using its market

4   power in the national -- in the trade show market, the

5   national trade show market, to tie the provision of

6   trade show services at the Convention Center to the

7   provision of trade show cleaning services.

8      Q    And is it your opinion that the Convention

9   Center has market power in the national market for trade

10  show services?

11         MR. SLANIA:  Trade show services?

12         MR. L'ESTRANGE:  Excuse me.  Let me restate the

13  question.

14  BY MR. L'ESTRANGE:

15     Q    Is it your opinion that the Convention Center

16  has market power in the national market for hosting

17  trade shows?

18     A    Yes.  Sufficient to tie the provision of trade

19  show cleaning services.

20     Q    What data have you reviewed which is the basis

21  of that opinion?

22     A    I've reviewed the data in a number of the

23  reports provided by the trade show -- the Convention

24  Center expansion committee done by various consulting

25  firms and the statements made by officials of the

1    Convention Center characterizing what their -- their

2    market position is.

3             And I've reviewed some of the data on what

4    convention centers they claim to be competing with and

5    how many conventions they get and so forth.

6       Q    But if understand your testimony, you have not

7    made any conclusion as to what the market share is of

8    the San Diego Convention Center in the national market

9    for hosting trade shows.  Right?

10      A    I have not concluded on a particular number as

11   far as their market share, no.

12      Q    Do you have a range?

13      A    I think the range of 5 -- you know, 3 to

14   10 percent, somewhere in that neighborhood.  Definitely

15   more than the 3 percent.

16      Q    How did you reach that conclusion?

17      A    Based on the number of centers they said they

18   compete with.

19      Q    Anything else?

20      A    If they -- if there's -- if there's 20 centers,

21   then you start from an average of 5 percent per center

22   and then look to see whether it would be very much

23   different from that.

24      Q    Well, you know, included in that list of 20

25   centers are two in Las Vegas that each have over a

1    million square feet of exhibitor space.   Right?

2        A    That's right.

3        Q    And you would consider them to have the same

4    market share as the San Diego Convention Center in this

5    list of 20 centers?

6        A    No.   I would -- as I said, starting from an

7    approximately 5 percent market share, you would say,

8    well, it would be lower to the extent that there are

9    larger centers in San Diego.   But it would be higher to

10   the extent that San Diego has unique advantages.   And

11   there's been a lot of statements made about why trade

12   shows want to come to San Diego because it is a -- has a

13   wonderful climate and is a beautiful vacation spot,

14   which -- which Chicago is not.   And some -- some of the

15   other large centers do not have those advantages.

16            So you balance all these things and say, well,

17   they seem to have -- they seem to have some degree of

18   market power.   And when the issue is how much market

19   power does it take to tie the cleaning services, it

20   doesn't take very much.

21       Q    Well, my question really was directed at market

22   share.   And from what I understand, you take the list of

23   20 largest centers in the United States and you -- and

24   your starting point is a per capita division, meaning if

25   there are 20 centers, you start off with the assumption

60

1    that each center has a 5 percent share, and then you

2    make adjustments based on subjective factors to get to

3    the real market share number?  Is that what you're

4    saying?

5        A    Well, as I said before, I didn't express an

6    opinion about a market share number.  What I'm looking

7    at is whether there is a solid argument that there is

8    some -- some degree of pricing power.

9             And that pricing power, for the facts of this

10   case, is whether the monopolization of cleaning services

11   at the center, if they caused a 5- or 10- or 20- or

12   30-percent increase in the charges for cleaning

13   services, would result in conventions deciding not to

14   locate in San Diego.

15            So that is the degree of pricing power that I'm

16   looking at.  And I'm concluding, from my past experience

17   and from the statements made by all the consultants and

18   all of the officials from the Convention Center, that

19   there are substantial draws that San Diego has.

20            So it is my opinion that a 5- or 10- or

21   20-percent increase in the price of cleaning services

22   would not result in conventions saying we're not going

23   to San Diego, we're going to go to Las Vegas instead,

24   because of the price of cleaning services.

25        Q    Have you made any analysis to determine what

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGY
877.955.3855                                 Ex 6 p 175

1    factors are considered by trade associations in

2    selecting a location for a trade show?

3        A    Well, my information there comes from the

4    testimony.  There's -- there was testimony by Rick Simon

5    and other officials of United about there were also a

6    large number of declarations that were made in 2007 from

7    various representatives of decorators, trade

8    associations, et cetera.  And I took all that into

9    account in deciding how much weight to give them.

10       Q    Did you make any effort to contact any trade

11   association people directly to ask them what factors

12   they took into account?

13       A    No, I didn't.

14       Q    Is there any reason why you did not?

15       A    It wasn't necessary to reach an opinion about

16   how much pricing power it takes to have an

17   anticompetitive effect in the cleaning services market.

18       Q    So do you believe that the Convention Center

19   has pricing power, as you've defined it, in the national

20   market for hosting trade shows?

21       A    I -- yes, I believe that they could -- they

22   could increase or decrease the total cost of a national

23   trade show by 1 or -- 1 or 2 percent and not have it

24   affect their business.

25       Q    Do you know anything about the pricing by the

62

1    San Diego Convention Center on rental of its hall for

2    trade shows?

3        A    I've read some of their financials, but I

4    don't -- I don't -- I haven't seen the contracts that

5    they have with exhibitors.  I don't recall that I have.

6        Q    Are you aware that in some instances the

7    San Diego Convention Center does not charge anything to

8    a trade show to use the facility --

9        A    Yes.

10       Q    -- meaning zero rent?

11       A    Yes, I am aware of that.

12       Q    And is that -- where did you learn that

13   information?

14       A    From reading a lot of descriptions in the

15   Convention Center expansion report; that there were some

16   nonrevenue events and so forth and description of

17   different events.

18       Q    And that's consistent with your opinion that

19   the Convention Center has a market power in the national

20   market for hosting trade shows?

21       A    Certainly.

22       Q    I'd like to invite your attention to

23   Exhibit 433, Exhibit 10 to that document, which is the

24   largest convention centers.

25            MR. SLANIA:  The actual convention centers are

63

1    an exhibit to the report?

2            MR. L'ESTRANGE:  A list of.  But it's --

3            MR. SLANIA:  I was being facetious.

4            MR. L'ESTRANGE:  -- titled "Largest Convention

5    Centers."

6    BY MR. L'ESTRANGE:

7        Q    Are you on that page, sir?

8        A    Yes.

9        Q    Is this the list you were referring to earlier

10   in your testimony about the 20 largest convention

11   centers?

12       A    It might be.  I mean, I've seen the list in the

13   Convention Center expansion reports, and I believe it's

14   approximately the same list that's here.

15       Q    So you would agree, on this list, in this

16   grouping, the San Diego Convention Center is the

17   smallest in terms of total space.  Correct?

18       A    That's right.

19       Q    So would that influence your decision in terms

20   of measuring their market share?

21       A    No.  I was aware of its size when I -- and --

22   and, also, I said I did not have a specific market share

23   number that I arrived at.  Rather, there could be a

24   convention center that has a 1-percent national market

25   share, but because of other benefits or other draws that

1    they have, they have some pricing power.  In other

2    words, there are reasons why some conventions come to

3    San Diego, and they're unrelated to the fact that it's

4    800,000 square feet instead of 3 million square feet.

5        Q    As an economist, is that something that you

6    would try to measure, namely, what those other draws are

7    and how it would factor into trying to determine market

8    share?

9        A    If it could be precisely measured, that would

10   add to the information that would be available.  Yes,

11   that would be good.

12       Q    Well, you understand that sometimes economists

13   attempt to measure market share.  Correct?

14       A    Yes.

15       Q    And if you were given the assignment to measure

16   the market share of the San Diego Convention Center and

17   the national market for hosting trade shows, how would

18   you go about doing that?

19       A    I think it would be a large task.  I think you

20   would have to study the nature of the trade shows.  I

21   know there are some that always come to San Diego.

22   There are some that are regional.  There's the San Diego

23   boat show.  It doesn't usually locate in Phoenix.  So

24   you'd have to study the characteristics of the markets.

25            I've used, in the past, a statistical method

65

1   called hedonic regression, which uses characteristics

2   of -- in this case, characteristics of centers,

3   characteristics of conventions, and do a lot of

4   statistical testing to try to come up with the

5   probability that given types of conventions would locate

6   in San Diego.

7            And so it would be a large study.  And I note

8   with all the money that's been spent on the Convention

9   Center expansion project, the consulting firms that were

10  engaged there have not done that type of quantification.

11  Rather, they have done a qualitative analysis of the

12  advantages of San Diego.

13  Q    Take a look back at Exhibit 446.  And directing

14  your attention to the very first page of that document,

15  where you've got the description of the case in which

16  the report is given.

17           Is there any reason why you listed the

18  San Diego County Superior Court and the docket number in

19  that case for this report?

20  A    No.  I noticed, actually, as I was pulling

21  together all the documents to bring them here a couple

22  of days ago, that that mistake had been made.  And I'm

23  going to correct that before -- correct that as soon as

24  I have an opportunity.

25  Q    Well, I noticed that -- and from your

66

**JOHN S. HEKMAN, PH.D.**                    **12/10/09**

1    testimony, you've told us that you gave a declaration

2    and a supplemental declaration in the preliminary

3    injunction motion in the Federal Court.  Right?

4         A    Mm-hmm.

5         Q    Right?

6         A    Yes.

7         Q    And you knew that there was a prior action

8    pending in the State Court?

9         A    Yes.

10        Q    Did you do any consulting in connection with

11   the State Court, and particularly the motion for

12   temporary restraining order?

13             MR. SLANIA:  Before he answers that question,

14   that case has been dismissed.  There was no designation

15   of experts in that case.  And if in fact he consulted,

16   that would be subject to the work product privilege in

17   that case because he was not designated as an expert.

18   And that case no longer exists.

19             MR. L'ESTRANGE:  I don't agree with that, but I

20   think you might want to consult with him on it.

21             MR. SLANIA:  Let's see what the answer is.

22             MR. L'ESTRANGE:  Let's take a break.

23             MR. SLANIA:  Sure.

24             MR. L'ESTRANGE:  Let's -- no point in getting

25   into a fight on something that is meaningless.

67

1          MR. SLANIA:   Right.

2          (Recess.)

3     BY MR. L'ESTRANGE:

4       Q    Let's take a look at the report.  Your report,

5     which is Exhibit 446 -- could you take that, please.

6       A    Yes.

7       Q    Going to page 1 of the report, I'm looking down

8     at the paragraph which is numbered 2, beginning at about

9     the fourth sentence down, which describes your

10    assignment, and it says, "First, I have been asked to

11    define the relevant geographic and product markets in

12    this matter."

13      A    Yes.

14      Q    That was your assignment?

15      A    Yes.

16      Q    And what markets did you define and what were

17    the definitions?

18      A    I defined the geographic and product markets

19    for trade show cleaning services.

20      Q    Did you also define the product market for

21    hosting trade shows?

22      A    Not formally, no.

23      Q    So your market definition has been limited to a

24    definition of the market of what we referred to as the

25    tying -- the tied product.  Is that right?

                                                         68

1     A     Right.  And then just the opinion that -- that

2   there is market power in the national trade show market.

3     Q     But without defining that market?

4     A     Without giving -- without defining it to the

5   degree of who's in the market and precise market share

6   and so forth.

7     Q     How is it you were able to conclude that a

8   company had market power in a market that you hadn't

9   defined?

10     A     As I think I've stated before, I'm relying on

11   the testimony from everyone involved and the analysis

12   that's been done by consultants for the Convention

13   Center that say that they have a degree of market power.

14     Q     No. 2, "Second, I have been asked to determine

15   whether the San Diego Convention Center has market power

16   or monopoly power in the relevant market."  That was one

17   of your assignments?

18     A     Yes.

19     Q     And what did you conclude?

20     A     I concluded that they did have market power

21   prior to 2007 due to having approximately a 50-percent

22   market share, and also, because of their control over

23   the Convention Center where the market is located, they

24   have substantial market power due to that.

25     Q     And the market you're referring to in Item 2 is

1    the market for trade show services, as you've defined

2    it?

3              MR. SLANIA:   Trade show cleaning services?

4              THE WITNESS:   Trade show cleaning services.

5    BY MR. L'ESTRANGE:

6         Q    Excuse me.

7              Trade show cleaning services.  Is that right?

8         A    Yes.

9         Q    No. 3, "I have been asked to determine whether

10   the Convention Center has exercised market power or

11   monopoly power by instituting its policy under which the

12   Convention Center's cleaning services labor is used

13   exclusively for trade shows."  That was your third

14   assignment?

15        A    Yes.

16        Q    And what was your conclusion?

17        A    Excuse me.  I'm just reading the exact words

18   here.

19             Oh.  My conclusion is that they -- they did

20   exercise monopoly power by their policy change.

21        Q    In the market for trade show cleaning services?

22        A    That's correct.

23        Q    "Finally, I have been asked to determine

24   whether consumer harm has resulted from the Convention

25   Center's exclusive cleaning services policy."  That was

70

1    another assignment?

2        A    Yes.

3        Q    What was your conclusion in regard to that

4    assignment?

5        A    I have concluded that there was consumer harm

6    as a result of their exercise in monopoly power.

7        Q    As you've used the term "consumer harm," who do

8    you define as the consumer?

9        A    The -- the consumer can be considered the --

10   the decorators who pay for trade show cleaning services,

11   and they pass it along to the ultimate consumer.  So

12   there's a whole chain of people paying for these

13   services.  Ultimately, the consumer is the exhibitor or

14   the trade association.

15       Q    Well, in regard to your opinion, are you

16   focusing on any particular consumer?

17       A    Yes.  I think the -- the -- the ultimate

18   consumer is the -- is the trade show exhibitor.

19       Q    So in your opinion, where we see a reference to

20   consumer harm, that's a reference to trade show

21   exhibitors.  Is that accurate?

22       A    Yes.

23       Q    Directing your attention to page 3,

24   Paragraph 5, Item No. 1a says, "I have reached the

25   following opinions: a, the economically meaningful

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOG
877.955.3855                          Ex 6 p 185

JOHN S. HEKMAN, PH.D.                          12/10/09

1   relevant product market is trade show cleaning services

2   at SDCC."

3           That's a correct statement of your opinion?

4       A    Yes.

5       Q    And the market that you're talking about is the

6   market for the tied service.  Is that right?

7       A    Excuse me?

8       Q    For the tied service.

9       A    Yes.

10      Q    Okay.  And then Item b, "The relevant

11  geographic market is large convention centers in the

12  San Diego Metropolitan area, or, equivalently, the

13  SDCC."  That's your second opinion under Item 5?

14      A    Yes.

15      Q    And when you refer to, quote, "large convention

16  centers," how do you define the term "large"?

17      A    Well, it's defined in operational terms as

18  large enough to use the economically-meaningful product

19  market, which is the type of trade show cleaning

20  services that we're discussing here that are

21  differentiated from ordinary cleaning services.

22          And so it's my understanding that the -- the

23  market that we're talking about operates only at SDCC in

24  the San Diego area.

25      Q    When you talk about trade show cleaning

72

1    services, you're talking about the work done by

2    employees to clean booths and clean aisles and other

3    areas in a trade show.  Is that right?

4        A    Yes.

5        Q    And you understand that UNM also provides

6    cleaning services to trade shows at hotel sites in

7    San Diego.  Is that right?

8        A    Yes.

9        Q    Is there any difference between the work that

10   is done by UNM employees prior to July 1, 2007 at the

11   Convention Center and the work those same employees do

12   at hotel sites?

13       A    Yes.

14       Q    What's the difference?

15       A    The difference is what I explained in some

16   detail and in what's been detailed in a lot of the

17   testimony in the case and also by representatives of the

18   Convention Center, of the specialized nature of the

19   cleaning services that are done by firms like United for

20   larger trade shows.  It requires a large degree of

21   organization, supervision, and planning through which

22   they contract with the decorators.

23       Q    You're talking about the work that's performed

24   by the supervisors to coordinate the work, the labor

25   effort, right, in terms of the coordination,

1    supervision, and so on?

2       A    That's an important part of it, yes.

3       Q    Well, as far as the actual labor of vacuuming,

4    sweeping, or picking up trash, it's exactly the same at

5    a convention center as it is at a hotel site.  Right?

6       A    I don't consider myself an expert in giving an

7    opinion about whether it's exactly the same.  I've read

8    the testimony about how much training there is and so

9    forth.  That's the basis of my understanding.  There may

10   be differences.  There may not be differences.  I really

11   don't know.

12      Q    Does it make any difference to your opinion?

13      A    No.  Whether it's exactly the same?  No,

14   because I've detailed what are the distinguishing

15   characteristics of the services provided in this market.

16      Q    Well, I'm focusing not on the services

17   provided, but I'm going a step below that to the labor

18   by the people who are actually doing the cleaning.  I'm

19   talking about the people who push the vacuum cleaners,

20   sweep the floors, and pick up the trash.  Is their work

21   any different at the San Diego Convention Center than it

22   is at a hotel site?

23      A    That would depend on how they're directed by

24   the supervisors.  I would assume that it is different

25   because it's being directed differently.

1           MR. SLANIA:  Your question seems a little bit

2    vague -- excuse me -- maybe not vague -- ambiguous to

3    me.  And are you referring to the difference between

4    trade show cleaning versus other types of cleaning, or

5    are you asking whether trade show cleaning at the

6    San Diego Convention Center is the same as trade show

7    cleaning at other venues?

8           MR. L'ESTRANGE:  I thought it was pretty clear

9    that's what I am asking him.

10          MR. SLANIA:  Okay.  I didn't quite understand

11   that.  But let's --

12          MR. L'ESTRANGE:  We'll frame it in the terms

13   set forth by your counsel.

14   BY MR. L'ESTRANGE:

15      Q    Is the actual work done by the laborers to

16   perform trade show cleaning at the San Diego Convention

17   Center any different than the actual work done by

18   laborers who provide trade show cleaning services at

19   hotel sites such as in San Diego?

20      A    It's my understanding that it is different;

21   that they are trained to do things differently; that

22   there are issues of coordination and timing and the

23   schedule of move-in and move-out and so forth.  But when

24   it gets down to the really nitty-gritty details of

25   pushing a vacuum cleaner, I don't know.

1       Q    Okay.   Take a look at -- we're back on

2   Exhibit 446, page 3, Paragraph Sub g, which reads, "SDCC

3   has eliminated current and future competition and has

4   effectively raised prices for trade show cleaning

5   services in connection with its exclusion of non-SDCC

6   cleaning employees."

7            Those are your words as part of your opinion.

8   Correct?

9       A    Yes.

10      Q    When you used the phrase that they have

11  "effectively raised prices," what prices are you

12  referring to?

13      A    I'm referring to the amount that is billed in

14  terms of labor rates, 17-dollar-per-hour labor rate, and

15  the quantity of labor that's billed as compared to what

16  United estimates that it would bill.

17      Q    Well, let's first talk about the

18  17-dollar-an-hour pricing.   That is between the

19  Convention Center and UNM.   Correct?

20      A    For the most part, it has been up to this

21  point.   There's been some testimony about United -- the

22  decorators sharing in some of the losses that United has

23  had.   To that extent, the higher costs have been passed

24  on to the decorators, and, ultimately, to the final

25  consumer.

1          There's the increased number of hours.  So if

2   you look at the labor hours estimated by United versus

3   billed by San Diego for the shows that were analyzed,

4   there's -- that's a higher number.

5          So there's -- there's an increase in the cost

6   of cleaning services in those two ways.

7     Q    Have you done an analysis to determine the

8   differences, as you've described them, between what's

9   been estimated by United versus what's been charged by

10  the Convention Center for a particular trade show?

11    A    I asked Jonathan Atun, who had all the data and

12  was helping with the damages work, to provide me with a

13  breakdown of labor versus supervision hours for United

14  and to have him give me a total for all the shows of the

15  labor hours billed by SDCC versus labor hours billed by

16  United.  And that's -- the fact that United's were

17  greater is the basis for my saying that that's a form of

18  price increase.

19    Q    United's what were greater?

20    A    United's total billings of labor hours were

21  greater than -- I'm sorry.  I better start that again,

22  because I'm not sure which one I said.

23         The Convention Center's billing of labor hours

24  were greater than United's for the shows in which they

25  had this unusual relationship.

77

1       Q    Is there a document in your file that contains

2   the analysis you've just described?

3       A    I believe that I cited that fact in my rebuttal

4   report and footnoted it to something -- to one of

5   Dr. Kennedy's exhibits.  I'm pretty sure I footnoted it.

6       Q    If there is such a footnote in your rebuttal

7   report, would that mean that somewhere in your documents

8   on the flash drive there is an analysis that backs up

9   that footnote?

10      A    Yes, there should be.

11      Q    Prior to the change in policy at the San Diego

12  Convention Center in July of 2007, are you familiar with

13  any of the work the Convention Center did for Freeman

14  Decorating, any cleaning services?

15      A    I haven't studied it, no.  I just heard about

16  it.

17      Q    You're aware that before and after the change

18  in policy, the Convention Center has performed cleaning

19  services for Freeman Decorating.  Right?

20      A    Yes.

21      Q    And you understand that when that happens,

22  there are no people from UNM present or participating in

23  the effort.  Right?

24      A    Correct.

25      Q    So that's strictly the work force of the

1    San Diego Convention Center.  Correct?

2         A     Correct.

3         Q     And is it your understanding that in addition

4    to laborers, the Convention Center also provides

5    supervisors in connection with the work it performs for

6    Freeman?

7         A     All that I know is what Dr. Hayes has stated in

8    his report, which is that he states that they do

9    supervise the work.  And that seems reasonable to me.

10        Q     Do you know whether the Convention Center has

11   ever charged Freeman for the supervisor's hours?

12        A     Well, I don't know what they charged Freeman

13   for.  But, as stated in my report, since we're dealing

14   with the Convention Center and they're doing multiple

15   tasks at the Convention Center, you would have to know

16   how everybody gets billed, because the Convention Center

17   is doing their own cleaning with the same staff and

18   supervising, probably, with the same people.  So, you

19   know, how they bill Freeman is only one element of the

20   whole structure.

21        Q     Well, do you understand that after the change

22   in policy, for shows where UNM is the cleaning

23   contractor, that the Convention Center also provides

24   supervisors to supervise its own labor?

25        A      I understand only what Dr. Hayes has asserted

1    in his report.  I haven't seen any testimony to that

2    effect other than that.

3        Q    Do you have any reason to doubt that's what

4    happens?

5        A    No.  I don't doubt that there is some

6    supervisory relationship.  Since they're Convention

7    Center employees, they'll probably report to someone.

8        Q    They'll report to a San Diego Convention Center

9    supervisor.  Right?

10       A    I would assume so.

11       Q    And since the change in policy after July 1,

12   2007, you're aware that the UNM charges the decorators

13   for supervisor labor?

14       A    Yes.

15       Q    And are those charges any different than the

16   supervisory labor charges that UNM directed to the

17   decorators prior to the change in policy?

18       A    It's my understanding that there was no change

19   in the way in which that is done.

20       Q    So it's the same amount of supervisory time and

21   same amount of charges, both before and after the policy

22   from UNM, to the decorators?

23            MR. SLANIA:  Well, that's a little bit too far

24   down the road, because if the amount of time the

25   supervisor spends there is different in 2008 than they

1    did in 2006, then you're talking about different --

2    because you put in the amount of time billed.  That's a

3    little bit too far down the road.

4    BY MR. L'ESTRANGE:

5        Q    Have you made any analysis to determine whether

6    the amount of supervisor time that was put in by UNM

7    prior to July 1, 2007 was any different than the amount

8    for comparable shows after July 1, 2007?

9        A    No, I haven't.

10       Q    Do you know exactly what it is that the UNM

11   supervisors do at the Convention Center after July 1,

12   2007?

13       A    I haven't seen a description of their work, no.

14       Q    Directing your attention back to page 3 of this

15   exhibit, Item h, your opinion is that "The Convention

16   Center is an essential facility for competitors in the

17   trade show cleaning market, and SDCC has denied access

18   to this facility for competitors in the market."  That's

19   one of your opinions.  Correct?

20       A    Yes.

21       Q    What is your definition of "essential

22   facility," as you've used it in that opinion?

23       A    Well, I don't know how good I am at giving

24   concise definitions of terms, but an essential facility

25   is something that is necessary for competitors in a

81

1   marketplace to operate.

2       Q    Is that a part of the tie-in claim in this

3   case, as far as you're concerned, this concept of an

4   essential facility?

5       A    It's not directly connected to the tying claim.

6   It's another way to -- there are unique circumstances in

7   this case.  There is tying going on, but you can have

8   tying without having an essential facility.  This --

9   this case has tying that also deals with an essential

10  facility.

11           So, for example, I guess it would be possible

12  for the center to say, "We're not requiring everybody to

13  use us for cleaning, but we're not going to allow any

14  other cleaners into our building."  That would be the

15  essential facility argument, without, explicitly, the

16  tying argument, if you see what I mean.  Although, they

17  would be, in effect, the same thing.

18      Q    Directing your attention to page 4,

19  subparagraph n, as in Nancy.  It reads, "Consumers in

20  the market for trade show cleaning services have been

21  harmed."  That's one of your opinions.  Correct?

22      A    Yes.

23      Q    And according to what you said earlier,

24  consumers in this context means exhibitors.  Correct?

25      A    Yes.

1     Q     How have the exhibitors been harmed?

2     A     Well, in three ways:  One is higher billing,

3     which I would call pricing for -- which I mentioned

4     before, the fact that some of it, at least, has already

5     been passed on up to the -- to the consumer.  And as

6     soon as this artificial period is over during which

7     there's a lawsuit over the policy, it -- I feel it's

8     likely that prices will be higher.

9           Secondly, there's a loss of choice by the

10    consumer.  They have now only one cleaning firm to use

11    in the market.

12          And, third, there's a loss of quality because

13    the testimony has been that the Convention Center

14    attempted to win over some of the business from United's

15    clients by offering them -- assuming that it's true --

16    that they were offered additional move-in days or

17    various other benefits which were effectively -- had

18    some monetary value, and, yet, they -- they didn't want

19    to switch.  So they're being forced to take a supplier

20    that they -- that they didn't want.  And consumers are

21    harmed to that extent.

22    Q     Okay.  Let's take these one at a time.

23          The consumers you've defined as the exhibitors.

24    Correct?

25    A     Yes.

SARNOFF COURT REPORTERS AND LEGAL TECHNO
877.955.3855                      Ex 6 p 197

1    Q    And it's your understanding that the only type

2    of cleaning that's provided to exhibitors is booth

3    cleaning.  Right?

4    A    The facilities cleaning is paid for.  So that

5    that gets passed up the line somehow also.  Ultimately,

6    you can't consider that the decorators are paying for

7    facilities cleaning.  They have to be compensated.  So

8    you go up the chain to the top.  And that's who's paying

9    for all the services at the Convention Center.

10   Q    So just so we understand the structure here, as

11   I understand the way it works, a trade association such

12   as, let's say, the California Bar Association, would

13   enter into a contract with the Convention Center to use

14   the space there to put on the annual meeting of the Bar

15   Association.  And that is in the form of a license

16   agreement.

17        Have you seen any of those agreements?

18   A    I think I've seen them and not read them.

19   Q    Okay.  And that -- so as far as the California

20   Bar Association and the Convention Center are concerned,

21   that's a fixed price for the license agreement, as

22   defined in the contract.  Right?

23   A    Yeah.  Okay.  I'll take -- I'll assume that's

24   correct.

25   Q    The next element in the structure is that the

1   Bar Association will hire either an event planner or a

2   decorator to help organize the event.   Right?

3        A    Yes.

4        Q    Sometimes they hire an event planner, which, in

5   turn, hires a decorator; or sometimes they'll go

6   directly to the decorator.   Right?

7        A    Correct.

8        Q    The decorator then enters into a contract with,

9   in this case, the California Bar Association to provide

10  booths, electrical, and all kinds of other things to

11  make the convention work.   Right?

12       A    Yes.

13       Q    And then exhibitors are contacted, such as the

14  Westlaw, Lexus, companies like that, who will come and

15  have exhibit booths at the convention.   Right?

16       A    Yes.

17       Q    And those exhibitors then enter into the

18  contracts with the decorator for booth cleaning

19  services.   Right?

20       A    Yes.

21       Q    Among other things.   Right?

22       A    Yes.

23       Q    And you agreed earlier, and I think you will

24  still agree, that it's the decorator that determines

25  whatever they're going to charge to the exhibitor for

JOHN S. HEKMAN, PH.D.                              12/10/09

```
 1   booth cleaning services.
 2        A    Yes.
 3        Q    And then the decorator goes out and hires a
 4   contractor to provide the cleaning services, such as
 5   United, or in the case of Freeman, going directly to the
 6   Convention Center.  And they enter into an agreement for
 7   how much will be charged for those booth cleaning
 8   services.  Right?
 9        A    Yes.
10        Q    And if the decorator decides to charge 10 cents
11   a square foot, then the profit from that will be split
12   50/50 between the decorator and the cleaning contractor.
13   Right?
14        A    Yes, that's my understanding.
15        Q    And if the decorator decides to charge 30 cents
16   a square foot, same thing, it's split 50/50.  Right?
17        A    Yes.
18        Q    And neither the Convention Center nor United
19   have any control whatsoever over what's charged by the
20   decorator for booth cleaning services.  Right?
21        A    I don't know, in a long-term sense, what the
22   relationship is, but I understand that that's how it's
23   done on a convention-by-convention basis.
24        Q    So do you have any evidence to suggest that
25   those charges for booth cleaning services from the
```

86

1    decorator to the exhibitor have been raised since this
2    change in policy?
3        A    No, I don't have any knowledge of what the
4    change in the rates has been.
5        Q    So for all you know, the prices for exhibitors
6    to have booth cleaning may have actually gone down?
7        A    Yeah, I don't know what the rates have been.
8        Q    Looking also back at the second sentence in
9    subparagraph n, on page 4 of Exhibit 446, it says,
10   "Consumers have had their choices in the market reduced
11   to a single supplier, i.e. SDCC."
12            And, again, consumers, as you've used it in
13   this sentence, is the exhibitor.  Right?
14       A    Well, given all of the details that you've
15   brought in about relationships, I just want to point out
16   that the exhibitors are ultimately, for example, the
17   American Bar Association -- or did you say the
18   California Bar Association?
19       Q    Either one.  It doesn't matter.
20       A    Yeah.
21       Q    California Bar.
22       A    Yeah.  Okay.  So the Bar Association members
23   are the ultimate payors, in my mind.  Their association
24   may actually write the check for some of the services to
25   the center or whatever, but the Bar Association gets its

87

1    revenues from the members of the Bar Association.

2              So I'm looking at who is the ultimate consumer

3    in this whole process of having trade shows.  And in

4    this case, it would be the members of the Bar

5    Association.  And whether their representative --

6    their -- in terms of the association, paid for some

7    things or they individually as exhibitors paid for some

8    things, doesn't really change the fact that if you raise

9    one of the prices in the whole chain, it's ultimately

10   the exhibitors, or the members of the association, who

11   are going to ultimately pay.

12       Q    Do I understand from your answer that you just

13   provided that you're now saying that the consumers, as

14   you've used that phrase in your report, are not the

15   exhibitors, but instead are the members of the trade

16   association who are putting on the show?

17             MR. SLANIA:  He said exhibitors or members.

18   That was his testimony.

19   BY MR. L'ESTRANGE:

20       Q    Okay.  So now your testimony is that when you

21   use the phrase "consumer" in your report, it either

22   could mean the exhibitor at a trade show or it could

23   mean, in the case of the California Bar Association,

24   members of the bar?

25       A    Yes.  It's -- it's whoever is the ultimate --

1    there are different types of associations and different

2    types of groups that put on trade shows.  And it's

3    whoever ultimately pays the bills for those.

4        Q     Okay.  Well, let's pick another example.

5    Comic-Con, which you're probably familiar with, is a

6    large trade show that's put on at the San Diego

7    Convention Center.  In that case, who would you consider

8    to be the consumer for purposes of determining whether

9    there's been harm to competition?

10       A     Well, I don't know where the revenues come

11   from.  Perhaps -- perhaps it's people paying for

12   admission to the center.  Perhaps it's exhibitors.

13   Perhaps it's the association.  I haven't focused on

14   that.

15             I'm simply saying that if one of the elements

16   of the cost of trade shows goes up, whoever it is at the

17   top of the chain that is ultimately paying for it is

18   going to ultimately have higher costs.  And it could be

19   people paying for admission.  It could be exhibitors.

20   It could be trade associations, whatever.  And if that

21   needs more fleshing out, then maybe I need to supplement

22   my report by specifying how those relationships work and

23   who is at the top of the food chain in all of these

24   cases and who's ultimately paying.

25             But I think the principle here is that when a

1    cost goes up, there is someone who is paying for and

2    benefitting from the trade show that goes on, and one of

3    those costs has gone up and they're going to have to pay

4    more.

5        Q    But you really have made no analysis to

6    determine where the increased cost, if there is one, has

7    been absorbed, whether it's by the member of the

8    California Bar Association or whether the decorator has

9    simply decided to charge more to the exhibitor for booth

10   cleaning?  Am I correct?

11            If there's been an increase in costs to

12   somebody, you don't know who that somebody is?

13            MR. SLANIA:  Okay.  So you're talking about a

14   hypothetical situation of costs of increase?

15            MR. L'ESTRANGE:  Yes.

16            MR. SLANIA:  Okay.  So.

17            THE WITNESS:  Once again, we're in -- we're in

18   an artificial time period where litigation has been

19   filed, a charge has been made of excluding a competitor

20   from the market, of tying.  I wouldn't expect the

21   Convention Center to raise their labor rates and to

22   raise prices as much as they ultimately could during

23   this time period.

24            So I don't think it's possible to follow any

25   increase.  There have been relatively small increases in

1    costs up to this point.  But I don't think that's

2    representative of what will happen if the Convention

3    Center succeeds in this litigation.

4    BY MR. L'ESTRANGE:

5        Q    So are you telling me that as far as you know,

6    there may not have been any damage to the consumer, as

7    you've defined consumer, at this point?

8        A    The three elements of damage I've mentioned I

9    believe have occurred.  One is loss of choice.  Second

10   is poorer quality for those who did not want to have

11   SDCC.  And the third is the higher costs charged by

12   SDCC, to the extent they have been passed on to, at

13   least -- no, I have not done -- I have not asked the

14   decorators to show whether they have -- where the higher

15   costs that they have so far absorbed have gone.

16            But as an economist -- it's -- it will happen

17   in -- at some point that higher costs will get passed on

18   to the consumer.

19            MR. SLANIA:  Let's take a quick break.

20            MR. L'ESTRANGE:  Okay.

21            (Recess.)

22   BY MR. L'ESTRANGE:

23       Q    We're back on the record.

24            One of the things that you mentioned in your

25   answer earlier was an artificial period.  Is that a

SARNOFF COURT REPORTERS AND LEGAL TECHNOLO(
877.955.3855                        Ex 6 p 205

1    reference to the period during pendency of this

2    litigation?

3        A    Yes.

4        Q    And is it your understanding or belief that as

5    long as the litigation is pending, that SDCC will likely

6    not raise its prices for cleaning services?

7        A    Well, I think it is likely that since they have

8    held them steady for the last several years and the

9    higher costs that United has suffered -- United has just

10   absorbed them.  But they can't be expected to -- when

11   their contract is up and they have honored their

12   contract, they can't be expected to continue to lose

13   money by being in this artificial situation.

14            And once they are out of the market and once

15   the litigation is over, then I would expect that SDCC

16   would be able to raise their rates.

17       Q    What's the basis of that expectation?

18       A    They would have 100 percent of the market.

19   That they -- there was no -- there was no security

20   reason for their appropriating the booth cleaning

21   revenues.  They could have simply charged for their time

22   of their employees.  But they appropriated that revenue,

23   and it looks like they want this market so they can make

24   money from it.

25       Q    Any other bases for your belief that SDCC will

92

1    raise their prices after the litigation?

2        A    I don't -- I'm not privy to the discussions

3    that they have had, what their plans are.  But just my

4    experience, that when -- when someone has 100 percent of

5    the market, they -- prices are raised more than if there

6    was competition.

7        Q    So, based on your experience, you're

8    speculating that will happen here.  Is that true?

9        A    I don't think it's speculation.  I think it's

10   what almost always happens when someone gets 100 percent

11   of a market.

12       Q    Almost always is not always.  Agreed?

13       A    I don't know of any cases where it hasn't

14   happened.  I'm just -- it's possible that there are

15   cases where it hasn't happened.

16       Q    Well, you know from reading Dr. Hayes' report,

17   there are a number of other convention centers in

18   different parts of the United States that have a

19   so-called exclusive on cleaning.  Right?

20       A    Yes.

21       Q    Have you done anything to investigate what the

22   pricing is at those other convention centers?

23       A    No, I haven't.

24       Q    So do you have any idea whether the pricing for

25   San Diego Convention Center for its cleaning services is

93

1    in line with what's charged elsewhere?

2        A     Well, I've seen Dr. Hayes' analysis of labor

3    rates, but that's not -- that's only one element of

4    what's charged for cleaning.  So I haven't seen any

5    analysis of what is actually charged for cleaning.

6        Q     Now, you've talked about a loss of choice.

7    Whose choice are you referring to?

8        A     Well, the choice that the decorator makes of a

9    cleaning firm on behalf of their client.

10       Q     You understand that the exhibitor really has no

11   choice in the matter of who the cleaning service will

12   be, meaning it's whoever the decorator happens to have a

13   contract with.  Right?

14       A     As a literal matter, yes.  But the decorator is

15   in business to please their client.  And so there are

16   many places in the economy where you have somebody in

17   between the provision of one service and the payor for

18   the whole bundle of services.  So that doesn't mean that

19   there isn't a loss of choice in the marketplace.

20       Q     You also said that there's a loss of quality

21   that's occurred since SDCC took over the cleaning.  Is

22   that your testimony?

23       A     Yes.

24       Q     What's the basis of making that statement?

25       A     Well, I stated before, that the loss of quality

94

1    means that these were -- the decorators had expressed a

2    preference for United.  And even when approached by the

3    Convention Center and offered supposedly additional

4    benefits to switch, they chose not to.  So then to be

5    forced to switch to the Convention Center is, in -- from

6    an economic point of view, is loss of quality for those

7    decorators.

8        Q    What do you mean by quality in the context of

9    your answer?

10       A    It's the -- in this case, it's the perception

11   by the purchaser of the benefits, other than price of

12   the service that's being provided.

13       Q    So, for example, a decorator like GES may

14   believe that it's in its interests to have UNM do its

15   cleaning all over the United States for reasons other

16   than the actual quality of work that's done by UNM in a

17   particular location.  Is that true?

18       A    I'm trying to understand your question.

19            You're saying that GES would want United to do

20   their cleaning all over the United States and that it

21   wouldn't have to do with quality?

22       Q    No.  The question was poorly framed.  Let me

23   restate it.

24            You know, for example, that GES has a national

25   contract with UNM.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGI
877.955.3855                                   Ex 6 p 209

1      A     Yes.

2      Q     And UNM does work for GES in many locations

3   outside San Diego?

4      A     Yes.

5      Q     And there are certain benefits to GES to having

6   that national relationship with UNM.  Correct?

7      A     I presume.

8      Q     They have more leverage over them because they

9   account for a large amount of UNM's business.  Right?

10      A     Not necessarily.

11      Q     But there are benefits to GES to having a

12   national relationship with a cleaning contractor?

13      A     Because they have expressed a preference for

14   that, they may believe that there are.  I don't know

15   specifically what the benefits on either side of the

16   relationship are.

17      Q     But GES may have elected to not go with the San

18   Diego Convention Center prior to the change in policy

19   for reasons other than the actual quality of the

20   cleaning work.  Would you agree?

21      A     I'm sorry.  GES may have decided --

22      Q     To remain with UNM and not switch to SDCC,

23   prior to July 1, 2007, for reasons that had nothing to

24   do with the quality of the cleaning work.

25      A     I don't know what their -- I don't know what

JOHN S. HEKMAN, PH.D.                                    12/10/09

1      their specific reasons were.

2          Q    Right.   You don't really have any idea why GES

3      preferred to use UNM prior to July 1, 2007.   Right?

4          A    Well, I think the testimony that I've seen from

5      United's employees and from other declarations in the

6      case has been that they were -- that they were pleased

7      with the quality of United.

8          Q    But no one has complained, that you know of,

9      about the quality of the work done by SDCC, after SDCC

10     labor started to do the work.   Correct?

11             MR. SLANIA:   Misstates the evidence.

12             THE WITNESS:   Yeah, I don't recall whether

13     there have been complaints or not.   There may have been.

14             MR. L'ESTRANGE:   My question had nothing to do

15     with the evidence.   It was whether he's aware of

16     anything.   And his answer was he is not.

17     BY MR. L'ESTRANGE:

18         Q    So your question -- your comment about a loss

19     of quality has to do with something other than the

20     actual quality of the work being done.   Is that

21     accurate?

22         A    No.   I --

23             (Cell phone interruption.)

24             THE WITNESS:   Excuse me.

25             No.   I -- when I wrote this, I had in mind also

SARNOFF COURT REPORTERS AND LEGAL TECHNOLO(          Ex 6 p 211
877.955.3855

1    the statements that had been made that decorators were

2    pleased with United and may have felt that United had

3    higher quality than SDCC.   That's what I had in mind.

4    BY MR. L'ESTRANGE:

5        Q     Okay.   One of the other things that you said

6    was that there have been larger -- or excuse me.   Let me

7    withdraw that.

8             One of the other things you said was that the

9    Convention Center has charged more hours for cleaning

10   jobs than UNM has estimated.   Is that right?

11       A     Yes.

12       Q     What data have you reviewed that leads you to

13   that conclusion?

14       A     The data compiled by Patrick Kennedy.

15       Q     Okay.   Do you want to --

16       A     I'm going to shut it off so that it doesn't

17   happen again.   Sorry about that.

18       Q     Going back to page 4, item n, the last

19   paragraph, it says, "And the prices charged by SDCC are

20   higher than those charged by United National."   Let's

21   break that into pieces.

22             First of all, the prices charged by SDCC for

23   booth cleaning revenue are exactly the same as the

24   prices that have been charged by UNM to the decorators.

25   Correct?

1          A    Yes.

2          Q    And as far as the charges for facilities

3    cleaning, as we've used that term, are now about the

4    same as between UNM and -- what UNM charges the

5    decorators and what SDCC charges UNM?

6               MR. SLANIA:  Misstates prior testimony and the

7    evidence.

8               THE WITNESS:  I'm focusing, as I -- as I said

9    in my rebuttal report, I'm focusing on the time at which

10   the policy was implemented.  And since that time, I

11   think that the failure of SDCC to raise their labor

12   rates, you know, can be explained by the fact that they

13   have been sued.

14              And so I -- I'm looking at the fact that at the

15   time the policy was instituted, they were charging a

16   higher labor rate, and that for the jobs that

17   Dr. Kennedy has analyzed, they charged a larger total

18   amount for labor than United did.

19   BY MR. L'ESTRANGE:

20         Q    Based on the review that you did of

21   Dr. Kennedy's analysis?

22         A    Yes.

23         Q    Okay.  Directing your attention to page 5 of

24   your report, Paragraph 9.  Why don't you read the entire

25   paragraph, and then I'm going to ask you about the two

99

1    sentences that are at the end of page 5 and go to the

2    top of page 6.

3         A    I recall it.

4         Q    This paragraph deals with the definition of the

5    geographic market.  Right?

6         A    Yes.

7         Q    And in this case, the geographic market for the

8    tied product?

9         A    Yes.

10        Q    Now, it reads, "The geographic market in this

11   case would include part of San Diego, but obviously not

12   include the rest of the U.S.  In this case, the size of

13   the market is determined by the willingness of consumers

14   to travel to competitors, as well as the ability of

15   competitors to enter the market."

16             In the sentence that I've just read, the second

17   sentence, what group are you referring to by the term

18   "consumers"?

19        A    Purchasers of groceries.

20        Q    But if I understand the second sentence, it's

21   not in reference to the hypothetical that follows, but

22   rather it said, in the first phrase in the second

23   sentence, "In this case the size of the market is

24   determined."

25        A    I'm sorry for the confusion.  That phrase

1    refers to in this case of a Safeway in San Diego.  I

2    don't know whether you interpreted it to mean this case,

3    this litigation.

4        Q    You're talking about this hypothetical case

5    referring to the grocery store example?

6        A    That's right.

7        Q    Directing your attention to page 9,

8    Paragraph 16.  Please feel free to read the entire

9    paragraph.  I'm interested in the third sentence which

10   says, "SDCC does not compete with the smaller hotel

11   convention facilities in the San Diego area for trade

12   shows."

13       A    Yes.

14       Q    Are you aware that the San Diego Convention

15   Center does host small meetings and trade shows from

16   time to time?

17       A    Yes.

18       Q    And those small meetings and trade shows that

19   it hosts from time to time would also fit in one of the

20   local hotel venues?

21       A    Yes, I'm aware of that.

22       Q    And you -- for some reason, you don't view that

23   as competition between the Convention Center and the

24   hotels for that business?

25       A    Correct.  There's more detailing of this that

1    needs to be done, given the back and forth that I've had

2    with Dr. Hayes, because he -- he brought out the number

3    of 500-some events that took place last year at the

4    Convention Center.  And then he pointed out how many of

5    them were small meetings or small trade shows, which

6    turned out to be, in many cases, meetings.  And he said

7    that many of those could fit into one of the other

8    facilities in the San Diego area.  So that's how I

9    understand the first -- the first idea here.

10          And what I said in response was that the

11   officials of the Convention Center have said that these

12   smaller meetings are ones that they don't make any money

13   on, or very little money.  They're economically

14   unimportant to the center; that the center's market, as

15   they see it, is the larger trade shows and is the

16   competition with these 20 other centers that we talked

17   about around the U.S.  So it may be the case that some

18   of the small meetings that take place at the San Diego

19   Convention Center have, from time to time, been in other

20   smaller venues in San Diego.  That doesn't really mean

21   that the market -- that those smaller venues are in the

22   same market as the San Diego Convention Center, because

23   the Convention Center exists not to have these small

24   meetings, but to have the larger conventions.  And

25   that's why they're expanding.

102

JOHN S. HEKMAN, PH.D.                    12/10/09

1           And I would like to add one more thing that I

2    said in my rebuttal report, and that is that Dr. Hayes

3    did not provide a single example of a smaller meeting

4    that did, at times, meet in smaller venues in San Diego,

5    in other words, that an association or other group that

6    had been in both places.  He was basing his opinion only

7    on the square footage issue.

8       Q    So are you aware that the California Bar

9    Association, which has held its annual meeting at the

10   San Diego Convention Center, now holds that meeting at a

11   hotel in San Diego when it's in this area?

12      A    I'm not aware of that specific case.

13      Q    Did you make any inquiry to find out if there

14   were any instances where there are trade associations or

15   event organizers who have put on shows both at the

16   San Diego Convention Center and at a hotel site?

17      A    I did investigate to the extent that I looked

18   at all the material that was available, analyzing the

19   market for the Convention Center.  But I did not reach

20   out to any associations or do a wider type of market

21   research.

22      Q    Directing your attention to page 11 of

23   Exhibit 446, Paragraph 20.  And I will represent to you

24   that I'm interested in the last three sentences which

25   begin on page 11 and go to the top of page 12.

1      A    Okay.

2      Q    It says, "When United does not have enough

3   workers in a particular city for a large trade show,

4   they do not hire local cleaning workers.  Instead, they

5   bring in their own workers from other cities, presumably

6   at considerable cost.  United's workers, other than

7   supervisors, are part-time, not salaried.  So it is not

8   because they are already being paid that they are used.

9   Rather, it illustrates the specialized nature of the

10  work."

11          Directing your attention to those sentences

12  that I've just read, is it your understanding that prior

13  to the change in policy in July of 2007, that United

14  National Maintenance had a group of employees that

15  worked in San Diego at the Convention Center?

16     A    Well, the testimony of Gabriel Ramirez was that

17  they had a group that I believe they added to from time

18  to time and that they recruited people in the San Diego

19  area to be their cleaning employees for -- that were

20  available for these larger conventions.

21     Q    And it was your understanding those were

22  employees of United National Maintenance?

23     A    I think in some cases they were employees of

24  one of United's other subsidiaries, but they were the

25  group that Gabriel had -- had recruited or had put

JOHN S. HEKMAN, PH.D.                          12/10/09

1   together.

2       Q    Are you aware that United National Maintenance

3   has represented to the California Franchise Tax Board on

4   more than one occasion that it had no employees in

5   California?

6            MR. SLANIA:  I believe that also misstates the

7   evidence.

8            THE WITNESS:  I haven't seen anything on that.

9   BY MR. L'ESTRANGE:

10      Q    Now, you say that United would "bring in its

11  own workers from other cities, presumably at

12  considerable cost."  What's the basis of that statement?

13      A    The testimony of Charles Linn that I cited.

14      Q    Do you know what the cost is that you have

15  characterized as considerable?

16      A    Well, the cost of bringing someone in, given

17  the wage rates that are paid and that it adds a

18  significant amount, in my opinion, to the -- for a

19  particular show to bring a person in like that.

20      Q    Do you know how often that happened?

21      A    From time to time.  I don't know how often.

22      Q    Do you know what the cost was that was incurred

23  by United National Maintenance over the last five years

24  for these employees that were brought in from other

25  places?

SARNOFF COURT REPORTERS AND LEGAL TECHNOL        Ex 6 p 219
877.955.3855

```
 1        A     No, I haven't seen that.
 2        Q     So for all you know, it could be less than
 3   $100?
 4        A     I don't see how you can bring someone in from
 5   another city several times and it would be less than
 6   $100.
 7        Q     But you don't know what it was?
 8        A     But I don't know.  I haven't seen the numbers.
 9        Q     I'd like to direct your attention to page 12.
10   And this is a sentence in Paragraph 21 of your report.
11   Let me read it to you.  It says, "Show organizers spend
12   years cultivating relationships and advantageous pricing
13   with their chosen suppliers.  In-house exclusives
14   arbitrarily increase costs to show organizers -- and
15   therefore exhibitors -- while decreasing the quality of
16   the service provided due to lack of competition."
17              That's a statement that's in your report?
18        A     Yes.
19        Q     What's the basis of that statement that
20   in-house exclusives arbitrarily increase costs to show
21   organizers?
22              MR. SLANIA:  The document speaks for itself.
23   It's a quote.
24              THE WITNESS:  I'm quoting the declaration of
25   Mary Beth Rebedeau.
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGI
877.955.3855                              Ex 6 p 220

1    BY MR. L'ESTRANGE:

2        Q   Are you adopting that statement as your own?

3        A   I'm not adopting the analysis, any analysis

4    that she's done, to show that it's -- that it increases

5    the costs to show organizers.  But rather, I was quoting

6    it to illustrate the unhappiness that people, such as

7    Mary Beth, have with having exclusives.  That was her

8    reason.

9        Q   Directing your attention to page 15,

10   Paragraph 28, on Paragraph -- or it includes the

11   following sentence:  "Increases in the price of trade

12   show cleaning services are paid by the decorator.  But

13   these increases are passed along to the exhibitor, which

14   reduces the impact of the price increase."

15           Do you have any data to back up that statement?

16       A   No.  The point I'm making here is that -- is

17   the 5 percent figure, that the cleaning services are

18   5 percent or less of the total cost of exhibitors.  So

19   by the time they go up through the chain, they become,

20   in a relative sense, less important.

21       Q   So you have no data to actually back that up.

22   Correct?

23       A   I don't know what you mean by data.

24       Q   Facts, figures.

25       A   In other words, how much of a price increase

107

1    gets passed on and how much gets absorbed by the

2    exhibit -- by the decorator?  Is that what you mean?

3        Q    Yes.  Mm-hmm.

4        A    No, I don't have data for that.

5        Q    Directing your attention to page 16,

6    Paragraph 29.  I'll read this.  Quote, "SDCC has

7    monopoly power in the large trade show market in the

8    San Diego region and also has market power in the

9    national trade show market."  That's part of your

10   opinion.  Is that correct?

11       A    Yes.

12       Q    Who are the San Diego Convention Center's

13   competitors in the national trade show market, as you

14   use that phrase in Paragraph 29?

15       A    The large centers they have identified that

16   they feel they can compete with.

17       Q    This is the 21 centers that are identified in

18   Dr. Hayes' report?

19       A    Well, they may be the same ones, but they were

20   identified in materials for the convention expansion

21   task force.

22       Q    So as an economist, in determining the size and

23   definition of a market, would you rely solely on the

24   information by one of the participants in the market as

25   to who they viewed as their competitors?

**JOHN S. HEKMAN, PH.D.**                                    12/10/09

1      A    As a general statement, I don't know.  It would

2  depend on the facts that were available.

3      Q    Well, for example, would it be useful to

4  contact some of the other participants in the market and

5  see who they view as their competitors?

6      A    That would add more information, yes.

7      Q    Did you do that?

8      A    No.

9      Q    Would it have been useful to have had someone

10 on the legal team for UNM take the deposition of the

11 marketing director at the San Diego Convention Center

12 and see who they viewed as their competitors for the

13 business that they were trying to get in the Center?

14     A    I think people from the San Diego Convention

15 Center have expressed who their competitors are in the

16 reports that I've seen.

17     Q    And that's what you're relying on for your

18 definition of the market?

19     A    That's part of what I relied on, yes.

20     Q    Directing your attention to page 18,

21 Paragraph 34, it says, "While SDCC allows United and

22 others to contract with decorators for the provision of

23 cleaning services at the Center, it is SDCC's workers

24 who do the work, and SDCC appropriates all of the

25 revenue" that was previously paid to United.

109

1           That's your statement.  Is that right?

2      A    Yes.

3      Q    Well, before the change in policy, one stream

4  of revenue that was paid by the decorators to United was

5  for United's supervisory workers, such as Gabriel

6  Ramirez.  Right?

7      A    Yes.

8      Q    SDCC has not appropriated that stream of

9  revenue.  Has it?

10     A    No.  Specifically, what SDCC appropriated was

11 the booth cleaning revenue.  Then there was the more

12 complicated relationship of billing for the facilities

13 cleaning.  So they haven't technically appropriated

14 that, but they have -- they do the work and bill United.

15 And then United will either make or lose money,

16 depending on how much they've contracted for.

17     Q    Well, but when you say, "SDCC appropriates all

18 of the revenue that previously was paid to United,"

19 that's not correct.

20     A    That should have said all of the booth cleaning

21 revenue, and it should have had additional details in

22 it.

23     Q    Did you examine the contractual relationship

24 between UNM and Champion before the change in policy at

25 the Convention Center?

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOC        Ex 6 p 224
877.955.3855

1      A    I've seen the contract, but I wouldn't
2  characterize that as my examining the relationship.
3      Q    Well, prior to the change in policy, did
4  Champion and UNM split booth cleaning revenue 50/50?
5      A    You know, I don't recall what the exceptions to
6  the policy were, whether -- all I recall is that in the
7  majority of cases, they were splitting it.
8           But I do recall testimony that in some cases,
9  it was a little bit different than that.  So I don't
10 know if you're referring to that.
11     Q    Directing your attention to page 19,
12 Paragraph 35, the first sentence reads, "SDCC has forced
13 United and other competitors in the market to operate at
14 a loss."
15          Who are the other competitors that are referred
16 to in that sentence?
17     A    By that, I mean any other competitors that
18 would be operating the same as United.  Right now, I
19 don't believe there are any others.  There have been in
20 the past.  But my point is that there can't be any -- if
21 there's anyone who wants to operate at the center,
22 they're going to have to operate at a loss because of
23 this policy.
24     Q    Directing your attention to page 38 -- excuse
25 me -- page 20, Paragraph 38.

111

1      A    Oh, I thought we were going to page 38.

2      Q    Paragraph 38, the first sentence reads, because

3   of the long-term nature of SDCC's contracts with large

4   convention trade shows, extending 10 or 15 years in some

5   cases, the exclusionary action by the -- that SDCC has

6   taken with regard to trade show cleaning services has

7   locked in customers who use those -- these services.

8           How many such contracts does the SDCC have that

9   extend 10 or 15 years in advance?

10     A    I don't know specifically.  Since writing this,

11  you know, there's been -- I read Dr. Hayes' report and

12  then I went and read some more of the statements made by

13  Carol Wallace and so forth.  So what I've read is that

14  there is a large number that are booked three to five

15  years.  There are some that are booked over ten years.

16  So I don't have a number for what the average is.  And I

17  don't have specific conventions and how long in advance

18  they're booked.

19     Q    Directing your attention to page 22, 43.  The

20  sentence I'd like to invite your attention to says,

21  Forcing the consumer to purchase the tied good results

22  in harm to consumers in that those consumers pay higher

23  prices and those who would have wished to purchase trade

24  show cleaning services from a competitor of SDCC are

25  prevented from doing so.  Consumer choice is

1    restricted."

2           In the context that I have just read to you,

3    who is the consumer?

4       A    Well, as we've discussed for facilities

5    cleaning, the exhibitor would be the consumer.  And the

6    decorator would be choosing which cleaning firm to use

7    on behalf of exhibitors.

8           So there's a -- there's an intermediary party,

9    but it's still -- I still stand behind the statement

10   that consumers are losing the choice.

11      Q    "Forcing the consumer to purchase the tied

12   good," in that part of the sentence, who do you mean by

13   "consumer"?  The decorator?  The exhibitor?  The trade

14   show?  Or some other party?

15      A    The -- the party being -- being forced to

16   choose the cleaning service is the decorator.  But they

17   are not the ultimate consumer because they are not

18   ultimately paying for the good.  It would be the

19   exhibitor, and the decorator is choosing on their

20   behalf.

21      Q    But I think from what your prior testimony was,

22   you don't know whether the exhibitors are paying higher

23   prices or not for booth cleaning services.  Correct?

24      A    Well, right now, United is taking the losses

25   and is suffering the damages from this policy.  And were

113

JOHN S. HEKMAN, PH.D.                              12/10/09

1   it not for United honoring their contracts, it would be

2   passed on.

3        Q    You're not suggesting United is the consumer in

4   the section I've just read.  Are you?

5        A    No.  United is the competitor.  But they are

6   suffering the consequences of this policy.

7        Q    Well, you're familiar with the old adage that

8   the antitrust laws are designed to protect competition,

9   not competitors.  Correct?

10       A    I am.

11       Q    And the competition that would be used in that

12  adage would be what in this case?  What is the

13  competition that you think has been damaged?

14       A    Well, what that -- the way I understand that

15  adage is that the laws are meant to protect competition,

16  meaning to -- to provide that there would be competition

17  between a firm such as United and a firm such as SDCC.

18            Competition has been harmed because the

19  competitor has been excluded from the market.

20       Q    Okay.  Directing your attention to page 25,

21  Paragraph 50.  The second and third sentence -- well,

22  excuse me.  The second reads, "Economists have no

23  special ability to measure the need for security at a

24  facility such as SDCC."

25            That's your statement.  Right?

114

1      A     Yes.

2      Q     And you stand by that?

3      A     Yes.

4      Q     You're not offering any opinion in this case

5  whether the security rationale that was given by the

6  Convention Center was a pretext.  Are you?

7      A     I'm offering testimony about the -- how the

8  situation looks from the economist's point of view.  But

9  I'm not offering testimony about the -- to say who does

10  and does not need security or the actual security

11  issues.

12          But I am offering testimony about the

13  environment of this decision in terms of the things that

14  I put in here about whether they did the same thing with

15  other nonemployees in the center and so forth and

16  evaluating that from an economic point of view.

17      Q     Is it your opinion that the security at the

18  San Diego Convention Center is lax?

19      A     I have not reached that opinion.

20      Q     So if you look at Paragraph 53 on page 27, it

21  says, "SDCC does not use a photo ID system for security,

22  and its monitoring of outside employees accessing the

23  facility is lax."

24          Is that your opinion, or are you simply

25  reciting something that was said by Charles Buddy Linn?

115

1      A      Right.  I'm -- I'm reporting on the testimony

2   of Mr. Linn.  And in my rebuttal report, I think I cited

3   the testimony of Mr. Simon.  I did here too.  So I'm

4   reporting on the testimony of -- of these two people and

5   saying that essentially if what they say is true, then

6   that adds credibility to the idea that the decision

7   wasn't made because of security, but rather because of

8   economics.

9      Q      But you're not giving any opinion whether their

10  assessment of the security situation at the Convention

11  Center is accurate or not?

12     A      I'm not, because I'm not a security expert.

13            MR. L'ESTRANGE:  Let's go off the record for a

14  second.

15            (Discussion off the record.)

16  BY MR. L'ESTRANGE:

17     Q      We're on page 29, and I'd like to invite your

18  attention to Paragraph 58, the following sentence:  "In

19  addition, when United National's current locked-in

20  contract rates expire, SDCC will be charging more for

21  the same number of hours estimated for purposes of

22  setting a not-to-exceed amount."

23            What is the basis of making that statement?

24     A      I'm referring here to the point at which the

25  exclusionary policy was adopted in July of 2007, that

1    SDCC was charging a higher hourly rate than -- than

2    United, so that if they were -- I'm saying if they were

3    billed the same number of hours, it would be a higher

4    amount because they're charging a higher labor rate.

5         Q    But you understand now UNM is actually charging

6    a higher labor rate for facility cleaning.  Right?

7              MR. SLANIA:  Misstates the evidence.

8              THE WITNESS:  Well, I think I said before, I

9    haven't seen an overall analysis of that.  But I

10   understand that I've seen cases where they have raised

11   their rates.

12   BY MR. L'ESTRANGE:

13        Q    In that same Paragraph 58 on page 29 in

14   Exhibit 446, it says, "Also, it appears that SDCC is not

15   using supervisors for cleaning jobs where United has the

16   contract and uses its own supervisor."

17             What is the basis of that statement?

18        A    Well, when I wrote this report, I understood

19   that they were not billing for supervisors.  Then

20   Dr. Hayes said that they -- that SDCC has supervisors

21   working.

22             So I think the way I would word this now is

23   not -- is not charging for supervisors, but they're

24   charged for -- in some other way.

25        Q    Quick question before we break for the lunch.

117

1          You understand that there are two separate

2     services that we're talking about here.  One is the

3     service of hosting trade shows, and the other is the

4     service of cleaning service, of cleaning booths and

5     facilities for trade shows.  Right?  Let me -- let me

6     back up a bit.

7          You have defined in your report trade show

8     cleaning services.  Right?

9     A     Yes.

10    Q     And those services are purchased both by trade

11    show organizers for the facility, as well as by

12    exhibitors for their booths.  Right?

13    A     Yes.

14    Q     And would you agree with me that exhibitors

15    would never purchase trade show services except in

16    connection with the trade show -- excuse me.  Let me --

17         You would agree with me that exhibitors would

18    never purchase trade show cleaning services except in

19    connection with a booth at a trade show?

20    A     You mean, if they're not going to be at the

21    Convention Center, then they wouldn't have any use of

22    cleaning services?

23    Q     Right.

24    A     I agree.

25    Q     And would you agree also that decorators and

1    trade show organizers are not going to purchase facility

2    cleaning unless it's in connection with a trade show?

3         A    Yes, as I understand it.

4              MR. L'ESTRANGE:  Okay.  Let's break for lunch.

5              MR. SLANIA:  Sure.

6              (Lunch recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       San Diego, California;Thursday, December 10, 2009;

2                            1:27 p.m.

3

4                      EXAMINATION (Resumed)

5   BY MR. L'ESTRANGE:

6       Q    I'd like to do a follow-up question with

7   respect to Exhibit 446, which is your report.  I invite

8   your attention to page 16, Paragraph 29.

9       A    Okay.

10      Q    Specifically, the sentence that reads, "SDCC

11  has monopoly power in the large trade show market in the

12  San Diego region and also has market power in the

13  national trade show market."

14           When I asked you about that earlier, your

15  answer was that in response to my question, "What was

16  the basis for that statement?" you said a report by the

17  SDCC, among other things.  And I want to follow up on

18  that and find out what are the -- all the bases for that

19  statement in Paragraph 9 -- excuse me -- Paragraph 29 on

20  page 16 of Exhibit 446.

21      A    Okay.  Well, it would be one basis is the

22  Convention Center website, which describes their market

23  and who they -- who they serve.

24           Another is the -- there are, I believe, three

25  reports that are on the Convention Center expansion

1    website, one by the firm ERA; and one by -- I believe

2    it's PricewaterhouseCoopers, one of the accounting

3    firms; and one by an economist who specializes in

4    Convention Center economics that they retained.  And I

5    read all of those and all of the reasons that they

6    provided for -- for why there was essentially drawing

7    power for the Convention Center.

8          And then I read testimony in the case.  And

9    there were some statements there about large trade shows

10   and where they go.  So I -- from what I can recall,

11   those would be the bases for the opinion.

12   Q     Whose testimony did you read that you were

13   referring to?

14   A     I don't recall if it was Rick Simon -- I don't

15   recall right now whose -- whose testimony it was.  But I

16   believe there was some talk about, in connection with

17   the contracts that United has, that they -- because they

18   specialize in larger trade shows at larger convention

19   centers around the country.

20         So putting all those things together, I feel

21   that there's -- that the San Diego center has

22   significant drawing power.

23   Q     Did you rely on any assumptions in writing your

24   opinions that you expressed in your report?

25         MR. SLANIA:  This is any of them.  Right?  Not

1    just this statement?

2              MR. L'ESTRANGE:  Yes.

3              MR. SLANIA:  Okay.

4              THE WITNESS:  Rely on assumptions in --

5    BY MR. L'ESTRANGE:

6         Q    In forming your opinions.

7         A    In forming all of my opinions?

8         Q    Yes.  We can go through them one by one, but I

9    thought I'd ask the question broadly first.  If your

10   answer is no, then we can go on to something else.

11        A    It's not a question that connects very well

12   with me because I don't -- my first reaction is that I'm

13   not making assumptions; that I'm looking at the facts of

14   the case and I'm using my knowledge of economics to --

15   to analyze the situation.  So I'm not -- I'm not

16   thinking of any assumptions that I'm making.

17             But assumption is a pretty broad word, you

18   know.  So I -- I can't think of any assumptions that are

19   important for achieving -- or reaching my opinions.

20        Q    Would it be accurate to say that one assumption

21   you made is that when the litigation is concluded, the

22   San Diego Convention Center will raise prices for trade

23   show cleaning services?

24        A    I don't know if that's an assumption or what I

25   said before was that it's a -- it's a conclusion of

                                                        122

1    economic theory, that when a firm gets in a monopoly

2    position, they use that to raise prices.  Now, you can

3    look at other elements of the situation, and I think

4    those just strengthen it, that the Convention Center

5    will have tremendous leverage over decorators because

6    they control both the Convention Center and the

7    exclusive cleaning services.

8            So I see it not really as an assumption, but as

9    a conclusion of economic theory and experience that this

10   will result in higher prices.

11      Q    You're assuming the Convention Center will

12   raise its prices at the conclusion of litigation?

13           MR. SLANIA:  Misstates his testimony.  He said

14   it was a conclusion, not an assumption.

15           THE WITNESS:  I'm not assuming they will.

16   BY MR. L'ESTRANGE:

17      Q    Okay.  You just really don't know one way or

18   another what will actually happen.  Right?

19      A    Well, I'm saying it is the -- it is the

20   conclusion of all of the economic theory and evidence

21   that I've seen in my career that that is what occurs.

22   But I do not just assume that it will occur.

23      Q    It may not?

24      A    It is possible that it will not occur.

25      Q    We're finished with Exhibit 446 for the moment.

123

1    And I've handed you Exhibit 447, previously marked,

2    which is your rebuttal report.

3              THE WITNESS:  Can I take a moment to take off

4    my coat, because it's getting kind of warm in here.

5              MR. L'ESTRANGE:  Of course.

6              THE WITNESS:  Okay.  I'm ready.

7    BY MR. L'ESTRANGE:

8       Q    Would you confirm that Exhibit 447 is a copy of

9    your rebuttal report in this case?

10      A    Yes, it appears that it is.

11      Q    And you signed this on or about November 12th,

12   2009?

13      A    Yes.

14      Q    I'd like to direct your attention to page 3,

15   Paragraph 8 of the rebuttal report.

16      A    Okay.

17      Q    And the sentence that I'm interested in reads

18   as follows:  "The provision of cleaning services by some

19   convention centers is properly seen as a form of

20   vertical integration, that is, of a firm producing a

21   service (trade show services) that also produces one or

22   more of the inputs used in the service (cleaning

23   services)."

24              Would you describe what the San Diego

25   Convention Center did in its change of policy in July of

Case 3:07-cv-02172-AJB   Document 150-3   Filed 03/04/11   Page 250 of 595

JOHN S. HEKMAN, PH.D.                    12/10/09


1    2007 as being a form of vertical integration?

2        A    No, I don't think that's a correct statement to

3    say vertical.  I think it's correct to say that they

4    excluded a competitor in a market for services that

5    resulted in -- that may result later in them becoming

6    more vertically integrated.

7        Q    Well, your statement says, "The provision of

8    cleaning services by some convention centers is properly

9    seen as a form of vertical integration."

10            What convention centers are you referring to

11   there?

12       A    The ones that have been mentioned in the

13   testimony as -- as having exclusives.  And I don't know

14   the history of those exclusives, but ones that have

15   exclusive cleaning services.

16       Q    So, for example, the Mandalay Bay in Las Vegas

17   has an exclusive cleaning service.  Would you consider

18   their providing that service on an exclusive basis a

19   form of vertical integration?

20       A    Yeah, it can be seen that way.  If they -- if

21   you provide -- if you produce some of the inputs for the

22   product or the service, then -- then you're more

23   vertically integrated.

24       Q    And you also read the depositions of -- or the

25   deposition of Mark Epstein, where he gave testimony

125

SARNOFF COURT REPORTERS AND LEGAL TECHNOLO(
877.955.3855                          Ex 6 p 239

1     about the Heinz Center in Boston that has an exclusive

2     on cleaning.  Do you remember that?

3          A     Yes, I do.

4          Q     And do you consider what Boston Convention

5     Center did as a form of vertical integration?

6          A     Well, it's a fact that if -- if you -- yeah.

7     It's a fact if you produce more of your component

8     services, that you're more vertically integrated.

9          Q     Is it your opinion that any large convention

10    center, as you've used that term, that provides an

11    exclusive on cleaning services is involved in

12    anticompetitive behavior?

13         A     No.  I believe it would depend on the

14    historical circumstances.

15         Q     What do you mean by that?

16         A     Well, for example, Ford Motor Company used to

17    produce their own steel and produce their own glass.

18    They were more vertically integrated than General Motors

19    because of those facts.

20               It wasn't anticompetitive for Ford to produce

21    their own steel.  What would have been anticompetitive

22    is if there would have been competition to produce -- to

23    supply them with steel and then they had driven someone

24    out of that market and instead produced it themselves.

25    So it depends on the historical circumstances.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGI
877.955.3855                                    Ex 6 p 240

1       Q    So are you suggesting that when the Convention

2  Center opened in 1989, if then it had established a

3  policy for an exclusive on cleaning which carried

4  forward to today, that would be okay?

5       A    I don't know.  I don't know the circumstances

6  around that.  And what -- for -- it's a little bit

7  different than my example about Ford Motor Company

8  because you have exhibitors and decorators and trade

9  show -- trade shows that all have different -- you know,

10  I haven't -- I haven't thought about whether it would be

11  anticompetitive because you have the national aspect

12  also of someone like United, who has a contract

13  nationally to provide services at different centers, and

14  if they're excluded from some centers, whether that's

15  anticompetitive.  I don't know the circumstances of the

16  Heinz Center or any of those other ones.

17       Q    Well, you've read the testimony of Richard

18  Simon concerning the Javits Center in New York, which

19  has an exclusive on cleaning.  Are you familiar with

20  that.

21       A    Yes.

22       Q    And do you remember, he said in his testimony

23  that was one of the reasons that United never even tried

24  to enter the New York City market for trade show

25  cleaning services?

1        A      Yes, I saw that.

2        Q      Would you consider the fact that the Javits

3    Center has an exclusive on cleaning to be an

4    anticompetitive act on its part?

5        A      I just don't know enough about the

6    circumstances of it to know whether there could be a

7    functioning in the market.  I suppose there could be.

8        Q      So is your dependent -- your opinion on whether

9    having an exclusive cleaning arrangement is

10   anticompetitive dependent on, in part, the historic

11   circumstances?

12       A      I think it does depend in part on

13   circumstances.

14       Q      Take a look, if you would, in your rebuttal

15   report, page 4, Paragraph 10.  Let me know when you have

16   had a chance to get there.

17       A      Yeah.

18       Q      Okay.  I'm looking at the end of Paragraph 10

19   on page 4 of Exhibit 447, which states, "Also,"

20   referring to Hayes, "he points out that I have not done

21   a cost benefit statement to back up my statements about

22   whether security was the reason for the change in

23   policy.  I stated clearly in my report that I was not

24   providing an opinion about security per se, but, rather

25   I was pointing out that the security argument lacked

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOG
877.955.3855                          Ex 6 p 242

1   credibility because United had higher security standards

2   than SDCC and had offered to address any deficiency that

3   SDCC could name."

4           I'm interested in your statement that United

5   had higher security standards than SDCC.  What's the

6   basis of that statement?

7       A   I'm relying there on the statements that I

8   quoted in my report from Rick Simon and Buddy Linn.

9       Q   Their conclusions that United's security

10  standards were higher?

11      A   I believe -- that's how I read their

12  depositions and declarations, yes.

13      Q   You haven't made any independent analysis,

14  though, to determine whether the security standards at

15  UNM were higher or lower than SDCC.  Right?

16      A   Right.  Right.

17      Q   Okay.  Directing your attention to page 6,

18  Paragraph 15.  It reads, "The SNIP test normally refers

19  to the ability to raise and maintain price 5 percent or

20  more.  So the question becomes how much pricing power in

21  the trade show market does it take to have an

22  anticompetitive effect in the trade show cleaning

23  services market?  The answer is not much."

24          That's your statement.

25      A   Yes.

1    Q    What do you mean by "not much"?

2    A    I mean, when I say further in the paragraph,

3  that you only have to be able to raise the overall price

4  by three-tenths of 1 percent.  And that doesn't take

5  very much pricing power.

6    Q    And you're talking about raising the price of

7  trade show cleaning services.  Is that true?

8    A    I'm talking about a 5-percent increase in the

9  price of trade show cleaning services, and that that

10  would raise the overall cost of exhibitors by

11  approximately three-tenths of 1 percent.

12    Q    The overall cost of what to exhibitors?

13    A    Of everything that they pay for at the

14  Convention Center in order to put a show on.

15    Q    By "exhibitors," are you referring to, like,

16  the trade association, for example, the California Bar

17  Association we were using in a previous illustration?

18         MR. SLANIA:  I think that misstates his prior

19  testimony.

20         But you can go ahead and explain it, if you

21  want.

22         MR. L'ESTRANGE:  Let me back up.

23  BY MR. L'ESTRANGE:

24    Q    What I'm trying to figure out here is you're

25  talking about an increase of only three-tenths of a

130

1    percent.  And I'm trying to figure out what that percent

2    applies to.

3        A    What I referenced to was the number provided by

4    Dr. Hayes that said that cleaning services were about

5    5 percent of overall -- I took it to mean overall cost

6    of trade shows.  But I'd have to look and see what words

7    he used.

8        Q    Did you make any analysis of what is the

9    overall cost of a typical trade show at the San Diego

10   Convention Center?

11       A    No, I didn't.

12       Q    Well, hold on.  Just a second.  Take a look at

13   the report of Dr. Hayes, which is Exhibit 433.  Excuse

14   me a minute.  I want to get the -- well, going back to

15   your rebuttal report, and that's on page 6, Paragraph 15

16   that we were referring to.

17            What paragraph in Dr. Hayes' report are you

18   referring to where he talks about the total costs of a

19   trade show?

20       A    I cited Paragraph 25.

21       Q    Okay.  And are you referring to the portion of

22   Exhibit 433, page 7, Paragraph 25, where he says,

23   "Exhibit 4 shows that on an annual basis during the

24   period 2006 to 2009, roughly 35 percent of SDCC's event

25   revenues were from services where it directs exhibitors

131

1    to an exclusive service provider"?

2         A    From that paragraph, yes.

3         Q    And what in that paragraph talks about the

4    total cost of a trade show?

5         A    Well, I was using the last sentence, "During

6    this same period, trade show cleaning services have

7    never accounted for more than 5.1 percent of SDCC's

8    event revenues on an annual basis."

9         Q    What do you understand to be SDCC's event

10   revenues?

11        A    Rental revenue for the center and whatever

12   other services that they provide, such as cleaning

13   services or --

14        Q    You understand that there are many other costs

15   associated with a trade show beyond what the event

16   organizer pays to the Convention Center, such as a

17   keynote speaker, for example, and things like that?

18        A    Yes, I do.

19        Q    And did you interpret what Dr. Hayes said in

20   Paragraph 25 of his report, which is Exhibit 433, to

21   mean that he was talking about the total costs of a

22   trade show?

23        A    No.  I understood it to be less than the total

24   cost of the trade show.

25        Q    Okay.

1      A     And so then the cleaning services would be less

2    than 5 percent.

3      Q     Okay.  Directing your attention to your

4    rebuttal report, page 7, and the top part of the page is

5    the carryover from Paragraph 16.  I'm interested in the

6    last sentence, which reads, "Whether or not the 35

7    percent figure that I present as a rough estimate is

8    correct, it is clear that the percentage of time that

9    SDCC is tied up with a large show is much more than the

10   3.6 percent provided by Dr. Hayes."

11           And you know what that's in reference to.

12     A     Yes.

13     Q     What is the basis of your 35 percent estimate?

14     A     To illustrate that he was making it look as if

15   large trade shows that used all or almost all of the

16   center were a -- I guess a minor part of their business.

17   He used a number of large trade shows.

18           And so I just did a rough calculation to say

19   how much time each of those shows would consume when you

20   include the move-in and move-out time, as well as the

21   exhibition time, and making a -- making a calculation

22   based on two weeks' total time for that, times the nine

23   shows, gets me 18 weeks of the year.  That's 35 percent

24   of 52 weeks.  And so I'm saying that it's much more

25   than -- it's much more important than the 3.6 percent

1    that he provided.

2        Q    But if your estimate of 35 percent is correct,

3    wouldn't that mean that 65 percent of the time, that the

4    Convention Center was being occupied by smaller trade

5    shows?

6        A    No.  He was just using ones that used all of

7    the center.  There could still be ones that used 50 or

8    60 or 70 percent of the center.

9             And I think -- I don't know whether I cited it,

10   but there is -- there is more information in some of the

11   materials provided by the Convention Center expansion

12   group that talk about -- Carol Wallace talks about how

13   much -- how many shows they have.

14             And, well, in Paragraph 17, they break it down

15   into primary versus secondary events.  I don't have any

16   information on how much space a primary event uses, but

17   it's probably -- it seems to be fairly large.

18       Q    But going back to my estimate, using your

19   estimate, right, wrong, or otherwise, that 35 percent of

20   the time the Convention Center is operated by large

21   shows as you define them, doesn't that mean that the

22   other 65 percent of the time it's occupied by small

23   trade shows or meetings?

24       A    No.  Not small.  Just ones that are -- he says

25   there were six shows that used the whole center.  So

                                                          134

1    that's 100 percent, and then three more, for a total of

2    nine, that use 75 percent.  So then you'd have to go

3    down -- something that uses less than 75 percent of the

4    center, but more than 50 percent, I would still consider

5    a large trade show.

6        Q    But I'm looking at your estimate, this 35

7    percent figure --

8        A    Yes.

9        Q    -- and you're saying, if I understand you

10   correctly, that you estimate that 35 percent of the

11   time, the Convention Center is occupied with large trade

12   shows.

13       A    Large, meaning the 75 percent ones I'm

14   illustrating.  I'm using his number and saying how much

15   more than 3.6 percent his number is.  But I'm not saying

16   those are the only shows that I would consider large

17   shows or significant shows.

18            And I've also cited elsewhere that Carol

19   Wallace and Kris Kremer have talked about how many

20   primary profit-making, significant shows they have.  I

21   see no evidence that any of those could go into smaller

22   venues in San Diego.

23       Q    Of the larger shows?

24       A    Of the -- of the ones that they call primary

25   shows, which is a lot more than nine.

1       Q     Your rebuttal report addresses both the reports

2   of John Hayes, as well as the reports of -- or the

3   report of Tom Lambert.   Correct?

4       A     Yes.

5       Q     Are there any other criticisms you have of the

6   report by Dr. Hayes that are not included in your

7   rebuttal report?

8       A     There may be other statements that he made that

9   I disagree with, but these are the ones that I feel are

10  important and that I would want to discuss.   So there's

11  no others that I can think of that I want to testify

12  about.

13      Q     And I take it none other -- no others occurred

14  to you after reading the rough draft of Dr. Hayes'

15  deposition?

16      A     No.   I don't think he raised new issues.   I

17  think he discussed issues that are in my rebuttal

18  report.

19      Q     And you've also addressed, in your rebuttal

20  report, your response to the comments by Mr. Lambert in

21  his report.   Right?

22      A     Yes.

23      Q     Are there any other comments you have

24  concerning the Lambert report that are not set forth in

25  your rebuttal report?

136

1      A      Not at this time.  I haven't seen his

2   deposition.  I suppose there could be things that I

3   would need to clarify if he addresses my report in his

4   deposition.  But I haven't seen that.

5          MR. SLANIA:  For the record, to be clear, John,

6   I don't want you to be surprised by this.  I don't

7   believe that Mr. Hekman has seen Mr. Lambert's

8   supplemental report that we just got on Monday.

9          MR. L'ESTRANGE:  I think that's -- I'm glad you

10  raised that.

11  BY MR. L'ESTRANGE:

12     Q     I'll represent to you that Mr. Lambert sent in

13  a supplemental report concerning the issue of

14  disgorgement to respond to the supplemental report of

15  Dr. Kennedy.

16          Are you aware that Mr. Lambert circulated such

17  a report?

18     A     I was told there was a supplemental report from

19  a few days ago, and then was there an additional

20  supplemental report yesterday at his deposition?

21     Q     It was provided earlier but discussed at his

22  deposition.

23          MR. SLANIA:  I made my statement -- I mean, I

24  don't mind saying this on the record.  Did I send you a

25  copy of his supplemental report on Monday?

1        THE WITNESS:  No.  But I was given one

2   yesterday afternoon.

3        MR. SLANIA:  Okay.

4        THE WITNESS:  And I briefly looked through it

5   to see if it addressed anything of my report, and I

6   don't believe I saw anything.  If there was something, I

7   missed it.

8   BY MR. L'ESTRANGE:

9   Q    And if it did not address your report, I assume

10  you have no further comment on what Mr. Lambert has to

11  say?

12  A    Not at -- no, I don't.

13       MR. L'ESTRANGE:  Okay.  I'm handing you a

14  document we've marked as Exhibit 504 for identification.

15  Exhibit 504 is a collection of billing statements from

16  LECG that you provided to us this morning in your

17  disclosure of documents.

18       (Deposition Exhibit 504 marked.)

19  BY MR. L'ESTRANGE:

20  Q    Are you familiar with these billing statements?

21  A    Yes.

22  Q    Directing your attention to page 3 of this

23  printout, page 3 from the top, it shows -- it appears

24  that the first contact between LECG and lawyers for UNM

25  concerning this engagement was on September 6th, 2007.

Ex 6 p 252

1            Is that consistent with your recollection?

2       A    For myself.  I think -- as I explained this

3    morning, I think Dr. Green had talked with Mr. Leon

4    before that.

5       Q    Directing your attention to page 3, the entry

6    for 9/28/07 says, "Telephone call with Dr. Green and

7    counsel," and then "worked on analysis."

8            What is the analysis you were working on?

9       A    That's the standard phrase that we use for

10   working on the case.  So that could cover -- at an early

11   stage like that, it probably just meant reading the case

12   documents.

13      Q    If you look at the -- the billing statement

14   we've been talking about so far is the invoice dated

15   October 17, 2007.  I'd like now to direct your attention

16   to the next invoice in this packet, which is dated

17   November 8, 2007.  And the third page of that invoice

18   shows that you had -- between the period 10/1/07 and

19   10/31/07, worked on analysis for 48 hours.

20           Is that correct?

21      A    Yes.

22      Q    What were you doing during that 48-hour period?

23      A    I was doing all aspects of reading the

24   documents and developing my declaration, which was, as I

25   recall, the task that I was given immediately.  And that

1    was the focus of my work.

2         Q    Well, let me show you a copy of a document

3    that's been previously marked in this case as

4    Exhibit 375.  Let me see.  You can leave that tag on

5    there because I'm going to refer to that later.

6              In Exhibit 375, you'll notice on the first

7    page, the file stamp is November 13, 2007.  Do you see

8    that?

9         A    Yes.

10        Q    And I'll represent to you that's the date this

11   complaint was filed with the Federal Court in San Diego.

12   It appears that you had been working on this engagement

13   for a full month or more before this complaint was

14   filed.

15             Did you have anything to do with drafting the

16   complaint?

17             MR. SLANIA:  I just want to object because the

18   way you describe work and engagement is different.  And

19   I don't necessarily know that it was for a full month.

20   But I -- I mean --

21             MR. L'ESTRANGE:  Well --

22             MR. SLANIA:  For somebody to be working on

23   something for a full month, it could be understood that

24   they worked on it every day for a month leading up to

25   something.  And that's not the evidence in the record.

1          I understand if you want to say the first time

2    you performed work on this case was more than a month

3    from when the complaint was filed.  That, I understand,

4    given the time sheets that have been produced.

5          But working on something for a full month is

6    different.  That's the premise to your question, which

7    is did he assist in drafting the complaint.  And I'll

8    let him answer that question.  I just was objecting to

9    the premise of your question regarding working fully for

10   a month or more than that on this assignment.

11   BY MR. L'ESTRANGE:

12       Q    Well, directing your attention to the

13   November 8, 2007 invoice, it appears that during the

14   month of October, you worked on it on October 1, 2007

15   for 6 hours.  Correct?

16       A    Yes.

17       Q    And you worked on October 31, 2007 for 4 hours.

18   Correct?

19       A    Yes.

20       Q    And all the time you spent during the month of

21   October between those two dates added up to 48 hours.

22   Correct?

23       A    Correct.

24       Q    And then if you'll skip next to the invoice for

25   December 6th, 2007, which is a part of Exhibit 504, and

1    look at the entries for your work in November, it shows

2    that you worked on it on November 2nd, 2007 for 3 hours.

3    Correct?

4        A    Yes.

5        Q    And then you worked on it on November 13, 2007,

6    for an hour.  Right?

7        A    Yes.

8        Q    And between those two dates, you put in a total

9    of 22 hours doing work entitled "worked on analysis."

10   Right?

11       A    Yes.

12       Q    What was all that work you were doing during

13   the months of October and November 2007?

14       A    It was reading the case documents, the

15   declarations, and then developing the declaration that

16   was filed with my name on it.

17       Q    Did you review any drafts of the complaints?

18       A    I don't recall.  But if -- if I did, it would

19   be in my electronic file.  If there's a prefiling draft,

20   then it would be in my file.

21       Q    Do you recall whether you provided any input on

22   the content of the antitrust claims in the complaint?

23       A    I recall that I did not provide any input on

24   drafting or on the antitrust complaint.

25            MR. L'ESTRANGE:  Next, I'll show you a document

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGI
877.955.3585                          Ex 6 p 256

1   we've marked as Exhibit 505 for identification.   This

2   was provided by you in connection with your document

3   production today.

4           Hang onto that.

5           (Deposition Exhibit 505 marked.)

6   BY MR. L'ESTRANGE:

7       Q    Can you identify Exhibit 505, please.

8       A    This is notes I made on a few of the

9   depositions.

10      Q    These were made as part of your review of data

11  to arrive at your opinions?

12      A    As review -- as a review of depositions, yeah.

13      Q    Or information -- data in the form of, in this

14  case, depositions?

15      A    Okay.   That's -- I see what you mean.

16          Yes.

17      Q    You provided two pages of notes.   Were there

18  any other pages of notes reflecting your review of

19  depositions that were not included in your production

20  today?

21      A    No.

22          MR. L'ESTRANGE:   Okay.   You can put that aside.

23          I'm handing you the next exhibit, 506 for

24  identification.

25          MR. SLANIA:  Thank you.

1              MR. L'ESTRANGE:  This is the July 30, 2007

2    complaint that was filed in the State Court case.

3              (Deposition Exhibit 506 marked.)

4    BY MR. L'ESTRANGE:

5         Q    Have you ever seen this before?

6         A    I don't recall.  But if I have, then it would

7    be -- it would be in my electronic file.

8         Q    Did you review the complaint filed in the

9    federal action, which is Exhibit 375, prior to the time

10   you submitted your declaration in that case?

11        A    I just -- I just don't recall what I -- what I

12   saw.  I may have seen a draft.  I just don't remember.

13        Q    I'd like to direct your attention back to

14   Exhibit 506.  And turn, if you would, to page six,

15   Paragraph 18.  And it says, "The lease of the convention

16   facility, pursuant to license agreements between SDCC

17   and Trade Associations, is a unique right to use the

18   convention facility and constitutes the tying product.

19   The booth cleaning services, which SDCC has now mandated

20   are to be provided by SDCC personnel, is the tied

21   product.  Up until recently, those two separate products

22   had never been tied together.  SDCC is doing so under

23   the guise that there is a 'security issue' when, in

24   fact, there is no such security issue, as discussed in

25   Paragraphs 14 and 15."

144

1          Does that refresh your recollection as to

2     whether you've read this State Court complaint before?

3          A    I recall reading, in some filing, that there

4     was a tying claim.  I don't recall which one it was.

5          Q    Well, you understand from reading Exhibit 506

6     that among other things, it alleges a tying claim.

7     Right?

8          A    That's how I read this, yes.

9          Q    And was the tying claim that's generally

10    described in this Paragraph 18 of Exhibit 506 that I

11    just read, the claim that you were asked to analyze in

12    this case?

13         A    No.  I don't recall being -- I don't recall it

14    being described that way.  The facts were described.

15    They exclude -- it was described, sort of, as United was

16    excluded from the market.  There's this new policy.  I

17    read the facts of it.  And as I developed my

18    declaration, there were various ways of describing that,

19    such as tying, central facilities, the other things I

20    have in my report.

21         Q    Well, when you were first engaged, were you

22    given any working assumption regarding the definition of

23    the relevant product or service market or relevant

24    geographic market?

25         A    No, I don't believe so.

145

1        Q    You basically started from scratch?

2        A    I did.  But I don't recall what conversations I

3    had with people from United or, you know, what -- but,

4    yes, I did start from scratch.

5        Q    Did anyone ask you if the allegation in

6    Paragraph 18 was consistent with what you would

7    ultimately wind up with as your opinion?

8        A    No, I don't believe so.

9        Q    Is it -- do you believe it is consistent with

10   your opinion, as expressed now in your 19 -- or your

11   2009 report?

12       A    Can I take a moment to read it?

13       Q    Sure.

14       A    Well, it's not the way I've described it.  I

15   don't know -- it -- there's nothing wrong with it to say

16   that the right to use the convention facility is a tying

17   product.  I don't quite understand that what that means

18   in terms of what's the product.

19            I've described it as being in the market for

20   trade show services and then talked about whether that

21   was a national market or whatever.  And that doesn't do

22   that here.  So I don't think it fleshes out what the

23   tying product is, but I don't think it's wrong.

24       Q    Do you know whether United National Maintenance

25   had engaged any other consulting economists to work on

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOG
877.955.3855                          Ex 6 p 260

1    the State Court case before you were engaged?

2        A    I don't know.

3        Q    Have you seen the work papers of any other

4    economists who worked on this case?

5        A    I don't -- no, I don't recall seeing any.

6             I'm just thinking, when I went through my file,

7    whether there was anything in there.  I don't believe

8    so.

9        Q    Have you ever been advised that there was

10   another economist that was engaged to work as a

11   consulting expert in this case?

12       A    No, not that I can recall.

13       Q    You have reviewed the verified complaint,

14   which -- in the federal action, which is Exhibit 375.

15   Right?

16       A    Yes, I believe so.

17       Q    Did you see this on or around the time it was

18   filed?

19       A    I believe so.  Because of the date -- because

20   of the date, November 13th, 2007, I believe so.

21       Q    Well, looking at your time sheets in

22   November -- excuse me -- in the bill that came out in

23   December, it shows that you were working on the analysis

24   during the month of November, from November 2nd, 2007 to

25   November 13, 2007.  But I don't see any time entries for

147

```
 1    the period after November 13, 2007 in that month.
 2        A    I'm looking at some hours in December.  So I
 3    don't know when -- I don't recall whether it was sent to
 4    me when it was filed or whether I was asked to look at
 5    it or -- I just -- I don't -- I don't recall what
 6    filings I saw at that time.
 7        Q    Well, it looks like, if you look at the bill
 8    for January the 10th, you have entries of December 26th
 9    and December 27th.  Right?
10        A    Yes.
11        Q    So it would appear that from November 14, 2007
12    until December 25, 2007, you -- you didn't put in any
13    time on this engagement.
14        A    Correct.
15            MR. SLANIA:  Unless, of course, you
16    volunteered.
17            THE WITNESS:  Pro bono.
18            MR. SLANIA:  Right.
19            MR. L'ESTRANGE:  Right.
20    BY MR. L'ESTRANGE:
21        Q    Take a look, if you would, at the federal
22    complaint, please, Exhibit 375.  And look at page 21.
23            The first cause of action in this complaint is
24    for attempted monopolization.  Is that right?
25            MR. SLANIA:  Can you say the paragraph again.
```

148

JOHN S. HEKMAN, PH.D.                         12/10/09

```
1              THE WITNESS:  I'm still looking for page --
2              MR. SLANIA:  We don't have page numbers.
3              MR. L'ESTRANGE:  Excuse me.  It starts on
4    page 70.
5              MR. SLANIA:  My page numbers got cut off.
6              MR. L'ESTRANGE:  See, I told you I put that
7    sticker there for a reason.
8              THE WITNESS:  I went to the sticker first.
9    BY MR. L'ESTRANGE:
10      Q    At the beginning of Paragraph 70, there's a
11   caution of action for attempted monopolization.  Is that
12   consistent with your understanding of what's alleged in
13   this complaint?
14      A    Yes.
15      Q    And have you given an opinion here that the
16   Convention Center has attempted to monopolize a market?
17      A    Well, that's -- that's essentially the opinion,
18   that they were -- that they excluded their competitor
19   from the market and took over the entire market, yeah.
20      Q    And what market is that you believe the
21   Convention Center has attempted to monopolize?
22      A    The trade show cleaning services market at the
23   Convention Center.
24      Q    Okay.  Turn next, if you would, to Paragraph 81
25   on page 23.  And that's the beginning of the cause of
```

149

1   action called "Essential Facilities."  That is another

2   subject upon which you have given opinion.  Correct?

3       A    Yes.

4       Q    And it's your opinion that the Convention

5   Center itself is an essential facility, as you have

6   defined it earlier in your testimony.  Correct?

7       A    Yes.

8       Q    If you look next at Paragraph 86, and again on

9   page 24 of this document, it alleges a claim for group

10  boycott.  Is that a claim upon when you have given an

11  opinion in this case?

12      A    I have -- I'm sorry.  I'm finding it hard to

13  focus on this.  But I have not offered any opinion about

14  a boycott.

15      Q    Okay.  Next cause of action is -- begins with

16  Paragraph 92 in Exhibit 375.

17           THE REPORTER:  That's the last one we referred

18  to, right, that was previously marked?

19  BY MR. L'ESTRANGE:

20      Q    And that's a claim for exclusive dealing.  Have

21  you given an opinion in this case with regard to a claim

22  for exclusive dealing?

23      A    No, I haven't.

24      Q    I will tell you that I have reviewed this

25  complaint and have been unable to find a claim in here

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGI
877.955.3855                                    Ex 6 p 264

1    for tying.

2            Are you aware that there is a claim for tying

3    alleged in this case?

4        A    I am not aware of --

5            MR. SLANIA:   The document speaks for itself.

6            THE WITNESS:   -- not aware of whether there is

7    a specific claim for tying in this -- in this federal

8    complaint.

9            MR. L'ESTRANGE:   Okay.

10           THE REPORTER:   Do we want to just take a look

11   at the front of that exhibit to make sure that it was

12   375?

13           MR. SLANIA:   Thank you.

14   BY MR. L'ESTRANGE:

15       Q    What are your total charges to date in this

16   case?

17       A    I don't know.  I'd have to add up the invoices.

18       Q    If I were to add up the invoices, which are

19   Exhibit 504, would that tell me the total charges to

20   date?

21       A    It depends on what the last bill is.

22       Q    The last bill is dated November 19, 2009.

23       A    That's for time in October.  So if there was

24   time in November, that would add to this.  And I don't

25   recall when I finished the rebuttal report.

1           And then, of course, there will be some time

2    for preparing for my deposition in December.  But this

3    would be most of the time so far.

4        Q    Have all of the bills been paid by UNM so far?

5        A    As far as I know, they're pretty much up to

6    date.

7        Q    Have you budgeted how much it's going to cost

8    to complete the engagement in this case?

9        A    No, I haven't done anything to do that.

10       Q    Has your rate changed during the engagement?

11       A    In 2007, my rate was 400.  I think it went up

12   to 440 in January of 2008, and it's still 440.  And

13   right now, I don't know of any move to increase it or

14   decrease it.

15       Q    Is it 440 both for trial testimony as well as

16   deposition as well and consulting?

17       A    Yes.

18       Q    So you have the same rate for all the services

19   you provide in this engagement.  Is that true?

20       A    Yes.

21       Q    Has there been any discounting of your bills?

22       A    No.

23       Q    Has UNM asked for a discount on any of their

24   bills?

25       A    No, I don't believe so.

```
 1            MR. L'ESTRANGE:  Exhibit 507 that I have just
 2   handed you is a copy of the declaration that you
 3   provided in this case, dated November 13, 2007.
 4            (Deposition Exhibit 507 marked.)
 5   BY MR. L'ESTRANGE:
 6       Q    Are you familiar with that document?
 7       A    Yes.
 8       Q    Did you review your declaration, Exhibit 507,
 9   in connection with preparing your 2009 report?
10       A    I did.
11       Q    Were there any changes in your opinion between
12   the time that you gave this declaration in November of
13   2007 and when you issued your report in 2009?
14       A    No, I don't believe so.
15       Q    Did you use the electronic version of your
16   declaration as the model to draft the report?
17       A    Meaning a template and then simply make changes
18   in it?
19       Q    Yes.
20       A    No, I didn't.
21       Q    Did you dictate the report from scratch?
22       A    I repeated some of the things from the
23   declaration in my report.
24       Q    So you did a copy and paste?
25       A    Yes.  There may be some copying and pasting.
```

153

1    Q     Have you had contact with anyone at the

2    San Diego Convention Center concerning this engagement?

3    A     No.

4    Q     Have you visited the San Diego Convention

5    Center in connection with this engagement?

6    A     No.

7    Q     Have you ever been to the San Diego Convention

8    Center?

9    A     I haven't attended a trade show there.  I've

10   just been, you know, up to it, but not in it, no.

11   Q     Was that in connection with this engagement?

12   A     No.  Just in the past.

13   Q     Are there any tasks left to be done to prepare

14   for trial and your testimony there?

15   A     Currently, there aren't.  I haven't been asked

16   to do anything else, and I have no unfinished business

17   right now.

18   Q     And you don't anticipate any other work, except

19   preparing to testify?

20   A     Right.  Just -- and that includes responding to

21   the testimony of Mr. Lambert and Dr. Hayes.  But I've

22   pretty much done that.  So I don't see anything that

23   would be classified as a new -- new piece of work.

24        MR. L'ESTRANGE:  Handing you Exhibit 508 for

25   identification.

154

1              (Deposition Exhibit 508 marked.)

2      BY MR. L'ESTRANGE:

3          Q    This is your rebuttal declaration filed in

4      connection with the preliminary injunction motion.  Is

5      that right?

6          A    Yes.

7          Q    Were you present during the oral argument on

8      the preliminary injunction?

9          A    No.

10         Q    Did you receive a copy of the judge's decision

11     on the preliminary junction?

12         A    I don't recall receiving that.

13         Q    Do you know what the outcome was on the

14     preliminary injunction?

15         A    I know it was denied.

16         Q    How did you learn that?

17         A    I don't recall.  I might have spoken to Jeff

18     Leon on the phone, but I don't recall.  I don't remember

19     the date of the hearing or the date of the decision

20     being released.  So I -- and I didn't do any work

21     during -- other -- I didn't do any work during 2008 on

22     this.

23              So at some point, I heard.  It might have even

24     been through Kevin Green.  I don't know.  But I don't

25     recall -- I don't recall being given any materials at

1    that time.

2         Q    I'm handing you a document that's been

3    previously marked as Exhibit 193 for identification.

4    It's something that's been referred to in the case as a

5    one-show contract.

6              Have you ever seen any documents like

7    Exhibit 193?

8         A    Yes.  This looks familiar.

9         Q    Do you understand that United National

10   Maintenance entered into a single contract for each show

11   that it has done at the Convention Center since July 1,

12   2007?

13        A    Yes.

14        Q    Have you reviewed all of those contracts?

15        A    No.

16        Q    Have you reviewed any of them?

17        A    I don't recall whether I looked at some of

18   them.  But it hasn't been a major focus.  So.

19        Q    Have you had any communications with Rick Simon

20   about this case?

21        A    I believe I was on a conference call with Rick

22   Simon, probably in 2007.  I'm trying to remember

23   whether -- yeah.  It was -- it was not in the last few

24   months.  So it was in 2007.

25        Q    When did that call take place in 2007 in

1    relation to when the complaint was filed?

2        A    Well, it was when I was preparing my

3    declaration, is all I can remember.

4        Q    How long did the call last?

5        A    Probably a half hour or something.

6        Q    Who was on the phone?

7        A    Mr. Leon, Rick Simon, and there may have been

8    other United people on the call.  Or I may have had

9    several calls and spoken to several of the United people

10   who are -- who made -- who have had their depositions

11   taken and who were involved in the litigation.

12       Q    Tell me, as best you can recall, what was

13   discussed in the call.

14       A    All that I remember was that it was a

15   description of the events that had occurred and how

16   unhappy they were with it and how unhappy their -- their

17   clients, like Champion, were with it.

18            So it was a repetition, really, of the facts

19   that I had already, you know, read in connection with

20   the case.  There was a chance to talk with them and hear

21   it from them.

22       Q    Have you ever talked with anyone from Champion?

23       A    Not that I can recall.

24       Q    Have you spoken with anyone from GES?

25       A    No.

157

1      Q    Have you talked with anyone from United

2   National Maintenance, other than Rick Simon in this

3   phone call you described?

4      A    I'm not sure.  I'm not sure how many people I

5   spoke to.  It was over two years ago.  I believe it was

6   more than one person from United that I spoke with, but

7   I just can't remember who it was.

8      Q    Have you spoken to Gabriel Ramirez?

9      A    I don't believe so.  It was probably Buddy Linn

10  and Rick Simon that I spoke with.

11     Q    Was that face to face or on the telephone?

12     A    On the telephone.

13     Q    When did that conversation occur?

14     A    Well, in the time frame of 2007 when I was

15  preparing my declaration.

16     Q    So in 2007, you prepared your declaration.  And

17  then there was a long, dormant period before you cranked

18  up again to do your report?  Would that be essentially

19  accurate?

20     A    Well, it's correct that I didn't do any work on

21  this case between the 1st of January, 2008 and August of

22  this year, I guess.

23     Q    Now, you mentioned earlier in your testimony

24  that at one point the general manager of the Convention

25  Center attempted to get the business of GES and

1    Champion.

2        A    Yes.

3        Q    Is that your understanding?

4        A    Yes.

5        Q    And that attempt occurred just prior to the

6    change in policy?

7        A    My understanding is it occurred not long before

8    the change in the policy.

9        Q    And is it your understanding there were other

10   attempts prior to that to secure the business of GES and

11   Champion?

12       A    I believe so.

13       Q    Okay.  Does that fact that the Convention

14   Center was attempting to get the business of GES and

15   Champion have any significance to your opinion?

16       A    It adds more information.  It's not necessary

17   for my opinion, because the policy itself is what's

18   necessary for the opinion.  But it adds more weight to

19   the idea that -- that they wanted to get all of the

20   business at the Convention Center.

21       Q    Well, isn't it the normal conduct of anyone in

22   business to try to get as much business as they can?

23       A    Yes.  Yes.  Wanting to get business is normal.

24       Q    Now, you would agree that the San Diego

25   Convention Center has the power to vary the price that

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOG
877.955.3855                          Ex 6 p 273

1    it charges for rental of the facility.  Right?

2        A    Yes.

3        Q    And is it your understanding that from time to

4    time, they reduce the price in order to get more room

5    nights in hotels?

6        A    That they reduce what price?

7        Q    The price of the rental.

8        A    The rental of the Convention Center?

9        Q    In order to get a convention to come into the

10   center that's going to generate a lot of room nights.

11       A    I understand, from reading some of the

12   documents, that they take into account the benefit for

13   the region, for the San Diego region, and so forth, and

14   that that's part of the -- part of the motivation of

15   bringing in conventions, yes.

16       Q    And varying the price for the rental.  Right?

17       A    As far as I know.  I don't know any details of

18   that, but --

19       Q    Well, you don't contend, do you, that simply

20   the fact that the Convention Center can vary the price

21   of its rental service means that it has market power?

22       A    No, I don't think I said that.

23       Q    And that's not accurate either.  Is it?

24       A    It's a -- it's complicated by the fact that it

25   isn't a standardized good, like a ballpoint pen.  You

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOG
877.955.3855                          Ex 6 p 274

1    know, it's -- so I understand that the prices are not

2    the same for renting different convention centers in

3    different parts of the country.

4            I have expressed the opinion that they have

5    some pricing power.  But I'm not saying that every time

6    they changed the price for a particular convention, that

7    that's an exercise of market power, if that's what

8    you're asking.

9        Q    Okay.  Have you ever previously done any work

10   for the Kirby Noonan law firm?

11       A    No.

12       Q    Has LECG ever previously done any work for the

13   Kirby Noonan law firm?

14       A    I believe so.

15       Q    Do you know on how many occasions they have

16   done so?

17       A    No, I don't.

18       Q    Would you agree that one definition of market

19   power is the ability of a seller to profitably maintain

20   prices above competitive levels for a significant period

21   of time?

22       A    Yes.  I don't see anything to disagree within

23   that.

24       Q    And it's your opinion, if I understand you

25   correctly, that a firm such as the Convention Center,

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGI
877.955.3855                              Ex 6 p 275

1    with a 5 percent market share, has market power, in this

2    case the ability to maintain prices for hosting trade

3    shows above competitive levels for a significant amount

4    of time?

5        A    Yes.

6        Q    And that 5 percent share that we're talking

7    about is a share in the nationwide market for hosting

8    trade shows.  Right?

9        A    Yeah.  That's not my number.  It's -- I said

10   that I could see it being somewhat in that neighborhood.

11       Q    Did you look at the history of the booth

12   cleaning revenue charges at the San Diego Convention

13   Center from the time it opened until the present?

14       A    The history of the revenue?

15       Q    Of the financial arrangement.  Let me back up.

16            We know now that the booth cleaning is paid for

17   by the decorator, a 50/50 split with the cleaning

18   contractor.  Right?

19       A    Yes.

20       Q    How long has that particular arrangement been

21   in effect?

22       A    I don't recall whether I read any testimony

23   about when that started.

24       Q    Are you familiar with the terms upon which

25   Century, which is another company in the cleaning

```
 1   business, charges for booth cleaning revenue for its
 2   customers?
 3        A    I don't recall right now what -- what was said
 4   about Century's charges.
 5        Q    You understand that on a national level,
 6   Century is UNM's principal competitor?
 7        A    Yes.
 8        Q    Have you looked at any contracts between
 9   Century and any of its customers?
10        A    I don't recall whether I have or -- I have or
11   not.
12        Q    Did you review any of the documents that were
13   produces by Freeman Decorating in this case?
14        A    I may have briefly.  I don't know.
15             MR. L'ESTRANGE:  Give me a few minutes.  Let's
16   go off the record.
17             (Discussion off the record.)
18             MR. L'ESTRANGE:  No further questions.
19             (Whereupon at 4:36 p.m., the proceedings
20              were adjourned.)
21                     * * * * *
22
23
24
25
```

163

1    (The following stipulation was reached during Volume II

2    of the percipient deposition of Brad Gessner, taken on

3    Tuesday, July 14, 2009:

4

5              MR. LANCE:  All right.  I have no further

6    questions about this document, and that will conclude

7    the percipient witness deposition.

8              I propose the following stipulation: that the

9    court reporter be relieved of her duties under the Code;

10   that the deposition transcript will be provided to

11   Mr. L'Estrange, who will then provide it to Mr. Gessner.

12   Mr. Gessner will read and review the transcript for

13   accuracy and sign it under penalty of perjury.  If for

14   some reason the original transcript is not available at

15   the time of trial, a certified copy can be used as

16   though it is the original.  It will not be necessary for

17   Mr. Gessner to sign in front of a notary public.  And

18   from a turnaround perspective, the transcript will be

19   provided to Mr. L'Estrange.  And -- 30 days okay?

20             MR. L'ESTRANGE:  Thirty days is fine.  And so

21   there's no uncertainty in terms of when that 30 days

22   starts to run, can we have it measured from the day of

23   the court reporter's signature on the transcript,

24   assuming she delivers it to us within a reasonable time?

25             MR. LANCE:  That's fine.  So the court reporter

SARNOFF COURT REPORTERS AND LEGAL TECHNOLO(
877.955.3855                    Ex 6 p 278

1    is nodding that she's in agreement with that.  So what

2    we'll do is we will have Mr. Gessner review the

3    transcript and sign under penalty of perjury within the

4    30 days of the time that the court reporter signs the

5    transcript, and then she will provide that post haste to

6    Mr. L'Estrange.

7              MR. L'ESTRANGE:  I would ask that the

8    transcript bear the legend on the page -- on the cover

9    that it contains confidential information subject to a

10   protective order, and that pursuant to the terms of that

11   order, each side will have 30 days in which to notify

12   the other side of material that they want designated,

13   either confidential or for counsel only.

14             MR. LANCE:  You want that on the first page?

15             MR. L'ESTRANGE:  I'd like that legend on the

16   first -- on the cover of the transcript.

17             MR. LANCE:  Okay.

18             MR. L'ESTRANGE:  It's not necessary to mark

19   every single page --

20             MR. LANCE:  Right.

21             MR. L'ESTRANGE:  -- because that would simply

22   cause confusion.

23             MR. LANCE:  I'm just wondering if we can get

24   all that on the first page.  We'll figure it out.

25   Somehow we will mark it on the cover page.  I agree with

Ex 6 p 279

1    you, there needs to be something on the cover page, and

2    we might need to reference a second page to get it, but

3    we can certainly work that out.

4            MR. L'ESTRANGE:  I'll leave that up to the

5    court reporter to come up with the appropriate language.

6            MR. LANCE:  Fine.  So stipulated?

7            MR. L'ESTRANGE:  So stipulated.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

166

1

2

3

4

5

6

7

8

9

10        I, JOHN S. HEKMAN, PH.D., do hereby declare under

11   penalty of perjury that I have read the foregoing

12   transcript; that I have made any corrections as appear

13   noted, in ink, initialed by me, or attached hereto; that

14   my testimony as contained herein, as corrected, is true

15   and correct.

16        EXECUTED this _25th_ day of _January_,

17   20_10_, at _Los Angeles_        _CA_.
                    (City)                (State)

18

19

20

21              _John S Hekman_
              JOHN S. HEKMAN, PH.D.

22

23

24

25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Ex 6 p 281

# EXHIBIT 7

1 James R. Lance (147173)
Jacob M. Slania (200652)
2 **KIRBY NOONAN LANCE & HOGE LLP**
350 Tenth Avenue, Suite 1300
3 San Diego, California 92101-8700
Telephone (619) 231-8666
4 Facsimile (619) 231-9593

5 Theodore R. Tetzlaff (*Pro Hac Vice*)
Kristopher J. Stark (*Pro Hac Vice*)
6 **UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
7 Chicago, Illinois 60602-4224
Telephone (312) 977-4400
8 Facsimile (312) 977-4405

9 Attorneys for Plaintiff
UNITED NATIONAL MAINTENANCE, INC.
10

11

12 **UNITED STATES DISTRICT COURT**

13 **SOUTHERN DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| UNITED NATIONAL MAINTENANCE, INC., a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SAN DIEGO CONVENTION CENTER CORPORATION, INC., a California corporation,<br><br>Defendant. | CASE NO. 07-CV-2172 BEN(JMA)<br><br>**DECLARATION OF DR. JOHN S. HEKMAN IN SUPPORT OF UNITED NATIONAL MAINTENANCE, INC.'S OPPOSITION TO SAN DIEGO CONVENTION CENTER CORPORATION, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**<br><br>Date:      March 22, 2010<br>Time:      10:30 a.m.<br>Judge:     Hon. Roger T. Benitez<br>Crtrm:    3<br><br>Complaint Filed: November 13, 2007<br>Trial Date:      None Set |

25 I, John S. Hekman, declare as follows:

26     1.     I have personal knowledge of the facts set forth herein and, if called as a witness, I

27 could and would testify competently to these facts under oath.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

2.      I am a Principal at LECG, a firm that provides consulting and expert testimony in economics, finance and accounting. Since 1990, I have testified in federal and state courts on such matters as price fixing, patent infringement, trade secrets, real estate finance and general economic damages. I have defined relevant markets in antitrust matters. I have analyzed allegations of exclusionary behavior by market participants. I have assessed the degree of market power by defendants accused of the abuse of market power. I earned a MBA in finance and a Ph.D. in economics at the University of Chicago. I have taught economics and finance at the University of Southern California, The University of North Carolina, Boston College and The University of Chicago. In addition, I have published a number of papers in academic and professional journals. I was also an economist with the Federal Reserve in Boston and Atlanta. My curriculum vitae is attached to this report as Exhibit 1.

3.      Previously in this matter, on November 13, 2007, I submitted a Declaration in connection with Plaintiffs Complaint for Injunctive Relief. I also submitted a Response to Defendant's Opposition to Motion for Preliminary Injunction. I have been asked by counsel for Plaintiff United National Maintenance, Inc. to provide several opinions. First, I have been asked to define the relevant geographic and product markets in this matter. Second, I have been asked to determine whether Defendant San Diego Convention Center Corporation, Inc. ("SDCCC") has market power or monopoly power in the relevant market. Third, I have been asked to determine whether SDCCC has exercised market power or monopoly power by instituting its policy under which SDCCC's cleaning services labor is used exclusively for trade shows. Finally, I have been asked to determine whether consumer harm has resulted from SDCCC's exclusive cleaning services policy.

4.      The materials I have reviewed in connection with forming my opinions include the Complaint for Injunctive Relief and Damages; Defendant's Objections to Evidence Submitted by Plaintiff; the Memoranda of Points and Authorities in Support and in Opposition to the application for a restraining order; the Declarations of Carol Wallace, Dessi Nintcheva, Thomas Robbins, Jason Kirby, Richard Simon, Charles Linn, Larry Colby, William Callaghan and Mark Epstein; the SDCCC cleaning services contract with United Service Companies; certain correspondence

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   between market participants and SDCCC from 1990 to 2000; correspondence from market

2   participants related to SDCCC's 2007 actions; 2006 Exhibitor Application and Contract, Internet

3   Telephony Conference & Expo; the SDCCC website; additional materials from my own research;

4   the depositions of Charles Linn, Richard Simon, Gabriel Ramirez, Raymond Santos and Mark

5   Epstein; the August 2009 Mayor's Citizen Task Force Report on the SDCCC; Defendant's

6   Memorandum of Points and Authorities in Opposition to Plaintiffs Motion for Preliminary

7   Injunction, with the Declarations of Chuck Gutensohn, Carol Wallace, Brad Gessner, T.M.

8   Mazzocco, and Sotera Anderson; SDCCC's Responses to Plaintiffs First Set of Interrogatories;

9   SDCCC's Amended Responses to Plaintiffs First Set of Interrogatories; United's Responses to

10  Defendant's First Set of Interrogatories; and the SDCCC 2008 Annual Report. A complete list of

11  the materials I have reviewed is attached to this Declaration as Exhibit 2.

12      5.      I have reached the following opinions:

13          a.      The economically meaningful relevant product market is trade show

14  cleaning services at the San Diego Convention Center Facility (the "Facility").

15          b.      The relevant geographic market is large convention centers in the

16  San Diego metropolitan area, or, equivalently, the Facility.

17          c.      SDCCC has market power in the trade show cleaning services market at the

18  Facility.

19          d.      The demand for large trade show services facing SDCCC is inelastic with

20  respect to price. Trade show cleaning services is a small portion of the price of large trade show

21  services. As a result, a price increase in the trade show cleaning services market will have a small

22  impact on the price of large trade show services and would be unlikely to cause a loss of SDCCC's

23  trade show business.

24          e.      SDCCC exercised its market power when it excluded non-SDCCC cleaning

25  services workers from the Facility.

26          f.      The effects of SDCC's denying United National and other cleaning services

27  access to the Facility are highly anti-competitive.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1        g.        SDCCC has eliminated current and future competition and has effectively

2   raised prices for trade show cleaning services in connection with its exclusion of non-SDCCC

3   cleaning employees.

4        h.        The Facility is an essential facility for competitors in the trade show

5   cleaning market, and SDCCC has denied access to this Facility for competitors in the market.

6        i.        SDCCC has used its market power in the national trade show market to

7   engage in an anticompetitive tie. The tying good is the Facility, and the tied good is trade show

8   cleaning services.

9        j.        SDCCC has leveraged its monopoly power in the San Diego large trade

10   show market to exclude competitors in the trade show cleaning services market.

11        k.        Because trade shows contract for space at SDCCC many years in advance,

12   trade show consumers are "locked in" to higher prices charged for cleaning services, and are

13   further unlikely to switch because trade show cleaning services are a small percentage of the total

14   expenditure for trade show services.

15        l.        The manner in which SDCCC has excluded competition is a form of

16   "raising rivals' costs", which is recognized by economics as an anti-competitive practice.

17        m.        I conclude from the "no economic sense" test that there is no pro-

18   competitive justification for SDCCC's actions.

19        n.        Consumers in the market for trade show cleaning services have been

20   harmed. Consumers have had their choices in the market reduced to a single supplier, i.e. SDCCC.

21   And the prices charged by SDCCC are higher than those charged by United National.

22        6.        Market Definition and Market Power.  Prior to SDCCC's imposition of exclusive

23   cleaning services in the Facility, United and SDCCC were competitors in the provision of trade show

24   cleaning services. To determine whether SDCCC's action was anticompetitive, it is necessary to define

25   the relevant market in which they compete. After the relevant market has been defined, SDCC's

26   market share in that relevant market can be measured. With the measured market share it is then

27   possible to conclude whether SDCCC's actions in that market are anticompetitive.

28

7.     Economists have identified the primary elements of market definition as, first, the definition of the specific products or services that, in this case, SDCCC and United sell. Products or services that have a high cross-price elasticity of demand are considered to be in the same market. A high cross-price elasticity of demand between services A and B means that if the price of A rises, the demand for B will rise by a significant amount. In the present case, a high cross-elasticity of demand would mean that if SDCCC raised its charges for trade show cleaning services, the customers (i.e. the decorators who contract for trade show cleaning services) would switch their business to one of SDCCC's competitors such as United. If this switching were to occur in a free market, then an economist would conclude that the services of SDCCC and United are close substitutes. The cross-elasticity would be estimated in the trade show cleaning market by measuring the percentage increase in the demand for United's services for a given percentage increase in SDCCC's trade show cleaning services charges. Products and services that are close substitutes using this measure are judged to be in the same market.

8.     The second primary element of the market definition is geographic. Competition in some markets is national in scope. For example, if a mortgage lender located in Southern California raises its mortgage rates above competitive levels, consumers (the borrowers) can switch to other mortgage lenders that are located anywhere in the country. This reduces the ability of mortgage lenders in any one location to charge above-competitive rates.

9.     Other markets are much smaller geographically; the geographic market for a Safeway grocery store in San Diego is limited to the area in which consumers would switch to another grocery store if the Safeway raised its prices above the competitive level. The geographic market in this case would include part of San Diego but obviously not include the rest of the U.S. In this case, the size of the market is determined by the willingness of consumers to travel to competitors as well as the ability of competitors to enter the market. If there is an Albertson's grocery store located near to the Safeway,

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  then it would probably be in the same market. But an Albertson's located in Los Angeles would not be

2  in the same market for the obvious reason that it cannot supply the consumer with groceries in

3  San Diego except at an uneconomic cost. Finally, it is possible for new competitors to enter the market

4  in response to a price increase. In this case, the question would be whether a competitor would

5  
6  establish a new grocery store in the local market when Safeway raised its prices above the competitive

7  level.

8      10.    The Product Market. The Federal Trade Commission ("FTC") and Department of

9  Justice's ("DOJ") 1992 Horizontal Merger Guidelines (Merger Guidelines) were developed in

10  conjunction with economists and are generally accepted by economists as appropriate economic

11  tools to be used by economists defining relevant markets and market power. The FTC/DOJ

12  guidelines define a product market to be a group of products that are related such that a

13  hypothetical profit-maximizing firm that was the only seller of those products (the monopolist)

14  could profitably impose at least a "small but significant and non-transitory" increase in or markup

15  of price over the competitive level.[1] This minimum price markup that could be maintained for a

16  significant period of time is typically taken to be 5 percent. This is sometimes called the

17  "hypothetical monopolist test" or the "SNIP" test.

18      11.    When the market has been defined correctly, then it is possible to measure the

19  market power of a firm in that market. In the present case, when the market in which SDCCC and

20  United compete has been properly defined, it is possible to measure whether SDCCC has market

21  power in that market and therefore has the ability to harm competition. If the market is defined too

22  broadly, then SDCCC will appear not to have market power. For example, if the market was

23  defined as all commercial cleaning services in the entire U.S., then SDCCC would appear to have

24  a very small market share in that market and market actions by SDCCC would be unlikely to have

25  an effect on competition. On the other hand, if the market is defined too narrowly, then SDCCC

26  

27      [1] U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section 1.1,
<http://www.ftc.gov/bc/docs/horizmer.htm> (17 October 2005).

28  

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Ex 7 p 287

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   would be considered to have too much market power. The market would be defined too narrowly
2   if it failed to take into account some potential competition that would be present to take business
3   away from SDCCC if SDCCC raised its prices above the competitive level.

4       12.    The ability of a hypothetical monopolist to maintain a price increase as described
5   above is analyzed by the competitive response that would result from the price increase. On the
6   demand side, the response comes from buyers who switch to substitute products or services when
7   the monopolist raises price. And on the supply side, the response comes from the ability of firms
8   producing other products and services to begin producing the monopolist's product or service. The
9   supply response also comes from new firms entering the industry because the price has risen.

10       13.    On the demand side, the market test asks, if the monopolist imposed the
11   "significant and non-transitory" 5% price increase, whether buyers of the service could switch to
12   other services in such numbers that the loss of sales by the monopolist would make the price
13   increase unprofitable. If this is probable then the service would be in the same product market, and
14   the market has not been defined broadly enough. Conversely, if the loss of sales is not enough to
15   make the price increase unprofitable for the monopolist, then the product market is not too broad.
16   The relevant market is the group of services just large enough that a monopolist could profitably
17   raise price because buyers would be unwilling or unable to switch to other services.[2]

18       14.    The supply side market test looks to see whether other suppliers could enter the
19   market or switch to producing the service produced by the monopolist in such a way that a price
20   increase would not be sustained. The market definition asks whether a 5% increase in price by the
21   hypothetical monopolist would cause more firms to enter the market within one to two years, thus
22   bringing price down and making the price increase by the monopolist unprofitable.[3]   If other firms
23   are able to start producing the product or service that the hypothetical monopolist produces, then

24   

25       [2] A well-known example of this test is the market for cellophane. If buyers switching to
26   wax paper in response to an increase in the price of cellophane do not make the price increase
   unprofitable, then wax paper is not in the same antitrust market as cellophane.

27       [3] The test requires both that there be entry of other firms and that the increase in supply be
28   sufficient to bring the price back to a competitive level.

1  the market definition is too narrow. The relevant market is the group of sellers such that a

2  monopolist could profitably raise price because no more sellers would be able to enter the market

3  in a reasonable period of time.

4     B. The Trade Show Cleaning Services Market

5     15.    I have concluded that the relevant product market definition is "trade show cleaning

6  services at major convention centers." To begin at the most general level, SDCCC and United

7  provide "cleaning services." More specifically, they provide trade show cleaning services to

8  contractors that are termed "decorators". The decorators are trade show contractors who plan and

9  execute trade shows on behalf of exhibitors at large convention centers.[4] Typically, a convention

10  center signs a contract with an exhibitor such as a trade group; the exhibitor hires a trade show

11  organizer; the organizer contracts with a decorator; and the decorator contracts with the trade show

12  cleaning services firm, among others.[5] The role of the decorator is to provide drapery, carpeting,

13  registration, graphics and props.[6] The question of product market definition relates to how specific

14  the cleaning services are. The hypothetical question is, if a firm in the market-SDCCC, United or

15  others raised its price above competitive levels, could another firm enter the market to compete

16  with them? The testimony in this case has been that the services to the trade shows are so

17  specialized that only trade show cleaning services firms would be able to compete for the business

18  of the decorators. That is, a commercial cleaning firm that did not have the specialized expertise in

19  trade show cleaning, move-in cleaning and move-out cleaning, would not be able to obtain

20  business from the decorators.

21     16.    United also provides trade show cleaning services at hotels and smaller exhibition

22  halls. However, testimony has shown that this is not in the same relevant market as the large trade

23  shows. Trade shows at SDCCC use up to fifty of United's workers. SDCCC does not compete with

24  —————————————————

25     [4] http://www.champion-nationwide.com/

26     [5] Deposition of Raymond Santos, pages 98-99; deposition of Mark Epstein page 23-24.
   Mr. Epstein also added that in some cases his firm, Champion, had an agreement with show their
27  booths.

28     [6] Deposition of Mark Epstein, page 42.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  the smaller hotel convention facilities in the San Diego area for trade shows. By contrast, the

2  hotels in the San Diego area that have trade shows require "one, max two other people."[7]

3  Therefore, looking from the demand side of the market, the demanders or users of the services of

4  the relevant market are the organizers of trade shows at convention centers. From the supply side,

5  the providers of trade show cleaning services are those firms that have developed the specialized

6  experience to be able to enter the market. Charles Linn, Vice President of the Western Division of

7  United, listed all of the trade show cleaning firms that had competed with United in California.

8  These included SDCC, Century Cleaning, Team Cleaning, and Show Ready.[8] SDCC, Century

9  Cleaning and United are the only trade show cleaning services that Linn is aware of that

10  performed work at SDCC.[9]

11        17.    The evidence I have reviewed indicates that the number of firms that supply trade

12  show cleaning services is limited, because the type of cleaning performed by United National at

13  the SDCCC is not standard space cleaning. Because this cleaning appears to be specialized in a

14  number of ways, United does not compete with ordinary janitorial services and similar firms. In

15  fact, United has a separate company, United Maintenance Company, Inc., that provides janitorial

16  services.[10] If it were the case that janitorial services and trade show cleaning services were

17  interchangeable, then United's trade show cleaning and janitorial work could be merged, and the

18  same workers could be used for both. On the contrary, Rick Simon testified that trade show

19  cleaning is "a totally different skill set, totally different labor requirement, and the trade show

20  business is itinerant in nature. So you have a lot of demand for a lot of people in a short period of

21  time. And the knowledge and skill set of cleaning an office building versus a trade show is the

22

23

24

25        [7] Deposition of Rick Simon, page 32. deposition of Mark Epstein page 23-24.

26        [8] Deposition of Charles Linn, page 40.

27        [9] Ibid, pages 104-105

28        [10] Deposition of Rick Simon, pages 20-21.

Ex 7 p 290

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  difference between, you know, flying a Piper Cub and a jet aircraft."[11]  He further explains that

2  this knowledge and skill is primarily at the supervisory level.

3      18.    One of United's primary customers in the trade show cleaning market is Champion

4  Exposition Services, a large general contractor for trade shows. Champion signs contracts with

5  trade associations to manage and organize their trade shows across the U.S.[12] Mark Epstein,

6  Champion's president, strongly supports the description of United and other firms in the trade

7  show cleaning market as highly specialized:

8          "While a janitorial firm hired to clean office space in a commercial
           building can expect each office to be the same size and in similar
9          condition every day, each trade show is unique in size,
           configuration, and its cleaning needs. Based on the scope and size of
10         a particular trade show, a provider of Trade Show Cleaning Services
           must constantly react to ever changing demands that involve the
11         amount and location of manpower and equipment at any given
           moment. A provider of Trade Show Cleaning Services must
12         ultimately have a tremendous amount of logistical expertise and
           must anticipate needs proactively based on the past experience of
13         the Trade Show Cleaning Services management. No two trade
           shows are the same from the perspective of Trade Show Cleaning
14         Services.[13]

15      19.    There are two main functions performed by firms in the trade show cleaning

16  market. The first is "facilities cleaning", which is cleaning aisles and common areas at SDCCC

17  during the move-in phase and construction of exhibits at conventions as well as during the move-

18  out phase. The second function is "booth cleaning", which is described as cleaning exhibit booths

19  during shows and during the night. Facilities cleaning is specialized in part because it must be

20  performed during a short window of time between trade shows. At times the show moving in and

21  the one moving out overlap, requiring even more experience to make the process run smoothly.

22  United states that its cleaning services are individually tailored to the needs of each type of show

23  and exhibitor. United National revenues from cleaning services at SDCCC were approximately

24  $500,000 per year.

25  _____

26      [11] Ibid., page 21.

27      [12] Affidavit of Mark Epstein, page 1.

    [13] Affidavit of Mark Epstein, page 2.
28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Ex 7 p 291

1    20.    The special need filled by the cleaning contractors was acknowledged by SDCCC.

2  In a June, 2000 letter to the Trade Show Contractors Association, the SDCCC's Director states:

3  "As you know, with the existing and increasing level of business at the Convention Center, the

4  time between move-out of one show and move-in of the next show is often extremely compressed.

5  Time frames to return a clean floor will likewise often be compressed. You also know that we

6  often run overlaps of move-outs and move-ins. The service contractors have been primary and key

7  players in making those overlaps happen."[14]  Move-outs and move-ins are complicated processes.

8  According to United's Charles Linn, a move-in typically takes one to three days.[15]  When United

9  does not have enough workers in a particular city for a large trade show, they do not hire local

10  cleaning workers.[16]  Instead, they bring in their own workers from other cities, presumably at

11  considerable cost. United's workers other than supervisors are part-time, not salaried, so it is not

12  because they are already being paid that they are used. Rather, it illustrates the specialized nature

13  of the work.

14    21.    The other aspect of the product market is whether new firms could enter the market

15  in response to a hypothetical price increase. If so, then a dominant firm in the market such as

16  SDCCC might not have significant market power. The testimony I have read as well as the past

17  record of the SDCCC indicates that there has been no new entry into the trade show cleaning

18  services market at the SDCCC. This is due to the specialized nature of the work as well as to the

19  relationships that have been built up over the years between the cleaning services firms and the

20  decorators for whom they work. Mark Epstein of Champion states "Due to the expertise and

21  specialized knowledge required, I would not consider even an extremely price competitive bid

22  from a traditional janitorial services firm to provide Trade Show Cleaning Services."[17]  Mary Beth

23  Rebedeau of the Society of Independent Show Organizers referred to how specialized the cleaning

24

---

25    [14] Letter from Joe Psulk to Marty Cymbal, June 20, 2000, page 2.

26    [15] Deposition of Charles Linn, page 80.

27    [16] Deposition of Charles Linn, page 85.

28    [17] Affidavit of Mark Epstein, page 2.

Ex 7 p 292

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   services are in her letter to SDCCC: "While we understand the need for facility managers to
2   generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors
3   of their choice. This is particularly true for large shows whose complexities demand carefully
4   selected and integrated vendor partners who have a thorough understanding of each show's special
5   needs. This includes cleaning services .... Show organizers spend years cultivating relationships
6   and advantageous pricing with their chosen suppliers. In-house exclusives arbitrarily increase
7   costs to show organizers -- and therefore exhibitors -- while decreasing the quality of the service
8   provided due to lack of competition."[18] Anecdotal evidence from customers can be an important
9   source of information for market definition. It can confirm what economic analysis of the market
10  situation indicates. In this case, United National's customers explain why they need certain kinds
11  of services that are not available from conventional cleaning firms, and this is borne out by the
12  market evidence that conventional cleaning firms have not obtained contracts for Trade Show
13  Cleaning Services at SDCCC.

14      22.     The specialization of United's services as well as the investment United has made
15  in developing a relationship with their customers represent barriers to entry for potential new firms
16  in the trade show cleaning services market. United CEO Rick Simon estimated that it would
17  require an initial investment of over $250,000 for a firm to enter the trade show cleaning market in
18  San Diego.[19] A hypothetical new entrant into the market would need time to develop the skills
19  necessary to perform on a level with United or other market competitors. This learning time is
20  more significant than the actual cost of equipment and supplies to open a cleaning business. The
21  knowledge and experience reside in the supervision and coordination of the work process. Gabriel
22  Ramirez, the Manager of United's San Diego operations, explained that new workers receive only
23  a brief training before beginning to do basic cleaning tasks.[20] However, it is knowing what to do
24  and how to coordinate what needs to be done that is significant. There is a long learning curve

25  _____

26      [18] June 22, 2007 letter from Mary Beth Rebedeau to SDCC.
27      [19] Deposition of Rick Simon, page 239.
28      [20] Deposition of Gabriel Ramirez, page 58.

Ex 7 p 293

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  down which firms would have to travel in order to be as efficient and therefore as competitive as

2  United in doing this work. "Learning by doing" is a process that takes time, and therefore in the

3  short run there would be no competitors able to enter the market. Century Trade Show Service,

4  one of United's competitors in other areas, attempted to enter the San Diego market but was

5  unsuccessful.[21]  So even if it were possible for new firms to bid on cleaning contracts at the

6  Facility, it is unlikely, from what I have seen, that there would be entry of new firms. However,

7  SDCCC is using its control over access to the center to eliminate all alternative cleaning firms.

8  This is an absolute barrier to entry.

9      C. The Geographic Market

10     23.    The relevant geographic market is large convention centers in the San Diego

11  metropolitan area. Since the Facility is the only large convention center in the area, the market can

12  be defined equivalently as the Facility. The two main aspects of this definition are, first, that the

13  trade show cleaning services firms in this market require large convention centers in which to

14  operate, and, second, that trade show cleaning services are provided by workers who live within

15  commuting distance of the convention centers where the work is performed.

16     24.    The issue of convention centers as the focus of the trade show cleaning services

17  market was addressed above in the product market section. The market is limited to the San Diego

18  area because workers who are trained to perform the cleaning services in this market cannot

19  profitably come from areas outside the local San Diego labor market and be competitive with

20  those workers who are located in the local market. The competition is among providers of trade

21  show cleaning services in the local labor market. Providers outside the local market area could

22  only compete with those located in San Diego if they could commute to San Diego to provide

23  services or if the trade shows were willing to switch their shows from San Diego to another city in

24  response to an increase in the price of trade show cleaning services in San Diego. The first

25  possibility is highly unlikely because the cost of non-San Diego cleaning services providers

26

27     [21] Deposition of Rick Simon, page 240.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Ex 7 p 294

1    commuting to San Diego to work would be prohibitive. The second possibility is also highly

2    unlikely because the cost of trade show cleaning services is a very small part of the overall cost of

3    putting on a trade show. Trade show exhibitors would not be willing to move to another city to

4    save a small fraction of the trade show cost.

5         25.    The issue of whether the relevant market is properly defined as trade show cleaning

6    services at the Facility involves the ability of other firms (the supply side of the market) or trade

7    show exhibitors (the demand side of the market) to react to an increase in price by SDCCC. In the

8    language of the FTC/DOJ antitrust guidelines, the hypothetical monopolist test asks whether a

9    hypothetical 5% increase in price by the monopolist, maintained for a significant period of time,

10   would elicit a sufficient competitive response to restrain the monopolist, making the attempted

11   price increase unprofitable. This ability of competition to "discipline" an increase in price can be

12   analyzed by the supply response and the demand response.

13        26.    The buyers, or demanders, of trade show cleaning services are ultimately the

14   exhibitors at trade shows. However, the exhibitors are not the direct buyers of cleaning services.

15   United National contracts with a decorator; the decorator is hired by a trade show organizer; the

16   trade show organizer is hired by a trade association or other exhibitor. The trade association

17   chooses the city and convention center where the show will be held, but the exhibitor-members of

18   the association pay the fees that go to the organizer and finally to the cleaning contractor, United.

19   The exhibitors do not choose the convention city.

20        27.    In this way, the trade show cleaning services market is in a vertical relationship to

21   the market for large trade shows. A monopolist who was the only seller of trade show cleaning

22   services in San Diego would face potential competition from other convention centers, if the

23   decorators that hire cleaning firms in San Diego could move to other venues. However, there are a

24   number of reasons why it is unlikely that decorators could switch to other convention centers to

25   restrain SDCCC's ability to raise price in the Trade Show Cleaning Services market.

26        28.    First, buyers are unlikely to discipline a SDCCC price increase because of a "third-

27   party payer" effect in the market. The ultimate buyer of trade show cleaning services as well as

28   other costs of trade shows is the exhibitor. But the contracting of cleaning services is done by the

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1 decorator, such as Champion. Increases in the price of trade show cleaning services are paid by the

2 decorator, but these increases are passed along to the exhibitor, which reduces the impact of the

3 price increase. Further, the choice of a location for the trade show is made by the trade association,

4 which is not the final buyer of the services. As a result of this third-party payer structure, it is

5 unlikely that a higher price charged by SDCCC for cleaning services would affect the choice of

6 location for conventions and thus provide competitive pressure on SDCCC. Mark Epstein of

7 Champion agreed that it is unusual for a trade show to change venues.[22]

8       29.    Second, decorators are unlikely to "discipline" price increases by SDCCC in

9 cleaning services because there are no similarly-sized convention centers in San Diego or nearby

10 that can host the large conventions that use the Facility. SDCCC has monopoly power in the large

11 trade show market in the San Diego region and also has market power in the national trade show

12 market. The Facility, with over 600,000 square feet of exhibit space, is one of the largest

13 convention centers in the United States.[23]  There is no other convention center of remotely

14 comparable size in the San Diego area. The next largest meeting area in San Diego is the Hilton

15 San Diego Bayfront Hotel, across from the Facility. It opened in December 2008 with 165,000

16 square feet of meeting space, but it is mostly designed to satisfy the demand for hotel rooms for

17 the SDCCC.[24]

18       30.    Third, it is unlikely that decorators buying cleaning services would discipline a

19 SDCCC price increase for trade show cleaning services by switching to venues in other cities. The

20 cost of exhibit cleaning is a very small portion of the total cost of putting on a convention, so that

21 a monopolist in San Diego would not experience significant limits on its ability to raise price due

22 to the possibility that contractors would move to other cities.

23

24

25       [22] Deposition of Mark Epstein, page 57.

26       [23] "San Diego Convention Center Market Demand Analysis", Jennifer Sutherland, PricewaterhouseCoopers, March 2009, p. 6. http://www.conventioncentertaskforce.org/index.shtml.

27       [24] http://vvww.portofsandiego.org/component/content/article/219-hilton-san-diego-bayfront-hotel-news/457-hilton-convention-center-hotel-to-open-in-fall-2008.html

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

**Ex 7 p 296**

-15-

07-CV-2172 BEN(JMA)

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    31.    Fourth, buyers are unlikely to discipline a SDCCC price increase because of the

2  long term planning that is necessary for the large trade shows that SDCCC serves. These shows

3  are often committed for five, ten or fifteen years in advance.[25] This reduces the ability of

4  contractors and trade shows to move to other convention centers.

5    D. Market Power

6    32.    The relevant market is trade show cleaning services at the Facility. Before the

7  imposition of the cleaning services exclusive, SDCCC had 50% or more of the trade show

8  cleaning services market at the Center.[26] After the exclusive in 2007, SDCCC has had a 100%

9  market share of Trade Show Cleaning Services, based on its exclusive use of SDCCC workers for

10  cleaning services in the Facility as well as the cleaning services revenue it has received. Both

11  before and after the imposition of the exclusive, SDCCC has possessed market power, also known

12  as monopoly power, in the trade show cleaning services market in San Diego. SDCCC has the

13  ability to exercise market power for three reasons. First, SDCCC has the power to exclude

14  competitors without the likelihood that new competitors could enter the market. Second, SDCCC

15  has the power to set a price floor for trade show cleaning services at the center by requiring all

16  outside firms to use SDCCC employees at wages set by SDCCC. Third, SDCCC has the power to

17  raise price in the market. Currently, SDCCC has control over 100% of the market, since it controls

18  access to the Facility and is dictating pricing in the market regardless of the level of involvement

19  that United is permitted to have.

20    IV. SDCCC has Engaged in Exclusionary Conduct in the Market.

21    33.    SDCCC has effectively excluded United and other competitors from the trade show

22  cleaning services market at the Facility. The exclusion was accomplished by the use of SDCCC's

23  control over access to the Facility . In May 2007 United National was notified that as of July 1 all

24  trade show cleaning services at the Facility would be performed by SDCCC employees. In June of

25

26    [25] E.G. UNM011963

27    [26] According to statements by SDCCC and United, SDCCC's share of the cleaning market
   at the Facility was as high as 60% before July 2007.
28

Ex 7 p 297

1   2007 United National was notified that it could work at the Facility, but that it would have to use

2   SDCCC employees to fulfill the terms of its contracts, at a labor rate of $17 per hour.[27] United's

3   workers are barred from working at the Facility.

4       34.    While SDCCC allows United and others to contract with decorators for the

5   provision of cleaning services at the Facility, it is SDCCC's workers who do the work, and

6   SDCCC appropriates all of the revenue that previously was paid to United. United obtains

7   contracts with Champion and other decorators that provide services to associations using the

8   Facility for shows. Champion is paid a fee for booth cleaning services. Champion retains

9   approximately 50% of the fee for its services and provides the remaining 50% to United for the

10  booth cleaning. United performs booth cleaning under its contract for this fixed amount. For

11  facilities cleaning, United estimates the number of hours that will be needed for individual

12  exhibitor booth cleaning on a fully-loaded hourly fee basis. United has produced its billing records

13  and trade show schedules from July 2007 through August 1, 2009.[28] The hourly rates in these

14  schedules cover not only the labor used to perform cleaning but also materials and United's

15  management of the services. This is done on a "not-to-exceed" basis. United does not control how

16  many hours SDCCC bills United for the work done by its employees. When the hours billed by

17  SDCCC are greater than the not-to-exceed amount United has contracted for, United absorbs the

18  additional cost. If the actual labor hours are less than what was estimated, United is compensated

19  only for the actual hours.

20      A. SDCCC Has Excluded Competition Entirely From the Facility.

21      35.    SDCCC has forced United and other competitors in the market to operate at a loss.

22  United has continued to fulfill its contracts for trade show cleaning services at the Facility, but it is

23  no longer competing for new business in San Diego.[29] United attempts to obtain business from

24  decorators that operate nationwide. In doing so, United attempts to clean as many shows as

25

26      [27] Deposition of Mark Epstein, page 57.

27      [28] UNM011966-UNMO28947.

28      [29] Deposition of Rick Simon, page 31.

Ex 7 p 298

1    possible for each decorator. This means that United may clean for a decorator in San Diego and

2    lose money by doing so if it helps to keep the nationwide business of that decorator.[30]

3          36.     SDCCC has argued that it is not excluding competition because it has not excluded

4    United from the Facility, only United's cleaning staff. This is entirely misleading and inaccurate,

5    in my opinion. United cannot control the pricing of the services that it would provide in the

6    market, since SDCCC dictates the hourly labor rates and takes all of the booth cleaning revenue

7    that United formerly received. Further, United's employees are not permitted to work in the

8    Facility. The only way that United could "compete" in the Facility would be processing paperwork

9    and requests for cleaning services. This is not competition in any meaningful sense, and since

10   SDCCC would control 100% of the pricing in the market and all of the cleaning staff, there is no

11   competition at all from the point of view of industrial organization economics.

12         37.     The manner in which SDCCC has attempted to exclude competitors in the market

13   for trade show cleaning services at the Facility is by leveraging its monopoly power in the market

14   for large convention services in San Diego. Because SDCCC has market power in the San Diego

15   large convention services market, it can require convention exhibitors to use SDCCC's cleaning

16   services exclusively or raise the price without suffering a significant loss of business in its primary

17   market. SDCCC serves very large trade shows that have only a small number of alternative venues

18   to choose from nationwide. This lack of alternative venues for large trade shows means that the

19   SDCCC has a relatively inelastic demand for its services, especially after a trade association has

20   booked a date for ten or more years in advance. Inelastic demand for a product or service such as

21   large trade shows means that if the price of the service rises, consumers of the service (such as

22   general contractors and show organizers) will not tend to look elsewhere for a convention center

23   but will tend to pay the higher price. The inelastic demand experienced by SDCCC for trade

24   shows means that if SDCCC succeeds in excluding all competition in the trade show cleaning

25

26

27         [30] Ibid., page 86.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  services market, SDCCC can raise the price of cleaning services that is ultimately paid by trade

2  show exhibitors without losing business in the large trade show market.

3     38.    Because of the long-term nature of SDCCC's contracts with large convention trade

4  shows, extending ten or fifteen years in some cases, the exclusionary action that SDCCC has taken

5  with regard to trade show cleaning services has "locked in" customers who use these services. In

6  economic terms, a lock-in occurs in a situation where a consumer contracts with a seller for goods

7  or services over an extended period of time. For the duration of the contract, the buyer is "locked

8  in" to whatever downstream services are needed. The seller can take advantage of the lock-in to

9  raise the prices of the services that are needed during the term of the contract. The buyer cannot go

10  elsewhere to purchase those services because of the lock-in. In the situation being considered here,

11  SDCCC has locked in the consumers of trade show cleaning services for the duration of the ten or

12  fifteen years that some trade shows have contracted.

13     39.    A number of trade show industry participants have responded to SDCCC's

14  exclusionary acts by writing letters to oppose the new policy. Some of these participants state that

15  they try to avoid convention centers that have "exclusives", and some threaten to take their

16  business elsewhere.[31]  However, it is a measure of SDCCC's market power in large trade shows

17  that none of these participants has taken any business away from SDCCC so far. And in spite of

18  the implicit threat by these market participants to oppose SDCCC's imposition of an exclusive,

19  SDCCC went ahead with their exclusionary action. This also indicates how much market power

20  SDCCC possesses.

21     B. SDCCC Has Attempted to Monopolize the Market by Raising Rivals' Costs.

25     [31] For example, Pat Dwyer, Sr. Manager of Trade Show Services for SmithBucklin, states
26  in a letter to SDCCC, "...one of the considerations we view as an imposition to our selection [of a
venue] is the lack of choice of contractors to meet our highest level of service and accountability..
27  While there are many factors that enter into the decisions to select a future site for our clients, one
of the aspects which definitely would weigh in as less desirable is an exclusive service where there
is no need to appoint one." June 27, 2007 letter from Pat Dwyer to SDCCC.

28                                                                    Ex 7 p 300

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1      40.    SDCCC argues that it is still allowing United and others to "compete" in the trade

2  show cleaning services market at the Facility.[32]  While United still fulfills its contracts with

3  decorators at the Facility, SDCCC has in reality excluded competition by "raising rivals' costs."[33]

4  In this case, SDCCC is appropriating all the booth cleaning revenue that would have been received

5  by United, and "allowing" United to compete in the market only by using SDCCC's employees

6  and by accepting no revenue. Thus, SDCCC has raised the costs of United and other potential

7  competitors to be greater than revenue.

8      41.    The raising rivals' costs action taken by SDCCC is an example of what Scheffman

9  and Higgins refer to as "cost-effective" strategies by monopolists. They say: "Some kinds of cost-

10  raising strategies can obviously be very cost-effective--e.g., actions that lead to governmental

11  actions that exclude your rivals, or impair their ability to compete with you."[34]

12      C. The Facility is an Essential Facility for Competitors in the Trade Show Cleaning Services

13  Market.

14      42.    Since the relevant market is trade show cleaning services at the Facility, the

15  Facility is an essential facility for firms that supply trade show cleaning services. An essential

16  facility is a resource possessed by one firm that other competitors must have access to in order to

17  compete with that firm. Another name for an essential facility is a bottleneck. An example would

18  be the only railroad bridge over a river for many miles. If the railroad that owns the bridge refuses

19  to deal with competing railroads that need to use the bridge, competition is harmed. The Facility is

20  an essential facility because it is the only venue for large trade shows in the San Diego area. It

21  would be prohibitively expensive for United to build another 600,000 square foot convention

22

23

24      [32] Deposition of Rick Simon, page 189.

25      [33] See for example Carlton, Dennis and Jeffrey Perloff, Modern Industrial Organization, 4th Ed, Boston: Pearson, Addison-Wesley, 2005, pp. 371-377; Thomas G. Krattenmaker & Steven

26  C. Salop, Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price, 96 Yale L.J. 209 (1986); Steven Salop and David Scheffman, Raising Rivals' Costs, 73 American Econ.

27  Rev. Papers and Proceedings 267 (May 1983); David Scheffman and Richard Higgins, 20 Years of Raising Rivals' Costs: History, Assessment, and Future, Federal Trade Commission,

28  http://wwwfic.gov/be/RRCGMU.pdf

Ex 7 p 301

1   center in order to compete with SDCCC. United National and other firms in this market cannot

2   compete in the market unless they have access to the Facility. Control over this essential facility

3   in the market for trade show cleaning services gives SDCCC the ability to exclude all of its

4   competitors from the market. SDCCC's actions are anticompetitive because it uses control over the

5   essential facility in the market for trade show cleaning services to exclude competitors.

6          D. SDCCC's Action Is Anticompetitive Because It Constitutes a Tying Arrangement.

7          43.      SDCCC has market power in the national trade show market. It has used its market

8   power in trade show services as a "tying good" to exclude competition in the local market for trade

9   show cleaning services at the Facility. Forcing the consumer to purchase the tied good results in

10  harm to consumers in that those consumers pay higher prices and those who would have wished to

11  purchase trade show cleaning services from a competitor of SDCCC are prevented from doing so.

12  Consumer choice is restricted.[35]

13         44.      Trade show cleaning services are tied to or bundled with trade shows in that

14  SDCCC requires that those who conduct trade shows at the Facility must also use SDCCC

15  employees for cleaning services and pay SDCCC for those services. SDCCC has the ability to

16  force trade show participants to buy cleaning services from the center because of its market power

17  in the trade show market. If the market for trade shows were very competitive, then it would not

18  be possible for SDCCC to restrict consumers' choice of cleaning services and to raise the price of

19  those services. But SDCCC has enough market power in the trade show market to be able to tie

20  cleaning services to the trade show market. The support for this market power opinion comes from

21  a number of sources. Currently, the City of San Diego is studying the possibility of expanding the

22  convention center. In connection with this effort, a number of analyses have been done of

23  SDCCC's strength in the market for trade shows.[36] The report of Heywood Sanders, the economist

24

25          [34] Sheffman and Higgins, 20 Years of Raising Rivals' Costs, page 5.

26          [35] http://www.ftc.gov/bc/antitrust/tying_sale.shtm.

27          [36] "Draft Mayor's Citizen Task Force on the San Diego Convention Center Project";
        http://www.conventioncentertaskforce.org.

28

**Ex 7 p 302**

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   retained to study the trade show and convention center market, is dated May 2009.[37]  Mr. Sanders

2   concludes that:

3         a.    The Facility is operating at or above practical maximum capacity

4         b.    loss of potential business most frequently due to lack of available

5   dates/space

6         c.    San Diego's hotel supply has continued to expand

7         d.    Competitors are moving forward with enhancements

8         e.    Past and potential customers have expressed interest in an expanded Facility

9         f.    Past events have and existing events are at risk of outgrowing the Facility

10        g.    There is room night loss from these events outgrowing the Facility

11        h.    Center has outperformed many of its competitors and the industry[38]

12  In these circumstances, SDCCC has the ability to engage in an anticompetitive tie because trade

13  show cleaning services are a small portion of the total cost of a trade show.

14      45.    Other concurring opinions regarding the strength of SDCCC's market position are

15  provided by PricewaterhouseCoopers, Economic Research Associates and Piper Jaffray

16  Company.[39]  They emphasize the fact that SDCCC has operated well above the average capacity

17  utilization of competing large convention centers. This is a strong sign of high demand for the

18  Facility.

19      46.    A more analytical approach is provided by the San Diego County Taxpayers

20  Association. This study concludes that the cost of expanding the Facility could be financed in part

21  by higher taxes on convention center visitors. These taxes, on airport taxis, hotel rooms,

22  restaurants, rental cars and tourist attractions, would amount to increases in the total price paid by

23  Facility visitors. If SDCCC did not have market power in the trade show market, then it would

24  _____

25      [37] "State of the Convention and Trade Show Industry and Convention Center
    Performance", Heywood Sanders, May 2009;

26  http://www.conventioncentertaskforce.org/MCTFdocs-presentations.shtml.

27      [38] Draft Mayor's Task Force Report, page 12.

    [39] www.conventioncentertaskforce.org.

28

           Ex 7 p 303

1   lose trade show business if taxes on convention visitors were raised. The fact that the proposed

2   taxes are estimated to produce substantial tax revenue is testimony to the power that SDCCC has

3   to raise price without losing significant business. This is the measure of market power.

4       47.     In sum, SDCCC has a degree of market power in the national trade show market

5   sufficient to make it possible to engage in an anticompetitive tying arrangement. This has allowed

6   SDCCC to exclude competitors from the trade show cleaning services market by tying cleaning

7   services to the use of the convention center.

8       V. The Security Explanation by SDCCC for Excluding United Fails the "No Economic Sense

9   Test"

10      48.     Actions by firms that tend to exclude their rivals can sometimes have pro-

11   competitive explanations. It is important to examine the possibility of a pro-competitive reason for

12   the exclusionary actions taken by SDCCC before concluding that the actions were anti-

13   competitive. The economics literature refers to the "no economic sense" test to examine whether

14   there is any normal business justification other than exclusion for actions such as those by

15   SDCCC.[40]  I have considered all of the statements by representatives of SDCCC and by other

16   participants in the market that were provided to me to examine the issue of a possible pro-

17   competitive reason for the exclusion.

18      49.     First, I considered the possibility of enhanced efficiency in the market for trade

19   show cleaning services if SDCCC employees have an exclusive. My conclusion is that there is no

20   enhanced efficiency justification for the conduct of SDCCC. Exclusive cleaning services at the

21   Facility will not reduce cost to consumers or provide a higher quality product. This is the only

22   conclusion that can be reached given that:

23          a.      The letters from contractors and show producers are unanimous in their

24   opposition to an exclusive arrangement.

25

26

27      [40] Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No

28   Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

b.    SDCCC has not even attempted to provide an argument that exclusive cleaning services is more efficient. Instead, the change has been explained as a security matter.

50.    Second, I considered whether SDCCC was carrying out a general shift in its security policy by restricting all non-SDCCC employees from using the Facility. Economists have no special ability to measure the need for security at a facility such as SDCCC. However, an economist can observe the incentive for the owner of an essential facility such as the SDCCC to use a pretext to exclude its competitors in a market such as trade show cleaning services where the SDCCC is a competitor in the market. The economist can weigh the consistency of the behavior of the SDCCC in applying its security policy against the behavior in which types of non-SDCCC employees are excluded.

51.    I have read the deposition of United CEO Rick Simon. He testified that he contacted Brad Gessner of SDCCC in April 2007 after he learned that the exclusionary policy was being implemented.[41] Mr. Simon offered to follow the same screening process for employees as that used by SDCCC. Simon reminded Gessner that United also owns a security company and is very knowledgeable about security matters. He said that he, Simon, was from a law enforcement background; that United employed a number of former federal agents; and that their security company had engagements that exceeded the security requirements of SDCCC. For example, United works on the Hyatt Regency security detail when the U.S. President comes to the Chicago Hyatt. They also worked with the Secret Service when the Pope was in Denver. United vetted 300 employees for that engagement and the Secret Service did not reject one of them. He explained that United uses a superior screening device to that used by SDCCC—Live Scan Fingerprint. And he offered to buy a $12,000 machine to fingerprint all of United's employees at the Facility. But Mr. Gessner was unmoved by any of these facts. He just insisted that SDCCC would use its own cleaning employees.

---

[41] Deposition of Rick Simon, pages 188-191.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Ex 7 p 305

52.    I have also read the declaration of William Callaghan, President of Century Security and an expert in convention floor security according to the documents I have seen. Mr. Callaghan concludes that SDCCC's policy of excluding only non-SDCCC cleaning employees "makes absolutely no sense:[42] He finds that the policy makes no sense from a security point of view because, among other reasons, cleaning employees tend to be lower security risks than other non-SDCCC employees who are not covered by the policy; because cleaning employees are only 5% or less of the outside employees accessing convention centers; because SDCCC does not require outside employees to wear badges, while United National does require badges; and because United National has offered to run background checks on its employees, which SDCCC has refused.[43]

53.    I have also read the declaration of Charles Buddy Linn, the Regional Vice President of United National, who is familiar with the security policies of not only SDCCC but other major convention centers. He provides more detail on the level of security at the Facility compared to other centers in his experience. SDCCC does not use a photo ID system for security, and its monitoring of outside employees accessing the facility is lax." Further, Mr. Linn provides evidence that SDCCC's claim that United was a security risk because it was using temporary employees is false.[44]

54.    From my own analysis as well as the evidence provided by Mr. Simon, Mr. Callaghan and Mr. Linn, I conclude that contrary to the idea of a general shift in security policy, cleaning services has been singled out for restrictions. SDCCC competes with outside trade show cleaning services firms such as United. In contrast, SDCCC does not compete directly with many other service providers who work on trade shows. Other non-SDCCC contract employees have not been similarly excluded from the Facility on grounds of security concerns. Examples of

---

[42] William Callaghan Declaration, November 2007, par. 6.

[43] Callaghan Declaration, par. 7, 8, 10, 12, Charles Buddy Linn Declaration, November 2007, par. 4.

[44] Linn Declaration, par. 7, 8.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  the other services performed by non-SDCCC workers are: drayage, cartage, furniture, booth and

2  floor decorations, signs, photographs, telephone services, electricians, plumbers, and carpenters.[45]

3      55.    SDCCC justifies its exclusion of competing cleaning suppliers on the basis of

4  security concerns at the Facility. If this justification is a sham, as alleged by United National, then

5  there is no pro-competitive justification for the exclusionary restrictions by SDCCC.  The

6  restrictions do not lower costs; on the contrary, the restrictions result in higher prices in the

7  cleaning services market. Similarly, the quality of service is not increased; no justification other

8  than the asserted security concern has been advanced. The restrictions also do not increase

9  consumer choice or services available; rather, they reduce the choice of services.

10     56.    SDCCC could have used a less restrictive alternative to accomplish their stated

11  goal of improving security at the Facility.  They could have subjected United's employees to

12  background checks. They could have accepted Rick Simon's offer to provide a fingerprint scanner.

13  They could have provided enhanced security training or requirements. They could have worked

14  with United, using United's proven expertise in security technology and security issues, to ensure

15  that United's employees were no more of a security risk than their own booth cleaning employees.

16     57.    According to Mark Epstein of Champion, the employees of United National have

17  been employed by the company for long periods of time and have had no security problems at the

18  center. In contrast, employees of some other contractors who work in the convention center are "a

19  huge security black hole."[46]  Yet these contractors have not been targeted in the way that United

20  National has. In particular, he mentions I&D employees (Installation and Dismantle) as being a

21  "transient" work force that "comes and goes", whose workers have never been seen before by the

22  contractors. There is "no screening at all" for these I&D employees.[47]

23     VI. Harm to Consumers.

24

25     [45] Terms and Conditions, 2006 Exhibitor Application & Contract, Internet Telephony

26  Conference & Expo, item 6; Linn Declaration, par. 4.

27     [46] Affidavit of Mark Epstein, page 5.

       [47] Deposition of Mark Epstein, page 88.

28

Ex 7 p 307

Kirby Noonan Lance & Hoge LLP
310 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    58.    Consumers have been harmed first of all because SDCCC is charging higher prices
2  in the trade show cleaning market in connection with its exclusion of all non-SDCCC cleaning
3  employees. The terms of the relationship with United National dictated by SDCCC in July 2007
4  represent a price increase for cleaning services. United National previously estimated the hours
5  needed for facilities cleaning at the fully loaded labor rate of $16.35 in order to provide a not-to-
6  exceed amount for services at particular exhibitor spaces. SDCCC has raised the hourly rate, not
7  including United National's management and other costs, to $17. Thus, SDCCC has raised rates
8  already to the extent that the hours expended are less than the not-to-exceed hours. In addition,
9  when United National's current locked-in contract rates expire, SDCCC will be charging more for
10  the same number of hours estimated for purposes of setting a not-to-exceed amount. In addition,
11  SDCCC has effectively raised prices for booth cleaning. Mark Epstein testified that Champion's
12  costs have increased because Champion was not previously paying for aisle and carpet cleaning
13  services that United had provided free of charge in conjunction with booth cleaning.[48]  Currently,
14  United National is locked into its contracts to provide booth cleaning, even though it passes all of
15  its booth-cleaning revenue on to SDCCC. Also, it appears that SDCCC is not using supervisors for
16  cleaning jobs where United has the contract and uses its own supervisor. If United is not allowed
17  to compete at the Facility and ceases to operate there, it seems likely that SDCCC will have to use
18  one or more supervisors on contracts that were previously handled by United. The charges for
19  these supervisors will constitute another increase in price.

20    59.    Harm to the competitive process is demonstrated by, among other things, the
21  statements by market participants. Because of the exercise of monopoly power by the SDCCC,
22  there is no longer any competition on the merits for exhibit cleaning services.  Letters expressing
23  the displeasure of the trade show industry with the actions of SDCCC include:

24

25

26

27

28

_____
[48] Deposition of Mark Epstein, page 100.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1          a.    Joint Statement of the Society of Independent Show Organizers, the

2   International Association for Exhibition Management, and the Major American Trade Show

3   Organizers.

4          b.    Richard Simon, President of United Service Companies.

5          c.    Joe Loggia, Chief Executive of Advanstar Communications.

6          d.    Patricia Dwyer, Senior Manager of Convention and Trade Show Services,

7   SmithBucklin Corporation.

8          e.    Barbara Myers, Conferences and Meeting Services Director, APCO

9   International

10         f.    B.J. Enright, President, Trade Show Logistics.

11         g.    Ken McAvoy, Senior Vice President, Reed Exhibitions.

12         h.    Mary Kay Sustek, Senior Vice President, Neilson Business Media.

13         i.    Martin Cymbal, President, Trade Show Contractors Association of Southern

14  California.

15         j.    Ty F. Bobit, President, Bobit Business Media.

16         k.    Mary Beth Rebedeau, Executive Director, Society of Independent Show

17  Organizers.

18    60.    Letters from trade show participants are clear in stating the harm they see in

19  SDCCC's policy:

20         a.    Pat Dwyer of SmithBucklin states: "By taking the decision our of our hands

21  to select this very important -- and visible service -- you could be taking away our ability to

22  negotiate competitive pricing models for our client, as well as the relationship to a valuable

23  member of our service level team environment."[49]

24         b.    Mary Kay Sustek of Nielson Business Media states: "While I believe we

25  have used the SDCCC cleaning services over the past years, it was by choice. Imposing an

26

27  _____

    [49] Letter from Pat Dwyer to SDCCC, June 27, 2007.
28

Ex 7 p 309

1  exclusive of any type isn't in the best interest of Nielsen or its customers. Nielsen manages its

2  shows based on the specific needs and requirements of customers and having this flexibility is a

3  key ingredient to a successful show. . . . In our experience, exclusive services ultimately become

4  more expensive and less service oriented as it takes the competitive nature out of the business."[50]

5          c.      Ty Bobit of Bobit Business Media states: "Please know that the imposition

6  of an exclusive service will be in contradiction to the wishes of your customers and it typically

7  reduces service levels and takes competitive pricing options away. We have found over the years

8  that the show manager's ability to choose a contractor and control price helps . .. provide better

9  service at competitive prices."[51]

10          d.      Mary Beth Rebedeau of the Society of Independent Show Organizers states:

11  "While we understand the need for facility managers to generate revenue, tradeshow organizers

12  and their exhibitors must retain the right to select vendors of their choice. This is particularly true

13  for large shows whose complexities demand carefully selected and integrated vendor partners who

14  have a thorough understanding of each show's special needs. This includes cleaning services .    .

15  Show organizers spend years cultivating relationships and advantageous pricing with their chosen

16  suppliers. In-house exclusives arbitrarily increase costs to show organizers -- and therefore

17  exhibitors -- while decreasing the quality of the service provided due to lack of competition."[52]

18          e.      B.J. Enright of Tradeshowlogistics states: "[O]ur clients would love to have

19  the San Diego Convention Center competitively bid for the opportunity to be the official cleaning

20  contractor. However, an exclusive situation does not promote competition and service."[53]

21          f.      John Mooney of SISO wrote: "Our opposition to exclusives is based on the

22  historical fact that competition among suppliers provides the best service at the lowest cost.

23  Exclusives have the reverse effect."[54]

24

25          [50] Letter from Mary Kay Sustek to SDCCC, June 22, 2007.

26          [51] June 14, 2007 letter from Ty Bobit to SDCCC.

27          [52] July 20, 2007 letter from Mary Beth Rebedeau to SDCCC.
          [53] July 26, 2007 letter from B.J. Enright to SDCCC.

28

Ex 7 p 310

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1        g.     Michael Muldoon, of the Convention Management Group, wrote to say

2  "Please know that food and beverage events, like the shows we manage, have extraordinary

3  cleaning requirements. Our relationship with United Services Companies has been extremely

4  important to the production of these events. We have not been as successful working in facilities

5  that require the hiring of "exclusive contractors" and we avoid "exclusive shops."[55]

6        61.     The conclusion I have reached from, among other things, my experience as an

7  economist as well as the statements from market participants quoted here is that SDCCC's

8  exclusion of competition in trade show cleaning services at the Facility, if it continues, will

9  produce higher prices and a lower quality of service. The experiences cited by Nielson Business

10  Services, Bobit Business Media, the Society of Independent Show Organizers and the Convention

11  Management Group all support this conclusion. The experiences of these organizations provide a

12  natural experiment that, while insufficient by themselves to provide a definitive prediction for

13  SDCCC, nevertheless points toward harm for consumers as a result of SDCCC's exclusion.

14       VII. Conclusion

15        62.     For all of the reasons stated above, I believe that the actions of SDCCC in

16  excluding competition in the market for trade show cleaning services in the Facility are highly

17  anti-competitive. Based on the documents I have examined, I also believe that there is no pro-

18  competitive justification for the SDCCC's actions. My opinions have been formed based on the

19  documents that I have seen.

20       VIII. Response to the Hayes Declaration

21        63.     I have read and reviewed the declaration submitted by John B. Hayes in support of

22  SDCCC's motion for summary judgment. His declaration is quite similar to the expert report he

23  submitted in this case. I responded to his comments in my rebuttal report, and I will also do so

24  here.

25

26

27      [54] March 31, 2000 letter from John Mooney to Carol Wallace.

    [55] March 13, 2000 letter from Michael Muldoon to Carol Wallace.

28

                                                      Ex 7 p 311

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

64.    Dr. Hayes says bundling and tying are commonplace and rarely harm competition. This is because most bundling and tying is the harmless variety such as shoes and shoelaces, or cars and tires. Because many consumer products have multiple parts and features, we can label all of these products with multiple features "bundling" or "tying." For example, automobiles have radios, carpeting, windshield wipers, and countless other separable parts that could conceptually be labeled part of a "bundle." Since these are the types of examples that Dr. Hayes refers to when he says that bundling and tying are "common," I assume that this is what he means. That in no way means that there are not anti-competitive tying arrangements in situations where consumers may wish to purchase products or services separately. So I reject the "everybody does it" explanation as being in any way relevant to the SDCCC policy being considered here.

65.    Dr. Hayes points out that bundling and tying are different economic concepts in that bundling "refers to selling two or more products together for a single price," while tying is selling one product "in conjunction with another." However, he confuses these concepts in his "shoelaces and shoes" and "cars and tires" analysis, because they are examples of bundling, not tying. My analysis identified SDCCC's policy as tying in that SDCCC ties trade show services (the tying good) and trade show cleaning services (the tied good). SDCCC may have priced some of their services as a bundle, where the cost of cleaning services was not separately stated, but I am not aware of any such instance. As a general matter and for the situation as it has been explained in the depositions that I have read, the SDCCC policy is a case of tying.

66.    I strongly disagree with Dr. Hayes' attempt to label the SDCCC policy as "bundling" as opposed to tying. He states: "exclusive provider arrangements are economically equivalent to pure bundling when the tied good is always purchased in conjunction with the tying good." I take this to mean that he is saying that everyone who conducts a trade show at SDCCC uses cleaning services, so these two services are like shoes and shoelaces. If Hayes can bridge this gap, making SDCCC's policy one of bundling, not tying, then it follows that he can use all of the justifications for bundling that can be found in the economics literature.

67.    However, SDCCC's policy is not bundling. For cleaning and exhibiting to be a bundle, two elements must be present, at a minimum. One is that the quantity of trade show

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   cleaning services must be in fixed proportions to the quantity of exhibitor services. In the case of

2   buying shoes, the laces are not separately priced because everyone needs exactly two shoelaces

3   with a pair of shoes. But in the Facility, everyone does not use the exact same amount of cleaning

4   services. That is why cleaning services are not "bundled" into the price of trade show services.

5   Cleaning services are separately calculated and then added to the cost of other services being

6   purchased.[56]

7        68.    The second element that must be present for cleaning and exhibiting to be a bundle

8   is that every consumer must purchase the bundle. If some consumers purchase trade show

9   exhibitor services while choosing not to purchase cleaning services, then it is not a bundle. And in

10  fact, some of the exhibitors at SDCCC trade shows do choose not to purchase some cleaning

11  services.[57] Not all exhibitors purchase booth cleaning services. United works the floor of

12  conventions to convince exhibitors who have not signed up for booth cleaning that they should

13  purchase it.

14       69.    In sum, the SDCCC policy does not pass Dr. Hayes' shoes-and-shoelaces, cars-and-

15  tires test. The characterization of exclusive provider arrangements at convention centers as

16  equivalent to "pure bundling" is wrong. Because SDCC is not "bundling," the discussion of the

17  benign effects of bundling that follows is largely irrelevant.

18       70.    The fact that some other convention centers tie cleaning services and trade show

19  services is irrelevant to the issue in this case. The provision of cleaning services by some

20  convention centers is properly seen as a form of vertical integration, that is, of a firm producing a

21  service (trade show services) that also produces one or more of the inputs used in the service

22  (cleaning services). Other convention centers that do not provide exclusive cleaning services are

23  less vertically integrated. The element that is important in the present case is that until 2007 there

24

25

26       [56] See for example the deposition of Charles Linn, page 39; deposition of Gabriel Ramirez,
27  page 47; page 133-136; deposition of Raymond Santos, pages 17-21;

         [57] See, for example, the deposition of Raymond Santos, page 147.
28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   was a functioning market for trade show cleaning services at SDCCC. The exclusion of

2   competitors from this market was anti-competitive and harmful to consumers.

3       71.     SDCCC's policy is not bundling, so the arguments for the possible efficiency of

4   bundling do not apply. Hayes says that bundling can eliminate the inefficiency of double margins.

5   This point is wrong because the double margin problem applies to situations where two

6   complementary products are supplied by separate firms and both have market power. The present

7   case is different because in 2007 SDCCC supplied both cleaning services as well as trade show

8   services. The double margin problem would not occur, because if United exercised market power

9   and raised the price of cleaning services, SDCCC could supply those services itself.

10      72.     In paragraphs 28 and 29, Dr. Hayes says that there can be efficiencies associated

11  with SDCCC's tying policy. He does not provide any analysis or data to back this up in SDCCC's

12  case, but he suggests that SDCCC's security justification for the exclusive policy could provide

13  efficiencies. Also, he points out that I have not done a cost-benefit study to back up my statements

14  about whether security was the reason for the change in policy. I stated clearly that I was not

15  providing an opinion about security per se, but rather I was pointing out that the security argument

16  lacked credibility because United had higher security standards than SDCCC and had offered to

17  address any deficiency that SDCCC could name.

18      73.     Dr. Hayes agrees with my position regarding market power as a necessary element

19  for SDCCC to be able to tie trade show cleaning services to trade show services. However, he says

20  the threshold question is whether SDCCC possesses "substantial" market power in the national

21  trade show market. This is incorrect. Market power means the power to influence price. The power

22  to influence price can vary from the maximum achievable by a monopolist (the only seller in a

23  market) all the way down to zero pricing power (in so-called atomistic competition). Market

24  power does not need to be "substantial," it only needs to be "sufficient."[58]

25

26

_____

27      [58] Ahlborn, Evans & Padilla, "The Antitrust Economics of Tying:  A Farewell To Per Se
    Illegality, p. 287.
28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

74.   The question for the SDCCC policy being considered here is whether SDCCC has a sufficient amount of pricing power in the trade show market that it can exclude competitors from the trade show cleaning market and raise price in that market. The amount by which price can be raised in the show cleaning market is the "small but significant and non-transitory" price increase (SNIP) that is the test used in the FTC/DOJ Antitrust Guidelines that I referred to in my report and that Dr. Hayes refers to in his report. This is because raising the price of cleaning services will raise the total price paid at the Facility by consumers of trade show services. If SDCCC has enough pricing power to raise that total price by raising the price of cleaning services, then consumer harm will result.

75.   The SNIP test normally refers to the ability to raise and maintain price 5% or more. So the question becomes, how much pricing power in the trade show market does it take to have an anticompetitive effect in the trade show cleaning services market? The answer is, not much. According to the figures reported by Dr. Hayes, trade show cleaning services accounts for no more than 5.1% of the total cost of trade show services at SDCC.[59] A 5% increase in the price of trade show cleaning services represents an increase in the total price of trade show services (including the cleaning services) of only 0.3% (three-tenths of one percent). SDCCC needs very little pricing power to be able to raise price by three-tenths of one percent. As a result, it is my opinion that Dr. Hayes is incorrect when he states that the issue is whether SDCCC "possesses substantial market power."

76.   In discussing the nature of the national market for trade shows in which SDCCC competes, Dr. Hayes says that I am wrong to emphasize the size of the Facility as a major factor in its market competitiveness. He presents SDCCC data that he reads to say that only 6 shows used the entire Facility, and only 9 shows (3.6% of the total number of shows) used 75% of the Facility in FY 2009. Using the number of shows rather than show revenues or the percent of space rented on an annual basis is misleading in this regard. For example, the 9 shows that he references that

---

[59] Hayes Declaration, paragraph 26.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

**Ex 7 p 315**

1   each used 75% or more of the Facility cannot overlap; if each of these shows used two weeks at

2   the SDCC, including show time, set-up and break-down, then they would use 18 weeks of the

3   year. This is 35% of the year in which SDCCC has shows that are too big for most convention

4   centers. Whether or not the 35% figure that I present as a rough estimate is correct, it is clear that

5   the percent of the time that Facility is tied up with a large show is much more than the 3.6%

6   provided by Dr. Hayes.

7       77.    The market analysis undertaken by ERA for the Convention Center Task Force

8   shows how misleading the figures used by Dr. Hayes are. He uses a total of 248 "events" at the

9   Facility in 2009. ERA has a figure of 249 for 2009, so they agree fairly well.[60]  However, 153 of

10  the 249 are labeled "Meetings, community events, food & Bev." Since the Facility has 118,700

11  square feet of "meeting room" space in addition to its 615,700 square feet of exhibit space, it is

12  misleading to be comparing the number of meetings with the number of conventions. ERA reports

13  72 "National/State Conventions and Trade Shows" and "Corporate Conventions" as "Primary

14  Events," while the 153 meetings and community events are labeled "secondary events."

15      78.    In sum, I disagree with the attempt by Dr. Hayes to characterize SDCCC as having

16  only a few large conventions and to have mostly smaller shows that compete with smaller

17  convention centers. It makes no sense to argue as he does that "SDCCC competes with much

18  smaller facilities for the vast majority of the events that it hosts."[61] If that were the case, why

19  would the City of San Diego be contemplating an expansion of the SDCCC in order to increase its

20  capacity to host large trade shows? The task force reports speak of the loss of potential business

21  due to lack of available space and of events that already have or will in the future outgrow the

22  available space.[62]

23      79.    Dr. Hayes' own discussion of the market refutes his conclusion that SDCCC mainly

24  competes with much smaller facilities. In paragraph 35 he quotes the ERA report's conclusion that

25  _____

26      [60] ERA presentation, Convention Center Task Force, Table 5.

27      [61] Hayes Declaration, paragraph 34.

28      [62] PricewaterhouseCoopers report, Jennifer Sutherland, March 2009, page 6.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   21 convention centers represent "the predominant competitive markets" for SDCCC. These 21

2   centers are the large centers throughout the U.S., not the "much smaller" centers referenced by Dr.

3   Hayes. In paragraph 36 Dr. Hayes quotes SDCC's Carol Wallace saying that SDCCC competes

4   with convention centers in 13 U.S. cities.

5        80.   Most significantly with regard to the position of SDCCC in the convention and

6   trade show market, the presentation to the convention center task force by board chairman Chris

7   Cramer and CEO Carol Wallace is in my opinion totally at variance with the analysis presented by

8   Dr. Hayes.[63]   For example, they say:

9   Chris Cramer remarks

10               Over the last 20 years, the corporation has established a proven track
                 record: Maximizing the building's economic potential attracting
11               many of the nation's most lucrative conventions

12               We are fortunate to have a customer base, largely driven by medical
                 association meetings, that continues to have a strong economic
13               performance and a necessity to continue to host their annual
                 meetings.
14

15   Carol Wallace remarks

16               [referring to an exhibit with four quadrants to illustrate different
                 types of uses of the center]
17
                 Our primary goal is to attract events that generate significant
18               economic impact for the city of San Diego

19               The Center specifically targets high-end events to maximize
                 economic impact for the city and produce significant revenues for
20               the Center. Good examples are medical shows which attract
                 attendees who have more disposable income, are likely to bring their
21               families and come for the convention and extend their stay into a
                 vacation. These events also have large budgets, host many off site
22               events and have the need for ancillary services which generate
                 substantial revenue for the facility.
23
                 In the upper left hand quadrant, are events that are good for the city,
24               but don't necessarily generate revenues for the facility. These events
                 provide positive media exposure for the city and economic benefits.
25               Examples are high profile political conventions or offshoot events
                 surrounding events like the Superbowl.
26   ────────────────────

27       [63] Presentation by Chris Cramer and Carol Wallace, Convention Center Task Force,
     February 2009.
28

Ex 7 p 317

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1
2
3
4
5
6

> In the two lower quadrants are events that don't generate significant economic benefits for the city. On the left, these include conventions, tradeshows and events, with smaller budgets — so they don't generate money for the facility either. And, they typically don't attract attendees who stay as many nights. If they do, they usually don't spend much money.

> The lower right quadrant represents consumer shows and local events. While these events may attract a large number of local attendees, they don't attract overnight visitors.

7
8
9

These remarks by Chris Cramer and Carol Wallace directly contradict Dr. Hayes' description of the market served by SDCCC and the Facility. It is clear that the primary market in which they see SDCCC competing is for larger national conventions.

10
11
12
13
14
15
16
17
18

81.    After arguing that SDCCC competes with many smaller convention centers, Dr. Hayes then estimates SDCC's market share by using the 20 convention centers that are larger than the Facility. This results in an estimated market share for SDCCC of 3% to 5%. His conclusion from this market share estimate is that "SDCCC does not possess market power in the nationwide market for hosting trade shows."[64] As I pointed out above, in order to have an anticompetitive effect on the market for trade show cleaning services, SDCCC only needs to be able to raise price by three-tenths of one percent. A market share of 3% to 5%, in addition to all of the other indicators of market power that are contained in the analyses done for the Convention Center Task Force, provide sufficient market power to be able to have this anticompetitive effect.

19
20
21
22
23
24

82.    Dr. Hayes also objects to the opinion that SDCCC is an essential facility for the trade show cleaning market. His basis for this objection is his claim that I have addressed the incorrect market, because he contends that SDCCC competes with other convention centers for business. In so arguing he completely ignores that trade show cleaning is a market, and for it to occur cleaning staff must have access to the Facility. Therefore, my opinion that SDCCC is an essential facility remains.

25
26
27
28

83.    Dr. Hayes argues that since SDCCC instituted its exclusive policy in 2007 it has not raised its labor rates for trade show cleaning. In my opinion this has no relevance for whether

---

[64] Hayes Declaration, paragraph 46.

Ex 7 p 318

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   the exclusion of competitors was an anticompetitive act. Since the exclusion was immediately

2   challenged and litigated, it is not surprising that SDCCC has not made any move to raise its rates.

3   The significant point is that if SDCCC is successful in excluding competition, it will have the

4   ability to raise rates without losing business to a competitor in the trade show cleaning market.

5        84.    If Dr. Hayes is arguing that SDCCC cannot raise its prices because of national

6   competition for trade shows, he is ignoring his own data. In exhibits 16 and 17 of Dr. Hayes'

7   declaration, and exhibit 18 of his report, Dr. Hayes acknowledges that the labor rates for trade

8   show cleaning at some venues is as high as $26 per hour, compared to the $17 per hour rate

9   charged by SDCCC. This data belies Dr. Hayes' argument on this point.

10        85.    Attached hereto as Exhibits 3 and 4 are my initial expert report and rebuttal report,

11   respectively.

12        I declare under penalty of perjury under the laws of the State of California that the

13   foregoing is true and correct and that this Declaration is executed this _____ day of February, 2010

14   in Los Angeles, California.

16                          John S. Hekman, Ph.D.

*Kirby Noonan Lance & Hoge LLP*
*350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700*

**Ex 7 p 319**

1  the exclusion of competitors was an anticompetitive act. Since the exclusion was immediately

2  challenged and litigated, it is not surprising that SDCCC has not made any move to raise its rates.

3  The significant point is that if SDCCC is successful in excluding competition, it will have the

4  ability to raise rates without losing business to a competitor in the trade show cleaning market.

5      84.    If Dr. Hayes is arguing that SDCCC cannot raise its prices because of national

6  competition for trade shows, he is ignoring his own data. In exhibits 16 and 17 of Dr. Hayes'

7  declaration, and exhibit 18 of his report, Dr. Hayes acknowledges that the labor rates for trade

8  show cleaning at some venues is as high as $26 per hour, compared to the $17 per hour rate

9  charged by SDCCC. This data belies Dr. Hayes' argument on this point.

10     85.    Attached hereto as Exhibits 3 and 4 are my initial expert report and rebuttal report,

11  respectively.

12      I declare under penalty of perjury under the laws of the State of California that the

13  foregoing is true and correct and that this Declaration is executed this 28th day of February, 2010

14  in Los Angeles, California.

15

16      _John S Hekman_

      John S. Hekman, Ph.D.

17

18

19

20

21

22

23

24

25

26

27

28                                      **Ex 7 p 320**

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1

2

*United National Maintenance, Inc. v. San Diego Convention Center Corporation, Inc.*
(Case No: 07-CV-2172 BEN(JMA))

3

4

5

TABLE OF CONTENTS OF EXHIBITS TO
DECLARATION OF DR. JOHN S. HEKMAN IN SUPPORT OF UNITED NATIONAL
MAINTENANCE, INC.'S OPPOSITION TO SAN DIEGO CONVENTION CENTER
CORPORATION, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE SUMMARY ADJUDICATION

6

7

| Exhibit | Page Nos. | Description |
|---------|-----------|-------------|
| 1 | 1-10 | John S. Hekman Curriculum Vitae |
| 2 | 11-14 | John S. Hekman list of materials reviewed in this matter |
| 3 | 15-62 | John S. Hekman Report dated September 30, 2009 |
| 4 | 63-83 | John S. Hekman Rebuttal Report dated November 12, 2009 |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ex 7 p 321

KNLH\708123.1

# EXHIBIT 1

# LECG

## John S. Hekman

550 South Hope Street          EXHIBIT 1
Suite 2150
Los Angeles, California 90071
Tel. (424) 204-8872
Fax (213) 243-3710
E-mail: jhekman@lecg.com

### EDUCATION

Ph.D., Economics, University of Chicago
M.B.A., Finance, University of Chicago
BA, History, Valparaiso University

### EMPLOYMENT

Principal, LECG, LLC, 2004-present.

Lecturer, MBA program, University of Southern California, 1989-present. Department of Finance and Business Economics.

Past Positions:

Principal, Economic Analysis LLC, 2000-03.

Principal, LECG, LLC, 1998-2000.

Director, Altschuler, Melvoin and Glasser LLP, 1996-98.

Vice President (1993-96), Senior Economist (1992), Economic Analysis Corporation.

Senior Economist, Micronomics, Inc., 1990-92.

Executive Vice President and Director of U.S. Economic Forecasting, Claremont Economics Institute, 1986-90. Editor, *The Main Street Journal* Investment letter.

Associate Professor of Finance, University of North Carolina, Chapel Hill 1981-86, (academic tenure granted, 1985).

Visiting Scholar, Federal Reserve Bank of Atlanta, 1981-84.

Economist, Federal Reserve Bank of Boston, 1980.

Research Associate, Harvard-MIT Joint Center For Urban Studies, 1978.

**Ex 7 p 323**

# LECG

Assistant Professor of Economics, Boston College, 1975-81.

Instructor, University of Chicago, 1974-75.

## RECENT ENGAGEMENTS

*Official Committee of Unsecured Creditors v. Credit Suisse, Cayman Islands, et al.* Retained by J. Thomas Beckett of Parsons Behle & Latimer regarding the bankruptcy of the Yellowstone Mountain Club, April 2009.

*Morton v. Morton.* California Superior Court for the County of Los Angeles. Retained by Thomas Nolan of Skadden, Arps, Meagher & Flom, November 2008 regarding the value of a large land parcel in Las Vegas, March 2009.

*Gartner, Inc. v. Parikh, et al.* United States District Court for the Central District of California. Retained by Thomas Mackey of Jackson Lewis, August 2008.

*Auerbach Acquisition Associates v. Greg Daily et al.* California Superior Court for the County of Los Angeles. Retained by Pierce O'Donnell of O'Donnell and Associates, April 2008.

*Stephen Shoemaker v. Daniels, Fine, Israel, Schonbuch & Lebovits.* California Superior Court for the County of Los Angeles. Retained by Sandra Block of Robie & Mattai, February, 2008.

Retained by Fremont Investment and Loan in connection with the sub-prime mortgage crisis, January 2008.

*Catherine Blaylock, et al. v. First American Title Insurance Company.* United States District Court, Western District of Washington. Retained by Stephen Rummage of Davis Wright Tremaine, November 2007.

*Janice Howland v. First American Title Insurance.* United States District Court, Northern District of Illinois, Eastern Division. Retained by Douglas Mansfield of Jones, Day, November 2007.

*United National Maintenance Inc. v. San Diego Convention Center Corp.* United States District Court for the Southern Distict of California, County of San Diego. Retained by Jeffrey Leon of Ungaretti & Harris, LLP, October, 2007; Jacob Slania of Kirby Noonan Lance & Hoge, August 2009.

*Julius Chang and Howard Chen v. Charles Schwab & Company,* California Superior Court, County of San Francisco. Retained by Daniel Newland of Seyfarth Shaw LLP, October, 2007.

Ex 7 p 324

# LECG

*Eric Seiken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San Diego. Retained by Kevin Quinn of Thorsnes Bartolatta McGuire, September, 2007.

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et al,* California Superior Court, County of San Mateo. Retained by Joel Wolosky of Hodgson Russ, March 2007.

*James Ripley v. Wyoming Medical Center et al.* United States District Court for the District of Wyoming. Retained by Stephen Kline of Kline Law Office PC, January 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District of California. Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman, November 2006.

*Caruso Affiliated Holdings v. General Growth Properties, Inc.* California Superior Court for the County of Los Angeles. Retained by Henry Shields of Irell & Manella, September 2006.

*Breakdown Services Ltd. v. Now Casting, Inc.* California Superior Court, County of Los Angeles. Retained by Stephen P. Krakowsky, September 2006.

*RitterRanch Development LLC, debtor. Los Angeles County Waterworks District No. 40 v. Robbin Itkin et al.,* United States District Court Central District of California. Retained by Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller, May 2006.

*Pamela Cunningham and Reet Caldwell v. Mattel, Inc.* Circuit Court, Third Judicial Circuit, Madison County, Illinois. Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges, October 2004.

## TESTIMONY

*United National Maintenance Inc. v. San Diego Convention Center Corp.* California Superior Court, County of San Diego. Retained by Jeffrey Leon of Ungaretti & Harris, and Jacob Slania of Kirby Noonan Lance & Hoge. Testimony filed December 2007; deposition December 2009.

*Ricardo Alfonso Leon, et al. v. Jose Francisco Leon, et al.* California Superior Court for the County of Los Angeles. Retained by Paul Workman of Holland and Knight. Deposition August 2009.

*Beth Robbins v. Essex Management Corp., et al.* California Superior Court for the County of Los Angeles. Retained by Jeremy Dwork of Daley & Heft. Deposition September, 2008; trial October 2009.

**Ex 7 p 325**

# LECG

*Official Committee of Unsecured Creditors v. Credit Suisse, Cayman Islands Branch, et al.* United States Bankruptcy Court for the District of Montana. Retained by J.Thomas Beckett of Parsons, Behle & Latimer. Deposition April 2009; trial testimony May 2009.

*Morton v. Morton.* California Superior Court for the County of Los Angeles. Retained by Thomas Nolan of Skadden, Arps, Meagher & Flom. Deposition March 2009.

*Bullock v. Philip Morris, Inc.* California Superior Court for the County of Los Angeles. Retained by Robert McCarter of Arnold & Porter. Deposition March 2009.

*Gartner, Inc. v. Parikh, et al.* United States District Court for the Central District of California. Retained by Thomas Mackey of Jackson Lewis, August 2008. Deposition October, 2008.

*Catherine Blaylock, et al. v. First American Title Insurance Company.* United States District Court, Western District of Washington. Retained by Stephen Rummage of Davis Wright Tremaine. Declaration filed January, 2008.

*Janice Howland v. First American Title Insurance.* United States District Court, Northern District of Illinois, Eastern Division. Retained by Douglas Mansfield of Jones, Day. Declaration filed January, 2008.

*Julius Chang and Howard Chen v. Charles Schwab & Company,* California Superior Court, County of San Francisco. Retained by Daniel Newland of Seyfarth Shaw LLP. Deposition October, 2007.

*Eric Seiken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San Diego. Retained by Kevin Quinn of Thorsnes Bartolatta McGuire. Class Certification Declaration submitted September, 2007; deposition November 2007.

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et al.* California Superior Court, County of San Mateo. Retained by Joel Wolosky of Hodgson Russ. Deposition April 2007.

*Dwight W. Crawford. v. Debra S. Katz, et al.,* Superior Court for the District of Columbia. Retained by Glenn M. Young of the Young Law Firm. Deposition April 2007.

*James Ripley v. Wyoming Medical Center et al.* United States District Court for the District of Wyoming. Retained by Stephen Kline of Kline Law Office PC. Deposition April 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District of California. Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman. Deposition February 2007.

*Breakdown Services Ltd. v. Now Casting, Inc.* California Superior Court, County of Los Angeles. Retained by Stephen P. Krakowsky. Deposition October 2006.

**Ex 7 p 326**

# LECG

*RitterRanch Development LLC, debtor. Los Angeles County Waterworks District No. 40 v. Robbin Itkin et al.,* United States District Court Central District of California. Retained by Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller. Deposition June 2006.

*Pamela Cunningham and Reet Caldwell v. Mattel, Inc.* Circuit Court, Third Judicial Circuit, Madison County, Illinois. Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges. Deposition February 2005.

*In re Cioffi,* California Superior Court, County of Santa Clara. Retained by William Russell of Lakin, Spears. Deposition and trial testimony January 2004.

*Ederel Sport, Inc. v. Gotcha International, L.P.* U.S. Bankruptcy Court, Central District of California. Retained by Michael Adele of Albert, Weiland & Golden. Deposition and trial testimony May 2003.

*In Re Fuqua Industries Shareholder Litigation,* Delaware Chancery Court Civil Action No. 11974. Retained by Lowell Sachnoff of Sachnoff & Weaver. Deposition March 2003.

*SPC/PomomaLLC v. Medianews Group, Inc.* Superior Court of California, County of Los Angeles. Retained by Steven Gardner of Cohon and Gardner. Deposition February 2003; trial testimony April 2003.

*MGM v. Midway Games, Inc.* U. S. District Court, Central District of California, Western Division. Retained by John Williams of Lord, Bissell & Brook. Report submitted October 2002.

*Freeman Industries LLC v. Eastman Chemical Company, et al.,* In the Law Court for Sullivan County at Kingsport, Tennessee. Retained by Aton Arbisser of Kaye Scholer. Class Certification Affidavit submitted September 2002.

*Keep v. State of California,* Superior Court of California, County of Los Angeles. Retained by Vladimir Shalkovich, Deputy Attorney General. Deposition October 2002.

*IMAX, LTD. v. Krikorian Premiere Theatres,* U.S. District Court for the Central District of California. Retained by Glenn Dassoff of Paul, Hastings, Janofsky & Walker. Deposition September 2002.

*Betty Bullock v. Phillip Morris, Inc. et al.;* California Superior Court, Los Angeles. Retained by Thomas Stoever of Arnold & Porter on behalf of defendant. Deposition May 2002.

*International Paper and Masonite v. Affiliated FM Insurance Co, et al.;* California Superior Court, San Francisco. Retained by Adam Murray of Howrey, Simon, Arnold & White. Deposition May 2001; trial testimony November 2001.

# LECG

*Copley Press, et al. v. Gray Davis, et al; Tony Strickland, et al. v. Gray Davis, et al.;*
California Superior Court, San Diego County; retained by Timothy Muscat, Deputy Attorney
General. Declaration in Support of Defendant's Opposition Brief submitted May 2001.

*Fitzgerald v. Silcott, et al.* California Superior Court, County of Los Angeles. Retained by
Law Offices of J. Jeffrey Long. Deposition January 2000; trial October 2001.

*Formal Complaint of Tesoro Alaska Petroleum Against Amerada Hess, et al.,* Federal Energy
Regulatory Commission and Regulatory Commission of Alaska. Retained by John Donovan
of Skadden, Arps, Slate Meagher & Flom. Testimony submitted November 2000.

*Alavi v. Kaiser Foundation Hospitals.* Retained by Walter Weiss. Arbitration testimony
November 2000.

*Seguritan v. State of California, et al.* Los Angeles County Superior Court. Retained by
Anne Hunter, Deputy Attorney General. Deposition July 2000.

*Lenehan v. Maryland Casualty.* California Superior Court, County of Los Angeles. Retained
by Law Offices of J. Jeffrey Long. Deposition May 2000.

*Hearing on Green Coke Pricing Issue for TAPS Quality Bank.* Federal Energy Regulatory
Commission. Retained by John Donovan of Skadden, Arps, Slate, Meagher & Flom.
Testimony May 2000.

*Tash v. Aviara Land Associates, L.P., et al.* San Diego Superior Court. Retained by Jerry
Phillips of Richman, Mann, Chizever, Phillips & Duboff. Deposition April 2000; Trial
testimony May 2000.

*First Pension Corp/Murray v. Belka.* California Superior Court, County of Orange.
Retained by William Meeske of Latham & Watkins. Deposition February 2000.

*Rhonda Jalali v. Assembly of God, Teen Challenge et al.* California Superior Court.
Retained by George Buehler of Howrey & Simon. Deposition and trial testimony July 1999.

*Alfred Martino, Jr. v. Northbrook Property and Casualty Company and St. Paul Fire and
Marine Insurance Company,* Arbitration. Retained by Law Offices of J. Jeffrey Long.
Testimony June 1999.

*Hugo Valdivia v. MCE Corporation, et al.,* California Superior Court for the County of Los
Angeles. Retained by Andrew Jacobs of the Law Offices of Andrew Hoffman (CNA
Insurance). Deposition November 1997; trial January 1998.

*Louisville Bedding Company v. Pillowtex Corporation,* United States District Court for the
Western District of Kentucky. Retained by Hartwell Morse of Welsh & Katz. Deposition
November, December 1997.

Ex 7 p 328

# LECG

*Infant and Nutritional Products, et al. v. BJ Family Food Center, et al,* California Superior Court for the County of Los Angeles. Retained by Farhad Novian of Novian & Novian. Deposition September 1997.

*William Gene Norman v. Herbalife International, et al.,* California Superior Court for the County of Los Angeles. Retained by Ward Benshoof of McClintock Weston Benshoof Rochefort Rubalcava MacCuish. Deposition April 1997.

*Jeffrey Alpert v. Gerald Busch, et al,* California Superior Court for the county of Los Angeles. Retained by Law Offices of Daniel Hoffman (CNA Insurance). Trial testimony November 1997.

*Janelle Flores v. Dapo Popoola, MD, et al.,* California Superior Court for the County of Los Angeles. Retained by Henry Tovmassian of Kehr, Crook, Tovmassian & Fox. Deposition September 1997.

*Ridgecrest Homeowners Association v. Nihon Lancre America, Inc., et al.,* California Superior Court for the County of Los Angeles. Retained by Ronald Caswell of Richmond, Lawrence, Mann, Greene, Chizever, Friedman & Phillips. Deposition June 1997.

*Harvey W. Stuart, et al. v. Kraft Foods, Inc. et al.,* United States District Court for the Eastern District of Wisconsin. Retained by Michael Freed of Much Shelist Freed Denenberg Ament Bell & Rubenstein. Affidavit November 1996; deposition and court testimony December 1996.

*Albert and Estelle Binder, et al. v. Thomas Gillespie, et al.,* United States District Court for the District of Idaho. Retained by Robert Bretz of Robert H. Bretz, PC. Affidavit December 1996.

*Ernst Paul Lehmann Patentwerk v. San-Val Discount, Inc.,* United States District Court, Central District of California. Retained by Douglas Adler of Skadden, Arps, Slate, Meagher & Flom. Affidavit submitted March 1996.

*JAR-PR Associates v. Unocal,* Superior Court of the State of California, County of Los Angeles. Retained by George Crook of Kehr, Crook, Tovmassian & Fox. Deposition and trial testimony, March 1996.

*Sarkis v. State of California,* California Superior Court, County of Kern. Retained by Deputy Attorney General Daniel Helfat. Deposition, January 1996.

*Casper Boso v. Chicago Bears.* Retained by Steven Wolf of Wolf & Ouimet to testify regarding the average career length of NFL players. Arbitration testimony November 1994.

*Styling Research Company v. Conair Corporation,* Superior Court of the State of California, County of Los Angeles. Retained by Phillip Belleville of Latham & Watkins. Deposition August 1992.

Ex 7 p 329

# LeCG

*Medical Designs, Inc. v. Donjoy, Inc.*, United States District Court, Southern District of California. Retained by Paul C. Van Slyke of Pravel, Gambrell, Hewitt, Kimball & Krieger. Deposition October 1991.

*California Grocers Association v. Bank of America*, Superior Court of the State of California for the County of Alameda, Northern District. Retained by Arne Wagner of Bank of America. Deposition May 1991.

## CONSULTANT

*Simpson Thatcher & Bartlett, New York, NY, Kenneth Logan;* Ronald Cleveland, et al. v. Viacom, Blockbuster, et al. *United States District Court for the Western District of Texas, 2002.*

In Re Maguire Thomas Partners – Grand Place Tower, Ltd. *United States Bankruptcy Court, Central District of California. Retained by Bennett Silverman of Gibson, Dunn & Crutcher on behalf of Sumitomo Bank, 1999.*

Howrey & Simon, Washington, DC, Thomas Heyer; *Litton Systems, Inc. v. Honeywell, Inc.,* 1995-1996.

Thelen, Marrin, Johnson & Bridges, San Francisco, Steven V. O'Neal; *IBM v. Fasco Industries,* 1994-1995.

*Packard Bell Electronics, Inc. v. Teledyne Industries, Inc.*, Superior Court of the State of California, County of Los Angeles. Retained by Ronald M. St. Marie of Ervin, Cohen & Jessup. August 1995.

O'Melveny & Myers, Los Angeles, Charles Diamond, Randy Oppenheimer; *Exxon Valdez Oil Spill Litigation*, 1993-1994; 2000; 2002.

## PUBLICATIONS

"California Under Siege: A Call for Perspective" (with Ken Agid, et al.), California Real Estate Roundtable, April 1991.

"Should We Reform Deposit Insurance?" *Los Angeles Times,* March 11, 1990, D3.

"New England's Economy in the 1980s" (with Lynn Browne), in *The Massachusetts Miracle,* David R. Lampe (ed.), The MIT Press: Cambridge, MA, 1988.

"Real Estate Returns and Inflation" (with David Hartzell and Mike Miles), *American Real Estate and Urban Economics Association Journal (AREUEA),* Spring 1987.

Ex 7 p 330

# LECG

"Factors Affecting Manufacturing Location in North Carolina," in Dale Whittington (ed.), *High Hopes for High Tech: Microelectronics in North Carolina,* University of North Carolina Press, 1987.

"Diversification Categories in Investment Real Estate" (with David Hartzell and Mike Miles), *AREUEA Journal,* Summer 1986.

*Land Supply Monitoring: A Guide for Improving Public and Private Urban Development Decisions* (with D. Godshalk, S. Bollens, and M. Miles), Oelgeschlager, Gunn & Hain: Boston, 1985.

"Rental Price Adjustment and Investment in the Office Construction Market," *AREUEA Journal,* Spring 1985.

"Branch Plant Location and the Product Cycle in Computer Manufacturing," *Journal of Economics and Business,* May 1985.

"Venture Capital and Economic Development in the Southeast" (with Mike Miles), *Economic Review,* Federal Reserve Bank of Atlanta, July 1983.

"Optimal Allocation of Economic Development Funds" (with Mike Miles, et al.), N.C. Department of Natural Resources and Community Development, January 1983.

"What are Businesses Looking for? A Survey of Industrial Firms in the South," *Economic Review,* Federal Reserve Bank of Atlanta, June 1982.

"Behind the Sunbelt's Growth: Industrial Decentralization" (with Alan Smith), *Economic Review,* Federal Reserve Bank of Atlanta, March 1982.

"Impact of Environmental Regulations on Industrial Development in North Carolina" (with Raymond Burby, et al.), North Carolina Department of Natural Resources and Community Development, February 1982.

"The Evolution of New England Industry" (with John Strong), *New England Economic Review,* March-April 1981.

"New England's Economy in the 1980s" (with Lynn Browne), *New England Economic Review,* January-February 1981.

"Income, Labor Supply and Urban Residence," *American Economic Review,* September 1980.

"Is there a Case for Plant Closing Laws?" (with John Strong), *New England Economic Review,* July-August 1980.

# LECG

"The Product Cycle and New England Textiles," *Quarterly Journal of Economics*, June 1980.

"Can New England Hold Onto its High Technology Industry?" *New England Economic Review*, April 1980.

"Regions Don't Grow Old, Products Do," *The New York Times*, Sunday Business, November 4, 1979.

"What Attracts Industry to New England?" *New England Economic indicators*, December 1978.

"An Analysis of the Changing Location of Iron and Steel Production in the Twentieth Century," *American Economic Review*, March 1978.

Ex 7 p 332

# EXHIBIT 2

Ex 7 p 333

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

Exhibit 2


List of Materials Reviewed

1. Complaint for Injunctive Relief and Damages

2. Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction

3. Defendants Objections to Evidence Submitted by Plaintiff in Support of Plaintiff's Ex Parte Application for a Temporary Restraining Order

4. Letter from Aaron Bludworth to Brad Gessner, September 21, 2007.

5. Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order

6. Memorandum of Points and Authorities in Support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order.

7. Plaintiff's Ex Parte Application for a Temporary Restraining Order.

8. Proposed Temporary Restraining Order

9. Proposed Temporary Restraining Order and Order to Show Cause re Preliminary Injunction

10. Request for Judicial Notice in support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order

11. Declaration of Carole Wallace in Support of Opposition to Ex Parte Application for a Temporary Restraining Order

12. Declaration of Dessi Nintcheva in Support of Opposition to Ex Parte Application for a Temporary Restraining Order

13. Declaration of Thomas Robbins in Support of Plaintiff's Application for a Temporary Restraining Order

14. Declaration of Jason Kirby in Support of Plaintiff's Application for a Temporary Restraining Order

15. Declaration of Charles Buddy Linn in Support of Plaintiff's Application for a Temporary Restraining Order

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

16. Declaration of Larry Colby in Support of Plaintiff's Application for a Temporary
    Restraining Order

17. Declaration of Mark Epstein in Support of Plaintiff's Application for a Temporary
    Restraining Order

18. Declaration of Mark Epstein, October 26, 2007

19. Declaration of Richard Simon in Support of Plaintiff's Application for a
    Temporary Restraining Order

20. San Diego Convention Center Corporation Cleaning Services Contract with
    United Service Companies 2007

21. UNM v. San Diego Convention Center Pleadings List

22. San Diego Convention Center 2006 Annual Report

23. San Diego Convention Center Corporation, Convention and Trade Show License
    Agreement

24. July 26, 2007 Letter from Richard Simon to Jerry Sanders

25. July 5, 2007 Letter from Joe Loggia to Brad Gessner

26. June 27, 2007 Letter from Pat Dwyer to Brad Gessner

27. June 18, 2007 Letter from Barbara Myers to Brad Gessner

28. July 26, 2007 Letter from B.J. Enright to Brad Gessner

29. June 14, 2007 Letter from Ken McAvoy to Brad Gessner

30. June 22, 2007 Letter from Mary Kay Sustek to Brad Gessner

31. June 8, 2007 Letter from Martin Cymbal to Brad Gessner

32. June 14, 2007 Letter from Ty Bobit to Brad Gessner

33. SISO, IAEM, AND MATSO ISSUE JOINT INDUSTRY STATEMENT ON
    EXCLUSIVE SERVICES

34. July 20, 2007 Letter from Mary Beth Rebedeau to Brad Gessner

35. June 20, 2000 Letter from Joe Psulk to Marty Cymbal

36. May 12, 2000 Letter from Beatrice Kemp to Mark Valley

37. March 31, 2000 Letter from John Mooney to Carole Wallace

38. March 13, 2000 Letter from Michael Muldoon to Carole Wallace

39. March 8, 2000 Letter from Brian Casey to Carole Wallace

40. March 7, 2000 Letter from Mary Beth Rebedeau to Carole Wallace

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

41. March 2, 2000 Letter from James Bracken to Carole Wallace

42. March 1, 2000 Letter from Stephen Shuldenfrei to Carole Wallace

43. June 20, 1990 Letter from Hugh Mac Lean to Tom Liegler

44. June 13, 1990 Letter from Richard Simon to the San Diego Convention Center
    Board of Directors

45. May 11, 1990 Letter from Hugh Mac Lean to John Hartley

46. U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section
    1.1, http://www.ftc.gov/bc/docs/horizmer.htm.

47. http://www.portofsandiego.org/projects/hiltonhotel/

48. Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.,*
    Boston: Pearson, Addison-Wesley, 2005.

49. Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising*
    *Rivals' Costs to Achieve Power Over Price,* 96 Yale L.J. 209 (1986)

50. Steven Salop and David Scheffman, *Raising Rivals' Costs,* 73 American
    Economic Review Papers and Proceedings 267 (May 1983)

51. David Scheffman and Richard Higgins, *20 Years of Raising Rivals' Costs:*
    *History, Assessment, and Future,* Federal Trade Commission,
    *http://www.ftc.gov/be/RRCGMU.pdf*

52. Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No
    Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

53. Terms and Conditions, 2006 Exhibitor Application & Contract, Internet
    Telephony Conference & Expo, item 6.

54. Declaration of Charles Buddy Linn, November 2007.

55. Declaration of William Callaghan, November 2007.

56. Deposition of Charles Linn, with exhibits.

57. Deposition of Richard Simon, with exhibits.

58. Deposition of Gabriel Ramirez, with exhibits.

59. Deposition of Raymond Santos, with exhibits.

60. Deposition of Mark Epstein, with exhibits.

61. Draft Mayor's Citizen Task Force on the San Diego Convention Center Project;
    http://www.conventioncentertaskforce.org/

Ex 7 p 336

Exhibit 2
Page 13

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

62. July 31, 2009 letter from John L'Estrange Jr. to Jake Slania.

63. United's Response to Defendant's First Set of Interrogatories.

64. Defendant's Amended Objections and Responses to First Set of Requests for
   Production of Documents.

65. Defendant's Objections and Responses to Amended First Set of Interrogatories.

66. United's four-page list of Contracts and Billing Information for SDCC Shows
   July 1, 2007 through August 1, 2009.

67. UNM008682-UNM 011963.

68. Declaration of Brad Gessner in Support of Defendant's Opposition to Plaintiff's
   Motion for Preliminary Injunction.

69. Declaration of Carol Wallace in Support of Defendant's Opposition to Plaintiff's
   Motion for Preliminary Injunction.

70. Declaration of T.M. Mazzocco in Support of Defendant's Opposition to Plaintiff's
   Motion for Preliminary Injunction.

71. Declaration of Sotera L. Anderson in Support of Defendant's Opposition to
   Plaintiff's Motion for Preliminary Injunction.

72. Defendant's Evidentiary Objections to Evidence Submitted by Plaintiff in Support
   of Plaintiff's Motion for Preliminary Injunction.

73. Request for Judicial Notice in Support of Defendant's Opposition to Plaintiff's
   Motion for Preliminary Injunction.
74. San Diego Convention Center Articles of Incorporation
75. Public Improvement and Assessment Proceedings: Article 1: San Diego Tourism
   Marketing District.
76. City of San Diego Rules Implementing the Living Wage Ordinance
77. Memorandum of Points and Authorities in Support of Defendant's Demurrer to
   Plaintiff's Complaint
78. Expert Report of John Hayes
79. Deposition of John Hayes
80. Declaration of John Hayes

Ex 7 p 337

Exhibit 2
Page 14

# EXHIBIT 3

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

Case No. 37-2007-00072054-CU-BT-CTL

REPORT

of

John S. Hekman Ph.D.

In the Matter of

*United National Maintenance, Inc.*

*v.*

*San Diego Convention Center Corporation, Inc.*

September 30, 2009

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

## TABLE OF CONTENTS

I. Introduction and Assignment..................................................................................................1

II. Summary of Opinions .........................................................................................................3

III. Market Definition and Market Power ...............................................................................4

    A. The Product Market .........................................................................................................6

    B. The Trade Show Cleaning Services Market...................................................................8

    C. The Geographic Market .................................................................................................13

    D. Market Power..................................................................................................................17

IV. SDCC has Engaged in Exclusionary Conduct in the Market. .......................................17

    A. SDCC Has Excluded Competition Entirely From the Convention Center. .................19

    B. SDCC Has Attempted to Monopolize the Market by Raising Rivals' Costs...............21

    C. The San Diego Convention Center is an Essential Facility for Competitors in the Trade
        Show Cleaning Services Market.....................................................................................22

    D. SDCC's Action Is Anticompetitive Because It Constitutes a Tying Arrangement. ...22

V. The Security Explanation by SDCC for Excluding United Fails the "No Economic Sense
    Test"...................................................................................................................................25

VI. Harm to Consumers. .........................................................................................................29

VII. Conclusion........................................................................................................................32

Ex 7 p 340

Exhibit 3
Page 16

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

## I. Introduction and Assignment

1.      My name is John S. Hekman. I am a Principal at LECG, a firm that provides consulting

and expert testimony in economics, finance and accounting. Since 1990, I have testified in

federal and state courts on such matters as price fixing, patent infringement, trade secrets, real

estate finance and general economic damages. I have defined relevant markets in antitrust

matters. I have analyzed allegations of exclusionary behavior by market participants. I have

assessed the degree of market power by defendants accused of the abuse of market power. I

earned a MBA in finance and a Ph.D. in economics at the University of Chicago. I have taught

economics and finance at the University of Southern California, The University of North

Carolina, Boston College and The University of Chicago. In addition, I have published a number

of papers in academic and professional journals. I was also an economist with the Federal

Reserve in Boston and Atlanta. My billing rate in this matter is $440 per hour. My curriculum

vitae is attached to this report as Exhibit 1.

2.      Previously in this matter, on November 13, 2007, I submitted a Declaration in connection

with Plaintiff's Complaint for Injunctive Relief. I also submitted a Response to Defendant's

Opposition to Motion for Preliminary Injunction. I have been asked by counsel for United

National Maintenance, Inc. to provide several opinions. First, I have been asked to define the

relevant geographic and product markets in this matter. Second, I have been asked to determine

whether the San Diego Convention Center has market power or monopoly power in the relevant

market. Third, I have been asked to determine whether the Convention Center has exercised

market power or monopoly power by instituting its policy under which the Convention Center's

cleaning services labor is used exclusively for trade shows. Finally, I have been asked to

1

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

determine whether consumer harm has resulted from the Convention Center's exclusive cleaning

services policy.

3.    The materials I have reviewed in connection with forming my opinions include the

Complaint for Injunctive Relief and Damages; Defendant's Objections to Evidence Submitted by

Plaintiff; the Memoranda of Points and Authorities in Support and in Opposition to the

application for a restraining order; the Declarations of Carol Wallace, Dessi Nintcheva, Thomas

Robbins, Jason Kirby, Richard Simon, Charles Linn, Larry Colby, William Callaghan and Mark

Epstein; the SDCC cleaning services contract with United Service Companies; certain

correspondence between market participants and SDCC from 1990 to 2000; correspondence

from market participants related to SDCC's 2007 actions; 2006 Exhibitor Application and

Contract, Internet Telephony Conference & Expo; the SDCC website; and additional materials

from my own research.

4.    Since submitting my Declaration in this matter on November 13, 2007, I have reviewed

additional materials. These materials include the depositions of Charles Linn, Richard Simon,

Gabriel Ramirez, Raymond Santos and Mark Epstein; the August 2009 Mayor's Citizen Task

Force Report on the SDCC; Defendant's Memorandum of Points and Authorities in Opposition

to Plaintiff's Motion for Preliminary Injunction, with the Declarations of Chuck Gutensohn,

Carol Wallace, Brad Gessner, T.M. Mazzocco, and Sotera Anderson; SDCC's Responses to

Plaintiff's First Set of Interrogatories; SDCC's Amended Responses to Plaintiff's First Set of

Interrogatories; United's Responses to Defendant's First Set of Interrogatories; and the SDCC

2008 Annual Report. A complete list of the materials I have reviewed is attached to this

Declaration as Exhibit 2.

2

Ex 7 p 342

Exhibit 3
Page 18

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

**II. Summary of Opinions**

5.     I have reached the following opinions:

a) The economically meaningful relevant product market is trade show cleaning services at SDCC.

b) The relevant geographic market is large convention centers in the San Diego metropolitan area, or, equivalently, the SDCC.

c) SDCC has market power in the trade show cleaning services market at the SDCC.

d) The demand for large trade show services facing SDCC is inelastic with respect to price. Trade show cleaning services is a small portion of the price of large trade show services. As a result, a price increase in the trade show cleaning services market will have a small impact on the price of large trade show services and would be unlikely to cause a loss of SDCC's trade show business.

e) SDCC exercised its market power when it excluded non-SDCC cleaning services workers from the convention center.

f) The effects of SDCC's denying United National and other cleaning services access to the convention center are highly anti-competitive.

g) SDCC has eliminated current and future competition and has effectively raised prices for trade show cleaning services in connection with its exclusion of non-SDCC cleaning employees.

h) The convention center is an essential facility for competitors in the trade show cleaning market, and SDCC has denied access to this facility for competitors in the market.

3

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

i) SDCC has used its market power in the national trade show market to engage in an anticompetitive tie. The tying good is the convention center, and the tied good is trade show cleaning services.

j) SDCC has leveraged its monopoly power in the San Diego large trade show market to exclude competitors in the trade show cleaning services market.

k) Because trade shows contract for space at SDCC many years in advance, trade show consumers are "locked in" to higher prices charged for cleaning services, and are further unlikely to switch because trade show cleaning services are a small percentage of the total expenditure for trade show services.

l) The manner in which SDCC has excluded competition is a form of "raising rivals' costs", which is recognized by economics as an anti-competitive practice.

m) I conclude from the "no economic sense" test that there is no pro-competitive justification for SDCC's actions.

n) Consumers in the market for trade show cleaning services have been harmed. Consumers have had their choices in the market reduced to a single supplier, i.e. SDCC. And the prices charged by SDCC are higher than those charged by United National.

**III. Market Definition and Market Power**

6.      Prior to SDCC's imposition of exclusive cleaning services in the Convention Center, United and SDCC were competitors in the provision of trade show cleaning services. To determine whether SDCC's action was anticompetitive, it is necessary to define the relevant market in which they compete. After the relevant market has been defined, SDCC's market share in that relevant market can be measured. With the measured market share it is then possible to conclude whether SDCC's actions in that market are anticompetitive.

4

Ex 7 p 344

Exhibit 3
Page 20

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

7.      Economists have identified the primary elements of market definition as, first, the

definition of the specific products or services that, in this case, SDCC and United sell. Products

or services that have a high cross-price elasticity of demand are considered to be in the same

market. A high cross-price elasticity of demand between services A and B means that if the

price of A rises, the demand for B will rise by a significant amount. In the present case, a high

cross-elasticity of demand would mean that if SDCC raised its charges for trade show cleaning

services, the customers (i.e. the decorators who contract for trade show cleaning services) would

switch their business to one of SDCC's competitors such as United. If this switching were to

occur in a free market, then an economist would conclude that the services of SDCC and United

are close substitutes. The cross-elasticity would be estimated in the trade show cleaning market

by measuring the percentage increase in the demand for United's services for a given percentage

increase in SDCC's trade show cleaning services charges. Products and services that are close

substitutes using this measure are judged to be in the same market.

8.      The second primary element of the market definition is geographic. Competition in some

markets is national in scope. For example, if a mortgage lender located in Southern California

raises its mortgage rates above competitive levels, consumers (the borrowers) can switch to other

mortgage lenders that are located anywhere in the country. This reduces the ability of mortgage

lenders in any one location to charge above-competitive rates.

9.      Other markets are much smaller geographically; the geographic market for a Safeway

grocery store in San Diego is limited to the area in which consumers would switch to another

grocery store if the Safeway raised its prices above the competitive level. The geographic

market in this case would include part of San Diego but obviously not include the rest of the U.S.

In this case, the size of the market is determined by the willingness of consumers to travel to

5

**Ex 7 p 345**

**Exhibit 3**
**Page 21**

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

competitors as well as the ability of competitors to enter the market. If there is an Albertson's

grocery store located near to the Safeway, then it would probably be in the same market. But an

Albertson's located in Los Angeles would not be in the same market for the obvious reason that

it cannot supply the consumer with groceries in San Diego except at an uneconomic cost.

Finally, it is possible for new competitors to enter the market in response to a price increase. In

this case, the question would be whether a competitor would establish a new grocery store in the

local market when Safeway raised its prices above the competitive level.

**A. The Product Market**

10.     The FTC and DOJ's 1992 Horizontal Merger Guidelines (Merger Guidelines) were

developed in conjunction with economists and are generally accepted by economists as

appropriate economic tools to be used by economists defining relevant markets and market

power. The FTC/DOJ guidelines define a product market to be a group of products that are

related such that a hypothetical profit-maximizing firm that was the only seller of those products

(the monopolist) could profitably impose at least a "small but significant and non-transitory"

increase in or markup of price over the competitive level.[1] This minimum price markup that

could be maintained for a significant period of time is typically taken to be 5 percent. This is

sometimes called the "hypothetical monopolist test" or the "SNIP" test.

11.     When the market has been defined correctly, then it is possible to measure the market

power of a firm in that market. In the present case, when the market in which SDCC and United

compete has been properly defined, it is possible to measure whether SDCC has market power in

that market and therefore has the ability to harm competition. If the market is defined too

broadly, then SDCC will appear not to have market power. For example, if the market was

---

[1] U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section 1.1,
<http://www.ftc.gov/bc/docs/horizmer.htm> (17 October 2005).

6

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

defined as all commercial cleaning services in the entire U.S., then SDCC would appear to have

a very small market share in that market and market actions by SDCC would be unlikely to have

an effect on competition. On the other hand, if the market is defined too narrowly, then SDCC

would be considered to have too much market power. The market would be defined too

narrowly if it failed to take into account some potential competition that would be present to take

business away from SDCC if SDCC raised its prices above the competitive level.

12.     The ability of a hypothetical monopolist to maintain a price increase as described above

is analyzed by the competitive response that would result from the price increase. On the

demand side, the response comes from buyers who switch to substitute products or services

when the monopolist raises price. And on the supply side, the response comes from the ability of

firms producing other products and services to begin producing the monopolist's product or

service. The supply response also comes from new firms entering the industry because the price

has risen.

13.     On the demand side, the market test asks, if the monopolist imposed the "significant and

non-transitory" 5% price increase, whether buyers of the service could switch to other services in

such numbers that the loss of sales by the monopolist would make the price increase

unprofitable. If this is probable then the service would be in the same product market, and the

market has not been defined broadly enough. Conversely, if the loss of sales is not enough to

make the price increase unprofitable for the monopolist, then the product market is not too broad.

The relevant market is the group of services just large enough that a monopolist could profitably

raise price because buyers would be unwilling or unable to switch to other services.[2]

---

[2] A well-known example of this test is the market for cellophane. If buyers switching to wax paper in response to an
increase in the price of cellophane do not make the price increase unprofitable, then wax paper is not in the same
antitrust market as cellophane.

7

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

14.      The supply side market test looks to see whether other suppliers could enter the market or

switch to producing the service produced by the monopolist in such a way that a price increase

would not be sustained.  The market definition asks whether a 5% increase in price by the

hypothetical monopolist would cause more firms to enter the market within one to two years,

thus bringing price down and making the price increase by the monopolist unprofitable.[3]  If other

firms are able to start producing the product or service that the hypothetical monopolist

produces, then the market definition is too narrow.  The relevant market is the group of sellers

such that a monopolist could profitably raise price because no more sellers would be able to enter

the market in a reasonable period of time.

**B. The Trade Show Cleaning Services Market**

15.      I have concluded that the relevant product market definition is "trade show cleaning

services at major convention centers."  To begin at the most general level, SDCC and United

provide "cleaning services."  More specifically, they provide trade show cleaning services to

contractors that are termed "decorators".  The decorators are trade show contractors who plan

and execute trade shows on behalf of exhibitors at large convention centers.[4]  Typically, a

convention center signs a contract with an exhibitor such as a trade group; the exhibitor hires a

trade show organizer; the organizer contracts with a decorator; and the decorator contracts with

the trade show cleaning services firm, among others.[5]  The role of the decorator is to provide

drapery, carpeting, registration, graphics and props.[6]  The question of product market definition

relates to how specific the cleaning services are.  The hypothetical question is, if a firm in the

---

[3] The test requires both that there be entry of other firms and that the increase in supply be sufficient to bring the
price back to a competitive level.
[4] http://www.champion-nationwide.com/
[5] Deposition of Raymond Santos, pages 98-99; deposition of Mark Epstein page 23-24. Mr. Epstein also added that
in some cases his firm, Champion, had an agreement with show management [organizer] as well as agreements with
individual exhibitors to clean their booths..
[6] Deposition of Mark Epstein, page 42.

8

Ex 7 p 348

Exhibit 3
Page 24

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

market—SDCC, United or others—raised its price above competitive levels, could another firm

enter the market to compete with them? The testimony in this case has been that the services to

the trade shows are so specialized that only trade show cleaning services firms would be able to

compete for the business of the decorators. That is, a commercial cleaning firm that did not have

the specialized expertise in trade show cleaning, move-in cleaning and move-out cleaning, would

not be able to obtain business from the decorators.

16.     United also provides trade show cleaning services at hotels and smaller exhibition halls.

However, testimony has shown that this is not in the same relevant market as the large trade

shows. Trade shows at SDCC use up to fifty of United's workers. SDCC does not compete with

the smaller hotel convention facilities in the San Diego area for trade shows. By contrast, the

hotels in the San Diego area that have trade shows require "one, max two other people."[7]

Therefore, looking from the demand side of the market, the demanders or users of the services of

the relevant market are the organizers of trade shows at convention centers. From the supply

side, the providers of trade show cleaning services are those firms that have developed the

specialized experience to be able to enter the market. Charles Linn, Vice President of the

Western Division of United, listed all of the trade show cleaning firms that had competed with

United in California. These included SDCC, Century Cleaning, Team Cleaning, and Show

Ready.[8]  SDCC, Century Cleaning and United are the only trade show cleaning services that

Linn is aware of that performed work at SDCC.[9]

17.     The evidence I have reviewed indicates that the number of firms that supply trade show

cleaning services is limited, because the type of cleaning performed by United National at the

SDCC is not standard space cleaning. Because this cleaning appears to be specialized in a

---

[7] Deposition of Rick Simon, page 32. deposition of Mark Epstein page 23-24.
[8] Deposition of Charles Linn, page 40.
[9] Ibid., pages 104-105.

9

Ex 7 p 349

Exhibit 3
Page 25

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

number of ways, United does not compete with ordinary janitorial services and similar firms. In

fact, United has a separate company, United Maintenance Company, Inc., that provides janitorial

services.[10] If it were the case that janitorial services and trade show cleaning services were

interchangeable, then United's trade show cleaning and janitorial work could be merged, and the

same workers could be used for both. On the contrary, Rick Simon testified that trade show

cleaning is "a totally different skill set, totally different labor requirement, and the trade show

business is itinerant in nature. So you have a lot of demand for a lot of people in a short period

of time. And the knowledge and skill set of cleaning an office building versus a trade show is

the difference between, you know, flying a Piper Cub and a jet aircraft."[11] He further explains

that this knowledge and skill is primarily at the supervisory level.

18.     One of United's primary customers in the trade show cleaning market is Champion

Exposition Services, a large general contractor for trade shows. Champion signs contracts with

trade associations to manage and organize their trade shows across the U.S.[12]   Mark Epstein,

Champion's president, strongly supports the description of United and other firms in the trade

show cleaning market as highly specialized:

> "While a janitorial firm hired to clean office space in a commercial building can expect
> each office to be the same size and in similar condition every day, each trade show is
> unique in size, configuration, and its cleaning needs. Based on the scope and size of a
> particular trade show, a provider of Trade Show Cleaning Services must constantly
> react to ever changing demands that involve the amount and location of manpower and
> equipment at any given moment. A provider of Trade Show Cleaning Services must
> ultimately have a tremendous amount of logistical expertise and must anticipate needs
> proactively based on the past experience of the Trade Show Cleaning Services
> management. No two trade shows are the same from the perspective of Trade Show
> Cleaning Services.[13]

---

[10] Deposition of Rick Simon, pages 20-21.
[11] Ibid., page 21.
[12] Affidavit of Mark Epstein, page 1.
[13] Affidavit of Mark Epstein, page 2.

10

Ex 7 p 350

Exhibit 3
Page 26

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

19.     There are two main functions performed by firms in the trade show cleaning market. The

first is "facilities cleaning", which is cleaning aisles and common areas at SDCC during the

move-in phase and construction of exhibits at conventions as well as during the move-out phase.

The second function is "booth cleaning", which is described as cleaning exhibit booths during

shows and during the night. Facilities cleaning is specialized in part because it must be

performed during a short window of time between trade shows. At times the show moving in

and the one moving out overlap, requiring even more experience to make the process run

smoothly. United states that its cleaning services are individually tailored to the needs of each

type of show and exhibitor. United National revenues from cleaning services at SDCC were

approximately $500,000 per year.

20.     The special need filled by the cleaning contractors was acknowledged by SDCC. In a

June, 2000 letter to the Trade Show Contractors Association, the Convention Center Director

states: "As you know, with the existing and increasing level of business at the Convention

Center, the time between move-out of one show and move-in of the next show is often extremely

compressed. Time frames to return a clean floor will likewise often be compressed. You also

know that we often run overlaps of move-outs and move-ins. The service contractors have been

primary and key players in making those overlaps happen."[14] Move-outs and move-ins are

complicated processes. According to Charles Linn, a move-in typically takes one to three

days.[15] When United does not have enough workers in a particular city for a large trade show,

they do not hire local cleaning workers.[16] Instead, they bring in their own workers from other

cities, presumably at considerable cost. United's workers other than supervisors are part-time,

---

[14] Letter from Joe Psulk to Marty Cymbal, June 20, 2000, page 2.
[15] Deposition of Charles Linn, page 80.
[16] Deposition of Charles Linn, page 85.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

not salaried, so it is not because they are already being paid that they are used. Rather, it
illustrates the specialized nature of the work.

21.     The other aspect of the product market is whether new firms could enter the market in
response to a hypothetical price increase. If so, then a dominant firm in the market such as
SDCC might not have significant market power. The testimony I have read as well as the past
record of the SDCC indicates that there has been no new entry into the trade show cleaning
services market at the SDCC. This is due to the specialized nature of the work as well as to the
relationships that have been built up over the years between the cleaning services firms and the
decorators for whom they work. Mark Epstein of Champion states "Due to the expertise and
specialized knowledge required, I would not consider even an extremely price competitive bid
from a traditional janitorial services firm to provide Trade Show Cleaning Services."[17] Mary
Beth Rebedeau of the Society of Independent Show Organizers referred to how specialized the
cleaning services are in her letter to SDCC: "While we understand the need for facility managers
to generate revenue, tradeshow organizers and their exhibitors must retain the right to select
vendors of their choice. This is particularly true for large shows whose complexities demand
carefully selected and integrated vendor partners who have a thorough understanding of each
show's special needs. This includes cleaning services . . . . Show organizers spend years
cultivating relationships and advantageous pricing with their chosen suppliers. In-house
exclusives arbitrarily increase costs to show organizers -- and therefore exhibitors -- while
decreasing the quality of the service provided due to lack of competition."[18]

---

[17] Affidavit of Mark Epstein, page 2. Anecdotal evidence from customers can be an important source of information
for market definition. It can confirm what economic analysis of the market situation indicates. In this case, United
National's customers explain why they need certain kinds of services that are not available from conventional
cleaning firms, and this is borne out by the market evidence that conventional cleaning firms have not obtained
contracts for Trade Show Cleaning Services at SDCC.
[18] June 22, 2007 letter from Mary Beth Rebedeau to SDCC.

12

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

22.     The specialization of United's services as well as the investment United has made in

developing a relationship with their customers represent barriers to entry for potential new firms

in the trade show cleaning services market.  United CEO Rick Simon estimated that it would

require an initial investment of over $250,000 for a firm to enter the trade show cleaning market

in San Diego.[19] A hypothetical new entrant into the market would need time to develop the

skills necessary to perform on a level with United or other market competitors.  This learning

time is more significant than the actual cost of equipment and supplies to open a cleaning

business.  The knowledge and experience reside in the supervision and coordination of the work

process.  Gabriel Ramirez, the Manager of United's San Diego operations, explained that new

workers receive only a brief training before beginning to do basic cleaning tasks.[20]  However, it

is knowing what to do and how to coordinate what needs to be done that is significant.  There is

a long learning curve down which firms would have to travel in order to be as efficient and

therefore as competitive as United in doing this work.  "Learning by doing" is a process that

takes time, and therefore in the short run there would be no competitors able to enter the market.

Century Trade Show Service, one of United's competitors in other areas, attempted to enter the

San Diego market but was unsuccessful.[21]  So even if it were possible for new firms to bid on

cleaning contracts at SDCC, it is unlikely, from what I have seen, that there would be entry of

new firms.  However, the San Diego Convention Center is using its control over access to the

center to eliminate all alternative cleaning firms.  This is an absolute barrier to entry.

**C. The Geographic Market**

23.     The relevant geographic market is large convention centers in the San Diego metropolitan

area.  Since SDCC is the only large convention center in the area, the market can be defined

---

[19] Deposition of Rick Simon, page 239.
[20] Deposition of Gabriel Ramirez, page 58.
[21] Deposition of Rick Simon, page 240.

13

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

equivalently as the SDCC. The two main aspects of this definition are, first, that the trade show

cleaning services firms in this market require large convention centers in which to operate, and,

second, that trade show cleaning services are provided by workers who live within commuting

distance of the convention centers where the work is performed.

24.    The issue of convention centers as the focus of the trade show cleaning services market

was addressed above in the product market section. The market is limited to the San Diego area

because workers who are trained to perform the cleaning services in this market cannot

profitably come from areas outside the local San Diego labor market and be competitive with

those workers who are located in the local market. The competition is among providers of trade

show cleaning services in the local labor market. Providers outside the local market area could

only compete with those located in San Diego if they could commute to San Diego to provide

services or if the trade shows were willing to switch their shows from San Diego to another city

in response to an increase in the price of trade show cleaning services in San Diego. The first

possibility is highly unlikely because the cost of non-San Diego cleaning services providers

commuting to San Diego to work would be prohibitive. The second possibility is also highly

unlikely because the cost of trade show cleaning services is a very small part of the overall cost

of putting on a trade show. Trade show exhibitors would not be willing to move to another city

to save a small fraction of the trade show cost.

25.    The issue of whether the relevant market is properly defined as trade show cleaning

services at SDCC involves the ability of other firms (the supply side of the market) or trade show

exhibitors (the demand side of the market) to react to an increase in price by SDCC. In the

language of the FTC/DOJ antitrust guidelines, the hypothetical monopolist test asks whether a

hypothetical 5% increase in price by the monopolist, maintained for a significant period of time,

14

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

would elicit a sufficient competitive response to restrain the monopolist, making the attempted

price increase unprofitable. This ability of competition to "discipline" an increase in price can be

analyzed by the supply response and the demand response.

26.     The buyers, or demanders, of trade show cleaning services are ultimately the exhibitors at

trade shows. However, the exhibitors are not the direct buyers of cleaning services. United

National contracts with a decorator; the decorator is hired by a trade show organizer; the trade

show organizer is hired by a trade association or other exhibitor. The trade association chooses

the city and convention center where the show will be held, but the exhibitor-members of the

association pay the fees that go to the organizer and finally to the cleaning contractor, United.

The exhibitors do not choose the convention city.

27.     In this way, the trade show cleaning services market is in a vertical relationship to the

market for large trade shows. A monopolist who was the only seller of trade show cleaning

services in San Diego would face potential competition from other convention centers, if the

decorators that hire cleaning firms in San Diego could move to other venues. However, there are

a number of reasons why it is unlikely that decorators could switch to other convention centers to

restrain SDCC's ability to raise price in the Trade Show Cleaning Services market.

28.     First, buyers are unlikely to discipline a SDCC price increase because of a "third-party

payer" effect in the market. The ultimate buyer of trade show cleaning services as well as other

costs of trade shows is the exhibitor. But the contracting of cleaning services is done by the

decorator, such as Champion. Increases in the price of trade show cleaning services are paid by

the decorator, but these increases are passed along to the exhibitor, which reduces the impact of

the price increase. Further, the choice of a location for the trade show is made by the trade

association, which is not the final buyer of the services. As a result of this third-party payer

15

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

structure, it is unlikely that a higher price charged by SDCC for cleaning services would affect
the choice of location for conventions and thus provide competitive pressure on SDCC. Mark
Epstein of Champion agreed that it is unusual for a trade show to change venues.[22]

29.     Second, decorators are unlikely to "discipline" price increases by SDCC in cleaning
services because there are no similarly-sized convention centers in San Diego or nearby that can
host the large conventions that use SDCC. SDCC has monopoly power in the large trade show
market in the San Diego region and also has market power in the national trade show market.
The SDCC, with over 600,000 square feet of exhibit space, is one of the largest convention
centers in the United States.[23] There is no other convention center of remotely comparable size
in the San Diego area. The next largest meeting area in San Diego is the Hilton San Diego
Bayfront Hotel, across from the SDCC. It opened in December 2008 with 165,000 square feet of
meeting space, but it is mostly designed to satisfy the demand for hotel rooms for the SDCC.[24]

30.     Third, it is unlikely that decorators buying cleaning services would discipline a SDCC
price increase for trade show cleaning services by switching to venues in other cities. The cost
of exhibit cleaning is a very small portion of the total cost of putting on a convention, so that a
monopolist in San Diego would not experience significant limits on its ability to raise price due
to the possibility that contractors would move to other cities.

31.     Fourth, buyers are unlikely to discipline a SDCC price increase because of the long term
planning that is necessary for the large trade shows that SDCC serves. These shows are often

---

[22] Deposition of Mark Epstein, page 57.
[23] "San Diego Convention Center Market Demand Analysis", Jennifer Sutherland, PricewaterhouseCoopers, March
2009, p. 6. http://www.conventioncentertaskforce.org/index.shtml.
[24] http://www.portofsandiego.org/component/content/article/219-hilton-san-diego-bayfront-hotel-news/457-hilton-
convention-center-hotel-to-open-in-fall-2008.html

Ex 7 p 356

Exhibit 3
Page 32

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

committed for five, ten or fifteen years in advance.[25] This reduces the ability of contractors and

trade shows to move to other convention centers.

### D. Market Power

32.　　The relevant market is trade show cleaning services at the SDCC. Before the imposition

of the cleaning services exclusive, SDCC had 50% or more of the trade show cleaning services

market at the Center.[26] After the exclusive in 2007, SDCC has had a 100% market share of trade

show cleaning services, based on its exclusive use of SDCC workers for cleaning services in the

Center as well as the cleaning services revenue it has received. Both before and after the

imposition of the exclusive, SDCC has possessed market power, also known as monopoly power,

in the trade show cleaning services market in San Diego. SDCC has the ability to exercise

market power for three reasons. First, SDCC has the power to exclude competitors without the

likelihood that new competitors could enter the market. Second, SDCC has the power to set a

price floor for trade show cleaning services at the center by requiring all outside firms to use

SDCC employees at wages set by SDCC. Third, SDCC has the power to raise price in the

market. Currently, SDCC has control over 100% of the market, since it controls access to the

SDCC and is dictating pricing in the market regardless of the level of involvement that United is

permitted to have.

### IV. SDCC has Engaged in Exclusionary Conduct in the Market.

33.　　·SDCC has effectively excluded United and other competitors from the trade show

cleaning services market at the SDCC. The exclusion was accomplished by the use of SDCC's

control over access to the Convention Center. In May 2007 United National was notified that as

of July 1 all trade show cleaning services at the Convention Center would be performed by

---

[25]Affidavit of Mark Epstein, page 3.
[26] According to statements by SDCC and United, SDCC's share of the cleaning market at the convention center was
as high as 60% before July 2007.

Ex 7 p 357

Exhibit 3
Page 33

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

SDCC employees. In June of 2007 United National was notified that it could work at the Convention Center, but that it would have to use SDCC employees to fulfill the terms of its contracts, at a labor rate of $17 per hour.[27]  United's workers are barred from working at the Center.

34.     While SDCC allows United and others to contract with decorators for the provision of cleaning services at the Center, it is SDCC's workers who do the work, and SDCC appropriates all of the revenue that previously was paid to United. United obtains contracts with Champion and other decorators that provide services to associations using the San Diego Convention Center for shows. Champion is paid a fee for booth cleaning services. Champion retains approximately 50% of the fee for its services and provides the remaining 50% to United for the booth cleaning. United performs booth cleaning under its contract for this fixed amount. For facilities cleaning, United estimates the number of hours that will be needed for individual exhibitor booth cleaning on a fully-loaded hourly fee basis. United has produced its billing records and trade show schedules from July 2007 through August 1, 2009.[28]  The hourly rates in these schedules cover not only the labor used to perform cleaning but also materials and United's management of the services. This is done on a "not-to-exceed" basis. United does not control how many hours SDCC bills United for the work done by its employees. When the hours billed by SDCC are greater than the not-to-exceed amount United has contracted for, United absorbs the additional cost. If the actual labor hours are less than what was estimated, United is compensated only for the actual hours.

---

[27] E.g. UNM011963.
[28] UNM011966-UNM028947.

18

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

**A. SDCC Has Excluded Competition Entirely From the Convention Center.**

35.     SDCC has forced United and other competitors in the market to operate at a loss. United

has continued to fulfill its contracts for trade show cleaning services at SDCC, but it is no longer

competing for new business in San Diego.[29]  United attempts to obtain business from decorators

that operate nationwide. In doing so, United attempts to clean as many shows as possible for

each decorator. This means that United may clean for a decorator in San Diego and lose money

by doing so if it helps to keep the nationwide business of that decorator.[30]

36.     SDCC has argued that it is not excluding competition because it has not excluded United

from the center, only United's cleaning staff. This is entirely misleading and inaccurate, in my

opinion. United cannot control the pricing of the services that it would provide in the market,

since SDCC dictates the hourly labor rates and takes all of the booth cleaning revenue that

United formerly received. Further, United's employees are not permitted to work in the SDCC.

The only way that United could "compete" in the center would be processing paperwork and

requests for cleaning services. This is not competition in any meaningful sense, and since SDCC

would control 100% of the pricing in the market and all of the cleaning staff, there is no

competition at all from the point of view of industrial organization economics.

37.     The manner in which SDCC has attempted to exclude competitors in the market for trade

show cleaning services at SDCC's facility is by leveraging its monopoly power in the market for

large convention services in San Diego. Because SDCC has market power in the San Diego

large convention services market, it can require convention exhibitors to use SDCC's cleaning

services exclusively or raise the price without suffering a significant loss of business in its

primary market. SDCC serves very large trade shows that have only a small number of

---

[29] Deposition of Rick Simon, page 31.
[30] Ibid., page 86.

19

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

alternative venues to choose from nationwide. This lack of alternative venues for large trade

shows means that the SDCC has a relatively inelastic demand for its services, especially after a

trade association has booked a date for ten or more years in advance. Inelastic demand for a

product or service such as large trade shows means that if the price of the service rises,

consumers of the service (such as general contractors and show organizers) will not tend to look

elsewhere for a convention center but will tend to pay the higher price. The inelastic demand

experienced by SDCC for trade shows means that if SDCC succeeds in excluding all competition

in the trade show cleaning services market, SDCC can raise the price of cleaning services that is

ultimately paid by trade show exhibitors without losing business in the large trade show market.

38.     Because of the long-term nature of SDCC's contracts with large convention trade shows,

extending ten or fifteen years in some cases, the exclusionary action that SDCC has taken with

regard to trade show cleaning services has "locked in" customers who use these services. In

economic terms, a lock-in occurs in a situation where a consumer contracts with a seller for

goods or services over an extended period of time. For the duration of the contract, the buyer is

"locked in" to whatever downstream services are needed. The seller can take advantage of the

lock-in to raise the prices of the services that are needed during the term of the contract. The

buyer cannot go elsewhere to purchase those services because of the lock-in. In the situation

being considered here, SDCC has locked in the consumers of trade show cleaning services for

the duration of the ten or fifteen years that some trade shows have contracted.

39.     A number of trade show industry participants have responded to SDCC's exclusionary

acts by writing letters to oppose the new policy. Some of these participants state that they try to

avoid convention centers that have "exclusives", and some threaten to take their business

20

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

elsewhere.[31]  However, it is a measure of SDCC's market power in large trade shows that none

of these participants has taken any business away from SDCC so far.  And in spite of the implicit

threat by these market participants to oppose SDCC's imposition of an exclusive, SDCC went

ahead with their exclusionary action.  This also indicates how much market power SDCC

possesses.

**B. SDCC Has Attempted to Monopolize the Market by Raising Rivals' Costs.**

40.     SDCC argues that it is still allowing United and others to "compete" in the trade show

cleaning services market at the Center.[32]  While United still fulfills its contracts with decorators

at the Center, SDCC has in reality excluded competition by "raising rivals' costs."[33]  In this

case, SDCC is appropriating all the booth cleaning revenue that would have been received by

United, and "allowing" United to compete in the market only by using SDCC's employees and

by accepting no revenue.  Thus, SDCC has raised the costs of United and other potential

competitors to be greater than revenue.

41.     The raising rivals' costs action taken by SDCC is an example of what Scheffman and

Higgins refer to as "cost-effective" strategies by monopolists.  They say: "Some kinds of cost-

raising strategies can obviously be very cost-effective—*e.g.*, actions that lead to governmental

actions that exclude your rivals, or impair their ability to compete with you."[34]

---

[31] For example, Pat Dwyer, Sr. Manager of Trade Show Services for SmithBucklin, states in a letter to SDCC, "...one of the considerations we view as an imposition to our selection [of a venue] is the lack of choice of contractors to meet our highest level of service and accountability...While there are many factors that enter into the decisions to select a future site for our clients, one of the aspects which definitely would weigh in as less desirable is an exclusive service where there is no need to appoint one." June 27, 2007 letter from Pat Dwyer to SDCC.
[32] Deposition of Rick Simon, page 189.
[33] See for example Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.*, Boston: Pearson, Addison-Wesley, 2005, pp. 371-377; Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price*, 96 Yale L.J. 209 (1986); Steven Salop and David Scheffman, *Raising Rivals' Costs*, 73 American Econ. Rev. Papers and Proceedings 267 (May 1983); David Scheffman and Richard Higgins, *20 Years of Raising Rivals' Costs: History, Assessment, and Future*, Federal Trade Commission, http://www.ftc.gov/be/RRCGMU.pdf.
[34] Sheffman and Higgins, *20 Years of Raising Rivals' Costs*, page 5.

**Ex 7 p 361**

**Exhibit 3**
**Page 37**

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

**C. The San Diego Convention Center is an Essential Facility for Competitors in the Trade Show Cleaning Services Market.**

42.     Since the relevant market is trade show cleaning services at the SDCC, the Convention Center is an essential facility for firms that supply trade show cleaning services. An essential facility is a resource possessed by one firm that other competitors must have access to in order to compete with that firm. Another name for an essential facility is a bottleneck. An example would be the only railroad bridge over a river for many miles. If the railroad that owns the bridge refuses to deal with competing railroads that need to use the bridge, competition is harmed. The SDCC is an essential facility because it is the only venue for large trade shows in the San Diego area. It would be prohibitively expensive for United to build another 600,000 square foot convention center in order to compete with SDCC. United National and other firms in this market cannot compete in the market unless they have access to the San Diego Convention Center facilities. Control over this essential facility in the market for trade show cleaning services gives SDCC the ability to exclude all of its competitors from the market. SDCC's actions are anticompetitive because it uses control over the essential facility in the market for trade show cleaning services to exclude competitors.

**D. SDCC's Action Is Anticompetitive Because It Constitutes a Tying Arrangement.**

43.     SDCC has market power in the national trade show market. It has used its market power in trade show services as a "tying good" to exclude competition in the local market for trade show cleaning services at SDCC. Forcing the consumer to purchase the tied good results in harm to consumers in that those consumers pay higher prices and those who would have wished

22

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

to purchase trade show cleaning services from a competitor of SDCC are prevented from doing

so. Consumer choice is restricted.[35]

44.     Trade show cleaning services are tied to or bundled with trade shows in that SDCC

requires that those who conduct trade shows at SDCC must also use SDCC employees for

cleaning services and pay SDCC for those services. SDCC has the ability to force trade show

participants to buy cleaning services from the center because of SDCC's market power in the

trade show market. If the market for trade shows were very competitive, then it would not be

possible for SDCC to restrict consumers' choice of cleaning services and to raise the price of

those services. But SDCC has enough market power in the trade show market to be able to tie

cleaning services to the trade show market. The support for this market power opinion comes

from a number of sources. Currently, the City of San Diego is studying the possibility of

expanding the convention center. In connection with this effort, a number of analyses have been

done of SDCC's strength in the market for trade shows.[36] The report of Heywood Sanders, the

economist retained to study the trade show and convention center market, is dated May 2009.[37]

Mr. Sanders concludes that:

o  Center is operating at or above practical maximum capacity
o  Loss of potential business most frequently due to lack of available dates/space
o  San Diego's hotel supply has continued to expand
o  Competitors are moving forward with enhancements
o  Past and potential customers have expressed interest in an expanded Center
o  Past events have and existing events are at risk of outgrowing the Center
o  There is room night loss from these events outgrowing the Center
o  Center has outperformed many of its competitors and the industry[38]

---

[35] http://www.ftc.gov/bc/antitrust/tying_sale.shtm.
[36] "Draft Mayor's Citizen Task Force on the San Diego Convention Center Project";
http://www.conventioncentertaskforce.org.
[37] "State of the Convention and Trade Show Industry and Convention Center Performance", Heywood Sanders, May
2009; http://www.conventioncentertaskforce.org/MCTFdocs-presentations.shtml.
[38] Draft Mayor's Task Force Report, page 12.

23

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

In these circumstances, SDCC has the ability to engage in an anticompetitive tie because trade

show cleaning services are a small portion of the total cost of a trade show.

45.     Other concurring opinions regarding the strength of SDCC's market position are

provided by PricewaterhouseCoopers, Economic Research Associates and Piper Jaffray

Company.[39] They emphasize the fact that SDCC has operated well above the average capacity

utilization of competing large convention centers. This is a strong sign of high demand for San

Diego's center.

46.     A more analytical approach is provided by the San Diego County Taxpayers Association.

This study concludes that the cost of expanding the convention center could be financed in part

by higher taxes on convention center visitors. These taxes, on airport taxis, hotel rooms,

restaurants, rental cars and tourist attractions, would amount to increases in the total price paid

by convention center visitors. If SDCC did not have market power in the trade show market,

then it would lose trade show business if taxes on convention visitors were raised. The fact that

the proposed taxes are estimated to produce substantial tax revenue is testimony to the power

that SDCC has to raise price without losing significant business. This is the measure of market

power.

47.     In sum, SDCC has a degree of market power in the national trade show market sufficient

to make it possible to engage in an anticompetitive tying arrangement. This has allowed SDCC

to exclude competitors from the trade show cleaning services market by tying cleaning services

to the use of the convention center.

---

[39] www.conventioncentertaskforce.org.

Ex 7 p 364

Exhibit 3
Page 40

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

**V. The Security Explanation by SDCC for Excluding United Fails the "No Economic Sense Test"**

48.    Actions by firms that tend to exclude their rivals can sometimes have pro-competitive explanations. It is important to examine the possibility of a pro-competitive reason for the exclusionary actions taken by SDCC before concluding that the actions were anti-competitive. The economics literature refers to the "no economic sense" test to examine whether there is any normal business justification other than exclusion for actions such as those by SDCC.[40] I have considered all of the statements by representatives of SDCC and by other participants in the market that were provided to me to examine the issue of a possible pro-competitive reason for the exclusion.

49.    First, I considered the possibility of enhanced efficiency in the market for trade show cleaning services if SDCC employees have an exclusive. My conclusion is that there is no enhanced efficiency justification for the conduct of SDCC. Exclusive cleaning services at the Convention Center will not reduce cost to consumers or provide a higher quality product. This is the only conclusion that can be reached given that:

1. The letters from contractors and show producers are unanimous in their opposition to an exclusive arrangement.

2. SDCC has not even attempted to provide an argument that exclusive cleaning services is more efficient. Instead, the change has been explained as a security matter.

50.    Second, I considered whether SDCC was carrying out a general shift in its security policy by restricting all non-SDCC employees from using the center. Economists have no special ability to measure the need for security at a facility such as SDCC. However, an economist can

---

[40] Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

**Ex 7 p 365**

**Exhibit 3**
**Page 41**

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

observe the incentive for the owner of an essential facility such as the SDCC to use a pretext to

exclude its competitors in a market such as trade show cleaning services where the SDCC is a

competitor in the market. The economist can weigh the consistency of the behavior of the SDCC

in applying its security policy against the behavior in which types of non-SDCC employees are

excluded.

51.    I have read the deposition of United CEO Rick Simon. He testified that he contacted

Brad Gessner of SDCC in April 2007 after he learned that the exclusionary policy was being

implemented.[41] Mr. Simon offered to follow the same screening process for employees as that

used by SDCC. Simon reminded Gessner that United also owns a security company and is very

knowledgeable about security matters. He said that he, Simon, was from a law enforcement

background; that United employed a number of former federal agents; and that their security

company had engagements that exceeded the security requirements of SDCC. For example,

United works on the Hyatt Regency security detail when the U.S. President comes to the

Chicago Hyatt. They also worked with the Secret Service when the Pope was in Denver. United

vetted 300 employees for that engagement and the Secret Service did not reject one of them. He

explained that United uses a superior screening device to that used by SDCC—Live Scan

Fingerprint. And he offered to buy a $12,000 machine to fingerprint all of United's employees at

SDCC. But Mr. Gessner was unmoved by any of these facts. He just insisted that SDCC would

use its own cleaning employees.

52.    I have also read the declaration of William Callaghan, President of Century Security and

an expert in convention floor security according to the documents I have seen. Mr. Callaghan

concludes that SDCC's policy of excluding only non-SDCC cleaning employees "makes

---

[41] Deposition of Rick Simon, pages 188-191.

26

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

absolutely no sense."[42] He finds that the policy makes no sense from a security point of view

because, among other reasons, cleaning employees tend to be lower security risks than other non-

SDCC employees who are not covered by the policy; because cleaning employees are only 5%

or less of the outside employees accessing convention centers; because SDCC does not require

outside employees to wear badges, while United National does require badges; and because

United National has offered to run background checks on its employees, which SDCC has

refused.[43]

53.     I have also read the declaration of Charles Buddy Linn, the Regional Vice President of

United National, who is familiar with the security policies of not only SDCC but other major

convention centers. He provides more detail on the level of security at SDCC compared to other

centers in his experience. SDCC does not use a photo ID system for security, and its monitoring

of outside employees accessing the facility is lax.[44] Further, Mr. Linn provides evidence that

SDCC's claim that United was a security risk because it was using temporary employees is

false.[45]

54.     From my own analysis as well as the evidence provided by Mr. Simon, Mr. Callaghan

and Mr. Linn, I conclude that contrary to the idea of a general shift in security policy, cleaning

services has been singled out for restrictions. SDCC competes with outside trade show cleaning

services firms such as United. In contrast, SDCC does not compete directly with many other

service providers who work on trade shows. Other non-SDCC contract employees have not been

similarly excluded from the center on grounds of security concerns. Examples of the other

---

[42] William Callaghan Declaration, November 2007, par. 6.
[43] Callaghan Declaration, par. 7, 8, 10, 12; Charles Buddy Linn Declaration, November 2007, par. 4.
[44] Linn Declaration, par. 4, 5.
[45] Linn Declaration, par. 7, 8.

27

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

services performed by non-SDCC workers are: drayage, cartage, furniture, booth and floor

decorations, signs, photographs, telephone services, electricians, plumbers, and carpenters.[46]

55.     SDCC justifies its exclusion of competing cleaning suppliers on the basis of security

concerns at the center. If this justification is a sham, as alleged by United National, then there is

no pro-competitive justification for the exclusionary restrictions by SDCC. The restrictions do

not lower costs; on the contrary, the restrictions result in higher prices in the cleaning services

market. Similarly, the quality of service is not increased; no justification other than the asserted

security concern has been advanced. The restrictions also do not increase consumer choice or

services available; rather, they reduce the choice of services.

56.     SDCC could have used a less restrictive alternative to accomplish their stated goal of

improving security at the convention center. They could have subjected United's employees to

background checks. They could have accepted Rick Simon's offer to provide a fingerprint

scanner. They could have provided enhanced security training or requirements. They could

have worked with United, using United's proven expertise in security technology and security

issues, to ensure that United's employees were no more of a security risk than their own booth

cleaning employees.

57.     According to Mark Epstein of Champion, the employees of United National have been

employed by the company for long periods of time and have had no security problems at the

center. In contrast, employees of some other contractors who work in the convention center are

"a huge security black hole."[47] Yet these contractors have not been targeted in the way that

United National has. In particular, he mentions I&D employees (Installation and Dismantle) as

---

[46] Terms and Conditions, 2006 Exhibitor Application & Contract, Internet Telephony Conference & Expo, item 6;
Linn Declaration, par. 4.
[47] Affidavit of Mark Epstein, page 5.

Ex 7 p 367

Exhibit 3
Page 44

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

being a "transient" work force that "comes and goes", whose workers have never been seen

before by the contractors. There is "no screening at all" for these I&D employees.[48]

## VI. Harm to Consumers.

58.     Consumers have been harmed first of all because SDCC is charging higher prices in the

trade show cleaning market in connection with its exclusion of all non-SDCC cleaning

employees. The terms of the relationship with United National dictated by SDCC in July 2007

represent a price increase for cleaning services. United National previously estimated the hours

needed for facilities cleaning at the fully loaded labor rate of $16.35 in order to provide a not-to-

exceed amount for services at particular exhibitor spaces. SDCC has raised the hourly rate, not

including United National's management and other costs, to $17. Thus, SDCC has raised rates

already to the extent that the hours expended are less than the not-to-exceed hours. In addition,

when United National's current locked-in contract rates expire, SDCC will be charging more for

the same number of hours estimated for purposes of setting a not-to-exceed amount. In addition,

SDCC has effectively raised prices for booth cleaning. Mark Epstein testified that Champion's

costs have increased because Champion was not previously paying for aisle and carpet cleaning

services that United had provided free of charge in conjunction with booth cleaning.[49]

Currently, United National is locked into its contracts to provide booth cleaning, even though it

passes all of its booth-cleaning revenue on to SDCC. Also, it appears that SDCC is not using

supervisors for cleaning jobs where United has the contract and uses its own supervisor. If

United is not allowed to compete at the center and ceases to operate there, it seems likely that

SDCC will have to use one or more supervisors on contracts that were previously handled by

United. The charges for these supervisors will constitute another increase in price.

[48] Deposition of Mark Epstein, page 88.
[49] Deposition of Mark Epstein, page 100.

**Ex 7 p 368**

**Exhibit 3**
**Page 45**

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

59.    Harm to the competitive process is demonstrated by, among other things, the statements

by market participants.  Because of the exercise of monopoly power by the SDCC, there is no

longer any competition on the merits for exhibit cleaning services.

Letters expressing the displeasure of the trade show industry with the actions of SDCC include:

1.  Joint Statement of the Society of Independent Show Organizers, the International
    Association for Exhibition Management, and the Major American Trade Show
    Organizers.
2.  Richard Simon, President of United Service Companies.
3.  Joe Loggia, Chief Executive of Advanstar Communications.
4.  Patricia Dwyer, Senior Manager of Convention and Trade Show Services,
    SmithBucklin Corporation.
5.  Barbara Myers, Conferences and Meeting Services Director, APCO International
6.  B.J. Enright, President, Trade Show Logistics.
7.  Ken McAvoy, Senior Vice President, Reed Exhibitions.
8.  Mary Kay Sustek, Senior Vice President, Neilson Business Media.
9.  Martin Cymbal, President, Trade Show Contractors Association of Southern
    California.
10. Ty F. Bobit, President, Bobit Business Media.
11. Mary Beth Rebedeau, Executive Director, Society of Independent Show
    Organizers.

60.    Letters from trade show participants are clear in stating the harm they see in  SDCC's

policy:

- Pat Dwyer of SmithBucklin states: "By taking the decision our of our hands to
  select this very important -- and visible service -- you could be taking away our
  ability to negotiate competitive pricing models for our client, as well as the
  relationship to a valuable member of our service level team environment."[50]
- Mary Kay Sustek of Nielson Business Media states: "While I believe we have used
  the SDCC cleaning services over the past years, it was by choice.  Imposing an
  exclusive of any type isn't in the best interest of Nielsen or its customers.  Nielsen
  manages its shows based on the specific needs and requirements of customers and
  having this flexibility is a key ingredient to a successful show. . . . In our
  experience, exclusive services ultimately become more expensive and less service
  oriented as it takes the competitive nature out of the business."[51]
- Ty Bobit of Bobit Business Media states: "Please know that the imposition of an
  exclusive service will be in contradiction to the wishes of your customers and it
  typically reduces service levels and takes competitive pricing options away.  We

---

[50] Letter from Pat Dwyer to SDCC, June 27, 2007.
[51] Letter from Mary Kay Sustek to SDCC, June 22, 2007.

Ex 7 p 369

Exhibit 3
Page 46

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

have found over the years that the show manager's ability to choose a contractor and control price helps . . . provide better service at competitive prices."[52]

- Mary Beth Rebedeau of the Society of Independent Show Organizers states: "While we understand the need for facility managers to generate revenue, tradeshow organizers and their exhibitors must retain the right to select vendors of their choice. This is particularly true for large shows whose complexities demand carefully selected and integrated vendor partners who have a thorough understanding of each show's special needs. This includes cleaning services . . . . . Show organizers spend years cultivating relationships and advantageous pricing with their chosen suppliers. In-house exclusives arbitrarily increase costs to show organizers -- and therefore exhibitors -- while decreasing the quality of the service provided due to lack of competition."[53]

- B.J. Enright of Tradeshowlogistics states: "[O]ur clients would love to have the San Diego Convention Center competitively bid for the opportunity to be the official cleaning contractor. However, an exclusive situation does not promote competition and service."[54]

- John Mooney of SISO wrote: "Our opposition to exclusives is based on the historical fact that competition among suppliers provides the best service at the lowest cost. Exclusives have the reverse effect."[55]

- Michael Muldoon, of the Convention Management Group, wrote to say "Please know that food and beverage events, like the shows we manage, have extraordinary cleaning requirements. Our relationship with United Services Companies has been extremely important to the production of these events. We have not been as successful working in facilities that require the hiring of "exclusive contractors" and we avoid "exclusive shops."[56]

61.     The conclusion I have reached from, among other things, my experience as an economist

as well as the statements from market participants quoted here is that SDCC's exclusion of

competition in trade show cleaning services at the convention center, if it continues, will produce

higher prices and a lower quality of service. The experiences cited by Nielson Business

Services, Bobit Business Media, the Society of Independent Show Organizers and the

Convention Management Group all support this conclusion. The experiences of these

organizations provide a natural experiment that, while insufficient by themselves to provide a

---

[52] June 14, 2007 letter from Ty Bobit to SDCC.
[53] July 20, 2007 letter from Mary Beth Rebedeau to SDCC.
[54] July 26, 2007 letter from B.J.Enright to SDCC.
[55] March 31, 2000 letter from John Mooney to Carol Wallace.
[56] March 13, 2000 letter from Michael Muldoon to Carol Wallace.

Ex 7 p 370

Exhibit 3
Page 47

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Report of John S. Hekman, Ph.D.*

definitive prediction for SDCC, nevertheless points toward harm for consumers as a result of

SDCC's exclusion.

**VII. Conclusion**

62.      For all of the reasons stated above, I believe that the actions of SDCC in excluding

competition in the market for trade show cleaning services in the convention center are highly

anti-competitive.  Based on the documents I have examined, I also believe that there is no pro-

competitive justification for the SDCC's actions.  My opinions have been formed based on the

documents that I have seen.  If more information becomes available, I reserve the right to amend

these opinions in the light of additional discovery.

John S. Hekman, Ph.D.      September 30, 2009

Ex 7 p 371

Exhibit 3
Page 48

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit I to Report of John S. Hekman*

# John S. Hekman

550 South Hope Street
Suite 2150
Los Angeles, California 90071
Tel. (424) 204-8872
Fax (213) 243-3710
E-mail: jhekman@lecg.com

## EDUCATION

Ph.D., Economics, University of Chicago
M.B.A., Finance, University of Chicago
BA, History, Valparaiso University

## EMPLOYMENT

Principal, LECG, LLC, 2004-present.

Lecturer, MBA program, University of Southern California, 1989-present. Department of Finance and Business Economics.

Past Positions:

Principal, Economic Analysis LLC, 2000-03.

Principal, LECG, LLC, 1998-2000.

Director, Altschuler, Melvoin and Glasser LLP, 1996-98.

Vice President (1993-96), Senior Economist (1992), Economic Analysis Corporation.

Senior Economist, Micronomics, Inc., 1990-92.

Executive Vice President and Director of U.S. Economic Forecasting, Claremont Economics Institute, 1986-90. Editor, *The Main Street Journal* Investment letter.

Associate Professor of Finance, University of North Carolina, Chapel Hill 1981-86, (academic tenure granted, 1985).

Visiting Scholar, Federal Reserve Bank of Atlanta, 1981-84.

Economist, Federal Reserve Bank of Boston, 1980.

Research Associate, Harvard-MIT Joint Center For Urban Studies, 1978.

Assistant Professor of Economics, Boston College, 1975-81.

Ex 7 p 372

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit I to Report of John S. Hekman*

Instructor, University of Chicago, 1974-75.

## RECENT ENGAGEMENTS

*Official Committee of Unsecured Creditors v. Credit Suisse, Cayman Islands, et al.* Retained by J. Thomas Beckett of Parsons Behle & Latimer regarding the bankruptcy of the Yellowstone Mountain Club, April 2009.

*Morton v. Morton.* California Superior Court for the County of Los Angeles. Retained by Thomas Nolan of Skadden, Arps, Meagher & Flom, November 2008 regarding the value of a large land parcel in Las Vegas, March 2009.

*Gartner, Inc. v. Parikh, et al.* United States District Court for the Central District of California. Retained by Thomas Mackey of Jackson Lewis, August 2008.

*Auerbach Acquisition Associates v. Greg Daily et al.* California Superior Court for the County of Los Angeles. Retained by Pierce O'Donnell of O'Donnell and Associates, April 2008.

*Stephen Shoemaker v. Daniels, Fine, Israel, Schonbuch & Lebovits.* California Superior Court for the County of Los Angeles. Retained by Sandra Block of Robie & Mattai, February, 2008.

Retained by Fremont Investment and Loan in connection with the sub-prime mortgage crisis, January 2008.

*Catherine Blaylock, et al. v. First American Title Insurance Company.* United States District Court, Western District of Washington. Retained by Stephen Rummage of Davis Wright Tremaine, November 2007.

*Janice Howland v. First American Title Insurance.* United States District Court, Northern District of Illinois, Eastern Division. Retained by Douglas Mansfield of Jones, Day, November 2007.

*United National Maintenance Inc. v. San Diego Convention Center Corp.* California Superior Court, County of San Diego. Retained by Jeffrey Leon of Ungaretti & Harris, LLP, October, 2007.

*Julius Chang and Howard Chen v. Charles Schwab & Company,* California Superior Court, County of San Francisco. Retained by Daniel Newland of Seyfarth Shaw LLP, October, 2007.

*Eric Seiken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San Diego. Retained by Kevin Quinn of Thorsnes Bartolatta McGuire, September, 2007.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et al*, California Superior Court, County of San Mateo. Retained by Joel Wolosky of Hodgson Russ, March 2007.

*James Ripley v. Wyoming Medical Center et al.* United States District Court for the District of Wyoming. Retained by Stephen Kline of Kline Law Office PC, January 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District of California. Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman, November 2006.

*Caruso Affiliated Holdings v. General Growth Properties, Inc.* California Superior Court for the County of Los Angeles. Retained by Henry Shields of Irell & Manella, September 2006.

*Breakdown Services Ltd. v. Now Casting, Inc.* California Superior Court, County of Los Angeles. Retained by Stephen P. Krakowsky, September 2006.

*RitterRanch Development LLC, debtor. Los Angeles County Waterworks District No. 40 v. Robbin Itkin et al.,* United States District Court Central District of California. Retained by Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller, May 2006.

*Pamela Cunningham and Reet Caldwell v. Mattel, Inc.* Circuit Court, Third Judicial Circuit, Madison County, Illinois. Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges, October 2004.

**TESTIMONY**

*Ricardo Alfonso Leon, et al. v. Jose Francisco Leon, et al.* California Superior Court for the County of Los Angeles. Retained by Paul Workman of Holland and Knight. Deposition August 2009.

*Official Committee of Unsecured Creditors v. Credit Suisse, Cayman Islands Branch, et al.* United States Bankruptcy Court for the District of Montana. Retained by J.Thomas Beckett of Parsons, Behle & Latimer. Deposition April 2009; trial testimony May 2009.

*Morton v. Morton.* California Superior Court for the County of Los Angeles. Retained by Thomas Nolan of Skadden, Arps, Meagher & Flom. Deposition March 2009.

*Bullock v. Philip Morris, Inc.* California Superior Court for the County of Los Angeles. Retained by Robert McCarter of Arnold & Porter. Deposition March 2009.

*Gartner, Inc. v. Parikh, et al.* United States District Court for the Central District of California. Retained by Thomas Mackey of Jackson Lewis, August 2008. Deposition October, 2008.

Ex 7 p 374

Exhibit 3
Page 51

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*Beth Robbins v. Essex Management Corp., et al.* California Superior Court for the County of
Los Angeles. Retained by Jeremy Dwork of Daley & Heft. Deposition September, 2008.

*Catherine Blaylock, et al. v. First American Title Insurance Company.* United States District
Court, Western District of Washington. Retained by Stephen Rummage of Davis Wright
Tremaine. Declaration filed January, 2008.

*Janice Howland v. First American Title Insurance.* United States District Court, Northern
District of Illinois, Eastern Division. Retained by Douglas Mansfield of Jones, Day.
Declaration filed January, 2008.

*United National Maintenance Inc. v. San Diego Convention Center Corp.* California
Superior Court, County of San Diego. Retained by Jeffrey Leon of Ungaretti & Harris, LLP.
Testimony filed December 2007.

*Julius Chang and Howard Chen v. Charles Schwab & Company,* California Superior Court,
County of San Francisco. Retained by Daniel Newland of Seyfarth Shaw LLP. Deposition
October, 2007.

*Eric Seiken, et al. v. Pearle Vision, Inc., et al.* California Superior Court, County of San
Diego. Retained by Kevin Quirm of Thorsnes Bartolatta McGuire. Class Certification
Declaration submitted September, 2007; deposition November 2007.

*Tim Wood, SFG Financial Corp. et al. v. Mark Boucher, Investment Research Associates, et
al,* California Superior Court, County of San Mateo. Retained by Joel Wolosky of Hodgson
Russ. Deposition April 2007.

*Dwight W. Crawford. v. Debra S. Katz, et al.,* Superior Court for the District of
Columbia. Retained by Glenn M. Young of the Young Law Firm. Deposition April 2007.

*James Ripley v. Wyoming Medical Center et al.* United States District Court for the District
of Wyoming. Retained by Stephen Kline of Kline Law Office PC. Deposition April 2007.

*American Medical Response v. City of Stockton* United States District Court Eastern District
of California. Retained by Michael Higgins of Wulfsberg Reese Colvig & Firstman.
Deposition February 2007.

*Breakdown Services Ltd. v. Now Casting, Inc.* California Superior Court, County of Los
Angeles. Retained by Stephen P. Krakowsky. Deposition October 2006.

*RitterRanch Development LLC, debtor. Los Angeles County Waterworks District No. 40 v.
Robbin Itkin et al.,* United States District Court Central District of California. Retained by
Parry Cameron of Stephan, Oringher, Richman, Theodora & Miller. Deposition June 2006.

Ex 7 p 375

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*Pamela Cunningham and Reet Caldwell v. Mattel, Inc.* Circuit Court, Third Judicial Circuit, Madison County, Illinois. Retained by Gerald Hawxhurst of Quinn Emanuel Urquhart Oliver & Hedges. Deposition February 2005.

*In re Cioffi,* California Superior Court, County of Santa Clara. Retained by William Russell of Lakin, Spears. Deposition and trial testimony January 2004.

*Ederel Sport, Inc. v. Gotcha International, L.P.* U.S. Bankruptcy Court, Central District of California. Retained by Michael Adele of Albert, Weiland & Golden. Deposition and trial testimony May 2003.

*In Re Fuqua Industries Shareholder Litigation,* Delaware Chancery Court Civil Action No. 11974. Retained by Lowell Sachnoff of Sachnoff & Weaver. Deposition March 2003.

*SPC/PomomaLLC v. Medianews Group, Inc.* Superior Court of California, County of Los Angeles. Retained by Steven Gardner of Cohon and Gardner. Deposition February 2003; trial testimony April 2003.

*MGM v. Midway Games, Inc.* U. S. District Court, Central District of California, Western Division. Retained by John Williams of Lord, Bissell & Brook. Report submitted October 2002.

*Freeman Industries LLC v. Eastman Chemical Company, et al.,* In the Law Court for Sullivan County at Kingsport, Tennessee. Retained by Aton Arbisser of Kaye Scholer. Class Certification Affidavit submitted September 2002.

*Keep v. State of California,* Superior Court of California, County of Los Angeles. Retained by Vladimir Shalkovich, Deputy Attorney General. Deposition October 2002.

*IMAX, LTD. v. Krikorian Premiere Theatres,* U.S. District Court for the Central District of California. Retained by Glenn Dassoff of Paul, Hastings, Janofsky & Walker. Deposition September 2002.

*Betty Bullock v. Phillip Morris, Inc. et al.;* California Superior Court, Los Angeles. Retained by Thomas Stoever of Arnold & Porter on behalf of defendant. Deposition May 2002.

*International Paper and Masonite v. Affiliated FM Insurance Co, et al.;* California Superior Court, San Francisco. Retained by Adam Murray of Howrey, Simon, Arnold & White. Deposition May 2001; trial testimony November 2001.

*Copley Press, et al. v. Gray Davis, et al; Tony Strickland, et al. v. Gray Davis, et al.;* California Superior Court, San Diego County; retained by Timothy Muscat, Deputy Attorney General. Declaration in Support of Defendant's Opposition Brief submitted May 2001.

*Fitzgerald v. Silcott, et al.* California Superior Court, County of Los Angeles. Retained by Law Offices of J. Jeffrey Long. Deposition January 2000; trial October 2001.

Ex 7 p 376

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit I to Report of John S. Hekman*

*Formal Complaint of Tesoro Alaska Petroleum Against Amerada Hess, et al.*, Federal Energy
Regulatory Commission and Regulatory Commission of Alaska. Retained by John Donovan
of Skadden, Arps, Slate Meagher & Flom. Testimony submitted November 2000.

*Alavi v. Kaiser Foundation Hospitals.* Retained by Walter Weiss. Arbitration testimony
November 2000.

*Seguritan v. State of California, et al.* Los Angeles County Superior Court. Retained by
Anne Hunter, Deputy Attorney General. Deposition July 2000.

*Lenehan v. Maryland Casualty.* California Superior Court, County of Los Angeles. Retained
by Law Offices of J. Jeffrey Long. Deposition May 2000.

*Hearing on Green Coke Pricing Issue for TAPS Quality Bank.* Federal Energy Regulatory
Commission. Retained by John Donovan of Skadden, Arps, Slate, Meagher & Flom.
Testimony May 2000.

*Tash v. Aviara Land Associates, L.P., et al.* San Diego Superior Court. Retained by Jerry
Phillips of Richman, Mann, Chizever, Phillips & Duboff. Deposition April 2000; Trial
testimony May 2000.

*First Pension Corp/Murray v. Belka.* California Superior Court, County of Orange.
Retained by William Meeske of Latham & Watkins. Deposition February 2000.

*Rhonda Jalali v. Assembly of God, Teen Challenge et al.* California Superior Court.
Retained by George Buehler of Howrey & Simon. Deposition and trial testimony July 1999.

*Alfred Martino, Jr. v. Northbrook Property and Casualty Company and St. Paul Fire and
Marine Insurance Company,* Arbitration. Retained by Law Offices of J. Jeffrey Long.
Testimony June 1999.

*Hugo Valdivia v. MCE Corporation, et al.,* California Superior Court for the County of Los
Angeles. Retained by Andrew Jacobs of the Law Offices of Andrew Hoffman (CNA
Insurance). Deposition November 1997; trial January 1998.

*Louisville Bedding Company v. Pillowtex Corporation,* United States District Court for the
Western District of Kentucky. Retained by Hartwell Morse of Welsh & Katz. Deposition
November, December 1997.

*Infant and Nutritional Products, et al. v. BJ Family Food Center, et al,* California Superior
Court for the County of Los Angeles. Retained by Farhad Novian of Novian & Novian.
Deposition September 1997.

Ex 7 p 377

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*William Gene Norman v. Herbalife International, et al.,* California Superior Court for the
County of Los Angeles. Retained by Ward Benshoof of McClintock Weston Benshoof
Rochefort Rubalcava MacCuish. Deposition April 1997.

*Jeffrey Alpert v. Gerald Busch, et al,* California Superior Court for the county of Los
Angeles. Retained by Law Offices of Daniel Hoffman (CNA Insurance). Trial testimony
November 1997.

*Janelle Flores v. Dapo Popoola, MD, et al.,* California Superior Court for the County of Los
Angeles. Retained by Henry Tovmassian of Kehr, Crook, Tovmassian & Fox. Deposition
September 1997.

*Ridgecrest Homeowners Association v. Nihon Lancre America, Inc., et al.,* California
Superior Court for the County of Los Angeles. Retained by Ronald Caswell of Richmond,
Lawrence, Mann, Greene, Chizever, Friedman & Phillips. Deposition June 1997.

*Harvey W. Stuart, et al. v. Kraft Foods, Inc. et al.,* United States District Court for the
Eastern District of Wisconsin. Retained by Michael Freed of Much Shelist Freed Denenberg
Ament Bell & Rubenstein. Affidavit November 1996; deposition and court testimony
December 1996.

*Albert and Estelle Binder, et al. v. Thomas Gillespie, et al.,* United States District Court for
the District of Idaho. Retained by Robert Bretz of Robert H. Bretz, PC. Affidavit December
1996.

*Ernst Paul Lehmann Patentwerk v. San-Val Discount, Inc.,* United States District Court,
Central District of California. Retained by Douglas Adler of Skadden, Arps, Slate, Meagher
& Flom. Affidavit submitted March 1996.

*JAR-PR Associates v. Unocal,* Superior Court of the State of California, County of Los
Angeles. Retained by George Crook of Kehr, Crook, Tovmassian & Fox. Deposition and
trial testimony, March 1996.

*Sarkis v. State of California,* California Superior Court, County of Kern. Retained by Deputy
Attorney General Daniel Helfat. Deposition, January 1996.

*Casper Boso v. Chicago Bears.* Retained by Steven Wolf of Wolf & Ouimet to testify
regarding the average career length of NFL players. Arbitration testimony November 1994.

*Styling Research Company v. Conair Corporation,* Superior Court of the State of California,
County of Los Angeles. Retained by Phillip Belleville of Latham & Watkins. Deposition
August 1992.

*Medical Designs, Inc. v. Donjoy, Inc.,* United States District Court, Southern District of
California. Retained by Paul C. Van Slyke of Pravel, Gambrell, Hewitt, Kimball & Krieger.
Deposition October 1991.

**Ex 7 p 378**

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

*California Grocers Association v. Bank of America*, Superior Court of the State of California for the County of Alameda, Northern District. Retained by Arne Wagner of Bank of America. Deposition May 1991.

## CONSULTANT

*Simpson Thatcher & Bartlett, New York, NY, Kenneth Logan;* Ronald Cleveland, et al. v. Viacom, Blockbuster, et al. *United States District Court for the Western District of Texas, 2002.*

In Re Maguire Thomas Partners – Grand Place Tower, Ltd. *United States Bankruptcy Court, Central District of California. Retained by Bennett Silverman of Gibson, Dunn & Crutcher on behalf of Sumitomo Bank, 1999.*

Howrey & Simon, Washington, DC, Thomas Heyer; *Litton Systems, Inc. v. Honeywell, Inc.*, 1995-1996.

Thelen, Marrin, Johnson & Bridges, San Francisco, Steven V. O'Neal; *IBM v. Fasco Industries*, 1994-1995.

*Packard Bell Electronics, Inc. v. Teledyne Industries, Inc.*, Superior Court of the State of California, County of Los Angeles. Retained by Ronald M. St. Marie of Ervin, Cohen & Jessup. August 1995.

O'Melveny & Myers, Los Angeles, Charles Diamond, Randy Oppenheimer; *Exxon Valdez Oil Spill Litigation*, 1993-1994; 2000; 2002.

## PUBLICATIONS

"California Under Siege: A Call for Perspective" (with Ken Agid, et al.), California Real Estate Roundtable, April 1991.

"Should We Reform Deposit Insurance?" *Los Angeles Times*, March 11, 1990, D3.

"New England's Economy in the 1980s" (with Lynn Browne), in *The Massachusetts Miracle*, David R. Lampe (ed.), The MIT Press: Cambridge, MA, 1988.

"Real Estate Returns and Inflation" (with David Hartzell and Mike Miles), *American Real Estate and Urban Economics Association Journal (AREUEA)*, Spring 1987.

"Factors Affecting Manufacturing Location in North Carolina," in Dale Whittington (ed.), *High Hopes for High Tech: Microelectronics in North Carolina*, University of North Carolina Press, 1987.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit 1 to Report of John S. Hekman*

"Diversification Categories in Investment Real Estate" (with David Hartzell and Mike Miles), *AREUEA Journal*, Summer 1986.

*Land Supply Monitoring: A Guide for Improving Public and Private Urban Development Decisions* (with D. Godshalk, S. Bollens, and M. Miles), Oelgeschlager, Gunn & Hain: Boston, 1985.

"Rental Price Adjustment and Investment in the Office Construction Market," *AREUEA Journal*, Spring 1985.

"Branch Plant Location and the Product Cycle in Computer Manufacturing," *Journal of Economics and Business*, May 1985.

"Venture Capital and Economic Development in the Southeast" (with Mike Miles), *Economic Review*, Federal Reserve Bank of Atlanta, July 1983.

"Optimal Allocation of Economic Development Funds" (with Mike Miles, et al.), N.C. Department of Natural Resources and Community Development, January 1983.

"What are Businesses Looking for? A Survey of Industrial Firms in the South," *Economic Review*, Federal Reserve Bank of Atlanta, June 1982.

"Behind the Sunbelt's Growth: Industrial Decentralization" (with Alan Smith), *Economic Review*, Federal Reserve Bank of Atlanta, March 1982.

"Impact of Environmental Regulations on Industrial Development in North Carolina" (with Raymond Burby, et al.), North Carolina Department of Natural Resources and Community Development, February 1982.

"The Evolution of New England Industry" (with John Strong), *New England Economic Review*, March-April 1981.

"New England's Economy in the 1980s" (with Lynn Browne), *New England Economic Review*, January-February 1981.

"Income, Labor Supply and Urban Residence," *American Economic Review*, September 1980.

"Is there a Case for Plant Closing Laws?" (with John Strong), *New England Economic Review*, July-August 1980.

"The Product Cycle and New England Textiles," *Quarterly Journal of Economics*, June 1980.

"Can New England Hold Onto its High Technology Industry?" *New England Economic Review*, April 1980.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Exhibit I to Report of John S. Hekman*

"Regions Don't Grow Old, Products Do," *The New York Times*, Sunday Business, November 4, 1979.

"What Attracts Industry to New England?" *New England Economic Indicators*, December 1978.

"An Analysis of the Changing Location of Iron and Steel Production in the Twentieth Century," *American Economic Review*, March 1978.

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

Exhibit 2


List of Materials Reviewed

1. Complaint for Injunctive Relief and Damages
2. Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction
3. Defendants Objections to Evidence Submitted by Plaintiff in Support of Plaintiff's Ex Parte Application for a Temporary Restraining Order
4. Letter from Aaron Bludworth to Brad Gessner, September 21, 2007.
5. Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order
6. Memorandum of Points and Authorities in Support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order.
7. Plaintiff's Ex Parte Application for a Temporary Restraining Order.
8. Proposed Temporary Restraining Order
9. Proposed Temporary Restraining Order and Order to Show Cause re Preliminary Injunction
10. Request for Judicial Notice in support of Opposition to Plaintiff's Ex Parte Application for a Temporary Restraining Order
11. Declaration of Carole Wallace in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
12. Declaration of Dessi Nintcheva in Support of Opposition to Ex Parte Application for a Temporary Restraining Order
13. Declaration of Thomas Robbins in Support of Plaintiff's Application for a Temporary Restraining Order
14. Declaration of Jason Kirby in Support of Plaintiff's Application for a Temporary Restraining Order
15. Declaration of Charles Buddy Linn in Support of Plaintiff's Application for a Temporary Restraining Order

Ex 7 p 382

Exhibit 3
Page 59

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

16. Declaration of Larry Colby in Support of Plaintiff's Application for a Temporary Restraining Order

17. Declaration of Mark Epstein in Support of Plaintiff's Application for a Temporary Restraining Order

18. Declaration of Mark Epstein, October 26, 2007

19. Declaration of Richard Simon in Support of Plaintiff's Application for a Temporary Restraining Order

20. San Diego Convention Center Corporation Cleaning Services Contract with United Service Companies 2007

21. UNM v. San Diego Convention Center Pleadings List

22. San Diego Convention Center 2006 Annual Report

23. San Diego Convention Center Corporation, Convention and Trade Show License Agreement

24. July 26, 2007 Letter from Richard Simon to Jerry Sanders

25. July 5, 2007 Letter from Joe Loggia to Brad Gessner

26. June 27, 2007 Letter from Pat Dwyer to Brad Gessner

27. June 18, 2007 Letter from Barbara Myers to Brad Gessner

28. July 26, 2007 Letter from B.J. Enright to Brad Gessner

29. June 14, 2007 Letter from Ken McAvoy to Brad Gessner

30. June 22, 2007 Letter from Mary Kay Sustek to Brad Gessner

31. June 8, 2007 Letter from Martin Cymbal to Brad Gessner

32. June 14, 2007 Letter from Ty Bobit to Brad Gessner

33. SISO, IAEM, AND MATSO ISSUE JOINT INDUSTRY STATEMENT ON EXCLUSIVE SERVICES

34. July 20, 2007 Letter from Mary Beth Rebedeau to Brad Gessner

35. June 20, 2000 Letter from Joe Psulk to Marty Cymbal

36. May 12, 2000 Letter from Beatrice Kemp to Mark Valley

37. March 31, 2000 Letter from John Mooney to Carole Wallace

38. March 13, 2000 Letter from Michael Muldoon to Carole Wallace

39. March 8, 2000 Letter from Brian Casey to Carole Wallace

40. March 7, 2000 Letter from Mary Beth Rebedeau to Carole Wallace

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

41. March 2, 2000 Letter from James Bracken to Carole Wallace

42. March 1, 2000 Letter from Stephen Shuldenfrei to Carole Wallace

43. June 20, 1990 Letter from Hugh Mac Lean to Tom Liegler

44. June 13, 1990 Letter from Richard Simon to the San Diego Convention Center
    Board of Directors

45. May 11, 1990 Letter from Hugh Mac Lean to John Hartley

46. U.S. Federal Trade Commission, "Horizontal Merger Guidelines," 1992, Section
    1.1, http://www.ftc.gov/bc/docs/horizmer.htm.

47. http://www.portofsandiego.org/projects/hiltonhotel/

48. Carlton, Dennis and Jeffrey Perloff, *Modern Industrial Organization, 4th Ed.,*
    Boston: Pearson, Addison-Wesley, 2005.

49. Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising*
    *Rivals' Costs to Achieve Power Over Price,* 96 Yale L.J. 209 (1986)

50. Steven Salop and David Scheffman, *Raising Rivals' Costs,* 73 American
    Economic Review Papers and Proceedings 267 (May 1983)

51. David Scheffman and Richard Higgins, *20 Years of Raising Rivals' Costs:*
    *History, Assessment, and Future,* Federal Trade Commission,
    *http://www.ftc.gov/be/RRCGMU.pdf*

52. Gregory Werden, "Identifying Exclusionary Conduct Under Section 2: The 'No
    Economic Sense' Test", Antitrust Law Journal 2005, Vol. 73, No. 2, pp. 413-434.

53. Terms and Conditions, 2006 Exhibitor Application & Contract, Internet
    Telephony Conference & Expo, item 6.

54. Declaration of Charles Buddy Linn, November 2007.

55. Declaration of William Callaghan, November 2007.

56. Deposition of Charles Linn, with exhibits.

57. Deposition of Richard Simon, with exhibits.

58. Deposition of Gabriel Ramirez, with exhibits.

59. Deposition of Raymond Santos, with exhibits.

60. Deposition of Mark Epstein, with exhibits.

61. Draft Mayor's Citizen Task Force on the San Diego Convention Center Project;
    http://www.conventioncentertaskforce.org/

*United National Maintenance v. San Diego Convention Center Corporation*
*Exhibit 2 to Report of John S. Hekman Ph.D.*

62. July 31, 2009 letter from John L'Estrange Jr. to Jake Slania.

63. United's Response to Defendant's First Set of Interrogatories.

64. Defendant's Amended Objections and Responses to First Set of Requests for
    Production of Documents.

65. Defendant's Objections and Responses to Amended First Set of Interrogatories.

66. United's four-page list of Contracts and Billing Information for SDCC Shows
    July 1, 2007 through August 1, 2009.

67. UNM008682-UNM 011963.

68. Declaration of Brad Gessner in Support of Defendant's Opposition to Plaintiff's
    Motion for Preliminary Injunction.

69. Declaration of Carol Wallace in Support of Defendant's Opposition to Plaintiff's
    Motion for Preliminary Injunction.

70. Declaration of T.M. Mazzocco in Support of Defendant's Opposition to Plaintiff's
    Motion for Preliminary Injunction.

71. Declaration of Sotera L. Anderson in Support of Defendant's Opposition to
    Plaintiff's Motion for Preliminary Injunction.

72. Defendant's Evidentiary Objections to Evidence Submitted by Plaintiff in Support
    of Plaintiff's Motion for Preliminary Injunction.

73. Request for Judicial Notice in Support of Defendant's Opposition to Plaintiff's
    Motion for Preliminary Injunction.
74. San Diego Convention Center Articles of Incorporation
75. Public Improvement and Assessment Proceedings: Article 1: San Diego Tourism
    Marketing District.
76. City of San Diego Rules Implementing the Living Wage Ordinance
77. Memorandum of Points and Authorities in Support of Defendant's Demurrer to
    Plaintiff's Complaint

# EXHIBIT 4

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO

Case No. 37-2007-00072054-CU-BT-CTL

REBUTTAL REPORT

of

John S. Hekman Ph.D.

In the Matter of

*United National Maintenance, Inc.*

v.

*San Diego Convention Center Corporation, Inc.*

November 12, 2009

Ex 7 p 387

Exhibit 4
Page 63

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

1.      My name is John Hekman.  On September 30, 2009 I submitted a report in this matter.  I
have been asked by counsel for United National Maintenance Inc. to respond to the expert
reports of John Hayes and Thomas Lambert that were submitted on October 21, 2009.

**The Hayes Report**

My comments on the report of John Hayes are organized by reference to the paragraph numbers
of his report.

*Hayes 18 to 24 (Tying and Bundling are different: bundling of convention center services is*
*common)*

2.      Dr. Hayes says bundling and tying are commonplace and rarely harm competition.  This
is because most bundling and tying is the harmless variety such as shoes and shoelaces, or cars
and tires.  Because many consumer products have multiple parts and features, we can label all of
these products with multiple features "bundling" or "tying".  For example, automobiles have
radios, carpeting, windshield wipers, and countless other separable parts that could conceptually
be labeled part of a "bundle." Since these are the types of examples that Dr. Hayes refers to when
he says that bundling and tying are "common", I assume that this is what he means.  That in no
way means that there are not anti-competitive tying arrangements in situations where consumers
may wish to purchase products or services separately.  So I reject the "everybody does it"
explanation as being in any way relevant to the SDCC policy being considered here.

3.      Dr. Hayes points out that bundling and tying are different economic concepts in that
bundling "refers to selling two or more products together for a single price", while tying is

Exhibit 4
Page 64

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

selling one product "in conjunction with another." However, he himself confuses these concepts

in his footnote 22: "shoelaces and shoes" as well as "cars and tires" are examples of bundling,

not tying. My analysis identified SDCC's policy as tying in that SDCC ties trade show services

(the tying good) and trade show cleaning services (the tied good). SDCC may have priced some

of their services as a bundle, where the cost of cleaning services was not separately stated, but I

am not aware of any such instance. As a general matter and for the situation as it has been

explained in the depositions that I have read, the SDCC policy is a case of tying.

4.      I strongly disagree with Dr. Hayes' attempt to label the SDCC policy as "bundling" as

opposed to tying. He states (par. 21): "exclusive provider arrangements are economically

equivalent to pure bundling when the tied good is always purchased in conjunction with the tying

good." I take this to mean that he is saying that everyone who conducts a trade show at SDCC

uses cleaning services, so these two services are like shoes and shoelaces. If Hayes can bridge

this gap, making SDCC's policy one of bundling, not tying, then it follows that he can use all of

the justifications for bundling that can be found in the economics literature.

5.      However, SDCC's policy is not bundling. For cleaning and exhibiting to be a bundle,

two elements must be present, at a minimum. One is that the quantity of trade show cleaning

services must be in fixed proportions to the quantity of exhibitor services. In the case of buying

shoes, the laces are not separately priced because everyone needs exactly two shoelaces with a

pair of shoes. But in the convention center, everyone does not use the exact same amount of

cleaning services. That is why cleaning services are not "bundled" into the price of trade show

Exhibit 4

Page 65

Ex 7 p 389

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

services. Cleaning services are separately calculated and then added to the cost of other services being purchased.[1]

6.      The second element that must be present for cleaning and exhibiting to be a bundle is that every consumer must purchase the bundle. If some consumers purchase trade show exhibitor services while choosing not to purchase cleaning services, then it is not a bundle. And in fact, some of the exhibitors at SDCC trade shows do choose not to purchase some cleaning services.[2] Not all exhibitors purchase booth cleaning services. United works the floor of conventions to convince exhibitors who have not signed up for booth cleaning that they should purchase it.

7.      In sum, the SDCC policy does not pass Dr. Hayes' shoes-and-shoelaces, cars-and-tires test. The characterization of exclusive provider arrangements at convention centers as equivalent to "pure bundling" is wrong. Because SDCC is not "bundling", the discussion of the benign effects of bundling that follows is largely irrelevant.

*Hayes 23 to 25 (A number of other convention centers tie cleaning services and trade show services)*

8.      The fact that some other convention centers tie cleaning services and trade show services is irrelevant to the issue in this case. The provision of cleaning services by some convention centers is properly seen as a form of vertical integration, that is, of a firm producing a service (trade show services) that also produces one or more of the inputs used in the service (cleaning services). Other convention centers that do not provide exclusive cleaning services are less vertically integrated. The element that is important in the present case is that until 2007 there

---

[1] See for example the deposition of Charles Linn, page 39; deposition of Gabriel Ramirez, page 47; page 133-136; deposition of Raymond Santos, pages 17-21;
[2] See, for example, the deposition of Raymond Santos, page 147.

Exhibit 4
Page 66

Ex 7 p 390

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

was a functioning market for trade show cleaning services at SDCC. The exclusion of
competitors from this market was anti-competitive and harmful to consumers.

*Hayes 26 to 28 (Bundling is often efficient)*

9.     SDCC's policy is not bundling, so the arguments for the possible efficiency of bundling
do not apply. Hayes says that bundling can eliminate the inefficiency of double margins. This
point is wrong because the double margin problem applies to situations where two
complementary products are supplied by separate firms and both have market power. The
present case is different because in 2007 SDCC supplied both cleaning services as well as trade
show services. The double margin problem would not occur, because if United exercised market
power and raised the price of cleaning services, SDCC could supply those services itself.

10.    In paragraphs 27 and 28, Dr. Hayes says that there can be efficiencies associated with
SDCC's tying policy. He does not provide any analysis or data to back this up in SDCC's case,
but he suggests that SDCC's security justification for the exclusive policy could provide
efficiencies. Also, he points out that I have not done a cost-benefit study to back up my
statements about whether security was the reason for the change in policy. I stated clearly in my
report that I was not providing an opinion about security per se, but rather I was pointing out that
the security argument lacked credibility because United had higher security standards than
SDCC and had offered to address any deficiency that SDCC could name.

*Hayes 30 to 33 (No viable economic theory of harm)*

11.    Dr. Hayes argues that when the tying good (the SDCC) and the tied good (trade show
cleaning) are consumed in fixed proportions, a monopolist over the tying good has an incentive
to support competition in the market for the tied good. As already noted, trade show cleaning

Exhibit 4
Page 67

Ex 7 p 391

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

services are not used in fixed proportions to trade show services, so this theoretical argument

does not apply. The article cited by Hayes to support his argument relates to fixed proportions.

He also refers to a theoretical result that occurs if some consumers purchase the tied good

without also purchasing the tying good. In this case, that would mean purchasing trade show

cleaning services without purchasing the services of the convention center. This makes no sense

at all.

12.    In concluding this discussion, Dr. Hayes reaches the opinion that no viable economic

theory of harm has been offered. Apparently he reaches this conclusion because he cannot think

of any theories of harm other than the ones he has mentioned. But he has dismissed the

possibility of harm by interpreting the situation narrowly in terms of theories that refer to goods

consumed in fixed proportions. This theory does not apply here, because this is not a fixed

proportions situation. Therefore, Dr. Hayes' opinion that there is no viable economic theory of

harm is unfounded.

*Hayes 34 to 43 (Nationwide market for trade shows)*

13.    Dr. Hayes agrees with my position regarding market power as a necessary element for

SDCC to be able to tie trade show cleaning services to trade show services. However, he says

the threshold question is whether SDCC possesses "substantial" market power in the national

trade show market. This is incorrect. Market power means the power to influence price. The

power to influence price can vary from the maximum achievable by a monopolist (the only seller

in a market) all the way down to zero pricing power (in so-called atomistic competition).

14.    The question for the SDCC policy being considered here is whether SDCC has a

sufficient amount of pricing power in the trade show market that it can exclude competitors from

Exhibit 4
Page 68

Ex 7 p 392

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

the trade show cleaning market and raise price in that market. The amount by which price can be

raised in the show cleaning market is the "small but significant and non-transitory" price increase

(SNIP) that is the test used in the FTC/DOJ Antitrust Guidelines that I referred to in my report

and that Dr. Hayes refers to in his report. This is because raising the price of cleaning services

will raise the total price paid at SDCC by consumers of trade show services. If SDCC has

enough pricing power to raise that total price by raising the price of cleaning services, then

consumer harm will result.

15.     The SNIP test normally refers to the ability to raise and maintain price 5% or more. So

the question becomes, how much pricing power in the trade show market does it take to have an

anticompetitive effect in the trade show cleaning services market? The answer is, not much.

According to the figures reported by Dr. Hayes, trade show cleaning services accounts for no

more than 5.1% of the total cost of trade show services at SDCC.[3] A 5% increase in the price of

trade show cleaning services represents an increase in the total price of trade show services

(including the cleaning services) of only 0.3% (three-tenths of one percent). SDCC needs very

little pricing power to be able to raise price by three-tenths of one percent. As a result, it is my

opinion that Dr. Hayes is incorrect when he states that the issue is whether SDCC "possesses

substantial market power."

16.     In discussing the nature of the national market for trade shows in which SDCC competes,

Dr. Hayes says that I am wrong to emphasize the size of SDCC as a major factor in its market

competitiveness. He presents SDCC data that he reads to say that only 6 shows used the whole

center, and only 9 shows (3.6% of the total number of shows) used 75% of the center in FY

2009. Using the number of shows rather than show revenues or the percent of space rented on an

---

[3] Hayes Report, paragraph 25.

Exhibit 4
Page 69

Ex 7 p 393

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

annual basis is misleading in this regard. For example, the 9 shows that he references that each

used 75% or more of the center cannot overlap; if each of these shows used two weeks at the

SDCC, including show time, set-up and break-down, then they would use 18 weeks of the year.

This is 35% of the year in which SDCC has shows that are too big for most convention centers.

Whether or not the 35% figure that I present as a rough estimate is correct, it is clear that the

percent of the time that SDCC is tied up with a large show is much more than the 3.6% provided

by Dr. Hayes.

17.    The market analysis undertaken by ERA for the Convention Center Task Force shows

how misleading the figures used by Dr. Hayes are. He uses a total of 248 "events" at SDCC in

2009. ERA has a figure of 249 for 2009, so they agree fairly well.[4]  However, 153 of the 249 are

labeled "Meetings, community events, food & Bev." Since SDCC has 118,700 square feet of

"meeting room" space in addition to its 615,700 square feet of exhibit space, it is misleading to

be comparing the number of meetings with the number of conventions. ERA reports 72

"National/State Conventions and Trade Shows" and "Corporate Conventions" as "Primary

Events", while the 153 meetings and community events are labeled "secondary events."

18.    In sum, I disagree with the attempt by Dr. Hayes to characterize SDCC as having only a

few large conventions and to have mostly smaller shows that compete with smaller convention

centers. It makes no sense to argue as he does that "SDCC competes with much smaller facilities

for the vast majority of the events that it hosts."[5]  If that were the case, why would the City of

San Diego be contemplating an expansion of the SDCC in order to increase its capacity to host

---

[4] ERA presentation, Convention Center Task Force, Table 5.
[5] Hayes Report, paragraph 37.

Exhibit 4
Page 70

Ex 7 p 394

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

large trade shows? The task force reports speak of the loss of potential business due to lack of available space and of events that already have or will in the future outgrow the available space.[6]

19.    Dr. Hayes' own discussion of the market refutes his conclusion that SDCC mainly competes with much smaller facilities. In paragraph 38 he quotes the ERA report's conclusion that 21 convention centers represent "the predominant competitive markets" for SDCC. These 21 centers are the large centers throughout the U.S., not the "much smaller" centers referenced by Dr. Hayes. In paragraph 39 Dr. Hayes quotes SDCC's Carol Wallace saying that SDCC competes with convention centers in 13 U.S. cities.

20.    Most significantly with regard to the position of SDCC in the convention and trade show market, the presentation to the convention center task force by board chairman Chris Cramer and CEO Carol Wallace is in my opinion totally at variance with the analysis presented by Dr. Hayes.[7] For example, they say:

Chris Cramer remarks

> Over the last 20 years, the corporation has established a proven track record: Maximizing the building's economic potential attracting many of the nation's most lucrative conventions

> We are fortunate to have a customer base, largely driven by medical association meetings, that continues to have a strong economic performance and a necessity to continue to host their annual meetings.

Carol Wallace remarks

> [referring to an exhibit with four quadrants to illustrate different types of uses of the center]

> Our primary goal is to attract events that generate significant economic impact for the city of San Diego

---

[6] PricewaterhouseCoopers report, Jennifer Sutherland, March 2009, page 6.
[7] Presentation by Chris Cramer and Carol Wallace, Convention Center Task Force, February 2009.

Exhibit 4
Page 71

Ex 7 p 395

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

> The Center specifically targets high-end events to maximize economic impact for the city
> and produce significant revenues for the Center. Good examples are medical shows
> which attract attendees who have more disposable income, are likely to bring their
> families and come for the convention and extend their stay into a vacation. These events
> also have large budgets, host many off site events and have the need for ancillary services
> which generate substantial revenue for the facility.
>
> In the upper left hand quadrant, are events that are good for the city, but don't
> necessarily generate revenues for the facility. These events provide positive media
> exposure for the city and economic benefits. Examples are high profile political
> conventions or offshoot events surrounding events like the Superbowl.
>
> In the two lower quadrants are events that don't generate significant economic
> benefits for the city. On the left, these include conventions, tradeshows and
> events, with smaller budgets – so they don't generate money for the facility either.
> And, they typically don't attract attendees who stay as many nights. If they do,
> they usually don't spend much money.
>
> The lower right quadrant represents consumer shows and local events. While these events
> may attract a large number of local attendees, they don't attract overnight visitors.

These remarks by Chris Cramer and Carol Wallace directly contradict Dr. Hayes' description of

the market served by SDCC. It is clear that the primary market in which they see SDCC

competing is for larger national conventions.

*Hayes 44 to 49 (Market share and market power)*

21.    After arguing that SDCC competes with many smaller convention centers, Dr. Hayes

then estimates SDCC's market share by using the 20 convention centers that are larger than

SDCC. This results in an estimated market share for SDCC of 3% to 5%. His conclusion from

this market share estimate is that "SDCC does not possess market power in the nationwide

market for hosting trade shows."[8] As I pointed out above, in order to have an anticompetitive

effect on the market for trade show cleaning services, SDCC only needs to be able to raise price

by three-tenths of one percent.  A market share of 3% to 5%, in addition to all of the other

---

[8] Hayes Report, paragraph 49.

Exhibit 4
Page 72

Ex 7 p 396

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

indicators of market power that are contained in the analyses done for the Convention Center

Task Force, provide sufficient market power to be able to have this anticompetitive effect.

*Hayes 50 to 53 (Exercise of market power)*

22.     Dr. Hayes misreads a statement in my report to say that the small share of trade show

cleaning services in the total cost of a trade show constitutes a reason why SDCC has market

power in the trade show market.[9]  This is not what I said.  I discussed the sources of SDCC's

market power in the trade show market, and then I said: "In these circumstances, SDCC has the

ability to engage in an anticompetitive tie because trade show cleaning services are a small

portion of the total cost of a trade show."[10]  In other words, SDCC has sufficient market power to

engage in a tie, considering that trade show cleaning is a small share of trade show cost.  Dr.

Hayes read the word "because" to mean "as a result of" when what I meant by "because" was

"considering that."

23.     In paragraph 53, Dr. Hayes addresses my point that SDCC is capacity-constrained and is

seeking to expand its space so that it can accommodate more trade shows.  I interpret this fact to

mean that there is strong demand for trade shows at SDCC, and it supports my opinion that

SDCC has a degree of market power.  Dr. Hayes states that "Firms with market power seek to

*reduce* output in order to *increase* prices."  This interpretation of SDCC's situation is incorrect.

As a matter of economic theory, a firm with market power will produce a lower level of output

than the competitive level of output, and will charge a higher price.  However, that does not

mean that a firm with market power never wishes to increase its output.  In the case of SDCC,

we have a convention facility that has insufficient capacity because of the dynamics of the

---

[9] Hayes Report, paragraphs 51-52.
[10] Report of John S. Hekman, September 30, 2009, paragraph 44.

Exhibit 4
Page 73

Ex 7 p 397

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekmon Ph.D.*

market since the time the facility was built. With reference to the economic theory of imperfect competition, it would be correct to say that there is an optimal size for the SDCC such that it could provide an output and price that satisfy the conditions of profit maximization where marginal revenue equals marginal cost. Dr. Hayes' conclusion is incorrect because he did not include the capacity constraint.

*Hayes 54 to 58 (tax increases and market power)*

24.     Dr. Hayes disagrees with my opinion that the contemplated taxes on taxis, hotel rooms, and restaurants indicate that SDCC has market power. He provides an example that is designed to show that higher tax revenues can be experienced even when there is a loss of business at SDCC. He concludes that for this reason, higher tax revenues are not an indicator of strong demand or market power. His analysis is incorrect, because he is assuming a completely different situation than that which exists in San Diego. The purpose of the proposed expansion of SDCC is to accommodate the lost business that is now being turned away. If the expansion occurs, there will be an increase in business at SDCC, not a decrease as assumed in Dr. Hayes' example. The tax analysis that I was referring to projects both an increase in convention business, in hotel rooms booked, in taxi rides and in restaurant meals purchased, as well as an increase in tax receipts. With both higher output of conventions as well as higher taxes on services, the total price paid by consumers for the conventions will rise. It is this increase in price in the market that I was referring to as an indicator of market power for SDCC.

25.     Dr. Hayes also quotes the ERA report from the convention task force to say that consumers are very sensitive to hotel rates and that "the cost of hosting an event in San Diego (for hotel rooms and convention hall space rental) is considered to be prohibitively high by a

Exhibit 4
Page 74

Ex 7 p 398

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

number of respondents."[11] Based on this and similar quotes, Dr. Hayes concludes that "SDCC

would lose business if hotel and other taxes were increased." This is directly contrary to the

assumptions of the sources from which he has taken his quotes. The convention task force

concluded that an expansion of the SDCC is called for because of lost business at present, and

the analysis of paying for part of the expansion with taxes on hotels and other services does not

say that there would be less business as a result. Rather, the projections are for higher levels of

business in spite of the taxes that increase the cost for users of the center.

*Hayes 59 (essential facility)*

26.     Dr. Hayes objects to the opinion that SDCC is an essential facility for the trade show

cleaning market. His reason for this objection is his earlier opinion that no viable economic

theory of harm has been offered. I refuted that opinion above. Therefore, my opinion that

SDCC is an essential facility remains.

*Hayes 60 to 61 (lock in)*

27.     Booking of trade shows years in advance provides additional market power to SDCC in

its tying policy with regard to cleaning services. Dr. Hayes does not disagree that advance

booking provides a measure of market power. However, he does attempt to minimize the length

of time for the advance booking. He says that only "a handful" of conventions are booked more

than ten years in advance, and that 71% of "customers" book less than five years in advance. In

my opinion, these details from SDCC do not change my opinion that advance booking provides

additional market power. First of all, the number of events that are booked more than ten years

in advance may be, and likely are, the largest and most important events for SDCC's

---

[11] Quoted in Hayes Report, paragraph 57.

Exhibit 4
Page 75
Ex 7 p 399

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

profitability. As pointed out previously, the larger conventions may be few in number but large

in importance. Second, the counting of events here confuses once again what SDCC refers to as

"primary" convention events with the more numerous "meetings" and other "secondary" events.

Dr. Hayes' opinion is contradicted by the statements of Carol Wallace and Chris Cramer for the

convention task force:

> This facility serves as the foundation for our visitor industry. Unlike the downturn
> we are seeing in leisure travel, the events hosted in the Convention Center are
> usually booked 3-5 years out minimizing the impact of the economic cycles on the
> performance.[12]

The fact that advance booking of conventions "minimizes the impact of the economic cycles on

the performance" is a statement that advance booking locks in events and the associated revenue.

This makes my point.

*Hayes 62 to 68 (trade show cleaning services market definition)*

28.      Dr. Hayes' first objection to the product market definition for trade show cleaning

services is that the market is defined to be "large convention centers" but the definition of a large

center is not quantified. My definition of large centers is meant to be consistent with the large

convention centers with which SDCC sees itself competing. The reports to the convention center

task force are clear in identifying the relevant large centers. Dr. Hayes wants to include smaller

centers, saying that many of the events that occur at SDCC could be housed at smaller centers.

This opinion is contradicted by the facts. No instance has been provided by Dr. Hayes of an

event that chose a small center over SDCC. He is relying exclusively on the square footage of

SDCC and the space used by small events. Also, as mentioned before, it is misleading to

conflate the meetings and other secondary events with the large primary conventions.

---

[12] Presentation by Chris Cramer and Carol Wallace, Convention Center Task Force, February 2009, page 3.

Exhibit 4
Page 76

Ex 7 p 400

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

29.     The second objection to my product market definition is that United National

Maintenance does in fact take cleaning jobs in smaller hotel venues in San Diego. However, this

fact does not mean that the smaller hotel spaces are in the same trade show cleaning services

market as the SDCC. The testimony of the market participants that I cited in my report is that

the cleaning function is not the same at SDCC as compared to small venues, because of the

planning and supervision that goes into shows at SDCC. Also, Gabriel Ramirez explained that

the scale of operation is not at all comparable between SDCC and hotels in the San Diego area

where United sometimes does show cleaning. A hotel operation uses one or two people, while

large shows at SDCC use a substantially higher number of employees, sometimes in excess of

fifty.

30.     The reason for having this debate over which venues should be included in the market

definition is that it affects the estimated size of the market. If smaller venues are included, then

the question becomes whether the additional cleaning firms that operate in those smaller venues

should be counted as competitors of SDCC and United in the defined trade show cleaning

services market. What is implied by Dr. Hayes' argument that United does do cleaning at

smaller venues is that the other cleaning firms that work there should be included in the market.

But the testimony that I have read has not identified a single instance in which a small local

cleaning firm has had a contract at SDCC for a large trade show. In my opinion, the facts clearly

show that the market should be defined as trade show cleaning services at the SDCC.

31.     Dr. Hayes objects to my geographic market definition. He believes that it should be

greater than the San Diego metropolitan area. He agrees with me that "knowledge and skill at

the supervisory level" is the key to explaining why United is different from standard cleaning

firms. However, he argues that this supervisory skill could be imported from more distant

Exhibit 4
Page 77

Ex 7 p 401

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

locations such as Los Angeles, Phoenix or Las Vegas and combined with labor from San Diego

to form a firm that could compete in the market at the SDCC. In my opinion this is an

incomplete hypothetical. To illustrate, assume there is a firm A in Phoenix that does trade show

cleaning services and has a supervisor with the same skills and experience as Gabriel Ramirez.

Then for each contract that firm A obtains to work at SDCC, A's supervisor must commute to

San Diego, recruit and train a cleaning team, and remain in San Diego for the duration of the

trade show. This would make firm A's costs higher than those for United or SDCC. I do not see

how firm A could compete with firms that are located in San Diego. Alternatively, if Dr. Hayes'

hypothetical assumes that firm A's supervisor takes up residence in San Diego in order to work

on shows at SDCC, then we are just dealing with a new firm entering the market in San Diego,

and the geographic market is still defined as the San Diego metropolitan area. In either version

of this hypothetical, I disagree that it changes my definition of the geographic market.

*Hayes 69 to 73 (SDCC has not raised its hourly rates for trade show cleaning since 2007)*

32.     Dr. Hayes argues that since SDCC instituted its exclusive policy in 2007 it has not raised

its labor rates for trade show cleaning. In my opinion this has no relevance for whether the

exclusion of competitors was an anticompetitive act. Since the exclusion was immediately

challenged and litigated, it is not surprising that SDCC has not made any move to raise its rates.

The significant point is that if SDCC is successful in excluding competition, it will have the

ability to raise rates without losing business to a competitor in the trade show cleaning market.

33.     Dr. Hayes disagrees with my statement that SDCC "has effectively raised prices for

booth cleaning."[13] My reason for this statement was the testimony of Mark Epstein, who

explained that SDCC was charging for some aisle and carpet cleaning that United had not

---

[13] Hayes Report, paragraph 79.

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

charged for. Dr. Hayes references the deposition of Charles Linn, where he was asked about

another element of cleaning that United for which United billed charges but that SDCC did not.

However, Mr. Linn said that he did not know if United was being paid for those charges.[14]

34.    In paragraph 77, Dr. Hayes asserts that SDCC billed a smaller total amount than did

United for the 51 shows analyzed in Dr. Kennedy's economic damages report. This assertion is

incorrect. SDCC did not bill for the same services as United. Therefore, this is comparing

apples to oranges. United's billing includes the hours of laborers as well as supervisors. SDCC

bills only for laborer hours. This is the reason that the total billing on United's shows, in which

United provides supervisors but must use SDCC labor, is greater than SDCC's billing for those

same shows. When United's supervisory charges are subtracted from its total billing, the

resulting laborer charges are less than those of SDCC.[15] As a result, Dr. Hayes is incorrect in his

conclusion.

35.    In paragraph 81, Dr. Hayes asserts that in the shows considered by Dr. Kennedy that took

place between July 2007 and August 2009, United charged a higher average labor rate than

SDCC. This is not relevant to the issue of increased price in my report. As of July 2007, SDCC

was charging $17 per hour for its cleaning labor, while United was charging less than $16.30 to

Champion and $16.74 to GES.[16] United's 2001 contract with GES, renewed in 2006, provided

for a maximum 3% increase in labor rates per year. The 2005 Champion contract called for a

fixed labor rate that could be adjusted if minimum wage rates in California were increased.

After being fixed for five years, the California minimum wage increased 11.1% on January 1,

2007.

---

[14] Deposition of Charles Linn, page 243.
[15] Exhibit G, Report of Patrick Kennedy.
[16] Hayes Report, Exhibits 16 and 18.

Exhibit 4
Page 79

Ex 7 p 403

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

36.     After SDCC eliminated United's employees from working at SDCC in 2007, United

initiated the litigation that is the subject of this report. The rate that SDCC charges to United has

to be considered in the light of the litigation. It is not in SDCC's economic interest to raise labor

rates for cleaning services while the litigation is pending, because raising rates would be an

indicator of market or monopoly power. However, the fact is that before the litigation was

initiated, SDCC was charging more for cleaning labor than United was charging. The

replacement of United's labor with that of SDCC therefore constituted a price increase.

37.     In paragraph 82, Dr. Hayes disagrees with my opinion that there would be an increase in

cleaning service charges if United's supervisory labor were to be replaced by that of SDCC. He

says that it is his "understanding" that SDCC does not charge a fee for supervisory labor. What I

do not see in Dr. Hayes' discussion of this issue is  a direct statement that if SDCC were to have

incurred over 1,000 hours of supervisor labor as United did on the show s that were considered

by Dr. Kennedy, that SDCC would not have charged for any of this time. What can be said

without any speculation is that for the cleaning labor (excluding supervisors) that is billed by

both SDCC and United, SDCC billed a greater amount, and this represents an increase in price to

the consumer. To the extent that United absorbed these increases itself, the consumer of trade

show cleaning services has not so far had to pay these increases. However, to the extent that

United's losses have been shared by the purchasers of the cleaning services, there has been an

increase.

**The Lambert Report**

My comments regarding the Lambert Report are organized with reference to the Lambert

Report's page numbers.

Exhibit 4
Page 80

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

*Lambert Report, page 18*

38.     Mr. Lambert asserts that my opinion regarding the higher prices charged by SDCC as a result of its exclusionary cleaning services policy is contradicted by the testimony of Richard Simon.[17] Mr. Simon said that Champion refused to alter United's contract to allow United to pass along the increased cost from SDCC. Mr. Simon's testimony does not contradict my conclusion regarding price increases. First of all, by quoting this testimony Mr. Lambert is agreeing that SDCC charged more than United in the cases referred to, which constitutes a price increase. For the most part, United has paid these price increases itself. But to the extent that decorators have shared the burden of the higher prices for some shows, the price increases have been passed along to the decorators. Second, the current situation in which SDCC loses money due to the price increases is temporary. In the long run it is likely that if SDCC prevails in its attempt to monopolize the cleaning services market at SDCC, either United will increase its rates to cover its losses or United will no longer contract to clean at SDCC if it cannot use its own employees to do so.

39.     Mr. Lambert also says that for the same reason cited above, i.e. that United did not pass along most of the price increase from SDCC, that as a result my opinion contradicts that of Dr. Kennedy.[18] This is incorrect. Dr. Kennedy has offset his damages calculations by the amounts of SDCC's price increases that were paid by decorators. Therefore, in my opinion it is still the case that SDCC did raise prices, and Dr. Kennedy has calculated damages in an appropriate way.

*Lambert Report, page 19*

---

[17] Lambert Report, page 18.
[18] Lambert Report, page 19.

Exhibit 4
Page 81

Ex 7 p 405

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

40.     I stated in my report that United sometimes brings in workers from other cities at
considerable cost rather than hiring local cleaning workers. Mr. Lambert says this has not been
accounted for in Dr. Kennedy's damages calculations.[19]  I was reporting what had been testified
to by United's employees.[20]  This did not refer to any specific show that was the basis for Dr.
Kennedy's damages calculations.

41.     Mr. Lambert disagrees with my statement that "SDCC appropriates all of the revenue that
previously was paid to United."[21]  SDCC takes the 50% of the booth-cleaning revenue that
previously went to United.  For facilities cleaning, United bills the decorator for supervisory and
labor hours estimated in advance of a show.  SDCC bills United for the labor hours worked by
SDCC employees.  Overall, SDCC has billed more for labor hours than United has billed or been
paid.  When SDCC's billing is less than United's billing for both labor and supervisory hours,
then United receives some net revenue.

*Lambert Report pages 20-21*

42.     Mr. Lambert states that "the documents and testimony are entirely consistent that
SDCCC supervisors <u>always</u> supervise SDCCC cleaning worker employees and that SDCCC
<u>never</u> charges UNM for the supervisor labor hours."[22]  Because SDCC earns income at the center
not only from trade show cleaning services but also from numerous other services and receives
income from the rental of the center, the fact that SDCC does not specifically charge United for
certain supervisor hours does not mean that SDCC is not receiving income for those supervisors'
work from some other revenue source.

---

[19] Lambert Report, page 19.
[20] Deposition of Charles Linn, page 85.
[21] Lambert Report, page 19.
[22] Lambert Report, page 21.

Exhibit 4
Page 82

Ex 7 p 406

*United National Maintenance Inc. v. San Diego Convention Center Corporation Inc.*
*Rebuttal Report of John S. Hekman Ph.D.*

43.   . Mr. Lambert disagrees with my statement that "SDCC has forced United and other

competitors in the market to operate at a loss."[23]  He states: "As reflected in Exhibit D, UNM's

documents produced indicate that UNM has been profitable on all shows since June 2008."[24]  It

is not correct that United has been profitable on all shows since SDCC's exclusive policy was

instituted.  I do not know why Mr. Lambert refers to shows starting with the arbitrary date of

June 2008.  But his assumption of profitability fails to take account of United's cost of

supervisory labor and of United's overhead costs.


_____

John S. Hekman, Ph.D.                              Los Angeles, CA November 12, 2009


---

[23] Lambert Report, page 20.
[24] Lambert Report, page 20.

Exhibit 4
Page 83

# EXHIBIT 8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

   Plaintiff,

vs.        No. 07-CV-2172 BEN (JMA)

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,

   Defendant.

**CERTIFIED COPY**

---

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order

DEPOSITION OF CAROL WALLACE

San Diego, California

Thursday, July 16, 2009

Reported by:
MARGARET A. SMITH, RPR, CRR
CSR No. 9733

Job No. 116058

| | | |
|---|---|---|
| 10:49:51 | 1 | **A**     Okay. |
| 10:49:52 | 2 | **Q**     You had cleaning revenue before July 1st, 2007. |
| 10:49:55 | 3 | Correct? |
| 10:49:55 | 4 | **A**     Yes. |
| 10:49:56 | 5 | **Q**     You were competing with United National and |
| 10:49:59 | 6 | other cleaning services for the cleaning work at the |
| 10:50:04 | 7 | Convention Center prior to July 1st, 2007.  Correct? |
| 10:50:07 | 8 | **A**     Yes. |
| 10:50:08 | 9 | **Q**     Okay.  So there was a certain amount of |
| 10:50:12 | 10 | cleaning revenue that you had on an annual basis, based |
| 10:50:14 | 11 | on the fact that Freeman and other service contractors |
| 10:50:18 | 12 | would hire the Convention Center to do the cleaning |
| 10:50:22 | 13 | during conventions.  Correct? |
| 10:50:24 | 14 | **A**     Yes. |
| 10:50:25 | 15 | **Q**     Okay.  When you implemented the exclusive |
| 10:50:27 | 16 | policy on July 1st, 2007 where only the Convention |
| 10:50:30 | 17 | Center employees could be used, the revenues from |
| 10:50:33 | 18 | cleaning increased.  Correct? |
| 10:50:39 | 19 | **A**     I can't say that is correct. |
| 10:50:40 | 20 | **Q**     You just don't know? |
| 10:50:41 | 21 | **A**     Well, there -- I don't know.  There were |
| 10:50:41 | 22 | more -- there were more revenues.  Yes.  Yes, there were |
| 10:50:44 | 23 | more revenues. |
| 10:50:46 | 24 | **Q**     Okay.  And if Mr. Gessner has testified that |
| 10:50:48 | 25 | the net increase in revenues after the July 1st, 2007 |

67

I, CAROL WALLACE, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _28th_ day of _August_,
20_09_, at _San Diego_, _CA_.
 (City)            (State)

_Carol Wallace_
CAROL WALLACE

224

# EXHIBIT 9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

        Plaintiff,

vs.                                    No. 07-CV-2172 BEN(JMA)

SAN DIEGO CONVENTION CENTER            **CERTIFIED**
CORPORATION, INC., a California
corporation,                           **COPY**

        Defendant.

---

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order


DEPOSITION OF BRAD GESSNER

San Diego, California

Monday, July 13, 2009

Volume 1


Reported by:
MARGARET A. SMITH, RPR, CRR
CSR No. 9733

Job No. 116057

| | | |
|---|---|---|
| 10:57:38 | 1 | actually, April of 2006, it was the City of Scottsdale. |
| 10:57:44 | 2 | I was the general manager of a special event and |
| 10:57:48 | 3 | equestrian facility called WestWorld of Scottsdale. |
| 10:57:52 | 4 | Point of clarification, I was still on the City |
| 10:57:54 | 5 | of Scottsdale payroll through April 15th of 2006, even |
| 10:58:00 | 6 | though I had accepted the job as general manager -- I'm |
| 10:58:04 | 7 | sorry -- as director of convention event services with |
| 10:58:07 | 8 | the San Diego Convention Center.  And that was at the |
| 10:58:10 | 9 | City of Scottsdale's request to be able to keep me on to |
| 10:58:13 | 10 | be able to finish up some projects that I had been |
| 10:58:17 | 11 | playing a key role in. |
| 10:58:19 | 12 | Q    But did you actually move to San Diego in |
| 10:58:21 | 13 | February of 2006? |
| 10:58:23 | 14 | A    Yes, I did. |
| 10:58:23 | 15 | Q    Okay.  So you were working with the Convention |
| 10:58:25 | 16 | Center, but you were following up on some projects you |
| 10:58:28 | 17 | had in Scottsdale? |
| 10:58:29 | 18 | A    Yes. |
| 10:58:35 | 19 | Q    When you came back to the Convention Center in |
| 10:58:39 | 20 | April of 2006, approximately how much of the cleaning |
| 10:58:42 | 21 | business did the Convention Center have at that time? |
| 10:58:45 | 22 | A    The best I can recall, over half.  We were |
| 10:58:50 | 23 | doing all of Freeman's cleaning and then a few smaller |
| 10:58:53 | 24 | events.  I know, for instance, Action Sports retailer -- |
| 10:58:58 | 25 | and the reason I know this is that was always one of my |

76

BRAD GESSNER                                    07/13/09

| | | |
|---|---|---|
| 10:59:01 | 1 | favorite shows.  I'm a surfer.  It's a surfing industry |
| 10:59:05 | 2 | show.  Their -- their show manager, Lori Jenks, I |
| 10:59:08 | 3 | consider a friend of mine.  And I was pleased to see |
| 10:59:11 | 4 | that even though it was a GES show, that she required |
| 10:59:15 | 5 | that they use our cleaning services.  And to quote her, |
| 10:59:18 | 6 | she said -- and I'm paraphrasing -- I wasn't pleased |
| 10:59:22 | 7 | with United National Maintenance.  You guys do such a |
| 10:59:24 | 8 | good job.  So I made it a requirement that they had to |
| 10:59:26 | 9 | use your cleaning services. |
| 10:59:28 | 10 | So I believe it was probably in the |
| 10:59:30 | 11 | neighborhood of 55, 60 percent of the cleaning business |
| 10:59:33 | 12 | is the best guess. |
| 10:59:44 | 13 | Q    And that you had been involved for overseeing |
| 10:59:46 | 14 | the cleaning services during your initial term with the |
| 10:59:50 | 15 | Convention Center, was that something that you were |
| 10:59:53 | 16 | interested in following up on to see if you could get |
| 10:59:56 | 17 | most of the cleaning service for the Convention Center |
| 10:59:58 | 18 | when you came back to the Convention Center in April -- |
| 11:00:02 | 19 | I'm sorry -- February of 2006? |
| 11:00:05 | 20 | A    No. |
| 11:00:07 | 21 | Q    Did you have any discussions with anyone before |
| 11:00:11 | 22 | the solicitations started of Champion and GES, about |
| 11:00:17 | 23 | whether you could be involved and that you had |
| 11:00:20 | 24 | experience with soliciting cleaning service and cleaning |
| 11:00:25 | 25 | service contracts in your earlier stent with the |

77

| | | |
|---|---|---|
| 11:15:38 | 1 | Q    If you look at page 4 of Mr. Epstein's |
| 11:15:42 | 2 | declaration, specifically on paragraph 10 -- |
| 11:15:49 | 3 | MR. L'ESTRANGE:  I think that's page 3. |
| 11:15:51 | 4 | THE WITNESS:  Yeah.  Page 4 -- |
| 11:15:54 | 5 | MR. LANCE:  Mine has two page numbers, then. |
| 11:15:57 | 6 | MR. L'ESTRANGE:  It's the one in the middle on |
| 11:15:58 | 7 | the bottom. |
| 11:16:00 | 8 | MR. LANCE:  Yeah.  So it's page 3.  I'm sorry. |
| 11:16:02 | 9 | Paragraph 10. |
| 11:16:14 | 10 | BY MR. LANCE: |
| 11:16:15 | 11 | Q    In paragraph 10, Mr. Epstein says, |
| 11:16:17 | 12 | "Historically, United and SDCC have aggressively |
| 11:16:22 | 13 | competed for the business of Trade Show Cleaning |
| 11:16:24 | 14 | services in San Diego." |
| 11:16:25 | 15 | Is that an accurate statement? |
| 11:16:27 | 16 | A    I don't believe so. |
| 11:16:30 | 17 | Q    You would agree that certainly United and the |
| 11:16:34 | 18 | Convention Center were competing for cleaning services |
| 11:16:38 | 19 | at the San Diego Convention Center before the policy was |
| 11:16:41 | 20 | put into effect on July 1st, 2007? |
| 11:16:44 | 21 | A    Yes. |
| 11:16:45 | 22 | Q    And, obviously, you were competing directly |
| 11:16:49 | 23 | with United in 2006 and early 2007 because you were |
| 11:16:52 | 24 | trying to convince the general contractor, specifically |
| 11:16:56 | 25 | Champion and GES and others, to use the Convention |

87

BRAD GESSNER

| | | |
|---|---|---|
| 11:16:59 | 1 | Center for cleaning services rather than United? |
| 11:17:01 | 2 | A    Yes. |
| 11:17:02 | 3 | Q    Were there any other services, other than |
| 11:17:04 | 4 | United, that competed with the Convention Center for |
| 11:17:09 | 5 | cleaning services in 2006 and early 2007? |
| 11:17:12 | 6 | A    Yes. |
| 11:17:12 | 7 | Q    What entities were they? |
| 11:17:14 | 8 | A    I believe the company's name is Team Clean out |
| 11:17:16 | 9 | of Las Vegas.  And then there was another one, Century |
| 11:17:21 | 10 | Cleaning, which I also think is based in Las Vegas.  I'm |
| 11:17:24 | 11 | not certain of that.  But there was nothing aggressive |
| 11:17:29 | 12 | about any of our -- any of our competition, at least not |
| 11:17:33 | 13 | the way I would characterize aggressive. |
| 11:17:37 | 14 | Q    You -- you said as of 2006, the Convention |
| 11:17:42 | 15 | Center had approximately 55 percent of the cleaning |
| 11:17:45 | 16 | services? |
| 11:17:46 | 17 | A    That's the best guess. |
| 11:17:47 | 18 | Q    Okay.  Approximately what percentage of the |
| 11:17:49 | 19 | cleaning services did United have in 2006? |
| 11:17:54 | 20 | A    The lion's share of the remainder.  I'm |
| 11:17:58 | 21 | guessing -- and it is a guess, because we didn't keep |
| 11:18:01 | 22 | track of that -- maybe another 30 or 40 percent.  And |
| 11:18:08 | 23 | the others maybe had 5 percent, 10 percent.  That's a |
| 11:18:13 | 24 | guess. |
| 11:18:15 | 25 | MR. L'ESTRANGE:  Just a point of clarification. |

88

| 11:18:17 | 1 | A percentage of what?  Show revenue?  Number of shows? |
| 11:18:20 | 2 | MR. LANCE:  Of the total cleaning services |
| 11:18:22 | 3 | for -- for shows. |
| 11:18:23 | 4 | BY MR. LANCE: |
| 11:18:24 | 5 | Q    And I'm going to -- I'm going to back up and |
| 11:18:27 | 6 | clarify.  We don't want you to guess.  There's a |
| 11:18:30 | 7 | difference between guess and estimate.  And attorneys |
| 11:18:34 | 8 | give different examples of that. |
| 11:18:36 | 9 | But, for example, if I asked you to estimate |
| 11:18:37 | 10 | the length of this table, you could do a pretty good |
| 11:18:40 | 11 | job.  It may not be something that you're really good |
| 11:18:43 | 12 | at, but you could do a pretty good job, because you can |
| 11:18:45 | 13 | look at it and based on experience say that this table |
| 11:18:48 | 14 | is about 8 feet long. |
| 11:18:50 | 15 | But if I asked you to tell me how long the |
| 11:18:52 | 16 | dining room table is in my house, since you haven't been |
| 11:18:55 | 17 | to my house, as far as I know, it would be really a |
| 11:18:57 | 18 | guess.  I mean, you might be able to, based on how long |
| 11:19:02 | 19 | dining room tables are generally, get relatively close. |
| 11:19:05 | 20 | But you really don't have a basis for that. |
| 11:19:08 | 21 | So I'm entitled to know if you have an |
| 11:19:09 | 22 | estimate.  However, no one wants you to guess or |
| 11:19:12 | 23 | speculate. |
| 11:19:15 | 24 | So with that in mind, if we go back and you |
| 11:19:17 | 25 | believe that your best estimate was that the Convention |

89

| 11:19:20 | 1 | Center had about 55 percent of the cleaning business for |
| 11:19:23 | 2 | conventions at the Convention Center in 2006 and in 2007 |
| 11:19:27 | 3 | before the new policy went into effect, you would say |
| 11:19:30 | 4 | that United had the lion's share of the remainder of |
| 11:19:33 | 5 | that. |
| 11:19:33 | 6 |          Is that fair to say? |
| 11:19:36 | 7 |     A    Yes. |
| 11:19:36 | 8 |     Q    And that these other entities, Team Clean and |
| 11:19:39 | 9 | Century Cleaning, they would have had only 5 or |
| 11:19:41 | 10 | 10 percent of the total? |
| 11:19:43 | 11 |     A    Yes. |
| 11:20:14 | 12 |          MR. LANCE:  Okay.  I'll show you what we'll |
| 11:20:15 | 13 | mark as Exhibit 3.  For the record, Exhibit 3 is a |
| 11:20:29 | 14 | document produced by the Convention Center.  It's SDCC |
| 11:20:31 | 15 | 102370 through 102371.  It's an email string; the first |
| 11:20:39 | 16 | one dated September 21, 2006 from Carly Andrews to you, |
| 11:20:44 | 17 | and then a follow-up from you to Carly Andrews. |
| 11:20:50 | 18 |          (Deposition Exhibit 3 marked.) |
| 11:20:53 | 19 | BY MR. LANCE: |
| 11:20:54 | 20 |     Q    Have you seen this document before? |
| 11:20:55 | 21 |     A    Let me read it.  I'm sure I have since it was |
| 11:20:57 | 22 | sent to me, but it's -- it's not triggering any memory. |
| 11:21:00 | 23 |     Q    Okay.  Go ahead and take your time. |
| 11:21:12 | 24 |          Okay.  Why don't we take a break while you're |
| 11:21:15 | 25 | reviewing that.  We need to change tapes. |

14:39:38 1    Convention Center and 50 percent to United when they

14:39:40 2    could contract with you directly and get 50 percent of

14:39:43 3    the revenues?

14:39:45 4            MR. L'ESTRANGE:  Objection.  Calls for

14:39:46 5    speculation.

14:39:46 6            THE WITNESS:  I have no idea.

14:39:47 7    BY MR. LANCE:

14:39:47 8        Q    It wouldn't make sense economically.  Would it?

14:39:50 9        A    It doesn't make sense to me.

14:39:54 10       Q    Right.  I mean, you -- strike that.

14:39:55 11           The new policy that you've implemented puts

14:39:59 12   United at an extreme competitive disadvantage for

14:40:04 13   performing booth cleaning services and aisle cleaning

14:40:08 14   services in the Convention Center.  Correct?

14:40:11 15       A    I don't -- I don't know that to be true.

14:40:13 16       Q    Well, you've said before that -- well,

14:40:17 17   clearly -- let me back up.  Strike that.

14:40:19 18           The two major competitors for cleaning services

14:40:22 19   at the Convention Center prior to the time that you

14:40:26 20   entered into this -- or that you implemented this policy

14:40:29 21   on July 1st, 2007, was the Convention Center and United

14:40:33 22   Services.  Right?

14:40:35 23       A    Right.

14:40:35 24       Q    Okay.  And you really didn't have a significant

14:40:37 25   competitor, other than United National Maintenance,

14:40:39  1    prior to July 1, 2007?

14:40:41  2        A    There were A few others, but United was the --

14:40:45  3    the main one.

14:40:46  4        Q    Okay.  And it's your position that United is

14:40:49  5    still a competitor with the Convention Center for the

14:40:51  6    cleaning services.  Correct?

14:40:53  7        A    Well, not so much anymore, because we're --

14:40:56  8    we're partnering with them on a lot of shows.

14:41:01  9        Q    So you see United as a forced partner as

14:41:04 10    opposed to a competitor now?

14:41:08 11        A    I don't know about a forced partner.  I -- I

14:41:10 12    think we -- we've got a good professional working

14:41:13 13    relationship now.  On the few occasions that we've had

14:41:17 14    some issues, Rick and I have been able to work it out.

14:41:21 15    I think things are going well with our agreements

14:41:27 16    with -- with United.

14:41:27 17        Q    Well, obviously, United is not happy with the

14:41:29 18    policy.  You know that?

14:41:30 19        A    Well, we're -- we're being sued, but our

14:41:32 20    working relationship, I think, is -- is -- is

14:41:33 21    professional.

14:41:38 22        Q    Fair enough.  And so despite the fact that

14:41:40 23    there's a disagreement as to whether the Convention

14:41:43 24    Center can legally implement this policy and there's a

14:41:47 25    lawsuit to be filed, you believe that, overall, United

183

| 14:41:50 | 1 | has been professional in -- in dealing with this issue |
| 14:41:52 | 2 | at the Convention Center from a working relationship |
| 14:41:53 | 3 | standpoint? |
| 14:41:54 | 4 | A    Yeah, I mean, together.  Reciprocal.  We -- |
| 14:41:56 | 5 | Q    Okay. |
| 14:41:56 | 6 | A    -- we, together, had a good working |
| 14:41:58 | 7 | professional relationship from both sides. |
| 14:42:07 | 8 | Q    Okay.  But you would agree, wouldn't you, |
| 14:42:09 | 9 | though, sir, that you went from a situation where you |
| 14:42:11 | 10 | had a competitor in United National Maintenance for |
| 14:42:15 | 11 | cleaning services at the Convention Center prior to |
| 14:42:17 | 12 | July 1st, 2007? |
| 14:42:19 | 13 | A    Yes. |
| 14:42:19 | 14 | Q    Okay.  You no longer have a competitor for |
| 14:42:22 | 15 | cleaning services at the Convention Center.  Do you? |
| 14:42:25 | 16 | A    Not for the actual work that's being done.  Not |
| 14:42:30 | 17 | the actual labor that's being done, no. |
| 14:42:32 | 18 | Q    And, effectively, you don't have a competitor |
| 14:42:35 | 19 | for the -- for the booth cleaning or for the aisle |
| 14:42:40 | 20 | cleaning.  Do you? |
| 14:42:41 | 21 | A    No.  As far as the actual cleaning that occurs, |
| 14:42:43 | 22 | we're the only ones doing it. |
| 14:42:45 | 23 | Q    Okay.  Because -- why is it that if your |
| 14:42:53 | 24 | concern is the security of the building, that you don't |
| 14:42:56 | 25 | provide the workers, the Convention Center workers, at a |

184

1    I, BRAD GESSNER, do hereby declare under penalty of

2  perjury that I have read the foregoing transcript; that

3  I have made any corrections as appear noted, in ink,

4  initialed by me, or attached hereto; that my testimony

5  as contained herein, as corrected, is true and correct.

6       EXECUTED this 27ᵗʰ day of AUGUST            ,

7  20 09 , at  SAN DIEGO          ,    CA.          .
                    (City)              (State)

8

9

10

11   _____
     BRAD  GESSNER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

247

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

        Plaintiff,


vs.                     No. 07-CV-2172 BEN (JMA)

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,
                  CERTIFIED
        Defendant.
                  COPY

---

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order


30(B)(6) DEPOSITION OF BRAD GESSNER

San Diego, California

Tuesday, July 14, 2009

Volume 1


Reported by:
MARGARET A. SMITH, RPR, CRR
CSR No. 9733

Job No. 116177B

| 13:41:40 | 1 | Q    You'd lose revenues of 300,000 per year if |

13:41:40  1      Q    You'd lose revenues of 300,000 per year if

13:41:44  2  United was able to clean at the Convention Center?

13:41:47  3      A    I'm not sure I understand the question.

13:41:48  4      Q    Well, yesterday, you testified that you

13:41:50  5  increased your revenues with this new policy to the tune

13:41:55  6  of 300,000 a year.  Actually, you've increased your

13:41:57  7  profits to the extent of 300,000 per year.  Right?

13:41:58  8      A    Approximately.

13:42:00  9      Q    Yeah.

13:42:01  10     A    But I still don't understand the question.

13:42:03  11     Q    Well, if -- if United could come up with a

13:42:07  12  security protocol to ensure the safety of the Convention

13:42:09  13  Center, that would get rid of the -- the safety concern

13:42:16  14  for the reason the policy was implemented.  Correct?

13:42:19  15     A    No.

13:42:19  16     Q    Why not?

13:42:20  17     A    Because we would not have control of the

13:42:22  18  employees.  They would not report to us, and that, we

13:42:29  19  feel, isn't as good a situation.

13:42:38  20     Q    And you haven't implemented that policy to gain

13:42:42  21  control of any other contractors' employees other than

13:42:47  22  the cleaning employees, since July 1, 2007.  Correct?

13:42:51  23     A    Correct.

13:42:54  24     Q    Did you directly compete with any contractor

13:42:58  25  other than United between July 1st, 2007 and the

1          I, BRAD GESSNER, do hereby declare under penalty of

2     perjury that I have read the foregoing transcript; that

3     I have made any corrections as appear noted, in ink,

4     initialed by me, or attached hereto; that my testimony

5     as contained herein, as corrected, is true and correct.

6          EXECUTED this 27ᵀᴴ day of AVGVST              ,

7     20 09  , at    SAN DIEGO          ,    CA.         .
                       (City)                 (State)

8

9

10

11                        _____
                          BRAD GESSNER
12                        30(B)(6)

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                            143

# EXHIBIT 10

## DECLARATION OF MARK EPSTEIN

I, Mark Epstein, declare and would testify under oath as follows:

1.    I am the President of Champion Exposition Services, LLC ("Champion"), and I am authorized to make this declaration on Champion's behalf.  All facts stated herein are true and are of my own personal knowledge.

2.    I have worked with Champion in excess of 20 years, and I am currently Champion's President.  Champion is a general contractor for trade shows.  As a general contractor, Champion signs contracts directly with trade associations to manage and organize their trade shows held at venues nationwide, including those held at the San Diego Convention Center ("Convention Facility").   Champion's contracts with trade associations generally run for three years or more.

3.    As a general contractor, Champion is responsible for hiring sub-contractors necessary for handling the logistical and service-oriented challenges needed to ensure the smooth operation of the trade show.  These sub-contractors may include providers of the following services: cleaning, janitorial, maintenance and related services (defined hereinafter as "Trade Show Cleaning Services"), electrical, and installation and dismantling ("I&D").  The employees of the selected sub-contractors enter the trade show venues to perform services for which they have contracted.   This is the standard procedure nationwide.

### Trade Show Cleaning Services

4.    United National Maintenance, Inc. ("United") is engaged in the business of providing Trade Show Cleaning Services to trade shows.  Champion is a consumer and a direct purchaser of Trade Show Cleaning Services and has contracted with United to

1

4

75



Ex 10 p 425

Trial Exhibit 2  Page 1

provide these services at venues nationwide, including SDCC, for more than 10 years. Trade Show Cleaning Services is a unique product that is very important to Champion because we, as general contractors, need to make it available in order to meet our responsibilities for cleaning individual exhibit space and the common areas of a show.

5.      Trade Show Cleaning Services are not traditional janitorial services and United is not a traditional janitorial services firm. While a janitorial firm hired to clean office space in a commercial building can expect each office to be the same size and in similar condition everyday, each trade show is unique in size, configuration, and its cleaning needs. Based on the scope and size of a particular trade show, a provider of Trade Show Cleaning Services must constantly react to ever changing demands that involve the amount and location of manpower and equipment at any given moment. A provider of Trade Show Cleaning Services must ultimately have a tremendous amount of logistical expertise and must anticipate needs proactively based on the past experience of the Trade Show Cleaning Services management. No two trade shows are the same from the perspective of Trade Show Cleaning Services.

6.      Due to the expertise and specialized knowledge required, I would not consider even an extremely price competitive bid from a traditional janitorial services firm to provide Trade Show Cleaning Services. Such a firm simply cannot efficiently and effectively provide the required level of service. If these services could be provided by a traditional janitorial services firm, there would be many other competitors to United and SDCC and Champion would not sub-contract for these services but would rather provide them itself. For these reasons, Champion and the trade show industry recognize

2

4

76

that these are specialized services that cannot be substituted for traditional janitorial services.

### Trade Shows in San Diego

7.     Because of its weather, attractions and facility size, San Diego is a very desirable location for trade shows. The Convention Facility offers over 600,000 square feet of exhibit space. In fact, I believe the Convention Facility it is one of the top five trade show venues in the nation. There is no other comparable venue in or around San Diego capable of hosting large trade shows. The next largest venues in and around the San Diego area are hotels, and they are capable of handling anywhere from 5 to a maximum of 100 exhibit booths. By comparison, the SPIE Annual Meeting Optics & Photonics trade show held at the Convention Center (a relatively small show by Convention Center standards) involved 225 exhibit booths.

8.     Because San Diego is such a desirable market, a trade association usually must sign a contract with the SDCC at least five years in advance. In order to secure a preferred date, a trade show association may even have to contract with SDCC 10 to 15 years in advance.

9.     Due to the long-term nature of these contracts, when Champion contracted with SPIE to manage the Annual Meeting Optics & Photonics trade show held at the Convention Facility from August 28-30, 2007, neither Champion nor SPIE knew anything about SDCC's security policy, which was only announced in July of 2007.

### Competition in the San Diego Market

10.    Historically, United and SDCC have aggressively competed for the business of Trade Show Cleaning Services in San Diego. Until recently, Champion has always had the absolute right to choose the company it wants to perform Trade Show

3

4

77

**Ex 10 p 427**

**Trial Exhibit 2  Page 3**

Cleaning Services for trade shows held at the Convention Facility.  As a result of its superior price and service, Champion chose United to be its Trade Show Cleaning services provider.

11.    Not long ago, Brad Gessner, the general manager of the Convention Facility, called me directly in an attempt to solicit Champion's Trade Show Cleaning Services business.  The phone call was unsolicited.  I told Mr. Gessner that Champion was satisfied with the service and price it got from United, that it had a long-term written contract with United whereby United was to perform all Trade Show Cleaning Services and that Champion would honor its written contract with United.   Upset with my response, the conversation became contentious and Mr. Gessner told me that "I'd be hearing from him again."

12.    A matter of months after I rejected SDCC's solicitation, SDCC notified Champion in a letter of its new security policy stating that, effective July 1, 2007, Champion would no longer have the right to select which company performed the Trade Show Cleaning Services for trade.shows at the Convention Facility.  Instead, SDCC notified Champion that only SDCC employees would be permitted to perform the Trade Show Cleaning Services for trade shows at the Convention Facility and SDCC proposed terms for providing these services that were substantially inferior to the terms of Champions contract with United.

## SDCC's Security Policy

14.    Security at the Convention Facility (and all convention facilities) is very important to me and Champion.  Should anything happen at the Convention Facility it would reflect poorly on Champion and on the industry as a whole.  I have a vested interest in the security of the Convention Facility.

4

4

78

15.    As a long-term participant in the trade show industry, SDCC's policy which singles out Trade Show Cleaning Service employees for security concerns makes no sense. Trade Show Cleaning Service employees constitute a very small percentage of the outside labor that is given access to the Convention Facility. It makes no sense that United's employees should be denied access to the Convention Facility when employees for providers of electrical contracting, I&D, floral contractors, photographers, modeling agencies or exhibitors are not subject to any security protocols or procedures. I don't see how replacing United employees with SDCC employees will do anything to improve security.

16.    United's employees are a low security risk because they have been working at the Facility for a long time. I am not aware of any security incidents caused by United's employees. By contrast, I&D employees are a huge security black hole. I&D companies tend to be numerous and small. There may be employees of a dozen or more I&D companies working in the Convention Facility at any given time. These employees of these companies go in and out of business with regularity.

17.    I do not believe this is truly a security policy. The security policy has only been applied to the services provided by United. United is coincidentally, our only sub-contractor that directly competes with SDCC as a service provider at the Facility, and the policy shortly followed my contentious conversation with Mr. Gessner.

## Effect on Competition

18.    After protracted discussions, SDCC has allowed Champion to continue some semblance of our contractual relationship with United, requiring United to use SDCC employees to perform Trade Show Cleaning Services. This is clearly a losing

5

4

79

3ff7dbee47b4c957

situation for United. I am positive that when our contract with United expires, it will not be renewed by United. Ultimately, with no competition and SDCC as the lone provider of Trade Show Cleaning Services, Champion and other general contractors will be forced to pay more for those services.

19.    Ultimately, SDCC's security policy, as applied to Trade Show Cleaning Services, is very unlikely to cause a trade show to switch shows from San Diego. The shows are locked in years in advance by contract, and the trade association selects the show location not general contractors such as Champion. Since Champion directly contracts for Trade Show Cleaning Services and not the trade association, and because increased Trade Show Cleaning Services costs will be lost in the midst of other cost fluctuations from year to year, this policy unlikely to cause a location change. Champion will thus have to absorb the price increase itself or pass it on to the trade associations and/or exhibitors.

Pursuant to 17 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___10/26/07___
            Date

Mark Epstein

6

4

80

Ex 10 p 430

Trial Exhibit 2  Page 6

# EXHIBIT 11

Jennifer Sutherland, PricewaterhouseCoopers
Thursday, March 26, 2009





Market Demand Analysis                                                                                    1

SDCC115421

Ex 11 p 431

Trial Exhibit 1018 Page 1

10|8

Jennifer Sutherland, PricewaterhouseCoopers
Thursday, March 26, 2009





Market Demand Analysis

2

SDCC115422

Ex 11 p 432

Trial Exhibit 1018  Page 2

Jennifer Sutherland, PricewaterhouseCoopers
Thursday, March 26, 2009



### SDCC Continues to Operate at or Above Practical Maximum Occupancy

| Conventions & Trade Shows | Fiscal 2003 | Fiscal 2004 | Fiscal 2005 | Fiscal 2006 | Fiscal 2007 |
|---|---|---|---|---|---|
| Events | 70 | 76 | 66 | 83 | 76 |
| Attendance | 426,797 | 512,515 | 516,011 | 543,260 | 641,255 |
| Room Nights | 703,446 | 710,817 | 660,658 | 637,099 | 729,258 |
| Exhibit Hall Occupancy | 54.5% | 61.4% | 63.4% | 56.2% | 67.4% |

| All Events | Fiscal 2003 | Fiscal 2004 | Fiscal 2005 | Fiscal 2006 | Fiscal 2007 |
|---|---|---|---|---|---|
| Events | 231 | 233 | 224 | 261 | 220 |
| Attendance | 810,784 | 895,358 | 860,058 | 950,760 | 983,706 |
| Room Nights | 708,319 | 714,519 | 675,308 | 648,184 | 738,758 |
| Exhibit Hall Occupancy | 65.1% | 75.2% | 66.0% | 58.8% | 79.1% |

Market Demand Analysis

3

SDCC115423

Ex 11 p 433

Trial Exhibit 1018  Page 3

Jennifer Sutherland, PricewaterhouseCoopers
Thursday, March 26, 2009

## SDCC Future Bookings Remain Strong
### (2010-2012 bookings should increase
### as many events not yet confirmed)

| Conventions & Trade Shows | Fiscal 2008 | Fiscal 2009 | Fiscal 2010 | Fiscal 2011 | Fiscal 2012 |
|---|---|---|---|---|---|
| Events | 69 | 60 | 53 | 46 | 32 |
| Attendance | 621,675 | 533,502 | 506,350 | 462,200 | 313,772 |
| Room Nights | 721,907 | 709,888 | 829,125 | 846,295 | 521,194 |
| Exhibit Hall Occupancy | 66.1% | 58.4% | 59.8% | 48.0% | 38.5% |

| All Events | Fiscal 2008 | Fiscal 2009 | Fiscal 2010 | Fiscal 2011 | Fiscal 2012 |
|---|---|---|---|---|---|
| Events | 114 | 72 | 54 | 47 | 33 |
| Attendance | 858,270 | 702,502 | 546,350 | 502,200 | 453,772 |
| Room Nights | 724,846 | 711,188 | 829,125 | 846,295 | 521,194 |
| Exhibit Hall Occupancy | 76.2% | 65.0% | 63.5% | 51.1% | 42.4% |



Market Demand Analysis

4

SDCC115424

Ex 11 p 434

Trial Exhibit 1018  Page 4

Jennifer Sutherland, PricewaterhouseCoopers
Thursday, March 26, 2009

## SDCC Proximate Hotel Supply – ¼ Mile

| Center | Location | Hotel Rooms |
|---|---|---|
| Sands Expo & Convention Center | Las Vegas, NV | 23,058 |
| Mandalay Bay Convention Center | Las Vegas, NV | 12,976 |
| Moscone Center | San Francisco, CA | 6,628 |
| San Diego Convention Center | San Diego, CA | 6,303 |
| Henry B. Gonzalez Convention Center | San Antonio, TX | 6,127 |
| Washington State Convention & Trade Center | Seattle, WA | 5,293 |
| Orange County Convention Center | Orlando, FL | 5,186 |
| Anaheim Convention Center | Anaheim, CA | 4,904 |
| Las Vegas Convention Center | Las Vegas, NV | 4,206 |
| Morial Convention Center | New Orleans, LA | 3,917 |
| Colorado Convention Center | Denver, CO | 3,524 |
| Washington Convention Center | Washington, D.C. | 2,722 |
| Phoenix Convention Center | Phoenix, AZ | 2,471 |
| Salt Palace Convention Center | Salt Lake City, UT | 2,070 |
| Miami Beach Convention Center | Miami, FL | 2,016 |
| George R. Brown Convention Center | Houston, TX | 1,920 |
| Hawaii Convention Center | Honolulu, HI | 1,774 |
| Georgia World Congress Center | Atlanta, GA | 1,740 |
| Vancouver Convention & Exhibition Center | Vancouver, BC | 1,633 |
| Long Beach Convention & Entertainment Center | Long Beach, CA | 1,587 |
| Los Angeles Convention Center | Los Angeles, CA | 1,481 |
| Dallas Convention Center | Dallas, TX | 238 |



Market Demand Analysis

5

SDCC115425

Ex 11 p 435

Trial Exhibit 1018  Page 5

Jennifer Sutherland, PricewaterhouseCoopers
Thursday, March 26, 2009





Market Demand Analysis                                                    6

SDCC115426

Ex 11 p 436

Trial Exhibit 1018  Page 6

Jennifer Sutherland, PricewaterhouseCoopers
Thursday, March 26, 2009





Market Demand Analysis                                                    7

SDCC115427

Ex 11 p 437

Trial Exhibit 1018  Page 7

Jennifer Sutherland, PricewaterhouseCoopers
Thursday, March 26, 2009





Market Demand Analysis                                                        8

SDCC115428

Ex 11 p 438

Trial Exhibit 1018  Page 8

Jennifer Sutherland, PricewaterhouseCoopers
Thursday, March 26, 2009



Market Demand Analysis

9

SDCC115429

Ex 11 p 439

Trial Exhibit 1018  Page 9

# EXHIBIT 12

# DRAFT


## MAYOR'S CITIZEN TASK FORCE
### on the san diego convention center project

- Final Report -



**August 2009**

1

SDCC115466

## Table of Contents

Introduction ................................................................................. 3

Task Force Findings and Recommendations ................................................ 5

I.      The San Diego Convention Center:  An Economic Engine ......... 16

II.     Market Demand and the Feasibility of an Expansion .................. 20

III.    Impact of the Economic Downturn on the Convention Industry.. 33

IV.     Public Access, Resource Conservation &Waterfront Enhancements...39

V.      Program for Proposed Convention Center Expansion ................. 45

VI.     Financing Options ...................................................................... 54

VII.    Potential Economic Impact......................................................... 64

VIII.   Public Comments and Letters ..................................................... 65

Appendices.................................................................................. 69
    •   Appendix One: Task Force Mission............................................. 70
    •   Appendix Two: Task Force Committee Chairs and Members ..... 71
    •   Appendix Three: Meeting Schedule............................................. 73
    •   Appendix Four: Overview of Tourism Marketing Districts, Business
        Improvement Districts and Lease-Revenue Bonds ...................... 75
    •   Appendix Five: Agendas and Meeting Notes Web Site; Presentations Web
        Site; Other Meeting Documents and Reports; and Public Comments and
        Letters Web Site........................................................................ 78
    •   Appendix Six: Overview of Possible Revenue Sources............... 79

SDCC115467

Ex 12 p 441

Trial Exhibit 1021  Page 2

## Introduction

### About the Task Force & Mission

In January 2009, San Diego Mayor Jerry Sanders formed the Mayor's Citizen Task Force on the Convention Center Project to evaluate and recommend the necessary steps to ensure San Diego's ability to retain and enhance its market position in the convention and meeting industry.

Mayor Sanders gave the following charge to the Task Force:

- To review the state of the convention and meeting industry, San Diego's success and profile among its competitive set, and evaluate the market demand for an expanded facility.

- To review and evaluate the feasibility of an expansion to the current Convention Center and related developments or enhancements and the impact on generating new jobs; and to identify key issues related to public access, resource conservation and waterfront enhancement.

- To identify and evaluate various financing options for an expanded convention center that relies mainly on revenues generated by the Convention Center and/or related developments or enhancements.

- To encourage public comment on the convention center project by holding meetings at locations and times accessible to the public.

- To present a final set of findings and recommendations to Mayor Sander's no later than September 2009. All meetings be conducted in accordance with the Brown Act.

Over the course of eight months, the Task Force conducted the following:

- Launched and maintained a web site, www.conventioncentertaskforce.org where all materials were posted and public comments could be made to the Task Force.

- Encouraged public and stakeholder participation.

- Convened 11 times at various times and locations, and held at least one meeting in each of the eight City Council Districts.

- Had 12 industry analysts and consultants present studies and industry trends during Task Force meetings. We encouraged and received a range of viewpoints and

3

SDCC115468

Ex 12 p 442

Trial Exhibit 1021   Page 3

- Received numerous comments regarding the various topics under discussion by the Task Force.

## Task Force Members

### Co-Chairs

Cheryl Kendrick, Co-Chair          Stephen Cushman, Co-Chair

### Members

- Richard Bartell
- Susie Baumann
- Gordon Boerner
- Patrick Duffy
- Bill Evans
- Pete Garcia
- Lorena Gonzalez
- Lani Lutar

- Fred Maas
- Mike McDowell
- Vince Mudd
- Bob Nelson
- Bill Sauls
- Mark Steele
- Diane Takvorian

## Contents of this Report

This report incorporates a summary of the Task Force's final work and recommendations. We believe the recommendations will ensure that Mayor Sanders has the information and facts to help guide his future actions related to expanding the San Diego Convention Center.

4

SDCC115469

Ex 12 p 443

Trial Exhibit 1021 Page 4

## Task Force Findings and Recommendations

### Mission

The mission of the Mayor's Citizen Task Force on the Convention Center Project is to evaluate and recommend to Mayor Sanders the necessary steps required to ensure San Diego's ability to protect and expand local jobs and retain and enhance its current market position in the convention and meeting industry.

### Charge & Findings

To review the state of the convention and meeting industry, San Diego's success and profile among its competitive set, and evaluate the market demand for an expanded facility;

> **Finding: It is the view of the Taskforce that an expanded Convention Center would provide a significant positive economic impact to our City and region.**

To review and evaluate the feasibility of an expansion to the current Convention Center and related developments or enhancements and the impact on generating new jobs;

> **Finding: It is the view of the Taskforce that expansion of the Convention Center is feasible and that new jobs will be generated.**

To identify and evaluate various financing options for an expanded convention center that relies mainly on revenues generated by the Convention Center and/or related developments or enhancements;

> **Finding: It is the view of the Taskforce that various financing options have been identified and evaluated relative to Convention Center Expansion.**

To identify key issues related to public access, resource conservation and waterfront enhancement;

The role of the Task Force has not been to review design and planning issues, however brief presentations have been made to illustrate site capacity and potential massing of Phase 3 which have identified some overall design subjects of concern. Recognizing that the impact of Phase 3 on the public realm surrounding the Convention Center is important to the Citizens of San Diego and influences their City's relationship to the bay;

> **Finding: It is the view of the Task Force, that in order to respect and improve public access and environmental conditions at the**

5

SDCC115470

Ex 12 p 444

Trial Exhibit 1021   Page 5

waterfront, urban design, sustainability and environmental guidelines should be adopted for the design of Phase 3.

To encourage public comment on the convention center project by holding meetings at locations and times accessible to the public;

*Finding: It is the view of the Taskforce that our meetings have been accessible and public comment encouraged.*

To present a final set of findings and recommendations to Mayor Sander's no later than September 2009. All meetings will be conducted in accordance with the Brown Act.

**Recommendation: Based on seven months of testimony and presentations it is the view of the Taskforce that we recommend to the Mayor that, based on the findings herein, he: more specifically define the scope and cost of the proposed Convention Center expansion project; work with the primary stakeholders to identify the revenue and financing necessary to bring it to fruition; then move forward on the expansion of the Convention Center.**

SDCC115471

Ex 12 p 445

Trial Exhibit 1021   Page 6

## Executive Summary

In January 2009, San Diego Mayor Jerry Sanders formed the Mayor's Citizen Task Force on the Convention Center Project to evaluate and recommend the necessary steps required to ensure San Diego's ability to retain and enhance its current market position in the convention and meeting industry. Fifteen members of the public have served 8 months, attended 11 meetings, and heard 00 professional presentations and numerous comments from the public in an effort to complete our evaluation and make our recommendations. Attached to this summary document are the documents and presentations that were given to the Taskforce over its tenure. They are provided as reference and resource to our conclusions here.

The San Diego Convention Center has proven to be a powerful economic engine for the City of San Diego and the entire local region. Since opening in 1989 it has hosted over 4,000 events that utilized more than 10 million hotel room nights. It is estimated that the economic impact of these events has been more than $17 billion to the region. Currently, more than 12,000 local jobs are directly connected to, or indirectly supported by, events held in the current facility. In addition, the convention center has been a catalyst for substantial change within our community, helping to transform downtown into a vibrant urban setting, complete with hundreds of restaurants, shops, entertainment venues and attractions that not only serve visitors but local residents as well.

As the numbers and concepts submitted above are a significant, measurable return on investment to our community, it is important to establish that the San Diego Convention Center is not a tourist attraction. In fact, the meeting and convention business has relatively little to do with the leisure sector that makes up the bulk of tourism here and throughout most of the world. Conventions and convention centers are more closely aligned with business and economic development than tourism. The nexus between the meetings and convention market and leisure tourism is the common need for accommodations, transportation and other destination amenities. Meetings and conventions are typically a business-to-business enterprise, focused on unique markets, reached through unique messaging, and not consumer driven like tourism; a single sale of a meeting can generate thousands of visits. Following this model, the San Diego Convention Center has proven to be an efficient and effective economic engine that delivers multiple levels of economic impact throughout our community.

Yet, while the convention industry is not about tourism, it nevertheless supports tourism, in many different ways. First, meetings and conventions grow the visitor base by attracting people who are coming to town to attend their event, not necessarily having chosen our destination exclusively on its own merits. As a result, the convention attendees are typically incremental visitors consisting of people who might otherwise not come at all. And it's not just that they come, it is when they come – often at times of the year when other kinds of visitors can't or won't. This off-season and incremental business helps support and maintain the tourism infrastructure and jobs, such as hotels, attractions, and transportations services so that they are plentiful and available to support all of the other types of visitors. Additional benefits delivered by convention attendees

7

SDCC115472

Ex 12 p 446

Trial Exhibit 1021  Page 7

include pre-or-post-event tourist experiences, return visit opportunities, and community prestige generated by a major national or international event.

The premise and measure of success of publicly funded municipal convention facilities is not without its critics. In an examination of the convention business and city and state spending on host venues, Heywood Sanders, PhD, a professor from the Department of Public Administration at the University of Texas at San Antonio, in a 2005 Research Brief published by the Brookings Institute finds that, "conventions are big business, attracting free-spending visitors booking downtown hotel rooms, eating at restaurants, and thronging theaters and night spots. At any rate, that's the theory. So in the last decade, state and local governments have made massive commitments to tourism and conventions as part of their central economic development strategies. From Atlanta to Austin, Charlotte to Chicago, cities, states, and public authorities have invested billions in an arms race with competing cities to lure conventions and their attendees to new or expanded convention centers. Many of these same places have also invested in publicly-owned hotels, new and expanded airports, and downtown-oriented rail transit systems, all designed to support their hunt for conventions and trade shows.

"However, while the supply of exhibit space in the United States has expanded steadily, the demand for convention and tradeshow exhibit space, and the attendees these events and space bring to a city, has actually plummeted. Many cities have seen their convention attendance fall by 40 percent, 50 percent, and more since the peak years of the late 1990s. The sharp drop has occurred across a range of communities, including a number of the historically most successful convention locales in the nation." Yet Dr. Sanders concludes his brief by acknowledging "there is no doubt that local meeting and event space provides an important public amenity for communities of all sizes. And few would disagree that even large-scale convention centers can be an asset for **certain highly competitive cities**, and certainly for the industries and visitors they host." (Emphasis added)

Dr. Sanders is right, not every city, Austin or Charlotte, Bemidji or Boise, or any of the dozens of other proud municipalities, that are second, third or even fourth tier meetings markets, can successfully support a major convention venue. But he recognizes that "certain highly competitive cities," like San Diego can be and are successful for reasons that go far beyond bricks and mortar. The San Diego Convention Center, over its 20 year history, has a demonstrated track-record of attracting valuable meetings and conventions to our destination, and then leveraging the venue, first-class service, and the West Coast "wow" factor to establish relationships that ensure their return. They have been so successful that an expansion of the Center completed in 2001 can no longer meet the current demand. According to Michael Hughes of Tradeshow Magazine, San Diego Convention Center has the brand, team, track record, experience, location, demographics, airport and hotel partners, but NOT the venue size to compete at the highest level of the convention and tradeshow industry.

The Mayor has asked what it would take to attain that highest competitive level. To that end we have attempted to succinctly address the Mayor's charge in this document and in the supporting documents and information.

8

SDCC115473

*To review the state of the convention and meeting industry, San Diego's success and profile among its competitive set, and evaluate the market demand for an expanded facility.*

State of the convention and meeting industry –

- Historically, the convention and exhibition industry experiences a 10 to 12 year business cycle that moves through expansion to peak, into slowdown then recovery, before expanding again. The current state of the convention and meeting industry, as with the economy in general, is in a period of slowdown, and is expected to recover with the economy. And while the current recession is having a negative impact on attendance, number of exhibitors, and association spending the long term importance of conventions and tradeshows remains unchanged to their underlying industries.

- Large conventions and tradeshows are not immune to economic downturns but they are the most resilient types of meeting events by far. In fact attendance rebounded quickly (2 Qtrs.) following the 1991 recession. After 9/11, the industry began to grow in early 2003, with strong growth until the first quarter of 2008.

San Diego's success and profile among its competitive set –

- Few major conventions and tradeshows are launched annually, therefore, the "supply of demand" is relatively static. Yet, San Diego has been able to effectively compete for the finite number of available conventions with several well documented features and benefits, that include:
  - o Authentic city experience, with optimal weather
  - o Great, unique convention district, hotels; good hotel supply near SDCC
  - o Tourism amenities, Waterfront area, Gaslamp, etc.
  - o Diverse business community; demographics
  - o One of the closest convention centers to a major airport
  - o Well respected and experienced SDCC staff
  - o SDCC high occupancy, near full capacity, demonstrates user confidence

- Nationally, there has been a 25 year convention center building and expansion boom, which is still underway. As a result, available convention center space in the United States has grown by 95%, nearly doubling over the twenty-year period 1988 to 2008. During this growth, in addition to publicly owned facilities, hotels have invested aggressively in convention and meeting facilities (i.e., Gaylord, Las Vegas, and other leading hotel owners/managers).

- This expansion and building boom, while slowed by the current recession, continues with 5.8 million square feet of new space in the pipeline.

- San Diego Convention Center Competitive Set Expansion Planning and Build-out

9

SDCC115474

Ex 12 p 448

- o McCormick Place in Chicago added 500,000 sq. ft. of exhibit and meeting space in 2007 (to reach a total of 2.7 million sq. ft.)
- o Phoenix Convention Center added over 400,000 sq. ft. in 2008
- o Anaheim Convention Center is studying expansion/renovation
- o Las Vegas Convention Center is planning a major $800 million renovation (on hold)
- o San Jose McEnery Convention Center is studying expansion/renovation
- o Washington State Convention Center in Seattle is studying expansion/renovation
- o Ernst N. Morial Convention Center in New Orleans is planning a renovation
- o Salt Palace Convention Center in Salt Lake City expanded in 2006 to 700,000 sq. ft.
- o Los Angeles Convention Center and Staples Center district – new hotels and LA Live project
- o Moscone Convention Center in San Francisco-a 25% expansion with 180,000 square feet of new meeting space.

- When measured by gross square feet, the San Diego Convention Center is ranked 24th nationally among all venues. And most importantly, by the same measure, is ranked 8th among its primary competitors in the West.

- The most vocal critic of publicly funded convention centers, Dr. Heywood Sanders of the University of Texas at San Antonio, when asked by Taskforce members about SDCC's relative performance against its competitors, characterized San Diego as a "conundrum," because it did not fit his profile of failed or failing convention centers across the country. In 2004, when asked about the then three year old expansion of SDCC he paid San Diego a backhand compliment in an interview, "(T)here are two places that have historically done well in expanding their convention business: that's Las Vegas and Orlando. And historically, they have managed to grow their business with great regularity. New Orleans for a long time in the 1990s seemed to be successful. Anaheim and San Diego may, but because of a lack of available information that I've been able to get my hands on, it's not entirely clear. But there's something in common certainly about the first two of them, and to some extent, about the other three, that's worth noting."

- General Success Factors for Convention Centers:
  - o Center able to meet market expectations
  - o Strong and visible reputation for quality
  - o A balanced destination package
  - o Attractive destination to drive attendance
  - o Business, academic, professional links
  - o Center well integrated with the city
  - o Responsive to evolving trends (flexibility)
  - o Diversified business base

- What's Driving San Diego's Success?
  - o Center "delivers the destination," West Coast wow factor
  - o High service, facility standards
  - o Facility evolved with market opportunity

SDCC115475

Ex 12 p 449

Trial Exhibit 1021  Page 10

- o  Hotel growth has kept pace
- o  Integration of center precinct / city
- o  Highly focused marketing process
- o  Diversified business base
- o  Community engagement and support

- • Established Centers Have an Advantage
    - o  They have a business history as a base for their projections
    - o  They understand how various destination components interact
    - o  They have a "captive" sample as a base for accurate survey data
    - o  They understand their clients evolving needs
    - o  Lost business reports quantify demand

*Market demand for an expanded facility –*

- • For the past several years market demand has surpassed the current supply of space the building offers.  In fact, 39.7% of prospective customers that do not book SDCC attribute that decision to "Center Unavailable," or a lack of space. As a result SDCC is losing many highly desirable, and lucrative events to our competitor cities.

- • These loses are not only existing business outgrowing the building, but fresh, new business that would like to come to San Diego, but simply can not be accommodated because the building is too small. While it is not assumed that all lost business would eventually be captured as a result of the proposed expansion, the additional space would allow SDCC to aggressively compete for new business from among a pool of customers desiring (demanding) to come to San Diego. Over the recent past, this pool of lost business translated into substantial prospective room nights:
    - o  810,000 room nights lost in 2006
    - o  975,000 room nights lost in 2007
    - o  705,000 room nights lost in 2008

- • There are over 100 major shows that need between 600,000 and 800,000+ gross square feet of exhibit space (expanded size) that average 20,000+ in attendance. Annually booking only three to five of these types of new events alone would make the expansion successful in terms of new economic impact.

- • It is an industry idiosyncrasy that there are really only about 20 weeks of the year that meeting planners consider "prime" for major meetings and conventions, and as a result of the current size limitations, 40% of SDCC's "lost business" can't get prime dates in the Winter, Spring and Fall. Expansion will create demand through flexibility, with the opportunity to hold a range of events simultaneously, such as two large events that require 300,000 to 400,000 gross square feet each.

11

SDCC115476

Ex 12 p 450

Trial Exhibit 1021  Page 11

- Customer (meeting planner) interviews unequivocally reflect a perception that San Diego is one of the most desirable (in demand) destinations in North America for meetings business. This is borne out by the Center's occupancy data that far exceeds the national average.

- Demand will be generated by keeping current clients that are growing, and will grow again following the recession, in San Diego – this would be particularly true of major medical shows that rotate through the country's other leading venues.

- Summary Points of Demand as Presented by Dr. Heywood Sanders:
  o Center is operating at or above practical maximum capacity
  o Loss of potential business most frequently due to lack of available dates/space
  o San Diego's hotel supply has continued to expand
  o Competitors are moving forward with enhancements
  o Past and potential customers have expressed interest in an expanded Center
  o Past events have and existing events are at risk of outgrowing the Center
  o There is room night loss from these events outgrowing the Center
  o Center has outperformed many of its competitors and the industry

*To review and evaluate the feasibility of an expansion to the current Convention Center and related developments or enhancements and the impact on generating new jobs; and to identify key issues related to public access, resource conservation and waterfront enhancement.*

- The San Diego Convention Center generates high valued visitors. There were more than 630,000 registered attendees for primary events at the SDCC during 2007. Including non-registered friends and relatives in the event attendee's travel group, there were an estimated 743,000 SDCC visitors to San Diego. About 84% (625,500 est.) of the SDCC visitors reported hotel accommodations in San Diego and they reported an average of almost 1.4 people per room. The average length of hotel stay was 3.73 nights generating an estimated 1,688,000 total hotel room nights during 2007.

- The 630,000 primary event attendees spent an average of $1,462 each in San Diego (vs. $458 for all other overnight visitors). This generated total direct spending of almost $921 million in San Diego. Lodging spending generated by SDCC primary events totaled nearly $374 million including about $35.5 million in transient lodging taxes.

- There is a convention and tradeshow "ecosystem" in San Diego that benefits greatly from the success of the SDCC, delivering economic benefit far beyond the convention center and hotels. That "ecosystem" represents:
  o Visits to Restaurants        92%
  o Other Entertainment          52%
  o Shopping                     44%
  o Stay-over Post-event         25%

12

SDCC115477

Ex 12 p 451

- o Pre-Event Sight-seeing — 19%
- o Cultural & Education — 17%
- o Sports Events — 12%
- o Other Activities — 10%
- o Outdoor Recreation — 6%
- o Family Events — 2%

- Of 381 events turned away,
  - o 89% could be accommodated by an expansion of 225,000 sq. ft.
  - o 82% could be accommodated by an expansion of 175,000 sq. ft.

- Architects presented a proposal for a feasible contiguous expansion on the 5th Avenue site that features:
  - o 197,665 sq ft. Exhibition Hall on Level 2
  - o 108,000 sq. ft. Meeting Room(s)
  - o 80,000 sq. ft. Ballroom
  - o 154' Overall Building Height
  - o Creative suggestions for
    - Public Access – an elevated pedestrian bridge over Harbor Dr.
    - Resource Conservation – rooftop solar generated electricity
    - Waterfront Enhancement – retail promenade at the waterfront

- Assuming an expansion of 225,000 sq. ft. of Exhibit Space and a total of 1,219,400 sq. ft. of Indoor Rentable Space, the annual economic impacts are projected to be:
  - o Economic Impacts:
    - $372 Million per year in Direct Spending.
    - $698 Million per year in Countywide Economic Impact
    - 6,885 new permanent jobs created
  - o Hotel Sector and City Tax Revenues:
    - $155.6 Million per year in gross room sales for hotels
    - $17.1 Million per year in Direct City Tax Revenues
      - $16.3 Million per year in Transient Occupancy Tax
      - $ 0.8 Million per year in Sales Tax

- The goal for SDCC is to host more large shows (that don't fit currently); and host more events simultaneously; and make move-in/move-out more efficient, therefore the highest probability for success could be expected from an expansion that utilizes contiguous space.

- A non-contiguous building if it is further than directly across the street, is not an expansion by definition to meeting planners – it would result in two completely different venues; basically no major conventions and tradeshows (or consumer shows) would book both venues at the same time.

- 86% of convention and tradeshow producers say their IDEAL convention center has the primary exhibition hall in one building, on one level.

13

SDCC115478

Ex 12 p 452

Trial Exhibit 1021  Page 13

- 61 % of Convention Center GM's surveyed in 2009 responded with "all in one facilities" when asked, "(W)hat types of new convention center new build and expansion projects will be the most common going forward?"

- Fundamental assumptions to financing/funding the Convention Center expansion:
    - Do not utilize any General Fund revenue not currently utilized or obligated for Convention Center Bond debt service;
    - Revenue for expansion must come from sources that have a nexus of benefit from the expanded Center;
    - Revenue available for Center expansion, may not be available for other civic purposes because it may only be available due to a direct measurable benefit.

- Construction Consultant Estimates: (as of July 6, 2009)
    - Gross square footage 1,266,719 GSF
    - Building cost $710.8 million
    - Pedestrian bridge cost $41.9 million
    - Total Cost $752.7 million

- Possible Revenue Sources (to meet bond obligation):
    - Adjacent, new convention center hotel
        - Residual cash flow
    - Convention Center Retail
        - Net income
    - Convention Center Hotel Business Improvement District Assessment
        - By geographic proximity to Center
    - Convention Center Entertainment District Assessment
        - All non-hotel businesses, by geographic proximity to Center
    - Convention Center Restaurant Business Improvement District Assessment
        - By geographic proximity to Center
    - Convention Center Parking District (BID)
        - By geographic proximity
    - Convention Center Taxi District
        - Drop-off/Pick-up Surcharge
    - Rental Car Surcharge
    - Convention Center Service Contractor Fee
    - Incremental Convention Center Parking Fees
        - 100% of all above 2007 baseline
    - Contribution of land and other concessions from Unified Port of San Diego

- The American Hotel & Lodging Industry Association, in its report *IMPACT of Room Tax Increases on the Lodging Industry*, concludes that, "non-travel earmarked uses of bed taxes do not benefit tourism and act only as a travel deterrent by increasing a guest's cost without attracting more guests." That "the negative impact of bed taxes can be mitigated if they are used for travel

14

SDCC115479

promotion." And that "a number of markets designate a portion of the bed tax to support convention and visitors bureaus, travel advertising and other activities aimed at increasing travel and tourism."

***To encourage public comment on the convention center project by holding meetings at locations and times accessible to the public;***

- Over the course of 8 months the Citizens Taskforce on the Convention Center Project:
  - o Launched and maintained a web site, www.conventioncentertaskforce.org where all materials were posted and public comments could be made to the Task Force;
  - o Encouraged public participation;
  - o Met 11 times at the following times and locations; (Add list of locations)
  - o These locations represent at least one meeting in each of the 8 City Council Districts;
  - o Had 00 speakers from the public participate in Public Comment;
  - o Received 00 correspondence/written comments regarding the activities of the Taskforce.

SDCC115480

Ex 12 p 454

Trial Exhibit 1021  Page 15

## I.) The San Diego Convention Center: An Economic Engine

*Finding: It is the view of the Taskforce that an expanded Convention Center would provide a significant positive economic impact to our City and region.*

The San Diego Convention Center has been a powerful economic engine for the City of San Diego and the entire local region. Since opening in 1989 the facility has hosted over 4,000 events that utilized more than 11 million hotel room nights. It is estimated that the economic impact of these events has been more than $18 billion to the region. Currently, more than 12,000 local jobs are directly connected to or indirectly supported by events held in the current facility.

In addition, the convention center has been a catalyst for substantial change within our community, helping to transform downtown into a vibrant urban setting, complete with hundreds of restaurants, retail shops, entertainment venues and attractions that not only serve visitors but local residents as well.

It is important to consider that conventions and convention centers are more closely aligned with business and economic development than tourism, according to industry expert Rod Cameron who presented "Making Sense of Today's Convention Industry" to the Task Force. Meetings and conventions are typically a business-to-business enterprise and are not consumer driven like tourism. In fact, a single booking of a convention and meeting can generate thousands of visits to the City. Following this model, the San Diego Convention Center has proven to be an efficient and effective economic engine that delivers multiple levels of economic impact throughout our community.

While the convention industry is not primarily about tourism, it nevertheless supports tourism in many ways. The nexus between the meetings and convention market and leisure tourism is the shared need for hotel accommodations, transportation and other destination amenities. Meetings and conventions grow the visitor base by attracting people who come to town to attend events, not necessarily having chosen our destination exclusively on its own merits. As a result, convention attendees are typically incremental visitors consisting of people who might otherwise not visit the City at all.

Meetings and conventions are also often held at times of the year when other kinds of visitors do not visit the City. This off-season and incremental business helps support and maintain the tourism infrastructure and jobs at hotels, attractions and transportation providers. Additional benefits derived from convention attendees include pre- or post-event tourist experiences, return visits, and the community prestige generated by hosting a major national or international event.

These event attendees and "business tourists" help support a meeting and convention "ecosystem" of jobs, services and facilities in San Diego. The heart of this ecosystem is the San Diego Convention Center, which delivers economic benefit well beyond the activities in the Center and hotels. According to a January 2009 study of U.S. convention

16

SDCC115481

Ex 12 p 455

Trial Exhibit 1021  Page 16

and tradeshow producers conducted by Tradeshow Week, the following activities represent the behavior of at least 25% of event attendees when they are "in-town" for an event:

- Visit restaurants: 91%
- Participate in "Other Entertainment": 52%
- Shopping: 44%
- Stay Over in the City or Region Post-Event: 25%
- Arrive Early for Pre-Event Site-Seeing: 19%
- Cultural and Educational Activities: 17%
- Sports Events: 12%
- Outdoor Recreation: 6%
- Family Events: 2%
- Other Activities: 10%

The same survey found that event producers estimate that 17% of their event attendees bring a spouse or friend with them to the event host city.

## San Diego Convention Center Record of Success

The results over the last two decades tell a story of success that has made San Diego the envy of our competition in the meeting and convention industry:
- $18.3 billion in regional economic impact.
- $7.6 billion in direct attendee spending.
- $364.4 million in tax revenues.
- 11 million hotel room nights for city hoteliers.
- Over 1,000 conventions and trade shows.
- More than 3,000 other community and local events.
- 15.8 million guests, including 7.7 million out-of-town visitors who spend money in our hotels, restaurants and attractions, infusing fresh dollars into our local economy.

Conventions translate into results for taxpayers. And an expansion would increase both economic impact and tax revenue at a time when new sources of revenue to fund city services are needed.

## San Diego Convention Center Visitor Profile

The San Diego Convention Center generates both high value and high spending visitors. According to the 2007 San Diego Visitor Profile Study by CIC Research, there were more than 630,000 registered attendees for primary events at the San Diego Convention Center during 2007. Including non-registered friends and relatives in the event attendee's travel group, there were an estimated 743,000 San Diego Convention Center visitors to San Diego. About 84% (625,500 est.) of the San Diego Convention Center visitors reported hotel accommodations in San Diego and they reported an average of almost 1.4 people per room. The average length of hotel stay was 3.73 nights generating an

17

estimated 1,688,000 total hotel room nights during 2007. This clearly shows that while the facility only reports an estimated 744,782 hotel room nights, in reality due to people that book "outside of the block" the Center is generating an estimated 1.688 million room nights.

The 630,000 primary event attendees spent an average of $1,462 each in San Diego (vs. $458 for all other overnight visitors). It is important to note that these are the highest value visitors for San Diego as they spend three times more than the typical tourist.

| Average Attendee & Visitor Spending | |
|---|---|
| Per SDCC Attendee | $1,462 |
| Per SD Overnight Visitor | $458 |

These visitors generated total direct spending of almost $921 million in San Diego. Lodging spending generated by San Diego Convention Center primary events totaled nearly $374 million including about $35.5 million in transient lodging taxes.

Convention Center visitors spend money throughout the local economy in hotels, restaurants, shops. According to CIC Research, Inc., the table below outlines the significant spending by category by convention attendees compared to traditional visitors.



Spending in San Diego* SDCC Attendees v. Overnight Visitors

| | Lodging | Assoc./Exhibitor Co. (Loc. Imp.) | Meals & Bev. | Air Travel (Loc. Imp.) | Shopping | Trans. (Loc. Grd.) | Amus./ Rec | Misc./ Conv./ Gros. |
|---|---|---|---|---|---|---|---|---|
| SDCC | $594 | $378 | $188 | $101 | $86 | $48 | $42 | $25 |
| SD Overnight | $167 | $25 | $97 | $42 | $53 | $13 | $36 | $25 |

Source: CIC; * Spending by category includes all applicable taxes and tips.

18

SDCC115483

Ex 12 p 457

Trial Exhibit 1021  Page 18

### A Critical Part of Downtown Redevelopment

The San Diego Convention Center has been and is expected to continue to be a key driver
of downtown redevelopment. The Center helps contribute to new revenues to fund
essential city services.

Jeff Graham, Assistant VP of Redevelopment with the Center City Development
Corporation presented "A Vision for the Future" to the Task Force which outlined the
redevelopment impact. According to Mr. Graham, the Convention Center has served as
an anchor for downtown redevelopment and holds the key to our city's future economic
success. The Convention Center has been a catalyst for revitalizing a blighted and often
forgotten downtown. It transformed the area into a vibrant and exciting place that
visitors and locals both enjoy. New restaurants, shopping and beautification programs
were launched, and thousands of jobs were created. New hotels sprang up along
Tideland Property and in the City center to support Convention Center events. The
Gaslamp Quarter has gone through a renaissance and boasts over 100 casual and fine
dining options, boutiques and galleries, arts and cultural venues, and world-class
entertainment. These businesses generate millions of dollars in tax revenue for the Port
to serve the public interests and for the City of San Diego's general fund.

As a result of the Phase II Convention Center expansion completed in 2001, hotel
development boomed. A few of the new hotel projects developed in the last five years
include:
- Omni San Diego
- Hotel Solomar
- Hard Rock Hotel
- US Grant (restoration project)
- Hilton San Diego Bayfront

It is clear that the San Diego Convention Center is a vital part of the San Diego economy.
Opened in 1989, then expanding in 2001, the convention center has helped make San
Diego one of the top 10 convention and meeting destinations in North America. With
tourism being the third largest industry in San Diego, the focus of the Mayor's Task
Force was to evaluate and recommend the necessary steps to ensure the City's ability to
retain and enhance its strong market position and continue to be a critical engine
economic development.

SDCC115484

Ex 12 p 458

Trial Exhibit 1021  Page 19

## II.) Market Demand and the Feasibility of an Expansion

**Finding: It is the view of the Taskforce that an expanded Convention Center would provide a significant positive economic impact to our City and region.**

One of the critical questions examined by the Task Force focused on if there is sufficient demand by conventions, tradeshows and meetings to drive significant new economic impact for an expanded San Diego Convention Center.

The specific requirement from Mayor Sanders was:

- **To review the state of the convention and meeting industry, San Diego's success and profile among its competitive set, and evaluate the market demand for an expanded facility.**

A number of industry consultants and analysts presented studies to the Task Force on convention and meeting industry trends and San Diego's current industry standing and projected demand for an expansion. The studies found that there is indeed strong market demand by convention, tradeshow and meeting planners for an expanded San Diego Convention Center. A summary of these findings and opinions are provided in this section of the report.

### The San Diego Convention Center – An Industry Leader

Michael Hughes with Tradeshow Week presented an overview of the convention and tradeshow industry and San Diego's standing in the industry to the Task Force. Some of the key issues impacting the San Diego Convention Center include:
- The Center is operating at or above practical maximum capacity.
- The loss of potential business is most frequently due to lack of available dates/space.
- Past and potential customers have expressed interest in an expanded Center.
- Past events have and existing events are at risk of outgrowing the Center.
- San Diego's hotel supply has continued to expand.
- There is hotel room night loss from these events outgrowing the Center.
- Competitors are moving forward with venue expansions and enhancements.
- Center has outperformed many of its competitors and the industry.

Michael Hughes pointed out that few major conventions and tradeshows are launched annually and therefore, the "supply of demand" is relatively static. Yet, San Diego has

SDCC115485

Ex 12 p 459

Trial Exhibit 1021  Page 20

been able to effectively compete for the finite number of available conventions with several well documented features and benefits that include:

- An authentic city experience, with optimal weather.
- A unique convention district with excellent hotel supply near the Convention Center.
- World class tourism amenities, Waterfront area, Gaslamp, etc.
- Diverse business community and professional demographics.
- One of the closest convention centers to a major airport.
- High Center occupancy, near full capacity, demonstrating user confidence.

In short, the City of San Diego and the San Diego Convention Center are leading convention and meeting destinations and are held in high standing by event planners. But more exhibition space capacity is needed. Michael Hughes also pointed out that it can be argued there is a disconnect in San Diego between the level of convention hotel room capacity and exhibition space. When measured by gross square feet, the San Diego Convention Center is ranked 24th nationally among all venues. Additionally, the City is ranked 8th among its primary competitors in the West in terms of total number of hotel rooms near-by the Convention Center. This is actually a good development as meeting and convention planners require quality hotel capacity near-by their convention centers.

;DCC115486

Ex 12 p 460

Trial Exhibit 1021 Page 21

## Projected Performance vs. Actual Performance

The track record shows that the original convention center development and the Phase II expansion in 2001 were highly successful. The table below outlines the projected performance vs. actual when the original Convention Center was planned, then opened and the second expansion against projections.

### Convention Center Original Projections vs. Actual Performance

|  | Gladstone[1] | 93-97 Actuals[2] |
|---|---|---|
| Primary Event Attendance | 372,860 | 282,133 |
| TOT[3] | $11,465,689 | $11,971,057 |
| Primary Events | 35 | 53 |

Source: Gladstone

### Convention Center Expansion: PricewaterhouseCoopers Original Projections vs. Actual Performance

|  | PricewaterhouseCoopers | Actual |
|---|---|---|
| Primary Business Attendance | 430,000[4] | 553,455[5] |
| TOT[6] | $11,381,202 | $24,865,010 |
| Exhibit Hall Occupancy | 55.0% | 73.1% |

Source: PricewaterhouseCoopers

## Building Occupancy

One of the key indicators of a convention facility's success is building occupancy. In Fiscal Year 2008, the San Diego Convention Center reached an occupancy rate of 71.6%, well beyond 60%, considered in the convention industry as a metric for a facility being fully occupied. In fact, the venue turns away business. Almost since the Phase II expansion opened the venue has been at maximum capacity. It is important to note that no facility ever reaches 100% occupancy, due to brief closures for maintenance, holidays, and the difficulty of booking back-to-back events because of move-in and move-out

---

[1] Amounts are stabilized year estimates per Gladstone study.
[2] Gladstone amount provided ($4,840,000.) has been escalated to mid-point of stabilized years (FY 1995) and at 9.0% hotel tax rate.
[3] Amounts are averages from initial stabilized years (FY 1993 - FY 1997) and calculated at 9.0% hotel tax rate.
[4] Amounts are "midpoint" estimates from PwC 1991 Expansion Analysis.
[5] PwC amount provided ($5,141,000) is in 1991 $'s and at 9.0% hotel tax rate, then increased based on current 10.5% hotel tax rate and escalated annually through "mid-point" (FY 2006) of Actual column using Smith Travel Research San Diego County Hotel ADR annual escalation factor
[6] Amounts are averages from post-Expansion stabilized years (FY 2004 - FY 2008).

22

SDCC115487

Ex 12 p 461

Trial Exhibit 1021  Page 22

schedules which vary widely.  San Diego continues to outpace the competition in building occupancy. The national average for similar size facilities is just over 44%.



**Market, Feasibility and Impact Analysis for the Proposed San Diego Convention Center Expansion**

As the graphic below illustrates, attendance has increased steadily since 2003, dipping slightly due to the current recession.  The chart also shows how strong the Convention Center attendance has been for National and State conventions and tradeshows which represent the largest and most important sector of the convention and meetings industry. These represent the key sector because they tend to be the largest events with the highest hotel room night requirements and many of these events are owned by associations which have to meet annually as part of their charters.  The competition for National conventions and tradeshows is the fiercest in the country due to their size and stability.  Corporate conventions and meetings, while also an important industry segment, are more cyclical as they are more closely tied to specific corporate performance and the economy.

23

SDCC115488

Ex 12 p 462

Trial Exhibit 1021  Page 23

## Attendance at SDCC Primary Event Types



The total number of hotel room nights resulting from events held at the Convention Center between 2003 to 2009 are presented in the chart below. Room night bookings have performed well even during the 2008-2009 recession. In fact, the past three years have been stronger than the 2004 to 2006 period.

## Total Number of Hotel Room Nights Utilized (2003-2009)



24

SDCC115489

## The Impact of Technology

The impact of technology on the convention and meeting industry was a topic of discussion among the Task Force, the public and presenters. The discussions focused on two central questions:

1. How has technology impacted the convention and meeting industry?
2. Will the increasing use of the Internet, and specifically online meeting technology, reduce the attendance at shows, thus reducing the size of the events and the need for an expansion?

Research compiled by Tradeshow Week was presented showing that technology has been used increasingly to help promote, market and facilitate events. Event management has used the web and digital media to create and extend relationships with exhibitors, attendees, sponsors and other partners. A copy of the detailed survey was distributed to the Task Force and is contained beginning on page 15 of the May 2009 Tradeshow Week "Space Available" report.

A much more significant impact of technology on the industry is the growing use of third party travel planning sites on the Internet (Travelocity, Expedia, Hotels.com, etc.) by attendees to locate and book hotel rooms outside of the traditional room block created by show management. As a result of this trend, it has become increasingly difficult for show managers and convention centers to accurately track the total amount of hotel room nights used for a given event hosted at a facility. In his presentation to the Task Force, Heywood Sanders said:

*"What is intriguing about these to me is after the expansion, how the primary attendance number rises very rapidly, but the hotel room night number does not show much of an increase from the peak years in the 1990s. This has for me, for a very long time presented an intriguing kind of analytical conundrum. Part of the reason, obviously, and this is taken from the PricewaterhouseCoopers report is that several large events, notably Comic-Con, the two ASR trade expos and the Rock N' Roll marathon, generate large attendance volumes without necessarily generating very many hotel room nights."*

However, several of the Task Force members raised concerns and objections to Mr. Sanders claims. Below are some of the minutes from the Tuesday, May 26, 2009 Task Force meeting covering the issue of hotel room blocks and Convention Center booking performance.

• Comment re: Impact of out-of-block dynamics on hotel room night tracking was addressed by Task Force member Mike McDowell. Mr. McDowell reminded Task Force members that he had specifically asked Heywood Sanders' about "out of block" dynamics in tracking hotel room nights however, Mr. Sanders did not answer. (Mr. Sanders argued in his presentation that hotel room night growth was flat). Mr. McDowell shared his experience in dealing with the impact of the Internet in how attendees book hotel rooms outside the pre-arranged block. Task Force members Bill Evans and Patrick Duffy agreed with Mr. McDowell and said

25

in their experience a minimum of 30 percent of hotel rooms used by attendees at meetings and conventions are booked outside the hotel room block (using the internet with 3rd party travel sites like hotels.com, Expedia, Travelocity, etc.) As a result, a large group of hotel rooms used by events booked cannot be directly tracked back to the event. Mr. McDowell also referenced two different studies completed by CIC Research of two primary events at the Convention Center in 2008 which showed out-of-block rates of 22% and 45%. Additionally, Mr. Evans and Mr. McDowell explained the impact of Convention Center events on countywide hotel occupancy, how events in the Convention Center cause "compression" resulting in increased revenue and occupancy, thus increased tax revenues from rooms outside the downtown core into Mission Valley, Shelter Island and North County.

• Mr. McDowell also addressed comments made by Mr. Sanders in his presentation when he stated that events like Comic Con, Action Sports Retail and Rock-n-Roll Marathon generate large attendance but do not necessarily generate large hotel room demand. Mr. McDowell explained how the four days of Comic Con are the highest occupancy and revenue days for hotels in the County of San Diego consistently from year to year. He explained that there was no doubt that Comic Con, which draws more than 126,000 attendees, utilizes many more hotel room nights than the 20,000 hotel room nights reported as part of the room block by the Convention Center.

### Hotel Room Occupancy Rates

Data from Smith Travel Research show that San Diego's hotels have performed well but that the recession brought down occupancy rates to near 60% in March 2009 from 80% in 2008. An expanded Convention Center will create demand through flexibility, with the opportunity to hold a range of events simultaneously, such as two large events that require 300,000 to 400,000 gross square feet each. These increased bookings will drive higher hotel occupancy and reduce hotel room night "peaks and valleys" due to more efficient event scheduling move-ins and out. This steadier stream of visitors will also help restaurants, retail stores, entertainment destinations and transportation providers.

### Monthly Occupancy Rates of San Diego Core Hotels

26

SDCC115491

## Event Projections

ERA has projected the expansion to add 13 national or state conventions and tradeshows by 2016, and a total of 36 events over the same period. The consulting firm projects a reduction in the number of events if the Convention Center is not expanded.

As mentioned in other parts of this report, the Primary Events – National and State conventions and tradeshows, and corporate meetings – represent the largest and most important sector of the convention and meetings industry. These are the largest events with the highest hotel room night requirements.

| | Average 2003-2007 | Fiscal Year 2009 | No Build Scenario (~ 2016) | Expansion Projections (~ 2016) |
|---|---|---|---|---|
| **Number of Primary Events** | | | | |
| National / State Conventions and Tradeshows | 51 | 62 | 55 | 75 |
| Corporate Conventions | 13 | 10 | 10 | 15 |
| Total Primary Business | 64 | 72 | 65 | 90 |
| | | | | |
| **Number of Secondary Events** | | | | |
| Local Trade Shows | 10 | 9 | 10 | 12 |
| Consumer Shows | 11 | 16 | 10 | 13 |
| Meetings, Community Events, Food & Bev. | 153 | 152 | 150 | 170 |
| Total Secondary Business | 174 | 177 | 170 | 195 |
| | | | | |
| Total Number of Events | 238 | 249 | 235 | 285 |

Source: San Diego Convention Center Corporation, ERA (2009)

Source: SDCCC historical data, ERA projections.   ERA | AECOM

## Lost Business

Besides the ERA estimates of the risk of reducing the total number of events, there is a cost of doing nothing and it is already seen in "lost business" reports maintained by Convention Center management. For the past several years market demand has surpassed the current supply of exhibit space in the building. In fact, 39.7% of prospective customers that do not book the San Diego Convention Center attribute that decision to "Center Unavailable," or a lack of space. As a result the San Diego Convention Center is losing many highly desirable and lucrative events to our competitor cities.

These loses are not only existing event clients that are outgrowing the building, but new business that would like to come to San Diego but simply can not be accommodated

SDCC115493

Ex 12 p 467

Trial Exhibit 1021  Page 28

because the building is too small. While it is not assumed that all lost business would eventually be captured as a result of the proposed expansion, the additional space would allow the San Diego Convention Center to aggressively compete for new business from among a pool of customers desiring to come to San Diego. Over the recent past, this pool of lost business translated into substantial prospective room nights:

- 810,000 room nights lost in 2006
- 975,000 room nights lost in 2007
- 705,000 room nights lost in 2008

According to the San Diego Convention Center, 381 events have been turned away due to lack of exhibit space or dates. Of these events, 89% could be accommodated by an expansion of 225,000 square feet and 82% could be accommodated by an expansion of 175,000 square feet.

### San Diego Convention Center Customer and Client Interviews and Analysis

ERA conducted interviews with clients which are summarized in this section. In fact the verbatim analysis has been copied below. The research findings show the strength among the convention and meeting planner community for San Diego as a destination.

ERA completed telephone interviews with a number of meeting and event executives who are familiar with the San Diego Convention Center. ERA interviewed groups that are regular users of the SDCC, groups that have booked but may no longer be able to book in the future due to lack of space, and "lost business" groups.

ERA contacted more than 90 representatives of past and potential events. In the end, we were able to conduct interviews and/or correspond with a total of 26 meeting and event executives, some of whom represent multiple events on behalf of third-party groups. Approximately 25 percent of the responses were considered to be "lost" events, and the remaining are either future users or currently booked events. The results of these interviews are described below.

ERA's executive interviewing research has unequivocally confirmed the attractiveness of San Diego as a convention destination.

### Lost Business Surveys

Of the facility's "lost" events, most reported not using the San Diego Convention Center due to its lack of space and available dates, as well as "other" reasons that often included the cost of the facility and/or local hotels. These events were primarily conventions or combination conventions and trade shows.

DCC115494

Ex 12 p 468

Trial Exhibit 1021  Page 29

San Diego was stated by many to be the top West Coast location and would be the number one pick on a rotation if they had more square footage of exhibit space. It was stated to be important to have more exhibit space than Los Angeles and Anaheim.

Though many of the groups stated that they need between 550,000-650,000 square feet of exhibit space (preferably contiguous), at least 30 percent of the lost business interviewees stated that their group could not use San Diego without 1 million square feet of total exhibit space. These groups also need at least 150,000 square feet of meeting space and between 50-100 individual breakout rooms. A couple groups also stated that they need a 100,000 square foot ballroom. Exhibit halls were explained to not be suitable for ballroom functions.

The second most common reason for lost business was the lack of ability to obtain preferred dates. Especially difficult have been the spring and fall months. The lack of available dates for many years into the future is representative of strong demand and a potential need for expansion. The expanded facility will considerably open the number of date's available and booking capacity of the Center.

Top facility competitors listed by the lost business groups are: Orlando, Atlanta, Las Vegas, Houston and Chicago. San Diego and Boston are noted to be the two large biotech hubs and are important to that industry.

### Booked Events Surveys

Of the facility's events that are currently booked to be held at the San Diego Convention Center in the future, and/or have recently been held at the facility, the most common reason for selecting San Diego was its general destination appeal and draw for attendees. The next-most common responses were San Diego's location and its hotel inventory. Most booked events that responded were conventions or combination conventions/trade shows, although a few were meetings and conferences. The main intent of the booked events interviews was to identify these events' interest in using the expansion facility on its own in the future or in conjunction with the existing facilities space as well as understand prevailing industry trends.

In terms of customer service, knowledgeable staff, physical location and strong collaboration from city partners, San Diego is listed in the top three event centers among current and future users of the facility.

Though many groups consider San Diego their preferred conference location, there has been a serious issue with lack of availability. Some groups have stated that they are not able to get into San Diego for the next 6 years. It is especially difficult for those groups with annual conferences between July and November.

Most user groups stated that San Diego has one of the best hotel packages in the U.S., but that rates are often too high. Given the reduction in many group's 2009 and 2010

SDCC115495

Ex 12 p 469

Trial Exhibit 1021  Page 30

budgets, the cost of hotel rates is going to be a key factor in deciding where groups book in the future. A couple groups stated that if they were not able to get favorable hotel rates, they might have to consider moving their events to second tier cities which offer lower facility rental fees and discount hotel packages.

At least 30 percent of the groups are outgrowing the facility and expect not to be able to use the SDCC by 2012-2016. Many groups increase the amount of necessary square footage by 10-20 percent per year. Groups that are not outgrowing the facility usually book San Diego on a 3, 4 or 6 year rotation given that dates are available.

## Additional Comments from ERA Interview Respondents

In general, most respondents indicated that they love meeting in San Diego and cite the city's draw as a major plus for their events. Most groups have San Diego as part of their top 5 desired locations and most see it is as the top west coast locale.

Venue meeting planner, client, and prospect interviews unequivocally reflect a perception that San Diego is one of the most desirable destinations in North America for meetings business. This is borne out by the Center's occupancy data that far exceeds the national average.

## New Market Opportunity

According to Tradeshow Week, there are over 100 major conventions, tradeshows and meetings that need between 600,000 and 800,000+ gross square feet of exhibit space that average 10,000+ in attendance. Annually booking only three to five of these types of new events alone would make the expansion successful in terms of new economic impact.

| Number of Events | Attendance | Opportunity |
|---|---|---|
| 100 major conventions, tradeshows and meetings require between 600,000 and 800,000 gross square feet of exhibit space | Average 10,000+ in attendance | Annually booking only three to five of these types of new events alone would make the expansion successful in terms of new economic impact. |

Source: Tradeshow Week Research

It is an industry idiosyncrasy that there are primarily only about 20 weeks of the year that meeting planners consider "prime" for major meetings and conventions, and as a result of the current size limitations, 40% of San Diego Convention Center's "lost business" can't get prime dates in the Winter, Spring and Fall.

CC115496

Ex 12 p 470

Trial Exhibit 1021  Page 31

## Convention Centers Throughout the Country Continue to Expand

Nationally, there has been a 25-year convention center building and expansion boom, which is still underway. As a result, available convention center space in the U.S. has grown by 95%, nearly doubling over the twenty-year period 1988 to 2008, according to Tradeshow Week. In addition to municipal facilities, hotels have invested aggressively in convention and meeting facilities (e.g., Gaylord Entertainment, various Las Vegas hotels and resorts, and other leading hotel companies).

This venue expansion and building boom, while slowed by the current recession, continues with 5.8 million square feet of new space in the pipeline. San Diego's western regional competitive set as well as other major convention centers throughout the U.S. have aggressively expanded – often multiple times – over the past few decades to remain competitive. The table below lists a number or recent or in-process new buildings and expansions across the U.S.

### San Diego Convention Center Competitive Set Recent or Current Expansions

| Convention Center | Recent or Current Expansion |
|---|---|
| McCormick Place in Chicago | Added 500,000 sq. ft. of exhibit and meeting space in 2007 (to reach a total of 2.7 million sq. ft.) |
| Phoenix Convention Center | Added over 400,000 sq. ft. in 2008 |
| Anaheim Convention Center | Studying expansion/renovation |
| Las Vegas Convention Center | Planning a major $800 million renovation (on hold) |
| San Jose McEnery Convention Center | Studying expansion/renovation |
| Washington State Convention Center in Seattle | Studying expansion/renovation |
| New Orleans Morial Convention Center | Planning a renovation |
| Salt Palace Convention Center in Salt Lake City | Expanded in 2006 to 700,000 sq. ft. |
| Los Angeles Convention Center, Staples Center district | New hotels and LA Live project |
| Moscone Convention Center in San Francisco | 25% expansion with 180,000 square feet of new meeting space. |

Source: Tradeshow Week

32

SDCC115497

Ex 12 p 471

Trial Exhibit 1021  Page 32

## III.) Impact of the Economic Downturn on the Convention Industry

In light of the recession, the Task Force discussed the impact of the economic downturn on the convention industry. There was also discussion concerning whether business people are changing their meeting behavior such as using online or video conferencing that make large shows less desirable.

The table below illustrates how the convention and tradeshow industry rebounded following the last recession in 2001. Attendance at the annual shows in the Tradeshow 200, the top 200 U.S. tradeshows ranked by net square feet, increased by 3.5% in 2005, 3.1% in 2006, and 1.6% in 2007. Conventions and tradeshows track the industries that they serve and collectively the overall health of the U.S. economy.

**Tradeshow 200 Growth Rates 1998 to 2008**

| Year | Net Square Feet | Exhibiting Companies | Attendees |
|------|-----------------|----------------------|-----------|
| 2008 | -1.6% | -2.7% | -3.0% |
| 2007 | 2.5% | 2.3% | 1.6% |
| 2006 | 2.6% | 1.4% | 3.1% |
| 2005 | 3.2% | 1.5% | 3.5% |
| 2004 | 2.3% | 2.8% | 2.5% |
| 2003 | -0.7% | 1.2% | 3.4% |
| 2002 | -6.0% | -2.6% | -4.4% |
| 2001 | -1.3% | -2.0% | -4.5% |
| 2000 | 3.2% | 3.4% | 2.8% |
| 1999 | 2.8% | 1.1% | 4.4% |
| 1998 | 5.2% | 3.4% | 2.4% |

Source: Tradeshow Week 200

33

SDCC115498

Ex 12 p 472

Trial Exhibit 1021  Page 33

The graphs below show how quickly conventions and tradeshows – the Convention Center's primary event types – rebounded following the past two recessions in 1991 and the 2001/2002 period. The industry rebounds were also driven by attendees.





34

SDCC115499

Ex 12 p 473

Trial Exhibit 1021  Page 34

After the very challenging period for tourism and business travel following 9/11, the hotel industry began to grow by 2003 and started to boom by 2004.



Recent survey data of major event exhibitors and attendees is provided below which speaks to the positive outlook for major events.

**Corporate Exhibitor Outlook**

Even in light of the current recession, the outlook for large conventions and tradeshows, those that use 200,000 gross square feet of exhibit space or more, is good. According to a recent Tradeshow Week survey, 69% of corporate exhibitors said the importance of large conventions and tradeshows to their companies is expected to remain the same or greater to over the next few years.

**Attendee and Buyer Outlook on Conventions and Tradeshows**

Research conducted in June 2009 by Tradeshow Week has found that 96% of CEOs and other senior executives say they are attending their industry's most important events this year.

In the face of the challenging economic environment, Tradeshow Week surveyed a cross-section of executives and managers in a range of industry sectors that attend or have

35

SDCC115500

Ex 12 p 474

Trial Exhibit 1021  Page 35

attended business events. A total of 323 executives and managers responded to the survey. Forty-eight percent of the respondents were company owners, CEOs, presidents or other senior executives.

The findings indicate that in a challenging economy it is even more important to keep up-to-date with industry trends, see new products and services, and maintain and build relationships -- all areas in which events provide significant value and efficiency. In short, attending leading conventions and tradeshows during a recession keeps executives informed and competitive.

As one event attendee said about going to events, "If you don't keep up with what is going on in your business, a recession can keep you going down." A different attendee commented, "(Going to the show) is actually a savings in travel costs. All my suppliers and potential suppliers are available at one venue." And another provided this reason to attend in a recession, "We still have to keep up with changes in the industry and be prepared for the upswing."

A series of questions on the value of events received highly positive responses, including:

- A significant 89% of the survey respondents said they are going to the most important events in their industry.

- Eighty-eight percent of attendees said they consider conventions and tradeshows to be an important part of their product sourcing and buying process.

- Eighty-seven percent agree that conventions and tradeshows are essential for comparing products and meeting suppliers in person.

- Fifty-four percent said that smaller crowds at events this year have enabled them to be more efficient when at the show.

- Fifty percent of attendees said that missing key events may negatively impact their future personal or organizational performance.


### Reasons for Attending Conventions and Tradeshows

The survey asked attendees their reasons for attending conventions and tradeshows this year. The top reasons are "keep up-to-date on trends and issues", followed by "see new products", "network" and "see many companies at once".

Interestingly, the survey found that 52% of attendees said they go to shows to "see products in person first seen online". This finding fits with recent corporate buying trends. Increasingly, product information gathering and research starts on the internet and ends with the purchase made online. Events are becoming important in the middle of

36

SDCC115501

Ex 12 p 475

the buying process as buyers need to "touch and feel" products and assess people behind brands.

| Reasons for Attending Shows | % of Attendees |
|---|---|
| Keep up-to-date on trends and issues | 84% |
| See new products | 82% |
| Network | 70% |
| See many companies at once | 70% |
| Create and strengthen relationships and partnerships | 68% |

Source: Tradeshow Week

### Travel Budget Outlook

Today travel budgets are under scrutiny in nearly every industry. Yet 59% of attendees believe their travel budgets will rebound within a year after seeing an economic or sales turnaround, and 42% say their company's travel budgets will increase within six months after spotting the recovery.

### Outlook

Based on additional Tradeshow Week research, attendees have a more positive outlook for events than exhibitors. For example, the number of exhibiting companies participating at tradeshows dropped at a faster rate (13.3%) than attendance in the second quarter of 2009 (10.4%). This is due to corporations having aggressively cut marketing, event, staffing and other budgets to get out in front of weak economic trends.

Even with tighter exhibitor budgets, the attendee survey findings suggest that the outlook for conventions and tradeshows is good. Consider that 84% of attendees say they will participate in more or the same number of conventions and tradeshows over the next two years. And that an even more significant 88% of respondents said that conventions and tradeshows will continue to be a critical part of their product sourcing and buying process over the next five years.

During the worst economic downturn in decades, attendees and buyers continue to see the value of participating in conventions and tradeshows. They know that missing key events may pose a competitive disadvantage. Following the past two recessions in the early 1990s and 2000s attendance growth rebounded relatively quickly. These survey results suggest another attendee-lead recovery will happen over the next few years.

CDCC115502

Ex 12 p 475.1

Trial Exhibit 1021  Page 37



Survey Question: "Do you agree that conventions, tradeshows and conferences will continue to be a critical part of the business-to-business product sourcing and buying process over the next 5 years?"

No, 12%

Yes, 88%

Source: Tradeshow Week

### Recent San Diego Convention Center Booking Performance

Concern was raised that the economic downturn would significantly impact the future performance of the convention center. Convention center staff provided a year to year comparison detailing the key performance metrics from FY08 and FY09. The results showed continued market strength in definite bookings with a substantial increase in tentative future bookings. According to Andy Mikschl, Senior Vice President of Sales for the Convention Center Corporation, historically about half (50%) of tentative bookings are converted into definite event bookings.

### April Year to Date Sales Activity Report

**PRIMARY MARKET:**

Conventions, Trade Shows, Corporate & Incentive Events

| | APRIL 09 | COMPARISON APRIL 08 | CUMULATIVE FYTD 2009 | COMPARISON FYTD 2008 |
|---|---|---|---|---|
| EVENTS | | | | |
| ATTENDANCE | 44,500 | 43,000 | 139,844 | 141,700 |
| DIRECT ATTENDEE SPENDING | $78,034,500 | $81,226,700 | $196,823,996 | $202,028,824 |
| EVENTS | 11 | 12 | 118 | 73 |
| ATTENDANCE | 455,900 | 765,200 | 843,344 | 925,500 |
| ROOM NIGHTS | 217,952 | 144,571 | 1,737,845 | 994,673 |
| DIRECT ATTENDEE SPENDING | $252,313,500 | $284,163,400 | $1,354,506,696 | $1,708,032,592 |

Within 2 COMIC-CON bookings.

SDCC115503

Ex 12 p 476

Trial Exhibit 1021  Page 38

## IV.) Public Access, Resource Conservation and Waterfront Enhancements

**Finding: It is the view of the Task Force, that in order to respect and improve public access and environmental conditions at the waterfront, urban design, sustainability and environmental guidelines should be adopted for the design of Phase 3.**

The Mayor's charge to the Task Force included identifying key issues related to public access, resource conservation and waterfront enhancements. The role of the Task Force has not been to review design and planning issues, however brief presentations have been made to illustrate site capacity and potential massing of an expansion which have identified some overall design subjects of concern. The Task Force recognizes the impact of a Phase III expansion on the public realm surrounding the current Convention Center is important to the Citizens of San Diego and influences their City's relationship to the bay. It is the view of the Task Force, that in order to respect and improve public access and environmental conditions at the waterfront, urban design, sustainability and environmental guidelines should be adopted for the design of Phase 3.

Below is a summary of information contained in presentations on the conceptual design of the expansion to the Task Force that contain suggested opportunities for enhancements to public access to and from the waterfront and convention center, identify opportunities for resource conservation and waterfront enhancements.

### Public Access

In the presentation by TSA/HNTB Architects, the Task Force was provided a brief analysis of urban design issues and opportunities that were incorporated in their analysis of the site selection and conceptual design. Specifically, the review considered view corridors, open space, and pedestrian and vehicular circulation.

39

*Access: Pedestrian, Service, Vehicle Diagram*



*View Corridors Diagram*



Pedestrian access to both the Convention Center and Marina Park is both enhanced and improved for safety with the addition of a pedestrian bridge from MLK Park adjacent to the Hilton Gaslamp Hotel connecting the existing Skywalk over the Convention Center, and continuing over to Marina Park. The bridge will also enhance public access to the top terraces of the proposed expansion.

40

SDCC115505

Ex 12 p 478

Trial Exhibit 1021  Page 40

*Diagram of the Proposed Pedestrian Bridge from 4ᵗʰ Avenue to Marina Park*

 

*Conceptual Rendering of the 4ᵗʰ Avenue Pedestrian Bridge.*



41

SDCC115506

Ex 12 p 479

Trial Exhibit 1021  Page 41

## Resource Conservation

The preliminary conceptual design of the expansion limited the amount of detail and discussion presented to the Task Force on sustainability issues. However, the presentation included reference to the architectural and design goals of achieving a minimum of "silver rating" from the US Green Building Council LEED certification. The elements discussed as potential opportunities included:

- Maximizing the incorporation of "natural light" in the design;
- Use of "gray" water;
- Incorporation of an on-site water treatment system;
- Incorporation of a photo voltaic system similar to what is current being pursued on the original building;
- Incorporation of a "green" roof on the expansion as shown in the conceptual renderings;
- Incorporation of recyclable materials;
- Minimizing the use of domestic water demand from the City;
- Use of high efficient mechanical systems;
- Use of sensors to adjust lighting levels, and
- Selection of high efficiency low energy use lighting fixtures.

The specific details and analysis of various sustainable features should be investigated during the design phase. Below is a conceptual rendering of the expansion that includes a "green roof" and solar array.



## Waterfront Enhancements

The conceptual renderings included design elements in the expansion to enhance pedestrian safety and views of the Convention Center by screening the current loading docks, separating service vehicles from pedestrians in order to provide a the pedestrian experience and public serving amenities along the bayside promenade.

42

SDCC115507

Ex 12 p 480



**Water Transportation Center**

In order to maximize the site for the program elements, the current water transportation facility located on the 5th Avenue Landing leasehold will be incorporated into the expanded facility and located adjacent to retail along the Promenade.

**Retail**

The Task Force was asked to identify key issues related to waterfront enhancements as part of their effort. In response to this charge, Concept A includes approximately 49,000 square feet of retail space located along the promenade and on the top of the expanded facility. Greg Mueller, President and CEO of Tucker Sadler Architects characterized this element as an opportunity to "complete the string of pearls running from the Hilton all the way to Seaport Village" on the waterfront to enhance the waterfront experience for visitors and residents.

43

SDCC115508

Ex 12 p 481

Trial Exhibit 1021  Page 43



*Retail Diagram*

44

SDCC115509

Ex 12 p 482

Trial Exhibit 1021  Page 44

## V.) Program for Proposed Convention Center Expansion

This section of the report details the recommendation that the expansion be contiguous, site analysis and recommendation including the program for an expansion, recommended facility size and ancillary developments.

### Recommendation for a Contiguous Expansion

The Task Force recommends that the expansion be contiguous with the current venue. Market experts presented information showing that a non-contiguous building, if it is built further than directly across the street, is not an expansion by definition to meeting planners. In fact, a non-contiguous building would result in two completely different venues. Essentially no major conventions and tradeshows, or consumer shows, would book both venues at the same time.

According to Tradeshow Week, 86% of convention and tradeshow producers say their ideal convention center has the primary exhibition hall in one building, on one level. A survey of convention center General Managers in 2008, found that 61% said "all in one facilities" will be the most common types of new convention center new building and expansion projects going forward.

### Site Analysis and Recommendation

The Task Force received a presentation from Tucker Sadler/HNTB Architects detailing sites considered for a possible expansion of the convention center. For all of the sites considered, a range of criteria were used to evaluate the feasibility of the location.

The following criteria were used:
- Facility Requirements (size, service area, pedestrian access, vehicular access, public transit access, parking, proximity)
- Environmental Criteria (water, air, habitat, acoustic, remediation)
- Urban Design (size and scale, urban space, views to and from site, view corridors, visual connection).
- Constructability
- Cost
- Land Use/Ownership

Between 2003 and 2007, nine sites were identified and eliminated as either not feasible due to cost, the land was no longer available, simply not feasible (ie: building over the bay or railroad yard) or a combination of reasons. The diagrams below identify the nine sites.

3DCC115510

Ex 12 p 483

Trial Exhibit 1021  Page 45



SDCC115511

Ex 12 p 484

Trial Exhibit 1021  Page 46

## 5th Avenue Landing and Tailgate Park Site Options

Two additional sites were evaluated as part of the current study. The first, identified as the 5th Avenue Landing site, is located immediately behind the loading docks of the Phase II expansion and San Diego Bay. The second site identified as the Tailgate Park site is located east of Petco Park along Park Boulevard.



The Tailgate site evaluation found that an active earthquake fault ran through the middle of the proposed site. Six different concepts were evaluated however the site was eliminated as feedback from convention center clients indicated the facility would not meet their primary needs of a contiguous space and was located too far from the current facility to be considered for use by large clients needing more space than currently exists in the current convention center.

 

47

SDCC115512

Ex 12 p 485

Trial Exhibit 1021  Page 47

Additionally, it was determined that to be marketable the Tailgate site would require a minimum of 400,000 square feet of exhibit space as well as meeting space. However, the bulk and scale of a facility of the size necessary to meet the program was deemed as another fatal flaw. The renderings below show the required size and scale of two scenarios in context with the current size and scale of Petco Park. As a result, the Tailgate Park site was eliminated as a viable alternative.

*Tailgate Park Bulk and Scale Diagrams*



The 5th Avenue Landing site plan was identified as the recommended site location for the proposed expansion program. Two design concepts using the 5th Avenue site were studied and presented, one that provided a larger facility, however the building would impact the Hilton leasehold. The second concept provided a somewhat smaller facility using only land within the Fifth Avenue Landing leasehold. After reviewing the required mitigations necessary to build on the larger site, it was eliminated for consideration.

A conceptual plan (Concept A) showing how the expansion would fit on the site was presented. The site was preferred for a number of reasons including:
- Allows for an expansion adjacent to the current facility that allows large groups to utilize the entire building for a single show as well as allowing for multiple large events to use the facility concurrently;
- Provides a functional and direct connection to the existing facility;
- Adds visitor and resident serving retail along the waterfront promenade;
- Creates improved access to and from the facility from the bayside and the Hilton Bayside;

48

SDCC115513

Ex 12 p 486

Trial Exhibit 1021  Page 48

- Improves the waterfront views of the facility by screening loading docks;
- Improves pedestrian access to and from the waterfront.

*Site Plan: Concept A*

## Securing the 5th Avenue Landing Site

The San Diego Convention Center Corporation is in a year-long due diligence process with the Unified Port of San Diego to secure the 5th Avenue Landing leasehold which is on Port tidelands. If the 5th Avenue Landing site is not secured, it will eliminate the last remaining option for an expansion that is contiguous to the current facility.

### Suggested Expansion Program Elements

Concept A incorporates the following major programmatic leasable spaces in five levels:

| Expansion Specifications | Square Feet & Height |
|---|---|
| Total Square Feet of the Exhibition Hall on Level 2 | 197,665 sf |
| Total Square Feet of the Meeting Rooms | 108,000 sf |
| Square Feet of Ballroom Space | 80,000 sf |
| Retail Space (Ground level and 5th floor) | 49,400 sf |

49

SDCC115514

Ex 12 p 487

Trial Exhibit 1021  Page 49

| Overall Building Height | 154' |
|---|---|

Source: Tucker Sadler, HNTB

Architects and design consultants advising the Task Force presented a proposal for a feasible contiguous expansion on the 5th Avenue site.

## Project Overview

| Convention Center Expansion | |
|---|---|
| Gross square footage | 1,266,719 GSF |
| Building cost | $710.8 million |
| Pedestrian bridge cost | $41.9 million |
| Total Cost | $752.7 million |
| Annual retail revenue est. | $4.01 |
| Construction begins | January 2012 |

Source: Piper Jaffray Co., Convention, Sports, and Leisure Intl.
Notes: Construction cost estimates provided by DavisLangdon; Retail revenue estimates provided by London Realty Group; Hotel operating pro-forma provided by PKF Consulting.

*Expansion Conceptual Floor Plans*

50

51

SDCC115516

Ex 12 p 489



52

SDCC115517

Ex 12 p 490

## Hotel Program

A new hotel program has also been discussed and initial information has been provided by consultants, but the Task Force is not making a recommendation with respect to the hotel as part of the report to the Mayor. The Task Force has not determined whether or not construction of a hotel is essential for the success of the expanded convention center. As a result, the materials presented to the Task Force on the proposed Hotel Program will not be included in the body of the report but will be included in the attachments.

53

SDCC115518

Ex 12 p 491

## VI.) Financing Options

**Finding: It is the view of the Taskforce that various financing options have been identified and evaluated relative to Convention Center Expansion.**

Mayor Sanders asked the Task Force to determine the estimated cost of an expansion and identify possible financing options.  Specifically, the charge was:

- **To identify and evaluate various financing options for an expanded convention center that relies mainly on revenues generated by the Convention Center and/or related developments or enhancements.**

The advisors were asked to consider these fundamental assumptions when analyzing the financing:

- Do not utilize any General Fund revenue not currently utilized or obligated for Convention Center Bond debt service, capital replacement or marketing support.

- Revenue for expansion must come from sources that benefit from the expanded Center.

- Revenue available for the Center expansion *would not otherwise be available for other civic purposes as these funds will only be available due to a direct measurable benefit.*

Financial advisors and construction consultants to the Task Force determined the following cost estimates for the proposed expansion and pedestrian bridge.

**Construction Cost Estimates ($000)** [7]

|  | Convention Center | Pedestrian Bridge | Total |
|---|---|---|---|
| Construction Costs | $560,792 | $33,104 | $593,896 |
| Escalation | $26,055 | $1,538 | $27,593 |
| Design Fees and Bond | $42,546 | $2,512 | $45,058 |
| Owner soft costs including land | $81,450 | $4,808 | $86,258 |
| *Total* | *$710,8473* | *$41,962* | *$752,805* |

---

[7] As of July 6, 2009.

SDCC115519

Ex 12 p 492

Trial Exhibit 1021  Page 54

## Convention Center Funding Requirements

### Construction Cost Estimates ($000)

| | Convention Center | Pedestrian Bridge | Total |
|---|---|---|---|
| Construction Costs | $560,792 | $33,104 | $593,896 |
| Escalation | $26,055 | $1,538 | $27,593 |
| Design Fees and Bond | $42,546 | $2,512 | $45,058 |
| Owner Soft Costs including land | $81,450 | $4,808 | $86,258 |
| **Total** | **$710,843** | **$41,962** | **$752,805** |

### Sources and Uses of Funds ($000)

| | Convention Center | Pedestrian Bridge | Total |
|---|---|---|---|
| Sources: | | | |
| Bond Proceeds | $716,081 | $42,313 | $758,394 |
| Interest Earnings | $9,155 | $541 | $9,696 |
| **Total** | **$725,236** | **$42,854** | **$768,090** |
| | | | |
| Uses of Funds: | | | |
| Project Fund Deposit | $710,844 | $42,000 | $752,844 |
| Capitalized Interest | -- | -- | -- |
| Other Reserve Funds | -- | -- | -- |
| Costs of Issuance | $14,392 | $854 | $15,246 |
| **Total** | **$725,236** | **$42,854** | **$768,090** |

| | |
|---|---|
| **Annual Debt Service Cost (1)** | **$57,010** |
| **Projected Annual Retail Revenues** | **($4,013)** |
| **Net Annual Funding Requirement** | **$52,997** |

(1) Assumes pledged revenue sources and any additional support generate a A/A2 bond rating.

### Potential Funding Sources

The firms of PiperJaffray and Convention, Sports and Leisure, Intl. were retained to help the Task Force:

55

SDCC115520

Ex 12 p 493

- Identify and evaluate potential and practical revenue sources;
- Estimate order of magnitude of identified revenue sources;
- Research financing methods of comparable projects;
- Prepare hypothetical plans of finance; and
- Identify and evaluate alternative financing options.

Following their initial presentation to the Task Force on June 15, 2009, the Task Force requested the consultants revise their project assumptions by narrowing the range of funding options to those that had a "nexus" to the Convention Center and were visitor related. Based on that presentation, and additional input from Task Force members who asked that other key funding sources be considered, the Task Force compiled a spreadsheet detailing the potential funding sources. The Task Force makes no representations to the accuracy of these revenue assumptions but has presented them for illustrative purposed based on the testimony presented to them. In addition to the various tax and fee options presented, the Task Force also identified three public entities, the Unified Port of San Diego, CCDC and the County of San Diego, that should be considered as possible sources of funding for an expansion.

### Broad Base Funding Options
- City or Countywide increase in TOT
- City or Countywide increase in sales tax
- Assessment of special sales tax on food and beverage sales (City or Countywide)

### Targeted Funding Options
- Create Tourism Improvement District – additional TOT tax based on proximity to CC (i.e., San Francisco)
- Assessment of food and beverage tax on restaurants near CC
- Extension/Increase in TMD assessment

### Additional Tourist Specific Charges
- Rental car surcharge
- Ticket tax on certain tourist activities (Zoo, Sea World)
- Ticket tax on sports and concert events at Petco Park, Cricket Wireless, Cox Arena
- Charge on taxicab airport drops/pickups

### Property Based and Other Options
- Citywide or Countywide parcel assessment
- Tax increment financing
- State or County government financial assistance; Unified Port of San Diego, CCDC.

### Possible Revenue Sources (to Meet Bond Obligation)

56

**Ex 12 p 494**

SDCC115521

| Source | Type of Revenue |
|---|---|
| Adjacent, New Convention Center Hotel | Residual cash flow |
| Convention Center Retail | Net income |
| Convention Center Hotel Business Improvement District Assessment | By geographic proximity to Center |
| Convention Center Entertainment District Assessment | All non-hotel businesses, by geographic proximity to Center |
| Convention Center Restaurant Business Improvement District Assessment | By geographic proximity to Center |
| Convention Center Parking District (BID) | By geographic proximity |
| Convention Center Taxi District | Drop-off/Pick-up Surcharge |
| Rental Car Surcharge | |
| Convention Center Service Contractor Fee | |
| Incremental Convention Center Parking Fees | 100% of all above 2007 baseline |
| Contribution of Land from Unified Port of San Diego | |

Source: Piper Jaffray Co., Convention, Sports, and Leisure Intl.

57

SDCC115522

Ex 12 p 495

## Possible Revenue Sources

(The task force makes no representations to the accuracy of these revenue assumptions but has presented them for illustrative purpose based on the testimony presented to the task force.)

| Funding Source | Description | Base Unit | Revenue Amount | Tax, Fee or Assessment | Approving Authority | Actions Needed to Implement |
|---|---|---|---|---|---|---|
| Citywide TOT / Citywide BID | Citywide increase of TOT vs. TMD | 1% 2% 3% | $14,700,00 $29,400,000 $44,100,000 | Special Tax | City / TMD Members | TOT requires submit to Voters, 2/3 approval. TMD requires TMD members vote 50+% |
| Downtown TOT / Downtown TMD | Downtown increase of TOT vs. TMD | 1% 2% 5% | $5,160,000 $10,320,000 $15,480,000 | Special Tax | City / TMD Members | TOT requires submit to Voters, 2/3 approval. TMD requires TMD members vote 50%+ |
| Extend or increase existing TMD | Extend or increase existing TMD | % | assessment not defined | Assessment | City/TMD members | Amend/prepare new assessment engineer's report; follow state law and local ordinance procedures for voting on amended plan and related assessment |
| Create new Convention Center BID | Create new Convention Center BID | % | assessment not defined | Assessment | City/proposed BID members | Engage in assessment district formation process per state law and local ordinance |
| Conv. Center Hotel | Adjacent hotel | $ | $0 | Business net profit | City, Port, Coastal Commission approval | Majority approval by each agency |
| Conv. Center Retail | 40,000 sq. ft. Retail component | $ | $0 | Business net profit | | City, Port, Coastal Commission approval |
| Entertainment District BID Assessment | Business Improvement District for all non-hotel businesses | % | no district has been defined | Assessment | City/ BID members | 50%+ vote of BID members |
| Restaurant District BID Assessment | Business Improvement District for all non-hotel businesses. (Assuming 60% sales are food) Percentage of gross food sales: | .05% 1% | $720,000 $1,440,000 | Assessment | City/ BID members | 50%+ vote of BID members |

58

SDCC115523

Ex 12 p 496

Trial Exhibit 1021  Page 58

| Parking BID Assessment - for specific parking jurisdiction | A. Hybrid of BID model to provide greater revenue B. Only incl. parking contractors/business that can self assess C. Inclusion of parking companies in entertainment BID | % | Option not defined | Assessment | City/ BID members | 50%+ vote of Parking BID members |
|---|---|---|---|---|---|---|
| Taxi District - Drop Off/Pick Up (1 of 2) | Drop Off/Pick Up Surcharge | $ | No $ analysis | Fee | City | City Council vote subject to Mayoral veto |
| Taxi District - Airport Taxicab pick-up/drop off (2 of 2) | Airport pick-up/drop off surcharge: per trip | $1 $3 $5 | $1,500,000 $4,500,000 $7,500,000 | Can be a tax or fee | City; subject to limitations, if any, of airport authority's jurisdiction | Tax-submit to voters Fee-City process |
| Rental Car Surcharge | Rental Car Surcharge: per rental | $1 $5 $10 | $1,150,000 $5,750,000 $11,500,000 | Can be a tax or fee depending on primary purpose (revenue or regulation) | City: also potentially Port District and/or Airport Authority | Tax - submit to voters Fee- Processed per City department request/Council approval (may not be applicable to rental operations on Port District/Authority lands) |
| Service Contractor Fee | Service Contractor fee (gross sales in the CC) | 2% | No $ analysis | Fee | | San Diego Convention Center Corporation, City |
| Parking Fees | Incremental parking fees (of all above '07 baseline) | 100% | No $ analysis | Fee | | City; Port of San Diego |
| Downtown food and beverage sales tax | Tax on food/beverage sales in vicinity of Convention Center | 1% 2% 3% | $2,400,000 $4,800,000 $7,200,000 | Special Tax | City (except City cannot impose it's own tax on alcoholic beverage sales) | Tax-submit to 2/3 voter approval |
| Ticket surcharge (tourist attractions) | Ticket surcharge (tourist attractions) | $1 $3 $5 | $5,000,000 $15,000,000 $25,000,000 | Can be a tax or fee | City (may be subject to limitations in leases or other contractual agreements) | Tax - submit to 2/3 voter approval Fee- City Process |

59

SDCC115524

Ex 12 p 497

| Ticket tax/fee (venues) | Ticket tax/fee on particular venues (e.g. PETCO park, Cricket Amphitheater, Cox Arena) | $ | No $ analysis | Can be a tax or fee | · PETCO governed by agreement between City and Padres limiting new taxes, fees or assessments · Cricket located in Chula Vista, CA · Cox Arena on property of CSUSD; may be able to impose tax on types of business conducted there | Tax-submit to 2/3 voter approval Fee-City process |

Source: Piper Jaffray Co., Convention, Sports, and Leisure Intl.

### Public Agencies

| Funding Source | Description | Base Unit | Revenue Amount | Tax, Fee or Assessment | Approving Authority | Actions Needed to Implement |
|---|---|---|---|---|---|---|
| Port of San Diego | Land, rent concessions, other general funding | $ | Unkown | | Port of San Diego | Majority approval by Port |
| CCDC | Tax increment financing | $ | Unkown | | CCDC, City of San Diego | CCDC Board, City Council |
| County of San Diego | General | $ | Unkown | | Board of Supervisor Support | Board Vote |

Source: Piper Jaffray Co., Convention, Sports, and Leisure Intl.

### Visitor Related Funding Options

| Lodging & Restaurant | Unit | Funds Generated |
|---|---|---|
| Citywide TOT or TMD | 1% | $14,700,000 |
| Citywide TOT or TMD | 2% | $29,400,000 |
| Citywide TOT or TMD | 3% | $44,100,000 |

SDCC115525

Ex 12 p 498

Trial Exhibit 1021  Page 60

| | | |
|---|---|---|
| Downtown TOT or TMD | 1% | $5,160,000 |
| Downtown TOT or TMD | 2% | $10,320,000 |
| Downtown TOT or TMD | 3% | $15,480,000 |
| | | |
| Downtown F&B Sales Tax | 1% | $2,400,000 |
| Downtown F&B Sales Tax | 2% | $4,800,000 |
| Downtown F&B Sales Tax | 3% | $7,200,000 |

| Transportation | Unit | Funds Generated |
|---|---|---|
| Rental Car Surcharge | $1 per rental | $1,150,000 |
| Rental Car Surcharge | $5 per rental | $5,750,000 |
| Rental Car Surcharge | $10 per rental | $11,500,000 |
| | | |
| Surcharge – Airport Taxi | $1 per trip | $1,500,000 |
| Surcharge – Airport Taxi | $3 per trip | $4,500,000 |
| Surcharge – Airport Taxi | $5 per trip | $7,500,000 |

| Other | Unit | Funds Generated |
|---|---|---|
| Ticket Surcharge (Tourist Attractions) | $1 per ticket | $5,000,000 |
| Ticket Surcharge (Tourist Attractions) | $3 per ticket | $15,000,000 |
| Ticket Surcharge (Tourist Attractions) | $5 per ticket | $25,000,000 |

**Total Funding Requirements ($000)**

**Funding Requirements:**

| | |
|---|---|
| Convention Center & Pedestrian Bridge | $52,997 |
| Hotel Residual (Stabilized Year) | (8,995) |
| Total Requirements | $44,002 |

**Coverage Factor:**      Requirement

| | |
|---|---|
| 1.25x | 55,000 |
| 1.50x | 66,000 |

61

SDCC115526

Ex 12 p 499

Trial Exhibit 1021  Page 61

## Opportunity Costs

- During Task Force meetings the issue of "opportunity costs" related to spending $759 million on an expansion versus other economic development activities was raised and discussed. The charge limited the Task Force to focus on the convention center and the merits of expansion. In identifying possible funding sources to pay for an expansion, the Task Force focused on identifying funding that would be tied to increased economic activity from events in the expanded facility. As a result, the revenues *would not otherwise be available for other civic purposes as these funds will only be available due to a direct measurable benefit from an expansion.*

## Impact of Various Tax Increases on San Diego's Competitiveness

Lani Lutar, President and Chief Executive Officer of the San Diego County Taxpayers Association presented an analysis of Price Elasticity of Demand. She raised concerns during the August 4th meeting that new taxes could make San Diego less competitive. Lutar provided a comparison of how San Diego tax rates tied to hotels, rental cars and restaurants would compare to San Diego's competitive convention cities if a range of possible revenue sources were adopted.

62

SDCC115527

Ex 12 p 500

Trial Exhibit 1021  Page 62

## VII.) Potential Economic Impact

**Finding: It is the view of the Taskforce that expansion of the Convention Center is feasible and that new jobs will be generated.**

The mission of the Task Force as established by Mayor Sanders was to evaluate and recommend the necessary steps required to ensure San Diego's ability to protect and expand local jobs and retain and enhance its current market position in the convention and meeting industry.

Municipal convention centers are primarily developed to stimulate new direct spending and economic impact in a city and metropolitan area. What is "new" about this spending is that it would not take place in the city if the convention center and related infrastructure was not built. Most of this spending results from event attendees and delegates that are based outside the region visiting the area as a result of an annual event or an event that rotates into the city. Spending is also generated by event managers and corporate exhibitors who spend on show services. These show services are often provided by local union labor.

According to the Task Force's economic consultants the additional economic impacts from an expansion are projected to be significant.[8] Although these estimates are based on a facility slightly larger than the proposed expansion program (225,000 sq. feet of exhibit space vs. 198,000 sq. feet), the projections provide a reasonable estimate of the economic impacts of a proposed expansion.

**Economic Impacts**

|  | Economic Impacts |
|---|---|
| Annual Direct Spending | $372 Million |
| Annual Countywide Economic Impact | $698 Million |
| New Permanent Jobs Created | 6,885 jobs |

Source: Piper Jaffray Co., Convention, Sports, and Leisure Intl.

[8] Assuming an expansion of 225,000 square feet of exhibit space and a total of 1,219,400 square feet of indoor rentable space.

63

SDCC115528

Ex 12 p 501

Trial Exhibit 1021  Page 63

**Hotel Sector and City Tax Revenues**

|  | Tax Revenues |
|---|---|
| Annual Gross Room Sales for Hotels | $155.6 Million |
| Annual Transient Occupancy Tax | $16.3 Million |
| Annual Sales Tax | $0.8 Million |
| Annual Direct City Tax Revenues | $17.1 Million |

Source: Piper Jaffray Co., Convention, Sports, and Leisure Intl.

SDCC115529

Ex 12 p 502

Trial Exhibit 1021  Page 64

## VIII.) Public Comments and Letters

**Finding: To encourage public comment on the convention center project by holding meetings at locations and times accessible to the public.**

A range of concerns were raised from the public in letters and public testimony. These issues included:

- That the building expansion might block views to the bay.
- That it might take public space for private events.
- Any reduction in park space.
- There is a water shortage and it would require more water to operate.
- That we ensure any expansion follow US Green Building Council's LEED certification for environmental standards.

Below are excerpts from some of the public comments and letters to the Task Force.

June 26, 2009

I saw power point phase 3 expansion of SDCC, I believe the hotel project between sdcc and south embarcadero park is a LOUSY LOUSY idea it kills the view and the openness san diego citizens enjoy, I visit seaport village and park 2-3 times a week and walk up and down the promenade. The hotel should go to tailgate park or surrounding vicinity.

Sammy Tejani

-----

June 22, 2009

Attention: Cheryl Kendrick & Stephen Cushman

In the Sunday Union-Tribune, the editorial espouses moving to a realistic funding plan. Let's take a step backward first and look at the whole idea more realistically.

The editorial – and, indeed, the entire development proposal – is predicated on the falsehood that the expansion "...would be a boon to the hotel industry..." which would benefit from increased bookings generated by a larger Convention Center. The project proponents argue that "if we build it, they will come." But this is truly a belief with no hard evidence to back it up. There are only a few mega-conventions at the top of the pyramid; there are many more smaller conferences further down the scale.

...Continued tech advances are diminishing the need for business travel; large convention attendance is sharply reduced; San Diego hotel bookings are down by about one-fourth; the W hotel has just gone into bankruptcy – when was the last time that happened, especially in San Diego? It is obvious that the very nature of the convention industry is changing; San Diego must adjust with it, not simply continue with outdated brick-and-mortar expansions.

...Increasing the TOT to 14.5% would make San Diego's rate higher than Las Vegas (13%), New York City (13.25%) or even LA (14%). Is that fair?

65

SDCC115530

Ex 12 p 503

Trial Exhibit 1021  Page 65

It is growing ever clearer that no viable market exists for an expanded convention center for the foreseeable future.

Michael-Leonard
Creditor

⸺

May 27, 2009

Attention: Cheryl Kendrick & Stephen Cushman

... I for one recommend that additional individuals and organizations be identified who might take a more balanced position and be asked to present to the Task Force as well. This will create a much more transparent process in making a recommendation to the Mayor.

One of the charges is:

• To identify key issues related to public access, resource conservation and waterfront enhancement

To my knowledge this charge has not been addresses yet and will be one that many memebers of the public will be interested in. The existing CC and the subsequent expansion have done an outstanding job of walling off the waterfront from the City. Additional in today's climate of limited natural resources, water shortages and climate change, the way the Convention center positions itself will become extremely imporatnt. is it possible to have a LEED Platinum facility? What about a zero carbo footprint? How WILL the public access the waterfront?

In the recent Red Bull races citizens were removed from the Convention Center steps. Are we to expect more of the same?

What about traffic, parking, bus staging accomodation?

Any expansion of the CC must not cost the City. Subject any agreements to an independent analysis with public vetting.

Charles Karninski

⸺

May 27, 2009

Attention: Cheryl Kendrick & Stephen Cushman

1. COMPOSITION OF THE TASK FORCE This group is supposed to represent diverse interests of San Diego. Taxpayers, the Convention Center's fellow port tenants, the hospitality industry, organized labor, the business and economic development community are here. However, there is nobody to represent the fiscally conservative position of not expanding. Only one person on the panel possibly represents anti-development viewpoint – Ms. Takvorian. This lack of true representation has the effect of turning the panel into a virtual "kangaroo court," totally biased in favor of expansion before even beginning its work...

Michael-Leonard
Creditor

66

-----

May 26, 2009
Attention: Chairman Steve Cushman

Subject: Privatizing Paradise: Comments to Convention Center Expansion Task Force

...Having created a massive concrete wall on the south embarcadero, we proceeded to exacerbate the problem with the first center expansion in the early part of this decade. Now your task force, the convention center corporation and many private parties who stand to make money if the center is further expanded, propose to spread the malignancy by paving over and blocking off even more publicly owned tidelands on downtowns waterfront.

Once again, the public's right to access its own downtown bayfront tidelands would be overridden by special interests seeking to cordon off public space for private gain. Eventually we will have paved over every square inch of the south embarcadero in the name of profits. Imagine if the City of San Diego were to fence off Balboa Park and charge citizens to go there. What you are doing is far worse then that, since downtown's waterfront is a unique place. I know of no other waterfront city in the world that has worked so hard to wall off its bayfront from its own citizen's to benefit private profit-making interests.

Don Wood

-----

May 7, 2009

To the members of the Mayor's Task Force Convention Center Expansion Proposal

I object to the Convention Center Expansion Proposal because it will continue to the walling off of the bay and designate more of our public tidelands to private enterprise. The latest studies report that there is no need for convention expansion especially in this economic climate. Thank you for the opportunity to comment.

Cathy O'Leary Carey

## Comments and Letters in Support of the Expansion

All of the Public Comments and Letters are posted on this web site:
http://www.conventioncentertaskforce.org/MCTFdocs-letters.shtml

## Convention Center Critic on San Diego

The most vocal critic of publicly funded convention centers, Dr. Heywood Sanders of the University of Texas at San Antonio, when asked by Task Force members about San Diego Convention Center's relative performance against its competitors, characterized San Diego as a "conundrum," because it did not fit his profile of failed or failing convention centers across the country. In 2004, when asked about the then three year old

67

expansion of San Diego Convention Center he paid San Diego a compliment in an
interview:

> *"(T)here are two places that have historically done well in expanding their*
> *convention business: that's Las Vegas and Orlando. And historically, they have*
> *managed to grow their business with great regularity. New Orleans for a long*
> *time in the 1990s seemed to be successful. Anaheim and San Diego may, but*
> *because of a lack of available information that I've been able to get my hands on,*
> *it's not entirely clear. But there's something in common certainly about the first*
> *two of them, and to some extent, about the other three, that's worth noting."*

68

SDCC115533

Ex 12 p 506

## Appendices

- Appendix One: Task Force Mission

- Appendix Two: Task Force Committee Chairs and Members

- Appendix Three: Meeting Schedule

- Appendix Four: Agendas and Meeting Notes Web Site; Presentations Web Site; Other Meeting Documents and Reports; and Public Comments and Letters Web Site

SDCC115534

Ex 12 p 507

**Appendix One:  Task Force Mission**

<u>Mission</u>

The mission of the Mayor's Citizen Task Force on the Convention Center Project is to evaluate and recommend to Mayor Sanders the necessary steps required to ensure San Diego's ability to protect and expand local jobs and retain and enhance its current market position in the convention and meeting industry.

<u>Charge</u>

- To review and evaluate the feasibility of an expansion to the current Convention Center and related developments or enhancements and the impact on generating new jobs.

- To identify and evaluate various financing options for an expanded convention center that relies mainly on revenues generated by the Convention Center and/or related developments or enhancements.

- To identify key issues related to public access, resource conservation and waterfront enhancement.

- To encourage public comment on the convention center project by holding meetings at locations and times accessible to the public.

- To present a final set of findings and recommendations to Mayor Sander's no later than September 2009. All meetings will be conducted in accordance with the Brown Act.

**Co-Chairs Roles and Responsibilities**

The Co-Chairs for this Task Force will serve in the public's interest to provide the requisite leadership to guide the discovery and analysis process in order to make recommendations to the Mayor on the expansion of the Convention Center as an economic driver for the City. To make certain there is clear understanding of the Co-Chairs' roles and responsibilities for all concerned the following information delineates their functions.

70

SDCC115535

Ex 12 p 508

Trial Exhibit 1021  Page 70

**Appendix Two:  Task Force Committee Chairs and Members**

**Cheryl Kendrick, Co-Chair**
Cheryl Kendrick is a marketing and community relations professional who recently served as campaign director for the United Way of San Diego County. Ms. Kendrick is the past board chair of both the San Diego Convention Center and the California State Commission on the Status of Women. She has served on the boards of the National Conference for Community and Justice and the Huntington's Disease Society of America. Ms. Kendrick received her Bachelor of Arts degree in French from the University of Connecticut.

**Stephen Cushman, Co-Chair**
Stephen Cushman is president of Cushman Enterprises. He is currently the board chair of the Port Commissioners, board chair of the College of Business Administration at San Diego State University and board chair of the San Diego Hospital Association. Mr. Cushman holds a degree in business administration from California Western University.

**Richard Bartell**
Mr. Bartell is general partner of Bartell Hotels. He serves on the board of directors of the San Diego Tourism Promotion Corporation.

**Susie Baumann**
Susie Baumann owns the Bali Hai and Lighthouse restaurants in Shelter Island. Ms. Baumann is board treasurer for the California Restaurant Association and has served as a board member for the association since 1988. She currently serves as secretary for San Diego Convention and Visitors Bureau Board of Directors and is active in the Shelter Island Association.

**Gordon Boerner**
Gordon Boerner is senior vice president and administrative services manager of San Diego National Bank. Mr. Boerner serves on the San Diego Downtown Partnership Board of Directors and is board chair of the Local Initiatives Support Corporation.

**Patrick Duffy**
Patrick Duffy is general manager of the Hilton La Jolla Torrey Pines Hotel. Mr. Duffy currently serves as board president to the San Diego Hotel Motel Association. He is a member of the San Diego Tourism Promotion Corporation's board of directors.

**Bill Evans**
Bill Evans is executive vice president of the Evans Hotel Group. Mr. Evans has served as a board member for the San Diego Convention Center Corporation, San Diego Regional Chamber of Commerce, California Hotel-Motel Association, San Diego Convention and Visitors Bureau and the San Diego Historical Society. He is currently a board member

SDCC115536

Ex 12 p 509

Trial Exhibit 1021  Page 71

and past president & chair of the San Diego Hotel-Motel Association. Mr. Evans earned a degree from Cornell University's School of Hotel and Restaurant Administration.

**Pete Garcia**
Pete Garcia is retired and previously served as president and CEO of the University Mechanical and Engineering Contractors. Mr. Garcia is chair of the San Diego Economic Development Foundation and is a member of the SDSU Science and Engineering Advisory Board. He previously served as vice chair of the State of California Commission for Economic Development. A native Cuban, Mr. Garcia graduated from the University of Florida with a degree in industrial engineering.

**Lorena Gonzalez**
Lorena Gonzalez is the secretary-treasurer & CEO of the San Diego and Imperial Counties Labor Council. She is the first woman to lead the Labor Council since its charter in 1902. Ms. Gonzalez previously served as the Labor Council's political director from September 2006 to January 2008. A native San Diegan, Ms. Gonzalez holds degrees from Stanford University, Georgetown University and the UCLA School of Law.

**Lani Lutar**
Lani Lutar is president and chief executive officer of the San Diego County Taxpayers Association. She served as executive director of the Asian Business Association of San Diego and as a board member of the San Diego Asian Film Foundation and the Japan Society of San Diego and Tijuana. Ms. Lutar graduated from San Diego State University and earned a master's degree from the School of International Relations & Pacific Studies at the University of California, San Diego.

**Fred Maas**
Fred Maas is the president and CEO of Black Mountain Ranch LLC. He is board chair of the Centre City Development Corporation. Mr. Maas is a founding director of Move San Diego and CleanTECH San Diego. He is an attorney and graduate of Hobart College and Syracuse University College of Law.

**Mike McDowell**
Mike McDowell is executive vice president for corporate affairs at Atlas Hotels and is CEO of the San Diego Lodging Industry Association. Mr. McDowell is also vice president of the House of Hospitality Association Board and board chair of the San Diego County Taxpayers Association. Mr. McDowell received his degree from University of the Redlands.

**Vince Mudd**
Vince Mudd is president and owner of Office Interiors, a full-service commercial design/build office interior firm. Mr. Mudd currently serves as board chair of the San Diego Red Cross and as treasurer of the San Diego Regional Economic Development Corporation. Mr. Mudd also serves as member to the City of San Diego's Charter Review Committee as well as the State Compensation Insurance Fund's Audit Committee.

SDCC115537

**Bob Nelson**
Bob Nelson is the Vice Chair of the San Diego Convention Center Corporation Board of
Directors. Mr. Nelson is an advertising and public relations executive with 30 years of
experience in government and communications. His company, Bob Nelson Associates,
advises a diverse list of clients, including public utilities, labor unions, and non-profit
corporations. Mr. Nelson currently serves as Secretary-Treasurer of San Diego Theatres,
Inc, manager of the San Diego Civic Theatre and Balboa Theatre.

**Bill Sauls**
Bill Sauls is an attorney with his own law firm is downtown San Diego practicing in the
areas of business law and estate planning. With over 20 years of community involvement,
he currently serves as a member of the Centre City Advisory Committee, on the
Executive Committee and Board of Directors for the Downtown San Diego Partnership,
and as a member of the Executive Committee and Board of Directors of the East Village
Association.

**Mark Steele**
Mark Steele owns his own planning and architectural firm, The MW Steele Group. Mr.
Steele previously worked with Dale Naegle Associates and served as chair of the City of
San Diego's Planning Commission, president of the San Diego Chapter of the American
Institute of Architects, and president of Lambda Alpha International. Mr. Steele is a
graduate of the University of Kentucky.

**Diane Takvorian**
Diane Takvorian is executive director and co-founder of the Environmental Health
Coalition. She is the recipient of a 2008 James Irvine Foundation Leadership Award for
her effective approach to creating a healthier environment for low income communities
across the state. Ms. Takvorian earned a Bachelor of Science and a Masters of Social
Work with public policy, community organization, and administration emphasis from San
Diego State University.

**SDCC115538**

Ex 12 p 511

Trial Exhibit 1021  Page 73

## Appendix Three: Meeting Schedule

| Date & Location | Topics | Presenters | District |
|---|---|---|---|
| Tuesday, February 24, 2009<br>Handlery Hotel and Resort<br>6:00-8:00 pm | Convention Center Economic<br>Impact, Convention Center<br>History & Downtown<br>Redevelopment, Convention<br>Center Success | Skip Hull, CIC Research<br>Jeff Graham, CCDC<br>Carol Wallace, SDCCC<br>Chris Cramer, SDCCC | 6 |
| Thursday, March 12, 2009<br>Scripps Ranch Library<br>6:00-8:00 pm | SDCCC Performance | Michael Hughes, TSW Research | 5 |
| Thursday, March 26, 2009<br>Jacobs Center for Neighborhood<br>Innovation<br>6:00-8:00 pm | Market Demand | Jennifer Sutherland,<br>PricewaterhouseCoopers<br>Convention and Tourism<br>Services | 4 |
| Tuesday, May 5, 2009<br>Cox Arena, Mezzanine Suite,<br>San Diego State University,<br>(parking available Lot L)<br>6:00-8:00 pm | Convention Center performance,<br>industry overview, challenges<br>and expectations | Heywood Sanders, University<br>of Texas<br>Rod Cameron, International<br>Association of Convention<br>Centres | 7 |
| Tuesday, May 26, 2009<br>Balboa Park Club Ballroom<br>4:00-6:00 pm | Updated Marketing Feasibility | Steve Spickard, Economic<br>Research Associates | 3 |
| Tuesday, June 2, 2009<br>San Diego Convention Center,<br>Room 31ABC<br>6:00-8:00 pm | Hotel Program<br>Convention Center Program | Greg Mueller, Tucker Sadler<br>Don Grinberg, HNTB | 2 |
| Monday, June 15, 2009<br>Lawrence Family Jewish<br>Community Center<br>9:00-11:00 am | Financing | Jim Sult, Piper Jaffray Co.<br>John Kaatz, Convention, Sports,<br>and Leisure Intl. | 1 |
| Monday, July 6, 2009<br>San Diego Convention Center,<br>Room 6A<br>4:00-6:00 pm | Financing | Art Castro, Tucker Sadler<br>Perry Dealy, Dealy Development<br>Jim Sult, Piper Jaffray Co.<br>John Kaatz, Convention,<br>Sports, and Leisure Intl. | 2 |
| Tuesday, July 21, 2009<br>Balboa Park, War Memorial<br>Building<br>4:00-6:00 pm | Discussion of funding and<br>recommendation | Task Force | 3 |
| Tuesday, August 4, 2009<br>San Diego Convention Center,<br>Room 30CDE<br>6:00-8:00 pm | Discussion of funding and<br>recommendation | Task Force | 2 |
| Monday, August 31, 2009<br>Barrio Station (Theater)<br>4:00-6:00 pm | Discussion of funding and<br>recommendation | Task Force | 8 |

74

**SDCC115539**

Ex 12 p 512

Trial Exhibit 1021  Page 74

## Appendix Four:  Overview of Tourism Marketing Districts, Business Improvement Districts and Lease-Revenue Bonds

### Tourism Marketing Districts

### What is a Tourism Marketing District?

The San Diego Tourism Marketing District follows the model of Tourism Business Improvement Districts (BID's) that utilize the efficiencies of private sector operation in the market-based promotion of local and regional tourism. Tourism BID's, such as the SDTPC allow lodging and other tourism-related business owners to organize their efforts to increase tourism. In San Diego, lodging business owners within the district assess themselves to fund the District and those funds will be used to provide programs and services that specifically benefit the assessed lodging businesses.

History: As a result of diminishing public resources available for effective and competitive destination marketing, local lodging industry leadership began discussing alternative funding sources and available options in 2003. A working group comprised of lodging industry representatives held dozens of meetings with proposed assessed businesses, stakeholder groups and interested parties. On May 8, 2007 the San Diego City Council adopted an enabling Procedural Ordinance that allowed for the formation of a Tourism Marketing District. In December of 2007, the qualifying businesses voted to establish the assessment district, and the Tourism Marketing District (TMD) was approved by San Diego City Council.

The Tourism Marketing District began on January 1, 2008.

The enabling Procedural Ordinance and the Management District Plan provide that the City contract with the San Diego Tourism Promotion Corporation (SDTPC), a nonprofit mutual benefit corporation, to plan and carry out specified activities, subject to the terms and conditions enumerated in the contract between SDTPC and the City. In April 2008, City Council gave final approval of the contract between SDTPC and the City, thus establishing the terms for SDTPC to manage the District assessments and to contract for implementation of the proposed marketing programs and services outlined in the Management District Plan.

Location: The Tourism Marketing District is citywide, inclusive of all areas within the city limits of the City of San Diego. A map of the District is included with the San Diego Tourism Marketing District Management District Plan.

Funding Source Entirely from Assessed Businesses: The TMD assessment is designed to benefit, and is levied upon, lodging businesses with 70 or more sleeping rooms in the City of San Diego. Business means any and all types of hotels where a structure, or any portion of a structure, is held out to the public as being occupied, or designed for

75

SDCC115540

occupancy, by transients for dwelling, lodging or sleeping purposes. The owner(s), operator(s), or an authorized representative who is noted on City records as the responsible party for remitting and reporting Transient Occupancy Tax for each lodging business is responsible for paying the assessment. The annual assessment is based upon 2% of gross room revenue from transient stays in the lodging business as described above.

More information can be found at:
http://www.sandiego.gov/treasurer/taxesfees/tot/tmdfaq.shtml

## Business Improvement Districts

Business Improvement Districts (BIDs) are a type of assessment district in which business owners choose to be assessed a fee, which is collected on their behalf by the City, for use in promoting and improving the business area. In California, BIDs date back to 1965 with the approval of Assembly Bill 103 - the "Parking and Business Improvement Area Law." Today there are approximately 200 BIDs in the state.

San Diego's Program
The City of San Diego's BID program, the largest in the state of California and one of the most active in the nation, is administered by the City's Office of Small Business. San Diego's program dates back to 1970 with the creation of the Downtown Improvement Area, California's first metropolitan downtown district. Since that time, the small business community and the City of San Diego have created 18 separate districts, with another two in the preliminary stages of formation. More than 11,000 small businesses participate in these self-assessment districts, raising more than $1 million annually.
   • San Diego's Program
   • Benefits
   • Marketing Activities
   • Additional Funding
   • Other City Assistance
   • Forming a BID
   • Assessment Fees
   • BID Locations
   • Contact Information

A complete overview can be found online at:
http://www.sandiego.gov/economic-development/business-assistance/small-business/bids.shtml

## Lease-Revenue Bonds

Lease Revenue Bonds and Certificates of Participation are lease obligations secured by an installment sale agreement or by a lease-back arrangement with a public entity, where

76

SDCC115541

Ex 12 p 514

Trial Exhibit 1021  Page 76

the general operating revenues are pledged to pay the lease payments, which are, in turn, used to pay debt service on the bonds or Certificates of Participation. These obligations do not constitute indebtedness under the state constitutional debt limitation and, therefore, are not subject to voter approval. Payments to be made under valid leases are payable only in the year in which use and occupancy of the leased property is available, and lease payments may not be accelerated. The governmental lessee is obligated to place in its annual budget the rentals that are due and payable during each fiscal year the lessee has use of the leased property.

Revenue Bonds are payable solely from net or gross non-ad valorem tax revenues derived from General Fund revenues, tax increment revenues, rates or tolls, or fees, charges or rents paid by users of the facility constructed with the proceeds of the bond issue. Pursuant to Section 90 of the City Charter, the City may incur bonded indebtedness for the purpose of acquiring, constructing, or completing any municipal improvements, not including improvements to the City's water facilities, in an amount not to exceed 10% of the total assessed valuation of all real and personal property in the City subject to an annual property tax levy. The City may also incur bonded indebtedness for the purpose of acquiring, constructing, or completing water facilities in an amount not to exceed 15% of the total assessed valuation. The combined limit on outstanding indebtedness for both non-utility related improvements and water related improvements is an amount not to exceed 25% of the total assessed valuation.

For more information:  http://www.sandiego.gov/fm/annual/pdf/fy07/debtobligations.pdf

SDCC115542

Ex 12 p 515

Trial Exhibit 1021  Page 77

**Appendix Five:**

**Agendas and Meeting Notes Web Site**

http://www.conventioncentertaskforce.org/taskforcemeetingagendas.shtml

**Presentations**

http://www.conventioncentertaskforce.org/MCTFdocs-presentations.shtml

**Other Meeting Documents and Reports**

http://www.conventioncentertaskforce.org/MCTFdocs-other.shtml

**Public Comments and Letters**

http://www.conventioncentertaskforce.org/MCTFdocs-letters.shtml

SDCC115543

Ex 12 p 516

Trial Exhibit 1021  Page 78

**Appendix Six: Overview of Possible Revenue Sources**

Overview of possible revenue sources (to meet bond obligation) and estimates on range of revenue expectations:

- **Adjacent, new convention center hotel- Residual cash flow**

    o *The Piper Jaffary presentations addressed the potential financial contribution and financing structures of an adjacent hotel on June 15th on pgs. 19 – 22 and 24 and on July 6th on pg. 6.*

    o *The projected range of annual "residual cash flow" from the hotel models as presented is $3,691,000 to $8,995,000.*

    o *At its meeting of July 6th the TF decided by consensus to "de-link" the hotel from the Convention Center Expansion project and to address its relationship to the project as a possible funding source versus in integral and necessary part of the project.*

- **Convention Center Retail- Net income**

    o *This references proposed income from a retail component of 40,000+ sf to be designed into and constructed concurrently with the convention center expansion.*

    o *In conceptual renderings presented by Tucker, Sadler, on June 2nd, their presentation calls out Ground Floor Retail on Pg. 9, references retail in the elevation on pg. 22, and shows an exterior featuring retail space on pg. 37.*

    o *In the revised conceptual renderings presented by Tucker Sadler on June 15th their presentation calls out 49,400 sf of retail on the Ground and 5th floors and references retail in the elevations on pgs. 3 and 7.*

    o *In their presentation of June 15th Piper Jaffary, proposes Projected Annual Retail Revenue of $6,045,000 from retail operations/rent on pg. 23. Piper Jaffary revised that number in their presentation of July 6th on pg. 4 to $4,013,000.*

- **Convention Center Hotel Business Improvement District Assessment- By geographic proximity to Center**

CC115544

Ex 12 p 517

Trial Exhibit 1021  Page 79

o  *One premise of a Business Improvement District (BID) is to allow similar businesses in a defined geographic area to self-assess to pay for infrastructure maintenance and improvements for the mutual benefit of the group, and for the individual benefit of each member. The BID can identify benefit zones and agree to a greater assessment for those with a greater benefit. For example, hotels adjacent to the convention center could agree to pay a larger assessment because their proximity allows for a greater benefit, versus a hotel near the airport that may realize a lower level of benefit and therefore pay a lower assessment. (NOTE: This was the structure for creating the San Diego Tourism Marketing District. Because the focus was on marketing and NOT infrastructure maintenance and improvements, it was given its hybrid name to avoid any confusion or question of purpose. The TMD is fundamentally a BID.)*

o  *All BID's obligate the property owner for payment, but do not preclude the recovery of the cost of the assessment through a direct pass-thru to customers or price increases.*

o  *A BID of this type, for this purpose would require a majority vote of the assessed businesses (hotels) and a majority vote of the City Council. The vote of the businesses is weighted by the estimated amount of the real assessment.*

o  *From Piper Jaffary presentation July 6, pg. 9 (TOT or TMD Reference)*
   • *Revenue Potential: (Assumes flat rate throughout District, no zones)*
      • *Citywide @ 1% = $14,700,000*
      • *Citywide @ 2% = $29,400,000*
      • *Citywide @ 3% = $44,100,000*
      • *Downtown @ 1% = $5,160,000*
      • *Downtown @ 2% = $10,320,000*
      • *Downtown @ 3% = $15,480,000*

• **Convention Center Entertainment District Assessment- All non-hotel businesses, by geographic proximity to Center**

   o  *The most typical and traditional BID is property based, and includes all businesses in a Business District.*

   o  *Assumes that all businesses with the district see some level of benefit from the investment of assessment revenue.*

   o  *Each business type can have a separate assessment value (drycleaners different from locksmith), and that assessment is based on the property tax rate of each business. Assessment is collected with property taxes.*

80

SDCC115545

Ex 12 p 518

- o *A BID of this type, for this purpose would require a majority vote of the assessed businesses and a majority vote of the City Council. The vote of the businesses is weighted by the estimated amount of the real assessment.*

- o *No District has been defined, therefore no revenue potential has been evaluated.*

- **Convention Center Restaurant Business Improvement District Assessment – By geographic proximity to Center**

  - o *See Convention Center Hotel Business Improvement District above, item # 3.*

  - o *In order to avoid conflict with state law over the taxation of alcoholic beverages, assessment could be property based or calculated on gross sales or gross food sales.*

  - o *Assuming that 60% of all sales are food sales, and therefore assuming that 60% of the projections by Piper Jaffray on pg. 9 of their July 6th presentation:*
    - *Downtown Gross Food Sales Assessment .5% = $ 720,000*
    - *Downtown Gross Food Sales Assessment 1% = $1,440,000*

- **Convention Center Parking District (BID)– By geographic proximity**

  - o *Several jurisdictions presented in the Piper Jaffray presentations of July 6th refer to a parking component of the available revenue stream.*

  - o *For San Diego, this would require a hybrid of the traditional BID model to provide for greater revenue capture within the parking district and a program of shared revenue with the City. Or,*

  - o *An alternative could be a parking district consisting of only parking contractors/businesses that can self-assess and pass that assessment on to their customers.*

  - o *A third option for capturing a contribution from parking revenues could be the inclusion of the parking companies in any Entertainment District proposal.*

- **Convention Center Taxi District**

  - o *Drop-off/Pick-up Surcharge – A special fee paid for the privilege of Convention Center drop-off or pick-up. No $ analysis provided.*

  - o *Airport Taxi Surcharge – Any taxi into or out of the airport pays an additional fee: (Piper Jaffray July 6, pg. 8 & 10)*

81

SDCC115546

- - *Airport Taxi $1 per trip = $1,500,000*
    - *Airport Taxi $3 per trip = $4,500,000*
    - *Airport Taxi $5 per trip = $7,500,000*

- **Rental Car Surcharge**

  - *Piper Jaffray July 6, pg. 8 & 10*
    - *Rental Car Surcharge $1 per rental = $1,150,000*
    - *Rental Car Surcharge $5 per rental = $5,750,000*
    - *Rental Car Surcharge $10 per rental = $11,500,000*

- **Convention Center Service Contractor Fee**

  - *Piper Jaffray June 15, pg. 15*
  - *New Orleans*
    - *Convention Center service contractor fee of 2.0 percent of gross sales in the Center.*

- **Incremental Convention Center Parking Fees - 100% of all above 2007 baseline**

  - *An increase in Convention Center business will potentially increase demand for Convention Center and adjacent Port owned parking. Establish a revenue baseline before expansion and then dedicate any incremental increase in parking revenue to off-set expansion costs.*

- **Contribution of land and other concessions from Unified Port of San Diego**

  - *Piper Jaffray July 6, pg. 4*
    - *Convention Center Construction Cost Estimate*
      - *Owner Soft costs including <u>land</u> = $86,258,000 (partial?)*

  - *Other Concessions*
    - *As negotiated*

SDCC115547

Ex 12 p 520

Trial Exhibit 1021  Page 82

# EXHIBIT 13

MAYOR'S CITIZEN TASK FORCE

- Good evening. I'm Chris Cramer, and I have the honor of serving as the chair of the San Diego Convention Center Corporation. In 1984, the city council created the corporation to manage, market, and operate the San Diego Convention Center.

- We are thrilled to be here at tonight as this civic dialogue on the future of our Convention Center begins anew, and I want to thank Mayor Sander's for his leadership on this important issue.

- In the coming months, you will learn about the Center and the role it has played in establishing our city as one of the nation's top convention and meeting destinations.

- The building is one of our city's most visible landmarks, attracting millions of visitors from around the world and is a great source of civic pride.

- MOST importantly, it's a powerful economic engine for our community, driving jobs, tax revenues and the third largest industry in San Diego, tourism.

- As Jeff shared with you, the Convention Center has been an anchor helping drive the revitalization of our downtown, a role that continues today as we just recently saw the opening of the new Hilton Bayfront with nearly 1200 hotel room and hundreds of new jobs for local San Diegans.



San Diego Convention Center

Chris Cramer
Chair, Board of Directors, San Diego Convention Center Corporation
Carol Wallace
President & CEO, San Diego Convention Center Corporation

San Diego Convention Center Presentation February 24, 2009

1

SDCC 115788

Ex 13 p 521

Trial Exhibit 1315  Page 1

- When the Convention Center opened in 1989 it was an immediate success, attracting so much business that plans for an expansion were begun only a few years later.  Events hosted in the building exceeded all expectations, proving even the most strident critics DEAD WRONG and launching San Diego's rise as a world-class convention destination.

- In 2001, an expansion that doubled the original building opened and as Carol Wallace will share with you, the Center once again exceeded all performance expectations. In fact, the Convention Center now turns millions of dollars in business away each year due to a lack of exhibit space.

- Over the last 20 years, the corporation has established a proven track record:
  - Maximizing the building's economic potential attracting many of the nation's most lucrative conventions;
  - Generating tax revenues reducing the tax burden on San Diegans;
  - Creating and sustaining more than 12,000 jobs; and
  - Serving as a catalyst for redevelopment that has transformed downtown into the thriving hub it is today.

- More than 25 years ago, a task force similar to this one helped lay the foundation to build our Center and created this economic powerhouse. Unlike that group of visionary civic leaders who had to make an informed decision using expert projections, but no actual operating history, we now have 20 years of success to show how wise an investment our Convention Center has become for our City.

---

**An Economic Engine Driving Our Economy**

- **Maximized the economic impact by attracting the most lucrative conventions;**

- **Generated hundreds of millions of tax revenues from visitors helping reduce the tax burden on San Diegans;**

- **Driving 12,000 jobs across all sectors of the local economy; and**

- **A catalyst for ongoing downtown redevelopment**

---

2

**SDCC 115789**

**Ex 13 p 522**

**Trial Exhibit 1315  Page 2**

MAYOR'S CITIZEN TASK FORCE

- As our city and nation face a difficult economic downturn, I think it is fair to ask if this is the right time for this discussion.
- Let me respond to that directly.
- This facility serves as the foundation for our visitor industry. Unlike the downturn we are seeing in leisure travel, the events hosted in the Convention Center are usually booked 3-5 years out minimizing the impact of the economic cycles on the performance.
- Our sales team is currently booking events into the building for 2013 and 2014. And as Carol will share with you, we are out of exhibit space to sell due to the success of San Diego.
- I don't want to suggest we have not seen some events have a drop in attendance this past few months. We have. But we have also seen events that have surpassed projected attendance. We are fortunate to have a customer base, largely driven by medical association meetings, that continues to have a strong economic performance and a necessity to continue to host their annual meetings.
- If we do not address expansion now, we will lose convention business, including some of our best current customers like ComicCon, which have outgrown our facility.
- Finally, I believe expanding this facility should NOT be viewed as an infrastructure project.
- Your decision is whether we, as a community, should expand the physical size of the Center in order to protect and grow this important and proven economic engine.
- The stakes are HUGE: Your decision will impact our regional economy, job creation, tax revenues, and San Diego's economic future into the next century.
- So, I want to thank the members of this Task Force for contributing your valuable time, expertise, and collective judgment to this important issue.
- Now, I'd like to turn it over to Carol Wallace to talk about the Convention Center's extraordinary success and the significant return it has generated since our community invested in this Center not once, but twice.

**Building on Success-
A Solid Investment in the Future**

- Ensuring our continued ability to attract and retain the top industry conventions;
- Protect and expand our ability to drive new tax revenues into the future;
- Create and sustain thousands of jobs for local San Diegans;
- Build on 20 years of success in driving our local economy.



3

**SDCC 115790**

Ex 13 p 523

Trial Exhibit 1315  Page 3

MAYOR'S CITIZEN TASK FORCE

• Good evening. I'm Carol Wallace, and it's a pleasure to be here to talk about one of our city's most important assets -- the Convention Center.



San Diego Convention Center Presentation February 24, 2009

4

**SDCC 115791**

**Ex 13 p 524**

MAYOR'S CITIZEN TASK FORCE

- The results over the last two decades tell a story of success that has made San Diego the envy of our competition in the meeting and convention industry:
  - $18.3 billion in regional economic impact
  - $7.6 billion in direct attendee spending
  - $364.4 million in tax revenues
  - We've sold 11 million hotel room nights for city hoteliers
  - Hosted over 1,000 conventions and trade shows
  - Held more than 3,000 other community and local events; and
  - Welcomed 15.8 million guests, including 7.7 million out-of-town visitors who spend money in our hotels, restaurants and attractions, infusing fresh dollars into our local economy.

**20 Years of Accomplishments**

| Economic Impact | $18.3 Billion |
|---|---|
| Direct Attendee Spending | $7.6 Billion |
| Tax Revenues | $364.4 Million |
| Hotel Room Nights | 11,001,857 |
| Number of Events (1,133 conventions) | 4,261 |
| Attendance (7.7 M out-of-town visitors) | 15,811,463 |

*20 years*     CY1996-2000 RESULTS

San Diego Convention Center Presentation February 24, 2009                                                        5

**SDCC 115792**

**Ex 13 p 525**

**Trial Exhibit 1315  Page 5**

MAYOR'S CITIZEN TASK FORCE

- In FY08, the SDCCC had an unprecedented fiscal year with all time historical highs in key performance categories setting the standard throughout the industry.
- How did we do it?  We hosted over 230 events -- 67 of those events were premier conventions that generated:

    - $1.8 billion in regional economic impact
    - $751.8 million in direct delegate spending
    - $31.9 million in total tax revenues for San Diego
    - 848,159 out-of-town attendees, and
    - Overall attendance of nearly one million

- The events held in our building also support over 12,000 jobs county-wide for the hard working men and women of San Diego.

- And they support San Diego's third leading industry, tourism.



FY08 Results

| CATEGORY | FY07 | FY08 | INCREASE |
|---|---|---|---|
| Economic Impact | $1.55 B | $1.8 B | 16.2% |
| Direct Attendee Spending | $650.2 M | $751.8 M | 15.6 % |
| Total Tax Revenues for San Diego | $25.1 M | $31.9 M | 77% |
| - Transient Occupancy Tax (TOT) | $23.7 M | $30.4 M | 76% |
| - Sales Tax | $1.4 M | $1.5 M | 14% |
| Total Attendance | 863,795 | 966,325 | 1.2% |
| - Out-of-town Attendee | 817,659 | 848,159 | 7% |

6

SDCC 115793

Ex 13 p 526

Trial Exhibit 1315  Page 6

Case 3:07-cv-02172-AJB   Document 150-3   Filed 03/04/11   Page 547 of 595

MAYOR'S CITIZEN TASK FORCE

- The Convention Center continues to be a wise investment for San Diego taxpayers.

- For every one dollar of tax revenues invested in the Convention Center, it has returned $2.36 in tax revenues this past year.

- The city uses these revenues to pay for basic city services including police and fire protection; street, park and beach maintenance; as well as libraries and museums.

Return on Investment

**For every one dollar invested in the Convention Center in 2008, it has returned $2.36 in tax revenues back to the city.**

San Diego Convention Center Presentation February 24, 2009

7

**SDCC 115794**

**Ex 13 p 527**

**Trial Exhibit 1315  Page 7**

MAYOR'S CITIZEN TASK FORCE

- We've been very successful.

- Because of our weather, destination amenities, five-star service and prime location.

- We must consider expanding the building or face losing billions of dollars in business.

- Let's talk about the need for an expansion.



Building on Success:
the Need for an Expansion

San Diego Convention Center Presentation February 24, 2009

8

**SDCC 115795**

**Ex 13 p 528**

- This slide represents our marketing and operating philosophy. It's divided into four quadrants.

- The sweet spot is in the upper right hand quadrant. The Center specifically targets high-end events to maximize economic impact for the city and produce significant revenues for the Center. Good examples are medical shows which attract attendees who have more disposable income, are likely to bring their families and come for the convention and extend their stay into a vacation. These events also have large budgets, host many off site events and have the need for ancillary services which generate substantial revenue for the facility.

- In the upper left hand quadrant, are events that are good for the city, but don't necessarily generate revenues for the facility. These events provide positive media exposure for the city and economic benefits. Examples are high profile political conventions or offshoot events surrounding events like the Superbowl.

- In the two lower quadrants are events that don't generate significant economic benefits for the city. On the left, these include conventions, tradeshows and events, with smaller budgets -- so they don't generate money for the facility either. And, they typically don't attract attendees who stay as many nights. If they do, they usually don't spend much money.

- The lower right quadrant represents consumer shows and local events. While these events may attract a large number of local attendees, they don't attract overnight visitors.



**Marketing & Operational Philosophy**

Our primary goal is to attract events that generate significant economic impact for the City of San Diego.

9

SDCC 115796

Ex 13 p 529

Trial Exhibit 1315  Page 9

MAYOR'S CITIZEN TASK FORCE

- As it stands today, market demand has surpassed the current supply of space the building offers.  And, we are losing many of the highly desirable events located in the sweet spot you saw on the previous slide.

- Presently, we turn away millions of dollars worth of business that goes to competitor cities.

- To remain competitive, we simply need more product to sell: meaning more exhibit and meeting space.

- In the simplest of terms, an expanded Convention Center means more jobs, more tax revenues to fund critical city services and a stronger economic impact helping drive our regional economy into the future

**The Need for an Expansion**

- **Market Demand**
- **Lost Business**
- **Competitive Environment**
- **Future Tax Revenues & Economic Impact**

San Diego Convention Center Presentation February 24, 2009

10

**SDCC 115797**

**Ex 13 p 530**

Trial Exhibit 1315  Page 10

**MAYOR'S CITIZEN TASK FORCE**

- Since the expansion opened in 2001, we have been operating at or above practical maximum capacity

- And even with the expansion, we can no longer accommodate the space needs of many events.

- While several of our most lucrative events have outgrown or expect to outgrow the Convention Center, many of these groups desire to remain in San Diego.

- For example, HIMSS (Health Information Management Systems Society) brought more than 25,000 attendees to San Diego in 2006 and generated nearly $2 million in tax revenues for the city.  While they wanted to remain in San Diego, they will not be back because we can no longer accommodate their space demand.

- Overall, if we don't expand we could lose millions o of room nights and tax revenues to the city.



**Market Demand**

- Operating at or above practical maximum capacity
- Losing business most frequently due to lack of available dates/space
- Customers interest in an expanded Center
- Events that have outgrown or expect to outgrow represent a potential cumulative room night loss of over 300,000

San Diego Convention Center Presentation February 24, 2009

11

**SDCC 115798**

**Ex 13 p 531**

MAYOR'S CITIZEN TASK FORCE

- One of the key indicators of a convention facility's success is building occupancy.

- In FY08, we reached an occupancy rate of 71.6 percent, well beyond 60% which is considered full, and we turn away business.

- As you can see, almost since we opened the Phase II expansion, we've been at maximum capacity. We are, quite literally, busting at the seams

- It's important to note that no facility ever reaches 100 percent, due to brief closures for maintenance, holidays, and the difficulty of booking back-to-back events because of move-in, move-out schedules which vary widely.

- San Diego continues to outpace the competition in building occupancy.

- The national average for similar size facilities is just over 44 percent

- As the future number of attendance and events grows, so too should our occupancy



San Diego Convention Center Presentation February 24, 2009

12

SDCC 115799

MAYOR'S CITIZEN TASK FORCE

- Let me breakdown the current rentable space we have:
  - 525,701 square feet of prime, contiguous exhibit space
  - 90,000 square feet of flexible space in the Sails Pavilion, which can be used for a variety of events from receptions to trade show activity
  - 204,000 square feet of meeting space, with 72 breakout rooms, including two 40,000 square foot ballrooms
  - 284,494 square feet of prefunction, registration and lobby areas; and
  - 184,500 square feet of outdoor terrace space
- Service and support areas.
- Total gross square footage is approximately 2.6 million square feet.

Square Footage Summary

SDCC 115800

Ex 13 p 533

## MAYOR'S CITIZEN TASK FORCE

- Here is a list of reasons we lose business.  As you can see, the number one reason for lost business is a lack of available space at the Convention Center

- 39.7% of lost business is due to this reason alone



San Diego Convention Center Presentation February 24, 2009

14

SDCC 115801

Ex 13 p 534

Trial Exhibit 1315  Page 14

MAYOR'S CITIZEN TASK FORCE

- San Diego competes with other first-tier convention cities including heavy hitters like Las Vegas, Anaheim, San Francisco, Orlando, Dallas, Washington DC and New Orleans.

- San Diego's strengths:
  - Coastal destination with great climate, vibrant downtown and top-notch visitor service
  - Award-winning facility with outstanding service and waterfront location
  - Close to the airport, hotels, restaurants and world-class attractions

- Challenges:
  - Nearly two-thirds of our competitive set is larger than us
  - Our strong market segment is increasingly being targeted by other western regional convention destinations attempting to lure conventions away by offering free or heavily discounted convention space and substantially lower rates

**Competitive Landscape**

San Diego is a first-tier convention city whose competitive set includes such heavy hitters as Las Vegas, Anaheim, San Francisco, Orlando, Dallas, Washington D.C. and New Orleans.

San Diego Convention Center Presentation February 24, 2009

15

SDCC 115802

Ex 13 p 535

Trial Exhibit 1315  Page 15

MAYOR'S CITIZEN TASK FORCE

- Our most lucrative market: medical meetings
  - Medical shows have large budgets
  - Perform well – even in economic downturns
  - Attract attendees with more disposable income
  - Attendees are more likely to bring family and extend their stay into a vacation

- In FY08, we hosted 16 medical convention with record-breaking results, including our largest economic generator to date, the Society for Neuroscience. This show alone attracted 32,000 attendees and generated:
  - $133 million in economic impact, and
  - $2.3 million in tax revenues for the city

- An expansion will allow us to tap deeper into this critical market.

Medical Shows

Why are medical conventions so highly prized by convention cities?

- Medical shows have large budgets
- Perform well even in economic downturns
- Attract attendees with more disposable income
- Attendees are more likely to bring family and extend their stay

SDCC 115803

Ex 13 p 536

Trial Exhibit 1315  Page 16

## MAYOR'S CITIZEN TASK FORCE

- Conventions translate into results for taxpayers. And an expansion would increase both economic impact and tax revenue at a time when new sources of revenue to fund city services are desperately needed.

- According to a recent study by PricewaterhouseCoopers, if we expand:
  - Room nights will increase from 810,800 to over one million
  - Additional jobs will be created – an increase from 12,500 to over 17,000
  - Sales tax revenue will increase from $4 million to $5.5 million
  - And, hotel taxes will rise from $29.7 million to $40.8 million

- The bottom line: an expansion is an investment in our city's financial future.

**Future Tax Revenues & Economic Impact**

| ECONOMIC IMPACTS | MODELED | EXPANSION ESTIMATES |
|---|---|---|
| Room Nights | 810,800 | 1,113,700 |
| Employment | 12,500 | 17,200 |
| Sales Tax | $4,000,000 | $5,500,000 |
| Hotel Tax | $29,700,000 | $40,800,000 |

Source: PricewaterhouseCoopers Study

San Diego Convention Center Presentation February 24, 2009

17

SDCC 115804

Ex 13 p 537

Trial Exhibit 1315  Page 17

MAYOR'S CITIZEN TASK FORCE

- Before I finish, I'd like to say that not only is the Convention Center one of the region's leading economic engines, but we're leaders in service excellence.

- Our facility and staff have earned 31 awards over the past 20 years, including receiving a Recycler of the Year Award last year from the City of San Diego.

- We're proud of our accomplishments on behalf of San Diego, and even prouder to share our story with you.

- The materials you received today include a backgrounder about the Convention Center, which provides additional details about our award-winning facility.



Awards

San Diego Convention Center Presentation February 24, 2009

18

SDCC 115805

Ex 13 p 538

- Thank you.

## MAYOR'S CITIZEN TASK FORCE



Thank You

**SDCC 115806**

**Ex 13 p 539**

Trial Exhibit 1315  Page 19

# EXHIBIT 14

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

            Plaintiff,

vs.                                  No. 07-CV-2172 BEN (JMA)

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,

            Defendant.          **ORIGINAL**

---

Some Portions of this Transcript are Designated
Confidential – Pursuant to Protective Order

DEPOSITION OF RICHARD SIMON

San Diego, California

Friday, July 17, 2009

Volume 1


Reported by:
MARGARET A. SMITH, RPR, CRR
CSR No. 9733

Job No. 116278

Ex 14 p 540

**RICHARD SIMON**                                                   07/17/09

| | | |
|---|---|---|
| 10:11:15 | 1 | their shows? |
| 10:11:16 | 2 | A     They have not. |
| 10:11:22 | 3 | Q     You -- you claim in this case that you're |
| 10:11:25 | 4 | forced to use the San Diego Convention Center employees |
| 10:11:27 | 5 | at a loss.  Is that right? |
| 10:11:31 | 6 | A     Yes, sir. |
| 10:11:31 | 7 | Q     How do you calculate that loss? |
| 10:11:33 | 8 | A     In the instance of the hourly charge, our |
| 10:11:37 | 9 | hourly charge to GES at the start of this lawsuit in |
| 10:11:42 | 10 | 2007 was $16.30 per hour. |
| 10:11:48 | 11 | San Diego Convention Center bills us $17 per |
| 10:11:51 | 12 | hour.  At the start of this lawsuit, we billed the |
| 10:11:55 | 13 | GES -- GES 50 percent of the exhibitor revenue.  We |
| 10:12:03 | 14 | currently bill them 50 percent of the exhibitor revenue. |
| 10:12:07 | 15 | San Diego Convention Center bills us 50 percent |
| 10:12:09 | 16 | of the exhibitor revenue, the same 50 percent that we |
| 10:12:13 | 17 | charge GES. |
| 10:12:14 | 18 | So we receive the money from GES, and we pay it |
| 10:12:18 | 19 | to San Diego.  In the -- in the middle, we have |
| 10:12:22 | 20 | supervisors.  Gabriel Ramirez, sometimes he brings a |
| 10:12:27 | 21 | supervisor or two with him, depending on the size of the |
| 10:12:30 | 22 | show.  We bring certain extra equipment with us because |
| 10:12:33 | 23 | they don't always have enough equipment.  We have to |
| 10:12:35 | 24 | have insurance and other infrastructure costs. |
| 10:12:42 | 25 | Previously, we had made a -- a margin of profit |

69

| 10:12:45 | 1 | so not only do we not make a margin of profit, we have |
| 10:12:49 | 2 | infrastructure costs that we can't even absorb.  And |
| 10:12:52 | 3 | then we directly lose 70 cents an hour on every hour |
| 10:12:56 | 4 | billed. |
| 10:12:57 | 5 | Q    As far as Gabriel Ramirez is concerned, he's a |
| 10:13:00 | 6 | supervisor.  Correct? |
| 10:13:02 | 7 | A    Yes. |
| 10:13:02 | 8 | Q    And you do bill the decorators for his services |
| 10:13:05 | 9 | at the show.  Correct? |
| 10:13:07 | 10 | A    No.  Actually, we don't. |
| 10:13:08 | 11 | Q    So it's your understanding, there's no hourly |
| 10:13:10 | 12 | charge for Mr. Ramirez's work? |
| 10:13:12 | 13 | A    For the management, that's correct. |
| 10:13:16 | 14 | Q    What equipment have you had to supply to the |
| 10:13:17 | 15 | San Diego Convention Center since July 1, 2007 that they |
| 10:13:20 | 16 | didn't have available to provide cleaning services? |
| 10:13:22 | 17 | A    I don't know.  I can just -- Mr. Ramirez told |
| 10:13:25 | 18 | me that he brings equipment with him in his vehicle in |
| 10:13:28 | 19 | case they're short of equipment, because that has |
| 10:13:31 | 20 | happened.  I don't know specifically what. |
| 10:13:33 | 21 | Q    So Mr. Ramirez would be the one who would know |
| 10:13:36 | 22 | more about that? |
| 10:13:37 | 23 | A    Yes. |
| 10:13:37 | 24 | Q    What's your opinion of Mr. Ramirez?  Is he a |
| 10:13:40 | 25 | good worker? |

70

Ex 14 p 542

I, RICHARD SIMON, do hereby declare under penalty
of perjury that I have read the foregoing transcript;
that I have made any corrections as appear noted, in
ink, initialed by me, or attached hereto; that my
testimony as contained herein, as corrected, is true and
correct.

EXECUTED this _31_ day of _August_ ,
20_09_ , at _Chicago_____ , _Illinois____ .
                        (City)                    (State)


_____
RICHARD SIMON

# EXHIBIT 15

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


UNITED NATIONAL MAINTENANCE, INC.,
a Nevada Corporation,

                    Plaintiff,

          v.                    Case No. 07-cv-2172-BEN (JMA)

SAN DIEGO CONVENTION CENTER CORPORATION, INC.,
a California Corporation,

                    Defendant.              CERTIFIED

                                            COPY

_____

      THIS TRANSCRIPT CONTAINS CONFIDENTIAL INFORMATION
          THAT IS SUBJECT TO A PROTECTIVE ORDER

            DEPOSITION OF MARK L. EPSTEIN

               Monday, August 31, 2009

              10:03 a.m. to 2:54 p.m.

                    Volume 1

                 HANIFY & KING, PC
          One Beacon Street, 21st Floor
              Boston, Massachusetts


Reporter by:
Marianne R. Wharram
CSR/RPR

JOB No. 119174

1    don't know.

2         Q.   Did you ever have any discussions with

3    Mr. Simon about exactly how this non-renewal as to

4    San Diego would occur?

5         A.   No.

6         Q.   The next sentence reads ultimately, with no

7    competition, as I read before, you believed that

8    Champion and the other contractors would be forced

9    to pay more for cleaning services?

10        A.   Yes.

11        Q.   And you're referring to at the San Diego

12   Convention Center?

13        A.   Yes.

14        Q.   What was the basis for making that

15   statement?

16        A.   I was -- with the analysis that was done

17   with the pricing that I previously referred to,

18   that San Diego Convention Center would be charging

19   higher prices and they would be also -- in addition

20   to the higher pricing for the booth cleaning, they

21   would also be charging for other areas, other

22   common areas in the facility where we previously

23   enjoyed complimentary services.

24        Q.   For example?

25        A.   Common areas.

Page  99

1     Q.   All -- were all common areas cleaned

2     complimentary by United National?

3     A.   Most of them, yes.

4     Q.   And the only charges that United assessed

5     were for booth cleaning?

6     A.   And there were also charges for aisle

7     carpet cleaning that were -- that were in the

8     analysis that was going to charge -- meaning it was

9     not only exhibitor -- it was not only booth

10    cleaning, exhibitor booth cleaning, but there was

11    also aisle carpet cleaning, which was not a common

12    area, but there was -- there was going to be an

13    additional charge for cleaning the aisle carpet --

14    Q.   So --

15    A.   -- from the San Diego Convention Center.

16    Q.   So if I understand what you're saying, the

17    terms that were proposed by the San Diego

18    Convention Center in 2007 were different from the

19    terms that United then had with Champion in its

20    national contract --

21    A.   Yes.

22    Q.   -- both in terms of scope of services and

23    pricing?

24    A.   Yes.

25    Q.   Were you anticipating that the San Diego

1    Convention Center would increase the prices that

2    were then being offered in 2007?

3        A.   I -- I think back then they -- they were --

4    that's what they were already proposing.

5        Q.   According to your analysis, the convention

6    center was then proposing a different price

7    structure which would cost Champion more?

8        A.   Yes.

9        Q.   Did you anticipate that those prices by the

10   convention center would be raised even further in

11   the future?

12       A.   Of course, yes.

13       Q.   What was the basis for that anticipation?

14       A.   Just general knowledge.

15       Q.   Just your general expectation?

16       A.   Like your hourly rate goes up every year.

17       Q.   Let me direct your attention to paragraph

18   18 on page six of Exhibit 2.  It reads since

19   Champion directly contracts for trade show cleaning

20   services and not the trade association and because

21   increased trade show cleaning services costs will

22   be lost in the midst of other cost fluctuations

23   from year to year, this policy unlikely to cause a

24   location change.  In regard to what I've just read,

25   what are the other cost fluctuations from year to

MARK L. EPSTEIN                                      08/31/09
CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

1

2

3

4

5

6

7

8

9          I, MARK L. EPSTEIN, do hereby declare

10    under penalty of perjury that I have read the

11    foregoing transcript; that I have made any

12    corrections as appear noted, in ink, initialed

13    by me, or attached hereto; that my testimony

14    as contained herein, as corrected, is true and

15    correct.

16          EXECUTED this____day of_____,

17    20___, at_____, _____.
                        (City)                      (State)

18

19

20          _____

21          MARK L. EPSTEIN

22

23

24

25

Page 207

# EXHIBIT 16

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED NATIONAL MAINTENANCE,
INC., a Nevada corporation,

    Plaintiff,

      vs.

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a
California corporation,

    Defendant.

No. 07-CV-2172 BEN
(JMA)

## CERTIFIED
# COPY

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order

DEPOSITION OF LELAND M. KRIZ

San Diego, California

Thursday, September 3, 2009

Reported by:
JEANNE M. GARLOW
CSR No. 3456

Job No. 119171

1        Q.      Would you also describe the work that was

2    done by UNM on other shows that were done by GES at

3    the convention center as adequate?

4        A.      Yes.

5        Q.      In your opinion, was the cleaning that was

6    done by the United National Maintenance essentially

7    the same quality as the cleaning done by the

8    Convention Center staff?

9        A.      No.

10        Q.      What was the difference, in your opinion?

11        A.      I would say that United Maintenance paid

12    closer attention to the hourly, minutely adjustments

13    that were required, and kept the aisles cleaner during

14    move-in and move-out than the San Diego Convention

15    Center.

16        Q.      Any other differences?

17        A.      No.

18        Q.      The first difference that you're referring

19    to is the variation between the estimate and the

20    actual hours expended?

21              MR. SLANIA:  Misstates his testimony.

22              THE WITNESS:  I'm sorry.

23    BY MR. L'ESTRANGE:

24        Q.      Okay.  The first difference you identified

25    was that the United National Maintenance paid closer

1   attention to the minutes and hours that were put in on

2   the job.

3       A.    No.  It was -- they -- they paid closer

4   attention to the needs of the show --

5       Q.    Okay.

6       A.    -- and adjusted accordingly.

7             If certain aisles or areas became congested

8   with trash and debris, they were on top of it much

9   sooner than the San Diego Convention Center staffing.

10            If we had a show that anticipated use of a

11  certain amount of people to keep the floor clean and

12  safe, United Maintenance would adjust their staffing

13  and keep the floors cleaner than the San Diego

14  Convention Center did.

15      Q.    And the period of time you're talking about

16  is after the change in policy in 2007; is that true?

17      A.    I would say basically historically United

18  Maintenance can flex up and flex down their staffing

19  quicker than the San Diego Convention Center could.

20      Q.    That was your impression?

21      A.    That was my general impression.

22      Q.    Is that based on personal observation or

23  secondhand information?

24      A.    Personal observation and secondhand

25  information.

1    difference between the performance of cleaning work by

2    United versus the performance of cleaning work by the

3    San Diego Convention Center.

4            Do you remember that?

5        A.    Yes.

6        Q.    And you identified areas in which the

7    Convention Center did not perform its cleaning as well

8    as United.

9            Do you remember that?

10       A.    Yes.

11       Q.    And you described both of them -- despite

12   those deficiencies on behalf of the Convention Center,

13   you described them both as performing the work

14   adequately.

15           Do you remember that?

16       A.    Yes.

17       Q.    All right.  Given the deficiencies that you

18   identified on behalf of the Convention Center, would

19   you say that United performs its cleaning work better

20   than the Convention Center does?

21       A.    Yes.

22       Q.    Are there others at GES who have told you

23   that United performs its cleaning work better than the

24   Convention Center?

25       A.    Yes.

Page 169

```
 1              Do you remember that?
 2      A.    Yes, I do.
 3      Q.    And you said you didn't recall whether or
 4  not something had been created?
 5      A.    That's correct.
 6              MR. SLANIA:  All right.  I'm going to show
 7  you a document right now.  Mark it as Exhibit No. 363.
 8  For the record, this is a one-page document
 9  Bates-labeled SDCC/GES 505.
10              (Deposition Exhibit 363 marked.)
11  BY MR. SLANIA:
12      Q.    Now, can you take a look at it and please
13  let me know after you've had a chance to review it.
14      A.    I remember this, yes.  No. 363 was reviewed.
15      Q.    Did you prepare 363?
16      A.    Yes.
17      Q.    Do you remember when you prepared it?
18      A.    No, I do not remember the exact timing of
19  this, but it was an e-mail that I sent out to our
20  account managers, our -- I believe to our director of
21  account management, Amy, and our lead operations
22  manager, Erich Watson, at the time.
23              MR. SLANIA:  Let me show you a document we
24  will mark as Exhibit No. 364.
25              For the record, this is a two-page document
```

1    Bates-labeled UNM2241 through UNM2242.  This is an

2    e-mail string, and the last e-mail of the string is an

3    e-mail from you to Buddy Linn, copying Erich Watson

4    and Amy Chilausky, C-H-I-L-A-U-S-K-Y.

5              (Deposition Exhibit 364 marked.)

6    BY MR. L'ESTRANGE:

7       Q.    Is the bottom e-mail the e-mail you're

8    referring to?

9       A.    Yes, exactly.

10      Q.    And the date of that e-mail is April 1st,

11   2008, correct?

12      A.    That's the date on it.

13      Q.    So did you prepare this list in or about the

14   end of March or beginning of April 2008?

15      A.    I would say that's probably a very good

16   estimate.

17      Q.    All right.  Now, in this list, there are the

18   a variety of items here that you've identified as

19   issues regarding cleaning, correct?

20      A.    Correct.

21      Q.    All right.  The first one says, "SDCC crews

22   work slower than UNM."

23            Do you see that?

24      A.    Yes.

25      Q.    Is that your notice -- or your comment that

1   the Convention Center crew takes more time to get its

2   cleaning done than United does?

3       A.    That's what I was being told by our account

4   managers and operations managers, yes.

5       Q.    So was that another complaint about the

6   Convention Center, in addition to overstaffing?

7       A.    Yes.

8       Q.    Item No. 2 references that the Convention

9   Center "has shift changes at critical times causing

10  confusion and the floor gets messy."

11          Is that another complaint that you were

12  hearing about the Convention Center's cleaning crews?

13      A.    Yes.

14      Q.    So that was in addition to the Convention

15  Center taking more time and overstaffing, correct?

16      A.    Correct.

17      Q.    Do you remember who it was that was giving

18  you these additional complaints?

19      A.    This was coming from account management and

20  operations.

21      Q.    Do you remember specifically who it was?

22      A.    No, I do not.

23      Q.    Item No. 3 references "a lack of

24  communication."

25          Is that the issue that you were discussing

**LELAND M. KRIZ**                    09/03/09
SOME PORTIONS OF TRANSCRIPT ARE DESIGNATED CONFIDENTIAL  PURSUANT TO PROTECTIVE ORDER

1  earlier in your deposition about too many middlemen?

2      A.    Yes, as well as the communication and the

3  prep work on the number of men and scheduling.

4      Q.    No. 4 talks about the Convention Center

5  recommending more manpower than GES requested and the

6  Convention Center staff working slower than United

7  National Maintenance staff.

8          That's a combination of the overstaffing

9  issue that you've already discussed and the item No. 1

10  that the Convention Center was working slower than

11  United National, correct?

12      A.    Correct.

13      Q.    Item No. 5 says that the Convention Center

14  was "taking too long to develop and send invoices

15  causing delays in billing our client."

16          Do you see that?

17      A.    Yes.

18      Q.    Is that another complaint about the

19  Convention Center?

20      A.    Yes.

21      Q.    Could you explain to me how that was

22  impacting GES?

23      A.    Basically, what -- what we need on our final

24  billing to our show organizers, when we are billing

25  them for cleaning costs, the San Diego Convention

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Ex 16 p 556

1    Center was taking longer time to prepare their

2    invoices, putting in total what their billing hours

3    were going to be for the show, and getting that

4    information to us in a timely fashion.

5        Q.    Item No. 6 says, the "Docks often fall

6    behind in cleaning creating safety concerns."

7              Do you see that?

8        A.    Yes, I do.

9        Q.    Was that in reference to the Convention

10   Center failing to clean the docks in a timely fashion?

11       A.    That was, again, falling back on the crews

12   working slower and not getting to the spots that they

13   need to get to in a timely fashion, yes.

14       Q.    And that's a complaint that GES had of the

15   Convention crews, correct?

16       A.    That's correct.

17       Q.    Item No. 7 talks about -- that "More than

18   once docks were a big mess after an FDC show and GES

19   was moving in, less dock spaces due to

20   trash/recycling.  Trash pallets on bayside wall in B

21   hall area."

22              What is that in reference to?

23       A.    Basically, with the Convention Center, there

24   has been some -- some tight show bookings where one

25   show is closing and moving out just before another

1    show is due to move in.

2              And on more than one instance where GES was

3    moving into the hall as Freeman had just moved out,

4    the facility was not clean and ready for us to move

5    in.

6              We had to move in on top of trash, less

7    docks that were filled with cardboard and recycle

8    material, which cut down on our efficiencies.

9         Q.    Was that a complaint regarding the San Diego

10   Convention Center failing to perform its cleaning

11   duties?

12        A.    Yes.

13        Q.    Item No. 8 talks about GES "not receiving

14   daily labor sheets for all crew - just Gabby's hours."

15   GES has "no way to track labor/cost or verify that the

16   charges are correct when we get them from United."

17             What is that in reference to?

18        A.    Basically, United National Maintenance would

19   always supply us with a daily sign-in sheet of their

20   workers, notating the name of the individual that

21   signed in, the time they started, the time they

22   stopped, any breaks notated, so that we would have

23   that as a tracking mechanism for our cost to know what

24   we were going to be getting billed from United for

25   that particular day.

1          The Convention Center does not provide that

2     type of information to United Maintenance, so in turn,

3     where we would be expecting to have an invoice for 10

4     workers for eight hours on a given day, we don't know

5     whether there were 10 workers or 15 workers or 8

6     workers on that given day for whatever time they

7     worked, and we would not be able to track what our

8     costs were.

9          Q.    So was this another complaint that GES had

10    about the Convention Center's cleaning crews?

11         A.    Yes.

12         Q.    Item No. 9 says, "Preshow arrangements are

13    confusing to all."

14          Is that in reference to your discussion

15    earlier when we were talking about item No. 3, the

16    lack of communication?

17         A.    Yes.  And it has to do with the spreadsheet

18    order form that the Convention Center wants the

19    account managers to fill out estimating costs.

20          They would -- they would send out a form

21    with the estimated cleaning hours on it.  If we did

22    not agree with the hours that were in there, we would

23    send back the information giving our updated estimate,

24    whether it was more or less, but they would never pay

25    attention to what we sent back to them.

Page 178

1       They would just proceed with what they sent

2   us, and that was -- that was what they were going to

3   do regardless of whether we wanted it or not.

4       Q.    So was that another complaint that GES had

5   about the Convention Center?

6       A.    Yes.

7       Q.    Item No. 10 says, "There is no daily backup

8   to SDCC/UNM labor.  We cannot track costs accurately."

9       Is that the same as item No. 8?

10      A.    Very similar, yes.

11      Q.    Now, after having a chance to look at

12  Exhibit 363 and 364, I want to ask you, aside from

13  those writings, are you aware of whether or not there

14  are any other written records documenting the

15  complaints that GES had with the Convention Center's

16  performance or deficiencies in its performance for its

17  cleaning crews?

18      A.    No, none -- none other than that or -- no.

19      Q.    You talked about the badging requirement

20  beginning in or about 2003 or 2004, something along

21  those lines.

22      A.    Correct.

23      Q.    In Exhibit No. 42, which is your

24  declaration, you reference paragraph 6, line 24 that

25  the badge policy took effect in February 2004.



**LEWIS**
**AND**
**ROCA**
— LLP —
L A W Y E R S



Dale A. Danneman
40 North Central Avenue
19th Floor
Phoenix, Arizona 85004-4429

**RECEIVED**

OCT 1 3 2009

KIRBY NOONAN LANCE & HOGE LLP

Direct Dial: (602) 262-5371
Direct Fax: (602) 734-3744
DDanneman@LRLaw.com
Admitted in: Arizona

Our File Number:  34095-00008

October 9, 2009

John H. L'Estrange, Jr.
Wright & L'Estrange
401 West A Street
suite 2250
San Diego, CA  92101

Re:     *United National Maintenance, Inc. v. San Diego*
        *Convention Center Corporation, Inc.;*
        Transcript of Deposition of Leland M. Kriz, 9-3-09

Dear Mr. L'Estrange:

        Mr. Kriz has elected not to read and sign his original deposition transcript.  Therefore, in accordance with our agreement I am enclosing the original transcript of that deposition that was sent to me by the court reporter.

        The court reporter did an excellent job in transcription.  The only error in the transcript that I noted is at page 13, line 23 where I believe the word "declarations" was actually "decorations" or "decorating."

                                        Sincerely,

                                        *Dale Danneman*

                                        Dale A. Danneman

DAD/ml
Enclosure.
cc/w/o enclosure:  Jacob M. Slania

Ex 16 p 561

# EXHIBIT 17

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

        Plaintiff,

vs.                        No. 07-CV-2172 BEN (JMA)

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,

        Defendant.      **ORIGINAL**

_____

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order

DEPOSITION OF LEIF LJUNGQUIST

San Diego, California

Tuesday, September 15, 2009

Volume 1

Reported by:
MARGARET A. SMITH, RPR, CRR
CSR No. 9733

Job No. 120353A

1      Q     Why not?

2      A     They're -- United is more like a contractor,

3   like us, at GES; that they have a specific job to do

4   where they come in and they're supposed to clean the

5   trade show floor.  Whereas the Convention Center

6   workers, cleaners, they have to clean the whole

7   Convention Center, from the dock area to the nonpublic

8   areas; the kitchens, say, to the lobbies, do the

9   vacuuming in the lobbies and all that.  And their --

10   their cleaning is more on the broader scope, where they

11   have to wash the windows -- they have to do it all.

12   Whereas United's was the trade show floor and the

13   registration area.

14      Q     All right.  Let's focus your attention to the

15   time since July 1st, 2007, where the Convention Center

16   have been doing the trade show floor cleaning as well as

17   all that other cleaning that you referred to.

18      A     Mm-hmm.

19      Q     Okay?

20      A     Yes.

21      Q     All right.  Has the Convention Center done a

22   worse job than United did on that trade show floor

23   cleaning?

24      A     In my opinion, yes.

25      Q     Why is that?

1     A     I think --

2     Q     Let me ask it again.  Why do you believe that

3   the Convention Center has done a worse job than United

4   when it comes to cleaning the trade show floor?

5     A     I think it's because they don't have as many

6   people on the trade show floor.  And a lot of the

7   cleaning people for the Convention Center weren't

8   experienced in how to clean the trade show floor.

9          And, yeah.  Well, less people.  If you're

10  overwhelmed trying to clean an area, it's hard to --

11  hard to get out from under it.

12    Q     Did you ever observe any problems with the

13  Convention Center not having enough people on the floor

14  because of shift changes?

15    A     Yes.

16    Q     Can you explain a little bit about that to me?

17    A     Okay.  Trade shows open and close any time of

18  the day or night.  And it's weird hours.  And United's

19  crew would take breaks when the job was done, for the

20  most part, or when there was a lull in the activity,

21  where the Convention Center -- being a contractor -- an

22  outside contractor.  Whereas the Convention Center

23  cleaning people, they have their shifts.

24         And say that a show was going to open at

25  2:00 p.m. during the day.  If the -- if the Convention

1  Center shift was over at 2:00 p.m. or at 1:30, then

2  there would be a noticeable disappearance of all the

3  cleaning people while the other shift rotated in.  And

4  that's at -- it would happen at critical times when the

5  carpet needed to be vacuumed or trash needed to be

6  picked up in the registration area or at -- at critical

7  times, they would -- they were told, I assume by their

8  supervisors, "Okay, you guys need to leave because the

9  next shift is coming."  So there -- there wasn't an

10 overlap of people to always man the floor.

11     Q    Is there anything additional as to why the

12 Convention Center staff did not do as good a job

13 cleaning the trade show floor as United, other than not

14 having enough people on the trade show floor, problems

15 with the shift changes, and the Convention Center staff

16 not being as experienced in cleaning trade shows?

17     A    No.  That's about it.

18          MR. SLANIA:  I don't have any further questions

19 at this time.

20          Do you have any questions for him?

21          MR. ERGASTOLO:  Yes.  I'll try and go

22 backwards.

23                    EXAMINATION

24 BY MR. ERGASTOLO:

25     Q    Let me start by introducing myself.  I

Page 40

1

2

3

4

5

6

7

8

9

10        I, LEIF LJUNGQUIST, do hereby declare under penalty

11    of perjury that I have read the foregoing transcript;

12    that I have made any corrections as appear noted, in

13    ink, initialed by me, or attached hereto; that my

14    testimony as contained herein, as corrected, is true and

15    correct.

16        EXECUTED this _____ day of _____,

17    20___, at _____, _____.
                        (City)                    (State)

18

19

20

21        _____
                LEIF LJUNGQUIST

22

23

24

25

# EXHIBIT 18

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED NATIONAL MAINTENANCE, INC.,
a Nevada corporation,

       Plaintiff,

vs.                       No. 07-CV-2172 BEN (JMA)

SAN DIEGO CONVENTION CENTER
CORPORATION, INC., a California
corporation,

       Defendant.      **ORIGINAL**

---

Some Portions of this Transcript are Designated
Confidential - Pursuant to Protective Order

DEPOSITION OF DAVID DICKERSON

San Diego, California

Tuesday, September 15, 2009

Volume 1

Reported by:
MARGARET A. SMITH, RPR, CRR
CSR No. 9733

Job No. 120353B

Ex 18 p 567

1   the middle of us laying aisle carpet.  And next thing
2   you know, don't have people in the aisles cleaning.
3       Q    Anything else about them being on their own
4   agenda?
5       A    We never -- a lot of times we didn't have
6   contact with them via radio or Nextel, which is how we
7   communicate.
8       Q    When you say "them," you're talking about you
9   didn't have contact with the Convention Center cleaners?
10      A    Correct.
11      Q    Did that cause problems?
12      A    Yes, because we'd have to go looking for them.
13  Whereas with United, we would have them on radio or have
14  them on Direct Connect.
15      Q    Did you have any other problems with the
16  Convention Center cleaners?
17      A    No.
18      Q    Would you say that the United cleaning did a
19  better job than the Convention Center?
20      A    Yes.
21      Q    Was there ever a time that you could observe
22  who did their job in a quicker or faster time?
23      A    Comparing the two?
24      Q    Yes.
25      A    Yeah.

Page 30

Ex 18 p 568

```
1      Q    Who was faster?

2      A    United, definitely.

3      Q    Any reasons that you could determine as to why

4   United was doing it faster?

5      A    Well, they tend staff accordingly where we

6   needed the most help.  Whereas the building, I think,

7   has a more shift set for man-hours or man -- man or

8   woman.  And it doesn't typically change from when we

9   need it.  They're not going to change their crew call.

10     Q    What other decorators have you worked for at

11  the Convention Center, other than GES?

12     A    You mean decorating companies, you're saying?

13     Q    Yes.  Yes.  Yes.

14     A    Freeman Decorating, Champion, Brede.

15     Q    And how is it that you've worked for all of

16  those companies?  Is there a way that the union

17  representatives are allowed to work for all the

18  companies?

19     A    Well, we're kind of -- we're kind of like an

20  independent contractor, let's say.  I mean, I am

21  employed by GES, when we have work.  When there's no

22  work, I'm able to freely go and work for other

23  companies, just get permission as a regular -- as a

24  foreman, I just have to get permission from my general

25  foreman to work with other companies.
```

Page 31

1
2
3
4
5
6
7
8
9
10      I, DAVID DICKERSON, do hereby declare under penalty
11   of perjury that I have read the foregoing transcript;
12   that I have made any corrections as appear noted, in
13   ink, initialed by me, or attached hereto; that my
14   testimony as contained herein, as corrected, is true and
15   correct.
16      EXECUTED this _19th_day of ___OCTOBER___,
17   20_09_, at ___LA MESA___, ___CA___.
                     (City)                (State)
18
19
20
21                  _____
22                  DAVID DICKERSON
23
24
25

Ex 18 p 570