James R. Lance (147173)
Jacob M. Slania (200652)
**KIRBY NOONAN LANCE & HOGE LLP**
350 Tenth Avenue, Suite 1300
San Diego, California 92101-8700
Telephone (619) 231-8666
Facsimile (619) 231-9593

Theodore R. Tetzlaff (*Pro Hac Vice*)
Kristopher J. Stark (*Pro Hac Vice*)
**UNGARETTI & HARRIS LLP**
3500 Three First National Plaza
Chicago, Illinois 60602-4224
Telephone (312) 977-4400
Facsimile (312) 977-4405

Attorneys for Plaintiff
UNITED NATIONAL MAINTENANCE, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED NATIONAL MAINTENANCE, INC., a Nevada corporation,<br><br>          Plaintiff,<br><br>     vs.<br><br>SAN DIEGO CONVENTION CENTER CORPORATION, INC., a California corporation,<br><br>          Defendant. | CASE NO. 07-CV-2172 AJB<br><br>**UNITED NATIONAL MAINTENANCE, INC.'S TRIAL BRIEF**<br><br>Judge: Hon. Anthony J. Battaglia<br>Crtrm.: 12<br><br>Complaint Filed: November 13, 2007<br>Trial Date: March 21, 2011 |

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

KNLH\826243.1

07-CV-2172 AJB

# TABLE OF CONTENTS

**Page**

1.   INTRODUCTION...................................................................................................... 1

2.   CASE BACKGROUND AND HISTORY ............................................................... 2

    A.   The San Diego Trade Show and Convention Market ................................. 2

    B.   The Trade Show Cleaning Market .............................................................. 3

    C.   Trade Show Cleaning Services Include Two Types of Services:  Facility
           Cleaning and Booth Cleaning ..................................................................... 3

    D.   History of Competition for Trade Show Cleaning in San Diego ................ 4

    E.   SDCCC's Exclusive Policy......................................................................... 4

    F.   SDCCC's Stated Justifications for the Exclusive Policy ........................... 5

3.   UNITED WILL PREVAIL ON EACH OF ITS CLAIMS ..................................... 5

    A.   Attempted Monopolization ......................................................................... 5

          1.   The Exclusive Policy controls prices and destroys competition. ................. 6

          2.   There is no justification for SDCCC's anti-competitive conduct. ................ 6

          3.   There is a dangerous probability that SDCCC will achieve
              monopoly power.......................................................................... 8

              a.   The relevant market........................................................... 8

              b.   Dominant share of the relevant market. ............................ 9

              c.   Barriers to entry............................................................... 10

          4.   There is a causal antitrust injury to United. ................................ 10

    B.   Essential Facilities..................................................................................... 11

    C.   Interference with Contract.......................................................................... 13

          1.   GES Contract.............................................................................. 14

          2.   Champion Contract ..................................................................... 14

    D.   Interference with Prospective Economic Advantage ................................ 15

4.   SDCCC'S AFFIRMATIVE DEFENSES HAVE NO MERIT............................. 15

    A.   State Action Doctrine ................................................................................ 16

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1          B.      Local Government Exemption ............................................................................ 17

2    5.    UNITED HAS SUFFERED DAMAGES OF $763,870 ...................................................... 19

3    6.    INJUNCTIVE RELIEF ........................................................................................................ 21

4    7.    CONCLUSION .................................................................................................................... 22

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1

## TABLE OF AUTHORITIES

2

3

Page(s)

CASES

4

*Alaska Airlines, Inc. v. United Airlines, Inc.*
5      948 F.2d 536 (9th Cir. 1991)............................................................................. 12

6    *Aspen Highlands Skiing Corp. v. Aspen Skiing Company,*
7      438 F.2d 1509 (10th Cir. 1984)........................................................................ 12

8    *California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.*
      445 U.S. 97 (1980) .......................................................................................... 16

9    *Chicago Bd. of Trade v. United States,*
10     246 U.S. 231 (1918) .......................................................................................... 6

11   *City of Anaheim v. So. Cal. Edison Co.,*
      955 F.2d 1373 (9th Cir. 1992) .......................................................................... 12
12

13   *Florists Nationwide Tel. Delivery Network — America's Phone*
      *Order Florists, Inc. v. Florists Telegraph Delivery Assn.,*
14     371 F.2d 263 (7th Cir. 1967)........................................................................ 21, 22

15   *Hornsby Oil Co., Inc. v. Champion Spark Plug, Co., Inc.,*
      714 F.2d 1384 (5th Cir. 1983)............................................................................ 9
16

17   *Image Technical Services, Inc. v. Eastman Kodak Co.,*
      125 F.3d 1195 (9th Cir. 1997)............................................................................ 6

18   *Knapp v. Palisades Charter High School,*
19     146 Cal. App. 4th 708 (2007)........................................................................... 18

20   *Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.,*
      940 F.2d 397 (9th Cir. 1991)............................................................................ 16
21

22   *Los Angeles Memorial Coliseum Com'n v National Football League,*
      726 F.2d 1381 (9th Cir. 1984)............................................................................ 8

23   *MetroNet Services Corp. v. Qwest Corp.,*
      383 F.3d 1124 (9th Cir. 2004).......................................................................... 11
24

25   *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,*
      924 F.2d 1484 (9th Cir. 1991)............................................................................ 9
26

27   *Otter Tail Power Co. v. United States,*
      410 U.S. 366 (1973) .................................................................................... 12, 13

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

*Pacific Gas & Electric Co. v. Bear Stearns & Co.,*
  50 Cal.3d 1118 (1990) ................................................................................. 13, 14

*Paladin Association, Inc. v. Montana Power Co.,*
  328 F.3d 1145 (9th Cir. 2003) ................................................................................. 10

*PMC, Inc. v. Saban Entertainment, Inc.,*
  45 Cal. App. 4th 579 (1996) ................................................................................. 15

*Quelimane Co. v. Stewart Title Guaranty Co.,*
  19 Cal.4th 26 (1998) ................................................................................. 14

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.,*
  51 F.3d 1421 (9th Cir. 1995) ................................................................................. 5, 8, 10

*Tarabishi v. McAlester Regional Hosp.,*
  951 F.2d 1558 (10th Cir. 1991) ................................................................................. 18

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,*
  875 F.2d 1369 (9th Cir. 1989) ................................................................................. 9

