1   WRIGHT & L'ESTRANGE
    A Partnership Including Professional Corporations
2       John H. L'Estrange, Jr. (SBN 049594)
        jlestrange@wllawsd.com
3       Joseph T. Ergastolo (SBN 137807)
        jte@wllawsd.com
4       Andrew E. Schouten (SBN 263684)
        aschouten@wllawsd.com
5   401 West A Street, Suite 2250
    San Diego, California 92101
6   (619) 231-4844  Fax:  (619) 231-6710

7   Attorneys for Defendant
    San Diego Convention Center
8   Corporation, Inc.

9                 **UNITED STATES DISTRICT COURT**

10             **SOUTHERN DISTRICT OF CALIFORNIA**

11  UNITED NATIONAL MAINTENANCE          )   **CASE NO. 07-cv-2172-AJB**
    INC., a Nevada Corporation            )
12                                        )   **DEFENDANT'S TRIAL BRIEF**
                  Plaintiff,              )
13                                        )
                                          )
14             v.                         )
                                          )
15  SAN DIEGO CONVENTION CENTER           )
    CORPORATION, INC., a California       )
16  Corporation,                          )   Trial Date:    March 21, 2011
                                          )   Time:          9:00 a.m.
17                Defendant.              )   Courtroom:     12
                                          )
18  _____ )

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.  STATEMENT OF FACTS .............................................................................. 2

    A.   SDCCC IS A GOVERNMENTAL AND COMMERCIAL ENTITY .................... 2

        1.   SDCCC Serves the Public by Attracting Trade Shows and Tourism. ................................................................................... 2

        2.   SDCCC Serves the Public by Maintaining Profitability. .......................... 3

        3.   SDCCC Serves the Public by Protecting the Public and the Building. ................................................................................... 3

    B.   THE RELEVANT MARKET IS THE NATIONAL MARKET FOR TRADE  SHOW HOSTING; CLEANING IS AN ANCILLARY SERVICE. ................................................................................... 4

        1.   Competition Occurs in the National Market for Trade Show Hosting. ................................................................................... 4

        2.   Ancillary Production Services are Purchased After a Venue is Chosen. ................................................................................... 4

        3.   The Building and the Exhibition Space Must be Cleaned During Shows. ................................................................................... 5

    C.   THE PARTIES' CONTRACTS DETERMINE THE SCOPE OF WORK AND  REFLECT THE LEVELS OF PRODUCTION AT A TRADE SHOW. ................................................................................... 6

        1.   SDCCC Licenses the Building and Regulates its Use. .............................. 6

        2.   Licensees or their Agents Hire Decorators. ................................................ 6

        3.   UNM Performs Cleaning Services Pursuant To Exclusive, Nationwide   Contracts With Decorators. ................................................ 6

    D.   SDCCC'S CLEANING SERVICES POLICY. ......................................... 7

        1.   SDCCC Implemented Its Cleaning Services Policy For Three Reasons. ................................................................................... 7

        2.   SDCCC Implemented its Policy by Amending the Building's Regulations. ................................................................................... 7

        3.   SDCCC's Cleaning Services Policy Is Not Discriminatory. ..................... 7

III. SUMMARY OF CLAIMS ............................................................................... 8

i

A.    ACTUAL MONOPOLIZATION ................................................................. 8

    1.    UNM Cannot Show Monopoly Power in the Relevant Market. ............... 8

    2.    UNM Cannot Show Anticompetitive Conduct Through the
           Essential Facilities  Doctrine. ................................................................. 10

        a.    UNM Cannot Establish the Elements of the Essential
              Facilities Doctrine. ..................................................................... 11

            i.    The Building is Not an Essential Facility. ....................... 11

            ii.    The Building is Not Vital to UNM's Survival. ................. 12

            iii.    UNM is Not Denied Access to the Building. .................... 13

        b.    SDCCC Acted Pursuant to Legitimate Business Reasons. ........... 13

            i.    The Burden-Shifting Standard. ......................................... 13

            ii.    Augmenting Security and Emergency
               Preparedness. ................................................................... 14

            iii.    Maintaining Quality Control and Brand Value. ............... 16

            iv.    Increasing Revenues and Reducing Expenses. ................ 17

    3.    UNM Cannot Show Antitrust Injury. ....................................................... 18

        a.    The Policy does not Restrict Consumer Choice. ........................... 19

        b.    The Policy Results in Greater Efficiencies. .................................. 19

        c.    The Policy does not Restrict Production at the Building. ............. 20

        d.    The Policy does not Increase Consumer Prices. ........................... 20

        e.    The Policy does not Diminish Service Quality. ............................ 20

B.    ATTEMPTED MONOPOLIZATION ................................................................. 20

    1.    UNM Cannot Demonstrate Specific Intent. ............................................. 21

    2.    UNM Cannot Demonstrate Predatory or Anticompetitive Conduct. ........ 21

        a.    "Generic" Anticompetitive Conduct ............................................ 21

        b.    Raising Rivals' Costs. .................................................................. 22

        c.    Monopoly Leveraging. .................................................................. 22

    3.    Dangerous Probability of Monopolization. .............................................. 22

ii

C.    ANTITRUST DAMAGES ........................................................................ 23

D.    INTENTIONAL INTERFERENCE WITH CONTRACT ................................... 24

    1.    SDCCC is not a Stranger to UNM's Contracts. ........................................ 24

    2.    At Least One Contract was not "Valid and Existing." ............................... 25

    3.    SDCCC Lacked Sufficient Knowledge of the Contracts to Form an Intent to Interfere. ............................................................................... 25

    4.    UNM Cannot Establish Disruption. ......................................................... 26

        a.    UNM's Expectations Under the GES Contract. ............................ 26

        b.    UNM's Expectations Under the Champion Contract. ................... 27

    5.    UNM Cannot Establish Resulting Damage (Proximate Cause). ............... 28

E.    INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE. ...................................................................................... 29

    1.    Relationship with the Probability of Future Economic Benefit. ............... 29

        a.    UNM's Oral Contracts with Paradice and Brede National. .......... 29

        b.    The Nielsen Contract. ............................................................... 30

    2.    Intentional and Wrongful Acts Designed to Interfere. ............................. 30

        a.    This Court's Summary Judgment Order Precludes Liability Under the UCL. .......................................................................... 31

        b.    This Court's Summary Judgment Order Precludes Liability Under the Cartwright Act. ............................................................ 31

F.    STATE ACTION DOCTRINE AFFIRMATIVE DEFENSE. ............................ 32

    1.    SDCCC's Statutory Authority to Maintain Convention Centers. ............. 33

    2.    SDCCC's Authority under State and National Policies of Preventing Terrorist Attacks and Securing Public Safety. ......................... 34

G.    LOCAL GOVERNMENT ANTITRUST ACT AFFIRMATIVE DEFENSE. ........................................................................................... 35

H.    JUSTIFICATION AFFIRMATIVE DEFENSE. ............................................. 36

    1.    Balancing Test ...................................................................................... 36

    2.    Legally Protected Interest ..................................................................... 36

I.   MITIGATION AFFIRMATIVE DEFENSE. ........................................................ 37

    1.   Antitrust Mitigation. ........................................................................ 37

    2.   Economic Interference Mitigation. ................................................. 38

IV.   SIGNIFICANT ISSUES OF LAW ................................................................. 40

    A.   THE ESSENTIAL FACILITIES DOCTRINE IS NO LONGER VIABLE, AND PLAINTIFF'S MONOPOLIZATION CLAIM SHOULD BE ANALYZED UNDER A UNILATERAL REFUSAL TO DEAL RUBRIC. ........................................................................................... 40

    B.   SDCCC HAS NO DUTY UNDER THE ANTITRUST LAWS TO COOPERATE WITH UNM. ........................................................... 41

    C.   UNM MAY NOT RELY ON A CONTRACTUAL "LOCK-IN" TO DEFINE THE RELEVANT MARKET AND ESTABLISH MONOPOLY POWER. ...................................................................... 42

    D.   UNM MAY NOT REBUT SDCCC'S BUSINESS JUSTIFICATIONS BY OFFERING A LESS RESTRICTIVE ALTERNATIVE OR SECOND-GUESSING SDCCC'S BUSINESS DECISIONS. ............................ 43

    E.   ANY ANTITRUST VIOLATION PROVEN BY UNM IS IRREMEDIABLE IF UNM WOULD RECEIVE A SHARE OF SDCCC'S ALLEGED MONOPOLY BUT MARKET CONDITIONS REMAIN UNCHANGED. ..................................................................... 43

    F.   THE COURT INTERPRETS THE MEANING OF UNM'S CONTRACTS AS A MATTER OF LAW, BUT THE JURY RESOLVES CONFLICTING EVIDENCE AS TO THEIR MEANING. ........... 45

    G.   THE COURT MUST DETERMINE, AS A MATTER OF LAW, WHETHER THE CONDUCT ALLEGED BY UNM IS OF THE TYPE THAT IS "INDEPENDENTLY WRONGFUL" FOR PURPOSES OF THE INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE CLAIM. ............................................... 47

    H.   THE COURT SHOULD DETERMINE THE PROPER SANCTIONS TO IMPOSE AGAINST UNM FOR DESTRUCTION OR SPOLIATION OF EVIDENCE. ...................................................................................... 48

    I.   THE PARTIES DISAGREE AS TO THE PROPER JURY INSTRUCTIONS. .................................................................................. 49

    J.   SDCCC ANTICIPATES THAT IT WILL RENEW ITS OBJECTIONS TO THE ADMISSIBILITY OF OPINION TESTIMONY OFFERED BY UNM'S EXPERT ECONOMIST. ................................................... 49

1

V.    CONCLUSION ................................................................................................. 49

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## CASES

AD/SAT v. AP,
    181 F.3d 216 (2d Cir. 1999).................................................................... 9

Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.,
    141 F.3d 947 (9th Cir. 1998)................................................................. 21

Alaska Airlines, Inc. v. United Airlines, Inc.,
    948 F.2d 536 (9th Cir. 1991).......................................................... 12, 22

Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,
    592 F.3d 991 (9th Cir. 2010)........................................................... 8, 43

Almeda Mall, Inc. v. Houston Lighting & Power Co.,
    615 F.2d 343 (5th Cir. 1980)................................................................. 44

Alpert's Newspaper Delivery, Inc. v. The New York Times Co.,
    876 F.2d 266 (2d Cir.1989)................................................................... 22

Anaheim v. Southern California Edison Co.,
    955 F.2d 1373 (1992)............................................................................ 16

Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,
    7 Cal.4th 503 (1994) ............................................................................ 24

Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,
    472 U.S. 585 (1985)....................................................................... 14, 21

Bank of N.Y. v. Fremont Gen. Corp.,
    523 F.3d 902 (9th Cir. 2008)................................................................. 29

Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture
    Partners,
    52 Cal. App.4th 867 (1997).................................................................. 29

Bigelow v. RKO Radio Pictures, Inc.,
    327 U.S. 251 (1946).............................................................................. 23

Blank v. Kirwan,
    39 Cal.3d 311 (1985) ........................................................................... 28

Brunswick Corp. v. Pueblo Bowl-O-Mat,
    429 U.S. 477 (1977).............................................................................. 43

Byars v. Bluff City News Co.,
    609 F.2d 843 (6th Cir. 1979)................................................................. 22

Cal. Computer Products, Inc. v. IBM Corp.,
    613 F.2d 727 (9th Cir. 1979)........................................................... 16, 18

Calculators Hawaii, Inc. v. Brandt, Inc.,
    724 F.2d 1332 (9th Cir. 1983)................................................................. 13, 14

Christy Sports, LLC v. Deer Valley Resort Co.,
    555 F.3d 1188 (10th Cir. 2009)........................................................ 10, 18, 33

City of Columbia v. Omni Outdoor Advertising, Inc.,
    499 U.S. 365 (1991) ................................................................................... 32

Clairol, Inc. v. Boston Discount Center, Inc.,
    608 F.2d 1114 (6th Cir. 1979)..................................................................... 15

Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.,
    611 F.3d 495 (9th Cir. 2010)....................................................................... 18

Davis v. Nadrich,
    174 Cal.App.4th 1 (2009).................................................................... 25, 28

Dimidowich v. Bell & Howell,
    803 F.2d 1473 (9th Cir. 1986)..................................................................... 32

Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.,
    773 F.2d 1506 (9th Cir. 1985)..................................................................... 23

Dryden v. Tri-Valley Growers,
    65 Cal.App.3d 990 (1977)........................................................................... 25

Eastman Kodak Co. v. Image Technical Services, Inc.,
    504 U.S. 451 (1992) ................................................................................... 14

Elliot v. United Center,
    126 F.3d 1003 (7th Cir. 1997)............................................................... 18, 33

Environmental Planning & Info. Council v. Superior Court,
    36 Cal.3d 188 (1984) ................................................................................. 36

Fishman v. Estate of Wirtz,
    807 F.2d 520 (7th Cir. 1986)....................................................................... 38

Flip Side Productions. v. Jam Productions, Ltd.,
    843 F.2d 1024 (7th Cir. 1988)..................................................................... 13

Forsyth v. Humana, Inc.,
    114 F.3d 1467 (9th Cir. 1997)..................................................................... 42

Freeman v. San Diego Ass'n of Realtors,
    322 F.3d 1133 (9th Cir. 2003)..................................................................... 16

G.H.I.I. v. MTS, Inc.,
    147 Cal.App.3d 256 (1983)......................................................................... 32

Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.,
    95 Cal.App.4th 1249 (2002)........................................................................ 36

Girard v. Delta Towers Joint Venture,
    20 Cal.App.4th 1741 (1993)........................................................................ 30

vii

Glen Holly Entertainment, Inc. v. Tektronix Inc.,
    352 F.3d 367 (9th Cir. 2003)............................................................... 19, 43

Glover v. BIC Corp.,
    6 F.3d 1318 (9th Cir. 1993)................................................................ 48

Golf City, Inc. v. Wilson Sporting Goods Co.,
    555 F.2d 426 (5th Cir. 1977)............................................................. 37, 38

Guerra v. Packard,
    236 Cal.App.2d 272 (1965).................................................................. 28

Hack v. President & Fellows of Yale College,
    237 F.3d 81 (2d Cir. 2000)................................................................. 42

Hass v. Oregon State Bar,
    883 F.2d 1453 (9th Cir. 1989)........................................................... 32, 33

HDC Medical, Inc. v. Minntech Corp.,
    474 F.3d 543 (8th Cir. 2007)............................................................. 15

Herron v. State Farm Mut. Ins. Co.,
    56 Cal.2d 202 (1961) ........................................................................ 36

Hunter v. Croysdill,
    169 Cal.App.2d 307 (1959)................................................................. 37

Huntleigh USA Corp. v. United States,
    525 F.3d 1370 (Fed. Cir. 2008).......................................................... 34

Illinois ex rel. Burris v. Panhandle E. Pipe Line Co.,
    935 F.2d 1469 (7th Cir. 1991)........................................................... 18

Image Tech. Servs. v. Eastman Kodak Co.,
    125 F.3d 1195 (9th Cir. 1997)............................................... 11, 14, 23

In re Citric Acid Litig.,
    191 F.3d 1090 (9th Cir. 1999)........................................................... 43

In re IBM Peripheral EDP Devices Antitrust Litig.,
    481 F.Supp. 965 (N.D. Cal. 1979) ................................................... 43

In re Live Concert Antitrust Litig.,
    247 F.R.D. 98 (C.D. Cal. 2007) ....................................................... 23

International Rys. of Central America v. United Brands Co.,
    532 F.2d 231 (2d Cir. 1976).............................................................. 18

Knutson v. Daily Review, Inc.,
    548 F.2d 795 (9th Cir. 1976)............................................................. 22

Korea Supply Co. v. Lockheed Martin Corp.,
    29 Cal. 4th 1134 (2003) ................................................... 29, 30, 31, 47

LiveUniverse, Inc. v. MySpace, Inc.,
    304 Fed.Appx. 554 (9th Cir. 2008)................................................... 41

viii

*Los Angeles Memorial Coliseum Comm'n v. National Football League,*
    791 F.2d 1356 (9th Cir. 1986)..................................................................... 23

*Lowell v. Mother's Cake & Cookie Co.,*
    79 Cal.App.3d 13 (1978)............................................................................ 36

*Malcolm v. Marathon Oil Co.,*
    642 F.2d 845 (5th Cir. 1981)................................................................ 37, 38

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.,*
    271 F.3d 825 (9th Cir. 2001)...................................................................... 25

