1                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF CALIFORNIA
2

        BEFORE THE HONORABLE ANTHONY J. BATTAGLIA, JUDGE PRESIDING
3


4
                                    ) VOLUME II (EXCERPT)
5  UNITED NATIONAL MAINTENANCE,      )
   INC.,                             ) CASE NO. 07CV2172-AJB
6               PLAINTIFF,           )
                                     )
7            -V-                     )
                                     ) SAN DIEGO, CALIFORNIA
8  SAN DIEGO CONVENTION CENTER       ) MARCH 22, 2011
   CORPORATION, INC.,                ) 1:59 P.M.
9                                    )
             DEFENDANT.              )
10 _____) JURY TRIAL

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS
          TESTIMONY OF DAVID DICKERSON AND LEIF LJUNGQUIST
14

15

16

17 APPEARANCES:

18 FOR THE PLAINTIFF:    JAMES R. LANCE, ESQ.
                         JAMES M. SLANIA, ESQ.
19                       KIRBY NOONAN LANCE & HOGE, LLP
                         350 TENTH AVENUE, STE. 1300
20                       SAN DIEGO, CALIFORNIA 92101

21 FOR THE DEFENDANT:    JOHN H. L'ESTRANGE, JR., ESQ
                         JOSEPH THOMAS ERGASTOLO, ESQ.
22                       ANDREW EDWARD SCHOUTEN, ESQ.
                         WRIGHT AND L'ESTRANGE
23                       401 A STREET, STE. 2250
                         SAN DIEGO, CALIFORNIA 92101
24
   OFFICIAL REPORTER:    JEANNETTE N. HILL, C.S.R.
25                       (619) 702-3905


                         MARCH 22, 2011

1    **SAN DIEGO, CALIFORNIA; TUESDAY, MARCH 22, 2011; 1:59 P.M.**

2    (PROCEEDINGS HAD IN OPEN COURT, IN THE HEARING OF THE JURY)

3         **THE COURT:**  AND THEN THE PLAINTIFF'S NEXT WITNESS.

4         **MR. SLANIA:**  DAVE DICKERSON, YOUR HONOR.

5         **THE COURT:**  WHY DON'T YOU GO AHEAD AND BRING HIM

6    FORWARD.

7    **(DAVID DICKERSON, PLAINTIFF WITNESS, TESTIFIED AS FOLLOWS:)**

8         **MR. L'ESTRANGE:**  YOUR HONOR, MR. SCHOUTEN WILL BE

9    HANDLING THIS WITNESS ON CROSS-EXAMINATION.

10         **THE COURT:**  GREAT.  THANKS, MR. L'ESTRANGE.

11         COME FORWARD, SIR, AND THE CLERK WILL SWEAR YOU UNDER

12    OATH.

13         **DEPUTY CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

14         YOU DO SOLEMNLY SWEAR THAT THE EVIDENCE YOU SHALL

15    GIVE IN THE CAUSE NOW BEFORE THE COURT SHALL BE THE TRUTH, THE

16    WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

17         **THE WITNESS:**  YES, I DO.

18         **DEPUTY CLERK:**  THANK YOU.  PLEASE TAKE THE STAND.

19    STATE YOUR FIRST AND SPELL YOUR LAST NAME FOR THE RECORD.

20         **THE WITNESS:**  DAVID DICKERSON, D-I-C-K-E-R-S-O-N.

21                        **DIRECT EXAMINATION**

22    **BY MR. SLANIA:**

23    **Q.**   GOOD AFTERNOON, MR. DICKERSON.  WHO ARE YOU CURRENTLY

24    EMPLOYED BY?

25    **A.**   GES.

MARCH 22, 2011

DICKERSON – DIRECT BY SLANIA
3

1    **Q.**   AND WHAT TYPE OF BUSINESS DOES GES DO?

2    **A.**   WE DO TRADE SHOWS.

3    **Q.**   WHEN YOU SAY GES PERFORMS TRADE SHOWS, WHAT DO YOU MEAN?

4    **A.**   WE PRODUCE TRADE SHOWS AT THE CONVENTION CENTER, LIKE

5    MEDICAL SHOWS, BANKER SHOWS.

6    **Q.**   IS GES COMMONLY REFERRED TO AS A DECORATOR OR GENERAL

7    CONTRACTOR?

8    **A.**   YEAH.  GENERAL CONTRACTOR.

9    **Q.**   HOW LONG HAVE YOU WORKED WITH GES?

10   **A.**   SINCE 1987.

11   **Q.**   DO YOU HAVE A POSITION OR A TITLE WITH THE COMPANY?

12   **A.**   DECORATOR FOREMAN.

13   **Q.**   AS A DECORATOR FOREMAN, WHAT TYPE OF WORK DO YOU

14   PERSONALLY PERFORM?

15   **A.**   MANAGE CREWS:  WE LAY CARPET, HANG SIGNS, SET UP BOOTHS,

16   UNLOAD TRUCKS.

17   **Q.**   ARE YOU A MEMBER OF ANY UNION?

18   **A.**   YES.  DECORATOR UNION, LOCAL 831.

19   **Q.**   HOW LONG HAVE YOU BEEN A MEMBER OF THE DECORATORS UNION?

20   **A.**   SINCE 1987.

21   **Q.**   DO YOU HAVE ANY POSITION OR CLASSIFICATION WITH THAT

22   UNION?

23   **A.**   YES.  CERTIFIED JOURNEYMAN.

24   **Q.**   AND WHAT DOES THAT MEAN?  WHAT CLASSIFICATION IS A

25   CERTIFIED JOURNEYMAN?

MARCH 22, 2011

DICKERSON - DIRECT BY SLANIA
4

1   **A.**   IT'S -- BASICALLY, AFTER FIVE YEARS YOU ARE A CERTIFIED

2   JOURNEYMAN.

3   **Q.**   SO WHEN YOU START WITH THE UNION, WHAT IS YOUR FIRST

4   POSITION?

5   **A.**   B HELPER.  B1.

6   **Q.**   AND HOW LONG DO YOU SERVE AS A B1 HELPER?

7   **A.**   TWO YEARS.

8   **Q.**   AND WHAT HAPPENS AFTER THAT?

9   **A.**   THEN YOU BECOME AN "A."  AND THEN YOU SERVE THREE YEARS,

10  AND AT THAT POINT A CERTIFIED JOURNEYMAN.

11  **Q.**   AND SO YOU HAVE BEEN A JOURNEYMAN FOR APPROXIMATELY 22, 23

12  YEARS?

13  **A.**   YEAH.  A LITTLE LESS, YES.

14  **Q.**   WHEN DID YOU START YOUR WORK FOR GES IN THE SAN DIEGO

15  AREA?

16  **A.**   FIRST SHOW I DID FOR GES WAS IN 1988.

17  **Q.**   AND WHERE WAS THAT SHOW LOCATED?

18  **A.**   THAT, I BELIEVE, WAS BROWN FIELD.

19  **Q.**   HAVE YOU WORKED CONTINUOUSLY FOR GES FROM THAT FIRST SHOW

20  IN 1988 TO THE PRESENT DAY?

21  **A.**   YES.

22  **Q.**   DID YOU WORK FOR GES TODAY?

23  **A.**   I DID.

24  **Q.**   WHERE WERE YOU WORKING TODAY?

25  **A.**   AT THE CONVENTION CENTER.

MARCH 22, 2011

DICKERSON - DIRECT BY SLANIA
5

1    **Q.**    HOW LONG HAVE YOU BEEN WORKING AT THE CONVENTION CENTER?

2    **A.**    SINCE IT OPENED.  I THINK I DID THE FIRST SHOW IN THE

3    BUILDING, ACTUALLY.

4    **Q.**    APPROXIMATELY 1989?

5    **A.**    YEAH, '89.

6    **Q.**    WHAT PERCENTAGE OF YOUR WORK FOR GES WOULD YOU ALLOCATE AS

7    BEING PERFORMED AT THE CONVENTION CENTER?

8    **A.**    PROBABLY 80 PERCENT OF OUR WORK.

9    **Q.**    AND THAT GOES FOR YOU, PERSONALLY?

10   **A.**    YES.

11   **Q.**    AS A MEMBER OF THE DECORATOR UNION, HAVE THEY EVER

12   PERFORMED A BACKGROUND CHECK ON YOU?

13   **A.**    NO.

14   **Q.**    HAVE YOU EVER BEEN PROVIDED ANY INFORMATION THAT THE

15   DECORATORS UNION PERFORMS BACKGROUND ON ANY OF ITS MEMBERS?

16   **A.**    NO.

17   **Q.**    AS A TENURED LONG-TERM EMPLOYEE OF GES, HAVE THEY EVER

18   PERFORMED A BACKGROUND CHECK ON YOU?

19   **A.**    NO.

20   **Q.**    HAVE YOU EVER BEEN PROVIDED ANY INFORMATION THAT GES

21   PERFORMS BACKGROUND CHECKS ON ANY OF ITS MEMBERS?

22   **A.**    NO.

23   **Q.**    GOING BACK TO YOUR UNION MEMBERSHIP, HAS THE UNION

24   PERFORMED A DRUG OR ALCOHOL SCREENING ON YOU?

25   **A.**    NO.

MARCH 22, 2011

DICKERSON – DIRECT BY SLANIA
6

1   **Q.**   HAVE YOU EVER BEEN PROVIDED ANY INFORMATION AS TO WHEN THE

2   UNION WOULD PERFORM A DRUG OR ALCOHOL SCREENING?

3   **A.**   IN A CASE OF AN ACCIDENT, I THINK, WITH A COMPANY VEHICLE,

4   FORKLIFT.

5   **Q.**   WHEN YOU SAY "ACCIDENT," ARE YOU REFERRING TO AN ACCIDENT

6   ON THE JOB?

7   **A.**   YEAH.  ACCIDENT ON THE JOB, YEAH.

8   **Q.**   JUST DESCRIBE A SCENARIO FOR ME.  SOMEBODY IS INSTALLING A

9   SHOW AND THERE IS AN ACCIDENT.  IS THAT WHAT YOU ARE REFERRING

10  TO?

11  **A.**   YEAH.  IF YOU ARE DRIVING A FORKLIFT AND YOU DAMAGE, LET'S

12  SAY, A CRATE OF A PARTICULAR EXHIBITOR/CLIENT.  OR AN INJURY TO

13  A PERSON, AS WELL.

14  **Q.**   AND IS THAT THE ONLY INCIDENT OR ONLY TIME THAT YOU ARE

15  AWARE OF THAT DRUG AND ALCOHOL SCREENING IS PERFORMED BY THE

16  UNION?

17  **A.**   YES.

18  **Q.**   WHEN YOU WENT TO WORK TODAY AT THE CONVENTION CENTER, DID

19  YOU HAVE TO WEAR A PHOTO IDENTIFICATION BADGE?

20  **A.**   YES.

21  **Q.**   WHEN YOU STARTED WORKING AT THE CONVENTION CENTER BACK IN

22  1989, DID YOU HAVE TO WEAR A PHOTO IDENTIFICATION BADGE?

23  **A.**   NO.

24  **Q.**   WHEN WAS THERE A CHANGE IN THE POLICY IN WHICH YOU WERE

25  REQUIRED TO WEAR A PHOTO IDENTIFICATION BADGE AT THE CONVENTION

MARCH 22, 2011

DICKERSON – DIRECT BY SLANIA
7

1    CENTER?

2    **A.**    POSSIBLY, LIKE, TWO TO THREE YEARS, MAYBE.

3    **Q.**    APPROXIMATELY 2009 OR 2008?

4    **A.**    YEAH.

5    **Q.**    THAT IS YOUR RECOLLECTION?

6    **A.**    YES.

7    **Q.**    WHAT STEPS DID YOU HAVE TO TAKE TO OBTAIN A PHOTO

8    IDENTIFICATION BADGE?

9    **A.**    THEY TAKE A PHOTO RIGHT THERE ON-SITE WITH SECURITY FROM

10   THE BUILDING, AND WITH YOUR NAME.  THAT, BASICALLY, IS IT.  AND

11   PRINT IT OUT.

12   **Q.**    DID YOU HAVE TO GIVE THEM ANY INFORMATION ABOUT YOURSELF?

13   **A.**    NO.

14   **Q.**    DID YOU HAVE TO PROVIDE THEM ANY TYPE OF PERSONAL

15   IDENTIFICATION?

16   **A.**    NOT THAT I CAN RECALL, NO.

17   **Q.**    DID YOU HAVE TO GIVE THEM A DRIVER'S LICENSE OR ANYTHING

18   ALONG THOSE LINES?

19   **A.**    I DON'T BELIEVE SO.

20   **Q.**    DID ANYBODY HAVE TO PROVIDE PROOF THAT YOU ACTUALLY WERE

21   EMPLOYED BY GES FOR YOU TO GET THE PHOTO IDENTIFICATION BADGE?

22   **A.**    NO.

23   **Q.**    SO WHAT HAPPENED?  DID YOU JUST WALK TO THE BACK AND SAY

24   "I NEED A PHOTO IDENTIFICATION BADGE?"

25   **A.**    WE HAD HEARD IT WAS A NEW POLICY.  SO, ACTUALLY, THE

DICKERSON – DIRECT BY SLANIA

1  CONTRACTOR, DEPENDING ON WHO YOU WERE WORKING FOR, WOULD NOTIFY

2  THE EMPLOYEES THAT YOU WOULD HAVE TO GET A BADGE TO ENTER THE

3  BUILDING -- IN AND OUT OF THE HALL, BASICALLY.

4  Q.   AND YOU SAY THAT THAT REQUIREMENT TO HAVE THE BADGE TO GET

5  IN AND OUT OF THE HALL WASN'T ENFORCED UNTIL TWO OR THREE YEARS

6  AGO?

7  A.   CORRECT.

8  Q.   WHEN YOU BEGAN WORKING AT THE CONVENTION CENTER AND YOU

9  DIDN'T HAVE TO WEAR THE BADGE, WAS THERE EVER A REQUIREMENT TO

10  WEAR A WRISTBAND?

11  A.   YES.

12  Q.   WHAT WAS THE PURPOSE -- OR WAS IT EVER EXPLAINED TO YOU

13  WHY YOU WOULD HAVE TO WEAR A WRISTBAND?

14  A.   NO.  REALLY, JUST TO GET IN AND OUT OF THE HALL, LET'S

15  SAY, FROM THE DOCK OR LOBBY.  NO EXPLANATION OTHER THAN THAT.

16  Q.   AND CAN YOU STILL WEAR A WRISTBAND AND WORK IN THE

17  CONVENTION CENTER TODAY?

18  A.   YES.

19  Q.   DID YOU SEE ANYBODY WORKING TODAY WEARING A WRISTBAND?

20  A.   YES.

21  Q.   DID YOU SEE ANYBODY WORKING TODAY NOT WEARING A BADGE?

22  A.   I DIDN'T REALLY LOOK AT EVERYONE AROUND ME.  TYPICALLY,

23  THESE DAYS, WE HAVE BADGES ON.

24  Q.   WHEN YOU SHOW UP TO WORK AT THE CONVENTION CENTER, HOW DO

25  YOU ENTER THE BUILDING?

MARCH 22, 2011

DICKERSON - DIRECT BY SLANIA

1    **A.**    THROUGH THE BACK DOCK OFF OF CONVENTION WAY.

2    **Q.**    AND IS THERE A DOOR THERE THAT YOU WALK THROUGH?

3    **A.**    THERE IS EITHER A DOOR NEAR SECURITY OR UP THE RAMP,

4    EITHER D DOCK OR C DOCK, BASICALLY.

5    **Q.**    AND HOW LONG HAS THAT BEEN THE GENERAL WAY IN WHICH YOU

6    ENTER THE BUILDING WHEN YOU SHOW UP TO WORK AT THE CONVENTION

7    FACILITY?

8    **A.**    FROM THE BACK DOCK IT'S BEEN SINCE I STARTED THERE.

9    **Q.**    HAVE THERE BEEN OTHER ENTRANCES THAT GES WORKERS HAVE

10   UTILIZED TO WORK -- TO ENTER THE BUILDING WHEN THEY SHOW UP TO

11   WORK?

12   **A.**    YES.

13   **Q.**    WHAT OTHER ENTRANCES?

14   **A.**    THROUGH THE PARKING STRUCTURE DOWN BELOW THE BUILDING.

15   **Q.**    THAT IS THE PARKING STRUCTURE LOCATED BENEATH THE

16   FACILITY?

17   **A.**    YES.

18   **Q.**    AND THERE IS A DOOR THERE?

19   **A.**    YEAH.  YOU ENTER THROUGH HUMAN RESOURCES, WHICH BRINGS YOU

20   UP AT THE SECURITY INSIDE THE BUILDING.

21   **Q.**    IS THERE A REQUIREMENT NOW THAT YOU USE A CERTAIN MORE

22   SPECIFIC DOOR?

23   **A.**    FROM OUTSIDE, YEAH.  THERE IS A SINGLE DOOR THAT IS

24   TYPICALLY OPEN IF THE GATES ARE CLOSED AT THE DOCK.

25   **Q.**    HOW LONG HAS THAT BEEN A REQUIREMENT THAT YOU USE THE DOOR

MARCH 22, 2011

1  ON CONVENTION WAY?

2  **A.**   JUST A FEW YEARS.  ABOUT THE SAME TIME THE BADGES WERE IN

3  PLACE.

4  **Q.**   SO APPROXIMATELY 2009, 2008?

5  **A.**   YES.

6  **Q.**   HAVE YOU EVER ENTERED THE CONVENTION FACILITY AROUND THE

7  SAIL BAY DOORS?

8  **A.**   YES.

9  **Q.**   FOR WHAT PURPOSE?

10 **A.**   SAY I AM WORKING UP THERE, GO OUTSIDE, TAKE A BREAK, EXIT,

11 ENTER BACK IN.

12 **Q.**   HAVE YOU EVER ENTERED THE FACILITY THROUGH THE SAIL BAY

13 DOORS FOR PERSONAL REASONS?

14 **A.**   YES.

15 **Q.**   FOR WHAT REASONS?

16 **A.**   MAYBE IF I PARKED IN THE BACK GOING TO A PADRE GAME,

17 WALKING THROUGH.

18 **Q.**   EXPLAIN THAT FOR THE JURY.  IS THERE A PARKING LOT BEHIND

19 THE CONVENTION CENTER?

20 **A.**   YEAH.  THERE IS A PARKING LOT IN THE BACK SIDE OFF

21 CONVENTION WAY, WHICH IS RIGHT UP AGAINST THE BAY.  JUST ACROSS

22 THE STREET, UP THE STAIRS, AND THROUGH THE BUILDING.

23 **Q.**   LET ME BREAK IT DOWN.  YOU PARK IN THE PARKING LOT WHICH

24 IS BEHIND OR ON CONVENTION WAY?

25 **A.**   YES.

MARCH 22, 2011

DICKERSON - DIRECT BY SLANIA

11

1   **Q.**   AND THEN TO GO TO THE PADRE GAME YOU WALK UNDER THE STAIRS

2   FOR THE FACILITY?

3   **A.**   YES.

4   **Q.**   AND THEN AT THAT TIME YOU ENTER THROUGH THE SAIL BAY?

5   **A.**   YOU CAN ENTER THROUGH THE SAIL -- OR IT DEPENDS.  THE

6   DOORS ARE LOCKED OR UNLOCKED, OR YOU GO UP AND OVER THROUGH THE

7   ACCESS, ALL THE WAY UP.  THERE IS PUBLIC ACCESS BETWEEN THE TWO

8   BUILDINGS.

9   **Q.**   BUT YOU HAVE GONE THROUGH THE SAIL BAY DOORS TO GO TO A

10  PADRE GAME?

11  **A.**   YEAH.  THROUGH THE LOBBY, YES.

12  **Q.**   WHEN YOU HAVE DONE THAT, WHAT HOURS OR WHAT TIMES OF THE

13  DAY HAVE YOU DONE IT?

14  **A.**   6:00 -- 5:00, 6:00, 7:00 AT NIGHT.

15  **Q.**   DO YOU WEAR YOUR BADGE TO DO THAT?

16  **A.**   NO.

17  **Q.**   WAS THERE ANYBODY CHECKING TO SEE IF YOU WERE ENTERING THE

18  CONVENTION FACILITY THROUGH THE SAIL BAY DOORS?

19  **A.**   NO.

20  **Q.**   WAS THERE A SHOW GOING ON?

21  **A.**   I CAN'T RECALL THE LAST TIME I'D SAY, WHEN I DID DO THAT,

22  THAT THERE WAS AN ACTUAL SHOW GOING ON, SO --

23  **Q.**   NOW, IN THE TIME THAT YOU WORKED FOR GES AT THE CONVENTION

24  FACILITY, HAVE YOU BECOME FAMILIAR WITH THE PERFORMANCE OF

25  TRADE SHOW CLEANING?

MARCH 22, 2011

DICKERSON - DIRECT BY SLANIA

1    **A.**    YES.

2    **Q.**    HAS THAT BEEN SOMETHING THAT YOU PERSONALLY OBSERVED

3    THROUGH YOUR YEARS WORKING AT THE CONVENTION FACILITY?

4    **A.**    YES.

5    **Q.**    PRIOR TO JULY 1ST, 2007 -- THAT'S A KEY DATE IN THIS CASE,

6    SO I WANT YOU THINKING BEFORE JULY 1ST, 2007 -- WHO DID YOU

7    OBSERVE PERFORM TRADE SHOW CLEANING SERVICES?

8    **A.**    UNITED MAINTENANCE.

9    **Q.**    AND WAS THAT SOMETHING THAT YOU OBSERVED ON A REGULAR

10   BASIS OR WAS IT SPORADIC?

11   **A.**    IT WAS PRETTY CONSISTENT WITH EVERY SHOW THAT GES DID,

12   YES.

13   **Q.**    SO EVERY SHOW THAT YOU WERE WORKING FOR GES, UNITED WAS

14   PERFORMING THE CLEANING?

15   **A.**    NOT EVERY -- MOST OF THE SHOWS, YES.  THERE MAY BE ONE

16   HERE AND THERE WHERE THE BUILDING WOULD DO THE CLEANING.

17   **Q.**    DID YOU OBSERVE UNITED PERFORM TRADE SHOW CLEANING DURING

18   THE MOVE-IN PHASE?

19   **A.**    YES.

20   **Q.**    AND LET ME BACK UP.  CAN YOU JUST BRIEFLY EXPLAIN, FOR THE

21   JURY, WHAT YOU UNDERSTAND THE MOVE-IN PHASE TO BE OF A SHOW?

22   **A.**    IT'S A PRE-OPENING OF THE SHOW.  WE HAVE, SAY, THREE OR

23   FOUR DAYS, WHATEVER DAYS ALLOWED TO MOVE IN THE SHOW, AND

24   THEN --

25   **Q.**    YOU HAVE OBSERVED UNITED NATIONAL MAINTENANCE PERFORM

MARCH 22, 2011

DICKERSON – DIRECT BY SLANIA

1   CLEANING DURING THE MOVE-IN PHASE?

2   **A.**   YES.

3   **Q.**   HOW DID THEY PERFORM?

4   **A.**   VERY WELL.

