1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10
11   UNITED NATIONAL MAINTENANCE,        )   Civil No.07cv2172 AJB
     INC., a Nevada Corporation,         )
                                         )
12                      Plaintiff,       )   ORDER GRANTING IN PART
     v.                                  )   AND DENYING IN PART
13                                       )   MOTION FOR NEW TRIAL
     SAN DIEGO CONVENTION CENTER         )   AND JUDGMENT FOR THE
14   CORPORATION, INC., a California     )   DEFENDANT AS A MATTER
     Corporation,                        )   OF LAW
15                                       )
                        Defendants.      )   [Doc. No. 239-1]
16   _____ )

17         Defendant, San Diego Convention Center Corporation, Inc., (hereinafter "SDC"), filed a Motion

18   for New Trial, (Doc. No. 239-1). Plaintiff, United National Maintenance, Inc., (hereinafter "United"),

19   filed an opposition, (Doc. No. 2540, and SDC filed a reply, (Doc. No. 252).  The initial hearing on the

20   motion was held on July 1, 2011, and a supplemental hearing was held on August 1, 2012 before Judge

21   Battaglia.  Appearing on behalf of the Plaintiff was James Lance and Jacob Slania. John L'Estrange,

22   Joseph Ergastolo and Andrew Schouten appeared on behalf of Defendants.  Based upon the parties

23   moving papers, arguments made during the hearings and for the reasons set forth below, the Defendant's

24   motion is hereby GRANTED IN PART AND DENIED IN PART as set forth below.

25                            ***Relevant Procedural Background***

26         The complaint in this case was filed on November 13, 2007. (Doc. No. 1.) United pled four

27   antitrust violations under the Sherman Act and three state law claims, including one under the California

28   Business and Professions Code. The action arose in response to a July 1, 2007 policy by SDC that

                                              1

required all cleaning services at trade shows at the San Diego Convention Center (hereinafter "Convention Center") be performed exclusively by SDC's in-house cleaning staff. Prior to July 1, 2007, these services were either performed by SDC who used its in-house cleaning staff or, at the trade show decorator's option, outsourced to vendors like United, who used their own staff.

The case proceeded to trial on March 21, 2011. At trial, United's case was paired down to four claims, Actual Monopolization under § 2 of the Sherman Act; Attempted Monopolization under § 2 of the Sherman Act (the "essential facilities claim"); Intentional Interference with Contract, and Intentional Interference With Prospective Economic Relations. United sought both economic damages and injunctive relief. The Defendants denied all of the alleged antitrust violations and contract claims, and asserted the affirmative defenses of United's failure to mitigate damages, business justification and immunity from liability for the antitrust claims under the Local Government Antitrust Act and the State Action Doctrines.

After a lengthy trial, on May 4, 2011, the jury returned a verdict for United on the Intentional Interference with Contract Claim. In the special verdict form, (Doc. No. 219), the jury found:

    (A)    There was a contract between United and GES/Champion (*Id*., at ¶33 ),

    (B)    SDC knew of the contacts between United and GES/Champion (*Id*., at ¶ 34),

    (C)    SDC intended to disrupt performance of the contracts between United and GES/Champion (*Id*., at ¶ 35),

    (D)    SDC's conduct actually prevented performance or made performance of said contracts more expensive or difficult (*Id*., at ¶ 36 ),

    (E)    SDC's conduct with respect to GES and Champion was a substantial factor in causing harm to United (*Id*., at ¶ 37) ; and

    (F)    SDC's interference with United's contracts was not justified (Doc. No. 219, at ¶ 38 ).

On these findings, the Jury awarded United $668,905. The jury did not reach a verdict on the Plaintiff's remaining claims. This motion followed seeking a new trial claiming Defendants were prejudiced by various legal, instructional and evidentiary errors by the Court regarding United's Intentional Interference with Contract Claim.

07cv2172

1

2                                          ***Legal Standard***

3          Rule 59(a) states, "A new trial may be granted . . . in an action in which there has been a trial by

4    jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the

5    courts of the United States." Fed. R. Civ. P. 59(a)(1). Rule 59 does not specify the grounds on which a

6    motion for a new trial may be granted, instead, the court is "bound by those grounds that have been

7    historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir.2003).

8    Historically recognized grounds include, but are not limited to, claims "that the verdict is against the

9    weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to

10   the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147

11   (1940). The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is

12   contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a

13   miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n. 15

14   (9th Cir.2000).

15         It is within the sole discretion of the trial judge whether to grant a new trial under Rule 59.

16   *Boston Scientific Corp. v. Johnson & Johnson*, 550 F.Supp.2d 1102, 1110 (N.D. Cal. 2008). A new trial

17   may be ordered to correct manifest errors of law or fact. *Id.* A court should not simply disregard a

18   verdict reached by the jury or decide the case as though there had been no jury. A court may grant a

19   motion for new trial only if the verdict is against the clear weight of the evidence. *Landes Canst. Co.,*

20   *Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  A verdict should only be set aside

21   where, after giving full respect to the jury's findings, the judge "is left with the definite and firm

22   conviction that a mistake has been committed by the jury." *Id.*

23         In a motion for new trial, the moving party bears the burden of establishing prejudice. *Boston*

24   *Scientific*, 550 F .Supp.2d at 1110.  A motion for a new trial should not be granted on the basis of

25   asserted errors which were not prejudicial. *Anglo-American General Agents v. Jackson Nat. Life Ins.*

26   *Co.*, 83 F.R.D. 41, 43 (N.D. Cal. 1979); *Boston Scientific*, 550 F. Supp.2d at 1110.

27

28

07cv2172

*Discussion*

SDC argues that it is entitled to a new trial on United's intentional interference with contract claim as a result of: 1) alleged instructional errors; 2) the alleged evidentiary errors regarding exclusion of evidence of other venues and policies; and 3) alleged legal errors by the Court concerning the issue of duty.

### III. Alleged Error Concerning the Legal Issue of Duty

Defendants argue that they were prejudiced by errors concerning the Court's ruling on the legal issue of duty.  Specifically, Defendants argue: 1) the Court erred by determining that SDC's legal duty not to interfere with United's contracts was a factual question for the jury; 2) the Court erred by finding that SDC owed a duty to United because SDC was not a stranger to the contract; and 3) that the jury's verdict is against the clear weight of the evidence because SDC is not a stranger to United's subcontracts under the applicable legal standards.

#### A. Whether SDC's Legal Duty Not to Interfere with UNM's Contracts Was a Factual Question for the Jury

As a preliminary matter, whether a defendant owes a duty is a question of law.[1] In order to be legally capable of committing the tort, the defendant must owe a duty to the plaintiff recognized by law and be subject to liability for breach of that duty. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 869 P.2d 454 Cal.,1994. A duty in tort owing from a defendant to a plaintiff can be created by law, by a defendant's assumption of that duty, or by a preexisting relationship between the plaintiff and the defendant.[2] The Court finds that upon further consideration of the parties arguments and cases cited, that the question of whether a defendant owes a tort duty to a plaintiff is a question of law to be decided by the Court.  *Jacobsen v. Marin Gen. Hosp.*, 192 F.3d 881, 885 (9th Cir. 1999) (citing *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 48 Cal.3d 583, 588-590 (1989)). Submitting the case to the jury in the absence of a legal duty is prejudicial legal error because "[w]ithout such a duty,

---

[1] *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 48 Cal.3d 583, 588, 257 Cal. Rptr. 98, 770 P.2d 278 (1989) (discussing whether a defendant owes a duty of care is a question of law).

[2] *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 48 Cal.3d 583, 590, 588, 257 Cal. Rptr. 98, 770 P.2d 278 (1989); *see also Aguirre-Alvarez v. Regents of the Univ. of California*, 67 Cal.App.4th 1058, 1063, 79 Cal.Rptr.2d 580 (1998).

1   any injury is . . . [an] injury without wrong." *Moore v. Regents of the University of California*, 51 Cal.3d

2   120, 135 n.16 (1990).

3          During the supplemental hearing on August 1, 2012, United raised two arguments.  First, United

4   argued that SDC waived the right to raise the issue of whether the Court erroneously submitted to the

5   jury the question of whether SDC owed a duty to United.  Second, United argues that the question of

6   whether or not SDC owed United a duty was a mixed question of fact and law. As a preliminary matter,

7   the Court notes that United failed to raise its waiver argument in its opposition to SDC's motion.  As

8   SDC so clearly articulated during the supplemental hearing on August 1, 2012, United waived its waiver

9   argument by failing to make it in response to SDC's motion for new trial.  With regard to United's

10  second argument that the question of duty was a mixed question of fact and law, the Court finds that the

11  authority cited by the Plaintiff in support of this argument to be distinguishable because questions of fact

12  remained regarding the issue of duty in the *City of Monterey*. *See City of Monterey v. Del Monte Dunes*

13  *at Monterey, Ltd.*, 526 U.S. 687, 720-21 (1999).  In the instant case, the Plaintiff has failed to cite to any

14  unresolved questions of fact on the issue of duty and upon review of the record, the Court was unable to

15  find any referenced by the parties.  As such, the Court finds United's argument to be unpersuasive.

