1        UNITED STATES DISTRICT COURT

2     FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED NATIONAL MAINTENANCE,        .
    INC.,                               .
5                                       . NO. 07-CV-2172
            PLAINTIFF,                  .
6                                       . APRIL 7, 2011
            V.                          .
7                                       . 9:16 A.M.
    SAN DIEGO CONVENTION CENTER         .
8   CORPORATION, INC.,                  . SAN DIEGO, CALIFORNIA
                                        .
9           DEFENDANT.
    . . . . . . . . . . . . . . . . .

10

11

12
            TRANSCRIPT OF JURY TRIAL, DAY 11
13       BEFORE THE HONORABLE ANTHONY J. BATTAGLIA
              UNITED STATES DISTRICT JUDGE
14

15     APPEARANCES:

16

17     FOR THE PLAINTIFF:      KIRBY, NOONAN, LANCE & HOGE, LLP
                               BY:  JAMES R. LANCE, ESQ.
                               BY:  JACOB M. SLANIA, ESQ.
18                             350 TENTH AVENUE, SUITE 1300
                               SAN DIEGO, CALIFORNIA  92101
19
       FOR THE DEFENDANT:      WRIGHT AND L'ESTRANGE
20                             BY:  JOHN H. L'ESTRANGE, ESQ.
                               BY:  JOSEPH T. ERGASTOLO, ESQ.
21                             401 WEST A STREET, SUITE 2250
                               SAN DIEGO, CALIFORNIA  92101
22

23     COURT REPORTER:         DEBORAH M. O'CONNELL, RPR, CSR
                               880 FRONT STREET, ROOM 4290
24                             SAN DIEGO, CALIFORNIA, 92101

25
    REPORTED BY STENOTYPE, TRANSCRIBED BY COMPUTER

```
1                        I N D E X


2


3                    INDEX TO WITNESSES


4


5      FOR THE PLAINTIFF    DIRECT    CROSS   REDIRECT   RECROSS


6      KENNETH H. MCAVOY


7      BY MR. LANCE                5                 34


8      BY MR. L'ESTRANGE                 22


9


10


11     FOR THE DEFENDANT    DIRECT    CROSS   REDIRECT   RECROSS


12     BRADLEY H. GESSNER


       BY MR. L'ESTRANGE    113


13     BY MR. LANCE                  176


14


15     THOMAS M. MAZZOCCO


16     BY MR. ERGASTOLO     203


17     BY MR. SLANIA                 241


18


19


20


21


22


23


24


25
```

INDEX TO EXHIBITS

| FOR THE PLAINTIFF | IDENTIFIED | RECEIVED |
|---|---|---|
| 3 | 190 | |
| 722 | 14 | |
| 872 | 43 | |

| FOR THE DEFENDANT | IDENTIFIED | RECEIVED |
|---|---|---|
| 10 | 150 | |
| 32 | 132 | |
| 53 | 142 | |
| 57 | 211 | 212 |
| 350 | 168 | |
| 421 | 227 | 236 |
| 806 | 232 | 232 |
| 1015-REDACTED | 32 | 32 |
| 1046 | 172 | |
| 1176 | 165 | |
| 1178 | 166 | |
| 1204 | 128 | 128 |
| 1324 | 27 | |

1          SAN DIEGO, CALIFORNIA, APRIL 7, 2011, 9:16 A.M.

2                        *  *  *  *

3          THE COURT:  GOOD MORNING.  THE JURORS ARE BACK,

4     COUNSEL AND PARTIES PRESENT.  LET'S START THE MORNING SESSION

5     BY CALLING THE CASE, AND THEN WE'LL ADDRESS THE NOTE FROM THE

6     JURY RIGHT AFTER THAT.  AND THEN WE'LL GET TO SOME TESTIMONY.

7          THE CLERK:  ONE ON CALENDAR, CASE NO. 07-CV-2172,

8     UNITED NATIONAL MAINTENANCE VS. SAN DIEGO CONVENTION CENTER, ON

9     FOR ELEVENTH DAY OF JURY TRIAL.

10         THE COURT:  I HAVE A NOTE FROM THE JURY, WHICH I'M

11    GOING TO DEAL WITH, WITH COUNSEL PRESENT, AND WITH THE JURY

12    PRESENT BECAUSE IT DOESN'T AFFECT THE SUBSTANCE OF THE CASE.

13    AND THE QUESTION IS, IF THE FEDERAL GOVERNMENT SHUTS DOWN, WILL

14    THE COURT WORK ON MONDAY, WHICH IS A VERY LEGITIMATE QUESTION.

15    AND THE ANSWER IS YES, WE WILL.  SO THE QUESTION IS, IF THE

16    FEDERAL GOVERNMENT DOES SHUT DOWN AFTER TOMORROW, IF THERE IS

17    NO BUDGET PASSED, WILL THE COURT WORK ON MONDAY, AND THE ANSWER

18    IS YES.  WE HAVE SOME LIMITED RESERVE FUNDS.  WE HOPE THERE

19    WON'T BE A SHUT DOWN.  WE HOPE AT THE MINIMUM, THEY'LL DO

20    ANOTHER CONTINUING RESOLUTION.  BUT IF THEY DON'T, AND A SHUT

21    DOWN OCCURS, THIS COURT WILL BE ABLE TO OPERATE FOR SOME WEEKS,

22    AND TRIAL CAN PROCEED.

23         THE MOMENT THERE IS ANY CHANGE IN THAT, POSITIVELY OR

24    NEGATIVELY, I'LL ALERT YOU SO YOU HAVE SOME ADVANCED WARNING ON

25    WHERE WE INTEND TO GO WITH THAT.  BUT WE'RE ALL GOING TO HOPE

1  FOR THE BEST, THAT REASONABLE MINDS COME TOGETHER.  AND WE

2  DON'T HAVE THAT, BUT COUNT ON NEXT WEEK FOR SURE, SHUT DOWN

3  NOTWITHSTANDING.  AND I'LL LET YOU KNOW EARLY IN THE WEEK WHAT

4  IT LOOKS LIKE FOR THE FOLLOWING.  OKAY.

5       AND THAT WILL BE MARKED, OF COURSE, NEXT EXHIBIT IN ORDER.

6       AND I TRUST COUNSEL THEY'RE SATISFIED WITH THE DISPOSITION

7  OF THAT NOW.

8            MR. LANCE:  WE ARE, YOUR HONOR.

9            THE COURT:  SO LET'S MOVE ON TO THE NEXT WITNESS, THE

10 FIRST WITNESS FOR TODAY, MR. LANCE.

11           MR. LANCE:  YOUR HONOR, WE CALL KEN MCAVOY TO THE

12 STAND.

13           THE COURT:  ALL RIGHT, MR. MCAVOY, COME FORWARD AND

14 BE SWORN, SIR.

15                    (WITNESS SWORN.)

16           THE CLERK:  STATE YOUR FULL NAME AND SPELL YOUR LAST

17 NAME FOR THE RECORD.

18           THE WITNESS:  KENNETH H. MC AVOY, M-C, CAPITAL A,

19 V-O-Y.

20           THE COURT:  YOU MAY PROCEED, MR. LANCE.

21                    DIRECT EXAMINATION

22 BY MR. LANCE:

23 Q.  GOOD MORNING, MR. MCAVOY.

24 A.  GOOD MORNING.

25 Q.  MR. MCAVOY, ARE YOU CURRENTLY EMPLOYED IN THE TRADE SHOW

1    INDUSTRY?

2    A.   YES, SIR.

3    Q.   WHO IS YOUR EMPLOYER?

4    A.   REED EXHIBITIONS.

5    Q.   AND WHERE IS YOUR OFFICES LOCATED, SIR?

6    A.   NORWALK, CONNECTICUT.

7    Q.   WHAT IS YOUR POSITION WITH REED EXHIBITIONS?

8    A.   SENIOR VICE PRESIDENT.

9    Q.   AND HOW LONG HAVE YOU BEEN WITH REED EXHIBITIONS?

10   A.   TWELVE YEARS.

11   Q.   WHAT POSITIONS HAVE YOU HELD WITH THAT COMPANY?

12   A.   MAINLY AS A SENIOR VICE PRESIDENT.  I WAS RECRUITED OUT OF

13   THE TRADE SHOW INDUSTRY TO TAKE A POSITION THERE.  AND I'VE

14   HELD THE SAME POSITION FOR THE LAST TWELVE YEARS.

15   Q.   LET'S TALK A LITTLE BIT ABOUT REED EXHIBITIONS.  WHAT DID

16   THAT COMPANY DO?

17   A.   TRADE SHOWS AND CONVENTIONS, SPECIAL EVENTS.  IN THE

18   UNITED STATES, WE'RE THE LARGEST PRODUCER OF TRADE SHOWS IN THE

19   UNITED STATES.  WE HAVE LED THE TOP TRADE SHOW 200 FOR THE

20   LAST -- I THINK IT IS 27 OR 28 YEARS.  WE DO 40 TRADE SHOWS ON

21   A NATIONWIDE BASIS.  THE COMPANY, ON A GLOBAL BASIS, IS THE

22   LARGEST PRODUCER OF TRADE SHOWS IN THE WORLD.  WE DO ABOUT 460

23   SHOWS AROUND THE WORLD.  WE HAVE 47 OFFICES, PRODUCING SHOWS

24   IN, I THINK, 62 COUNTRIES.  AND DON'T HOLD ME TO THAT, BUT

25   THOSE ARE PRETTY CLOSE.

1  Q.   OKAY.  WOULD YOU PULL UP EXHIBIT 872, PLEASE.

2       MR. MCAVOY, THIS DOCUMENT IS A DOCUMENT WE'VE USED

3  DEMONSTRATIVELY AS AN EXHIBIT TO SHOW THE VARIOUS PARTIES

4  INVOLVED AT THE SAN DIEGO CONVENTION CENTER.

5       CAN YOU SEE THAT, SIR?

6  A.   YES, SIR.

7  Q.   AND SO WE'VE USED THIS DOCUMENT, AND THE WITNESSES HAVE

8  USED THIS TO EXPLAIN THE VARIOUS PARTIES AND HOW -- WHAT

9  PARTIES ARE INVOLVED AND WHAT ARE THE RELATIONSHIPS IN A TRADE

10 SHOW AT THE SAN DIEGO CONVENTION CENTER.

11      AND AS I UNDERSTAND YOUR TESTIMONY ABOUT REED EXHIBITIONS,

12 YOU WOULD BE THE TRADE SHOW MANAGER, IS THAT -- AT THIS LEVEL

13 RIGHT HERE?

14 A.   YES, SIR.

15 Q.   AND SO YOU WOULD CONTRACT OR LICENSE WITH A BUILDING TO

16 PUT ON A TRADE SHOW?

17 A.   THAT'S CORRECT.

18 Q.   OKAY.  AND THEN YOU WOULD HIRE A DECORATOR, SUCH AS

19 FREEMAN, OR GES, OR CHAMPION, TO ASSIST YOU IN THAT, THE

20 OPERATION OF THAT TRADE SHOW?

21 A.   CORRECT.

22 Q.   NOW BEFORE WE GET INTO MORE DETAIL ABOUT REED, I DO WANT

23 TO TALK A LITTLE BIT MORE ABOUT YOUR EXPERIENCE IN THE TRADE

24 SHOW BUSINESS.  HOW LONG HAVE YOU BEEN IN THE TRADE SHOW

25 BUSINESS, SIR?

1    A.   IN EXCESS OF 40 YEARS.

2    Q.   AND WHAT TYPE OF JOBS HAVE YOU HELD IN THE INDUSTRY?

3    A.   FROM SWEEPING FLOORS TO -- I WAS WITH LABOR FOR ABOUT 15

4    YEARS.  I WAS A UNION STEWART.  I WAS RECRUITED OUT OF THE

5    UNION TO GO INTO MANAGEMENT.  I WENT INTO MANAGEMENT WITH A

6    LARGE GENERAL SERVICE CONTRACTOR THAT WAS ACQUIRED BY GES.  AND

7    I HELD AN EXECUTIVE VICE PRESIDENT POSITION IN THAT WITH GES

8    FOR AROUND EIGHT YEARS.  I HAD 900 EMPLOYEES.  I HAD THE WHOLE

9    EAST COAST OF THE UNITED STATES.  I DON'T KNOW -- I WAS

10   RECRUITED FROM GES -- OUT OF GES TO -- BY THE CHAIRMAN OF THE

11   BOARD OF REED EXHIBITIONS, AND I'VE BEEN WITH THEM EVER SINCE.

12   Q.   THAT'S ABOUT TWELVE YEARS?

13   A.   APPROXIMATELY TWELVE YEARS.

14   Q.   WHAT ARE YOUR JOB DUTIES AT REED EXHIBITIONS?

15   A.   I'M IN CHARGE OF ALL NEGOTIATIONS OF ALL CONTRACTS, THE

16   CONTRACTS FOR VENUES, HOTELS, THE DECORATORS, THE

17   SUBCONTRACTORS, BUSSING, MODELS, CLEANING.  EVERY ASPECT OF THE

18   TRADE SHOW IS MY RESPONSIBILITY.  I SIGN ALL CONTRACTS.  MY

19   SIGNING AUTHORITY IS THE SECOND HIGHEST IN REED EXHIBITIONS.

20   IT'S IN EXCESS OF $10 MILLION PER CONTRACT I HAVE THE AUTHORITY

21   TO SIGN UP TO.

22        THE OTHER AREAS THAT I COVER ARE REGISTRATION, HOTELS,

23   CLIENT SERVICES.  I HAVE A CALL CENTER THAT IS UNDERNEATH ME.

24   I HAVE APPROXIMATELY, I'M GOING TO SAY, 65 FULL-TIME EMPLOYEES;

25   FOUR VICE PRESIDENTS UNDERNEATH ME.  I DON'T -- I MEAN, I

1    DIDN'T BRING THE JOB DESCRIPTION WITH ME.  I HAVE A SAYING,

2    THOUGH, I'M IN THE TWILIGHT OF A MEDIOCRE CAREER, AND I'VE DONE

3    IT ALL.

4    Q.   THANK YOU, SIR.  LET'S TALK ABOUT THE TYPE OF SHOWS REED

5    PRODUCES.  YOU'VE GIVEN US SOME NUMBERS, OF 40 PER YEAR IN THE

6    U.S.  WHAT TYPE OF SHOWS IS REED INVOLVED IN?

7    A.   WE HAVE PUBLIC SHOWS, WHICH ARE B TO C, WHICH IS BUSINESS

8    TO CONSUMER.  OUR PRIMARY MARKET IS B TO B, WHICH IS BUSINESS

9    TO BUSINESS.  WE ARE THE LARGEST CUSTOMER OF THE JACOB JAVITS

10   CONVENTION CENTER.  I'M THE LARGEST CUSTOMER OF THE CITY OF

11   LAS VEGAS.

12        THE TYPE OF SHOWS THAT WE DO ARE -- I'LL GO ON THE

13   CONSUMER SITE.  YOU IN SAN DIEGO HERE HAVE A VERY SUCCESSFUL

14   SHOW CALLED "COMICON."  AND WE PRODUCE THE SAME SHOW IN NEW

15   YORK AND CHICAGO.  SO WE'RE VERY FAMILIAR WITH YOUR COMICON

16   CONVENTION HERE.  AND OURS IS VERY SIMILAR, WHAT WE DO IN

17   CHICAGO AND NEW YORK.  WE DRAW 96,000 PEOPLE TO OUR SHOW IN NEW

18   YORK.  WE JUST HELD THE ONE IN CHICAGO.  WE DREW ABOUT 42,000

19   PEOPLE.

20        WE HAVE GAME DEVELOPMENT SHOWS.  WE HAVE UFC, UNITING

21   FIGHTING CHAMPIONSHIP.  YOU SEE IT ON PAY-PER-VIEW.  WE HAVE AN

22   ALLIANCE WITH THE TITAS (PHONETIC) BROTHERS, OUT OF LAS VEGAS.

23   WE PRODUCE ALL THOSE TRADE SHOWS.  WE DO THAT ON A GLOBAL

24   BASIS.  WE JUST DID ONE IN LONDON.  WE PLAN TO DO ONE IN CHINA.

25        ON THE BUSINESS TO BUSINESS, WHICH IS OUR MAIN FOCUS, WE

1  DO MEDICAL.  WE DO THE PGA GOLF SHOW.  WE DO THE INTERNATIONAL

2  SECURITY CONFERENCE.  I'M GOING TO MISS A FEW.  WHEN YOU HAVE

3  40 -- BUT I THINK THE BEST WAY TO SAY IT, WE COVER ALMOST FIVE

4  OR SIX INDUSTRIES.  JEWELRY, WE RUN THE LARGEST JEWELRY SHOW IN

5  THE UNITED STATES, THE JCK JEWELRY SHOW.  LET ME THINK WHAT

6  ELSE.

7  Q.    THAT IS A PRETTY BROAD SPECTRUM.

8  A.    IT IS BIG.

9  Q.    AS THE SENIOR VICE PRESIDENT OF REED EXHIBITIONS, DO YOU

10 PRODUCE TRADE SHOWS HERE IN CALIFORNIA?

11 A.    WE HAVE ONE TRADE SHOW HERE THAT ROTATES IN AND OUT OF

12 SAN DIEGO.

13 Q.    WHAT IS YOUR PERSONAL INVOLVEMENT IN PRODUCING THAT SHOW?

14 A.    THE OPERATIONS.  I DON'T DO THE MARKETING.  I DON'T DO THE

15 ATTENDANCE PROMOTION.  BUT I DO THE NEGOTIATIONS ON THE

16 CONTRACTS, AND I DO THE SELECTION OF ALL THE VENDORS, AND THE

17 HOTELS, AND THINGS LIKE THAT.

18 Q.    WHAT IS THE NAME OF THAT SHOW?

19 A.    WESTERN FOOD SERVICE.  WE CHANGED THE NAME.  IT USED TO BE

20 THE CALIFORNIA RESTAURANT SHOW, AND WE CALL IT THE WESTERN FOOD

21 SERVICE SHOW.

22 Q.    OKAY.  CAN YOU EXPLAIN FOR THE JURY WHAT THE WESTERN FOOD

23 SERVICE SHOW IS.

24 A.    WELL, THE WESTERN FOOD SERVICE SHOW COVERS EVERYTHING THAT

25 A RESTAURANT COULD USE, FROM COOKING EQUIPMENT, STOVES, AND

1   REFRIGERATED CABINETS, TO UNIFORMS, TO -- ANYTHING, UTENSILS,

2   TABLE CLOTHS.  AND EXHIBITORS COME IN AND SHOW THEIR WARES.

3        AND WE HAVE A RELATIONSHIP WITH THE CALIFORNIA RESTAURANT

4   ASSOCIATION.  THEY SUPPLY THE ATTENDEE, ALL YOUR RESTAURANTS.

5   WE HAVE CHEF COMPETITIONS.  WE HAVE WINE TASTINGS.  AND WHAT IT

6   IS, IS SO THE RESTAURANTS IN SOUTHERN CALIFORNIA KEEP THE

7   LATEST AND THE BEST, THE NEWEST PRODUCTS THAT ARE ON THE

8   MARKET, THE VARIOUS THINGS THAT THE VENDORS ARE PROMOTING, SO

9   IT'S A -- IT'S A VERY NICE SHOW FOR US.

10  Q.   AND, SIR, WHO DO YOU USE AS YOUR DECORATOR AT REED?

11  A.   WE PRIMARILY USE FREEMAN DECORATING.

12  Q.   YOU HAVE A CONTRACT WITH THEM?

13  A.   WE HAVE A CONTRACT WITH THEM.

14  Q.   HOW LONG HAVE YOU BEEN USING FREEMAN?

15  A.   EVER SINCE I WAS THERE.  WE'VE USED THEM ON A SPLIT OF

16  ABOUT 80 PERCENT OF OUR BUSINESS TO 20 PERCENT TO OTHER

17  CONTRACTORS.  THERE ARE SOME CITIES THAT THEY'RE NOT IN THAT WE

18  USE OTHER CONTRACTORS IN.  PRIOR TO ME COMING THERE, THEY USED

19  THEM FOR ABOUT, I'M GOING TO SAY, 15 YEARS.  I'D SAY OVERALL,

20  REED EXHIBITIONS HAS BEEN DEALING WITH FREEMAN FOR WELL OVER 30

21  YEARS, I WOULD THINK.

22  Q.   DO YOU HAVE A CLEANING COMPANY, A TRADE SHOW CLEANING

23  COMPANY THAT YOU TYPICALLY USE?

24  A.   WELL, WE HAVE A CONTRACT WITH A CLEANING COMPANY, YES.

25  Q.   WHO IS THAT?

1    A.   CENTURY MAINTENANCE.

2    Q.   AND HOW LONG HAS CENTURY CLEANING BEEN THE PRIMARY TRADE

3    SHOW CLEANING CONTRACTOR FOR REED?

4    A.   I'D SAY ALSO IN EXCESS OF 30 YEARS.   CAN I MAKE A COMMENT?

5    Q.   SURE.

6    A.   WHEN I CAME IN TO REED EXHIBITIONS --

7            MR. L'ESTRANGE:   EXCUSE ME, MOVE TO STRIKE.   NOT

8    RESPONSIVE TO A QUESTION.

9            THE COURT:   THERE IS NO QUESTION PENDING, SO GRANTED.

10   BY MR. LANCE:

11   Q.   SIR, YOU SAID THAT CENTURY CLEANING HAD BEEN USED WHEN YOU

12   CAME IN TWELVE YEARS AGO; AND YOU HAVE A CONTRACT WITH CENTURY

13   CLEANING?

14   A.   YES.

15   Q.   AND TELL ME ABOUT THAT CONTRACT.   DOES THAT -- WELL,

16   STRIKE THAT.   LET ME BACK UP FOR A SECOND.

17       WHY WOULD YOU -- WELL, STRIKE THAT.

18       DOES REED EXHIBITIONS HAVE THE ABILITY TO MANDATE WHICH

19   TRADE SHOW CLEANING COMPANY THAT FREEMAN USES?

20   A.   YES.

21   Q.   AND HOW DO YOU HAVE THAT RIGHT, SIR?

22   A.   IT'S IN THE CONTRACT WITH FREEMAN THAT ALL VENDORS --

23           MR. L'ESTRANGE:   EXCUSE ME, OBJECTION.   BEST

24   EVIDENCE.

25           THE COURT:   OVERRULED.

1   BY MR. LANCE:

2   Q.   YOU CAN ANSWER.

3   A.   IN THE CONTRACT THAT I HAVE WITH FREEMAN, I HAVE THE RIGHT

4   OF APPROVAL OF ALL SUBCONTRACTORS THAT ARE USED ON THE TRADE

5   SHOW FLOOR.

6   Q.   WHY IS IT IMPORTANT FOR YOU TO HAVE CONTROL OVER THE

7   SUBCONTRACTORS?

8   A.   PERFORMANCE, PRICE, RELIABILITY, BELOW-MARKET ARRANGEMENTS

9   ON SHOWS THAT ARE MARGINAL.   THERE ARE QUITE A FEW REASONS.   I

10  GUESS I COULD TELL YOU BY EXAMPLE A LITTLE BIT.

11  Q.   SURE.

12  A.   A FLORIST, FOR INSTANCE, IF FREEMAN HAS A FLORIST, AND

13  THEY SUGGEST THEM TO ME, I MAY CONSIDER THEM.   BUT IF THE

14  FLOWERS DIE AFTER THE SECOND DAY, I MIGHT HAVE A PROBLEM THERE.

15  SO I'D RATHER HAVE MY OWN FLORIST WHO I KNOW BUYS FRESH FLORAL.

16  SO THE ISSUE, IT IS MORE OF A PERFORMANCE PRICE AND BEING ABLE

17  TO NEGOTIATE WHAT I NEED TO MAKE MY SHOW SUCCESSFUL.

18  Q.   OKAY.   AND THESE SUBCONTRACTORS OF YOUR DECORATOR, DO

19  THEIR SERVICES AND THE QUALITY OF THEIR SERVICES REFLECT BACK

20  UP THE CHART TO YOU AT REED?

21  A.   IT GOES MORE THAN THAT.   EVERY ONE OF MY PEOPLE ARE ON A

22  CUSTOMER SATISFACTION BONUS.   IF MY CUSTOMERS, MEANING, THE

23  EXHIBITORS WHO ARE PAYING US THE MONEY, OR THE ATTENDEES THAT

24  ARE COMING TO THE SHOW, IF WE GET BAD SCORES ON OUR -- AFTER

25  EVERY SHOW, WE SURVEY EVERY SHOW, IT'S REFLECTED IN THEIR

1    BONUS, AND THEIR PAY STRUCTURE.  SO, CONSEQUENTLY, A SELECTION

2    OF THE VENDORS OF WHO WE USE IS CRITICAL TO OUR CUSTOMER

3    SATISFACTION SCORES.

4    Q.   SIR, ARE YOU AWARE THAT THE SAN DIEGO CONVENTION CENTER

5    IMPLEMENTED A POLICY MANDATING THAT THEIR EMPLOYEES BE USED FOR

6    TRADE SHOW CLEANING EFFECTIVE JULY 1ST, 2007?

7    A.   YES.

8    Q.   AND UPON HEARING ABOUT THAT POLICY, OR THAT THAT POLICY

9    WAS GOING TO BE IMPLEMENTED, DID YOU CONTACT THE SAN DIEGO

10   CONVENTION CENTER?

11   A.   I WROTE THEM A LETTER.

12   Q.   I'D LIKE YOU TO TAKE A LOOK AT EXHIBIT 722.  I'LL FIND

13   THAT FOR YOU.

14        (PLAINTIFF'S EXHIBIT 722 MARKED FOR IDENTIFICATION.)

15        THE WITNESS:  THAT'S THE LETTER I WROTE, YES.

16   BY MR. LANCE:

17   Q.   SIR, DID YOU SEND A LETTER TO BRAD GESSNER, AT THE

18   CONVENTION CENTER?

19   A.   YES.

20   Q.   AND YOU SENT HIM A LETTER ON JUNE 24TH, 2000 -- I'M SORRY,

21   JUNE 14TH, 2007?

22   A.   YES, SIR.

23   Q.   NOW THE POLICY WAS IMPLEMENTED ON JULY 1ST, BUT THERE WAS

24   AN ANNOUNCEMENT IN MAY OF 2007 THAT IT WAS COMING.  HOW DID YOU

25   LEARN ABOUT THIS POLICY?

1   A.   WELL, I GOT AN E-MAIL FROM RICK SIMON, WHO APPRISED ME OF

2   IT.  I TOLD HIM, I SAID, LET'S SEE HOW THIS THING DEVELOPS.

3   AND THEN I GOT ANOTHER E-MAIL THAT -- SAYING THAT IT WAS

4   DEVELOPING NEGATIVELY AND WOULD I WRITE A LETTER.  AND QUITE

5   FRANKLY, HE DIDN'T HAVE TO ASK ME TO WRITE THE LETTER.  I WOULD

6   HAVE WROTE THE LETTER ANYHOW.  BECAUSE IT WAS COMPLETELY

7   AGAINST THE BUSINESS PHILOSOPHY --

8           MR. L'ESTRANGE:  EXCUSE ME, MOVE TO STRIKE.

9   NONRESPONSIVE.

10          THE COURT:  EVERYTHING AFTER THE E-MAILS FROM

11  MR. SIMON SHOULD BE DISREGARDED, LADIES AND GENTLEMEN.  I'LL

12  GRANT THE MOTION.

13      YOU CAN FOLLOW UP, MR. LANCE, WITH QUESTIONS AS YOU'D

14  LIKE.

15          MR. LANCE:  SURE.

16  BY MR. LANCE:

17  Q.   MR. MCAVOY, WHY DID YOU SEND THIS LETTER TO MR. GESSNER?

18  A.   I DIDN'T AGREE WITH THE POLICY THAT WAS ABOUT TO BE

19  ADOPTED.

20  Q.   WHY IS THAT?

21  A.   FREEDOM OF CHOICE.  ALL THE REASONS THAT I STATED

22  PREVIOUSLY.  I DON'T THINK WE COULD CONTROL PRICING.  I DON'T

23  THINK WE COULD CONTROL QUALITY.  I THINK IT TOOK AWAY OUR

24  NEGOTIATING ABILITY TO DO WHAT IS NECESSARY ON OUR EVENTS.

25  Q.   NOW WHEN YOU SENT THIS LETTER TO MR. GESSNER ON JUNE 14,

1    2007, DID YOU IDENTIFY YOUR COMPANY AND YOUR POSITION IN THE

2    COMPANY?

3    A.   YES.

4    Q.   AND DID YOU IDENTIFY THAT REED WAS THE LARGEST TRADE SHOW

5    PRODUCER IN THE COUNTRY?

6    A.   I DON'T THINK I IDENTIFIED THAT WE ARE.   BUT I DON'T THINK

7    WE HAD TO.   IF YOU DON'T KNOW WHO REED IS, YOU HAVE A PROBLEM.

8    Q.   SO CERTAINLY YOU -- BEING IN THE INDUSTRY, YOU BELIEVE HE

9    WOULD HAVE BEEN AWARE OF THAT, BUT YOU DID LET HIM KNOW?

10   A.   YES.

11   Q.   OKAY.   DID YOU INDICATE TO MR. GESSNER THAT REED WAS

12   OPPOSED TO THIS POLICY?

13   A.   YES.

14   Q.   AND DID YOU TELL HIM WHY?

15   A.   YES.

16   Q.   WHAT DID YOU TELL HIM?

17   A.   COMPETITION IS GOOD.   IT CREATES THE WILLINGNESS TO HOLD

18   THE PRICES DOWN AND DO A GOOD JOB, AND THAT THE POLICY THAT

19   THEY WERE ABOUT TO ADOPT WAS NOT GOING TO ALIGN WITH WHAT WE

20   FELT WAS NECESSARY TO COMPLETE OUR TRADE SHOW AND EVENTS IN

21   THEIR VENUE.

22   Q.   AND YOU LISTED SPECIFIC TYPES OF SUBCONTRACTORS THAT YOU

23   WANTED TO HAVE THE ABILITY TO CONTROL, CORRECT?

24            MR. L'ESTRANGE:   OBJECTION.   LEADING.

25            THE COURT:   SUSTAINED.

BY MR. LANCE:

Q.   SIR, DID YOU LIST ANY SUBCONTRACTORS THAT YOU WANTED TO HAVE THE ABILITY TO CONTROL AT THE TRADE SHOW?

A.   WELL, THIS POLICY CHANGE WAS DIRECTLY RELATED TO THE CLEANING, AND THAT'S THE ONE I IDENTIFIED.

Q.   AND IN YOUR LETTER, DID YOU ALSO IDENTIFY OTHER SERVICES IN PARAGRAPH 2?

A.   I BASICALLY DID A COVER ALL, ALL SERVICES.  I DIDN'T SPECIFICALLY GO TO THE ISSUE OF CLEANING, BUT ALL SERVICES.

Q.   DID YOU, IN YOUR LETTER, REQUEST THAT MR. GESSNER AND THE CONVENTION CENTER NOT IMPLEMENT THIS POLICY?

A.   YES.

Q.   AND DID YOU ASK MR. GESSNER TO CONTACT YOU IF HE HAD ANY QUESTIONS?

A.   YES, I DID.

Q.   DID HE EVER DO THAT?

A.   NO, SIR.

Q.   LET'S MOVE BACK TO THE WESTERN FOOD SERVICE SHOWS, SIR. WHEN IS THAT SHOW GOING TO BE HELD NEXT?

A.   IT IS COMING UP IN -- I THINK IT'S AUGUST OF THIS YEAR.

Q.   AND WHERE IS THAT GOING TO BE?

A.   THAT SHOW ROTATES BETWEEN LOS ANGELES AND SAN DIEGO.  THIS YEAR, IT'S IN THE SAN DIEGO CONVENTION CENTER.

Q.   WOULD YOU LIKE TO HAVE THE CHOICE TO USE CENTURY CLEANING FOR THE FOOD SERVICE SHOW IN SAN DIEGO IN AUGUST?

1   A.   YES.

2   Q.   WHY WOULD YOU LIKE TO USE CENTURY FOR THAT SHOW?

3   A.   IT IS THE QUALITY OF THE SERVICE.  THE PRICE THAT I

4   NEGOTIATED ON, BY BEING ABLE TO LEVERAGE THE 40 EVENTS THAT I

5   HAVE WITH THEM, THE ABILITY TO SERVICE INDIVIDUAL CLIENTS'

6   NEEDS, WITHOUT EXCESSIVE COSTS BEING PASSED ON TO THOSE

7   CLIENTS.

8   Q.   NOW WHEN YOU HAVE THIS FOOD SERVICE SHOW, THE WESTERN FOOD

9   SERVICE SHOW IN LOS ANGELES, WHO DO YOU USE FOR TRADE SHOW

10  CLEANING?

11  A.   CENTURY.

12  Q.   DID YOU DISCUSS WITH FREEMAN THAT -- DID YOU DISCUSS WITH

13  FREEMAN THAT YOU WOULD LIKE TO USE CENTURY FOR THE WESTERN FOOD

14  SERVICE SHOW IN SAN DIEGO?

15  A.   YES.

16  Q.   TELL US ABOUT THAT.

17  A.   I ASKED THEM TO -- WHICH WE DO ON ALL SHOWS, WE ASK THEM

18  TO GIVE US A PRO FORMA INVOICE BEFORE THE SHOW, SAYING WHAT THE

19  DIFFERENT COSTS ARE GOING TO BE.  AND THAT'S FOR EVERYTHING,

20  THAT IS FOR EVERY FACET OF THEIR CONTRACT.  I ASKED THEM TO DO

21  A PRO FORMA INVOICE FOR THE WESTERN FOOD SERVICE SHOW.  AND

22  WHEN I GOT IT AND THEY HAD CENTURY IN THERE, CENTURY'S COSTS

23  WERE 50, 60 PERCENT --

24          MR. L'ESTRANGE:  OBJECTION.  BEST EVIDENCE.

25          THE COURT:  OVERRULED.  AS IT GOES TO YOUR STATE OF

1    MIND OR PLANNING FOR THE CONVENTION, AS OPPOSED TO WHAT THE

2    TRUE PRICING WAS, GO AHEAD.

3            THE WITNESS:  IT WAS 50 TO 60 PERCENT OVER WHAT WE

4    WERE PAYING IN LOS ANGELES.  AND THAT WAS KIND OF A RED FLAG.

5    BECAUSE OUR BUDGET HAD IT IN AT APPROXIMATELY WHAT IT WAS IN

6    LOS ANGELES.  AND, OF COURSE, I QUESTIONED IT AND I SAID, HOW

7    CAN CLEANING IN SAN DIEGO, USING THE SAME CONTRACTOR, BE 50, 60

8    PERCENT HIGHER?  AND THE COMMENT BACK FROM FREEMAN WAS THAT

9    THEY HAD TO PURCHASE THEIR LABOR THROUGH THE HALL.  AND I DON'T

10   REMEMBER THE RATE, BUT IT WAS SOME RATE THAT WAS -- LOOKED LIKE

11   IT WAS EXORBITANT TO ME, BUT I DON'T KNOW.  AND ALSO THEY HAD

12   TO GIVE UP 50 PERCENT OF THEIR CLEANING REVENUES TO THE

13   BUILDING.  AND THERE WAS NO WAY FOR CENTURY TO DO IT ANY

14   CHEAPER.  AND I SAID, WE'RE NOT DOING THIS.  I HAVE A FIDUCIARY

15   RESPONSIBILITY TO MY COMPANY, AND CENTURY IS OUT AND WE'LL USE

16   THE IN-HOUSE CLEANER, AND THAT IS IT.

17   BY MR. LANCE:

18   Q.  DID YOU FEEL YOU HAD AN ECONOMIC CHOICE?

19           MR. L'ESTRANGE:  OBJECTION.  THAT CALLS FOR

20   SPECULATION.

21           THE COURT:  OVERRULED.

22     IF YOU HAVE THAT OPINION ONE WAY OR ANOTHER, YOU CAN

23   ANSWER.  DON'T GUESS OR SPECULATE.

24           THE WITNESS:  THERE IS NO GUESS.  THE NUMBERS WERE

25   THE NUMBERS.  AND I BASICALLY -- IF I WANTED TO USE CENTURY,

1    AND DO WHAT I NEEDED TO DO TO MAKE MY SHOW BETTER, IT WAS GOING

2    TO COST ME 50 TO 60 PERCENT MORE.  AND I MADE THE DECISION, I'M

3    NOT DOING THAT, AND THAT WAS IT.  AND I FELT LIKE I HAD NO

4    CHOICE.  I FELT LIKE IT WAS -- I MEAN, PEOPLE GET FIRED FOR

5    MAKING THOSE KIND OF DECISIONS.

6    BY MR. LANCE:

7    Q.   BUT YOU DID WANT TO USE CENTURY UNTIL YOU GOT THE PRICING?

8    A.   I'D USE CENTURY TODAY IF THE PRICING WAS IN ORDER, BUT THE

9    PRICE WAS WAY OUT OF WHACK.

10   Q.   SO THIS POLICY AFFECTED YOUR ABILITY TO CHOOSE THE

11   CLEANING COMPANY YOU WANT?

12   A.   IT, IN ESSENCE, TIED MY HANDS TO THE POINT THAT I HAD NO

13   CHOICE.  I HAD NO CHOICE.

14   Q.   SO, SIR, YOU TOLD US ABOUT YOUR POSITION IN 2007, WHEN YOU

15   CONTACTED MR. GESSNER.  ARE YOU AND REED OPPOSED TO THIS POLICY

16   TODAY?

17   A.   YES, SIR.

18           MR. L'ESTRANGE:  OBJECTION.  LACK OF FOUNDATION.

19           THE COURT:  SUSTAINED.

20   BY MR. LANCE:

21   Q.   SIR, ARE YOU OPPOSED TO THIS POLICY TODAY?

22           MR. L'ESTRANGE:  OBJECTION.  IRRELEVANT.

23           THE COURT:  OVERRULED.

24           THE WITNESS:  YES, SIR.

25   BY MR. LANCE:

1  Q.   TELL US WHY.

2           THE COURT:  YOU'RE OPPOSED TO IT IN YOUR ROLE AS

3  SENIOR VICE PRESIDENT IN THE TRADE SHOW INDUSTRY?

4           THE WITNESS:  YES, SIR.

5           THE COURT:  GO AHEAD.

6           THE WITNESS:  I FEEL THE POLICY THAT WAS IMPLEMENTED

7  BY THE SAN DIEGO CONVENTION CENTER IS JUST ANOTHER WAY OF

8  RAISING MY RENT, EXTRACTING REVENUES FROM US IN AN UNETHICAL

9  MANNER BY SKIRTING RULES, TRADE SHOW INDUSTRY STANDARDS, THINGS

10  LIKE THAT.  AND I DON'T HAVE THE FREEDOM OF CHOICE.  AND JUST

11  LIKE WITH ANYBODY, YOU DON'T LIKE TO BE TOLD THIS IS WHAT YOU

12  HAVE TO DO BECAUSE IT AFFECTS WHAT THE PRODUCT IS.

13  BY MR. LANCE:

14  Q.   SIR, YOU LIVE ON THE EAST COAST; IS THAT RIGHT?

15  A.   YES, SIR.

16  Q.   AND AS I UNDERSTAND, YOU WERE AT A TRADE SHOW IN

17  LAS VEGAS?

18  A.   YES, SIR.

19  Q.   AND YOU CAME HERE TO TESTIFY IN COURT?

20  A.   YES, SIR.

21  Q.   WHY DID YOU COME HERE?

22  A.   IT GOES BACK TO MY COMMENT, THAT I'M IN THE TWILIGHT OF A

23  MEDIOCRE CAREER.  I THINK THERE IS INJUSTICES IN THE TRADE SHOW

24  INDUSTRY, AND I THINK THIS IS ONE OF THEM.

25           MR. LANCE:  NOTHING ELSE AT THIS TIME, YOUR HONOR.

1          THE COURT:  OKAY.  MR. L'ESTRANGE?

2          MR. L'ESTRANGE:  YES, SIR.

3                    CROSS-EXAMINATION

4  BY MR. L'ESTRANGE:

5  Q.   GOOD MORNING, MR. MCAVOY.

6  A.   GOOD MORNING.

7  Q.   MY NAME IS JOHN L'ESTRANGE.  AND WE'VE NEVER MET BEFORE,

8  RIGHT?

9  A.   NO, SIR.

10  Q.   AND I REPRESENT THE SAN DIEGO CONVENTION CENTER

11  CORPORATION IN THIS LAWSUIT.

12       FIRST OF ALL, I WANT TO ASK YOU ABOUT THE TRADE SHOW AT

13  THE SAN DIEGO CONVENTION CENTER.

14  A.   SURE.

15  Q.   WHICH IS THE RESTAURANT OR FOOD SHOW THAT YOU TALKED

16  ABOUT.

17  A.   YES, SIR.

18  Q.   WHAT IS THE FIRST YEAR YOU HAD THAT SHOW AT THE SAN DIEGO

19  CONVENTION CENTER?

20  A.   I'M GOING TO SAY, LET'S SEE, THIS IS 2011, I'M GOING TO

21  SAY IT'S EITHER 2005 OR 2007.  IT IS A BIANNUAL.  IT COMES IN

22  EVERY OTHER YEAR.

23  Q.   SO THE FIRST YEAR WAS, WHAT, 2007?

24  A.   IT WAS PROBABLY 2007.  IT WAS PROBABLY THE YEAR RIGHT WHEN

25  THIS WAS BEING IMPLEMENTED.

1    Q.   AND HAVE YOU DONE ANY BUSINESS AT THE SAN DIEGO CONVENTION

2    CENTER PRIOR TO 2007, YOU, PERSONALLY, ON BEHALF OF REED?

3    A.   I DON'T THINK SO.  NO, SIR.

4    Q.   SO YOU HAVE NEVER USED CENTURY TO DO ANY CLEANING AT THE

5    SAN DIEGO CONVENTION CENTER; IS THAT CORRECT?

6    A.   YES, SIR, THAT'S CORRECT.

7    Q.   AND AS FAR AS THIS NEGOTIATION OF THE CONTRACT IS

8    CONCERNED, YOU TALKED ABOUT A PRO FORMA, WHICH WAS DONE BY

9    FREEMAN, WHICH YOU SAID SHOWED THE DIFFERENCE BETWEEN CENTURY

10   DOING THE WORK IN SAN DIEGO, AND WHAT THEY WOULD DO IT IN

11   LOS ANGELES FOR WAS ABOUT 50 TO 60 PERCENT --

12   A.   THAT'S FROM RECOLLECTION, BUT YES, SIR.

13   Q.   AND TRANSLATED INTO DOLLARS, THAT WAS $5,000, CORRECT?

14   A.   SIR, I CAN'T REMEMBER THE MONEY.  IT WAS APPRECIABLE,

15   THOUGH.

16   Q.   ARE YOU FAMILIAR WITH A GENTLEMAN NAMED MICHAEL KISKEN?

17   A.   YES.

18   Q.   HE'S ONE OF THE PEOPLE ON YOUR STAFF, CORRECT?

19   A.   CORRECT.

20   Q.   AND HE'S INVOLVED IN, AMONG OTHER THINGS, NEGOTIATING

21   CONTRACTS, CORRECT?

22   A.   NO, SIR.

23   Q.   WHAT IS HIS ROLE?

24   A.   HE IS THE OPERATIONS MANAGER.

25   Q.   OKAY.

1        THE COURT:  HOW DO WE SPELL THAT LAST NAME?

2        MR. L'ESTRANGE:  THE LAST NAME IS SPELLED

3  K-I-S-K-E-N.

4        THE COURT:  OKAY.

5  BY MR. L'ESTRANGE:

6  Q.  I'M GOING TO --

7        MR. L'ESTRANGE:  MAY I APPROACH THE WITNESS, YOUR

8  HONOR?

9        THE COURT:  YES.

10  BY MR. L'ESTRANGE:

11  Q.  I'M HANDING YOU A DOCUMENT, SIR.  IT IS NOT MARKED AS AN

12  EXHIBIT.

13  A.  SURE.

14  Q.  BUT I'M ASKING YOU IF THIS DOCUMENT WILL REFRESH YOUR

15  RECOLLECTION ON THE MONEY DIFFERENTIAL BETWEEN THE CLEANING

16  DONE BY CENTURY IN LOS ANGELES AND THE CLEANING IN THE PRO

17  FORMA THAT WAS DONE BY FREEMAN FOR THE JOB IN SAN DIEGO?

18  A.  I'VE NEVER SEEN THE E-MAIL, BUT IT SOUNDS CORRECT.

19  Q.  SO WE CAN AGREE IT WAS APPROXIMATELY $5,000?

20  A.  AND I WILL GO BY -- IF THIS E-MAIL IS ACCURATE, YES, SIR.

21  Q.  AND WHAT THAT REPRESENTS IS HOW MUCH IT WOULD HAVE COST

22  YOU MORE THAN LA IF YOU WANTED TO USE CENTURY IN SAN DIEGO?

23  A.  YES, SIR.

24  Q.  AND IN THE NEGOTIATIONS WITH THE SAN DIEGO CONVENTION

25  CENTER, MS. WALLACE'S TEAM ACTUALLY AGREED TO GIVE YOU A $5,000

1 DISCOUNT, CORRECT?

2 A.   THAT'S CORRECT.

3 Q.   AND THEY AGREED TO GIVE YOU THAT DISCOUNT IN CONSIDERATION

4 OF WHAT YOU SAID WAS THE DIFFERENTIAL ON CLEANING COSTS,

5 CORRECT?

6 A.   ACCORDING TO THIS, YES, SIR.

7 Q.   AND THAT'S CONSISTENT WITH YOUR RECOLLECTION, ISN'T IT,

8 SIR?

9 A.   I THINK MR. KISKEN DID THAT.  I CANNOT RECALL THE

10 CIRCUMSTANCES UNDER.  I DO KNOW THAT WHEN WE SAID WE WEREN'T

11 GOING TO USE CENTURY BECAUSE OF THE COST DIFFERENTIAL, I SAID,

12 GO BACK TO THE HALL AND SEE WHAT YOU CAN DO.  AND THIS IS WHAT

13 HE MUST HAVE DONE.

14 Q.   OKAY.  SO NOW HAVING SEEN THAT DISCOUNT, ACCORDING TO THE

15 PRO FORMA, YOU CAN USE CENTURY IN THE SAN DIEGO CONVENTION

16 CENTER, AND IT'S NOT GOING TO COST YOU ANYMORE THAN IT WOULD

17 HAVE IN LOS ANGELES, CORRECT?

18 A.   I DON'T UNDERSTAND WHAT YOU'RE TRYING TO SAY.

19 Q.   WHAT YOU'VE TOLD THE JURY IS THAT UNDER THE PRO FORMA THAT

20 WAS DONE BY FREEMAN, IT WAS GOING TO COST YOU $5,000 MORE TO

21 USE CENTURY IN SAN DIEGO THAN YOU HAD EXPERIENCED IN

22 LOS ANGELES?

23 A.   WELL, IT WAS PHRASED TO ME A LITTLE BIT DIFFERENTLY BY

24 FREEMAN.

25 Q.   HOWEVER IT WAS PHRASED TO YOU BY FREEMAN --

1  A.   I THINK IT IS IMPORTANT FOR YOU TO KNOW HOW IT WAS PHRASED

2  TO ME BY FREEMAN.

3  Q.   THAT'S NOT MY QUESTION, SIR.   MR. LANCE WILL HAVE THE

4  OPPORTUNITY TO ASK YOU THAT ON REDIRECT EXAMINATION.

5       WHAT I'M TRYING TO CONFIRM IS, YOU CLOSED THE $5,000 GAP

6  ON THE EXTRA EXPENSE TO USE CENTURY, RIGHT?

7  A.   YES, SIR.

8  Q.   SO NOW, WHEN THIS SHOW TAKES PLACE IN 2011, IN SAN DIEGO,

9  YOU CAN USE CENTURY, AND IT'S NOT GOING TO USE -- COST YOU

10  ANYMORE THAN IT WOULD HAVE IN LOS ANGELES, CORRECT?

11  A.   I'M NOT AWARE IF THIS AGREEMENT IS IN FORCE FOR THIS

12  YEAR'S SHOW.   I WOULD HAVE TO CHECK ON THAT WITH MR. KISKEN.

13  Q.   SO YOU REALLY DON'T KNOW WHETHER THERE WOULD BE A COST

14  DIFFERENTIAL TO USE CENTURY IN LIGHT OF DISCOUNTS THAT HAVE

15  BEEN PROVIDED BY THE SAN DIEGO CONVENTION CENTER?

16  A.   I WOULD HAVE TO CHECK ON IT, SIR.   I DON'T KNOW.

17  Q.   YOU DON'T KNOW.   OKAY.   AND YOU RECOGNIZE THAT PUTTING

18  ASIDE THE MONEY, YOU HAVE EVERY RIGHT TO USE CENTURY IN THE SAN

19  DIEGO CONVENTION CENTER AS LONG AS THEY USE THE LABOR FORCE

20  FROM THE CORPORATION, CORRECT?

21  A.   CORRECT.

22  Q.   OKAY.

23       THE COURT:   WHY DON'T WE MARK THE EXHIBIT USED TO

24  REFRESH HIS RECOLLECTION AS NEXT IN ORDER FOR IDENTIFICATION

25  PURPOSES ONLY.

1          MR. L'ESTRANGE:  THAT WOULD BE FINE.

2          THE COURT:  THAT IS GOING TO BE WHAT, 1324?

3          MR. L'ESTRANGE:  1324.

4          THE CLERK:  YES.

5          THE COURT:  OKAY, 1324.

6      (DEFENDANT'S EXHIBIT 1324 MARKED FOR IDENTIFICATION.)

7          MR. L'ESTRANGE:  IF I MAY APPROACH, I'LL GIVE YOUR

8   HONOR A COPY.

9   BY MR. L'ESTRANGE:

10  Q.   NOW YOU TESTIFIED THAT ONE OF THE REASONS THAT YOU WERE

11  OPPOSED TO THIS POLICY IN SAN DIEGO IS BECAUSE THEY WERE

12  SKIRTING TRADE INDUSTRY STANDARDS?

13  A.   YES.

14  Q.   DO YOU RECALL THAT TESTIMONY?  WHAT STANDARDS ARE YOU

15  TALKING ABOUT?

16  A.   IF YOU'RE GOING TO INCUR AN EXCLUSIVE, OR YOU'RE GOING TO

17  MAKE IT AN EXCLUSIVE, IF YOU'RE GOING TO SKIRT AROUND IT,

18  INSTITUTE A POLICY THAT BASICALLY FORCES YOU INTO AN EXCLUSIVE.

19  Q.   IN OTHER WORDS, THE POLICY THAT WAS INSTITUTED BY THE SAN

20  DIEGO CONVENTION CENTER ON CLEANING IS NOT AN EXCLUSIVE AS THAT

21  TERM IS USED IN YOUR INDUSTRY?

22  A.   IT IS PARAMOUNT TO AN EXCLUSIVE BASED ON THE WAY THE

23  POLICY IS.

24  Q.   WHAT DO YOU MEAN "PARAMOUNT"?

25  A.   PARAMOUNT THAT WHEN THE COST IS HIGHER, IT'S AN EXCLUSIVE;

1   YOU HAVE TO USE THEM.  FROM A BUSINESS STANDPOINT, I WASN'T

2   GOING TO INCUR EXTRA COSTS.  MR. KISKEN WAS ABLE TO GET THOSE

3   OUT.  BUT I'M SAYING AS AN INDUSTRY, YOU SHOULDN'T HAVE TO GO

4   AND NEGOTIATE THOSE THINGS.  THOSE SHOULD BE IN YOUR PUBLISHED

5   RULES AND REGULATIONS.  AND IF YOU'RE GOING TO HAVE AN

6   EXCLUSIVE, HAVE AN EXCLUSIVE.  IF YOU'RE GOING TO HAVE A POLICY

7   THAT PEOPLE DON'T EVEN REALIZE THEY'RE SIGNING WHEN THEY SIGN

8   THE CONTRACT FOR THE HALL, THAT'S ANOTHER ISSUE.

9   Q.   LET ME SHOW YOU AN EXHIBIT, SIR.  I'D LIKE YOU TO LOOK AT

10  IT IN THE BOOK UNDER THE TAB FOR 32.  EXHIBIT 32 IS A COPY OF

11  THE POLICIES, RULES, AND REGULATIONS OF THE SAN DIEGO

12  CONVENTION CENTER.  ARE YOU FAMILIAR WITH THOSE, SIR?

13  A.   NO.

14  Q.   BUT IN YOUR ROLE AT REED, ONE OF THE THINGS THAT YOU WOULD

15  CERTAINLY WANT TO DO AT ANY PLACE WHERE YOU DO BUSINESS IS TO

16  FIND OUT WHETHER THERE ARE INTERNAL RULES AND REGULATIONS,

17  RIGHT?

18  A.   THAT'S CORRECT.

19  Q.   THAT IS SOMETHING THAT IS DONE BY ONE OF YOUR

20  SUBORDINATES?

21  A.   YES, SIR.

22  Q.   ARE YOU AWARE THAT THESE POLICIES, RULES, AND REGULATIONS

23  ARE POSTED ON THE INTERNET?

24  A.   OH, YES.

25  Q.   SO I'D LIKE YOU TO TURN TO PAGE 3 OF EXHIBIT 32.  AND IF

1  WE CAN HAVE THE FACILITY CLEANING PORTION.  THIS, I'LL

2  REPRESENT TO YOU, SIR, IS THE PORTION OF THE POLICIES, RULES,

3  AND REGULATIONS, AS DISCLOSED ON THE INTERNET, WHICH IDENTIFY

4  THE POLICY THAT WE'VE BEEN TALKING ABOUT HERE THIS MORNING, THE

5  CLEANING POLICY.  AND I'LL READ IT, IT SAYS, IN AN EFFORT TO

6  ENHANCE SECURITY AND MAINTAIN HIGH STANDARDS OF CLEANLINESS,

7  ONLY SDCC EMPLOYEES ARE PERMITTED TO PROVIDE EVENT CLEANING

8  WITHIN THE CENTER.

9       AND THAT'S THE POLICY THAT YOU'RE TALKING ABOUT THIS

10 MORNING?

11 A.   YES, SIR.

12 Q.   SO WHEN YOU SAID A MOMENT AGO, IT IS UNFAIR TO SIGN A

13 CONTRACT AND NOT REALIZE THAT YOU'RE BEING BOUND BY THIS

14 POLICY, IN FACT, IT WAS AVAILABLE TO YOU IF YOU HAD TAKEN THE

15 TIME TO GO TO THE WEBSITE FOR THE CONVENTION CENTER, CORRECT?

16 A.   I DON'T THINK IT WAS, SIR, AT THE TIME THAT WE SIGNED THE

17 ORIGINAL CONTRACT IN 2007.  I THINK WE SIGNED THAT CONTRACT

18 WELL BEFORE THEN, BEFORE THIS POLICY BECAME IN EFFECT.

19 Q.   FOR WHICH SHOW?

20 A.   I'M GOING TO SAY THE 2007 SHOW.

21 Q.   OKAY.  I'LL REPRESENT TO YOU THAT THE POLICY WAS THEN IN

22 EFFECT.

23 A.   I DON'T KNOW.  I'M NOT CONTESTING THAT.

24 Q.   YOU'RE SAYING YOU DON'T KNOW?

25 A.   I DON'T KNOW.

1    Q.   NOW YOU'VE SIGNED TWO RECENT CONTRACTS?

2    A.   YES.

3    Q.   AND YOU CERTAINLY KNEW ABOUT THIS POLICY AT THE TIME YOU

4    SIGNED THOSE OTHER CONTRACTS?

5    A.   YES.

6    Q.   AND YOU AGREED IN THOSE CONTRACTS TO BE BOUND BY THE

7    POLICIES AND RULES AND REGULATIONS OF THE BUILDING, CORRECT?

8    A.   IT IS HARD TO HOLD THE WESTERN FOOD SERVICE SHOW IN TULSA,

9    OKLAHOMA, SO, YES, SIR.

10   Q.   YOU'VE HELD IT IN LOS ANGELES, HAVEN'T YOU?

11   A.   IT'S A CALIFORNIA RESTAURANT SHOW; THEY'RE THE SPONSORS OF

12   THE SHOW.

13   Q.   LAST TIME I CHECKED, LA IS IN CALIFORNIA, RIGHT?

14   A.   THE LAST TIME I CHECKED, SO WAS SAN DIEGO.

15   Q.   AND THE SHOW, I THINK YOU SAID, ROTATES FROM ONE VENUE TO

16   ANOTHER?

17   A.   BACK AND FORTH, YES.

18   Q.   BUT THE POINT OF THE MATTER IS, IN SIGNING THESE TWO

19   RECENT CONTRACTS, YOU WERE AWARE --

20   A.   ABSOLUTELY.

21   Q.   -- OF THIS POLICY?

22        AND THAT'S WHAT CAUSED YOU TO NEGOTIATE, IN PART, THIS

23   REDUCTION?

24   A.   ABSOLUTELY.  BECAUSE WE DON'T AGREE WITH IT.

25   Q.   LET ME GO BACK TO THE FIRST PART OF YOUR EXAMINATION.  AND

1    THIS HAS TO DO WITH YOUR COMMUNICATION WITH MR. GESSNER,

2    EXPRESSING YOUR DISSATISFACTION WITH THE POLICY.

3    A.   YES.

4    Q.   REMEMBER THAT WAS THE FIRST SERIES OF QUESTIONS THAT WAS

5    ASKED OF YOU?

6    A.   YES, SIR.

7    Q.   IN FACT, YOU RECEIVED AN E-MAIL FROM MR. SIMON IMMEDIATELY

8    PRIOR TO SENDING THIS COMMUNICATION TO MR. GESSNER --

9    A.   YES, SIR.

10   Q.   -- CORRECT?

11        AND IN THAT COMMUNICATION FROM MR. SIMON, HE IDENTIFIED

12   THE POLICY AND EVEN GAVE YOU SUGGESTED LANGUAGE TO PUT IN YOUR

13   LETTER TO MR. GESSNER?

14   A.   YES.

15   Q.   OKAY.

16        MR. L'ESTRANGE:  I'VE HANDED COUNSEL FOR UNM THE

17   REDACTED VERSION OF THIS DOCUMENT, PREVIOUSLY MARKED AS

18   EXHIBIT 1015.  MAY I HAND IT UP?

19        THE COURT:  THANK YOU.

20        MR. L'ESTRANGE:  I WILL TAKE A COPY TO THE WITNESS.

21   BY MR. L'ESTRANGE:

22   Q.   IF YOU CAN HANG ON TO THIS, SIR, WHEN YOU'RE DONE --

23   A.   DO YOU WANT THIS BOOK BACK?

24   Q.   YES.  HAVE YOU HAD AN OPPORTUNITY TO READ THAT?

25   A.   I DIDN'T READ IT.  I JUST BRUSHED IT, YES.  DO YOU WANT ME

1  TO READ IT IN DEPTH?  I REMEMBER GETTING IT.

2  Q.   OKAY.  I'M GOING TO ASK YOU SOME QUESTIONS ABOUT IT.  AND

3  WHEN I ASK A QUESTION, IF YOU FEEL THAT IT'S NECESSARY TO READ

4  THE ENTIRE DOCUMENT TO ANSWER IT PROPERLY --

5  A.   COULD I HAVE THE LETTER I SENT SO I CAN --

6  Q.   SURE.  I'LL HAVE TO GET THAT.  THAT'S EXHIBIT 8 --

7           MR. LANCE:  722.

8  BY MR. L'ESTRANGE:

9  Q.   HERE YOU GO.

10  A.   THANK YOU.

11  Q.   YOU'RE WELCOME.  YOU WILL CONFIRM THAT THIS DOCUMENT I

12  HAVE HANDED YOU, WHICH IS EXHIBIT 1215, IS THE COPY OF THE

13  E-MAIL YOU RECEIVED FROM MR. SIMON; IS THAT CORRECT?

14  A.   YES.  I GOT IT -- I DON'T REMEMBER, BUT I GOT IT.  I KNOW

15  I DID.

16           MR. L'ESTRANGE:  DO YOU HAVE ANY OBJECTION TO THE

17  REDACTED --

18           MR. LANCE:  NO OBJECTION.

19           MR. L'ESTRANGE:  WE MOVE THE ADMISSION OF

20  EXHIBIT 1015 AS REDACTED.

21           THE COURT:  OKAY.  THAT WILL BE RECEIVED SINCE THERE

22  IS NO OBJECTION.

23  (DEFENDANT'S EXHIBIT 1015 MARKED AND RECEIVED INTO EVIDENCE.)

24  BY MR. L'ESTRANGE:

25  Q.   I'D LIKE TO EXPLAIN THIS IN THE ELMO BECAUSE OF THE

1  REDACTIONS.  IT'S A LITTLE OUT OF SYNC.  BUT I'M FIRST GOING TO

2  PUT UP PAGE 4.  THIS IS THE -- A PORTION OF EXHIBIT 1015, WHICH

3  YOU HAVE IN FRONT OF YOU, SIR, RIGHT?

4  A.   YES, SIR.

5  Q.   AND THIS E-MAIL WAS SENT TO YOU BY MR. SIMON, ADVISING YOU

6  OF THE POLICY HERE IN SAN DIEGO, CORRECT?

7  A.   YES, SIR.

8  Q.   AND HE WAS SUGGESTING THAT YOU WRITE A LETTER TO

9  MR. GESSNER, EXPRESSING YOUR DISSATISFACTION WITH THE POLICY,

10  RIGHT?

11  A.   YES, SIR.

12  Q.   AND HE EVEN GAVE YOU A SAMPLE LETTER THAT YOU COULD SEND

13  TO MR. GESSNER, CORRECT?

14  A.   I REMEMBER GETTING THE E-MAIL.  I DID NOT USE THIS

15  DOCUMENT TO DO MY LETTER.  THESE WERE MY THOUGHTS AT THE TIME

16  WHEN I WAS APPRISED THAT THIS WAS GOING ON.  I KNEW ABOUT THIS,

17  I'M GOING TO SAY, A COUPLE MONTHS PRIOR.

18          THE COURT:  LET ME INTERRUPT YOU, SIR.  THE QUESTION

19  IS:  DID MR. SIMON PROVIDE YOU A SAMPLE LETTER --

20          THE WITNESS:  YES --

21          THE COURT:  YOU CAN ANSWER THAT YES OR NO.

22          THE WITNESS:  YES, HE DID.

23  BY MR. L'ESTRANGE:

24  Q.   OKAY.  AND ON THE BOTTOM OF THE E-MAIL IS THE SUGGESTED

25  LETTER TO GO TO MR. GESSNER, CORRECT?

1    A.   CORRECT.

2    Q.   IS THAT RIGHT?  I'D LIKE TO GO OVER NEXT TO PAGE 5 OF

3    EXHIBIT 1015.  AND THEN THIS IS THE CONCLUSION OF THE LETTER

4    THAT MR. SIMON SCRIPTED FOR YOU TO SEND, RIGHT?

5    A.   YES, SIR.

6              MR. L'ESTRANGE:  I HAVE NO FURTHER QUESTIONS.

7              THE COURT:  ALL RIGHT.  AND MR. LANCE.

8                        REDIRECT EXAMINATION

9    BY MR. LANCE:

10   Q.   BACK ON THAT LETTER THAT YOU SENT TO MR. GESSNER, WAS

11   EVERYTHING IN THAT LETTER ACCURATE, SIR?

12   A.   THE LETTER THAT I SENT?

13   Q.   YES.

14   A.   YES.

15   Q.   AND IS THAT HOW YOU FELT ABOUT THIS SITUATION IN JUNE OF

16   2007?

17   A.   YES, SIR.

18   Q.   WOULD YOU LET MR. SIMON PUT WORDS IN YOUR MOUTH?

19   A.   NO, SIR.  I WOULD HAVE WROTE THIS LETTER ANYWAY.

20   Q.   SIR, I WANT TO ASK YOU SOME QUESTIONS.  MR. L'ESTRANGE

21   ASKED YOU A QUESTION ABOUT YOUR DISCUSSIONS BETWEEN CENTURY AND

22   FREEMAN, AND THEN HE STOPPED YOU.  HE DIDN'T WANT YOU TO FINISH

23   YOUR ANSWER.

24        WHAT IS IT THAT YOU WANTED TO ADD ABOUT WHAT FREEMAN SAID

25   WHEN YOU WERE DISCUSSING WHETHER YOU COULD USE CENTURY AT THE

1   SAN DIEGO CONVENTION CENTER?

2   A.   WHEN THIS SUBJECT CAME UP AND WE WERE COMPARING THE

3   PRICES, AND THE PRICES WERE OFF, THE REPRESENTATIVES FROM

4   FREEMAN SAID, KEN, WE RECEIVE OTHER PERKS FROM THE CENTER --

5            MR. L'ESTRANGE:   EXCUSE ME, OBJECTION.   HEARSAY.

6   MOTION IN LIMINE.

7            THE COURT:   YEAH, SUSTAINED.

8   BY MR. LANCE:

9   Q.   MR. MCAVOY, WHEN YOU WERE DISCUSSING THE ISSUES OF THE

10  FINANCIAL ASPECTS OF WHETHER YOU COULD USE CENTURY, WHAT DID

11  CENTURY TELL YOU ABOUT WHAT THEY WOULD NEED FROM A BOOTH

12  CLEANING STANDPOINT AND A FACILITY CLEANING RATE IN ORDER FOR

13  YOU TO USE THEM AT THE CONVENTION CENTER?

14           MR. L'ESTRANGE:   OBJECTION.   HEARSAY.

15           THE COURT:   SUSTAINED.

16  BY MR. LANCE:

17  Q.   WAS THAT PART OF YOUR PROCESS WHEN YOU WERE TRYING TO

18  DETERMINE WHETHER OR NOT YOU COULD USE CENTURY FOR THE WESTERN

19  FOOD SHOW IN AUGUST OF THE INFORMATION YOU HAD FROM FREEMAN AND

20  FROM CENTURY ON WHAT THE ECONOMICS WOULD BE?

21  A.   YES.

22  Q.   AND THAT'S WHAT YOU CONSIDERED WHEN YOU DECIDED TO USE THE

23  SAN DIEGO CONVENTION CENTER TO DO THE TRADE SHOW CLEANING AT

24  THE END OF THE DAY?

25  A.   THAT AND THE URGING FROM FREEMAN NOT TO CAUSE ANY

1  PROBLEMS.

2        MR. L'ESTRANGE:  MOVE TO -- WITHDRAW.

3        THE COURT:  I'M SORRY, YOU -- ARE YOU WITHDRAWING?

4        MR. L'ESTRANGE:  (NODDING.)

5        THE COURT:  OH, OKAY.  GO AHEAD.

6  BY MR. LANCE:

7  Q.  SO WHEN YOU WERE GATHERING THIS INFORMATION FROM CENTURY,

8  WHAT WAS THEIR PROPOSAL TO YOU AT -- ON WHETHER THEY WOULD --

9  STRIKE THAT.

10      WHAT DID CENTURY TELL YOU THAT THEY WOULD NEED IN ORDER TO

11  DO THE TRADE SHOW CLEANING FOR THE WESTERN FOOD SHOW IN AUGUST

12  AT THE CONVENTION CENTER?

13        MR. L'ESTRANGE:  OBJECTION.  HEARSAY.  BEST EVIDENCE.

14        THE COURT:  SUSTAINED.  HE'S TESTIFIED THAT IT WAS

15  GOING TO COST MORE AND THAT DROVE THE DECISION.  I THINK THE

16  SPECIFICS OF THE MECHANICS ARE IN THE MINDS AND WILL BE IN THE

17  TESTIMONY OF OTHERS.

18        MR. LANCE:  WELL, YOUR HONOR, THE SPECIFICS IS WHY HE

19  MADE THE DECISION.  SO IT'S IMPORTANT TO KNOW -- MR. L'ESTRANGE

20  HAS CROSS-EXAMINED HIM ON THE AMOUNT.  SO THAT HAS OPENED THE

21  DOOR FOR ME TO ASK HIM WHAT THE SPECIFICS WERE.

22        THE COURT:  OF WHICH IT WAS IN THE HANDS OF SOMEONE

23  ELSE, AND HE REALLY DIDN'T KNOW, THAT'S WHY I'M SUSTAINING THE

24  OBJECTION.  CONTINUE.

25  BY MR. LANCE:

1    Q.   MR. MCAVOY, I WANT TO ASK YOU ABOUT THE BOOTH CLEANING

2    ASPECT OF THIS ISSUE OF WHO YOU WERE GOING TO USE FOR TRADE

3    SHOW CLEANING IN SAN DIEGO.  WHEN YOU WERE TRYING TO MAKE A

4    DECISION AS TO WHETHER YOU WERE GOING TO USE CENTURY, WHAT WAS

5    YOUR UNDERSTANDING AS TO WHAT PERCENTAGE OF THE BOOTH CLEANING

6    THAT CENTURY WOULD BE --

7              MR. L'ESTRANGE:  OBJECTION.  LACK OF FOUNDATION.

8    CALLS FOR HEARSAY.

9              THE COURT:  DO YOU HAVE AN UNDERSTANDING?

10             THE WITNESS:  I DID AT THE TIME OF THE CONVERSATION,

11   YES.

12             THE COURT:  ALL RIGHT.  OVERRULED.

13       AS TO YOUR UNDERSTANDING, YOU CAN TESTIFY.

14             THE WITNESS:  MY UNDERSTANDING WAS THAT IT WAS 50

15   PERCENT OF THE GROSS REVENUES.

16   BY MR. LANCE:

17   Q.   AND 50 PERCENT OF THE GROSS REVENUES WAS GOING TO BE --

18   A.   FOR EXHIBIT BOOTH CLEANING.

19   Q.   AND WHO WAS GOING TO GET THAT?

20   A.   THE CENTER.

21   Q.   AND WHO DID YOU -- WHEN YOU HAD THOSE DISCUSSIONS, THEN,

22   OF IF YOU WERE GOING TO USE CENTURY, WOULD THE CENTER STILL GET

23   50 PERCENT?

24             MR. L'ESTRANGE:  OBJECTION.  THAT CALLS FOR HEARSAY

25   ABOUT HIS CONVERSATIONS WITH CENTURY.

1          THE COURT:  OVERRULED.  HE JUST SAID THAT LAST

2  ANSWER.  SO IT'S CUMULATIVE, BUT GO AHEAD.

3          THE WITNESS:  YES.  CENTURY WAS GOING TO HAVE TO GIVE

4  THE SAN DIEGO CONVENTION CENTER 50 PERCENT OF THE GROSS

5  REVENUES TO BE ABLE TO OPERATE IN THE BUILDING.

6  BY MR. LANCE:

7  Q.  WAS CENTURY WILLING TO STILL DO THE SHOW IF 50 PERCENT OF

8  THE GROSS REVENUES WENT TO THE CONVENTION CENTER AND THE OTHER

9  50 PERCENT WENT TO FREEMAN?

10          MR. L'ESTRANGE:  OBJECTION.  HEARSAY.

11          THE COURT:  SUSTAINED.

12          THE WITNESS:  I --

13          THE COURT:  THERE IS NO NEED TO ANSWER THAT QUESTION.

14  I SUSTAINED IT.

15          THE WITNESS:  THANK YOU.

16  BY MR. LANCE:

17  Q.  SIR, YOU WANTED TO USE CENTURY, CORRECT?

18  A.  YES.

19          MR. L'ESTRANGE:  OBJECTION.  CUMULATIVE.

20          THE COURT:  OVERRULED.  GO AHEAD.

21  BY MR. LANCE:

22  Q.  THE REASON THAT YOU MADE THE DECISION DURING THESE

23  NEGOTIATIONS THAT YOU COULDN'T USE CENTURY WAS WHAT?

24  A.  IT WAS A LITTLE BIT MORE THAN FINANCIAL.  THE FINANCIAL

25  WAS THE DRIVER, BUT THERE WERE OTHER REASONS.

1   Q.   WHAT WERE THE OTHER REASONS?

2   A.   THE OTHER REASONS, THAT FREEMAN TOLD ME THEY WERE

3   RECEIVING --

4          MR. L'ESTRANGE:  OBJECTION.

5          THE WITNESS:  -- SPECIAL CONSIDERATION FROM THE --

6          THE COURT:  HOLD ON.  THE OBJECTION IS?

7          MR. L'ESTRANGE:  HE IS RECITING HEARSAY.

8          MR. ERGASTOLO:  AND MOTION IN LIMINE.

9          THE COURT:  I'LL ALLOW IT FOR THE LIMITED PURPOSE OF

10  HIS STATE OF MIND IN MAKING DECISIONS.

11         THIS IS ONE OF THOSE AREAS, LADIES AND GENTLEMEN, WHERE

12  THE TESTIMONY WILL BE ALLOWED FOR A LIMITED PURPOSE ONLY, ONLY

13  AS TO HIS DECISION PROCESS, NOT WHICH HE WAS TOLD IS

14  NECESSARILY TRUE, CORRECT.

15         MR. L'ESTRANGE:  THE ONLY REQUEST I HAVE, YOUR HONOR,

16  IS THAT HE NOT WANDER INTO THE AREAS COVERED BY THE MOTION IN

17  LIMINE, WHICH HE SUGGESTED IN HIS EARLIER TESTIMONY IS WHERE HE

18  WAS HEADED.

19         THE COURT:  THAT IS AN APPROPRIATE LIMITATION.

20      SO, MR. LANCE, YOU CAN FRAME THE QUESTIONS AS NEEDED.

21         MR. LANCE:  WELL, YOUR HONOR, I'M NOT SURE --

22         THE COURT:  THE POLICIES AND THE PROCEDURES OF OTHER

23  CONVENTION CENTERS AREN'T AN ISSUE.

24         MR. LANCE:  YEAH, WE'RE ONLY TALKING ABOUT THE SAN

25  DIEGO CONVENTION CENTER.

1      THE COURT:  WHAT ELSE DO YOU WANT TO USE AS A

2  FRAMEWORK HERE?

3      MR. ERGASTOLO:  MOTION IN LIMINE, YOUR HONOR.  DO YOU

4  WANT A NUMBER, WOULD THAT HELP YOU?

5      THE COURT:  YES.

6      MR. ERGASTOLO:  NO. 10, SAN DIEGO CONVENTION CENTER,

7  MOTION IN LIMINE NO. 10.  WE'RE WANDERING IN THERE.

8      THE COURT:  YEAH, THAT WOULD GO TO THE PURPOSE AS

9  WELL.  SO WITH THOSE LIMITATIONS, HIS FRAME OF MIND AS TO THE

10  COST.  IF THERE IS SOMETHING OTHER THAN COVERED BY THOSE

11  MOTIONS, I'LL ALLOW A LEADING QUESTION FOR PURPOSES OF GETTING

12  THERE AND HEMMING IT IN.

13  BY MR. LANCE:

14  Q.  WHEN YOU HAD THE DISCUSSIONS WITH FREEMAN, SIR, ABOUT

15  WHETHER IT WAS POSSIBLE TO USE CENTURY FOR THIS WESTERN FOOD

16  SERVICE TRADE SHOW, IN THIS COMING AUGUST, DID THEY INDICATE TO

17  YOU WHETHER IT WOULD BE A FINANCIAL PROBLEM FOR THEM IF YOU

18  USED CENTURY INSTEAD OF THE CONVENTION CENTER?

19      MR. L'ESTRANGE:  OBJECTION.  THAT CALLS FOR HEARSAY.

20      THE COURT:  SUSTAINED.

21  BY MR. LANCE:

22  Q.  SIR, ARE YOU A MEMBER OF ANY TRADE INDUSTRY ORGANIZATIONS?

23  A.  IAE, WHICH IS INTERNATIONAL ASSOCIATION OF EXHIBITS AND

24  EVENTS, SOCIETY OF INDEPENDENT SHOW ORGANIZERS.  I'M ALSO ON

25  THE CLIENT ADVISORY BOARD OF THREE OR FOUR CONVENTION CENTERS

1   ACROSS THE UNITED STATES.

2   Q.   HAS REED EVER HAD A REPRESENTATIVE ON THE SAN DIEGO

3   CONVENTION BOARD?

4   A.   YES.

5   Q.   ADVISORY BOARD?

6   A.   YES.

7   Q.   WHO IS THAT?

8   A.   HUGH SINNOCK.

9   Q.   AND WERE YOU INVOLVED IN MAKING A DECISION WHETHER REED

10  SHOULD HAVE A REPRESENTATIVE ON THE ADVISORY BOARD FOR

11  SAN DIEGO?

12  A.   THEY ASKED -- THEY ASKED FOR A REPRESENTATIVE FROM REED

13  BECAUSE IT'S A LONG WAY FROM NORWALK TO SAN DIEGO.  WE

14  DECIDED -- WE HAVE AN OFFICE IN LAS VEGAS.  WE DECIDED TO USE

15  OUR REPRESENTATIVE FROM LAS VEGAS TO SIT ON THAT COMMITTEE.

16          MR. L'ESTRANGE:  OBJECTION.  RELEVANCE ON THIS LINE

17  OF INTERROGATION.

18          THE COURT:  WELL, I'LL ALLOW IT, SUBJECT TO MOTION IN

19  LIMINE TO STRIKE.  SEE IF WE CAN TIE IT IN.

20  BY MR. LANCE:

21  Q.   SIR, AT SOME POINT, DID REED MAKE A DECISION TO REMOVE

22  THAT MEMBER?

23  A.   WE DECIDED NOT TO PARTICIPATE AFTER THE -- AFTER THE FIRST

24  TERM OR WHATEVER YOU CALL IT.  THEY GIVE THEM A TERM OF SO MANY

25  YEARS, AND WE DECIDED NOT TO PARTICIPATE.

1  Q.   AND WHY WAS THAT?

2  A.   MY FRAME OF MIND IS THAT IT WAS A WASTE OF TIME, THAT THE

3  CENTER WAS -- HAD ITS MIND MADE UP OF WHAT IT WANTED TO DO AND

4  WAS LOOKING FOR SHOW MANAGERS TO BASICALLY PUT THEIR STAMP OF

5  APPROVAL ON POLICIES LIKE THIS.  AND I HAD BETTER THINGS FOR MY

6  EMPLOYEE TO DO IN LAS VEGAS THAN TO PLAY RUBBER STAMP.

7  Q.   AND, SIR, YOU INDICATED THAT THIS --

8        MR. L'ESTRANGE:  EXCUSE ME, MOVE TO STRIKE.  THIS

9  ISN'T RELEVANT TO THE ISSUE OF THE CASE.

10       THE COURT:  I'M GOING TO GRANT THE MOTION, AND PLEASE

11  DISREGARD HIS LAST ANSWER.

12  BY MR. LANCE:

13  Q.   SIR, YOU INDICATED THAT THIS EXCLUSIVE TO YOU IS PARAMOUNT

14  TO AN EXCLUSIVE -- I'M SORRY, YOU INDICATED THAT THIS POLICY IS

15  PARAMOUNT TO AN EXCLUSIVE.  WHAT DID YOU MEAN BY THAT?

16  A.   I MEANT THAT BY HAVING A POLICY THAT THEY HAVE HERE, THAT

17  I -- IT IS THE SAME THING AS HAVING AN EXCLUSIVE BECAUSE IT'S

18  ECONOMICALLY UNFEASIBLE FOR A SHOW MANAGER TO DO ANYTHING BUT

19  USE THEIR SERVICES.

20       MR. LANCE:  NOTHING FURTHER, YOUR HONOR.

21       THE COURT:  MR. L'ESTRANGE?

22       MR. L'ESTRANGE:  NO FURTHER QUESTIONS.

23       THE COURT:  MAY THIS WITNESS BE EXCUSED?

24       MR. LANCE:  HE MAY.

25       THE COURT:  YOU'RE FREE TO GO, MR. MCAVOY.  THANKS.

1    YOU'RE EXCUSED.

2        AND THEN DO THE PLAINTIFFS HAVE ANY FURTHER WITNESSES FOR

3    THEIR CASE-IN-CHIEF?

4            MR. LANCE:  YOUR HONOR, THE ONLY OTHER MATTER IS WE

5    WANT TO OFFER EXHIBIT 813, THE INCIDENT REPORTS INTO EVIDENCE,

6    THE SAN DIEGO CONVENTION CENTER INCIDENT REPORT.

7            THE COURT:  IS THERE ANY OBJECTION ON 813?  I'LL GIVE

8    YOU A MOMENT TO LOOK FOR THAT.

9            MR. ERGASTOLO:  OBJECTION.  RELEVANCE.  403.

10           THE COURT:  LET'S TAKE THAT ONE UP OUTSIDE THE

11   PRESENCE OF THE JURY WHILE THEY'RE ON THEIR BREAK.  AND 872 HAS

12   BEEN TALKED ABOUT AN AWFUL LOT, BUT IT'S NEVER BEEN OFFERED.

13   IS THE INTENT THAT IT IS ONLY TO ASSIST THE TESTIMONY, OR IS IT

14   GOING TO BE A DOCUMENT IN EVIDENCE?

15           MR. LANCE:  YOUR HONOR, WE'LL OFFER THAT INTO

16   EVIDENCE, 872.

17           MR. L'ESTRANGE:  THIS IS THE CONTRACT CHART?

18           THE COURT:  YEAH, THE FLOW CHART THAT WE'VE LOOKED AT

19   100 TIMES.

20           MR. L'ESTRANGE:  NO OBJECTION.

21       (PLAINTIFF'S EXHIBIT 872 MARKED FOR IDENTIFICATION.)

22           THE COURT:  I DIDN'T MEAN THAT TO GUIDE YOUR CHOICE

23   HERE, BUT -- ALL RIGHT.  AND SUBJECT TO ANY OTHER EXHIBITS WE

24   MAY HAVE MISSED, AND THE DISPOSITION OF 813, THE PLAINTIFF

25   WOULD BE RESTING AT THIS TIME?

1          MR. LANCE:  THAT'S CORRECT, YOUR HONOR.

2          THE COURT:  ALL RIGHT, SO, LADIES AND GENTLEMEN, THE

3   PLAINTIFF HAS RESTED THEIR CASE.  MEANING, THEY'VE PRESENTED

4   ALL THEIR EVIDENCE TO SUPPORT THEIR CLAIMS.  AND THAT LEADS US

5   TO DEALING NOW WITH THIS ONE EXHIBIT THAT YOU'VE HEARD

6   SOMETHING ABOUT BUT HAVEN'T SEEN YET AND SOME OTHER LEGAL

7   MATTERS THAT WE NEED TO ATTEND TO.

8          SO WHAT I'M GOING TO DO IS SEND YOU ON A BRUNCH BREAK, AS

9   OPPOSED TO A LUNCH BREAK.  BECAUSE WE'RE GOING TO NEED THE

10  BETTER PART OF AN HOUR AND CHANGE, I THINK, TO DEAL WITH SOME

11  OF THESE ISSUES.  SO IT'S 10:15 AT THIS TIME.  I'M GOING TO

12  ALLOW YOU TO HAVE A BREAK UNTIL 12:15.  SO YOU CAN HAVE AN

13  EARLY LUNCH, SOME TIME TO DO SOME OTHER THINGS.  AT 12:15,

14  WE'LL CONTINUE ON WITH THE CASE.  WE'LL HAVE A LONGER BREAK IN

15  THE MID AFTERNOON AS NECESSARY TO KEEP YOU REFRESHED AND ALERT,

16  AND THEN FINISH UP BY THE END OF THE DAY, UNLESS -- THE NORMAL

17  END OF THE DAY UNLESS OTHER MATTERS INTERCEDE.

18         SO I'LL SEND YOU ON A BREAK UNTIL 12:15.  AND I'LL REMIND

19  YOU OF THE ADMONITION:  DON'T DISCUSS THE CASE; DON'T MAKE UP

20  YOUR MIND.  A LOT YET TO BE DONE.  AND HAVE A GOOD TIME.  I

21  HOPE IT IS NOT RAINING YET, AND YOU CAN ENJOY YOUR BRUNCH.

22                 (JURY EXITS COURTROOM.)

23         THE COURT:  THE JURY HAS LEFT.  COUNSEL AND PARTIES

24  REMAIN.  AND YOU MAY HAVE A SEAT.  WE CAN TALK ABOUT 813, I

25  GUESS, FIRST, AND ANYTHING ELSE TO FOLLOW THAT'S BEEN OFFERED;

1    OBJECTIONS AS TO 403, AMONG PROBABLY OTHER THINGS HAVE BEEN

2    INDICATED AT LEAST AT THE OUTSET.

3         AND MR. ERGASTOLO, OR OTHERS, YOU FOLKS WANT TO, PERHAPS,

4    AMPLIFY YOUR OBJECTIONS AND I CAN HEAR FROM MR. LANCE AND HIS

5    COLLEAGUES ON IT.  THESE ARE THE ALLEGED INCIDENT RECORDS, 2006

6    TO 2008.  SO MR. ERGASTOLO, GO AHEAD.

7         MR. ERGASTOLO:  WHAT EXHIBIT 13 IS A COLLECTION OF

8    APPROXIMATELY, I DON'T KNOW, IT IS ABOUT THIS MUCH PAPER

9    TOGETHER.  ABOUT 700 PAGES OF -- WELL, WITH THAT, IT IS ABOUT

10   700 PAGES OF INCIDENT REPORTS AT THE CONVENTION CENTER.  THEY

11   ARE RANDOM INCIDENTS THAT ARE REPORTED TO THE SECURITY

12   DEPARTMENT AND ARE PUT IN WRITING.

13        THE COURT:  OKAY.

14        MR. ERGASTOLO:  I'M NOT QUITE SURE WHAT THE RELEVANCE

15   IS.  THERE HAS BEEN NO FOUNDATION LAID REGARDING THESE REPORTS,

16   WHETHER THEY'RE ACCURATE.  THERE IS -- WE OBJECTED ON A NUMBER

17   OF GROUNDS, INCLUDING RELEVANCE.  AND I'M NOT QUITE SURE THE

18   JURY -- WHAT THEY WOULD DO WITH 700 PAGES OF INCIDENT RECORDS.

19        THE COURT:  I'M SKIMMING THEM AS YOU'RE TALKING.

20        LET'S HEAR FROM THE PLAINTIFF.  WHAT IS THE, FIRST, THE

21   FOUNDATION, AND THEN THE -- LET'S START WITH THE RELEVANCE, AND

22   WE CAN GET TO THE FOUNDATION.

23        MR. LANCE:  THE RELEVANCE IS, YOUR HONOR, IS THAT

24   THESE ARE INCIDENT REPORTS AT THE SAN DIEGO CONVENTION CENTER,

25   THAT THESE ARE ALL OF THE REPORTS THAT THEY PRODUCED.  AND

1    THERE IS NOT ONE REPORT IN THERE THAT INDICATES THERE IS ANY

2    SECURITY WITH UNITED.  THE ABSENCE OF UNITED BEING IN THOSE

3    RECORDS IS THE KEY.  IF THEY WANT TO STIPULATE THAT THEY'RE --

4    DURING THAT TIME PERIOD, THIS MANY REPORTS WERE FILED AND THERE

5    WERE NO INCIDENTS REPORTING ANY THEFT, VANDALISM, OR OTHER

6    ISSUES WITH UNITED, THAT IS FINE.  BUT THE ABSENCE OF THAT

7    REPORT IS WHY THIS IS RELEVANT AND WHY IT'S IMPORTANT.

8        IN ADDITION, THESE ARE THEIR OWN DOCUMENTS, THEIR OWN

9    INCIDENT RECORDS, THEIR BUSINESS RECORDS, PRODUCED BY THE SAN

10   DIEGO CONVENTION CENTER.  I TALKED ABOUT THOSE WITH

11   MR. GESSNER, AND I ASKED HIM IF THERE WERE ANY INCIDENT REPORTS

12   REGARDING THE, YOU KNOW, UNITED, WERE YOU AWARE OF ANY WRITTEN

13   DOCUMENTS.  WE'VE ASKED SEVERAL OF THE WITNESSES.

14            THE COURT:  THEY SAID NO, NO, NO.

15            MR. LANCE:  RIGHT.  THEY SAID NO.  AND SO THE ISSUE

16   IS, THERE IS A LARGE GROUP OF INCIDENT REPORTS, AND THIS IS NOT

17   RANDOM.  UNLESS THEY WANT TO STIPULATE THAT THEY ONLY HAD A

18   RANDOM INCIDENT REPORT PROCESS, WHICH I HAVEN'T HEARD BEFORE.

19            THE COURT:  A VARIETY OF INCIDENT REPORTS IN TERMS OF

20   TOPICS, TYPICALLY MISSING PROPERTY.

21            MR. LANCE:  AND WHAT WE'VE TALKED ABOUT, WHAT THE

22   WITNESSES HAVE TALKED ABOUT AND TESTIFIED TO IS THAT THEY HAVE

23   A POLICY THAT IF THERE IS A THEFT, IF THERE IS A VANDALISM

24   PROBLEM, THERE IS A SECURITY ISSUE, THAT THEY WILL PREPARE AN

25   INCIDENT REPORT.  SO THE ABSENCE OF THE REPORT IS IMPORTANT

1    EVIDENCE IN THIS CASE.

2          MR. ERGASTOLO:  MAY I RESPOND, YOUR HONOR?

3          THE COURT:  CERTAINLY.

4          MR. ERGASTOLO:  ON THE RELEVANCE GROUND, MR. -- OR

5    UNM HAD THE ABILITY TO CROSS-EXAMINE TWO WITNESSES THAT WOULD

6    HAVE KNOWLEDGE OF THESE REPORTS AND INTRODUCE THEM THROUGH

7    THOSE WITNESSES, MR. LAYNE AND MR. GESSNER.  THEY CHOSE NOT TO

8    DO SO.  SO RIGHT NOW, THOSE DOCUMENTS ARE NOT AUTHENTICATED BY

9    ANYBODY.  THE SIMPLE FACT THEY WERE PRODUCED IN LITIGATION

10    DOESN'T MAKE THEM ADMISSIBLE.

11    SECOND, MORE IMPORTANT, UNM DID INQUIRE OF THOSE WITNESSES

12    WHETHER THERE WERE ANY INCIDENTS RELATED TO UNITED ON SECURITY.

13    AND THE TESTIMONY ALREADY CAME IN THAT THE ANSWER WAS NO.  SO

14    THIS IS CUMULATIVE AND A WASTE OF TIME FOR THE JURY TO BE

15    HANDED 700 PAGES OF VERY -- AND I USE THE WORD "RANDOM" BECAUSE

16    THEY'RE RANDOM.  THERE IS A WRITTEN POLICY TO CREATE REPORTS,

17    BUT THIS IS EVERYTHING FROM, SOMEBODY LEFT A JACKET THERE AND

18    COULDN'T FIND IT, AND IN ONE OF THE ROOMS, TO, YOU NAME IT.

19    ANYTHING THAT HAS BEEN PUT IN WRITING OR REQUEST TO BE PUT IN

20    WRITING IS PUT IN WRITING.  IT IS THE POLICY OF THE COMPANY.

21    SO AT BEST, CUMULATIVE, NOT AUTHENTICATED, NO REASON TO PUT

22    THEM IN.

23          THE COURT:  WELL, IT IS UNDISPUTED THAT THERE ARE NO

24    WRITTEN -- THERE ARE NO WRITTEN INCIDENT REPORTS OR CLAIMS BY

25    THE CONVENTION CENTER WITNESSES THAT THE CLEANING STAFF WAS

1    INVOLVED IN ANY SECURITY THEFT OR OTHER ISSUES.

2            MR. ERGASTOLO:  THAT HAS BEEN THE TESTIMONY.

3            THE COURT:  SO WHAT -- AND SO TO THE EXTENT THAT'S

4    NOT DISPUTED, WOULD IT BE -- TO SIMPLIFY THINGS, TO SIMPLY ADD

5    THAT TO THE JOINT STATEMENT OF FACTS EITHER AGREED OR NOT

6    DISPUTED, AND BECAUSE I AGREE THAT THE -- GOING THROUGH THE 700

7    OR WHATEVER, IT IS A SUBSTANTIAL VOLUME, IS EXTRAORDINARILY

8    PUNISHING TO THE JURY, TIMEWISE AND ENERGY WISE, ON A CASE

9    WHERE THERE IS NO DISPUTE.  IT'S NOT LIKE GESSNER OR OTHER

10   WITNESSES SAID, YEAH, THERE WERE, BUT I DON'T RECALL WHEN OR

11   HOW.  WHAT ABOUT A STIPULATION ON THAT FACT, AND WE DISPOSE OF

12   700 PAGES OF STUFF?

13           MR. LANCE:  THE PLAINTIFFS WOULD AGREE TO THAT, YOUR

14   HONOR.

15           MR. ERGASTOLO:  YOUR HONOR, THE TESTIMONY IS ALREADY

16   IN.  I'M NOT COMFORTABLE WITH MAKING A STIPULATION TO THE JURY

17   ON THIS ISSUE.  I DON'T THINK IT'S NECESSARY.  THERE HAS BEEN

18   TESTIMONY THERE CONSISTENTLY.  WHAT WOULD THE STIPULATION ADD

19   TO WHAT HAS ALREADY BEEN TESTIFIED TO?

20           THE COURT:  YEAH, I GUESS THAT'S TRUE.

21           MR. ERGASTOLO:  IT WOULD BE EMPHASIZING A FACT THAT

22   WE DON'T THINK IS RELEVANT TO ANY ISSUE IN THIS CASE.  IT'S

23   MARGINALLY RELEVANT AT BEST.

24           THE COURT:  THERE IS RELEVANCE TO WHETHER OR NOT

25   THERE WAS A SECURITY CONCERN ABOUT THE CLEANING STAFF.  THAT

1  IS, IN ESSENCE, WHAT THE WHOLE CASE IS ABOUT --

2  　　　　MR. ERGASTOLO:  YOUR HONOR --

3  　　　　THE COURT:  AS IT IS ONE OF THE THREE REASONS GIVEN

4  BY THE CONVENTION CENTER FOR THE POLICY.  SO I THINK THE

5  PLAINTIFF WAS APPROPRIATE IN THE INQUIRY.  BUT I AGREE WITH

6  YOU, THERE IS NO ISSUE.  YOU KNOW, THE PLAINTIFF CAN ARGUE THAT

7  THE -- YOU KNOW, WITNESSES FROM THE CONVENTION CENTER STOOD UP

8  AND SAID THEY HAD NO COMPLAINTS OF THEFT OR SECURITY ISSUES.

9  THE EXPERTS HAVE OPINED.  THE YOUNG LADY YESTERDAY OPINED THAT

10  MR. SIMON, I THINK, TESTIFIED HE HAD NEVER HEARD OF ANY

11  CONCERNS OR ISSUES.  IT IS EXTRAORDINARILY TIME CONSUMING ON AN

12  ISSUE THAT IS NOT IN DISPUTE.  PLAINTIFFS CAN ARGUE THE

13  TESTIMONY.  THE -- YOU KNOW, THE TESTIMONY IS THE TESTIMONY.

14  AND SO I'M GOING TO GRANT -- SUSTAIN THE OBJECTION.  IT'S 700

15  PAGES OF -- ON A NON-ISSUE, IN A CASE WHERE WE HAVE 14- --

16  ALMOST 1,324 EXHIBITS, AND GOD KNOWS HOW MANY PAGES THAT THIS

17  JURY IS GOING TO GO THROUGH.  SO I'D RATHER THEY FOCUS, IN THE

18  INTEREST OF EFFICIENCY AND THEIR TIME, ON WHAT IS IN DISPUTE,

19  NOT WHAT IS NOT.

20  　　SO THE OBJECTION IS SUSTAINED, ON THE 13.

21  　　　　MR. LANCE:  YOUR HONOR, CAN I ASK ONE QUESTION?

22  　　　　THE COURT:  YES.

23  　　　　MR. LANCE:  WHEN THE DEFENSE IS PUTTING ON THEIR

24  CASE, I DON'T WANT TO VIOLATE THE COURT'S RULING HERE.  BUT I

25  ASSUME I CAN ASK, HOW MANY INCIDENT REPORTS THERE WERE, YOU

1    KNOW.  AND AT LEAST THEY CAN TAKE A LOOK AT IT.  BECAUSE THE

2    FACT -- AND THIS IS THE ISSUE WE DEAL WITH, OH, THESE ARE

3    RANDOM INCIDENT REPORTS, WELL, THAT --

4              THE COURT:  THEY'RE NOT RANDOM.  THESE ARE THE

5    INCIDENT REPORTS FOR A TWO-YEAR PERIOD.  THEY HAVE RANDOM

6    TOPICS, VARIABLE TOPICS, PICK YOUR ADJECTIVE.  BUT IS THERE ANY

7    OBJECTION TO SOME FOLLOW-UP ON THIS?  NOT THAT THAT IS GOING TO

8    OVERCOME THE OBJECTION, THAT THEY'RE GOING TO GO INTO EVIDENCE.

9    BUT TO ALLOW THE PLAINTIFF THE ABILITY TO FLESH THAT OUT TO

10   MAKE SURE THERE IS NO QUESTION.

11             MR. ERGASTOLO:  I'LL HAVE TO WAIT AND SEE WHAT THE

12   QUESTIONS ARE AND THE ANSWERS ARE.

13             THE COURT:  I DON'T SEE ANY PROBLEM WITH YOUR

14   CONFIRMING THE ABSENCE OF -- THE FACT THAT THEY'RE REQUIRED TO

15   DO IT EVERY TIME, THERE ARE HUNDREDS FOR THIS PERIOD.  IF THEY

16   KNOW THE EXACT NUMBER, GREAT.  IF THEY DON'T, THEY CAN SAY

17   HUNDREDS.  AND NOT ONE SAYS THAT UNITED IS A SECURITY RISK.

18   THERE ARE SOME COMMENTS IN SOME OF THESE ABOUT HOUSEKEEPERS, SO

19   TO SOME DEGREE, THERE IS -- YOU KNOW, IT'S A LITTLE BIT

20   CONFUSING, TOO.  AND WE HAVE NO TESTIMONY ON THESE THINGS

21   SPECIFICALLY; WE HAVE GENERICALLY.  YOU CAN FOLLOW UP AS LONG

22   AS IT DOESN'T PROLONG THE AGONY, SO TO SPEAK.

23        OKAY, SO THAT BEING DONE, THEN THE DEFENSE WANTS TO RAISE

24   ITS MOTIONS THAT IT INTENDS IT'S GOING TO MAKE AT THIS POINT.

25   THAT WOULD BE MOTIONS UNDER RULE 50, I TAKE IT?

1          MR. L'ESTRANGE:  YES, YOUR HONOR.

2          THE COURT:  AND THIS WOULD BE -- THERE ARE FOUR

3    CAUSES OF ACTION AS I SEE IT.  AND THE PLAINTIFFS CAN TELL ME

4    IF I'M WRONG, BUT WE HAVE THE ATTEMPTED MONOPOLIZATION, THE

5    SHERMAN ACT, SECTION 2, WE HAVE THE ESSENTIAL FACILITIES

6    DOCTRINE, SECTION 2, WE HAVE THE INTENTIONAL INTERFERENCE WITH

7    CONTRACTUAL RELATIONS, UNDER STATE LAW, AND WE HAVE THE

8    INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE UNDER STATE

9    LAW.  SO THAT'S WHAT I THINK THIS CASE IS ABOUT.  YOU FOLKS

10   AGREE GENERICALLY?

11         MR. L'ESTRANGE:  YES, YOUR HONOR.

12         MR. LANCE:  YES.

13         THE COURT:  SHOULD WE TAKE THEM ONE AT A TIME, OR HOW

14   WERE YOU INTENDING TO PROCEED, MR. L'ESTRANGE?

15         MR. L'ESTRANGE:  WHAT I WOULD PROPOSE IS, WE TAKE

16   EACH CAUSE OF ACTION, WHERE I MAKE OUR PRESENTATION, AND THEN

17   SOMEONE FROM UNM'S SIDE CAN RESPOND.

18         THE COURT:  THAT IS WHAT I WAS THINKING.  I WANT TO

19   MAKE SURE THAT WORKS FOR YOU.

20         MR. L'ESTRANGE:  I'D LIKE TO TAKE THEM IN THE REVERSE

21   ORDER OF WHAT YOU JUST IDENTIFIED.

22         THE COURT:  HOWEVER YOU WANT TO DO IT.

23         MR. L'ESTRANGE:  OKAY.  THE FIRST, I'M MOVING UNDER

24   FEDERAL RULES OF CIVIL PROCEDURE 50(A), THAT THE COURT ISSUE AN

25   ORDER RESOLVING CERTAIN ISSUES AGAINST UNITED NATIONAL

1  MAINTENANCE, AND I WILL NOW GO THROUGH THOSE VARIOUS ISSUES

2  THAT I AM ASKING TO BE RESOLVED AGAINST THEM.

3          THE COURT:  OKAY.

4          MR. L'ESTRANGE:  FIRST, WITH RESPECT TO THE CLAIM FOR

5  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE,

6  WE REQUEST THAT THE COURT ENTER AN ORDER THAT THAT CLAIM BE

7  DISMISSED AND JUDGMENT BE GRANTED IN FAVOR OF THE SAN DIEGO

8  CONVENTION CENTER CORPORATION.

9          THE COURT:  THAT IS THE SIXTH CAUSE OF ACTION --

10         MR. L'ESTRANGE:  YES.

11         THE COURT:  -- IN THE COMPLAINT?  GO AHEAD.

12         MR. L'ESTRANGE:  FIRST OF ALL, THERE IS NO DAMAGE

13  STUDY FOR THAT CAUSE OF ACTION, AS MR. -- DR. KENNEDY SAID

14  YESTERDAY.  I SPECIFICALLY ASKED HIM IF HE HAD A DAMAGE

15  ANALYSIS FOR THE CLAIM FOR INTERFERENCE WITH PROSPECTIVE

16  ECONOMIC ADVANTAGE, AND HE SAID NO.  EVERYTHING IS FOR THE

17  PAST.  NOW SO THAT'S ONE POINT.

18      SECONDLY, AS TO NIELSEN, WHICH IS ONE OF THE ENTITIES THAT

19  IS THE SUBJECT OF THAT CLAIM, THERE ARE ABSOLUTELY NO DAMAGES

20  OF ANY KIND FOR NIELSEN.  LIKEWISE FOR BLANE (PHONETIC), BLANE,

21  WHICH IS ALSO THE SUBJECT FOR THE CLAIM FOR INTERFERENCE WITH

22  PROSPECTIVE ECONOMIC ADVANTAGES, NO DAMAGES.

23      FINALLY, FOR TWO OTHER DECORATORS THAT WERE IDENTIFIED BY

24  DR. KENNEDY, BUT HAVE NOT BEEN MENTIONED AT ALL IN THE TRIAL,

25  ARE FERN (PHONETIC) AND SPARGO (PHONETIC).  SO AS TO THOSE TWO

1    DECORATORS, TO THE EXTENT THERE IS ANY REQUEST THAT THEY BE

2    BROUGHT UNDER THIS CAUSE OF ACTION, THERE IS SIMPLY NO EVIDENCE

3    TO SUPPORT THAT CLAIM.  AND THE MOTION SHOULD BE GRANTED AS TO

4    THEM AT THE VERY LEAST.  AND UNDER RULE 50(A) YOU DO HAVE THE

5    POWER TO GRANT AN ORDER THAT ONLY LIMITS IT AS TO SPECIFIC

6    DECORATORS.  IT DOESN'T HAVE TO BE ALL OR NOTHING.

7        SO WHERE WE'RE REALLY LEFT, THE ONLY DECORATOR FOR WHICH

8    THERE IS ANY EVIDENCE THAT WAS PRESENTED IS PARADISE, AND AS TO

9    PARADISE, ITS PAST DAMAGES; NEVERTHELESS, AS I UNDERSTAND IT,

10   FOR A CONTRACT THAT IS UNENFORCEABLE, AS THE ONE WITH PARADISE

11   WOULD BE UNDER THE STATUTE OF FRAUDS, IT FALLS WITHIN THE

12   CATEGORY OF INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC

13   ADVANTAGE.  SO EVEN THOUGH IT IS NOT PROSPECTIVE, AS THAT TERM

14   IS USED IN THE CAUSE OF ACTION, I THINK BASED ON WHAT HAS BEEN

15   SET FORTH IN THE TRIAL BRIEFS, THE CLAIM FOR PARADISE AND THE

16   ATTENDANT DAMAGES WOULD FALL WITHIN THIS CAUSE OF ACTION.

17           THE COURT:  THE CLAIM FOR PARADISE I THINK WAS

18   ROUGHLY -- IS IT 25,000, IS MY MEMORY SOMEWHAT GOOD?

19           MR. SLANIA:  I BELIEVE IT IS 25,746.

20           MR. L'ESTRANGE:  I BELIEVE SO.

21           THE COURT:  SO FERN AND SPARGO WERE THERE IN THE

22   TABLE IN THAT SHORT OF CATCH-ALL 5- TO 10,000 OR SOMETHING?

23           MR. L'ESTRANGE:  NO.  THOSE NAMES WERE NEVER

24   MENTIONED BEFORE THEY CAME OUT OF DR. KENNEDY'S MOUTH

25   YESTERDAY.

1          THE COURT:  THAT IS WHY I ASKED HIM TO SPELL ONE OF

2    THEM BECAUSE I HADN'T HEARD IT.  OKAY, CONTINUE.

3          MR. L'ESTRANGE:  SO BASICALLY WE'RE DOWN TO PARADISE.

4    BECAUSE AS TO BLANE, NIELSEN, FERN, AND SPARGO, THERE IS SIMPLY

5    NO DAMAGES; THERE CAN BE NO CLAIM.

6          AS TO PARADISE, THERE IS NO EVIDENCE IN TERMS OF THE

7    ARRANGEMENT WITH PARADISE.  THERE IS SIMPLY AN ABSENCE OF

8    EVIDENCE AS TO WHAT CONTRACT ARRANGEMENT WAS PROSPECTIVE,

9    CURRENT, OR ANY OTHER FORM, BETWEEN UNM AND PARADISE; AND,

10   THEREFORE, THEY SIMPLY HAVE FAILED TO DEMONSTRATE THAT THEY HAD

11   ANY REASONABLE EXPECTATIONS OF AN ECONOMIC ADVANTAGE.  BECAUSE

12   WE DON'T KNOW WHAT THE DEAL WAS, THERE IS ONLY VERY GENERALIZED

13   TESTIMONY THAT MR. SIMON SUGGESTED THAT WHOEVER RUNS PARADISE

14   WOULD CONTINUE TO GIVE HIM BUSINESS.

15    I WILL NOTE THAT RAY MORIARITY OF PARADISE WAS LISTED AS A

16   TRIAL WITNESS, AND HIS APPEARANCE WAS CONDITIONED ON PRESENTING

17   HIM FOR DEPOSITION.  HE WAS NEVER TENDERED, NEVER CALLED.  SO

18   NO ONE FROM PARADISE HAS TESTIFIED IN THIS CASE, ALTHOUGH THEY

19   WERE ON THE WITNESS LIST.

20         SO AS TO PARADISE, THERE IS SIMPLY NO EVIDENCE OF ANY

21   ACTUAL DISRUPTION, EITHER.  BECAUSE WHAT WE KNOW IS THAT

22   MR. SIMON AND HIS COMPANY CONTINUED TO DO WORK FOR PARADISE AT

23   THE SAN DIEGO CONVENTION CENTER.  SO WE WOULD REQUEST THAT

24   JUDGMENT BE GRANTED ON THE CLAIM FOR INTENTIONAL INTERFERENCE

25   WITH PROSPECTIVE ECONOMIC ADVANTAGE ON THE GROUNDS THERE IS

1    SIMPLY A LACK OF PROOF AS TO THAT CLAIM.

2            THE COURT:   OKAY.   AND THEN LET'S TURN TO MR. SLANIA.

3    I MEAN, THE ELEMENTS TO THIS CLAIM WOULD BE AN ECONOMIC

4    RELATIONSHIP BETWEEN THE PLAINTIFF AND SOME THIRD PARTY WITH

5    THE PROBABILITY OF SOME FUTURE ECONOMIC BENEFIT.   SECOND, THE

6    DEFENDANT'S KNOWLEDGE OF THEIR RELATIONSHIP.   THIRD,

7    INTENTIONAL ACTS ON THE PART OF THE DEFENDANT DESIGNED TO

8    DISRUPT THEIR RELATIONSHIP.   FOURTH, ACTUAL DISRUPTION OF THE

9    RELATIONSHIP.   AND FIVE, ECONOMIC HARM TO THE PLAINTIFF

10   PROXIMATELY CAUSED BY THE ACTS OF THE DEFENDANT.

11       SO YOU CAN DISAGREE, AND CERTAINLY I'M INVITING YOU TO

12   TELL ME IF I'VE UNFAIRLY STATED YOUR BURDEN HERE.   BUT THAT'S

13   FROM THE YOUST VS. LONGO, 43 CAL. 3D 64 (1987), CALIFORNIA

14   SUPREME COURT.

15           MR. SLANIA:   YOUR HONOR, I AGREE WITH THE GENERAL

16   RECITATION OF THOSE FIVE ELEMENTS FOR THE CAUSE OF ACTION.   I

17   BELIEVE WE PRESENTED EVIDENCE TO SATISFY EACH AND EVERY ONE OF

18   THOSE ELEMENTS.

19       REGARDING THE ECONOMIC RELATIONSHIP, MR. SIMON -- AS IT

20   RELATES TO PARADISE, MR. SIMON TESTIFIED THAT HE'S HAD A

21   HAND-SHAKE DEAL WITH MR. MORIARITY OR PEOPLE AT PARADISE FOR, I

22   BELIEVE, 25 OR 30 YEARS.   I DON'T RECALL THE SPECIFIC YEARS

23   THAT HE USED DURING THIS TESTIMONY, BUT THAT WAS HIS

24   DESCRIPTION.   AND HE WENT INTO A LITTLE BIT MORE DETAIL ABOUT

25   THAT, OF AN ECONOMIC RELATIONSHIP BETWEEN THE PARTIES, AND

1    WHICH THEY CONTINUED TO DO BUSINESS OVER TIME FOR TRADE SHOWS.

2        WHEN PARADISE WOULD CONTACT UNITED, WHEN THEY HAD SHOWS,

3    UNITED WOULD SERVE AS THE TRADE SHOW CLEANING CONTRACTOR.

4    THERE IS DOCUMENTARY EVIDENCE ABOUT THE KNOWLEDGE OF THAT.

5    THERE IS TESTIMONY FROM ROBERT DENOFRIO, BRAD GESSNER, THAT

6    THEY KNEW ABOUT THE FACT THAT PARADISE WAS INVOLVED.  I BELIEVE

7    THERE WAS ALSO TESTIMONY FROM -- I DON'T RECALL SPECIFICALLY

8    RIGHT NOW, THE WITNESS IS ESCAPING ME, BUT I CROSS-EXAMINED,

9    AND I SAID, WEREN'T YOU TOLD BY PARADISE THAT THEY WANTED TO

10   CONTINUE USING UNITED, AND THE ANSWER WAS YES.  I DON'T RECALL

11   SPECIFICALLY RIGHT NOW WHICH WITNESS THAT WAS, RIGHT NOW, YOUR

12   HONOR.  BUT SO THERE IS KNOWLEDGE ABOUT THIS RELATIONSHIP.  THE

13   SHOWS HAVE BEEN GOING ON OVER TIME; UNITED HAS CLEANED

14   PARADISE'S SHOWS.  THE CONVENTION CENTER IS VERY WELL AWARE

15   THAT PARADISE IS THE DECORATOR ON THE AFCEA WEST SHOW, AS WELL

16   AS OTHERS.  AND I BELIEVE THERE HAS EVEN BEEN DOCUMENTS SHOWN

17   TO THE JURY ABOUT THE AFCEA WEST SHOW.

18       THERE HAS ALSO BEEN THE ONE SHOW PROFIT AND LOSS

19   STATEMENTS, YOUR HONOR, THAT WERE ALL ADMITTED INTO EVIDENCE,

20   WHICH REFERENCE THE SHOWS WHICH TALK ABOUT THE FACTS THAT THE

21   SHOWS WERE GOING ON, WHICH IDENTIFIES KNOWLEDGE ON BEHALF OF

22   THE CONVENTION CENTER.  IT ALSO DISCUSSES THE AMOUNT OF BOOTH

23   CLEANING REVENUE, AND CLEANING SERVICES REVENUE, WHICH THE

24   CONVENTION CENTER RECEIVED ON THOSE SHOWS.  AND THAT WAS THE

25   MORE COSTLY PERFORMANCE FOR UNITED UNDER ITS ECONOMIC

1    RELATIONSHIP WITH ALL OF THOSE CONTRACTORS THAT ARE NOT A PART

2    OF THE INTENTIONAL INTERFERENCE WITH CONTRACT CLAIM.  AND ALL

3    OF THOSE ONE SHOW PROFIT AND LOSS STATEMENTS ARE IN EVIDENCE.

4         AND WE ALSO HAD DR. KENNEDY TESTIFY AS TO WHAT THE AMOUNTS

5    AND SPECIFICS ARE FOR DAMAGES FOR PARADISE, WHICH I BELIEVE WAS

6    THE 25,746, AND FOR BREEDY (PHONETIC), OF $53,215, WHICH

7    MR. L'ESTRANGE DIDN'T ADDRESS IN HIS MOTIONS.  I BELIEVE THE

8    MOTION IS NOT ADDRESSED IN THE BREEDY NATIONAL.  SO WE HAVE

9    SPECIFIC TESTIMONY THAT SETS FORTH WHAT THOSE DAMAGES ARE AND

10   WHAT THE DISRUPTION IS BECAUSE EVERYBODY HAS CONSISTENTLY SAID

11   THAT YOU HAVE TO USE CONVENTION CENTER LABOR TO PERFORM THE

12   CLEANING AT ALL OF THOSE SHOWS.

13        AND THEN REGARDING THE ACTS DESIGNED TO DISRUPT THE

14   RELATIONSHIP, THE IMPLEMENTATION OF THE POLICY DISRUPTED THE

15   RELATIONSHIP.

16             THE COURT:  YEAH, I AGREE WITH YOU ON THAT ONE.  WHAT

17   ABOUT NIELSEN AND BLANE (PHONETIC), FERN AND SPARGO, AND THE

18   LACK OF ANY DAMAGES ASSERTED THERE?

19             MR. SLANIA:  WELL, AS FAR AS THE AMOUNT OF DAMAGES,

20   DR. KENNEDY DID IDENTIFY FERN AND SPARGO.  AND THERE ARE ONE

21   SHOW PROFIT AND LOSS STATEMENTS THAT RELATE TO THOSE SHOWS,

22   WHICH ARE IN EVIDENCE.

23             THE COURT:  BUT THERE IS NO EVIDENCE OF THE

24   CONVENTION CENTER -- FROM THE CONVENTION CENTER WITNESSES THAT

25   THEY WERE AWARE OF FERN AND SPARGO.  THIS WAS -- CAME OUT OF

1    LEFT FIELD.

2            MR. SLANIA:  I UNDERSTAND, YOUR HONOR, BUT THERE IS

3    EVIDENCE THAT THEY WERE AWARE OF THE SHOWS.  AND WHEN THE SHOWS

4    ARE GOING ON, THEY KNOW WHO THE DECORATORS ARE.  AND THEY KNEW

5    THAT UNITED WAS THE SUBCONTRACTOR THAT WAS PERFORMING THE

6    CLEANING BECAUSE THERE WERE ONE SHOW CONTRACTS THAT THERE HAS

7    BEEN TESTIMONY ABOUT THAT UNITED CONTINUED TO PERFORM UNDER

8    DURESS UNDER THOSE ONE SHOW CONTRACTS.

9            THE COURT:  BUT IT IS MORE THAN JUST HAVING

10   KNOWLEDGE, AN ECONOMIC RELATIONSHIP.  IT HAS TO BE WITH THE

11   PROBABILITY OF FUTURE ECONOMIC BENEFIT TO THE PLAINTIFF.  THAT,

12   A ONE-SHOW CONTRACT BASIS DOESN'T FILL THAT GAP, DOES IT?

13           MR. SLANIA:  WELL, BEFORE THE EVENTS TOOK PLACE, THE

14   CONVENTION CENTER REQUIRED ONE SHOW CONTRACTS TO BE SIGNED.

15   THAT IS KNOWLEDGE THAT AS FOR THAT EVENT, THERE IS AN ECONOMIC

16   RELATIONSHIP WHICH UNITED SOUGHT TO BE ABLE TO PROFIT FROM.

17   AND THAT IS WHAT THE TESTIMONY IS FROM THE CONVENTION CENTER,

18   THAT THE ONE SHOW CONTRACTS HAD TO BE SIGNED BEFORE THE EVENTS

19   TOOK PLACE.

20           THE COURT:  BUT UNLIKE GES AND -- OR, YEAH, GES AND

21   CHAMPION AND SOME OF THESE OTHER ONES THAT HAVE HAD CONTRACTS

22   FOR UMPTEEN YEARS, OR AN ONGOING RELATIONSHIP FROM WHICH SOME

23   CLAIM A PROBABILITY OF FUTURE WORK COULD HAPPEN, THIS IS BY

24   ANALOGY, THE RECORD IS VOID THERE, AS TO THESE FOUR -- FERN,

25   SPARGO, BLANE, AND NIELSEN.  NOBODY TESTIFIED ABOUT THEIR

1     ONGOING, LONG-TERM RELATIONSHIPS AS TO THOSE FOUR.  WE KNOW

2     THAT EPISODICALLY THEY HAD SOME.  BUT THIS HOOK OF PROBABILITY

3     OF FUTURE ECONOMIC BENEFIT IS THE MOST TROUBLING IN THE

4     CONSTRUCT OF THE ELEMENTS AND THE PLAINTIFF'S EVIDENCE.

5                 MR. SLANIA:  I RECOGNIZE, YOUR HONOR, THAT MR. SIMON

6     DIDN'T TESTIFY AS TO THOSE.  BUT I DO BELIEVE MR. LINN DID

7     TESTIFY.  I BELIEVE HE DID MENTION FERN DURING HIS TESTIMONY.

8                 THE COURT:  NO, NOT FROM MY MEMORY OR MY NOTES.  WE

9     HEARD FERN, WE HEARD SPARGO FOR THE FIRST TIME FROM KENNEDY.

10    THAT WAS NEW, NEW INFORMATION.  ANYTHING ELSE YOU WANT TO ADD?

11                MR. L'ESTRANGE:  I WOULD LIKE --

12                THE COURT:  I MEANT MR. SLANIA, THEN YOU GET YOUR

13    CHANCE.

14                MR. L'ESTRANGE:  SORRY.

15                MR. SLANIA:  DID YOUR HONOR HAVE ANY OTHER QUESTIONS

16    AS TO THE OTHER ELEMENTS OR AS TO THE OTHER DECORATORS?

17                THE COURT:  AGAIN, THE DAMAGES AS TO NIELSEN AND

18    BLANE AND FERN AND SPARGO, YOU'RE SAYING ARE PART OF THE

19    OVERALL ANALYSIS THAT KENNEDY GAVE US?

20                MR. SLANIA:  HE DID THE SPECIFIC -- IT'S INCLUDED

21    WITHIN HIS ANALYSIS OF THE TOTAL LOSSES.  HE CALCULATED WHAT

22    THE TOTAL LOSSES WERE.  AND THEN HE ALSO SPECIFIED AS IT

23    RELATED TO EACH DECORATOR WHAT THOSE LOSSES WERE.  AND THAT'S

24    WHY WE TOOK THE BREAK YESTERDAY TO ALLOW HIM TO PERFORM THOSE

25    CALCULATIONS SO THAT THE TESTIMONY THAT IS IN FRONT OF THE JURY

1   AS TO HOW MUCH THE DAMAGES WERE FOR EACH AND EVERY ONE OF THESE

2   DECORATORS.

3            THE COURT:  OKAY.  ALL RIGHT.  SO MR. L'ESTRANGE.

4            MR. L'ESTRANGE:  SORRY, I FORGOT TO MENTION BREEDY IN

5   MY OPENING COMMENTS.

6            THE COURT:  THAT IS OKAY.  YOU CAN ADD HIM NOW IF YOU

7   WANT.

8            MR. L'ESTRANGE:  THE BIGGEST ABSENCE HERE IS THE

9   PERFORMANCE TERMS.  AND IT IS NECESSARY, IF YOU'RE BRINGING A

10  CLAIM FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC

11  ADVANTAGE, TO DEMONSTRATE WHAT ARE THE PERFORMANCE TERMS THAT

12  WERE INTERFERED WITH?  WE DON'T HAVE THAT AS TO ANY OF THESE

13  DECORATORS.  FOR EXAMPLE, AS TO BREEDY, THIS IS A QUESTION AND

14  ANSWER THAT WAS ON MARCH 29, PAGE 100, LINES 16 TO 20 OF THE

15  TRANSCRIPT.

16     QUESTION:  AND AGAIN, THOSE AGREEMENTS THAT YOU ENTERED

17  INTO WITH BREEDY ARE SUBJECT TO THE TERMS OF THIS POLICY?

18     ANSWER:  YES, SIR.

19     QUESTION:  SAME TERMS WE TALKED ABOUT RELATED TO GES AND

20  CHAMPION?

21     ANSWER:  YES, SIR.

22     THAT IS IT ON THE PERFORMANCE TERMS FOR BREEDY.  THE

23  PROBLEM WITH THAT TESTIMONY IS THAT AS WE KNOW, FROM EXHIBITS

24  83 AND 84, THE PERFORMANCE TERMS FROM CHAMPION AND GES ARE

25  QUITE DIFFERENT.  AND HERE, HE'S SAYING THEY'RE THE SAME.

1      THIS SIMPLY ISN'T SUFFICIENT EVIDENCE AS TO BREEDY TO

2  JUSTIFY CONTINUING WITH THIS CLAIM.  AS TO -- LIKEWISE WITH

3  PARADISE; WE DON'T KNOW WHAT THE PERFORMANCE TERMS ARE FOR

4  PARADISE.  THERE HAS BEEN ABSOLUTELY NO EVIDENCE ON THAT.  SO

5  THERE IS NO WAY FOR ANYONE TO MAKE A DETERMINATION AS TO

6  WHETHER THERE HAS BEEN AN INTERFERENCE WITH A PROSPECTIVE

7  ECONOMIC RELATIONSHIP BECAUSE WE DON'T KNOW WHAT THAT

8  RELATIONSHIP IS.

9          THE COURT:  WE DO HAVE THE ANALYSIS BY KENNEDY AS TO

10  WHAT THE PARADISE INVOICES HAVE BEEN THROUGHOUT THE -- FROM

11  SINCE THE POLICY UP TO THIS JANUARY.  AND THE ONE SHOW

12  CONTRACTS WOULD GIVE US THOSE TERMS.  SO AT LEAST IN THAT

13  REGARD, I DISAGREE THAT WE DON'T HAVE ANY EVIDENCE THERE.

14  WHERE WE MAY STILL LACK IS THE PROBABILITY OF FUTURE ECONOMIC

15  BENEFIT, BUT WHAT ELSE WOULD YOU LIKE TO SAY?

16          MR. L'ESTRANGE:  WHAT YOU'RE TALKING ABOUT, YOUR

17  HONOR, ARE THE ONE SHOW CONTRACTS.  THAT'S THE ARRANGEMENT

18  BETWEEN THE SAN DIEGO CONVENTION CENTER CORPORATION AND UNM.

19  THAT IS ONLY ONE HALF OF WHAT THE PLAINTIFFS NEED TO PUT IN.

20  THE OTHER HALF IS, WHAT ARE THE PERFORMANCE TERMS OF THE

21  AGREEMENT BETWEEN UNM AND ALL THESE DECORATORS, INCLUDING

22  PARADISE, BLANE, BREEDY, FERN, SPARGO, AND SO ON.  THAT IS WHAT

23  IS MISSING.  SO IT REALLY DOESN'T MATTER WHAT OUR TERMS ARE.

24  BECAUSE DEPENDING ON WHAT THE TERMS ARE BETWEEN UNM AND THESE

25  OTHER DECORATORS, THERE MAY NOT HAVE BEEN ANY INTERFERENCE, WE

1    SIMPLY DON'T KNOW.   THERE IS NOT SUFFICIENT EVIDENCE.

2            THE COURT:   AND YOU'RE SAYING -- OR ARE YOU SAYING

3    THAT -- WELL, FERN AND SPARGO, WE DIDN'T HEAR DIDDLEY ABOUT

4    THEM IN THE TESTIMONY.   THOUGH, THEIR ONE SHOW CONTRACTS ARE,

5    HOWEVER, IN EVIDENCE.

6            MR. L'ESTRANGE:   I ASSUME THEY ARE -- BUT EVEN IF

7    THEY ARE IN EVIDENCE, THAT TELLS US ABSOLUTELY NOTHING ABOUT

8    THE RELATIONSHIP BETWEEN UNM ON ONE HAND AND FERN AND SPARGO ON

9    THE OTHER.   AND THERE IS NOT SUFFICIENT DETAIL IN DR. KENNEDY'S

10   TESTIMONY OTHER THAN GIVING A BALD NUMBER THAT HE CLAIMED WERE

11   DAMAGES.

12           THE COURT:   AND, OF COURSE, HIS NUMBER AS TO

13   PARADISE, ISN'T THAT REALLY A PAST LOSS AS OPPOSED TO A FUTURE

14   LOSS?

15           MR. L'ESTRANGE:   IT IS.

16           THE COURT:   IT IS NOT PROSPECTIVE AT THIS POINT.   IT

17   WAS PROSPECTIVE -- IT WAS PROSPECTIVE WHEN THE CASE STARTED.

18   IT HAS NOW BEEN PARSED.

19           MR. L'ESTRANGE:   THAT'S RIGHT.   BUT IT'S NOT, OF

20   COURSE, THE SUBJECT OF THE CLAIM FOR INTERFERENCE WITH THE

21   CONTRACT.

22           THE COURT:   RIGHT.

23           MR. L'ESTRANGE:   THAT CLAIM IS LIMITED TO GES AND

24   CHAMPION.   THERE IS REALLY NOTHING IN TERMS OF FUTURE DAMAGES

25   FOR PARADISE OR ANY OF THOSE OTHER DECORATORS.   BUT ALSO,

1   ASSUMING THAT ALL OF THESE ORAL CONTRACTS HAD THE SAME BASIC

2   PERFORMANCE TERMS AS GES AND CHAMPION.  AND I'LL -- JUST FOR

3   THE SAKE OF ARGUMENT, GIVING THAT ASSUMPTION, WE SAW FROM THE

4   TESTIMONY OF THE WITNESSES, AND THIS IS NOT CONTRADICTED, THAT

5   THE ABILITY OF THOSE DECORATORS TO HIRE UNM AS ITS CLEANING

6   CONTRACTOR IS CONDITIONAL UPON WHAT HAPPENED HIGHER UP IN THE

7   CONTRACT CHAIN.  THERE IS A MISSING LINK.  WE DON'T KNOW ABOUT

8   THE CONTRACTS BETWEEN THE DECORATORS AND THE TRADE, THE TRADE

9   ASSOCIATIONS -- OR EXCUSE ME, THE DECORATORS AND THE EVENT

10  PLANNERS.  WE DO KNOW FROM THE TESTIMONY ABOUT THE CONTRACTS

11  BETWEEN THE CONVENTION CENTER AND THE ASSOCIATIONS.  AND THOSE

12  CONTRACTORS CLEARLY PROVIDE THAT IF YOU WANT TO USE THE SAN

13  DIEGO CONVENTION CENTER, YOU'RE REQUIRED TO USE OUR PERSONNEL

14  TO DO YOUR CLEANING.  THAT WAS A CONDITION THAT THE

15  ASSOCIATIONS AGREED TO.

16      AND EVERY WITNESS WHO HAS TESTIFIED HAS SAID THAT IF THAT

17  RIGHT IS GIVEN AWAY, HIGHER UP IN THE CONTRACT CHAIN, THEN THE

18  DECORATOR HAS NO RIGHT TO DO SOMETHING THAT IS CONTRARY TO

19  THAT.  AND THE BEST ILLUSTRATION OF THIS IS THE ACTION SPORTS

20  RETAILER SHOW.  THERE WAS TESTIMONY, IF YOU RECALL, BY A

21  WITNESS LARRY COLE BY ABOUT THAT -- DESCRIBING HOW THE CHOICE

22  HAD BEEN MADE BY LORI JENCKS (PHONETIC), AT GES TO USE THE SAN

23  DIEGO CONVENTION CENTER AS ITS CLEANING CONTRACTOR.

24      AND MR. SIMON HAS SAID HE HAS NO PROBLEM WITH THAT.  HE

25  UNDERSTANDS THAT IF SOMEONE HIGHER UP THE FOOD CHAIN AGREES TO

1    USE A DIFFERENT CONTRACTOR, OR IN THE CASE OF THE CURRENT

2    POLICY, AGREES THAT ALL OF THE CLEANING WILL BE DONE BY THE SAN

3    DIEGO CONVENTION CENTER CORPORATION'S CLEANING PERSONNEL, THEN

4    HE HAS NO RIGHT TO THAT BUSINESS.  SO AS TO EVERY ONE OF THESE

5    CONTRACTS THAT WE'RE TALKING ABOUT, THEY'RE NECESSARILY SUBJECT

6    TO THAT LIMITATION.

7         THEY'RE SIMPLY, IN LIGHT OF THAT, THERE CANNOT BE ANY

8    CLAIM THAT WE INTERFERED WITH A RIGHT THAT MR. SIMON HAD,

9    VIS-A-VIS, THE DECORATORS BECAUSE THE DECORATORS NEVER OBTAINED

10   THAT RIGHT FROM THEIR ASSOCIATION CUSTOMERS.  I MEAN, THAT IS

11   SIMPLY A MATTER OF CONTRACT INTERPRETATION AND CONFIRMED BY THE

12   WITNESSES WHO WERE ASKED ABOUT THIS.  FINALLY, I JUST WANT TO

13   ADDRESS ONE OTHER POINT THAT I DIDN'T ADDRESS IN MY OPENING

14   REMARKS.

15             THE COURT:  WHAT IS THAT?

16             MR. L'ESTRANGE:  AND THAT IS, THAT ONE OF THE

17   ELEMENTS THAT THEY NEED TO ADDRESS HERE, IS THE -- THAT THAT

18   WAS SOME INDEPENDENT WRONG THAT OCCURRED.  THAT IS ONE OF THE

19   ELEMENTS OF THIS CLAIM.

20             THE COURT:  RIGHT, WRONGFUL CONDUCT.

21             MR. L'ESTRANGE:  WRONGFUL CONDUCT.  NOW, IF, FOR

22   EXAMPLE, YOU FIND IN OUR FAVOR ON EITHER ONE OF THE ANTITRUST

23   CLAIMS, WHICH ARE CURRENTLY THE PREDICATE WRONG FOR THIS CAUSE

24   OF ACTION, THEN THAT IS SOMEHOW GOING TO HAVE TO BE UNRAVELED.

25             THE COURT:  SURE.  AND WE START WITH THE TAIL AS

1    OPPOSED TO THE DOG HERE.  AND I UNDERSTAND WHAT YOU'RE SAYING.

2            MR. L'ESTRANGE:  AND THE OTHER THING THAT HAS

3    HAPPENED HERE, YOUR HONOR, IS THAT THEY HAVE FAILED, REALLY, TO

4    COME UP WITH A SEPARATE DAMAGE ANALYSIS FOR THIS.  AND SINCE I

5    -- SINCE, I THINK, CERTAINLY FERN AND SPARGO SHOULD BE KNOCKED

6    OUT, IT'S GOING TO BE VERY DIFFICULT FOR THE JURY TO UNRAVEL

7    THOSE FROM THE TOTAL DAMAGES AMOUNTS.  AND I'LL SPEAK MORE

8    ABOUT THAT IN CONNECTION WITH THE ANTITRUST CLAIMS.

9            THE COURT:  OKAY.

10           MR. L'ESTRANGE:  BUT I THINK AS TO ALL OF THE

11   DECORATORS THAT ARE IDENTIFIED IN THE CLAIM FOR INTENTIONAL

12   INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE, WE REQUEST

13   THAT YOU GRANT THE RULE 50(A)(1) MOTION.

14           THE COURT:  OKAY.  LET ME ASK YOU, MR. SLANIA, I MEAN

15   AT THE END OF THE DAY, HOW DO YOU TELL THE JURY WHAT TO GIVE

16   YOU FOR THE SIXTH CAUSE OF ACTION AND WHAT TO GIVE YOU FOR THE

17   FIFTH CAUSE OF ACTION, TO THE EXTENT THAT THEY'RE DISTINCT

18   ENTITIES?

19           MR. SLANIA:  WE TELL THEM THAT DR. KENNEDY VERY

20   CLEARLY IDENTIFIED THE AMOUNT OF DAMAGES ATTRIBUTABLE TO EACH

21   OF THE DECORATORS.  AND THAT GES AND CHAMPION HAD A CONTRACT

22   WITH UNITED.  ONE OF THOSE, I BELIEVE, IS EXHIBIT 83, ANOTHER

23   ONE IS EXHIBIT 84.  YOU'LL HAVE WITH YOU IN THE JURY ROOM THE

24   ONE SHOW PROFIT AND LOSS STATEMENTS FOR THE GES AND CHAMPION

25   SHOWS.  AND IF YOU ADD THOSE UP, YOU'LL FIND THAT THEY'RE

1    CONSISTENT WITH DR. KENNEDY'S CALCULATIONS.

2        THERE IS ALSO COST INVOLVED, BUT YOU'LL FIND THEY'RE

3    CONSISTENT.  AND YOU CAN DO THE SAME THING, BECAUSE -- YOU

4    ASKED HOW YOU DIFFERENTIATE BETWEEN THE CONTRACTS.  THAT'S ONE

5    WAY IN WHICH YOU COULD CONVEY GES AND CHAMPION.  AND WE SAY

6    NOW, DR. KENNEDY ALSO IDENTIFIED FOR YOU THESE OTHER

7    DECORATORS, WHO DID NOT HAVE FORMAL CONTRACTS WITH UNITED, BUT

8    DID HAVE ECONOMIC RELATIONSHIPS WITH UNITED, WHICH UNITED LOST

9    THE ABILITY TO PROSPER FROM, WHICH IS WHEN WE LOST THE

10   PROBABILITY OF FUTURE ECONOMIC BENEFIT AS OF JULY 1ST, 2007.

11   AND I WANTED TO CLARIFY FOR YOUR HONOR, WE'RE NOT ASKING FOR

12   FUTURE DAMAGES FROM THIS POINT FORWARD.

13           THE COURT:  RIGHT.  IT WAS PROSPECTIVE AT THE TIME OF

14   FILING THE LAWSUIT.

15       DO WE HAVE THAT EXHIBIT FROM KENNEDY, THE ONE THAT HE

16   BROKE IT DOWN.  I THINK IT'S IN EVIDENCE.

17           MR. SLANIA:  HE BROKE DOWN --

18           THE COURT:  NOT THE BREAK DOWN OF INDIVIDUALS, BUT

19   HIS OVERALL GENERAL SUMMARY OF ANALYSIS.  IS THAT HANDY TO POP

20   OUT?

21           MR. SLANIA:  I BELIEVE, I DON'T KNOW IF --

22           THE COURT:  TELL ME WHAT NUMBER IT IS, AND I'LL FIND

23   IT IN MY --

24           MR. SLANIA:  I THINK WE'RE HAVING SOME TECHNICAL

25   DIFFICULTIES, BUT --

1              THE COURT:  WHAT NUMBER WAS IT?  THAT WILL BE AS

2      GOOD.

3              MR. SLANIA:  800 -- 877, I BELIEVE, YOUR HONOR.

4              THE COURT:  ALL RIGHT.  WELL, THE STANDARD IS WHETHER

5      OR NOT A REASONABLE JURY COULD FIND FOR THE PLAINTIFF ON THESE

6      ELEMENTS.  I'M GOING TO GRANT IN PART AND DENY IN PART.  I'M

7      GOING TO GRANT AS TO FERN AND SPARGO.  I DON'T FIND THERE WAS

8      ANY EVIDENCE SHORT OF THIS, SOME ONE SHOW CONTRACTS TO SUPPORT

9      AN INFERENCE THAT THERE WAS AN ONGOING -- THERE WAS AN ECONOMIC

10     RELATIONSHIP WITH A PROBABILITY OF FUTURE ECONOMIC BENEFIT,

11     WHEN THE HARMS ALLEGEDLY WERE COMMITTED.

12         AND IT'S TRUE THE HARMS NEED TO BE SUPPORTED AND THE

13     ULTIMATE -- AT THE END OF THE DAY, BY THE ANTITRUST ALLEGATIONS

14     OF ANTI-COMPETITIVE CONDUCT, SOME SORT OF WRONGFUL CONDUCT

15     HERE.  SO FERN AND SPARGO, I'M GOING TO GRANT.  I'M GOING TO

16     DENY, OTHERWISE, WITH PARADISE.  WE'VE HAD TESTIMONY ABOUT

17     THEIR RELATIONSHIP.  WE HAVE AN ARTICULABLE AMOUNT, THE JURY

18     COULD INFER FROM THAT, REASONABLY AND LOGICALLY THERE WAS A

19     RELATIONSHIP, AND THE PROBABILITY OF CONTINUATION WAS THERE.

20     PARADISE WAS KNOWN TO ALL OF THE PARTIES.  IT IS IN THE RECORDS

21     AND SO FORTH.  WE'VE SEEN AT LENGTH THE ACAA WEST SHOW INVOICE

22     THAT WAS UP THERE A NUMBER OF TIMES.  BREEDY, THE SAME THING.

23         SO FERN AND SPARGO ARE OUT.  NIELSEN AND BLANE WERE COMMON

24     TOPICS OF DISCUSSION.  A JURY COULD MAKE THE NECESSARY

25     INFERENCES THERE OF BOTH THE RELATIONSHIP AND THE KNOWLEDGE.

1    AGAIN, IT HINGES ON THE WRONGFUL ACT AT THE END OF THE DAY.  SO

2    IT'S GRANTED AS TO FERN AND SPARGO; DENIED AS TO ALL OTHER

3    RESPECTS AS TO THE SIXTH CAUSE OF ACTION.

4            MR. L'ESTRANGE:  YOUR HONOR, CAN I ASK FOR

5    CLARIFICATION?

6            THE COURT:  YES.

7            MR. L'ESTRANGE:  I MAY NOT HAVE BEEN SUFFICIENTLY

8    CLEAR, BUT AS TO BLANE AND NIELSEN, THERE ARE NO DAMAGES.

9            THE COURT:  I THOUGHT THERE WERE -- AND YOU CORRECT

10   ME IF I'M WRONG, AND MR. SLANIA, YOU CAN ADD IN -- THAT THE

11   ECONOMIST, KENNEDY, ADDED UP ALL THE 90-SOME-ODD INVOICES,

12   WHICH INCLUDED NIELSEN AND BLANE, AND, THEREFORE, THE

13   DIFFERENTIAL ON PROFIT AND PROFIT LOSS, WOULD BE IN HIS NUMBER.

14   IF THAT'S WRONG, THEN I WOULD CHANGE MY RULING.

15           MR. SLANIA:  I DO NOT BELIEVE THAT DR. KENNEDY

16   MENTIONED BLANE OR NIELSEN WHEN CONDUCTING HIS -- I BELIEVE THE

17   SIXTH GROUP OR THE SIX THAT HE IDENTIFIED WERE PARADISE, GES,

18   CHAMPION, BREEDY, SPARGO, AND FERN.

19           THE COURT:  OKAY.  WELL, I'M GOING TO, THEN -- I'LL

20   MODIFY THAT NIELSEN, BLANE, FERN, AND SPARGO ARE OUT, AND THAT

21   AS TO NIELSEN AND BLANE, THE LACK OF DAMAGES, LACK OF HARM, IS

22   THE FAILING IN THIS ANALYSIS.  AND FERN AND SPARGO, WE LOSE ON

23   THE LACK OF SUFFICIENT EVIDENCE TO SUPPORT THE ONGOING

24   RELATIONSHIP OR THE PROBABILITY OF FUTURE ECONOMIC BENEFIT.

25   DENY AS TO ALL ELSE.

1      YOU FOLKS WANT A LITTLE BREAK BEFORE WE TAKE ON THE FIFTH

2   CAUSE OF ACTION?

3           MR. L'ESTRANGE:  SURE.  AND I'D LIKE TO ASK FOR A

4   POINT OF CLARIFICATION.  YOU ASKED TO LOOK AT EXHIBIT 877,

5   WHICH IS THE SUMMARY OF ECONOMIC LOSS.

6           THE COURT:  RIGHT.

7           MR. L'ESTRANGE:  AND THE NUMBERS THAT DR. KENNEDY

8   RECITED YESTERDAY WERE A COMBINATION OF BOOTH CLEANING AND

9   FACILITY CLEANING.  THE EXHIBIT 877 BREAKS THOSE OUT INTO TWO

10  SEPARATE CATEGORIES.  THERE WOULD REALLY BE NO WAY FOR THE JURY

11  TO SEGREGATE OUT, FILTER OUT, THE DAMAGES FOR SPARGO AND FERN

12  FROM THOSE NUMBERS.

13          THE COURT:  I DON'T KNOW THAT THERE WERE -- WERE

14  THERE FERN AND SPARGO NUMBERS IN THERE?

15          MR. L'ESTRANGE:  YES, YES.  HE SAID THAT THERE WERE.

16          THE COURT:  WELL, HE TESTIFIED AND BROKE THEM DOWN.

17          MR. L'ESTRANGE:  HE DID, HE DID.

18          THE COURT:  SO --

19          MR. L'ESTRANGE:  HE BROKE THEM DOWN IN GROSS BUT NOT

20  AS SEPARATED AS BETWEEN HOURLY AND BOOTH CLEANING.  THAT BREAK

21  OUT WAS NOT MADE.

22          THE COURT:  WHAT WAS THE NUMBER FOR SPARGO?

23          MR. L'ESTRANGE:  THE NUMBER FOR SPARGO WAS 12,394.

24          THE COURT:  AND FERN?

25          MR. L'ESTRANGE:  AND FOR FERN --

1          MR. SLANIA:  3,610.

2          MR. L'ESTRANGE:  3,610.  AND THAT IS NOT SPLIT AS

3   BETWEEN BOOTH CLEANING AND FACILITY CLEANING, SO IT WOULD BE

4   IMPOSSIBLE TO FILTER IT OUT OF THIS SUMMARY OF ECONOMIC LOSS.

5          MR. SLANIA:  YOUR HONOR, I'M SORRY, THAT IS NOT

6   ACCURATE.  THE DOCUMENTS ARE IN EVIDENCE, AS ARE THE ONE SHOW

7   PROFIT AND LOSS STATEMENTS.  YOU CAN EASILY FERRET THAT

8   INFORMATION OUT.  MAYBE NOT EASILY, BUT IT CAN BE FERRETED OUT

9   FOR A REASONABLE JURY TO DO, ESPECIALLY A JURY THAT HAS BEEN AS

10  COPIOUS AS WE'VE HEARD.  THEY KEEP TAKING NOTES.

11         THE COURT:  THEY'RE ON THEIR THIRD NOTEPADS.

12         MR. SLANIA:  I THINK THAT THAT CAN BE FERRETED OUT,

13  AND WE CAN OBVIOUSLY ARGUE FROM THAT EVIDENCE HOW MUCH CAN BE

14  ATTRIBUTABLE TO EACH OF THE CONTRACTORS AND WE WOULD EXPLAIN

15  THE EVIDENTIARY BASIS.

16         THE COURT:  WHY DON'T YOU FOLKS CONFER ON THAT TO SEE

17  IF YOU CAN COME TO SOME AGREEMENT AS TO WHAT WE FERRET OUT OR

18  REDUCE THE NUMBER BY AND INSTRUCT THE JURY THAT BASED ON

19  RULINGS, THE NUMBER IS REDUCED TO X.

20         MR. L'ESTRANGE:  HERE IS WHERE I THINK IS THE

21  PROBLEM, I DON'T THINK WE'RE GOING TO BE ABLE TO REACH AN

22  AGREEMENT.  BECAUSE AS TO THE ONE SHOW CONTRACTS, THEY SIMPLY

23  STATE THE RATES THAT WILL BE CHARGED.  THEY DON'T GIVE ANY

24  AMOUNTS.  AS TO THE ONE SHOW PROFIT AND LOSS STATEMENTS, THOSE

25  ARE DOCUMENTS THAT SHOW THE AMOUNT THAT WAS CHARGED BY THE

1  CONVENTION CENTER FOR THESE SERVICES.

2       THERE IS NOTHING IN THE ONE SHOW PROFIT AND LOSS

3  STATEMENTS OR IN THE ONE SHOW CONTRACTS, ABOUT THE AMOUNTS THAT

4  MR. SIMON CHARGED TO THESE DECORATORS FOR THESE SERVICES.

5  THERE IS SIMPLY NO EVIDENCE ON THAT.

6            THE COURT:  WELL, I THOUGHT KENNEDY DID ALL OF THAT

7  IN HIS ANALYSIS.  THE SIMPLE MATTER WOULD BE -- YEAH, WELL, IT

8  IS NOT A SIMPLE MATTER FOR THE JURY TO SORT THAT OUT.  I THINK

9  THE SIMPLE ANALYSIS IS, WE, IN GRANTING THE MOTION, CHANGE HIS

10 ULTIMATE NUMBER AND INSTRUCT THE JURY THAT THE NEW NUMBER IS

11 15,000 -- 16,000 SOMETHING LESS OR $16,004.

12           MR. SLANIA:  CORRECT, YOUR HONOR.

13           THE COURT:  THAT WILL BE MY RULING.  THE JURY WILL BE

14 INSTRUCTED AT SOME POINT THAT BASED ON LEGAL RULINGS, THE

15 NUMBER IS REDUCED BY $16,004.  I THINK THAT'S -- OTHERWISE,

16 THEY GO ON A HUGE EXPEDITION TRYING TO CONCOCT THAT.

17    OKAY, IT'S FIVE MINUTES TO 11:00.  WHY DON'T WE TAKE 15

18 MINUTES, GET BACK TOGETHER AT TEN MINUTES AFTER 11:00 AND

19 ATTACK THE REMAINING CAUSES OF ACTION.

20    SO WE'RE IN RECESS FOR 15 MINUTES.

21                 (RECESS TAKEN.)

22           THE COURT:  SO THE FIFTH CAUSE OF ACTION --

23           MR. L'ESTRANGE:  FIFTH CAUSE OF ACTION IS INTENTIONAL

24 INTERFERENCE WITH A CONTRACT.  AND AS TO THAT CAUSE OF ACTION,

25 THERE ARE TWO DECORATORS, WHICH ARE THE SUBJECT OF IT, GES AND

1   CHAMPION.

2       THE FIRST FAILURE IS THE FAILURE OF UNM TO DEMONSTRATE

3   THAT THE SAN DIEGO CONVENTION CENTER CORPORATION IS A STRANGER

4   TO THEIR CONTRACTS WITH GES AND CHAMPION.  AND AS WE POINTED

5   OUT IN OUR TRIAL BRIEF, UNDER THE APPLIED EQUIPMENT CORP. VS.

6   LITTON SAUDI ARABIA LTD. CASE, THAT'S 7 CAL.4TH 503, 513 TO

7   514, ONLY A STRANGER TO THE CONTRACT MAY BE LIABLE FOR

8   INTERFERING WITH IT, INTERLOPERS, WHO HAVE NO LEGITIMATE

9   INTEREST IN THE SCOPE OR COURSE OF THE CONTRACT'S PERFORMANCE,

10  BUT THAT IS NOT TRUE AS IT RELATES TO THE SAN DIEGO CONVENTION

11  CENTER CORPORATION.

12      AND UNDER THE LAW, WHERE SUBCONTRACTS ARE PREDICATED ON A

13  PERSON'S PERFORMANCE HIGHER UP THE CONTRACT IN THE CHAIN, THAT

14  PERSON CANNOT BE HELD LIABLE FOR INTERFERING WITH THE

15  PERFORMANCE FURTHER DOWN THE CHAIN.  AND THAT IS PM GROUP, INC.

16  VS. STEWART, 154 CAL.APP.4TH 55, 65.  IN THIS CASE, THE

17  UNCONTRADICTED EVIDENCE IS THAT THE SAN DIEGO CONVENTION CENTER

18  CORPORATION DID HAVE AN INTEREST IN THE CONTRACTS BETWEEN GES

19  AND UNM AND BETWEEN CHAMPION AND UNM.  AND, IN FACT, THEY --

20  THEIR PERFORMANCE WAS NECESSARY FOR UNITED TO BE ABLE TO

21  PERFORM UNDER THEIR CONTRACTS WITH GES AND CHAMPION.

22      MR. SIMON TESTIFIED TO THE NEED FOR COOPERATION.  FOR

23  EXAMPLE, THE SAN DIEGO CONVENTION CENTER CORPORATION HAS TO

24  CREDENTIAL THE UNM WORKERS TO PERMIT THEM IN THE BUILDING.

25      SECONDLY, WE HAVE TO PROVIDE THE ELECTRICITY SO UNM CAN

1  RUN ITS VACUUM CLEANERS.  HEKMAN TESTIFIED THAT THE COMMON AREA

2  CLEANING, THAT IS THE BATHROOMS AND HALLWAYS, AND ALL OF THE

3  THINGS THAT ARE DONE BY THE SAN DIEGO CONVENTION CENTER

4  CORPORATION FOR EVERY TRADE SHOW ARE ESSENTIAL TO THE OPERATION

5  OF THE PERFORMANCE OF THAT SHOW.  THERE IS NO CONTRADICTORY

6  EVIDENCE.

7       MR. SIMON TESTIFIED THAT TRADE SHOW CLEANING IS LIKE A

8  CONDOMINIUM, WHERE THE EXHIBITOR PAYS FOR BOOTH CLEANING, AND

9  BOOTH CLEANING PAYS FOR THE FACILITY AND COMMON AREA CLEANING,

10  MUCH OF WHICH IS DONE BY THE SAN DIEGO CONVENTION CENTER FOR

11  EVERY TRADE SHOW.

12       SO THE FIRST FAILURE OF PROOF IS THAT THEY FAILED TO

13  DEMONSTRATE THAT THE SAN DIEGO CONVENTION CENTER CORP. IS A

14  STRANGER TO THEIR CONTRACTS WITH GES AND CHAMPION.

15       AND BEFORE I PROCEED, I WOULD LIKE TO STATE ON THE RECORD

16  THAT UNDER FEDERAL RULE OF CIVIL PROCEDURE 50(A)(1), I'M ASKING

17  THAT THE COURT ENTER AN ORDER, DISMISSING THE FIFTH CAUSE OF

18  ACTION FOR INTERFERENCE WITH CONTRACT, AND ENTER JUDGMENT IN

19  FAVOR OF THE SAN DIEGO CONVENTION CENTER CORPORATION.

20            THE COURT:  OKAY.

21            MR. L'ESTRANGE:  SO THAT'S -- MY SECOND POINT, THERE

22  IS A FAILURE TO DEMONSTRATE ACTUAL DISRUPTION OF THE CONTRACT.

23  THERE HAS BEEN EVIDENCE OF THE RELATIONSHIPS BETWEEN GES AND

24  UNM, AND CHAMPION AND UNM.  BUT PLAINTIFF MUST ESTABLISH THE

25  NATURE AND EXTENT OF HIS REASONABLE EXPECTATIONS UNDER THE

1   CONTRACT, AND THAT DEFENDANT'S INTERFERING ACT ACTUALLY

2   DISRUPTED THOSE EXPECTATIONS.  AND THE KEY ON THE EXPECTATIONS

3   IS REASONABLE.  EXHIBITS 83 AND 84 ARE QUITE CLEAR.  THEY MAKE

4   UNM'S PERFORMANCE CONDITIONAL ON THE DECORATOR BEING NAMED THE

5   DESIGNATING CLEANING SUBCONTRACTOR FOR A PARTICULAR SHOW.  THE

6   TESTIMONY HAS BEEN UNIFORM THAT THE DECORATOR CLEANING

7   SUBCONTRACTOR, OR CONTRACTS, ARE SUBJECT TO THE UPSTREAM

8   CONTRACTUAL OBLIGATIONS OR ARRANGEMENTS.  FOR EXAMPLE, IF THE

9   TRADE ASSOCIATION DOESN'T WANT TO USE UNM, AND WANTS TO USE THE

10  SAN DIEGO CONVENTION CENTER CORPORATION, THEN THAT IS BINDING

11  ON THE DECORATOR, NOTWITHSTANDING WHATEVER THE DECORATOR WANTS

12  TO DO.  AND AN EXAMPLE OF THAT IS THE ACTION SPORTS RETAILER

13  SHOW, WHICH I MENTIONED IN MY REMARKS A MOMENT AGO.

14          THE COURT:  SURE.

15          MR. L'ESTRANGE:  AND AGAIN, THE TESTIMONY OF LARRY

16  COLBY WAS UNCONTRADICTED, THAT ANY RIGHT OF THE DECORATOR TO

17  ELECT TO -- OR TO SELECT A CLEANING SUBCONTRACTOR IS SUBJECT TO

18  THE CONTRACTS UPSTREAM FROM THE DECORATOR.  AND MR. SIMON

19  AGREED AS TO THE ACTION SPORTS RETAILER SHOW, THAT THAT IS --

20  IS EXACTLY WHAT HAPPENED THERE.

21      IN THE UPSTREAM CONTRACTS, THE LICENSEES, WHICH ARE TRADE

22  ASSOCIATIONS AND SHOW MANAGERS, SPECIFICALLY AGREE TO COMPLY

23  WITH THE BUILDING'S PROCEDURES, RULES, AND REGULATIONS.  AND AS

24  WE SAW IN EXHIBIT 32, THE PR&R'S, THAT EFFECTIVE JULY 1, 2007,

25  THOSE RULES AND REGULATIONS REQUIRE THAT ANYONE USING THE

1   CONVENTION CENTER MUST USE THE CONVENTION CENTER'S PERSONNEL TO

2   DO THE CLEANING.  SO THAT AGREEMENT WAS MADE AT THE TOP OF THE

3   CONTRACTUAL CHAIN BEFORE THE DECORATOR EVEN -- EVER COMES INTO

4   THE PICTURE.  AND ALL THE LICENSEES AGREED TO THAT TERM AS A

5   CONDITION TO USING THE HALL.

6        NOW THERE IS NO EVIDENCE, WHATSOEVER, IN THE RECORD OF THE

7   TERMS OF THE CONTRACTS BETWEEN THE TRADE ASSOCIATIONS AND THE

8   DECORATORS, WHICH IS THE -- THE LINK IN THE CHAIN IMMEDIATELY

9   BELOW THE LICENSE AGREEMENTS.  NO SUCH CONTRACTS WERE OFFERED

10  INTO EVIDENCE.  AND THE ONLY TESTIMONY WAS WHEN MR. SIMON

11  ATTEMPTED TO GIVE A SUMMARY OF THE TERMS OF THOSE CONTRACTS, I

12  OBJECTED UNDER THE BEST EVIDENCE RULE, AND YOUR HONOR'S RULING

13  WAS, AFTER DENYING THE OBJECTION, THAT IT ONLY GOES TO THE

14  QUESTION GENERALLY HOW THESE THINGS WORK AS OPPOSED TO ANY

15  SPECIFIC CONTRACT.  AND THAT IS IN THE TRANSCRIPT ON MARCH 28,

16  2011, AT PAGE 44, LINE 22 TO 45, LINE 2.

17       SO THERE IS SIMPLY NO EVIDENCE THAT WOULD SUGGEST THAT THE

18  DECORATORS OBTAIN SOME GREATER RIGHT THAN THE LICENSEES HAD

19  ABOVE THEM IN THE CONTRACTUAL CHAIN.  GIVEN THESE FACTS, UNM

20  CERTAINLY CANNOT SHOW ANY REASONABLE EXPECTATION OF A RIGHT TO

21  BE IN THE BUILDING AND USE ITS OWN EMPLOYEES TO DO THE

22  CLEANING.  THE TRADE ASSOCIATIONS HAVE AGREED WITH THE SAN

23  DIEGO CONVENTION CENTERS WHEN THEY SIGNED THE LICENSE

24  AGREEMENTS, THAT ONLY THE CONVENTION CENTER'S CLEANING

25  EMPLOYEES WOULD BE USED.

1     AND FOR THAT REASON, IN THE ABSENCE OF A SPECIFIC,

2  REASONABLE EXPECTATION, THEY CANNOT PROVE THEIR CLAIM FOR

3  INTENTIONAL INTERFERENCE WITH CONTRACT, AND WE WOULD REQUEST,

4  UNDER RULE 50(A)(1), THAT YOU ENTER JUDGMENT FOR THE CONVENTION

5  CENTER ON THAT CAUSE OF ACTION.

6        THE COURT:  OKAY.  SO MR. LANCE, MR. SLANIA, WHO

7  WOULD LIKE TO --

8        MR. LANCE:  YOUR HONOR, I WOULD ADDRESS THAT.  THANK

9  YOU.  THE ISSUE OF THE CONVENTION CENTER BEING A STRANGER IS AN

10  INTERESTING ARGUMENT, ESPECIALLY IN LIGHT OF THE FACT THAT THE

11  CONVENTION CENTER WAS TRYING TO GET THE PARTY TO BREACH THE

12  AGREEMENT.  SO SAYING HE'S NOT A STRANGER TO THIS CONTRACT, AND

13  WE HAVE EVIDENCE THAT BEFORE THIS POLICY WAS IMPLEMENTED, THEY

14  WERE TRYING TO GET GES, CLEARLY, AND CHAMPION, TO BREACH THAT

15  CONTRACT.

16        THE COURT:  RIGHT.  AND THEY WEAR TWO HATS.  THEY'RE

17  THE BUILDING, AND THEY'RE A COMPETING CLEANING CONTRACTOR, AND

18  I THINK THAT IS PROBLEMATIC FOR THE DEFENSE ON THE MOTION, BUT

19  GO AHEAD.

20        MR. LANCE:  OKAY.  AND THE ISSUE IS -- THIS ISSUE OF

21  PROVIDING ELECTRICITY AND COOPERATION, THEY'RE NOT PAYING FOR

22  THAT.  THEY ARE PAID HANDSOMELY BY THIS LICENSE AGREEMENT TO

23  PROVIDE THOSE SERVICES.  AND THEY OWE THOSE SERVICES TO THE

24  TRADE SHOW MANAGER, WHO THEN CHOOSES WHO HE OR SHE WANTS TO USE

25  AS THE SUBCONTRACTOR.  SO I DON'T UNDERSTAND THAT ARGUMENT.

1    I -- THIS IS THE FIRST TIME I'VE HEARD IT ARTICULATED BY THE

2    OTHER SIDE.

3        BUT THE FACT THAT THIS IS A NATIONAL CONTRACT BETWEEN GES

4    AND CHAMPION INDICATES THAT SAN DIEGO CONVENTION CENTER IS NOT

5    A PARTY TO THIS CONTRACT.   THEY'RE A STRANGER TO THIS CONTRACT.

6    IT JUST SO HAPPENS THIS CONTRACT IS ENFORCED WHEN THERE IS AN

7    EVENT IN THE CONVENTION CENTER, AND THE DECORATOR CHOOSES

8    UNITED.

9        ON THE SECOND ISSUE, THE ACTUAL DISRUPTION OF THE

10   CONTRACT, I'VE HEARD THIS THROUGH THE EVIDENCE, AND IT IS

11   INTERESTING BECAUSE THIS SHOWS MONOPOLY POWER WHEN THEY KEEP

12   BRINGING UP THESE POLICIES, RULES, AND REGULATIONS.   SO IF

13   THERE IS AN UNLAWFUL POLICY THAT THEY WANT TO IMPLEMENT, AND

14   THEN THEY GO AND PUT IT IN THEIR POLICIES, RULES, AND

15   REGULATIONS, AND SAY, YOU HAVE TO USE THIS, THAT SHOWS MONOPOLY

16   POWER.   AND THAT JUST GOES TO SHOW THAT YOU CAN'T AVOID A

17   BREACH OF CONTRACT.   YOU CAN'T AVOID AN ANTITRUST CLAIM BY

18   ENGAGING IN UNLAWFUL CONDUCT AND THEN PUTTING IT IN YOUR

19   POLICIES, RULES, AND REGULATIONS, AND TELLING PEOPLE, THAT YOU

20   HAVE NO CHOICE, YOU HAVE TO ENTER INTO THIS.   THAT IS WHY WE'RE

21   HERE.

22       WE'RE HERE BECAUSE THIS IS AN UNLAWFUL POLICY; THAT IS

23   WHAT WE'RE PUTTING IN FRONT OF THE JURY TO DECIDE AND FOR THE

24   COURT TO DECIDE.   AND MERELY BECAUSE THEY TAKE THIS UNLAWFUL

25   POLICY AND THROW IT INTO THEIR POLICIES, RULES, AND

1   REGULATIONS, AND SAY, EVERYBODY AGREED TO THIS, WE KNOW

2   EVERYONE HASN'T AGREED TO IT.  EVERYONE THAT WE'VE PUT ON THE

3   STAND, WHO WASN'T AN SDCC EMPLOYEE, SAID, WE DON'T AGREE, MY

4   HANDS ARE TIED.

5         THE COURT:  THEY SAID WE ACQUIESCE, ESSENTIALLY.

6      OKAY.  YOU WANT TO SAY ANYTHING IN FINAL RESPONSE ON THIS

7   ONE, MR. L'ESTRANGE?

8         MR. L'ESTRANGE:  QUICKLY, FIRST OF ALL, AS TO THE

9   STRANGER TO THE CONTRACT, I WOULD INVITE THE COURT'S ATTENTION

10  TO THE MARIN TUG & BARGE, INC. VS. WESTPORT PETROLEUM, INC.,

11  271 F.3D 825, 834, (9TH CIR. 2001).

12     AND THAT IS A CASE INVOLVING STRANGER TO THE CONTRACT,

13  WHICH IS NOT A NEW CONCEPT.  IT IS DISPLAYED PROMINENTLY IN OUR

14  TRIAL BRIEF.

15        THE COURT:  IT IS ALSO PART OF THE CALIFORNIA CIVIL

16  JURY INSTRUCTION 2201; THEY TALK ABOUT THIRD PARTY, SAME THING.

17        MR. L'ESTRANGE:  RIGHT.  IN THAT CASE, THERE WAS A

18  CLAIM OF INTERFERENCE WITH CONTRACT BY THESE -- THE TUG AND

19  BARGE COMPANY, AND THE COMPANY THAT THEY CLAIMED WAS

20  INTERFERING ACTUALLY HAD TO HELP THEM IN TERMS OF LOADING

21  PRODUCT ONTO THEIR BOATS.

22     AND SO I THINK THIS IDEA OF STRANGER TO THE CONTRACT, AS

23  THE COURT RECOGNIZES, IS AN ELEMENT OF CALIFORNIA LAW.  AND

24  THEY SIMPLY HAVE NOT PROVEN THAT WE ARE A STRANGER TO THE

25  CONTRACT.  THE EVIDENCE SUGGESTS THAT WE ARE NOT.  THE

1  UNIMPEACHED AND UNCONTRADICTED EVIDENCE DEMONSTRATES THAT WE

2  ARE NOT A STRANGER TO THE CONTRACT.

3      AS FAR AS THE INCLUSION OF THE POLICY BY REFERENCE INTO

4  THE LICENSE AGREEMENTS, THERE IS NOTHING INHERENTLY ILLEGAL

5  ABOUT REQUIRING THAT OUR OWN EMPLOYEES BE USED TO DO THE

6  CLEANING.  WE ARE THE LANDLORD.  AS THE LANDLORD, WE CAN PUT

7  REASONABLE CLAUSES IN A LEASE AGREEMENT.  AND THERE IS NOTHING

8  AT ALL INHERENTLY ILLEGAL OR UNREASONABLE ABOUT REQUIRING THAT

9  OUR OWN PEOPLE DO THE CLEANING IN OUR OWN BUILDING.  SO THIS

10 IDEA THAT IT SOMEHOW DEMONSTRATES MONOPOLY POWER, WOULD SUGGEST

11 THAT IF YOU ARE A LANDLORD AND HAVE A NO PETS POLICY IN YOUR

12 APARTMENT LEASE, THAT YOU'RE SUDDENLY A MONOPOLIST BECAUSE

13 YOU'RE IMPOSING A CONDITION THAT SOME OF THE TENANTS MAY NOT

14 LIKE.  AND THE MERE FACT THAT SOME PEOPLE IN THE INDUSTRY HAVE

15 EXPRESSED DISSATISFACTION WITH THIS POLICY DOES NOT MAKE IT

16 ILLEGAL.

17         THE COURT:  EXCEPT YOU -- THAT IS A LIMITED CONTEXT.

18 THE CONTEXT IS THE ENTIRE HISTORY SINCE 1989, THE COMPETITIVE

19 ENVIRONMENT, AND THE MANNER IN WHICH THIS WHOLE PROCESS WENT

20 DOWN.  AND WHETHER OR NOT IT IS ANTI-COMPETITIVE CONDUCT IS A

21 TRIABLE QUESTION THAT THE JURY WILL NEED TO RESOLVE.  I THINK

22 THAT BECAUSE OF THE TWO HATS, AND THE CONVENTION CENTER'S ROLE

23 AS A COMPETITOR FOR CLEANING, THERE IS A REASONABLE BASIS FROM

24 WHICH THE JURY CAN INFER THAT THE CONVENTION CENTER IS A THIRD

25 PARTY, RELATIVE TO THE CONTRACTS BETWEEN UNITED AND GES AND

1    CHAMPION.  MAYBE THEY DECIDE THAT THEY'RE NOT.  BUT I THINK AS

2    A FACTUAL MATTER, THERE IS A BASIS FOR THAT, AND IT IS A

3    REASONABLE ONE THAT THEY COULD DRAW.

4        AS TO THE QUESTION OF THE DISRUPTION, WHICH IS REALLY THE

5    GROUND THAT WAS MOVED UPON, AND AGAIN, IN CONTEXT OF HIS

6    ARGUMENT OF WHAT THE LANDLORD CAN DO, AND THE PET ANALOGY, THE

7    PROBLEM WITH THAT IS, THERE IS NO ECONOMIC -- NO ECONOMIC

8    INCIDENCE AT STAKE.  AND THE HISTORY HERE GOES FAR BEYOND THE

9    ABSTRACT ANALOGY.  BUT FOR DISRUPTION, CALIFORNIA LAW TALKS

10   ABOUT IT BEING SUFFICIENT TO SHOW DEFENDANT'S CONDUCT MADE THE

11   PLAINTIFF'S PERFORMANCE, AND INFERENTIALLY, ENJOYMENT UNDER THE

12   CONTRACT MORE BURDENSOME OR COSTLY.  AND I THINK THERE IS

13   PLENTY OF EVIDENCE FROM WHICH A JURY COULD MAKE THAT FINDING.

14   MAYBE THEY CHOOSE NOT TO, BUT I THINK THERE IS PLENTY.  THAT IS

15   GOLDEN WEST BASEBALL VS. CITY OF ANAHEIM, 25 CAL.APP. 4TH 11

16   (1994).

17       SO I'M GOING TO DENY THE MOTION AS TO FIFTH CAUSE OF

18   ACTION ON THE BASIS ASSERTED, BASED ON THESE FINDINGS, THAT A

19   REASONABLE JURY HAS EVIDENCE BEFORE IT, FROM WHICH THEY COULD

20   FIND THE TWO PRONGS IN DISPUTE AS TO THIS CAUSE OF ACTION.

21       LET'S MOVE TO THE ANTITRUST, AND DO YOU WANT TO GO

22   CAUSE -- FIRST OR SECOND?  ARE WE STILL GOING IN REVERSE ORDER?

23           MR. L'ESTRANGE:  THE ESSENTIAL FACILITIES CAUSE OF

24   ACTION, WHICH, I BELIEVE, IS THE FIRST.

25           THE COURT:  I HAVE THAT DOWN AS THE SECOND CAUSE OF

1    ACTION.  THE FIRST BEING THE ATTEMPTED MONOPOLIZATION.

2         MR. L'ESTRANGE:  WELL, THEN I WILL CONTINUE WITH MY

3    MODE OF GOING IN REVERSE ORDER.

4         THE COURT:  HOWEVER YOU WANT TO DO IT.

5         MR. L'ESTRANGE:  OKAY.  AS TO THE SECOND CAUSE OF

6    ACTION IN THE OPERATIVE COMPLAINT FOR ACTUAL MONOPOLIZATION

7    UNDER THE SO-CALLED ESSENTIAL FACILITIES DOCTRINE, WE MOVE

8    UNDER RULE 50(A)(1), THAT THE COURT ENTER JUDGMENT ON THAT

9    CAUSE OF ACTION FOR US ON THE GROUNDS OF AN ABSENCE OF PROOF.

10        AND FIRST -- FIRST POINT IS THE FAILURE TO DEFINE AN

11   UPSTREAM MARKET.  AND YOU KNOW FROM OUR TRIAL BRIEF, AND OTHER

12   ARGUMENTS WE'VE MADE IN THE CASE, THAT UNDER THE NINTH CIRCUIT

13   LAW -- AND I'M REFERRING TO THE ALASKA AIRLINES CASE AND THE

14   PALADIN CASE, PARTICULARLY, IT IS NECESSARY TO PROVE IN TWO

15   MARKETS, A FACILITY IS ESSENTIALLY ONLY IF CONTROL OF THE

16   FACILITY CARRIES WITH IT THE POWER TO ELIMINATE COMPETITION IN

17   A DOWNSTREAM MARKET.  THAT IS CITING ALASKA AIRLINES AND

18   PALADIN.  MONOPOLY CONTROL OF THE UPSTREAM MARKET IS A

19   NECESSARY ELEMENT OF THE ESSENTIAL FACILITIES CLAIM.

20        NOW, AS YOU KNOW, WE'VE TAKEN THE POSITION IN OUR PAPERS

21   AND CONTINUE TO TAKE THAT POSITION THAT THE ESSENTIAL

22   FACILITIES CLAIM IS NO LONGER VALID LAW AFTER TRINKO.  BUT EVEN

23   ASSUMING THAT IT IS STILL VALID, IN THE NINTH CIRCUIT, YOU ARE

24   REQUIRED TO PROVE TWO MARKETS.

25        IN THE CONTEXT OF ANTITRUST LAW, IF THERE ARE UNDISPUTED

1    FACTS ABOUT THE STRUCTURE OF THE MARKET THAT RENDER THE

2    INFERENCE ECONOMICALLY UNREASONABLE, THE EXPERT OPINION IS

3    INSUFFICIENT TO SUPPORT A JURY VERDICT.

4        AND HERE, YOU CAN'T USE THE EXPERT OPINION FROM DR. HEKMAN

5    AS A SUBSTITUTE FOR THE ACTUAL FACTS TO DEFINE THE MARKET.  BUT

6    HE DIDN'T EVEN GIVE AN OPINION ABOUT TWO MARKETS IN THE

7    ESSENTIAL FACILITIES CLAIM.  IN FACT, WHAT HE SAID ON THE

8    WITNESS STAND WAS THAT IT WAS HIS OPINION THAT YOU DON'T NEED

9    TO DEFINE TWO MARKETS.  WELL, THE NINTH CIRCUIT DOESN'T AGREE

10   WITH HIM.  AND SO IT REALLY DOESN'T MATTER WHAT HE THINKS ABOUT

11   THE LEGAL REQUIREMENT.

12        THE COURT:  DID YOU SAY -- DID YOU MENTION THE ALASKA

13   AIRLINES?

14        MR. L'ESTRANGE:  ALASKA AIRLINES AND THE PALADIN

15   CASE.

16        THE COURT:  GOT IT.

17        MR. L'ESTRANGE:  SO HE ONLY DEFINED THE MARKET FOR

18   TRADE SHOW CLEANING SERVICES AT THE SAN DIEGO CONVENTION

19   CENTER, WHICH IS THE DOWNSTREAM MARKET ACCORDING TO HIS

20   ANALYSIS.  HE DID NOT PROVIDE ANY MARKET DEFINITION OF THE

21   UPSTREAM MARKET.  HE SORT OF INFORMALLY ASSUMED THAT THERE WAS

22   AN UPSTREAM MARKET FOR THE NATIONAL MARKET FOR HOSTING TRADE

23   SHOWS.  BUT THERE IS NO EXPERT OPINION DEFINING THAT MARKET,

24   AND THERE ARE INSUFFICIENT OBJECTIVE MARKET FACTS FROM WHICH

25   THE JURY CAN DETERMINE THAT IS A RELEVANT MARKET.

1        THE COURT:  TO THE EXTENT THAT HE SPENT GREAT LENGTH

2   TALKING ABOUT THE NATIONAL MARKET FOR LARGE CONVENTION CENTERS

3   OR TRADE SHOWS.

4        MR. L'ESTRANGE:  HE DIDN'T DEFINE THAT AS A MARKET.

5   HE TALKED ABOUT IT.  AND HE LOOKED AT A REPORT THAT HAD NOTHING

6   TO DO WITH TRADE SHOW CLEANING SERVICES OR THIS CASE.  AND FROM

7   THAT, HE SORT OF INFORMALLY SAID THAT THE SAN DIEGO CONVENTION

8   CENTER HAS SOMEWHERE BETWEEN THREE AND 10 PERCENT OF THIS

9   NATIONAL MARKET FOR HOSTING TRADE SHOWS.  THAT'S WHAT HE SAID.

10       SO LET'S ASSUME THAT THAT INFORMAL CONSIDERATION

11  CONSTITUTES THE DEFINITION OF A RELEVANT MARKET FOR PURPOSES OF

12  THE ANTITRUST LAWS.  I'M NOT CONCEDING THAT, BUT LET'S ASSUME

13  THAT IS TRUE.  HIS OPINION -- HE STILL HAS NOT PROVIDED

14  SUFFICIENT OPINION TO CARRY THE DAY FOR THE ESSENTIAL

15  FACILITIES CLAIM.  AND THE REASON IS, A MARKET SHARE OF 10

16  PERCENT IS INSUFFICIENT, EVEN IN AN ATTEMPTED MONOPOLIZATION

17  CASE.

18       AND JUDGMENT, AS A MATTER OF LAW, SHOULD BE ENTERED FOR

19  THE DEFENDANT IF THE BEST HE CAN COME UP WITH IS A 10 PERCENT

20  SHARE OF THE UPSTREAM MARKET.  AND FOR THAT, I CITE VOLLRATH,

21  V-O-L-L-R-A-T-H, COMPANY VS. SAMMI, S-A-M-M-I, CORP., 9 F.3D

22  1455, AT PAGE 1461, AND THAT IS A NINTH CIRCUIT CASE, IN 1993.

23       HE OPINED THAT -- HE -- NOT OPINED, HE TALKED ABOUT

24  PRICING POWER.  BUT WHEN I CHALLENGED HIM ON CROSS-EXAMINATION,

25  BASICALLY DR. HEKMAN CONCEDED THAT THE SAN DIEGO CONVENTION

1    CENTER CORP. CANNOT CONTROL THE PRICES CHARGED BY OTHER

2    CONVENTION CENTERS.  AND THE FACT THAT IT CAN CONTROL THE PRICE

3    CHARGED IN ITS OWN BUILDING IS NOT RELEVANT FOR ANTITRUST

4    PURPOSES.

5         HE DID NOT COMPUTE FORMALLY A MARKET SHARE FOR THE

6    UPSTREAM MARKET.  HE HAD A RANGE, AND HE SAID THAT HE DIDN'T

7    BELIEVE THAT IT WAS NECESSARY TO COMPETE -- TO COMPUTE A MARKET

8    SHARE TO DETERMINE WHETHER THE SDCC CAN RAISE ITS PRICES.

9    WELL, HE'S WRONG.  IT IS NECESSARY UNDER THE LAW.  THE

10   MONOPOLY -- THE ANTITRUST LAW, WHICH CARRIES SOME VERY SEVERE

11   CONSEQUENCES WITH IT, HAS VERY STRICT REQUIREMENTS.  AND IT IS

12   NOT CONCERNED WITH ONE SELLER'S ABILITY TO INCREASE PRICES, AS

13   HE DEFINED PRICING POWER.  IT IS CONCERNED WITH THE FIRM'S

14   ABILITY TO INCREASE PRICES MARKET WIDE.  AND THERE SIMPLY IS NO

15   EVIDENCE OF THAT.  SO THAT'S THE FIRST ITEM.

16        THE SECOND ITEM, AND THAT IS THE FAILURE TO DEMONSTRATE

17   MONOPOLY POWER IN THE UPSTREAM MARKET.  THE THIRD ITEM, WHERE

18   DR. HEKMAN FAILED, AND UNM HAS FAILED, IN THE ESSENTIAL

19   FACILITIES CLAIM, IS THE FAILURE OF -- TO DEMONSTRATE DENIAL OF

20   ACCESS TO THE BUILDING.  THE INDISPENSABLE REQUIREMENT FOR THE

21   ESSENTIAL FACILITIES DOCTRINE IS THE UNAVAILABILITY OF ACCESS

22   TO THE, QUOTE, ESSENTIAL FACILITY.

23        AND UNDER TRINKO, WHICH IS VERIZON COMMUNICATIONS, INC.

24   VS. LAW OFFICES OF CURTIS V. TRINKO, LLP, AT 540 U.S. 398, 411,

25   THE SUPREME COURT HAS STATED, THE INDISPENSABLE REQUIREMENT FOR

1   INVOKING THE DOCTRINE, THIS IS A FACILITIES DOCTRINE, IS THE

2   UNAVAILABILITY OF ACCESS TO THE ESSENTIAL FACILITIES, WHERE

3   ACCESS EXISTS, THE DOCTRINE SERVES NO PURPOSE.

4       IT DOESN'T GUARANTEE COMPETITORS ACCESS TO THE FACILITY ON

5   THE MOST PROFITABLE TERMS, OR EVEN ON THE TERMS THAT ARE

6   CONDUCIVE WITH THEIR BUSINESS MODEL.  AND THAT IS THE METRONET

7   SERVICES CASE, WHICH IS FROM THE NINTH CIRCUIT, 383 F.3D 1124,

8   1129, (9TH CIR. 2004).

9           THE COURT:  BUT METRONET TALKS ABOUT 1129, THAT THE

10  FACILITIES IS ONLY ESSENTIAL IF OTHERWISE UNAVAILABLE AND

11  CANNOT BE REASONABLY OR PRACTICALLY REPLICATED.  AND YOU'RE

12  SAYING THAT MAY BE TRUE IN HIS TESTIMONY DOWNSTREAM, BUT NOT

13  UPSTREAM?

14          MR. L'ESTRANGE:  YES.

15          THE COURT:  OKAY.  I JUST WANT TO MAKE SURE I'M

16  FOLLOWING.  GO AHEAD.

17          MR. L'ESTRANGE:  NOW MR. SIMON HAS ADMITTED THAT HIS

18  COMPANY IS STILL IN THE BUILDING, MEANING THAT THEY STILL HAVE

19  ACCESS.  HE CONTENDED IT REQUIRES HIM TO COMMIT FINANCIAL

20  SUICIDE TO STAY THERE, BUT HE'S STILL IN THE BUILDING.  AND AS

21  I SAID, UNDER THE METRONET SERVICES CASE, WE'RE NOT REQUIRED TO

22  PERMIT HIM IN THERE ON THE BEST FINANCIAL TERMS AVAILABLE UNDER

23  HIS VIEW.

24      ALL OF THE TESTIMONY HAS BEEN THAT UNITED'S SUPERVISORS

25  CONTINUE TO OPERATE IN THE BUILDING, AND THAT UNM IS CONTINUING

1    TO SERVICE ITS CONTRACTS IN THE BUILDING BY SIGNING THE ONE

2    SHOW CONTRACTS AND THEN BY CONDUCTING BILLING WITH THEIR

3    DECORATOR CUSTOMERS.

4        IF YOU RECALL THE TESTIMONY, BASICALLY PRIOR TO JULY 1,

5    2007, UNITED SUBCONTRACTED LABOR FROM UNITED TEMPS, AN

6    INDEPENDENT COMPANY, AND USED THAT LABOR TO DO CLEANING IN THE

7    BUILDING.  AFTER JULY 1, 2007, UNITED SUBCONTRACTED LABOR FROM

8    THE SAN DIEGO CONVENTION CENTER CORPORATION AND CONTINUED TO DO

9    WORK IN THE BUILDING.  SO THE ONLY CHANGE THAT HAS OCCURRED

10   HERE IS THE DIFFERENT SUBCONTRACTOR FOR LABOR THAT IS BEING

11   USED BY UNITED.

12           THE COURT:  WELL, AND THE PRICING AND FLOW-THROUGH

13   PROFIT CHANGED BETWEEN THE -- THE UNITED TEMPS EXAMPLE, AND THE

14   CONVENTION CENTER, AND THAT PALADIN CASE -- I THINK IT IS

15   PALADIN.  YEAH, PALADIN TALKS ABOUT THE SORT OF EXCLUSION FROM

16   THE BUILDING, EITHER PRACTICALLY OR REASONABLY, SO THE PROFIT

17   MOTIVE MAY BE SOMETHING A JURY COULD USE TO FIND PRECLUSION OR

18   EXCLUSION UNDER THAT BROADER DEFINITION.

19           MR. L'ESTRANGE:  ASSUMING HE'S TO FIND THE MARKETS.

20           THE COURT:  RIGHT.  WE'RE TALKING ABOUT JUST THIS

21   PRONG.

22           MR. L'ESTRANGE:  CORRECT.

23           THE COURT:  NO, I DON'T DISAGREE WITH -- THIS IS --

24   WE'RE TALKING ABOUT ONE ISSUE AT A TIME HERE.

25           MR. L'ESTRANGE:  YES.  THE NEXT POINT IS THAT THEY

1   HAVE FAILED TO DEMONSTRATE ANTITRUST INJURY.  AND THAT'S A
2   REQUIREMENT UNDER SECTION 2 OF THE SHERMAN ACT.  ANTITRUST
3   INJURY SHOULD REFLECT THE ANTI-COMPETITIVE EFFECT EITHER OF THE
4   VIOLATION OR OF THE ANTI-COMPETITIVE ACTS MADE POSSIBLE BY THE
5   VIOLATION.  THE HARM SUFFERED BY UNM MUST FLOW FROM THE TYPE OF
6   CONDUCT THE ANTITRUST LAWS WERE INTENDED TO PREVENT.  BECAUSE
7   ANTI-COMPETITIVE CONDUCT HARMS CONSUMER WELFARE, A DEFENDANT'S
8   CONDUCT IS OF THE TYPE THE ANTITRUST LAWS WERE INTENDED TO
9   PREVENT ONLY WHEN IT HARMS ALLOCATIVE EFFICIENCY AND EITHER
10  RAISES PRICES OF GOODS ABOVE COMPETITIVE LEVELS OR DIMINISHES
11  THEIR QUALITY.
12      AND IN THIS CASE, AS FAR AS THE PRICE INCREASES ARE
13  CONCERNED, THERE IS NO EVIDENCE THAT PRICES TO EXHIBITORS WERE
14  INCREASED.  THERE IS NO EVIDENCE THAT PRICES TO DECORATORS WERE
15  INCREASED.  AS FAR AS THE EXHIBITORS ARE CONCERNED -- AND THERE
16  WAS NO ANALYSIS OF EITHER LEVEL OF PRICING BY DR. HEKMAN.  HE
17  DREW SOME CONCLUSIONS FROM DEPOSITION TESTIMONY, BUT HE DIDN'T
18  DO ANY PRICE STUDY, WHATSOEVER.
19      WHEN THE DEFENDANT'S CONDUCT HARMS THE PLAINTIFF, IN THIS
20  CASE, UNITED, WITHOUT ADVERSELY AFFECTING COMPETITION
21  GENERALLY, THERE IS NO ANTITRUST INJURY.  AND IN THIS CASE, THE
22  EXPERT EVIDENCE GIVES US SOME GUIDE, BUT IT ISN'T A SUBSTITUTE
23  FOR ACTUAL FACTS.
24      FIRST, AS TO PRICING, GES WITNESSES TESTIFIED THAT GES DID
25  NOT LOSE MONEY OR PAY ADDITIONAL COSTS BECAUSE THEY WERE ABLE

1    TO ENFORCE THE CONTRACT THAT THEY HAD WITH UNITED.   MR. EPSTEIN

2    TESTIFIED THAT CHAMPION LOST MONEY WHEN THE POLICY WAS

3    ANNOUNCED, BUT THAT INJURY WAS ESSENTIALLY SELF-INFLICTED.   IN

4    FACT, IT WAS ALMOST COLLUSIVE BECAUSE MR. EPSTEIN HAD A

5    CONTRACT, HE COULD HAVE HELD UNITED TO THE CONTRACT, BUT

6    INSTEAD, HE ELECTED TO RENEGOTIATE THE CONTRACT SO THAT THE

7    RESULT WAS HE WAS PAYING MORE MONEY FOR CLEANING THAN HE HAD A

8    CONTRACTUAL RIGHT TO PAY.   THAT IS SIMPLY ECONOMICALLY

9    IRRATIONAL.   AND SELF-INFLICTED DAMAGE DOES NOT SATISFY THE

10   ELEMENT OF DAMAGE TO A CONSUMER.

11       MR. SIMON TESTIFIED THAT UNM ASKED FOR AND RECEIVED

12   PRICING INCREASES FROM THE DECORATORS FROM JULY 1, 2007, GOING

13   FORWARD.   BUT THOSE PRICE INCREASES WERE BASED ON THE COST OF

14   LIVING.   THEY WERE NOT BASED ON ANYTHING AT THE SAN DIEGO

15   CONVENTION CENTER.   THEY WERE ACROSS THE BOARD FOR ALL THE

16   CITIES WHERE HE DOES BUSINESS.

17       MR. MCAVOY TESTIFIED TODAY THAT HE THOUGHT IT WOULD BE

18   UNDULY EXPENSIVE COMPARED TO WHAT HE HAD DONE IN LOS ANGELES TO

19   HAVE CENTURY COME DOWN HERE TO SAN DIEGO.   AND THE -- HIS

20   PEOPLE CALCULATED THE DIFFERENCE AT $5,000.   THEY NEGOTIATED

21   THAT DIFFERENCE WITH THE SAN DIEGO CONVENTION CENTER.   SO THERE

22   WAS NO DAMAGE SUFFERED BY REED SINCE THE SAN DIEGO CONVENTION

23   CENTER ESSENTIALLY GAVE HIM WHAT HE CALCULATED WOULD HAVE BEEN

24   THE DAMAGE.

25       DR. HEKMAN FAILED TO STUDY ANY PRICE INCREASES.   HE

1    ABSOLUTELY DID NOTHING WITH REGARD TO PRICE.  AND HE CONCEDED

2    THAT THERE WERE NO PRICE INCREASES TO GES.  HE KEPT GOING BACK

3    TO THE CHAMPION EXAMPLE, BUT IGNORING THE FACT THAT THAT DAMAGE

4    WAS ESSENTIALLY SELF-INFLICTED.  DR. HEKMAN ASSUMED THAT UNM

5    ABSORBED ALL THESE INCREASED COSTS.  WELL, IF THAT IS THE CASE,

6    THAT MEANS EVEN FURTHER THAT THERE WAS NO DAMAGE TO THE

7    EXHIBITORS OR TO THE DECORATORS.  HE ALSO ASSUMED THAT THE

8    PRICE FLOOR IN SDCC'S ONE SHOW CONTRACTS SOMEHOW CONSTITUTED AN

9    ANTITRUST VIOLATION.

10        BUT IF YOU RECALL YESTERDAY, WHEN HE WAS ON THE STAND, I

11   SHOWED HIM UNM'S OWN CONTRACTS WITH GES, WHICH HAS A SIMILAR

12   PRICE FLOOR.  IN FACT, THE ONE BETWEEN UNM AND GES HAS A

13   FLOATING PRICE FLOOR THAT IS ADJUSTED EVERY TIME UNM RAISES ITS

14   PRICES.  AND THERE IS ALSO A PRICE FLOOR IN THE CHAMPION

15   CONTRACT.  IF YOU REMEMBER, WHEN I HAD MR. EPSTEIN ON THE STAND

16   AND CROSS-EXAMINED HIM ABOUT THE CONTRACT, EXHIBIT 83, THE

17   CHAMPION CONTRACT, PARAGRAPH 7, IN THE FIRST PAGE, PROVIDES

18   THAT IF THE COSTS FOR BOOTH CLEANING SERVICES EXCEED UNM'S

19   LABOR COSTS, THEY HAVE THE CONTRACTUAL RIGHT TO CHARGE COSTS,

20   PLUS 15 PERCENT, WHICH THEY ELECTED NOT TO USE.

21        YOU MAY REMEMBER IN CONNECTION WITH THAT TESTIMONY,

22   MR. SIMON ATTEMPTED TO GET INTO GIVING TESTIMONY ABOUT THE

23   PARTIES' UNEXPRESSED UNDERSTANDINGS OF THE CONTRACT, WHICH, OF

24   COURSE, IS NOT RELEVANT AT ALL TO CONTRACT INTERPRETATION.

25        AND THE ISSUE OF CONTRACT INTERPRETATION IS ACTUALLY AN

1   ISSUE OF LAW TO BE DECIDED BY THE COURT.  I THINK IT IS QUITE

2   CLEAR IN TERMS OF BOTH OF THOSE CONTRACTS THAT THE DECORATORS

3   HAD MORE THAN ADEQUATE PROTECTION, WHICH GES UTILIZED AND

4   CHAMPION DID NOT, TO PROTECT THEM FROM ANY PRICE INCREASES FROM

5   MR. SIMON.

6        NOW DR. HEKMAN MADE A LOT ABOUT THE LACK OF CHOICE.  AND

7   WE HEARD THAT AGAIN HERE FROM MR. MCAVOY.  THAT IS NOT A

8   CRITERION.  LACK OF CHOICE IS NOT A CRITERION UNDER THE

9   ANTITRUST LAWS THAT IMPLICATES SECTION 2 OF THE SHERMAN ACT.

10  AND YOU MAY RECALL FROM THE TESTIMONY, AS FAR AS THE EXHIBITORS

11  ARE CONCERNED, THEY NEVER HAD A CHOICE.  THEY ARE ALWAYS BOUND

12  BY THE EXCLUSIVE CONTRACT BETWEEN THE DECORATOR AND THE TRADE

13  ASSOCIATION, TO THE POINT WHERE THEY'RE NOT ALLOWED TO BRING

14  THEIR OWN VACUUM CLEANERS TO THE SHOW TO DO IT THEMSELVES.

15       AND IF YOU REMEMBER, MR. EPSTEIN TESTIFIED THAT AS TO THE

16  ENFORCEMENT OF THAT PROVISION AGAINST THE I&D HOUSES, THEY'RE

17  NOT EVEN ALLOWED TO CLEAN UP THEIR WORK AREA AFTER THEY FINISH

18  INSTALLING A BOOTH.  ALL THEY'RE ALLOWED TO DO IS PICK UP THEIR

19  TOOLS AND WALK AWAY SO UNITED AND CHAMPION CAN COME IN AND REAP

20  SOME BENEFIT, ECONOMIC BENEFIT FROM DOING THAT.  SO THE

21  EXHIBITORS DIDN'T LOSE ANY CHOICE; THEY NEVER HAD ONE TO BEGIN

22  WITH.  AS FAR AS THE DECORATORS ARE CONCERNED --

23            THE COURT:  WELL, THEY DO HAVE THE CHOICE OF NOT

24  HAVING CLEANING.

25            MR. L'ESTRANGE:  THAT IS TRUE.  THAT IS A CHOICE.

1          THE COURT:  YEAH.

2          MR. L'ESTRANGE:  BUT THE DECORATORS ALWAYS HAVE THE

3    CHOICE.  AND THEY CAN CONTINUE TO USE UNITED TO DO THEIR

4    CLEANING.  THE POLICY OF EXHIBIT 32, BY ITS TERMS, DOES NOT

5    EXCLUDE THE DECORATORS FROM USING THEIR CONTRACTED CLEANING

6    SUBCONTRACTOR.

7          THE COURT:  IT IS JUST WHICH EMPLOYEES YOU USE --

8          MR. L'ESTRANGE:  RIGHT.

9          THE COURT:  -- AND WE'VE HAD A LOT OF TESTIMONY ON

10   THAT.

11         MR. L'ESTRANGE:  LOADS OF IT.  SO THERE IS REALLY NO

12   HARM TO CONSUMERS.

13      NOW LET'S TALK ABOUT QUALITY.  THERE IS CONFLICTING

14   ANECDOTAL EVIDENCE ON THE QUALITY OF THE WORK THAT IS DONE.  WE

15   HAVE HEARD MR. KRIZ GO BOTH WAYS ON THE SITUATION.  HE SENDS

16   THE UNSOLICITED E-MAIL TO MR. GESSNER, CONGRATULATING HIM ON

17   THE GOOD JOB DONE, AND HE SENDS AN E-MAIL TO BUDDY LINN THAT

18   WAS NEVER GIVEN TO THE CONVENTION CENTER, COMPLAINING ABOUT THE

19   TEN ITEMS HE HAD THOUGHT WERE NOT BEING DONE VERY WELL.  BUT

20   THERE IS NO SURVEY OF CLEANING.  THERE WAS NO CUSTOMER SURVEY.

21   THERE WAS NO ACCUMULATION OF DATA ON HOURS USED, NUMBER OF

22   WRITTEN COMPLAINTS, OR ANYTHING LIKE THAT.

23      ALL OF THE ANECDOTAL EVIDENCE THAT WE HAVE SEEN DEALS

24   SOLELY WITH OPERATIONAL ISSUES.  IT HAS NOTHING TO DO WITH THE

25   ACTUAL QUALITY OF THE CLEANING THAT WAS DONE.  FAILURE TO

1    INVOICE QUICKLY ENOUGH, THAT WAS ONE OF MR. KRIZ'S COMPLAINTS,

2    OVERLAP IN THE SHIFTS, THINGS OF THAT NATURE.  IT IS ALL

3    OPERATIONAL ISSUES.

4        NEXT, IS THE FAILURE TO DISAGGREGATE DAMAGES.  AND THIS IS

5    THE LAST POINT, THE ESSENTIAL FACILITIES CLAIM.  UNDER THE

6    ANTITRUST LAWS, UNM IS REQUIRED TO DISAGGREGATE ITS DAMAGES.

7    ANTITRUST DAMAGES ARE LIMITED TO THE NET INJURY UNDER SECTION 4

8    OF THE CLAYTON ACT AND A VERDICT CANNOT BE BASED ON DAMAGES

9    GREATER THAN WHAT IS ATTRIBUTABLE TO THE ANTITRUST INJURY.  SO

10   THAT HAS TO BE SORTED OUT, AND IT WAS NOT.

11        THE COURT:  YOU MEAN, THEY HAVE TO SORT OUT BETWEEN

12   ESSENTIAL FACILITIES AND THE SECTION TO MONOPOLIZATION CLAIM?

13        MR. L'ESTRANGE:  THEY HAVE TO SORT OUT BETWEEN THE

14   ANTITRUST CLAIMS AND THE NONANTITRUST CLAIMS.

15        THE COURT:  OH, OKAY.

16        MR. L'ESTRANGE:  WHICH THEY HAVE NOT DONE.  AND THEY

17   ALSO HAVE TO SORT OUT BETWEEN THE ESSENTIAL FACILITIES CLAIM,

18   NOT ONLY AMONG THE VARIOUS CLAIMS, BUT AS AMONG THINGS THAT ARE

19   INSIDE AND OUTSIDE THE MARKET.

20        NOW YOU HEARD DR. HEKMAN AND I GOING BACK AND FORTH ON HIS

21   DEFINITION OF THE WORD "LARGE," WHICH IS AN IMPORTANT

22   INGREDIENT IN HIS DEFINITION OF THE MARKET.  BASICALLY IT IS

23   FOR LARGE -- THE CLEANING SERVICES FOR LARGE TRADE SHOWS THAT

24   CAN ONLY FIT INSIDE THE SAN DIEGO CONVENTION CENTER.  NOW

25   THAT'S, UNDER HIS THEORY, AN IMPORTANT ELEMENT OF THE ANTITRUST

1   MARKET HERE.  AND IF YOU RECALL IN THE CHART THAT WAS PUBLISHED

2   BY THE CITIZEN'S TASK FORCE, THERE WERE ABOUT 200 EVENTS EACH

3   YEAR, BUT ONLY ABOUT 70 OR SO ACTUAL LARGE SHOWS.  AND HE

4   DIFFERENTIATED BETWEEN THOSE TWO GROUPS AND SAID IT'S ONLY THE

5   LARGE ONES THAT ARE IN THE MARKET THAT WE'RE TALKING ABOUT

6   HERE.

7        WELL, WHEN I ASKED HIM TO DEFINE "LARGE," AND ASKED WHAT

8   METRIC HE USED, HE COULDN'T COME UP WITH AN ANSWER.  HE

9   COULDN'T SAY WHETHER IT WAS IN TERMS OF SQUARE FEET, IN TERMS

10  OF NUMBER OF PEOPLE USED TO DO BOOTH CLEANING, OR ANYTHING

11  ELSE.  IT'S SIMPLY A TERM THAT HE PULLED OUT OF THE AIR.

12        THE COURT:  BUT DIDN'T THE CONVENTION CENTER ITSELF

13  DEFINE IT BY SAYING, THESE ARE THE LARGE TRADE SHOWS AND THIS

14  IS EVERYTHING ELSE?

15        MR. L'ESTRANGE:  WELL, LET'S ASSUME THAT THEY DID.

16  LET'S ASSUME FROM THAT CHART THAT THEY DEFINED THE LARGE TRADE

17  SHOWS.  THEY'RE NOT IDENTIFIED BY NAME, OF COURSE, SO WE DON'T

18  KNOW WHAT SHOWS THOSE WERE.  BUT IF YOU REMEMBER ON

19  CROSS-EXAMINATION, I IDENTIFIED THREE SMALL TRADE SHOWS TO

20  DR. HEKMAN, AND HE AGREED THOSE WERE OUTSIDE OF THE MARKET

21  BECAUSE THEY WERE NOT LARGE AS HE DEFINED THE TERM.

22        YESTERDAY, WHEN I CROSS-EXAMINED DR. KENNEDY AND WENT

23  THROUGH HIS DAMAGE ANALYSIS, YOU MAY RECALL THAT I ASKED HIM

24  ABOUT ALL OF THE SHOWS WHERE THERE WAS ZERO AVOIDED HOURS FOR

25  BOOTH CLEANING.  AND HE TOLD US THAT HE HAS SOMEWHERE BETWEEN

1   95 AND 98 SHOWS LISTED ON THAT CHART, AND THOSE ARE THE SUBJECT

2   OF HIS OPINION.  AND 31 OF THOSE SHOWS HAD NO AVOIDED HOURS FOR

3   BOOTH CLEANING.  AND HE SAID, THOSE ARE SMALL SHOWS.  WE HAVE

4   NO WAY OF TELLING, AND THE JURY HAS NO WAY OF TELLING, WHETHER

5   THOSE 31 SMALL SHOWS ARE IN THE TOP GROUP OF 70 OR SO LARGE

6   SHOWS, ON THAT GRAPHIC, OR THE BOTTOM GROUP OF 200-PLUS SHOWS.

7        SO WHAT WE HAVE HERE IS THAT THE PLAINTIFFS HAVE SIMPLY

8   DEFINED A MARKET TO INCLUDE LARGE TRADE SHOWS THAT REQUIRE

9   CLEANING SERVICES AT THE SAN DIEGO CONVENTION CENTER, WITHOUT

10  DEFINING LARGE.  AND THEY HAVE BUNCHED INTO THIS CASE EVERY ONE

11  OF THE SHOWS THAT THEY CLAIM THEY HAVE SUFFERED INJURY ON AS A

12  RESULT OF THIS PRACTICE.  BUT THE SHOWS THAT THEY HAVE BUNCHED

13  TOGETHER DON'T ALL FIT WITHIN THE DESCRIPTION OF LARGE,

14  ACCORDING TO BOTH DR. HEKMAN AND DR. KENNEDY.  SO THERE IS NO

15  WAY ANYONE CAN DISAGGREGATE THE DAMAGES AND FIGURE OUT WHICH

16  DAMAGES THEY'RE CLAIMING RELATE TO THE ANTITRUST CLAIMS AND

17  WHICH DAMAGES THEY'RE CLAIMING RELATE TO THE NONANTITRUST

18  CLAIMS.

19        THE COURT:  WELL, IF WE TAKE THE LARGE, SMALL ASIDE,

20  THE DAMAGES ARE ESSENTIALLY THE SAME ON EITHER SIDE OF THE

21  LEDGER.  TAKE THAT DISTINCTION AWAY, AREN'T THE DAMAGES

22  ESSENTIALLY THE SAME, LOSS OF PROFIT, EXPENSE, OVERHEAD,

23  WHATEVER THAT HE'S -- KENNEDY TESTIFIED TO?

24        MR. L'ESTRANGE:  KENNEDY HAS TESTIFIED TO ALL THE

25  SHOWS IN GROUP BY DECORATOR.

1        THE COURT:  YES, BUT I MEAN, AT THE END OF THE DAY,

2    IF THEY WIN ON ALL GROUPS, WE DON'T TAKE 750,000 TIMES 4 AND

3    TREBLE HALF OF THAT BECAUSE HE HAS FOUR CAUSES OF ACTION, AND

4    THE DAMAGES ARE THE SAME AS TO EACH CAUSE OF ACTION.

5        MR. L'ESTRANGE:  I AGREE.  BUT AS TO THE ANTITRUST

6    CLAIMS, THEY HAVEN'T SEGREGATED OUT WHICH DAMAGES FLOW FROM THE

7    LARGE SHOWS, WHICH ARE THE ONLY ONES IN THE MARKET.  THAT'S

8    WHAT I'M SAYING.

9        THE COURT:  I UNDERSTAND THE POINT.  OKAY, ANYTHING

10   ELSE?

11       MR. L'ESTRANGE:  HOLD ON FOR A SECOND.  AS TO THAT

12   LAST POINT, I CITE TO THE COURT'S ATTENTION THE IMAGE TECHNICAL

13   SERVICES VS. EASTMAN KODAK COMPANY, AND THIS IS THE NINTH

14   CIRCUIT CASE, AT 125 F.3D 1195, 1224, (9TH CIR. 1997).  AND

15   THAT CASE HOLDS THAT IN THE CONTEXT OF A SECTION 2

16   MONOPOLIZATION CLAIM, WHICH IS WHAT THE ESSENTIAL FACILITIES

17   CLAIM IS, CONDUCT IS UNLAWFUL BECAUSE OF ITS ANTI-COMPETITIVE

18   EFFECTS ON THE RELEVANT MARKET, WHICH REQUIRES ANTITRUST

19   PLAINTIFF TO SEGREGATE DAMAGES THAT OCCUR OUTSIDE OF THE

20   RELEVANT MARKET.

21       AND BY DR. KENNEDY'S DEFINITION, ANY DAMAGES THAT FLOWED

22   FROM SMALL SHOWS OCCURRED OUTSIDE OF THE RELEVANT MARKET AND

23   CANNOT BE THE SUBJECT OF THE ANTITRUST CLAIMS, BUT YET, WE

24   CAN'T IDENTIFY WHICH SHOWS THOSE ARE BASED ON THE EVIDENCE THAT

25   WAS PRESENTED.

1          THE COURT:  OKAY.  ALL RIGHT.  SO PLAINTIFF WANTS TO

2     RESPOND?  AND, I GUESS, THE CRITICAL STARTING PLACE WOULD BE

3     THE TWO MARKETS' ANALYSIS, WHICH IS WHERE MR. L'ESTRANGE

4     STARTED.

5          MR. SLANIA:  AND I'M HAPPY TO START THERE AS WELL,

6     YOUR HONOR.

7       FIRST OF ALL, MR. L'ESTRANGE STARTED BY STATING THAT THE

8     ESSENTIAL FACILITIES DOCTRINE DOESN'T EXIST, AND HE REFERS BACK

9     TO HIS EARLIER PAPERS.  BUT IN THE MOTION FOR SUMMARY JUDGMENT

10    SETTING, AS WE POINTED OUT IN OUR OPPOSITION TO THEIR SECOND

11    DAUBERT MOTION, YOUR HONOR, WHICH, I BELIEVE, WAS DOCKET

12    NO. 150-1, AND IT IS PAGE 12 OF THAT EXHIBIT, LINES 1 THROUGH

13    16, THE CONVENTION CENTER STATES, AFTER DISCUSSING THE

14    DOCTRINE, THE NINTH CIRCUIT CONTINUES TO RECOGNIZE THE DOCTRINE

15    AFTER TRINKO.

16          THE COURT:  RIGHT.

17          MR. SLANIA:  AND THEY'RE NOW TAKING AN INCONSISTENT

18    POSITION, JUST LIKE THEY DID IN THE DAUBERT MOTIONS, WHICH IS,

19    YOU DENIED THEIR DAUBERT MOTION.  SO WE'RE HEARING THE SAME

20    THING OVER AGAIN.  I CAN ADDRESS THOSE POINTS AGAIN, BUT IT'S

21    TAKEN CARE OF IN THOSE --

22          THE COURT:  I THINK THE NINTH CIRCUIT STILL

23    RECOGNIZES IT, SO THIS COURT MUST.  BUT LET'S GET TO THE

24    MARKETS.

25          MR. SLANIA:  WELL, DR. KENNEDY WAS ON THE STAND

1    DISCUSSING THE UPSTREAM MARKET AND THE DOWNSTREAM MARKET.

2    THERE WERE, I DON'T REMEMBER EXACTLY HOW MANY SCOPE OBJECTIONS

3    THAT WERE ADDRESSED TO THIS TESTIMONY, RELATING TO THE MARKETS,

4    BUT HE WENT THROUGH THE MARKETS IN DETAIL.  WE HAD A SESSION

5    WHERE YOUR HONOR RULED ON ALL OF HIS OPINIONS BEING WITHIN THE

6    SCOPE OF HIS REPORTS, AND THAT THOSE OPINIONS MADE IT TO THE

7    JURY, AND THOSE OPINIONS INCLUDED THE CONVENTION CENTER HAD

8    MARKET POWER IN THE UPSTREAM MARKET, AND THEY HAD MARKET POWER

9    IN THE DOWNSTREAM MARKET.

10       SO I BELIEVE THAT EVIDENCE IS WHAT A REASONABLE JURY COULD

11   USE TO INFER THAT THOSE MARKETS HAD BEEN DEFINED FROM WHICH WE

12   COULD HAVE A TWO MARKET ESSENTIAL FACILITIES ANALYSIS.  AND AS

13   WE ALSO POINTED OUT IN OUR DAUBERT OPPOSITIONS, YOUR HONOR,

14   THERE IS NO REQUIREMENT THAT TWO MARKETS BE DEFINED, ALTHOUGH

15   DR. HEKMAN DID DO THAT ON THE STAND.  BUT I BELIEVE WE POINTED

16   OUT THAT YOU CAN HAVE ONE MARKET, AND I BELIEVE THAT IS IN OUR

17   DAUBERT OPPOSITION, DOCKET NO. 150-1, PAGE 13, LINE 15, THROUGH

18   PAGE 14, LINE 3, WHERE WE ADDRESS THAT ISSUE.  AND WE CITED TO

19   ASPEN HIGHLANDS SKIING CORP., 438, F.2D 1509, 1520, AND 1521.

20       SO I BELIEVE WE'VE GOT THE TESTIMONY REGARDING THE MARKETS

21   HERE, YOUR HONOR.  IT CAME IN THROUGH DR. HEKMAN'S OPINIONS.

22   YOU ANALYZED THE OPINIONS BEFORE AT LEAST IN SOME FASHION ON

23   THE DAUBERT MOTIONS.  YOU RULED ON THE SCOPE OBJECTIONS.  THOSE

24   OPINIONS ARE BEFORE THE JURY.  AND ON THE STANDARD THAT WE HAVE

25   HERE, I BELIEVE WE DO HAVE THE MARKETS THAT ARE DEFINED, FROM

1    WHICH THEY CAN MAKE THE ANALYSIS FOR AN ESSENTIAL FACILITIES

2    CLAIM.

3            THE COURT:  WHAT ABOUT THE ANTITRUST INJURY AND THE

4    NEED TO SEGREGATE POINTS?  AND THEN YOU CAN GO ON TO WHATEVER

5    ELSE YOU WANT TO SAY.

6            MR. SLANIA:  WELL, THE INJURY ISSUES, YOUR HONOR,

7    MR. L'ESTRANGE SAID THAT THERE WAS NO TESTIMONY THAT PRICES

8    WERE RAISED.  THAT'S NOT WHAT I HEARD THE WITNESSES SAY.  MATT

9    KRIZ SAID, TIME IS MONEY.  HE TALKED ABOUT THE FACT THAT GES

10   INCURRED ADDITIONAL EXPENSES BECAUSE THEIR LABOR HAD TO WORK

11   LONGER HOURS BECAUSE THE CONVENTION CENTER COULDN'T GET THE JOB

12   DONE AS QUICKLY OR AS EFFICIENTLY AS UNITED DID.  AND

13   MR. L'ESTRANGE TRIED TO CATEGORIZE THOSE TYPES OF PROBLEMS WITH

14   THE CONVENTION CENTER CLEANING CREW AS OPERATIONAL ISSUES.

15   WELL, TRADE SHOW CLEANING, AS WE'VE HEARD MULTIPLE PEOPLE

16   TESTIFY ABOUT, IS NOT SIMPLY JUST CLEANING ITSELF.  IT IS

17   COORDINATION WITH THE DECORATOR.  IT IS MOVING IN IN A TIMELY

18   BASIS.  IT'S HAVING THE BOOTHS READY WHEN THE EXHIBITORS COME

19   IN THE NEXT DAY AND WHEN THE PATRONS COME IN THE NEXT DAY.  IT

20   IS GETTING THE TRADE SHOW MOVED OUT IN A TIMELY BASIS.

21       SO THIS IS NOT JUST AN OPERATIONAL ISSUE.  THIS IS PART OF

22   THE WHOLE SERVICE, WHICH UNITED IS BEING FORECLOSED FROM HAVING

23   ITS LABORERS PERFORM THE WORK AT.  SO I DO BELIEVE WE HAVE GOT

24   DAMAGE TO THE CONSUMERS.  AND BY THE WAY, THE DECORATORS ARE

25   CONSUMERS HERE AS WELL.  THEY PAID MORE.  THEIR PRICES DID

1  INCREASE.  DAN PITTS SAID THAT AS WELL, AS WELL AS MARK

2  EPSTEIN, AS WELL AS ALL OF THE GES --

3          THE COURT:  THERE IS TESTIMONY, THERE IS A NUMBER OF

4  CONSUMERS THROUGHOUT THE MATRIX OF THIS INDUSTRY, DEPENDING

5  UPON WHERE YOU FOCUS.

6          MR. SLANIA:  RIGHT.  AND REGARDING THE DIMINISHED

7  QUALITY, IN ADDITION TO THE E-MAIL FROM MATT KRIZ AND HIS

8  PERSONAL KNOWLEDGE REGARDING ALL OF THOSE ITEMS THAT ARE

9  DEFINED, ARE DESCRIBED IN HIS E-MAIL, EXHIBIT 364.  DAVE

10 DICKERSON AND LEIF LJUNGQUIST ARE PEOPLE ON THE FLOOR.  THEY

11 CAME IN AND TESTIFIED THAT UNITED'S WORKERS DID A BETTER JOB

12 THAN THE CONVENTION CENTER CREWS.  SO WE HAVE PLENTY OF

13 EVIDENCE UPON WHICH A JURY CAN INFER THAT THERE HAS BEEN HARM

14 TO CONSUMERS HERE REGARDING BOTH THE PRICING AND THE QUALITY.

15         THE COURT:  WELL, THE QUALITY ISSUES ALSO SPILL OVER

16 INTO THE ISSUE OF PRETEXT, BUT WE'RE NOT ARGUING THAT.  BUT GO

17 AHEAD.  IS THAT IT?

18         MR. LANCE:  I WAS GOING TO ADDRESS THE DISSEGREGATION

19 ARGUMENT.  DR. HEKMAN DEFINED THAT MARKET.  HE DEFINED WHAT THE

20 MARKET WAS AND WHAT THE COMPETITION WAS BETWEEN UNITED,

21 CENTURY, SDCC.  AND IT IS CLEAR THAT IF THERE IS A

22 DIFFERENTIAL -- THERE IS A DIFFERENCE BETWEEN THE SAN DIEGO

23 CONVENTION CENTER AND THE OTHER LOCATIONS IN TOWN, YOU ARE

24 TALKING 40,000 SQUARE FEET VERSUS 600,000.  SO THAT OPERATIVE

25 MARKET FROM 1989 THROUGH JULY 1ST, 2007, WAS FOR SHOWS IN THE

1  CONVENTION CENTER.

2      NOW WERE THERE ANCILLARY SERVICES THAT WERE REQUIRED TO

3  PARTICIPATE IN THAT MARKET, HE TALKED ABOUT THAT.  YES, THERE

4  WERE.  BECAUSE IF YOU'RE GOING TO GET THE PLUMS, YOU'RE GOING

5  TO HAVE SOME OF THE SMALLER SHOWS AS WELL.  BECAUSE IF GES IS

6  DOING A SMALLER SHOW, THEY'RE GOING TO WANT YOU TO DO THAT AS

7  WELL.  AND THAT'S WHAT YOU'RE SEEING, THAT THE CONVENTION

8  CENTER DOES, UNITED DOES.

9          THE COURT:  EVERYBODY DOES IT.

10         MR. LANCE:  SO IT'S ALL PART OF THAT MARKET.  BUT THE

11  REASON THAT THIS MARKET IS ATTRACTIVE, AND THE REASON THAT

12  WE'RE HERE TODAY, IS BECAUSE THE CONVENTION CENTER IS WHAT THEY

13  SAY THEY ARE.  IT'S THIS ONE-OF-A-KIND PLACE IN SAN DIEGO,

14  600,000 SQUARE FEET, WE NEED TO SPEND 200 MILLION TO EXPAND

15  AGAIN BECAUSE WE HAVE SO MANY PEOPLE WANTING TO COME HERE.

16  THAT'S THE UPSTREAM MARKET.  SO IT'S CLEAR THAT THE MARKET HAS

17  DEFINED ITSELF FROM 1989 THROUGH 2007.  AND THAT IS WHAT

18  DR. HEKMAN IS SAYING, YEAH, THIS IS THE MARKET, THIS IS WHAT WE

19  HAD COMPETITION FOR 18 YEARS.  AND IT HAS DEFINED ITSELF.  AND

20  TO TRY TO SAY THIS IS A NATIONAL MARKET, AND BEING

21  CROSS-EXAMINED ON THAT, WE'RE GOING TO HEAR DR. HAYES, WHEN THE

22  CONVENTION CENTER ONLY OPERATES THERE.  SO IT'S CLEAR THAT IS

23  WHERE THE MARKET WAS, AND THAT IS WHAT OUR DAMAGES ARE, AND THE

24  DAMAGES THAT WE'VE SUFFERED, DOCUMENTED FROM JULY 1ST, 2007, TO

25  THE PRESENT.

1          THE COURT:  AND HEKMAN TALKS ABOUT THE NATIONAL

2    MARKET, WHICH FEEDS INTO THE FIRST CAUSE OF ACTION AS WELL.

3          ANYTHING YOU WANT TO SAY IN CLOSING, MR. L'ESTRANGE?

4          MR. L'ESTRANGE:  YES, BRIEFLY, YOUR HONOR.  AND THIS

5    IS ONLY TO THE POINT OF THE FAILURE TO DEFINE TWO MARKETS.

6    MR. SLANIA HAS CITED TO THE CASE, TO THE COURT, TO THE ASPEN

7    HIGHLANDS SKIING CASE, THAT IS A 10TH CIRCUIT CASE.  AND IT'S

8    NOT ONLY NOT CONTROLLING IN THIS CIRCUIT, BUT IT'S CONTRARY TO

9    THE NINTH CIRCUIT DECISIONS IN ALASKA AIRLINES VS. UNITED

10   AIRLINES, AND THE PALADIN CASE, BOTH OF WHICH CLEARLY STATE

11   THAT TWO -- PROOF OF TWO MARKETS IS REQUIRED.

12         AND THE ONE POINT THAT I DIDN'T HEAR ADDRESSED IN RESPONSE

13   WAS THAT EVEN IF YOU ASSUME THAT DR. HEKMAN DID DEFINE TWO

14   MARKETS, AS TO THE UPSTREAM MARKET, FOR HOSTING CONVENTION

15   CENTERS NATIONALLY, HE SAID THAT THE MARKET SHARE IS 10

16   PERCENT.  AS A MATTER OF LAW, THAT IS INSUFFICIENT TO SUPPORT

17   ANY THEORY UNDER THE ANTITRUST LAWS IN THE UPSTREAM MARKET.

18   AND THAT'S GOING BACK TO THE VOLLRATH VS. SAMMI CORPORATION

19   CASE, THAT I CITED TO YOU EARLIER, THE NINTH CIRCUIT CASE.  SO

20   EVEN ASSUMING THEY'VE PROVEN TWO MARKETS, WHICH IS REQUIRED IN

21   THE NINTH CIRCUIT, HIS -- HE FAILED TO SHOW THAT WE HAVE

22   MONOPOLY POWER IN THE UPSTREAM MARKET, WHICH, ITSELF, IS FATAL

23   TO THE CLAIM FOR THE ESSENTIAL FACILITIES.  AND ON THAT BASIS,

24   WE WOULD ASK THAT JUDGMENT BE ENTERED IN OUR FAVOR.

25         THE COURT:  WELL, I DON'T KNOW THAT IT HAS BEEN SHOWN

1    AS A MATTER OF LAW.  I THINK THERE IS A QUESTION OF FACT, AND

2    THIS IS THE MOTION FOR, YOU KNOW, FOR -- IT IS THE MOTION THE

3    DEFENSE IS BRINGING HERE FOR JUDGMENT AS A MATTER OF LAW.

4    THERE ARE TRIABLE QUESTIONS OF FACT.  YOU HAVE HAD NO END TO

5    THE TESTIMONY AS TO HOW THE MARKET IS TO BE DEFINED.  AND HOW

6    THE MARKET, IF IT EXISTS AT ALL, OR HOW YOU DEFINE IT, IS ONE

7    THAT IS CRITICAL TO THE ULTIMATE FINDINGS BY THE JURY.  AND

8    THERE IS EVIDENCE ON BOTH SIDES.  THE EXPERTS DON'T AGREE.

9    CLEARLY, WE CAN ANTICIPATE THAT.  THERE IS SOME DIFFERENCES OF

10   HOW ONE APPROACHES IT.

11       BUT CLEARLY, THERE IS EVIDENCE FROM WHICH THE JURY CAN

12   CONCLUDE THE APPROPRIATE MARKETS HAVE BEEN DEFINED OR NOT.  NO

13   DOUBT THEY'LL HEAR FROM THE DEFENSE HOW THIS IS ALL MADE OUT OF

14   WHOLE CLOTH, AND THEY'LL HAVE TWO SIDES FROM WHICH THEY CAN

15   DESIGN.  I THINK THE ESSENTIAL FACILITIES ASPECT OF THE

16   CONVENTION CENTER ITSELF IS WELL-ESTABLISHED AS AN ENTITY HERE

17   BY THE TESTIMONY IN THE CONVENTION CENTER'S OWN MATERIALS, AND

18   BY ITS SHEER SCOPE OF SIZE, RELATIVE TO THE SMALLER FACILITIES.

19   AND IT'S CLEAR UNITED CAN'T DUPLICATE THE FACILITY, NOR IS

20   ANYONE ELSE GOING TO DUPLICATE THAT FACILITY ANY TIME SOON.

21       AND AS I SAID, THE ISSUE IS NOT -- I MEAN, BASICALLY WE'RE

22   TALKING ABOUT COMPETITION.  AND THE INTERFERENCE WITH

23   COMPETITION, WHICH WE'VE HEARD A LOT ABOUT, AND A LOT ABOUT THE

24   VARIOUS LOSSES.  AND MY COMMENT ABOUT THERE IS A VARIETY OF

25   INSTANCES THROUGHOUT THE MATRIX WE'VE SEEN IN EXHIBIT 872,

1    WHERE THERE ARE ANY NUMBERS OF SELLERS AND CONSUMERS, WITHIN

2    WHICH LOSS HAS BEEN ALLEGED AND HAS BEEN ASSERTED.  AND I'LL GO

3    BACK AND READ VOLLRATH, AND I MIGHT WANT TO READ ALASKA AGAIN,

4    TOO.  AND I'LL FINALIZE THIS AFTER I'VE READ THOSE.

5        BUT AT THIS POINT, I THINK THE JURY HAS HEARD ENOUGH

6    EVIDENCE FROM WHICH IT CAN REASONABLY FIND FOR THE PLAINTIFF ON

7    THE ELEMENTS OF THE ESSENTIAL FACILITIES DOCTRINE.  IT DOESN'T

8    MEAN THEY WILL.  AND IT MAY BE MARGINAL ON SOME, STRONGER ON

9    OTHERS, BUT AT THIS POINT, THEY'VE HEARD IT AND THEY HAVE IT --

10   THEY WILL HAVE IT IN THEIR HANDS TO DECIDE.

11       SO THE MOTION IS DENIED TENTATIVELY, AND I'LL FINALIZE

12   THAT AFTER WE HAVE WHATEVER LITTLE BIT OF A BREAK WE GET IN THE

13   NEXT 15 MINUTES BEFORE THE JURY RETURNS.

14       SO WHAT ABOUT NO. 1?  I THINK THE CAUSAL ANTITRUST INJURY,

15   I'M GOING TO FIND FOR UNLESS YOU HAVE SOMETHING REMARKABLE TO

16   SAY.  THE ANTI-COMPETITIVE CONDUCT, I THINK THERE ARE QUESTIONS

17   OF FACT THAT THE JURY CAN FIND FROM THERE.  THE INTENT TO

18   CONTROL PRICES OR DESTROY COMPETITION, THERE IS A WEALTH OF

19   EVIDENCE.  THEY MAY NOT BUY IT, BUT IF THEY DO, WOULD SUPPORT

20   PLAINTIFF.  SO WHAT ARE YOUR SHOTS AT THE FIRST CAUSE OF

21   ACTION?

22       MR. L'ESTRANGE:  WELL, I WILL NOT REPEAT THE

23   ARGUMENTS THAT I MADE ON THE ESSENTIAL FACILITIES CLAIM THAT

24   YOU HAVE JUST DISCUSSED.

25       THE COURT:  AND I WILL ASSUME THEY'VE BEEN MADE, AND

1   MY RESULT WOULD BE THE SAME.  BUT GO AHEAD.  AND I DON'T WANT

2   TO -- I'M NOT TRYING TO RESTRICT YOU.  I'M JUST TRYING TO MOVE

3   QUICKLY SO WE GET THE JURY BACK IN HERE AS WE PLANNED.

4               MR. L'ESTRANGE:  I APPRECIATE THAT, YOUR HONOR.  I

5   MOVE UNDER RULE 50(A)(1), ON BEHALF OF THE SAN DIEGO CONVENTION

6   CENTER CORPORATION, THAT THE COURT RESOLVE THE FIRST CAUSE OF

7   ACTION FOR ATTEMPTED MONOPOLIZATION AGAINST UNITED NATIONAL

8   MAINTENANCE AND ENTER JUDGMENT FOR THE SAN DIEGO CONVENTION

9   CENTER CORPORATION ON THAT CAUSE OF ACTION.  MY FIRST POINT IS

10  THAT THEY HAVE FAILED TO DEFINE A LEGALLY SUFFICIENT MARKET.

11       IN THIS CASE, YOU MAY RECALL, WHEN I ASKED THE WITNESS IF

12  HE HAD DONE ANY PRICE CROSS ELASTICITY STUDIES, AND I'M SURE

13  THERE WAS A BIT OF WONDERMENT AMONG THE JURY ABOUT WHAT I WAS

14  TALKING ABOUT.  AND YOU ASKED HIM TO EXPLAIN, WHICH I SHOULD

15  HAVE DONE, BUT YOU DID, AND HE DID.  BUT THE IMPORTANT THING IS

16  HIS ANSWER TO THE QUESTION.  AND HIS ANSWER TO THE QUESTION

17  WAS, HE DID NOT.  AND WHEN A PLAINTIFF FAILS TO DEFINE THE

18  PROPOSED RELEVANT MARKET WITH REFERENCE TO THE RULE OF

19  REASONABLE INTERCHANGEABILITY, AND CROSS ELASTICITY OF DEMAND,

20  THEN THE RELEVANT MARKET IS LEGALLY INSUFFICIENT, AND THE

21  PLAINTIFF FAILS TO STATE A CLAIM.

22       HERE, THE WORK THAT WAS DONE BY DR. HEKMAN, WITH ALL DUE

23  RESPECT TO HIM, WAS VERY SUPERFICIAL.  FIRST OF ALL, HE WAS

24  REQUIRED TO DEFINE THE RELEVANT MARKET, AS ONE OF HIS

25  ASSIGNMENTS; NEXT TO SHOW THAT THE DEFENDANT OWNS A DOMINANT

1   SHARE OF THAT MARKET; NEXT TO SHOW THAT THERE ARE SIGNIFICANT

2   BARRIERS TO ENTRY; AND FINALLY, TO SHOW THAT EXISTING

3   COMPETITORS LACKED THE CAPACITY TO INCREASE THEIR OUTPUT IN THE

4   SHORT RUN.  AND REMEMBER, I ALSO ASKED HIM QUESTIONS ABOUT

5   OUTPUT, AND HE HAD DONE NO STUDY OF THAT, WHATSOEVER.  HE

6   THOUGHT IT WAS TOTALLY INAPPLICABLE TO THIS SITUATION.

7        MARKET POWER CANNOT BE INFERRED SOLELY FROM THE EXISTENCE

8   OF ENTRY BARRIERS AND A DOMINANT MARKET SHARE.  THE ABILITY TO

9   CONTROL OUTPUT AND PRICES, THE ESSENCE OF MARKET POWER, DEPENDS

10  LARGELY ON THE ABILITY OF EXISTING FIRMS TO QUICKLY INCREASE

11  THEIR OWN OUTPUT IN RESPONSE TO A CONTRACTION BY THE DEFENDANT.

12  AND THAT IS THE REBEL OIL CASE THAT HAS BEEN FREQUENTLY CITED

13  BY BOTH SIDES.  HERE, THE LAW PROHIBITS AN ANTITRUST CLAIMANT,

14  IN THIS CASE, UNITED, FROM RESTING ON MARKET POWER THAT FLOWS

15  FROM CONTRACTUAL EXCLUSIVITY, I.E., SUCH POWER ARISES SOLELY

16  FROM CONTRACTUAL RIGHTS THAT CONSUMERS KNOWINGLY AND

17  VOLUNTARILY GAVE TO THE DEFENDANT.  AND IF YOU RECALL THE

18  TESTIMONY WITH DR. HEKMAN, I ASKED HIM ABOUT THE 60 PERCENT

19  MARKET SHARE THAT HE SAID THE SAN DIEGO CONVENTION CENTER

20  ENJOYED BEFORE THE CHANGE IN POLICY.  AND HE CONCEDED THAT THAT

21  SHARE WAS BASED SOLELY ON ITS CONTRACTUAL ARRANGEMENTS WITH

22  FREEMAN.

23        SO THAT ITSELF CANNOT BE THE SOURCE OF MARKET POWER,

24  SIMPLY THE FACT THAT WE HAVE ENTERED INTO A CONTRACT WITH

25  FREEMAN.  AND YOU MAY ALSO RECALL WHEN WE WERE TALKING ABOUT

1   THOSE PERCENTAGE SHARES, I ASKED HIM, IT IS A PERCENTAGE OF

2   WHAT, AND HE COULDN'T ANSWER THE QUESTION.  HE DIDN'T KNOW

3   WHETHER IT WAS A PERCENTAGE OF DOLLARS, NUMBER OF SHOWS ON A

4   PER CAPITA BASIS, OR ANYTHING ELSE.  SO IN TERMS OF IDENTIFYING

5   THE MARKET SHARE, HIS ANALYSIS FALLS WAY SHORT.  AND HE

6   SIMPLY -- IT SIMPLY IS A FAILURE OF PROOF.  THERE IS NO PROOF

7   OF THE MARKET SHARE, EVEN IF YOU ACCEPT THAT HE HAD AN

8   ECONOMICALLY SIGNIFICANT RELEVANT MARKET THAT HE DEFINED.

9   NEXT, HE FAILED TO DEMONSTRATE, OR UNITED HAS FAILED TO

10  DEMONSTRATE, A DANGEROUS PROBABILITY OF SUCCESSFUL

11  MONOPOLIZATION.

12      AND YOU MAY RECALL, WHEN I WAS INTERROGATING DR. HEKMAN, I

13  ASKED HIM, WHEN WAS IT THAT THE SAN DIEGO CONVENTION CENTER

14  CORPORATION BECAME A MONOPOLIST, AND HE SAID HE DIDN'T KNOW.

15  AND I SAID IT WAS -- WAS IT 1992, AND HE SAID HE DIDN'T KNOW IF

16  IT WAS ON THAT DATE.  SO HOW CAN YOU POSSIBLY PROVE A CLAIM FOR

17  ATTEMPTED MONOPOLIZATION IF YOU CANNOT EVEN TELL THE TRIER OF

18  FACT WHEN IT WAS THAT THE DEFENDANT ACQUIRED THIS MONOPOLY

19  POWER.

20      MR. HEKMAN TESTIFIED THAT THE SAN DIEGO CONVENTION CENTER

21  CORPORATION EXERCISED MONOPOLY POWER BECAUSE IT CONTROLLED

22  ACCESS TO THE BUILDING.  WELL, IF THAT IS THE CASE, THEN

23  THEY'VE HAD THAT POWER SINCE THE DAY THE BUILDING WAS OPENED

24  FOR BUSINESS BECAUSE -- IF THAT IS THE ONLY SOURCE OF THAT

25  MARKET POWER.  AND THERE IS NOTHING THAT BRINGS THE MERE

1   OWNERSHIP OF A BUILDING WITHIN SECTION 2 FOR ATTEMPTED

2   MONOPOLIZATION.  SO THE CONTROL OVER THE BUILDING IS SIMPLY NOT

3   ENOUGH.  AND THAT'S REALLY ALL THE EVIDENCE SHOWS AT THIS

4   POINT, IS THAT WE ALLEGEDLY HAVE MONOPOLY POWER BECAUSE WE

5   CONTROL THE BUILDING.

6        THE FAILURE TO DEMONSTRATE ANTITRUST INJURY, I ADDRESS

7   THAT IN THE ESSENTIAL FACILITIES CLAIM ARGUMENT.  I WILL NOT

8   RE-ARGUE THAT.  I'LL INCORPORATE THAT ARGUMENT BY REFERENCE.

9             THE COURT:  YOU MAY.

10            MR. L'ESTRANGE:  SAME WITH FAILURE TO DISSEGREGATE

11  DAMAGES, I'LL INCORPORATE THAT BY REFERENCE.

12            THE COURT:  AGAIN, YOU MAY.

13            MR. L'ESTRANGE:  AND WITH THAT, I RENEW MY REQUEST

14  THAT AS TO THE FIRST CAUSE OF ACTION, YOU DISMISS THAT CAUSE OF

15  ACTION, WITH PREJUDICE, FOR FAILURE OF PROOF.

16            THE COURT:  OKAY, AND MR. LANCE, THEN, YOU'D LIKE TO

17  ADDRESS THAT?

18            MR. LANCE:  JUST BRIEFLY, YOUR HONOR.

19        SAN DIEGO CONVENTION CENTER WITH HAT NO. 1, AGAIN, THIS

20  GOES BACK TO HAT NO. 1 AND HAT NO. 2 ISSUE.  HAT NO. 1, THEY

21  HAVE ABSOLUTE MARKET POWER.  MR. L'ESTRANGE SAYS, IN FACT, THEY

22  HAVE THE RIGHT TO IMPLEMENT THIS POLICY, PUT IT IN THEIR

23  POLICIES AND PROCEDURES, AND IPSO FACTO, WE CAN EXCLUDE

24  EVERYBODY FROM THE CONVENTION CENTER AND TAKE 50 PERCENT OF THE

25  BOOTH REVENUE.  SO IT'S CLEAR, THEY HAVE 100 PERCENT OF THE

1   POWER WITH HAT NO. 1.  WITH HAT NO. 2, DO THEY HAVE MARKET

2   POWER?  WHERE DID THAT COME FROM?  BRAD GESSNER.  BRAD GESSNER

3   TESTIFIED ON THE STAND THAT THEY HAD 55 TO 60 PERCENT OF THE

4   MARKET.  HE TESTIFIED THAT VARIED, BUT AT THE TIME THEY

5   IMPLEMENTED THE POLICY, THEY HAD 55 TO 60 PERCENT OF THE

6   MARKET.

7        AND WHAT DO WE KNOW, THE ISSUE IS NOT WHEN THEY HAD

8   MONOPOLY POWER.  THE QUESTION IS, DID THEY HAVE MONOPOLY POWER

9   AT THE TIME THEY IMPLEMENTED THE POLICY IN JULY 2007?  AND WE

10  ABSOLUTELY KNOW THEY DID.  BECAUSE THEY HAD 55 TO 60 PERCENT OF

11  THE MARKET WITH HAT NO. 2, AND THEY HAD 100 PERCENT CONTROL

12  WITH HAT NO. 1.  SO, YOU KNOW, IT'S INTERESTING THAT HE IS

13  CROSS-EXAMINING DR. HEKMAN ABOUT WHETHER THEY HAD POWER IN '89

14  AND '91.  THE ISSUE IS NOT THAT.  THE ISSUE IS, DID THEY HAVE

15  MONOPOLY POWER WHEN THEY ACTED IN THIS ANTI-COMPETITIVE WAY.

16           THE COURT:  DO YOU WANT TO RESPOND TO THAT?

17           MR. L'ESTRANGE:  I'LL RESPOND BRIEFLY.  I DON'T HAVE

18  THE CITATION AT HAND, BUT THE CHRISTY SPORTS CASE IS ONE THAT

19  WE CITED IN OUR TRIAL BRIEF.  AND THAT CASE HAS FACTS THAT ARE

20  REMARKABLY SIMILAR TO WHAT WE HAVE GOING ON HERE.  THAT WAS A

21  COMPANY THAT SPENT MILLIONS OF DOLLARS TO BUILD A SKI RESORT.

22  AND WHEN THE RESORT FIRST OPENED, THEY WERE COMPETING WITH AN

23  OUTSIDE VENDOR FOR SKI RENTALS.  AT SOME POINT AFTER THAT

24  COMPETITION WAS UNDERWAY, THE SKI RESORT OPERATOR DECIDED THEY

25  WANTED TO TAKE ALL THE SKI RENTAL BUSINESS IN-HOUSE.  AND THEY

1   DID SO.  AND AT THE EXPENSE OF THE RENTAL COMPANY BEING

2   EXCLUDED FROM THE RESORT TO RENT SKIS, WHICH IS IDENTICAL TO

3   WHAT WE HAVE GOING ON HERE.  AND IN THAT CASE, THE COURT FOUND

4   THAT IT WAS JUST SIMPLY AN ANCILLARY SERVICE THAT WAS PART OF

5   OPERATING THE RESORT.  AND THAT THE MARKET IS THE DESTINATION

6   FOR A SKI VACATION.

7       AND YOU CAN'T STRIP OUT ALL THESE LITTLE PIECES OF THAT

8   BUSINESS AND FORM A SEPARATE, RELEVANT MARKET, WHICH IS WHAT

9   DR. HEKMAN HAS DONE HERE FOR THE ATTEMPTED MONOPOLIZATION

10  CLAIM.  HE HAS STRIPPED OUT A PORTION OF THE CLEANING SERVICES

11  FOR A TRADE SHOW, JUST A PORTION, NOT ALL OF IT.  AND THAT

12  PORTION JUST HAPPENS TO COINCIDE WITH UNITED'S BUSINESS MODEL,

13  AND SAID, THEREFORE, THAT IS THE RELEVANT MARKET.

14          THE COURT:  WELL, THAT HAPPENS TO BE THE PROFITABLE

15  ASPECT OF THE CLEANING MARKET, THE GENERALIZED CLEANING AND SO

16  FORTH IS LAID OFF ON THE TRADE SHOWS IN SOME OTHER WAY.  AND IT

17  WOULD BE INTERESTING TO SEE CHRISTY IF THE ISSUE WAS THAT YOU

18  COULD RENT SKIS, BUT YOU COULD ONLY RENT SKIS OWNED BY THE

19  RESORT.

20          MR. L'ESTRANGE:  THAT WAS WHAT IT WAS CHANGED TO.

21          THE COURT:  YOU -- THE OTHER PLACE COULD DO IT, BUT

22  YOU'D HAVE TO USE THE RESORT SKIS TO DO THAT, AS OPPOSED TO

23  RUNNING YOUR OWN OPERATION.  BUT I UNDERSTAND THE POINT.  AND

24  IT IS TRUE THAT A LOT OF THE CRITICISM THAT GOES TO -- FROM THE

25  DEFENSE STANDPOINT, THAT GOES TO THE PLAINTIFF'S EXPERTS AS TO

1   INFORMATION THAT HAS BEEN READILY TESTIFIED TO BY THE DEFENSE'S

2   OWN WITNESSES WITH REGARD TO THE MARKET AND THE MARKET SHARE

3   THAT THEY HAD.  WE ALSO HAVE THE TWO HATS, WHICH, I THINK,

4   FIGURE IN HERE MIGHTILY, AND THEY DO RELATE, CERTAINLY, TO THE

5   CHRISTY EXAMPLE.

6        BUT WHEN YOU LOOK AT THE CONTEXT OF THE CLAIM, THE

7   RELEVANT MARKET, THE INTENT, ALLEGEDLY, TO MONOPOLIZE THAT

8   RELEVANT MARKET, THE ACTS COMPLAINED OF THAT WOULD INTERFERE,

9   THE INTENT AND ACTS APPEARING, YOU KNOW, BASICALLY, WITH THE

10  PROBABILITY TO EFFECT MONOPOLIZATION, AND THEN THE DAMAGES PLED

11  TO.  THE PLAINTIFFS MADE A CASE, AT LEAST PRIMA FACIALLY, FROM

12  WHICH A JURY CAN MAKE A DECISION THAT ALL OF THE ELEMENTS HAVE

13  BEEN MET.

14       I'M NOT SAYING THAT THAT IS WHAT THEY'RE GOING TO FIND.

15  THERE IS STILL A LOT OF THE CASE YET TO GO.  BUT I DON'T THINK

16  THAT THE ARGUMENTS MADE, OR THE CRITICISM OF THE EXPERTS, AS TO

17  THE MARKET DISTRIBUTIONS, OR FOR THAT MATTER, WE'LL GET TO THE

18  AGGREGATION, OR THE FAILURE TO BREAK IT DOWN.  WE'RE NOT

19  DEALING WITH SUMMARY JUDGMENT AT THIS POINT.  IT IS NOT A BENCH

20  TRIAL, WHERE THE COURT IS RULING, ASSESSING THE EVIDENCE.  MY

21  JUDGMENT IS THAT THERE IS EVIDENCE SUFFICIENT FROM WHICH THE

22  JURY COULD FIND REASONABLY THE PLAINTIFF MET ITS BURDEN IN

23  THESE REGARDS.

24       I THINK IT IS VERY DIFFICULT IN THE WAY THIS CASE IS

25  COMPOSED, AND THE FACT THAT THE DAMAGES ARE, THE DAMAGES ARE

1   THE DAMAGES, TO SAY THAT WE SHOULD DISMISS THE PLAINTIFF'S CASE

2   BECAUSE THEY DON'T PARSE OUT FOR EACH OF THE FOUR CAUSES OF

3   ACTION A SPECIFIC AMOUNT FOR ONE, TWO, AND THREE.  BECAUSE AT

4   THE END OF THE DAY, THEY ALL ARE BALLED UP TOGETHER.  WHETHER

5   OR NOT THE JURY AGREES THOSE ARE DAMAGES, THOSE ARE LOSSES, AND

6   ALL SHOULD BE AWARDED IN THE AMOUNTS ASSERTED, IS THEIR JOB.  I

7   THINK THEY HAVE EVIDENCE FROM WHICH THEY CERTAINLY CAN DO THAT.

8       WE'RE NOT GOING TO ALLOW DOUBLE RECOVERY IN THE SENSE THAT

9   THE SAME QUARTER -- THREE QUARTERS OF A MILLION BUCKS GETS

10   REPEATEDLY AWARDED CAUSE OF ACTION BY CAUSE OF ACTION.  YOU CAN

11   CERTAINLY ARGUE THAT WHO KNOWS WHAT THE PLAINTIFFS REALLY

12   CLAIM, SINCE IT IS ALL ONE BIG BALL OF WAX, AND WHO KNOWS.  AND

13   THEY'LL SORT IT OUT AS IS THEIR DUTY TO DO.

14       SO ON THE FIRST CAUSE OF ACTION, I'LL DENY THE MOTION, AND

15   THAT WOULD COMPLETE THE -- EXCEPT FOR CAUSE OF ACTION 2, WHICH

16   IS TENTATIVELY DENIED, SUBJECT TO READING ANOTHER CASE OR TWO.

17   AND THAT SHOULD BRING US TO A CLOSE.

18       WHY DON'T WE TELL THE JURY, YOLI, WE'RE GOING TO KEEP THEM

19   OUT UNTIL 12:30 TO GIVE YOU FOLKS 20 MINUTES TO TRY TO GRAB

20   SOMETHING.

21       AND SO WE'LL BE IN RECESS UNTIL 12:30, FOR THE DEFENSE'S

22   CASE.  I'D LIKE TO ARGUE AND PERHAPS DISPOSE OF THE LGA CLAIM,

23   MAYBE AT THE END OF THE DAY, AT 4:00, INCLUDING, PERHAPS, THE

24   POTENTIAL OF HAVING MS. WALLACE TESTIFY OUTSIDE THE PRESENCE OF

25   THE JURY SO I CAN UNDERSTAND FULLY WHAT IT IS SHE IS GOING TO

1    SAY.  BECAUSE AS PROFFERED, I DON'T THINK SO.  BUT IT MAY BE

2    THAT IT IS MORE -- IN FAIRNESS TO MR. ERGASTOLO, IT WAS A QUICK

3    ON THE FLY, AND I MAY WANT TO HEAR THE WITNESS ON THAT ISSUE

4    BEFORE WE GET TO THE POINT OF HER TESTIFYING ON THAT SPECIFIC

5    QUESTION.

6         I THINK THERE ARE ISSUES OF LEGAL EXPERTISE.  I'M GOING TO

7    BE ASKING QUESTIONS ABOUT INSURANCE CONTRACTS, LOOKING AT THE

8    STRICT LETTER OF THE CONTRACT, INDEMNITY AGREEMENTS, ANY SIDE

9    AGREEMENTS.  I THINK THERE IS A LOT THERE, AND IT'S GOING TO BE

10   A TOUGH BURDEN FOR DEFENSE TO MEET, FRANKLY.  BUT HOPE SPRINGS

11   ETERNAL.  SEE YOU AT 12:30.

12              MR. SLANIA:  THANK YOU, YOUR HONOR.

13                   (RECESS TAKEN.)

14              THE COURT:  BACK ON THE RECORD WITH THE JURY, PARTIES

15   AND COUNSEL.  AND I TRUST YOUR BRUNCH WAS A GOOD ONE.  I ASSURE

16   YOU WE WORKED THROUGH IT IN ORDER TO MAINTAIN OUR PRESENTING

17   THE CASE TO YOU IN AN EXPEDITIOUS MANNER.

18        WE'RE NOW GOING TO TURN TO THE DEFENDANT'S CASE, AND I'LL

19   TELL COUNSEL, I DID REVIEW THE LAW THAT WE DISCUSSED AT THE END

20   OF OUR PRIVATE SESSION, AND I'M CONFIRMING THE RULING AS TO THE

21   SECOND CAUSE OF ACTION.

22        AND WITH THAT, MR. L'ESTRANGE, THE DEFENSE'S FIRST

23   WITNESS.

24              MR. L'ESTRANGE:  THE DEFENSE CALLS BRADLEY GESSNER.

25              THE COURT:  ALL RIGHT.

```
 1                    (WITNESS SWORN.)

 2           THE CLERK:  STATE YOUR FULL NAME AND SPELL YOUR LAST

 3   NAME FOR THE RECORD.

 4           THE WITNESS:  BRADLEY HOFFMAN GESSNER, G-E-S-S-N-E-R.

 5                    DIRECT EXAMINATION

 6   BY MR. L'ESTRANGE:

 7   Q.   WHAT IS YOUR CURRENT POSITION AT THE SAN DIEGO CONVENTION

 8   CENTER CORPORATION, MR. GESSNER?

 9   A.   GENERAL MANAGER.

10   Q.   WOULD YOU GIVE US A BRIEF SUMMARY OF YOUR EDUCATION

11   THROUGH COLLEGE.

12   A.   SURE.  I ATTENDED SOUTHWEST TEXAS STATE UNIVERSITY, WHICH

13   HAS BEEN RENAMED ABOUT FIVE YEARS AGO TO TEXAS STATE

14   UNIVERSITY, IN SAN MARCOS, TEXAS.  AND RECEIVED A BACHELOR OF

15   SCIENCE DEGREE IN RECREATIONAL ADMINISTRATION.  SINCE THEN,

16   I'VE ATTENDED A NUMBER OF GRADUATE-LEVEL COURSES, MOST

17   RECENTLY, THE SENIOR EXECUTIVE SYMPOSIUM AT CORNELL UNIVERSITY.

18   IT WAS A THREE-YEAR PROGRAM, ONE WEEK A YEAR, GO BACK TO

19   CORNELL AND GO THROUGH THAT PROGRAM.  AND I COMPLETED THAT LAST

20   YEAR.  ALSO, OLGEBAY SCHOOL OF FACILITY MANAGEMENT, IT IS A

21   TWO-YEAR PROGRAM, PUT ON BY OUR INDUSTRY ASSOCIATION, THE

22   INTERNATIONAL ASSOCIATION OF VENUE MANAGEMENT.

23           THE COURT:  DID YOU SAY "OLGEBAY"?

24           THE WITNESS:  YES.  WELL, IT IS SPELLED LIKE OLGEBAY,

25   B-Y, BUT IT IS OLGEBAY, THAT'S ACTUALLY THE WAY IT'S
```

1   PRONOUNCED.

2           THE COURT:   THANK YOU.

3   BY MR. L'ESTRANGE:

4   Q.   IF YOU COULD SLOW DOWN A LITTLE BIT.

5   A.   AND THAT WAS A TWO-YEAR PROGRAM, WHICH I COMPLETED IN

6   1993.  AND THEN AGAIN, I'VE ATTENDED A NUMBER OF INDUSTRY

7   ASSOCIATED EDUCATIONAL SEMINARS IN THE LAST TEN YEARS.

8   Q.   DO YOU CURRENTLY DO ANY TEACHING?

9   A.   YES, I DO.  I'M AN ADJUNCT FACULTY PROFESSOR AT SAN DIEGO

10  STATE UNIVERSITY.  I TAUGHT LAST SPRING, A CONVENTION SERVICES

11  MANAGEMENT.  AND I'M A FREQUENT LECTURER.  I LECTURED JUST TWO

12  WEEKS AGO THERE.

13  Q.   HOW LONG HAVE YOU BEEN AN ADJUNCT PROFESSOR AT SDSU?

14  A.   FOR THE LAST YEAR.

15  Q.   AND HAVE YOU LECTURED AT TRADE ASSOCIATION GATHERINGS

16  DURING THE TIME YOU'VE BEEN WORKING IN THE TRADE SHOW INDUSTRY?

17  A.   YES.  I'VE LECTURED AT CAL POLY, SAN LUIS OBISPO.  I WAS

18  ALSO AN ADJUNCT FACULTY PROFESSOR AT SCOTTSDALE COMMUNITY

19  COLLEGE IN SCOTTSDALE, ARIZONA.  AND I LECTURE TWO TO THREE

20  TIMES A YEAR AT INDUSTRY FUNCTIONS.

21  Q.   YOU CURRENTLY WORK IN WHAT IS CALLED THE TRADE SHOW

22  INDUSTRY?

23  A.   YES.

24  Q.   WOULD YOU GIVE US A SUMMARY OF YOUR WORK HISTORY AFTER YOU

25  FINISHED YOUR STUDIES IN TEXAS.

1  A.  SHORTLY AFTER I GRADUATED IN 1977, I BECAME THE ASSISTANT

2  FACILITIES MANAGER OF SPECIAL FACILITIES FOR SAINT LUCIE

3  COUNTY, FLORIDA, IN FORT PIERCE, FLORIDA.

4  Q.  LET'S HOLD UP A SECOND.  WERE YOU -- YOU WERE WORKING AT A

5  CONVENTION CENTER THERE?

6  A.  IT IS A -- IT WAS A CONFERENCE CENTER AND AMPHITHEATER.

7  Q.  WHAT WERE YOUR DUTIES AND RESPONSIBILITIES IN THAT JOB?

8  A.  I WAS ESSENTIALLY THE NO. 2 IN COMMAND.  WE DID EVERYTHING

9  IN-HOUSE.  SO I OVERSAW THE OPERATIONS OF THE FACILITIES, THE

10  TWO FACILITIES THAT WE SUPERVISED, ALL THE EVENTS.

11  Q.  HOW LONG DID YOU HOLD THAT POSITION?

12  A.  I WAS THE ASSISTANT FOR TWO YEARS, AND THEN WAS PROMOTED

13  TO THE SUPERVISOR.  I WAS IN THAT POSITION A LITTLE OVER A

14  YEAR, AND THEN MOVED TO A POSITION IN TAMPA, FLORIDA.

15  Q.  SO THIS TAKES US TO WHAT YEAR WHEN YOU MOVED TO TAMPA?

16  A.  1980.

17  Q.  WHERE DID YOU MOVE IN 1980?

18  A.  TO THE SUN DOME, ON THE UNIVERSITY OF SOUTH FLORIDA, AS

19  THE ASSISTANT DIRECTOR OF THE SUN DOME.

20  Q.  WHAT WERE YOUR DUTIES AND RESPONSIBILITIES IN THAT

21  POSITION?

22  A.  ALL OF THE EVENT MANAGEMENT, OPERATIONAL MANAGEMENT,

23  HOUSEKEEPING, SECURITY OF THE UNIVERSITY FACILITY.  WE WERE

24  ALSO A GOVERNMENTAL ENTITY OF A 501(C)(3) NOT FOR PROFIT OF THE

25  UNIVERSITY THAT MANAGED THE ARENA.

1    Q.   AND HOW LONG DID YOU HOLD THAT POSITION?

2    A.   JUST A LITTLE OVER A YEAR.   AND THEN I RETURNED TO MY

3    HOMETOWN OF SAN ANTONIO BECAUSE MY FATHER WAS ILL WITH CANCER.

4    Q.   DID YOU TAKE A POSITION IN THE TRADE SHOW INDUSTRY IN SAN

5    ANTONIO?

6    A.   SHORTLY AFTER RETURNING TO SAN ANTONIO, I WAS IN -- I HAD

7    A POSITION LINED UP AT A HOTEL, AND WORKED AT A HOTEL FOR A

8    LITTLE OVER A YEAR AND THEN BECAME THE FACILITIES MANAGER OF

9    THE SAN ANTONIO CONVENTION CENTER.

10   Q.   HOW LARGE A FACILITY IS THE SAN ANTONIO CONVENTION CENTER?

11   A.   AT THE TIME, IT WAS A LITTLE OVER 200,000 SQUARE FEET OF

12   EXHIBIT SPACE; APPROXIMATELY 100,000 SQUARE FEET OF MEETING

13   SPACE; AND WE HAD A 30,000 SQUARE FOOT BALLROOM, A 16,000 SEAT

14   ARENA WHERE THE NBA'S FIRST PLACED.   AND I ALSO OVERSAW THE

15   MANAGEMENT OF THE 5,000 SEAT MUNICIPAL AUDITORIUM IN SAN

16   ANTONIO.

17   Q.   WHAT GENERAL AREAS WERE UNDER YOUR JURISDICTION AS THE

18   GENERAL MANAGER?

19   A.   PRIMARILY, ALL ASPECTS OF MANAGEMENT, OPERATIONAL

20   MANAGEMENT OF THE HEMISPHERE ARENA, AND THE MUNICIPAL

21   AUDITORIUM, BOTH FACILITIES.

22   Q.   HOW LONG DID YOU STAY IN THAT POSITION?

23   A.   I WAS THERE FOR FOUR YEARS.

24   Q.   WHERE DID YOU GO NEXT?

25   A.   I WENT TO SAN DIEGO.

1   Q.   HOW DID YOU COME UPON GETTING THE JOB IN SAN DIEGO?

2   A.   WELL, IT WAS A WRITTEN GOAL OF MINE.  I READ IN 1984 THAT

3   SAN DIEGO WAS LOOKING TO BUILD A CONVENTION CENTER, SO I HAD A

4   WRITTEN GOAL TO BECOME SOME DAY THE GENERAL MANAGER OF THE SAN

5   DIEGO CONVENTION CENTER.  CAME OUT THERE WITH MY WIFE ON A

6   VACATION IN 1986.  MET WITH THE THEN GENERAL MANAGER, TOM

7   LEADLER (PHONETIC), TOLD HIM ABOUT MY DESIRE TO JOIN HIS

8   ORGANIZATION.  AND HE INDICATED THAT HE WAS PROBABLY GOING TO

9   BE HIRING FOLKS LOCALLY.  SO I LOOKED IN THE PAPER, FOUND A

10  CONVENTION SERVICES MANAGER JOB AT THE SHERATON, ON HARBOR

11  ISLAND, AND APPLIED FOR THE JOB THE NEXT DAY, AND WAS HIRED THE

12  DAY AFTER THAT.

13  Q.   HIRED WHERE, AT THE SAN DIEGO CONVENTION CENTER

14  CORPORATION?

15  A.   NO.  AT THE SHERATON, ON HARBOR ISLAND.

16  Q.   WHAT ROLE DID YOU HAVE AT THE SHERATON ON HARBOR ISLAND?

17  A.   I WAS CONVENTION SERVICES MANAGER.

18  Q.   HOW LONG DID YOU HOLD THAT POSITION?

19  A.   FOR ALMOST THREE YEARS.  AND THEN WAS HIRED BY THE SAN

20  DIEGO CONVENTION CENTER CORPORATION.

21  Q.   AND WHAT WERE YOUR DUTIES AND RESPONSIBILITIES AT THE

22  SHERATON HARBOR ISLAND?

23  A.   I WAS IN CHARGE OF ALL EVENT MANAGEMENT.  WE CALL IT

24  ACCOUNT EXECUTIVE MANAGEMENT, AND ALL THE OPERATIONS OF THE

25  CONVENTION AND CONFERENCE FACILITIES, INCLUDING HOUSEKEEPING,

1    ROOM SET UPS, BANQUETS.

2    Q.   AND THEN YOU SAID YOU WENT NEXT TO THE SAN DIEGO

3    CONVENTION CENTER CORPORATION?

4    A.   YES.  I WAS HIRED IN DECEMBER OF 1988, AS THE EVENT

5    SERVICES MANAGER OF THE FACILITY.  IT WASN'T OPEN YET.  IT WAS

6    FINALLY OPENED IN NOVEMBER, SO THEY HIRED ME ALMOST A YEAR

7    BEFORE IT OPENED.

8    Q.   WHAT DID YOU DO FOR THE SAN DIEGO CONVENTION CENTER

9    CORPORATION IN THAT YEAR PERIOD, FROM WHEN YOU WERE HIRED UNTIL

10   THE CENTER OPENED?

11   A.   WE PREPARED ALL THE JOB DESCRIPTIONS, ALL THE STANDARD

12   OPERATING PROCEDURES, ALL THE UNIFORMING POLICIES, HELPED

13   DEVELOP WHAT WE CALLED THE SAN DIEGO SPIRIT, WHICH WAS MODELED

14   AFTER THE DISNEY PHILOSOPHY OF MANAGEMENT, FACILITY MANAGEMENT,

15   AND PEOPLE MANAGEMENT, AND PREPARED FOR THE FACILITY, FFNA,

16   WHICH IS THE EQUIPMENT THAT IS NECESSARY TO RUN A FACILITY.

17   ESSENTIALLY, EVERYTHING THAT NEEDED TO BE DONE, WORKING WITH

18   THE TEAM THAT WAS IN PLACE -- AND THERE WERE ONLY ABOUT TWELVE

19   OF US -- IN PREPARATION OF OPENING THE BUILDING.

20   Q.   WHO WAS THE PRESIDENT AND CEO OF THE SAN DIEGO CONVENTION

21   CENTER CORP. AT THE TIME YOU JOINED THE ENTITY?

22   A.   WE DIDN'T HAVE A PRESIDENT AND CEO BACK THEN.  IT WAS

23   SIMPLY THE GENERAL MANAGER HAD THAT RESPONSIBILITY, AND HIS

24   NAME WAS TOM LEADLER.

25   Q.   AND WHAT WAS YOUR TITLE?

1   A.   EVENTS SERVICES MANAGER AT THAT TIME.

2   Q.   AND HOW DID YOU RANK IN THE HIERARCHY UNDER MR. LEADLER?

3   A.   I WAS TWO RUNGS DOWN.   WE HAD THE GENERAL MANAGER, AND

4   THEN WE HAD DIRECTOR LEVELS, AND I WAS THE MANAGER LEVEL.

5   Q.   SO SAN DIEGO CONVENTION CENTER CORPORATION, I THINK YOU

6   SAID -- LET ME WITHDRAW THAT.   THE SAN DIEGO CONVENTION CENTER

7   OPENED IN NOVEMBER OF 1989?

8   A.   YES.

9   Q.   WERE YOU THERE FOR THE FIRST EVENT THAT WAS AT THE

10  BUILDING?

11  A.   YES.

12  Q.   AND HOW LONG DID YOU STAY AT THE SAN DIEGO CONVENTION

13  CENTER IN YOUR FIRST TOUR OF DUTY?

14  A.   ABOUT SEVEN AND A HALF YEARS; I LEFT IN MARCH OF 1996.

15  Q.   AND WHERE DID YOU GO THEN?

16  A.   I BECAME THE DEPUTY GENERAL MANAGER OF THE DEL MAR FAIR

17  GROUNDS AND RACETRACK, WHICH IS KNOWN TECHNICALLY AS THE 22ND

18  DISTRICT AGRICULTURAL ASSOCIATION.   IT IS A STATE AGENCY.

19  Q.   WAS THAT AN UPWARD MOVE FOR YOU IN YOUR CAREER?

20  A.   YES, IT WAS.

21  Q.   AND WHAT WERE YOUR DUTIES AND RESPONSIBILITIES AT THE

22  DEL MAR RACETRACK?

23  A.   I WAS RESPONSIBLE FOR ALL OPERATIONAL MANAGEMENT OF THE

24  DAY-TO-DAY MANAGEMENT OF THE ENTIRE COMPLEX.

25  Q.   HOW LONG DID YOU STAY IN THAT POSITION?

1    A.   FIVE YEARS, A LITTLE OVER.

2    Q.   AND WHERE DID YOU GO AFTER YOU FINISHED YOUR WORK AT THE

3    DEL MAR FAIR GROUNDS?

4    A.   I WAS RECRUITED BY THE CITY OF SCOTTSDALE, IN ARIZONA, TO

5    MANAGE THEIR 200-ACRE EQUESTRIAN SPECIAL EVENT FACILITY.   IT'S

6    CALLED WEST WORLD OF SCOTTSDALE.

7    Q.   CAN YOU DESCRIBE FOR THE JURY WHAT EXACTLY WAS THE NATURE

8    OF THE BUSINESS AT THAT EQUESTRIAN FACILITY?

9    A.   IT WAS PRIMARILY EQUESTRIAN.   WE HAD SEVEN EQUESTRIAN

10   ARENAS.   ONE OF THE MAJOR ARENAS DOUBLED AS AN EVENT VENUE.

11   BUT WE WOULD HAVE CONCERTS AND RODEOS AND THAT KIND OF ACTIVITY

12   THERE.   WE ALSO HAD A 20-ACRE POLO FIELD, THAT IN ADDITION TO

13   POLO, WE HAD SPECIAL EVENTS AND CONCERTS AND OUTDOOR FESTIVALS

14   THERE.   IN MY FIVE YEARS THERE, I ALSO ARRANGED FOR THE

15   PURCHASE OF A 100,000 SQUARE FOOT TENT STRUCTURE TO HOLD

16   SPECIAL EVENTS IN AND CONSUMER SHOWS MOSTLY, SPECIAL EVENTS.

17   FOR INSTANCE, LOTS OF FOLKS KNOW ABOUT THE BARRETT-JACKSON

18   CLASSIC CAR AUCTION.   THAT WAS HELD AT THE FACILITY I MANAGED.

19   Q.   HOW LONG DID YOU STAY IN THAT POSITION?

20   A.   FIVE YEARS.

21   Q.   WHERE DID YOU GO NEXT?

22   A.   I CAME BACK TO SAN DIEGO, IN THE SAN DIEGO CONVENTION

23   CENTER CORPORATION AS THE DIRECTOR OF CONVENTION AND EVENT

24   SERVICES.

25   Q.   THAT WAS YOUR TITLE WHEN YOU RETURNED?

1   A.   YES.

2   Q.   IS THAT A HIGHER POSITION YOU HAD THAN WHEN YOU LEFT?

3   A.   WELL -- OH, YES.  IT WAS HIGHER THAN WHEN I LEFT IN '96,

4   YES.  I WAS OVERSEEING TWO DEPARTMENTS, TWO LARGE DEPARTMENTS,

5   WHEN I RETURNED IN 2006.

6   Q.   WHEN YOU WERE ON YOUR FIRST TOUR OF DUTY AT THE SAN DIEGO

7   CONVENTION CENTER, WERE YOU RESPONSIBLE FOR THE CLEANING

8   FUNCTION?

9   A.   YES, I WAS.

10  Q.   FROM THE DAY THE BUILDING OPENED UNTIL YOU LEFT?

11  A.   NO.  THAT WAS ADDED WHEN MS. WALLACE CAME.  SHE CAME IN

12  '91, AND SHORTLY THEREAFTER, SHE PROMOTED ME TO DIRECTOR FROM

13  MANAGER LEVEL.  SO THEN I WAS AT THAT DIRECTOR LEVEL.  AND PART

14  OF THE ADDED RESPONSIBILITIES WERE HOUSEKEEPING, ROOM SET UPS,

15  GUEST SERVICES, IN ADDITION TO EVENT MANAGEMENT, WHICH I

16  ALREADY WAS OVERSEEING.

17  Q.   WHEN YOU RETURNED FOR YOUR SECOND TOUR, DID YOU HAVE ANY

18  RESPONSIBILITY FOR THE CLEANING FUNCTION?

19  A.   NO.

20  Q.   DO YOU CURRENTLY HAVE ANY RESPONSIBILITY FOR THE CLEANING

21  FUNCTION?

22  A.   YES.

23  Q.   WHEN DID YOU ACQUIRE THAT RESPONSIBILITY?

24  A.   WHEN MS. WALLACE AND OUR THEN GENERAL MANAGER, RUDY

25  JOHNSON, PROMOTED ME TO ASSISTANT GENERAL MANAGER JUST A FEW

1   MONTHS AFTER I RETURNED.

2   Q.   HAVE YOU HAD THAT RESPONSIBILITY FOR THE CLEANING FUNCTION

3   EVER SINCE?

4   A.   YES.

5   Q.   DO YOU CURRENTLY HAVE RESPONSIBILITY FOR THE SECURITY

6   FUNCTION AT THE SAN DIEGO CONVENTION CENTER?

7   A.   YES, I DO.

8   Q.   WHEN DID YOU FIRST ACQUIRE THAT RESPONSIBILITY DURING YOUR

9   SECOND TOUR?

10   A.   AT THE SAME TIME WHEN I WAS PROMOTED TO ASSISTANT GENERAL

11   MANAGER.   IT WAS ABOUT APRIL OF 2006.

12   Q.   NOW, MR. GESSNER, YOU'RE FAMILIAR WITH THE LITIGATION IN

13   WHICH WE'RE ALL APPEARING HERE IN COURT TODAY, RIGHT?

14   A.   YES.

15   Q.   DO YOU REMEMBER THAT YOUR DEPOSITION WAS TAKEN IN THIS

16   LITIGATION?

17   A.   YES, I DO.

18   Q.   AND AFTER YOUR DEPOSITION WAS TAKEN, WERE YOU GIVEN THE

19   OPPORTUNITY TO REVIEW THE TRANSCRIPT TO MAKE CORRECTIONS?

20   A.   YES, I WAS.

21   Q.   DID YOU, IN FACT, MAKE SOME CORRECTIONS TO THE DEPOSITION

22   TRANSCRIPT?

23   A.   YES, I DID.

24   Q.   AND COULD YOU TELL THE JURY WHY YOU MADE THOSE

25   CORRECTIONS.

1    A.   WELL, SOME OF THEM WERE AS SIMPLE AS SPELLING ERROR

2    CORRECTIONS, OR JUST CLARIFICATION OF THE ANSWER.   SOME OF THEM

3    ACTUALLY WERE, I LEARNED SOME ADDITIONAL INFORMATION AFTER I

4    HAD GIVEN THE DEPOSITION, SO I CORRECTED IT SO THAT IT WAS MORE

5    ACCURATE.

6    Q.   AND WHY IS IT THAT YOU MADE THOSE CORRECTIONS?

7    A.   AGAIN, SO THAT THE DEPOSITION WAS AS ACCURATE AS IT COULD

8    BE.

9    Q.   COULD WE SEE ON THE SCREEN, PLEASE, EXHIBIT 941, PAGE 1.

10          MR. L'ESTRANGE:   THIS IS IN EVIDENCE.

11   BY MR. L'ESTRANGE:

12   Q.   DO YOU RECOGNIZE EXHIBIT 941 AS THE LETTER WHICH

13   TRANSMITTED YOUR CHANGES TO THE DEPOSITION?

14   A.   YES, I DO.

15   Q.   AND I'M NOT GOING TO GO OVER EACH ONE OF THESE, BUT

16   LOOKING AT THE FIRST ONE, WHERE IT SAYS "MM-HMM," THAT IS M-M,

17   HYPHEN, H-M-M, SHOULD BE CHANGED TO, QUOTE, YES.

18          IS THAT ONE OF THE EXAMPLES YOU WERE TALKING ABOUT, THINGS

19   THAT WERE RELATIVELY MINOR?

20   A.   YES.   THEY HAD MADE IT CLEAR DURING THE DEPOSITION, THAT I

21   NEEDED TO SAY YES.   AND WHEN I READ "MM-HMM," I WANTED TO MAKE

22   SURE I CORRECTED IT.

23   Q.   AND THEN THE SECOND ONE IS ERIC, E-R-I-C, SHOULD BE

24   CHANGED TO E-R-I-C-H?

25   A.   YEAH.   THAT'S HOW ERICH WATSON SPELLS HIS NAME FROM GES.

1  Q.   WHEN YOU CHANGED THE DEPOSITION, YOU TRIED TO CHANGE EVERY

2  SPELLING ERROR THAT YOU CAME ACROSS?

3  A.   YES.

4  Q.   AND YOU SAID ALSO THAT YOU MADE SOME SUBSTANTIVE CHANGES

5  AS WELL?

6  A.   YES.

7  Q.   LET'S LOOK NEXT AT THE SECOND PAGE OF EXHIBIT 941.   THIS

8  IS THE CONCLUSION OF YOUR CHANGES?

9  A.   YES.

10  Q.   WHAT WERE THE SUBSTANTIVE CHANGES THAT YOU MADE TO THE

11  DEPOSITION?

12  A.   WELL, ONE OF THEM, I THINK, WAS CORRECTING WHERE I'D SAID

13  "ATTORNEY GENERAL," I MEANT U.S. MARSHAL.  ANOTHER ONE WAS, I

14  BELIEVE, AND IT MAY HAVE BEEN ON THE OTHER PAGE, WHERE IT WAS

15  CORRECTING A MISIMPRESSION THAT I HAD THAT THE MEMO OF

16  UNDERSTANDING WITH THE UNIONS THAT OUR CORPORATION HAS REQUIRED

17  THEM TO DO BACKGROUND CHECKS AND DRUG SCREENS.  THAT WAS MY

18  MISIMPRESSION WHEN I WAS AT THE DEPOSITION.  AND I LEARNED

19  AFTER THE DEPOSITION, THAT THAT WASN'T TRUE.  WE DID HAVE A

20  CODE OF CONDUCT THAT WAS A PART OF THE MOU, AND THOSE KINDS OF

21  THINGS, BUT IT DID NOT REQUIRE THEM TO DO BACKGROUND CHECKS.

22  Q.   THE MOU IS AN ACRONYM FOR THE MEMORANDUM OF UNDERSTANDING?

23  A.   YES.

24  Q.   COULD YOU DESCRIBE GENERALLY FOR THE JURY WHAT THAT

25  DOCUMENT IS.

1   A.   YES.   IT ESSENTIALLY ESTABLISHED EXCLUSIVE JURISDICTIONS

2   OF PARTICULAR UNIONS WHEN WORKING IN THE CONVENTION CENTER.

3   FOR INSTANCE, IBEW, WHICH IS THE ELECTRICAL WORKERS, ARE THE

4   ONLY ONES THAT ARE ALLOWED TO DO ELECTRICAL AND UTILITY

5   DISTRIBUTION ON THE TRADE SHOW FLOOR.   ALSO, LOCAL 831 IS THE

6   DECORATORS' UNION.   THEIR UNION IS THE ONLY ONES ALLOWED TO DO

7   INSULATION AND DISMANTLING ON OUR TRADE SHOW FLOOR.   AND IT

8   NARROWED THE AREAS WHERE THEY HAD EXCLUSIVE JURISDICTION TO THE

9   EXHIBIT HALL FLOOR, THE BALLROOMS, AND THE SALE AREA.

10  Q.   AND WHAT WAS THE MISIMPRESSION YOU HAD ABOUT THE MOU AT

11  THE TIME YOU GAVE YOUR DEPOSITION TESTIMONY?

12  A.   WELL, I HAD BEEN TOLD AS SOON AS I RETURNED IN 2006, THAT

13  THE MOU ESSENTIALLY ELEVATED THE -- OR GUARANTEED THE LEVEL OF

14  WORK IN THE FACILITY BY GIVING THE EXCLUSIVITY TO THE

15  PARTICULAR UNIONS, AND THAT THE CALIBER OF INDIVIDUALS WERE

16  GOING TO BE A HIGHER CALIBER, AND THAT THERE WAS A CODE OF

17  CONDUCT.   ESSENTIALLY, I WAS GIVEN THE IMPRESSION THAT THEY

18  WERE GOING TO BE -- THAT IT WAS MUCH LIKE THE EMPLOYEES THAT WE

19  HIRE FOR OUR CORPORATION.   AND SO MY MISIMPRESSION WAS THAT

20  THEY ALSO REQUIRED THEIR FOLKS TO BE BACKGROUND CHECKED BEFORE

21  THEY WERE HIRED AND ISSUED UNION CREDENTIALS.

22  Q.   AFTER YOUR DEPOSITION, DID YOU LEARN THAT, IN FACT, IT WAS

23  OTHERWISE?

24  A.   YES.   I ACTUALLY WENT BACK AND READ THE MEMO -- OR, I'M

25  SORRY, READ THE MOU A LITTLE MORE CLOSELY AND SAW IT WAS NOT IN

1   THERE THAT THAT WAS REQUIRED.

2   Q.   AND THAT WAS WHAT LED TO THE SUBSTANTIVE CHANGES TO YOUR

3   DEPOSITION TESTIMONY?

4   A.   YES, IT WAS.

5   Q.   LET ME ASK YOU A COUPLE QUESTIONS ABOUT THE BUILDING

6   ITSELF.  HAS THE SAN DIEGO CONVENTION CENTER WON ANY AWARDS?

7   A.   OH, A NUMBER OF AWARDS.

8   Q.   WHAT KINDS OF AWARDS HAS IT WON?

9   A.   WE HAVE WON AWARDS FROM THE PCA, PROFESSIONAL CONVENTIONAL

10  MANAGEMENT ASSOCIATION; ASAE, AMERICAN SOCIETY OF ASSOCIATION

11  EXECUTIVES; MEETING PLANNER MAGAZINE.  THERE HAS BEEN A NUMBER

12  OF AWARDS.  I JOKED WITH CAROL WALLACE RECENTLY THAT WE NEED A

13  LARGER TROPHY CASE FOR THE CONVENTION CENTER.

14  Q.   HAS THE SAN DIEGO CONVENTION CENTER CORPORATION WON ANY

15  AWARDS FOR ITS CONDUCT, SUCH AS DIVERSITY AWARDS OR THINGS OF

16  THAT NATURE?

17  A.   YES, WE HAVE.  I DON'T KNOW THE EXACT NAME OF THE AWARDS,

18  BUT OUR HUMAN RESOURCES DEPARTMENT HAS RECEIVED THOSE AWARDS,

19  AND THERE IS A NUMBER OF THEM.

20  Q.   DO YOU, YOURSELF, BELONG TO ANY TRADE ASSOCIATIONS?

21  A.   YES, I DO.

22  Q.   WHAT ASSOCIATIONS DO YOU CURRENTLY BELONG TO?

23  A.   WELL, IN ADDITION TO THE TWO I JUST NAMED, ASAE AND PCMA,

24  I'M ALSO ACTIVE, AND HAVE BEEN FOR 25 YEARS, IN THE IAVM.

25  Q.   COULD YOU TELL THE JURY WHAT THAT IS.

1   A.   IT'S AN ACRONYM FOR INTERNATIONAL ASSOCIATION OF VENUE

2   MANAGEMENT.

3   Q.   IS THIS A TRADE ASSOCIATION FOR PEOPLE WHO MANAGE

4   CONVENTION CENTERS?

5   A.   YES.   CONVENTION CENTERS, ARENAS, STADIUMS, THEATERS.

6   Q.   HOW LONG HAVE YOU BELONGED TO THAT GROUP?

7   A.   OVER 25 YEARS.

8   Q.   DO YOU EVER CHAIR ANY COMMITTEES WITHIN THAT ORGANIZATION?

9   A.   YES.   I'M CURRENTLY THE CHAIR OF THE SUSTAINABILITY

10  COMMITTEE.   IN THE PAST, I HAVE CHAIRED THE NATIONAL FIRE

11  PROTECTION ASSOCIATION COMMITTEE AND HAVE BEEN ACTIVE AS A

12  COMMITTEE MEMBER ON A NUMBER OF OTHER COMMITTEES, INCLUDING THE

13  CROWD MANAGEMENT COMMITTEE.

14  Q.   WHAT IS THE "CROWD MANAGEMENT COMMITTEE"?

15  A.   IT -- EARLY ON, ALTHOUGH IT DOESN'T EXIST IN ITS SAME FORM

16  TODAY, IN THE 1980'S, AND EARLY '90S, WHEN I WAS INVOLVED IN

17  IT, IT BASICALLY WAS ESTABLISHING BEST PRACTICES FOR CROWD

18  MANAGEMENT AND SECURITY FOR PUBLIC ASSEMBLY FACILITIES.

19  Q.   DOES THAT RESULT IN THE PUBLICATION OF A PAPER ON THAT

20  TOPIC?

21  A.   ON OCCASION, THEY WOULD ISSUE WHITE PAPERS AND BEST

22  PRACTICES.

23  Q.   NOW I WOULD LIKE TO ASK YOU SOME QUESTIONS ABOUT THE SAN

24  DIEGO CONVENTION CENTER SPECIFICALLY, AND MOST PARTICULARLY,

25  THE HANDBOOK.   LET ME GET YOU EXHIBIT 1204.

1      DO YOU RECOGNIZE EXHIBIT 1204?

2          (DEFENDANT'S EXHIBIT 1204 MARKED FOR IDENTIFICATION.)

3            THE WITNESS:  YES, I DO.

4    BY MR. L'ESTRANGE:

5    Q.   COULD YOU TELL THE JURY, WHAT IS THAT DOCUMENT?

6    A.   IT LOOKS LIKE THE MANUAL THAT WE GIVE -- OR IS THE MANUAL

7    THAT WE GIVE TO ALL NEW HIRES, CALLED THE SAN DIEGO SPIRIT, AS

8    PART OF THEIR TRAINING.

9    Q.   THIS IS A DOCUMENT THAT IS GIVEN TO EACH PERSON WHO IS

10   EMPLOYED BY THE SAN DIEGO CONVENTION CENTER CORP.?

11   A.   YES.

12            MR. L'ESTRANGE:  MOVE THE ADMISSION OF EXHIBIT 1204.

13            MR. LANCE:  NO OBJECTION, YOUR HONOR.

14            THE COURT:  OKAY, IT'S RECEIVED.

15            (DEFENDANT'S EXHIBIT 1204 RECEIVED INTO EVIDENCE.)

16   BY MR. L'ESTRANGE:

17   Q.   WE HAVE ON THE SCREEN PAGE 1 OF EXHIBIT 1204?

18            JUROR:  COULD WE TURN ON THE TV?

19            THE COURT:  THE TV ISN'T ON.  THANK YOU, SIR.  LET'S

20   GO AHEAD AND GET THAT ON.  OKAY.

21   BY MR. L'ESTRANGE:

22   Q.   COULD YOU TELL THE JURY, WHAT IS THE SAN DIEGO SPIRIT

23   TRAINING PROGRAM?

24   A.   AS I MENTIONED A LITTLE EARLIER, IT WAS MODELED AFTER THE

25   DISNEY PROGRAM.  BECAUSE OUR PREVIOUS GENERAL MANAGER HAD BEEN

1   THE GENERAL MANAGER OF THE ANAHEIM CONVENTION CENTER, WHEN

2   DISNEY, DURING ITS HEYDAY, AND HE WORKED VERY CLOSELY WITH

3   DISNEY.  AND ESSENTIALLY, ITS EXCELLENCE IN MANAGEMENT OF

4   PUBLIC ASSEMBLY FACILITIES, AMUSEMENT PARKS, THAT TYPE OF

5   THING.  SAN DIEGO SPIRIT, ESSENTIALLY, WAS TO TRAIN ALL OF OUR

6   EMPLOYEES TO PROVIDE EXEMPLARY SERVICES AND TO TREAT EVERY

7   ATTENDEE AS THOUGH THEY WERE A GUEST IN THEIR OWN HOUSE.  AND

8   EVERYTHING FROM HOW YOU PRESENT YOURSELF, THE CLEANLINESS OF

9   PERSONAL GROOMING, HOW YOU ADDRESS ATTENDEES AND COWORKERS,

10  ATTITUDES, ESSENTIALLY ESTABLISHING A VERY HIGH BAR FOR

11  PERFORMANCE OF ALL OF OUR EMPLOYEES SO THAT WE WOULD HAVE THE

12  ABSOLUTE BEST SERVICES FOR OUR SHOW MANAGERS AND OUR ATTENDEES

13  AND OUR COWORKERS.

14  Q.   ARE THE CLEANING STAFF AT THE SAN DIEGO CONVENTION CENTER

15  CORP. TRAINED IN THE SAN DIEGO SPIRIT PROGRAM?

16  A.   YES, THEY ARE.

17  Q.   I THINK YOU TESTIFIED WHEN YOU WERE HERE BEFORE, THAT THE

18  SAN DIEGO CONVENTION CENTER CORP. ISSUES UNIFORMS TO THE

19  CLEANING STAFF; IS THAT TRUE?

20  A.   YES, THEY DO.

21  Q.   THAT'S MAINTAINED BY THE WARDROBE DEPARTMENT?

22  A.   YES, IT IS.

23  Q.   IS THAT ALL PART OF THE SAN DIEGO SPIRIT TRAINING PROGRAM

24  THAT THERE BE A UNIFORM, A DRESS CODE FOR THE PEOPLE WORKING IN

25  THE BUILDING?

1   A.   YES, THERE IS.

2   Q.   NOW, WHAT ABOUT DURING MOVE IN AND MOVE OUT, IS THE DRESS

3   CODE FOR THE CLEANING PEOPLE RELAXED DURING THAT PHASE OF THE

4   PROCESS?

5   A.   IT'S NEVER RELAXED.

6   Q.   SO YOUR CLEANING PERSONNEL WEAR THEIR UNIFORM EVERY DAY,

7   NO MATTER WHAT TASK THEY'RE PERFORMING?

8   A.   YES.  IT NEVER CHANGES.  EVERY DAY YOU'RE AT WORK, YOU'RE

9   IN THE SAME UNIFORM, SAME PRESENTATION.

10  Q.   NOW WHO IS IT THAT PROVIDES THE TRAINING FOR THE SAN DIEGO

11  SPIRIT PROGRAM?

12  A.   WE HAVE A TRAINING MANAGER THAT IS PART OF THE HUMAN

13  RESOURCES DEPARTMENT.

14  Q.   AND APPROXIMATELY HOW MUCH TIME DOES THAT TAKE TO

15  ADMINISTER THIS PROGRAM TO A NEW RECRUIT?

16  A.   IT IS A FULL DAY.

17  Q.   ARE THERE FREQUENTLY REFRESHER COURSES ON IT?

18  A.   YES.  THERE -- YOU NEED TO GO THROUGH A REFRESHER EVERY

19  TWO YEARS MINIMUM.

20  Q.   NOW WHAT ARE THE EMPLOYEES AT THE SAN DIEGO CONVENTION

21  CENTER CORPORATION TAUGHT ABOUT INTERACTING WITH THE PUBLIC

22  WHEN THEY COME IN CONTACT WITH THEM AT A TRADE SHOW?

23  A.   WELL, THAT THEY MAKE EYE CONTACT.  IF YOU CAN TELL THAT AN

24  ATTENDEE -- OF COURSE, MANY OF OUR ATTENDEES ARE FROM OUT OF

25  TOWN.  IF THEY NEED HELP, IF THEY NEED DIRECTIONS, IF IT LOOKS

1   LIKE THEY'RE LOOKING FOR A PARTICULAR ROOM OR A PARTICULAR

2   EVENT OR SESSION, TO ASK THEM, LOOK THEM IN THE EYE AND ASK

3   THEM, CAN I HELP YOU, THAT TYPE OF THING.

4   Q.   IS THERE A REQUIREMENT OF EMPLOYMENT AT THE SAN DIEGO

5   CONVENTION CENTER CORPORATION THAT THE PERSON MUST SPEAK

6   ENGLISH?

7   A.   YES.

8   Q.   IS THERE ANY RESTRICTION ON SPEAKING ANY OTHER LANGUAGE?

9   A.   NO.   AS A MATTER OF FACT, WE HAVE A NUMBER OF EMPLOYEES

10  THAT ARE MULTI-LINGUAL.

11  Q.   WAS THERE AN EVENT RECENTLY AT THE SAN DIEGO CONVENTION

12  CENTER, WHERE THE MULTI-LINGUAL TALENTS OF SOME OF YOUR

13  EMPLOYEES WERE DISPLAYED ON THEIR UNIFORMS?

14  A.   YES.

15  Q.   WOULD YOU DESCRIBE FOR THE JURY WHAT THAT WAS ALL ABOUT.

16  A.   THAT WAS THE AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS;

17  32,000 ORTHOPAEDIC SURGEONS FROM AROUND THE WORLD WERE HERE A

18  FEW MONTHS AGO.   AND PROBABLY 15 TO 20 PERCENT OF THEM WERE

19  FROM OUT OF THE COUNTRY.   ALTHOUGH ENGLISH IS A -- YOU KNOW, A

20  LANGUAGE THAT A LOT OF OTHER EUROPEAN COUNTRIES SPEAK, THERE

21  WAS DEFINITELY -- IT WAS DEFINITELY A SECOND LANGUAGE OR MAYBE

22  A THIRD LANGUAGE TO SOME OF THEM.   SO WE HAD A LOT OF OUR STAFF

23  THAT SPOKE A NUMBER OF LANGUAGES WEAR THE FLAG OF THE COUNTRY

24  OF THE LANGUAGES THAT THEY SPOKE.   SO THAT IF SOMEBODY WERE

25  HERE FROM FRANCE, THAT THEY WOULD BE ABLE TO SEE THAT I SPOKE

1  FRENCH, OR THAT ONE OF OUR HOUSEKEEPERS SPOKE FRENCH OR

2  ITALIAN.  AND IT WAS VERY WELL RECEIVED AND VERY HELPFUL.

3  Q.   SO YOU HAVE NO RESTRICTION AT THE SAN DIEGO CONVENTION

4  CENTER ABOUT YOUR EMPLOYEES SPEAKING A FOREIGN LANGUAGE?

5  A.   ABSOLUTELY NOT.

6  Q.   NEXT, I'D LIKE YOU TO TAKE A LOOK AT EXHIBIT 32.  AND YOU

7  NEED NOT LOOK AT IT IN THE BOOK.  I'LL PUT IT UP ON THE SCREEN,

8  IT WILL BE EASIER.

9             (DEFENDANT'S EXHIBIT 32 MARKED FOR IDENTIFICATION.

10            THE WITNESS:  OKAY.

11  BY MR. L'ESTRANGE:

12  Q.   THESE ARE THE GENERAL POLICIES, RULES, AND REGULATIONS OF

13  THE SAN DIEGO CONVENTION CENTER CORPORATION.  DID YOU

14  PARTICIPATE IN DRAFTING THESE POLICIES, RULES, AND REGULATIONS?

15  A.   NOT INITIALLY.  BUT I HAVE BEEN INVOLVED WITH EDITS AND

16  MODIFICATIONS OVER THE YEARS.

17  Q.   IS THIS SORT OF A LIVING DOCUMENT THAT CHANGES OVER TIME

18  AS THINGS CHANGE AT THE BUILDING?

19  A.   TO A DEGREE.  IT DOESN'T CHANGE OFTEN, BUT WHEN IT NEEDS

20  TO CHANGE, WE'RE ABLE TO MAKE CHANGES PRETTY EASILY.

21  Q.   IS THIS DOCUMENT DISPLAYED ON THE WEBSITE FOR THE SAN

22  DIEGO CONVENTION CENTER?

23  A.   YES.

24  Q.   HAS THAT ALWAYS BEEN THE CASE?

25  A.   YES.

1   Q.   ARE THESE THE TERMS AND CONDITIONS IN EXHIBIT 32 THAT ARE

2   INCORPORATED BY REFERENCE IN THE LICENSE AGREEMENTS THAT THE

3   SAN DIEGO CONVENTION CENTER CORP. USES TO LEASE THE BUILDING?

4   A.   YES, IT IS.

5   Q.   HAS THAT ALWAYS BEEN THE CASE AS FAR AS YOU KNOW?

6   A.   YES.

7   Q.   ARE THESE POLICIES, RULES, AND REGULATIONS APPLICABLE TO

8   THE EXHIBITORS WHO PUT ON EXHIBITS AT SHOWS AT YOUR BUILDINGS?

9   A.   YES.

10  Q.   ARE THEY APPLICABLE TO THE DECORATORS?

11  A.   YES.

12  Q.   ARE THEY APPLICABLE TO THE TRADE ASSOCIATIONS?

13  A.   YES.

14  Q.   HAS THERE EVER BEEN ANY ATTEMPT TO CONCEAL THESE POLICIES,

15  RULES, AND REGULATIONS FROM ANYBODY WHO IS USING THE BUILDING?

16  A.   NO.

17  Q.   I'M GOING TO ASK YOU SOME QUESTIONS NOW ABOUT SECURITY AT

18  THE SAN DIEGO CONVENTION CENTER.  AND YOU'VE TESTIFIED THAT ON

19  YOUR SECOND TOUR, YOU HAD SOME RESPONSIBILITY FOR SECURITY; IS

20  THAT RIGHT?

21  A.   YES.

22  Q.   IN FACT, YOU'RE IN CHARGE OF SECURITY?

23  A.   YES.  SINCE I BECAME ASSISTANT GENERAL MANAGER IN APRIL OF

24  '06, I'VE BEEN IN CHARGE.

25  Q.   AND PRIOR TO THE TIME WHEN YOU WERE ON YOUR FIRST TOUR,

1    WERE YOU RESPONSIBLE FOR SECURITY?

2    A.   NO, I WASN'T.

3    Q.   YOU LEFT AT THE END OF YOUR FIRST TOUR BEFORE 9/11?

4    A.   YES.

5    Q.   DID YOU NOTICE ANY CHANGE IN THE SECURITY AT THE SAN DIEGO

6    CONVENTION CENTER WHEN YOU RETURNED AFTER 9/11, FOR YOUR SECOND

7    TOUR?

8    A.   YES.

9    Q.   WHAT KINDS OF CHANGES DID YOU NOTICE?

10   A.   WELL, WE HAD INSTALLED -- OR THEY HAD INSTALLED KEYPADS TO

11   ALL OF THE OFFICES, SO THAT ONLY THE EMPLOYEES HAD THE CODES TO

12   BE ABLE TO GET INTO THE OFFICES IN THE BACK CORRIDORS, THAT

13   KIND OF THING, AND THE STORAGE AREAS.  THEY HAD ALSO

14   IMPLEMENTED A PHOTO ID BADGE THAT ALL EMPLOYEES WERE REQUIRED

15   TO WEAR AT ALL TIMES, THAT HAD THE EMPLOYEES' NAME, DEPARTMENT,

16   AND THEIR PHOTO ON IT.  THEY ALSO WERE IN THE PROCESS OF

17   IMPLEMENTING PHOTO ID BADGES FOR ALL SERVICE CONTRACTORS THAT

18   WERE WORKING IN THE FACILITIES.  THAT WAS IN THE PROCESS WHEN I

19   RETURNED IN '06, ALSO.

20   Q.   SO YOU NOTICED A LOT OF CHANGES WHEN YOU CAME BACK?

21   A.   OH, YES.

22   Q.   HAVE THERE BEEN ADDITIONAL CHANGES TO SECURITY SINCE YOU

23   RETURNED?

24   A.   YES.

25   Q.   LET ME ASK YOU ABOUT EVENT SECURITY.  AND COULD YOU

1   DESCRIBE FOR THE JURY THE DIFFERENCE BETWEEN EVENT SECURITY AND

2   BUILDING SECURITY AS YOU UNDERSTAND THOSE TERMS.

3   A.   SURE.   THE BUILDING SECURITY IS WHAT THE SAN DIEGO

4   CONVENTION CENTER CORPORATION IS RESPONSIBLE FOR 365, 24/7.   ON

5   ANY GIVEN SHIFT, FIRST AND SECOND SHIFT, WE HAVE SEVEN GUARDS

6   THAT WORK FOR US, THAT ARE EITHER MONITORING THE OVER 100

7   CAMERA LOCATIONS THAT WE HAVE IN THE FACILITY, ESSENTIALLY

8   SECURING THE CONVENTION CENTER ITSELF.

9        WE ALSO PROVIDE GUEST SERVICES STAFF, USUALLY TWO THAT ARE

10  IN THE LOBBY.   EVEN THOUGH THEIR PRIMARY FUNCTION IS TO ASSIST

11  ATTENDEES AND HELPING THEM FIND WHERE THEY'RE GOING, THEIR

12  SECONDARY, OR MAYBE EVEN PARALLEL OR LEVEL OF RESPONSIBILITY IS

13  TO ALSO SEE IF THERE IS ANYBODY WHO LOOKS OUT OF LINE, IF THERE

14  ARE ANY SUSPICIOUS PACKAGES, THAT KIND OF THING.   THAT IS

15  BUILDING SECURITY.

16       EVENT SECURITY IS RELATED STRICTLY TO EVENT.   THEY'RE

17  MONITORING WHO COMES AND GOES THROUGH THEIR EXHIBIT HALLS, INTO

18  THEIR MEETING ROOMS, CHECKING THE CREDENTIALS THAT THE ACTUAL

19  ATTENDEE WOULD HAVE.   AND THEY ARE HIRED BY THE SHOW MANAGER,

20  WORKING FOR THE SHOW MANAGER, AND WORKING FOR THAT SHOW ONLY.

21  Q.   AT SOME POINT, DURING YOUR SECOND TOUR, DID YOU CONSIDER

22  THE POSSIBILITY OF TAKING EVENT SECURITY IN-HOUSE?

23  A.   YES.

24  Q.   AND NOW, MAYBE BACK UP A STEP.   WHO PROVIDES THE EVENT

25  SECURITY?

1    A.    THERE IS OUTSIDE SECURITY FIRMS THAT NOW ARE ON WHAT WE

2    CALL AN APPROVED VENDOR LIST.

3    Q.    WHAT DOES THAT MEAN?

4    A.    THEY MEET THE CRITERIA THAT WE'VE ESTABLISHED FOR -- THE

5    MINIMUM CRITERIA THAT WE'VE ESTABLISHED FOR A SECURITY FIRM TO

6    BE ABLE TO WORK IN OUR FACILITY AND PROVIDE SECURITY SERVICES

7    TO THE SHOWS.

8    Q.    IS ONE OF THOSE CRITERIA THAT EACH PERSON HAVE A GUARD

9    CARD?

10   A.    YES.

11   Q.    WOULD YOU TELL THE JURY WHAT THAT IS?

12   A.    A GUARD CARD IS A STATE REQUIREMENT THAT YOU HAVE TO GO

13   THROUGH TO RECEIVE A CREDENTIAL AND AUTHORIZATION FROM THE

14   STATE TO BE A SECURITY GUARD IN THE STATE OF CALIFORNIA.

15   Q.    NOW YOU SAID THAT AT ONE POINT, YOU CONSIDERED THE

16   POSSIBILITY OF TAKING EVENT SECURITY IN-HOUSE.  AND WHAT WOULD

17   THAT -- WHAT WOULD HAVE RESULTED HAD YOU MADE THE DECISION TO

18   DO THAT?

19   A.    WELL, THE REASON WHY WE WERE CONSIDERING TO DO THAT WAS

20   REALLY FOR CONTROL.  WE WOULD BE ABLE TO MAKE SURE THAT WE

21   BACKGROUND CHECK, TRAINED, BETTED AND CONTROLLED THE STAFF.

22   AND IT WOULD JUST BE ONE SOURCE, SO THAT WOULD BE THE BENEFIT

23   OF DOING THAT.

24   Q.    DID YOU DECIDE AGAINST DOING SO?

25   A.    WE DID.

1    Q.   WHO WAS IT THAT MADE THAT DECISION?

2    A.   WELL, IT WAS A GROUP EFFORT.  AS I TESTIFIED BEFORE, CAROL

3    WALLACE, OUR PRESIDENT AND CEO, ULTIMATELY MAKES ALL THE

4    DECISIONS.  BUT SHE RECEIVES INPUT FROM HER SUBORDINATES.

5    Q.   DID YOU PARTICIPATE IN THAT DECISION-MAKING PROCESS?

6    A.   YES, I DID.

7    Q.   AND PROVIDED SOME INPUT TO HER?

8    A.   YES.

9    Q.   AND WHAT WAS YOUR POSITION REGARDING CHANGING THE EVENT

10   SECURITY AND MAKING IT IN-HOUSE?

11   A.   WELL, I LARGELY WAS IN FAVOR OF IT, BUT I AGREED WITH THE

12   CONSENSUS THAT BECAUSE OF THE LIVING WAY ORDINANCE AND SOME

13   OTHER REASONS, IMPACT TO HUMAN RESOURCES, ETC., THAT AT LEAST

14   AT THAT TIME, IT WASN'T SOMETHING THAT WE WERE RECOMMENDING TO

15   DO.

16   Q.   WAS THAT BECAUSE YOU COULDN'T AFFORD IT?

17   A.   WELL, IT WASN'T SO MUCH THAT WE COULDN'T AFFORD IT.  WE

18   COULD HAVE PROBABLY MADE THAT WORK.  BUT IT WAS SOMETHING TO

19   WHERE WE THOUGHT WOULD BE MORE EXTENSIVE TO OUR SHOW MANAGERS

20   AND IT WOULD BE DIFFICULT TO IMPLEMENT.

21   Q.   BECAUSE OF THE WAGES YOU WOULD HAVE TO PAY TO THESE

22   IN-HOUSE GUARDS?

23   A.   EXACTLY.

24   Q.   NOW LET ME ASK YOU SOME QUESTIONS ABOUT ANOTHER ASPECT OF

25   SECURITY THAT HAS TO DO WITH THE PARKING GARAGE.  AND SEVERAL

1  PEOPLE HAVE ALREADY TESTIFIED ABOUT THAT IN THE TRIAL.

2      WHO CONTROLS THE PARKING GARAGE?

3  A.   IT IS OWNED BY THE SAN DIEGO UNIFIED PORT DISTRICT, AND

4  THEY HAVE SUBCONTRACTED IT TO ACE PARKING.

5  Q.   HAS THAT ALWAYS BEEN THE CASE SINCE YOU'VE BEEN ASSOCIATED

6  WITH THE CONVENTION CENTER?

7  A.   YES.

8  Q.   NOW AT SOME POINT, DID YOU MAKE AN ATTEMPT TO OBTAIN

9  CONTROL OVER THE PARKING GARAGE FOR THE SAN DIEGO CONVENTION

10 CENTER CORP.?

11 A.   SEVERAL TIMES.

12 Q.   AND WHAT EFFORTS DID YOU MAKE TO OBTAIN CONTROL OF THE

13 PARKING GARAGE?

14 A.   WELL, IN MY FIRST TOUR OF DUTY, WE APPROACHED THEM IN

15 1989, 1990.

16 Q.   APPROACHED WHO?

17 A.   APPROACHED THE PORT DISTRICT.

18 Q.   OKAY.

19 A.   ABOUT ALLOWING THE CONVENTION CENTER CORPORATION TO MANAGE

20 IT AND OPERATE IT AND KEEP THE REVENUES FROM IT.  THERE IS

21 SEVERAL MILLION DOLLARS A YEAR NET PROFIT THAT COME OUT OF THAT

22 OPERATION.  WE WERE TURNED DOWN THEN.  A FEW YEARS LATER, WE, I

23 AND OUR THEN OPERATIONS DIRECTOR, APPROACHED ACE PARKING TO SEE

24 IF WE COULD PROVIDE THE SECURITY DOWN THERE AT A BILL BACK.

25 AND THEY HAD A DIFFERENT SECURITY COMPANY THAT THEY CHOSE TO

1  STAY WITH.

2      SINCE I'VE BEEN BACK IN 2006, I DID HAVE ONE CONVERSATION

3  WITH A DIRECTOR LEVEL AT THE PORT AND THE CHIEF OF POLICE FOR

4  THE PORT DISTRICT ABOUT SOME OF THE CONCERNS WE HAVE ABOUT THE

5  SECURITY IN THE PARKING GARAGE, AND WHETHER THEY WOULD CONSIDER

6  UTILIZING OUR SECURITY DOWN THERE.  AND AT THIS POINT, THEY

7  HAVE CHOSEN NOT TO USE US.

8  Q.   SO YOU'RE AWARE THAT THERE IS SOME SECURITY PROBLEM IN THE

9  PARKING GARAGE?

10 A.   IT IS A CONCERN, YES.

11 Q.   AND YOU HAVE MADE EFFORTS TO TAKE CARE OF IT BUT WITHOUT

12 SUCCESS?

13 A.   YES.

14 Q.   AND THAT IS BECAUSE IT'S CONTROLLED BY THE PORT?

15 A.   YES.

16 Q.   LET ME TALK ABOUT THE LOADING DOCK.  YESTERDAY WE HEARD

17 FROM THE PLAINTIFF'S EXPERT, CANDICE WRIGHT, WHO IS A POLICE

18 OFFICER IN THE CITY OF LONG BEACH, THAT SHE BELIEVED THERE WAS

19 A SECURITY HAZARD ASSOCIATED WITH THE LOADING DOCK BECAUSE ALL

20 INCOMING FREIGHT IS NOT SCREENED.  HAS THAT BEEN SOMETHING YOU

21 HAVE EVER CONSIDERED, THAT IS, SCREENING INCOMING FREIGHT

22 BEFORE -- BETWEEN THE TIME IT IS OFF-LOADED FROM TRUCKS AND

23 THEN PUT IN ON THE TRADE SHOW FLOOR?

24 A.   IT IS SOMETHING THAT WE'VE DISCUSSED, BUT IT'S NOT

25 SOMETHING THAT WE'VE EVER SERIOUSLY CONSIDERED DOING IT.

1  Q.   COULD YOU EXPLAIN WHY YOU HAVE NOT SERIOUSLY CONSIDERED

2  DOING IT?

3  A.   IT WOULD MAKE IT VIRTUALLY IMPOSSIBLE TO LOAD A CONVENTION

4  AND TRADE SHOW INTO OUR EXHIBIT HALL OF ANY SIZE.

5  Q.   WHY WOULD THAT BE?

6  A.   WELL, ON SOME SHOWS, WE DO SEVERAL HUNDRED TRUCKS, AND

7  THESE ARE TRACTOR-TRAILER SEMIS, THAT HAVE A NARROW WINDOW OF

8  OPPORTUNITY TO MOVE A SHOW IN.  WE'RE A HEAVILY USED BUILDING.

9  THERE IS USUALLY A TWO, MAYBE A THREE DAY, ON SOME OCCASIONS

10  EVEN JUST ONE DAY TO LOAD IN.  AND IT IS PRETTY PHRENETIC BACK

11  ON THAT LOADING DOCK.  SO WE HAVE FOUND DIFFERENT WAYS THAT WE

12  THINK WE'VE SECURED THE DOCK TO OUR SATISFACTION.

13  Q.   DOES THE SAN DIEGO CONVENTION CENTER CORP. CURRENTLY HAVE

14  SECURITY PROCEDURES APPLICABLE TO DECORATORS WHO USE THE

15  BUILDING?

16  A.   YES.

17  Q.   AND IN GENERAL, WHAT ARE THOSE PROCEDURES?

18  A.   WELL, THERE IS A CERTAIN ENTRANCE FOR THE DECORATORS.

19  THEY HAVE TO ABIDE BY ALL OF OUR POLICY RULES AND REGULATIONS.

20  THEY HAVE TO BE CREDENTIALED AND HAVE PHOTO ID'S FOR THEIR

21  FOLKS.  AND IF IT'S A TEMPORARY PERSON, THAT THEY HAVE TO BE

22  ISSUED A TEMPORARY BADGE FROM OUR SECURITY DEPARTMENT.  AND IT

23  IS PRETTY EXTENSIVE, BUT THAT'S JUST A NUTSHELL.

24  Q.   HOW IS THAT COMMUNICATED TO THE DECORATORS?

25  A.   A NUMBER OF WAYS.  BUT MORE OFTEN, IT IS THROUGH OUR

1   SERVICE CONTRACTOR MEETINGS THAT WE HOLD TWO TO THREE TIMES A

2   YEAR.

3   Q.   TELL THE JURY WHAT YOU MEAN BY THE SERVICE CONTRACTOR

4   MEETING.   WHAT IS THAT ALL ABOUT?

5   A.   WELL, SINCE THE DAY WE OPENED, WE PRIDE OURSELVES ON

6   COMMUNICATING TO ALL THE FOLKS THAT DO BUSINESS AT THE

7   CONVENTION CENTER.   WE'VE BEEN HOLDING -- IT USED TO BE

8   QUARTERLY, BUT NOW THERE IS -- WE'VE BEEN OPENED 22 YEARS;

9   THERE ISN'T THAT MUCH TO TALK ABOUT A LOT OF TIMES.

10       SO TWO TO THREE TIMES A YEAR WE INVITE THE SERVICE

11  CONTRACTORS, THEIR REPRESENTATIVES, EVEN THE UNIONS THAT WORK

12  FOR THE SERVICE CONTRACTORS, TO COME IN AND MEET WITH US.   AND

13  WE GO OVER ANY NEW POLICIES THAT WE'RE IMPLEMENTING, ANY

14  CHALLENGES OR ISSUES THAT WE'VE BEEN HAVING WITH EITHER -- ANY

15  ONE OF US.   AND IT IS A TWO-WAY DIALOGUE.   IT IS NOT JUST A

16  CONVENTION CENTER TALKING TO THE SERVICE CONTRACTORS.   THEY

17  HAVE THE OPPORTUNITY TO PUT THINGS ON THE AGENDA AND DISCUSS

18  THEM, IF THERE IS SOME CHALLENGES WITH THE MARSHALLING YARD, OR

19  WITH SECURITY ISSUES -- WE JUST IMPLEMENTED A FEW YEARS AGO A

20  NEW RIGGING POLICY.   THOSE KINDS OF POLICIES ARE ALL DISCUSSED

21  WHEN WE IMPLEMENT THEM, SO THEY'RE REAL CLEAR WHAT IS EXPECTED

22  OF THEM.

23  Q.   WHAT IS YOUR ROLE IN THESE MEETINGS WITH THE DECORATORS?

24  A.   I CHAIR THE MEETING.

25  Q.   AND WHAT PEOPLE ARE -- WHO IS INVITED TO THESE MEETINGS?

1   A.   SERVICE CONTRACTOR REPRESENTATIVES.  WE'VE TALKED ABOUT

2   FREEMAN AND CHAMPION AND GES.  THEIR REPRESENTATIVES, SOMETIMES

3   THEY'LL BRING THEIR FREIGHT INDIVIDUALS, THE REPRESENTATIVES

4   FROM THE UNIONS THAT WORK FOR THE SERVICE CONTRACTORS, AND THEN

5   WE'LL HAVE OUR STAFF, OUR EVENT MANAGERS, OUR OPERATIONS

6   DIRECTOR, OUR FACILITIES MANAGER, SOMETIMES SOME OF OUR SALES

7   MANAGERS THAT CHOOSE TO ATTEND SO THAT THEY'RE UP TO SPEED ON

8   THE PROGRAMS THAT WE'RE IMPLEMENTING AND THE DISCUSSION THAT IS

9   TAKING PLACE.

10  Q.   ARE THERE MINUTES CREATED AFTER THESE MEETINGS?

11  A.   YES, THERE ARE.

12  Q.   I'D LIKE YOU TO TAKE A LOOK AT EXHIBIT 53.

13          (DEFENDANT'S EXHIBIT 53 MARKED FOR IDENTIFICATION.)

14           THE WITNESS:  OKAY.

15  BY MR. L'ESTRANGE:

16  Q.   IS EXHIBIT 53 AN EXAMPLE OF THE MINUTES OF ONE OF THOSE

17  MEETINGS?

18  A.   YES, IT IS.

19  Q.   IS THIS BASICALLY AN OPEN FORUM THAT YOU HAVE WITH THE

20  PEOPLE WHO ARE INVITED TO ATTEND?

21  A.   I WOULDN'T CALL IT OPEN FORUM; ALTHOUGH, THERE IS

22  DEFINITELY DIALOGUE BACK AND FORTH.  BUT WE ESTABLISH AN

23  AGENDA, ASKING AGAIN -- WE SEND OUT WEEKS IN ADVANCE AN E-MAIL

24  TO THEIR REPRESENTATIVES, ASKING THEM IF THEY HAVE ANY TOPICS

25  THAT THEY'D LIKE TO DISCUSS, TO SEND IT BACK TO MY ASSISTANT,

1   CATHY ANTONE, (PHONETIC).  AND WE DEVELOP AN AGENDA.  AND THEN

2   IT IS AN OPEN DISCUSSION DURING THE MEETING.  TYPICALLY IT

3   LASTS AN HOUR LONG.

4   Q.   SO DO YOU RECEIVE IDEAS FROM THE DECORATORS FOR AGENDA

5   ITEMS?

6   A.   YES, WE DO.

7   Q.   LOOKING AT THIS, IF WE COULD GO TO PAGE 2, PLEASE.  FIRST,

8   IS SECURITY REQUIREMENTS.  DO YOU REMEMBER -- WERE YOU A

9   PARTICIPANT IN THIS MEETING, WHICH IS REFLECTED IN EXHIBIT 53?

10  A.   YES, I WAS.

11  Q.   DO YOU SEE THERE WHERE THERE WAS A DISCUSSION OF SECURITY

12  REQUIREMENTS?

13  A.   YES.

14  Q.   IS THAT THE KIND OF TOPICS THAT IS DISCUSSED AT THESE

15  MEETINGS?

16  A.   THIS WAS DISCUSSED AT THIS MEETING IN 2008, YES.

17  Q.   IF YOU CAN GO TO THE THIRD PAGE, PLEASE.

18       SO RIGGING POLICY PROGRAM UPDATE, WHAT IS THAT ABOUT?

19  A.   WE -- AS I MENTIONED A MINUTE AGO, WE IMPLEMENTED A NEW

20  RIGGING POLICY.  PREVIOUSLY, IT HAD BEEN AN EXCLUSIVE BY OUR

21  PREFERRED IN-HOUSE AD CONTRACTOR.  THEY WERE THE ONLY ONES

22  PERMITTED TO DO ANY RIGGING.  AND WE OPENED IT UP, JUST A FEW

23  YEARS AGO, TO WHERE THE SERVICE CONTRACTORS, PROVIDED THEY MET

24  ALL OF THE MINIMUM REQUIREMENTS AND THE TRAINING REQUIRED, AND

25  HAD A SUPERVISOR THAT WAS TRAINED IN RIGGING, COULD ALSO DO

1   RIGGING ON A TRADE SHOW FLOOR.

2   Q.   NOW IN THIS DOCUMENT, IF YOU GO BACK TO PAGE 1, WAS YOUR

3   DIRECTOR -- THEN DIRECTOR OF SECURITY CHUCK GUTENSOHN, AN

4   ATTENDEE AT THAT MEETING?

5   A.   HE WAS OUR SECURITY MANAGER.  I THINK WE CALLED HIM ASSET

6   PROTECTION MANAGER.

7   Q.   DO YOU NORMALLY HAVE PRESENT AT THESE MEETINGS A PERSON IN

8   CHARGE OF THE SECURITY AT THE CONVENTION CENTER?

9   A.   YES, WE DO.

10  Q.   ARE ALL OF THE CONTRACTORS WELCOME TO ATTEND?

11  A.   YES.

12  Q.   APART FROM THE PERIODIC MEETINGS, THE FORMAL MEETINGS,

13  THAT YOU HAVE WITH THE CONTRACTORS, DO YOU ALSO, FROM TIME TO

14  TIME, SPEAK WITH THE CONTRACTORS ABOUT ANY CONCERNS THEY HAVE

15  CONCERNING THE OPERATION OF THE CONVENTION CENTER?

16  A.   YEAH.  THEY FEEL FREE -- AND I'VE KNOWN MANY OF THEM FOR

17  MANY YEARS, IF THEY HAVE ANY ISSUES, TO BE ABLE TO CALL ME

18  DIRECTLY OR CALL ONE OF MY SUBORDINATES DIRECTLY.

19  Q.   AND DOES THAT, IN FACT, HAPPEN, WHERE YOU RECEIVE CALLS?

20  A.   ON OCCASION, YES.

21  Q.   AND YOUR SUBORDINATES ALSO RECEIVE CALLS FROM THE

22  DECORATORS?

23  A.   YES, THEY DO.

24  Q.   SO YOU'RE OPEN TO ANY DISCUSSION THEY WANT, IF THEY HAVE

25  ANY THOUGHTS OR IDEAS OR COMPLAINTS OR ANYTHING THEY WANT TO

1  SHARE WITH YOU?

2  A.  ABSOLUTELY.

3  Q.  AND DO YOU RECEIVE COMPLAINTS FROM TIME TO TIME?

4  A.  ON OCCASION.

5  Q.  IS THAT SOMETHING YOU TRY TO RESOLVE WHEN YOU DO?

6  A.  OH, ABSOLUTELY.

7  Q.  I'D LIKE TO GO BACK TO EXHIBIT 32, WHICH I ACTUALLY

8  BELIEVE IS IN THAT BOOK, AND GO TO PAGE 3.

9      AND THIS IS THE -- I'LL WAIT UNTIL YOU GET TO EXHIBIT 32,

10  PAGE 3.

11  A.  OKAY.

12  Q.  FOCUSING THE ATTENTION ON THE FIRST PARAGRAPH OF FACILITY

13  CLEANING, WHICH THAT IS THE POLICY THAT WE'RE TALKING ABOUT

14  HERE IN THIS LAWSUIT, WHEN DID THAT COME INTO EFFECT?

15  A.  IT WAS ABOUT THE TIME WE IMPLEMENTED THIS NEW POLICY.

16  Q.  AND WHAT WAS THE POLICY BEFORE JULY 1, 2007, IF THERE WAS

17  ANY?

18  A.  WELL, THERE WAS A FACILITY CLEANING SECTION, BUT

19  ESSENTIALLY, IT WAS OPEN; ANY FACILITY OR CLEANING COMPANY

20  COULD BRING THEIR OWN PEOPLE IN AND CLEAN.

21  Q.  IT IDENTIFIED ALL THE OTHER CLEANING SERVICES YOU PROVIDE,

22  BUT IN TERMS OF YOUR PEOPLE PROVIDING THE WORK, IT WAS -- THAT

23  RESTRICTION WAS NOT IN THERE?

24  A.  EXACTLY.

25  Q.  OKAY.  AT THE TIME YOU RETURNED TO THE CONVENTION CENTER

1   IN 2006, DID YOU LEARN THAT THERE HAD BEEN DISCUSSION ABOUT

2   THIS CHANGE IN POLICY BEFORE YOU RETURNED?

3   A.   YES.

4   Q.   SO THAT -- THE CONVERSATIONS ABOUT CHANGING THIS WERE

5   UNDERWAY WHEN YOU CAME BACK TO THE BUILDING?

6   A.   YES, THEY WERE.

7   Q.   DID YOU, THEN, JOIN IN THOSE DISCUSSIONS AFTER YOUR

8   RETURN?

9   A.   NOT IMMEDIATELY.  BECAUSE IT DIDN'T FALL UNDER MY

10  RESPONSIBILITY AS THE CONVENTION AND EVENT SERVICES DIRECTOR.

11  Q.   SO AT WHAT POINT DID YOU BECOME INVOLVED IN THESE

12  CONVERSATIONS?

13  A.   ALTHOUGH I WAS AWARE THAT THE CONVERSATIONS WERE GOING ON,

14  I DIDN'T REALLY START GETTING INVOLVED IN THE -- ACTUALLY EVEN

15  INVITED TO THE MEETINGS UNTIL I BECAME THE ASSISTANT GENERAL

16  MANAGER IN APRIL OF 2006.

17  Q.   SO BETWEEN APRIL 2006, AND JULY 1ST, 2007, WERE YOU THEN

18  INVOLVED IN THE DISCUSSIONS THAT LED TO THIS CHANGE IN POLICY?

19  A.   YES, I WAS.

20  Q.   AND WHAT WAS YOUR INVOLVEMENT?  TELL THE JURY WHAT YOU DID

21  IN CONNECTION WITH THIS DECISION TO CHANGE THE POLICY.

22  A.   WELL, IT WAS -- I PARTICIPATED WITH OUR CHIEF OPERATING

23  OFFICER, AND OUR HUMAN RESOURCES MANAGER, AND OUR FACILITIES

24  MANAGER, AND OTHERS TO EVALUATE THE BENEFITS OF IMPLEMENTING

25  THIS POLICY, AND PREPARED A RECOMMENDATION -- HELPED PREPARE A

1    RECOMMENDATION FOR OUR PRESIDENT, CEO, CAROL WALLACE.

2    Q.    AND WHAT WAS YOUR RECOMMENDATION?

3    A.    TO IMPLEMENT THE POLICY THAT ULTIMATELY WAS IMPLEMENTED,

4    AND THAT IS TO REQUIRE ONLY CONVENTION CENTER HOUSEKEEPING

5    STAFF TO DO THE CLEANING IN OUR FACILITY.

6    Q.    WHAT WAS YOUR RATIONALE IN MAKING THAT RECOMMENDATION?

7    A.    AND WHAT IS INTERESTING, JOHN, IS THAT EVERY PERSON

8    PROBABLY HAD A DIFFERENT REAL REASON FOR DOING IT, BUT WE ALL

9    THREE HAD -- OR ALL OF US HAD THE SAME THREE REASONS.

10        I WAS MOSTLY CONCERNED ABOUT THE CLEANLINESS.  THERE WERE

11   TIMES WHERE I WOULD WALK THROUGH THE TRADE SHOW FLOOR AND BE

12   ASHAMED OF WHAT I SAW.  SO THE LEVEL OF CLEANING WAS THE NO. 1

13   THING IN MY MIND, OR AT LEAST ONE OF THE TOP THINGS IN MY MIND.

14   ALSO ENHANCING SECURITY, THEY WOULD BE OUR PEOPLE, WE KNEW WHO

15   THEY WERE, THEY HAD BEEN TRAINED, THEY WERE BACKGROUND CHECKED,

16   THEY WERE TRAINED IN EMERGENCY RESPONSE, THEY WOULD ASSIST US

17   WITH -- IF, GOD FORBID, THERE EVER WAS AN EARTHQUAKE, A FIRE,

18   OR OTHER EMERGENCY.  AND THEN IT WOULD GENERATE SOME ADDITIONAL

19   NEEDED REVENUE.

20   Q.    TELL ME WHAT YOU OBSERVED IN THE TIME AFTER YOU RETURNED

21   FROM -- ON YOUR SECOND TOUR, ABOUT THE CLEANLINESS OF THE

22   BUILDING AT THE TIME THE WORK WAS BEING DONE BY UNITED.

23   A.    IT JUST WASN'T UP TO OUR STANDARDS.  AND ONE IN

24   PARTICULAR, ONE SHOW, WHERE THERE WERE A NUMBER OF BOX LUNCHES

25   THAT WERE GIVEN OUT ON THE TRADE SHOW FLOOR, WHICH HAPPENS ON

1    OCCASION, AND IT'S THEIR WAY OF KEEPING EVERYBODY IN THE TRADE

2    SHOW, OR ON THE TRADE SHOW FLOOR.  THEY -- AND UNITED NATIONAL

3    MAINTENANCE WAS DOING THE CLEANING.  THEY KNEW ABOUT THE BOX

4    LUNCHES.  THEY WERE UNDER-STAFFED.  THEY DIDN'T HAVE ENOUGH

5    EQUIPMENT ON THE FLOOR.  AND PEOPLE WERE LITERALLY JUST

6    DROPPING THEIR BOX LUNCHES AFTER THEY HAD CONSUMED IT JUST DOWN

7    ON THE FLOOR BECAUSE THERE WERE NO TRASH CANS.  ALL THE TRASH

8    CANS WERE OVERFLOWED.  THE SHOW MANAGER, IN A PANIC, CALLED OUR

9    EVENT MANAGER, JEFF PINKLEY (PHONETIC), SENIOR EVENT MANAGER,

10   AND OUR HOUSEKEEPING CREW CAME IN AND ESSENTIALLY CLEANED IT

11   ALL UP.

12   Q.   YOU WERE ASKED TO COME IN AND ASSIST IN THE CLEAN UP?

13   A.   YES.

14   Q.   WERE THERE ANY OTHER THINGS THAT YOU OBSERVED REGARDING

15   THE QUALITY OF WORK THAT WAS BEING DONE BY UNITED PRIOR TO THIS

16   CHANGE IN POLICY?

17   A.   WELL, JUST THAT THEIR STAFF WEREN'T UP TO OUR SAN DIEGO

18   SPIRIT STANDARDS, AND I FELT IT AFFECTED OUR IMAGE AS A WORLD

19   CLASS CONVENTION CENTER.

20   Q.   LET'S TALK ABOUT THE SECURITY REASONS.  YOU SAID THAT YOU

21   WANTED CONTROL OVER THE PEOPLE WHO WERE ON THE FLOOR?

22   A.   YES.

23   Q.   WHAT DID YOU MEAN BY THAT?

24   A.   WELL, SO THAT IF WE HAD AN ISSUE, IT WAS SOMETHING TO

25   WHERE -- LIKE THE SITUATION THAT I JUST DESCRIBED, I WOULD LIKE

1   TO THINK THAT WOULD NEVER HAPPEN, AND IT HASN'T UNDER US, BUT

2   IF SOMETHING LIKE THAT WERE TO HAPPEN, WE COULD GET OUR PEOPLE

3   WHO WERE THERE, WITH OUR EQUIPMENT, AND WE COULD EFFECT A

4   CHANGE IMMEDIATELY.  WHEN IT WAS A THIRD-PARTY CONTRACTOR, WHO

5   DIDN'T REPORT TO US, WE HAD NO AUTHORITY.  BUT YET, WE HAD THE

6   RESPONSIBILITY.  AND IT WAS NOT A GOOD SITUATION TO HAVE THE

7   RESPONSIBILITY OF HAVING A WORLD CLASS FACILITY, BUT YET HAVING

8   NO AUTHORITY TO BE ABLE TO EFFECT THE CHANGES THAT NEEDED TO

9   HAPPEN SOMETIMES IMMEDIATELY TO GET IT CLEAN.

10  Q.   WELL, LET ME ASK YOU ABOUT THE FINANCIAL REASONS.  DID YOU

11  MAKE ANY ANALYSIS OF THE FINANCIAL IMPLICATIONS OF CHANGING THE

12  POLICY?

13  A.   YES, WE DID.

14  Q.   AND WERE YOU INVOLVED IN THAT PERSONALLY?

15  A.   YES, I WAS.

16  Q.   AND WHAT CONCLUSIONS DID YOU REACH?

17  A.   THAT WE GENERATE AN ADDITIONAL -- WE THOUGHT AROUND

18  250,000 NET PROFIT A YEAR FOR OUR BOTTOM LINE.

19  Q.   AND DID THAT FACTOR INTO YOUR RECOMMENDATION TO

20  MS. WALLACE TO CHANGE THE POLICY?

21  A.   YES, IT DID.

22  Q.   AND DID THE COMMENTS YOU MADE ABOUT SECURITY AND

23  CLEANLINESS ALSO FACTOR INTO YOUR DECISION TO RECOMMEND THAT

24  THE POLICY BE CHANGED?

25  A.   YES, THEY DID.

1  Q.   NOW AT SOME POINT ALONG THE WAY, THERE WAS A FORM CONTRACT

2  CREATED TO IMPLEMENT THIS CHANGE IN POLICY?

3  A.   YES.

4  Q.   WAS THAT SOMETHING THAT WAS PROPOSED TO THE DECORATORS?

5  A.   YES, IT WAS.

6  Q.   MAY I SEE EXHIBIT 10, PAGE 1.  IT SHOULD ALSO BE IN THAT

7  BOOK.

8          (DEFENDANT'S EXHIBIT 10 MARKED FOR IDENTIFICATION.

9          THE WITNESS:  OKAY.

10 BY MR. L'ESTRANGE:

11 Q.   IS THIS DOCUMENT WE HAVE IDENTIFIED AS EXHIBIT 10, THAT

12 FORM OF CONTRACT?

13 A.   YES, IT IS.

14 Q.   WHO CREATED THIS CONTRACT?

15 A.   IT WAS A COLLABORATIVE EFFORT, WITH MYSELF, OUR DIRECTOR

16 OF OPERATIONS, AND OUR IN-HOUSE COUNSEL, B. GEMP (PHONETIC).

17 Q.   WERE YOU INVOLVED IN DETERMINING WHAT THE ECONOMIC TERMS

18 OF THIS CONTRACT WOULD BE?

19 A.   YES, I WAS.

20 Q.   IT PROVIDES IN THERE THAT HOURLY WORK WILL BE DONE AT $17

21 AN HOUR, AND BOOTH CLEANING ON A 50/50 SPLIT; IS THAT TRUE?

22 A.   YES.

23 Q.   WHERE DID YOU COME UP WITH THOSE NUMBERS?

24 A.   THAT WAS THE INDUSTRY STANDARD.  AND IT WAS ALSO THE

25 CONTRACT THAT WE HAD HAD FOR MANY YEARS WITH GES, SINCE WE

1    OPENED IN 1989, AND WITH FREEMAN.

2    Q.   THE 50/50 SPLIT, RIGHT?

3    A.   YES.

4    Q.   BUT A DIFFERENT HOURLY RATE?

5    A.   YES.   THE HOURLY RATE HAS ADJUSTED WITH COST OF LIVING AND

6    THAT KIND OF THING OVER THE 22 YEARS.

7    Q.   LET'S GO BACK.   WHEN YOU WERE ON YOUR FIRST TOUR OF DUTY

8    AT THE SAN DIEGO CONVENTION CENTER, DID THE IN-HOUSE CLEANING

9    STAFF DO THE WORK AT THE GES SHOWS?

10   A.   YES, WE DID.

11   Q.   AND WAS THAT STILL THE CASE WHEN YOU LEFT AT THE END OF

12   YOUR FIRST TOUR OF DUTY?

13   A.   YES, IT WAS.

14   Q.   AND THEN WHEN YOU RETURNED FOR YOUR SECOND TOUR OF DUTY,

15   WAS THE CONVENTION CENTER CORP. STILL DOING THE CLEANING FOR

16   GES?

17   A.   NO, THEY WEREN'T.   WITH THE EXCEPTION OF THE ACTION SPORTS

18   RETAILER SHOW, WHICH I'VE MENTIONED WHEN I TESTIFIED BEFORE,

19   THE SHOW MANAGER WANTED TO USE OUR CLEANING STAFF BECAUSE SHE

20   HAD HAD A PROBLEM WITH UNITED NATIONAL MAINTENANCE.

21   Q.   PRIOR TO THE ACTUAL IMPLEMENTATION OF THIS POLICY, DID YOU

22   APPROACH ANYONE AT GES ABOUT THE PROSPECT THAT GES WOULD SWITCH

23   ITS CLEANING WORK BACK TO THE SAN DIEGO CONVENTION CENTER?

24   A.   IN MY SECOND TOUR OF DUTY?

25   Q.   YES.

1    A.   YES, I DID.

2    Q.   WHEN DID YOU MAKE THE FIRST SUCH APPROACH TO ANYONE AT

3    GES?

4    A.   I BELIEVE IT WAS THE LATE SPRING OF 2006, EARLY SUMMER.

5    Q.   AND TO WHOM DID YOU MAKE THAT APPROACH?

6    A.   TO LARRY COLBY, THEIR DIRECTOR OF MARKETING, WHO I HAD

7    KNOWN WELL FOR MANY YEARS, AND TO MATT KRIZ, WHO WAS WITH GES

8    AT THE TIME.

9    Q.   ANYONE ELSE?

10   A.   I BELIEVE ERICH WATSON WAS INVOLVED IN THAT --

11   Q.   DID --

12   A.   -- THOSE MEETINGS ALSO.

13   Q.   DID YOU HAVE A FACE-TO-FACE MEETING WITH THOSE THREE

14   INDIVIDUALS?

15   A.   YES, I DID.

16   Q.   WHERE DID THAT MEETING TAKE PLACE?

17   A.   THERE WERE SEVERAL MEETINGS.  THEY WOULD TAKE PLACE -- ONE

18   TOOK PLACE AT THE CONVENTION CENTER AND ANOTHER ONE TOOK PLACE

19   WHEN THEY BROUGHT THEIR REGIONAL VICE PRESIDENT DOWN.  AND WE

20   HAD LUNCH OVER AT MCCORMICK & SCHMICK'S, ACROSS THE STREET FROM

21   THE CONVENTION CENTER.

22   Q.   LET'S TALK ABOUT THE FIRST MEETINGS THAT YOU HAD BEFORE

23   THE LUNCH AT THE MCCORMICK & SCHMICK'S RESTAURANT.  WHAT DO YOU

24   REMEMBER ABOUT THE OTHER MEETINGS THAT YOU HAD WITH KRIZ AND

25   WATSON?

1    A.   WELL, IT WAS -- BECAUSE I KNEW THEM FROM -- ACTUALLY WHEN

2    I WAS WITH THE SHERATON IN THE MID '80S.   THESE FOLKS HAVE BEEN

3    IN THE INDUSTRY A LONG TIME.   I CONSIDERED THEM INDUSTRY

4    FRIENDS.   I ASKED THEM WHY WE LOST THE BUSINESS IN THE TIME

5    THAT I WAS GONE.   I BELIEVE THEY WENT TO UNITED NATIONAL

6    MAINTENANCE AROUND 2000, 2001.   AND THEY SAID IT WAS A

7    CORPORATE DECISION, THAT IT WASN'T A LOCAL DECISION.   AND

8    APPROACHED THEM ABOUT -- JUST ASKED THEM ABOUT HOW WOULD WE GO

9    ABOUT GETTING THE BUSINESS BACK.   AND THEY SEEMED VERY AMENABLE

10   TO THE IDEA, BUT THEY SAID WE NEEDED TO TALK TO TOM ROBBINS,

11   WHO WAS A FAIRLY NEW REGIONAL VP THAT THEY HAD HIRED.

12   Q.   DID YOU THEN ARRANGE A MEETING THAT INCLUDED MR. ROBBINS?

13   A.   YES, I DID.

14   Q.   IS THAT THE MEETING AT THE MCCORMICK & SCHMICK'S

15   RESTAURANT THAT YOU MENTIONED?

16   A.   YEAH.   WE MET AT MY OFFICE, AND THEN WE ALL WENT TO LUNCH

17   AFTER A BRIEF MEETING IN MY OFFICE.

18   Q.   APPROXIMATELY, WHEN DID THAT TAKE PLACE?

19   A.   IT MUST HAVE BEEN THE SUMMER OF 2006, MAYBE THE FALL OF

20   2006, SEPTEMBER-ISH, MAYBE.

21   Q.   WHO WAS IN THE MEETING IN YOUR OFFICE?

22   A.   IT WAS TONY BREDO (PHONETIC), WHO WAS OUR FACILITIES

23   MANAGER AT THE TIME, ROBERT DENOFRIO, WHO IS STILL OUR DIRECTOR

24   OF OPERATIONS, AND MYSELF.

25   Q.   THE THREE IN-HOUSE PEOPLE?

1    A.   YES.

2    Q.   YOU AND YOUR TWO SUBORDINATES.  AND WHAT DID YOU DISCUSS

3    WITH THEM IN THAT MEETING?

4    A.   AS I DESCRIBED IT, WE USED TO HAVE THE BUSINESS.  WERE

5    THERE ANY PROBLEMS WHEN WE HAD THE BUSINESS BEFORE.  AND THEY

6    INDICATED THERE WASN'T.  AND HOW WOULD WE GO ABOUT GETTING THE

7    BUSINESS IN THE FUTURE.

8    Q.   AND AT SOME POINT, YOU WENT TO LUNCH WITH ROBBINS, COLBY,

9    AND DENOFRIO?

10   A.   YES.

11   Q.   AND DID THAT LUNCHEON MEETING START IN YOUR OFFICE?

12   A.   YES, IT DID.

13   Q.   WHO WAS PRESENT IN YOUR OFFICE FOR THAT MEETING?

14   A.   WELL, FROM MY -- FROM OUR STAFF, IT WAS ROBERT DENOFRIO,

15   TONY BREDO, AND MYSELF.  AND THEN FROM THEIR SIDE, IT WAS TOM

16   ROBBINS, LARRY COLBY, AND, I BELIEVE, MATT KRIZ.

17   Q.   BUT ONLY FOUR OF YOU ENDED UP GOING TO LUNCH?

18   A.   I BELIEVE SO, YES.

19   Q.   WHAT WAS DISCUSSED IN THE PORTION OF THE MEETING THAT TOOK

20   PLACE IN YOUR OFFICE BEFORE YOU WENT TO LUNCH?

21   A.   IT REALLY WAS MORE JUST INTRODUCTIONS.  I HAD INVITED THEM

22   DOWN FOR LUNCH.  AND SO THEY CAME UP TO OUR OFFICE.  WE MET

23   OUT, ACTUALLY, IN THE LOBBY, AND THEN WE WALKED OVER TO LUNCH.

24   SO IT WAS REALLY JUST THE PRELIMINARY HELLOS AND INTRODUCTIONS.

25   Q.   SO WALKING OVER TO LUNCH WAS YOU, MR. DENOFRIO, MR. COLBY,

1   AND MR. ROBBINS?

2   A.   AND TONY BREDO.

3   Q.   SO YOU WALKED FROM YOUR OFFICE OVER TO LUNCH.   AND DID YOU

4   OBSERVE ANYTHING DURING THAT TRIP?

5   A.   YES, WE DID.   AND I REMEMBER THIS CLEARLY.   BECAUSE I HAD

6   -- IN THE LOBBY, THEY HAD -- I HAD MENTIONED TO THEM AS WE WERE

7   WALKING TO THE ELEVATOR, THAT WE REALLY COULD DO A BETTER JOB

8   FOR YOU, AND WE'RE NOT SATISFIED WITH THE LOOK OR THE CALIBER

9   OF WORK THAT UNITED NATIONAL MAINTENANCE WAS DOING.   AND AS WE

10  WALKED OUT OF THE ELEVATOR, ON THE GROUND LEVEL, THERE STOOD,

11  GOING INTO THE EXHIBIT HALL, ONE OF THE UNITED NATIONAL

12  MAINTAIN HOUSEKEEPERS, SHIRT TAIL OUT, WEARING DIRTY BLUE

13  JEANS, DIRTY TENNIS SHOES, WITH A DIRTY STAINED ORANGE TRASH

14  CAN.   AND I SAID SOMETHING TO THE EFFECT OF, THAT MAKES MY CASE

15  RIGHT THERE, MR. ROBBINS.   AND HE JUST KIND OF SHOOK HIS HEAD,

16  AND SAID SOMETHING TO THE EFFECT, I SEE WHAT YOU MEAN.

17  Q.   SO THEN YOU WENT TO LUNCH.   AND HOW LONG DID THE LUNCHEON

18  MEETING LAST?

19  A.   ABOUT AN HOUR.

20  Q.   AT ANY TIME DURING THAT LUNCHEON MEETING, DID YOU EVER

21  SUGGEST TO MR. ROBBINS THAT GES SHOULD BREACH ITS CONTRACT WITH

22  UNITED NATIONAL MAINTENANCE?

23  A.   NO, I DIDN'T.

24  Q.   DID YOU KNOW AT THE TIME YOU WENT TO THAT LUNCHEON

25  MEETING, THAT THERE WAS A CONTRACT BETWEEN GES AND UNITED?

1   A.   I HAD BEEN TOLD THERE WAS.

2   Q.   HAD YOU EVER SEEN IT?

3   A.   NO.

4   Q.   AT ANY TIME DURING THAT MEETING, AT MCCORMICK & SCHMICK'S,

5   WITH MR. ROBBINS, MR. COLBY, YOURSELF, AND MR. DENOFRIO, DID

6   YOU EVER SUGGEST THAT GES WOULD BE BETTER SERVED TO CHOOSE YOUR

7   CLEANING, AND THEY COULD HAVE THE SAME KIND OF PARTNERSHIP YOU

8   HAD WITH FREEMAN?

9   A.   ABSOLUTELY.

10  Q.   AND WHAT DID YOU TELL THEM ABOUT THAT?

11  A.   WELL, THAT WE JUST -- WE -- OUR FOLKS WERE, IN MY OPINION,

12  A HIGHER CALIBER OF INDIVIDUAL.  WE BACKGROUND CHECK AND DRUG

13  SCREEN OUR PEOPLE.  WE SPEND A LOT OF TIME AND MONEY TRAINING

14  OUR PEOPLE.  WE HAVE GOT THE EQUIPMENT THERE, SO THERE WAS THE

15  ECONOMY SCALE.  WE HAVE THE RESOURCES RIGHT THERE, WHETHER IT

16  BE OUR PEOPLE OR OUR EQUIPMENT.  AND THAT WE COULD PROBABLY

17  EVEN SAVE THEM SOME MONEY BECAUSE WE DON'T CHARGE FOR SOME

18  THINGS THAT UNITED NATIONAL MAINTENANCE CHARGE FOR; LIKE, AISLE

19  CLEANING DURING THE SHOWS, WE PROVIDE FOR FREE.  UNITED

20  NATIONAL MAINTENANCE HAS ALWAYS BILLED FOR THAT.  WE DON'T BILL

21  FOR OUR SUPERVISORS; THEY DO, THOSE KINDS OF THINGS.  SO I

22  THOUGHT WE COULD PROBABLY NOT ONLY ELEVATE THE LEVEL OF

23  CLEANING, BUT MAYBE SAVE THEM SOME MONEY.  AND HE SEEMED VERY

24  INTERESTED.

25  Q.   WHO IS THE "HE" YOU'RE TALKING ABOUT?

1    A.   TOM ROBBINS.  OF COURSE, HIS SUBORDINATES HAD INDICATED

2    THEY WERE VERY INTERESTED, AND THAT'S WHY THEY ARRANGED FOR THE

3    MEETING WITH THEIR SUPERIORS.

4    Q.   WHAT WAS THE OUTCOME OF THE MEETING WITH MR. ROBBINS AND

5    MR. COLBY?

6    A.   WELL, THE INITIAL OUTCOME WAS VERY POSITIVE.  AS WE WALKED

7    BACK, HE THANKED ME FOR MY TIME AND SAID THAT HE WAS -- HE

8    NEEDED TO -- HE DIDN'T HAVE THE AUTHORITY TO MAKE THE DECISION.

9    I DON'T REMEMBER THE EXACT WORDS, BUT OUR IMPRESSION, ROBERT

10   DENOFRIO AND TONY BREDO AND I'S IMPRESSION WAS, WE HAVE A GOOD

11   CHANCE OF GETTING THIS BUSINESS.  IT SEEMS LIKE WE -- WE WERE

12   VERY OPTIMISTIC.  BUT THAT HE NEEDED TO GET HIS CORPORATE

13   OFFICE IN LAS VEGAS TO AUTHORIZE HIM TO MAKE THE CHANGE.

14   Q.   NOW AT ANY TIME DURING THAT MEETING, DID YOU THREATEN

15   MR. COLBY OR MR. ROBBINS WITH ANY KIND OF CONSEQUENCES IF THEY

16   DID NOT ACCEPT YOUR PROPOSAL TO HAVE THE CONVENTION CENTER

17   STAFF DO THEIR CLEANING?

18   A.   ABSOLUTELY NOT.

19   Q.   DID YOU HAVE ANY FURTHER DISCUSSIONS WITH GES AFTER THIS

20   MEETING AT THE MCCORMICK & SCHMICK'S RESTAURANT?

21   A.   YES.

22   Q.   AND WHAT DISCUSSIONS WERE THOSE?

23   A.   WELL, I WASN'T HEARING BACK FROM MR. ROBBINS.  AND WHEN HE

24   LEFT, HE HAD INDICATED HE'D GET RIGHT BACK TO ME.  SO AT FIRST

25   I THOUGHT, SEVERAL WEEKS WENT BY, WELL, HE HAD SOME DIFFICULTY

1    GETTING AHOLD OF HIS SUPERIORS.  FINALLY, WE HAD A SERVICE

2    CONTRACTOR MEETING, WHERE LARRY COLBY AND MATT KRIZ WERE THERE,

3    AND I ASKED HIM, WHAT IS GOING ON, HE WON'T EVEN RETURN MY

4    CALLS, AND THEY SEEMED SOMEWHAT ASHAMED.  AND THAT THEY WOULD

5    FOLLOW-UP WITH IT.

6         A FEW DAYS LATER, I DID GET A PHONE CALL FROM MR. ROBBINS

7    SAYING THAT HE HAD BEEN TOLD BY CORPORATE THAT THEY DIDN'T --

8    THEY WEREN'T INTERESTED IN CHANGING, AND THAT THEY WERE GOING

9    TO STAY WITH UNITED NATIONAL MAINTENANCE.

10        AND IT WAS TOM ROBBINS WHO SUGGESTED TO ME, THOUGH, BUT

11   YOU MIGHT WANT TO TALK TO OUR CORPORATE YOURSELF.  IF YOU'RE

12   STILL INTERESTED, I SUGGEST YOU SPEAK TO MR. RABBIT IS WHAT HE

13   TOLD ME.

14   Q.   WHO IS MR. RABBIT?

15   A.   AT THE TIME, I BELIEVE HE WAS THE CEO.

16   Q.   THIS IS NOT --

17   A.   GES.

18   Q.   THIS IS KEVIN RABBIT?

19   A.   KEVIN RABBIT.

20   Q.   AND DID YOU PURSUE IT WITH MR. RABBIT?

21   A.   YES, I DID.  I WAS GOING TO A CONFERENCE OVER IN LAS

22   VEGAS, WHERE THEIR CORPORATE OFFICES ARE, JUST A FEW MONTHS

23   AFTER THAT.  SO I MADE ARRANGEMENTS TO MEET WITH MR. RABBIT

24   WHILE I WAS THERE.

25   Q.   AND WHAT WAS THE OUTCOME OF THAT ATTEMPTED MEETING?

1   A.   HE DIDN'T SHOW UP.  HE ENDED UP SENDING MR. BARCOSI

2   (PHONETIC), WHO WAS A SUBORDINATE OF HIS, AND A RICK RIPITO

3   (PHONETIC), WHO WAS THE GENERAL MANAGER OF GES IN LAS VEGAS.

4   Q.   AND WHAT WAS DISCUSSED AT THAT MEETING WITH THE GES

5   PEOPLE?

6   A.   THEY ESSENTIALLY CAME WITH A DIRECTOR FROM MR. RABBIT TO

7   INFORM ME THAT THEY WEREN'T INTERESTED IN CHANGING.

8   Q.   APPROXIMATELY WHEN DID THAT MEETING TAKE PLACE IN

9   LAS VEGAS?

10  A.   I BELIEVE IT WAS -- WELL, IT WAS THE IAE, SO MAYBE IN

11  JANUARY OF 2007?  I'M NOT EXACTLY SURE.

12  Q.   OKAY.  AND AFTER THAT MEETING IN LAS VEGAS, DID YOU MAKE

13  ANY OTHER ATTEMPTS TO SOLICIT THE BUSINESS OF GES?

14  A.   NO.

15  Q.   NEXT, I'D LIKE TO TURN TO CHAMPION.  AT SOME POINT, PRIOR

16  TO THE CHANGE IN POLICY, DID YOU APPROACH CHAMPION ABOUT THE

17  POSSIBILITY OF OBTAINING ITS CLEANING BUSINESS AT THE SAN DIEGO

18  CONVENTION CENTER?

19  A.   YES.  AND IT HAD BEEN ONGOING.  FOLKS HAD BEEN TALKING TO

20  CHAMPION ABOUT THAT FOR OVER A YEAR BEFORE I GOT BACK.

21  Q.   AND WHO WAS IT THAT WAS INVOLVED IN THOSE CONVERSATIONS?

22  A.   IT WAS OUR DIRECTOR OF OPERATIONS, ROBERT DENOFRIO, OUR

23  FACILITIES MANAGER AT THE TIME, TONY BREDO, AND ACTUALLY ONE OF

24  OUR SENIOR EVENT MANAGERS, DEANNE SNYDER (PHONETIC).

25  Q.   AND AT SOME POINT, WERE YOU BRIEFED ON WHAT DISCUSSIONS

1    THERE HAD BEEN WITH CHAMPION?

2    A.   YES.   IN FACT, THEY HAD TOLD ME THAT RON BROWN, FROM

3    CHAMPION, HAD INDICATED TO THEM BEFORE I CAME BACK IN FEBRUARY

4    OF '06 THAT THEY WERE GOING TO USE US ON A TRIAL BASIS FOR A

5    SHOW THAT WAS GOING TO HAPPEN IN -- I THINK IT WAS MAY OF 2006.

6    Q.   DID THAT ACTUALLY HAPPEN?

7    A.   NO.

8    Q.   SO AT WHAT POINT DID YOU BECOME INVOLVED IN THE ATTEMPT TO

9    SOLICIT BUSINESS FROM CHAMPION?

10   A.   IN APRIL OF 2006, WHEN I BECAME ASSISTANT GENERAL MANAGER.

11   Q.   WHAT DID YOU DO TO SOLICIT THE CHAMPION BUSINESS?

12   A.   WE MET WITH A JOE -- I'M DRAWING A BLANK ON JOE'S LAST

13   NAME -- WHO WAS LIKE THE OPERATIONS MANAGER FOR CHAMPION, AND

14   DISCUSSED IT WITH HIM.   AND HE SPOKE WITH RON BROWN, AND WE

15   SENT THEM A PROPOSAL.

16   Q.   A WRITTEN PROPOSAL?

17   A.   A WRITTEN PROPOSAL.

18   Q.   AND DID YOU RECEIVE A RESPONSE TO THAT?

19   A.   YES.

20   Q.   WHAT WAS THE RESPONSE?

21   A.   RECEIVED A RESPONSE FROM A MR. EPSTEIN, THAT THEY WEREN'T

22   INTERESTED IN USING OUR CLEANING; THEY WERE GOING TO STAY WITH

23   UNITED NATIONAL MAINTENANCE.

24   Q.   DID YOU HAVE, AT SOME POINT IN THAT PROCESS, HAVE ANY

25   TELEPHONE CALLS WITH MR. EPSTEIN?

1   A.   YES, I DID.

2   Q.   APPROXIMATELY, WHEN WAS THAT?

3   A.   I REMEMBER EXACTLY BECAUSE IT WAS ON MY BIRTHDAY.   IT WAS

4   SEPTEMBER 20TH, OF 2006.

5   Q.   WHO INITIATED THAT TELEPHONE CALL?

6   A.   WE HAD PLAYED PHONE TAG, LEAVING EACH OTHER MESSAGES FOR A

7   COUPLE DAYS PRIOR, AND HE ULTIMATELY ENDED UP CALLING ME.

8   Q.   HOW LONG DID THE CALL LAST?

9   A.   FIVE OR TEN MINUTES.

10   Q.   ANYONE ON THE PHONE BESIDES YOURSELF AND MR. EPSTEIN?

11   A.   NO.

12   Q.   TELL US, AS BEST YOU CAN RECALL, WHAT WAS DISCUSSED IN

13   THAT PHONE CALL?

14   A.   HE ESSENTIALLY CALLED AND SAID THAT HE COULDN'T CHANGE HIS

15   CONTRACT BECAUSE HE WAS LOCKED INTO A LONG-TERM CONTRACT WITH

16   UNITED NATIONAL MAINTENANCE.

17   Q.   WHAT DID YOU TELL HIM?

18   A.   I TOLD HIM I HAD UNDERSTOOD FROM HIS SUBORDINATES THAT HIS

19   CONTRACT WAS ACTUALLY EXPIRING OR HAD JUST EXPIRED.   AND HE

20   BECAME VERY IRRITATED WITH THAT COMMENT.

21   Q.   FOLLOWING THAT CONVERSATION, DID MR. EPSTEIN SEND YOU A

22   REDACTED COPY OF THE CONTRACT?

23   A.   YES, HE DID.

24   Q.   DID THAT REDACTED COPY BLOCK OUT ALL THE ECONOMIC TERMS?

25   A.   YES, IT DID.

1  Q.   PRIOR TO RECEIVING THAT CONTRACT, DID YOU HAVE ANY

2  KNOWLEDGE OF THE TERMS OF THE CONTRACT BETWEEN CHAMPION AND

3  UNITED?

4  A.   ONLY ON WHAT HIS SUBORDINATES HAD TOLD ME.  I HAD NEVER

5  SEEN ANY CONTRACT.

6  Q.   WHAT DID HIS SUBORDINATES TELL YOU?

7  A.   THEY TOLD US THAT, ESSENTIALLY, IT WAS IN THE PROCESS OF

8  EXPIRING.  AND THAT THERE WAS AN OPPORTUNITY HERE FOR US TO GET

9  THE CLEANING.  AND SO WHEN MR. EPSTEIN TOLD ME SOMETHING

10 DIFFERENT, I TOLD HIM THAT IS NOT WHAT I UNDERSTOOD.  HIS

11 SUBORDINATES HAD TOLD US SOMETHING DIFFERENT.  AND HE BECAME

12 IMMEDIATELY AGITATED AND SAID SOMETHING TO THE EFFECT OF, ARE

13 YOU CALLING ME A LIAR?  YOU COULD TELL HE WAS UPSET.  AND I

14 SAID, NO, I'M JUST TELLING YOU WHAT YOUR SUBORDINATES HAD TOLD

15 US, I'M NOT CALLING YOU ANYTHING.  AND HE SAID -- HE

16 ESSENTIALLY SAID, I WANT THE NAMES OF THOSE SUBORDINATES.  HE

17 JUST WAS VERY IRRITATED.  I SENSED HE WAS VERY IRRITATED WITH

18 ME AT MY SUGGESTION THAT HE WASN'T TELLING THE TRUTH, AND HE

19 WAS IRRITATED WITH HIS SUBORDINATES FOR SHARING THAT

20 INFORMATION.

21 Q.   AND THEN HE SENT YOU THE REDACTED CONTRACT?

22 A.   HIS SECRETARY DID, YES.

23 Q.   PRIOR TO THAT, HAD YOU SEEN ANY CONTRACT BETWEEN CHAMPION

24 AND UNITED NATIONAL MAINTENANCE?

25 A.   NO, I HAD NOT.

1   Q.   HAVE YOU EVER SEEN THE WRITTEN CONTRACT BETWEEN GES AND

2   UNITED NATIONAL MAINTENANCE?

3   A.   NO, I HAVE NOT.

4   Q.   SO AFTER THE TELEPHONE CALL WITH MR. EPSTEIN, DID YOU MAKE

5   ANY FURTHER EFFORTS TO SOLICIT THE BUSINESS FROM CHAMPION, THE

6   CLEANING BUSINESS?

7   A.   NO, I DID NOT.

8   Q.   DID YOU APPROACH ANY OTHER DECORATORS ABOUT THE

9   POSSIBILITY OF THEM SWITCHING THEIR CLEANING BUSINESS TO THE

10  SAN DIEGO CONVENTION CENTER CORP.?

11  A.   I PERSONALLY DID NOT, BUT MY SUBORDINATES DID.

12  Q.   PRIOR TO THE CHANGE IN POLICY, DID YOU EVER SEE ANY

13  WRITTEN CONTRACTS WITH DECORATORS, OTHER THAN THE ONE THAT YOU

14  SAW, THE REDACTED VERSION, FROM CHAMPION, LIKE BREEDY, BLANE,

15  ANY OF THE OTHERS?

16  A.   NO.

17  Q.   SO IS IT FAIR TO SAY THAT THE ONLY WRITTEN CONTRACT YOU'VE

18  SEEN BETWEEN UNITED AND ANY OF ITS DECORATOR CUSTOMERS IS THE

19  REDACTED CHAMPION CONTRACT?

20  A.   YES.

21  Q.   NOW I'M GOING TO ASK YOU ABOUT THE IMPLEMENTATION OF THIS

22  POLICY.   AT THE TIME YOU HAD THESE -- OR AT THE TIME THE POLICY

23  WAS CHANGED, DID THE SAN DIEGO CONVENTION CENTER CORP. THEN

24  HAVE IN PLACE A CONTRACT WITH FREEMAN DECORATING?

25  A.   YES.

1    Q.   I'D LIKE YOU TO TAKE A LOOK AT A COPY OF EXHIBIT 1175.

2    1175 IS IN EVIDENCE.  CAN YOU IDENTIFY THAT FOR US?

3    A.   YES.  THIS IS OUR CLEANING CONTRACT WITH SERVICE

4    CONTRACTORS.

5    Q.   WITH FREEMAN?

6    A.   I'M LOOKING FOR THE NAME OF THE -- YES, FREEMAN.

7    Q.   AND WAS THIS THE CONTRACT THAT WAS IN PLACE BETWEEN THE

8    SAN DIEGO CONVENTION CENTER CORP. AND FREEMAN AT THE TIME THE

9    POLICY CHANGED?

10   A.   YES.

11   Q.   BASICALLY, WHAT WERE THE TERMS OF THIS, THE ECONOMIC

12   TERMS?

13   A.   THAT WE WOULD DO ALL OF THE CLEANING AND THE BOOTH

14   CLEANING, PROVIDE ALL THE STAFF AND EQUIPMENT AND SUPPLIES.

15   THEY WOULD TAKE THE ORDERS AND COLLECT THE MONEY.  AND THAT WE

16   WOULD SPLIT THE BOOTH CLEANING AND SPECIALTY CLEANING REVENUES

17   50/50, AND WE WOULD BILL THEM BACK HOURLY FOR ALL OF THE OTHER

18   PRE AND POST -- OR SET UP AND TEAR DOWN CLEANING IN THE EXHIBIT

19   HALL.

20   Q.   AND DID YOU OFFER A NEW CONTRACT TO FREEMAN AFTER THE

21   CHANGE IN POLICY?

22   A.   NO.

23   Q.   DID YOU ENTER INTO -- LATER ENTER INTO A NEW CONTRACT?

24   AND IF YOU CAN LOOK AT EXHIBIT 1176.

25          (DEFENDANT'S EXHIBIT 1176 MARKED FOR IDENTIFICATION.)

1   BY MR. L'ESTRANGE:

2   Q.   THIS IS A CONTRACT WITH FREEMAN.   IT'S EFFECTIVE JULY 1,

3   2007.

4   A.   YES.

5   Q.   AND IS THIS CONTRACT WITH FREEMAN, EFFECTIVE JULY 1, 2007,

6   FOR A TERM, FOR A PERIOD OF TIME?

7   A.   YES.

8   Q.   WHAT PERIOD IS IT FOR?

9   A.   A THREE-YEAR TERM, WITH TWO ONE-YEAR OPTIONS.

10  Q.   SO THE INITIAL TERM WAS JULY 1, 2007, TO JUNE 30, 2010?

11  A.   YES.

12  Q.   HAS IT BEEN RENEWED SINCE THEN?

13  A.   YES.

14  Q.   ARE THE ECONOMIC TERMS IN THIS CONTRACT THAT FREEMAN

15  SIGNED THE SAME AS THE ECONOMIC TERMS THAT WERE OFFERED TO GES

16  AND CHAMPION?

17  A.   IDENTICAL.

18  Q.   OKAY.   HAVE YOU BILLED FREEMAN FOR THE CLEANING WORK THAT

19  HAS BEEN DONE FOR THEIR SHOWS?

20  A.   YES, WE HAVE.

21  Q.   DO THEY MAKE TIMELY PAYMENT?

22  A.   ALWAYS.

23  Q.   HAS THERE EVER BEEN A PROBLEM RECEIVING PAYMENT FROM

24  FREEMAN?

25  A.   NEVER.

1   Q.   NOW DID YOU ALSO PROVIDE SUCH A CONTRACT TO TEAM CLEAN,

2   AND I'LL HAVE YOU LOOK AT EXHIBIT 1178, WHICH IS THERE.

3   A.   YES.

4        (DEFENDANT'S EXHIBIT 1178 MARKED FOR IDENTIFICATION.)

5   BY MR. L'ESTRANGE:

6   Q.   EXHIBIT 1178 IS A CONTRACT WITH TEAM CLEAN.  IS THIS ALSO

7   FOR A TERM?

8   A.   YES, IT IS.

9   Q.   WHAT IS THE TERM ON THIS CONTRACT?

10  A.   IT IS A THREE-YEAR TERM, WITH TWO ONE-YEAR OPTIONS, JUST

11  LIKE THE FREEMAN.

12  Q.   HAS IT BEEN RENEWED?

13  A.   I DON'T KNOW IF IT HAS BECAUSE TEAM CLEAN IS RARELY IN THE

14  BUILDING.

15  Q.   NOW, FREEMAN IS A DECORATOR, AS WE'VE LEARNED HERE.

16       WHAT IS THE BUSINESS OF TEAM CLEAN?

17  A.   THEY'RE LIKE UNITED NATIONAL MAINTENANCE; THEY'RE A

18  CLEANING CONTRACTOR.

19  Q.   DID YOU APPROACH ANYONE AT TEAM CLEAN ABOUT ENTERING INTO

20  THIS CONTRACT?

21  A.   THEY APPROACHED US WHEN THEY KNEW ABOUT OUR POLICY.

22  Q.   WHO WAS IT FROM TEAM CLEAN THAT APPROACHED YOU?

23  A.   NORM YURIAS (PHONETIC), FORMERLY OF GES.

24  Q.   WHO DID HE APPROACH?

25  A.   ME.

1  Q.   AND DID HE ULTIMATELY AGREE TO ENTER INTO THIS CONTRACT?

2  A.   YES, HE DID.

3  Q.   DID HE EXPRESS ANY RESERVATION ABOUT IT?

4  A.   EARLY ON, HE DID.  BUT HE WAS VERY SATISFIED WHEN HE LEFT.

5  Q.   AND FOR THE SHOWS WHERE HE'S OCCASIONALLY IN THE BUILDING,

6  HE CONTINUES TO USE YOUR CLEANING SERVICE?

7  A.   YES.  WE CONSIDER NORM A GOOD INDUSTRY FRIEND.

8  Q.   HAVE YOU ALSO ENTERED INTO CONTRACTS WITH OTHER DECORATORS

9  TO DO THEIR CLEANING WORK AT THE BUILDING?

10  A.   YES, WE HAVE.

11  Q.   WHO OTHER DECORATORS HAVE YOU ENTERED INTO CONTRACTS WITH?

12  A.   OFF THE TOP OF MY HEAD, BREEDY.  THERE IS AT LEAST TWO OR

13  THREE OTHERS, BREEDY AND PARADISE.  I CAN'T THINK OF ANY

14  OTHERS, BUT I KNOW THERE ARE PROBABLY AT LEAST ONE OR TWO

15  OTHERS.

16  Q.   OKAY.  NOW I'D LIKE TO TALK ABOUT WORK THAT YOU DID FOR

17  GES AND CHAMPION AFTER JULY 1, 2007.  HAVE THERE BEEN ANY SHOWS

18  WHERE THE SAN DIEGO CONVENTION CENTER CORP. CLEANING CREW HAS

19  CLEANED FOR GES?

20  A.   YES.

21  Q.   AND DO YOU -- DID YOU PARTICIPATE IN ANY OF THE

22  DISCUSSIONS LEADING TO THE AGREEMENT TO HAVE GES DO THAT WORK?

23  A.   TO HAVE GES --

24  Q.   I MEAN -- EXCUSE ME, TO HAVE YOU DO THE WORK FOR GES.

25  A.   YES, EARLY ON I DID.  BUT NOW OUR FACILITIES MANAGER AND

1   DIRECTOR OF OPERATIONS ARE THE DAY-TO-DAY COORDINATORS WITH GES

2   AND WITH FREEMAN AND THE OTHERS.

3   Q.   I'D LIKE TO HAVE YOU TAKE A LOOK AT EXHIBIT 350.   AND

4   WE'LL PUT IT UP ON THE SCREEN.   THAT'S PROBABLY THE EASIEST WAY

5   TO SEE IT.

6   A.   OKAY.

7        (DEFENDANT'S EXHIBIT 350 MARKED FOR IDENTIFICATION.)

8   BY MR. L'ESTRANGE:

9   Q.   IF YOU COULD -- WHO SENT THIS TO YOU, THIS E-MAIL?   LET ME

10  GET IT FOR YOU.

11  A.   YOU KNOW, I DON'T THINK YOU NEED TO, JOHN.   THIS LOOKS

12  LIKE THE ONE THAT MATT KRIZ, WHO WAS THE ASSISTANT GENERAL

13  MANAGER AT GES, SENT THIS TO ME AFTER A SHOW, WHERE THEY WERE

14  VERY HAPPY WITH THE CLEANING THAT OUR CREWS DID.

15  Q.   THIS APPEARS TO BE FOR THE HOME AND REMODELING SHOW?

16  A.   YES.

17  Q.   IN 2007?

18  A.   SHORTLY AFTER WE IMPLEMENTED THE POLICY, YES.

19  Q.   AND HAVE YOU EVER RECEIVED AN E-MAIL FROM MR. KRIZ WHERE

20  HE HAS COMPLAINED ABOUT THE QUALITY OF WORK DONE BY THE SAN

21  DIEGO CONVENTION CENTER CORP. CLEANING CREWS?

22  A.   NO, I HAVEN'T.

23  Q.   NOW LET'S TALK ABOUT CHAMPION AND WHAT HAPPENED AFTER THE

24  CHANGE IN POLICY.   WAS THERE A PERIOD IMMEDIATELY AFTER THE

25  CHANGE IN POLICY, WHERE YOU HAD ANY DISCUSSIONS WITH

1    MR. EPSTEIN ABOUT THE POSSIBILITY OF CHAMPION DOING ITS OWN

2    CLEANING WORK?

3    A.   YES, THERE WAS.

4    Q.   AND HOW DID THAT COME ABOUT?

5    A.   IT WAS THE FIRST SHOW THAT CHAMPION WAS DOING AFTER WE

6    IMPLEMENTED THE POLICY, I BELIEVE IT WAS SPIE.  I'M NOT

7    100 PERCENT SURE OF THAT.  AND HE WAS, ESSENTIALLY, RESISTING

8    THE IMPLEMENTATION OF OUR NEW POLICY AND RESISTING THE USE OF

9    OUR EMPLOYEES.  AND SO HE WAS, VIA E-MAIL, EXCHANGING IDEAS OF

10   HOW HE COULD, ESSENTIALLY, GET AROUND OUR NEW POLICY.

11   Q.   AND WHAT IDEAS DID HE PROMOTE?

12   A.   THAT -- AT ONE POINT, WHERE HE WOULD HAVE HIS 831

13   DECORATORS ACTUALLY DO THE CLEANING BECAUSE IT WAS HIS CARPET,

14   AND HE DIDN'T WANT OUR PEOPLE CLEANING HIS CARPET.

15   Q.   WHAT WAS YOUR RESPONSE TO THAT PROPOSAL?

16   A.   WOULDN'T ALLOW IT.

17   Q.   WHAT WAS YOUR REASONING BEHIND THAT?

18   A.   THAT OUR POLICY WAS THAT ONLY OUR HOUSEKEEPERS DO ANY

19   CLEANING IN THE CONVENTION CENTER, AS THE POLICY STATED.

20   Q.   DID MR. EPSTEIN ACCEPT YOUR RESPONSE?

21   A.   ULTIMATELY HE DID.  BUT YOU COULD TELL HE WAS -- HE WAS

22   NOT HAPPY WITH IT, AND HE WAS LOOKING EVERY WAY HE COULD TO GET

23   AROUND IT.

24   Q.   IN YOUR EXPERIENCE AT THE SAN DIEGO CONVENTION CENTER, DO

25   YOU KNOW OF ANY INSTANCE WHERE A DECORATOR HAS DONE THEIR OWN

1   CLEANING?

2   A.   NO.

3   Q.   LET ME TALK NOW ABOUT YOUR RELATIONS WITH UNITED NATIONAL

4   MAINTENANCE BEFORE AND AFTER THE CHANGE IN POLICY.  BEFORE

5   JULY 1, 2007, DID YOU HAVE ANY OCCASION TO BE IN CONTACT WITH

6   ANYONE FROM UNITED ABOUT THE CLEANING WORK THEY WERE DOING AT

7   THE SAN DIEGO CONVENTION CENTER?

8   A.   JOHN, IF I CAN CLARIFY, DURING MY FIRST TOUR OF DUTY --

9   Q.   YES.

10  A.   -- I DID WORK WITH BUDDY LINN, WHO WAS A MANAGER FOR UNM

11  BACK IN 1989, '90, '91, THAT TIME PERIOD.  AND ON OCCASION, WE

12  WOULD HAVE SOME CONCERNS ABOUT THE CLEANLINESS, AND WE WOULD

13  WORK WITH BUDDY LINN AND TRY TO GET IT CORRECTED.  SO THERE WAS

14  THAT DIALOGUE BETWEEN 1989, WHEN WE OPENED, UNTIL I LEFT IN '96

15  ON OCCASION.

16  Q.   AND THEN WHEN YOU RETURNED IN 2006, FROM THE DATE OF YOUR

17  RETURN, UNTIL THE CHANGE IN POLICY, DID YOU HAVE ANY CONTACT

18  WITH ANYONE FROM UNITED?

19  A.   BUDDY LINN -- SHORTLY AFTER I GOT BACK, BUDDY LINN WAS IN

20  THE BUILDING AND CAME UP TO WELCOME ME BACK AND SAY HELLO.

21  Q.   HAVE YOU EVER -- DID YOU HAVE ANY CONTACT WITH MR. SIMON

22  DURING THAT PERIOD FROM WHEN YOU RETURNED UNTIL THE POLICY

23  CHANGED?

24  A.   NOT ON PHONE OR FACE TO FACE; IT WAS THROUGH E-MAIL.

25  Q.   AND WAS THE FIRST E-MAIL YOU RECEIVED FROM MR. SIMON IN

1    CONNECTION WITH THE ANNOUNCEMENT OF THE CHANGE IN POLICY?

2    A.   I BELIEVE SO, YES.

3    Q.   DO YOU HAVE ANY RECOLLECTION OF THOSE SPECIFIC DISCUSSIONS

4    THAT YOU HAD WITH MR. SIMON BY -- OR ANY OF THOSE E-MAILS THAT

5    YOU EXCHANGED?

6    A.   JUST THAT HE WAS ASKING FOR CLARIFICATION AND THE BASICS.

7    Q.   NOW AT SOME POINT, RIGHT AROUND WHEN THE POLICY CHANGED,

8    YOU'VE TESTIFIED THAT YOU DID HAVE SOME TELEPHONE CONVERSATIONS

9    WITH MR. SIMON; IS THAT RIGHT?

10   A.   I'M SORRY, WHAT TIME PERIOD?

11   Q.   YOU TESTIFIED THAT YOU HAD PHONE CONVERSATIONS WITH

12   MR. SIMON.

13   A.   NOT AFTER I RETURNED IN 2006.

14   Q.   DID YOU HAVE ANY FACE-TO-FACE MEETINGS WITH HIM?

15   A.   NO.

16   Q.   DID YOU HAVE ANY -- IN ANY OTHER COMMUNICATIONS YOU HAD

17   WITH MR. SIMON, WHETHER THEY WERE FACE TO FACE, ON THE

18   TELEPHONE, BY E-MAIL, OR BY WHATEVER MEANS, DID HE EVER OFFER

19   TO PROVIDE A LIVE SCAN FINGERPRINT MACHINE FOR THE SAN DIEGO

20   CONVENTION CENTER?

21   A.   NO.  AND THAT IS SOMETHING I WOULD DEFINITELY REMEMBER IF

22   HE HAD.

23   Q.   HAS THE CONVENTION CENTER EVER CONSIDERED USING A LIVE

24   SCAN FINGERPRINT MACHINE?

25   A.   I BELIEVE IT HAS BEEN DISCUSSED WHEN CHUCK GUTENSOHN WAS

1   OUR ASSET PROTECTION MANAGER, BUT WE HAVE NOT IMPLEMENTED IT.

2   Q.   NOW LET ME SHOW YOU ONE OF THE ONE-SHOW CONTRACTS, AND

3   I'LL SHOW YOU EXHIBIT 1046.

4        (DEFENDANT'S EXHIBIT 1046 MARKED FOR IDENTIFICATION.)

5   BY MR. L'ESTRANGE:

6   Q.   IS THAT IN THE BOOK YOU HAVE?  IF NOT, I'LL GET IT FOR

7   YOU.

8   A.   NO, IT IS NOT.

9   Q.   I'LL JUST PUT IT UP ON THE SCREEN HERE.  THIS IS, I'LL

10  REPRESENT TO YOU, A ONE SHOW CONTRACT BETWEEN THE SAN DIEGO

11  CONVENTION CENTER CORP. AND UNITED FOR THE ROCK AND ROLL

12  MARATHON SHOW.  ARE YOU FAMILIAR WITH THAT SHOW?

13  A.   YES, I AM.

14  Q.   DID -- AT SOME POINT, YOU HAD DISCUSSIONS WITH MR. SIMON

15  ABOUT A FORM OF CONTRACT THAT WOULD BE USED SO THAT UNITED

16  CONTINUED TO SERVICE ITS CUSTOMERS WITH CLEANING SERVICES IN

17  THE BUILDING?

18  A.   YES.

19  Q.   AND DID YOU MAKE A PROPOSAL TO MR. SIMON?

20  A.   YES.

21  Q.   WHAT DID YOU INITIALLY PROPOSE TO HIM?

22  A.   THE SAME TERMS THAT WE HAD WITH FREEMAN AND ALL THE

23  OTHERS, AND THAT IS, AN INITIAL THREE-YEAR CONTRACT, WITH TWO

24  ONE-YEAR OPTIONS.

25  Q.   AND WHAT WAS HIS RESPONSE?

1   A.   HE WASN'T INTERESTED IN THAT.   HE WANTED A SHOW-BY-SHOW

2   CONTRACT.

3   Q.   DID YOU ACCOMMODATE HIM ON THAT?

4   A.   WE DID.   THERE WAS A LOT OF CONCERN BECAUSE IT CREATES A

5   LOT MORE WORK FOR OUR LEGAL STAFF AND FOR MY OPERATIONS STAFF,

6   OBVIOUSLY, BECAUSE WE'RE NOW DOING NINETY CONTRACTS AS OPPOSED

7   TO ONE.   BUT YES, WE ACCOMMODATED IT.

8   Q.   SO PERIODICALLY, THESE CONTRACTS ARE SIGNED BY SOMEONE AT

9   THE CONVENTION CENTER AND BY MR. SIMON, AND THEY GO IN THE FILE

10  FOR THE SHOW?

11  A.   THEY'RE SIGNED BY ME AND MR. SIMON.

12  Q.   ARE ALL OF THESE CONTRACTS THE SAME?

13  A.   YES.

14  Q.   SAME TERMS?

15  A.   YES.

16  Q.   NOW DID THERE COME A POINT IN TIME WHEN YOU HAD A PROBLEM

17  WITH MR. SIMON, AND UNITED PAYING THE BILLS FOR WORK THAT WAS

18  DONE PURSUANT TO THESE CONTRACTS?

19  A.   A NUMBER OF TIMES.

20  Q.   AT SOME POINT, DID THE ACCOUNT RECEIVABLE BECOME SO LARGE

21  THAT YOU ACTUALLY PROHIBITED UNITED FROM COMING INTO THE

22  BUILDING?

23  A.   IT WAS OVER $150,000 IN ARREARS, YES.

24  Q.   DID YOU PARTICIPATE IN THE DECISION TO EXCLUDE UNITED FROM

25  THE BUILDING UNTIL IT BROUGHT THE ACCOUNT CURRENT?

1   A.   YES, I DID.

2   Q.   AND WHAT REQUIREMENT, IF ANY, DID YOU IMPOSE AS A

3   CONDITION TO UNITED RETURNING TO THE BUILDING?

4   A.   THEY WOULD HAVE TO PAY THEIR AMOUNT, WHICH BY THAT TIME,

5   WAS OVER $250,000, 150,000 OF IT WAS LATE.  AND THEY HAD TO BE

6   PAID IN FULL, AND THEY HAD TO LEAVE A 25- -- OR GIVE US A

7   $25,000 RETAINER DEPOSIT SO THAT IF THERE WERE ANY ISSUES AGAIN

8   IN THE FUTURE, WE COULD DEBIT IT OUT OF THAT $25,000 DEPOSIT.

9   Q.   AND ARE YOU -- HAVE YOU EVER HAD A PROBLEM WITH ANY OTHER

10  DECORATOR, OR TEAM CLEAN, IN REGARD TO THEM NOT PAYING THEIR

11  BILLS ON TIME?

12  A.   NOT ONE.

13  Q.   THIS IS SOMETHING THAT HAS ONLY OCCURRED WITH RESPECT TO

14  UNITED?

15  A.   YES.

16  Q.   HOW LONG WERE THEY EXCLUDED FROM THE BUILDING BEFORE THEY

17  WERE PERMITTED TO RETURN?

18  A.   IT WASN'T A VERY LONG TIME.  I THINK IT WAS A FEW MONTHS.

19  Q.   BUT EVENTUALLY, THEY DID COME BACK?

20  A.   YES, THEY DID.  AND I DON'T BELIEVE THEY MISSED ANY SHOWS.

21  I'M NOT CERTAIN OF THAT.  I THINK IT WAS A PERIOD OF TIME WHERE

22  NONE OF THE SERVICE CONTRACTORS THEY HAD AGREEMENTS WITH WERE

23  SERVICING ANY OF THE SHOWS.  THEY WERE MOSTLY FREEMAN SHOWS,

24  AND WE ALREADY HAD A CONTRACT WITH THEM.

25  Q.   NOW SINCE THE CHANGE IN POLICY, HAVE ANY OF THE

1    SUPERVISORS FROM UNITED BEEN DENIED ACCESS TO THE BUILDING?

2    A.   NOT THAT I'M AWARE.

3            THE COURT:  IS THIS A GOOD SPOT TO MAYBE INTERRUPT

4    FOR A BREAK?

5            MR. L'ESTRANGE:  YES.

6            THE COURT:  ALL RIGHT.  IT IS 2:00.  LADIES AND

7    GENTLEMEN, WHY DON'T WE TAKE 15 MINUTES, SINCE WE HAD A LONGER

8    NOON BREAK THAN I THOUGHT WE WOULD BE.  AND BE BACK AT 2:15 FOR

9    THE CONTINUATION OF MR. GESSNER'S TESTIMONY.  AND REMEMBER THE

10   ADMONITION ABOUT MAKING UP YOUR MIND AND DISCUSSING IT.  WE'LL

11   SEE YOU IN 15 AND CONTINUE ON.

12                   (JURY EXITS COURTROOM.)

13           THE COURT:  THE JURY IS ON ITS BREAK.  ANYTHING WE

14   NEED TO TAKE UP BEFORE WE TURN OUR ATTENTION TO YOURS?

15           MR. L'ESTRANGE:  NO, YOUR HONOR.

16           THE COURT:  ALL RIGHT.  WE'LL SEE YOU AT 2:15.  WE'LL

17   BE IN RECESS UNTIL THEN.

18                   (RECESS TAKEN.)

19           THE CLERK:  PLEASE REMAIN SEATED AND COME TO ORDER.

20           THE COURT:  WE'RE BACK ON THE RECORD WITH OUR JURY,

21   COUNSEL, AND PARTIES.

22      MR. GESSNER, YOU CAN HAVE A SEAT, SIR, AND WE'LL CONTINUE

23   WITH YOUR EXAMINATION.

24      MR. L'ESTRANGE?

25           MR. L'ESTRANGE:  I HAVE NO FURTHER QUESTIONS, YOUR

1    HONOR.

2            THE COURT:  ALL RIGHT, THEN, MR. LANCE, WOULD YOU

3    LIKE TO CROSS-EXAMINATION?

4            MR. LANCE:  THANK YOU, YOUR HONOR.

5                        CROSS-EXAMINATION

6    BY MR. LANCE:

7    Q.  GOOD AFTERNOON, MR. GESSNER.

8    A.  HELLO.

9    Q.  MR. GESSNER, YOU JUST TESTIFIED THAT YOU WERE IN CHARGE OF

10   SECURITY FROM THE TIME YOU BECAME THE ASSISTANT GENERAL MANAGER

11   IN APRIL 2006, TO THE PRESENT, CORRECT?

12   A.  YES.

13   Q.  AND I TOOK YOUR DEPOSITION ON JULY 14TH, 2009; DO YOU

14   RECALL THAT?

15   A.  YES, I DO.

16   Q.  AND IF YOU WANT TO REFRESH YOUR RECOLLECTION OF THE DATE,

17   THE TRANSCRIPT IS BEHIND YOU.  BUT I'LL REPRESENT TO YOU THE

18   DATE WAS JULY 14, 2009, OKAY?

19   A.  OKAY.

20   Q.  SO THAT WAS TWO YEARS AFTER THIS POLICY WAS IMPLEMENTED,

21   CORRECT?

22   A.  YES.

23   Q.  AND YOU SAID YOU WERE PART OF THE PROCESS WHEN IT WAS

24   DISCUSSED AS TO WHY THIS POLICY WAS GOING TO BE IMPLEMENTED,

25   CORRECT?

1   A.   YES.

2   Q.   AND THERE WERE DISCUSSIONS BETWEEN YOU AND OTHER PEOPLE AT

3   THE CONVENTION CENTER AS TO WHY YOU SHOULD IMPLEMENT THIS

4   POLICY?

5   A.   YES.

6   Q.   AND ONE OF THE REASONS THAT WAS DISCUSSED WAS THAT YOU

7   WANTED TO INCREASE SECURITY AT THE CONVENTION CENTER, CORRECT?

8   A.   ENHANCE SECURITY.

9   Q.   ENHANCE SECURITY.  AND YOU WERE IN CHARGE OF SECURITY

10  DURING THE TIME PERIOD YOU WERE HAVING THESE DISCUSSIONS ABOUT

11  WHETHER YOU WERE GOING TO IMPLEMENT THE POLICY IN 2007?

12  A.   YES.

13  Q.   SO CERTAINLY, YOU WEIGHED IN ON THIS ISSUE?

14  A.   YES.

15  Q.   BEING IN CHARGE OF SECURITY, YOU CERTAINLY WOULD BE THE

16  PRIMARY PERSON AT THE CONVENTION CENTER, THE BUCK STOPPED WITH

17  YOU ON SECURITY ISSUES, CORRECT?

18  A.   THE BUCK STOPPED WITH ME AND ACTUALLY WITH CAROL, BUT I

19  WAS INVOLVED, ALONG WITH MY SUBORDINATES, THAT HAD THE

20  EXPERTISE, LIKE CHUCK GUTENSOHN, WHO IS THE MANAGER OF ASSET

21  PROTECTION.

22  Q.   AND MS. WALLACE TESTIFIED THAT SHE LOOKED TO YOU TO HANDLE

23  THE SECURITY ISSUES, TO BE IN CHARGE OF THAT FOR THE CONVENTION

24  CENTER.

25  A.   YES.

1  Q.   SO WHEN I ASKED YOU QUESTIONS IN DEPOSITION IN JULY OF

2  2009, ABOUT, SIR, WHY WOULD YOU IMPLEMENT THIS POLICY FOR

3  SECURITY REASONS WHEN UNITED AND TEAM CLEAN, THE TRADE SHOW

4  CLEANING COMPANIES, ARE ONLY 5 PERCENT OF THE WORKFORCE; DO YOU

5  REMEMBER THOSE QUESTIONS?

6  A.   VAGUELY, YES.

7  Q.   VAGUELY?

8  A.   IT WAS TWO YEARS AGO, YES.

9  Q.   I'VE TALKED TO YOU ABOUT IT LAST WEEK OR TWO WEEKS AGO,

10 RIGHT?

11 A.   YES.

12 Q.   OKAY.  SO I ASKED YOU THAT QUESTION, AND YOUR RESPONSE

13 WAS, WELL, YOU KNOW, THERE ARE OTHER PEOPLE THAT ARE

14 RESPONSIBLE FOR THE VETTING OF THESE AND DOING CRIMINAL

15 BACKGROUND CHECKS.  THE UNIONS DO THAT, RIGHT.  WE'VE DELEGATED

16 THAT RESPONSIBILITY TO THE UNIONS FOR ALL OF THOSE UNION

17 WORKERS THAT WORK THOSE SHIFTS.  DO YOU RECALL THAT?

18 A.   I DON'T REMEMBER IF THOSE WERE MY EXACT WORDS, BUT

19 SOMETHING TO THAT EFFECT.

20 Q.   DO WE NEED TO GO TO THE DEPO OR --

21 A.   IT IS UP TO YOU, SIR.

22 Q.   OKAY, LET'S DO IT.  WHY DON'T YOU TAKE A LOOK AT YOUR

23 DEPOSITION, PAGE 228.

24 A.   IS THIS VOLUME I OR --

25 Q.   YEAH, VOLUME I.  228, LINE 7, OF VOLUME I.  AND THIS IS

1  JULY 13, 2009.  AND I THINK I SAID JULY 14, 2009.

2  A.   I'M SORRY, DID YOU SAY PAGE 228?

3  Q.   YES.  THAT IS NOT IN VOLUME I.

4  A.   MAYBE IT'S IN VOLUME II?

5  Q.   NO, IT'S IN VOLUME I.  LET ME SEE IF I CAN HELP YOU, SIR.

6       SO LET'S TAKE A LOOK AT EXHIBIT -- I'M SORRY, YOUR

7  DEPOSITION ON JULY 13, 2009, PAGE 228, LINE 7.

8  A.   YES.

9  Q.   AND SO WE WERE TALKING ABOUT A SPECIFIC DECLARATION FROM

10  MARTY CYMBAL; DO YOU KNOW WHO HE IS?

11  A.   YES, I DO.

12  Q.   HE'S WITH FREEMAN?

13  A.   YEAH.  HE'S THE VICE PRESIDENT OF FREEMAN OUT OF ANAHEIM.

14  Q.   AND HE SUPERVISES SHOWS AT THE CONVENTION CENTER?

15  A.   HE'S IN CHARGE OF THOSE SOUTHERN CALIFORNIA -- OR

16  ACTUALLY, CALIFORNIA.  BUT HE'S VERY RARELY AT THE CONVENTION

17  CENTER.  JOHN GIORDANO IS OUR MAIN CONTACT IN SAN DIEGO FOR

18  FREEMAN.

19  Q.   OKAY.  SO ON PAGE 228, LINE 7, I ASKED YOU THE QUESTION,

20  OKAY, OTHER THAN THE SAN DIEGO CONVENTION CENTER EMPLOYEES, WAS

21  THERE A PROCEDURE IN JANUARY 2008 FOR HIRING OR SCREENING OF

22  WORKERS?

23       ANSWER:  I DON'T KNOW THAT THERE IS A PROCEDURE, BUT I

24  BELIEVE THERE IS -- THERE IS AN AGREEMENT, AND THAT'S THROUGH

25  THAT, AS I MENTIONED EARLIER, A MEMO OF UNDERSTANDING WITH THE

1   TRADE UNIONS THAT PROVIDE THE EMPLOYEES THAT MR. CYMBAL AND

2   OTHER SERVICE CONTRACTORS WOULD HIRE.

3       IT GOES ON, THIS SAYS -- AND I'M LOOKING AT MR. CYMBAL'S

4   DECLARATION -- THIS SAYS, MR. CYMBAL GOES ON TO STATE THAT THE

5   CONVENTION CENTER, QUOTE, HAS NO ENFORCED POLICY REQUIRING

6   WORKERS AT THE SAN DIEGO CONVENTION CENTER TO HAVE PROPER

7   PAPERWORK, OR TO SUBMIT TO BACKGROUND CHECKS FOR FELONY

8   CONVICTIONS, OR DRUG SCREENS.  DO YOU AGREE WITH THAT?

9       YOUR ANSWER WAS NO, CORRECT?

10  A.   CORRECT.

11  Q.   AND YOU GO ON AFTER THAT, ON PAGE 229, LINE 9, AND WE TALK

12  ABOUT THAT, WHAT MAKES YOU -- THE QUESTION IS, AND WHAT MAKES

13  YOU THINK THE UNIONS HAVE DONE SUCH CHECKS?  BECAUSE I BELIEVE

14  IT'S LISTED IN OUR MEMO OF UNDERSTANDING WITH THE UNIONS THAT

15  ARE SIGNED AS AN AGREEMENT WITH THE UNIONS.

16      AND THAT'S WHAT YOU WERE TALKING ABOUT -- WAS THAT YOUR

17  TESTIMONY, SIR?

18  A.   YES, IT WAS.

19  Q.   AND THAT IS WHAT YOU WERE TALKING ABOUT WITH --

20          MR. L'ESTRANGE:  EXCUSE ME, I REQUEST UNDER RULE 106

21  THAT THE CHANGE BE READ.  THAT TESTIMONY HAS BEEN CHANGED.

22          MR. LANCE:  I'M GOING TO --

23          THE COURT:  IT LOOKS LIKE WE'RE RIGHT ABOUT THERE.

24  SO YOU CAN RENEW THE OBJECTION IF WE DON'T GET THERE.  SO

25  OVERRULED FOR NOW.

BY MR. LANCE:

Q.   AND YOU DID CHANGE THAT TESTIMONY?

A.   I DID.

Q.   BUT BEFORE YOU CHANGED THE TESTIMONY, I TOOK YOUR
DEPOSITION ON THE NEXT DAY; DO YOU REMEMBER THAT?

A.   OH, I DO.

Q.   A LOT OF FUN.

A.   IT WAS.

Q.   SO THE NEXT DAY, LET'S TAKE A LOOK AT VOLUME II.  I'LL SEE
IF I CAN HELP YOU.  YOU WERE LUCKY ENOUGH TO SPEND ANOTHER DAY
WITH ME IN JULY OF 2009.  AND ON PAGE 265, SIR, TAKE A LOOK AT
THAT.

      IT SAYS, YESTERDAY, I WAS -- I'M SORRY, 265, LINE 21,
YESTERDAY, I WAS ASKING YOU SOME QUESTIONS ABOUT THE EMPLOYEES
WHO WORK IN THE CENTER THAT ARE HIRED THROUGH LABOR UNIONS.  DO
YOU RECALL THOSE QUESTIONS?

      ANSWER:  YES.

      AND YOU INDICATED YOU BELIEVED THAT THE LABOR UNIONS WERE
PERFORMING BACKGROUND CHECKS AND DRUG SCREENS FOR THOSE
EMPLOYEES.

      ANSWER:  I DON'T KNOW IF THEY'RE DOING DRUG SCREENS.  I DO
BELIEVE THAT THEY'RE DOING, OR ARE REQUIRED TO DO, BACKGROUND
CHECKS THROUGH THE MEMO OF UNDERSTANDING.

      THEN I GO DOWN TO PAGE 266, LINE 12, AND I ASK YOU SOME
DETAILS ABOUT THIS.  I SAID, AND WHAT TYPE OF BACKGROUND CHECKS

1  DO YOU UNDERSTAND THAT THE LABOR UNIONS ARE REQUIRED TO PERFORM

2  WHEN THEY ARE -- WHEN THEY'RE HIRING, OR WHEN THEY'RE SUPPLYING

3  INDIVIDUALS TO WORK AT THE CONVENTION CENTER?

4      ANSWER:  WELL, IT IS MY UNDERSTANDING THAT IT'S A CRIMINAL

5  BACKGROUND CHECK.  AND SO --

6          MR. L'ESTRANGE:  EXCUSE ME --

7  BY MR. LANCE:

8  Q.  -- IN JULY OF 2009, THAT WAS YOUR TESTIMONY.  AND YOU

9  LATER CHANGED THAT BECAUSE YOU FOUND OUT THE LABOR UNIONS WERE

10 NOT DOING BACKGROUND CHECKS?

11 A.  I FOUND OUT OUR MEMO OF UNDERSTANDING DID NOT REQUIRE THEM

12 TO DO THAT.

13         MR. L'ESTRANGE:  EXCUSE ME, UNDER 106, I WOULD

14 REQUEST THAT THE PRECEDING QUESTIONS AND ANSWERS ON 265 BE READ

15 TO PUT THIS IN CONTEXT.  AND THIS WOULD BE 265-12 THROUGH

16 265-20.

17         MR. LANCE:  YOUR HONOR, I HAVE NO PROBLEM DOING THAT.

18         THE COURT:  OKAY, GO AHEAD AND READ THAT, MR. LANCE.

19 I'LL SUSTAIN THE OBJECTION.  AND GO AHEAD AND READ THAT

20 PORTION.

21 BY MR. LANCE:

22 Q.  SO IN BETWEEN THERE, WHEN WE ARE ASKING -- WHEN WE ARE

23 TALKING ABOUT THIS IN JULY 14, 2009, YOU SAY -- I ASKED YOU,

24 WHO WOULD BE THE MOST KNOWLEDGEABLE AT THE CONVENTION CENTER

25 ABOUT WHAT IS REQUIRED OF THE LABOR UNIONS CONCERNING

1    BACKGROUND CHECKS, AND/OR DRUG SCREENS, AND YOU SAID TOM

2    MAZZOCCO?

3    A.   YES.

4    Q.   AND MR. MAZZOCCO HAD TESTIFIED THAT THE LABOR UNIONS DID

5    NOT DO BACKGROUND CHECKS, CORRECT?

6    A.   I DON'T KNOW WHAT HIS TESTIMONY IS.

7    Q.   OKAY.  WELL, CERTAINLY, SOMETIME AFTER I TOOK YOUR

8    DEPOSITION ON THOSE TWO DAYS, YOU FOUND OUT THAT THE LABOR

9    UNIONS WEREN'T DOING BACKGROUND CHECKS?

10   A.   NO.  I WENT BACK AND READ THE MEMO OF UNDERSTANDING AND

11   SAW THAT IT WASN'T REQUIRED IN MOU.  I'M STILL NOT SURE WHETHER

12   THEY'RE DOING THEM THEMSELVES OR NOT.  THEY MIGHT BE.

13   Q.   SIR, AS THE HEAD OF SECURITY OF THE SAN DIEGO CONVENTION

14   CENTER, ARE YOU TELLING ME THAT YOU DON'T KNOW WHETHER THE

15   LABOR UNIONS DO BACKGROUND CHECKS TODAY?

16   A.   THAT'S EXACTLY WHAT I'M TELLING YOU.

17   Q.   SO NO ONE HAS TOLD YOU ABOUT THE TESTIMONY FROM PEOPLE AT

18   THE CONVENTION CENTER, OR THE UNION MEMBERS WHO CAME IN HERE TO

19   TESTIFY, AND SAID, THE LABOR UNIONS HAVE NEVER DONE BACKGROUND

20   CHECKS; YOU DON'T KNOW THAT?

21   A.   NO ONE HAS TOLD ME THAT THE LABOR UNIONS NEVER DO

22   BACKGROUND CHECKS, NO.

23   Q.   SO WE KNOW TWO YEARS AFTER THIS POLICY, YOU DIDN'T KNOW

24   WHETHER THE MAJORITY OF THE WORKERS AT THE CONVENTION CENTER

25   HAD BACKGROUND CHECKS, AND EVEN AS YOU SIT HERE TODAY, YOU

1  DON'T KNOW WHETHER THE MAJORITY OF THE WORKERS THAT WORK ON THE

2  TRADE SHOW AT YOUR CONVENTION CENTER HAVE HAD CRIMINAL

3  BACKGROUND CHECKS?

4  A.  I KNOW THAT ALL OF MY EMPLOYEES THAT WORK FOR THE SAN

5  DIEGO CONVENTION CENTER CORPORATION HAVE BEEN DRUG SCREENED AND

6  BACKGROUND CHECKED.  I DON'T KNOW IF THE SERVICE CONTRACTORS

7  REQUIRE IT INDIVIDUALLY.  I DO KNOW THAT IN OUR APPROVED

8  SECURITY PROGRAM, WE REQUIRE THAT THEIR EMPLOYEES BE BACKGROUND

9  CHECKED, SO THAT PART I DO KNOW.  BUT I COULD NOT TELL YOU, AND

10 I'M TRYING TO BE RESPONSIVE TO YOUR QUESTION, WHETHER THE

11 SERVICE CONTRACTORS REQUIRE THEIR EMPLOYEES TO BE BACKGROUND

12 CHECKED OR NOT.  I DON'T KNOW THAT.

13 Q.  OKAY.  SO ONE OF THE REASONS YOU IMPLEMENT THIS POLICY IS

14 BECAUSE YOU WANT TO INCREASE SECURITY AND USE TRADE SHOW

15 CLEANING WORKERS THAT HAVE HAD BACKGROUND CHECKS; THAT'S BEEN

16 YOUR TESTIMONY?

17 A.  YES.

18 Q.  OKAY.  HOWEVER, ALMOST FOUR YEARS AFTER YOU'VE IMPLEMENTED

19 THAT POLICY, AND GIVEN THAT AS A REASON, YOU STILL DON'T KNOW

20 WITH -- WHETHER A MAJORITY OF THE WORKERS IN YOUR CONVENTION

21 CENTER, DURING A TRADE SHOW OR CONVENTION, HAVE BEEN BACKGROUND

22 CHECKED; IS THAT YOUR TESTIMONY?

23 A.  I THINK THE WAY YOU'RE ASKING THE QUESTION IS UNCLEAR.  I,

24 FRANKLY, THINK THE MAJORITY OF THE EMPLOYEES THAT ARE WORKING

25 IN THE CONVENTION CENTER HAVE BEEN BACKGROUND CHECKED.  BECAUSE

1  I THINK, MORE OFTEN THAN NOT, THE MAJORITY OF THE EMPLOYEES

2  THAT ARE IN THE CONVENTION CENTER WORK FOR OUR CORPORATION.

3  AND I KNOW THAT THEY'VE BEEN BACKGROUND CHECKED AND DRUG

4  SCREENED.

5  Q.   SO THAT'S INCONSISTENT WITH THE TESTIMONY THAT YOU GAVE

6  EARLIER, THAT OVER 50 PERCENT OF THE WORKERS DURING THE TYPICAL

7  TRADE SHOW WOULD BE LABOR UNION WORKERS?

8  A.   50 PERCENT OF THE EMPLOYEES THAT ARE ON THE TRADE SHOW

9  FLOOR.

10  Q.   OH, OKAY.  SO THAT IS -- THE TRADE SHOW FLOOR IS WHERE THE

11  DECORATORS, THE RIGGERS, THE ELECTRICIANS, AND THE CLEANING

12  WORKERS WORK, CORRECT?

13  A.   YES.  WE HAVE 2.6 MILLION SQUARE FEET; 525,000 OF IT IS

14  EXHIBIT SPACE.

15  Q.   AND WHAT IS AT ISSUE HERE IS WHETHER UNITED NATIONAL

16  MAINTENANCE, AND TEAM CLEAN, AND CENTURY, WERE A SECURITY RISK

17  ON THE TRADE SHOW FLOOR WHERE THEY'RE PERFORMING THEIR WORK?

18  A.   WELL, WITHIN THE BUILDING ITSELF.  ONCE YOU'RE IN THE

19  BUILDING, YOU'RE INSIDE THE ENVELOPE.

20  Q.   AND, OF COURSE, A HIGH PERCENTAGE OF THOSE WORKERS THAT

21  ARE WORKING ON THE TRADE SHOW FLOOR ARE UNION WORKERS?

22  A.   YES, THEY ARE.

23  Q.   MR. L'ESTRANGE ASKED YOU SOME QUESTIONS ABOUT EVENT

24  SECURITY AND WHY THE SAN DIEGO CONVENTION CENTER DIDN'T TAKE

25  IN -- TAKE IN-HOUSE THE EVENT SECURITY SERVICES; DO YOU RECALL

1    THAT?

2    A.   YES.

3    Q.   AND I WROTE MY NOTES DOWN, YOU SAID YOU WERE CONCERNED

4    BECAUSE THE LIVING WAGE ORDINANCE WOULD MAKE IT MORE EXPENSIVE

5    FOR THE SHOW MANAGERS, CORRECT?

6    A.   YES.

7    Q.   AND THE SHOW MANAGERS ARE YOUR CUSTOMERS, CORRECT?

8    A.   YES, THEY ARE.

9    Q.   CAN YOU PULL UP 872, PLEASE.  SO WE'VE SEEN THIS OVER AND

10   OVER, BUT THIS -- THE TRADE SHOW MANAGERS ARE HERE; THEY'RE

11   YOUR CUSTOMERS.  AND SO FROM AN EVENT SECURITY STANDPOINT, YOU

12   WERE CONCERNED THAT IF YOU TOOK THE EVENT SECURITY IN-HOUSE,

13   THAT IT WOULD BE MORE EXPENSIVE TO THE TRADE SHOW MANAGERS, AND

14   THEY WOULD COMPLAIN ABOUT THAT, CORRECT?

15   A.   YES.

16   Q.   AND THE CONVENTION CENTER DOESN'T COMPETE WITH ANYONE FOR

17   SECURITY SERVICES, DO THEY?

18   A.   WE'RE NOT PROVIDING EVENT SECURITY SERVICES.

19   Q.   SO THAT'S NOT SOMETHING YOU COMPETE IN AND WHERE YOU GET

20   REVENUES DURING A SHOW?

21   A.   CORRECT.

22   Q.   NOW YOU ALSO RECEIVED COMPLAINTS FROM THOSE SAME PEOPLE,

23   THE TRADE SHOW MANAGERS, WHEN YOU IMPLEMENTED THIS POLICY,

24   CORRECT?

25          MR. L'ESTRANGE:   OBJECTION.   MOTION IN LIMINE RULING.

1       THE COURT:  TRADE SHOW MANAGERS, OVERRULED.

2   BY MR. LANCE:

3   Q.  ISN'T THAT TRUE, SIR?

4   A.  I RECEIVED SOME LETTERS FROM SOME --

5       THE COURT:  HOLD ON.  WE'RE TALKING ABOUT TRADE SHOW

6   MANAGERS AS OPPOSED TO ANYBODY ELSE.  AREN'T THEIR LETTERS PART

7   OF THAT?

8       MR. LANCE:  YES, YOUR HONOR.

9       THE COURT:  OKAY.  SO I'M GOING TO REVERSE MYSELF AND

10  SUSTAIN THE OBJECTION.  YOU CAN BE SPECIFIC AS TO, PERHAPS,

11  MR. MCAVOY OR SOMETHING THAT'S IN EVIDENCE.

12      MR. LANCE:  I UNDERSTAND THAT THE LETTERS DON'T COME

13  IN, BUT I CAN CERTAINLY ASK HIM IF HE'S RECEIVED THESE

14  COMPLAINTS FROM THEM?

15      THE COURT:  WELL, FROM A GENERAL STANDPOINT, I'LL

16  ALLOW IT.

17      MR. LANCE:  OKAY.

18      THE COURT:  BUT NOT SPECIFICS.

19  BY MR. LANCE:

20  Q.  SIR, YOU CERTAINLY RECEIVED COMPLAINTS FROM YOUR CUSTOMERS

21  ABOUT THIS POLICY WHEN IT WAS IMPLEMENTED, CORRECT?

22  A.  VERY FEW.

23  Q.  OKAY.  DID YOU RECEIVE COMPLAINTS?

24  A.  SURE.  VERY FEW.

25  Q.  WHEN YOU SAY "VERY FEW," HOW MANY ARE YOU TALKING ABOUT?

1   A.   MAYBE ONE OR TWO FROM ACTUAL CLIENTS OF OURS.

2   Q.   OKAY, WHEN YOU SAY "ACTUAL CLIENTS," WHAT DO YOU MEAN BY

3   THAT?

4   A.   SOMEBODY WHO HAS BEEN UNDER CONTRACT WITH US, THAT

5   ACTUALLY WE'VE DONE BUSINESS WITH BEFORE.

6   Q.   OKAY.  AND CERTAINLY IF A TRADE SHOW MANAGER OR TRADE

7   ASSOCIATION WAS INTERESTED IN DOING BUSINESS WITH YOU,

8   POTENTIALLY, YOU WOULD -- YOU WOULD COURT THEM, AND YOU WOULD

9   WANT TO TRY TO MAKE YOUR CONVENTION CENTER ATTRACTIVE TO THEM?

10  A.   OH, ABSOLUTELY.

11  Q.   OKAY.  SO IT'S NOT JUST PEOPLE WHO HAVE ACTUALLY DONE

12  BUSINESS WITH YOU; YOU CONSIDER YOUR CUSTOMERS ANYONE WHO RUNS

13  A LARGE TRADE SHOW OR CONVENTION BECAUSE THEY MIGHT COME TO

14  SAN DIEGO?

15  A.   NO, I WOULDN'T.

16  Q.   OKAY.

17  A.   AND I CAN EXPLAIN IF YOU'D LIKE.

18  Q.   SURE.

19  A.   LIKE IN ANY BUSINESS, THERE ARE CERTAIN -- YOU GO AFTER

20  CERTAIN CUSTOMERS.  FOR INSTANCE, WE GO AFTER A LOT OF MEDICAL

21  SHOWS, AND THAT'S WHY WE HAVE AN OFFICE IN CHICAGO.  BECAUSE

22  MEDICAL SHOWS ARE EXCELLENT CUSTOMERS.  THERE ARE A NUMBER OF

23  SHOWS THAT ARE OUT THERE THAT ARE BETTER SUITED FOR SMALLER

24  FACILITIES, MAYBE BETTER SUITED FOR THE DEL MAR FAIR GROUNDS

25  THAT WE DO NOT GO AFTER.  AND, QUITE FRANKLY, EVEN THOUGH

1    THEY'RE IN THIS BUSINESS, WE DO NOT CONSIDER THEM OUR

2    CUSTOMERS.

3         AND SO IF I GOT A LETTER OR PHONE CALL FROM THE ANTIQUE

4    PROMOTER AT THE DEL MAR FAIR GROUNDS THAT HE WAS OPPOSED TO

5    THIS POLICY, I WOULD NOT CONSIDER HIM MY CUSTOMER BECAUSE HE

6    NEVER HAS BEEN, NOR AM I INTERESTED IN HIM BEING MY CUSTOMER

7    FOR CLARIFICATION.

8    Q.   LET ME SHOW YOU SOME DOCUMENTS, SIR.  AND CAN YOU TELL ME

9    WHETHER THESE PEOPLE ARE YOUR CUSTOMERS.

10             THE COURT:  ARE THESE THE ONES SUBJECT TO THE MOTION

11   IN LIMINE?

12             MR. LANCE:  YES.

13             THE COURT:  WE NEED TO MOVE ON.  WE'RE NOT GOING TO

14   GET INTO THOSE.  IT'S BEGGING THE QUESTION OF THE PRIOR RULING,

15   AND THEY'RE NOT IN EVIDENCE.  SO I'LL SUSTAIN THE PRIOR

16   OBJECTION ONCE AGAIN.

17   BY MR. LANCE:

18   Q.   NOW, SIR, YOU TALKED ABOUT THE DISCUSSIONS YOU HAD WITH

19   GES AND CHAMPION BEFORE THE POLICY WAS IMPLEMENTED; DO YOU

20   RECALL THAT?

21   A.   YES.

22   Q.   AND DURING THOSE DISCUSSIONS, YOU HAD -- YOU TALKED TO THE

23   REPRESENTATIVES OF GES AND CHAMPION ABOUT WHY THEY SHOULD USE

24   THE CONVENTION CENTER?

25   A.   YES.

1    Q.   SO YOU WERE SOLICITING THEIR BUSINESS?

2    A.   YES.

3    Q.   AND ONE OF THE THINGS YOU SAID WAS, WE DO A BETTER JOB

4    CLEANING THAN UNITED DOES AT THE SAN DIEGO CONVENTION CENTER?

5    A.   THAT I THOUGHT WE DID, YES.

6    Q.   AND YOU ALSO TOLD THEM THAT YOU, IN FACT, THOUGHT THAT YOU

7    COULD SAVE THEM MONEY, SO YOU COULD INCREASE THEIR NET PROFIT?

8    A.   YES.

9    Q.   AND EVEN THOUGH YOU MADE THOSE ARGUMENTS IN 2006 AND 2007,

10   THEY DECIDED NOT TO HIRE THE CONVENTION CENTER, RIGHT?

11   A.   YES.

12   Q.   NOW, I WANT YOU TO TAKE A LOOK AT EXHIBIT 3.

13            THE COURT:  I'M SORRY, WHICH ONE?

14            MR. LANCE:  EXHIBIT 3.

15         (PLAINTIFF'S EXHIBIT 3 MARKED FOR IDENTIFICATION.)

16   BY MR. LANCE:

17   Q.   AND SPECIFICALLY AT THE TOP E-MAIL.  AND THIS IS THE

18   E-MAIL THAT YOU SENT BACK TO MR. EPSTEIN AFTER YOU FOUND OUT

19   CHAMPION WASN'T GOING TO USE THE CONVENTION CENTER, CORRECT?

20   A.   YES, IT WAS.

21   Q.   OKAY.  AND DOWN HERE -- IN THIS E-MAIL, YOU ARE AGAIN

22   PITCHING THE CONVENTION CENTER, AND YOU'RE SAYING, LOOK, WE DO

23   A BETTER JOB WITH THE QUALITY OF SERVICE AND CLEANLINESS OF OUR

24   FACILITIES.  THAT IS ONE OF THE THINGS YOU SAY IN THE SECOND

25   PARAGRAPH?

1   A.   YES.

2   Q.   AND THEN YOU GO ON IN THE LAST PARAGRAPH HERE, NOT THE

3   THANK YOU, BUT IT SAYS, IN YOUR LAST SENTENCE OF THAT SECOND TO

4   LAST PARAGRAPH, WE SINCERELY WISH CHAMPION WOULD PARTNER WITH

5   US, TOO, BUT WILL ACCEPT IT IF YOU CHOOSE NOT TO.

6        SO IN 2006, YOU'RE TELLING CHAMPION, LOOK, WE DO A BETTER

7   JOB, YOU SHOULD USE US, BUT WE'LL ACCEPT IT IF YOU CHOOSE NOT

8   TO PARTNER WITH US AND CONTINUE WITH UNITED, CORRECT?

9   A.   I DON'T SEE A DATE ON THERE, SO I DON'T REMEMBER WHEN THAT

10  E-MAIL -- CAN THAT BE SHOWN ON THIS?

11  Q.   IF YOU LOOK AT, SEPTEMBER 2006?

12       THE COURT:  9/21.

13  BY MR. LANCE:

14  Q.   SEPTEMBER 21, 2006.

15  A.   I SEE HER E-MAIL.  I'M LOOKING FOR THE DATE ON MY E-MAIL,

16  MY E-MAIL RESPONSE.

17  Q.   APPARENTLY THERE IS NOT A DATE ON THAT.  YOU TESTIFIED

18  EARLIER THAT IT WAS THE FALL OF 2006; DOES THAT SOUND ABOUT

19  RIGHT?

20  A.   YES.  I WANTED TO BE RESPONSIVE TO YOUR QUESTION ABOUT

21  WHAT THE TIME FRAME WAS.

22  Q.   IN THE FALL OF 2006, YOU TRIED TO GET CHAMPION'S BUSINESS,

23  AND YOU'RE SAYING, LOOK, IF YOU'RE GOING TO STAY WITH UNITED,

24  I'M OKAY WITH THAT, RIGHT?

25  A.   YES.

1  Q.   NOW, TALK TO YOU ABOUT GES FOR A MOMENT.  I ASKED YOU SOME

2  QUESTIONS IN YOUR DEPOSITION, AND I ASKED YOU SOME QUESTIONS

3  DURING YOUR -- DURING THE TRIAL DAY OF MARCH 22ND, OF THIS

4  YEAR, ABOUT WHEN YOUR MEETING WAS IN LAS VEGAS WITH GES, WHERE

5  THEY FINALLY TOLD YOU, MR. BONOCORE (PHONETIC) SAID, LOOK,

6  WE'RE NOT INTERESTED IN USING YOU; DO YOU RECALL THAT?

7  A.   YES.

8  Q.   AND IN YOUR DEPOSITION, AND THE LAST TIME YOU WERE ON THE

9  STAND, YOU SAID IT WAS MARCH OR APRIL OF 2007, CORRECT?

10  A.   I DON'T RECALL, BUT I VERY LIKELY COULD HAVE.

11  Q.   OKAY.  AND THE REASON I ASK THAT IS BECAUSE IN 2009, YOU

12  SAID IT WAS MARCH OR APRIL, ON MARCH 22ND OF THIS YEAR IN TRIAL

13  YOU SAID IT WAS MARCH OR APRIL, AND ALL OF A SUDDEN TODAY, IT

14  WAS JANUARY.

15  A.   HONESTLY, I DON'T KNOW EXACTLY.  I CAN TELL YOU IT WAS THE

16  INTERNATIONAL -- IAEE CONFERENCE.  AND WE CAN VERY EASILY FIND

17  OUT WHEN THAT WAS.  I'M NOT TRYING TO BE DECEPTIVE.  IT WAS

18  SOMETIME IN THE JANUARY TO MARCH TIME FRAME OF THAT YEAR.

19  Q.   YOU TALKED ABOUT, DURING MR. L'ESTRANGE'S QUESTIONING, THE

20  SAN DIEGO SPIRIT MANUAL; DO YOU RECALL THAT, YOU IDENTIFIED

21  THAT MANUAL?

22  A.   YES.

23  Q.   AND YOU SAID YOU HAD MEETINGS WITH CONTRACTORS, AND

24  MR. L'ESTRANGE SHOWED YOU THE MINUTES FROM ONE OF THOSE

25  MEETINGS; IS THAT RIGHT?

1  A.   YES.

2  Q.   HAS THE CONVENTION CENTER EVER INSTITUTED A POLICY,

3  WHEREBY THEY WOULD PROVIDE THAT SPIRIT MANUAL TO THE

4  CONTRACTORS AND ASK THEM TO ASSIST YOU IN THAT PROCESS OF THE

5  SAN DIEGO SPIRIT?

6  A.   EARLY ON, WE DID, YES.  BACK IN '89, WHEN WE OPENED UP, WE

7  DID HAVE SESSIONS WITH THE SERVICE CONTRACTORS, WE EVEN HAD IT

8  FOR THE TAXI-CAB DRIVERS TO GO THROUGH OUR SAN DIEGO SPIRIT, AS

9  WE PREPARED TO OPEN UP AS A CONVENTION CENTER, IN HOPES THAT

10 THE ENTIRE SAN DIEGO TEAM WOULD EMBRACE THE SAN DIEGO SPIRIT.

11 Q.   BEFORE YOU IMPLEMENTED THIS POLICY ON JULY 1ST, 2007, DID

12 YOU GO TO UNITED AND SAY, LOOK, HERE ARE SOME ISSUES WE HAVE

13 WITH YOU, WE WOULD LIKE YOU TO HELP US WITH THE SAN DIEGO

14 SPIRIT, IMPROVE THE APPEARANCE OF YOUR EMPLOYEES, AND LET'S DO

15 THIS ALL TOGETHER HERE AND SEE IF YOU CAN MEET OUR STANDARDS?

16 A.   NO, I DIDN'T.

17 Q.   AND DID YOU GO TO ANY OF THE OTHER OUTSIDE TRADE SHOW

18 CLEANING COMPANIES AND SAY, LOOK, WE WOULD LIKE YOU TO PARTNER

19 WITH US, WORK WITH US, WITH THE SAN DIEGO SPIRIT, WE'LL PROVIDE

20 YOU THE BROCHURE, AND LET'S SEE IF WE CAN GET YOU GUYS TO WHAT

21 WE THINK OUR LEVEL IS?

22 A.   NO, WE DIDN'T.

23 Q.   I WANT TO TALK TO YOU ABOUT THE -- SOME OTHER SECURITY

24 ISSUES, ABOUT THE LOADING DOCKS.  YOU WERE ASKED SOME QUESTIONS

25 BY MR. L'ESTRANGE ABOUT WHETHER YOU COULD SCREEN FREIGHT WHEN

1  IT CAME INTO THE LOADING DOCK; DO YOU RECALL THAT?

2  A.   YES.

3  Q.   AND YOU SAID IT WOULD BE IMPOSSIBLE?

4  A.   THE WAY HE CHARACTERIZED IT, WHERE WE WOULD BE ESSENTIALLY

5  SCREENING ALL THE FREIGHT COMING THROUGH WITH EVERY TRUCK WOULD

6  MAKE IT IMPOSSIBLE TO MOVE A SHOW IN IN A TIMELY FASHION, YES.

7  Q.   YEAH, IF YOU WERE SCREENING EVERY PARCEL THAT CAME IN,

8  LIKE AT AN AIRPORT, WHERE YOU HAVE TO PUT YOUR BAGS THROUGH,

9  THAT WOULDN'T BE PRACTICAL, CORRECT?

10  A.   CORRECT.

11  Q.   BUT YOU CERTAINLY COULD DO RANDOM SCREENINGS, CORRECT?

12  A.   YES, WE COULD.

13  Q.   AND YOU DON'T DO THAT?

14  A.   VERY RARELY, BUT WE HAVE ON OCCASION.

15  Q.   AND YOU COULD HAVE DOGS THAT GO THROUGH, JUST LIKE WHEN

16  YOU'RE AT THE BORDER, AND YOU'RE SITTING THERE WAITING TO COME

17  ACROSS THE BORDER, AND THEY HAVE THE DOGS GOING UP AND DOWN,

18  YOU COULD CERTAINLY DO THAT ON YOUR LOADING DOCK, CORRECT?

19  A.   I DON'T KNOW HOW EFFECTIVE THAT WOULD BE, OR EVEN HOW SAFE

20  THAT WOULD BE WITH FORKLIFTS FLYING AND FREIGHT COMING OFF, TO

21  ANSWER YOUR QUESTION, NO, EFFECTIVELY, I DON'T THINK YOU COULD.

22  Q.   DID YOU LOOK INTO THAT?

23  A.   NO.  IT WASN'T EVEN SOMETHING -- AS MANY YEARS AS I'VE

24  BEEN IN THE BUSINESS, IT WOULDN'T EVEN BE SERIOUSLY CONSIDERED

25  AS POSSIBLE.

1    Q.   OKAY, SO YOU HAVEN'T EVEN THOUGHT OF IT?

2    A.   NO FACILITY HAS EVER DONE IT, AND IT'S NOT SOMETHING THAT

3    WE WOULD CONSIDER.

4    Q.   AND YOU'RE CERTAINLY FAMILIAR WITH THE BOMB-SNIFFING DOGS,

5    WHERE THEY HAVE THEM ON A SHORT LEASH, AND THEY WALK THEM

6    AROUND AT THE BORDER OR DIFFERENT LOCATIONS.  I'VE SEEN THEM AT

7    QUALCOMM STADIUM AND THINGS LIKE THAT.  YOU'VE SEEN THOSE,

8    CORRECT?

9    A.   I'VE SEEN THEM AT AIRPORTS, YES.

10   Q.   NOW LET'S TALK ABOUT THE PARKING GARAGE.  WE'VE GONE

11   THROUGH THE ASSESSMENTS, THE SECURITY ASSESSMENTS THAT THE

12   CONVENTION CENTER DID FROM YEAR 2003 THROUGH 2008.  AND I

13   ASSUME, AS BEING THE PERSON IN CHARGE OF SECURITY, YOU'RE

14   FAMILIAR WITH THOSE SECURITY ASSESSMENTS?

15   A.   YES, I AM.

16   Q.   AND THE PRIMARY SECURITY RISK OR THREAT THAT IS IDENTIFIED

17   IN ALL OF THOSE ASSESSMENTS IS THE PARKING GARAGE, CORRECT?

18   A.   YES.

19   Q.   AND YOU MENTIONED THAT SINCE 2006, WHEN YOU RETURNED TO

20   THE CONVENTION CENTER, YOU HAVE HAD ONE CONVERSATION WITH

21   SOMEONE AT THE PORT, OR ACE, ABOUT THAT ISSUE?

22   A.   I'VE HAD MORE THAN ONE CONVERSATION.

23   Q.   MAYBE MY NOTES ARE WRONG.  I HAD SINCE 2006, YOU SAID YOU

24   HAD ONE CONVERSATION SINCE YOU RETURNED IN MARCH OF '06.  IS

25   THAT NOT ACCURATE?

1    A.   THAT'S NOT ACCURATE.   WHAT I THOUGHT I SAID WAS, I MET

2    WITH -- ACTUALLY, I DIDN'T MENTION HIS NAME, BUT DIRK

3    MATHIASEN, WHO IS AN UPPER LEVEL MANAGER AT THE PORT, ABOUT THE

4    ISSUE.   AND I MET WITH THE CHIEF OF POLICE FOR THE PORT.   AND I

5    MET WITH ACE PARKING.

6    Q.   OKAY.

7    A.   IT WAS THREE MEETINGS THERE.

8    Q.   AND YOU'VE BEEN TALKING TO THE PORT AND ACE PARKING ABOUT

9    THIS ISSUE FOR YEARS, CORRECT?

10   A.   NOT ON A REGULAR BASIS, BUT YES, WE'VE HAD THOSE

11   DISCUSSIONS SINCE 1989.

12   Q.   AND ONE OF THE PRIMARY ISSUES WITH THAT PARKING GARAGE IS

13   THAT THERE IS NO SCREENING EXCEPT ON RARE OCCASIONS OF THE

14   VEHICLES THAT COME RIGHT UNDER THE EXHIBIT HALLS, CORRECT?

15   A.   CORRECT.

16   Q.   AND YOU'VE TALKED ABOUT THE CONTACTS WITH THE PORT.   HAVE

17   YOU GONE ABOVE THEM, OR ACE PARKING, AND TRIED TO BRING THIS

18   ISSUE TO THE DEPARTMENT OF HOMELAND SECURITY OR SOMEONE ELSE

19   AND SAY, LOOK, WE NEED YOUR HELP HERE, THIS NEEDS TO BE

20   ADDRESSED?

21   A.   HOMELAND SECURITY IS ONE OF THE AGENCIES THAT ACTUALLY DID

22   THE ASSESSMENT.   SO THEY'RE ALREADY AWARE OF IT.   AND I DON'T

23   WANT TO CHARACTERIZE IT AS TO WHERE WE THINK IT IS AN IMMINENT

24   THREAT.   IT IS A CONCERN.   IT WAS NOTED AS AN AREA OF

25   VULNERABILITY.

1     BUT WHAT IS IMPORTANT, I THINK, FOR THE JURY TO KNOW IS

2   THAT IT'S NOT WITHIN THE ENVELOPE OF OUR FACILITY, NOR IS IT

3   WITHIN THE SCOPE OF OUR RESPONSIBILITY.

4   Q.   SINCE THIS TRIAL BEGAN, HAVE YOU HAD ANY DISCUSSIONS WITH

5   ANYONE AT FREEMAN ABOUT ANY FREEMAN EMPLOYEES WHO TESTIFIED IN

6   THIS CASE?

7   A.   NO, I HAVE NOT.

8   Q.   ARE YOU AWARE OF ANYONE ELSE AT THE CONVENTION CENTER

9   HAVING ANY DISCUSSIONS WITH FREEMAN ABOUT THEIR EMPLOYEES THAT

10  HAVE TESTIFIED?

11  A.   NO, I HAVE NOT.

12  Q.   SIR, YOU TESTIFIED TODAY ABOUT YOUR DISCUSSIONS WITH

13  MR. SIMON, AND I WANT TO MAKE SURE I HAVE THAT CLEAR.  WE

14  TALKED ABOUT CONVERSATIONS YOU HAD OR CONTACTS YOU HAD WITH

15  UNITED NATIONAL MAINTENANCE.  AND AS I RECALL, YOU HAD A COUPLE

16  OF CONVERSATIONS WITH BUDDY LINN; ONE, IN YOUR FIRST PERIOD OF

17  TIME AT THE CONVENTION CENTER, AND ONE AFTER YOU RETURNED,

18  WHERE HE SAID, WELCOME BACK?

19  A.   YES.  ACTUALLY WHEN -- IN MY FIRST TOUR OF DUTY, I WOULD

20  SEE BUDDY AT THE FACILITY ON A FAIRLY REGULAR BASIS.  OTHER

21  THAN HIM WELCOMING ME BACK IN 2006, I NEVER SAW HIM IN THE

22  BUILDING AGAIN.

23  Q.   OKAY.  AND YOU SAID YOU DIDN'T HAVE CONVERSATIONS WITH

24  MR. SIMON UNTIL THIS POLICY CAME UP; IS THAT CORRECT?

25  A.   I DON'T BELIEVE I HAD ANY VERBAL OR FACE-TO-FACE

1   CONVERSATIONS.  I BELIEVE IT WAS ALL E-MAIL.

2   Q.   OKAY.  AND DID YOU HAVE A TELEPHONE CONVERSATION WITH HIM?

3   A.   I DON'T BELIEVE SO.

4   Q.   THE REASON I ASKED YOU THE QUESTION, SIR, WHEN YOU

5   TESTIFIED HERE EARLIER IN TRIAL, ON MARCH 22ND, YOU WERE ASKED

6   BY MR. L'ESTRANGE WHETHER YOU HAD TELEPHONE CONVERSATIONS WITH

7   MR. SIMON, AND YOU SAID, VERY FEW, ONCE, PERHAPS ONCE OR TWICE,

8   AND IT WOULD HAVE BEEN A PHONE CONVERSATION.  SO ARE YOU

9   CHANGING THAT TESTIMONY?

10  A.   I DON'T RECALL THAT AS BEING MY EXACT TESTIMONY.  IF IT

11  WAS, THAT WASN'T ACCURATE.  I THINK WHAT I SAID, OR AT LEAST

12  TRIED TO SAY, WAS, YOU ASKED ME IF I HAD HAD ANY PHONE

13  CONVERSATIONS WITH MR. SIMON.  I SAID PERHAPS, MAYBE ONE OR

14  TWO, I DON'T RECALL, SOMETHING TO THAT EFFECT.

15  Q.   THIS WASN'T ME.  THIS WAS MR. L'ESTRANGE, WHEN HE ASKED

16  YOU, HE ACTUALLY WENT THROUGH A DIVIDING LINE, TALKING ABOUT

17  BEFORE JULY 1ST, 2007, AND AFTER.  AND YOU SAID THAT YOU HAD

18  HAD ONE OR TWO TELEPHONE CONVERSATIONS WITH MR. SIMON BEFORE.

19  A.   I DON'T RECALL EVER HAVING ANY TELEPHONE CONVERSATIONS

20  WITH MR. SIMON.

21  Q.   SO THAT -- SO YOU'RE -- YOUR TESTIMONY TODAY IS, THAT YOU

22  NEVER HAD ANY TELEPHONE CONVERSATIONS?

23  A.   THAT I'M AWARE OF, THAT I RECALL.  I'M TRYING TO BE

24  RESPONSIVE AND TRYING TO BE 100 PERCENT HONEST, AND THAT'S --

25  THAT IS THE HONEST TRUTH.

1    Q.   AND MR. L'ESTRANGE FOLLOWED UP WITH YOU.  HE DIDN'T JUST

2    ASK YOU, DID YOU HAVE TELEPHONE CONVERSATIONS.  HE FOLLOWED UP

3    WITH YOU, AND HE ASKED YOU ABOUT THOSE CONVERSATIONS.  AND YOU

4    WENT ON TO SAY, WELL, IT WAS MAYBE THREE MONTHS, FOUR MONTHS,

5    FIVE MONTHS PRIOR TO IMPLEMENTING THE POLICY.  DOES THAT

6    REFRESH YOUR RECOLLECTION THAT YOU DID HAVE SOME TELEPHONE

7    CONVERSATIONS?

8    A.   NOT AT ALL.

9    Q.   SO AS I UNDERSTAND YOUR TESTIMONY TODAY, IT IS THAT YOU

10   NEVER HAD A TELEPHONE CONVERSATION BEFORE JULY 1ST, 2007, WITH

11   MR. SIMON?

12   A.   TO THE BEST OF MY KNOWLEDGE, THAT'S CORRECT.  AND I

13   THOUGHT THAT'S WHAT I MADE CLEAR ALL ALONG THE WAY.  IT IS THE

14   SAME IMPRESSION I'VE HAD.  COULD ONE HAVE OCCURRED, POSSIBLY.

15   BUT I DON'T RECALL IT, SO IT COULDN'T HAVE BEEN ANYTHING -- AND

16   I THINK I USED THIS TERM -- IT COULDN'T HAVE BEEN ANYTHING

17   SUBSTANTIVE, AND I BELIEVE THAT FIRMLY.

18   Q.   IT CERTAINLY WOULDN'T SURPRISE YOU WHEN YOU'RE SENDING OUT

19   LETTERS AS THE GENERAL MANAGER OF THE SAN DIEGO CONVENTION

20   CENTER, THAT YOU'RE GOING TO CHANGE THE POLICY TO SIGNIFICANTLY

21   IMPACT HIS COMPANY, THAT MR. SIMON WOULD CALL YOU, RIGHT?

22   A.   WELL, NO, I WASN'T EXPECTING A CALL FROM HIM.  I BELIEVE

23   WE DID GET E-MAILS FROM HIM, AND WE GOT E-MAILS FROM OTHERS,

24   TOO.  BUT I WASN'T SURPRISED THAT HE DIDN'T CALL.

25   Q.   AND YOU DON'T RECALL ANY CALLS WITH -- FOR MR. SIMON,

1   TODAY, YOU DON'T RECALL ANY TELEPHONE CONVERSATION?

2   A.   AND KEEP IN MIND, YOU'RE TALKING ABOUT SOMETHING FOUR

3   YEARS AGO.  I DON'T THINK ANYONE SHOULD BE SHOCKED THAT I DON'T

4   REMEMBER A POSSIBLE CALL.  IF IT HAD BEEN ANYTHING SUBSTANTIVE,

5   TRUST ME, I WOULD HAVE REMEMBERED IT AND SO WOULD MY SUPERIORS,

6   BECAUSE I WOULD HAVE SHARED IT WITH THEM.

7   Q.   I'M NOT SHOCKED BY THAT.  WHAT I'M SHOCKED BY IS THAT YOU

8   TESTIFIED THAT YOU HAD PHONE CALLS ON MARCH 22ND, AND TODAY,

9   YOU'RE SAYING YOU DON'T?

10  A.   I DON'T BELIEVE THAT'S WHAT I TESTIFIED.  IF I DID, THAT

11  WAS NOT MY INTENTION.  I THINK IT MAY BE OUT OF CONTEXT.  WHAT

12  I WAS BEING ASKED WAS, DID YOU -- COULD YOU HAVE POSSIBLY HAD

13  SOME CALLS WITH MR. SIMON.  AND I BELIEVE WHAT I TESTIFIED, AT

14  LEAST WHAT I INTENDED TO TESTIFY WAS, POSSIBLY, YEAH, MAYBE

15  ONE, OR TWO, OR THREE, BUT IT WASN'T ANYTHING SUBSTANTIVE.  I

16  BELIEVE THAT IS PRETTY CLOSE TO VERBATIM.

17  Q.   WELL, ACTUALLY WHAT YOU SAID WAS, YOU HAD ONE OR TWO, BUT

18  YOU HAVE NO RECOLLECTION OF EVEN THE SUBJECT MATTER?

19  A.   COULD YOU POSSIBLY READ BACK THE WHOLE QUESTION AND MY

20  ENTIRE ANSWER?

21  Q.   SURE, ABSOLUTELY.

22  A.   I JUST DON'T RECALL IT THAT I WAY.

23          THE COURT:  WHY DON'T WE GET A REFERENCE TO THE DATE,

24  TRANSCRIPT --

25  BY MR. LANCE:

1   Q.   THIS IS THE TRIAL EXAMINATION OF BRADLEY GESSNER,

2   MARCH 22ND, 2011.  AND THIS IS ON PAGE 133, QUESTIONS BY

3   MR. L'ESTRANGE:  I WANT TO ASK YOU BRIEFLY SOME QUESTIONS ON A

4   DIFFERENT TOPIC, MR. GESSNER.  AND TO SET THE TIME FRAME, WE

5   HAVE THE DIVIDING LINE OF JULY 1, 2007, WHICH IS THE EFFECTIVE

6   DATE OF CHANGE IN THE POLICIES, RULES, AND REGULATIONS AT THE

7   CONVENTION CENTER FOR CLEANING.

8        USING THAT AS A DIVIDING LINE, HOW MANY TIMES DID YOU HAVE

9   ANY CONTACT, WHETHER IT WAS ON TELEPHONE, IN PERSON, OR IN ANY

10  OTHER WAY WITH RICK SIMON?

11       VERY FEW.  ONCE, PERHAPS, TWICE, AND IT WOULD HAVE BEEN A

12  PHONE CONVERSATION.

13       QUESTION:  IN BOTH INSTANCES, PHONE CONVERSATIONS?

14       ANSWER:  I BELIEVE SO, YES.

15       QUESTION:  AND CAN YOU PLACE THOSE IN POINT OF TIME WITH

16  REFERENCE TO THIS DIVIDING LINE OF JULY 1ST, 2007?  WERE THEY A

17  YEAR BEFORE, OR TWO YEARS BEFORE, THREE WEEKS BEFORE, IF YOU

18  CAN?

19       IT WOULD HAVE BEEN -- AND IT'S NOT CLEAR.  AS I TESTIFIED

20  EARLIER, IT IS NOT CLEAR.  POINT BEING, THAT THERE WERE NONE

21  VERY KNEW.  AND IT WOULD HAVE BEEN MAYBE THREE MONTHS, FOUR

22  MONTHS, FIVE MONTHS PRIOR TO IMPLEMENTING THE POLICY.

23       QUESTION:  ANY OF THOSE CONVERSATIONS STAND OUT?

24       ANSWER:  NONE.

25       QUESTION:  HAVE YOU -- YOU HAVE ANY RECOLLECTION OF -- LET

1   ME TRY THAT AGAIN -- YOU HAVE ANY RECOLLECTION OF EVEN THE

2   SUBJECT MATTER THAT WAS DISCUSSED?

3        NO, I DON'T.

4        SO, SIR, AGAIN, THAT WAS YOUR ATTORNEY?

5   A.   I THINK THAT SUPPORTS WHAT I'M TRYING TO SAY.

6             THE COURT:  JUST ANSWER THE QUESTIONS.

7   BY MR. LANCE:

8   Q.   SO WAS THAT YOUR TESTIMONY?

9   A.   EVIDENTLY.

10            MR. LANCE:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

11            THE COURT:  MR. L'ESTRANGE?

12            MR. L'ESTRANGE:  NO FURTHER QUESTIONS.

13            THE COURT:  ALL RIGHT, YOU MAY STEP DOWN,

14   MR. GESSNER.

15            MR. L'ESTRANGE:  MAY THE WITNESS BE EXCUSED?

16            MR. LANCE:  YES.

17            THE COURT:  HE'LL BE EXCUSED.  AND THEN DEFENSE'S

18   NEXT WITNESS?

19            MR. ERGASTOLO:  THE CONVENTION CENTER CALLS TOM

20   MAZZOCCO.

21            THE COURT:  OKAY.

22            MR. LANCE:  YOUR HONOR, AS TO MR. GESSNER, THERE WAS

23   ONE THING I WANTED TO TAKE UP WITH THE COURT, I EXCUSE HIM

24   SUBJECT TO THAT.

25            THE COURT:  OKAY, WE'LL HOLD OFF ON THE EXCUSED THEN.

1    EXCUSED FOR NOW.

2                        (WITNESS SWORN.)

3           THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

4    YOUR LAST NAME FOR THE RECORD.

5           THE WITNESS:  THOMAS MICHAEL MAZZOCCO,

6    M-A-Z-Z-O-C-C-O.

7           THE COURT:  ALL RIGHT, MR. ERGASTOLO, YOU MAY

8    PROCEED.

9                        DIRECT EXAMINATION

10          MR. ERGASTOLO:  THANK YOU, YOUR HONOR.

11   BY MR. ERGASTOLO:

12   Q.  GOOD AFTERNOON, MR. MAZZOCCO.  WELCOME BACK.

13   A.  THANK YOU.

14   Q.  WOULD YOU REMIND THE JURY OF YOUR CURRENT POSITION AT THE

15   CONVENTION CENTER.

16   A.  VICE PRESIDENT HUMAN RESOURCES, WITH LABOR RELATIONS.

17   Q.  AND BEFORE WE GET INTO THE SUBSTANCE OF YOUR TESTIMONY,

18   COULD YOU BRIEFLY DESCRIBE FOR THE JURY YOUR EDUCATION SINCE

19   HIGH SCHOOL.

20   A.  COLLEGE EDUCATION, UNIVERSITY OF ARIZONA, BUSINESS DEGREE.

21   Q.  AND DO YOU HAVE ANY CONTINUING EDUCATION IN THE HUMAN

22   RESOURCES AREA?

23   A.  NONE -- NONE AT A UNIVERSITY, NO.

24   Q.  OTHER THAN AT A UNIVERSITY?

25   A.  YES.

1  Q.   WOULD YOU DESCRIBE THAT FOR THE JURY.

2  A.   VARIOUS CONFERENCES, VARIOUS SEMINARS.

3  Q.   HAS THE HUMAN RESOURCES DEPARTMENT AND THE CONVENTION

4  CENTER EVER WON ANY AWARDS?

5  A.   YES, WE HAVE.

6  Q.   COULD YOU DESCRIBE FOR THE JURY THE AWARDS THAT THE HUMAN

7  RESOURCES CENTER HAS WON.

8  A.   WE WON THE AWARD FROM THE SOCIETY OF HUMAN RESOURCES HERE

9  IN SAN DIEGO FOR THE BEST EMPLOYER.

10  Q.   COULD YOU BRIEFLY DESCRIBE FOR THE JURY YOUR WORK HISTORY

11  SINCE COLLEGE.

12  A.   I WORKED WITH A COMPANY CALLED SUN CORP., WHICH WAS

13  HEADQUARTERED OUT OF ARIZONA.   I WAS WITH SUN CORP. FOR

14  APPROXIMATELY 14 YEARS.   THEY WERE AN INTERNATIONAL CONTRACTOR,

15  GENERAL CONTRACTOR.   WORKED FOR VARIOUS SUBSIDIARIES OF THEIRS.

16  I CAME TO SAN DIEGO IN '85.   WORKED FOR A COMPANY HERE CALLED

17  FENTON; WORKED FOR THEM FOR SIX YEARS.

18       THEN I HAD MY OWN ORGANIZATION COMPANY, HUNG A SHINGLE

19  OUT, AND I WAS A CONSULTANT, AND ALSO WAS PURCHASED INTO AN

20  ENVIRONMENTAL EQUIPMENT MANUFACTURING COMPANY IN THE EAST

21  COAST.   AND I HAD A DISTRIBUTION COMPANY HERE, SMALL COMPANY

22  HERE.   AND I DID THAT FOR A NUMBER OF YEARS, AND THEN I STARTED

23  WORKING FOR THE SAN DIEGO CONVENTION CENTER CORPORATION IN

24  1994.

25  Q.   HOW LONG HAVE YOU BEEN IN THE HUMAN RESOURCES BUSINESS?

1    A.   SINCE I GRADUATED FROM COLLEGE IN 1972.

2    Q.   SO ALL OF THOSE POSITIONS THAT YOU JUST DESCRIBED TO THE

3    JURY, YOUR ROLE WAS IN THE HUMAN RESOURCES AREA?

4    A.   YES.   THEY'VE ALWAYS BEEN IN HUMAN RESOURCES AND LABOR

5    RELATIONS, YES.

6    Q.   AND WHEN WERE YOU FIRST HIRED BY THE CONVENTION CENTER?

7    A.   I BEGAN WORKING JULY OF 1994.

8    Q.   AND WHAT WERE YOUR DUTIES AND RESPONSIBILITIES WHEN YOU

9    WERE FIRST HIRED AT THE CONVENTION CENTER?

10   A.   ALL THE DISCIPLINES OF HUMAN RESOURCES, FROM EMPLOYMENT,

11   BENEFITS, COMPENSATION, LEARNING DEVELOPMENT, LABOR RELATIONS,

12   EMPLOYEE RELATIONS.

13   Q.   THE WHOLE BALL OF WAX?

14   A.   ALL THE DISCIPLINES OF HUMAN RESOURCES, YES.

15   Q.   DID YOUR DUTIES AND RESPONSIBILITIES CHANGE OVER TIME AT

16   THE CONVENTION CENTER?

17   A.   NO, THEY HAVEN'T.

18   Q.   WHAT ABOUT YOUR TITLE WHEN YOU FIRST STARTED, DID YOU HAVE

19   A TITLE?

20   A.   YES.   I BEGAN AS DIRECTOR OF HUMAN RESOURCES.   THEN

21   APPROXIMATELY TEN YEARS AGO, I WAS -- MY TITLE CHANGED TO VICE

22   PRESIDENT OF HUMAN RESOURCES, LABOR RELATIONS.

23   Q.   AND EVEN THOUGH THE TITLE CHANGED, WHAT YOU DID

24   ESSENTIALLY STAYED THE SAME?

25   A.   THAT'S CORRECT.

1    Q.   AND WHOM DO YOU REPORT TO CURRENTLY?

2    A.   I REPORT TO THE PRESIDENT OF THE COMPANY, CAROL WALLACE.

3    Q.   ARE YOU FAMILIAR WITH THE HIRING PROCESS AT THE SAN DIEGO

4    CONVENTION CENTER?

5    A.   YES, I AM.

6    Q.   AND HOW ARE YOU FAMILIAR WITH IT?

7    A.   IT'S MY RESPONSIBILITY TO OVERSEE THAT PROCESS.

8    Q.   YOU ALSO DEVELOP POLICIES FOR THAT PROCESS?

9    A.   YES, I DO.

10   Q.   WHAT IS YOUR ROLE IN THE DEVELOPMENT OF THOSE POLICIES?

11   A.   MAKING SURE THAT OUR POLICIES ARE IN COMPLIANCE WITH

12   FEDERAL, STATE, AND LOCAL LAWS; MAKING SURE WE'RE SELECTING THE

13   APPROPRIATE CANDIDATES FOR THE POSITIONS WE HAVE.

14   Q.   COULD YOU SUMMARIZE FOR THE JURY THE CONVENTION CENTER'S

15   EMPLOYEE HIRING PROCESS.

16   A.   WE START WITH AN APPLICANT WHO APPLIES CURRENTLY.  WE

17   APPLY ON-LINE -- ALL OF OUR APPLICANTS APPLY ON-LINE.  WE

18   REVIEW THE APPLICATIONS THAT WE RECEIVE ELECTRONICALLY.  WE

19   SCREEN THOSE APPLICATIONS.  WE THEN FORWARD THE APPLICATIONS

20   THAT MEET THE MINIMUM REQUIREMENTS FOR THE POSITION TO THE

21   HIRING AUTHORITY, THE HIRING MANAGER.  THEY THEN GO THROUGH

22   THAT PROCESS OF SELECTING POTENTIAL CANDIDATES FROM THAT POOL.

23   WE THEN SET UP INTERVIEWS.  DEPENDING ON WHAT THE POSITION IS,

24   WHAT LEVEL THE POSITION IS, THEY COULD HAVE ANYWHERE FROM TWO

25   TO THREE TO FOUR INTERVIEWS.  SO WE TYPICALLY DO WHAT WE CALL

1  PANEL INTERVIEWS.  SO IT WOULD BE A MEMBER OF HUMAN RESOURCES

2  WOULD BE ON THE PANEL, THE HIRING AUTHORITY WOULD BE ON THE

3  PANEL, AND THEN MAYBE SOMEONE OTHER THAN THE HIRING AUTHORITY,

4  BUT SOMEONE THAT WOULD WORK WITH THAT POSITION WOULD BE ON THE

5  PANEL AS WELL.

6       AND THEN THE FURTHER INTERVIEWS WOULD BE FOR POSSIBLY THE

7  HIRING AUTHORITIES, NEXT SUPERVISOR UP, AND POSSIBLY NEXT

8  SUPERVISOR UP.  AS WE GO FURTHER IN THE INTERVIEWS, WE WOULD

9  NARROW THE FIELD DOWN TO FEWER SELECTEES.

10  Q.   WOULD YOU EXPLAIN TO THE JURY WHAT YOU MEAN BY HIRING

11  AUTHORITY.

12  A.   IF WE'RE HIRING SOMEBODY FOR EVENT MANAGEMENT, IT WOULD BE

13  THE DIRECTOR OF EVENT MANAGEMENT.  HE WOULD BE THE MANAGER OF

14  THAT DEPARTMENT.  HE'S THE HIRING MANAGER OR HIRING AUTHORITY.

15  Q.   AND THE CLEANING DEPARTMENT, THAT WOULD BE SARA ZETTS,

16  CORRECT?

17  A.   YES.  SHE'S THE MANAGER OF THAT DEPARTMENT.

18  Q.   WERE YOU DONE SUMMARIZING?

19  A.   NO, I WASN'T.

20  Q.   I INTERRUPTED.  PLEASE CONTINUE.

21  A.   THAT'S OKAY.  ONCE WE MAKE THE SELECTION -- OR ONCE WE

22  NARROW IT DOWN TO A FEW CANDIDATES, FINALISTS, IF YOU WILL,

23  THEN WE GO THROUGH A BACKGROUND CHECK.  AND THEN ONCE THE

24  FINALIST IS SELECTED, WE MAKE AN OFFER TO THE FINALIST, AND

25  ONCE AN OFFER IS MADE, THEN WE SEND THAT APPLICANT TO A DRUG

1   SCREEN.  AND THAT'S THE FINAL STEP BEFORE THEY ACTUALLY BECOME

2   EMPLOYED.

3   Q.   IS THE HIRING PROCESS THE SAME WHETHER THE PERSON BEING

4   HIRED IS FULL TIME OR PART TIME?

5   A.   YES.

6   Q.   AND BEFORE WE GET SPECIFICALLY INTO COVERING SOME OF THESE

7   AREAS, I WANTED TO DISCUSS WITH YOU TEMPORARY EMPLOYEES.  DOES

8   THE CONVENTION CENTER OCCASIONALLY HIRE TEMPORARY EMPLOYEES?

9   A.   YES, WE DO.

10  Q.   AND IS THERE A SPECIFIC REASON WHY THE CONVENTION CENTER

11  WOULD HIRE TEMPORARY EMPLOYEES?

12  A.   WE HAVE ONE EVENT, COMICON, THAT HAPPENS EVERY YEAR IN THE

13  MONTH OF JULY.  TYPICALLY, BECAUSE OF THE SIZE OF THAT EVENT,

14  WE NEED ADDITIONAL STAFF TO HELP US THROUGH THAT EVENT.  AND

15  WE'LL HAVE ON OCCASION ONE OR TWO OTHER EVENTS IN GIVEN YEARS

16  THAT ARE SUCH A MAGNITUDE AND SUCH A SIZE, THAT WE DON'T HAVE A

17  REGULAR POOL OF PEOPLE TO DRAW FROM SO WE HIRE SPECIFICALLY FOR

18  THAT EVENT.

19  Q.   AND HOW DOES THE CONVENTION CENTER SOLICIT TEMPORARY

20  EMPLOYEES?

21  A.   WE ADVERTISE IN VARIOUS LOCAL PUBLICATIONS AND ON THE WEB.

22  WORD OF MOUTH, WE GET A LOT OF APPLICANTS THAT COME IN WORD OF

23  MOUTH, REFERRED BY EMPLOYEES.

24  Q.   IS THERE ANY EFFORT MADE TO ALSO USE PRIOR TEMPORARY

25  EMPLOYEES?

1   A.   YES.

2   Q.   AND HOW DOES THAT HAPPEN?

3   A.   WE'LL REACH OUT TO EMPLOYEES THAT HAVE WORKED FOR US

4   BEFORE AND SEE IF THEY WOULD -- ARE INTERESTED IN ADDITIONAL

5   EMPLOYMENT.   A NUMBER OF TIMES, WE'VE -- AS WE'VE GONE INTO

6   THIS EVENT, WE'LL ASK THEM, IF WE HAVE A KNOWN EVENT COMING UP

7   IN THE NEXT SEVERAL MONTHS, WE'LL ASK THEM IF THEY'RE

8   INTERESTED IN A POSITION FOR THAT EVENT.   THEY WOULD BE LAID

9   OFF AT THE END OF THE EVENT, BUT THEN REHIRED WHEN THE NEW

10  EVENT COMES AROUND.

11  Q.   DOES THE CONVENTION CENTER CURRENTLY USE THE SAME PROCESS

12  YOU DESCRIBED FOR HIRING FULL- AND PART-TIME EMPLOYEES IN ITS

13  HIRING PROCESS OF TEMPORARY EMPLOYEES?

14  A.   YES.

15  Q.   AND HAS THAT ALWAYS BEEN THE CASE?

16  A.   YES.   WELL, NO, IT HAS NOT.

17  Q.   HOW HAS IT BEEN DIFFERENT?

18  A.   DURING ONE PERIOD OF TIME, WE DID NOT PROCESS THE

19  TEMPORARY EMPLOYEES THROUGH THE BACKGROUND CHECK AND THE DRUG

20  SCREENS.

21  Q.   I BELIEVE YOU TESTIFIED ABOUT THAT DURING YOUR FIRST VISIT

22  TO THIS TRIAL LAST MONTH NOW, MAYBE LESS?

23  A.   YES.

24  Q.   DID THE PROCESS -- DOES CURRENTLY THE CONVENTION CENTER

25  BACKGROUND CHECK AND DRUG SCREEN ITS TEMPORARY EMPLOYEES?

1   A.   CURRENTLY, YES, WE DO.

2   Q.   AND DURING THAT PERIOD OF TIME, IT DID NOT DO SO, HOW LONG

3   WAS THAT PERIOD OF TIME?

4   A.   IT WAS APPROXIMATELY TWELVE TO SIXTEEN MONTHS.

5   Q.   HOW MANY SHOWS WERE COVERED DURING THAT PERIOD OF TIME?

6   A.   I BELIEVE THERE WAS ONE.

7   Q.   WHAT SHOW WAS THAT?

8   A.   COMICON.

9   Q.   WHY DID THE CONVENTION CENTER CHANGE THE POLICY BACK TO

10  CURRENT -- THE CURRENT POLICY OF DRUG SCREENING AND BACKGROUND

11  CHECKING THOSE TEMPORARY EMPLOYEES?

12  A.   WE ELIMINATED THAT PROCESS DUE TO BUDGETARY REASONS

13  ORIGINALLY.  AND WE FELT IT WAS IMPORTANT FOR SECURITY AND

14  SAFETY TO BRING THAT POLICY BACK ON BOARD.  AND WE DEALT WITH

15  THE BUDGET ISSUES THROUGH OTHER MEANS.

16  Q.   YOU MENTIONED EARLIER THAT ONE OF THE STEPS IN THE HIRING

17  PROCESS IS A DRUG AND ALCOHOL SCREEN --

18  A.   YES.

19  Q.   -- CORRECT?  HOW LONG HAS THE CONVENTION CENTER DONE DRUG

20  AND ALCOHOL SCREENS FOR ITS FULL-TIME EMPLOYEES?

21  A.   THEY'VE BEEN DOING DRUG AND ALCOHOL SCREENINGS SINCE PRIOR

22  TO MY ARRIVAL.

23  Q.   AND WHAT YEAR WAS THAT?

24  A.   IN 1994 IS WHEN I STARTED.

25  Q.   IS THAT SAME DRUG AND ALCOHOL SCREENING PROVIDED TO THE

1    PART-TIME EMPLOYEES AS WELL?

2    A.   YES.

3    Q.   WHAT ABOUT THE TEMPORARY EMPLOYEES OTHER THAN THE GAP THAT

4    YOU'VE ALREADY DISCUSSED?

5    A.   OTHER THAN THE GAP, YES.

6    Q.   AND WHAT DOES THE DRUG SCREEN CONSIST OF?

7    A.   THERE IS A PANEL OF DRUGS THAT WE WOULD LOOK AT, THAT WE

8    WOULD EMPLOY A VENDOR TO PROCESS THE SCREENING FOR US.  AND

9    IT'S A URINE SAMPLE SCREENING.

10   Q.   IF I COULD HAVE YOU TAKE A LOOK AT EXHIBIT 57.

11        (DEFENDANT'S EXHIBIT 57 MARKED FOR IDENTIFICATION.)

12   BY MR. ERGASTOLO:

13   Q.   DO YOU HAVE THAT IN FRONT OF YOU, MR. MAZZOCCO?

14   A.   YES, I DO.

15   Q.   COULD YOU IDENTIFY EXHIBIT 57 FOR THE RECORD, PLEASE.

16   A.   THIS IS A SECTION OF OUR EMPLOYER HANDBOOK, DEALING WITH

17   EMPLOYMENT.

18   Q.   IS THIS A DOCUMENT YOU'RE FAMILIAR WITH?

19   A.   YES.

20   Q.   KEPT IN THE ORDINARY COURSE OF BUSINESS IN THE CONVENTION

21   CENTER?

22   A.   YES, IT IS.

23        MR. ERGASTOLO:  MOVE TO ADMIT EXHIBIT 57.

24        THE COURT:  ANY OBJECTION?

25        MR. LANCE:  NO OBJECTION.

1          THE COURT:  OKAY, RECEIVED.

2             (DEFENDANT'S EXHIBIT 57 RECEIVED INTO EVIDENCE.)

3    BY MR. ERGASTOLO:

4    Q.   MR. MAZZOCCO, IF YOU COULD TURN TO PAGE 4 OF EXHIBIT 57.

5    A.   YES.

6    Q.   WHAT IS PAGE 4?

7    A.   IT'S THE POLICY ON POST EMPLOYMENT OFFER, DRUG SCREEN.

8    Q.   THAT'S THE POLICY WE'VE BEEN TALKING ABOUT, CORRECT?

9    A.   YES.

10   Q.   AND CAN YOU TELL BY LOOKING AT PAGE 4, OF EXHIBIT 57, WHEN

11   THE POLICY FIRST WAS IMPLEMENTED?

12   A.   THIS -- THE CURRENT POLICY THAT WE'RE LOOKING AT WAS

13   SUPERSEDED BY -- WELL, IT SUPERSEDED A POLICY THAT WAS PUT IN

14   IN AUGUST OF 1999.

15   Q.   AND THE CURRENT POLICY, WHICH IS THE ONE THAT IS IN

16   EXISTENCE TODAY, WAS PUT IN PLACE IN 2003?

17   A.   CORRECT.

18   Q.   AND EXHIBIT 57 IS PART OF THE PERSONNEL MANUAL FOR

19   EMPLOYEES OF THE CONVENTION CENTER, CORRECT?

20   A.   YES.

21   Q.   CAN A SAN DIEGO CONVENTION CENTER APPLICANT GET HIRED

22   WITHOUT A DRUG SCREEN CURRENTLY?

23   A.   NO.

24   Q.   WHY DOES THE CONVENTION CENTER DO DRUG TESTING?

25   A.   WE HAVE AN OBLIGATION TO MAKE SURE WE HAVE A SECURE AND

1    SAVE WORKPLACE FOR OUR EMPLOYEES AND A DRUG FREE WORKPLACE.

2    Q.   HOW LONG HAS THE CONVENTION CENTER PERFORMED BACKGROUND

3    CHECKS ON ITS FULL-TIME EMPLOYEES?

4    A.   WE STARTED BACKGROUND CHECKS IN 2001, LATE 2001.

5    Q.   IS THAT THE SAME TIME THEY STARTED THEM FOR PART-TIME

6    EMPLOYEES?

7    A.   YES.

8    Q.   AND THE CURRENT POLICY FOR TEMPORARY EMPLOYEES FOR

9    BACKGROUND CHECKS IS THE SAME FOR THE FULL TIME AND PART TIME,

10   CORRECT?

11   A.   YES.

12   Q.   AND OTHER THAN THAT GAP WE TALKED ABOUT SEVERAL TIMES,

13   EVERY EMPLOYEE SINCE THE IMPLEMENTATION OF THAT POLICY, HAS

14   BEEN BACKGROUND CHECKED?

15   A.   YES.

16   Q.   IF I COULD HAVE YOU TURN TO PAGE 6 OF EXHIBIT 57.  CAN YOU

17   IDENTIFY PAGE 6, PLEASE.

18   A.   IT'S THE POLICY ON REFERENCES AND BACKGROUND CHECKS.

19   Q.   AND THIS ONE HAS A DATE OF NOVEMBER 2003 AND A SUPERSEDING

20   DATE OF 2001, CORRECT?

21   A.   CORRECT.

22   Q.   WHY WAS THE BACKGROUND CHECK POLICY PUT IN PLACE?

23   A.   SO THAT WE KNEW WHO WE WERE HIRING IN OUR WORKPLACE.

24   Q.   WERE YOU INVOLVED IN THE DECISION TO PUT THAT POLICY IN

25   PLACE?

1  A.   YES.

2  Q.   DID 9/11 HAVE ANYTHING TO DO WITH YOUR CONCERNS ABOUT

3  BACKGROUND CHECKS?

4  A.   IT HEIGHTENED OUR SENSITIVITY TO SECURITY AND SAFETY, YES.

5        MR. ERGASTOLO:  IF YOU COULD HIGHLIGHT PARAGRAPH 1,

6  PLEASE.

7  BY MR. ERGASTOLO:

8  Q.   PARAGRAPH 1 STATES, AS PART OF THE PROCESS OF WEIGHING

9  APPLICANTS' QUALIFICATIONS AND DETERMINING THEIR SUITABILITY

10  FOR OPEN POSITIONS, THE CORPORATION MAY CONDUCT REFERENCE AND

11  BACKGROUND CHECKS OF APPLICANTS FOR EMPLOYMENT?

12  A.   YES.

13  Q.   THAT IS IN THE PERMISSIVE, CORRECT?

14  A.   YES, IT IS.

15  Q.   AND NOTWITHSTANDING THE LANGUAGE OF THIS, EXHIBIT 57, ARE

16  BACKGROUND CHECKS MANDATORY?

17  A.   WE BACKGROUND CHECK EVERY EMPLOYEE.

18  Q.   WHO PERFORMS BACKGROUND CHECKS?

19  A.   WE HAVE A THIRD-PARTY VENDOR THAT PERFORMS THAT FOR US.

20  Q.   COULD YOU DESCRIBE THE CURRENT BACKGROUND CHECK THAT'S

21  PROVIDED BY THAT THIRD PARTY FOR YOU.

22  A.   DEPENDING ON WHAT THE POSITION IS, THEY DO A SOCIAL

23  SECURITY CHECK, THEY DO A CRIMINAL BACKGROUND CHECK ON EVERY

24  EMPLOYEE.  AND THEN AGAIN, DEPENDING ON THE POSITION, THEY MAY

25  DO AN EMPLOYMENT BACKGROUND CHECK, OR THEY MAY DO AN

1   EDUCATIONAL BACKGROUND CHECK.

2   Q.   AND WHAT FACTORS WOULD GO INTO DETERMINING WHAT LEVEL OF

3   BACKGROUND CHECKS AN APPLICANT WOULD RECEIVE?

4   A.   DEPENDING ON WHAT POSITION THEY ARE, IF THEY'RE A MANAGER,

5   DIRECTOR, OR HIGHER LEVEL.

6   Q.   THE HIGHER THE LEVEL, THE MORE THE SCRUTINY?

7   A.   YES.

8   Q.   OTHER THAN THAT GAP WE'VE TALKED ABOUT FOR TEMPORARY

9   EMPLOYEES, HAS EVERY SAN DIEGO CONVENTION CENTER EMPLOYEE BEEN

10  BACKGROUND CHECKED?

11  A.   YES.   OTHER THAN THOSE PRIOR TO THE IMPLEMENTATION OF THE

12  POLICY.

13  Q.   SO WHEN THE POLICY WAS IMPLEMENTED -- WHAT YEAR WAS IT

14  IMPLEMENTED?

15  A.   IN 2001.

16  Q.   WHEN THE POLICY WAS IMPLEMENTED IN 2001, DID THE

17  CONVENTION CENTER GO BACK AND BACKGROUND CHECK EVERY ONE OF ITS

18  THEN CURRENT EMPLOYEES?

19  A.   NO, WE DID NOT.

20  Q.   WHY NOT?

21  A.   WE DIDN'T THINK IT WAS NECESSARY TO GO TO THE EXPENSE OF

22  DOING THAT, ONE, AND THAT WE KNEW THE EMPLOYEES THAT WERE

23  WORKING FOR US AT THE TIME.

24  Q.   ARE THESE BACKGROUND CHECKS PERFORMED ON CLEANING

25  DEPARTMENT EMPLOYEES?   LET ME ASK A BETTER QUESTION.

1     ARE THE BACKGROUND CHECKS CURRENTLY PERFORMED ON

2   APPLICANTS FOR THE CLEANING DEPARTMENT AT THE CONVENTION

3   CENTER?

4   A.   YES, THEY ARE.

5   Q.   WHAT ABOUT THE APPLICANTS FOR THE SECURITY DEPARTMENT?

6   A.   YES, THEY ARE.

7   Q.   COULD YOU DESCRIBE FOR THE JURY THE CURRENT EMPLOYEE

8   BADGING POLICY FOR THE CONVENTION CENTER.

9   A.   WE HAVE A PHOTO ID BADGE THAT EVERY EMPLOYEE IS REQUIRED

10   TO WEAR; IT INCLUDES HIS PHOTO, IT INCLUDES HIS TITLE, AND IT

11   INCLUDES HIS NAME AND DEPARTMENT THAT HE WORKS FOR.

12   Q.   HOW LONG HAS THAT POLICY BEEN IN PLACE?

13   A.   IT WAS PUT IN SHORTLY AFTER WE PUT IN -- SOMETIME SHORTLY

14   AFTER WE PUT IN THE BACKGROUND CHECK POLICY.

15   Q.   AND PRIOR TO IMPLEMENTING THE PHOTO ID POLICY, WHAT WAS

16   THE POLICY FOR THE NAME BADGES FOR EMPLOYEES AT THE CONVENTION

17   CENTER, IF THERE WAS ONE?

18   A.   EMPLOYEES WERE TO WEAR A BADGE; IT WAS A PLASTIC BADGE

19   THAT INCLUDED JUST THEIR NAME, AND THEN IN SOME CASES, THEIR

20   EMPLOYEE NUMBER.

21   Q.   AND CURRENTLY, WHEN WOULD AN EMPLOYEE -- LET ME ASK YOU A

22   BETTER QUESTION AGAIN.

23     CURRENTLY WHEN WOULD AN APPLICANT ACTUALLY GET A BADGE?

24   A.   CURRENTLY THEY GET IT ON THEIR FIRST DAY OF EMPLOYMENT,

25   WHEN THEY COME INTO THE HUMAN RESOURCES DEPARTMENT.  AND THEY

1  FILL OUT THEIR NECESSARY PAPERWORK, THEY GO THROUGH SPIRIT

2  TRAINING.  WE TAKE THEIR PHOTOS AND THEN AT THE END OF SPIRIT

3  TRAINING, THEY'RE ISSUED THEIR BADGE.

4  Q.  IS THERE A REQUIREMENT AT THE CONVENTION CENTER FOR

5  ACTUALLY WEARING THE BADGE THAT'S PROVIDED TO THE EMPLOYEE?

6  A.  YES, THERE IS.

7  Q.  WHAT IS THAT REQUIREMENT?

8  A.  THAT THEY WEAR THAT BADGE AT ALL TIMES.

9  Q.  IS THERE A CONSEQUENCE FOR NOT WEARING THE BADGE?

10  A.  YES, THERE IS A CONSEQUENCE.

11  Q.  WHAT IS THE CONSEQUENCE?

12  A.  UNDER OUR DISCIPLINARY POLICIES, YOU CAN RECEIVE

13  DISCIPLINE FOR NOT WEARING THE BADGE.

14  Q.  WHY CHANGE FROM A PHOTOLESS BADGE TO A PHOTO BADGE?

15  A.  IT PROVIDES MORE SECURITY, A HIGHER LEVEL OF SECURITY.

16  Q.  NOW THE BADGE ACTS AS AN IDENTIFICATION TOOL, CORRECT?

17  A.  YES.

18  Q.  DOES IT SERVE ANY OTHER FUNCTION?

19  A.  YES.  THERE IS A BAR, A SCAN BAR ON THE BACK SIDE OF THE

20  BADGE THAT IS USED FOR THE HOURLY EMPLOYEES WHO USE A CLOCK TO

21  CLOCK IN.  AND THEY SCAN THE BAR TO -- WHICH HAS THEIR NUMBERS,

22  AND THEY CLOCK IN AND OUT OF WORK THAT WAY.

23  Q.  IS THAT IN LIEU OF MANUAL SIGN-IN, SIGN-OUT SHEETS?

24  A.  YES.

25  Q.  DOES THE BADGE -- DOES THAT SWIPING OF THE BADGE KEEP

1   TRACK OF WHERE THE EMPLOYEE IS IN THE BUILDING?

2   A.   NO, IT DOES NOT.

3   Q.   SO IT DOESN'T CONTROL ACCESS?

4   A.   IT ONLY ALLOWS THEM INTO THE BUILDING.  IT ALLOWS THEM --

5   THROUGHOUT THE BUILDING, THEY NEED TO HAVE THEIR BADGE ON, BUT

6   IT DOESN'T CONTROL ACCESS.  YOU DON'T HAVE TO SWIPE THE BADGE

7   TO GET INTO CERTAIN AREAS OF THE BUILDING.

8   Q.   WHAT WOULD HAPPEN IF AN EMPLOYEE CAME IN WITH A BADGE ON

9   ON THEIR DAY OFF?  IS THERE -- IS THAT A VIOLATION OF THE

10  POLICY OF THE CONVENTION CENTER?

11  A.   WELL, THEY'RE NOT TO BE IN THE BACK OF THE HOUSE UNLESS

12  THEY'RE ON WORK, OR UNLESS THEY HAVE BUSINESS TO BE THERE.  IF

13  THEY'RE THERE FOR A MEETING WITH THE MANAGER OR SOMETHING, THEY

14  CAN BE THERE FOR THAT PURPOSE.  BUT THEY'RE NOT TO BE USING THE

15  BADGE TO GAIN UNAUTHORIZED ENTRY INTO THE BUILDING.

16  Q.   FOR EXAMPLE, IF AN EMPLOYEE DECIDED THAT HE REALLY,

17  REALLY, REALLY WANTED TO GO TO COMICON AND DIDN'T BUY A TICKET,

18  WOULD HE BE ABLE TO GET IN WITH HIS BADGE?

19  A.   HE MIGHT BE ABLE TO GET IN AND PASS THROUGH.  BUT IF HE'S

20  FOUND THAT HE'S USED HIS BADGE INAPPROPRIATELY TO GAIN ACCESS

21  TO AN EVENT, THERE ARE DISCIPLINARY POLICIES THAT WOULD COME

22  INTO PLAY.

23  Q.   I WANT TO CHANGE SUBJECTS AND DISCUSS TRAINING OF

24  EMPLOYEES AT THE CONVENTION CENTER.  CAN YOU SUMMARIZE FOR THE

25  JURY THE TRAINING THAT IS PROVIDED TO NEW EMPLOYEES BY THE

1   HUMAN RESOURCES DEPARTMENT AT THE CONVENTION CENTER.

2   A.   YES.   WE CALL THAT SPIRIT TRAINING.   ON THE FIRST DAY OF

3   EMPLOYMENT, WE'LL TAKE THE EMPLOYEES THROUGH A NUMBER OF HOURS

4   OF TRAINING, AGAIN, DEPENDING ON THE LEVEL OF THE INDIVIDUAL.

5   THEY ALL GO THROUGH A MINIMUM OF FOUR HOURS.   THAT FOUR HOURS

6   TALKS ABOUT THE CORPORATION, THE CULTURE OF THE CORPORATION,

7   HOW TO CONDUCT BUSINESS, THE ISSUES THAT ARE IMPORTANT TO US,

8   CLIENT -- CUSTOMER SERVICE AND CLIENT SERVICE, IT TALKS ABOUT

9   OUR POLICIES AND PROCEDURES.

10       WE HAVE A SECTION IN THERE THAT TALKS ABOUT THE EMERGENCY

11   PREPAREDNESS, THAT'S WHAT WE CALL MODULE I, EMERGENCY

12   PREPAREDNESS.   AND THEN BEYOND THE FIRST FOUR HOURS, WHICH IS

13   GENERAL OVERVIEW OF THE CORPORATION, WE WILL THEN TAKE THEM

14   THROUGH, AGAIN DEPENDING ON WHAT POSITION THEY HOLD, AND WHAT

15   PROGRAMS, SYSTEMS THEY WILL BE USING, WE TAKE THEM THROUGH AND

16   GET THEM INTRODUCED TO THE VARIOUS PROGRAMS THAT CAN BE USED IN

17   THE BUILDING, BE IT A TIME CLOCK, BE IT A COMPUTER, BE IT -- IF

18   THEY'RE CLERICAL, WHETHER IT'S THE OFFICE PRODUCTS, MICROSOFT

19   OFFICE, OR WHETHER IT IS OUR HR SYSTEM, OR WHETHER IT IS OUR

20   BOOKING SYSTEM, WHATEVER THE SYSTEM IS THAT THEY'RE GOING TO BE

21   USING, WE'LL GET THEM INTRODUCED TO THAT.   AND THAT'S WHAT WE

22   ENTAIL IN THE SPIRIT.   AND NOW AGAIN, DEPENDING ON WHAT LEVEL

23   OF EMPLOYEE YOU ARE, IT MAY TAKE A LITTLE OVER HALF A DAY, TO

24   TWO TO THREE DAYS TO GO THROUGH THAT PROCESS.

25   Q.   I'LL BREAK THIS DOWN SO THAT WE CAN KEEP TRACK OF ALL

1    THESE PIECES YOU TALKED ABOUT IN THE SUMMARY.  FIRST OF ALL,

2    THE SPIRIT TRAINING, HOW LONG HAS THAT BEEN IN PLACE?

3    A.    THAT WAS IN PLACE BEFORE I CAME TO THE CORPORATION.

4    Q.    AND DO YOU KNOW WHAT THE MODEL IS FOR THE SPIRIT TRAINING?

5    A.    IT WAS ORIGINALLY MODELED AFTER DISNEYLAND.

6    Q.    AND YOU COVERED SOME OF THE REASONS FOR IT, FOR THE

7    TRAINING, AND I'D ACTUALLY LIKE YOU TO TAKE A LOOK AT EXHIBIT

8    1204 IN EVIDENCE, FIRST PAGE.  AND I'LL GET THE BOOK FOR YOU.

9         DO YOU HAVE EXHIBIT 1204 IN FRONT OF YOU, MR. MAZZOCCO?

10   A.    YES, I DO.

11   Q.    BEFORE I ASK YOU SOME QUESTIONS ABOUT 1204, QUICK QUESTION

12   ABOUT TEMPS.  DO TEMPS GET SPIRIT TRAINING?

13   A.    YES, THEY DO.

14   Q.    THE SPIRIT, THE PREAMBLE OF THE EMPLOYEE HANDBOOK, WHICH

15   IS THE FIRST PAGE OF EXHIBIT 1204, IT TALKS ABOUT THE CULTURE

16   OF THE CONVENTION CENTER.

17   A.    YES, CORRECT.

18   Q.    CAN YOU JUST DESCRIBE THAT CULTURE FOR THE JURY.

19   A.    WELL, IT IS A CULTURE OF CUSTOMER SERVICE, MAKING SURE THE

20   CUSTOMER IS PLEASED WITH THE PRODUCT THAT WE PUT OUT.  WE'RE A

21   COMMUNITY BENEFIT ORGANIZATION.  WE WANT TO MAKE SURE THAT WE

22   SATISFY THE CUSTOMERS AND BRING THEM BACK TO OUR COMMUNITY.  SO

23   IT'S A CULTURE OF OPENNESS, AND IT'S A CULTURE OF MAKING SURE

24   WE PROVIDE AN EXCELLENT SERVICE, MAKING SURE THAT WE MEET THE

25   CLIENT'S NEEDS WHILE THEY'RE IN THE BUILDING.

1    Q.   EVERYONE VISITING OUR FACILITIES IS A VIP AND SHOULD BE

2    TREATED AS YOUR PERSONAL GUEST.

3    A.   YES.

4    Q.   HOW IMPORTANT IS THAT TO THE PHILOSOPHY OF THE CONVENTION

5    CENTER?

6    A.   IT IS VERY IMPORTANT.

7    Q.   WHY?

8    A.   BECAUSE WE WANT THOSE INDIVIDUALS, WHETHER THEY'RE A

9    CLIENT OR THEY ARE A GUEST, OR ATTENDEE AT ONE OF THEIR

10   MEETINGS, TO HAVE AN OUTSTANDING EXPERIENCE WHILE THEY'RE IN

11   SAN DIEGO AND MAKE SURE THAT THEY RETURN TO SAN DIEGO AND COME

12   BACK TO OUR BUILDING AND OUR CITY.

13   Q.   IF YOU COULD TURN TO THE SECOND PAGE OF EXHIBIT 1204, AND

14   HIGHLIGHT THE SECOND PARAGRAPH.

15        I'LL READ THIS TO YOU AND ASK YOU SOME QUESTIONS ABOUT IT.

16        YOU'LL BE TRAINED AND ASSIGNED AN IMPORTANT ROLE TO

17   PROUDLY PRESENT THE ORGANIZATION FOR THE CITY OF SAN DIEGO AND

18   THE ENTIRE SAN DIEGO AREA.  HENCEFORTH, YOU ARE AN OFFICIAL

19   HOST AND EVERYONE VISITING OUR FACILITIES IS YOUR GUEST.  WHAT

20   YOU DO AND HOW YOU ACT CREATES AN IMAGE THAT OUR GUESTS WILL

21   USE TO JUDGE OUR ENTIRE STAFF, FACILITIES, AND CITY.  EVERY

22   MEMBER OF OUR TEAM IS IN A POSITION TO CONTRIBUTE TOWARDS OUR

23   SUCCESS.  THEREFORE, YOUR ROLE IS IMPORTANT AND SHOULD BE

24   PERFORMED WITH STRICT ADHERENCE TO EACH AND EVERY DETAIL OF

25   APPEARANCE, SPEECH, COURTESY, EFFICIENCY, ETHICS AND INTEGRITY.

1   BE PROFESSIONAL AT ALL TIMES.  OUR GUESTS' INITIAL IMPRESSIONS

2   ARE LASTING ONES, AND WE NEVER GET A SECOND CHANCE TO MAKE A

3   GOOD FIRST IMPRESSION.

4        IS THAT SOMETHING THAT IS TAUGHT TO EVERY NEW EMPLOYEE

5   THAT JOINS THE CONVENTION CENTER?

6   A.   YES, IT IS.

7   Q.   AND AGAIN, WHY IS THAT IMPORTANT TO TEACH THEM THIS

8   SPIRIT?

9   A.   AGAIN, WE WANT TO MAKE SURE THAT OUR CLIENTS AND THE

10  ATTENDEES AND THE EVENTS THAT COME TO THE CONVENTION CENTER AND

11  COME TO THE CITY, HAVE AN EXCELLENT EXPERIENCE IN THE CITY OF

12  SAN DIEGO, AND IN OUR BUILDING, SO THAT THEY RETURN TO

13  SAN DIEGO.

14  Q.   IF YOU COULD TURN TO PAGE 3.  AND HIGHLIGHT THE TOP

15  PARAGRAPH.  CLEANLINESS, THE IMAGE EACH OF US PROJECTS REFLECTS

16  ON THE ENTIRE TEAM.  EXCELLENCE IS OUR MINIMUM STANDARD OF

17  MAINTAINING OUR FACILITIES AND IN PERSONAL GROOMING, CREATING

18  AN EXCEPTIONAL FIRST IMPRESSION FOR OUR CLIENTS.

19       IS THE IMPORTANCE OF CLEANLINESS TAUGHT TO THE NEW

20  RECRUITS, THE NEW EMPLOYEES, JOINING THE CONVENTION CENTER?

21  A.   YES.

22  Q.   AND THE REASON AGAIN?

23  A.   AGAIN, WE WANT TO MAKE SURE THAT WE GIVE A POSITIVE

24  IMPRESSION TO OUR CLIENTS AND TO THE ATTENDEES OF THEIR EVENTS.

25  Q.   DOES THE SPIRIT TRAINING INCLUDE A TOUR OF THE BUILDING?

1   A.   YES, IT DOES.

2   Q.   WHAT IS THE REASON FOR THAT?

3   A.   JUST SO THEY HAVE A KNOWLEDGE OF THE BUILDING.   IT IS NOT

4   SOMETHING THAT WE EXPECT THEM TO MEMORIZE WHERE EVERYTHING IS,

5   BUT IT'S TO GIVE THEM A GENERAL KNOWLEDGE OF WHAT THE BUILDING

6   CONSISTS OF.   AND IT ALSO GIVES THEM THE MAGNITUDE OF THE

7   BUILDING.

8   Q.   DOES THE SPIRIT TRAINING ALSO INCLUDE INSTRUCTIONS ON

9   GROOMING, DRESS, AND UNIFORMS?

10  A.   YES, IT DOES.

11        MR. ERGASTOLO:   MS. JOHNSON, PAGE 12, PLEASE.   WOULD

12  YOU HIGHLIGHT THE TOP, THE CAPTION IN THE FIRST PARAGRAPH.

13  BY MR. ERGASTOLO:

14  Q.   AND THIS -- GENERALLY, THE SPIRIT PROGRAM, IMPRESSES ON

15  NEW EMPLOYEES THE IMPORTANCE OF THEIR PHYSICAL APPEARANCE?

16  A.   YES.

17  Q.   IN FACT, IT STATES, THIS APPEARANCE GOES BEYOND JUST YOUR

18  CLOTHES.   IT INCLUDES YOUR HAIR, YOUR FINGERNAILS, JEWELRY,

19  MAKEUP, PERFUMES, COLOGNES, HOSIERY, SOCKS AND SHOES.

20  A.   YES, IT DOES.

21        THE COURT:   AND THIS IS READING FROM PAGE 12?

22        MR. ERGASTOLO:   YES.

23        THE COURT:   OKAY.

24  BY MR. ERGASTOLO:

25  Q.   IT SEEMS LIKE A LOT OF DETAILS, MR. MAZZOCCO.

1  A.   YES, IT DOES.

2  Q.   WHY IS THAT IMPORTANT?

3  A.   IT IS IMPORTANT TO US BECAUSE WE WANT TO MAKE SURE THAT WE

4  GIVE OUR CLIENTS, AND THEIR ATTENDEES, A POSITIVE EXPERIENCE OF

5  SAN DIEGO.

6  Q.   AND THE GROOMING IS A BIG PART OF THAT?

7  A.   YES, IT IS.

8  Q.   DOES THE CONVENTION CENTER REQUIRE CERTAIN OF ITS

9  EMPLOYEES TO WEAR UNIFORMS?

10  A.   YES, WE DO.

11  Q.   ARE THE CLEANING DEPARTMENT EMPLOYEES REQUIRED TO WEAR

12  UNIFORMS?

13  A.   YES, THEY ARE.

14  Q.   WHAT ABOUT THE SECURITY DEPARTMENT?

15  A.   YES, THEY ARE UNIFORMED.

16  Q.   WHO MAINTAINS THOSE UNIFORMS?

17  A.   WE DO.  THE CORPORATION DOES.

18  Q.   AND HOW DOES IT DO THAT?

19  A.   THE EMPLOYEES TURN THE UNIFORMS IN THAT ARE WORN, AND THEN

20  WE SEND THEM OFF TO BE CLEANED AND REISSUED BACK TO THE

21  EMPLOYEE?

22  Q.   SO IS THERE A WARDROBE DEPARTMENT WITHIN THE BUILDING?

23  A.   YES, THERE IS.

24  Q.   DOES THAT WARDROBE DEPARTMENT ALSO HAVE A SECURITY

25  FUNCTION IN THE SENSE OF CONTROL OVER THE UNIFORMS?

1   A.   YES, THEY DO.

2   Q.   WHAT HAPPENS IF AN EMPLOYEE SHOWS UP TO WORK WITHOUT A

3   UNIFORM?

4   A.   THEY'RE NOT PUT TO WORK.

5   Q.   WHERE DO THEY GO?

6   A.   WELL, IF WE HAVE A UNIFORM AVAILABLE TO THEM IN WARDROBE,

7   WE'LL TRY AND GET THEM UNIFORMED, BUT IF NOT, THEY GO HOME.

8   THEY'RE SENT HOME.

9   Q.   MR. MAZZACCO, PLEASE TURN TO PAGE 13.  AND THIS IS THE

10   BADGING POLICY WE DISCUSSED EARLIER AS WRITTEN RIGHT INTO THE

11   SAN DIEGO SPIRIT TRAINING?

12   A.   YES.

13   Q.   ONLY PHOTO -- I'M READING FROM PAGE 13, THE SECOND OR

14   THIRD SENTENCE OF THE NAME BADGE SECTION, ONLY PHOTO

15   IDENTIFICATIONS OR OTHER SPECIAL EVENT RIBBONS OR PINS ISSUED

16   OR AUTHORIZED BY THE CORPORATION ARE TO BE WORN.  DO YOU SEE

17   THAT?

18   A.   YES.

19   Q.   WHAT IS THE GOAL THERE?

20   A.   IT'S SO EMPLOYEES DON'T DECIDE TO WEAR WHATEVER THEY WANT

21   TO WEAR ON THEIR UNIFORM.  IT'S TO MAINTAIN THE PROPER IMAGE

22   AND PROPER PLACE OF THE UNIFORM.

23   Q.   ARE CONVENTION CENTER EMPLOYEES TAUGHT HOW TO GREET GUESTS

24   AS PART OF THE SPIRIT TRAINING?

25   A.   THEY'RE TAUGHT TO GREET THE GUESTS WARMLY, YES.

1  Q.   ARE THEY TAUGHT WHAT TO DO IN CASE A QUESTION IS PRESENTED

2  TO THEM?

3  A.   YES, THEY ARE.

4  Q.   WHAT ARE THEY TAUGHT TO DO IF THEY DON'T KNOW THE ANSWER

5  TO A QUESTION?

6  A.   THEY'RE TAUGHT TO TAKE THEM TO SOMEBODY THAT KNOWS THE

7  ANSWER TO THE QUESTION.

8  Q.   AMONG OTHER ITEMS COVERED -- I'M GOING TO READ THE LIST,

9  ON PAGE 14 -- A DESCRIPTION OF WHAT YOUR FINGERNAILS SHOULD

10  LOOK LIKE, HOW MUCH MAKEUP YOU SHOULD BE WEARING, WHICH SHOES

11  ARE APPROPRIATE, AND WHAT YOUR SOCKS SHOULD LOOK LIKE?

12  A.   YES.

13  Q.   NOW DOES THE SPIRIT TRAINING ALSO INCLUDE EMERGENCY

14  TRAINING?

15  A.   IT DOES.

16  Q.   AND IF I COULD HAVE YOU TAKE A LOOK AT PAGE 17.  JUST PUT

17  UP ON THE SCREEN THE LOWER PART OF PAGE 17 OF EXHIBIT 1204.

18      IS THIS AN EXAMPLE OF THE TRAINING GIVEN TO EMPLOYEES IN

19  CASE OF A FIRE?

20  A.   YES, IT WOULD BE.

21  Q.   THEY'RE INSTRUCTED ON WHAT TO DO?

22  A.   YES.

23  Q.   ARE THEY ALSO INSTRUCTED ON WHAT TO DO IN CASE OF A BOMB

24  THREAT?

25  A.   YES.

1   Q.   WHAT ABOUT FIRST AID, ARE THEY INSTRUCTED ON WHAT TO DO IF

2   THERE IS A FIRST AID SITUATION?

3   A.   YES.

4   Q.   NOW THERE IS A -- IS THERE A SEPARATE COMPONENT TO

5   TRAINING THAT SPECIFICALLY DEALS WITH EMERGENCY PREPAREDNESS?

6   A.   YES, THERE IS.

7   Q.   WHEN DOES THE EMERGENCY PREPAREDNESS TRAINING TAKE PLACE?

8   A.   IT WOULD TAKE PLACE WITHIN THE FIRST SIX MONTHS, OR WITHIN

9   THE PROBATIONARY PERIOD, THAT THE EMPLOYEE IS EMPLOYED.

10  Q.   WHAT DO YOU MEAN BY "PROBATIONARY PERIOD"?

11  A.   WE HAVE A PROBATIONARY PERIOD OF EVERY NEW EMPLOYEE, AND

12  IT'S A SIX-MONTH PROBATIONARY PERIOD.  SO IT -- BEFORE THAT

13  PROBATIONARY PERIOD IS ENDED, THEY MUST GO THROUGH WHAT WE CALL

14  MOD II OF THE EMERGENCY PREPAREDNESS.

15  Q.   AND WHO SUPPLIES THE EMERGENCY PREPAREDNESS TRAINING?

16  A.   HUMAN RESOURCES PERFORMS THAT.

17  Q.   IF I COULD HAVE YOU TAKE A LOOK AT WHAT IS MARKED AS

18  EXHIBIT 421.

19        (DEFENDANT'S EXHIBIT 421 MARKED FOR IDENTIFICATION.)

20  BY MR. ERGASTOLO:

21  Q.   WOULD YOU IDENTIFY EXHIBIT 421 FOR THE RECORD, PLEASE.

22  A.   IT'S A NUMBER OF MANUALS CONCERNING SECURITY AND EMERGENCY

23  TRAINING.

24  Q.   AND THESE ARE -- THEY'RE ALL TOGETHER IN AN EXHIBIT.  IS

25  THERE A REASON THEY'RE TOGETHER IN ONE EXHIBIT?

1   A.   JUST FOR PLACEMENT, I MEAN, STORAGE.

2   Q.   ARE THEY COLLECTED LIKE THIS WITHIN HUMAN RESOURCES?

3   A.   WE DO HAVE A BINDER THAT HAS THIS IN THIS WAY, YES.

4   Q.   SO THIS IS A HUMAN RESOURCES BINDER, ESSENTIALLY, THAT

5   CONTAINS ALL OF THESE DIFFERENT MANUALS?

6   A.   YES.

7           MR. ERGASTOLO:  MOVE TO ADMIT EXHIBIT 421.

8           THE COURT:  ANY OBJECTION?

9           MR. SLANIA:  IT'S CUMULATIVE, YOUR HONOR.  I'D LIKE

10  TO HAVE A LITTLE BIT OF TIME TO LOOK AT THIS 275-PAGE EXHIBIT.

11          THE COURT:  LET'S MOVE ON TO SOMETHING ELSE.  AND

12  GIVE HIM A CHANCE TO EXAMINE THE DOCUMENT IN FULL, UNLESS THERE

13  IS SOME PARTICULAR PORTION YOU WANT TO EXCISE TO USE RIGHT NOW.

14  IF NOT, LET'S MOVE ON TO THE NEXT LINE OF QUESTIONS.

15  BY MR. ERGASTOLO:

16  Q.   WE'LL COME BACK TO THE MANUAL AFTER THE BREAK, WHEN

17  MR. SLANIA HAS HAD AN OPPORTUNITY TO TAKE A LOOK AT IT.

18          IN ADDITION TO THE HUMAN RESOURCES TRAINING PROVIDED WHEN

19  AN EMPLOYEE IS FIRST HIRED, DOES THE HUMAN RESOURCES DEPARTMENT

20  DO ANY ADDITIONAL TRAINING?

21  A.   YES, WE DO.

22  Q.   CAN YOU DESCRIBE THAT FOR THE JURY, PLEASE.

23  A.   WE DO EMERGENCY PREPAREDNESS, MOD II, WHICH IS A FOUR-HOUR

24  BLOCK OF TRAINING.  WE DO RESPECT IN THE WORK PLACE, WHICH

25  ENCOMPASSES HARASSMENT, SEXUAL HARASSMENT AWARENESS, FOR BOTH

1    SUPERVISORS AND OTHER EMPLOYEES.  WE DO SAFETY TRAINING.  WE DO

2    LEADERSHIP TRAINING.  WE DO ADMINISTRATIVE TRAINING.  THERE IS

3    A WHOLE ARRAY OF FIRST AID TRAINING.  WE BRING IN OUTSIDE

4    CONSULTANTS TO PERFORM VARIOUS FIRST AID AND CPR TRAINING, FIRE

5    SAFETY TRAINING.

6    Q.   YOU MENTIONED EMERGENCY PREPAREDNESS TRAINING AS A

7    FOLLOW-UP COURSE AS WELL?

8    A.   YES.

9    Q.   IS THAT IN ADDITION TO THE EMERGENCY PREPAREDNESS TRAINING

10   THAT TAKES PLACE WHEN THE EMPLOYEE IS FIRST HIRED?

11   A.   YES.

12   Q.   ARE ALL EMPLOYEES REQUIRED TO TAKE THE FOLLOW-UP EMERGENCY

13   PREPAREDNESS TRAINING?

14   A.   YES, THEY ARE.

15   Q.   IS THERE A REQUIREMENT ON HOW OFTEN THOSE EMPLOYEES HAVE

16   TO TAKE THAT TRAINING?

17   A.   WELL, THE INITIAL TRAINING IS A FOUR-HOUR BLOCK OF TIME,

18   AND THEN WE HAVE TWO-HOUR BLOCK OF FOLLOW-UP TRAINING, AND

19   THAT'S TAKEN EVERY TWO YEARS.

20   Q.   HOW DO THE EMPLOYEES KNOW WHEN THEY NEED TO TAKE A

21   FOLLOW-UP TRAINING FOR EMERGENCY TRAINING?

22   A.   HUMAN RESOURCES TRACKS WHEN THEY TAKE THE TRAINING AND

23   SENDS OUT NOTICES WHEN THEY'RE DUE TO TAKE THE REFRESHER.

24   Q.   HOW LONG HAS THE FOLLOW-UP TRAINING FOR EMERGENCY

25   PREPAREDNESS BEEN IN PLACE AT THE CONVENTION CENTER?

1    A.   A NUMBER OF YEARS.   IT'S BEEN IN PLACE FOR A NUMBER OF

2    YEARS.

3    Q.   IN ADDITION TO HUMAN RESOURCES TRAINING, ARE NEW EMPLOYEES

4    PROVIDED ADDITIONAL TRAINING?

5    A.   I'M SORRY?

6    Q.   ONCE HUMAN RESOURCES IS DONE WITH THE EMPLOYEE, ARE THEY

7    THEN FURTHER TRAINED BY SOMEONE ELSE AT THE CONVENTION CENTER?

8    A.   OH, YES, YES.   THEY RECEIVE WHAT I CALL OCCUPATIONAL

9    TRAINING OR DEPARTMENTAL TRAINING BY THEIR DEPARTMENTS.

10   Q.   AND COULD YOU DESCRIBE WHAT YOU MEAN BY THE "OCCUPATIONAL

11   TRAINING"?

12   A.   FOR CLEANING SERVICES, FOR INSTANCE, IT WOULD BE TRAINING

13   THEM IN HOW TO OPERATE THE EQUIPMENT THE CLEANING SERVICES

14   USES, HOW TO USE THE CHEMICALS THAT THEY USE, THE CLEANSERS

15   THAT THEY USE, WHETHER IT IS A TENANT (PHONETIC) OR WALK-ALONG

16   SWEEPER OR VACUUM, OR WHATEVER THE PIECE OF EQUIPMENT IS, HOW

17   THEY PERFORM THEIR TASKS ON A DAY-TO-DAY BASIS.   AND THEN THEY

18   ALSO PROVIDE SAFE ONGOING SAFETY TRAINING AS WELL.

19   Q.   HAVE YOU EVER -- IN ADDITION TO THE DEPARTMENT TRAINING,

20   AND THE ONGOING TRAINING, IS THERE ANY LINE-UP TRAINING?

21   A.   YES.

22   Q.   COULD YOU DESCRIBE THAT FOR THE JURY.

23   A.   A LINE-UP IS WHAT WE DO EVERY DAY BEFORE THE SHIFT STARTS.

24   AND DURING THE LINE-UP, THE EMPLOYEES WOULD RECEIVE THEIR WORK

25   ASSIGNMENTS -- OR AT LEAST THEIR INITIAL WORK ASSIGNMENTS FOR

1   THAT DAY.  AND THEN THEY WOULD ALSO RECEIVE SOME FORM OF

2   TRAINING, BE IT AN OCCUPATIONAL TRAINING OR BE IT SAFETY

3   TRAINING.

4   Q.   NOW THE TEMPORARY EMPLOYEES, ARE THEY PROVIDED HUMAN

5   RESOURCES DEPARTMENT TRAINING?

6   A.   THEY'RE PROVIDED THE SPIRIT TRAINING, YES.

7   Q.   AND ARE THEY ALSO PROVIDED DEPARTMENT TRAINING?

8   A.   YES.

9   Q.   IS THERE A SYSTEM IN PLACE TO ASSIST THE TEMPS TO WORK AT

10  THE CONVENTION CENTER?

11  A.   WE BRING THEM IN EARLY, USUALLY BEFORE THE SHOW STARTS, TO

12  GIVE THEM THE BASIC TRAINING THAT THEY'LL NEED WITHIN THE

13  DEPARTMENT.  SO ONCE HUMAN RESOURCES TAKES THEM THROUGH THE

14  SPIRIT TRAINING, THEN WE HAND THEM OVER TO THE DEPARTMENT TO

15  TAKE THEM THROUGH I'M SURE ABBREVIATED TRAINING, BUT IT'S A

16  TRAINING FOR WHAT THEY'RE GOING TO BE DOING WHEN THEY'RE

17  EMPLOYED DURING THE EVENT.  AND THEN THE DEPARTMENT TEAMS THEM

18  UP, IT MIGHT BE ONE, TWO, THREE TEMPORARIES, WITH A REGULAR

19  FULL-TIME OR PART-TIME EMPLOYEE, THAT -- SO DURING THE SHOW,

20  THEY'RE TEAMED UP WITH THAT EMPLOYEE.

21  Q.   HAS THAT BEEN THE PRACTICE OF THE CONVENTION CENTER, TO

22  TEAM UP TEMPORARY EMPLOYEES WITH EITHER FULL OR PART-TIME

23  CONVENTION CENTER EMPLOYEES?

24  A.   YES.

25  Q.   I'D LIKE YOU TO TAKE A LOOK AT WHAT WE'VE MARKED AS 806.

1          (DEFENDANT'S EXHIBIT 806 MARKED FOR IDENTIFICATION.)

2     BY MR. ERGASTOLO:

3     Q.   IF YOU COULD IDENTIFY EXHIBIT 806 FOR THE RECORD, PLEASE.

4     A.   THIS IS A SECURITY LIFE AND FIRE SAFETY RELATED TRAINING

5     FOR CLEANING SERVICES WORKERS.  IT IS A LIST OF TRAINING

6     PROGRAMS.  IT SHOWS WHO SPONSORS THE PROGRAM.  IT SHOWS WHO

7     ATTENDS THE PROGRAM.  WHETHER -- WHAT THE PRIORITY IS, HOW LONG

8     THE PROGRAM IS, AND WHAT THE RENEWAL FREQUENCY IS.

9     Q.   IS THIS A DOCUMENT YOU'RE FAMILIAR WITH FROM YOUR WORK IN

10    THE HUMAN RESOURCES DEPARTMENT AT THE CONVENTION CENTER?

11    A.   YES.

12    Q.   KEPT IN THE NORMAL COURSE OF THE BUSINESS OF THE

13    CONVENTION CENTER?

14    A.   YES.

15          MR. ERGASTOLO:  MOVE TO ADMIT 806.

16          MR. SLANIA:  IT'S CUMULATIVE.  HE'S ALREADY TESTIFIED

17    TO IT.

18          THE COURT:  ON THAT BASIS, IT WILL BE RECEIVED.

19    OBJECTION OVERRULED.

20          (DEFENDANT'S EXHIBIT 806 RECEIVED INTO EVIDENCE.)

21    BY MR. ERGASTOLO:

22    Q.   WE'VE GONE THROUGH SOME OF THESE, MAYBE ALL OF THESE, BUT

23    THIS IS A DOCUMENT THAT SUMMARIZES THE TRAINING FOR CLEANING

24    SERVICE WORKERS, CORRECT?

25    A.   YES.

1   Q.   AND THE FIRST ITEM IS AED CPR TRAINING.  WHAT IS THAT?

2   A.   AUTOMATIC ELECTRONIC DEFIBRILLATORS.  IT'S EQUIPMENT THAT

3   WE HAVE AT VARIOUS PLACES AROUND THE BUILDING FOR HEART

4   RESUSCITATION, HEART ATTACK.

5   Q.   AND THE FOURTH COLUMN, THE COLUMN THAT'S LABELED "LEVEL,"

6   WHAT DOES THAT MEAN?

7   A.   THAT IS THE LEVEL OF EMPLOYEE THAT WOULD RECEIVE THAT

8   TRAINING.

9   Q.   SO THIS INDICATES THAT SUPERVISORS RECEIVE THAT TRAINING,

10  CORRECT?

11  A.   IN THE CLEANING SERVICES AREA, YES.

12  Q.   BUT THE RANK AND FILE WOULD NOT RECEIVE THAT TRAINING?

13  A.   NO.

14  Q.   THE NEXT ITEM, BIOHAZARDS AND BLOOD BORN PATHOGEN SAFETY?

15  A.   YES.

16  Q.   WHAT IS THAT?

17  A.   IT'S DEALING WITH CONTAMINATES.  IF SOMEONE IS BLEEDING IN

18  THE BUILDING, WE HAVE MEDICAL SHOWS IN THE BUILDING, SO THEY

19  HAVE TO UNDERSTAND HOW TO CLEAN THAT UP AND DEALING WITH THE

20  BIOHAZARDS AND BLOOD BORN PATHOGENS.

21  Q.   AND WHO IN THE CLEANING DEPARTMENT IS REQUIRED TO TAKE

22  THAT TRAINING?

23  A.   ALL OF THEM IN THE DEPARTMENT.

24  Q.   AND IT LOOKS LIKE THAT TRAINING HAS A LOT OF UPDATES

25  REQUIRED.

1    A.   EVERY TWO YEARS.

2    Q.   AND WE'VE TALKED ABOUT SOME OF THE EMERGENCY PREPAREDNESS,

3    THE NEXT THREE.  SO I DON'T WANT TO GO OVER THOSE AGAIN, BUT I

4    JUST WANT TO NOTE, ON THE UPDATES, THAT'S ALSO REQUIRED TO BE

5    TAKEN QUITE OFTEN?

6    A.   YES.

7    Q.   ON THE SPIRIT ORIENTATION LINE, POLICIES AND PROCEDURES

8    SECTION, DO YOU SEE THAT LINE?

9    A.   YES.

10   Q.   IS THAT SOMETHING DIFFERENT THAN WHAT WE'VE TALKED ABOUT

11   FOR SPIRIT ORIENTATION?

12   A.   NO.

13   Q.   BUT IT LOOKS LIKE IT'S REQUIRED TO BE GIVEN OFTEN?

14   A.   THOSE ARE THE UPDATES, WHEN THE PROGRAM IS UPDATED.

15   Q.   SO WHEN THERE IS SOMETHING CHANGED WITHIN THE SPIRIT

16   PROGRAM, WHATEVER IS CHANGED IS TAUGHT?

17   A.   YES.

18   Q.   THEN THE NEXT ITEM SAYS, RADIO AND NEXTEL COMMUNICATIONS,

19   SURVEILLANCE, SUSPICIOUS BEHAVIORS, BOMBS, PACKAGES.  DO YOU

20   SEE THAT LINE, SURVEILLANCE, SUSPICIOUS BEHAVIORS, BOMBS AND

21   PACKAGES?

22   A.   YES.

23   Q.   WHAT IS THAT?

24   A.   THAT IS SPONSORED BY SECURITY.  AND SECURITY USUALLY

25   BRINGS IN A THIRD PARTY TO -- AN OUTSIDE PARTY TO COME IN AND

1    PROVIDE THAT TRAINING, USUALLY DEPARTMENT OF HOMELAND SECURITY.

2    AND THAT IS PROVIDED TO FULL-TIME EMPLOYEES IN THAT DEPARTMENT.

3    Q.    AND IT LOOKS LIKE IT IS ALSO REPEATED OCCASIONALLY?

4    A.    YES.

5    Q.    HAVE YOU PARTICIPATED IN THAT TRAINING?

6    A.    YES.

7    Q.    WHAT DOES THAT TRAINING CONSIST OF?

8    A.    WELL, IT TALKS ABOUT BEING AWARE OF WHAT IS IN THE

9    SURROUNDINGS; IT TALKS ABOUT SUSPICIOUS PACKAGES; IT TALKS

10   ABOUT WHERE SUSPICIOUS PACKAGES MAY BE LEFT, IN WHAT POSITIONS

11   THEY MIGHT BE LEFT, AND HOW THEY MIGHT LOOK, WHETHER THERE IS A

12   WIRE STICKING OUT OF IT OR NOT.  AND IT TALKS ABOUT WHAT YOU'RE

13   TO DO IF YOU SEE A SUSPICIOUS PACKAGE.

14   Q.    THANK YOU.

15         MR. ERGASTOLO:  YOUR HONOR, MY REMAINING QUESTIONS

16   DEAL WITH EXHIBIT 421, WHICH IS THE EXHIBIT THAT THERE HAS BEEN

17   AN OBJECTION RAISED.

18         THE COURT:  HAVE YOU FOLKS HAD A CHANCE TO REVIEW IT

19   AS TO THE OBJECTIONS.  I ASSUME, EVEN THOUGH WE'VE HEARD ABOUT

20   IT, THERE ARE SOME PARTICULAR POINTS THAT MR. ERGASTOLO WANTS

21   TO MAKE.

22         MR. SLANIA:  IT'S REPETITIVE AND CUMULATIVE TO A LOT

23   OF THE TESTIMONY THAT WE'VE ALREADY RECEIVED, YOUR HONOR.  IT'S

24   275 PAGES, BUT --

25         THE COURT:  OKAY, I'LL RECEIVE IT.  SO THAT IF THERE

1  IS SOMETHING IN PARTICULAR YOU WANT TO POINT OUT, YOU CAN SO WE

2  CAN CONCLUDE THIS WITNESS.

3           MR. ERGASTOLO:  I PROMISE YOU I WILL NOT GO OVER ALL

4  275 PAGES, YOUR HONOR.

5           THE COURT:  I'LL HOLD YOU TO THAT.

6           (DEFENDANT'S EXHIBIT 421 RECEIVED INTO EVIDENCE.)

7  BY MR. ERGASTOLO:

8  Q.   YOU STILL HAVE EXHIBIT 421 IN FRONT OF YOU?

9  A.   YES, I DO.

10  Q.   YOU TESTIFIED EARLIER THAT EXHIBIT 421 IS A COLLECTION OF

11  A BUNCH OF DIFFERENT THINGS RELATED TO SECURITY AND EMERGENCY

12  TRAINING, CORRECT?

13  A.   YES.

14  Q.   THE FIRST THING I WANT YOU TO TAKE A LOOK AT IS PAGE 11.

15  AND WHAT STARTS ON PAGE 11 IN THIS MANUAL?

16  A.   TERRORISM, SURVEILLANCE AWARENESS, SUSPICIOUS BEHAVIORS,

17  BOMBS AND PACKAGES.

18  Q.   IS THAT THE ITEM WE JUST DISCUSSED IN REFERENCE TO EXHIBIT

19  806?

20  A.   YES.

21  Q.   AND THIS IS PROVIDED TO FULL-TIME EMPLOYEES IN THE

22  CLEANING DEPARTMENT?

23  A.   YES.

24  Q.   AND WHO PROVIDES THIS TRAINING?

25  A.   USUALLY IT IS THE DEPARTMENT OF HOMELAND SECURITY.

1  Q.   IF YOU CAN TURN TO PAGE 13, JUST SO THE JURY UNDERSTANDS

2  WHAT IS TAUGHT.   I'M NOT GOING TO ASK YOU A LOT OF QUESTIONS

3  ABOUT THIS.   THERE IS A DISCUSSION OF WHAT SUSPICIOUS ACTIVITY

4  IS, CORRECT --

5  A.   YES.

6  Q.   -- AS PART OF THAT TRAINING?

7     IF YOU COULD TURN TO PAGE 15.   ONE OF THE ITEMS THAT IS

8  TAUGHT IS, THINGS THAT SHOULD MAKE AN EMPLOYEE SUSPICIOUS,

9  CORRECT?

10  A.   YES.

11  Q.   AND AMONG THOSE THINGS ARE, INAPPROPRIATE PHOTOGRAPH

12  TAKING, NOTE TAKING, SOMEBODY TRYING TO DRAW A MAP, USING

13  BINOCULARS.   THERE IS A WHOLE DISCUSSION OF HELPING EMPLOYEES

14  UNDERSTAND WHAT TO LOOK FOR THAT IS SUSPICIOUS.

15  A.   YES, THAT'S CORRECT.

16  Q.   WHY IS THIS TRAINING PROVIDED TO THE CONVENTION CENTER

17  EMPLOYEES?

18  A.   WELL, THIS ALL CAME ABOUT AFTER 9/11, AND WE BECAME MORE

19  HEIGHTENED, MORE AWARE, SENSITIVE TO THE THREATS THAT ARE

20  ABOUT -- AROUND US.   WE SIT ACROSS THE BAY FROM A VERY LARGE

21  TARGET, AND WE ARE A VERY LARGE TARGET.   WE'RE TOLD BY THE

22  DEPARTMENT OF HOMELAND SECURITY THAT WE'RE A LARGE TARGET FOR A

23  TERRORIST DUE TO THE FACT THAT WE HAVE A LARGE VOLUME OF PEOPLE

24  IN OUR BUILDING.

25  Q.   IF YOU COULD TURN TO PAGE 25 OF THE EXHIBIT.   AND I THINK

1   STARTING ON PAGE 25, WE HAVE A DIFFERENT MANUAL, CORRECT?

2   A.   YES.

3   Q.   WHAT IS THE MANUAL THAT STARTS ON PAGE 25?

4   A.   THREAT PROTOCOLS.

5   Q.   WHAT IS THAT?

6   A.   TALKING ABOUT THREATS THAT MIGHT BE MADE VERBALLY, IT

7   MIGHT BE MADE ON THE TELEPHONE, IT MIGHT BE MADE ON E-MAIL.

8   Q.   AND THIS IS PART OF THE TRAINING OF NEW EMPLOYEES AT THE

9   CONVENTION CENTER?

10  A.   IT'S PART OF THE TRAINING OF EMPLOYEES, YES?

11          THE COURT:  NOT JUST ANYONE?

12          THE WITNESS:  CORRECT.

13          THE COURT:  YOUR QUESTION WAS NEW, AND HE SAID

14  EVERYBODY GETS IT, AND SO I WANTED TO CLARIFY.

15  BY MR. ERGASTOLO:

16  Q.   AND IT IS GIVEN TO THEM WHEN THEY'RE HIRED?

17  A.   YES.  CERTAIN CLASSIFICATION OF EMPLOYEES, YES.

18          MR. ERGASTOLO:  THANK YOU, YOUR HONOR.

19  BY MR. ERGASTOLO:

20  Q.   YOU CAN TURN TO THE NEXT PAGE, PAGE 26.

21      AND PART OF THIS TRAINING IS TO TEACH EMPLOYEES WHAT TO DO

22  FOR A TELEPHONE THREAT, WHAT TO DO IN CASE OF SUSPICIOUS

23  PACKAGE, AND/OR EVEN A VISITOR THREAT OR DISRUPTION?

24  A.   YES.

25  Q.   SO IN THE LAST ONE, COULD YOU DESCRIBE WHAT IS MEANT BY

1  VISITOR THREAT OR DISRUPTION?

2  A.   WE DO HAVE OCCASIONALLY PICKETS AND DEMONSTRATIONS IN OUR

3  BUILDING.  SO WE HAVE TO RECOGNIZE IF WE HAVE SOMEONE THAT

4  COMES INTO THE BUILDING TO CREATE A DISRUPTION.

5  Q.   AND EMPLOYEES ARE TRAINED ON WHAT TO DO IN RESPONSE

6  THERETO?

7  A.   YES.

8  Q.   TURN TO PAGE 29.  WHAT IS DESCRIBED ON PAGE 29,

9  MR. MAZZOCCO?

10  A.   EXIT STRATEGIES.

11  Q.   WHAT DOES THAT MEAN?

12  A.   IT IS HOW TO EXIT THE BUILDING IF THERE IS AN EMERGENCY

13  AND WE NEED TO EVACUATE THE BUILDING.

14  Q.   WHAT IS MEANT BY ISOLATION SPACES?

15  A.   IT JUST MEANS AREAS THAT ARE ISOLATED -- THEY'RE ISOLATED

16  IF THERE IS A CONTAMINANT; IF THERE IS A BOMB, IT'S ISOLATED,

17  THE AREA IS ISOLATED.

18  Q.   AND ALL EMPLOYEES ARE TAUGHT ON HOW TO EXIT THE BUILDING?

19  A.   YES.

20  Q.   IN THE CASE OF -- I'LL PICK A RANDOM -- AN EARTHQUAKE.  IN

21  ADDITION TO EXITING THE BUILDING, ARE THE EMPLOYEES TAUGHT TO

22  DO ANYTHING ELSE?

23  A.   THEY'RE INSTRUCTED TO EXIT THE BUILDING.  AND AS THEY'RE

24  EXITING TO ASSIST ANY OTHERS THAT NEED ASSISTANCE IN EXITING

25  THE BUILDING.

1   Q.   AND HOW DO THEY KNOW WHERE TO GO IN THE CASE OF AN

2   EARTHQUAKE?

3   A.   WE DRILL THEM -- WE TRAIN THEM WHERE THE ASSEMBLY POINTS

4   ARE.   WE HAVE THREE, AND WE DRILL THEM ON EXITING THE BUILDING

5   AND ASSEMBLING AT THOSE POINTS.

6   Q.   IS PART OF THE PHILOSOPHY OF THE SAN DIEGO SPIRIT TO

7   CREATE OWNERSHIP IN THE EMPLOYEES FOR THE CONVENTION CENTER?

8   A.   YES.

9   Q.   WHY IS THAT?

10  A.   WE BELIEVE IF THEY CREATE OWNERSHIP, THEY HAVE MORE VESTED

11  IN THE WORK THAT THEY DO, AND THEY'RE PROUD OF THE WORK THEY

12  DO, AND THEY'LL PERFORM BETTER.   AND THEY'LL DO WHAT NEEDS TO

13  BE DONE TO MAKE SURE THAT WE GIVE THE CLIENT THE PRODUCT

14  THEY'RE LOOKING FOR.

15  Q.   IF YOU COULD TURN TO PAGE 158, MR. MAZZOCCO.   AND THIS

16  SECTION OF THE NOTEBOOK, THIS IS THE FIRST PAGE OF A NEW PIECE,

17  CORRECT?

18  A.   YES.

19  Q.   WHAT IS IT?

20  A.   THIS IS THE EMERGENCY PREPAREDNESS HANDBOOK.

21  Q.   AND WHO GETS THE HANDBOOK?

22  A.   EVERY EMPLOYEE.

23  Q.   ARE THEY REQUIRED TO SIGN AN ACKNOWLEDGMENT THAT THEY

24  RECEIVED IT?

25  A.   YES, THEY ARE.

1  Q.   AND THEY'RE REQUIRED TO ACTUALLY READ IT?

2  A.   YES.

3  Q.   SO THEY PHYSICALLY GET SOMETHING THAT TELLS THEM A LOT

4  ABOUT -- SUMMARIZES THE THINGS WE'VE BEEN TALKING ABOUT THIS

5  AFTERNOON?

6  A.   YES.

7          MR. ERGASTOLO:  I HAVE NO FURTHER QUESTIONS.

8          THE COURT:  ANYTHING FROM THE PLAINTIFFS?

9          MR. SLANIA:  YES, YOUR HONOR.

10          THE COURT:  OKAY.

11                    CROSS-EXAMINATION

12  BY MR. SLANIA:

13  Q.   GOOD AFTERNOON, MR. MAZZOCCO.

14  A.   GOOD AFTERNOON.

15  Q.   YOU RECALL I ASKED YOU SOME QUESTIONS THE FIRST TIME YOU

16  WERE HERE ON THE 24TH.  I HAVE A FEW QUESTIONS IN RESPONSE TO

17  QUESTIONS TODAY, IT WON'T BE TOO LONG.

18  A.   OKAY.

19  Q.   THE SPIRIT ORIENTATION THAT YOU DISCUSSED AT LENGTH WITH

20  MR. ERGASTOLO, ON EXHIBIT 806, IT IDENTIFIED THAT THE TRAINING

21  WAS TWO HOURS IN LENGTH, CORRECT?

22  A.   THE SPIRIT TRAINING?

23  Q.   THE SPIRIT ORIENTATION, THE TWO-HOUR PROGRAM?

24  A.   THE SPIRIT ORIENTATION IS LONGER THAN TWO HOURS.

25  Q.   TAKE A QUICK LOOK, IF YOU COULD, I BELIEVE IT WAS 806 OR

1   807.

2           THE COURT:  IT IS 806, IS THAT THE NUMBER?

3           MR. SLANIA:  I BELIEVE SO, YOUR HONOR.

4           THE COURT:  OKAY.

5   BY MR. SLANIA:

6   Q.  IN THE MIDDLE SECTION THERE, WHERE IT'S TALKING ABOUT THE

7   SPIRIT ORIENTATION --

8   A.  YES.

9   Q.  -- THE TIME IS 2.0 HOURS, CORRECT?

10  A.  THAT'S CORRECT.

11  Q.  AND THAT IS IN THE MIDDLE, JUST FOR THE JURY'S BENEFIT, IT

12  WAS BRIEFLY IN FRONT OF THEM BEFORE.

13      BUT THAT'S THE 2.0 HOURS, RIGHT?

14  A.  YES.

15  Q.  AND YOU TESTIFIED THAT THE TEMPORARY EMPLOYEES ALSO

16  RECEIVE SPIRIT ORIENTATION?

17  A.  YES.

18  Q.  AND THAT'S EVEN FOR THE PEOPLE THAT JUST WORK ONE EVENT AT

19  THE CONVENTION CENTER EVERY YEAR, COMICON, CORRECT?

20  A.  YES.

21  Q.  NOW EARLIER MR. GESSNER -- EARLIER TODAY MR. GESSNER

22  TESTIFIED THAT WHEN THE CONVENTION CENTER OPENED, THAT THERE

23  WAS TRAINING PROVIDED TO OUTSIDE CONTRACTORS THAT WORKED IN THE

24  BUILDING BACK IN 1989.  SOME OF THE TAXI-CAB DRIVERS WERE GIVEN

25  TRAINING IN SAN DIEGO SPIRIT; WERE YOU AWARE OF THAT?

1   A.   NO, I WAS NOT.

2   Q.   THE WHOLE TIME THAT YOU'VE BEEN WORKING AT THE CONVENTION

3   CENTER, THERE HASN'T BEEN TRAINING PROVIDED TO THE OUTSIDE

4   CONTRACTORS, CORRECT?

5   A.   THERE HAS BEEN SOME.

6   Q.   IS THAT IN THESE -- WHAT'S BEEN DESCRIBED SOMEWHAT AS THE

7   QUARTERLY MEETINGS OR THE SEMI-ANNUAL MEETINGS, THAT THERE IS A

8   LITTLE BIT OF A DISCREPANCY, THEY USED TO BE QUARTERLY, BUT

9   NOW, I BELIEVE, MR. GESSNER SAID TODAY THAT THEY HAPPEN TWICE

10  OR THREE TIMES A YEAR; IS THAT CORRECT?

11  A.   THE SERVICE CONTRACTOR MEETINGS?

12  Q.   YES, SIR.

13  A.   YES.

14  Q.   AND THAT'S THE PLACE WHERE THE TRAINING IS PROVIDED TO THE

15  OUTSIDE CONTRACTORS, CORRECT?

16  A.   IF YOU'RE TALKING ABOUT THE SERVICE CONTRACTORS, YEAH -- I

17  ASSUME, YES.

18  Q.   NOW YOU ALSO TESTIFIED ABOUT THE APPLICATION PROCESS FOR

19  CONVENTION CENTER EMPLOYEES.  AND YOU ADMIT, LIKE YOU TESTIFIED

20  EARLIER, THAT THERE WAS A PERIOD OF ABOUT 12 TO 16 MONTHS WHEN

21  THE TEMPORARY CLEANING EMPLOYEES DID NOT HAVE BACKGROUND CHECKS

22  PERFORMED ON THEM, CORRECT?

23  A.   THAT'S CORRECT.

24  Q.   AND THEY ALSO DIDN'T HAVE DRUG OR ALCOHOL SCREENINGS

25  PERFORMED ON THEM DURING THAT TIME, CORRECT?

1    A.   THAT'S CORRECT.

2    Q.   AND THE REASON THAT YOU TESTIFIED THAT THAT DIDN'T TAKE

3    PLACE WAS BECAUSE THERE WERE BUDGETARY CONCERNS, CORRECT?

4    A.   YES.

5    Q.   BUT AFTER THAT 12- TO 16-MONTH TIME PERIOD THAT CLEANING

6    EMPLOYEES DID NOT GET BACKGROUND CHECKED AND DID NOT HAVE DRUG

7    SCREENS, YOU TESTIFIED THAT THOSE FINANCIAL ISSUES WERE

8    RECTIFIED AND THE CONVENTION CENTER WENT BACK TO PERFORMING THE

9    BACKGROUND CHECKS AND DRUG AND ALCOHOL SCREENINGS, CORRECT?

10   A.   WE FELT IT WAS IMPORTANT ENOUGH TO BRING IT BACK IN AND TO

11   ADDRESS THE BUDGETARY ISSUES IN ANOTHER WAY.

12   Q.   AND THAT WAS AFTER THE EXCLUSIVE POLICY THAT WE'RE

13   LITIGATING ABOUT TODAY WAS IMPLEMENTED, CORRECT?

14   A.   I DON'T KNOW THE TIMING OF THAT.

15   Q.   YOU'RE NOT AWARE THAT EFFECTIVE JULY 1ST, 2007, ALL TRADE

16   SHOW CLEANING IS TO BE PERFORMED BY SAN DIEGO CONVENTION CENTER

17   PERSONNEL IN THE BUILDING?

18   A.   I WAS NOT SPECIFICALLY AWARE OF ANY SPECIFIC DATES.

19   Q.   WELL, WERE YOU EVER NOTIFIED THAT THE CLEANING SERVICES

20   DIVISION RECEIVED AN ADDITIONAL $260,000 IN THAT PROFIT FROM

21   ITS CLEANING OPERATION AS A RESULT OF IMPLEMENTING THAT POLICY?

22   A.   I'M NOT FAMILIAR WITH THAT.

23   Q.   SO NOBODY EVER TOLD YOU THAT THOSE FINANCIAL ISSUES WERE

24   RECTIFIED BY THE ADDITIONAL MONEY THAT THE CONVENTION CENTER

25   RECEIVED FROM IMPLEMENTING THE EXCLUSIVE POLICIES IT RELATES TO

1   PERFORMANCE OF TRADE SHOW CLEANING AT THE CONVENTION CENTER?

2   A.   I'M NOT FAMILIAR WITH THAT.

3   Q.   AND YOU ALSO ADMITTED THAT EMPLOYEES AT THE CONVENTION

4   CENTER THAT WERE EMPLOYED BEFORE THE BACKGROUND CHECK POLICY

5   WAS IMPLEMENTED, HAVEN'T BEEN BACKGROUND CHECKED SINCE THEN,

6   CORRECT?

7   A.   THAT'S CORRECT.

8   Q.   AND THERE ARE TRADE SHOW CLEANING EMPLOYEES AT THE

9   CONVENTION CENTER THAT HAVE NOT HAD BACKGROUND CHECKS PERFORMED

10  ON THEM, CORRECT?

11  A.   TRADE SHOW EMPLOYEES?

12  Q.   THE CLEANING EMPLOYEES.

13  A.   CLEANING EMPLOYEES?

14  Q.   YES, SIR.

15  A.   YES, THAT'S CORRECT.

16  Q.   SO THERE ARE CURRENTLY CLEANING EMPLOYEES EMPLOYED BY THE

17  SAN DIEGO CONVENTION CENTER CORPORATION THAT HAVE NOT HAD

18  BACKGROUND CHECKS PERFORMED ON THEM, CORRECT?

19  A.   THOSE EMPLOYEES THAT WERE EMPLOYED PRIOR TO THE

20  IMPLEMENTATION OF THE POLICY, THAT'S CORRECT.

21  Q.   IN THE 12- TO 16-MONTH TIME PERIOD THAT YOU WERE REFERRING

22  TO EARLIER, THAT WAS APPROXIMATELY JULY 2007, UNTIL THE END OF

23  2008; IS THAT CORRECT?

24  A.   APPROXIMATELY.

25  Q.   AND YOU DON'T KNOW IF THAT WAS THE SAME TIME PERIOD THAT

1  THE EXCLUSIVE POLICY THAT WE'RE LITIGATING ABOUT AT THE TIME

2  PERIOD WAS AFTER THAT POLICY WAS IMPLEMENTED?

3  A.   I'M NOT AWARE WHEN THAT POLICY WAS IMPLEMENTED.

4          MR. SLANIA:  I DON'T HAVE ANYTHING FURTHER, YOUR

5  HONOR.

6          THE COURT:  MR. ERGASTOLO?

7          MR. ERGASTOLO:  NO FURTHER QUESTIONS.

8          THE COURT:  ALL RIGHT.  THANK YOU, MR. MAZZOCCO.  YOU

9  MAY STEP DOWN.

10     IS THE WITNESS EXCUSED, OR DO YOU WANT HIM SUBJECT TO

11  RECALL?

12         MR. SLANIA:  HE CAN BE EXCUSED, YOUR HONOR.

13         THE COURT:  OKAY, YOU'RE EXCUSED, SIR.

14         MR. L'ESTRANGE:  HE CAN BE EXCUSED.

15         THE COURT:  AND WE'LL USE THIS AS THE TIME TO BREAK

16  NOT ONLY FOR THE DAY, BUT THE WEEK.  SO, LADIES AND GENTLEMEN,

17  WE'LL BE IN RECESS UNTIL 9:00 MONDAY MORNING.  AND AS I TOLD

18  YOU, WE'LL HAVE THE 90-MINUTE LUNCHES ON MONDAY, WEDNESDAY;

19  OTHERWISE, IT WILL BE THE STANDARD SCHEDULE.  I'LL GIVE YOU AN

20  UPDATE ON THE FEDERAL GOVERNMENT'S FUNDING AS SOON AS I HEAR

21  IT.

22     IN THE MEANTIME, REMEMBER THE ADMONITION.  IT'S IMPORTANT

23  TO MAKE SURE THAT THESE PEOPLE GET A FAIR TRIAL.  DON'T MAKE UP

24  YOUR MIND ABOUT ANY OF THE ISSUES; DON'T DISCUSS IT AMONGST

25  YOURSELVES; DON'T DISCUSS IT WITH ANYBODY ELSE; DON'T DO ANY

1   RESEARCH.  AND HAVE A GREAT WEEKEND.  SEE YOU MONDAY MORNING.

2                    (JURY EXITS COURTROOM.)

3         THE COURT:  THE JURY IS ON THEIR WAY.  I PROPOSE WE

4   TAKE A FIVE-MINUTE BREAK.  I NEED ONE, YOU MAY NEED ONE, TOO.

5   AND THEN WE TALK ABOUT THE GOVERNMENT IMMUNITY, THE LOCAL

6   GOVERNMENT IMMUNITY ISSUE, AND SEE WHAT WE CAN MAKE ON THAT.

7         SO LET'S TAKE A FIVE-MINUTE RECESS, AND THEN REGROUP, AND

8   CONTINUE ON WITH THE WORK.

9         MR. ERGASTOLO:  YOUR HONOR, BEFORE WE TAKE THAT

10  BREAK, I WANT TO UNDERSTAND WHAT ISSUE ARE WE GOING TO BE

11  TALKING ABOUT AFTER THE BREAK?  IS THIS THE ISSUE REGARDING

12  THE --

13        THE COURT:  WELL, WHETHER OR NOT MS. WALLACE CAN

14  TESTIFY THAT IF YOU GUYS GET A VERDICT AGAINST YOU, SHE'S GOING

15  TO GO TO THE CITY AND ASK FOR MONEY, WHICH IS --

16        MR. ERGASTOLO:  SO THE ISSUE ISN'T ANYTHING REGARDING

17  DISCLOSURE?

18        THE COURT:  WELL, NO, THAT IS PART OF IT.  IF YOU

19  WANT A LIST OF ISSUES, LET'S TALK ABOUT IT NOW.

20        MR. ERGASTOLO:  WELL, I'M PREPARED TO DISCUSS THE

21  DISCLOSURE ISSUES, NO PROBLEM.  THE REMAINDER OF IT, NOT YET.

22        THE COURT:  OKAY, WELL, THEN, LET'S TAKE OUR BREAK.

23  WE CAN TALK ABOUT THE DISCLOSURE ISSUES, AND THEN WE WILL GET

24  INTO SETTING THOSE ASIDE, WHETHER OR NOT SHE IS EVEN COMPETENT

25  TO TESTIFY ABOUT THIS ISSUE, GIVEN A WHOLE HOST OF CONCERNS

1  THAT I'VE WRITTEN ON MY IPAD THAT I'LL SHARE WITH YOU WHEN I

2  GET BACK.  ALL RIGHT, SO WE ARE IN RECESS FOR FIVE MINUTES, AND

3  THEN WE'LL GET BACK TO IT.

4                 (RECESS TAKEN.)

5        THE CLERK:  PLEASE REMAIN SEATED AND COME TO ORDER.

6        THE COURT:  WE'RE BACK ON THE RECORD TO DISCUSS

7  INSTEAD OF CONTEXT, THE ISSUES RAISED BY THE PLAINTIFFS

8  YESTERDAY WITH REGARD TO THEIR LEARNING THAT MS. WALLACE IS

9  GOING TO BE PROVIDING TESTIMONY WITH REGARD TO THE LOCAL

10  GOVERNMENT IMMUNITY, AND THE PRONG OF THAT, THAT IMMUNITY WITH

11  REGARD TO THE TAXPAYERS BEING AFFECTED BY A VERDICT IN THIS

12  CASE, THE PLAINTIFF CLAIMING IT WAS NOT DISCLOSED UNTIL THE

13  COMMENCEMENT OF TRIAL, AND WE STARTED A DISCUSSION ON THAT.

14      AND WHEN I MENTIONED BEFORE THE BREAK QUESTIONING THE

15  COMPETENCE OF MS. WALLACE, I WANT TO MAKE SURE SHE UNDERSTANDS,

16  THAT IS IN THE LEGAL SENSE, NOT IN THE SENSE THAT SHE DOESN'T

17  KNOW WHAT SHE'S DOING, BUT IN TERMS OF BEING ABLE TO PROVIDE

18  TESTIMONY ON THAT.

19      AND WE CAN TALK ABOUT THE DISCLOSURE ASPECTS OF THIS, BUT

20  LET ME LAY OUT THE REST OF WHAT MY CONCERNS ARE.  WE HAVE GOT

21  THE CONTRACT IN EVIDENCE, AND WE HAVE CERTAIN STIPULATIONS AND

22  SO FORTH CONCERNING THIS RELATIONSHIP BETWEEN THE CITY OF

23  SAN DIEGO AND THE SAN DIEGO CONVENTION CENTER CORPORATION.  I

24  THINK IT IS UNDISPUTED, AND I'M LOOKING AT EXHIBIT 37, PAGE 3,

25  THAT THE EXCLUSIVE AUTHORITY TO MANAGE, OPERATE, ETC., IS

1   VESTED IN THE CORPORATION, BY THE CITY, UNDER THE AGREEMENTS

2   THEY HAVE.  EXHIBIT 37 IS THE THIRD AMENDED AGREEMENT.  AND

3   WE'VE HEARD EARLIER FROM MS. WALLACE THAT UNDER THAT CONTRACT,

4   THE DECISION TO EMPLOY THE POLICY IN DISPUTE WAS MADE

5   ULTIMATELY BY HER AND HER COLLEAGUES.  AND WHILE IT MAY HAVE

6   BEEN DISCUSSED, AS FAR AS TAKING IT OR RUNNING IT BY THE CITY,

7   THE CITY COUNCIL, AND SO FORTH, UNDER THE CONTRACT, THAT WAS A

8   DECISION THEY HAD THE POWER TO MAKE AND SO MADE.  AND THAT

9   APPEARS IN PAGE 4, PARAGRAPH SMALL ROMAN NUMERAL VIII, PAGE 5,

10  PARAGRAPH C, ESSENTIALLY.

11         GOING ON THROUGH THE AGREEMENT, WE HAVE SECTION 203, AT

12  PAGE 6, THAT TALKS ABOUT THE CORPORATION BEING AN INDEPENDENT

13  CONTRACTOR, AND NOT AN AGENT OF THE CITY.  THEN WE GET TO 301,

14  THAT TALKS ABOUT THE ANNUAL BUDGET AND REQUEST FOR CITY

15  FUNDING, WHICH AT THE FOURTH, FIFTH, AND SIXTH LINES, TALKS

16  ABOUT THE CITY FUNDING TO BE SOLELY USED FOR MARKETING,

17  PROMOTION, AND/OR CAPITAL PROJECTS FOR THE CENTER, BASED ON

18  BURGEONING AND ALLOCATION PROCESS.

19         SO ONE WONDERS THE DEGREE TO WHICH THERE IS A CONTRACTUAL

20  OBLIGATION HERE BY AND BETWEEN THE CITY FOR THE CITY TO RESPOND

21  TO A VERDICT BASED ON THAT CLAUSE.  PAGE 7, SECTION 304, TALKS

22  ABOUT INSURANCE COVERAGE, AND THE REQUIREMENT OF THE

23  CORPORATION TO HAVE INSURANCE COVERAGE FOR GENERAL LIABILITY.

24  AND I THINK I SAW, AND THIS I AM NOT POSITIVE OF, BUT I THINK I

25  SAW SOMEWHERE IN HERE, DIRECTOR AND OFFICER LIABILITY AS WELL.

1    AND SO TO THE EXTENT THAT WE'RE GOING TO GET INTO THIS

2  TESTIMONY, IT DOES SEEM APPROPRIATE THAT QUESTIONS AS TO THE

3  INSURANCE COVERAGE, AVAILABLE TO RESPOND TO SOME VERDICT, BE

4  PUT INTO EVIDENCE.  I HAVE A FEELING THAT THERE IS PROBABLY

5  RESERVATION OF RIGHTS ON SOME OF THIS COVERAGE, AND DISPUTES

6  ABOUT THE COVERAGE.  THAT IS GOING TO BE PART OF THE MATRIX OF

7  DECISION, OR THE EQUATION AS TO THE TAXPAYERS ULTIMATELY.  AND

8  THERE IS ADDITIONALLY IN TERMS OF THE INSURING AGREEMENT ON

9  PAGE 8, OF EXHIBIT 37.

10    AND THEN WE GET TO THE INDEMNITY PROVISIONS, WHICH REALLY

11  ARE PART OF THE INSURING AGREEMENT.  I TAKE THAT BACK, THEY

12  CONTINUE ON PAGE 15, SECTION 607, WITH REGARD TO THE

13  INDEMNIFICATION GOING AND COMING FOR THEIR OWN RESPECTIVE

14  LIABILITIES.  AND THEN THE CITY EXCLUDES ITSELF UNDER OTHER --

15  EXCLUDES THE CORPORATION IN TERMS OF ITS RELATIONSHIP WITH THE

16  PORT DISTRICT.  I DON'T WANT TO ANALYZE THIS CONTRACT TOO

17  DEEPLY.  BUT THIS IS IN EVIDENCE.

18    SO TO INTERPRET THIS IN A REASONABLE AND RELEVANT FORM, TO

19  SAY THAT THERE IS SOME CONTRACT REASON FOR THE CITY RESPONDING

20  AND THE TAXPAYERS TO BE INUNDATED WITH THE VERDICT, IN MY VIEW,

21  IS GOING TO TAKE A LEGAL EXPERT.  AND I DON'T THINK ANY LEGAL

22  EXPERTS HAVE BEEN DESIGNATED IN THE CASE.

23    I DON'T KNOW THAT THERE IS ANY AMBIGUITY IN THE DOCUMENT

24  THAT WE WOULD GET INTO PAROLE EVIDENCE, BUT THAT WOULD TAKE UP

25  SOME TIME AS TO WHAT WAS INTENDED OR MEANT.  AND AT THE END OF

1   THE DAY, THE PREMISE, AS I HEARD THE OFFER OF PROOF, AND YOU

2   CAN CLARIFY, WAS THAT IF THE CONVENTION CENTER DIDN'T HAVE

3   MONEY TO RESPOND, THEY WOULD GO TO THE CITY, SEEMS LIKE THAT

4   CALLS INTO QUESTION THE RELEVANT STATE OF THE FUNDING OF THE

5   CONVENTION CENTER NOW, ITS RESERVES AND SO FORTH.  AND IT'S

6   GOING TO HAVE TO PUT INTO EVIDENCE, AS PART OF THIS ANALYSIS,

7   WHAT IT HAS AND DOESN'T HAVE.

8       AND CLEARLY IF THEY HAD $2 BILLION, WE WOULDN'T LET THE

9   PLAINTIFF OFFER THAT IN TERMS OF EVIDENCE TO SUGGEST THEY COULD

10  WITHSTAND A VERDICT, THE FACT THAT THEY'RE IMPECUNIOUS, YOU

11  CAN'T COME IN UNLESS THERE IS SOME OTHER RELEVANT REASON TO TRY

12  AND PREJUDICE THE JURY OR INFLUENCE THE JURY WITH -- IN TERMS

13  OF NOT HAVING THE MONEY.

14      SO THERE IS -- SO THERE IS SOME 403 PROBLEMS THERE.  THERE

15  IS THE INSURANCE PROBLEMS.  AND THEN AT THE END OF THE DAY, WE

16  HAVE TO ASK, GO TO THE CITY AND SAY HELP, IT'S SPECULATIVE, AT

17  BEST AS TO WHAT THE CITY IS GOING TO DO ON THE STRENGTH OF WHAT

18  I THINK MS. WALLACE CAN TESTIFY, TO SAY THAT THE CITY WILL --

19  IS GUARANTEED TO RESPOND, THAT THAT IS A CERTAINTY OR SOMETHING

20  MORE THAN A SPECULATION THAT THE TAXPAYERS ARE ULTIMATELY GOING

21  TO BE IMPACTED OR EFFECTED BY THIS.

22      YES, THE CONVENTION CENTER IS A SHINING STAR, AND THE CITY

23  WOULD LIKELY WANT TO HOLD ONTO IT.  IT IS A REVENUE GENERATOR

24  AND SO FORTH, BUT THAT'S SPECULATION.  AND SO UNLESS THERE IS

25  SOME SIDE AGREEMENT LAW THAT SPECIFICALLY STATES, THE CITY AND

1    THE TAXPAYERS MUST RESPOND IF THERE IS LIABILITY, OR SOME OTHER

2    BASIS THAT THE COURT CAN TAKE JUDICIAL NOTICE OF, I DON'T THINK

3    YOU'RE GOING TO BE ABLE TO, LEGALLY, GET TO THE EVIDENCE.  AND

4    THAT IS, NOTWITHSTANDING ANY ISSUES ABOUT DISCLOSURE.  I MEAN,

5    DISCLOSURE IS THE FIRST STEP.

6        BUT I SEE A HOST OF PROBLEMS.  AND I THINK THIS ALL BEGINS

7    AND ENDS WITH SOME LEGAL EXPERTISE, AND NOBODY DESIGNATED

8    EXPERTS.  AND IT'S FAR TOO LATE NOW TO DO IT.  SO THOSE ARE MY

9    CONCERNS.  BUT WE CAN ADDRESS JUST THE DISCLOSURE PORTION FOR

10   NOW, AND THE DEFENSE CAN CERTAINLY RESPOND TO THE OTHER THINGS.

11   BUT THAT'S WHY I SAID IN PASSING, I THINK IT'S A LARGE MOUNTAIN

12   TO CLIMB.

13       NOW GOING TO THE DISCLOSURE ITSELF, THE TRIAL BRIEF SAYS,

14   MANAGEMENT OF THE CORPORATION ARE GOING TO TESTIFY ABOUT THIS;

15   SOMEWHAT NONSPECIFIC TO BE SURE.  AND TO THE EXTENT IT IS BASED

16   ON SOMETHING OTHER THAN SOMEONE'S IMPRESSION, SPECULATION, OR

17   LAY OPINION, IT WOULD NEED TO BE SUPPORTED BY DOCUMENTS OF THE

18   KIND I HAVE TALKED ABOUT, BEYOND THE CONTRACT, THAT GIVE US A

19   DIFFERENT VIEW OF THE LEGAL OBLIGATIONS OR POLICY STATEMENTS OR

20   WHATEVER, THAT ONE WOULD THINK WOULD HAVE BEEN DISCLOSED FOUR

21   YEARS AGO WHEN THE INITIAL DISCLOSURE WAS GOING AROUND BECAUSE

22   THEY WOULD BE SUPPORTIVE OF THIS AFFIRMATIVE DEFENSE.

23       AND SO I'M WONDERING, YOU KNOW, ABOUT WHY THERE WERE NO

24   DOCUMENTS -- I MEAN, CLEARLY THE PLAINTIFF COULD HAVE BEEN MORE

25   AGGRESSIVE, BUT THEN AGAIN, IT'S THE DEFENDANT'S BURDEN OF

1    PROOF.  AND I DON'T THINK THAT THIS DISCLOSURE, OR EVEN THE

2    INITIAL DISCLOSURES THAT WERE STATED, OR THE 30(B)(6)

3    DEPOSITION IS SPECIFIC ENOUGH.  BUT EVEN IF IT IS, THEN WHAT

4    ABOUT THE UNDERLYING DOCUMENTATION?

5        SO THERE IS A BIG MOUTHFUL OF STUFF THAT HAS REALLY BEEN

6    BOTHERING ME ALL NIGHT, SINCE THIS ISSUE AROSE.  AND AGAIN, I'M

7    NOT SO -- I'M CONCERNED ABOUT THE DISCLOSURE, BUT I THINK THAT

8    THE ISSUE IS MUCH MORE PROBLEMATIC THAN THAT.

9        SO MR. ERGASTOLO, I'LL LET YOU TAKE A CRACK AT WHATEVER

10   PART OF IT YOU FEEL YOU ARE READY TO GO WITH ON DISCLOSURE OR

11   OTHERWISE.

12            MR. ERGASTOLO:  I WANT TO DISCUSS THE DISCLOSURE

13   ISSUE AND ADDRESS YOUR CONCERNS ON THE DISCLOSURE.  ON THE REST

14   OF IT, I WANT TO MAKE SURE I UNDERSTAND WHAT MOTION I'M

15   RESPONDING TO HERE.

16            THE COURT:  THEY WANT TO PRECLUDE MS. WALLACE FROM

17   TESTIFYING THAT IF A VERDICT OCCURS, SHE'S GOING TO THE CITY

18   AND THE CITY IS GOING TO -- THE TAXPAYERS WILL BE -- I FORGET

19   THE -- IT IS A LONG DAY NOW, I FORGET EXACTLY WHAT THE THIRD

20   PRONG SAYS, BUT, ESSENTIALLY, THE TAXPAYERS ARE GOING TO PAY

21   THE FREIGHT.

22            MR. ERGASTOLO:  SO THIS A MOTION IN LIMINE THAT IS

23   BROUGHT AFTER THE FACT?

24            THE COURT:  THIS IS A MOTION -- WELL, YEAH, IN

25   ESSENCE.

1          MR. ERGASTOLO:  PAST THE DEADLINE?

2          THE COURT:  SURE.

3          MR. ERGASTOLO:  AND THE COURT IS ENTERTAINING IT?

4          THE COURT:  YEAH.  AND OF COURSE, YOU GUYS PUT ALL

5   KINDS OF SUMMARY JUDGMENTS INTO YOUR MOTIONS IN LIMINE PAST THE

6   MOTION FILING DEADLINE FOR THAT.  SO TO THE EXTENT YOU WANT TO

7   THROW BARBS BACK AND FORTH, GO AHEAD; YOU'RE BOTH GUILTY.  BUT

8   WHAT WE'RE TRYING TO DO IS GET THE CASE TRIED FAIRLY AND ON THE

9   EVIDENCE.

10          MR. ERGASTOLO:  I UNDERSTAND.  AND WHAT I'M TRYING TO

11  UNDERSTAND IS, WHAT I'M RESPONDING TO.

12          THE COURT:  RIGHT.  AND YOU'RE RESPONDING TO THE FACT

13  THAT TUESDAY NIGHT, OR WHATEVER IT WAS, OR MONDAY, OR

14  WEDNESDAY, OR SOMETIME, YOU SAID, OH, BY THE WAY, MS. WALLACE

15  IS GOING TO OFFER THIS TESTIMONY.

16          MR. ERGASTOLO:  AND THAT WAS IN RESPONSE TO A

17  REQUEST, AND I MADE AN OFFER OF PROOF.

18          THE COURT:  YEAH.  AND THE OFFER OF PROOF IS, SHE IS

19  GOING TO SAY, IF WE'RE HIT, WE'RE GOING TO THE CITY FOR MONEY.

20          MR. ERGASTOLO:  CORRECT.

21          THE COURT:  AND THAT IS NOT PROPER TESTIMONY ABSENT

22  SOME OF THE THINGS THAT I'M MENTIONING.  IT'S HER SPECULATION.

23  BECAUSE THE CONTRACT IS INCONSISTENT WITH THAT.

24          MR. ERGASTOLO:  I UNDERSTAND WHAT YOU'RE SAYING.  I'M

25  NOT PREPARED TO ADDRESS ANY OF THOSE ISSUES AND I'M NOT GOING

1   TO ADDRESS ANY OF THOSE ISSUES.

2           THE COURT:  OKAY, I UNDERSTAND.  SO TELL ME ABOUT THE

3   DISCLOSURE.

4           MR. ERGASTOLO:  I DO WANT TO TALK TO YOU ABOUT

5   DISCLOSURE BECAUSE THAT, I'VE HAD A CHANCE TO TAKE A LOOK AT.

6           THE COURT:  GO AHEAD.

7           MR. ERGASTOLO:  THE PARTIES INITIALLY DISCLOSED IN

8   THIS CASE IN 2007 OR 2008, BOTH UNITED AND THE CONVENTION

9   CENTER MADE INITIAL DISCLOSURES.  THOSE ARE NOT PART OF THE

10  COURT RECORD, OF COURSE; THOSE ARE JUST EXCHANGED WITH THE

11  PARTIES.  ON THE PLAINTIFF SIDE, MR. SIMON WAS DISCLOSED TO

12  JUST STATE INFORMATION CONCERNING ALLEGATIONS IN THE COMPLAINT.

13  ON THE DEFENSE SIDE, FOR MS. WALLACE, IT STATES, GENERAL AND

14  SPECIFIC INFORMATION RELATING TO SDCCC AND THE CONVENTION

15  CENTER.  BOTH VERY BROAD.

16      THE NEXT ITEM IN THE DISCLOSURE IS THE DEPOSITIONS.  THERE

17  WAS NO CONTENTION INTERROGATORIES SENT REGARDING OUR

18  AFFIRMATIVE DEFENSE THAT WE RAISED WHEN WE ANSWERED THE

19  COMPLAINT.  THE LGAA HAS BEEN INTO THIS CASE SINCE DAY ONE FOR

20  THE CONVENTION CENTER ON THE ANSWER.  NO SPECIFIC QUESTION

21  DEALING WITH THAT ISSUE.

22      WHAT WE DID GET IS, WE GOT A DEPOSITION CAMPAIGN NOTICE,

23  WITH ABOUT TWENTY DIFFERENT CATEGORIES LISTED.  CATEGORIES 11

24  THROUGH 14 DON'T SPECIFICALLY COVER THE LGAA.  AGAIN, IT COULD

25  HAVE; IT DIDN'T.  BUT 11 THROUGH 14, GENERALLY DISCUSS THE

1  RELATIONSHIP BETWEEN THE CITY AND THE CONVENTION CENTER.  AND I

2  DON'T KNOW IF YOUR HONOR -- I BELIEVE IT IS MARKED AS AN

3  EXHIBIT, EXHIBIT 38?

4         THE COURT:  I DID.  I READ THAT.

5         MR. ERGASTOLO:  OKAY.

6         THE COURT:  AND IT IS 12, 13, 14, OR THAT RANGE, TO

7  DEAL WITH THAT.

8         MR. ERGASTOLO:  CORRECT.  JULY 31ST, 2009, THIS IS

9  THE TRANSCRIPT OF MS. WALLACE'S DEPOSITION ON JUST THOSE

10  ISSUES.  SHE WAS ASKED EXTENSIVELY ABOUT THE RELATIONSHIP WITH

11  THE CITY, ABOUT RECORDING REQUIREMENTS, BASICALLY HOW THE CITY

12  WORKS WITH THE CONVENTION CENTER, WHAT THE OBLIGATIONS OF THE

13  CITY ARE TO THE CONVENTION CENTER, BOTH IN REPORTING AND BY

14  AGREEMENT.

15     ONE OF THE THINGS SHE STATES IS FINANCIALLY,

16  OPERATIONALLY, ORGANIZATIONALLY, BY AUTHORITY, THE CITY

17  CONTROLS THE CONVENTION CENTER.  AND SO, I DON'T THINK THERE IS

18  ANY ISSUE HERE THAT WE HAVEN'T DISCLOSED OR RESPONDED TO ANY

19  QUESTIONS REGARDING THE LGAA.  IF THEY WERE SPECIFICALLY ASKED,

20  THEY WOULD HAVE BEEN ANSWERED.  IT DIDN'T HAPPEN.  WE'RE UNDER

21  NO OBLIGATION TO PREVIEW ANYTHING IN THIS CASE IN TERMS OF OUR

22  TESTIMONY AS LONG AS WE'VE COMPLIED WITH OUR DISCLOSURE

23  REQUIREMENTS AND HAVE PROPERLY RESPONDED TO THE DISCOVERY.  AND

24  I THINK WE'VE DONE ALL OF THOSE THINGS.

25     SO I'M AT A LOSS TO UNDERSTAND HOW WE COULD MEET A

1    DISCLOSURE PROBLEM HERE.  IN THE PRETRIAL STATEMENT THAT WAS

2    SUBMITTED BY UNITED, THEY LIST OUT ALL OF THE ITEMS THAT DEAL

3    WITH LGAA, INCLUDING NO. 107, WHICH SPECIFICALLY STATES,

4    TAXPAYERS WOULD NOT BEAR THE BURDEN OF AN ANTITRUST DAMAGE

5    AWARD AGAINST SCCC.  SO THERE IS NO SURPRISE ELEMENT HERE.  WE

6    DON'T EVEN GET TO THE HARMFULNESS ISSUE IF THERE WEREN'T A

7    DISCLOSURE.

8         MY POSITION IS, WE'VE DISCLOSED APPROPRIATELY.  THE

9    DISCLOSURES COVER EVERYTHING THAT WE WERE SUPPOSED TO.  WE ARE

10   NOT OBLIGATED TO DISCLOSE IN THE INITIAL DISCLOSURES ELEMENT BY

11   ELEMENT OF THE CLAIMS, NOR DID UNITED DO THAT, OR DISCLOSE

12   ELEMENT BY ELEMENT OF THE AFFIRMATIVE DEFENSES.

13        THE COURT:  SO TELL ME THE METHODOLOGY OR THE MINDSET

14   IN YOUR TRIAL BRIEF SAYING, WE'LL HAVE ONE OF OUR MANAGING

15   OFFICERS TESTIFY TO THIS.  ARE YOU TELLING ME, AT THAT POINT IN

16   TIME, YOU HAD NO IDEA WHICH OF THE MANAGING OFFICERS IT WAS

17   GOING TO BE?

18        MR. ERGASTOLO:  WE DID HAVE AN IDEA WHO THE MANAGING

19   OFFICER WAS GOING TO BE.  BUT THE QUESTION IS, ARE WE OBLIGATED

20   TO DISCLOSE WHO THAT MANAGING OFFICER IS?  THAT MANAGING OFFICE

21   WAS DEPOSED ON THESE EXACT ISSUES.

22        THE COURT:  AND AS I TOLD YOU TWENTY MINUTES AGO, I

23   THINK THE ISSUE IS DEEPER THAN THAT.  AND IF YOU WANT TO

24   RESPOND TO THIS, THEN GO AHEAD.  I THINK THE ISSUE IS MUCH MORE

25   FUNDAMENTAL AS A RULE OF EVIDENCE THAN AS A RULE OF PROCEDURE.

1          MR. ERGASTOLO:  CORRECT.  AND AS I EXPLAINED TO THE

2     COURT, AS A RULE OF EVIDENCE, I'M NOT PREPARED TO RESPOND.  AS

3     A RULE OF PROCEDURE ON THE DISCLOSURE, THAT'S WHAT I'M

4     RESPONDING TO.

5          THE COURT:  SO --

6          MR. ERGASTOLO:  AND I KNOW THAT THAT'S NOT EXACTLY A

7     REALLY HARD LINE BETWEEN THOSE TWO, YOUR HONOR.

8          THE COURT:  ARE YOU SAYING THAT BECAUSE YOU DISCLOSED

9     PROPERLY, SHE CAN SAY WHATEVER SHE WANTS?

10         MR. ERGASTOLO:  ABSOLUTELY NOT.

11         THE COURT:  NEITHER AM I.

12         MR. ERGASTOLO:  I THINK THE ISSUE, THEN, ISN'T

13    DISCLOSURE.  THE ISSUE IS EVIDENCE, WHICH WE SHOULD PUNT UNTIL

14    MONDAY.

15         THE COURT:  I THINK THAT'S WHAT I SAID.

16         MR. ERGASTOLO:  WELL, THEN I'M DONE.

17         THE COURT:  OKAY, ALL RIGHT.

18       YOU FOLKS WANT TO ADD ANYTHING?

19         MR. LANCE:  YOUR HONOR, JUST BRIEFLY, THERE IS A

20    DISCLOSURE ISSUE BECAUSE THEY DIDN'T PUT IT IN THEIR INITIAL

21    DISCLOSURES.  WHAT HAPPENED IS, WHEN THEY DID FINALLY DISCLOSE

22    IT, THEY DIDN'T DISCLOSE ANYTHING EITHER.  THAT IS WHAT PUT US

23    ON NOTICE IN THE TRIAL BRIEF IS, WAIT A MINUTE, WHAT ARE THEY

24    DOING HERE?  WE LOOKED FOR EXPERTS.  THEY DIDN'T DESIGNATE

25    EXPERTS.  WE SAW THE CONTRACT.  I, OBVIOUSLY, WENT THROUGH THAT

1   WITH MS. WALLACE.  WE SAW THE 2005 AMENDMENT TO THE

2   RELATIONSHIP WITH THE CITY, WHERE THE CITY IS SAYING, LOOK, WE

3   HAVE NO OBLIGATION ANYMORE TO PAY, YOU KNOW, TO FUND YOU, TO

4   PAY FOR ANYTHING.

5       SO BASED ON THAT, WE WERE PRETTY COMFORTABLE THAT, HEY,

6   THIS IS NOT -- THEY'RE NOT GOING TO BE ABLE TO ESTABLISH THEIR

7   LGAA DEFENSE.  AND THEN IN THE TRIAL BRIEF, WHEN THEY FINALLY

8   ADDRESS IT, AND IT'S THIS VAGUE, WELL, IT'S GOING TO BE ONE OF

9   OUR MANAGING OFFICERS, THAT'S WHEN WE RAISED THE ISSUE BEFORE

10  THEY PUT THEM ON.  BECAUSE WE WEREN'T -- WE DIDN'T KNOW THAT

11  THEY WERE GOING TO TRY TO TESTIFY THIS -- WITH THEIR MANAGING

12  OFFICER UNTIL THEIR TRIAL BRIEF.  THAT IS WHY THE MOTION WAS

13  BROUGHT UP NOW.

14          THE COURT:  I UNDERSTAND THAT.  AND I'M NOT TRYING TO

15  GIVE YOU GUYS A HARD TIME OR DIMINISH THE ISSUE OF DISCLOSURE.

16  BUT AT THE END OF THE DAY, IF I FIND THAT IT WAS SUFFICIENT

17  ENOUGH, WHAT I'M LOOKING AT IS, WHAT DO WE END UP WITH?  DO WE

18  END UP WITH A BIG PROBLEM, IN TERMS OF THE WITNESS'S ABILITY TO

19  TESTIFY, IN MY VIEW, ON WHAT LOOKS TO BE A LEGAL ISSUE.

20      AND SO, YOU KNOW, I DON'T THINK YOU WIN OR LOSE -- I MEAN,

21  I'M HAPPY TO SAY, OKAY, THERE WAS -- IT IS NOT AN INAPPROPRIATE

22  DISCLOSURE.  AND NOW THE QUESTION BECOMES, WHAT DO WE DO WITH

23  THE ACTUAL TESTIMONY?  AND THAT IS SOMETHING THAT WE CAN TALK

24  ABOUT, APPARENTLY, LATER.  BUT I'M JUST TRYING TO HIGHLIGHT FOR

25  YOU MY CONCERNS.  BECAUSE I GAVE THIS A WHOLE LOT OF THOUGHT IN

1    TERMS OF THE PROFFER MADE YESTERDAY WITH REGARD TO THE

2    NECESSITY OF A LEGAL OPINION, AND ALL OF THESE ANCILLARY ISSUES

3    ABOUT INSURANCE, POTENTIAL INSURANCE CONFLICTS, YOU NAME IT,

4    THAT ARE GOING TO PREVENT MS. WALLACE, IN MY VIEW, AT THE

5    MOMENT, TENTATIVELY, FROM STANDING UP AND SAYING, WE GET HIT,

6    WE'RE GOING TO THE CITY FOR MONEY.  SHE'LL BE MORE ARTICULATE,

7    OF COURSE, BUT THE ESSENCE IS, WE ARE GOING TO MAKE THE

8    TAXPAYERS FUND THIS.  AND I DON'T KNOW THAT THAT IS TRUE.  AND

9    I DON'T KNOW THAT WE HAVE, IN THE RECORD, DISCOVERED,

10   DISCLOSED, AND ARE PROPERLY READY FOR TESTIMONY THE REQUISITE

11   EVIDENCE TO GET THERE.

12        AND SO YOU CAN -- YOU GUYS CAN TALK ABOUT THAT, AND WE CAN

13   TALK ABOUT IT BEFORE WE GET TO THOSE QUESTIONS.  BUT JUST

14   BECAUSE SHE SAYS -- OR I SAY, YOU DIDN'T DO ANYTHING WRONG ON

15   DISCLOSURES, WE STILL HAVE THE PROBLEM.  AND I WAS JUST TRYING

16   TO GET TO THE REAL PROBLEM, NOT -- IF THAT WAS ALL IT WAS, WE'D

17   BE DONE.  I'D MAKE A DECISION UP OR DOWN.  BUT IT'S MUCH MORE

18   FUNDAMENTAL THAN THAT.  IT IS A CRITICAL DEFENSE TO THE

19   DEFENDANT.  IT IS A CRITICAL PROBLEM FOR THE PLAINTIFF.  AND IT

20   IS GOING TO HAVE TO BE RESOLVED ON THE STRENGTH OF RELEVANT

21   EVIDENCE.

22             MR. ERGASTOLO:  I UNDERSTAND THAT, YOUR HONOR.  I

23   APPRECIATE THE TIME YOU'VE PUT INTO THIS ISSUE.  IT REALLY DOES

24   LAY OUT EVERYTHING YOU WANT US TO ADDRESS, AND WE WILL

25   ADDRESS --

1          THE COURT:  AND YOU CAN AT THE APPROPRIATE TIME.

2          MR. ERGASTOLO:  AT THE APPROPRIATE TIME.

3          THE COURT:  YEAH.

4          MR. ERGASTOLO:  AND WE WILL BE PREPARED TO DO SO.  MY

5    UNDERSTANDING WHEN WE LEFT YESTERDAY, WAS, I WASN'T EXACTLY

6    SURE WHAT WAS COMING AT ME, WHETHER WE WERE TALKING DISCLOSURE,

7    WHICH I FOCUSED ON YESTERDAY, RATHER THAN ALL THESE ISSUES I'M

8    HEARING, SOMETIMES FOR THE FIRST TIME TODAY.

9          THE COURT:  YEAH, THAT IS TRUE.  I THINK I STARTED TO

10   GET SOME SINKING FEELING ABOUT IT AS WE WERE TALKING, BUT IT

11   CERTAINLY, YOU KNOW, CAME UP FROM THE DEPTHS AS I PONDERED THIS

12   ALL LAST NIGHT, IN TERMS OF, WHERE WE GET AT THE END.  BECAUSE

13   I DON'T LIKE THINGS RESOLVED ON TECHNICALITIES.  AND IT IS A

14   TECHNICAL ARGUMENT AS IT BEGINS.  IT BECOMES MUCH MORE

15   COMPLICATED WHEN YOU GET INTO SUBSTANTIALLY JUSTIFIED, NOT

16   HARMLESS, BUT THEN YOU GET TO THE NEXT STEP OF ITS EVIDENTIARY

17   VALUE OR PROPRIETY, I MEAN, THAT IS A DONNYBROOK.  AND SO I'M

18   NOT GOING TO FORCE YOU INTO DISCUSSING IT NOW, BUT I THINK THAT

19   THOSE ARE ISSUES THAT NEED TO BE CONSIDERED.

20         MR. ERGASTOLO:  UNDERSTOOD.

21         THE COURT:  AND, YOU KNOW, YOU MAY COME UP WITH

22   SOMETHING, AND I CHANGE MY MIND.  I'M JUST SEEING LOTS OF

23   HURDLES.  AND THERE IS NO DECISION UNTIL WE MAKE A DECISION,

24   BUT I'M SEEING SOME PROBLEMS WITH IT THAT WE'RE GOING TO HAVE

25   TO OVERCOME TO MAKE SURE THAT THE RULES OF EVIDENCE ARE

1 FOLLOWED.

2     SO WE CAN DO THAT, YOU KNOW, MONDAY AFTERNOON.  I DON'T

3 KNOW WHAT THE PLAN IS FOR WITNESSES ON MONDAY, BUT IF, TO THE

4 EXTENT THAT YOU WANT MS. WALLACE NEXT, I SAY WE LET HER TESTIFY

5 ABOUT EVERYTHING BUT THAT UNTIL IT GETS RESOLVED, OR HOWEVER IT

6 WORKS OUT IN THE MIX.

7          MR. ERGASTOLO:  MS. WALLACE IS NOT SCHEDULED TO

8 TESTIFY ON MONDAY OR, I BELIEVE, TUESDAY.

9          THE COURT:  SO WE HAVE TIME --

10          MR. ERGASTOLO:  WE HAVE TIME.  AND I'LL BE PREPARED

11 TO ADDRESS THE ISSUE.  I UNDERSTAND THE COURT DOESN'T WANT A

12 50-PAGE BRIEF.

13          THE COURT:  I DON'T WANT 50 PAGES, BUT IF YOU HAVE TO

14 PUT SOMETHING OUT, YOU HAVE TO PUT SOMETHING OUT.  I READ

15 EVERYTHING YOU FOLKS SEND IN.  TO SOME DEGREE, I THINK AS PART

16 OF THE TRIAL BAR, WE DO ON OUR FEET.  SO YEAH, LOOK INTO IT AND

17 SEE.  BUT THOSE ARE ALL ISSUES.  AND THE PROBLEM WITH ALL OF

18 THOSE ISSUES I POINT OUT IS, THE LACK OF DESIGNATED EXPERTS, OR

19 THE LACK OF OUTSIDE DOCUMENTS OR INFORMATION IN TERMS OF IT

20 BEING OUT THERE TO DATE FOR THE PLAINTIFF.

21     SO GIVE IT SOME THOUGHT.  IT IS A WORK IN PROGRESS.  I'M

22 NOT SAYING YAY OR NAY ON THE DISCLOSURE ISSUE.  I THINK I WANT

23 TO GET THE WHOLE BALL OF WAX IN CONTEXT.  BUT I UNDERSTAND YOUR

24 RESPECTIVE POSITIONS.  BUT I'M MORE INTERESTED IN JUSTICE THAN

25 LITERALLY FOLLOWING THE DISCOVERY RULES.  I'M MORE INTERESTED

1    IN THE EVIDENCE CODE AND THE ULTIMATE JUSTICE OF THE SITUATION.

2        SO, ALL RIGHT.  WE'VE GOT FOUR DAYS NEXT WEEK.  ANY GUESS

3    AS TO WHEN THE CITY MIGHT BE ANTICIPATING WRAPPING UP AT THIS

4    POINT?  I'M NOT GOING TO HOLD YOU TO IT.

5            MR. L'ESTRANGE:  WE ARE NOT ALLOWED TO REFER TO

6    OURSELVES AS THE CITY, YOUR HONOR.

7            THE COURT:  I MEAN THE CONVENTION CENTER.  I'M SORRY,

8    IT'S A LONG DAY.  I SEE "SD" DOWN HERE, AND I GO, "CITY," YOU

9    KNOW.

10           MR. L'ESTRANGE:  I'M JUST KIDDING.

11           THE COURT:  NO, YOUR POINT WAS WELL TAKEN.

12           MR. L'ESTRANGE:  THE SAN DIEGO CONVENTION CENTER

13   CORPORATION, INC., WILL -- I EXPECT -- OUR CURRENT PROJECTION

14   IS THAT WE'RE LOOKING AT THE 18TH, APPROXIMATELY.

15           THE COURT:  JUST TRYING TO GET A FEEL.  AND I

16   APPRECIATE THAT.

17           MR. L'ESTRANGE:  AND THAT IS, IN PART, GOING TO BE A

18   FUNCTION OF THE CROSS-EXAMINATION OF OUR WITNESSES.

19           THE COURT:  OF COURSE.

20           MR. L'ESTRANGE:  WHICH TODAY WAS RELATIVELY BRIEF.

21   SO THAT MAY BE MOVED UP A LITTLE BIT.

22           THE COURT:  AND AGAIN, I'M NOT SAYING, OKAY, YOU'RE

23   STUCK WITH THAT.  I'M JUST TRYING TO GET A READ BECAUSE THERE

24   ARE OTHER PEOPLE CLAMORING FOR MY ATTENTION.  SO I'M TRYING TO

25   KEEP TRACK OF ALL THAT.

1      MR. L'ESTRANGE:  AND ON THAT SUBJECT, ON SATURDAY,

2  THIS PAST SATURDAY, WE DID AN E-FILING OF OUR OBJECTIONS TO THE

3  PLAINTIFF'S JURY INSTRUCTIONS.

4      THE COURT:  YEAH, I GOT THOSE.

5      MR. L'ESTRANGE:  WHICH I THINK YOU HAVE RECEIVED.  I

6  THINK WE PROVIDED A NOTEBOOK THAT WAS TABBED IN THERE.  EACH

7  ONE IS A STAND-ALONE DOCUMENT.  TO DATE, WE HAVE NOT RECEIVED

8  ANY OBJECTIONS FROM THE PLAINTIFFS REGARDING OUR PROPOSED

9  INSTRUCTIONS.  AND I WANTED TO INQUIRE THROUGH THE COURT WHEN

10  WE MIGHT EXPECT THAT.  BECAUSE THAT'S A LOT OF WORK TO SIT DOWN

11  AND GO THROUGH THAT MATERIAL.

12      THE COURT:  YEAH, IT IS.

13      MR. SLANIA:  I'M HAPPY TO RESPOND TO THAT, YOUR

14  HONOR.  I BELIEVE WHEN HE BROUGHT UP THE ISSUE OF JURY

15  INSTRUCTIONS, AND THAT WE MIGHT BE GETTING HOMEWORK RELATED TO,

16  I DID SAY ONCE WE WERE ABLE TO GET THROUGH WITH OUR CASE IN

17  CHIEF, THAT I WAS GOING TO TURN MY ATTENTION TO THOSE JURY

18  INSTRUCTION ISSUES.  AS I MENTIONED, WE STARTED A DRAFT.  I

19  BELIEVE THAT THE RESPONSE TO THE CONVENTION CENTER'S

20  INSTRUCTIONS IS CLOSE TO BEING DONE.  IF I CAN GET IT DONE AND

21  FILED BY TOMORROW, I WILL.  BUT, OTHERWISE, IT COULD BE

22  SATURDAY OR MONDAY, BUT IT WILL BE DONE IN RELATIVELY SHORT

23  ORDER.  I BELIEVE IT IS VERY CLOSE.  SO THAT IS COMING DOWN THE

24  PIPELINE.  AND I UNDERSTOOD YOUR HONOR'S COMMENTS TO MEAN,

25  MR. SLANIA, GET YOUR STUFF HERE AS QUICKLY AS YOU CAN, AND THEN

1   WE'RE GOING TO LOOK AT THE ISSUE AND WE MIGHT HAVE TO MEET AND

2   CONFER AND MIGHT GO THROUGH IT IN A STEP PROCESS.  HOWEVER,

3   YOUR HONOR WANTED TO HANDLE IT.

4            THE COURT:  RIGHT.  AND WE DID.  CERTAIN ISSUES WERE

5   RESOLVED TODAY, WHICH WILL AFFECT THE -- I MEAN, THINKING ABOUT

6   YOUR 2201, 2202 OF THE CALIFORNIA INSTRUCTIONS, WE HAVE

7   SINGULAR INSTRUCTION VERSUS MULTIPLE PAGES BECAUSE THERE IS

8   MULTIPLE PEOPLE, AND ALL OF THAT.  I WOULD SAY, YEAH, YOU FOLKS

9   PROBABLY COULD GET TOGETHER ON SOME OF THAT.  AND I REALLY AM

10  GOING TO BE LEANING TOWARDS THE STANDARDIZED WORDING, EXCEPT TO

11  THE EXTENT IT IS INCONSISTENT WITH THE FACTS.  THERE HAS BEEN

12  SOME CHANGES, AND I FORGET WHO DID WHAT.  BUT IF THE

13  INSTRUCTION SAYS IT A CERTAIN WAY, THERE IS NO NEED TO MONKEY

14  WITH THAT.  IT'S BEEN VETTED, TRIED AND TRUE.  THE SAME IS TRUE

15  ON THE MONOPOLY INSTRUCTIONS.  THE FEDERAL INSTRUCTION BOOKLET,

16  IT'S AWFULLY GOOD.  IT'S AWFULLY NEUTRAL AND ON PART.  AND

17  SOMEONE -- TODAY THE DEFENSE OBJECTED TO IT, NEEDING TO HAVE

18  SOMETHING ABOUT THE PURPOSE OF THE SHERMAN ACT.  AND I THINK

19  THAT'S TRUE.  IF YOU LOOK AT YOUR OBJECTIONS, I THINK THE

20  PURPOSE AND THE REASON WE HAVE SUCH A LAW NEEDS TO BE BEFORE

21  THE JURY, AS WELL AS THE ELEMENTS, AND SO FORTH.  SO IT SOUNDS

22  LIKE BY THE WEEKEND, YOU'LL SEE IT.

23            MR. L'ESTRANGE:  ON THAT PARTICULAR ONE, I DON'T KNOW

24  IF HE HAS IT COMMITTED TO MEMORY.  BUT I BELIEVE THAT ONE OF

25  OUR OBJECTIONS WAS, REFERRED TO CONSPIRACIES, WHICH ARE NO

1   LONGER PART OF THIS CASE.

2          THE COURT:  YEAH, I'M NOT SAYING WE TAKE IT

3   LITERALLY, BY SAYING -- I WOULD PROBABLY WANT TO DEFAULT IN

4   FAVOR OF THE STANDARDIZED LANGUAGE EXCEPT WHERE IT IS

5   INCONSISTENT, AS OPPOSED TO TRYING TO RECRAFT OR RESPIN THE

6   LANGUAGE IN SOME OTHER WAY.  CONSPIRACY CAN CERTAINLY GO OUT,

7   AS CAN OTHER WORDS, BUT I JUST NOTICED THERE IS A LOT OF

8   RESHAPING THAT MAY NOT BE A PRODUCTIVE EXERCISE.

9      BUT IT SOUNDS LIKE YOU'LL GET IT SOON.  MONDAY AFTERNOON,

10  IF WE'RE DEALING WITH THE CONTINUING ISSUES OF MS. WALLACE'S

11  TESTIMONY ON ONE POINT, MAYBE WE'LL START LOOKING AT, YOU KNOW,

12  TUESDAY, WEDNESDAY, THURSDAY, AFTER TAKING AT LEAST SECTION BY

13  SECTION SOME OF THESE INSTRUCTIONS TO TRY AND GET THEM SETTLED

14  BY WEEKS' END, GIVEN THE ESTIMATE.

15         MR. L'ESTRANGE:  ANOTHER QUESTION, I ASKED IF

16  MR. GESSNER COULD BE EXCUSED.  AND INITIALLY, THE ANSWER WAS

17  YES.  AND THEN THERE WAS A QUALIFICATION IN THAT.

18         THE COURT:  THANK YOU FOR REMINDING ME BECAUSE THAT

19  SLIPPED MY MIND.  YOU MIGHT WANT HIM BACK FOR SOMETHING?

20         MR. LANCE:  THE ISSUE, YOUR HONOR, IT HAS TO DO WITH

21  THOSE LETTERS.  BECAUSE THERE IS TESTIMONY -- AND I APOLOGIZE,

22  I KNOW --

23         THE COURT:  IT IS TRICKY WITH THE JURY HERE.

24         MR. LANCE:  IT IS TRICKY.  BUT THE ISSUE WAS, THERE

25  HAS BEEN TESTIMONY FROM MR. DENOFRIO AND MR. GESSNER THAT THEY

1   DID NOT IMPLEMENT THE EVENT SECURITY EXCLUSIVE BECAUSE OF AN

2   INCREASED COST TO THE TRADE SHOW ORGANIZERS.  AND THE FACT --

3   AND MR. DENOFRIO SAID, IN ADDITION BECAUSE WE DIDN'T THINK THAT

4   THE TRADE SHOW ORGANIZERS OR TRADE SHOW MANAGERS WOULD BE HAPPY

5   WITH THE LACK OF CHOICE.  WE WOULD BE TAKING THEIR CHOICE AWAY.

6           THE COURT:  I REMEMBER THEIR TESTIMONY.

7           MR. LANCE:  OKAY.  AND MR. GESSNER, HE SAID THE FACT

8   THAT IT WOULD BE AN INCREASED COST.  WHAT WE HAVE IS TESTIMONY

9   THAT THIS POLICY WAS IMPLEMENTED.  AND BECAUSE OF, YOU KNOW,

10  THIS ISSUE OF AT LEAST WE HAVE COMPLAINTS FROM THE TRADE SHOW

11  MANAGERS.  AND SO, I'M NOT -- I WASN'T GOING TO OFFER THE

12  LETTERS, BUT THE FACT THAT HE RECEIVED COMPLAINTS AND THEIR

13  THOUGHT PROCESS WAS A VERY SIMILAR POLICY, WHICH WE SAY IS EVEN

14  MORE IMPORTANT.  THEY LOOK AT THE COMPLAINTS OF THEIR CUSTOMERS

15  IS VERY RELEVANT.  AND HE TRIES TO SAY, WELL, THEY'RE NOT MY

16  CUSTOMERS.

17      SO I THINK, ONE, HE'S OPENED THE DOOR BY SAYING THAT.  BUT

18  HE FEELS INSULATED BECAUSE I CAN'T EVEN SHOW HIM THE LETTERS.

19  I WASN'T PLANNING TO OFFER THEM INTO EVIDENCE.

20          THE COURT:  I KNOW, BUT THE MORE WE GET INTO THEM,

21  THE MORE TRICKY IT BECOMES.  AND HE SAID, YEAH, HE GOT

22  COMPLAINTS.  AND WE DID HAVE MCAVOY TESTIFY HE SENT COMPLAINTS.

23  HE WOULD BE IN THAT CUSTOMER REALM.  HE WAS A TRADE SHOW GUY.

24      SOME OF THE OTHERS IN THE LETTERS ARE DECORATORS, AND SO

25  THERE IS AN ARGUMENT AS TO WHETHER THOSE ARE CUSTOMERS OR NOT.

1    NONE OF THESE FOLKS TESTIFIED BESIDES MCAVOY, OR MAYBE A COUPLE

2    OTHERS.  AND SO OTHER THAN -- I THINK IT -- I DON'T KNOW THAT

3    HE OPENED THE DOOR.  TO SOME DEGREE, HE WAS TAKEN TO THE

4    THRESHOLD, AND I FELT I NEEDED TO INTERVENE IN THAT.

5        SO THE -- YOU KNOW, I'M NOT SURE HOW THAT GETS BACK TO

6    GESSNER, OTHER THAN -- HE CERTAINLY IS NOT GOING TO SAY THEY'RE

7    AFRAID THEY'LL GET COMPLAINTS IF THEY TAKE SECURITY IN-HOUSE.

8    HE MADE IT A MONEY ISSUE, BASICALLY.  SO WHAT WOULD YOU CALL

9    HIM BACK TO DO IS THE QUESTION?

10           MR. LANCE:  THE QUESTION IS, HIS -- THEIR STATE OF

11   MIND WHEN THEY'RE INSTITUTING THIS POLICY.  WHEN IT WAS THE

12   EVENT SECURITY'S STATE OF MIND WAS, WE DON'T WANT TO TAKE THIS

13   IN-HOUSE, EVEN THOUGH IT IS IMPORTANT, WE DON'T WANT TO TAKE IT

14   IN-HOUSE BECAUSE OUR CUSTOMERS ARE GOING TO BE UNHAPPY.

15           THE COURT:  IT IS GOING TO COST THEM MORE.

16           MR. LANCE:  IT'S GOING TO COST THEM MORE, THEY ARE

17   GOING TO BE UNHAPPY, WE ARE GOING TO TAKE AWAY THEIR CHOICE.

18   THAT'S WHAT DENOFRIO SAID, THERE WERE TWO REASONS.  IT'S GOING

19   TO COST THEM MORE MONEY, IT'S GOING TO TAKE AWAY THEIR CHOICE

20   BECAUSE OF THE REACTION OF THE CUSTOMERS, WE DIDN'T IMPLEMENT

21   THE POLICY.

22       NOW TRADE SHOW CLEANING IS DIFFERENT, RIGHT, BECAUSE WE

23   KNOW THE CUSTOMERS ARE COMPLAINING, BUT SINCE WE COMPETE FOR

24   THIS, AS OPPOSED TO EVENT SECURITY, THEN WE'RE GOING TO GO

25   AHEAD AND IMPLEMENT IT.

1        THE COURT:  BUT THAT IS AN ARGUMENT THAT YOU CAN

2   MAKE.  THERE IS TESTIMONY THAT THERE HAVE BEEN COMPLAINTS ABOUT

3   THAT IN THAT SEGMENT OF THE BUSINESS, AND THEY WENT AHEAD WITH

4   THE POLICY ANYWAY.  THEN THEY CONSIDERED DOING IT WITH

5   SECURITY.  THEY WORRIED ABOUT COMPLAINTS.  THEY WORRIED ABOUT

6   BUDGET AND CHOSE NOT TO DO IT.  YOU CAN ARGUE THAT.  THE

7   PROBLEM WITH THAT, WITHOUT CONTINUING, AND I DON'T THINK IT WAS

8   DONE -- YOU HAD AN INAPPROPRIATE MOTIVE, BUT WE'RE TRYING TO

9   GET AROUND THE ORDER.  BUT EVERY TIME WE OPEN UP THAT BOX, IT

10  GETS SO CLOSE TO HAVING TO THEN -- I HATE TO HAVE THIS JURY

11  SAY, WELL, CAN WE SEE THESE LETTERS, AND NOW WE HAVE ANOTHER

12  PROBLEM.

13      AND I THINK THAT'S WHAT I'M TRYING TO PREVENT IS, TO GET

14  THEM TOO CURIOUS ABOUT THE SUBSTANCE OF THESE COMPLAINTS OTHER

15  THAN WHAT THEY'VE HEARD FROM THE WITNESS STAND, OR WHAT THE

16  WITNESSES HAVE SAID THEY RECEIVED FROM PEOPLE OTHER THAN THE

17  ONES IN THE LETTERS THAT WE'VE EXCLUDED.

18        MR. LANCE:  AND I KNOW IT IS LATE.  I WON'T SAY -- IF

19  HE WOULD HAVE SAID, YEAH, WE HAVE COMPLAINTS, OR YEAH, I DID

20  GET SOME COMPLAINTS.  BUT HE SAID, I GOT ONE OR TWO FROM MY

21  CUSTOMERS, AND SO THAT'S JUST NOT TRUE.  IT IS JUST NOT TRUE.

22  THERE ARE SEVERAL OF HIS CUSTOMERS IN THAT LIST THAT SAID --

23  AND SO IT PUTS ME IN A BAD POSITION.  BECAUSE HE, I BELIEVE, IS

24  NOT BEING HONEST, COMPLETELY HONEST, BECAUSE HE KNOWS THAT I

25  CAN'T SHOW HIM THOSE AND SAY, WELL, WAIT A MINUTE, WHO IS THIS

1    PERSON, THIS PERSON IS ONE OF YOUR CUSTOMERS.  AND IF HE DENIES

2    IT, THEN I CAN BRING SOMEBODY IN REBUTTAL, AND SAY, YEAH, WE

3    DID SHOWS THERE.  SO WE DON'T HAVE TO DECIDE RIGHT NOW.

4            THE COURT:  BUT THAT IS THE ESSENCE OF WHERE YOU'RE

5    GOING.  I MEAN, YEAH, HE TESTIFIED A LITTLE -- HE WAS A LITTLE

6    WOBBLY ON THAT.  THERE IS CLEARLY OTHER TESTIMONY THAT

7    COMPLAINTS WERE MADE, MR. SIMON.  AND THE PROBLEM WITH GESSNER

8    IS, HOW HE DEFINES HIS CUSTOMERS.  IN FACT, THAT IS A PROBLEM

9    WITH THE ENTIRE CASE IS, WHO IS A CUSTOMER OF WHOM?  IT IS A

10   REVOLVING DOOR.

11       I MEAN, I UNDERSTAND YOUR PROBLEM.  AND AS I SAID, I DON'T

12   THINK YOU WERE TRYING TO GET AROUND THE ORDER.  YOU'RE TRYING

13   TO ACHIEVE A LEGITIMATE PURPOSE ON BEHALF OF YOUR CLIENT.  SO

14   DON'T TAKE OFFENSE THAT I THINK YOU'RE DOING SOMETHING SHADY.

15   BUT THE PROBLEM IS, THAT WE'RE TAKING IT RIGHT UP TO THE

16   THRESHOLD, AND WE ARE SHOWING THEM THESE LETTERS THAT HAVE BEEN

17   ALREADY RULED AS BEING EXCLUDED FROM USE IN THE CASE.  AND I

18   KNOW WHAT IS GOING TO HAPPEN WITH THIS JURY; THEY ARE A VERY

19   ATTENTIVE GROUP.  THERE IS GOING TO BE A LETTER FROM THE JURY

20   ROOM, OR FROM -- ONE OF THESE DAYS SAYING, WHEN DO WE GET THOSE

21   LETTERS THAT HE'S NOW TALKING ABOUT.

22       SO AT SOME POINT, I HAVE TO WEIGH THE PREJUDICE AND THE

23   PRIOR ORDER AGAINST THE POTENTIAL RELEVANCE.  AND I THINK YOU

24   HAVE ENOUGH EVIDENCE TO ARGUE, LEGITIMATELY, THEY WERE GETTING

25   COMPLAINTS AND STILL WENT AHEAD ON ONE HAND, AND THEN WERE

1   AFRAID OF COMPLAINTS AND DIDN'T GO AHEAD ON THE OTHER HAND.

2   YOU CAN ARGUE THAT TO YOUR HEART'S CONTENT.  BUT I THINK I HAVE

3   TO, AT SOME POINT, DRAW A LINE.

4            MR. LANCE:  I UNDERSTAND.

5            THE COURT:  I HAVE TO PROTECT THE RECORD.  I HAVE TO

6   PROTECT THE PRIOR RULINGS.  AND IT WAS JUST -- I COULD SEE

7   THE -- I WAS LOOKING AHEAD THREE OR FOUR STEPS AND JUST SEEING

8   PROBLEMS.

9     SO YOU CAN -- YOU CAN RENEW YOUR REQUEST TO HAVE HIM

10  RECALLED, TALK WITH YOUR COLLEAGUES ABOUT IT.  WE CAN TALK

11  ABOUT IT OFF THE RECORD.  I'M OPEN TO ANY REASONABLE ARGUMENTS

12  ON ANY OF THIS STUFF.  BUT I JUST WANTED TO MAKE CLEAR THE

13  NATURE OF THE RULING AND MY CONCERN ABOUT HOW WE WERE SLIPPING

14  DOWN A SLOPE.

15          MR. LANCE:  I APPRECIATE THAT.  AND I CERTAINLY WAS

16  NOT TRYING TO BACKDOOR THOSE.

17          THE COURT:  I DIDN'T THINK YOU WERE.  AND IF

18  MR. GESSNER HAS GOT TO GO SOMEWHERE AND BE SOMEWHERE AND HIS

19  BEING SOMEWHAT ON A TETHER IS A PROBLEM, ALERT MR. LANCE; HE

20  HAS GOT TO FISH OR CUT BAIT ON PUSHING THE ARGUMENT FURTHER.

21         MR. L'ESTRANGE:  WELL, HE DOES HAVE TO GO SOMEWHERE,

22  AND THAT IS WHY I RAISED THE QUESTION.

23         THE COURT:  OKAY.  WHEN DOES HE HAVE TO GO?

24         MR. L'ESTRANGE:  I THINK HE IS LEAVING TODAY TO GO

25  OUT OF TOWN TO VISIT HIS GRANDCHILDREN.

1          THE COURT:  WHEN WILL HE BE BACK DO YOU THINK?

2          MR. L'ESTRANGE:  I'M NOT SURE.  I DIDN'T HAVE A

3  CHANCE TO DISCUSS THAT WITH HIM BECAUSE HE WAS ON HIS WAY OUT

4  THE DOOR.  AND WHEN I ASKED IF HE COULD BE EXCUSED, THE INITIAL

5  ANSWER WAS YES AND THEN IT BECAME AN ISSUE.

6          THE COURT:  AND HE LEFT, AND WE HAD THE -- IT CAME UP

7  AGAIN.  AND IT WOULD BE IN REBUTTAL, SO WE'RE TALKING ABOUT A

8  WEEK FROM MONDAY.  SO MAYBE YOU FOLKS CAN CHECK ON WHEN HE IS

9  GOING TO BE RETURNING.  IT SOUNDS LIKE THEY WANT TO CALL HIM

10  BACK IN REBUTTAL, AND WE'LL SEE.  HE MAY HAVE TO TESTIFY BY

11  PHONE FROM WHEREVER HE IS WITH HIS KIDS OR GRANDKIDS.  I DON'T

12  KNOW THAT THEY'RE GOING TO EVEN ASK NOW IN LIGHT OF THIS

13  CONVERSATION.

14          MR. L'ESTRANGE:  I JUST DON'T WANT HIM TO BE

15  RESTRICTED IN HIS TRAVEL.  BECAUSE HE ALSO HAS BUSINESS TRAVEL.

16          THE COURT:  I UNDERSTAND.  BUT IT MAY HAVE TO BE,

17  GIVEN HIS BUSINESS TRAVEL, AND THE MANNER IN WHICH THIS CAME

18  UP, IT MAY HAVE TO BE BY PHONE CALL.  WE'VE SEEN ENOUGH OF HIS

19  DEMEANOR, I THINK, THE JURY CAN VISUALIZE HIM AS HE GIVES

20  WHATEVER FURTHER ANSWERS, IF THERE ARE ANY.  SO WE'LL BE

21  CERTAINLY SENSITIVE TO HIS TRAVEL NEEDS.

22          MR. L'ESTRANGE:  CAN I RAISE ONE OTHER ISSUE, AND

23  THEN MR. ERGASTOLO HAS AN ISSUE.

24          THE COURT:  YES.

25          MR. L'ESTRANGE:  THE ISSUE HAS TO DO WITH DR. HEKMAN

1   AND THE TRANSCRIPT OF HIS TESTIMONY.  AS FAR AS I KNOW, WE

2   HAVEN'T RECEIVED THAT YET, BUT I EXPECT WE WILL.  AND YOUR

3   PRIOR ORDER WAS THAT WE WERE NOT ALLOWED TO SHOW IT TO OUR

4   EXPERT BECAUSE OF YOUR EXCLUSION ORDER.  IF YOU RECALL AT THE

5   VERY END OF MY EXAMINATION, I ASKED A QUESTION OF DR. HEKMAN,

6   AND HE PROVIDED A NONRESPONSIVE ANSWER.  AND ALSO SAID IN HIS

7   RESPONSE, HIS ANSWER, THAT HE WAS STATING SOMETHING THAT WAS

8   OUTSIDE OF HIS REPORT AND THEN PROCEEDED TO GIVE AN OPINION AS

9   TO WHY THE REVENUE JUSTIFICATION WAS ANTI-COMPETITIVE.  NOW --

10          THE COURT:  WAS THIS HEKMAN OR WAS THIS KENNEDY?

11          MR. L'ESTRANGE:  HEKMAN, THE ECONOMIST, THE TALL GUY.

12          THE COURT:  OKAY.

13          MR. L'ESTRANGE:  YOU REMEMBER WE HAD THAT

14   DISCUSSION --

15          THE COURT:  I REMEMBER THE WHOLE DISCUSSION.  I JUST

16   HAD A DIFFERENT FACE.  GO AHEAD.

17          MR. L'ESTRANGE:  OKAY.  HE PUT SOMETHING IN, THAT BY

18   HIS OWN ADMISSION, WAS OUTSIDE THE SCOPE OF HIS REPORT.  THAT

19   IS THE WAY HE CHARACTERIZED IT.  IT WAS NOT INVITED BECAUSE MY

20   QUESTION WAS SIMPLY TO SEAL OFF WHAT HAD BEEN -- HAPPENED ON

21   DIRECT EXAMINATION, I SAID -- BECAUSE HE ONLY TALKED ABOUT THE

22   QUALITY JUSTIFICATION AND THE SECURITY JUSTIFICATION, AND I

23   SAID, AND YOU HAVE NO OPINION REGARDING THE REVENUE

24   JUSTIFICATION, AND HE SAID, WELL, THERE IS SOMETHING I WANT TO

25   TELL YOU OUTSIDE OF MY REPORT, AND HE DROPPED THAT BOMB.

```
1          THE COURT:  RIGHT.  AND THEN -- WE'D HAVE TO LOOK AT
2     THE TRANSCRIPT, BUT THERE WAS SOME QUESTIONS THAT FOLLOWED
3     THAT, SORT OF PERPETUATED THE DISCUSSION, AND THEN HE WAS GONE.
4     BUT LET'S GET THE TRANSCRIPT OF THAT PORTION AND READ IT AND IF
5     YOU FEEL -- YOU CAN MAKE YOUR ARGUMENT AS TO WHETHER OR NOT
6     THAT NEEDS TO EITHER BE STILL DEALT WITH, ALTHOUGH I ALREADY
7     RULED, I WASN'T GOING TO STRIKE IT.  BUT YOU CAN MAKE YOUR
8     ARGUMENT ABOUT SHOWING THAT PORTION OF THE TRANSCRIPT TO YOUR
9     EXPERT OR WHATEVER YOU WANT TO ARGUE ABOUT.  THE PROBLEM WITH
10    ASKING, YOU KNOW, YOU DON'T HAVE AN OPINION ON THAT, DO YOU, IS
11    THAT SOMETIMES THEY'LL SAY, OH, YEAH, BY THE WAY.  A COUPLE OF
12    THESE OTHER WITNESSES HAVE DONE THE SAME THING.  GIVE THEM AN
13    OPEN-ENDED QUESTION, THEY'LL RUN RIGHT THROUGH IT.
14          MR. L'ESTRANGE:  I'VE NOTICED THAT.
15          THE COURT:  SO TO BE FAIR, AND BECAUSE OF THE HOUR,
16    AND TO PUT IT INTO CONTEXT, YOU GET THE TRANSCRIPT AND GIVE ME
17    THE TWO PAGES, AND THEN I'LL GIVE THE PLAINTIFF A CHANCE TO
18    RESPOND AS TO THE DISPOSITION OF THAT.  BUT THE PROBLEM I FELT
19    WAS, WE LET THE WITNESS GO, THE JURY GO, IT IS REAL TOUGH TO
20    UNRING THAT BELL OVERNIGHT.  AND THE SOONER INTERVENTION WAS
21    WARRANTED AT THAT POINT.  BUT LET'S KEEP THAT AS AN OPEN
22    DIALOGUE.  YOU'RE NOT PRECLUDED.
23          AND THEN, MR. ERGASTOLO, UNLESS YOU FOLKS HAVE WORKED IT
24    OUT --
25          MR. SLANIA:  WE'RE TRYING TO.  IT IS THE ISSUE
```

1   REGARDING EXHIBIT 159, WHICH WAS ONE OF THE E-MAILS THAT I

2   BELIEVE MR. ERGASTOLO WAS TRYING TO GET INTO EVIDENCE AND IT

3   HAD THE DESCRIPTION OF MR. RAMIREZ TAKING PHOTOS.

4           THE COURT:  YEAH, AND I ASKED THAT IT BE TAKEN DOWN

5   AND THEN WE REDACTED IT.

6           MR. ERGASTOLO:  AND WE DID.

7           MR. SLANIA:  AND IT'S REDACTED.  AND I'M JUST TRYING

8   TO GO THROUGH, I MEAN, THE ONLY ISSUE I HAD BRIEFLY IS THAT THE

9   TOP E-MAIL REFERS TO MR. RAMIREZ TAKING THE PHOTOS.

10          THE COURT:  OH, IT DOES?

11          MR. SLANIA:  AND THE NEXT SENTENCE SAYS, I DON'T KNOW

12  OF ONE COMPLAINT.  WELL, THE COMPLAINT HE KNOWS ABOUT IS

13  MR. RAMIREZ TAKING PHOTOS OF THAT ISSUE.  SO BY REDACTING THOSE

14  PHOTOS, IT'S JUST A MISLEADING DOCUMENT THAT THERE WASN'T

15  ANYBODY COMPLAINING.  THE REASON WHY MR. RAMIREZ WAS TAKING THE

16  PHOTOS WAS BECAUSE THERE WAS AN ISSUE RELATING TO THE CLEAN UP

17  PERFORMED BY THE CONVENTION CENTER CREWS.

18     SO I WAS TRYING TO FIGURE OUT A WAY TO REDACT IT, KEEPING

19  THE INTEGRITY OF THE DOCUMENT, BUT --

20          THE COURT:  IF YOU GUYS CAN COME TO SOME AGREEMENT ON

21  IT, TRY.

22          MR. SLANIA:  SURE.

23          THE COURT:  THE PROBLEM IS, THAT I WANTED THOSE LAST

24  TWO LINES OUT BECAUSE THEY INVITED THIS WHOLE ISSUE OF

25  EXFOLIATION OR WHATEVER, AND WE'VE ALREADY DEALT WITH THAT.

1          MR. SLANIA:  I'M CONFIDENT THAT BY TOMORROW, I CAN

2     HAVE IT WORKED OUT.

3          THE COURT:  YEAH, YOU GUYS TALK AND BEFORE THE CASE

4     IS OVER, WE HAVE TIME NEXT WEEK TO TALK ABOUT IT.

5          MR. ERGASTOLO:  YOUR HONOR, KIND OF USING THIS

6     EXHIBIT, WHICH I BELIEVE HAS BEEN ADMITTED AS REDACTED, WITH

7     THE WITNESS ON MONDAY SO IF WE DON'T REACH AGREEMENT --

8          MR. SLANIA:  I WILL WORK IT OUT WITH MR. ERGASTOLO.

9          THE COURT:  WELL, LET'S TALK ABOUT IT AT 8:45 ON

10    MONDAY BEFORE WE PUT ON THAT NEXT WITNESS TO MAKE SURE.

11         THE CLERK:  WHICH I DON'T HAVE A COPY OF, 159,

12    REDACTED, FOR THE EXHIBITS.

13         THE COURT:  I MIGHT.  AND THEN WHEN YOU FOLKS COME IN

14    MONDAY, IT LOOKS LIKE WE'RE LACKING THE REDACTED COPY, OR AT

15    LEAST THE CLERK IS, IN TERMS OF AN OFFICIAL EXHIBIT.  I

16    PROBABLY HAVE IT SOMEWHERE ON THE FLOOR BACK HERE.  I'LL LOOK

17    FOR IT.  BUT WORK IT OUT, AND THEN BRING IN WHATEVER YOU

18    ULTIMATELY HAVE OR DON'T HAVE.  BRING THE ORIGINAL, AND WE'LL

19    FIGURE IT OUT.

20         THE CLERK:  THERE IS A FEW, 183, I DON'T HAVE AT ALL.

21         MR. ERGASTOLO:  YOU DON'T HAVE EXHIBIT 183 AS

22    REDACTED?

23         THE CLERK:  RIGHT.  I NEED ALSO 1015.

24         MR. ERGASTOLO:  WOULD THAT HAVE A REDACTED ISSUE.

25         THE CLERK:  NEED REDACTED.  AND 1323, I DON'T HAVE IT

1    AT ALL IN MY BINDER.  IT WAS JUST OFFERED.  IT WASN'T RECEIVED

2    INTO EVIDENCE.  BUT I DON'T HAVE IT.  JUST SO YOU KNOW.

3              MR. ERGASTOLO:  THAT IS AS REDACTED?

4              THE COURT:  DID YOU SAY 1324?

5              THE CLERK:  NO, 1323.

6              MR. ERGASTOLO:  THAT WAS PRESENTED THIS MORNING, I

7    BELIEVE.

8              MR. SLANIA:  BUT THAT WAS, I THINK, MARKED AS NEXT IN

9    EVIDENCE, BUT IT WAS NOT ADMITTED.  BECAUSE IT WAS USED TO

10   REFRESH RECOLLECTION.

11             THE COURT:  I JUST WANT IT MARKED AS REFERRED TO TO

12   REFRESH RECOLLECTION AND NOT FOR ANY OTHER PURPOSE AS PART OF

13   THE RECORD.

14       ALL RIGHT, YOU FOLKS WORK ON THE EXHIBITS OFF LINE.  THAT

15   WAY WE CAN MAKE SURE WE GET A FULL BOOK WHEN WE GET THERE.

16   MEANTIME, HAVE A GOOD WEEKEND.  WE'LL BE IN RECESS UNTIL MONDAY

17   MORNING AT 8:45 TO TALK ABOUT THE LAST EXHIBIT, 9:00 FOR THE

18   EVIDENCE.  TAKE CARE.  WE'RE IN RECESS.

19             MR. L'ESTRANGE:  THANK YOU, YOUR HONOR.

20             MR. LANCE:  THANK YOU, YOUR HONOR.

21                       (RECESS AT 4:49 P.M.)

22                          ---000---

23

24

25

1       C-E-R-T-I-F-I-C-A-T-I-O-N

2    I HEREBY CERTIFY THAT I AM A DULY APPOINTED,

3 QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED

4 STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT

5 TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE;

6 THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY

7 STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES

8 WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL

9 CONFERENCE.

10    DATED:  APRIL 10, 2011, AT SAN DIEGO, CALIFORNIA

11

12        _____

13        S/DEBORAH M. O'CONNELL, CSR #10563
         REGISTERED PROFESSIONAL REPORTER

14

15

16

17

18

19

20

21

22

23

24

25