*Wells v. One2One Learning Found.,*
  39 Cal. 4th 1164 (2006) ................................................................................. 18

*Youst v. Longo,*
  43 Cal.3d 64 (1987) ................................................................................. 15

**STATUTES**

15 U.S.C. §14 ................................................................................. 12

15 U.S.C. § 34(1) ................................................................................. 17

15 U.S.C. § 34(1)(B) ................................................................................. 17, 18

Clayton Antitrust Act, 15 U.S.C. § 15 ................................................................................. 18, 19

**OTHER AUTHORITIES**

FRCP 26 and 37 ................................................................................. 16, 217, 18

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

# 1. INTRODUCTION

United provides specialized cleaning and maintenance for trade shows/conventions held at convention facilities nationwide ("Trade Show Cleaning").  United provided Trade Show Cleaning at the San Diego Convention Center (the "Facility") since the Facility opened in 1989, in direct competition with Defendant San Diego Convention Center Corporation, Inc. ("SDCCC").[1]  After unsuccessfully soliciting United's key customers in late 2006 and early 2007, SDCCC unlawfully excluded Unified from the Facility, taking United's revenue in the process.  Effective July 1, 2007, SDCCC implemented a policy excluding United, and any other competitor, from performing Trade Show Cleaning in the Facility unless:  (1) only SDCCC employees were used to perform Trade Show Cleaning; and (2) almost all Trade Show Cleaning profits earned by United (or any other competitor) were paid to SDCCC ("Exclusive Policy").  The Exclusive Policy barred United's workers and all other non-SDCCC employees from performing Trade Show Cleaning at the Facility, and immediately achieved SDCCC's goal of increasing revenues.  Simply stated, the Exclusive Policy is a money grab which violates Federal antitrust laws and California tort law.

United alleges four causes of action against SDCCC for implementing the Exclusive Policy, including antitrust violations for attempted monopolization and violation of the essential facilities doctrine, interference with contract, and interference with prospective economic advantage.  At trial United will present the evidence necessary to establish each of these claims. The evidence will come from United, SDCCC, and third parties.

Under the terms of the Exclusive Policy, United's San Diego operations are operating in the red, but United must continue operating in San Diego at a loss to preserve its national contracts with its largest customers.  United seeks a damages award from the jury making United whole for its past financial losses.  United asks this Court to treble the damages, issue an injunction

---

[1] SDCCC wears two different hats which are relevant to this case.  SDCCC is the operator of a Trade Show Cleaning business within the Facility.  SDCCC also is the operator/manager of the Facility through a contract with the Lessee of the Facility, the City of San Diego.  The facility is owned by the San Diego Unified Port District.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

1   prohibiting SDCCC's exclusion of United from performing Trade Show Cleaning in the future,
2   and to award attorney's fees and costs.

3        SDCCC claims it is immune from the antitrust claims under both the State Action
4   Doctrine and the Local Government Antitrust Act.  SDCCC is not immune.  SDCCC was not
5   acting pursuant to an affirmatively expressed state policy to displace competition, nor can SDCCC
6   establish that taxpayers would bear the burden of any antitrust damages award.  SDCCC also
7   claims its implementation of the Exclusive Policy was a justified business decision.  Not so.  The
8   true facts will show that SDCCC implemented the Exclusive Policy to eliminate competition and
9   to increase revenues, not for any legitimate business justification.

10        United will prevail at trial.

11        **2. CASE BACKGROUND AND HISTORY**

12        **A.**    **The San Diego Trade Show and Convention Market**

13        SDCCC has managed and operated the Facility since it opened in 1989.  SDCCC's primary
14   business is to lease the Facility, pursuant to license agreements, to various trade associations for
15   daily periods to hold trade shows/conventions.  The Facility is unique in that it is the only true
16   convention center in San Diego.  The Facility offers over 615,000 square feet of exhibit space and
17   over 1,000,000 square feet of combined exhibit and meeting space, making it the 11th largest
18   convention center in the United States.  Because of its elite status, trade associations must
19   typically sign a contract with SDCCC years in advance to secure a preferable date for their trade
20   show/convention.

21        Trade associations that license the Facility are essentially handed the keys to an empty
22   building.  They typically hire decorators (also called general contractors), such as GES Exposition
23   Services ("GES") and Champion Exposition Services ("Champion"), to organize and manage their
24   trade show/convention at the Facility.   Organizing and managing shows at the Facility is no small
25   job.  There are a tremendous number of logistical challenges for decorators, including setting up
26   and taking down a trade show/convention in very narrow time windows.

27        Since the Facility opened 21 years ago, the decorators, including but not limited to GES
28   and Champion, have hired subcontractors to perform many of the services associated with trade

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  shows, such as electrical work, exhibit installation and dismantling ("I&D") and Trade Show

2  Cleaning Services. The decorators often hire United to perform Trade Show Cleaning. In fact,

3  United has long term contracts with both GES and Champion for Trade Show Cleaning Services

4  nationwide.

5  **B.  The Trade Show Cleaning Market**

6  Trade Show Cleaning is a specialized product that is not reasonably interchangeable with

7  other janitorial or custodial services. Traditional janitorial service firms can expect their work

8  areas to be the same size and in a relatively similar condition each day. However, in trade show

9  cleaning the size, scope and cleaning needs of each trade show are unique. To successfully handle

10  a large show, a provider of trade show cleaning services must have a tremendous amount of trade

11  show experience. They must anticipate needs proactively because of the specific logistical

12  challenges each show brings. Trade show cleaning has become a specialty market because

13  traditional janitorial firms cannot provide Trade Show Cleaning Services in an efficient and

14  effective manner.

15  United is a national service provider of Trade Show Cleaning Services. United provides

16  services to customers that promote trade shows/conventions wherever they are held in the United

17  States, including the shows produced at the San Diego Convention Center Facility. The

18  knowledge and experience gained from working shows in many cities with its customers enables

19  United to provide a specialized level of service that its customers value. Ultimately, the

20  complexities of these shows demand carefully selected and integrated vendor partners, such as

21  United, who have a thorough understanding of each show's special needs.

22  **C.  Trade Show Cleaning Services Include Two Types of Services: Facility**
   **Cleaning and Booth Cleaning**

23

24  Trade Show Cleaning Services are comprised of Facility Cleaning and Booth Cleaning.

25  Facility Cleaning is the cleaning of all common areas used by a trade show during the move-in

26  phase (which includes construction and installation of the booths and show exhibits) and the

27  move-out phase (comprised of dismantling the booths and exhibits and vacating the premises).