*Maritz Inc. v. Carlson Mktg. Group, Inc.,*
    2009 U.S. Dist. LEXIS 105195 (N.D. Cal. Oct. 30, 2009)............................. 24

*Mattel, Inc. v. MGA Entertainment, Inc.,*
    616 F.3d 904 (9th Cir. 2010)................................................................ 45, 46

*Mayes v. Bryan,*
    139 Cal.App.4th 1075 (2006)..................................................................... 28

*McGahee v. Northern Propane Gas Co.,*
    858 F.2d 1487 (11th Cir. 1988).................................................................. 23

*McGlinchy v. Shell Chemical Co.,*
    845 F.2d 802 (9th Cir.1988)....................................................................... 23

*Mendelovitz v. Adolph Coors Co.,*
    693 F.2d 570 (5th Cir. 1982)...................................................................... 15

*MetroNet Servs. Corp. v. Qwest Corp.,*
    383 F.3d 1124 (9th Cir. 2004)............................................. 11, 13, 40, 41, 42

*Mid-South Grizzlies v. NFL,*
    720 F.2d 772 (3d Cir. 1983)................................................................ 11, 44

*Millenkamp v. Davisco Foods Int'l, Inc.,*
    562 F.3d 971 (9th Cir. 2009)...................................................................... 48

*Morey v. Vannucci,*
    64 Cal.App.4th 904 (1998)................................................................... 46, 47

*Morris Commns. Corp. v. PGA Tour, Inc.,*
    364 F.3d 1288 (11th Cir. 2004).................................................................. 18

*Mozart Co. v. Mercedes-Benz of North America, Inc.,*
    833 F.2d 1342 (9th Cir. 1987).................................................................... 17

*National Data Payment Systems, Inc. v. Meridian Bank,*
    212 F.3d 849 (3rd Cir. 2000) ............................................................... 27, 28

*Newcal Indus., Inc. v. Ikon Office Solution,*
    513 F.3d 1038 (9th Cir. 2008)................................................................. 9, 42

*Oahu Gas Service, Inc. v. Pacific Resources, Inc.,*
    838 F.2d 360 (9th Cir. 1988)......................................................... 10, 13, 18

ix

Olympia Equipment Leasing Co. v. Western Union Tel. Co.,
   797 F.2d 370 (7th Cir. 1986) ........................................................................ 13

Pac. Bell Tel. Co. v. linkLine Communs., Inc.,
   129 S.Ct. 1109 (2009) .................................................................................. 41

Pacific Gas & E. Co. v. G. W. Thomas Drayage & Rigging Co.,
   69 Cal.2d 33 (1968) ..................................................................................... 26

Paladin Assocs. v. Montana Power Co.,
   328 F.3d 1145 (9th Cir. 2003) ..................................................... 9, 10, 11, 20

Palm Springs Medical Clinic, Inc. v. Desert Hospital,
   628 F.Supp. 454 (C.D. Cal. (1986) .............................................................. 35

Paragould Cablevision, Inc. v. Paragould,
   930 F.2d 1310 (8th Cir. 1991) ..................................................................... 33

Parker v. Brown,
   317 U.S. 341 (1943) ..................................................................................... 32

Paschall v. Kansas City Star Co.,
   727 F.2d 692 (8th Cir. 1994) ....................................................................... 22

Penn v. San Diego,
   188 Cal.App.3d 636 (1987) .......................................................................... 31

People ex rel. Freitas v. City and County of San Francisco,
   92 Cal.App.3d 913 (1979) ............................................................................ 31

Pittsburg County Rural Water District No. 7 v. City of McAlester,
   358 F.3d 694 (10th Cir. 2004) ............................................................... 11, 12

PM Group, Inc. v. Stewart,
   154 Cal.App.4th 55 (2007) ........................................................................... 24

Pool v. City of Oakland,
   42 Cal.3d 1051 (1986) ................................................................................. 37

Queen City Pizza, Inc. v. Domino's Pizza, Inc.,
   124 F.3d 430 (3rd Cir. 1997) .................................................................. 42, 43

Rebel Oil Co. v. Atlantic Richfield Co.,
   51 F.3d 1421 (9th Cir. 1995) ....................................................... 8, 19, 23, 45

Republic Tobacco Co. v. No. Atlantic Trading Co.,
   381 F.3d 717 (7th Cir. 2004) ....................................................................... 42

Richardson v. La Rancherita of La Jolla, Inc.,
   98 Cal.App.3d 73 (1979) ......................................................................... 36, 37

Short v. Nevada Joint Union High School Dist.,
   163 Cal.App.3d 1087 (1985) ........................................................................ 28

So. Cal. Edison Co. v. Superior Court,
    37 Cal.App.4th 839 (1995)......................................................................... 46, 47

Southern Motor Carriers Rate Conf. v. United States,
    471 U.S. 48 (1985).................................................................................... 32

Spectrum Sports v. McQuillan,
    506 U.S. 447 (1993)................................................................................ 21, 22

Springs Ambulance Service, Inc. v. City of Rancho Mirage,
    745 F.2d 1270 (9th Cir. 1984).................................................................. 33

Springs v. Stone,
    362 F.Supp.2d 686 (E.D. Va. 2005).......................................................... 35

Stein v. Pac. Bell,
    172 Fed. Appx. 192 (9th Cir. 2006).................................................. 22, 40, 41

Tanaka v. University of Southern California,
    252 F.3d 1059 (9th Cir. 2001)...................................................................... 8

Tate v. Canonica,
    180 Cal.App.2d 898 (1960)...................................................................... 28, 29

Town of Hallie v. City of Eau Claire,
    471 U.S. 34 (1985).................................................................................... 32

Traweek v. San Francisco,
    920 F.2d 589 (9th Cir. 1990)...................................................................... 32

TV Events & Mktg. v. AMCON Distrib. Co.,
    484 F.Supp.2d 1124 (D. Haw. 2006) ...................................................... 27, 28

Twin City Sportservice, Inc. v. Charles O. Finley & Co.,
    512 F.2d 1264 (9th Cir. 1975)................................................................. 10, 12

Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg. Corp.,
    982 F.2d 363 (9th Cir. 1992)....................................................................... 48

United States v. E. I. du Pont de Nemours & Co.,
    351 U.S. 377 (1956)...................................................................................... 8

United States v. Grinnell Corp.,
    384 U.S. 563 (1966)...................................................................................... 8

United States v. Microsoft Corp.,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................. 14, 16

United States v. Syufy Enterprises,
    903 F.2d 659 (9th Cir. 1990)........................................................................ 8

Valencia v. Shell Oil Co.,
    23 Cal.2d 840 (1944) ................................................................................. 39

xi

1

Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP,
    540 U.S. 398 (2004) ................................................................ passim

2

Vernon v. So. Cal. Edison Co.,
    955 F.2d 1361 (9th Cir. 1992) .................................................. 23

3

4

Weiss v. York Hospital,
    745 F.2d 786 (3rd Cir. 1984) .................................................. 17

5

Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,
    549 U.S. 312 (2007) .................................................. 45

6

William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.,
    668 F.2d 1014 (9th Cir. 1981) .................................................. 21

7

8

Wolf v. Superior Court,
    114 Cal. App. 4th 1343 (2004).................................................. 45

9

10

Worldwide Commerce, Inc. v. Fruehauf Corp.,
    84 Cal.App.3d 803 (1978).................................................. 30

11

**STATUTES**

12

15 U.S.C. § 34 .................................................. 35

13

15 U.S.C. § 35(a) .................................................. 35

14

49 U.S.C. § 44901(a) .................................................. 34

15

6 U.S.C. § 111 .................................................. 34

16

6 U.S.C. § 124h.................................................. 34

17

6 U.S.C. § 605 .................................................. 34

18

Cal. Bus. & Prof. Code § 16702 .................................................. 31

19

Cal. Bus. & Prof. Code § 16720 .................................................. 31

20

Cal. Civ. Code § 1624(a)(1).................................................. 29

21

Cal. Cov't Code § 37506 .................................................. 33

22

Cal. Gov't Code § 37500 .................................................. 2

23

Cal. Gov't Code § 37506 .................................................. 2

24

Cal. Gov't Code § 37501 .................................................. 33

25

California Business and Professions Code § 17000.................................................. 31

26

California Business and Professions Code § 16700.................................................. 31

27

28

1

2

**OTHER AUTHORITIES**

3

6 Witkin, <u>Cal. Summary of Law</u>, Torts
   § 1624 (10th ed. 2005) ................................................................................ 39

4

IIIA Areeda & Hovenkamp, <u>Antitrust Law: An Analysis of Antitrust Principles</u>
   <u>and Their Application</u> (3d ed. 2006) ............................................... 41, 43, 44

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 07-cv-2172-AJB

1    Defendant San Diego Convention Center Corporation, Inc. ("SDCCC") submits this

2    Trial Brief pursuant to Local Civil Rule 16.1(f)(9).  As required by Rule 16.1(f), this brief

3    addresses the significant disputed issues of law and evidentiary issues.  It does not purport to be

4    exhaustive or to address every issue that may arise at trial. Should additional issues of law or

5    evidence arise, SDCCC will prepare further briefing, as necessary.

6                                                    **I.**

7                                        **INTRODUCTION**

8    This dispute concerns a policy implemented by SDCCC for the provision of cleaning

9    services at conventions, trade shows and other events at the San Diego Convention Center

10   ("Building").  Prior to July 1, 2007, Plaintiff United National Maintenance ("UNM") never paid

11   SDCCC any monies to conduct business on SDCCC's property.  UNM never invested in the

12   Building.   Instead, UNM gained access to the Building by signing nationwide, exclusive

13   contracts with trade show industry members.

14   The policy, which became effective on July 1, 2007, mandates that only SDCCC

15   employees may perform event-related cleaning services at the Building.  Acting in its capacity

16   as the Building's property manager, SDCCC implemented its cleaning services policy for three

17   reasons: (1) augmenting security and emergency preparedness; (2) maintaining quality control

18   and brand value; and (3) improving efficiency, i.e., increasing revenues and reducing expenses.

19   Competing cleaning service providers, such as UNM, may still operate at the Building, so long

20   as they use SDCCC labor.  SDCCC charges customers and competitors the same price for the

21   labor.  SDCCC took reasonable steps to protect its patrons, its property, and its bottom line.

22   In its bid to regain free access to the Building on terms favorable to it, UNM asserts two

23   monopolization claims under section 2 of the Sherman Act, and claims for intentional

24   interference with contract and prospective economic advantage.  UNM's claims lack economic

25   and common sense and would subvert fundamental public policies underlying antitrust and

26   property law.

27   UNM contends that it is entitled to compete against SDCCC on SDCCC's property by

28   virtue of UNM's contracts with third parties.  UNM is like a popcorn vendor who demands entry

                                                     1

1    into a movie theater to sell popcorn to theater-goers.  Like the theater owner, SDCCC must be

2    permitted to exclude the vendor so that it may recoup its capital investment, marketing expenses,

3    and other costs by operating its own business on its own property.  Similarly, the popcorn

4    vendor may not execute contracts to sell popcorn at the theater without the owner's permission.

5    If it were so simple to commandeer the theater owner's property and investments, no movie

6    theaters would ever be built.  UNM has yet to come forward with any credible explanation as to

7    how its contracts with third parties compel SDCCC to share its property or entitle UNM to

8    operate in the Building over SDCCC's objection.

## II.

## STATEMENT OF FACTS

**A.    SDCCC IS A GOVERNMENTAL AND COMMERCIAL ENTITY.**

12          SDCCC is a nonprofit public benefit corporation, and the City of San Diego is SDCCC's

13   sole shareholder.  It is a governmental entity separate and apart from, but owned by, the City.

14   SDCCC's only business purpose is to operate the Building on the City's behalf.[1]

**1.    SDCCC Serves the Public by Attracting Trade Shows and Tourism.**

16          SDCCC is charged with attracting events, trade shows, and conventions to the Building,

17   which generates tourism profits for local businesses and tax revenues for the City.  SDCCC's

18   primary product is space suitable for hosting trade shows, conventions, and other meetings.  It

19   competes with other venues locally, nationally and internationally to secure these benefits for the

20   San Diego region.

21          Given its many desirable qualities, San Diego is recognized as a top destination for

22   conventions and trade shows.  However, the Building's location is not the only reason for

23   SDCCC's competitive advantage.  "San Diego Spirit," SDCCC's quality control and brand

24   management program, is also a key factor underlying the Building's success.  It is a total service

25   quality management program embodied by each SDCCC employee's personal commitment to

---

[1]  California cities have statutory authority to construct and maintain public assembly or convention halls.  See Cal. Gov't Code §§ 37500- 37506.  Pursuant to that authority, cities may construct and maintain a public assembly or convention hall and arrange for a separate entity to supervise and manage its use.  Id. at §§ 37501, 37506.

2

1  provide Building guests with the best service possible and proudly represent the organization as
2  well as San Diego.   SDCCC trains each employee/representative on the program's
3  comprehensive policies and guidelines on topics from team-building and interpersonal
4  relationships to employee appearance (including grooming and dress), conduct, etiquette, and
5  ethics. Each SDCCC employee is tasked with representing San Diego by playing the part of a
6  host to the many visitors at the Building. The evidence will show that San Diego's philosophy
7  has earned industry accolades and high praise from customers.

8       **2.**     **SDCCC Serves the Public by Maintaining Profitability.**

9       SDCCC is also charged with managing the costs of operating the Building. Because the
10 City provides funding for some aspects of Building operations, SDCCC serves the public good
11 by implementing business operation strategies that reduce its reliance on City funding.
12 Consistent with most industries, the convention and exposition industry has seen an increasing
13 trend towards vertical integration and SDCCC is no exception.  In addition to licensing, SDCCC
14 provides numerous services at the Building, including: (1) convention registration and support
15 services; (2) clerical services; (3) cashiering; (4) catering service; (5) security and asset
16 protection services; (6) telecommunications and data services; (7) audio/visual and information
17 technology services; (8) on-site business and overnight delivery services; (9) special event and
18 production design services; and (10) cleaning and housekeeping services. SDCCC either uses
19 its in-house staff or teams with preferred vendors or subcontractors to provide these services.
20 Revenues from these services enable SDCCC to become more financially self-sufficient.

21      **3.**     **SDCCC Serves the Public by Protecting the Public and the Building.**

22      Last but not least, SDCCC is charged with ensuring the safety and security of tens of
23 thousands of visitors, as well as the Building itself. Given their large size, visibility, and
24 accessibility, public assembly facilities present unique security and safety issues and attractive
25 targets for terrorists and other malevolent actors. SDCCC continually monitors these issues.
26 Additionally, the Building poses safety issues. An orderly evacuation of 30,000 visitors to the
27 Building in the event of a natural (or manmade) disaster requires significant planning and
28 / / /

3

preparation. Consequently, SDCCC personnel (including cleaning department employees) receive training on various emergency preparedness measures.

**B.     THE RELEVANT MARKET IS THE NATIONAL MARKET FOR TRADE SHOW HOSTING; CLEANING IS AN ANCILLARY SERVICE.**

**1.     Competition Occurs in the National Market for Trade Show Hosting.**

SDCCC's customers are trade associations, corporations, political organizations and other promoters (alternatively "Associations" or "Licensees"), such as the State Bar of California, Comic-Con International, and the Society for Neuroscience, which license the Building from SDCCC for a specific period.  Associations host these shows so that dues-paying members, employees and other industry players ("Attendees") may attend educational sessions, participate in meetings and discussions, socialize, exhibit or purchase industry-related products and services, and otherwise stay current in the field.  Attendees are the ultimate consumers of the convention and trade show experience and associated activities.

Different sources estimate that SDCCC's primary competitors are alternately 13, 21, or 51 convention centers located in North America.  Each year, SDCCC tracks 140 to 170 trade shows for which it competes to host.  In 2006-2009, SDCCC successfully attracted only 14.05% of its target list, with the remainder hosted by venues in 51 different cities located in the United States, Canada, and beyond.  SDCCC maintains regional sales offices in Virginia and Illinois.

SDCCC faces very stiff competition in this national market.   Assuming that the competitive market includes the top 21 convention centers in the country, SDCCC has only an estimated 3-5% share of the national market and the market is not heavily concentrated in one region or in one firm.

**2.     Ancillary Production Services are Purchased After a Venue is Chosen.**

Trade shows are produced by Associations or by professional trade show managers ("Show Managers") acting on their behalf.  Producing a successful convention or trade show requires, among other things, determining workshop topics that would interest Attendees, collecting Attendee registration fees, and hiring the keynote speaker.