5   **Q.**   DID YOU HAVE ANY COMPLAINTS, DURING YOUR YEARS THAT YOU

6   WORKED AT THE CONVENTION FACILITY, OF UNITED'S PERFORMANCE OR

7   TRADE SHOW CLEANING DURING THE MOVE-IN PHASE OF THE SHOW?

8   **A.**   TYPICALLY, NO.

9   **Q.**   ARE THERE ANY SPECIFIC INDIVIDUALS THAT YOU WORKED WITH ON

10  A REGULAR BASIS WITH UNITED DURING THE MOVE-IN PHASE --

11  **A.**   YES.

12  **Q.**   -- BEFORE JULY 1ST, 2007?

13  **A.**   I MAINLY DEAL WITH GABE RAMIREZ.

14  **Q.**   DID HE EVER TELL YOU WHAT HIS POSITION WAS WITH UNITED?

15  **A.**   YEAH.  HE'S THE LEAD -- LIKE, THE LEAD FOREMAN, WHATEVER.

16  THE SUPERVISOR, LET'S SAY.

17  **Q.**   AFTER THE MOVE-IN PHASE, WHAT IS THE NEXT PHASE OF THE

18  TRADE SHOW FOR THE CONVENTION?

19  **A.**   YOU HAVE THE SHOW OPEN DATES.

20  **Q.**   AND HAVE YOU OBSERVED UNITED NATIONAL MAINTENANCE PERFORM

21  TRADE SHOW CLEANING DURING THE SHOW OPENING AND DURING THE

22  ACTUAL SHOW?

23  **A.**   YES.

24  **Q.**   HOW DID UNITED PERFORM?

25  **A.**   GOOD.

MARCH 22, 2011

DICKERSON - DIRECT BY SLANIA

1   **Q.**   HAVE YOU EVER NEEDED OR ASKED UNITED'S ASSISTANCE TO

2   PERFORM CERTAIN TASKS DURING A SHOW?

3   **A.**   YES.

4   **Q.**   WHAT SPECIFICALLY DO YOU RECALL ASKING FOR ASSISTANCE WITH

5   FROM UNITED?

6   **A.**   LET'S SAY -- WELL, ARE YOU TALKING -- WE'RE TALKING

7   OPENING, LIKE, SHOW OPEN PHASE?

8   **Q.**   SURE.  SHOW OPEN.

9   **A.**   LET'S SAY THERE IS SOME TRASHCANS AT REGISTRATION OR SOME

10  TRASH THAT NEEDS TO BE CLEANED UP FOR AN EXHIBITOR.  WE'D CALL

11  THEM UP AND THEY WOULD COME CLEAN UP.  WE'D MEET THEM IN THE

12  AREA, OR SOMETHING LIKE THAT.

13  **Q.**   HOW WOULD YOU CALL UNITED?

14  **A.**   EITHER TWO-WAY RADIO OR NEXTEL.

15  **Q.**   AND WHO WOULD ANSWER ON UNITED'S BEHALF?

16  **A.**   GABE.

17  **Q.**   SO YOU COMMUNICATED WITH HIM WHATEVER NEEDS YOU OR GES HAD

18  AT THAT SPECIFIC MOMENT?

19  **A.**   YES.

20  **Q.**   AND WAS UNITED RESPONSIVE TO YOUR REQUEST?

21  **A.**   YES.

22  **Q.**   IS THE SAME THING TRUE DURING THE MOVE-IN PHASE?  DID YOU

23  HAVE SPECIFIC REQUESTS OF UNITED?

24  **A.**   YES.

25  **Q.**   WAS IT A SIMILAR PROCESS?

MARCH 22, 2011

DICKERSON - DIRECT BY SLANIA

1  **A.**   YES.

2  **Q.**   YOU WOULD CONTACT --

3  **A.**   WE'D CALL THEM ON THE NEXTEL OR THE RADIO.  SAME PROCESS

4  OF COMMUNICATION.

5  **Q.**   WHAT IS THE PHASE THAT FOLLOWS THE ACTUAL SHOW ITSELF?

6  **A.**   DISMANTLE.

7  **Q.**   DISMANTLE.  IS IT ALSO CALLED MOVE-OUT?

8  **A.**   MOVE-OUT.

9  **Q.**   HAVE YOU OBSERVED UNITED NATIONAL MAINTENANCE PERFORM

10  TRADE SHOW CLEANING DURING THE MOVE-OUT PHASE?

11  **A.**   YES.

12  **Q.**   HOW DID UNITED PERFORM?

13  **A.**   GOOD.  VERY WELL.

14  **Q.**   WHAT TYPES OF TASKS OR SPECIFIC REQUESTS DID YOU MAKE OF

15  UNITED DURING THE MOVE-OUT PHASE?

16  **A.**   WE WOULD HAVE CLEAN UP IN AISLES FOR FORKLIFT TRAFFIC,

17  PEOPLE WALKING, ELECTRIC CARTS, VEHICLES AT TIMES.  JUST

18  BASICALLY CLEANING AISLES.

19  **Q.**   WERE THERE ANY TIME-SENSITIVE ISSUES DURING THE MOVE-OUT

20  PHASE OF A SHOW?

21  **A.**   YES.

22  **Q.**   WHAT TYPES OF ISSUES ARE THERE THAT YOU, AS A GES

23  EMPLOYEE, HAVE TO FACE?

24  **A.**   WELL, TYPICALLY, YOU ROLL THE CARPET UP IMMEDIATELY

25  FOLLOWING THE FIRST 30 MINUTES.  AND AT THAT TIME YOU HAVE LOTS

MARCH 22, 2011

DICKERSON – DIRECT BY SLANIA

1  OF PEOPLE WALKING AROUND, AND TAPE THAT COLLECTS FROM WHAT WE

2  USED TO STICK THE CARPET DOWN WITH, WHICH BECOMES A SAFETY

3  HAZARD WHICH NEEDS TO BE CLEANED UP.  AND YOU HAVE EXHIBITORS

4  OR PEOPLE THROWING TRASH IN THE AISLE WHICH, IF IT'S IN THE

5  AISLE, YOU CAN'T PASS THROUGH THE AISLES.  SO AT THAT TIME WE

6  CALL THEM AND THEY GO TO WHATEVER AISLE WE WOULD NEED TO FOCUS

7  ON.

8  **Q.**  WAS UNITED RESPONSIVE TO THOSE SAFETY ISSUES AND THE

9  TIME-SENSITIVE ISSUES THAT YOU WERE JUST REFERENCING?

10  **A.**  YES.

11  **Q.**  DID YOU EVER HAVE ANY PROBLEMS WITH UNITED DURING THE

12  MOVE-OUT PHASE?

13  **A.**  NO.

14  **Q.**  WHEN UNITED WAS PERFORMING ITS TRADE SHOW CLEANING, WERE

15  THERE EVER ANY CHANGES OF STAFF OR SOME PEOPLE SHOWING UP AND

16  SOME PEOPLE LEAVING DURING THE PERFORMANCE OF THE WORK?

17  **A.**  NO, NOT THAT I CAN RECALL.  NO.

18  **Q.**  NOW, ON JULY 1ST, 2007, THE SAN DIEGO CONVENTION CENTER

19  IMPLEMENTED A NEW POLICY WHICH PROHIBITED UNITED FROM USING ITS

20  OWN EMPLOYEES TO PERFORM TRADE SHOW CLEANING SERVICES.  AND YOU

21  HAVE BEEN WORKING AT THE BUILDING SINCE THAT DATE, CORRECT?

22  **A.**  YES.

23  **Q.**  WHO HAS BEEN PERFORMING THE TRADE SHOW CLEANING WORK FOR

24  GES AFTER JULY 1ST, 2007?

25  **A.**  THE CONVENTION CENTER.

MARCH 22, 2011

DICKERSON - DIRECT BY SLANIA

1    **Q.**   AND HAVE YOU HAD THE OPPORTUNITY TO OBSERVE THE CONVENTION

2    CENTER PERFORM TRADE SHOW CLEANING AFTER JULY 1ST, 2007?

3    **A.**   YES.

4    **Q.**   HAVE YOU OBSERVED THE CONVENTION CENTER STAFF PERFORM

5    TRADE SHOW CLEANING DURING MOVE-IN?

6    **A.**   YES.

7    **Q.**   HAVE YOU HAD ANY PROBLEMS WITH THE CONVENTION CENTER STAFF

8    DURING MOVE-IN?

9    **A.**   IT'S HARD TO GET AHOLD OF THEM, BASICALLY.  WE DON'T HAVE

10   DIRECT CONTACT WITH THEM.

11   **Q.**   WHAT DO YOU MEAN YOU DON'T HAVE DIRECT CONTACT WITH THE

12   CONVENTION CENTER STAFF?

13   **A.**   IT GOES THROUGH, LIKE, A CHAIN OF ACCOUNT MANAGER TO THEIR

14   SUPERVISOR TO THEIR CREW AND NOT A DIRECT.

15   **Q.**   DOES THAT CAUSE ANY DIFFICULTY FOR YOU INSTALLING THE

16   TRADE SHOW DURING THE MOVE-IN PHASE?

17   **A.**   AT TIMES, YES.

18   **Q.**   HOW SO?

19   **A.**   SAFETY ISSUES.  TRASH IN THE AISLES.

20   **Q.**   SO AS OPPOSED TO CONTACTING UNITED DIRECTLY ON THE NEXTEL

21   PHONE LIKE YOU DID BEFORE JULY 1ST, 2007, WHAT DO YOU HAVE TO

22   ENDURE NOW WHEN YOU NEED ASSISTANCE DURING THE MOVE-IN PHASE?

23   **A.**   PRESENTLY, TODAY?

24   **Q.**   AFTER JULY 1ST, 2007.

25   **A.**   THAT'S -- YEAH, YOU HAVE TO CALL A SUPERVISOR WITH

MARCH 22, 2011

DICKERSON - DIRECT BY SLANIA

1    HOUSEKEEPING WHICH -- ACTUALLY, WE CALL AN ACCOUNT MANAGER WITH

2    GES.  AND THEN THEY WOULD CALL A SUPERVISOR WITH HOUSEKEEPING.

3    AND THEN THAT PERSON WOULD CALL THEIR CREW.  AND, BASICALLY,

4    THE PEOPLE WOULD CLEAN UP FROM THERE.

5    **Q.**   AND DURING THE MOVE-IN PHASE OF A SHOW, DO YOU HAVE A TIME

6    DEADLINE AS TO WHEN YOU NEED TO HAVE THE SHOW INSTALLED?

7    **A.**   YES.  PRETTY MUCH EVERY DAY.  EVERY HOUR, IT SEEMS LIKE.

8    **Q.**   ARE THERE ANY OTHER PROBLEMS YOU'VE EXPERIENCED WITH THE

9    CONVENTION CENTER STAFF DURING THE MOVE-IN PHASE, OTHER THAN

10   NOT HAVING DIRECT COMMUNICATION WITH THEM?

11   **A.**   YES.  NO REAL SENSE OF URGENCY.  IT DOESN'T SEEM LIKE WE

12   ARE REALLY ON THE SAME AGENDA.

13   **Q.**   WHAT DO YOU MEAN BY THAT STATEMENT, THAT YOU DON'T BELIEVE

14   THE CONVENTION CENTER STAFF IS ON THE SAME AGENDA?

15   **A.**   JUST AT TIMES IT DOESN'T SEEM LIKE THEY ARE WORKING WITH

16   US AS A TEAM, BASICALLY.  THEY DO THEIR OWN THING AT TIMES.  AT

17   TIMES THEY ARE IN THE RIGHT PLACE; AT TIMES THEY ARE NOT.

18   **Q.**   DID YOU EVER HAVE THAT SENSE THAT UNITED'S CLEANING

19   WORKERS WEREN'T ON THE SAME AGENDA AS GES?

20   **A.**   NO.  THEY ARE IN OUR MEETINGS.  WE HAVE TWO MEETINGS A DAY

21   PER SHOW.  LET'S SAY EVERY DAY, RATHER.  SO THEY WOULD BE AT

22   OUR MEETINGS AND WE ADDRESS WHAT THE NEEDS ARE DAILY.

23   **Q.**   WHEN YOU SAY THEY WERE AT OUR MEETINGS --

24   **A.**   UNITED MAINTENANCE, YES.

25   **Q.**   THE CONVENTION CENTER STAFF ATTEND YOUR MEETINGS?

MARCH 22, 2011

DICKERSON – DIRECT BY SLANIA

1    **A.**   NO.

2    **Q.**   HOW ABOUT DURING THE ACTUAL SHOW ITSELF?  HAVE YOU

3    OBSERVED THE CONVENTION CENTER PERFORM TRADE SHOW CLEANING

4    SERVICES?

5    **A.**   YES.

6    **Q.**   HAVE YOU HAD ANY PROBLEMS WITH THE CONVENTION CENTER IN

7    THAT SETTING?

8    **A.**   YEAH.  AT TIMES, SAME –– SAME TYPE OF ISSUES.

9    **Q.**   SO YOU ALSO HAD ISSUES WITH THE CONVENTION CENTER DURING

10   THE SHOW, ABOUT HAVING DIRECT CONTACT WITH THE CONVENTION

11   CENTER STAFF?

12   **A.**   YES.

13   **Q.**   AND YOU ALSO HAD THE SAME ISSUE OF THE CONVENTION CENTER

14   STAFF NOT BEING ON THE SAME AGENDA AS GES?

15   **A.**   CORRECT.

16   **Q.**   DID THAT IMPACT THE PERFORMANCE OF YOUR JOB?

17   **A.**   AT TIMES, YES.

18   **Q.**   HOW SO?

19   **A.**   WELL, YOU HAVE AN EXHIBITOR COME UP TO THE DESK, LOOKING

20   TO GET THEIR TRASH EMPTIED, OR –– WHICH –– OR, LET'S SAY,

21   SAFETY ISSUE WITH TAPE ON THE FLOOR, OR WHATEVER IT MIGHT BE.

22   **Q.**   AND THEN HOW ABOUT THE LAST PHASE OF THE SHOW, DURING

23   MOVE-OUT?  HAVE YOU EXPERIENCED ANY DIFFICULTIES OR PROBLEMS

24   WITH THE CONVENTION CENTER STAFF ON MOVE-OUT?

25   **A.**   YEAH.  MOVE-OUT IS TYPICALLY THE MOST DIFFICULT, WHICH IS

MARCH 22, 2011

DICKERSON – DIRECT BY SLANIA

1    WHERE YOU HAVE ALL YOUR TRASH.  IMMEDIATELY FOLLOWING THE CLOSE

2    OF THE SHOW, IT WOULD COLLECT IN THE AISLES, WHICH IMPACTS THE

3    FREIGHT.  YOU KNOW, ALL THE CRATES COMING IN, THE EMPTIES, THE

4    FORKLIFTS, PEOPLE WALKING.  AND A LOT OF TIMES THEY WOULDN'T

5    EVEN BE THERE FOR THE MOVE-OUT, WHICH WOULD BE, SAY, A WINDOW

6    OF A FEW HOURS IN THE EVENING.  AND THEY WAIT UNTIL THE NEXT

7    DAY OR THEREAFTER -- LATE, TO DO IT ALL AT ONE TIME RATHER

8    THAN, LIKE, ON A DAILY, LET'S SAY, MAINTENANCE.

9    **Q.**    SO IF I UNDERSTOOD YOUR TESTIMONY CORRECTLY, THE

10   CONVENTION CENTER WOULD WAIT UNTIL THE END TO TAKE THE TRASH

11   OUT, AS OPPOSED TO DOING IT ON A CONTINUOUS BASIS?

12   **A.**    CORRECT.

13   **Q.**    IS THAT DIFFERENT FROM HOW UNITED PERFORMED DURING THE

14   MOVE-OUT PHASE?

15   **A.**    YES.

16   **Q.**    HOW SO?

17   **A.**    THEY WOULD GO TO WHERE WE NEEDED TO BASICALLY FOCUS ON:

18   CLEARING AISLES FOR TRAFFIC.

19   **Q.**    UNITED DID A BETTER JOB AT RESPONDING TO YOUR NEEDS?

20   **A.**    YES.

21   **Q.**    BASED ON YOUR PERSONAL EXPERIENCE THAT YOU HAVE HAD AT THE

22   CONVENTION CENTER SINCE YOU HAVE BEEN WORKING THERE -- SINCE

23   1989, WHO WOULD YOU PREFER TO PERFORM TRADE SHOW CLEANING WHEN

24   YOU ARE INSTALLING AND MOVING A TRADE SHOW OUT:  UNITED OR THE

25   CONVENTION CENTER?

MARCH 22, 2011

DICKERSON – CROSS BY SCHOUTEN

1   **A.**   UNITED.

2   **Q.**   WHY IS THAT?

3   **A.**   IT'S MORE OF A TEAM EFFORT.

4          **MR. SLANIA:**   I DON'T HAVE ANYTHING FURTHER AT THIS

5   TIME, YOUR HONOR.

6          **THE COURT:**   OKAY.   MR. SCHOUTEN.

7                     **CROSS–EXAMINATION**

8   **BY MR. SCHOUTEN:**

9   **Q.**   MR. DICKERSON, YOU WORK FOR GES, NOT UNITED?

10  **A.**   CORRECT.

11  **Q.**   AND WHEN YOU PREVIOUSLY WERE ASKED TO TESTIFY IN A

12  DEPOSITION, YOU WERE SERVED WITH A SUBPOENA IN THAT MATTER,

13  WEREN'T YOU?

14  **A.**   YES.

15  **Q.**   AND YOU ALSO SPOKE TO UNM ATTORNEYS EARLY ON IN THIS CASE;

16  ISN'T THAT RIGHT?

17  **A.**   YES.

18  **Q.**   IN FACT, YOU SPOKE TO MR. SLANIA ON THE TELEPHONE ABOUT 15

19  OR 20 MINUTES BEFORE YOU WERE SERVED WITH THE SUBPOENA; ISN'T

20  THAT RIGHT?

21  **A.**   I CAN'T -- ARE YOU TALKING A YEAR AND A HALF AGO?   I'M NOT

22  SURE.

23  **Q.**   IS THERE ANYTHING THAT WOULD HELP YOU REFRESH YOUR

24  RECOLLECTION?

25  **A.**   SURE.

DICKERSON - CROSS BY SCHOUTEN

1  **Q.**  I HAVE HANDED YOU A COPY OF THE DEPOSITION.

2          **THE COURT:**  THE DATE OF THE DEPOSITION IS WHEN, SIR?

3  WHY DON'T YOU READ IT OFF THE COVER.

4          **THE WITNESS:**  RIGHT HERE, ON THE BOTTOM, TUESDAY,

5  SEPTEMBER 15TH, 2009.

6          **THE COURT:**  THANK YOU.

7  **Q.  (BY MR. SCHOUTEN):**  IF YOU COULD PLEASE TURN TO PAGE 56 OF

8  THE DEPOSITION.  AND THEN COULD YOU READ LINES 19 TO 23 TO

9  YOURSELF.

10  **A.**  OKAY.

11  **Q.**  SO DID YOU SPEAK WITH MR. SLANIA 15 TO 20 MINUTES BEFORE

12  YOU WERE SERVED WITH THE SUBPOENA?

13  **A.**  NO.

14  **Q.**  MR. DICKERSON, I REMIND YOU THAT YOU ARE UNDER OATH.

15  **A.**  SAY AGAIN?

16  **Q.**  YOU ARE UNDER OATH.

17  **A.**  OKAY.

18  **Q.**  AND WHEN YOU TESTIFIED AT YOUR DEPOSITION, YOU WERE ALSO

19  UNDER OATH; ISN'T THAT RIGHT?

20  **A.**  YEAH.

21  **Q.**  AND YOU UNDERSTOOD AT THE TIME THAT THE TESTIMONY YOU WERE

22  GIVING WAS TO HAVE THE SAME FORCE AND EFFECT THEN AS IT DOES

23  NOW HERE IN COURT?

24  **A.**  UH-HUH.

25  **Q.**  AND YOU ALSO SAID THAT THERE WAS NO REASON WHY YOU

DICKERSON – CROSS BY SCHOUTEN

1   COULDN'T GIVE YOUR BEST TESTIMONY; ISN'T THAT RIGHT?

2            **THE COURT:**  IS THAT A YES, SIR?

3            **THE WITNESS:**  YES.

4            **THE COURT:**  YOU NEED TO PUT WORDS TO YOUR GESTURES.

5   THANK YOU.

6            **THE WITNESS:**  OKAY.

7               MR. SCHOUTEN:  "QUESTION:  DID YOU RECEIVE A

8            SUBPOENA PRIOR TO THE TIME THAT YOU SPOKE TO

9            MR. SLANIA FOR 15 OR 20 MINUTES?"

10  **A.**   CORRECT.

11           **MR. SLANIA:**  OBJECTION.  THAT IS IMPROPER

12  IMPEACHMENT.  THAT'S NOT THE SAME QUESTION HE ASKED THE

13  WITNESS.

14           **THE COURT:**  OVERRULED.  GO AHEAD.

15               MR. SCHOUTEN:  "ANSWER:  NO, I GOT THIS AFTER.

16           QUESTION:  YOU GOT THE SUBPOENA AFTER?

17           ANSWER:  YEAH."

18           THOSE ARE THE QUESTIONS THAT WERE GIVEN TO YOU?

19  **A.**   OKAY.  YES.

20  **Q.**   THAT WAS YOUR ANSWERS?

21  **A.**   YES.

22  **Q.**   SO IN THIS CONVERSATION THAT OCCURRED PRIOR TO YOU GETTING

23  SUBPOENAED, YOU AND MR. SLANIA REVIEWED THE QUESTIONS THAT YOU

24  WOULD BE ASKED AT YOUR DEPOSITION; ISN'T THAT RIGHT?

25  **A.**   YES.

MARCH 22, 2011

DICKERSON – CROSS BY SCHOUTEN

1    **Q.**    THANK YOU.

2    **A.**    I MUST HAVE MISUNDERSTOOD YOUR QUESTION.  I'M A LITTLE

3    NERVOUS, TRYING TO GO BACK.

4    **Q.**    IT WAS A COUPLE YEARS AGO.  NO WORRIES.  SO YOU FIRST

5    STARTED WORKING WITH GES IN 1987?

6    **A.**    JOINED THE UNION IN 1987.  MY FIRST SHOW FOR GES WAS IN

7    '88.

8    **Q.**    SORRY.  1988?

9    **A.**    YES.

10   **Q.**    AND YOU WERE WHAT'S KNOWN AS A CASUAL DECORATOR AT THAT

11   TIME?

12   **A.**    CORRECT.

13   **Q.**    AND WHEN YOU WERE WORKING FOR GES IN 1988, THE CONVENTION

14   CENTER WAS NOT YET OPENED?

15   **A.**    NO.

16   **Q.**    SO YOU WORKED AT THE TOWN AND COUNTRY HOTEL, THE DEL MAR

17   FAIRGROUNDS AND THE CIVIC CONCOURSE?

18   **A.**    YEAH.  YES, I DID, UH-HUH.

19   **Q.**    YOU ALSO TESTIFIED THAT ABOUT 80 PERCENT OF WORK THAT YOU

20   DO FOR GES IS AT THE CONVENTION CENTER?

21   **A.**    CORRECT.