16  Based upon the foregoing, the Court finds the question of whether SDC owed a duty to be a question of

17  law.

18

19       **B.  United's Intentional Interference with Contract Claims**
             **and Relevant State and Federal Case Law**

20          Having found the question of whether SDC owed United a duty to be a question of law for the

21  Court to decide, the Court now turns to the relevant state and federal cases on claims of intentional

22  interference with contract and SDC's contention that it was not a stranger to United's contracts and

23  therefore cannot be liable to United for intentional interference with the contract.

24

25       **1.  Relevant Case Law On Claims of Intentional Interference With**
             **Contract and the "Not A Stranger Exception"**

26          The parties were asked to provide further argument during the supplemental hearing on August

27  1, 2012 on the relevant case law on claims of intentional interference and the "not a stranger exception"

28  as set forth in *Marin Tug* and *Applied Equipment*. *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*,

07cv2172

271 F.3d 825 (9th Cir.2001); *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 28

Cal.Rptr.2d 475, 869 P.2d 454 (1994)). Specifically, the Court asked the parties to present further

argument on whether or not SDC is not a stranger to United's subcontracts under the applicable legal

standards.

### a.  Relevant California Case Law on Tortious Interference Claims

Review of the case law on tortious interference claims begins with the ruling by the California

Supreme Court in *Applied Equipment. Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th

503, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994)).  In *Applied Equipment*, the California Supreme Court

addressed the issue of whether a party to a contract could be liable in tort for conspiracy to interfere with

its own contract, holding that a claim for tortious interference[3] does not lie against a party to the

contract. *Applied Equip.*, 7 Cal.4th at 508–510, 28 Cal.Rptr.2d 475, 869 P.2d 454.  The California

Supreme Court based its decision, in part, on precedent and longstanding policy, including the

"underlying policy of protecting the expectations of contracting parties against frustration by outsiders

who have no legitimate social or economic interest in the contractual relationship" and the principle that

"[t]he tort duty not to interfere with the contract falls only on strangers—interlopers who have no

---

[3] Under California law, the elements of a claim for intentional interference with contractual relations consist of: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elect. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587 (1990). A claim for tortious interference with prospective economic advantage is largely similar to the claim for tortious interference with an existing contractual relationship and protects the same interest in stable economic relationships, except that interference with prospective economic advantage does not require proof of a valid contract and recognizes a broader range of privilege to interfere. *Id.; see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1157, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003) ("[T]he tort of interference with contract is merely a species of the broader tort of interference with prospective economic advantage." (citation and quotes omitted)). The elements of tortious interference with prospective economic advantage are: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co.*, 29 Cal.4th at 1153, 131 Cal.Rptr.2d 29, 63 P.3d 937 (citations and quotes omitted). In addition to these elements, a claim for interference with prospective economic advantage requires proof that the defendant "not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995). The intent requirement is the same for the torts of intentional interference with contract and intentional interference with prospective economic advantage. *Korea Supply Co.*, 29 Cal.4th at 1157, 131 Cal.Rptr.2d 29, 63 P.3d 937.

1   legitimate interest in the scope or course of the contract's performance." *Id.* at 514, 28 Cal.Rptr.2d 475,

2   869 P.2d 454.

3       *Applied Equipment* was revisited by the California Appellate Court in *Woods v. Fox*

4   *Broadcasting Sub., Inc.*, 129 Cal.App.4th 344 (2005).  In *Woods*, the plaintiffs, officers and employees

5   of Fox Family Worldwide, Inc. ("Fox Family"), brought suit against the company's major shareholder in

6   connection with the sale of the company. *Woods*, 129 Cal.App.4th at 348. The plaintiffs claimed that the

7   major shareholder engineered the Fox Family–Disney deal in such a way as to cut its losses and unload

8   undesirable obligations, with knowledge of the plaintiffs' stock option rights and with the intent to

9   interfere with those rights. *Id.* Based on these allegations, the plaintiffs brought tortious interference

10  claims against the major shareholder. *Id.* The shareholder later demurred to these claims on the basis

11  that, as a holder of just under half of Fox Family stock, it was not a stranger to the plaintiffs' contracts

12  with the company and therefore could not, as a matter of law, be liable for interfering with those

13  contracts. *Id.* at 349, 28 Cal.Rptr.3d 463. The trial court sustained the demurrer and found that the major

14  shareholder was not a stranger under *Applied Equipment*. *Id.* at 349, 28 Cal.Rptr.3d 463.

15      The California Court of Appeal, Second District reversed the trial court's decision, finding "it

16  highly unlikely that *Applied Equipment* intended to hold, or should be construed as holding, that persons

17  or entities with an ownership interest in a corporation are automatically immune from liability for

18  interfering with their corporation's contractual obligations." *Id.* at 353, 28 Cal.Rptr.3d 463. In reaching

19  its decision, the appellate court focused on *Applied Equipment's* use of the phrase "outsiders who have

20  no legitimate social or economic interest in the contractual relationship," as being only dicta and a

21  "mystery," with no apparent connection to the issue before the appellate court. *Id.* at 352, 353, 28

22  Cal.Rptr.3d 463. The *Woods* court concluded that when the *Applied Equipment* court used the term

23  "stranger to a contract," it did so interchangeably with the terms "noncontracting parties." *Id.* at 353, 28

24  Cal.Rptr.3d 463. The appellate court also rejected the interpretation that the quoted language meant that

25  "not only were contracting parties immune from interference claims, so too were another class of

26  defendants who, although not parties to a contract, were not true 'strangers' to the contract because they

27  had some general interest in the contractual relationship." *Id.* at 352, 28 Cal.Rptr.3d 463.  However, the

28  Court in *Woods* stressed that "the language of an opinion must be construed in light of the facts of the

7

particular case, an opinion's authority is no broader that its factual setting, and the parties cannot rely on a rule announced in a factually dissimilar case." *Id.* (citing *Finegan v. County of Los Angeles*, 91 Cal.App.4th 1, 8, 109 Cal.Rptr.2d 762 (2001).

### *b. Relevant Federal Case Law and the Not-A-Stranger Doctrine*

Although not specifically cited in *Marin Tug*, the Ninth Circuit invoked and applied the not-a-stranger principle set forth in *Applied Equipment* in deciding whether the wrongfulness element of the claim for tortious interference with prospective economic advantage was satisfied.  *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825 (9th Cir.2001). In that case, Marin Tug and Barge Inc., a barge company that transported oil, entered into a contract with a petroleum company that brokered fuel, under which one of Marin Tug's barges (the "Tenor") was loaded with oil at Shell Oil's refinery. *Marin Tug*, 271 F.3d at 827. After the Tenor was contaminated, allegedly by Shell Oil, Marin Tug brought suit against Shell and the petroleum company, asserting various contract and tort causes of action. *Id.* at 827–28. After Marin Tug filed suit, Shell refused to have any further business dealings with Marin Tug and prohibited it from loading fuel at Shell's refinery, which resulted not only in Shell's refusal to contract with Marin Tug, but also Marin Tug's inability to conduct business with third-party fuel brokers and consumers who would have otherwise hired it to transport Shell's oil. *Id.* at 828. In response to Shell's refusal to do business with Marin Tug, Marin Tug amended its complaint to allege intentional interference with prospective economic advantage against Shell. *Id.* The district court granted summary judgment in favor of Shell on the tortious interference claim, and the Ninth Circuit affirmed, holding that Marin Tug and its owners could not show the unlawful act necessary to satisfy the requisite wrongfulness element for their tortious interference claim. *Id.* at 834–35.  The Ninth Circuit noted that: "Shell's actions were, at bottom, simply a refusal to deal with Marin Tug, and therefore presumptively valid . . . absent some unlawful element," and that it was "not dissuaded from this conclusion by the fact that in some instances the actual contracts were between Marin Tug and the buyer, not with Shell. Such contracts, no less than those in which Marin Tug contracted directly with Shell, required direct, active involvement by Shell-the loading of Shell oil onto Marin Tug's barges." *Id.* at 834. "Because the economic relationship between Marin Tug and the buyer of any Shell oil shipped on Marin Tug's barges depend[ed] on Shell's cooperation," the Ninth Circuit found that "Shell is not easily characterized as a

07cv2172

stranger to that relationship." *Id.* Furthermore, the Ninth Circuit observed, as demonstrated by the underlying dispute giving rise to the lawsuit, Marin Tug and Shell had a "mutual economic interest in delivering the oil safely and cleanly, and were dependent upon each other to do so." *Id.* "In this situation, there is nothing wrongful under California law about the means Shell chose to advance its interests, a simple refusal to deal with Marin Tug or to load its oil on Marin Tug's barges." *Id.*

In reaching its decision, the Ninth Circuit relied on three core principles of California tort law, including the principle that "California law has long recognized that the core of intentional interference business torts is interference with an economic relationship by a third-party stranger to that relationship, so that an entity with a direct interest or involvement in that relationship is not usually liable for harm caused by pursuit of its interests."[4]  A defendant has a "direct interest" in a business relationship when the underlying contract cannot exist without the defendant's participation or cooperation, *Marin Tug*, 271 F.3d at 834, or when the defendant stands to benefit from the contract's performance, *DIRECTV*, 319 F.Supp.2d at 1070.