28  Daily porter cleaning also is a component of Facility Cleaning. United bills Facility Cleaning to

1  its customer (the decorator) on an hourly basis.  Prior to implementation of the Exclusive Policy,

2  United charged the decorators $16.30 per hour for Facility Cleaning.

3      Booth Cleaning is the cleaning of individual booths and contiguous aisle space during a

4  show.  Booth Cleaning is provided to specific exhibitors upon request.  This service is tailored to

5  ensure that the unique needs of each individual exhibitor, and each exhibitor pays the decorator on

6  a per square foot basis.  The decorator then splits the Booth Cleaning revenue 50/50 with the

7  cleaning subcontractor.  Booth Cleaning is where Trade Show Cleaning subcontractors like United

8  make most of their profit.

9      **D.      History of Competition for Trade Show Cleaning in San Diego**

10     From the opening of the Facility in 1989, until July 1, 2007, SDCCC and United competed

11  head to head for the business of Trade Show Cleaning Services.  The beneficiaries of the

12  competition included show managers, exhibitors and decorators.  Until July 1, 2007, the

13  decorators, including GES and Champion, always had the unfettered right to choose which

14  company would perform its Trade Show Cleaning at the Facility.

15     In 2006 and early 2007, SDCCC unsuccessfully attempted to increase its share of the

16  Trade Show Cleaning business by aggressively soliciting United's two major customers, GES and

17  Champion.  When SDCCC's solicitation efforts failed, SDCCC instituted another plan to

18  eliminate competition and get United's business.

19     **E.      SDCCC's Exclusive Policy**

20     Following its unsuccessful efforts to solicit United's customers, SDCCC instituted the

21  Exclusive Policy effective July 1, 2007, making it impossible for United (or anyone else) to

22  compete with SDCCC for Trade Show Cleaning Services at the Facility.  The Exclusive Policy

23  excludes United and all other competitors from using their own employees to perform Trade Show

24  Cleaning in the Facility.  The Exclusive Policy requires United, and all other Trade Show

25  Cleaning companies, to use SDCCC employees to perform all cleaning at the Facility.  United

26  must pay SDCCC $17 per hour for each hour a SDCCC employee works on Facility Cleaning.

27  For United, this is about a $.70 per hour loss.  But, that is not the only financial detriment to

28  United.  Under the Exclusive Policy SDCCC also requires United (and all other competitors) to

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  pay to SDCCC their 50% share of the Booth Cleaning revenue.  In short, SDCCC is taking all of

2  the Booth Cleaning revenue, and more than all of the Facility Cleaning revenue, from cleaning

3  subcontractors like United.

4  By implementing the Exclusive Policy, SDCCC immediately achieved the goal it could not

5  accomplish through lawful competition, significantly increasing its revenue.  In the first year of

6  this anti-competitive policy, SDCCC nearly tripled its Booth Cleaning revenues.  Through

7  January 31, 2011, SDCCC had taken approximately $750,000 in Trade Show Cleaning profit from

8  United, and the losses increase with every show.

9  **F.     SDCCC's Stated Justifications for the Exclusive Policy**

10  SDCCC claims its Exclusive Policy was justified for business reasons.  SDCCC's

11  documents and management personnel have all provided inconsistent stories and testimony in this

12  regard.  The evidence at trial will demonstrate that SDCCC's stated justifications are pretextual

13  (the security concerns are unfounded, United's performance is better than SDCCC's), and the true

14  reason for the Exclusive Policy is to unlawfully eliminate competition and increase revenues.

15  **3. UNITED WILL PREVAIL ON EACH OF ITS CLAIMS**

16  United is pursuing four causes of action against SDCCC: (1) attempted monopolization,

17  (2) essential facilities, (3) interference with contract and (4) interference with prospective business

18  advantage.  United is confident that at trial it can and will establish every element for each cause

19  of action.

20  **A.     Attempted Monopolization**

21  To prove its attempted monopolization claim, United must show: (1) SDCCC's specific

22  intent to control prices or destroy competition; (2) SDCCC's predatory or anticompetitive conduct

23  directed at creating a monopoly; (3) a dangerous probability of achieving monopoly power; and

24  (4) causal antitrust injury to United stemming from SDCCC's violation of the Sherman Act.  *Rebel*

25  *Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1432-1433 (9th Cir. 1995).  United will so

26  demonstrate.

27

28

**1.    The Exclusive Policy controls prices and destroys competition.**

There is no evidence to dispute that United can satisfy the first element of this cause of action.  SDCCC's Exclusive Policy mandates the price for Trade Show Cleaning (*i.e.*, controls the pricing) and mandates that only SDCCC employees perform the Trade Show Cleaning (*i.e.*, reducing competition by eliminating performance from competitors).

**2.    There is no justification for SDCCC's anti-competitive conduct.**

There is no denying that the Exclusive Policy prohibits outsiders from performing Trade Show Cleaning of the Facility.  SDCCC attempts to justify implementation of the Exclusive Policy, arguing that it was established because of a purported "security" concern regarding United employees.  SDCCC's purported justification is that, in light of the September 11, 2001 attacks, Trade Show Cleaning personnel pose a security risk at the Facility, and that specifically includes United.  The evidence does not support SDCCC's contention.

When defending against an attempted monopolization claim, antitrust defendants may demonstrate a business justification for an otherwise per se illegal tying arrangement; however, the justification must further competition on the merits, reduce prices, enhance the quality of the product, increase efficiency by reducing costs, or otherwise benefit consumers. *Image Technical Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9th Cir. 1997).  Generally, courts look to the "history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, [and] the purpose or end sought to be attained" in assessing the legitimacy of a business justification. *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238 (1918).

SDCCC's security argument is not legitimate, but rather a pretext to hide the true reason for implementing the Exclusive Policy – money.  The evidence clearly establishes that the primary reason for this anti-competitive policy was to increase revenue.

United will present evidence that the Exclusive Policy is applied solely to providers of Trade Show Cleaning despite the fact that Trade Show Cleaning Service employees constitute only about 5% of the outside labor required to operate and manage a trade show/convention.  Almost all of the workers on site are exempt from SDCCC's Exclusive Policy, including employees of trade associations, decorators, employees, electricians, exhibit installers, freight

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   handlers, carpet installers, display houses, sign hangers, advertisers, florists, caterers, and other
2   general labor.  In addition, much of this labor force is unionized, and the unions admittedly do not
3   perform background checks on these workers.  It is not just coincidence that SDCCC permits these
4   non-SDCCC employees to work at the Facility in trades that do not compete against SDCCC.  If
5   there was a true security concern, SDCCC would apply its Exclusive Policy across the board.