/ / /

4

1   Licensees or Show Managers hire a service contractor to provide, coordinate, and market

2   event-related production and other services at the Building.  The service contractor is referred to

3   as a "Decorator."  Three principal Decorators provide these services at the Building: Champion

4   Exposition Services ("Champion"), Freeman, and Global Experience Specialists ("GES").  All

5   three provide similar services at convention centers, hotels and conference centers, and other

6   venues across the United States.  Smaller Decorators also operate at the Building.  Decorators

7   not only coordinate show production for Licensees and Show Managers, but also provide event-

8   related services to Exhibitors.  Exhibitors attend trade shows to market their wares and services

9   directly to Attendees and other industry players.  Exhibitors register with Licensees or Show

10   Managers to rent a booth at a show, and enter into contracts with Decorators for, among other

11   things, booth installation, electrical, and cleaning services.

12      **3.      The Building and the Exhibition Space Must be Cleaned During Shows.**

13   Event-related cleaning services fall into three categories, which the parties have called

14   "Facility Cleaning," "Booth Cleaning," and "Building Cleaning" for purposes of this litigation.

15   Facility Cleaning addresses the cleaning of licensed areas in the Building.  It includes the trade

16   show exhibit floor, aisles between Exhibitor booths, and move-in and move-out phases, i.e., the

17   construction, installation, and breakdown of exhibits.  Booth Cleaning addresses the cleaning of

18   individual exhibits and Exhibitor booths.  Additional cleaning services, including the cleaning

19   and maintenance of restrooms, non-exhibition meeting rooms, nonpublic areas such as loading

20   docks, and the Building grounds, is called "Building Cleaning."  The same equipment is

21   generally used for all three types of cleaning.

22   UNM does not perform Building Cleaning.  SDCCC performs this work at no cost

23   because it concerns common areas of the Building or its infrastructure that SDCCC does not

24   license, or which are shared by multiple Licensees.

25   / / /

26   / / /

27   / / /

28   / / /

5

C.     **THE PARTIES' CONTRACTS DETERMINE THE SCOPE OF WORK AND REFLECT THE LEVELS OF PRODUCTION AT A TRADE SHOW.**

      1.     **SDCCC Licenses the Building and Regulates its Use.**

SDCCC's generic license agreement sets forth the rights granted to Licensees, the rights retained by SDCCC, and the terms and conditions governing usage of the Building. The license requires the Licensee to comply with SDCCC's Policies, Rules and Regulations ("PRRs") for the Building's use. The Licensee acknowledges the PRRs may be amended before the event, and consents to any future changes.

      2.     **Licensees or their Agents Hire Decorators.**

As noted, Licensees or Show Managers hire Decorators to provide, coordinate, and market event-related production and other services at the Building. Among other things, Decorators provide carpet, furniture, and registration counter rentals, as well as drayage,[2] rigging, electrical, and cleaning services. The contractual obligations and rights under the Licensee-Decorator contracts are unclear because no discovery was taken from third parties on this subject, neither party has disclosed any of these contracts, and they are otherwise not in the record. What is clear is the fact that the Licensees and Show Managers cannot give contractual rights to the Decorators that are reserved to SDCCC in the License Agreements.

      3.     **UNM Performs Cleaning Services Pursuant To Exclusive, Nationwide Contracts With Decorators.**

Decorators may perform some of the work themselves or hire subcontractors. SDCCC and UNM compete to sell Booth and Facility Cleaning to Decorators at the Building. Facility Cleaning is sold to Decorators at flat, per hour rates. Decorators sell Booth Cleaning Services directly to Exhibitors, and split the revenues with providers like SDCCC and UNM. Booth Cleaning prices are set entirely by Decorators. Providers' labor rates are immaterial to pricing because Decorators and providers split revenues before expenses.

UNM provides cleaning services for many (but not all) GES and Champion events at the Building. Freeman, which accounts for about 60% of the events at the Building, contracts with

---

[2]   Drayage means the transportation of goods a short distance.

6

SDCCC for all of its event cleaning services.  Smaller Decorators are split between UNM and SDCCC.

UNM has oral and written contracts for subcontracting cleaning services with Decorators at thirty or more cities nationwide.  UNM increases its business by cultivating personal relationships with Decorators and signing exclusive, nationwide contracts with them.  None of the contracts existing as of the date of the change of the cleaning policy contains any provisions specific to the Building.

**D.      SDCCC'S CLEANING SERVICES POLICY.**

From its opening in 1989 until 2007, SDCCC gave Decorators the choice of using the Building's employees or outside labor to do event-related cleaning at the Building.  Effective July 1, 2007, SDCCC implemented a new cleaning services policy, which provides that only SDCCC employees may perform event-related cleaning services at the Building.

**1.      SDCCC Implemented Its Cleaning Services Policy For Three Reasons.**

After a lengthy, wholly internal review process, SDCCC adopted its policy, which was motivated by three reasons:  (1) augmenting security and emergency preparedness; (2) maintaining quality control and brand value; and (3) improving efficiency, i.e., increasing revenues and reducing expenses.

**2.      SDCCC Implemented its Policy by Amending the Building's Regulations.**

SDCCC changed its policy by amending its PRRs, which are incorporated by reference into each of its licenses.  Thus, Licensees are obligated to ensure that only SDCCC labor is utilized on event-related cleaning at the Building.

**3.      SDCCC's Cleaning Services Policy Is Not Discriminatory.**

SDCCC sells cleaning services pursuant to contracts with Licensees, Show Managers, Decorators, or resellers like UNM.  SDCCC's policy permits outside vendors and sub-contractors such as UNM to continue to sell cleaning services at the Building, provided they use SDCCC employees to perform the work.  In this respect, SDCCC provides UNM with an input—cleaning services—which UNM resells to Decorators. Decorators are involved in, and

///

7

1    profit from, the arrangement, purchasing cleaning services directly from SDCCC or through a

2    middleman such as UNM, and reselling those services to Licensees and Exhibitors.

3         Under standard contractual terms, SDCCC charges $17 per hour for Facility Cleaning,

4    but that price includes general labor only; SDCCC provides supervisory labor for free. As to

5    Booth Cleaning, SDCCC charges fifty percent (50%) of the gross revenue generated by

6    Decorators from resales of that service to Exhibitors. SDCCC offers all customers the same

7    price, regardless UNM's involvement. SDCCC does not charge for Building Cleaning.

8    **III.**

9    **SUMMARY OF CLAIMS**

10   **A.    ACTUAL MONOPOLIZATION**

11   "[L]ike all antitrust cases, this one must make economic sense." United States v. Syufy

12   Enterprises, 903 F.2d 659, 663 (9th Cir. 1990). This one does not.

13        To recover on its claim for actual monopolization in violation of section 2 of the

14   Sherman Act, UNM must prove, by a preponderance of the evidence: (1) SDCCC's possession

15   of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that

16   power through exclusionary or anticompetitive conduct; and (3) causal antitrust injury. Allied

17   Orthopedic Appliances Inc. v. Tyco Health Care Group LP, 592 F.3d 991, 998 (9th Cir. 2010).

18        **1.    UNM Cannot Show Monopoly Power in the Relevant Market.**

19        Monopoly power is "the power to control prices or exclude competition" in a relevant

20   market. United States v. Grinnell Corp., 384 U.S. 563, 571 (1966). To establish monopoly

21   power, UNM must: (1) define the relevant market, (2) show that the defendant owns a dominant

22   share of that market, (3) show that there are significant barriers to entry; and (4) show that

23   existing competitors lack the capacity to increase their output in the short run. Rebel Oil Co. v.

24   Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995). A relevant market has two

25   components: the product market and the geographic market. Tanaka v. University of Southern

26   California, 252 F.3d 1059, 1063 (9th Cir. 2001). The market must also be economically

27   meaningful. United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 400 (1956).

28   / / /

8

1    UNM has defined its relevant market as the market for "trade show cleaning services at

2    [the Building]," located in "large convention centers in the San Diego metropolitan area, or,

3    equivalently, [the Building]."   It contends that these cleaning services are unlike any other

4    services because they are so highly specialized that no customer would accept a substitute.  It

5    contends that SDCCC has complete monopoly power in this market because UNM has been

6    excluded from the market, and only SDCCC remains.  According to UNM, SDCCC's control

7    over an essential resource—the Building—gives it power to control access to the Building, and

8    therefore the power to set prices for cleaning services and the power to exclude new and existing

9    market participants.

10    UNM's market ignores commercial realities and is economically insignificant.  Reduced

11    to its essence, UNM's "market" consists of one building wherein two providers compete to

12    service the special cleaning needs of 3-8 purchasers (the Decorators) by cultivating personal

13    relationships with those purchasers.   This is not a true antitrust market.  "[A]ntitrust law is

14    concerned only with 'substantial' market power"; as such, it is improper to define a market by

15    carving out a narrow segment "made up of only a few buyers with extremely strong preferences"

16    from a larger market; such narrow segment markets are legally "insubstantial."  See AD/SAT v.

17    AP, 181 F.3d 216, 228 (2d Cir. 1999) (despite price differences, rush electronic and non-rush

18    advertising delivery services did not constitute distinct markets).[3]

19    Indeed, UNM's market improperly ignores commercial realities because it purports to

20    define stand-alone services by isolating them from their larger, commercial context.  In Paladin

21    Assocs. v. Montana Power Co., 328 F.3d 1145 (9th Cir. 2003), the Ninth Circuit rejected a

22    proposed market for the shipment and sale of natural gas through a certain pipeline interchange

23    (which was also alleged to be an essential facility), because plaintiff had made no showing that

24    the interchange was separate and apart from the larger market for shipment and sale of natural

25    ─────────────────────────

26    [3] Assuming UNM is correct, and cleaning services at the Building is its own market, then
SDCCC's customers have agreed to comply with its rules when they license the Building from
SDCCC.  UNM's claim necessarily fails because validly conferred contractual rights, standing

27    alone, are not a cognizable source of monopoly power.  Newco Indus., Inc. v. Ikon Office
Solution, 513 F.3d 1038, 1048 (9th Cir. 2008); Forsyth v. Humana, Inc., 114 F.3d 1467, 1476

28    (9th Cir. 1997).

9

1   gas or that the gas passing through the interchange was chemically or functionally different than

2   other gas, or that its pricing was unrelated to gas pricing elsewhere. See id. at 1163. In another

3   example, the Tenth Circuit rejected a proposed service market of ski rentals at a ski resort

4   because only out-of-town visitors rented skis, which meant that those rentals were components

5   of a larger destination ski experience product and service package. See Christy Sports, LLC v.

6   Deer Valley Resort Co., 555 F.3d 1188, 1194 (10th Cir. 2009). These, along with the other

7   deficiencies identified by SDCCC in its Daubert challenges (see Dkt. Nos. 140-18, 140-19, 140-

8   20, 151, 151-1, 152-2), render UNM's market insufficient to support a jury verdict.

9      SDCCC contends that the relevant market is the nationwide market for hosting trade

10   shows. SDCCC's primary product is space suitable for hosting sizable trade shows and

11   conventions. Trade show producers choose between convention centers offering suitable space

12   based on a range of factors that include cost, location, availability, and size. Cleaning services

13   are purchased only in conjunction with exhibition space, but exhibition space may be purchased

14   without purchasing cleaning services. By analogy, exhibition space is like a first-run movie

15   theater, while cleaning services are like popcorn. Generally speaking, consumers determine

16   what theater they will frequent based on what film is playing or by comparing particular

17   theaters' screen size and seating configurations. Choice between different popcorn providers

18   does not draw audiences into theaters.

19      SDCCC has only a 3-5% share of the nationwide market for trade shows. As a rule of

20   thumb, a ninety percent share of the market "is enough to constitute a monopoly; it is doubtful

21   whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not."

22   Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264, 1274 (9th Cir. 1975).

23   **2.**   **UNM Cannot Show Anticompetitive Conduct Through the Essential Facilities**

24      **Doctrine.**

25      "The test of willful maintenance or acquisition of monopoly power is whether the acts

26   complained of unreasonably restrict competition." Oahu Gas Service, Inc. v. Pacific Resources,

27   Inc., 838 F.2d 360, 370 (9th Cir. 1988). "Such conduct does not refer to ordinary means of

28   competition, like offering better products or services, exercising superior skill or business

10

1   judgment, utilizing more efficient technology, or exercising natural competitive advantages."

2   Image Tech. Servs. v. Eastman Kodak Co. ("Image Tech. II"), 125 F.3d 1195, 1211 n.6 (9th Cir.

3   1997).

4               **a.   UNM Cannot Establish the Elements of the Essential Facilities Doctrine.**

5          According to UNM's verified complaint, the anticompetitive conduct element is satisfied

6   by the "essential facilities" doctrine.  MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124,

7   1129-30 (9th Cir. 2004).  As discussed in section IV.A below, the "essential facilities" doctrine

8   has been repudiated by the U.S. Supreme Court, and it no longer can support a section 2 claim.

9          Assuming the "essential facilities" doctrine has survived Verizon Communs., Inc. v. Law

10  Offices of Curtis V. Trinko, LLP, 540 U.S. 398 (2004), the doctrine "imposes on the owner of a

11  facility that cannot reasonably be duplicated and which is essential to competition in a given

12  market a duty to make that facility available to its competitors on a nondiscriminatory basis."

13  MetroNet, 383 F.3d at 1128.  UNM must prove: (1) SDCCC is a monopolist in control of an

14  essential facility; (2) UNM, as SDCCC's competitor, is unable reasonably or practically to

15  duplicate the essential facility; (3) SDCCC has refused to provide UNM access to the essential

16  facility; (4) it is feasible for SDCCC to provide such access; and (5) UNM incurred antitrust

17  injury as a result of the denial of access.  Paladin, 328 F.3d at 1163 n.21.  "The fourth element

18  [asks] whether there is a legitimate business justification for the refusal."  MetroNet, 383 F.3d at

19  1129 n.10.

20               **i.     The Building is Not an Essential Facility.**

21         A facility is essential only if: (a) control of the facility carries with it the power to

22  eliminate competition in a downstream market, Paladin, 328 F.3d at 1163; (b) it is absolutely

23  vital to the plaintiff competitor's survival in the market, Pittsburg County Rural Water District

24  No. 7 v. City of McAlester, 358 F.3d 694, 721 (10th Cir. 2004); and (c) court-ordered sharing of

25  the facility will, in fact, remedy competitive harm to the downstream market, Mid-South

26  Grizzlies v. NFL, 720 F.2d 772, 787 (3d Cir. 1983).

27         UNM has not defined the upstream or downstream market.  "Monopoly control of the

28  upstream market is a necessary element of essential facility . . . claims."  Alaska Airlines, Inc. v.

1   United Airlines, Inc., 948 F.2d 536, 545 n.12 (9th Cir. 1991). The doctrine cannot be applied

2   within the context of a single market only. See id. at 544 (facility essential "only if control of

3   the facility carries with it the power to eliminate competition in the downstream market").

4   Assuming UNM identifies the upstream market as the national market for trade shows, SDCCC

5   must still have monopoly control of that market. Id. at 545 n.12. But SDCCC has at most a 5%

6   share of that market—far short of the threshold for monopoly power. See Twin City

7   Sportservice, 512 F.2d at 1274.

ii.    **The Building is Not Vital to UNM's Survival.**

9        UNM cannot show that the Building is "essential" to its survival in the market.

10  Assuming UNM's definition of the geographic market ("large convention centers in the San

11  Diego metropolitan area") is proper, the Building is still not essential because not all of the

12  events at the Building require a "large convention center."  From fiscal years 2006 through mid-

13  2011, 74% of all shows at the Building used less than 203,981 sq. ft. in combined exhibit hall

14  and ballroom/meeting room space.  From fiscal year 2008 to mid-2011, 43% of the shows for

15  which UNM claims damages used less than 203,981 sq. ft. in combined space.

16       This is significant because the Building is not San Diego's only exhibition and meeting

17  venue.  Including the Building, San Diego boasts more than 1,898,134 square feet of comparable

18  exhibit and meeting space.  Those venues include, by square footage: San Diego Concourse

19  (300,000 sq. ft.), Town & Country Resort Hotel and Convention Center (225,000 sq. ft.), Hilton

20  San Diego Bayfront Hotel (165,000 sq. ft.), Manchester Grand Hyatt San Diego (128,319 sq.

21  ft.), Sheraton San Diego Resort & Marina (120,000 sq. ft.), San Diego Marriott Hotel & Marina

22  (75,000 sq. ft.), and Hotel Del Coronado (65,000 sq. ft.).  Combined, these alternative venues

23  account for 56.8% of the total capacity of exhibition and meeting space in San Diego.  Notably,

24  UNM performs or resells cleaning services at all of these venues (save the San Diego

25  Concourse), and it does so pursuant to the same nationwide contracts and prices at issue here.

26  Under these circumstances, UNM remains able to operate and compete in the San Diego market.

27  See Pittsburg County Rural Water District No. 7 v. City of McAlester, 358 F.3d 694, 721 (10th

28  Cir. 2004) (city's waterworks not essential to rural water district where plaintiff had alternative

12

1  sources of supply in geographic market); Flip Side Productions. v. Jam Productions, Ltd., 843

2  F.2d 1024, 1034 (7th Cir. 1988) (concert arena not essential facility where several other concert

3  venues in metropolitan area).