22   **Q.**    THE REMAINING 20 PERCENT THAT YOU DO THAT IS NOT AT THE

23   CONVENTION CENTER, IS IT AT THE DEL MAR FAIRGROUNDS, THE

24   CONCOURSE?

25   **A.**    ARE YOU TALKING BACK IN '88 OR CURRENTLY, NOW?

MARCH 22, 2011

DICKERSON - CROSS BY SCHOUTEN
25

1    Q.    CURRENTLY.

2    A.    CURRENTLY AT THE MARRIOTT, HYATT, HILTON.  ANY HOTEL,

3    BASICALLY, IN TOWN.

4    Q.    SO THERE ARE TRADE SHOWS AND CONVENTIONS THAT OCCUR AT

5    THESE OTHER HOTELS?

6    A.    PRETTY MUCH ANY HOTEL THAT HAS A BALLROOM.  THE DEL MAR

7    FAIR, NOT MUCH -- DEL MAR FAIRGROUNDS.

8    Q.    DOES SDCCC DO THE CLEANING AT THOSE CONVENTION AND TRADE

9    SHOWS?

10   A.    NO.

11   Q.    DOES UNM DO THE CLEANING AT SOME OF THOSE?

12   A.    YES.

13   Q.    LET'S TALK ABOUT BADGING.  YOU MENTIONED THAT SDCCC BEGAN

14   REQUIRING YOU TO A WEAR PHOTO I.D. BADGE ISSUED BY SDCCC IN

15   2008?

16   A.    CORRECT.

17   Q.    SO COULD YOU BRING UP -- ACTUALLY, NO.  SORRY.

18         SDCCC ENFORCES THIS REQUIREMENT BY ASKING PEOPLE WHO

19   AREN'T WEARING BADGING TO GO TO THE SECURITY DESK.  AM I RIGHT?

20   A.    YES.

21   Q.    AT THE SECURITY DESK, THE PHOTO IS TAKEN OF THEM AND THE

22   BADGE IS MADE FOR THEM?

23   A.    YES.

24   Q.    AND YOU TESTIFIED THAT YOU DIDN'T HAVE TO GIVE THEM ANY

25   PERSONAL IDENTIFICATION AT THAT POINT?

MARCH 22, 2011

DICKERSON - CROSS BY SCHOUTEN

1    **A.**    CORRECT.

2    **Q.**    SO YOU DIDN'T HAVE TO GIVE THEM A DRIVER'S LICENSE AND

3    SWIPE A MAGNETIC CARD TO RECORD YOUR INFORMATION WHEN YOU HAD

4    YOUR PICTURE TAKEN?

5    **A.**    NO.  NOT THAT I CAN RECALL, NO.

6    **Q.**    OKAY.

7    **A.**    ACTUALLY, OUR UNION DOES A BADGE, AS WELL.  AND THAT'S THE

8    ONE I WEAR TYPICALLY, A UNION PHOTO BADGE.

9    **Q.**    SO THAT HAS YOUR PHOTO I.D.?

10   **A.**    CORRECT.

11   **Q.**    WHEN DID YOU START WEARING THE UNION PHOTO I.D.?

12   **A.**    ABOUT THE SAME TIME THE REQUIREMENT FOR THE BADGE FROM THE

13   CONVENTION CENTER.

14   **Q.**    SORRY?  YOU STARTED WEARING THEM ABOUT THE SAME TIME AS

15   2008?

16   **A.**    YES.

17   **Q.**    YOU DID NOT WEAR YOUR UNION I.D. BADGE PRIOR TO 2008?

18   **A.**    NOT ALL THE TIME, NO.  IT WASN'T A REQUIREMENT.

19          **MR. SCHOUTEN:**  CAN WE BRING UP 52?

20   **Q.  (BY MR. SCHOUTEN):**  AGAIN, I WOULD ASK YOU, BEFORE THE

21   BUILDING REQUIRED YOU TO WEAR SDCCC PHOTO BADGES, DID YOU WEAR

22   ANY OTHER PHOTO IDENTIFICATION BADGE PRIOR TO SEPTEMBER OF

23   2008?

24   **A.**    BEFORE THE CONVENTION CENTER REQUIRED --

25   **Q.**    UH-HUH.

MARCH 22, 2011

1    **A.**    -- DID I WEAR ANOTHER BADGE?

2    **Q.**    YES.

3    **A.**    AT TIMES, YES, WE WEAR BADGES.

4    **Q.**    PRIOR TO 2008?

5    **A.**    CORRECT.

6    **Q.**    AND THAT WAS YOUR UNION I.D. BADGE?

7    **A.**    CORRECT.

8    **Q.**    OKAY.

9    **A.**    WHICH IS NOT A REQUIREMENT.

10           **MR. SCHOUTEN:**  GO AHEAD AND TAKE IT DOWN.

11   **Q.**    **(BY MR. SCHOUTEN):**  YOU ALSO WORE A GES BADGE?

12   **A.**    YES.

13   **Q.**    AND THAT DID NOT HAVE A PHOTO I.D.?

14   **A.**    NO.

15   **Q.**    AND YOU ARE SAYING THAT BEFORE 2008 THEY DIDN'T ENFORCE

16   THIS BADGING AND POLICY VERY STRICTLY; IS THAT CORRECT?

17   **A.**    CORRECT.

18   **Q.**    SO SOMETIME PRIOR TO 2008, WHEN YOU WERE WALKING AROUND

19   THE CONVENTION CENTER, THERE WAS TIMES WHEN SDCCC SECURITY

20   WOULD SEE YOU WITHOUT A BADGE, BUT THEY WOULDN'T STOP YOU AND

21   REQUIRE YOU TO WEAR ONE; ISN'T THAT RIGHT?

22   **A.**    PERIODICALLY.  IT WASN'T EVERY TIME, NO.

23   **Q.**    AND YOU'VE WORKED AT THAT BUILDING NOW FOR 20 YEARS?

24   **A.**    SINCE '89, YES.

25   **Q.**    I WANTED TO TALK ABOUT THE BUILDING SECURITY A LITTLE BIT.

MARCH 22, 2011

DICKERSON – CROSS BY SCHOUTEN

1   NOW, WHEN YOU ARE SETTING UP A SHOW, SOMEONE FROM GES HAS TO

2   DRIVE THE TRUCK IN TO THE LOADING DOCK THAT CORRESPONDS TO THE

3   EXHIBIT HALL WHERE THE BOOTHS AND OTHER MATERIALS ARE GOING TO;

4   IS THAT RIGHT?

5   **A.**   CORRECT.

6   **Q.**   AND AT THE LOADING DOCK, YOU HAVE THESE ROLL-UP DOORS, AM

7   I RIGHT?

8   **A.**   NO.  THERE IS A GATE THAT IS, LIKE, A REGULAR GATE AT THE

9   DOCK.  AND ONCE YOU PASS THE DOCK, THEN THERE IS A ROW OF DOCKS

10  AND THERE IS NO -- WELL, THERE IS THREE -- DEPENDS ON WHERE YOU

11  ARE AT WITH THE ROLL-UP DOOR.

12  **Q.**   I'M SORRY.  PLEASE, WHERE ARE THE ROLL-UP DOORS?

13  **A.**   THERE IS -- ON, SAY, A THROUGH C SIDE WE HAVE THREE

14  ROLL-UP DOORS -- ONE, TWO, THREE.  AND THEN THE OTHER SIDE HAS

15  PROBABLY ANOTHER FOUR OR FIVE SLIDING DOORS THAT RAMPS.

16  **Q.**   AND THE TRUCKS ENTER IN THROUGH THE ROLL-UP DOORS?  DO

17  THEY BACK UP?

18  **A.**   NO.  THEY BACK UP TO THE DOCK.

19  **Q.**   THROUGH THE ROLL-UP DOORS?

20  **A.**   NO, NOT THROUGH THE ROLL-UP DOOR.

21  **Q.**   OKAY.  SO AT SOME POINT WERE THOSE ROLL-UP DOORS OPEN --

22  THAT IS, AT SOME POINT, LET'S SAY BEFORE 2008, WERE THOSE

23  ROLL-UP DOORS OPEN DURING YOUR MOVE-IN AND MOVE-OUT?

24  **A.**   YES.

25  **Q.**   AND DID THAT CHANGE IN 2008?

MARCH 22, 2011

DICKERSON - CROSS BY SCHOUTEN

29

1   A.   IN 2008, YEAH.  IT'S CHANGED A LITTLE BIT THE LAST COUPLE

2   OF YEARS, YES.

3   Q.   AND NOW GES HAS TO CALL THE CONVENTION CENTER AND LET THEM

4   KNOW AT WHAT TIME TO EXPECT THESE ROLL-UP DOORS SHOULD OPEN UP

5   FOR AN INCOMING TRUCK.  AM I RIGHT?

6   A.   CORRECT.

7   Q.   I WANT TO TALK ABOUT GUARDS.  WE WERE TALKING ABOUT

8   MOVE-IN.  YOU ARE BRINGING MATERIALS IN AND OUT OF THE EXHIBIT

9   HALL.  THERE ARE SOME TIMES WHEN YOU HAVE TO PROP A DOOR OPEN

10  TO MOVE THINGS IN AND OUT; ISN'T THAT RIGHT?

11  A.   YES.

12  Q.   AND SOMETIMES THAT HAPPENED BETWEEN, SAY, THE LOBBY AND

13  THE EXHIBIT HALL?

14  A.   YES.

15  Q.   WHEN YOU ARE DOING THIS, ARE THERE GUARDS ON THOSE DOORS?

16  A.   SOMETIMES.

17  Q.   SOMETIMES, OR IS THAT A REQUIREMENT IN RECENT TIMES?

18  A.   RECENT TIMES, THERE ARE MORE GUARDS REQUIRED AT THE DOOR.

19  AND IN PAST YEARS, SAY PRE-2008, IT WASN'T A REQUIREMENT.

20  Q.   BUT AS OF 2008 THERE IS A REQUIREMENT THAT THERE IS A

21  GUARD ON THE DOOR?

22  A.   CORRECT.

23  Q.   SPEAKING OF DOORS, YOU TESTIFIED EARLIER THAT YOU

24  SOMETIMES CUT THROUGH THE SAIL PAVILION; IS THAT RIGHT?

25  A.   YES.

MARCH 22, 2011

1       **MR. SCHOUTEN:**  CAN WE BRING UP EXHIBIT 1271?

2    **Q.   (BY MR. SCHOUTEN):**  MR. DICKERSON, THE SAIL PAVILION, THAT

3    IS THE WHITE, TENTED AREA?

4    **A.**   YES.

5    **Q.**   AND THIS WALKWAY, YOU CAN SEE THERE IS KIND OF THIS --

6    WELL, THERE IS THIS PASSAGEWAY BETWEEN BOTH THE WHITE, TENTED

7    AREA AND THE OTHER KIND OF TENTED AREA?

8    **A.**   UH-HUH.

9    **Q.**   THERE IS A PEDESTRIAN WALKWAY IN THERE?

10   **A.**   ON THE VERY TOP, YES.

11   **Q.**   ON THE VERY TOP.  YOU HAVE TO GO UP ALMOST, LIKE -- I

12   THINK A WINDING STAIRCASE, A BIG CONCRETE WINDING STAIRCASE?

13   **A.**   CORRECT.

14   **Q.**   BUT THAT IS NOT WHAT YOU ARE TALKING ABOUT.  YOU ARE

15   TALKING ABOUT A CORRIDOR WITH THESE GLASS DOORS.  IT'S ABOUT A

16   FLOOR DOWN, BETWEEN THESE TWO AREAS, CORRECT?

17   **A.**   YES.  I HAVE USED BOTH, DEPENDING ON WHERE I PARKED.

18   **Q.**   YOU USED BOTH, THE PEDESTRIAN AND THE OTHER ONE?

19   **A.**   CORRECT.

20   **Q.**   AND THIS GLASS DOOR CORRIDOR HAS DOORS FACING TOWARDS THE

21   BAY SIDE AND DOORS FACING TOWARD THE CITY SIDE; IS THAT RIGHT?

22   **A.**   CORRECT.

23   **Q.**   AND THERE IS DOORS THAT LINE THE CORRIDOR LEADING INTO THE

24   SAIL AREA?

25   **A.**   CORRECT.

DICKERSON – CROSS BY SCHOUTEN

1   **Q.**   NOW, YOU'VE ENTERED THE SAIL PAVILION GOING THROUGH THESE

2   GLASS DOORS?

3   **A.**   YES.

4   **Q.**   AND YOU TESTIFED EARLIER THAT IS NOT HOW YOU TYPICALLY

5   ENTER THE CONVENTION CENTER; IS THAT RIGHT?

6   **A.**   FOR WORK OR JUST --

7   **Q.**   FOR WORK.

8   **A.**   NO.  TYPICALLY, TO GO TO WORK, NO, I DON'T GO UP THROUGH

9   THE SAIL, NO.

10  **Q.**   YOU GO IN THROUGH THAT --

11  **A.**   THE GROUND LEVEL.

12  **Q.**   THE CONTRACTOR-ACCESS LOADING DOCK?

13  **A.**   YEAH, OR THE RAMP OF THE DOCK.

14  **Q.**   OR THE RAMP.  SO DID YOU ENTER THE SAIL PAVILION THROUGH

15  THESE GLASS DOORS AT TIMES DURING THE MOVE-IN AND MOVE-OUT KIND

16  OF PHASES?

17  **A.**   YES.

18  **Q.**   AND THESE WERE TIMES THAT YOU WERE AUTHORIZED TO BE IN THE

19  BUILDING TO WORK, RIGHT?

20  **A.**   YES.

21  **Q.**   WERE THEIR TIMES THAT YOU EVER DID THIS WHEN YOU WERE NOT

22  AUTHORIZED TO BE IN THE BUILDING TO WORK?

23  **A.**   YES.

24  **Q.**   DID YOU EVER ENTER WHILE THERE WAS AN EVENT IN THE

25  BUILDING?

MARCH 22, 2011

1  **A.**   IT'S POSSIBLE.

2  **Q.**   SO IT'S YOUR TESTIMONY HERE TODAY IT'S POSSIBLE YOU

3  ENTERED THE BUILDING THROUGH THE SAIL PAVILION WHILE THERE WAS

4  AN EVENT?

5  **A.**   I WOULDN'T CUT THROUGH THE SHOW, NO.  LET'S SAY IF I

6  WALKED THROUGH THE LOBBY, WHICH IS OF THE SAIL, LITERALLY

7  ADJACENT TO THE GLASS DOORS.

8  **Q.**   SO IF THERE WAS A SHOW GOING ON, YOU WOULDN'T DO THAT?

9  **A.**   NO, I WOULDN'T DO THAT.

10  **Q.**   AND YOU WOULDN'T DO THAT BECAUSE THAT WOULD GET BOTH YOUR

11  COMPANY AND YOUR COWORKERS IN TROUBLE; ISN'T THAT RIGHT?

12  **A.**   YEAH.  IT'S JUST NOT THE RIGHT THING TO DO, YES.

13  **Q.**   BECAUSE YOU'RE TRESPASSING?

14  **A.**   THROUGH THE SHOW, YEAH.  CORRECT.  I DON'T KNOW IF YOU

15  WOULD CALL IT "TRESPASSING."

16  **Q.**   BUT YOU ARE NOT AUTHORIZED TO WORK THERE AT THE TIME?

17  **A.**   RIGHT.  I MIGHT HAVE BEEN THERE THAT DAY, MAYBE, BUT AT

18  THAT TIME -- CORRECT.

19  **Q.**   HOW LONG HAVE YOU BEEN USING THAT CUT-THROUGH?

20  **A.**   I DON'T USE THE CUT-THROUGH ANYMORE.

21  **Q.**   WELL, I MEAN --

22  **A.**   WE HAVE BEEN GOING THAT WAY FOR YEARS.  SINCE THE BUILDING

23  OPENED.

24  **Q.**   SINCE THE BUILDING OPENED?

25  **A.**   YOU CAN ACCESS THROUGH THE BACKSIDE FROM THE BAY.

MARCH 22, 2011

1   **Q.**   TO GET TO THE PADRE GAMES?

2   **A.**   THE MEZZANINE, UPPER LEVEL OR IN BETWEEN.

3   **Q.**   TO GET TO THE PADRE GAMES?

4   **A.**   CORRECT.

5   **Q.**   PETCO PARK OPENED IN 2004?

6           **THE COURT:**  IS THAT A YES?

7           **THE WITNESS:**  YES.  I DIDN'T KNOW IF THAT WAS A

8   DIRECTED QUESTION.

9   **Q.**   **(BY MR. SCHOUTEN):**  NOW, YOU SAID THAT YOU THOUGHT THAT

10  SDCCC WORKERS WERE ON THEIR OWN AGENDA?

11  **A.**   CORRECT.

12  **Q.**   YOU ALSO SAID THAT THERE WERE PROBLEMS WITH COMMUNICATING

13  WITH SDCC CLEANERS.  AM I RIGHT?

14  **A.**   YES.  THROUGH THE CHAIN OF COMMAND.

15  **Q.**   RIGHT.  OTHER THAN THESE TWO ISSUES, DO YOU HAVE ANY OTHER

16  COMPLAINTS ABOUT SDCCC CLEANING?

17  **A.**   BEING ON THEIR OWN AGENDA AND COMMUNICATION, NO.

18  **Q.**   NOW, YOU WERE SAYING THAT PART OF THE REASON YOU THINK

19  THEY ARE ON THEIR OWN AGENDA IS BECAUSE THEY DON'T SEEM TO

20  PROPERLY STAFF AT THE TIMES AND THEY DON'T HAVE PEOPLE WHERE

21  YOU NEED THEM TO BE; ISN'T THAT RIGHT?

22  **A.**   YES.

23  **Q.**   AND THEY DON'T PARTICIPATE IN THE CONTRACTOR MEETINGS?

24  **A.**   CORRECT.

25  **Q.**   AND YOU ALSO SAID THAT SDCC WORKERS TAKE BREAKS AT ODD

MARCH 22, 2011

1   TIMES; ISN'T THAT RIGHT?

2   **A.**  THEY HAVE A SHIFT CHANGE IN THE AFTERNOON, SOMEWHERE

3   AROUND 2:00, I THINK.  THERE WOULD BE A GAP OF COVERAGE,

4   TYPICALLY FROM 2:00 TO 3:00 OR WHATEVER TIME THAT IS.  EARLY

5   AFTERNOON.

6   **Q.**  NOW, THERE WOULDN'T BE THIS SHIFT CHANGE ISSUE WITH

7   UNITED, RIGHT?

8   **A.**  NO.

9   **Q.**  UNITED ACTUALLY WOULD WORK NON-STOP UNTIL THE WORK WAS

10  DONE, GENERALLY SPEAKING?

11  **A.**  CORRECT.

12  **Q.**  NOW, YOU WORKED FOR GES AS A FOREMAN, RIGHT?

13  **A.**  CORRECT.

14  **Q.**  YOU HAVE BEEN A FOREMAN FOR ALMOST 15 YEARS?

15  **A.**  YES.

16  **Q.**  HOW MANY PEOPLE ARE YOU IN CHARGE OF?

17  **A.**  DEPENDS ON THE SIZE OF THE SHOW.

18  **Q.**  BALLPARK IT.

19  **A.**  COULD BE 30, COULD BE 20, IT COULD BE FOUR.

20  **Q.**  DO YOUR WORKERS TAKE BREAKS?

21  **A.**  YES.

22  **Q.**  ARE YOU AWARE THAT IN CALIFORNIA EMPLOYERS HAVE TO GIVE

23  EMPLOYEES BREAKS?

24  **A.**  YES.

25          **MR. SLANIA:**  OBJECTION.  CALLS FOR LEGAL CONCLUSION.

DICKERSON – CROSS BY SCHOUTEN

1   ARGUMENTATIVE.

2            **THE COURT:**  OVERRULED.

3   **Q.   (BY MR. SCHOUTEN):**  LET'S TALK ABOUT THE COMMUNICATIONS.

4   NOW, YOU WERE SAYING THAT BEFORE 2007 IT WAS VERY EASY TO GET

5   AHOLD OF UNITED WORKERS THROUGH NEXTEL OR TWO-WAY RADIO OR

6   SOMETHING ALONG THOSE LINES?

7   **A.**   YES.

8   **Q.**   THAT IS NOT THE CASE WITH SDCCC?

9   **A.**   CORRECT.

10  **Q.**   YOU ALSO TESTIFIED THAT WHEN THERE IS A PROBLEM NOW, AFTER

11  JULY 1ST, 2007, YOU HAVE TO NOTIFY YOUR ACCOUNT MANAGER WHO

12  THEN TALKS TO THE BUILDER; IS THAT RIGHT?

13  **A.**   YEAH.  THE SUPERVISOR.  YES.

14  **Q.**   IT'S NOT THAT YOUR SUPERVISOR CONTACTS THE UNM SUPERVISOR,

15  CONTACTS THE BUILDING?

16  **A.**   NO.  ARE YOU SAYING -- AS OF NOW ARE YOU SAYING WE CONTACT

17  UNITED AND THEN THE BUILDING -- OR ACCOUNT MANAGER, UNITED, AND

18  THEN THE BUILDING?

19  **Q.**   YES.

20  **A.**   YES, AS OF NOW.

21  **Q.**   THAT'S HOW IT WORKS?

22  **A.**   YES.

23  **Q.**   OKAY.  DO ALL GES WORKERS HAVE ACCESS TO UNITED

24  SUPERVISORS THROUGH NEXTEL AND TWO-WAY?

25  **A.**   ALL OF OUR LEAD FOREMAN, YEAH.

MARCH 22, 2011

1    **Q.**   BUT NOT ALL WORKERS?

2    **A.**   NO.

3    **Q.**   SO IF THERE WAS A SPILL, NOT EVERY GES WORKER COULD PICK

4    UP THE PHONE AND CALL UNITED TO HAVE IT FIXED?

5    **A.**   I GUESS IT DEPENDS ON THE SIZE OF THE SHOW, TOO, IF YOU

6    ARE SAYING ALL WORKERS.

7    **Q.**   WELL, I MEAN, LET'S ASSUME A VERY LARGE SHOW.  YOU HAVE

8    MAYBE 200 DECORATORS IN THERE?

9    **A.**   POSSIBLY, YES.

10   **Q.**   NOT ALL OF THEM WOULD HAVE THE NEXTEL COMMUNICATIONS WITH

11   THE SUPERVISOR?

12   **A.**   NO.

13   **Q.**   AND THAT WAS TRUE -- THAT'S TRUE NOW?

14   **A.**   CORRECT.

15   **Q.**   AND WAS THAT TRUE BEFORE 2007?

16   **A.**   CORRECT.

17   **Q.**   DID YOU EVER COMPLAIN TO ANYONE ABOUT SDCCC CLEANING?

18   **A.**   YES.

19   **Q.**   YOU HAVE COMPLAINED TO THE ACCOUNT MANAGERS?

20   **A.**   YES.

21   **Q.**   YOU NEVER SUBMITTED ANY COMPLAINTS IN WRITING, DID YOU?

22   **A.**   NO.

23   **Q.**   NEVER KEPT ANY WRITTEN RECORDS OF THEM?

24   **A.**   NO.  PERSONALLY, NO.

25   **Q.**   BUT YOU DIDN'T?