### 2. *Whether SDC Was a Stranger to United's Contract*

The tort of intentional interference with contractual relations is committed only by "strangers - interlopers who have no legitimate interest in the scope or course of the contract's performance." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 514, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994)). SDC argues that they had a direct interest and involvement in the contract and therefore cannot be a stranger to the contract.  SDC further argues that as a party to the prime contract, they cannot be a stranger to the subcontract that requires or contemplates the SDC's performance.  In support

---

[4] *Id.* at 832; *see also ViChip Corp. v. Lee*, 438 F.Supp.2d 1087, 1097 (N.D.Cal.2006) ("[T]he core of intentional interference business torts is interference with an economic relationship by a third-party stranger to that relationship."); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 319 F.Supp.2d 1059, 1070 (C.D.Cal.2003) ("[T]he threshold test for determining whether a defendant is not a stranger to an economic relationship and thus cannot be liable for tortious interference, is whether such defendant has a direct interest or involvement in that relationship."); *Exxon Corp. v. Superior Court*, 51 Cal.App.4th 1672, 1688, 60 Cal.Rptr.2d 195 (1997) (finding that a gasoline franchisor "has a clear financial interest in its dealers and therefore is privileged to 'interfere' with the contract."); *Lowell v. Mother's Cake & Cookie Co.*, 79 Cal.App.3d 13, 21, 144 Cal.Rptr. 664 (1978) (invoking the privilege under Restatement of Torts, section 769, that "[o]ne who has a financial interest in the business of another is privileged purposely to cause him not to enter into or continue a relation with a third person in that business if the actor (a) does not employ improper means, and (b) acts to protect his interest from being prejudiced by the relation.").

of this argument, SDC relies upon *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 834 (9th 2001).

In its oral Rule 50(a) motion, SDC asked that judgment be entered in its favor on United's interference claims due to United's failure to demonstrate, as a matter of law, that SDC is a stranger to United's contracts with GES and Champion under *Applied Equipment* (04/07/2011 Trial Tr. 72:13-73:11, 78-16). Specifically, SDC argued that pursuant to *PM Group*, United's subcontracts required and necessarily contemplated SDC's performance in the first contract tier in that SDC had to license the Convention Center to the trade show, which in turn, had to hire the decorator, which then had to retain United's services. *PM Group, Inc. v. Stewart*, 154 Cal.App.4th 55 (2007). Next, and pursuant to *Marin Tug*, SDC argued that it was directly involved in, and had to cooperate with, United by, among other things, affording United access to the Convention Center, providing electrical power, and performing common area cleaning. (Doc. No. 176, 04/07/2011 Trial Tr. 72:13-73:11, 78-16).

United argues that SDC has misinterpreted the not-a-stranger principle under *Applied Equipment* in light of the purported clarifications of the case by the California Court of Appeal in *Woods*. *Woods v. Fox Broadcasting Sub., Inc.*, 129 Cal.App.4th 344 (2005). United argues that *Woods* supports the proposition that because SDC was a nonparty to the contracts between United, GES and Champion, SDC is necessarily a stranger, such that it is liable for tortious interference without any immunity. The Court disagrees.

The California appellate court in *Woods* revisited *Applied Equipment* and criticized the application of the not-a-stranger principle in *Marin Tug*. While this Court agrees with the *Woods* court that the issue before the *Applied Equipment* court concerned liability of a party for interfering with its own contract, the Court does not agree that the phrase "outsiders who have no legitimate social or economic interest in the contractual relationship" was only dicta or an arbitrary phrase. The California Supreme Court in *Applied Equipment* based its holding on a longstanding underlying policy, as noted by the Ninth Circuit in *Marin Tug* that: "[t]he tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." *Applied Equipment*, 7 Cal.4th at 514, 28 Cal.Rptr.2d 475, 869 P.2d 454. This statement suggests that the California Supreme Court deliberately applied the not-a-stranger principle and

07cv2172

1   determined that non-parties to a contract who clearly do have a legitimate interest in the underlying

2   contract, are not strangers to that contract and therefore cannot be held liable for interference.

3         The *Woods* court did not reject this policy; rather, the court refused to apply it to the particular

4   circumstances of the case before it in light of existing precedent involving shareholder liability for

5   interfering with contracts between the company and third parties. *See Woods*, 129 Cal.App.4th at 353,

6   28 Cal.Rptr.3d 463 ("In short, neither *Applied Equipment* nor any of the authorities it relied upon when

7   discussing the liability of third parties arose from factual settings like the one here—where a powerful

8   shareholder allegedly interferes in a contract between the corporation whose shares it owns and some

9   other person or entity.")  Even if the Court were to accept United's reading of *Woods* and *Applied*

10   *Equipment* as holding that mere economic interest is insufficient to shield a nonparty from a tortious

11   interference claim, it does not govern situations where, as here, SDC alleges not some generalized

12   economic interest, but a substantial, continuing interest that was contractually and statutorily protected.

13         The Court also finds United's reliance on *G & C Auto Body, Inc.* to be misplaced.  *G & C Auto*

14   *Body, Inc. v. Geico Gen. Ins. Co.*, 552 F.Supp.2d 1015 (N.D. Cal.2008). In *G & C*, two auto body repair

15   shops ("G & C") sued insurance companies (collectively, "GEICO") for interference with economic

16   relationship. 552 F.Supp.2d at 1018. G & C alleged that the labor repair rates that GEICO used to

17   resolve the claims of their policyholders were below the prevailing auto body rates in the region and

18   below the alleged reasonable labor repair rates that G & C was entitled to charge for auto repair work.

19   *Id.* at 1018. G & C alleged that GEICO was steering its policyholders away from taking their business to

20   G & C in an effort to avoid having to pay G & C's rates. *Id.*

21         GEICO argued that they were entitled to summary judgment on the interference claim because

22   they were not strangers to the relationship between G & C and GEICO's policyholders. *Id.* at 1019. In

23   doing so, GEICO relied on the line of federal cases beginning with *Marin Tug*. *Id.* The court in *G & C*

24   declined to follow those federal cases, finding that *Woods* "casts serious doubt on the viability of this

25   line of decisions for purposes of interpreting California state law." *Id.* at 1019.  The Court in *G & C*

26   stated that "[i]n light of *Woods*, the Court is unable to conclude that, as a matter of California state law,

27   G & C's intentional interference with prospective economic advantage claim cannot extend to GEICO

28   merely because GEICO has an economic interest in the relationship between *G & C* and its

policyholders." *Id.* at 1020.  However, the *G & C* Court did not conduct an independent analysis of *Woods* in conjunction with *Applied Equipment* and *Marin Tug*.  Even assuming *G & C's* holding is correct, it is inapplicable because SDC does not have a general economic interest, but rather, SDC has a substantial, continuing economic interest and direct involvement in United's subcontract.  SDC's performance in its first tier licenses is contemplated by, and necessary to, United's performance under its third tier subcontracts and SDC's cooperation and direct involvement with United's performance was necessary for United to discharge its contractual obligations.

Based upon the foregoing, the Court finds that *G & C* is neither binding nor persuasive on this Court given the factual distinctions between that case, which involved the insurance companies' purported interference with the commercial relationship between an auto shop and the companies' policy holders, and the instant case.  Instead, the Court finds *Fresno Motors* to be more relevant and factually similar than *G & C*.  *Fresno Motors, LLC v. Mercedes-Benz USA, LLC,* --- F.Supp.2d ----, 2012 WL 1038004 (E.D. Cal. 2012). In *Frenso Motors*, MBUSA, a car manufacturer/distributor was alleged to have interfered with the contractual relationship between an existing dealer, Asbury, and a prospective one where the manufacturer/distributor had to approve the assignment and had a statutory and contractual right to interfere with that contract.  The Court in Fresno found that MBUSA had a direct, active role in the contractual relationship between Plaintiffs and Asbury—the distribution of Mercedes–Benz vehicles to the Fresno Dealership for sale, lease, and maintenance. The contractual relationship between Plaintiffs and Asbury further depended on MBUSA's cooperation, i.e., its explicit approval of Fresno Motors as an authorized Mercedes–Benz dealership and consent and release of Asbury's Dealer Agreements under the Asset Purchase Agreement ("APA"). Moreover, as in *Marin Tug*, Asbury and MBUSA had a mutual economic interest in distributing and selling Mercedes–Benz vehicles to consumers and, as a distributor and dealer, were dependent on the other in furthering their economic interest. In fact, MBUSA's interest and involvement in Fresno Motors' and Asbury's contractual relationship moves well beyond that in *Marin Tug*, given the necessity of MBUSA's approval of the transfer of interest, which was contractually built into the APA, and MBUSA's prospect of entering a long-term, interdependent business relationship with Fresno Motors.