6       In addition, SDCCC never brought a single security issue to United's attention while
7   United worked at the Facility.  United does not use temporary workers and the entirety of its San
8   Diego workforce came from a common roster of local W-2 employees.  Except for minimal
9   employee turnover, the same United employees are the ones entering and working in the Facility.
10  Moreover, not one of United's employees was ever involved in any type of security incident at the
11  Facility, and SDCCC's incident reports confirm this fact because there is no reported incident
12  regarding a United employee.

13      In an effort to satisfy SDCCC's purported security concern, United offered to pay for and
14  subject its employees to the same background checks and screening SDCCC uses for its own
15  employees, or to even let SDCCC run these identical checks on United's workers.  SDCCC
16  rejected United's proposal.

17      United even offered to subject its employees who work at the Facility to a more stringent
18  security protocol than that used by SDCCC on its employees.  The proposal was drafted by
19  Mr. Anthony D'Angelo, a retired FBI expert on homeland security hired by United.  SDCCC was
20  unwilling to adopt the protocol, while at the same time allowing other third party employees to
21  work at the Facility without having any background checks performed.  Once again, if there truly
22  was a security concern, wouldn't SDCCC want to adopt a protocol that increased security?
23  Apparently not.

24      Additionally, SDCCC had numerous security assessments performed on the Facility.
25  Those assessments identified numerous security concerns, none of which had anything to do with
26  United or Trade Show Cleaning Service contractors.

27      In sum, the Exclusive Policy did nothing to alleviate the concerns identified in the
28  assessments.  The overwhelming evidence establishes that the only motive to implement the

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California  92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1   Exclusive Policy was financial.  SDCCC's own documents demonstrate that during the first two

2   years of the Exclusive Policy it received well over $1,200,000 in additional Trade Show Cleaning

3   revenue that SDCCC had not received in prior years (and that number continues to grow).  Unable

4   to compete fairly, SDCCC found a way to use its power over the Facility to exclude its

5   competitors.  This is direct evidence of an anti-competitive animus.

6       SDCCC also claims that it was justified in implementing its Exclusive Policy because of

7   quality concerns.  Essentially, SDCCC argues its workers do a better job than United's.  If that

8   were true, then GES and Champion would have hired SDCCC, not United.  The evidence will

9   show United performs better than SDCCC.

10      The bottom-line is that SDCCC did not have a valid business justification for its anti-

11  competitive conduct in implementing the Exclusive Policy.

12          **3.      There is a dangerous probability that SDCCC will achieve monopoly
                     power.**

13

14      United can establish a dangerous probability of obtaining monopoly power by showing

15  that SDCCC has market power.  United can make this showing by: (1) defining the relevant

16  market; (2) showing that SDCCC owns a dominant share of the relevant market; and (3) showing

17  that potential competitors (such as United) face significant barriers to entry and that existing

18  competitors lack the capacity to increase output in the short run.  *Rebel*, 51 F.3d at 1433-34.  As

19  demonstrated below, all three elements are present here.

20          **a.      The relevant market.**

21      The relevant market has two components: (1) the product market and (2) the geographic

22  market.  *Los Angeles Memorial Coliseum Com'n v National Football League*, 726 F.2d 1381,

23  1392 (9th Cir. 1984).  The product market encompasses producers which, because of the similarity

24  of their products, have the actual or potential ability to take significant amounts of business away

25  from each other.  *Id.; Rebel*, 51 F.3d at 1434.  Products fall within the same market if they are

26  "reasonably interchangeable" for the same or similar uses.  *Coliseum*, 726 F.2d at 1393.  "The

27  outer boundaries of the product market are drawn in terms of the presence of substitutes to which

28  consumers will turn in response to price changes…and the ability of other existing producers…to

1  expand output from their present facilities..." *Hornsby Oil Co., Inc. v. Champion Spark Plug,*

2  *Co., Inc.*, 714 F.2d 1384, 1393 (5th Cir. 1983).

3      United will present evidence and expert testimony at trial to establish that the relevant

4  product market is Trade Show Cleaning at major convention centers. United and SDCCC are

5  producers in this same market because their products, Trade Show Cleaning at the Facility, are

6  reasonably interchangeable and SDCCC has taken significant business from United by

7  implementing its unlawful Exclusive Policy. Also, United will demonstrate that there are no

8  substitutes for Trade Show Cleaning.

9      The relevant geographic market is an area of effective competition where buyers can turn

10  to alternate sources of supply. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d

11  1484, 1490 (9th Cir. 1991) (internal quotation and citation omitted). Assuming products are

12  substitutes, a geographic market is the area in which cross-elasticity of demand would be high

13  between them. High cross-elasticity of demand exists where increases or decreases in one

14  product's price cause substantial increases or decreases in demand for the other product. If buyers

15  in one geographic area do not change their consumption habits in response to a decrease in price

16  of a substitute product supplied in another geographic area, then the two areas probably do not fall

17  within the same geographic market. Cross-elasticity of demand would be low in that case. *See*

18  *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1375-77 (9th Cir. 1989).

19      United will present evidence and expert testimony at trial to establish that the relevant

20  geographic market is limited to large convention centers in the San Diego metropolitan area, of

21  which there is only one, the Facility. Indeed, the territory in which United and SDCCC compete

22  is the Facility. Consumers of Trade Show Cleaning cannot and will not be able to turn to other

23  facilities in or out of San Diego for their conventions, even if the price of Trade Show Cleaning

24  were to rise substantially, because there are few facilities of a similar size as the Facility, and

25  nothing even close to its size in San Diego.

26              **b.    Dominant share of the relevant market.**

27      United will also establish that SDCCC owns a dominant share of the relevant market.

28  Before imposing the Exclusive Policy in 2007, SDCCC performed about 55-60% of the Trade

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  Show Cleaning at the Facility.  After implementing the Exclusive Policy, SDCCC now performs

2  100% of the Trade Show Cleaning in the Facility.  So, both before and after the Policy was

3  enacted, SDCCC possessed a dominant share of the relevant market.  *See Rebel,* 51 F.3d at 1438

4  (holding that ownership of a 44% market share was sufficient to prove attempted monopoly).