4    iii.    **UNM is Not Denied Access to the Building.**

5    Nor is UNM prevented from accessing the Building.  Provided it pays its bills in a timely

6  fashion and complies with the Building rules, UNM is permitted to service its contracts in the

7  Building.  UNM's supervisory employees supervise the work of SDCCC laborers.  Indeed, the

8  evidence will show that SDCCC treats UNM the same as it does its other customers.   The

9  doctrine  does  not  apply  where  competitors  are  treated  equally,  nor  does  it  "guarantee

10  competitors access to the essential facility in the most profitable manner." MetroNet, 383 F.3d

11  at 1128, 1130.  UNM enjoys access to the Building, and where any access exists, the doctrine

12  serves no purpose.  Trinko, 540 U.S. at 411.  It is of no consequence that UNM previously

13  enjoyed better access.  Olympia Equipment Leasing Co. v. Western Union Tel. Co., 797 F.2d

14  370, 376 (7th Cir. 1986) ("If a monopolist does extend a helping hand, though not required to do

15  so, and later withdraws it as happened in this case, does he incur antitrust liability? We think not

16  . . . . the controlling consideration in an antitrust case is antitrust policy rather than common law

17  analogies").

18    b.    **SDCCC Acted Pursuant to Legitimate Business Reasons.**

19    The evidence will show that SDCCC implemented its cleaning services policy for three

20  reasons: (1) augmenting security and emergency preparedness; (2) maintaining quality control

21  and brand value; and (3) improving efficiency, i.e., increasing revenues and reducing expenses.

22    i.    **The Burden-Shifting Standard.**

23    Conduct that is otherwise anticompetitive or predatory is not actionable if it is justified

24  by legitimate business reasons.  Oahu Gas Service, Inc. v. Pacific Resources, Inc., 838 F.2d 360,

25  368 (9th Cir. 1988).  Regardless of motive, no firm must injure itself for a rival's benefit.  Id.

26  Indeed, a legitimate purpose renders any accompanying motive irrelevant.  Id. at 368-370.

27    UNM  must  prove  SDCCC's  conduct  lacks  a  legitimate  business  justification.

28  Calculators Hawaii, Inc. v. Brandt, Inc., 724 F.2d 1332, 1339 (9th Cir. 1983).  Analysis of

13

1    business justifications is a burden-shifting inquiry: if UNM successfully establishes a prima

2    facie section 2 case, SDCCC may proffer a legitimate business justification for its conduct.

3    Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 483 (1992) ("Kodak");

4    Image Tech. II, 125 F.3d at 1212-1213.. The defendant's burden is only a burden of production;

5    the plaintiff retains the ultimate burden of persuasion.  Calculators Hawaii, 724 F.2d at 1339.

6    The burden then shifts back to UNM to rebut an asserted business reason by demonstrating that

7    it does not legitimately promote competition or that it is pretextual.  Image Tech. Servs. II, 125

8    F.3d at 1212.

9         As a general rule, a justification is "legitimate" if the challenged practice increases the

10   firm's efficiency, Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985),

11   or if it directly or indirectly enhances consumer welfare, United States v. Microsoft Corp., 253

12   F.3d 34, 58-59 (D.C. Cir. 2001).  To show pretext, UNM must prove that the asserted reason is

13   not genuine, i.e., not the actual reason for SDCCC's conduct.  Image Tech. Servs. II, 125 F.3d at

14   1212; Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1156 (9th Cir. 2003).

15              **ii.      Augmenting Security and Emergency Preparedness.**

16        A requirement that SDCCC employees perform all cleaning services provides tangible

17   (albeit incremental) reduction of the Building's vulnerability to attack and substantial emergency

18   preparedness benefits.  First, the various assessments commissioned by SDCCC indicated that

19   the Building was as a high-profile target for terrorists and other malevolent actors, and that it

20   was vulnerable to incidents creating mass casualties or damaging critical infrastructure and

21   assets.  SDCCC officials also became concerned upon learning of the results of a "war game"

22   conducted under the auspices of the International Association of Assembly Managers.   The

23   simulation analyzed the public assembly halls' vulnerabilities, by looking to the Building as a

24   test case.  Participants were split into two teams, aggressors and defenders.  The aggressors

25   employed a multi-pronged attack, in which they successfully infiltrated the San Diego

26   Convention Center by posing as housekeeping, food service and Decorator-affiliated workers,

27   and by disguising themselves as emergency workers to conduct follow-on attacks on first

28   responders.

                                                    14

1    A key security objective at the Building is management's knowledge of, and control

2  over, persons with access to public and non-public areas in the Building.  SDCCC did not have

3  any formal relationships with UNM.  Not only were UNM employees an unknown variable, they

4  had access to nonpublic Building areas and operated outside of SDCCC's chain of command.

5    Second, SDCCC employees receive training on standard operating procedures designed

6  to ensure the safety and security of the Building and its guests through SDCCC's "San Diego

7  Spirit" orientation program, including an intensive "Emergency Preparedness Training" course.

8  Topics covered by the orientation include safety expectations, emergency response and

9  reporting, Building access, uniform and identification protocols, evacuation procedures, and

10  early detection of hazards including fires, bombs and bomb threats, hazardous substances, and

11  violent disturbances.  SDCCC employees in public areas (like cleaning personnel) work in and

12  among Attendees and other visitors during events.  Such employees are in a unique position to

13  assist guests and patrons in the event of an emergency. UNM employees do not receive the same

14  training.   Indeed, SDCCC officials were concerned that UNM workers would hamstring

15  emergency efforts because many appeared not to speak English, and emergency instructions,

16  which vary by hazard, would be broadcast only in English.

17    Providing a safe and secure environment for visitors, patrons, vendors, staff and the

18  Building itself is a legitimate business purpose.  See HDC Medical, Inc. v. Minntech Corp., 474

19  F.3d 543, 550 (8th Cir. 2007) (redesigning product to ensure dialysis "[p]atient safety is a valid

20  business justification"); Mendelovitz v. Adolph Coors Co., 693 F.2d 570, 576 (5th Cir. 1982)

21  (preserving beer freshness from adverse effect of age, light, and heat justified territorial

22  limitations and quality control procedures); Clairol, Inc. v. Boston Discount Center, Inc., 608

23  F.2d 1114, 1125 (6th Cir. 1979) (restricting professional salon products' resale restrictions

24  justified where products not suitable for public consumption).

25    SDCCC employees will testify that they adopted the cleaning services policy in part

26  because of these safety and security issues.

27  / / /

28  / / /

15

### iii.      Maintaining Quality Control and Brand Value.

Requiring SDCCC employees to perform all cleaning functions furthers SDCCC's quality control and brand management goals contained in the "San Diego Spirit" program.  A total service quality program and philosophy, the "San Diego Spirit" challenges all SDCCC employees to make a personal commitment to providing Attendees, Exhibitors, and other visitors with superlative service.  Employees are "trained and assigned an important role – to proudly represent our organization, the city of San Diego and the entire San Diego region."  As grassroots civic ambassadors, they are taught that "[w]hat you do and how you act creates an image that our guests will use to judge our entire staff, facilities, and city – every member of our team is in a position to contribute towards our success."  Because of this public role, employees receive training (and evaluation) on such topics as guest hospitality, proper speech, etiquette, ethics, grooming, and dress.  Desirable personal attributes are encouraged.   For example, "Cleanliness" is a central tenet of the "San Diego Spirit" philosophy, in that: "[t]he image each of us projects reflects on the entire team. Excellence is our minimum standard in maintaining our facilities and in personal grooming, creating an exceptional first impression for our guests."

UNM employees are not trained in the "San Diego Spirit."  Their service quality and cleanliness did not comply with the "San Diego Spirit."  UNM's failure to staff shows properly often led to overflowing trash and recycling receptacles on the exhibit floor.  UNM laborers' uniforms consist of green and white t-shirts and non-denim dark pants.  The laborers often appeared slovenly, wearing dirty uniforms, or blue jeans.

Quality control, customer service, and brand management are all legitimate business reasons, particularly given the nature SDCCC's mission—promoting the City and the region and attracting tourism dollars and tax revenues. See Freeman, 322 F.3d at 1156 (rejecting business proposal as incompatible with current business model is valid justification); Anaheim v. Southern California Edison Co., 955 F.2d 1373, 1380-1381 (1992) (denying access to electricity transmission lines justified because the reduced capacity would decrease defendant's competitiveness and increase consumer prices); Cal. Computer Prods., Inc. v. IBM Corp., 613 F.2d 727, 744 (9th Cir. 1979) (improving product performance or features); Microsoft Corp.,

16

253 F.3d at 58-59 (same); see also Weiss v. York Hospital, 745 F.2d 786, 821 (3rd Cir. 1984) (enhancing hospital's reputation, improving quality of care, and preventing reduction in efficiency justified restrictions on osteopath doctor's hospital staff privileges in section 1 claim); Mozart Co. v. Mercedes-Benz of North America, Inc., 833 F.2d 1342, 1349-1351 (9th Cir. 1987) (ensuring quality control and company goodwill was legitimate purpose for section 1 tying agreement for branded car parts).

SDCCC employees will testify that they adopted the cleaning services policy in part because of these quality control and brand management issues.

### iv.   Increasing Revenues and Reducing Expenses.

SDCCC is always examining how it can become more efficient, and the need to become more efficient took on greater urgency in 2005. That year, the City adopted the Living Wage Ordinance ("LWO"), SDMC § 22.4205 et seq. The LWO set a minimum wage of $10 per hour, which would be adjusted with annual increases based on the cost of living. SDCCC was exempt from the LWO's operation for the initial two years. The City indicated to SDCCC that it would have to absorb increased costs due to the LWO. Beginning in 2005, SDCCC reexamined its operations to find ways to increase revenues and decrease expenses to offset the LWO's impact.

SDCCC's cleaning services department faced significantly higher expenses. As noted, before July 1, 2007, SDCCC cleaning crews performed Building Cleaning during UNM events. Building Cleaning is unprofitable, and is usually offset by revenue generated from Facility and Booth Cleaning or Building license fees. However, the national market for trade show hosting is very competitive. Convention centers often discount their licensing fees to attract desirable trade shows of the type that generate significant tourist spending and tax revenues.

Thus, SDCCC's cleaning services department frequently lost money on UNM shows because UNM captured the Booth and Facility Cleaning revenue for those shows and Building license fees were often reduced or waived to attract Associations and did not cover the Building cleaning expenses. The LWO threatened higher labor costs, which would only worsen the cleaning services department's bottom line. Given that SDCCC's employees were already performing Building cleaning at every show, a requirement that SDCCC's employees be used

17

1   for all event-related cleaning would permit the cleaning services department to become more

2   efficient by realizing economies of scale and scope.

3        Boosting short-run profitability, avoiding additional costs or losses, achieving economies

4   of scale and scope, and realizing a return on investment are all legitimate business purposes.

5   Oahu Gas, 838 F.2d at 368-70 & nn.3-4 (refusing produce propane for competitor is justified

6   where doing so would require additional investment and result in negative return); International

7   Rys. of Central America v. United Brands Co., 532 F.2d 231, 239 (2d Cir. 1976) ("abandon[ing]

8   an unprofitable and uncomfortable operation" is always justified business conduct).   Morris

9   Communs. Corp. v. PGA Tour, Inc., 364 F.3d 1288 (11th Cir. 2004) (preventing free riding on

10   investment by requiring reseller to purchase product); Cal. Computer Prods, 613 F.2d at 739-740

11   (reducing manufacturing costs); Illinois ex rel. Burris v. Panhandle E. Pipe Line Co., 935 F.2d

12   1469, 1483 & n.13 (7th Cir. 1991) (refusing to rewrite customer contracts justified where

13   pipeline would be exposed to potential $ 4 billion losses); see also Christy Sports, 555 F.3d at

14   1196 (refusal to grant access to competitors is not anticompetitive conduct in the first instance

15   because "antitrust will not force a resort developer to share its internal profit-making

16   opportunities with competitors"); Elliot v. United Center, 126 F.3d 1003, 1004-06 (7th Cir.

17   1997) ("[stadium] can recoup the cost of putting on the event in any of a number of ways. It can

18   charge very high ticket prices, and allow unlimited numbers of food concessions in and around

19   the stadium, or it can charge somewhat lower ticket prices and restrict the number of

20   concessions (thereby earning some of its profits from the food sales).").

21        SDCCC employees will testify that they adopted the cleaning services policy in part

22   because of these concerns over SDCCC's expenses, costs, and out of a desire to become more

23   efficient.

24       **3.**    **UNM Cannot Show Antitrust Injury.**

25        UNM must establish that SDCCC engaged in conduct that "actually causes injury to

26   competition, beyond the impact on the claimant." Coalition for ICANN Transparency, Inc. v.

27   VeriSign, Inc., 611 F.3d 495, 502-03 (9th Cir. 2010). Antitrust injury has five elements:

28   "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which

1    makes the conduct unlawful . . . (4) that is of the type the antitrust laws were intended to

2    prevent. . . . [and 5] that the injured party be a participant in the same market as the alleged

3    malefactors." Glen Holly Entertainment, Inc. v. Tektronix Inc., 352 F.3d 367, 372 (9th Cir.

4    2003). Because anticompetitive conduct "harms consumer welfare," a defendant's conduct "is

5    of the type the antitrust laws were intended to prevent" only when it: (1) harms allocative

6    efficiency; and (2) either (a) raises prices of goods above competitive levels, or (b) diminishes

7    their quality. Rebel Oil, 51 F.3d at 1433.

8          Assuming UNM's market  is proper,[4] SDCCC's policy has had no demonstrable,

9    negative effect on consumers, prices, production, or quality in such a flawed market.

10                     **a.  The Policy does not Restrict Consumer Choice.**

11          The policy does not restrict or eliminate the types of cleaning services available at the

12    Building.  Nor does the policy reduce the number of service providers that may operate in the

13    Building.  UNM is still free to service its contracts at the Building as a reseller of SDCCC labor.

14    Decorators are not required to contract with SDCCC. Licensees are still free to designate

15    Decorators as their exclusive cleaning providers. Because Exhibitors could not choose a

16    cleaning provider before July 1, 2007, the policy does not affect Exhibitors' choices.

17                     **b.  The Policy Results in Greater Efficiencies.**

18          Before July 1, 2007, UNM cleaned the trade show floor and SDCCC cleaned the

19    Building common areas for shows where UNM was designated as the cleaning contractor.

20    Under the new cleaning policy, SDCCC performs all cleaning functions. Because it has achieved

21    economies of scale and scope, the "market" is more efficient.

22    / / /

23    / / /

24    / / /

---

25        [4] The cleaning policy has no effect on the relevant market as defined by SDCCC.  The
26    properly defined relevant product market is Trade Show Exhibition Space, and the geographic
      market is the United States. SDCCC's policy extends only to the Building. It does not require
27    that SDCCC labor be used at any other convention center or venue. It does not restrict or
      otherwise limit Associations' ability to license venues or produce trade shows. It does not reduce
28    the amount of exhibition space in the nationwide trade show market.

19

**c.   The Policy does not Restrict Production at the Building.**

There is no evidence that Associations or Exhibitors have ordered less cleaning services at the Building because of the change in policy.   Nor is there any evidence that Associations have chosen different venues for their events.

**d.   The Policy does not Increase Consumer Prices.**

SDCCC's policy has not led to higher consumer prices.   The ultimate consumers— Attendees—never purchase cleaning services directly.   UNM admits that Decorators have refused to absorb or pass along to Associations of Exhibitors any increased costs UNM faces. The policy has not increased Licensees' rental rates or Attendees' registration fees.

Decorators set Booth Cleaning prices for Exhibitors, which they sell on a square foot basis. Before and after July 1, 2007, Decorators split gross revenues with the cleaning subcontractor 50-50%. Because SDCCC is paid as a percentage of revenue, its prices have no causal effect on Decorators' prices to Exhibitors. Similarly, Decorators' production costs are unaffected by the policy because the Decorators retain 50% of the gross revenues regardless of whether SDCCC or UNM provide the cleaning.