DICKERSON – CROSS BY SCHOUTEN
                                                                    37

1    **A.**   NO, I DID NOT.

2    **Q.**   THANK YOU.

3              **MR. SCHOUTEN:**  NOTHING FURTHER.

4              **THE COURT:**  ANY FURTHER QUESTIONS?

5              **MR. SLANIA:**  NO, YOUR HONOR.

6              **THE COURT:**  ALL RIGHT.  THANK YOU, SIR.  YOU MAY STEP

7    DOWN.

8              MAY WE EXCUSE THIS WITNESS?

9              **MR. SLANIA:**  YES.

10             **THE COURT:**  ANY OBJECTION?  YOU ARE EXCUSED, SIR.

11   THANKS VERY MUCH.

12             **MR. ERGASTOLO:**  NO.  NO OBJECTION.

13             **MR. SCHOUTEN:**  NO OBJECTION.

14             **THE COURT:**  WHY DON'T WE TAKE OUR AFTERNOON BREAK AT

15   THIS TIME, SINCE WE ARE BETWEEN WITNESSES.  I WILL GIVE YOU

16   FOLKS 20 MINUTES BECAUSE THE LAWYERS AND I HAVE A FEW THINGS TO

17   WORK THROUGH.  SO WE'LL HAVE YOU BACK AT 3:05.  AND IN THE

18   MEANTIME HAVE A GOOD BREAK.  REMEMBER THE ADMONITION:  DON'T

19   TALK ABOUT THE CASE WITH ANYBODY ELSE AND DON'T LET ANYBODY

20   TALK TO YOU.  KEEP AN OPEN MIND BECAUSE THERE IS YET EVIDENCE

21   TO BE BROUGHT FORWARD FOR YOUR CONSIDERATION.  HAVE A GOOD

22   BREAK AND WE'LL SEE YOU AFTER THAT.

23   (JURY IN RECESS)

24   (PROCEEDINGS HAD IN OPEN COURT, OUTSIDE THE HEARING OF THE

25   JURY)


                            MARCH 22, 2011

DICKERSON – CROSS BY SCHOUTEN

38

1          **THE COURT:**  ALL RIGHT.  THE JURY IS ON ITS BREAK,

2    COUNSEL AND THE PARTIES REMAIN.  AND THEN WE HAVE THIS

3    MR. PITTS ISSUE.  AND BASED ON THE TIME WE ARE MAKING, DO WE

4    NEED TO DEAL WITH THAT NOW?

5          **MR. SLANIA:**  I DON'T THINK WE NEED TO DEAL WITH IT

6    BEFORE THE JURY COMES BACK.  WE HAVE MR. LJUNGQUIST, WHO I KNOW

7    IS WAITING.  AND DEPENDING ON HOW LONG HE GOES, WE CAN ALSO

8    CALL MR. KING OR WE COULD ADJOURN EARLY AND DEAL WITH THE

9    OBJECTIONS AND START TOMORROW MORNING.

10         **THE COURT:**  SO WE CAN JUST HOLD ON TO AT LEAST THE

11   END OF THE DAY, FOR NOW.

12         **MR. SLANIA:**  ABSOLUTELY.

13         **THE COURT:**  SO I WILL LET YOU FOLKS HAVE THE TIME

14   ALLOTTED FOR YOUR BREAK, AS WELL.  WE'LL SEE YOU AT 3:05 AND

15   MOVE FORWARD WITH THE NEXT WITNESS.

16         **MR. SLANIA:**  THANK YOU, YOUR HONOR.

17         **THE COURT:**  WE'LL BE IN RECESS UNTIL THEN.

18   (COURT IN RECESS)

19   (PROCEEDINGS HAD IN OPEN COURT, IN THE HEARING OF THE JURY)

20         **THE COURT:**  WE ARE BACK IN SESSION, COUNSEL AND THE

21   PARTIES ARE BACK.  AND LET'S PROCEED WITH THE PLAINTIFF'S NEXT

22   WITNESS.

23         **MR. SLANIA:**  LEIF LJUNGQUIST, YOUR HONOR.

24         **THE COURT:**  LET'S GO AHEAD AND BRING MR. LJUNGQUIST

25   FORWARD.

MARCH 22, 2011

1    **(LEIF LJUNGQUIST, PLAINTIFF WITNESS, TESTIFIED AS FOLLOWS:).**

2              **THE COURT:**  ALL RIGHT.  SIR, WHY DON'T YOU COME

3    FORWARD, OVER HERE, TO MY LEFT, YOUR RIGHT.  THE CLERK WILL

4    SWEAR YOU UNDER OATH.

5              **DEPUTY CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

6              YOU DO SOLEMNLY SWEAR THAT THE EVIDENCE YOU SHALL

7    GIVE IN THE CAUSE NOW BEFORE THE COURT SHALL BE THE TRUTH, THE

8    WHOLE TRUTH AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

9              **THE WITNESS:**  YES.

10             **DEPUTY CLERK:**  THANK YOU.  PLEASE TAKE THE STAND.

11   STATE YOUR FULL NAME AND SPELL YOUR LAST NAME FOR THE RECORD.

12             **THE WITNESS:**  LEIF LJUNGQUIST, L-J-U-N-G-Q-U-I-S-T.

13             **THE COURT:**  THANK YOU, SIR.

14             **MR. SLANIA:**  THANK YOU, YOUR HONOR.

15             MR. SLANIA, GO AHEAD.

16                      **DIRECT EXAMINATION**

17   **BY MR. SLANIA:**

18   **Q.**   GOOD AFTERNOON, MR. LJUNGQUIST.

19   **A.**   GOOD AFTERNOON.

20   **Q.**   ARE YOU CURRENTLY EMPLOYED?

21   **A.**   YES.

22   **Q.**   BY WHOM?

23   **A.**   GES EXPOSITION SERVICES.

24   **Q.**   AND WHAT POSITION DO YOU HOLD WITH GES?

25   **A.**   I AM A TEAMSTER REGULAR IN THE NUMBER FIVE SENIORITY.

LJUNGQUIST - DIRECT BY SLANIA

1    **Q.**    WHAT TYPE OF BUSINESS DOES GES PERFORM?

2    **A.**    TRADE SHOWS AND CONVENTIONS.  THEY SET THEM UP.

3    **Q.**    WHEN YOU SAY "SET THEM UP," ARE YOU TALKING ABOUT

4    INSTALLING?

5    **A.**    INSTALL.

6    **Q.**    DO THEY ALSO MOVE THE TRADE SHOWS OUT?

7    **A.**    YES.

8    **Q.**    IS THIS YOUR FIRST TIME TESTIFYING IN A COURTROOM?

9    **A.**    YES.

10   **Q.**    ARE YOU A LITTLE BIT NERVOUS?

11   **A.**    VERY.

12   **Q.**    IT'S OKAY.  DON'T WORRY ABOUT IT.  JUST LISTEN TO THE

13   QUESTIONS THAT ARE ASKED OF YOU AND JUST, PLEASE, GIVE HONEST

14   ANSWERS.

15   **A.**    OKAY.

16   **Q.**    YOU SAID THAT YOU ARE A TEAMSTER; IS THAT CORRECT?

17   **A.**    YES.

18   **Q.**    HOW LONG YOU HAVE BEEN A MEMBER OF THE TEAMSTER UNION?

19   **A.**    APPROXIMATELY 28 YEARS.

20   **Q.**    IS THERE A LOCAL UNION NUMBER?

21   **A.**    YES.  NUMBER 542.

22   **Q.**    HAVE YOU ALWAYS BEEN A TEAMSTER IN SAN DIEGO?

23   **A.**    NO.  I STARTED -- I ALWAYS LIVED IN SAN DIEGO, BUT I

24   STARTED UP IN ANAHEIM, IN THE L.A. AREA, IN A DIFFERENT LOCAL.

25   THEIR LOCAL UP THERE, ALSO DOING TRADE SHOWS.


MARCH 22, 2011

1   **Q.**   DID YOU WORK FOR GES AT THE TIME?

2   **A.**   AS A CASUAL, YES.

3   **Q.**   WHEN YOU SAY "AS A CASUAL," WHAT ARE YOU REFERRING TO?

4   **A.**   WELL, UM, IF YOU ARE NOT PUT ON THEIR SENIORITY LIST --

5   IT'S EXTRAS.  WHEN THEY NEED EXTRA PEOPLE, THEN THEY WOULD USE

6   US.

7   **Q.**   OKAY.  YOU SAID CURRENTLY YOU ARE NUMBER FIVE ON THE

8   SENIORITY LIST FOR GES?

9   **A.**   YES.

10  **Q.**   PLEASE EXPLAIN WHAT THAT MEANS, TO THE JURY.

11  **A.**   UM, THE SENIORITY LIST IS BY HIRE DATE AND THE ORDER IN

12  WHICH YOU ARE ASKED TO WORK.  AND, LIKE, THERE IS PEOPLE --

13  NUMBER ONE THROUGH FOUR WILL WORK AHEAD OF ME, IF WE HAVE WORK

14  AND WHEN WE HAVE WORK.  AND NUMBER SIX THROUGH NUMBER NINE OR

15  TEN, WHATEVER, WILL WORK BELOW ME, AFTER, ON THE DAILY BASIS.

16  **Q.**   DOES THAT MEAN IF THERE IS A SHOW THAT REQUIRES AT LEAST

17  FIVE PEOPLE TO WORK, YOU WILL GET A PHONE CALL OR NOTIFICATION

18  OF SOME TYPE, ASKING YOU TO WORK?

19  **A.**   YES.

20  **Q.**   DO YOU PERFORM ALL OF YOUR WORK FOR GES?

21  **A.**   NO.  I WORK FOR OTHER COMPANIES, ALSO.  IN OUR UNION

22  CONTRACT WE HAVE WHAT'S CALLED "A CROSSOVER PRIVILEGE,"

23  WHICH -- WHEN -- IF GES DID NOT HAVE ANY WORK, THEN I MAKE

24  MYSELF AVAILABLE TO THE OTHER TRADE SHOW COMPANIES.  AND

25  THEY -- ME BEING A REGULAR WITH SENIORITY, THEY HAVE TO WORK ME

LJUNGQUIST – DIRECT BY SLANIA

42

1   BEFORE THEY WORK SOMEBODY LOWER IN SENIORITY THAN ME, EVEN IN

2   THE OTHER COMPANIES.

3   **Q.**   GES IS A GENERAL CONTRACTOR OR DECORATOR.  DO YOU

4   UNDERSTAND THOSE TERMS?

5   **A.**   YES.

6   **Q.**   WHAT OTHER DECORATORS DO YOU WORK FOR WITH THIS CROSSOVER

7   RIGHT?

8   **A.**   THE LARGE ONES ARE FREEMAN DECORATOR COMPANY, CHAMPION

9   EXPOSITION SERVICES, ARATA, BREDE, BLAINE CONVENTION SERVICES.

10  THERE IS QUITE A FEW.

11  **Q.**   HAVE YOU WORKED FOR ALL OF THOSE ENTITIES AT ONE POINT IN

12  TIME OR ANOTHER?

13  **A.**   YES.

14  **Q.**   WHO DO YOU DO THE MAJORITY OF YOUR WORK FOR?

15  **A.**   WITH GES.

16  **Q.**   ABOUT WHAT PERCENTAGE OF YOUR WORK IS WITH GES?

17  **A.**   I WOULD SAY ABOUT 80 PERCENT.

18  **Q.**   HOW MANY HOURS A YEAR DO YOU TYPICALLY WORK FOR GES?

19  **A.**   3,028 (SIC) TO 3,000 HOURS.

20  **Q.**   2,800 TO 3,000, IS THAT WHAT YOU SAID?

21  **A.**   YES.

22  **Q.**   AND THEN HOW MUCH TIME DO YOU SPEND WORKING FOR THOSE

23  OTHER DECORATORS?

24  **A.**   APPROXIMATELY 600 HOURS A YEAR.

25  **Q.**   NOW, HOW LONG HAVE YOU BEEN A REGULAR?

MARCH 22, 2011

LJUNGQUIST - DIRECT BY SLANIA

1   **A.**   FOR GES.  UM, AROUND 17 YEARS.

2   **Q.**   SO SINCE APPROXIMATELY THE EARLY '90S?

3   **A.**   YES.

4   **Q.**   WHO DID YOU WORK FOR BEFORE THAT?

5   **A.**   I WAS A REGULAR FOR UNITED EXPOSITION SERVICES -- FOR

6   THEM.

7   **Q.**   AND UNITED EXPOSITION SERVICES, DO THEY HAVE ANY

8   AFFILIATION WITH THE PLAINTIFF IN THIS CASE, UNITED NATIONAL

9   MAINTENANCE?

10  **A.**   NO.

11  **Q.**   WHAT HAPPENED TO UNITED EXPOSITION SERVICES?

12  **A.**   THEY WERE BOUGHT OUT BY GES EXPOSITION SERVICES.

13  **Q.**   THAT'S WHEN YOU BEGAN WORKING FOR GES?

14  **A.**   NO.  ACTUALLY, I DROPPED OUT BECAUSE WE WEREN'T BROUGHT

15  ON -- DOVETAILED IN OR WHATEVER YOU WOULD LIKE TO CALL IT.  I

16  HAD TO BE REHIRED BY GES.

17  **Q.**   AND THAT TOOK PLACE IN THE EARLY '90S?

18  **A.**   YES.  '92, '93.

19  **Q.**   DO YOU PERFORM WORK INSTALLING TRADE SHOWS AT THE SAN

20  DIEGO CONVENTION CENTER?

21  **A.**   UNLOADING, LOADING THE TRUCKS, THE TRAFFIC OF THE TRUCKS.

22  TEAMSTERS WILL UNLOAD AND LOAD THE TRUCKS.  AND THERE IS OTHER

23  UNIONS THAT WILL SET UP THE DISPLAYS AND TEAR DOWN THE

24  DISPLAYS.  WE DRIVE THE FORKLIFTS AND THE TRUCKS -- DOLLIES.

25  WHATEVER IT TAKES TO GET WHATEVER IT IS IN.

MARCH 22, 2011

LJUNGQUIST – DIRECT BY SLANIA

1    Q.   AND YOU ARE DESCRIBING THE WORK THAT IS INVOLVED IN MOVING

2    IN A TRADE SHOW TO THE CONVENTION CENTER?

3    A.   YES.

4    Q.   IS THE SAME TYPE OF WORK INVOLVED IN MOVING A TRADE SHOW

5    OUT?

6    A.   YES.

7    Q.   HOW LONG HAVE YOU BEEN INSTALLING AND REMOVING TRADE SHOWS

8    AT THE SAN DIEGO CONVENTION CENTER?

9    A.   SINCE THE FIRST DAY IT OPENED.  25 YEARS AGO, MAYBE.

10   Q.   1989?

11   A.   YES.

12   Q.   DO YOU THINK YOU WORKED THE FIRST SHOW THERE?

13   A.   I DID.  I KNOW I DID.

14   Q.   OKAY.  DID YOU WORK THERE TODAY?

15   A.   YES.

16   Q.   WHAT PERCENTAGE, IF YOU CAN TELL US -- WHAT PERCENTAGE OF

17   YOUR WORK IS PERFORMED AT THE SAN DIEGO CONVENTION CENTER?

18   A.   APPROXIMATELY 60 PERCENT OR SO.

19   Q.   DO YOU KNOW WHY YOU PERFORM THAT AMOUNT OF WORK IN THAT

20   LOCATION?

21   A.   WELL, IT'S NOT 100 PERCENT BECAUSE I ALSO WORK IN OUR

22   WAREHOUSE, PREPARING FOR THE SHOWS.  AND BESIDES THE CONVENTION

23   CENTER, WE WORK AT HOTELS THAT HAVE BALLROOMS, AND OTHER

24   VENUES.  AND I TRAVEL OUT OF TOWN TO DIFFERENT CONVENTION

25   CENTERS ON CERTAIN SHOWS.

MARCH 22, 2011

LJUNGQUIST – DIRECT BY SLANIA

1    **Q.**   ARE THERE ANY OTHER VENUES IN SAN DIEGO THAT ARE AS LARGE

2    AS THE CONVENTION CENTER?

3    **A.**   NO.

4    **Q.**   NOW, YOU HAVE BEEN A MEMBER OF THE TEAMSTERS UNION FOR

5    OVER 20 YEARS.  DURING THAT TIME, HAVE THEY EVER PERFORMED A

6    BACKGROUND CHECK ON YOU?

7    **A.**   NO.

8    **Q.**   DURING THE ENTIRE TIME YOU HAVE BEEN A MEMBER OF THE

9    TEAMSTERS, HAS ANYONE EVER PROVIDED YOU INFORMATION THAT THE

10   TEAMSTERS HAD PERFORMED A BACKGROUND CHECK ON ANY OF THEIR

11   MEMBERS?

12   **A.**   NOT THAT I KNOW OF.

13   **Q.**   DURING THE TIME THAT YOU WORKED FOR GES, HAVE THEY EVER

14   PERFORMED A BACKGROUND CHECK ON YOU?

15   **A.**   NOT THAT I KNOW OF.

16   **Q.**   WHEN YOU WORKED FOR CHAMPION ON CROSSOVER RIGHTS, ARE YOU

17   AWARE OF THEM EVER PERFORMING A BACKGROUND CHECK ON YOU?

18   **A.**   NO.

19   **Q.**   WHEN YOU WORKED FOR FREEMAN ON THOSE CROSSOVER RIGHTS, ARE

20   YOU AWARE OF FREEMAN EVER PERFORMING A BACKGROUND CHECK ON YOU?

21   **A.**   NO.

22   **Q.**   ANY OTHER DECORATORS THAT YOU'VE WORKED FOR WITH YOUR

23   CROSSOVER RIGHTS, HAVE ANY OF THEM PERFORMED A BACKGROUND CHECK

24   ON YOU?

25   **A.**   DECORATOR COMPANY?

MARCH 22, 2011

LJUNGQUIST – DIRECT BY SLANIA

1    **Q.**   THAT'S CORRECT.

2    **A.**   NOT THAT I KNOW OF.

3    **Q.**   HAS THE TEAMSTER'S UNION EVER PERFORMED A DRUG AND ALCOHOL

4    TEST ON YOU?

5    **A.**   NO.

6    **Q.**   HAS ANYONE EVER PROVIDED YOU INFORMATION THAT THE

7    TEAMSTER'S UNION HAS PERFORMED A DRUG AND ALCOHOL CHECK ON ANY

8    OF ITS MEMBERS?

9    **A.**   NO.

10   **Q.**   HAVE YOU EVER LEARNED OR BEEN PROVIDED INFORMATION THAT A

11   DRUG AND ALCOHOL TEST IS PERFORMED ON UNION MEMBERS WORKING AT

12   THE SAN DIEGO CONVENTION CENTER?

13   **A.**   YES.

14   **Q.**   WHAT INSTANCES OR WHAT INFORMATION HAVE YOU LEARNED?

15   **A.**   WELL, I KNOW ABOUT THAT FIRSTHAND.  BEING A TRUCK DRIVER,

16   I'M PART OF THE D.O.T. RANDOM DRUG TESTING.  AND LIKE IT SAYS,

17   "RANDOM," YOU ARE PICKED TO GO DRUG TEST EVERY ONCE IN A WHILE.

18   AND ALSO, IF THERE IS AN ACCIDENT OR INJURY, THEN THEY WILL

19   TAKE YOU.  AND ALSO, THE TRADE SHOW MANAGEMENT, THE COMPANY'S

20   MANAGEMENT HAS GONE TO CLASSES TO RECOGNIZE PROBLEMS OF ABUSE.

21   AND IF THEY HAVE PROBABLE CAUSE, THEN THEY CAN ALSO TAKE

22   SOMEBODY OUT AND HAVE THEM TESTED.

23   **Q.**   HAVE YOU EVER BEEN MADE AWARE OF PROBABLE-CAUSE TESTING

24   FOR ANY OF YOUR TEAMSTER UNION MEMBERS?

25   **A.**   NO.

MARCH 22, 2011

LJUNGQUIST – DIRECT BY SLANIA

1   **Q.**   NOW, WHEN YOU BEGAN WORKING AT THE CONVENTION FACILITY --

2   I'M TALKING ABOUT THE SAN DIEGO CONVENTION FACILITY -- DID YOU

3   HAVE TO WEAR A BADGE OR PHOTO IDENTIFICATION?

4   **A.**   NO.

5   **Q.**   DO YOU HAVE TO WEAR PHOTO IDENTIFICATION TODAY?

6   **A.**   YES.

7   **Q.**   WHEN YOU ARE WORKING AT THE FACILITY?

8   **A.**   YES.

9   **Q.**   WHEN DID THAT CHANGE TAKE PLACE?

10  **A.**   AROUND THREE YEARS AGO.

11  **Q.**   APPROXIMATELY 2008?

12  **A.**   YES.

13  **Q.**   HOW DID YOU OBTAIN SUCH A BADGE?

14  **A.**   WELL, FIRST OF ALL, AROUND THAT TIME THE CONVENTION CENTER

15  WAS ISSUING WRISTBANDS.  AND WE WOULD GO TELL THE SECURITY

16  OFFICE HOW MANY PEOPLE WE WOULD USE DURING THE DAY, AND WE WERE

17  ISSUED WRISTBANDS FOR ALL OUR EMPLOYEES.

18          AND THEN THEY SWITCHED OVER TO THE PHOTO I.D., MAYBE

19  A YEAR AFTER THAT.  AND GES ISSUED US PHOTO I.D.S. AND ALSO,

20  THE CONVENTION CENTER HAD US TAKE PHOTO I.D.S THAT THEY

21  PROVIDED.

22  **Q.**   THE JURY HAS HEARD SOME TESTIMONY ABOUT WRISTBANDS, AND I

23  WANT TO ELABORATE ON THAT A LITTLE BIT FURTHER.  WHEN YOU SAY

24  YOU WOULD GO TO THE SECURITY OFFICE AND GET WRISTBANDS, COULD

25  YOU DESCRIBE WHAT INFORMATION YOU WOULD PROVIDE TO THE SECURITY

MARCH 22, 2011

LJUNGQUIST - DIRECT BY SLANIA

1    OFFICE AT THE CONVENTION CENTER TO OBTAIN THOSE WRISTBANDS?

2    **A.**   WELL, THE FOREMAN, WHICH I WAS SOMETIMES -- IT CHANGES ON

3    A DAILY BASIS -- BUT THEY WOULD -- WHOEVER WAS IN CHARGE FOR

4    THE TEAMSTER'S UNION OR THE ELECTRICIAN UNION OR THE DECORATOR

5    UNION WOULD GO AND TELL THE SECURITY OFFICE HOW MANY PEOPLE WE

6    WERE GOING TO EMPLOY THAT DAY.  AND THEN WE WERE GIVEN A

7    CERTAIN COLOR WRISTBAND FOR THAT DAY, AND IT CHANGED EVERY DAY.

8    **Q.**   AND THEN WOULD YOU DISTRIBUTE THOSE WRISTBANDS?

9    **A.**   YES.

10   **Q.**   WOULD YOU DISTRIBUTE THOSE TO THE OTHER UNION MEMBERS THAT

11   WERE WORKING FOR GES?

12   **A.**   YES.  THE TEAMSTER UNION MEMBER OR WHOEVER WAS SIGNING IN

13   THE TEAMSTER MEMBERS WOULD GET A WRISTBAND.

14   **Q.**   AND THAT WAS THE POLICY THAT WAS IN PLACE BEFORE THE

15   REQUIREMENT TO WEAR THE PHOTO IDENTIFICATION?

16   **A.**   YES.