07cv2172

1    The California Supreme Court and the California Court of Appeals have not elaborated on the

2    degree of interest that a nonparty must have in a contract or business relationship to be a non-stranger,

3    nor have these Courts analyzed the not-a-stranger principle specifically within factual circumstances set

4    forth in this case.  As such, this Court must approximate how the California Supreme Court would

5    adjudicate this issue within the factual circumstances set forth in this case. *See Aetna Cas. & Sur. Co. v.*

6    *Sheft*, 989 F.2d 1105, 1108 (9th Cir.1993) ("When a decision turns on applicable state law and the state's

7    highest court has not adjudicated the issue, a federal court must make a reasonable determination of the

8    result the highest state court would reach if it were deciding the case."); *accord Kona Enters., Inc. v.*

9    Estate of Bishop, *229 F.3d 877, 885 n. 7 (9th Cir.2000); Owen By and Through Owen v. U.S.*, 713 F.2d

10   1461, 1464 (9th Cir.1983) ("In the absence of a pronouncement by the highest court of a state, the

11   federal courts must follow the decision of the intermediate appellate courts of the state unless there is

12   convincing evidence that the highest court of the state would decide differently."

13   In applying the not-a-stranger principle in the instant case, the Court believes that the California

14   Supreme Court would find that SDC was not a stranger to United's contracts with GES and Champion,

15   given SDC's inextricable economic interest and involvement in the operation of the Convention Center

16   as set forth above. This Court, as well as several other district courts,[5] does not believe that the

17   California appellate court's decision in *Woods* is binding on this Court because *Woods* stressed that "the

18   language of an opinion must be construed in light of the facts of the particular case, an opinion's

19   authority is no broader that its factual setting, and the parties cannot rely on a rule announced in a

20   factually dissimilar case." *Id.* (citing *Finegan v. County of Los Angeles*, 91 Cal.App.4th 1, 8, 109

21   Cal.Rptr.2d 762 (2001).

22                    ***3.  Whether the Jury Verdict Was Against the Clear Weight of the Evidence***

23   The Court may grant a new trial if the jury's verdict is against the clear weight of the evidence.

24   *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987).  Unlike motions

25

26        [5] *See McGehee v. Coe Newnes/McGehee ULC*, 2004 WL 2496127 at *6 (N.D. Cal. Nov. 4.2004)
     (relying on *Marin Tug* to dismiss intentional interference with prospective economic relations claim
27   because defendants could not be characterized as "strangers" to the business relationship); *ViChip Corp.
     v. Lee*, 438 F.Supp.2d 1087, 1097 (N.D. Cal.2006) (same); *National Rural Telecommunications Coop. v.
28   DIRECTV, Inc.*, 319 F. Supp.2d 1059, 1069-73 (C.D. Cal.2003) (same); In re Leisure Corp., 2007 WL
     607696 at *13 (N.D. Cal. Feb.23, 2007) (same).

07cv2172

1    for judgment as a matter of law, the Court must "weigh the evidence as [the court] saw it'" and may set

2    aside the verdict even if it is supported by substantial evidence. *Molski v. M.J. Cable, Inc.*, 481 F.3d

3    724, 729 (9th Cir. 2007). Thus, the new trial should be granted if, "having given full respect to the jury's

4    findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has

5    been committed." *Landes Const.*, 833 F.2d at 1371-72; 11 Wright, Miller & Kane, Federal Practice and

6    Procedure § 2806, at pp. 74-76 (2d ed. 1995).

7            SDC argues that the clear weight of the evidence leads to the conclusion that SDC is not a

8    stranger to United's subcontracts with the decorators, because SDC's performance in its first tier

9    licenses is contemplated by, and necessary to, United's performance under its third tier subcontracts.

10   Similarly, SDC's cooperation and direct involvement with United's performance was necessary for

11   United to discharge its contractual obligations.  The Court disagrees. SDC's argument on the weight of

12   the evidence muddled this purely legal issue throughout the trial.  Clearly articulated, post trial, for the

13   first time, is the legal question of duty as discussed herein.  The question of duty does not involve the

14   weight of the evidence, but rather turns on conclusions of law decided by the Court regarding whether

15   SDC was not a stranger and had a duty.  *Jacobsen v. Marin Gen. Hosp.*, 192 F.3d 881, 885 (9th Cir.

16   1999) (citing *Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 48 Cal.3d 583, 588-590 (1989)).  In

17   the absence of a legal duty there is no question to submit to the jury because "[w]ithout such a duty, any

18   injury is . . . [an] injury without wrong." *Moore v. Regents of the University of California*, 51 Cal.3d

19   120, 135 n.16 (1990). Based upon the foregoing, SDC's request for a new trial on United's interference

20   with contract claim is not the appropriate remedy.  As such, the Court hereby construes SDC's Rule

21   59(a) motion on the issue of duty as a renewed motion for judgment after trial under Rule 50.  Given the

22   conclusions of law set forth above that SDC was not a stranger to United's contracts and had no duty not

23   to interfere, the Court hereby directs entry of judgment as a matter of law for SDC on United's

24   Interference with Contract Claim.  The jury verdict here must be vacated, not for any failure on the

25   jury's part, but due to the error of submitting this question to the jury in the first point.  A failure to do

26   so would be contrary to law and a miscarriage of justice.

27   ///

28   ///

14

1    ***II. Alleged Instructional Errors***

2         SDC contends that the Court made the following instructional errors with regard to United's

3    claim for intentional interference with contract: 1) the Court failed to properly instruct the jury as to the

4    disruption element; 2) the Court failed to instruct the jury on SDC's affirmative defense of justification;

5    and 3) the Court's supplemental instructions to the jury were erroneous, confusing and prejudicial.

6         ***A. Legal Standard***

7         Under Federal Rule of Civil Procedure 51, a party may assign as error an instruction actually

8    given, or may assign as error the failure to give a properly requested instruction, if the party has

9    properly objected. Fed. R. Civ. P. 51(d)(1). "A party who objects to an instruction or the failure to give

10   an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the

11   objection." Fed. R. Civ. P. 51(c)(1). When the court, before instructions and arguments are delivered to

12   the jury, gives the parties the opportunity to object to an instruction, or to the failure to give an

13   instruction, on the record and out of the presence of the jury, a party must make its objection at that time

14   for the objection to be timely. Fed. R. Civ. P. 51(c)(2)(B) (referring to time provided in Rule 51(b)(2)).

15   The Ninth Circuit strictly enforces Rule 51 and does not recognize a plain error exception to a party's

16   failure to object to a jury instruction. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1030 (9th

17   Cir.2003) (citing *Hammer v. Gross*, 932 F.2d 842, 847 (9th Cir.1991). Therefore, absent an objection to

18   an instruction, a party is foreclosed from arguing error related to that instruction. *Hammer*, 932 F.2d at

19   848.

20        The "court may consider a plain error in the instructions that has not been preserved as required

21   by Rule 51(d)(1) if the error affects substantial rights." Fed. R. Civ. P. 51(d)(2).  The Ninth Circuit

22   recognizes this limited exception to the objection requirements of Rule 51 "where the district court is

23   aware of a party's concerns and further objection would be unavailing [,]" the court has made clear that

24   "the exception is available when (1) throughout the trial the party argued the disputed matter with the

25   court, (2) it is clear from the record that the court knew the party's grounds for disagreement with the

26   instruction, and (3) the party offered an alternative instruction." *Medtronic, Inc. v. White*, 526 F.3d 487,

27   495 (9th Cir. 2008).

28   ///

07cv2172

### B.  Element of Disruption and Instruction 435

In SDC's Proposed Separate Jury Instruction No. 435, SDC asked the Court to instruct the jury that the disruption element required United to establish: (1) the nature and extent of United's reasonable expectations under the subcontract; and (2) that SDC's interfering act actually disrupted those expectations by making performance more costly or burdensome. (Doc. Nos. 163, at 40, 161, at 59.) SDC further asked the Court to construe the first requirement as a matter of law pursuant to principles of contract interpretation (*Id.*) SDC renewed these requests at the jury instruction conference. (Doc. No. 248-1, 4/18/11 Trial Tr. 12:1-20).

The Court rejected SDC's Proposed Separate Jury Instruction No. 435, finding no "conflicts in the evidence," and that each of United's contracts was "clear" and "speaks for itself." (*See* Doc. No. 248-1, 4/18/11 Trial Tr., at 11:19-25; 12:21– 69:5).  The Court gave the jury the standard state-law CACI 2201 instruction without further elaboration. (Doc. No. 178, at 68.)

SDC contends that the Court's failure to give SDC's Proposed Separate Jury Instruction No. 435 constituted instructional error because the Court failed to interpret the contract and consider extrinsic evidence.  Alternatively, United argues that SDC: 1) failed to preserve its objection to jury instruction 435; 2) the Court did not commit any error with regard to instruction 435; and 3) SDC did not suffer any prejudice with regard to instruction 435.

### 1. Whether SDC Waived its Objection to 435

United argues that in order to preserve an objection on a jury instruction, SDC must provide a suitable or satisfactory cure. *Parker v. City of Nashua, N.H.*, 76 F.3d 9, 12 (1st Cir. 1996). United argues that SDC failed to offer a satisfactory proposed instruction[6] regarding United's reasonable expectations, and therefore SDC failed to preserve any objections to the Court's decision not to provide the modified proposed instruction 435.