### c.   Barriers to entry.

6      Moreover, United faces significant barriers to market entry.  Entry barriers are "factors in

7  the market that deter entry while permitting incumbent firms to earn monopoly returns."  *Rebel,* 51

8  F.3d at 1439 (quoting *Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1427-28 (9th Cir.

9  1993)).  Control of an essential resource is a barrier to entry.  *Rebel,* 51 F.3d at 1439.  Clearly that

10  is present here, because SDCCC controls entry to the Facility under its Exclusive Policy.

11     United also cannot increase its output to capture the market share from SDCCC if SDCCC

12  increases its prices.  *See Rebel,* 51 F.3d at 1441.  If a defendant prevents competitors from

13  accessing the essential facility, then competitors cannot increase production and cannot capture

14  defendant's market share if defendant increases prices.  *Id.*  That is precisely what SDCCC has

15  done with its Exclusive Policy – precluded competitors from providing Trade Show Cleaning at

16  the Facility.

### 4.   There is a causal antitrust injury to United.

18     Conduct harms consumer welfare if it increases product prices or decreases product quality

19  or availability, and causes inefficiency.  *Paladin Association, Inc. v. Montana Power Co.*, 328

20  F.3d 1145, 1156 (9th Cir. 2003); *Rebel,* 51 F.3d at 1433.  Allocative inefficiency occurs when

21  market participants who can use products most efficiently, lack access to those products because

22  of a defendant's conduct.  *See Rebel*, 51 F.3d at 1433-34.

23     United will present evidence at trial demonstrating harm to both consumers and

24  competitors such as United.  Decorators will testify that costs have increased because they must

25  now pay SDCCC for certain cleaning that United previously provided free of charge.  Also,

26  Decorators have been damaged by the loss of choice in selecting a Trade Show Cleaning

27  subcontractor.  This loss of choice has also caused a decline in quality.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    In addition, United has been harmed by SDCCC's implementation of the Exclusive Policy

2  to the tune of approximately $763,870 as of January 31, 2011.  Prior to the Exclusive Policy,

3  United was charging GES and Champion $16.30 per hour for Facility Cleaning in San Diego and

4  50% of the total revenue from exhibitors for Booth Cleaning.  After imposition of the Exclusive

5  Policy, United must pay SDCCC a flat $17 per hour rate for Facility Cleaning, even though

6  SDCCC knew that United was contractually bound to charge GES and Champion less.  United

7  also is constrained by the estimates it provides the decorator prior to each show, and United cannot

8  bill for hours worked in excess of its contractual estimate; placing a premium on the efficiency of

9  the workforce.  Under the Exclusive Policy, United has no control over how many employees are

10  dispatched by SDCCC for a show, and it cannot incentivize SDCCC's workers to be more

11  efficient.

12    Prior to the Exclusive Policy, Booth Cleaning revenue was split 50/50 between the

13  decorator and the Trade Show Cleaning Company.  This is how Trade Show Cleaning companies

14  make most of their profits.  However, under the Exclusive Policy, any competitor of SDCCC for

15  Trade Show Cleaning must agree to pay 50% of the Booth Cleaning Revenue to SDCCC.

16  Therefore, unless United is able to increase its percentage of Booth Cleaning revenue, there is no

17  profit for United.

18    Finally, no other competitor can even bid to offer services with its own personnel.

19    Clearly, there is a causal antitrust injury to United, and United will prevail on this cause of

20  action.

21    **B.    Essential Facilities**

22    "The 'essential facilities' doctrine imposes on the owner of a facility that cannot reasonably

23  be duplicated and which is essential to competition in a given market a duty to make that facility

24  available to its competitors on a nondiscriminatory basis." *MetroNet Services Corp. v. Qwest*

25  *Corp.*, 383 F.3d 1124, 1128 (9th Cir. 2004) (internal citations omitted).

26    In this case, neither United nor any other cleaning company has meaningful access to the

27  Facility.  By mandating that United can only work at the Facility on the condition that (1) United

28  uses SDCCC's labor, and (2) SDCCC receives all of United's profit on the Booth Cleaning and the

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  hourly Facility Cleaning, SDCCC is making the Facility available in a discriminatory manner.

2  Indeed, since the Policy was implemented through January 31, 2011, United was forced to operate

3  at a loss of approximately $763,870 at the Facility to service its long-term contracts with its key

4  customers. United is not asking to have "access" to the Facility in the "most profitable manner."

5  Rather, United merely seeks access as was provided in the past: with the ability to use its own

6  superior labor and without the outrageous theft of its profits. Clearly, it is feasible for SDCCC to

7  provide this access to United because United had this access since the Facility opened in 1989

8  until implementation of the Exclusive Policy in 2007.

9        The power underlying SDCCC's control of the Facility is that SDCCC can parlay that

10  control into a powerful mechanism to monopolize a market for services that depend on use of the

11  essential facility. *See City of Anaheim v. So. Cal. Edison Co.*, 955 F.2d 1373, 1379 (9th Cir. 1992).

12  This is also an improper form of leveraging in the essential facilities context. *Alaska Airlines, Inc.*

13  *v. United Airlines, Inc.* 948 F.2d 536, 547 (9th Cir. 1991). The mechanism works through

14  SDCCC's refusal to deal with competitors who can compete only if they have access to the

15  Facility.[2] Because SDCCC can deny that access, SDCCC can "extend monopoly power from one

16  stage of production to another..." *Id.* Denial of access to an essential facility is a form of refusal

17  to deal and illegal under the Clayton Act (15 U.S.C. §14). *See Aspen*, 438 F.2d at 1519.

18        In *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973), the Supreme Court

19  applied the elements of refusal to deal in the essential facilities context when an electric utility

20  monopolized the retail market for electricity. Otter Tail, the defendant utility, refused to provide

21  access to its essential infrastructure (power grid), as well as refused to sell its own wholesale

22  electricity to municipal distributors and transport electricity from other electricity sellers to the

23  municipal distribution systems. *Id.*, at 370.

24

25

26  [2] As pointed out in the *Daubert* proceedings, United can also establish its essential facilities

27  claim without defining two markets. *Aspen Highlands Skiing Corp. v. Aspen Skiing Company*, 438 F.2d 1509, 1519-21 (10th Cir. 1984).