**e.   The Policy does not Diminish Service Quality.**

There is no evidence of a reduction in quality of cleaning services at the Building. There is no empirical or survey evidence of consumer attitudes toward quality. There are no records of written complaints by Licensees, Decorators or Exhibitors. Despite conflicting anecdotal evidence, Decorators uniformly agree that there is no measurable difference in the quality of service following implementation of the policy.

**B.     ATTEMPTED MONOPOLIZATION**

To prove attempted monopolization, UNM must establish: (1) a specific intent to monopolize a relevant market — i.e., an intent to control prices or destroy competition in a relevant market; (2) predatory or anticompetitive conduct designed to control prices or destroy competition; (3) a dangerous probability of success — i.e., a probability of achieving monopoly power in the relevant market; and (4) causal antitrust injury. Paladin, 328 F.3d at 1163 n. 22.

///

1        **1.      UNM Cannot Demonstrate Specific Intent.**

2        UNM must establish that SDCCC acted with the specific intent to monopolize; a mere

3   desire to increase market share, win customers, or even drive competitors out of the market

4   through vigorous competition is insufficient. <u>Spectrum Sports v. McQuillan</u>, 506 U.S. 447, 459

5   (1993); <u>United States Steel Corp. v. Fortner Enterprises</u>, 429 U.S. 610, 612 n.1 (1977).  Direct

6   evidence of intent to vanquish a rival is not enough; "it also must be shown that the defendant

7   sought victory through unfair or predatory means." <u>William Inglis & Sons Baking Co. v. ITT</u>

8   <u>Cont'l Baking Co.</u>, 668 F.2d 1014, 1027 (9th Cir. 1981). UNM will be unable to prove such

9   intent.

10       **2.      UNM Cannot Demonstrate Predatory or Anticompetitive Conduct.**

11       The predatory or anticompetitive conduct prong is largely identical to the "willful

12  acquisition or maintenance" of monopoly power. <u>See</u> <u>Transamerica Computer Co. v. IBM Corp.</u>,

13  698 F.2d 1377, 1382 (9th Cir. 1983).  In addition to the essential facility doctrine discussed

14  above, UNM has alleged other liability theories here.

15       **a.      "Generic" Anticompetitive Conduct**

16       "Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and

17  either does not further competition on the merits or does so in an unnecessarily restrictive way."

18  <u>Aspen Skiing Co.</u>, 472 U.S. at 605 n.32.  UNM comes forward with evidence of its losses on the

19  theory that such losses are "demonstrative" of losses others would suffer, and thus, it has proven

20  harm to "the entire market, not just one competitor." (Dkt. 150 at 6:12-21). However, the

21  question of whether conduct is anticompetitive cannot be determined simply by considering the

22  effect on plaintiff; there must also be evidence of the effect of the policies on consumers and an

23  examination into the defendant's business reasons.  <u>Id.</u> at 605; <u>see</u> <u>also</u> <u>Adaptive Power</u>

24  <u>Solutions, LLC v. Hughes Missile Sys. Co.</u>, 141 F.3d 947, 952 (9th Cir. 1998) (no injury to

25  competition when plaintiff out of market, only temporary decline in number of competitors). As

26  discussed previously, UNM is unable to show harm to consumers or rebut SDCCC's

27  legitimately pro-competitive and nonpretextual business reasons.

28  / / /

21

1

   **b.      Raising Rivals' Costs.**

2      According to UNM, SDCCC has been engaging in strategic conduct intended to exclude

3   UNM by raising its production costs.  UNM cannot show anticompetitive conduct because, at

4   most, SDCCC vertically integrated the cleaning services.  However, vertical integration, even by

5   a monopolist, does not violate section 2.  Paschall v. Kansas City Star Co., 727 F.2d 692 (8th

6   Cir. 1994); Alpert's Newspaper Delivery, Inc. v. The New York Times Co., 876 F.2d 266, 269

7   (2d Cir.1989); Knutson v. Daily Review, Inc., 548 F.2d 795, 805 n.10 (9th Cir. 1976); Byars v.

8   Bluff City News Co., 609 F.2d 843, 861 (6th Cir. 1979).

9

   **c.      Monopoly Leveraging.**

10      Finally, UNM "cannot establish a violation of Section 2 without proving that the

11   defendant used its monopoly power in one market to obtain, or attempt to attain, a monopoly in

12   the downstream, or leveraged, market." Alaska Airlines, 948 F.2d at 547.  Thus, UNM must

13   prove: (1) SDCCC is an actual monopolist in the upstream market; and (2) SDCCC's

14   anticompetitive conduct creates the "dangerous probability of success" of monopolization in the

15   downstream market.  Id. at 545-47 & n. 12.  As explained in SDCCC's Daubert motions, this

16   market is not properly defined (see Dkt. Nos. 140-18, 140-19, 140-20, 151, 151-1 and 151-2).

17      Leveraging, moreover, is not an independent theory of liability; rather "leveraging

18   presupposes anticompetitive conduct."  See Trinko, 540 U.S. at 415 n.4; Alaska Airlines, 948

19   F.2d at 547.  Because the remainder of UNM's "other anticompetitive claims have been rejected,

20   there is nothing upon which to base [monopoly leveraging] claim." Stein v. Pac. Bell, 172 Fed.

21   Appx. 192, 194 (9th Cir. 2006).

22

   **3.      Dangerous Probability of Monopolization.**

23      "[T]o determine whether there is a dangerous probability of monopolization, courts have

24   found it necessary to consider the relevant market and the defendant's ability to lessen or destroy

25   competition in that market." Spectrum Sports, 506 U.S. at 459.

26      This relevant market requirement is discussed fully in section III.A.1., supra.  The ability

27   to lessen or destroy competition element is the same as the monopoly power component of an

28   actual monopolization claim, only to a lesser degree.  McGahee v. Northern Propane Gas Co.,

1    858 F.2d 1487, 1505 (11th Cir. 1988).  The most significant difference concerns market share:

2    "a minimum showing of market share required in an attempt case is a lower quantum than the

3    minimum showing required in an actual monopolization case." Rebel Oil, 51 F.3d at 1438.  For

4    the same reasons discussed in the actual monopolization section, UNM will be unable to

5    establish this proof at trial.

6    **C.     ANTITRUST DAMAGES**

7        To recover damages under section 4 of the Clayton Act, 15 U.S.C. § 15(a), UNM must

8    prove: (1) injury-in-fact; (2) causation; and (3) antitrust injury.[5]  In re Live Concert Antitrust

9    Litig., 247 F.R.D. 98, 133 (C.D. Cal. 2007).  Injury-in-fact is shown by a loss to plaintiff's

10   business or property, while causation is established if the illegality is shown to be a material

11   cause of its injury. Id.  If it establishes injury-in-fact and causation, a plaintiff proves the amount

12   of damages by providing the trier-of-fact with some basis from which to estimate reasonably,

13   and without undue speculation, the amount of damages flowing from the antitrust violations.

14   See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946).

15       An antitrust plaintiff who is excluded from the relevant market is entitled to recover its

16   lost profits.  Dolphin Tours, Inc. v. Pacifico Creative Service, Inc., 773 F.2d 1506, 1511 (9th

17   Cir. 1985).  Those lost profits, however, are limited to "net" injury under section 4 of the

18   Clayton Act.  Los Angeles Memorial Coliseum Comm'n v. National Football League, 791 F.2d

19   1356, 1370 (9th Cir. 1986).  As such, UNM must segregate damages attributable to lawful

20   competition from damages attributable to SDCCC's alleged monopolizing conduct.  Vernon v.

21   So. Cal. Edison Co., 955 F.2d, 1361, 1372 (9th Cir. 1992).  That means also that UNM must

22   disaggregate damages caused by claims that have been dismissed and damages that occur

23   outside of the market.  Image Tech. II, 125 F.3d at 1224. Indeed, UNM must even segregate

24   damages caused by antitrust violations from those caused by tortious interference.  McGlinchy

25   v. Shell Chemical Co., 845 F.2d 802, 807-809 (9th Cir.1988).  It must also disaggregate any

26   benefit that it received from SDCCC's conduct.  Los Angeles Memorial Coliseum, 791 F.2d at

27   1370.

28   [5] Antitrust injury is discussed in section III.A.4, supra.

23

1        UNM will be unable to disaggregate damages at trial; its expert failed to do in his report.

2 As noted, 43% of the shows for which UNM seeks damages do not fall within its defined

3 "market" because they need not be hosted in "large convention centers."  Similarly, UNM has

4 insisted from the beginning of this litigation that it must perform at the Building to preserve its

5 nationwide contracts. If so, UNM has received a benefit from SDCCC because SDCCC has

6 allowed it to maintain its relationships. More importantly, all of the damages for which UNM

7 seeks treble damage antitrust recovery are also allegedly due to SDCCC's tortious interference.

8 Because UNM's damages expert failed to consider these issues and failed to disaggregate

9 UNM's alleged damages, UNM's damages model will not support a jury verdict.

10 **D.     INTENTIONAL INTERFERENCE WITH CONTRACT**

11        UNM must prove the following elements of intentional interference with contract by a

12 preponderance of the evidence: (1) a valid and existing contract between plaintiff and a third

13 party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to

14 induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of

15 the contractual relationship; and (5) resulting damage.  Pac. Gas & Elec. Co. v. Bear Stearns &

16 Co., 50 Cal.3d 1118, 1126 (1990) ("PG&E").

17        **1.     SDCCC is not a Stranger to UNM's Contracts.**

18        Only "a stranger to [the] contract" may be liable for interfering with it. Applied

19 Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal.4th 503, 513-514 (1994). "The tort duty not

20 to interfere with the contract falls only on strangers—interlopers who have no legitimate interest

21 in the scope or course of the contract's performance." Id. Where the allegedly-interfered with

22 contractual relationships directly or indirectly depend on a third-party's performance, the third-

23 party is not a stranger to the contract, and no liability results. See, e.g., PM Group, Inc. v.

24 Stewart, 154 Cal.App.4th 55, 65 (2007) (after negotiations for South American concert tour

25 between singer and promoter fell through, singer did not interfere with promoter's subcontracts

26 for concert halls); Maritz Inc. v. Carlson Mktg. Group, Inc., 2009 U.S. Dist. LEXIS 105195 at

27 *10 (N.D. Cal. Oct. 30, 2009) ("[b]ecause the contractual obligations at issue here provided for

28 [defendant's] performance, it cannot be found to be a stranger to the contract"). For example, in

24

1   <u>Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.</u>, 271 F.3d 825 (9th Cir. 2001), the Ninth

2   Circuit explained that it was perfectly lawful for an oil company to refuse to sell oil to a barge

3   company, even though that refusal interfered with the barge company's contracts and

4   prospective sales of oil because the shipping and transportation of the oil required "direct, active

5   involvement" by the defendant. <u>Id.</u> at 834.

6          When, as now, cooperation between plaintiff and defendant is necessary for

7   performance, "[the defendant] is not easily characterized as a stranger" to plaintiff's

8   relationships. <u>Id.</u> Even prior to July 1, 2007, SDCCC's cooperation was necessary for UNM to

9   perform, because SDCCC had to make the Building available to UNM workers.  As such,

10  SDCCC is not a stranger to these contracts, and no liability attaches.

11         **2.      At Least One Contract was not "Valid and Existing."**

12         In 2010, Champion and UNM renegotiated their contract. The 2010 contract is different

13  than the 2005 contract.  In certain instances, the 2010 contract appears designed to be disrupted.

14  (For example, UNM is prohibited from using subcontractors without Champion's written

15  permission.) Because it was not in existence at the time of the alleged interference, the 2010

16  contract cannot support liability.   <u>Dryden v. Tri-Valley Growers</u>, 65 Cal.App.3d 990, 995

17  (1977).

18         **3.      SDCCC Lacked Sufficient Knowledge of the Contracts to Form an Intent to
                      Interfere.**
19

20         UNM must establish that SDCCC was sufficiently aware of the details of the contracts at

21  issue to form an intent to disrupt them.  <u>Davis v. Nadrich</u>, 174 Cal.App.4th 1, 10 (2009).  The

22  evidence will show that although SDCCC knew of the UNM contracts, it did not know their

23  details. When SDCCC's sales efforts were rebuffed by certain Decorators, SDCCC was

24  provided with contracts that redacted material pricing terms and other conditions. Because the

25  contracts were redacted, SDCCC could not have known that the cleaning services policy would

26  interfere with the provisions contained therein.

27  / / /

28  / / /

1    **4.    UNM Cannot Establish Disruption.**

2         Disruption occurs when "plaintiff's performance is made more costly or more

3    burdensome," as a result of the defendant's interference. PG&E, 50 Cal.3d at 1129.  UNM and

4    SDCCC agree this is measured by impairment of a party's expected contractual or economic

5    benefits (see Dkt. 132, 32:12-24; 133, 13:19-22).  To determine the extent and nature of those

6    expectancies, the Court will be required to interpret the underlying contracts. See Pacific Gas &

7    E. Co. v. G. W. Thomas Drayage & Rigging Co., 69 Cal.2d 33, 38 (1968) ("the intention of the

8    parties as expressed in the contract is the source of contractual rights and duties").

9              **a.    UNM's Expectations Under the GES Contract.**

10        The GES contract covers all venues where GES currently operates within the United

11   States, "except Shows where the Show Management has a contractual relationship with another

12   cleaning service provider."

13   • Assuming a show occurs at a covered venue and the following conditions exist:

14   ○ GES is designated by third-parties to be the designated cleaning contractor at

15        any show where GES performs another service; and

16   ○ GES has the right to directly bill "applicable customers," i.e., Exhibitors;

17   • Then, GES agrees to retain UNM to perform "cleaning services," provided that:

18   ○ UNM agrees to perform at the price established by GES;

19   ○ UNM furnishes all necessary labor, equipment, and supplies at its sole

20        expense;

21   ○ GES' "right to retain [UNM] is not restricted by law, or Show management's

22        relationship with another cleaning service provider."

23        On the face of the GES contract, it is clear that UNM has no reasonable expectation of

24   performance where "Show Management" has a relationship with another cleaning firm.

25   SDCCC's licenses incorporate the Building RPPs, which regulate the Building's usage. The

26   RPPs require Licensees and Show Managers to use SDCCC employees to perform cleaning

27   only—which means that "Show Management" has a contractual relationship with another

28   cleaning provider and UNM need not perform.

26

1    This interpretation of the contract is confirmed by extrinsic evidence[6] of the parties'

2    conduct. As defined by the contract, "cleaning services" means "all standard cleaning and

3    janitorial functions provided in accordance with the past performance between the parties" and

4    specifically, trade show cleaning services.  UNM management has admitted that UNM does not

5    perform the cleaning at GES shows where the convention center had a true "exclusive" on

6    cleaning.  Nor did UNM perform at the Building at certain shows where Licensee and Show

7    Manager Nielsen Business Media retained SDCCC to perform cleaning functions, despite the

8    fact that those shows were GES shows. (Indeed, UNM does not make a claim for damages

9    relating to these shows).  Finally, UNM admits that a venue may delimit or determine the proper

10   scope of its performance.  For example, UNM cleans the entire grounds, including parking lots,

11   at one Las Vegas venue because venue management requires UNM to perform such cleaning

12   whenever it cleans trade shows at the venue.

13   **b.  UNM's Expectations Under the Champion Contract.**

14       The 2005 Champion contract covers "exhibitor and common area cleaning services for

15   shows produced by Champion."  Under it, Champion is obligated to "use its best efforts to

16   secure cleaning service to all shows that it is the contractor for and designate [UNM] as the

17   cleaning contractor."   The remainder of the 2005 Champion contract then sets forth the

18   procedures for payment, billing, and the rates charged by UNM for different areas of the trade

19   show floor, including rates for 34 cities and one venue.

20       "The duty of best efforts 'has diligence as its essence' and is 'more exacting' than the

21   usual contractual duty of good faith."  National Data Payment Systems, Inc. v. Meridian Bank,

22   212 F.3d 849, 854 (3rd Cir. 2000). The Ninth Circuit has indicated the exact contours of the

23   obligation to fulfill a "best efforts" clause are unclear.  TV Events & Mktg. v. AMCON Distrib.