17   **Q.**   AND WHEN YOU TESTIFIED ABOUT OBTAINING THE BADGE, WHAT

18   INFORMATION, IF ANY, DID YOU HAVE TO PROVIDE TO THE CONVENTION

19   CENTER WHEN THEY PROVIDED YOU WITH THE BADGE?

20   **A.**   I PERSONALLY GAVE THEM A DRIVER'S LICENSE.  I THINK YOU

21   NEED SOME SORT OF I.D. WHERE THEY CAN SCAN IT OR SWIPE IT.  SO

22   I THINK -- I DON'T KNOW WHAT IS ACTUALLY ON THE BACK OF THAT

23   MAGNETIC STRIP.  I THINK IT'S JUST YOUR NAME OR WHATEVER, BUT

24   THAT'S WHAT I GAVE THEM.

25   **Q.**   SINCE THAT REQUIREMENT WAS PUT IN PLACE, HAVE YOU OBSERVED

1    TEAMSTER MEMBERS WORKING AT THE CONVENTION CENTER WITHOUT A

2    PHOTO IDENTIFICATION BADGE?

3    **A.**    YES.

4    **Q.**    DO PEOPLE STILL WEAR WRISTBANDS WORKING AT THE CONVENTION

5    CENTER FACILITY?

6    **A.**    NOT SO MUCH ANYMORE.   CERTAIN SHOWS REQUIRE WRISTBANDS.

7    IT'S PRETTY MUCH ON A SHOW-BY-SHOW BASIS ON THE WRISTBANDS.   SO

8    YOU WILL HAVE YOUR PHOTO I.D. PLUS A WRISTBAND.

9    **Q.**    WHAT HAPPENS TO INDIVIDUALS THAT YOU HAVE OBSERVED WORKING

10   IN THE CONVENTION CENTER FACILITY WITHOUT THEIR PHOTO

11   IDENTIFICATION BADGE?

12   **A.**    IF SECURITY SEES THEM, THEN THEY ARE ASKED TO GO GET ONE

13   IF THEY DON'T ALREADY HAVE ONE; A REPLACEMENT, IF THEY HAVE

14   LOST IT; OR THEY ARE ESCORTED OFF THE BUILDING UNTIL THEY CAN

15   COME UP WITH ONE.   IF THEY FORGOT IT AT HOME, THEY CAN GET A

16   TEMPORARY ONE.

17   **Q.**    YOU STARTED THAT ANSWER BY SAYING "IF SECURITY SEES THEM."

18   HAVE YOU OBSERVED PEOPLE WORKING AT THE FACILITY WITHOUT PHOTO

19   IDENTIFICATION BADGES, THAT HAVE NOT BEEN SEEN BY SECURITY?

20   **A.**    YES.

21   **Q.**    AND DO THEY HAVE ANY RAMIFICATION OR THEY JUST CONTINUE

22   WORKING THAT DAY?

23   **A.**    I WOULD ASSUME THAT THEY JUST WORK UNTIL THEY GO HOME.

24   **Q.**    DURING THE TIME THAT YOU HAVE BEEN INSTALLING TRADE SHOWS

25   AT THE SAN DIEGO CONVENTION CENTER, DID YOU HAVE THE

MARCH 22, 2011

1  OPPORTUNITY TO OBSERVE COMPANIES OR FIRMS PERFORM TRADE SHOW

2  CLEANING SERVICES?

3  **A.**   YES.

4  **Q.**   AND ARE YOU AWARE THAT JULY 1ST, 2007, THE SAN DIEGO

5  CONVENTION CENTER IMPLEMENTED A POLICY THAT PROHIBITED UNITED

6  FROM UTILIZING ITS OWN EMPLOYEES TO PERFORM TRADE SHOW CLEANING

7  AT THE CONVENTION CENTER?

8  **A.**   YES.

9  **Q.**   BEFORE JULY 1ST, 2007 -- THAT'S THE TIME FRAME I'M GOING

10  TO ASK YOU ABOUT RIGHT NOW -- DID YOU OBSERVE UNITED NATIONAL

11  MAINTENANCE EMPLOYEES PERFORM TRADE SHOW CLEANING SERVICES AT

12  THE SAN DIEGO CONVENTION CENTER?

13  **A.**   YES.

14  **Q.**   WAS THAT SOMETHING THAT OCCURRED ON A REGULAR BASIS?

15  **A.**   ON ALL THE GES SHOWS AND OTHER TRADE SHOW COMPANIES --

16  DECORATING COMPANIES SHOWS THAT UNITED CONTRACTED WITH THEM TO

17  CLEAN.

18  **Q.**   SO YOU HAD MANY OPPORTUNITIES TO OBSERVE UNITED PERFORM

19  TRADE SHOW CLEANING AT THE SAN DIEGO CONVENTION CENTER

20  FACILITY?

21  **A.**   YES.

22  **Q.**   DID YOU OBSERVE UNITED PERFORM TRADE SHOW CLEANING AT THE

23  SAN DIEGO CONVENTION CENTER FACILITY DURING THE MOVE-IN PHASE?

24  **A.**   YES.

25  **Q.**   AND TELL THE JURY A LITTLE BIT, WHAT IS THE MOVE-IN PHASE

LJUNGQUIST – DIRECT BY SLANIA

1  OF A SHOW?

2  **A.**   WELL, THAT'S WHEN THE DECORATING COMPANY FIRST STARTS

3  UNLOADING OUR EQUIPMENT AND STARTS SETTING UP THE BOOTHS, THE

4  CURTAIN BACK WALLS, AND UNLOADING ALL THE EQUIPMENT –– ALL THE

5  TABLES, CHAIRS, LIKE THAT –– AND STARTS DELIVERING THEM OUT.

6  AND THEN WE START DELIVERING ALL THE OTHER –– WHAT'S CALLED

7  "FREIGHT," WHICH WOULD BE THE BIGGER BOOTHS THAT THE EXHIBITORS

8  WOULD COME IN AND SET UP.

9  **Q.**   AND YOU OBSERVED UNITED ON MANY OCCASIONS PERFORM TRADE

10  SHOW CLEANING DURING THAT PHASE?

11  **A.**   YES.

12  **Q.**   HOW WAS UNITED'S PERFORMANCE?

13  **A.**   VERY GOOD.

14  **Q.**   WHY WOULD YOU DESCRIBE IT AS VERY GOOD?

15  **A.**   WELL, WHEN THEY ARE ON THE FLOOR, CLEANING, YOU WOULDN'T

16  WANT TO WALK OVER DEBRIS IN THE AISLES BECAUSE ALL THE SHOW

17  FLOOR HAS –– IT'S KIND OF LIKE A STREET.  IT HAS AISLES THAT

18  PEOPLE WOULD GO UP AND DOWN WITH THEIR EQUIPMENT AND EVERYTHING

19  ELSE.  AND YOU WOULDN'T WANT TO WALK OVER DEBRIS OR DRIVE YOUR

20  EQUIPMENT OVER THE DEBRIS.  SO IT'S JUST A LOT CLEANER, SAFER

21  ATMOSPHERE.

22  **Q.**   AND UNITED DID A GOOD JOB DURING THAT MOVE-IN PHASE?

23  **A.**   YES.

24  **Q.**   THE NEXT PHASE WAS THE ACTUAL SHOW OPENING AND THE SHOW

25  ITSELF.  DID YOU OBSERVE UNITED PERFORM TRADE SHOW CLEANING

LJUNGQUIST – DIRECT BY SLANIA

1    DURING THAT PHASE?

2    **A.**   YES.

3    **Q.**   HOW WAS UNITED'S PERFORMANCE?

4    **A.**   GOOD.

5    **Q.**   WHY WAS UNITED'S PERFORMANCE GOOD IN THAT PHASE?

6    **A.**   WELL, AT THAT TIME IT'S MORE LIKE SHOW-READY, WHERE IT'S

7    ALL PRETTY.  SO THE GENERAL PUBLIC OR THE EXHIBITORS WOULD BE

8    ON THE FLOOR, WITH THE CARPET DOWN AND EVERYTHING.  SO THEY

9    WOULD BE –– OR EMPTYING THE TRASHCANS, POLICING THE FRONT

10   LOBBIES WHERE THE REGISTRATION IS, REMOVING THE EMPTY CARTONS,

11   AND ALL THAT.  JUST KEEPING IT ALL ORDERLY.

12   **Q.**   AND AFTER THE SHOW WAS THE MOVE-OUT PHASE.  DID YOU

13   OBSERVE UNITED PERFORM TRADE SHOW CLEANING DURING THE MOVE-OUT

14   PHASE?

15   **A.**   YES.

16   **Q.**   HOW WAS UNITED'S PERFORMANCE?

17   **A.**   ALSO GOOD.

18   **Q.**   WHY IS THAT?

19   **A.**   THEY WOULD HAVE ENOUGH PEOPLE ON THE FLOOR TO KEEP THE

20   TRASH OFF THE FLOOR TO A VERY MINIMUM.  BECAUSE ON THE OUT OF

21   THE SHOW, IT SEEMS LIKE EVERYBODY JUST THROWS THINGS ALL OVER

22   THE PLACE.  ON THE IN, THEY TRY TO THROW IT IN THE TRASH CAN;

23   BUT ON THE OUT, IT JUST GOES ON THE FLOOR.  SO PEOPLE ARE

24   CONSTANTLY PICKING UP ALL THE JUNK.

25   **Q.**   THERE IS MORE TRASH AT THE END OF A SHOW THAN THE

MARCH 22, 2011

LJUNGQUIST – DIRECT BY SLANIA

1  BEGINNING OF A SHOW.  IS THAT WHAT YOU ARE DESCRIBING?

2  **A.**   YES.

3  **Q.**   AND UNITED DID A GOOD JOB, THAT YOU OBSERVED, IN PICKING

4  UP THAT TRASH?

5  **A.**   YES.

6  **Q.**   DID YOU HAVE THE OPPORTUNITY TO SEE WHAT THE PHYSICAL

7  APPEARANCE WAS OF UNITED'S WORKERS?  IN OTHER WORDS, DID THEY

8  WEAR A UNIFORM?

9  **A.**   YES.  THEY WERE ALL REQUIRED, I WOULD THINK, TO WEAR --

10  THEY ALL WORE GREEN SHIRTS.

11  **Q.**   DID THAT STAND OUT?

12  **A.**   YES.

13  **Q.**   SO IT WAS EASY FOR YOU TO SPOT A UNITED WORKER IF YOU

14  NEEDED SOME ASSISTANCE?

15  **A.**   YES.

16  **Q.**   DID UNITED'S WORKERS HAVE A PROFESSIONAL APPEARANCE, BASED

17  ON YOUR OWN PERSONAL OBSERVATIONS?

18  **A.**   YES.

19  **Q.**   DID YOU HAVE REGULAR INTERACTIONS WITH ANY SPECIFIC UNITED

20  PERSONNEL DURING THIS TIME THAT YOU OBSERVED THEM PERFORMING

21  TRADE SHOW CLEANING WHEN THE FACILITY OPENED UNTIL JULY 1ST,

22  2007?

23  **A.**   YES.

24  **Q.**   WITH WHOM?

25  **A.**   WITH -- ONE WAS GABRIEL RAMIREZ, AND BUDDY LINN.  AND

1  BEFORE THAT THERE WAS OTHER ONES.

2  **Q.**   THOSE ARE THE TWO MOST RECENT?

3  **A.**   YES.

4  **Q.**   WHAT DID YOU COMMUNICATE WITH THEM ABOUT?

5  **A.**   JUST THE DAILY WORKINGS, GOINGS-ON.  WHEN THERE IS A

6  PROBLEM AREA, A HOT SPOT, LIKE UP IN REGISTRATION OR ON THE

7  FLOOR, IF SOMETHING SPILLED OR, SAY, IF A CERTAIN AISLE IS A

8  LOT DIRTIER THAN ANOTHER AISLE, SO THEY COULD CONCENTRATE MORE

9  ON THAT.

10  **Q.**   WOULD YOU NOTIFY THEM IF THERE WAS, AS YOU DESCRIBED IT,

11  "A HOT SPOT"?

12  **A.**   YES.

13  **Q.**   HOW WOULD YOU DO THAT?

14  **A.**   DIRECT CONNECT.  TWO-WAY RADIOS OR WALKIE-TALKIES.

15  **Q.**   WERE YOU PLEASED WITH UNITED'S PERFORMANCE OR TRADE SHOW

16  CLEANING --

17  **A.**   YES.

18  **Q.**   -- WHEN THEY WERE PERFORMING THE CLEANING AND YOU WERE

19  WORKING IN THE FACILITY?

20  **A.**   YES.

21  **Q.**   DID YOU HAVE ANY PROBLEMS WITH UNITED'S PERFORMANCE?

22  **A.**   NO.

23  **Q.**   NOW, AFTER JULY 1ST, 2007, HAVE YOU HAD THE OPPORTUNITY TO

24  OBSERVE SAN DIEGO CONVENTION CENTER'S CORPORATION TRADE SHOW

25  CLEANING CREWS?

MARCH 22, 2011

LJUNGQUIST – DIRECT BY SLANIA

1  **A.**   YES.

2  **Q.**   HAVE YOU OBSERVED THE CORPORATION'S TRADE SHOW CLEANING

3  CREWS WORK DURING THE MOVE-IN PHASE?

4  **A.**   YES.

5  **Q.**   DID YOU HAVE ANY PROBLEMS WITH THOSE CREWS?

6  **A.**   PROBLEMS AS IN -- COULD YOU ELABORATE MORE ON THAT?

7  **Q.**   SURE.  ARE THE CREWS RESPONSIVE TO YOUR NEEDS?

8  **A.**   WELL, THEY ARE NOT -- LIKE, IF YOU WOULD COME UP TO ONE --

9  JUST A PERSON, NOT A SUPERVISOR -- AND ASK THEM TO DO

10 SOMETHING, THEY WOULD HAVE TO CHECK WITH THEIR SUPERVISOR FIRST

11 AND THEN GO DO IT.  AND THEN THEY WOULD TELL THEM TO GO DO IT.

12 SOMETHING LIKE THAT.

13 **Q.**   DID THAT CAUSE ANY TIME DELAYS IN THE PERFORMANCE OF YOUR

14 JOB?

15 **A.**   YES.

16 **Q.**   DID THAT IMPACT ANY TIME DEADLINES THAT YOU HAD DURING THE

17 MOVE-IN PHASE OF A SHOW?

18 **A.**   PROBABLY, DID.

19 **Q.**   DID YOU HAVE THAT SAME PROBLEM WHEN UNITED WAS WORKING AND

20 PERFORMING TRADE SHOW CLEANING?

21 **A.**   NOT SO MUCH.

22 **Q.**   HOW ABOUT DURING THE ACTUAL SHOW ITSELF?  DID YOU OBSERVE

23 TRADE SHOW CONVENTION CENTER CREWS PERFORM TRADE SHOW CLEANING

24 SERVICES?

25 **A.**   YES.

MARCH 22, 2011

LJUNGQUIST - DIRECT BY SLANIA

1    **Q.**    DID YOU HAVE ANY PROBLEMS WITH THEM IN THAT PHASE?

2    **A.**    WELL, NOT SO MUCH DURING THE SHOW HOURS.  MAYBE A LITTLE

3    BIT UP IN THE LOBBY AREAS, WHERE -- LIKE, DURING SHIFT CHANGES,

4    SOMETHING LIKE THAT, WHERE SOME OF THE CARTONS -- WHERE THERE

5    WAS BUILD-UP A LITTLE BIT AROUND REGISTRATION.

6    **Q.**    DID YOU HAVE ANY PROBLEMS WITH SHIFT CHANGES WHILE UNITED

7    WAS PERFORMING TRADE SHOW CLEANING AT THE CONVENTION CENTER?

8    **A.**    NO.

9    **Q.**    BUT YOU HAVE HAD THOSE PROBLEMS WITH THE CONVENTION CENTER

10   CREWS?

11   **A.**    YES.

12   **Q.**    DID YOU HAVE THOSE PROBLEMS WITH SHIFT CHANGES DURING THE

13   MOVE-IN PHASE?

14   **A.**    YES.

15   **Q.**    AND DURING THE SHOW ITSELF?

16   **A.**    YES.

17   **Q.**    HOW ABOUT DURING THE MOVE-OUT PHASE?

18   **A.**    THE MOVE-OUT PHASE -- WELL, IT JUST SEEMED LIKE -- WELL,

19   WHEN THE SHIFT CHANGED, NOBODY WOULD BE ON THE FLOOR CLEANING

20   DURING THAT PHASE, THE SHIFT CHANGE, AND THE TRASH WOULD

21   BUILD-UP A LITTLE MORE.

22   **Q.**    DID YOU MAKE ANY OBSERVATIONS ABOUT THE AMOUNT OF PEOPLE

23   THAT THE CONVENTION CENTER CREWS WERE UTILIZING TO PERFORM

24   TRADE SHOW CLEANING?

25   **A.**    IT SEEMED TO ME THAT THERE WAS LESS PEOPLE --

MARCH 22, 2011

1   **Q.**   LESS PEOPLE --

2   **A.**   -- TRYING TO --

3   **Q.**   -- THAN WHAT?

4   **A.**   THAN UNITED'S PEOPLE TRYING TO DO THE SAME JOB.

5   **Q.**   ARE THERE ANY OTHER DIFFICULTIES OR PROBLEMS THAT YOU

6   ENCOUNTERED WITH THE CONVENTION CENTER'S TRADE SHOW CLEANING

7   CREWS SINCE JULY 1ST, 2007?

8   **A.**   WELL, LIKE, RIGHT BEFORE A TRADE SHOW OPENS IS KIND OF

9   LIKE THE CRUNCH TIME, WHERE EVERYTHING IS -- IT BUILDS UP TO A

10  PITCH.  AND THEN ONCE IT OPENS, IT STRAIGHTENS OUT.  BUT IF

11  THAT -- LIKE, THE SHIFT CHANGE WAS DURING THAT TIME, THEN THEY

12  WOULD JUST DISAPPEAR AND YOU WOULD HAVE TO END UP REMOVING

13  TRASH SO THE SHOW COULD OPEN CLEAN AND ALL THAT.  AND THEN THEY

14  WOULD COME BY LATER AND PICK IT UP OFF THE DOCK.

15  **Q.**   AND YOU NEVER HAD ANY OF THOSE SHIFT-CHANGE-TYPE PROBLEMS

16  WITH UNITED FOR A SHOW OPENING?

17  **A.**   NO.

18  **Q.**   AND THAT'S JUST BEEN WITH THE CONVENTION CENTER'S WORK

19  CREWS?

20  **A.**   YES.

21  **Q.**   BASED ON YOUR OWN PERSONAL EXPERIENCES AND OBSERVATIONS,

22  WOULD YOU RATHER HAVE UNITED PERFORM TRADE SHOW CLEANING ON THE

23  SHOWS THAT YOU ARE WORKING AT THE CONVENTION CENTER?

24  **A.**   YES.

25  **Q.**   WHY IS THAT?

MARCH 22, 2011

1  **A.**   SAFER ATMOSPHERE, AS FAR AS NOT HAVING DEBRIS ON THE FLOOR

2  THAT YOU CAN SLIP ON OR RUN OVER WITH THE EQUIPMENT THAT WE

3  USED.  AND I GUESS THAT'S ABOUT IT.

4  **Q.**   WOULD YOU SAY UNITED WAS MORE RESPONSIVE?

5  **A.**   YES.

6  **Q.**   WHAT ABOUT THE UNIFORMS?  YOU TALKED ABOUT UNITED HAVING

7  GREEN SHIRTS THAT STOOD OUT.  IS THAT DIFFERENT FROM THE

8  CONVENTION CENTER'S WORK CREWS?

9  **A.**   YES.

10  **Q.**   WHAT TYPE OF UNIFORMS DO THE CONVENTION CENTER WORK CREWS

11  WEAR?

12  **A.**   THEY HAVE A FULL UNIFORM.  THE SAME COLOR PANTS.  THE SAME

13  COLOR SHIRT.  EVERYBODY WEARS THE SAME COLOR PANTS.  I THINK

14  RIGHT NOW IT'S LIGHT BROWN -- KHAKI -- BLUE SHIRT.  AND WHEN

15  THEY ARE ON THE FLOOR, THEY USE SAFETY VESTS -- REFLECTIVE

16  SAFETY VESTS.

17  **Q.**   WAS THERE ANY DIFFERENCE THAT YOU DREW, OR DISTINCTION

18  THAT YOU DREW ABOUT THE UNIFORMS THAT UNITED WORE VERSUS WHAT

19  THE CONVENTION CENTER WORE, AS TO HOW IT IMPACTED YOUR JOB

20  PERFORMANCE?

21  **A.**   NOT REALLY.  YOU COULD -- YOU CAN PICK OUT BOTH OF THEM

22  THE SAME.

23  **Q.**   HAVE YOU EVER VOICED ANY COMPLAINTS ABOUT THE PERFORMANCE

24  OF TRADE SHOW CLEANING BY THE CONVENTION CENTER CREWS?

25  **A.**   JUST -- NOT FORMALLY.  JUST, YOU KNOW, "THEY NEED TO GET

1    THIS STUFF DOWN, COME ON -- LET'S -- WE GOT TO GET THIS SHOW

2    OPENED."  SOMETHING LIKE THAT, BUT --

3    **Q.**    SIMILAR TO WHAT YOU ALREADY TESTIFIED ABOUT?

4    **A.**    YES.

5    **Q.**    THANK YOU VERY MUCH.

6    **A.**    YOU'RE WELCOME.

7              **THE COURT:**  ALL RIGHT.  MR. SCHOUTEN.

8              **MR. SCHOUTEN:**  THANK YOU, YOUR HONOR.

9                          **CROSS-EXAMINATION**

10   **BY MR. SCHOUTEN:**

11   **Q.**    GOOD AFTERNOON, MR. LJUNGQUIST?

12   **A.**    HELLO.

13   **Q.**    IT'S MR. LJUNGQUIST?

14   **A.**    LJUNGQUIST.

15   **Q.**    I'M SORRY.  I HOPE I GET THAT RIGHT.  IT'S A TOUGH ONE.

16            I UNDERSTAND IT'S YOUR FIRST TIME AT TRIAL.  TAKE IT

17   EASY.  IF YOU TAKE IT FROM ME, THIS IS MY FIRST TIME IN TRIAL,

18   TOO.

19            YOU JUST TESTIFIED THAT THERE WERE A NUMBER OF

20   PROBLEMS WITH THE SAN DIEGO CONVENTION CENTER'S CLEANING.  LET

21   ME MAKE SURE I GET THESE ALL RIGHT.  THEY WERE DIFFICULT TO

22   COMMUNICATE WITH.  THERE WAS A PROBLEM WITH THE CHAIN OF

23   COMMAND.  THERE WAS THIS SHIFT CHANGE ISSUE WITH THIS

24   BUILDING-UP OF A PITCH, A MOMENTUM LEADING UP TO THE SHOW.

25   THERE WAS DEBRIS AND SAFETY ISSUE.  AND THEY WERE NOT

1    RESPONSIVE.

2              IS THAT ABOUT RIGHT?

3    **A.**   YES.  DURING THE SHIFT CHANGES.