The Court finds United's reliance on *Parker* is misplaced because in the Ninth Circuit, an objection is preserved when the court rejects a party's proposed instruction and notes the party's

---

[6] Before the instruction conference on April 18, 2011, SDC's proposed instruction 435 contained a footnote, stating that additional language was required after it was determined what United's reasonable expectations were. United argues that it is not clear if that footnote survived the modification of the instruction at the jury conference.

1   objection on the record. *Glover v. BIC Corp.*, 6 F.3d 1318, 1327 (9th Cir. 1993). The Court clearly

2   stated during the instruction conference that it rejected SDC's proposed instruction 435 and would give

3   the standard CACI instruction without further articulation of the disruption element over SDC's

4   objection (Doc. No. 248-1, 4/18/11 Trial Tr. 11:19-25; 12:21 – 169:5). Based upon the foregoing, the

5   Court finds that SDC preserved its objection.

6
7
### 2.   Interpretation of United's Contracts With GES and Champion and Consideration of Extrinsic Evidence

8           SDC argues that the Court failed to interpret the contract and properly instruct the jury on the

9   full scope of the disruption element, or make a determination of which, if any, of United's rights and

10  duties were actually disrupted.  SDC relies upon the *Mattel* case in support of its argument that the

11  contracts were ambiguous and extrinsic evidence should have been considered. *Mattel, Inc. v. MGA*

12  *Entertainment, Inc.*, 616 F .3d 904 (9th Cir. 2010). SDC argues that the Court erred in finding that there

13  were no conflicts in the evidence and that United's contracts were clear and speak for themselves.[7]  SDC

14  contends that United's contracts contained ambiguous terms, because whether United had a right to

15  perform at the Convention Center cannot be determined simply by looking within the four corners of

16  United's subcontracts.  SDC argues that United's subcontracts with GES and Champion do not mention

17  _____

18      [7] The Court stated:
            I think we are trying to inject issues that don't need to be there. The
19          construct for the cause of action is there was a contract. We have
            plenty of evidence on that. Whether or not SDC knew of it and
20          intended to disrupt it is, I think, plainly clear from their own
            language. And then, of course, we go on to the prevention of
            performance.
21  (Doc. No. 248-1, at 166:19-24.)
                                    ***
22          United has a contract with GES and a contract with Champion
            where it got x dollars for x services, the 50/50 split, and these
23          varying hourly contract rates. The contract is in evidence. It speaks
            for itself. Nobody came in and said that's not the deal. So I do not find
24          there are conflicts that need to be resolved on a contract interpretation.
                                    ***
25          I am going to reject it. Let's move on. I don't buy it. The contract is
            clear. The jury can understand what disruption means: preventing it; made
26          it more difficult. It's a jury question and I think you are
            attempting to over-complicate it or inject new issues that simply
27          don't exist. If there was conflicts in the evidence about the contract
            interpretation that would be different, but there is nothing for the
28          court to sort out. It's a jury question. So 435 is out.
        (Doc. No. 248-1, at 167:22-168:3; 169:4-12.)

the Convention Center or the events at issue.  SDC argues that because the trade show licensees that retained GES or Champion did so under terms that incorporated SDC's PRRs, and an agreement to abide by any changes to them, these terms created a condition precedent which clearly limited the trade show's ability to obtain cleaning services from anyone other than SDC. The parties introduced conflicting extrinsic evidence to help explain the ambiguity of United's subcontract terms and their significance in the multi-tier contracting structure.[8]

The rules governing the role of the court in interpreting a written instrument are well established. *Wolf v. Walt Disney Pictures and Television*, 162 Cal.App.4th 1107, 1126 (2008). The interpretation of a contract is a judicial function.  *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging*, 69 Cal.2d 33, 39–40, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). In engaging in this function, the trial court "give[s] effect to the mutual intention of the parties as it existed" at the time the contract was executed. (Civ. Code, § 1636.) Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms.[9]  The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract.[10] Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous.[11]

---

[8] *See, e.g.*, 3/24/11 Trial Tr. 18:8 – 19:4 (Colby); 3/23/11 Trial Tr. 74:19 – 75:7 (Epstein); 3/28/11 Trial Tr. 45:4-20 (Simon); 3/29/11 Trial Tr. 33:15 – 34:17 (Simon); 3/30/11 Trial Tr. 26:16 – 27:2 (Robbins);  The deposition testimony of Dan Pitts that was read into the record on 4/11/11 has not been transcribed. (Pitts depo 49:10-21); 3 Ex. 872).

[9] Civ. Code, § 1639("[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . ."); Civ. Code, § 1638 (the "language of a contract is to govern its interpretation . . ."

[10] *See* Code Civ. Proc., § 1856, subd. (a); *Cerritos Valley Bank v. Stirling,* 81 Cal.App.4th 1108, 1115–1116, 97 Cal.Rptr.2d 432 (2000); *Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman,* 65 Cal.App.4th 1469, 1478, 77 Cal.Rptr.2d 479 (1998) (finding parol evidence may not be used to create a contract the parties did not intend to make or to insert language one or both parties now wish had been included].)

[11] *See* Code Civ. Proc., § 1856, subd. (g); Pacific Gas & Electric, 69 Cal.2d at p. 37, 69 Cal.Rptr. 561, 442 P.2d 641 (stating that if extrinsic evidence reveals that apparently clear language in the contract is, in fact, "susceptible to more than one reasonable interpretation," then extrinsic evidence may be used to determine the contracting parties' objective intent); *Los Angeles City Employees Union v. City of El Monte*, 177 Cal.App.3d 615, 622, 220 Cal.Rptr. 411 (1985).

Upon further consideration and in light of the case law, the Court finds that it should have more fully considered the extrinsic evidence that United's contracts contained terms that could not be determined simply by looking within the four corners of the subcontracts.[12] In light of the apparent ambiguities and conflicting extrinsic evidence, the Court should have engaged in the three-step process set forth in *Wolf*.[13] *See Wolf v. Walt Disney Pictures & Television*, 162 Cal. App.4th 1107, 1126-1127 (2008).  In the absence of the three step process, the instruction given to the jury by the Court did not convey the interpretation of United's subcontracts, or their significance with relation to the conditions precedent in the license agreements with trade show licensees.[14]  Where there is an error by the Court in instructing the jury, the erroneous instruction is not grounds for granting a new trial unless the error

---

[12] *See Medical Operations Management, Inc. v. National Health Laboratories, Inc.*, 176 Cal.App.3d 886, 891-892 (1986) (parties submitted extrinsic evidence that "presented the context in which the contract arose and described the conduct of the parties after the execution of the contract which cast light on their original intent" to resolve ambiguity).

[13] First, the Court must provisionally receive any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. *Pacific Gas & Electric*, 69 Cal.2d at p. 37, 69 Cal.Rptr. 561, 442 P.2d 641; *Dore v. Arnold Worldwide, Inc.*, 39 Cal.4th 384, 391, 46 Cal.Rptr.3d 668, 139 P.3d 56 (2006). Second, if, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract. Third, when there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law.  If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract. *Pacific Gas & Electric*, at 39-40; *Wolf v. Superior Court*, 114 Cal.App.4th 1343, 1350-51 (2004). When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law. *City of Hope Nat. Medical Center v. Genentech, Inc.* 43 Cal.4th 375, 395 (2008) (interpretation of written instrument solely a judicial function "when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or a determination was made based on incompetent evidence"); *Parsons v. Bristol Development Co.*, 62 Cal.2d 861, 865–866, 44 Cal.Rptr. 767, 402 P.2d 839 (1965). This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence (*Garcia v. Truck Ins. Exchange*, 36 Cal.3d 426, 439, 204 Cal.Rptr. 435, 682 P.2d 1100 (1984); *Parsons*, at 866, fn. 2) or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation. *Parsons*, at 865, 44 Cal.Rptr. 767, 402 P.2d 839; *New Haven Unified School Dist. v. Taco Bell Corp*., 24 Cal.App.4th 1473, 1483, 30 Cal.Rptr.2d 469 (1994). If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury. *City of Hope Nat. Medical Center*, at p. 395, 75 Cal.Rptr.3d at 350 ("when, as here, ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury"); *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 291, 85 Cal.Rptr. 444, 466 P.2d 996 (1970) (it is a "'judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence'"); *Pacific Gas & Electric*, at pp. 39-40, 69 Cal.Rptr. 561, 442 P.2d 641.)

[14] The jury confusion is evident in that the jury twice asked the Court to explain the significance of the contractual relationships at the Convention Center and to construe SDC's obligations and rights under the primary first tier licenses. (*See* Ct. Exs. 13, 15, 21 and 22.)

19

affects the essential fairness of the trial and a new trial is necessary to achieve substantial justice.[15]

*Baxter Healthcare Corp. v. Fresenius Medical Care Holdings, Inc.*, WL 672640 *3 (N.D. Cal. 2011).

Since the Court has found that SDC was not-a-stranger and had no duty to refrain from interfering with

United's contracts, any error by the Court with regard to this instruction is rendered moot. As such,

SDC's motion for new trial on this ground is DENIED.