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    The district court found defendant's conduct violated Section 2 of the Sherman Act and the

2    Supreme Court affirmed. *Id.* at 375, 377. Otter Tail's denial of competitors' access to its

3    transmission grid deprived competitors of essential infrastructure and therefore precluded

4    competition in the retail energy market. *Id.* at 375-77. Otter Tail had a "strategic dominance" in

5    the transmission of power in most of its service area, which it used to foreclose potential entrants

6    into the retail market from obtaining electric power from outside sources of supply. *Id.* at 377.

7    This harmed consumers, impeded competition on grounds other than efficiency, was allocatively

8    inefficient, and harmed municipalities and their utilities. *Id.* at 377-78.

9    This case is analogous. In *Otter Tail*, successful competition in the retail distribution of

10   electricity market required access to the power grid, which was an essential infrastructure. Here,

11   successful competition in the Trade Show Cleaning market requires United be provided

12   meaningful access to the Facility. Thus, access to the Facility plays an indispensable role in

13   United's Trade Show Cleaning business. By implementing the Exclusive Policy SDCCC acquired

14   a "strategic dominance" in the Trade Show Cleaning Service market in San Diego, which it is

15   using to foreclose competitors from competing with SDCCC for providing Trade Show Cleaning

16   Services at the Facility. This in turn is foreclosing (and harming) consumers from choosing which

17   company performs Trade Show Cleaning at the Facility.

18   United will prevail on this cause of action.

19   **C.    Interference with Contract**

20   To demonstrate its claim for interference with contract, United must show: (1) a valid

21   contract between United and a third party; (2) SDCCC's knowledge of this contract; (3) SDCCC's

22   intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual

23   breach or disruption of the contractual relationship; and (5) resulting damages. *Pacific Gas &*

24   *Electric Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126 (1990). Actual breach or disruption

25   occurs when the contract is breached or when "plaintiff's performance is made more costly or

26   burdensome," as a result of defendant's interference. *Pacific Gas & Electric,* 50 Cal.3d at 1129.

27   At trial, United will establish both a breach and a disruption of its contractual relationships with

28   both GES and Champion due to SDCCC's implementation of its Exclusive Policy.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

### 1.   GES Contract

Under its contract with GES, United agreed to "perform first class, quality service," furnish all labor, equipment and supplies, and "use its best efforts to hire suitable individuals" to perform the services under the contract. The Exclusive Policy makes it impossible for United to comply with these provisions of the GES contract because United can no longer furnish the labor or use its best efforts to hire suitable individuals to perform the services under the contract, a term expressly contracted for.

The Exclusive Policy has also caused a disruption of United's expected contractual benefits with GES. Disruption to a contract is measured by impairment of a party's expected contractual benefits. *See Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 56-57 (1998).  Under its contracts with GES, United had received 50% of the Booth Cleaning Revenue for many years before SDCCC implemented its Exclusive Policy. The Exclusive Policy forces United to pay that entire 50% to SDCCC. Clearly, this is a disruption of the United/GES contract.

In addition, performance of the contract also has become more expensive for United. United has to pay more to SDCCC for SDCCC's labor than United would pay its own labor, making performance more expensive for United.  GES' performance has also become more expensive and their witnesses will so testify. An increase in the costs of contract performance constitutes disruption. *Pacific Gas & Electric,* 50 Cal.3d at 1129.

United will prevail on this claim.

### 2.   Champion Contract

The United-Champion contract provides that Champion "will use its best efforts" to designate United as the cleaning contractor for trade shows/conventions at the Facility.  Champion is no longer able to do so under the Exclusive Policy. This is undoubtedly a disruption of Champion's and United's expected benefits of the contract, caused by the SDCCC.  Additionally, as with GES, United has to pay more for SDCCC's labor, thereby increasing United's costs to perform.  Similarly, Champion's costs have also increased.

United will prevail on this claim.

**D.   Interference with Prospective Economic Advantage**

"The tort of interference with prospective business relations protects nonformalized or anticipated business relationships which are reasonably certain to occur, but which are nonetheless prospective." *PMC, Inc. v. Saban Entertainment, Inc.*, 45 Cal. App. 4th 579, 601 (1996) (overruled on other grounds). To prevail on this claim, a plaintiff must show that it is "reasonably probable that the prospective economic advantage would have been realized but for defendant's interference." *Youst v. Longo*, 43 Cal.3d 64, 71 (1987).

United has continuing relationships with several decorators, including Brede National and Paradice Decorating, with the probability of future economic benefit to United. United will demonstrate it would continue to work with these contractors in San Diego but for the Exclusive Policy. United has also entered into an economic relationship with Nielsen Business Media, a trade show organizer/manager. Under this arrangement, United has an expectation that Nielsen would designate United as the Trade Show Cleaning contractor for any and all shows at the Facility, but for the Exclusive Policy.

United will prevail on this claim.

**4. SDCCC'S AFFIRMATIVE DEFENSES HAVE NO MERIT**

SDCCC only has actively pursued two of its affirmative defenses: State Action Doctrine and Local Government Exemption. Neither of these defenses has any merit.[3] In fact, when denying SDCCC's Motion for Summary Judgment and/or Adjudication as to the currently pending claims, the Court ruled that SDCCC did not present evidence to establish these defenses. Since that ruling was issued, SDCCC has not produced any new facts or evidence which would support these defenses.

---

[3] Because SDCCC has not presented any significant evidence on any of its other affirmative defenses to date, United will not address those defenses here. Regardless, United is confident that at trial the evidence will show that all of SDCCC's defenses have no merit.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

## A.   State Action Doctrine

SDCCC claims it is exempt from liability on the antitrust claims under the "State Action Doctrine," which provides that states are immune from antitrust laws.  State action immunity only applies if the challenged activity was actively supervised by the state, and was "one clearly articulated and affirmatively expressed as state policy." *California Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105 (1980).  This means that the effect of SDCCC's Exclusive Policy (*i.e.*, eliminating competition for Trade Show Cleaning at the Facility) must be a foreseeable and logical result of the expressed state policy. *Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 400 (9th Cir. 1991).