24   Co., 484 F.Supp.2d 1124, 1132 (D. Hawaii 2006).  "[I]n some cases, where the information is

25   available, the promisor's obligation is measured against the efforts exerted in past dealings

26   where its efforts were not questioned."  Id.  "In other cases . . . the promisor is simply barred

27   _____

28   [6] As discussed in the "significant issues of law" section, infra, the Court must look to extrinsic
     evidence to construe UNM's contract.

1   from creating a manifest harm that leads the court to conclude the contract is breached." Id. In

2   National Data, the parties agreed to use their "best efforts" to close a deal by a certain date. The

3   court found that the defendant did not breach the purchase agreement because there was

4   evidence the transaction would not have closed on the designated date even if the defendant had

5   employed its best efforts. Id. 212 F.3d at 854.

6       The same is true here.  SDCCC did not transfer to Licensees or Show Managers the right

7   to use other cleaning contractors on its own property.  Guerra v. Packard, 236 Cal.App.2d 272,

8   285 (1965) ("A license in respect to real estate is an authority to do a particular act, or series of

9   acts, on another's land without possessing an estate therein").  Because Licensees cannot use

10  other cleaning subcontractors, Champion cannot designate UNM to be its cleaning subcontractor

11  even if UNM used its best efforts.

12      This interpretation is corroborated by the extrinsic evidence.   Boston's Hynes

13  Convention Center went to a true "exclusive" cleaning service policy during the 2005 Champion

14  contract's term.  Champion has worked on shows in Hynes after it went to its exclusive policy.

15  UNM employees will admit at trial that since Hynes went to a true "exclusive" policy,

16  Champion has not asked UNM to perform at Hynes.

17      In short, SDCCC, acting in its capacity as the venue, could define the scope of UNM's

18  performance, and could dictate whether GES or Champion could be designated as the cleaning

19  subcontractor through its contractual relationships with Licensees and Show Managers.  Because

20  this conduct was entirely consistent with the terms of the GES and Champion contracts, there is

21  no actionable disruption.  PG&E, 50 Cal.3d at 1137; Davis, 174 Cal.App.4th at 10; Short v.

22  Nevada Joint Union High School Dist., 163 Cal.App.3d 1087, 1101 (1985).

23      **5.**      **UNM Cannot Establish Resulting Damage (Proximate Cause).**

24      UNM must prove that SDCCC's intentional act proximately caused UNM's damages.

25  Blank v. Kirwan, 39 Cal.3d 311, 330 (1985).  UNM must do so by showing that SDCCC's

26  conduct was a substantial factor in causing it harm.  Tate v. Canonica, 180 Cal.App.2d 898, 907-

27  12 (1960).  A factor is substantial if it "has such an effect in producing the harm as to lead

28  reasonable men to regard it as a cause." Mayes v. Bryan, 139 Cal.App.4th 1075, 1095 (2006).

1   SDCCC implemented its cleaning policy because it believed that requiring its employees

2   to perform the work would better serve its business interests.  The evidence will show that when

3   it implemented the policy, SDCCC did not expect that UNM would continue any attempt to

4   work in the Building.  Faced with UNM's insistence that it be allowed to service its contracts,

5   SDCCC relented and agreed to subcontract its labor to UNM, which UNM would supervise and

6   resell to GES and Champion.  UNM, not SDCCC, chose this path.

7   UNM cannot show proximate cause because SDCCC did not intend to cause the type of

8   self-inflicted harm that UNM has suffered.  Bank of N.Y. v. Fremont Gen. Corp., 523 F.3d 902,

9   910 (9th Cir. 2008); Tate, 180 Cal.App.2d at 907-12.

10  **E.      INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC**
            **ADVANTAGE**
11

12  The elements of intentional interference with prospective economic advantage are: (1) an

13  economic relationship between the plaintiff and a third party, with the probability of future

14  economic benefit to the plaintiff;  (2)  the defendant's knowledge of the relationship;

15  (3) intentional and wrongful acts designed to disrupt the relationship; (4) actual disruption; and

16  (5) economic harm proximately caused by the defendant's acts.  Korea Supply Co. v. Lockheed

17  Martin Corp., 29 Cal. 4th 1134, 1159 (2003).  The knowledge, disruption, and proximate cause

18  elements the same as in intentional interference with contract, and are discussed above.

19          **1.      Relationship with the Probability of Future Economic Benefit.**

20                  **a.      UNM's Oral Contracts with Paradice and Brede National.**

21  UNM performed cleaning services pursuant to oral contracts for smaller Decorators

22  Brede National and Paradice.  Because these are oral contracts that call for performance longer

23  than one year, they are unenforceable under the statute of frauds.  See Cal. Civ. Code §

24  1624(a)(1). Unenforceable contracts cannot the basis of relationships with the probability of

25  future economic benefit.  Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square

26  Venture Partners, 52 Cal. App.4th 867, 879 (1997).

27  / / /

28  / / /

29

b.      **The Nielsen Contract.**

On February 1, 2009, more than 1½ years after SDCCC's cleaning services policy was implemented, UNM entered into a written contract with Nielsen Business Media ("NBM"). For some shows, NBM is a Licensee, and for others, a Show Manager. Under the contract, NBM agrees to "designate by Show [UNM] as the cleaning-janitorial contractor for the Show which it requires cleaning services of [UNM] and have asked [UNM] to perform the services described herein at those Shows." UNM agrees to "perform and supervise all required and requested cleaning services," furnishing all necessary labor, equipment and supplies at its sole cost. Under this contract, NBM and UNM cut out the middlemen Decorators and split Booth Cleaning revenue between themselves, notwithstanding UNM's nationwide contracts with the Decorators.

Intentional interference with prospective economic advantage protects "the interest in reasonable expectations of economic advantage." Worldwide Commerce, Inc. v. Fruehauf Corp., 84 Cal.App.3d 803, 808 (1978). "The wrong ordinarily requires conduct intended to interrupt negotiations or prevent the consummation of a contract." Id. It therefore applies to situations where "the tortfeasor induces or otherwise purposely causes a third party not to enter into a business relation with the plaintiff," or the plaintiff and third party are in a terminable at will business relationship and the tortfeasor causes the third party to terminate the relationship. Id. As a fully-executed contract, the UNM-NBM contract is simply not the type of interest protected by this tort.

Moreover, UNM proves (by cutting out the Decorators) that the advantage was not lost, but was, in fact, realized—despite SDCCC's alleged interference. There must be proof that the economic advantage was lost and "would have been realized but for the defendant's interference." Girard v. Delta Towers Joint Venture, 20 Cal.App.4th 1741, 1750 (1993). Finally, UNM has never claimed any damages for Nielsen shows or produced evidence of such, so the economic harm prong cannot be proven at trial. Korea Supply, 29 Cal. 4th at 1159.

2.      **Intentional and Wrongful Acts Designed to Interfere.**

Under this element, a defendant's acts must be both intentional, and wrongful. See Korea Supply, 29 Cal.4th at 1159. The intent component is the same as in intentional

30

interference with contract claims.  See id.  As to the wrongful component, "a plaintiff must plead and prove that the defendant's acts are wrongful apart from the interference itself."  Id.  An act is independently "wrongful" if it is unlawful, i.e., it must be conduct proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.  Id. at 1159 & n.11.

UNM alleged that SDCCC's acts "are wrongful by a measure other than the interference itself, because the acts constitute violations of California Business and Professions Code §§ 16700, et seq. and 17000, et seq," (Dkt. 1, at ¶107), more commonly known as the Cartwright Act and Unfair Competition Law ("UCL"), respectively. UNM cannot prove violations of either.

### a.    This Court's Summary Judgment Order Precludes Liability Under the UCL.

UNM cannot predicate its interference tort on UCL violations.  This Court previously entered summary adjudication on UNM's UCL claim because SDCCC is a governmental entity, and therefore immune to UCL liability (Dkt. 120, at 15:21-26).

### b.    This Court's Summary Judgment Order Precludes Liability Under the Cartwright Act.

The Court also adjudicated that SDCCC is a state actor for purposes of the state actor doctrine (Dkt. 120, at 4:14-15, 15:21-26).  These findings immunize SDCCC from Cartwright Act because "political subdivisions," i.e., local governments, are not covered by the statute. Cal. Bus. & Prof. Code § 16702; Penn v. San Diego, 188 Cal.App.3d 636, 642-43 (1987).  Indeed, a finding that SDCCC is a state actor for purposes of the state actor doctrine is equivalent to a finding of Cartwright immunity, because such immunity is solely a function of status; state authorization is not required.  See People ex rel. Freitas v. City and County of San Francisco, 92 Cal.App.3d 913, 917-21 (1979).

In addition, the Court found that SDCCC acted wholly unilaterally and entered summary adjudication on UNM's restraint of trade claims under section 1 of the Sherman Act (Dkt. 120 at 12:5-10, 13:1-2).  The Cartwright Act prohibits the combination of "of capital, skill or acts by two or more persons" for the purpose of restraining trade.  Cal. Bus. & Prof. Code § 16720;

1    G.H.I.I. v. MTS, Inc., 147 Cal.App.3d 256, 266 (1983). As such, the Cartwright Act emulates

2    section 1 of the Sherman Act and does not reach the kind of unilateral monopolizing conduct at

3    issue in the claims surviving summary judgment. Dimidowich v. Bell & Howell, 803 F.2d

4    1473, 1478 (9th Cir. 1986). Accordingly, UNM cannot show independently wrongful conduct.

5    **F.    STATE ACTION DOCTRINE AFFIRMATIVE DEFENSE.**

6          States are immune from antitrust laws. Parker v. Brown, 317 U.S. 341, 351 (1943). This

7    immunity extends to municipalities that take allegedly anticompetitive actions pursuant to a

8    clearly expressed state policy. Town of Hallie v. City of Eau Claire, 471 U.S. 34, 40 (1985).

9    This Court previously found that SDCCC was a "state actor" for purposes of this affirmative

10   defense (Dkt. 120, at 15:21-26). Accordingly, SDCCC must prove that the California

11   Legislature: (1) authorized SDCCC's actions challenged by UNM; and (2) intended to displace

12   competition with regulation. Traweek v. San Francisco, 920 F.2d 589, 591-592 (9th Cir. 1990).

13         Authorization may be found in legislation, as well as in decisions of a State Supreme

14   Court, and regulatory agencies. Southern Motor Carriers Rate Conf. v. United States, 471 U.S.

15   48, 63-64 (1985), Hass v. Oregon State Bar, 883 F.2d 1453, 1457 (9th Cir. 1989). A State's

16   failure to describe its policy in detail will not defeat immunity if the legislature's intent is

17   otherwise clear. Southern Motor Carriers, 471 U.S. at 64.

18         The legislature is deemed to have intended to replace competition with regulation "if

19   suppression of competition is the 'foreseeable result' of what the statute authorizes." City of

20   Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 373 (1991). As such, competition

21   is displaced with regulation if the State statutes clearly contemplate that a local government

22   entity may engage in anticompetitive conduct.[7] Traweek, 920 F.2d at 592. However, the statute

23   need not expressly compel the anticompetitive activity. Town of Hallie, 471 U.S. at 45-46;

24   Hass, 883 F.2d at 1457-58. Instead, the State intended to displace competition if the allegedly

25   anticompetitive conduct is foreseeable from the State's authorization, Traweek, 920 F.2d at 593,

26   / / /

---

27   [7] This inquiry is limited in scope; the Court may not undertake a substantive review of the State
     law, and individual actors' subjective motives and the efficacy or legality of efforts to comply

28   with State law are irrelevant. Traweek, 920 F.2d at 593.

32

1  or if it specifically authorizes a proprietary function, <u>Paragould Cablevision, Inc. v. Paragould</u>,

2  930 F.2d 1310, 1312 (8th Cir. 1991).

3     **1.    SDCCC's Statutory Authority to Maintain Convention Centers.**

4     California cities have statutory authority to construct and maintain public assembly or

5  convention halls. See Cal. Gov't Code §§ 37500- 37506.  Pursuant to that authority, cities may:

6  (1) acquire land (by condemnation or otherwise), and construct and maintain a public assembly

7  or convention hall upon it, and incur indebtedness for such purpose, <u>id.</u> at § 37501; and (2) by an

8  ordinance setting forth its powers and duties, appoint a commission or other entity to supervise

9  and manage its construction and use,  <u>id.</u> at § 37506.  Pursuant to this state authority, the City of

10  San Diego created SDCCC to operate and maintain the Building when it enacted City Council

11  Resolution R-261419 (Aug. 20, 1984) (<u>see</u> Dkt. No. 92-7, ¶ 9).  This is sufficient.

12     In <u>Springs Ambulance Service, Inc. v. City of Rancho Mirage</u>, 745 F.2d 1270, 1273 (9th

13  Cir. 1984), the court held that a statute authorizing cities to contract for ambulance services

14  meant that the city could provide free ambulance services and effectively abolish competition

15  from private ambulance companies.  Likewise, the Oregon State Bar was permitted to require

16  attorneys to carry the Bar's own malpractice insurance, effectively monopolizing the attorney

17  malpractice insurance market, because that was a foreseeable consequence of the Bar's authority

18  to require attorneys to carry malpractice insurance.  <u>Hass</u>, 883 F.2d at 1458-59.

19     In this case, the Government Code authorizes the City to establish, operate and maintain

20  a public convention hall like the Building.  It is foreseeable that SDCCC, pursuant to this

21  authority, would choose to keep some of its services in-house.  <u>See, generally, Elliot</u>, 126 F. 3d

22  at 1004-06 (stadium may choose to limit vendor's access); <u>Christy Sports</u>, 555 F.3d at 1196 (ski

23  resort may choose to limit what business may operate on resort property).  Like the Oregon State

24  Bar's malpractice insurance and Rancho Mirage's ambulances, SDCCC is not required to permit

25  private cleaning companies to operate at the Building.  There is no question that SDCCC is

26  authorized to manage the Building under California law.

27  / / /

28  / / /

33

### 2.   SDCCC's Authority under State and National Policies of Preventing Terrorist Attacks and Securing Public Safety.

Preventing terrorist attacks and reducing the vulnerability of the United States to terrorism is a key national policy.  See 6 U.S.C. § 111 (establishing the Department of Homeland Security).  The federal government has established programs to coordinate with state and local officials in order to further those goals. See 6 U.S.C. § 124h (establishing "Fusion Centers" to work with state and local governments); 6 U.S.C. § 605 (creating grants to assist state and local governments in preventing terrorism).

California has made a firm commitment to supporting these policies and protecting public safety. Exec. Order No. D-67-03 (Feb. 7, 2003 (see Dkt. No. 92-7, ¶ 7).  California recognizes that "state and local officials must assure California's readiness to prevent and respond to terrorist attacks."  Id.  The California Office of Homeland Security ("OHS") was established in order to develop and coordinate security activities throughout the state. Id.  OHS administers state and federal homeland security grants and distributes them to localities throughout California (see Gov.'s Office of Homeland Security, "Grants Management," http://www.homeland.ca.gov/ grants.html, last accessed January 20, 2009).  As a directive from the Governor, this order reflects the policy of the State acting as sovereign.

Through OHS, San Diego County has received over $400 million in state and federal grant money since 2002 (see Dkt. No. 92-7, ¶ 8).  The City has received over $78 million of that money, some of which has gone to SDCCC to make the Building safer. Id.  SDCCC used that grant money to evaluate the Building's security weaknesses.   Once those weaknesses were discovered, SDCCC took steps to repair them.

One of SDCCC's security related measures was to limit the provision of cleaning services to SDCCC staff.  Similarly, after the terrorist attacks of September 11, 2001, the federal government limited the provision of screening services at airports to federal government personnel. 49 U.S.C. § 44901(a).  Private security screening companies lost their contracts with the airlines as a result of the new law. See Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1373 (Fed. Cir. 2008).   Yet, this was necessary to ensure the security of air travel

34

1   throughout the country.  See Springs v. Stone, 362 F.Supp.2d 686, 694 (E.D. Va. 2005) (noting

2   the purpose of the Aviation Transportation and Security Act is to improve airport security).

3         SDCCC made a determination that limiting the provision of cleaning services to SDCCC

4   staff increases the security of the Building.  SDCCC used state and federal grant money, which

5   was allocated to find ways to enhance security, to make this determination.  The foreseeable

6   result of such grants is that state and local government will implement policies that will enhance

7   security.  It would be anomalous to say that SDCCC could use state and federal grant money to

8   learn how to make the Building more secure but could not actually carry out the steps needed to

9   enhance security.