4    **Q.**   OH, THEY WEREN'T RESPONSIVE DURING THE SHIFT CHANGES?

5    **A.**   THEY WEREN'T THERE TO -- TO TAKE CARE OF THE PROBLEMS THAT

6    WOULD ARISE.

7    **Q.**   BUT YOU JUST TESTIFIED THAT THERE WERE THESE FIVE

8    PROBLEMS; IS THAT RIGHT?

9    **A.**   YES.

10   **Q.**   YOU REALIZE YOU ARE UNDER OATH, SIR?

11   **A.**   YES.

12   **Q.**   AND THIS ISN'T THE FIRST TIME THAT YOU HAVE TESTIFIED

13   UNDER OATH IN THIS LAWSUIT, IS IT?

14   **A.**   IN THE LAWYER'S OFFICE, WE HAD A DEPOSITION.

15   **Q.**   YOU HAD YOUR DEPOSITION TAKEN SEPTEMBER 15TH, 2009?

16   **A.**   I DON'T KNOW THE EXACT DATE.

17              **MR. SCHOUTEN:**  YOUR HONOR, MAY I APPROACH?

18              **THE COURT:**  CERTAINLY.

19   **Q.   (BY MR. SCHOUTEN):**  I HAND YOU A COPY OF YOUR DEPOSITION

20   FROM THAT DATE.

21              REFERRING COURT AND COUNSEL TO PAGE 40, LINES 11

22   THROUGH 17.  I ASK YOU TO GO AHEAD AND TURN TO PAGE 40 IN THE

23   DEPOSITION, AND THEN I WANT YOU TO GO AHEAD AND READ -- FOLLOW

24   ALONG QUIETLY WHILE I READ THIS.  LINES 11 TO 17.

25              "QUESTION:  IS THERE ANYTHING ADDITIONAL AS TO

MARCH 22, 2011

1           WHY THE CONVENTION CENTER DID NOT DO A GOOD JOB CLEANING

2           THE TRADE SHOW FLOORS AS UNITED, OTHER THAN NOT HAVING

3           ENOUGH PEOPLE ON THE TRADE SHOW FLOOR, PROBLEMS WITH SHIFT

4           CHANGES, AND THE CONVENTION CENTER STAFF NOT BEING AS

5           EXPERIENCED IN CLEANING TRADE SHOWS?

6                ANSWER:  NO, THAT'S ABOUT IT."

7                IS THAT THE QUESTION THAT YOU WERE ASKED?

8    **A.**   YES.

9    **Q.**   AND THAT WAS THE ANSWER THAT YOU GAVE?

10   **A.**   UH-HUH.

11           **THE COURT:**  IS THAT A "YES"?

12           **THE WITNESS:**  YES.  I'M SORRY.

13   **Q.**   **(BY MR. SCHOUTEN):**  SO YOU DIDN'T TALK ABOUT THE CHAIN OF

14   COMMAND, DEBRIS OR SAFETY, THE GREEN SHIRTS, THIS NOTION OF THE

15   PITCH, COMMUNICATIONS.  PREVIOUSLY WHEN YOU WERE UNDER OATH,

16   YOU DIDN'T SPEAK ABOUT THAT; IS THAT RIGHT?

17   **A.**   NO.  I DON'T THINK I WAS ASKED.

18   **Q.**   WELL, YOU SAID THAT BEYOND THESE THREE THINGS THAT YOU

19   WERE ASKED ABOUT, YOU HAD NO OTHER PROBLEMS WITH THE CLEANING;

20   IS THAT RIGHT?

21           "IS THERE ANYTHING ADDITIONAL AS TO WHY THE

22           CONVENTION CENTER STAFF DID NOT DO AS GOOD A JOB CLEANING

23           THE TRADE SHOW FLOOR AS UNITED, OTHER THAN NOT HAVING

24           ENOUGH PEOPLE ON THE TRADE SHOW FLOOR, PROBLEMS WITH THE

25           SHIFT CHANGES, AND THE CONVENTION CENTER STAFF NOT BEING

1      AS EXPERIENCED IN CLEANING TRADE SHOWS?"

2              "NO, THAT'S ABOUT IT."

3          DID I READ THAT CORRECTLY?

4  **A.**   YES.  I SAID THAT IS ABOUT IT, BUT --

5  **Q.**   OKAY.  THANK YOU.  AND NOW YOU WORK FOR GES:  YOU DON'T

6  WORK FOR UNITED?

7  **A.**   UNITED CLEANING --

8  **Q.**   YOU WORK FOR GES?

9  **A.**   I WORK FOR --

10  **Q.**   GES EXPOSITION SERVICES?

11  **A.**   YES.  ACTUALLY, THEIR NAME HAS CHANGED.

12  **Q.**   GENERAL EXPOSITION SERVICES?

13  **A.**   NO, NO.  GLOBAL EXPERIENCE SPECIALISTS NOW.

14  **Q.**   OH, SORRY.

15  **A.**   BUT IT'S STILL KNOWN AS GES.

16  **Q.**   GES.  OKAY.  FANTASTIC.  SO IT'S OKAY IF I REFER TO IT AS

17  GES?

18  **A.**   YES.  EVERYBODY DOES, STILL.

19  **Q.**   NOW, BEFORE YOU GAVE YOUR TESTIMONY IN THAT DEPOSITION,

20  YOU WERE SERVED WITH A SUBPOENA; IS THAT RIGHT?

21  **A.**   YES.

22  **Q.**   AND AT THE TIME THAT YOU WERE SERVED WITH THE SUBPOENA,

23  YOU KNEW YOU WERE GOING TO BE SERVED WITH THE SUBPOENA; IS THAT

24  CORRECT?

25  **A.**   YES.

MARCH 22, 2011

LJUNGQUIST – CROSS BY SCHOUTEN

1   **Q.**   AND THE REASON IS THAT ATTORNEYS FOR UNM HAD ARRANGED FOR

2   YOU TO RECEIVE THAT SUBPOENA?

3   **A.**   YES.

4   **Q.**   WHAT HAPPENED IS THAT YOUR BOSS, SMILEY CARRASCO –– ISMAEL

5   "SMILEY" CARRASCO CALLED AND ASKED YOU WHETHER YOU FEEL

6   COMFORTABLE WITH THE UNM ATTORNEYS SPEAKING WITH YOU; IS THAT

7   RIGHT?

8   **A.**   YES.

9   **Q.**   AND YOU SAID YES?

10   **A.**   YES.

11   **Q.**   AND THEN UNM ATTORNEYS CALLED YOU TO TALK ABOUT YOUR

12   TESTIMONY; IS THAT RIGHT?

13   **A.**   YES.

14   **Q.**   AND BOTH MR. SLANIA AND MR. LANCE WERE ON THE TELEPHONE

15   WITH YOU?

16   **A.**   YES.

17   **Q.**   AND THAT CALL LASTED FOR ABOUT 15 TO 20 MINUTES?

18   **A.**   IF I REMEMBER CORRECTLY, YES.

19   **Q.**   AND AFTER THAT CALL, YOU GOT A SECOND CALL ASKING YOU:

20   "WOULD YOU PLEASE TESTIFY"?

21   **A.**   YES.

22   **Q.**   AND THEN YOU WERE SERVED WITH A SUBPOENA?

23   **A.**   I BELIEVE SO, YES.

24   **Q.**   OKAY.  NOW, YOU SAID THAT YOU'RE NUMBER FIFTH ON THE

25   SENIORITY LIST FOR TEAMSTERS, YOUR LOCAL?

MARCH 22, 2011

1  **A.**   NO.  ACTUALLY, I AM FIFTH WITH GES --

2  **Q.**   I'M SORRY.

3  **A.**   -- ON THE TEAMSTER LIST.  I'M A REGULAR TEAMSTER WITH GES.

4  WE DON'T HAVE A HIRING HALL LIKE OTHER CITIES.  WE ARE ALL

5  LUMPED TOGETHER.  THE REGULARS ARE SEPARATED BY COMPANIES.

6  **Q.**   OKAY.  AND SO YOU'RE FIFTH ON THE LIST, BUT YOU'RE

7  ACTUALLY FOURTH IN TERMS OF GETTING THE WORK BECAUSE THERE IS A

8  WAREHOUSE MAN, BUT HE IS ALWAYS AT THE WAREHOUSE; IS THAT

9  RIGHT?

10  **A.**   YES.

11  **Q.**   AND AS PART OF YOUR WORK -- GES IS LOCATED IN CHULA VISTA,

12  RIGHT?

13  **A.**   YES.

14  **Q.**   AND AS PART OF YOUR WORK, YOU DO WORK AT THE CONVENTION

15  CENTER AS WELL AS OTHER TRADE SHOWS AND CONVENTIONS IN THE SAN

16  DIEGO AREA HOTELS, AND EVEN PALM SPRINGS; IS THAT RIGHT?

17  **A.**   YES.

18  **Q.**   WHICH HOTELS?

19  **A.**   THE HILTONS, MARRIOTT, HYATT, TOWN AND COUNTRY, PARADISE

20  POINT, CATAMARAN, BAHIA.  THERE IS A BUNCH OF THEM.

21  **Q.**   NOW, YOU ALSO DO A LOT OF DIFFERENT TASKS, AND IT DEPENDS

22  ON THE SHOW THAT YOU ARE AT.  YOU MIGHT, SAY, DRIVE A TRUCK OR

23  FORKLIFT OR EVEN SUPERVISE TRAFFIC?

24  **A.**   YES.

25  **Q.**   I'M CURIOUS.  YOU SAID THAT YOU HAD A CHANCE TO PERSONALLY

1  OBSERVE THE CLEANING THAT WAS GOING ON DURING THE SHOWS.  WAS

2  THAT DRIVING A FORKLIFT?

3  **A.**   DURING THE SHOWS, NO.  THE TRADE SHOW FLOOR IS OPEN.  AND

4  WHEN THERE IS PUBLIC ON THE FLOOR, WE CAN'T DRIVE ANY EQUIPMENT

5  ON THE FLOOR.

6  **Q.**   SO YOU WERE ON THE SHOW AS PART OF YOUR JOB

7  RESPONSIBILITIES?

8  **A.**   YES.

9  **Q.**   DURING THE SHOW?

10  **A.**   YES.

11  **Q.**   DOING WHAT?

12  **A.**   A NUMBER OF DIFFERENT THINGS.  DELIVERING ACCESSIBLE

13  STORAGE.  WHEN SOMEBODY NEEDS TO RE-SUPPLY THEIR BOOTHS, WE

14  TAKE IN MORE PRODUCT TO THEM SO THEY CAN GIVE OUT GIVEAWAYS.

15  OR MAINTAINING THE REGISTRATION AREA FOR THE SHOW MANAGEMENT.

16  **Q.**   I'M SORRY.  I WASN'T TALKING ABOUT THE REGISTRATION AREA,

17  JUST THE TRADE SHOW FLOOR.  SO YOU RE-STOCK THE BOOTHS?

18  **A.**   BOOTHS.

19  **Q.**   NOT USING A FORKLIFT?

20  **A.**   NO.  A TWO-WHEELED DOLLY OR A FOUR-WHEELED DOLLY.  WE'LL

21  PUSH STUFF IN ON THE FLOOR.

22  **Q.**   SO PRIOR TO JULY 1ST, 2007, YOU HAD AN OPPORTUNITY TO SEE

23  UNITED MOVE IN, MOVE OUT, AND THOSE LIMITED TIMES YOU WERE

24  WHEELING STUFF OUT WITH A DOLLY DURING THE SHOW ON THE FLOOR;

25  IS THAT RIGHT?

LJUNGQUIST - CROSS BY SCHOUTEN

1    **A.**    YES.  SOME SHOWS -- ACTUALLY, IT WAS MORE MOVING STUFF IN

2    ON THE FLOOR --

3    **Q.**    OKAY.

4    **A.**    -- THAN OUT.  BUT IT DEPENDED ON WHICH SHOW IT WAS.  IF

5    THERE WAS A LOT OF TRAFFIC AND A LOT OF GIVEAWAYS, WE WOULD BE

6    ON THE FLOOR AN AWFUL LOT OR VERY LITTLE.  IT DEPENDED ON THE

7    KIND OF SHOW IT WAS AND HOW MANY -- HOW GOOD THE GIVEAWAY WAS.

8    **Q.**    SO PRIOR TO JULY 1ST, 2007, UNITED CLEANED ONLY THE TRADE

9    SHOW FLOOR; IS THAT RIGHT?

10   **A.**    AND THE REGISTRATION AREAS.

11   **Q.**    THE REGISTRATION AREAS?

12   **A.**    YES.

13   **Q.**    SO THAT WOULD BE THE LOBBY?

14   **A.**    YES.  NOT THE GENERAL LOBBY; JUST THE AREA WHERE THE

15   REGISTRATION ITSELF WAS -- WOULD BE SET UP.

16   **Q.**    WHERE THE GES BOOTH IS?

17   **A.**    NO.  WELL, THEY WOULD CLEAN THAT AREA, TOO, BUT THAT WAS

18   MORE IN THE BACK OF THE HALL, USUALLY.  THIS IS WHERE -- WHEN

19   ATTENDEES WOULD COME TO GET THEIR BADGES AND THEIR BAG OF --

20   **Q.**    GOODIES.

21   **A.**    -- SYLLABUSES OR WHATEVER.  THE FRONT LOBBY AREA.

22   **Q.**    SO UNITED DID NOT CLEAN THE LOADING DOCKS?

23   **A.**    NO.

24   **Q.**    THEY DID NOT CLEAN THE MEETING ROOMS?

25   **A.**    NO.

MARCH 22, 2011

LJUNGQUIST - CROSS BY SCHOUTEN

1  **Q.**   THEY DIDN'T CLEAN THE BATHROOMS?

2  **A.**   NO.

3  **Q.**   THEY DIDN'T CLEAN THE KITCHENS?

4  **A.**   NO.

5  **Q.**   THEY DIDN'T WASH THE WINDOWS?

6  **A.**   NO.

7  **Q.**   NOW, AFTER JULY 1ST, 2007, SDCCC CLEANS ALL OF THAT -- THE

8  BATHROOMS, THE FLOORS, THE TRADE SHOW FLOOR, THE REGISTRATION

9  AREA, THE WINDOWS, THE ENTIRE BUILDING; IS THAT RIGHT?

10  **A.**   THEY CLEAN THE ENTIRE BUILDING, YES.

11  **Q.**   PREVIOUSLY YOU TESTIFIED THAT YOU COMPLAINED TO SOME

12  PEOPLE ABOUT SAN DIEGO CONVENTION CENTER CLEANING; IS THAT

13  RIGHT?

14  **A.**   YES.

15  **Q.**   WHO?

16  **A.**   MY SUPERVISOR -- MY DIRECT SUPERVISOR AT THE TIME.

17  **Q.**   SO IT'S YOUR TESTIMONY HERE TODAY THAT YOU COMPLAINED TO

18  YOUR DIRECT SUPERVISOR ABOUT CLEANING BY THE SAN DIEGO

19  CONVENTION CENTER?

20  **A.**   YES.

21        **MR. SCHOUTEN:**   I WOULD LIKE TO REFER COURT AND

22  COUNSEL TO PAGE 44, LINES 13 THROUGH 18.

23  **Q.**   **(BY MR. SCHOUTEN):**   IF I COULD ASK YOU, SIR, TO PLEASE

24  TURN TO PAGE 44 IN YOUR DEPOSITION THERE.

25        **MR. SLANIA:**   IMPROPER IMPEACHMENT, YOUR HONOR, TO

1  READ THE WHOLE ENTRY.

2          **THE COURT:**  LET ME BORROW YOUR TRANSCRIPT, SIR.

3          **MR. SLANIA:**  SPECIFICALLY, LINES 23 THROUGH 25 ON THE

4  SAME PAGE, PAGE 44.

5          **THE COURT:**  WELL, I WILL OVERRULE IT AND YOU CAN

6  PURSUE THE REMAINDER OF THE TEXT ON REDIRECT.

7  **Q.**  **(BY MR. SCHOUTEN):**  SO IF YOU PLEASE READ TO YOURSELF

8  LINES 13 THROUGH 18, ON PAGE 44.

9              "QUESTION:  DID YOU EVER REPORT ANY COMPLAINTS

10       REGARDING THE SAN DIEGO CONVENTION CENTER EMPLOYEES

11       CLEANING AT THE SAN DIEGO CONVENTION CENTER TO ANYONE?"

12              ANSWER:  NO.

13              QUESTION:  WHY NOT?

14              ANSWER:  THERE'S NO -- IT'S NOT MY POSITION TO

15       DO THAT.

16          DID I READ THAT CORRECTLY?

17  **A.**  YES.

18  **Q.**  THOSE ARE YOUR QUESTIONS AND THOSE ARE YOUR ANSWERS?

19  **A.**  YES.

20  **Q.**  SO IT'S NOT YOUR JOB TO COMPLAIN ABOUT THE CLEANING; IS

21  THAT RIGHT?

22  **A.**  WELL, IN A FORMAL -- TO MAKE A FORMAL COMPLAINT, NO,

23  BECAUSE THEN FARTHER DOWN --

24  **Q.**  WELL, SIR, YOU WERE ASKED:  DID YOU EVER REPORT ANY

25  COMPLAINTS TO ANYONE.  THE ANSWER WAS NO, ISN'T THAT RIGHT?

MARCH 22, 2011

1   **A.**   YES.

2   **Q.**   NOW, YOU WORKED AT THE CONVENTION CENTER –– I AM SORRY.

3   STRIKE THAT.

4         YOU SAID THAT THERE IS A PROBLEM WITH SHIFT CHANGES;

5   ISN'T THAT RIGHT?

6   **A.**   YES.

7   **Q.**   SO UNITED NEVER BOTHERED TO TAKE SHIFT CHANGES DURING THE

8   DAY?

9   **A.**   I DO NOT KNOW.  ALL I KNOW IS THAT WHEN IT WAS A CRUNCH

10   TIME, THERE WAS ALWAYS ENOUGH PEOPLE TO KEEP IT CLEAN.  I DON'T

11   KNOW HOW THEY WORKED THEIR BREAKS.  IT ALWAYS SEEMED LIKE THEY

12   WERE ON THE FLOOR.

13   **Q.**   SO IT'S FAIR TO SAY THAT TO YOUR KNOWLEDGE THEY WOULD TAKE

14   THEIR BREAKS WHEN THE JOB WAS DONE?

15   **A.**   OR THEY WOULD GO –– THEY WOULD STAGGER THEIR BREAKS.  I'M

16   NOT REALLY SURE HOW THEY WORKED IT.

17         **MR. SCHOUTEN:**  REFERRING COURT AND COUNSEL TO

18   PAGE 39, LINES 17 TO 20.

19         **THE COURT:**  GO TO PAGE 39, SIR.

20         **MR. SCHOUTEN:**  HOW ABOUT YOUR HONOR?

21         **THE COURT:**  THAT'S OKAY.  ONLY IF WE HAVE AN

22   OBJECTION, YOU CAN GIVE IT TO ME.

23   **Q.**   **(BY MR. SCHOUTEN):**  ACTUALLY, I'M GOING TO SAY FROM LINES

24   12 TO 20.

25         "QUESTION:  DID YOU EVER OBSERVE ANY

MARCH 22, 2011

LJUNGQUIST – CROSS BY SCHOUTEN

1    PROBLEMS WITH THE CONVENTION CENTER NOT HAVING ENOUGH

2    PEOPLE ON THE FLOOR BECAUSE OF SHIFT CHANGES?

3              ANSWER:  YES.

4              QUESTION:  CAN YOU EXPLAIN A LITTLE BIT

5    ABOUT THAT TO ME?

6              ANSWER:  OKAY.  TRADE SHOWS OPEN AND CLOSE

7    ANY TIME OF THE DAY OR NIGHT, AND IT'S WEIRD HOURS, AND

8    UNITED'S CREW WOULD TAKE BREAKS WHEN THE JOB WAS DONE, FOR

9    THE MOST PART, OR WHEN THERE WAS A LULL IN THE ACTIVITY."

10        DID I READ THAT CORRECTLY?

11   **A.**   YES.

12   **Q.**   THOSE ARE YOUR QUESTIONS THAT WERE POSED TO YOU AND THOSE

13   ARE THE ANSWERS THAT YOU GAVE; ISN'T THAT RIGHT?

14   **A.**   YES.

15   **Q.**   IN ADDITION TO BEING A FOREMAN, YOU WERE A SHOP STEWARD

16   FOR THE UNION; ISN'T THAT RIGHT?

17   **A.**   YES.

18   **Q.**   2002 TO 2006?

19   **A.**   YES, APPROXIMATELY.

20   **Q.**   AND YOUR RESPONSIBILITIES INCLUDED OBSERVING EXHIBITORS

21   AND INSTALLATION AND DISMANTLE TEAMS, TO MAKE SURE THEY WERE

22   OBSERVING THE TEAMSTERS' CONTRACT?

23   **A.**   YES.

24   **Q.**   YOU ALSO ACTED AS LIAISON BETWEEN THE TEAMSTERS' MEMBERS

25   AND THEIR EMPLOYERS IF ANY PROBLEM AROSE ON THE WORK SITE?

MARCH 22, 2011

LJUNGQUIST - CROSS BY SCHOUTEN

1   **A.**   YES.

2   **Q.**   AND SOMETIMES YOU WORKED AS A FOREMAN?

3   **A.**   YES.

4   **Q.**   ABOUT HOW MANY PEOPLE ARE YOU IN CHARGE OF AT ANY GIVEN

5   TIME?

6   **A.**   IT DEPENDED ON THE SHOW.  FROM ONE OR TWO TO 20.

7   **Q.**   DO YOUR WORKERS TAKE BREAKS?

8   **A.**   YES.

9   **Q.**   ARE YOU AWARE THAT IN CALIFORNIA EMPLOYERS HAVE TO GIVE

10  THEIR EMPLOYEES REST BREAKS?

11  **A.**   YES.

12  **Q.**   DO YOU KNOW ANYTHING ABOUT HOW SDCCC SCHEDULES ITS PEOPLE?

13  **A.**   NO.

14  **Q.**   BUT IT WAS A PROBLEM WITH SHIFT CHANGES?

15  **A.**   YES.  THAT I NOTICED ON THE FLOOR WHEN NOBODY WOULD BE

16  THERE.

17  **Q.**   BUT YOU HAVE NO IDEA HOW THEY ACTUALLY SCHEDULE THAT?

18  **A.**   NO.

19  **Q.**   LET'S TALK ABOUT SOME BADGES.  AND YOU SAID IN 1989, WHEN

20  YOU STARTED WORKING AT THE CONVENTION CENTER, YOU DIDN'T WEAR A

21  BADGE?

22  **A.**   NO.

23  **Q.**   AND YOU ALSO SAID THAT AT SOME POINT THEY STARTED ISSUING

24  WRISTBANDS TO YOU ON A DAILY BASIS?

25  **A.**   YES.

1   **Q.**   DO YOU REMEMBER WHAT YEAR THAT WAS?

2   **A.**   NO, I DON'T.