### B.  SDC's Affirmative Defense Of Justification By Legally Protected Interest

#### 1.  Relevant Background

SDC initially proposed two jury instructions, 437 and 438, for its justification affirmative

defense to United's intentional interference with contract claim. (Doc. No. 248-1, at 15-16.) SDC also

proposed two instructions 446 and 447 on this defense to United's intentional interference with

prospective economic advantage claim. (*Id*.)  During the jury instruction conference held on April 18,

2011, SDC voluntarily offered to combine the four instructions into two. (*Id*.)  The parties and the Court

then discussed the propriety of having two separate instructions given to the jury on SDC's justification

affirmative defense. (Doc. No. 248-1, at 183-194). The parties agreed, and the Court ruled, that

Instruction 447 would be given with regard to all of United's interference claims.[16] (*Id*.; *see also* Jury

Instructions, Doc. No. 218, at 75 (Final Jury Instruction 447.)) The Court noted that the instruction

proposed by SDC, identified for the jury the nature, motive, interest, proximity and remoteness of SDC's

conduct, and that "the relevant factors give them a lot of information from which to determine

---

[15] The court in *Munley v. US.*, WL 444422 *1 (Nev. 1995), described the standard as follows:
A new trial is warranted only if, based on a review of the record as a
whole, the error is found to be prejudicial. *National R. Passenger Corp. v.
25,900 Square Foot*, 766 F.2d 685,688 (2nd Cir. 1985). Determination of
whether error was prejudicial is guided by the harmless error doctrine as
incorporated in F ed.R. Civ.P. 61. *Id.* When a motion for a new trial is
based on a challenge to the jury instructions, the court must 'determine,
after examining the record as a whole, whether the instructions 'correctly
state the applicable law and provide the jury with ample understanding of
the issues and standards of the case. *Lamon v. City of Shawnee, Kansas*,
972 F.2d 1145, 1153 (loth Cir. 1992) (citations omitted/emphasis added).'
*Denbo v. United States*, 988 F.2d 1029, 1034 (10th Cir. 1993). A new trial
on the grounds of erroneous jury instructions will not be granted unless
the instructions 'misled the jury or had a probable effect on its verdict.' *E.I.
du Pont de Nemours v. Berkley & Co., Inc.*, 620 F.2d 1247, 1257 (8th Cir.
1980).

[16] This instruction was originally identified as SDC's proposed instruction 437.

07cv2172

justification." (Doc. No. 248-1, at 19-20.)   It is clear from the record that SDC consented to Instruction 447 being given to the jury for all of United's Intentional Interference claims. (Doc. No. 248-1, at 16 and 22.)

The discussion in the jury instruction conference then moved on to SDC's proposed instruction 438, which was the combination of instructions 438 and 446. SDC acknowledged that the instruction was crafted by counsel from case law (*Richardson v. La Rancherita*, 98 Cal. App.3d 73 (1979)), and not based on a form instruction.  (*See* Doc. No. 248-1, at 22:11-16.) SDC stated "that this instruction was an alternative and narrower test for determining justification.  Because when a person is looking to protect their own legally valid interest, we don't have the same kind of general balancing test." (*Id*., at 22:16-20.)  United argued that if 438 is an alternative way for describing SDC's justification defense, SDC should have to choose between 447 and 438, and should not be able to use both, because up to this point, alternative instructions hadn't been given, only one instruction was being given to the jury.  (*Id*., at 23:16-22.)  SDC responded by arguing that 438 was not an alternative to 447, that the instructions "are different justifications.  They were not intended by us to be alternative instructions.  They have different things that they are protecting. . . . They are both justifications, but they are separate issues of justification." (*Id*., at 24:22-25:2.)  SDC went on to argue that instruction 438 indicates examples of a legally valid interest, which include the "ownership or condition of property; the Defendant's own prior, existing contract; or financial interest in the affairs of the thrid party to the contract." (*Id*., at 26:21-25.)

The parties and the Court then discussed the interest that SDC was attempting to protect through its conduct. (Doc. No. 248-1, at 193:6-194:5.) The Court, having heard all of the evidence and argument of counsel, stated:

> You know what? I think the defense falls short in terms of the good-faith aspect. We have Ms. Wallace saying it was her decision - she consulted with others. She made the decision. So this idea of the good-faith aspect hasn't been developed. It otherwise used lawful and appropriate means to protect that interest. There is little, if any, evidence on alternate means, other than moving forward toward this policy. And the interest in security, you know, may touch on the first element. But I don't think there is sufficient evidence to instruct the jury on this defense. And I am going to rule it out . . .

Slania Dec. at ¶ 3; Ex. I at 194: 6-17.)  Based upon the foregoing, the Court declined to give instruction 438.

### 2. Arguments

The parties raise several arguments with regard to Defendants' proposed jury instruction 438. United argues that the Defendants failed to properly object to the Court's ruling. United argues that by failing to object on the record after the Court's ruling, SDC waived any right to argue that there was any instructional error associated with the Court's decision not to give instruction 438. Alternatively, Defendants argue that they properly preserved their objection and that SDC was prejudiced by the court's failure to give 438, which would have instructed the jury on SDC's affirmative defense of justification by legally protected interest.

### a. Whether SDC Properly Objected

United argues that because SDC did not object on the record after the Court ruled on the instruction, SDC waived any right to argue that there was any error associated with the failure to give proposed jury instruction 438. United further contends that the purpose of requiring SDC to voice a specific objection during the conference is to bring possible errors to light while there is time to correct them, without entailing the cost, delay, and expenditure of judicial resources caused by retrials. *Voohries-Larson v. Cessna Aircraft Co.*, 241 F.3d 707, 713 (9th Cir. 2001). United argues that even if SDC's discussion could be considered an objection, SDC failed to provide a satisfactory cure by offering an alternative instruction. *Parker v. City of Nashua*, 76 F.3d 9, 12 (1st Cir. 1996).[17] United contends that proposed instruction 438 was a one-sided recitation of the *Richardson*[18] case in SDC's favor, which is insufficient under *Parker*.[19] United argues that SDC was required to provide an alternative instruction that did not overstate the law and by failing to do so, SDC waived any and all rights to object to proposed instruction 438 not being given. *Parker*, 76 F.3d at 12.

Alternatively, SDC argues that it made its position known to the Court throughout the discussion during the hearing on instruction 438 and its memorandum of contentions of fact and law and its trial brief. (Doc. No. 132, at 49 (filed 12/17/10); Doc. No. 163, at 50 (filed 3/18/11).) SDC argues that the trial transcripts put in evidence by United confirm that the Court was familiar with SDC's position to

---

[17] Plaintiff's cite to this First Circuit case which relies of FRCP 51 prior to the 2003 amendment.

[18] *Richardson v. La Rancherita La Jolla*, 98 Cal. App.3d 73, 81, 159 Cal. Rptr. 285 (1979).

[19] *Parker v. City of Nashua*, 76 F.3d 9, 12 (1st Cir. 1996).

07cv2172

1   address specific elements of the defense, before denying the instruction and therefore SDC properly

2   preserved its objection. (Doc. No. 248-1, Ex. 1, at 194:6-17).

3       Based upon the record, the Court finds: 1) that SDC waived any objection to the combining of

4   the four jury instructions (Nos. 437, 438, 446 and 447) into two (Nos. 438 and 447), because SDC

5   voluntarly agreed to do so during the April 18, 2011 hearing; and 2) SDC adequately preserved its

6   objection to the Court's decision not to give instruction 438.

7

8   ### b. Whether There Was Sufficient Evidence of the Affirmative Defense of Justification by Legally Protected Interest

9       As an affirmative defense to a charge of tortious interference with contract,[20] a defendant may

10  show that its actions were justified.[21] To prove this affirmative defense of justification by legally

11  protected interest, a defendant must show: (1) it has a legally protected interest; (2) it acted in good faith

12  to protect that interest; and (3) it used otherwise lawful and appropriate means to protect that interest.

13  *Richardson v. La Rancherita of La Jolla*, 98 Cal. App.3d 73, 81 (1979). If these elements are met, "[the

14

15

16

17  _____

18      [20] Under California law, the elements of intentional interference with contractual relations are:
    (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this
19  contract; (3) intentional acts designed to induce a breach or disruption of the contractual relationship; (4)
    actual breach or disruption of the relationship; and (5) resulting damage. *See Quelimane Co. v. Stewart*
20  *Title Guar. Co.*, 19 Cal.4th 26, 77 Cal. Rptr. 2d 709, 960 P.2d 513 (1998).

21      [21] *See A. F. Arnold & Co. v. Pacific Prof'l Ins., Inc.*, 27 Cal. App.3d 710, 104 Cal. Rptr. 96, 99
    (1972).
22          One who, by asserting in good faith a legally protected interest of his own or
            threatening in good faith to protect the interest by appropriate means, intentionally
23          causes a third person not to perform an existing contract or enter into a prospective
            contractual relation with another does not interfere improperly with the other's
24          relation if the actor believes that his interest may otherwise be impaired or destroyed
            by the performance of the contract or transaction.

25  Restatement (Second) of Torts § 773.
            The test of whether there is justification for conduct which induces a breach of
26          contract turns on a balancing of the social and private importance of the objective
            advanced by the interference against the importance of the interest interfered with,
27          considering all the circumstances including the nature of the actor's conduct and the
            relationship between the parties.
28
    *Richardson v. La Rancherita La Jolla*, 98 Cal. App.3d 73, 81, 159 Cal. Rptr. 285 (1979).