SDCCC argues that it is immune because the Exclusive Policy was enacted pursuant to state and national policies of preventing terrorist attacks and securing public safety, specifically pursuant to an Executive Order issued in February of 2003.  However, the Court has already considered this defense on SDCCC's Motion for Summary Judgment and/or Adjudication and ruled that SDCCC failed to produce any evidence explaining that its "security concerns" related in any way to homeland security or a fear of terrorism, which was the essence of the Executive Order.[4]  The State of California has never expressed that security at the Facility was compromised by United's access thereto, and therefore only SDCCC labor should be allowed to perform Trade Show Cleaning at the Facility.  Indeed, the State has made no findings whatsoever with respect to security at the Facility.

At the time Judge Benitez ruled on SDCCC's motion, discovery was closed.  There is no additional evidence SDCCC can present now under Rules 26 and 37 of the FRCP.  Accordingly, SDCCC cannot establish this affirmative defense.

The Exclusive Policy also does not qualify as a "foreseeable and logical result" of a State policy. *Lancaster*, at 400.  Even if the Governor mandated that security be tightened at the Facility, it would be absurd for SDCCC to limit the application to only Trade Show Cleaning

---

[4] See August 3, 2010 Order [Dkt. No. 120], p. 5:12-20.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  Service workers as they did here.  Furthermore, the "state policy" SDCCC relies on says nothing

2  about eliminating competition through increased security.  There are many feasible options that

3  SDCCC has to increase security, if that is the true motivation.  One would be to force all outside

4  workers to undergo the same screening and background checks that SDCCC employees undergo.

5  United offered to undergo this process, but it was rejected by SDCCC.  Another would be to

6  implement a more stringent screening and background check process than what SDCCC

7  employees undergo.  United had a retired FBI subject matter expert on homeland security prepare

8  such a protocol, which was also rejected by SDCCC.

9  　　　　Since the Court issued its ruling in August of 2010 denying SDCCC's motion for summary

10  adjudication on this defense, SDCCC has not produced any new evidence which would support

11  this defense.  Furthermore, SDCCC cannot now produce new evidence under FRCP 26 and 37.

12  SDCCC will not prevail on its immunity defense.

13  　　　　**B.**　　**Local Government Exemption**

14  　　　　SDCCC argues that United is not entitled to monetary relief under its antitrust claims

15  because SDCCC is afforded immunity under the 1984 Local Government Antitrust Act

16  ("LGAA").  Local government means: "(A) a city, county, parish, town, township, village, or any

17  other general function governmental unit established by State law, or (B) a school district, sanitary

18  district, or any other special function governmental unit established by State law in one or more

19  states..." 15 U.S.C. § 34(1).  SDCCC cannot be a "general function governmental unit" because it

20  serves a specific function as a convention center.

21  　　　　Therefore, in order for the LGAA to apply to the SDCCC, it must qualify as a "special

22  function governmental unit" within the meaning of 15 U.S.C. § 34(1)(B).  A "special function

23  governmental unit" is one that has limited geographic jurisdiction and exposes taxpayers to

24

25

26

27

28

1  antitrust liability under the Clayton Antitrust Act, 15 U.S.C. § 15.[5] In *Tarabishi v. McAlester*

2  *Regional Hosp.*, 951 F.2d 1558 (10th Cir. 1991) the court defined eligibility for immunity

3  under the LGAA based on status as a "governmental instrumentality" and based on "effect on

4  taxpayers." *Id.* at 1566. That definition led the court to hold that an Oklahoma public trust

5  hospital was not a special function governmental unit under the LGAA, 15 U.S.C. § 34(1)(B).

6  While the court noted that no single factor was determinative, it held "a significant

7  consideration is where liability for an antitrust damage award will actually fall, in light of the

8  LGAA's obvious concern to limit the imposition of treble damage awards on *taxpayers*." *Id.*

9  (emphasis added). Because the taxpayers of Oklahoma were not liable for damage awards

10 levied against the public trust hospital, the LGAA did not exempt it from antitrust suits for

11 damages. *Id.*

12         Here, SDCCC has presented no percipient evidence to satisfy this element of the defense.

13 SDCCC failed to designate an expert on this technical area (i.e. who bears responsibility for a

14 damages award against SDCCC). Thus, SDCCC cannot present any evidence at trial to establish

15 this element of the defense. FRCP 26 and 37.

16         SDCCC also cannot demonstrate that it is legally, operationally, or financially accountable

17 to or controlled by the public. The City has previously sued SDCCC claiming SDCCC was not a

18 public entity. SDCCC is not listed as a department of the City. SDCCC exercises both

19 operational and financial autonomy because it handles its own operations, has its own budget, and

20 hires its own executive management and employees. *See Knapp,* 146 Cal. App. 4th at 717.

21 Moreover, SDCCC is responsible for its own financial management and the City has no obligation

22 to fund SDCCC's operations, nor is the City liable for SDCCC's debts. *See Wells v. One2One*

23

24 [5] It is also a requirement that SDCCC be treated as a governmental entity under California law.
   *Knapp v. Palisades Charter High School,* 146 Cal. App. 4th 708, 710 (2007). United also

25 recognizes that during the March 11, 2011 hearing the Court, relying on a prior order, found
   that SDCCC has satisfied this element. United respectfully disagrees with this finding, and

26 may raise this issue on appeal. United contends determination of this issue is a fact-intensive
   inquiry for the jury. *Wells v. One2One Learning Found.,* 39 Cal. 4th 1164, 1201 (2006).

27 Furthermore, United contends that non-profit public benefit corporations, like SDCCC, are *not*
   treated as the government. *Knapp,* 146 Cal. App. 4th at 710, 717.

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1 *Learning Found.*, 39 Cal.4th 1164, 1201 (2006). SDCCC creates its own budget and only reports

2 on its budget to the City. Indeed, SDCCC is one of the most self-sufficient convention center

3 corporations in the United States. SDCCC's operating revenues during fiscal year 2008 were

4 $34.8 million, of which 87.7% came from self-generated revenues. Even though the City makes

5 an annual investment in SDCCC (hoping for a larger return in tax revenues) the investment is

6 entirely at the city's *discretion* and SDCCC has no rights to the City's investment.

7        Finally, in denying SDCCC's Motion for Summary Judgment and/or Adjudication, the

8 Court ruled that SDCCC provided no evidence to prove that taxpayers would bear the burden of

9 any antitrust damage award. [6] There is no admissible or persuasive evidence to the contrary.