10   **G.    LOCAL GOVERNMENT ANTITRUST ACT AFFIRMATIVE DEFENSE.**

11        The Local Government Antitrust Act ("LGAA") immunizes local government entities

12   from antitrust damage awards.  15 U.S.C. § 35(a).  The LGAA is broadly construed and applies

13   to all aspects of local government entities' decision making and activities.  Palm Springs

14   Medical Clinic, Inc. v. Desert Hospital, 628 F.Supp. 454, 458 n. 3 (C.D. Cal. 1986).

15        SDCCC may qualify[8] for LGAA immunity if it is "a school district, sanitary district, or

16   any other special function governmental unit established by State law in one or more States."  15

17   U.S.C. § 34.  To qualify as a "special government unit," a defendant must show that: (a)

18   California law treats it as a government entity; (b) the defendant has limited geographic

19   jurisdiction; and (c) taxpayers would bear the burden of any antitrust damage award.  15 U.S.C.

20   §§ 34(i), 35.

21        SDCCC will satisfy all three prongs of this test.  First, the Court has already determined

22   that SDCCC is a governmental entity under State law (Dkt. 120, at 4:14-15, 15:21-26).  Second,

23   it is clear from the City Council Resolution R-261419 (Aug. 20, 1984) and the management

24   agreement entered into by the City and SDCCC that SDCCC only has jurisdiction over the

25   Building. Finally, SDCCC will offer testimony from its managing officers that taxpayers will

26   bear the burden of any antitrust award entered against SDCCC.

27   ――――――――――――――
[8] SDCCC will not attempt to establish at trial that it is the City or County of San Diego, or "any
28   other general function governmental unit established by State law." 15 U.S.C. § 34.

35

**H.    JUSTIFICATION AFFIRMATIVE DEFENSE.**

The affirmative defense of justification applies to both economic interference claims.[9] Environmental Planning & Info. Council v. Superior Court, 36 Cal.3d 188, 193-94 (1984). Courts employ a general balancing test or a test based on specific factual scenarios. Id. The ultimate question is whether an actor's conduct was fair and reasonable under the circumstances. Lowell v. Mother's Cake & Cookie Co., 79 Cal.App.3d 13, 21 (1978).

**1.    Balancing Test**

The general test balances the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all of the circumstances, including the nature of the actor's conduct and the relationship between the parties. Herron v. State Farm Mut. Ins. Co., 56 Cal.2d 202, 206 (1961). Relevant factors include: (1) the nature of defendant's conduct; (2) defendant's motive; (3) the interest sought to be advanced by defendant; (4) the proximity or remoteness of defendant's conduct to the interference; (5) the relationship between the parties; (6) the nature of plaintiff's expectancy; and (7) the social interest in protecting the expectancy on the one hand, and defendant's freedom of action on the other. Lowell, 79 Cal.App.3d at 21 (1978).

As discussed above, SDCCC implemented its cleaning services policy for three reasons: (1) augmenting security and emergency preparedness; (2) maintaining quality control and brand value; and (3) improving efficiency, i.e., increasing revenues and reducing expenses. These reasons, coupled with the public policies underlying antitrust and property law, and SDCCC's interests in controlling the use of the Building, outweigh plaintiff's business expectancies.

**2.    Legally Protected Interest**

A defendant's interference may be justified if it acts to protect a legally valid interest. Richardson v. La Rancherita of La Jolla, Inc., 98 Cal.App.3d 73, 81 (1979). If the defendant

---

[9] By articulating the "independently wrongful" element, the California Supreme Court shifted the burden of proof from the defendant to the plaintiff, effectively rendering the affirmative defense of fair competition superfluous to interference with prospective advantage claims. See Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc., 95 Cal.App.4th 1249, 1256-57 (2002). Thus, the question of fair competition bears only on the court's determination of whether the conduct at issue is of a type that is independently wrongful as a matter of law. See CACI 2202.

36

1   "has a present, existing economic interest to protect, such as the ownership or condition of

2   property, or a prior contract of his own . . . [it] is privileged to prevent performance of the

3   contract of another which threatens [the interest]." Id.  To assert this defense, the defendant must

4   show: (1) it has a legally protected interest, (2) it acted in good faith to protect that interest, and

5   (3) it used otherwise lawful and appropriate means to protect that interest. Id.

6           Here, the City charged SDCCC with operating the Building on its behalf pursuant to a

7   management agreement.  SDCCC acted in good faith as it saw fit to protect the Building and its

8   patrons from harm.  It used lawful and appropriate means to protect that interest by amending

9   the Building's use regulations.  SDCCC meets all three conditions. (If not, then any popcorn

10  vendor could strip a theater owner of independence and autonomy by seizing a piece of the

11  theater's own business merely by executing contracts with third parties for popcorn at the theater

12  without the owner's consent. The law does not tolerate such absurdities.)

13  **I.        MITIGATION AFFIRMATIVE DEFENSE.**

14          Mitigation is a defense to both antitrust and common-law interference claims.  A

15  defendant is not liable for post-injury consequences avoidable by the plaintiff who uses

16  reasonable care.  Malcolm v. Marathon Oil Co., 642 F.2d 845, 863 n.30 (5th Cir. 1981); Pool v.

17  City of Oakland, 42 Cal.3d 1051, 1066 (1986).  The defendant bears the burden of showing that

18  the plaintiff's conduct was unreasonable and aggravated its harm as well as the amount of losses

19  which might have been prevented by reasonable efforts and expenditures.  Malcolm, 642 F.2d at

20  863; Hunter v. Croysdill, 169 Cal.App.2d 307, 318 (1959).

21          **1.        Antitrust Mitigation.**

22          In antitrust exclusion and refusal-to-deal cases, the plaintiff has an obligation to mitigate

23  damages.  Such a plaintiff may be required to mitigate its damages in the line of business

24  affected by the exclusion, but also in its other lines of business.  See Golf City, Inc. v. Wilson

25  Sporting Goods Co., 555 F.2d 426, 436 (5th Cir. 1977).  For example, the Golf City plaintiff

26  sued the PGA and an equipment manufacturer for refusing to sell to it prestigious "pro-line"

27  equipment.  The court suggested that plaintiff could have mitigated its damages by obtaining

28  "pro-line" equipment through the grey market or, it could have compensated for its inability to

37

1    obtain "pro-line" equipment by increasing its volume of "store-line" equipment. Id. at 436.  In

2    refusal-to-deal cases a plaintiff's opportunity cost may be proxy for mitigation.  Fishman v.

3    Estate of Wirtz, 807 F.2d 520, 556 (7th Cir. 1986). In Fishman, the frustrated purchasers of a

4    professional basketball franchise were required to offset their damages "by a figure that accounts

5    for the fact that the plaintiffs actually had use of money that, but for the violation, would have

6    been tied up in the lost business opportunity." Id.  Finally, a plaintiff in exclusion and refusal-to-

7    deal cases must take reasonable steps to find adequate substitute sources of supply.  In Malcolm,

8    a discount gas station sued its former supplier after the supplier stopped selling him gasoline.

9    The court noted that under those circumstances, a plaintiff is required to take reasonable steps to

10   find alternate supplies, and if an unsuccessful but reasonable attempt is made, the plaintiff's

11   losses will not be decreased. Malcolm, 642 F.2d at 863.

12       SDCCC will adduce evidence at trial that UNM did not attempt to increase its trade show

13   cleaning business at other San Diego events in response to SDCCC's cleaning services policy.

14   It made no attempt to use its San Diego work force to break into a different "large convention

15   center" located elsewhere in the western United States.  To the contrary, UNM terminated most

16   of the workers.  Nor did UNM attempt to enter into other types of specialized commercial

17   cleaning work.  After all, UNM contends its elite labor force's unique know-how of logistics and

18   complex cleaning put it in a completely different league from ordinary commercial cleaners.  It

19   should have been very easy for UNM to compete for work at stadiums, racetracks, concert halls,

20   hospitals, airports, research laboratories, military bases, and nuclear power plants in San Diego,

21   to name a few.  Indeed, one of UNM's sister companies, United Maintenance Company, Inc., is

22   a traditional janitorial service. It could have easily absorbed those workers to expand United

23   Maintenance Company's business in San Diego.  Rather than take any of these avenues, UNM

24   simply allowed its allegedly most valuable asset – a highly-specialized labor force – to dissipate

25   to further its litigation goals.

26       **2.      Economic Interference Mitigation.**

27       As to the common law interference torts, the mitigation concept is slightly different: the

28   rule's essence is that "[plaintiff's] conduct rather than that of defendants proximately caused

38

1   such losses." <u>Valencia v. Shell Oil Co.</u>, 23 Cal.2d 840, 846-847 (1944).   Reflecting this

2   concept, many California authorities call mitigation the doctrine of "avoidable consequences."

3   <u>See</u> 6 Witkin, <u>Cal. Summary of Law</u>, Torts § 1624 (10th ed. 2005).   Here, UNM failed to invoke

4   several contractual provisions that would have relieved it of all the harm it attributes to

5   SDCCC's alleged interference.

6        The 2005 Champion contract paid UNM a flat rate of "$.10 per net square foot per night

7   for exhibitor ordered vacuuming," i.e., Booth Cleaning.   After July 1, 2007, UNM insisted on

8   performing at the Building and acceded to SDCCC's terms: 50% of the gross Booth Cleaning

9   revenue.   In 2008, UNM and Champion agreed to an oral modification of the 2005 contract,

10   wherein UNM would no longer be paid on a square foot basis, but would be paid 50% of the

11   gross revenue.   This course of action actually aggravated UNM's alleged damages.   The 2005

12   Champion contract provides that "[o]n shows where [UNM's] revenue (based on the $.10 per

13   net square foot) does not cover [UNM's] labor cost, [UNM] will bill Champion our cost of

14   cleaning the show plus 15%."   In other words, UNM could request payment from Champion

15   equal to its labor costs plus 15% if the agreed-upon flat rate did not cover UNM's costs.   The

16   evidence will show that UNM agreed to pay SDCCC 50% of the gross revenue for SDCCC

17   labor, and that this amount was less than the amount due under the 10 cents per square foot rate.

18   UNM therefore had the contractual right to require Champion to pay it 50% of the gross Booth

19   Cleaning revenue plus 15%.   The evidence will show that it never occurred to UNM

20   management to request this adjustment despite the fact that UNM drafted the agreement.

21        Similarly, the GES contract contains a provision governing material changes in UNM's

22   workforce: "Notwithstanding any other terms of this Section 2, if there is material [sic] change

23   in [UNM's] labor force (such as a change for non-union to union workers), the parties agree to

24   renegotiate appropriate changed hereunder."   If the parties are unable to reach agreement, the

25   parties could terminate the agreement upon thirty days' notice, but only as to the affected shows.

26   Here, UNM was required under the cleaning services policy to use SDCCC employees.

27   Moreover, SDCCC's workforce is unionized, while UNM's is not. However, when faced with a

28   material change in labor conditions, UNM did not seek to renegotiate its rates for San Diego, or

1   even just for the Building.  UNM did not seek termination of the agreement as to only San

2   Diego, despite having bargained for the right to do so.

3          Accordingly, SDCCC will be able to show that UNM unreasonably failed to mitigate its

4   damages.

### IV.

### SIGNIFICANT ISSUES OF LAW

**A.     THE ESSENTIAL FACILITIES DOCTRINE IS NO LONGER VIABLE, AND
        PLAINTIFF'S MONOPOLIZATION CLAIM SHOULD BE ANALYZED UNDER
        A UNILATERAL REFUSAL TO DEAL RUBRIC.**

9          In Trinko, 540 U.S. at 406-11, plaintiff alleged that the defendant violated the essential

10  facilities doctrine, utilized its control over the local telephone exchange infrastructure to engage

11  in a anticompetitive scheme whereby it filled rivals' connection orders on a discriminatory basis,

12  and frustrated the competitor's access to the local exchange and discouraging consumers from

13  switching to its would-be competitors.  Framing the question as "whether the allegations of

14  respondent's complaint fit within existing exceptions or provide a basis, under traditional

15  antitrust principles, for recognizing a new one," the Supreme Court analyzed the complaint

16  under a unilateral refusal-to-deal rubric.  Id., at 406-411.  It explained that the Court had "never

17  recognized [the essential facility] doctrine," and found "no need either to recognize it or to

18  repudiate it" because competitors had some access to the local telephone exchange, and "where

19  access exists, the doctrine serves no purpose."  540 U.S. at 411.

20         A post-Trinko Ninth Circuit opinion suggests the doctrine remains viable, but that

21  discussion is dicta in light of the court's resolution of the essential facility claim under Trinko's

22  unilateral refusal-to-deal analysis.  See MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124,

23  1128-1130 (9th Cir. 2004) (essential facility claim challenging telephone company's duty to

24  share local exchange); Stein v. Pac. Bell, 172 Fed.Appx. 192, 194 (9th Cir. 2006) (same).  Thus,

25  the Trinko analysis, set forth below, is the proper analysis for UNM's section 2 "essential

26  facilities" claim.

27  / / /

28  / / /

1   **B.   SDCCC HAS NO DUTY UNDER THE ANTITRUST LAWS TO COOPERATE
2        WITH UNM.**

3          Because it determines the limits of a firm's antitrust duty to deal with rivals, <u>Trinko</u> is

4   the touchstone for analyzing any claim implicating a unilateral refusal to deal under section 2 of

5   the Sherman Act. <u>See</u> IIIA Areeda & Hovenkamp, <u>Antitrust Law: An Analysis of Antitrust

6   Principles and Their Application</u> ¶ 773g (3d ed. 2006) ("<u>Areeda & Hovenkamp</u>"); and <u>see</u>, <u>e.g.</u>,

7   <u>Pac. Bell Tel. Co. v. linkLine Communs., Inc.</u>, 129 S.Ct. 1109, 1119 (2009) (price-squeeze);

8   <u>Stein</u>, 172 Fed.Appx. at 194 (refusal to deal and essential facilities).

9          As a general matter, the antitrust laws do not provide for a duty to aid, deal, or cooperate

10  with competitors. <u>Trinko</u>, 540 U.S. at 411; <u>MetroNet</u>, 383 F.3d at 1131.  The right to refuse to

11  deal with competitors is not wholly unqualified, but the exception is narrow and limited to very

12  particular circumstances.  <u>Trinko</u>, 540 U.S. at 409, <u>MetroNet</u>, 383 F.3d at 1131.  To prove

13  exclusionary conduct under a unilateral refusal to deal theory, UNM must prove: (1) the refusal

14  amounted to a termination of a voluntary, profitable course of dealing between UNM and

15  SDCCC; (2) such termination was sacrificial, in that it was contrary to SDCCC's short-term

16  economic interests; and (3) SDCCC's conduct makes sense only because it harms competitors

17  and enhances its long-term monopoly power. <u>Trinko</u>, 540 U.S. at 406-11; <u>MetroNet</u>, 383 F.3d at

18  1131-34.  In addition, UNM must show that SDCCC refused to deal with it on the same terms as

19  other customers.  <u>MetroNet</u>, 383 F.3d at 1133.  The antitrust laws cannot be used to compel

20  sharing where the assets "allegedly withheld are not otherwise marketed or available to the

21  public." <u>Trinko</u>, 540 U.S. at 410.  A unilateral refusal to deal claim is "irremediable by antitrust

22  law" if the relief sought requires the court to "assume the day-to-day controls characteristic of a

23  regulatory agency." <u>Id.</u> at 415; <u>MetroNet</u>, 383 F.3d at 1133.

24         SDCCC has no duty to deal with UNM because SDCCC and UNM had no business

25  relationship prior to July 1, 2007.  SDCCC made no profits from UNM's presence in the

26  Building.  Absent SDCCC's "unilateral termination of a voluntary and profitable course of

27  dealing," it is of no consequence that UNM previously operated in the Building. <u>LiveUniverse,

28  Inc. v. MySpace, Inc.</u>, 304 Fed.Appx. 554, 556 (9th Cir. 2008).  Moreover, the termination of

41

1   UNM's access to the Building was in SDCCC's short-term economic interest because it would

2   gain all of the cleaning services revenues.  Because there is no sacrifice on SDCCC's part, and it

3   will decrease its operating costs by implementing the cleaning services policy, SDCCC's

4   conduct makes business sense absent harm to UNM or the creation of long-term monopoly

5   power.  Trinko, 540 U.S. at 406-11; MetroNet, 383 F.3d at 1131-34.  Finally, SDCCC does not

6   sell access to the Building to other cleaning service providers, and the antitrust laws do not

7   compel the sharing of non-marketed resources.  Trinko, 540 U.S. at 410; MetroNet, 383 F.3d at

8   1133.