3   **Q.**   IF I TOLD YOU IT WAS 2000 WOULD YOU BELIEVE THAT?

4   **A.**   I COULDN'T REALLY TELL YOU FOR SURE.

5   **Q.**   WELL, AT SOME POINT YOU STARTED GETTING THESE WRISTBANDS

6   AND YOU WOULD ACTUALLY GO AND ASK THE CONVENTION CENTER FOR

7   THESE WRISTBANDS?

8   **A.**   YES.

9   **Q.**   AND AT SOME POINT THE CONVENTION CENTER STARTED ASKING YOU

10  FOR A LIST OF PEOPLE FOR WHOM YOU WERE GETTING THESE

11  WRISTBANDS?

12  **A.**   YES.

13  **Q.**   DO YOU HAVE ANY SENSE OF WHEN THAT WAS?

14  **A.**   NO.

15  **Q.**   MAYBE A YEAR OR TWO AFTER YOU STARTED GETTING THESE

16  WRISTBANDS?

17  **A.**   MAYBE.  MAYBE LONGER AFTER THAT.  EXACTLY, I'M AM NOT

18  SURE.

19  **Q.**   YOU FIRST RECEIVED A BADGE FROM SOMEONE OTHER THAN THE

20  SDCCC; ISN'T THAT RIGHT?

21  **A.**   YES.

22  **Q.**   AND WAS THAT THE UNION OR WAS THAT GES?

23  **A.**   THE FIRST BADGE I GOT WAS FROM GES.  AND THEN I ALSO GOT A

24  BADGE FROM THE -- ACTUALLY, THE DECORATING UNION MADE US BADGES

25  WITH THE TEAMSTER LOGO ON IT, ALSO.

MARCH 22, 2011

LJUNGQUIST - CROSS BY SCHOUTEN

1    **Q.**   AND THAT WAS IN 2005?

2    **A.**   I'M NOT SURE OF THE YEAR.

3    **Q.**   NOW, YOU SAID THAT WHEN YOU GOT A PHOTO I.D., YOU HAD TO

4    PRESENT A DRIVER'S LICENSE?

5    **A.**   YES.  OR ANY OTHER KIND OF PHOTO I.D.

6    **Q.**   BUT IN YOUR CASE --

7    **A.**   IN MY CASE IT WAS A --

8    **Q.**   -- A DRIVER'S LICENSE?

9    **A.**   -- DRIVER'S LICENSE.  YES.

10   **Q.**   AND THEY SWIPED THE CARD WITH THE MAGNETIC STRIP TO RECORD

11   YOUR INFORMATION?

12   **A.**   OR -- THEY SCANNED IT OR THEY SWIPED IT.  ONE OR THE

13   OTHER.

14   **Q.**   BUT THEY GOT IT OFF --

15   **A.**   YES, YES.

16   **Q.**   OKAY.  NOW, AFTER 2008, AT THE CONVENTION CENTER, THEY PUT

17   A RENEWED EMPHASIS ON THIS SECURITY BADGE -- THE BADGES; IS

18   THAT RIGHT?

19   **A.**   YES.

20   **Q.**   HAVE YOU SEEN PEOPLE BE REMOVED FROM THE FLOOR BECAUSE

21   THEY ARE NOT WEARING BADGES?

22   **A.**   YES.

23   **Q.**   ONE MORE THING.  DO YOU KNOW MR. SIMON PERSONALLY?

24   **A.**   YES.  I'VE MET HIM BEFORE.

25   **Q.**   SIX OR SEVEN YEARS AGO?

MARCH 22, 2011

LJUNGQUIST – REDIRECT BY SLANIA
74

1    **A.**    IT WAS LONGER THAN THAT.   IT WAS BEFORE KATRINA.   A FEW

2    YEARS BEFORE KATRINA.

3    **Q.**    WOULD YOU SAY YOU KNOW HIM SOCIALLY?

4    **A.**    NO -- WELL, EXPLAIN YOURSELF, SOCIALLY.

5    **Q.**    HAVE YOU EVER, I DON'T KNOW, HAD A DRINK WITH HIM AT A

6    BAR?

7    **A.**    YES.

8    **Q.**    THANK YOU.

9              **MR. SCHOUTEN:**  NO MORE FURTHER QUESTIONS.

10             **THE COURT:**  MR. SLANIA.

11             **MR. SLANIA:**  TWO QUICK FOLLOW-UPS.

12                     **REDIRECT EXAMINATION**

13   **BY MR. SLANIA:**

14   **Q.**    DO YOU REGULARLY SOCIALIZE WITH MR. SIMON?

15   **A.**    NO.

16   **Q.**    WHERE DO YOU LIVE?

17   **A.**    SAN DIEGO.

18   **Q.**    AND, SECONDLY, MR. SCHOUTEN WOULD NOT LET ME READ YOUR

19   DEPOSITION TESTIMONY WHEN YOU WERE TRYING TO EXPLAIN TO THE

20   JURY ABOUT YOUR COMPLAINING TO YOUR SUPERVISOR.   SO WHY DON'T

21   YOU GO AHEAD AND READ YOUR TESTIMONY ON PAGE 44.

22             THE QUESTION -- I WILL READ THE QUESTION AND GIVE

23   YOUR ANSWERS.   YOU CAN READ THE ANSWER ON PAGE 44.

24             **THE COURT:**  THE QUESTION STARTING AT LINE --

25             **MR. SLANIA:**  THE QUESTION STARTS ON LINE 19.


                     MARCH 22, 2011

1           "YOU NEVER REPORTED BACK TO YOUR SUPERVISOR

2      THAT THERE WERE ANY PROBLEMS WITH WORK DONE BY THE SAN

3      DIEGO CONVENTION CENTER EMPLOYEES FOR CLEANING AT THE

4      CONVENTION CENTER?"

5  Q.  **(BY MR. SLANIA):**  PLEASE GO AHEAD AND READ YOUR ANSWER.

6  A.  LINE 23.

7           "ANSWER:  YES, WHEN -- WHEN SOMETHING --

8      WHEN TIME CRITICAL -- SOMETHING TIME CRITICAL NEEDED TO BE

9      CLEANED AND IT DIDN'T GET DONE, I TOLD MY SUPERVISORS AND

10     WE ACTUALLY WOULD JUST PICK UP THE CARTONS OR TRASH SO THE

11     SHOW COULD OPEN IN A TIMELY MANNER AND THEN IT WAS JUST

12     THROWN AWAY AFTERWARDS."

13  Q.  BUT YOU TESTIFIED THAT YOU DID TELL YOUR SUPERVISORS ABOUT

14  POOR PERFORMANCE BY THE CONVENTION CENTER; IS THAT CORRECT?

15  A.  YES, HERE I DID.

16  Q.  THANK YOU.

17          **MR. SLANIA:**  NOTHING FURTHER, YOUR HONOR.

18          **THE COURT:**  OKAY.  ANYTHING ELSE?

19          **MR. SCHOUTEN:**  NOTHING FURTHER, YOUR HONOR.

20          **THE COURT:**  ALL RIGHT.  MAY WE EXCUSE MR. LJUNGQUIST,

21  THEN, AS A WITNESS?

22          **MR. SLANIA:**  YES, YOUR HONOR.

23          **THE COURT:**  YOU ARE EXCUSED, SIR.  THANK YOU.  YOU

24  ARE FREE TO GO.  AND THEN YOU CAN RETURN THAT TO MR. SCHOUTEN.

25          AND THEN IS THERE ANOTHER WITNESS READY THAT IS

MARCH 22, 2011

1    SHORT, OR --

2              **MR. SLANIA:**  WITH IT BEING 4:00, YOUR HONOR, IT WILL

3    PROBABLY BE BETTER TO TAKE HIM TOMORROW.

4              **THE COURT:**  LADIES AND GENTLEMEN, WE'LL TAKE OUR

5    EVENING RECESS.  WE HAVE A LONG WITNESS AND SOME ADDITIONAL

6    WORK TO DO TO HELP STREAMLINE THE CASE FOR YOU.  SO I WILL

7    RELEASE YOU FOR THE EVENING, TO BE BACK AT 9:00 TOMORROW.  YOU

8    WILL HAVE A LONG LUNCH TOMORROW BECAUSE OF AN EVENT I HAVE TO

9    ATTEND.  IT WILL BE PROBABLY SOMEWHERE BEFORE 12:00 UNTIL ABOUT

10   1:30.  SO IF YOU NEED TO PLAN TO DO SOMETHING, YOU WILL HAVE

11   ALMOST TWO HOURS AT THAT POINT.  WE'LL RECONVENE AT 1:30 FOR

12   THE AFTERNOON AND GO THE REST OF THE DAY.

13            SO REMEMBER THE ADMONITION.  DON'T DISCUSS THE MATTER

14   AMONGST YOURSELVES OR ANYBODY ELSE.  DON'T LET ANYBODY APPROACH

15   YOU ABOUT THE CASE.  DON'T BLOG, TWITTER OR E-MAIL ABOUT THE

16   FACTS, THE CIRCUMSTANCES HERE.  DON'T MAKE UP YOUR MIND ON ANY

17   OF THE ISSUES.  IT'S A LONG TIME BEFORE IT'S SUBMITTED TO YOU.

18   HAVE A GOOD EVENING.  HOPEFULLY, IT WAS WARMER THIS AFTERNOON.

19   HAVE A GREAT NIGHT, AND WE'LL SEE YOU TOMORROW.

20   (PROCEEDINGS HAD IN OPEN COURT, OUTSIDE THE HEARING OF THE

21   JURY)

22            **THE COURT:**  AND THE JURY HAS LEFT FOR THE DAY.  IN

23   CASE YOU ARE WONDERING, MY CLERK HAS HANDED THEM HER CARDS

24   BECAUSE SOMEBODY ASKED FOR A NUMBER IN CASE THEY WERE RUNNING

25   LATE IN THE MORNING.  SO THEY HAVE MY COURTROOM DEPUTY'S DIRECT

MARCH 22, 2011

1    LINE HERE TO THE COURTROOM.

2               AND SHOULD WE TALK ABOUT THE DEPOSITION OF MR. PITTS?

3          **MR. SLANIA:**  YES, YOUR HONOR.

4          **THE COURT:**  ALL RIGHT.  WELL, HAVE A SEAT AND LET'S

5    GO THROUGH THIS.  AND I SCANNED IT AS BEST I CAN, BUT WE'LL GO

6    THOUGH IT UNTIL WE GET IT CLEANED UP.

7               GO AHEAD, SIR.

8          **MR. SLANIA:**  THE FIRST OBJECTION BY THE CONVENTION

9    CENTER IS TO PAGE 26, LINES 20 TO 23.  WE UNDERSTAND THAT

10   OBJECTION.  WE WON'T READ THAT.  WE WON'T HAVE THAT PLAYED.

11         **THE COURT:**  PAGE 26?

12         **MR. SLANIA:**  LINES 20 TO 23.

13         **THE COURT:**  SO YOU ARE GOING TO EXCISE THAT OR YIELD

14   THAT?

15         **MR. SLANIA:**  WE'LL TAKE THAT OUT, YOUR HONOR.

16         **THE COURT:**  SO THAT IS ON THE THIRD PAGE OF YOUR

17   LIST.  ALL RIGHT.  SO THAT WILL BE DELETED.

18              AND THEN THE NEXT ONE LOOKS TO BE -- IS IT PAGE 28,

19   LINE 15?

20         **MR. SLANIA:**  YES, YOUR HONOR.

21         **THE COURT:**  ALL RIGHT.  ACTUALLY, I SKIPPED OVER THIS

22   ONE.  LET ME READ IT QUICKLY.  IT'S PAGE 28, LINE 15 TO PAGE

23   30, LINE 10.

24   (PAUSE)

25              ALL RIGHT.  THIS IS ABOUT THE DECLARATION THAT WAS IN

MARCH 22, 2011

1   CONJUNCTION WITH THE SUMMARY JUDGMENT MOTION THAT IS REFERENCED

2   IN OTHER PLACES IN THE DEPOSITION, AS WELL?

3           **MR. SLANIA:**  IT IS, BUT IT ALSO REFERENCES CHAMPION'S

4   POSITION ABOUT MAKING STATEMENTS IN THIS CASE WHERE THEY DIDN'T

5   WANT TO DAMAGE THEIR RELATIONSHIP WITH THE SAN DIEGO CONVENTION

6   CENTER.  AND I BELIEVE THAT TESTIMONY AND THE FACT THAT

7   MR. PITTS DISCUSSED THAT WITH HIS SUPERVISORS AND WITH COUNSEL

8   AT CHAMPION IS RELEVANT TO HIS TESTIMONY.

9           **THE COURT:**  OKAY.  AND THEN FROM THE DEFENSE SIDE,

10  THE OBJECTION IS LACK OF RELEVANCE AND A 403?

11          **MR. ERGASTOLO:**  THAT'S CORRECT, YOUR HONOR.  AND IT'S

12  ALSO HEARSAY BECAUSE IT'S TIED IN TO THE DECLARATION, WHICH IS

13  ITSELF HEARSAY.  THE DECLARATION IS NOT GOING TO BE COMING INTO

14  EVIDENCE.  IT COULD ALSO CONFUSE THE JURY TO DISCUSS A

15  DECLARATION THAT IS NOT BEFORE IT, GIVEN IN A PROCEEDING THAT

16  IS PRIOR TO THE TRIAL.

17          **THE COURT:**  AND MR. PRIEST-HECK IS NOT GOING TO

18  TESTIFY, I TAKE IT?

19          **MR. ERGASTOLO:**  CORRECT.

20          **THE COURT:**  YES.  I MEAN, AS IT GOES TO THE ISSUE OF

21  CHAMPION -- CHAMPION'S POSITION ADVERSE TO THE CONVENTION

22  CENTER, IT'S BASED UPON THE STATEMENT OF MR. PRIEST-HECK, AND

23  SO IT WOULD BE HEARSAY, PURE AND SIMPLE.  I DON'T SEE AN

24  EXCEPTION -- OR CAN'T CONCEIVE AN EXCEPTION THAT WOULD ALLOW

25  IT.

MARCH 22, 2011

1          SO I WILL SUSTAIN THE OBJECTION AND WE'LL EXCISE 28,

2    15 THROUGH 30, 10.

3          **MR. SLANIA:**  I UNDERSTAND THAT, YOUR HONOR.  HEARSAY

4    WASN'T VOICED WHEN I GOT THE E-MAIL.  IT WAS JUST A RELEVANCE

5    OBJECTION AND A 403 OBJECTION.

6          **THE COURT:**  YEAH.  BUT THE 403 PROBABLY SUBSUMES THE

7    HEARSAY PROBLEM BECAUSE WE ARE GOING TO NEED TO DO OTHER THINGS

8    TO GAIN ITS ADMISSION.  BUT I THINK ON THE HEARSAY, AS WELL AS

9    THE OTHER GROUNDS, IT'S SUSTAINED.

10          SO THAT'S 28, 15.

11          AND THE NEXT ONE, I THINK, IS 83, 3 THROUGH -- EXCUSE

12    ME.  IT'S 88, 20 THROUGH 90, 17, ONLY.

13          **MR. ERGASTOLO:**  IT'S AT 88, 20, YOUR HONOR.

14          **THE COURT:**  RIGHT.  I MEANT TO SAY THAT.  I GUESS I

15    DIDN'T.  OBJECTION BEING RELEVANCE IN THIS REGARD.

16          LET ME REVIEW THIS AGAIN AND WE CAN TALK ABOUT IT.

17    (PAUSE)

18          ALL RIGHT.  AND I'M LOOKING AT THREE PAGES OF E-MAILS

19    WITH TWO SEPARATE SECTIONS.  LET ME JUST ASK, WHO IS OBJECTING?

20    THE DEFENSE.  OKAY.

21          AND SO WHY DON'T YOU TELL ME, MR. SLANIA, WHY IT'S

22    NOT -- WELL, I GUESS THE MARGIN BEING REDUCED WOULD HAVE SOME

23    RELEVANCE.  SO THE OBJECTION AS TO RELEVANCE IS A PROBLEM.  NOT

24    THE BIG PROBLEM, BUT THE OBJECTION ON THE RECORD.  AND, OF

25    COURSE, YOUR OBJECTION, MR. SLANIA, WAS THAT IT CALLS FOR

MARCH 22, 2011

1   SPECULATION AND IT APPEARS THAT COULD BE A GOOD OBJECTION, SO

2   HOW DO I SORT THAT OUT?

3            **MR. SLANIA:**  WE WITHDRAW OUR OBJECTION, YOUR HONOR.

4            **THE COURT:**  I'M SORRY?

5            **MR. SLANIA:**  WE WITHDRAW OUR OBJECTION, YOUR HONOR.

6            **THE COURT:**  OKAY.  ALL RIGHT.  SO I WOULD SAY IF YOU

7   TAKE OUT YOUR OBJECTION, I THINK THAT THERE IS SOME RELEVANCE.

8   THE WEIGHT, IT'S PROBABLY MARGINAL, BUT I DON'T SEE ANY 403

9   PROBLEM.  IT'S BRIEF.  AND SO WE'LL OVERRULE THE OBJECTION BY

10  THE DEFENSE.  IT CAN BE CLEANED UP AS FAR AS -- CAN YOU JUST

11  EXCISE YOUR OBJECTION?

12           **MR. SLANIA:**  WE ARE GOING TO TAKE OUT ALL THE

13  ATTORNEY COLLOQUY AND ALL THE CITES, YOUR HONOR.  TAKE ALL OF

14  THAT OUT.

15           **THE COURT:**  SO THAT ONE IS OVERRULED.  AND THAT

16  COMPLETES WHAT APPEARS TO BE THE THREE PASSAGES MARKED ON PAGE

17  THREE OF THIS E-MAIL CHAIN.

18            SO I'M GOING TO MOVE TO WHAT WOULD APPEAR TO BE AHEAD

19  IN THE TRANSCRIPT, TO 304.  AND THEN EXHIBIT 582 IS THE FOCUS

20  OF THIS.  AND THIS IS THE DECLARATION ITSELF, RIGHT --

21           **MR. SLANIA:**  NO, YOUR HONOR.

22           **THE COURT:**  -- THAT MR. PITTS MADE?

23           **MR. SLANIA:**  NO.  THIS IS NOT THE DECLARATION.

24           **THE COURT:**  OH, 304, LINE 21.  WHAT IS 582?  HELP ME

25  WITH THAT.  OH, IT'S THE E-MAIL CHAIN.  NOW I'M BACK ON TRACK.

MARCH 22, 2011

1          ALL RIGHT.  SO THE DISCUSSION ABOUT THE E-MAILS AND

2   ISSUES WITH REGARD TO THE OVERSTAFFING POINT.  I THINK THE 602

3   IS OVERRULED.  HE HAS A BASIS OR FOUNDATION WITHIN WHICH, SAY,

4   HE IS PRIVY TO THE DISCUSSION.  I'M TAKING IT RICK IS

5   MR. SIMON.  HE IS AVAILABLE FOR CROSS-EXAMINATION AS TO HIS

6   SIDE OF THIS, ALTHOUGH I RECOGNIZE IT'S SOME OTHER UNITED

7   REPRESENTATIVE THAT MAY BE THE AUTHOR OF THE INFORMATION.

8          SO HOW DO YOU OVERCOME THE HEARSAY PROBLEM THERE AS

9   IT RELATES TO THE POTENTIAL, IF IT'S SOMEONE OTHER THAN

10  MR. SIMON, WHO COULD NOT BE CROSS-EXAMINED ON THIS POINT?

11          **MR. SLANIA:**  AS TO WHICH PART, YOUR HONOR?  ARE YOU

12  TALKING ABOUT THE E-MAIL OR THE FOLLOW-UP DISCUSSION?

13          **THE COURT:**  WITH THE FOLLOW-UP DISCUSSION.  WE HAVE

14  THE DISCUSSION HAPPENING WITH -- I BELIEVE HE SAYS IT WAS A

15  REPRESENTATIVE FROM UNITED.  I CAN'T SAY IF IT WAS RICK OR

16  SOMEBODY ELSE.

17          AND I'M THINKING TO THE EXTENT IT WAS RICK, AND THAT

18  IS MR. SIMON, HE COULD BE CROSS-EXAMINED ON THIS.  IF IT'S

19  SOMEBODY ELSE, IT'S A PROBLEM.

20          **MR. SLANIA:**  YOUR HONOR, THE RULING IS TO HAVE IT

21  ADMITTED UP THROUGH 306, LINE 5 -- TO HAVE THE EXHIBIT ITSELF

22  AND THE TESTIMONY UP THROUGH 306, LINE 5.  BUT AS I UNDERSTAND

23  WHAT YOU'RE ASKING, IT'S ADMISSIBLE UP TO THAT POINT, BUT THEN

24  DEALING WITH THE HEARSAY ISSUE.

25          **THE COURT:**  I'M HAVING PROBLEMS FROM 6 TO 18 BECAUSE

MARCH 22, 2011

1  OF THE HEARSAY BY AN UNDISCLOSED SOURCE IS NOT SUBJECT TO

2  CROSS-EXAMINATION AT THAT STAGE.

3          **MR. SLANIA:**  IF IT'S ADMISSIBLE UP TO LINE 6, YOUR

4  HONOR, THEN I UNDERSTAND.

5          **THE COURT:**  OKAY.  THEN WE'LL GRANT THE OBJECTION AS

6  TO PAGE 306, LINES 6 THROUGH 18.  DENIED AS TO 304, LINE 21

7  THROUGH 306, LINE 5.  THAT WILL SOLVE THAT PROBLEM.

8          AND THEN WE MOVE TO 308, LINE 9 THROUGH 311, 19.

9  (PAUSE)

10          ALL RIGHT.  AS TO 602, HE CLEARLY WAS PRIVY TO THIS

11  TRANSACTION OF E-MAILS WHICH REFLECTED SOME DISCUSSIONS HE HAD

12  WITH MR. KING.  SO I THINK THE 602 IS OVERRULED.

13          THE HEARSAY, I'M GOING TO OVERRULE.  MR. KING IS A

14  LISTED WITNESS AND WILL BE CALLED.  THERE IS A VARIETY OF WAYS

15  IN WHICH THIS INFORMATION, EITHER IN TERMS OF REFRESHING

16  RECOLLECTION OR DEALING IN SOME OTHER WAY WITH MR. PITTS'

17  RECALL -- THE HISTORY OR CHRONOLOGY OF THE EVENTS -- THAT MAKE

18  IT ADMISSIBLE.  SO OBJECTIONS ARE OVERRULED ON THOSE PASSAGES

19  THROUGH 311, 19.

20          AND WE GET TO 312, 1 THROUGH 16.

21  (PAUSE)

22          I'M GOING TO OVERRULE THAT.  CLEARLY, HE IS IN A

23  POSITION TO HAVE MADE SOME GENERAL ANALYSIS, REFLECT ON

24  EFFICIENCIES, AND THEN DISCUSS OPTIONS THAT WERE PRESENTED FOR

25  CONSIDERATION.  SO OVERRULED.  THAT CAN BE ADMITTED.

MARCH 22, 2011

1            314, 14 IS THE NEXT BIT.