1  defendant's] interference is not improper although [it] knows that [its] conduct will cause another to

2  break [its] contract or otherwise refuse to do business with a third person."[22]

3          SDC argues that it proffered ample evidence on all three conditions. First, SDC contends that it

4  had valid legal interests to protect. SDC argues that an admitted fact in this trial is that SDC managed

5  and operated the Convention Center on behalf of the City of San Diego pursuant to a Management

6  Agreement. (Doc. No. 139, at 9.) The Management Agreement provides that SDC has the exclusive

7  authority to manage, operate, market and promote the Convention Center. (Ex. 37 § 2.01, at pp. 3-4.)

8  SDC also contends that its existing licenses with trade shows managers presented a legally valid interest

9  to protect. Pursuant to the license agreements, SDC granted trade shows the exclusive right to conduct

10 certain activities in certain areas of the Convention Center, as well as the nonexclusive right to use

11 public or common areas of the Convention Center, subject to the licensing conditions. (Ex. 1106, § 1 at

12 3.) One of the licensing conditions was that trade show management agrees to comply with SDC's

13 operational and use policies for the Convention Center contained in SDC's Policies, Rules and

14 Regulations ("PRRs"), and that show management agreed, in advance, to any change to the PRRs before

15 their event. (Ex. 1106 § 4 at 4.) SDC argues that its interests in the Management Agreement, PRR's, and

16 licenses are "legally protected interests."[23]  The Court agrees.

17         Second, SDC argues that it acted in good faith, as it saw fit, to protect the Convention Center and

18 its patrons from harm, and to protect its brand and bottom line. Joe Psuik testified that United employees

19 were not subject to SDC control, and that United employees were completely unresponsive to its

20 requests for assistance and cooperation (4/12/11 Trial Tr. ___) (Psuik depo at 225:07 – 226:9).[24] Carol

21 Wallace testified about the increasingly competitive nationwide convention center business and the need

22 for SDC to continue to distinguish itself in that marketplace by, among other things, protecting its brand.

23

24         [22] *See* Restatement (Second) Torts § 773 cmt. a; *Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464,
25 1473 (9th Cir. 1993) (franchisee sued franchisor for interfering with contract for sale of franchise;
   franchisor justified in protecting its interests by advising would-be purchaser that franchise would soon
26 expire).

27         [23] *See Richardson*, 98 Cal. App.3d at 81 (right to receive rent and demand compliance with lease
   terms are legally protected interests); *Reyes*, 12 F.3d at 1473 (franchisor's interests in compliance with
28 franchise agreement and orderly transfer of franchise are legally protected interests).

           [24] The deposition testimony of Joe Psuik that was read into the record has not been transcribed.

1    She testified regarding her personal observations of United's employees which she believed, in good

2    faith, negatively impacted SDC's brand image (4/12/11 Trial Tr. at 35:4 – 37:19) (Wallace). Other SDC

3    witnesses, including Sara Zetts and Tom Mazzocco, testified about the importance of San Diego Spirit

4    training to maintaining SDC's brand image. James McGee gave an opinion that requiring all event

5    cleaning to be performed by SDC's employees improved security at the Convention Center.

6          Third, SDC contends that it used lawful and appropriate means to protect that interest by

7    amending the Convention Center's use regulations. The Management Agreement gives SDC the

8    authority and the responsibility to set policies for the use of the Convention Center (Ex. 37 §§ 2.01,

9    2.02). SDC's clients, the trade shows, agree to abide by SDC's PRRs and agreed in advance to abide by

10   any changes in the PRRs. (Ex. 1106, § 4 at 4.) Because a license is an authorization to perform an act or

11   acts on the property of another, SDC argues that the licensees have only a limited and conditional use

12   right. *See Golden West Baseball*, 25 Cal. App.4th at 36. A license is nothing more than a consent to

13   trespass, which may be revoked or altered at any time.[25]  SDC argues that "[t]he extent of a license is

14   fixed by the terms of the consent which creates it.[26]  SDC argues that an amendment of a license

15   condition is both lawful and appropriate when it is intended to protect the property manager's interests

16   in the property.

17         As such, SDC contends that all three conditions were met, legally and factually, and SDC was

18   therefore entitled to have instruction 438 given to the jury on the affirmative defense of justification of

19   legally protected interest. *Galdamez*, 415 F.3d at 1022. SDC argues that United cannot show that the

20   jury would have found as it did absent the instructional error and that a properly instructed jury may

21   have found that SDC acted appropriately to protect valid interests, in good faith. *Id.*

22         Alternatively, United argues that SDC was not prejudiced by the exclusion of proposed

23   instruction 438, because the jury would have arrived at the same conclusion even if that instruction had

24   been given. The same factors discussed in proposed instruction 438 for the jury's consideration were

25

26         [25] *See Fisher v. General Petroleum Corp.*, 123 Cal. App.2d 770, 776 (1954); 6 Miller & Starr,
     Cal. Real Estate, Easements § 15.2 (3d ed. 2000).

27

28         [26] Restatement (First) Property § 516; *see Mangini v. Aerojet-General Corp.*, 230 Cal. App.3d
     1125, 1141 (1991) ("A conditional or restricted consent to enter land creates a privilege to do so only in
     so far as the condition or restriction is complied with.").

                                                25

adequately explained Instruction 447, which was given with regard to all of United's Intentional Interference claims. Instruction 447 provides that three of the factors that the jury should consider in determining whether SDC's conduct was justified are the interest sought to be advanced by SDC (or a legally valid interest), SDC's motive (or good faith) and the nature of SDC's conduct (or whether it used unlawful and appropriate means). United argues that the Court properly refused to instruct the jury on SDC's defense, because it "[fell] short in terms of the good-faith aspect." (Opp. at 21:15-28). The jury deliberated for two weeks and carefully considered each of these factors in determining that SDC's conduct was not justified. United argues that giving proposed instruction 438 would not have changed the jury's verdict.

Despite SDC's arguments to the contrary, the Court finds that Instruction 438 is duplicative of Instruction 447 and that Instruction 447 was the appropriate instruction to be given to the jury for SDC's justification defense to all of United's Intentional Interference claims.  As such, SDC's motion for a new trial on this ground is DENIED.

### C. Supplemental Jury Instructions

#### 1. Whether SDC's Objection Was Timely and Preserved

SDC argues that the Court erred in its responses to juror questions 21 and 22.  (Slania Dec. at ¶ 11; Ex. 9.) Those questions related specifically to the term "parties" as stated on the fifth bullet point in Instruction 447. (Slania Dec. at ¶ 12; Ex. 10 at p. 7-16.)  The Court instructed the jury that the term "parties" was previously defined for them,[27] and that for purposes of Instruction 447, "the parties . . . are those contracting parties that we already told them," i.e., SDC, United, and the Decorators (*Id*. at 14:7-13).[28]  The Court noted that this instruction was over SDC's objection (*Id*. at 14:13-14).

---

[27]  Juror question 21 acknowledges that the jury had previously asked about who the term "parties" referred to in the fifth bullet point of instruction 447. (Slania Dec. at ¶ 11; Ex. 9 (Juror Question No. 13.)

[28] The Court instructed the jury as follows:

> Good afternoon, ladies and gentlemen. We are on the record with the parties and Ms. Wallace, to address the two questions that you provided us here this afternoon. They are related. And let me start with (name redacted: juror no. 1's) question about Instruction 447, the intentional interference justification instruction.

26

The initial jury question regarding the term "parties" in Instruction 447 was addressed by the Court, SDC and United on Friday, April 22, 2011, and again on Monday, April 25, 2011. On both occasions, SDC agreed that the term "parties" referred to United, SDC, GES, Champion, Paradice and/or Brede. (Slania Dec. at ¶ 13; Ex. 11 at 7:4-21.) Based upon this understanding and agreement by the parties, the Court so instructed the jury on April 25, 2011. (Slania Dec. at ¶ 14; Ex. 12 at 15:6-7.) SDC did not object on April 25, 2011. (Slania Dec. at ¶ 12; Ex. 10 at 8:4-6). SDC now argues that in answering those questions, the jury should have been instructed to include entities with which SDC contracted.[29]

By failing to object on April 25, 2011, United argues that SDC waived any objection to the supplemental instruction. *FN Enterprises, Inc. v. Callahan Mining Corp.*, WL 509459 *6 (N.D. Cal. 1995).  When the issue arose on May 2, 2011, United argues that SDC's prior consent to the instruction waived any right to later object to the same instruction. United argued to the Court on May 2, 2011, that giving a different answer would confuse the jury. The Court agreed, stating:

> And, in my view, to read more into bullet point 5 than we have already instructed them would be inappropriate and would reopen more questions and would cause them to have to interpret or reflect back on argument of well over a week ago.

(Slania Dec. at ¶ 12; Ex. 10 at 13:22-14:1).