10        SDCCC cannot demonstrate that it qualifies for immunity under the LGAA because it

11 cannot demonstrate that SDCCC places the taxpayers at risk of antitrust liability. Therefore,

12 SDCCC will not prevail on this affirmative defense at trial.

13 **5. UNITED HAS SUFFERED DAMAGES OF $763,870**

14        Any person who is injured in his business or property by reason of an antitrust law

15 violation shall be entitled to recover threefold the damages sustained, including attorneys' fees and

16 costs. 15 U.S.C.A. § 15. Interest on actual damages also is recoverable.

17        United seeks damages for its lost profits as a result of the Exclusive Policy. United will

18 present expert witness Patrick F. Kennedy, Ph.D., an economist, to testify regarding the nature and

19 amount of its damages.[7]

20        As discussed above, United provides two types of Trade Show Cleaning Services: Facility

21 Cleaning and Booth Cleaning. Facility Cleaning is paid for out of the general fees received by the

22 general contractor. Facility Cleaning is billed on a pre-negotiated, fully-loaded, hourly basis. In

23 San Diego, prior to the Exclusive Policy, United contracted with GES and Champion to provide

24

25 [6] Dkt. No. 120 at 6:11-16 .

26 [7] On August 3, 2010, the Court ruled that Dr. Kennedy is qualified to testify as an expert
witness in this matter and it denied SDCCC's motion in limine to exclude his testimony [Dkt.
27 No. 119].

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1  Facility Cleaning at a fully-loaded hourly rate of $16.30. This rate was calculated based on

2  United's costs of paying its own labor and it includes costs associated with the time spent by

3  United's supervisory employees (who do not bill their time to the general contractor), equipment

4  depreciation and other overhead, including benefits and United's profit margin.

5      In order for United to service its San Diego contracts today under the Exclusive Policy,

6  SDCCC charges United $17 an hour for labor and gives United no input into the number of

7  workers used or the hours worked. This $17 figure is the same price SDCCC charges its own

8  customers. Thus, even when United is still technically the contractor, SDCCC is earning a profit

9  on the back of United while United suffers a loss.

10      United's contracts for Facility Cleaning require United to provide estimates in advance of

11  each specific trade show. United's estimates are based on the overall square footage of the

12  common areas for a particular show and the fully-loaded hourly rates required to clean those areas.

13  United is not allowed to bill for hours in excess of this estimate. Since United is paid pursuant to

14  this estimate, the efficiency of the workforce is particularly important for this phase. At trial,

15  United will show that, in addition to charging a higher price, SDCCC did not comply with

16  United's estimates and overstaffed certain events, and then charged United for the extra labor

17  hours.

18      Booth Cleaning is provided to specific exhibitors upon request and is paid for on a flat per

19  square foot basis. Each requesting exhibitor at a trade show pays the fee to the general contractor.

20  United receives a fixed percent of the cleaning fees paid by exhibitors to the general contractor to

21  do the Booth Cleaning. In San Diego, United's contracts with GES and Champion call for United

22  to receive roughly 50% of the general contractor's revenue from these fees. From that 50%,

23  United has to pay its overhead and operating costs, including paying its local San Diego

24  employees. The remainder of any revenue constitutes United's Booth Cleaning profit margin.

25  Under the Exclusive Policy, SDCCC has charged United 100% of the Booth Cleaning revenue that

26  United receives from the decorators.

27      United's damages are comprised of the following:

28

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700

1    1.    <u>Facility Cleaning</u>:  United's damages consist of the difference in the hourly rate

2    charged by SDCCC compared to United's internal labor rate for Facility Cleaning.  As of

3    January 31, 2011, these damages total $108,893.  These damages continue to accrue as trade

4    shows are held at the Facility.

5    2.    <u>Booth Cleaning</u>:  Booth Cleaning and other non-hourly services are billed on a per

6    square foot basis.  United's economic damages for Booth Cleaning are the amount that United

7    would have received to perform the Booth Cleaning, reduced by the labor cost that United would

8    have paid to perform the Booth Cleaning.  As of January 31, 2011, these damages total $683,739.

9    Again, these damages grow as trade shows occur.

10    Dr. Kennedy offset these damages by reducing an appropriate percentage for supplies and

11    expenses that were avoided since United employees did not perform the cleaning services.

12    Dr. Kennedy also offset the damages by the cost of the aisle porter hours billed to the general

13    services contractors because these services are not billed by SDCCC to United.  Therefore,

14    United's economic damages for losses on facility and booth cleaning are **$763,870** as of

15    January 31, 2011.

16    Pursuant to the Sherman Act, United is also entitled to treble damages, as well as to

17    recover its attorneys' fees and costs.

18    ### 6. INJUNCTIVE RELIEF

19    United also seeks an injunction precluding SDCCC from continuing to enforce its

20    Exclusive Policy prohibiting United employees from performing Trade Show Cleaning Services at

21    the Facility.  United's claims for monetary damages and injunctive relief involve common issues

22    regarding violations of the Sherman Act, and California interference law.  In such a case, trial of

23    the damages claim to a jury proceeds first, followed by the Court's ruling on the claim for

24    injunctive relief.  *See Florists Nationwide Tel. Delivery Network – America's Phone Order*

25    *Florists, Inc. v. Florists Telegraph Delivery Assn.,* 371 F.2d 263, 270-71 (7th Cir. 1967).  The

26

27

28

1  Court must then rule on the claim for injunctive relief consistent with the record from the jury

2  trial.[8]  *Id.*

## 7. CONCLUSION

4  For the above reasons, as will be established at trial, United is entitled to a damages verdict

5  for $763,870 to compensate United for all of its past lost profits, that such amount be trebled, that

6  its costs and attorneys' fees be awarded, and that SDCCC's affirmative defenses be denied.  United

7  also is entitled to an injunction permitting United to use its employees to perform Trade Show

8  Cleaning Services at the Facility.

10  DATED: March 18, 2011                    KIRBY NOONAN LANCE & HOGE LLP

12                                          By:  */s/ Jacob M. Slania*
13                                               James R. Lance
                                                 Jacob M. Slania
14                                               Attorneys for Plaintiff
                                                 UNITED NATIONAL MAINTENANCE, INC.

---

26  [8] Of course, considerations peculiar to the award of equitable relief which are not
common to the damages claim remain within the Court's sole province, to be decided based on
27  the evidence presented to the Court. *Florists,* 371 F.2d at 271.

Kirby Noonan Lance & Hoge LLP
350 Tenth Avenue, Suite 1300 San Diego, California 92101-8700