9   **C.      UNM MAY NOT RELY ON A CONTRACTUAL "LOCK-IN" TO DEFINE THE
10            RELEVANT MARKET AND ESTABLISH MONOPOLY POWER.**

11          A relevant market predicated upon a contract is insufficient as a matter of law because

12   "contracts represent transactions that have occurred within the market.  The question of what

13   transactions have occurred in the market is subsequent to and therefore irrelevant to the

14   definition of the market itself."  Republic Tobacco Co. v. No. Atlantic Trading Co., 381 F.3d

15   717, 738 (7th Cir. 2004) (affirming national market and rejecting regional market for cigarette

16   papers; sales contracts limiting wholesalers' ability to utilize outside suppliers irrelevant to

17   geographic market definition); Forsyth, 114 F.3d at 1476 (health insurance policy did not define

18   relevant market for hospital services; relevant purchasing decision occurred in different market);

19   Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 438 (3rd Cir. 1997) (franchise

20   agreement did not create relevant product market); Hack v. President & Fellows of Yale

21   College, 237 F.3d 81, 85 (2d Cir. 2000) (university housing contracts did not create relevant

22   product market).

23          Moreover, validly conferred contractual rights, standing alone, are not a cognizable

24   source of market power.  Newcal Indus. v. Ikon Office Solution, 513 F.3d at 1048.  In other

25   words, the law prohibits an antitrust claimant from resting on market power that flows from

26   contractual exclusivity, i.e., such power arises solely from contractual rights that consumers

27   knowingly and voluntarily gave to the defendant.  Id.; see, e.g., Forsyth, 114 F.3d. at 1476

28   (health insurance agreement did not create monopoly power; contract explicitly granted insurer

42

1  such power); <u>Queen City Pizza</u>, 124 F.3d at 438-40 (franchisor did not have market power in

2  market defined by franchise agreement).

3  **D.    UNM MAY NOT REBUT SDCCC'S BUSINESS JUSTIFICATIONS BY**
   **OFFERING A LESS RESTRICTIVE ALTERNATIVE OR SECOND-GUESSING**
4  **SDCCC'S BUSINESS DECISIONS.**

5        The Ninth Circuit has rejected justification inquiries under Section 2 that second guess

6  an alleged monopolist's business judgment, including analyses that ask whether defendant's

7  business judgment was wise or correct in retrospect, look to "less restrictive alternatives," or

8  weigh as-yet-unknown social gains against current competitive injuries.  <u>Allied Orthopedic</u>, 592

9  F.3d at 999-1000; <u>Image Tech. Servs., Inc. v. Eastman Kodak Co.</u>, 903 F.2d 612, 620 (9th Cir.

10  1990) ("<u>Image Tech. Servs. I</u>"), <u>aff'd</u>, 504 U.S. 451 (1992).

11       These inquiries would restrict, rather than promote, competition because nearly all

12  business activity is designed to increase market share at competitor's expense, and

13  "[m]anagement's safest course might be to do nothing, but that, of course, would violate their

14  duty to shareholders, and would do nothing to benefit a healthy, innovative and competitive

15  market." <u>In re IBM Peripheral EDP Devices Antitrust Litig.</u>, 481 F.Supp. 965, 1021-1022 (N.D.

16  Cal. 1979).  "Courts have recognized that firms must have broad discretion to make decisions

17  based on their judgments of what is best for them and that business judgments should not be

18  second-guessed even where the evidence concerning the rationality of the challenged activities

19  might be subject to reasonable dispute."  <u>In re Citric Acid Litig.</u>, 191 F.3d 1090, 1101 (9th Cir.

20  1999) (section 1 claim).

21  **E.    ANY ANTITRUST VIOLATION PROVEN BY UNM IS IRREMEDIABLE IF**
   **UNM WOULD RECEIVE A SHARE OF SDCCC'S ALLEGED MONOPOLY**
22  **BUT MARKET CONDITIONS REMAIN UNCHANGED.**

23       Antitrust injury "should reflect the anticompetitive effect either of the violation or of

24  anticompetitive acts made possible by the violation."  <u>Brunswick Corp. v. Pueblo Bowl-O-Mat</u>,

25  429 U.S. 477, 489 (1977).  The harm must be of the type the antitrust laws were intended to

26  prevent.  <u>Glen Holly Entertainment, Inc.</u>, 352 F.3d at 372.

27       Antitrust is concerned with producing competitive alternatives to monopoly, not dividing

28  such power among rivals. IIIA <u>Areeda & Hovenkamp</u> at ¶774b.  The reason is simple: "as a

43

1   general matter, the refusal to share a monopoly is not antitrust injury" because when firms

2   divide proceeds, "price and output ordinarily remain at the monopoly level and consumers are

3   no better off." Id. Two cases illustrate this principle.

4       In Mid-South Grizzlies, 720 F.2d at 772, a World Football League team desired to join

5   the NFL, but was refused admission.   The Grizzlies brought suit under section 2, alleging,

6   among other things, that the NFL is an essential facility for the monopoly sale of television

7   rights for professional football.   The Court rejected the essential facilities theory, noting that

8   there was no NFL team in the Grizzlies' hometown of Memphis, Tennessee.  The Grizzlies were

9   unable to demonstrate antitrust injury because the team "failed to show how competition in any

10  arguably relevant market would be improved if they were given a share of the NFL's monopoly

11  power." Id. at 787.

12      In Almeda Mall, Inc. v. Houston Lighting & Power Co., 615 F.2d 343, 348 (5th Cir.

13  1980), the defendant utility sold electricity at both retail and wholesale rates.  Stores in Houston-

14  area shopping malls were served by individual meters and charged the retail rate.  The plaintiff

15  malls asked the utility to remove all of the individual meters and connect the mall to a single

16  meter, which would allow the plaintiffs to purchase power at wholesale rates and resell it to their

17  tenants at defendant's retail rates.   After defendant refused, the plaintiffs brought suit for

18  antitrust violations.  The court had little trouble rejecting the claim for lack of anticompetitive

19  conduct or antitrust injury.  The plaintiffs "wish[ed] to . . . pre-empt the utility's business for

20  their own profit, not as true competitors for the same market." Id. at 353.  "[T]he activity sought

21  by the [malls] is more akin to mere 'substitution' than to competition." Id.  The tenants would

22  not be benefited by the malls' requested relief because prices would remain the same and tenant

23  would not gain a choice of providers because the tenants were contractually bound to buy power

24  from the malls. Id.

25      Here, UNM desires access to the Building on the same conditions that it previously

26  enjoyed.  It argues that if it is granted such access, consumers would benefit from its presence in

27  the market because it would reduce prices and increase service quality.  However, if UNM were

28  to regain its pre-July 1, 2007 market share, UNM and SDCCC would be the only two players in

44

1   the market enjoying near equal oligopolies.  Market output would be unaffected.  Consumers

2   face higher prices when a monopolist restricts its own output, thereby reducing marketwide

3   output and increasing demand.  Rebel Oil, 51 F.3d at 1434.  Conversely, "increases in output

4   generally result in lower prices to consumers." Weyerhaeuser Co. v. Ross-Simmons Hardwood

5   Lumber Co., 549 U.S. 312, 324 (2007). Substitution of UNM for SDCCC would neither increase

6   nor decrease output because sharing the Building (and the customers therein) would not lead to

7   more or less shows at the Building, nor would it increase the Building's size or capacity.

8          Because UNM operating in the Building would not substantially improve competition in

9   the marketplace by reducing price or by increasing output or innovation, UNM is unable to show

10  antitrust injury.

11  **F.    THE COURT INTERPRETS THE MEANING OF UNM'S CONTRACTS AS A
            MATTER OF LAW, BUT THE JURY RESOLVES CONFLICTING EVIDENCE**
12  **         AS TO THEIR MEANING.**

13         Contract interpretation is usually a matter of law for the Court.  Wolf v. Superior Court,

14  114 Cal. App. 4th 1343, 1350 (2004).  The Ninth Circuit recently confirmed that all contract

15  interpretation issues must be treated the same regardless of whether the dispute concerns

16  contract claims or tort claims that depend on contract interpretation.  Mattel, Inc. v. MGA

17  Entertainment, Inc., 616 F.3d 904, 907 (9th Cir. 2010).  Mattel concerned a dispute over the

18  ownership to a particular line of "bratty" dolls that one of the defendants allegedly developed a

19  while working for plaintiff doll maker.  The defendant was subject to an employment agreement

20  that assigned all of his "inventions" to plaintiff.  "Prior to trial, the district court held that

21  [defendant's] employment agreement assigned his ideas to [plaintiff], and so instructed the jury.

22  What was left for the jury to decide was which ideas [defendant] came up with during his time

23  with [plaintiff]." Id. at 909.  The jury returned a verdict for plaintiff on a number of state court

24  claims, including tortious interference with contract.  On appeal, the Ninth Circuit noted that

25  whether a defendant assigned his ideas to plaintiff turns on the interpretation of [defendant's]

26  employment agreement, which the Ninth Circuit reviewed de novo.  The district court had

27  determined that "inventions" were the same as "ideas." Id.

28  / / /

                                                 45

1   The Ninth Circuit reversed. It found "inventions" to be ambiguous and, therefore, it was

2   improper for the district court to interpret the employment agreement as a matter of law. The

3   parties had introduced conflicting extrinsic evidence as to whether "inventions" included

4   "ideas," but the district court did not consider that evidence, and instructed the jury pursuant to

5   its contract interpretation. Id. 909-910. The Ninth Circuit noted that even if "inventions" was

6   unambiguous, the district court would have been unable to resolve the meaning of "inventions"

7   as a matter of law. "If the meaning turns in part on the credibility of conflicting extrinsic

8   evidence, a properly instructed jury should have decided the issue." Id. at 910 (citing Morey v.

9   Vannucci, 64 Cal.App.4th 904, 912-913 (1998)).

10  Morey, provides the framework for construing the contracts at issue.

11  "The mutual intention [of the parties] to which the courts give effect is
    determined by objective manifestations of the parties' intent, including the words
12  used in the agreement, as well as extrinsic evidence of such objective matters as
    the surrounding circumstances under which the parties negotiated or entered into
13  the contract; the object, nature and subject matter of the contract; and the
    subsequent conduct of the parties." Id.
14

15  A trial court must provisionally receive any proffered extrinsic evidence which is

16  relevant to show whether the contract is reasonably susceptible of a particular meaning. Id. It is

17  reversible error for a trial court to refuse to consider extrinsic evidence based on its own

18  conclusion that the contracts at issue appear clear and unambiguous on their face. Id. Where

19  contract interpretation turns on the credibility of extrinsic evidence, interpretation is not solely a

20  judicial function; the jury must resolve any conflict in properly-admitted extrinsic evidence. Id.

21  at 912-913. Under those circumstances, the proper procedure is "for the trial court to require the

22  jury to make special findings on the disputed issues and then base its interpretation of the

23  contract on those findings." Id. at 913.

24  Course of performance evidence is not limited to the contracting parties' joint conduct:

25  the "practical interpretation of the contract by one party, evidenced by his words or acts, can be

26  used against him." So. Cal. Edison Co. v. Superior Court, 37 Cal.App.4th 839, 851 (1995).

27  Provided that the proponent of the evidence advances an interpretation of the contract

28  "evidenced by the other party's earlier words, and acts," the conduct is admissible even if the

46

1    proponent had no knowledge of, and did not consent to, it.  Id.  Such conduct evidence is made

2    relevant under state substantive contract law "to show the contract is reasonably susceptible to

3    the meaning evidenced by that party's conduct." Id.

4         The UNM contracts do not require UNM to perform when decorators cannot designate it

5    as the cleaning subcontractor. UNM interprets these contracts differently, arguing that it would

6    breach its contracts if it did not perform at SDCCC.  Extrinsic evidence of UNM's conduct and

7    course of performance under the same contracts is therefore relevant and necessary to rebut

8    UNM's interpretation of its own contracts.  The Court may consider this evidence, but if there is

9    a genuine conflict in the evidence, the issues must be tendered to the jury. Morey, 64 Cal. App.

10   4th at 912; So. Cal. Edison, 37 Cal.App.4th at 851.

11   **G.    THE COURT MUST DETERMINE, AS A MATTER OF LAW, WHETHER THE**
**CONDUCT    ALLEGED    BY    UNM    IS    OF    THE    TYPE    THAT    IS**
12   **"INDEPENDENTLY WRONGFUL" FOR PURPOSES OF THE INTENTIONAL**
**INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE CLAIM.**
13

14        As discussed previously, it is plaintiff's burden to plead and prove wrongful conduct,

15   which is "proscribed by some constitutional, statutory, regulatory, common law, or other

16   determinable legal standard." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134,

17   1159 (2003).  The pattern jury instruction for UNM's intentional interference with prospective

18   economic advantage claim contains the following directions for use:

19        Regarding element 4, the court must specifically state for the jury the conduct
that the judge has determined as a matter of law would satisfy the "wrongful
20        conduct" standard. This conduct must fall outside the privilege of fair
competition. . . .The jury must then decide whether the defendant engaged in the
21        conduct as defined by the judge. If the conduct is tortious, the judge should
instruct on the elements of the tort.
22

23   CACI 2202.

24        In other words, the Court must determine, as a matter of law, whether the conduct

25   alleged by UNM is "independently actionable conduct" before it instructs the jury on elements

26   of the underlying tort. Id.  As discussed in section III.E above, because UNM alleges conduct

27   that is not "independently actionable," the Court should enter judgment as a matter of law in

28   SDCCC's favor on the prospective advantage claim.

47

**H.    THE COURT SHOULD DETERMINE THE PROPER SANCTIONS TO IMPOSE AGAINST UNM FOR DESTRUCTION OR SPOLIATION OF EVIDENCE.**

The Court "has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." Glover v. BIC Corp., 6 F.3d 1318, 1329-1330 (9th Cir. 1993).  Sanctions may include exclusion of evidence or instructing the jury that a party spoiled or destroyed evidence and that it may draw an adverse inference from that fact, i.e., that the spoiled or destroyed evidence would have been unfavorable to the responsible party. Id.  Exclusion is warranted when the other party is denied the opportunity to review the evidence by virtue of the destruction or spoliation.  Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg. Corp., 982 F.2d 363, 369 (9th Cir. 1992).  An adverse inference should be permitted when a party has had the opportunity to review the evidence and such an instruction serves evidentiary and deterrence purposes.  Millenkamp v. Davisco Foods Int'l, Inc., 562 F.3d 971, 981 (9th Cir. 2009).  The evidentiary rationale recognizes that when a party who has notice that evidence is relevant to litigation destroys such evidence, it is reasonable to assume that the evidence would have been more harmful to the responsible party than its opponent. Id.  The second rationale is both "prophylactic and punitive" in that permitting the jury to draw an adverse inference will deter "parties from destroying relevant evidence before it can be introduced at trial." Id.

UNM Vice-President Raymond Santos ordered Gabriel Ramirez, UNM's San Diego Supervisor, to record evidence of the quality of SDCCC's cleaning work at the Building in late 2007.  Mr. Ramirez complied, taking photographs on his smartphone and a digital camera.  Mr. Ramirez deleted all of these photographs, some as late at ten days before his deposition.  Mr. Ramirez's only explanation was that he needed the room for additional pictures of his family.  Not only did Mr. Ramirez have knowledge that these photographs were relevant to this litigation, but they were generated specifically for litigation purposes.  He destroyed them before SDCCC had an opportunity to review them.  Under these circumstances, Mr. Ramirez should be prevented from offering evidence as to his percipient knowledge concerning the quality of SDCCC's work and the jury should be given an adverse inference instruction.

48

**I.      THE PARTIES DISAGREE AS TO THE PROPER JURY INSTRUCTIONS.**

The parties disagree as to the proper instructions to be given to the jury.   SDCCC's objections to UNM's proposed instructions will be filed with the Court in a timely manner.

**J.      SDCCC ANTICIPATES THAT IT WILL RENEW ITS OBJECTIONS TO THE ADMISSIBILITY OF OPINION TESTIMONY OFFERED BY UNM'S EXPERT ECONOMIST.**

The Court denied all three of SDCCC's <u>Daubert</u> challenges without prejudice. SDCCC anticipates renewing these objections at the appropriate times.

**V.**

**CONCLUSION**

For the foregoing reasons, and the evidence presented at trial, SDCCC requests that this Court enter judgment in its favor on each claim asserted by plaintiff UNM.

Dated:  March 18, 2011                  WRIGHT & L'ESTRANGE
                                        Attorneys for Defendant
                                        San Diego Convention Center Corp., Inc.

                                        */s/ John H. L'Estrange, Jr.*
                                        John H. L'Estrange, Jr.
                                        jlestrange@wllawsd.com