2    (PAUSE)

3            AND I AM GOING TO OVERRULE THE 602 OBJECTION, THE

4    GENTLEMAN PRIVY TO THESE E-MAILS OR DISCUSSIONS.

5            LET ME DEAL WITH THE HEARSAY BY REREADING THIS A

6    MINUTE.

7    (PAUSE)

8            SOMEBODY TELL ME, IN THE INTEREST OF EXPEDIENCY, THE

9    CONTENT OF THE E-MAIL CHAIN.  MAYBE I WILL ASK THE DEFENSE THIS

10   QUESTION, SINCE THEY LODGED THE OBJECTION.

11           WHAT IS IT ABOUT THE CONTENT OF THE E-MAIL CHAIN THAT

12   YOU FEEL THE HEARSAY OBJECTION APPLIES TO?  BECAUSE THE

13   TRANSCRIPT ITSELF TALKS ABOUT THE DOCUMENT AND TALKS ALL AROUND

14   IT, BUT THERE IS NO HEARSAY STATEMENTS IN THE TESTIMONY ITSELF

15   THAT WOULD CLEARLY BE SOMETHING CONTAINED, I GUESS, WITHIN 584.

16           **MR. ERGASTOLO:**  CORRECT, YOUR HONOR.  MORE

17   APPROPRIATELY, I THINK THE ISSUE HERE IS RELEVANCE.  I MAY HAVE

18   MISSTATED THIS ONE.

19           **THE COURT:**  OKAY.

20           **MR. ERGASTOLO:**  WHAT ANYBODY AT CHAMPION THOUGHT WERE

21   APPROPRIATE REASONS FOR THE CONVENTION CENTER CHANGING ITS

22   POLICY AREN'T RELEVANT TO ANY ISSUE IN THIS CASE, AND THAT IS

23   WHAT THIS DISCUSSION IS ABOUT.  THIS IS MR. PITTS OPINING ON

24   THE FACT THAT HE DIDN'T BELIEVE OUR RATIONALE, SO WHAT DOES

25   THAT HAVE TO DO WITH ANYTHING HERE?

1          **THE COURT:**  ALL RIGHT.  AND SO THERE IS THE QUESTION.

2   WHAT DOES THIS HAVE TO DO WITH ANYTHING AS FAR AS HIS ALLEGEDLY

3   SPECULATING ON THE REASONS BEHIND THE POLICY?

4          **MR. SLANIA:**  IT'S A STATEMENT BY A CUSTOMER AGAINST

5   THE POLICY WHICH IS RELEVANT IN THE ANTITRUST CONTEXT.  IT'S

6   ALSO DIRECTLY RELEVANT TO THE EXAMINATION OF MR. GESSNER TODAY,

7   WHERE IT WAS POINTED OUT THAT THE CONVENTION CENTER WAS

8   ANTICIPATING GETTING NEGATIVE RESPONSES.  THIS WOULD BE ONE OF

9   THOSE RESPONSES.  ALL THAT INFORMATION IS IN FRONT OF THE JURY.

10  AND THE FACT THAT WE HAVE A NEGATIVE RESPONSE FROM CHAMPION TO

11  THIS POLICY IS RELEVANT ON BOTH OF THOSE GROUNDS, YOUR HONOR.

12         **THE COURT:**  ALL RIGHT.  WELL, IT MAY BE THE THING.  I

13  THINK THAT IT HAS SOME RELEVANCE.

14         **MR. ERGASTOLO:**  MAY I RESPOND, YOUR HONOR?

15         **THE COURT:**  BUT IT MAY BE SOMETHING APPROPRIATE FOR A

16  LIMITING INSTRUCTION.

17         GO AHEAD, MR. ERGASTOLO.

18         **MR. ERGASTOLO:**  CHAMPION IS NOT A CUSTOMER OF THE

19  CONVENTION CENTER.  WE'LL START THERE.  CHAMPION ISN'T ENTITLED

20  TO AN OPINION OF WHY -- WE WOULD INTRODUCE IT AS AN OPINION OF

21  WHY THEY THOUGHT WE ENTERED INTO THE DECISION WE DID.  THAT'S A

22  QUESTION FOR THE JURY TO DECIDE:  WHETHER THIS WAS A DECISION

23  FOR THE REASONS WE STATED OR NOT.  AND TO HAVE A THIRD PARTY

24  GET UP THERE AND SAY WE DON'T BELIEVE YOUR REASONS FOR DOING

25  THIS, WHO -- AGAIN, I GET TO ASK THE QUESTION OF HOW IS THIS

1   RELEVANT.

2           AND I UNDERSTAND MR. SLANIA HAS SAID ANTITRUST, BUT I

3   DON'T UNDERSTAND HOW THE OPINION -- SPECULATIVE OPINION OF

4   MR. PITTS REGARDING OUR REASONS FOR DOING ANYTHING ARE RELEVANT

5   TO ANY ISSUE IN THE ANTITRUST CONTEXT.

6           **THE COURT:**  OKAY.  I AM GOING TO FIND THE EXHIBIT

7   HERE TO HELP WITH THIS.

8           **MR. ERGASTOLO:**  AND WE RAISED A SEPARATE OBJECTION

9   WHEN WE SUBMITTED OUR TRIAL EXHIBIT INDEX TO 584 ON THE GROUNDS

10  OF HEARSAY, RELEVANCE, 401, 402, AND I'LL ADD 403 TO THAT, AS

11  WELL.

12          **THE COURT:**  LET ME TAKE ALL OF THAT INTO

13  CONSIDERATION AS SOON AS I FIND IT.

14  (PAUSE)

15          WELL, FOR THE LIFE OF ME, I CAN'T FIGURE OUT WHY THE

16  FIRST PAGE HAS ANY RELEVANCE.  BUT I THINK THE SECOND PAGE --

17  SEE 122.  YES, HE IS COMMENTING UPON HIS FEELING THAT IT'S

18  DISINGENUOUS, AND THEN GOES ON TO EXPRESS THE LACK OF

19  COMPLAINTS COMMUNICATED BY THE BUILDING OR ANY CLIENTS ON

20  CHAMPION SHOWS.  I THINK THAT ALL SUITABLY MEETS THE MATRIX OF

21  THE TESTIMONY WE HAVE BEEN HEARING ALREADY CLEARLY IS AN ISSUE.

22          AND TELL ME WHY PAGE ONE, OTHER THAN TO BE COMPLETE,

23  HAS A ROLE HERE.  I GUESS IT'S BEEN MENTIONED IN THE

24  TRANSCRIPT, BUT --

25          I MEAN, THEY ARE TALKING ABOUT UNITED IS GOING TO

MARCH 22, 2011

1    MANAGE IT, WHICH FORM DO WE USE, I HAVE TO GET MY KIT OUT.

2              TAKE A LOOK AT IT.

3         **MR. SLANIA:**  SURE.  THANK YOU, YOUR HONOR.  JUST PAGE

4    ONE, CORRECT?

5         **THE COURT:**  JUST PAGE ONE.  I THINK PAGE TWO IS

6    ADMISSIBLE, AND I OVERRULE THE OBJECTIONS, FOR THE REASONS

7    STATED.  PAGE ONE IS HARMLESS.  IT'S NOT PARTICULARLY

8    MEANINGFUL.

9              **DEPUTY CLERK:**  WHAT EXHIBIT IS THIS?

10        **THE COURT:**  584.

11        **MR. SLANIA:**  THE SECOND PAGE IS FINE, YOUR HONOR.

12        **THE COURT:**  ALL RIGHT.  SO WE'LL SUSTAIN IN PART AND

13   DENY IN PART THE OBJECTION.  EXHIBIT 584, PAGE TWO ITSELF, DOES

14   NOT DISQUALIFY OR PREVENT THE TESTIMONY ON THE DEPOSITION THAT

15   WE'RE TALKING ABOUT, WHICH IS PAGES 314, LINE 14 TO 318,

16   LINE 10.

17             AND THEN THAT TAKES US TO 319.  AND 319, 8 THROUGH

18   327.  WELL, THIS ACTUALLY FITS INTO ONE OF THE MOTIONS IN

19   LIMINE THAT WAS GRANTED WITH REGARD TO GOING DOWN THE SLIPPERY

20   SLOPE OF THE WHAT IF'S.  AND THE WITNESS WOULD NOT HAVE THE

21   INFORMATION TO SAY WITH ANY CERTAINTY THAT THAT IS THE CASE.

22        **MR. SLANIA:**  THAT IS ACCEPTABLE, YOUR HONOR.

23        **THE COURT:**  SO THAT IS SUSTAINED.  AND SO 319, LINE 8

24   THROUGH 320, LINE 7 ARE OUT, WITH THE OBJECTION SUSTAINED.

25             AND THEN WE GET TO LINE 320, 19 THROUGH 322, 8.  THIS

MARCH 22, 2011

1   IS GIVEN WITH 585.

2           **MR. SLANIA:**  YOUR HONOR, THAT IS ALSO THE SUBJECT OF

3   THE MOTION, SO WE'LL PULL THAT BACK.

4           **THE COURT:**  OKAY.

5           **MR. ERGASTOLO:**  YOUR HONOR -- OR, COUNSEL, DOES THAT

6   ALSO INCLUDE EXHIBIT 585, WHICH IS REFERENCED IN THAT SEGMENT:

7   320, 19 THROUGH 322, 8?

8           **MR. SLANIA:**  NOT THE ENTIRE EXHIBIT, NO.  WE'LL HAVE

9   TO MEET AND CONFER ON THAT BECAUSE THE EXHIBIT HAS MANY E-MAILS

10  OTHER THAN WHAT IS DISCUSSED IN THIS.

11          **THE COURT:**  BUT THE SECTION OF THE TESTIMONY 320, 19

12  THROUGH 322, 8, THE OBJECTIONS WILL BE SUSTAINED.  THE

13  INFORMATION IS OUT AND YOU CAN DISCUSS 585 IN SOME INDEPENDENT

14  SETTING AND WHETHER OR NOT IT SEES THE LIGHT OF DAY ULTIMATELY

15  IN THE CASE.

16          ALL RIGHT.  MOVING AHEAD.  THE NEXT ONE I HAVE MARKED

17  AS 322, 20 THROUGH 331, 15.  AND 586 IS THE SALIENT EXHIBIT,

18  AND LET ME LOOK AT THAT.

19  (PAUSE)

20          **MR. ERGASTOLO:**  YOUR HONOR, WE WITHDRAW THE OBJECTION

21  ON THIS ONE.

22          **THE COURT:**  OKAY.  THANKS.  I ONLY READ ABOUT HALF OF

23  IT.

24          **MR. ERGASTOLO:**  SORRY.

25          **THE COURT:**  NO, THAT IS FINE.  THE OBJECTION IS

MARCH 22, 2011

1    WITHDRAWN AND THAT MAY BE PRESENTED AS PART OF THE VIDEO.

2              AND THAT WOULD TAKE US TO 338, 3, OR AM I MISSING

3    SOMETHING?

4              **MR. ERGASTOLO:**  I NEED TO DOUBLE CHECK.

5              **THE COURT:**  WE STILL HAVE -- OKAY.  322, 20 THROUGH

6    331 --

7              **MR. SLANIA:**  THEY JUST WITHDREW THAT.

8              **THE COURT:**  THEY WITHDREW OR NOT?

9              **MR. ERGASTOLO:**  THE FIRST PART OF THAT DEALT WITH

10   586.  WE WITHDREW THAT PART.

11             **THE COURT:**  SO TELL ME WHERE -- YOU ARE WITHDRAWING

12   FROM 322, LINE 20, THROUGH WHAT?

13             **MR. ERGASTOLO:**  322, LINE 20 THROUGH 323, LINE 20.

14             **THE COURT:**  OKAY.

15             **MR. ERGASTOLO:**  THAT IS FOR CERTAIN.  THE NEXT IS THE

16   AUTHENTICATION OF EXHIBIT 587.

17             **THE COURT:**  OKAY.  SO WE ARE CLEAR, THEN, THE

18   PRESENTATION OF THE WITNESS BY VIDEO MAY INCLUDE THE TESTIMONY

19   FROM 322, LINE 20 THROUGH 323, LINE 20.

20             AND THEN WE'LL DEAL WITH THE OBJECTION TO THE NEXT

21   STAGE, WHICH IS 587.

22             **MR. ERGASTOLO:**  AND NO OBJECTION ON THIS NEXT STAGE,

23   WHICH DEALS WITH EXHIBIT 587, WHICH TAKES US TO PAGE 325,

24   LINE 14.

25             **THE COURT:**  SO IF IT'S WITHDRAWN THROUGH 325,

1   LINE 14, THAT INFORMATION CAN BE PRESENTED TOMORROW.

2           AND THEN 588, ARE WE -- OKAY.  THIS IS AS TO

3   EXHIBIT 588.

4   (PAUSE)

5           **MR. ERGASTOLO:**  WE'LL WITHDRAW ALSO REGARDING THE

6   TESTIMONY REGARDING 588, WHICH STARTS ON 325, 15, ALL THE WAY

7   THROUGH 328, 4.

8           **THE COURT:**  328, 4.  THE INTERIM OBJECTION HAVING

9   BEEN WITHDRAWN, AND THAT INFORMATION MAY BE PRESENTED TO THE

10  JURY.

11          AND THAT TAKES US TO 589, THE DECLARATION.

12          **MR. ERGASTOLO:**  AND THERE WE'RE NOT WITHDRAWING.

13          **THE COURT:**  OKAY.  AND THIS IS THE DECLARATION OF

14  MR. PITTS IN SUPPORT OF -- OR IN CONNECTION WITH THE

15  DEFENDANT'S SUMMARY JUDGMENT.  IT'S THREE PAGES MARKED AS

16  EXHIBIT 589, SWORN FEBRUARY 27TH, 2010.

17          AND I DID READ THIS SEVERAL TIMES OVER THE BREAK, AND

18  IT'S BASICALLY THE IDENTIFICATION OR DERIVATION OF THE

19  DECLARATION.  THAT'S HOW I READ IT.  AND SO THE DECLARATION

20  ITSELF IS NOT AN AGREED EXHIBIT, I TAKE IT?

21          **MR. ERGASTOLO:**  CORRECT.  WE ASSERTED AN OBJECTION TO

22  THE DECLARATION ON THE GROUND OF HEARSAY, LACKS RELEVANCE, AND

23  403 -- OR DIDN'T SAY 403, BUT WE SHOULD HAVE.

24          **THE COURT:**  403.  YOU SAID BEST EVIDENCE.

25          **MR. ERGASTOLO:**  BEST EVIDENCE.

MARCH 22, 2011

1          **THE COURT:**  YOU DON'T WANT ANY OF THIS EVIDENCE, BEST

2    OR OTHERWISE.

3          **MR. ERGASTOLO:**  IT'S HEARSAY.

4          **THE COURT:**  ALL RIGHT.  WELL, IT IS HEARSAY.  AND SO

5    HOW WOULD THE PLAINTIFFS OVERCOME THE PROBLEMS WITH ITS

6    ADMISSION?  CLEARLY, IT'S IDENTIFIED ADEQUATELY BY THE

7    DEPOSITION TRANSCRIPT, BUT I DON'T SEE THAT IT WAS USED IN THE

8    DEPOSITION TO, YOU KNOW, REFRESH RECOLLECTION, TO IMPEACH, OR

9    ANYTHING ELSE THAT IS POPPING INTO MY MIND.  SO UNLESS THE

10   WITNESS -- IT WAS UTILIZED BY A WITNESS FOR SOME PURPOSE AND

11   THEN THE OPPONENT CHOSE TO MARK IT AND PURSUE IT FURTHER, I

12   DON'T KNOW HOW WE GET IT.

13         **MR. SLANIA:**  YOUR HONOR, WE ARE OKAY WITH THAT

14   BECAUSE ALL THE TESTIMONY THAT FOLLOWS -- THAT THEY HAVEN'T

15   OBJECTED TO -- IS IN.

16         **THE COURT:**  OKAY.  SO WE'LL GRANT THE OBJECTION OVER

17   NO OPPOSITION.

18         AND WILL THIS TAKE US ALL THE WAY TO 331, LINE 15?

19         **MR. ERGASTOLO:**  YES, YOUR HONOR.

20         **THE COURT:**  SO THE OBJECTION TO THE TESTIMONY AT PAGE

21   328, LINE 5 THROUGH 331, LINE 7 -- EXCUSE ME -- LINE 15 IS THE

22   OBJECTION IS SUSTAINED AND THE INFORMATION WILL BE STRICKEN

23   FROM THE RECORD TO BE PRESENTED.

24         THEN WE HAVE 338, 3 THROUGH 339, 19.  AND MR. PITTS,

25   HE IS WHAT, WITH CHAMPION?

1           **MR. ERGASTOLO:**  YES.

2           **THE COURT:**  AND HIS ROLE WITH CHAMPION IS?

3           **MR. L'ESTRANGE:**  HE IS THE REVENUE MANAGER.

4           **THE COURT:**  OKAY.  THE MONEY GUY.

5           **MR. SLANIA:**  PRIOR TO THAT HE WAS IN THE ACCOUNTS AND

6   HE MANAGED SHOWS AT THE SAN DIEGO CONVENTION CENTER, AND THAT

7   IS EARLIER IN THE TRANSCRIPT.

8           **THE COURT:**  OKAY.  THANK YOU.

9           ALL RIGHT.  IT GOES TO HIS PERSONAL KNOWLEDGE, WHICH

10  IS MARGINAL, AS FAR AS CERTAIN THINGS, HIS LACK OF AWARENESS AS

11  TO OTHER THINGS.  I THINK OVERRULE 602.  THIS IS THE SAME

12  TESTIMONY ABOUT CUSTOM AND PRACTICE OF DOING BACKGROUND CHECKS

13  OR DRUG SCREENING, ABOUT WHICH WE HAVE HEARD MUCH ALREADY.

14          SO I WILL OVERRULE THE RELEVANCE OBJECTION IN THAT

15  PORTION AND THAT PORTION MAY BE PART OF THE PRESENTMENT TO THE

16  JURY.  AND THAT I THINK TAKES CARE OF ALL OF THE NOTES ON YOUR

17  THREE-PART E-MAIL LIST OF EVENTS -- OR ISSUES, UNLESS THERE IS

18  SOMETHING ELSE I'M MISSING.

19          SEEING NOBODY SAY YES --

20          **MR. ERGASTOLO:**  I'M SORRY.  WHAT WAS THAT LAST

21  STATEMENT, YOUR HONOR?

22          **THE COURT:**  IT LOOKS LIKE I COVERED ALL THE ONES THAT

23  ARE ON THE THREE PAGES OF E-MAILS.  IS THERE ANYTHING ELSE?

24          **MR. ERGASTOLO:**  YES.  THIS LAST SEGMENT, YOUR HONOR.

25  THE ANSWER TO THESE QUESTIONS IS I AM NOT AWARE.  I AM NOT

1    AWARE.  I AM NOT AWARE.  I AM NOT AWARE.  I INTERPRET THAT TO

2    MEAN, "I DON'T KNOW," SPECIALLY SINCE THE FIRST ANSWER WAS "I

3    DON'T KNOW THE INNER WORKINGS OF THE TEAMSTERS TO MAKE AN

4    OPINION ON THAT."

5             SO WOULD THIS TESTIMONY COMING IN BASICALLY BE HE IS

6    BEING ASKED QUESTIONS ABOUT TEAMSTERS AND DECORATORS AND

7    CARPENTERS AND HIM SAYING I DON'T KNOW?  IS THAT WHAT THE

8    ATTEMPTED TESTIMONY IS HERE?

9             **THE COURT:**  IT'S SUBJECT TO SEVERAL INTERPRETATIONS,

10   PROBABLY, OF WHICH THE DEMEANOR WILL SUPPLY SOME MEANING.

11            **MR. SLANIA:**  WE'LL WITHDRAW IT.  NOW THAT WE HAVE THE

12   TESTIMONY FROM THE INDIVIDUALS WHO ARE MEMBERS OF THESE UNIONS,

13   WE ARE HAPPY TO WITHDRAW IT.

14            **THE COURT:**  OKAY.  IF IT'S NOT THAT IMPORTANT, THEN

15   LET'S TAKE IT OUT.  ALL RIGHT.  SO 322 THROUGH --

16            **MR. SLANIA:**  IT'S THE 338, 3.

17            **THE COURT:**  I LOST MY PLACE.  I GOT EXCITED.  I

18   THOUGHT WE WERE DONE.  338, LINE 3 THROUGH 339, LINE 19, THE

19   TESTIMONY IS WITHDRAWN.  THE OBJECTION IS SUSTAINED WITHOUT

20   OPPOSITION.

21            AND DOES THAT TAKE CARE OF MR. PITTS' TRANSCRIPT?

22            **MR. ERGASTOLO:**  YES, YOUR HONOR.

23            **MR. SLANIA:**  YES, YOUR HONOR.

24            **THE COURT:**  OKAY.  SO TOMORROW MORNING WE ARE GOING

25   TO HAVE MR. PITTS BY VIDEO IS THE PLAN, OR NOT?

1          MR. SLANIA:  MR. EPSTEIN ARRIVES AND WHEN HE IS

2   COMPLETED, DEPENDING ON HOW LONG HIS TESTIMONY GOES, WE MIGHT

3   GO TO VIDEO; WE MIGHT GO TO ANOTHER LIVE WITNESS.

4          THE COURT:  YOUR CALL.  YOU WANTED YOUR COPY BACK OR

5   IS THIS AN EXTRA COPY?  I DIDN'T WRITE ANYTHING ON THE

6   TRANSCRIPT; JUST WROTE LOTS OF STICKIES.  AND I AM REMOVING

7   THOSE STICKIES, FOR THE RECORD.  AND IF THERE IS NO OTHER

8   ISSUES, WE'LL GO INTO RECESS.  SEE YOU IN THE MORNING AND

9   CONTINUE ON WITH THE TESTIMONY.

10          MR. SLANIA:  THANK YOU, YOUR HONOR.

11          MR. SCHOUTEN:  THANK YOU, YOUR HONOR.

12          THE COURT:  HAVE A GOOD EVENING, AND WE'LL BE IN

13   RECESS.

14   (PROCEEDINGS CONCLUDED AT 4:35 P.M.)

15                        CERTIFICATION

16          I HEREBY CERTIFY THAT I AM A DULY APPOINTED,
     QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
17   STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT
     TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE
18   ON MARCH 22, 2011, THAT SAID TRANSCRIPT IS A TRUE AND CORRECT
     TRANSCRIPTION OF MY STENOGRAPHIC NOTES; AND THAT THE FORMAT
19   USED HEREIN COMPLIES WITH THE RULES AND REQUIREMENTS OF THE
     UNITED STATES JUDICIAL CONFERENCE.

20

21   DATED:    4/3/11, AT SAN DIEGO, CALIFORNIA.

22          S/N_____
            JEANNETTE N. HILL, OFFICIAL REPORTER, CSR NO. 11148
23

24

25

                          MARCH 22, 2011

94

```
 1
 2                          INDEX TO WITNESSES
 3                      DIRECT   CROSS   REDIRECT   RECROSS
 4   DICKERSON, DAVID
 5      BY MR. SLANIA          2
 6      BY MR. SCHOUTEN               21
 7   LJUNGQUIST, LEIF
 8      BY MR. SLANIA         39                74
 9      BY MR. SCHOUTEN               59
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MARCH 22, 2011