---

> The question being: can/does the word "parties" refer to anyone other than [SDC], United, GES, Champion, Paradise or Brede?
>
> After conferring with the lawyers here, the answer is no. These are the contracting parties for bullet point 5 that were referenced in the first clause of the Instruction of 447.
>
> The related question is whether you can expand that term "parties" in bullet 5 to include the licensees referenced in the master license agreements, as in Exhibit 1196, page one, and Exhibit 1200, page one.
>
> The answer to that would be no. Bullet point 5, again, relates to just those parties that have been referenced in the instruction, the contracting parties for the contracts allegedly interfered with.

(05/02/2011 Trial Tr. 14:22-15:16).

[29] Although SDC argued this position when the issue was discussed during a hearing on May 2, 2011 (Slania Dec. at ¶ 12; Ex. 10 at p. 8-14), prior to May 2, SDC argued a different position on this specific issue.

07cv2172

1   United argues that it should not be penalized, nor should the Court have to expend significant

2   resources on a retrial, because SDC had a change of heart.  Since the record is clear that SDC in fact

3   agreed to the supplemental instructions that were given, the Court finds SDC's agreement on April 22

4   and April 25, 2011 acts as both a waiver and a barr to SDC's later asserted objection to the supplemental

5   instructions on May 2, 2011.  *See* Slania Dec. at ¶ 12; Ex. 10 at 9:21-22) (" . . . when we agreed the last

6   time, this set of circumstances is something that we didn't anticipate.") Accordingly, the Court finds

7   SDC's objection was untimely and waived.

8   SDC argues that their objection was adequately preserved because the Court noted for the record

9   that it rejected SDC's proposed supplemental instructions on Instruction 447 on May 2, and would give

10  United's proposed supplemental instructions over SDC's objection (05/02/2011 Trial Tr. at 14:7-15).

11  The Court disagrees. The Court finds SDC's change of heart and subsequent objection and argument

12  regarding the supplemental instructions disingenuous because the supplemental instruction given was

13  the same instruction SDC agreed to on two prior occasions and that was previously given to the jury.

14  Based upon the foregoing, the Court finds that SDC's untimely objection forecloses any

15  argument of error.  Even if SDC had timely objected to the supplemental instructions to the jury, which

16  the Court has found it did not, it would have been prejudicial and confusing to the jury to give any

17  answer other than the same answer previously provided.

18  ### *2. Whether the Court Erred In Giving the Supplemental Jury Instructions*

19  SDC also argues that it was prejudiced by the fact that the Court said that it could argue to the

20  jury that SDC's arrangements higher up the contracting chain preclude liability only later to instruct the

21  jury that it could not consider those arrangements.[30] The Court finds this argument disingenuous at best.

22  At no time did the Court ever instruct the jury not to consider SDC's relationships with its licensees.

23  Rather, the Court, with the agreement of both parties, answered a specific question regarding the fifth

24  bullet point of instruction 437. The jury asked who was included within the term "parties" in that bullet

25  point. (Slania Dec. at ¶ 11; Ex. 9.) The Court answered that question the same way it had previously and

26  SDC agreed to that definition on at least two prior occasions.  Furthermore, the jury instructions were

27  agreed upon before closing arguments. Upon receiving the jury's question during deliberations, the

28

---

[30] SDC does not cite to the record where the Court made this statement to counsel.

07cv2172

1   Court conferred with counsel and gave the jury an agreed upon answer that was consistent with the prior

2   instructions. The Court did not change the actual jury instructions before SDC made its closing

3   argument to the jury and the Court maintained the same instruction thereafter. SDC was not hindered in

4   its ability to place the issues before the jury.  The supplemental instructions in no way undercut SDC's

5   summation. For SDC to suggest that the Court should have changed the definition of the term "parties"

6   in the instruction, after closing arguments, would actually have created the very error and prejudice that

7   SDC complains to have suffered.  *Gordon v. New York City Bd. of Educ.*, 232 F .3d 111, 118-19 (2nd

8   Cir. 2000) (explaining that it is error only when counsel is hindered in their ability to present

9   summations which fully deal with the issues to be placed before the jury).

10      Based upon the foregoing, the Court finds SDC's argument that the supplemental jury

11  instructions were erroneous because they did not clarify the jury question with "concrete accuracy" to be

12  wholly without merit. As such, SDC's motion for a new trial on the grounds that the supplemental jury

13  instructions were erroneous is DENIED.

14  ***III. Exclusion of Evidence Pursuant to the Court's Ruling on United's MIL #4***

15      SDC argues that a new trial is warranted because the Court erred in granting United's Motion in

16  Limine No. 4 of 9, in which United asked the Court to exclude evidence relating to exclusive policies at

17  convention facilities other than the San Diego Convention Center on the grounds that such evidence was

18  irrelevant, more prejudicial than probative, and inadmissible hearsay pursuant to Federal Rules of

19  Evidence 401, 403, and 802.  (Doc. No. 144-4, at 2:2-6). SDC contends that it was prejudicial and

20  reversible error for the Court to exclude evidence of policies at other locations and United's performance

21  at other locations, claiming the evidence bears on United's contractual expectations.[31]  SDC argues that

22  the effect of exclusive policies at other convention centers is relevant course-of-performance evidence

23  of the effect of other exclusive policies on United's contractual and business relationships. SDC sought

24  to introduce the course of performance evidence to prove the existence of conditions precedent

25

26      [31] SDC argues that what occurs at other venues is probative of the meaning of the contracts, because United's reasonable expectations should be examined under its nationwide subcontracts because they do not identify any convention center, exposition hall, hotel, or show by name (Exs. 83 at 2; 84 at

27  1; 553 at 1). Instead, the subcontracts stipulate that United will provide cleaning services to Decorators as a subcontractor, at specified rates in certain cities in the United States for trade shows and other

28  events where the Decorators are designated as the exclusive cleaning contractor for the show (Exs. 83 at 1; 84 at 1; 553 at 1).

07cv2172

1   contained in United's subcontracts at issue. SDC argues that course of performance evidence would

2   have shown that at every other venue that has "exclusive" cleaning services, United does not perform,

3   and GES and Champion do not consider United's nonperformance to be a breach of its contracts (Doc.

4   No. 149-3, at 2:19-4:2; Doc. No. 239-1, at 30:17-21).

5          SDC argues that the Court adopted United's view, that the "competitive environment" at the

6   Convention Center was the "best evidence" of United's third tier contract expectations and thereby

7   implicitly concluded that United's preferred set of facts and evidence was "better" than SDC's otherwise

8   relevant, admissible evidence.  Despite SDC's arguments to the contrary, the Court thoroughly

9   considered both parties arguments and determined that the actual history of the parties' conduct was

10  better evidence of the parties' reasonable expectations than uncertain evidence of various other policies

11  that were not at issue in this litigation. (Slania Dec. at ¶ 6; Ex. 4 at 26:8-13 and 34:10-22.)

12         Furthermore, the Court also granted SDC's Motion in Limine No. 1 to exclude, at SDC's request,

13  United's successful challenge of the implementation of a similar exclusive policy in San Francisco at the

14  Moscone Center.  (Doc. No. 152.) The Court determined it was more prejudicial than probative to offer

15  evidence of other policies to the jury, as the parties would have had to supply meaning to each of the

16  other policies in order to compare and contrast SDC's policy and United's reasonable expectations under

17  the circumstances. (Slania Dec. at ¶ 6; Ex. 4 at 31: 11-16).  If evidence of other exclusive policies were

18  admitted into evidence, the Court was concerned that the parties would spend an undue amount of time

19  and effort offering evidence regarding the meaning and interpretation of those other policies, the terms

20  of those policies, and whether United ever challenged those policies. The Court found the other policies

21  were not determinative of the legality of SDC's Exclusive Policy and there was sufficient evidence of

22  the parties' expectations independent from the excluded evidence. (Slania Dec. at, ¶ 6; Ex. 4 at pp. 26¶

23  29-30, 34, 43.)  Based upon the foregoing, the Court finds that SDC has failed to demonstrate that it was

24  substantially prejudiced by the exclusion of this evidence because the probative value of this evidence

25  was substantially outweighed by the undue consumption of time by counsel, witnesses and the jury

26  necessary to hear and fully explain this evidence.  As such, the Court's exclusion of this evidence was

27  both reasonable and justified under Federal Rule of Evidence 403 and SDC's motion for a new trial on

28  this ground is DENIED.

07cv2172

### *Conclusion*

Based upon the foregoing, SDC's motion for new trial is DENIED as to instructional errors on Disruption; DENIED as to instructional errors on the affirmative defense of justification by legally protected interest; DENIED as to the supplemental instructions; DENIED as to the exclusion of evidence.   and GRANTED as to the legal issue of duty.

Having found SDC's request for a new trial on United's interference with contract claim is not the appropriate remedy, the Court hereby construes SDC's Rule 59(a) motion on the issue of duty as a renewed motion for judgment after trial. Given the conclusions of law set forth above that SDC was not a stranger to United's contracts and had no duty not interfere, the Court hereby directs entry of judgment as a matter of law for SDC on United's Interference with Contract Claim. In so doing, the Court sets aside the jury verdict on the intentional interference with contract claim.

IT IS SO ORDERED.


DATED:  September 5, 2012

Hon. Anthony J. Battaglia
U.S. District Judge